1                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
2                  BEFORE THE HONORABLE KIMBERLY J. MUELLER


3    MARK BAIRD and RICHARD
     GALLARDO,
4
                    Plaintiff,
5    vs.                              Sacramento, California
                                      No. 2:19-CV-00617
6    XAVIER BECERRA, in his           Wednesday, October 9, 2019
     official capacity as            11:02 a.m.
7    Attorney General of the
     State of California, and
8    DOES 1-10,

9                    Defendant.
     _____/
10

11                            --oOo--
                  REPORTER'S TRANSCRIPT OF PROCEEDINGS
12         DEFENDANT'S MOTION TO DISMISS, PLAINTIFFS' MOTION FOR
               PRELIMINARY INJUNCTION AND STATUS CONFERENCE
13                            --oOo--

14
     APPEARANCES:
15
     For the Plaintiffs:          THE BELLANTONI LAW FIRM, PLLC
16                                BY:  AMY BELLANTONI
                                       Attorney at Law
17                                2 Overhill Road, Suite 400
                                  Scarsdale, NY 10583
18
     For the Defendant:           OFFICE OF THE ATTORNEY GENERAL
19                                BY:  R. MATTHEW WISE
                                       Attorney at Law
20                                1300 I Street
                                  Sacramento, CA  95814
21
     Official Reporter:           KACY PARKER BARAJAS
22                                CSR No. 10915, RMR, CRR, CRC
                                  501 I Street
23                                Sacramento, CA  95814
                                  kbarajas.csr@gmail.com
24
     *Proceedings recorded by mechanical stenography.  Transcript*
25   *produced by computer-aided transcription.*

1    SACRAMENTO, CALIFORNIA, WEDNESDAY, OCTOBER 9, 2019, 11:02 AM

2                                  --oOo--

3              THE CLERK:  Calling civil case 19-617, Baird, et al.

4    versus Becerra.  This is on for defendant's motion to dismiss,

5    plaintiff's motion for preliminary injunction, and a status

6    conference.

7              THE COURT:  All right.  Good morning.  Appearances,

8    please.

9              MS. BELLANTONI:  Good morning, your Honor.  Amy

10   Bellantoni for the plaintiffs Mark Baird and Richard

11   Gallardo.

12             THE COURT:  Good morning, Ms. Bellantoni.

13             MR. WISE:  Good morning, your Honor.  Matthew Wise for

14   Attorney General Xavier Becerra.

15             THE COURT:  Good morning, Mr. Wise.

16             This is on for preliminary injunction, to dismiss, and

17   for scheduling.  And I have several questions regarding each.

18   What I'd like to do is work through my questions.  Then I would

19   allow you to make wrap-up argument if you think there's not

20   something fully covered by the briefing or my discussion with

21   you.

22             First, to clarify one threshold question the Court

23   has, Ms. Bellantoni, as the defense points out, the sheriffs

24   are not sued here.  Is there anything in the complaint that

25   alleges the attorney general's interference with the sheriffs'

1    carrying out of the state statutes?

2          MS. BELLANTONI:  Well, your Honor, the Department of

3    Justice requires the sheriffs to use their specific procedure

4    and their statutory forms which only provide for concealed

5    carry application.  There is no provision online or in the hard

6    cover -- the hard copy forms that allows for open carry to be

7    applied for.  But notwithstanding that requirement, the statute

8    itself is inadequate and should be enjoined because the

9    language, the may issue language, the requirement of the

10   establishment of good cause for open carry, the geographical

11   restrictions, and the restrictions as to population size in

12   areas where open carry permits are allowed to be issued.  So

13   notwithstanding that the forms themselves and the procedures do

14   not allow for the application of open carry, the sheriffs

15   themselves are not mandated to enforce the God given rights

16   that these residents of California have to open carry.

17         THE COURT:  God given, not constitutional.

18         MS. BELLANTONI:  Well, the constitution and precedent

19   following recognize that the constitution and the government

20   actually give no rights.  They restrict the government from

21   infringing on preexisting rights.

22         THE COURT:  All right.  Well, this Court is

23   determining legal rights and constitutional rights.  I just

24   want to make that clear.

25         So on the use of the forms, is there a link there,

1   Mr. Wise?  Is it -- I believe it is pled, at least it's argued

2   that the AG requires the use of certain forms by the local

3   sheriffs.  That's undisputed or at least that's what the

4   plaintiffs have pled?

5               MR. WISE:  May I ask your preference if I stand or

6   sit?

7               THE COURT:  It's up to you.  This is not a jury

8   proceeding.  If you need access to your materials, you may

9   remain seated.  The key is that you use a microphone so the

10  court reporter can hear you.

11              MR. WISE:  I think I'll sit then.  Thank you, your

12  Honor.

13              So yeah.  My understanding is that the application

14  is -- at least by appearances, it appears to be geared toward

15  concealed carry.  But as we indicate in our briefing, there are

16  statements that make reference to the open carry statute.  So

17  those would be the applications presumably that would be used

18  for the counties that do allow open carry.

19              THE COURT:  All right.  Another threshold question,

20  the plaintiff suggests that the defense is using the terms

21  "open," "concealed," "public" in a confusing way.  Is there a

22  stipulated definition of public?  Does public just mean outside

23  the home, or how is the defense using public?

24              MR. WISE:  Yeah.  I mean public would be any manner of

25  carry outside of the home.

1        THE COURT:  Agree with that, Ms. Bellantoni?  Any

2   reason not to use that definition for public wherever it

3   appears, particularly in the defense briefing?

4        MS. BELLANTONI:  Yes, your Honor.  Because there is a

5   vast distinction between open carry and concealed carry with

6   respect to how the Ninth Circuit views them.

7        THE COURT:  I understand that.  But you suggested

8   there was some misleading use of the word public.

9        MS. BELLANTONI:  Sure.

10        THE COURT:  And I'm trying to -- so open carry and

11   concealed carry could both be public if it's outside the home.

12        MS. BELLANTONI:  Yes.  But it's -- in reading the

13   documentation, it's my position that the state is creating --

14   when using the word public carry is sliding into areas and

15   arguments that are applicable only to concealed carry which is

16   vastly different under the Ninth Circuit holdings from open

17   carry.

18        THE COURT:  So you think when I see "public" in their

19   brief I should assume it's concealed only?

20        MS. BELLANTONI:  I think that it's going to depend on

21   the context in which they're arguing.  But by using public

22   carry, it certainly allows for arguments to be made that are

23   applicable solely to concealed carry, and it blurs the line.

24        THE COURT:  All right.  I don't know if it matters,

25   but are there any allegations that either plaintiff has applied

1    for and been denied a concealed carry license, Ms. Bellantoni?

2           MS. BELLANTONI:  I believe that it's not relevant to

3    the arguments here.

4           THE COURT:  Agree with that, Mr. Wise?

5           MR. WISE:  That concealed carry is not relevant to the

6    arguments here, yes, I agree with that.

7           THE COURT:  All right.  On the preliminary injunction,

8    based only on the Second Amendment claims, correct?

9           MS. BELLANTONI:  Yes.

10          THE COURT:  So help me understand how I can find a

11   likelihood of success on the merits given the state of the law.

12   I mean, often parties are laying foundation for going to higher

13   courts here, and it's hard not to see this as one of those

14   cases.  The Ninth Circuit specifically stayed Young pending

15   resolution of the New York case before the Supreme Court.  So I

16   can't rely on Young at this point, right?

17          MS. BELLANTONI:  Correct.  That's why there's no

18   reference to Young in my papers.

19          THE COURT:  So how can I find the likelihood of

20   success given that the question is currently undecided?

21          MS. BELLANTONI:  Because the careful reading or plain

22   reading actually of *Heller* as well as the dissent of Justice

23   Thomas and Justice Gorsuch in the *Peruta II* case decided in

24   2017, so the last of the Peruta cases, specifically recognizes

25   the right to bear arms in public, you know, putting aside the

1   plain reading of the Second Amendment.  So in light of the fact

2   that the Ninth Circuit has deemed concealed carry to be a

3   privilege, not a right, that takes concealed carry out of the

4   scope under their opinion of the Second Amendment leaving only

5   one manner of carry which would be open carry.  So if the right

6   to keep has already been decided by the Supreme Court, the

7   right to bear, which is also within the scope of the Second

8   Amendment protections, only leaves open carry, and so it is

9   highly likely that we will succeed on the merits of that claim

10  whether here or in the higher courts.

11          THE COURT:  *Heller* didn't say the right was completely

12  unfettered, agreed?

13          MS. BELLANTONI:  The right to bear arms in public?  I

14  just want to understand.

15          THE COURT:  The right to bear arms.

16          MS. BELLANTONI:   The right to bear arms, that it was

17  not completely unfettered?  Justice Scalia identified narrow

18  instances such as sensitive places like schools or government

19  buildings where that right may be curtailed and/or regulated.

20  But the state has taken the broad-brush approach and has

21  basically relegated -- well, has essentially banned the right

22  to bear arms.  The right to bear arms in California today is

23  banned.

24          THE COURT:  In effect.

25          MS. BELLANTONI:  In fact.  In fact.  Because the only

1    right --

2              THE COURT:  Not by statute.

3              MS. BELLANTONI:  By statute because the language of

4    the statute for open carry permits is may issue.  It's left in

5    the hands of sheriffs.

6              THE COURT:  It may be.  I understand that you're

7    saying you can create a factual record.  The allegations in the

8    complaint say factually no open carry licenses have been

9    issued.  But that's an in effect claim.  It's not saying the

10   statute expressly bans, or are you saying the statute expressly

11   bans?  Is that how you read the statute?

12             MS. BELLANTONI:  I'm saying that the statute is a ban

13   on open carry because it's treating open carry the same way it

14   treats concealed carry, as a privilege.  And since 2012, by

15   concession of the attorney general's office, no open carry

16   permits have been issued.  The open carry of a firearm is

17   criminalized.

18             THE COURT:  I understand those arguments.

19             So Mr. Wise, on *Peruta II*, recognizing the questions

20   that *Peruta II* says it left open, is it possible to read that

21   case as saying that there is no right to carry a weapon

22   concealed unless open carry is unavailable?

23             MR. WISE:  That's not our reading of *Peruta*.  *Peruta*

24   was dealing specifically with concealed carry.  That was the

25   question in that case, and it doesn't, I don't think, purport

1    to represent that it was dealing with anything else.  And so

2    that's why we've had a series of cases that have come alongside

3    and after *Peruta*.  *Flanagan*, you know, addresses the question

4    of is there some manner of carry that is allowed.  This case

5    appears to be focused specifically on open carry I think

6    regardless of whether there's concealed carry.  So we've, of

7    course, in our briefing addressed the historical and, you know,

8    tradition as reasons why we believe that open carry

9    restrictions are permitted.

10           THE COURT:  So Ms. Bellantoni, if I were to issue a

11   preliminary injunction, are you suggesting that I would limit

12   it to enjoining enforcement of the statutes only against quote,

13   unquote, law-abiding citizens?

14           MS. BELLANTONI:  I'm sorry.  Can you repeat that.  I'm

15   not sure I understand what you're saying.

16           THE COURT:  I believe your briefing really emphasizes

17   that the plaintiffs here are law-abiding citizens.

18           MS. BELLANTONI:  Correct.

19           THE COURT:  I query whether or not any one of us is a

20   one hundred percent law-abiding citizen.  So that seems to be a

21   critical part of your argument.  I guess my point is some of us

22   jaywalk.

23           MS. BELLANTONI:  Yeah.  That's not -- so

24   respectfully --

25           THE COURT:  It's not a fixed status necessarily, and

1  so how would I craft a preliminary injunction given your

2  apparent acknowledgment that law abiding is an important factor

3  here?

4            MS. BELLANTONI:  Yeah.  So law abiding, to the extent

5  that there is no statutory prohibitor to the possession or

6  purchase of a firearm by my clients or by other law-abiding

7  individuals, there are statutory enumerations of prohibitors

8  federally that ban certain individuals such as those convicted

9  of a felony offense, those convicted of misdemeanor domestic

10 violence, those who have been dishonorably discharged from the

11 military forces, those who have been involuntarily committed to

12 a mental institution or adjudicated by a court of having a

13 mental disease or defect, those are -- additionally, people who

14 have an active order of protection against them, those are

15 individuals who, unless there was some type of civil relief

16 that has been granted to them, are statutorily prohibited from

17 firearm possession.  Anyone else is not.

18            THE COURT:  So would the preliminary injunction need

19 to spell out those categories or not?

20            MS. BELLANTONI:  I could certainly craft --

21            THE COURT:  I'm just asking you in terms of clarity.

22            MS. BELLANTONI:  Anyone who is not otherwise

23 statutorily under state or federal law prohibited from

24 possessing firearms.  In other words, if someone went to

25 the --

1          THE COURT:  I think I understand the point.

2          MS. BELLANTONI:  Thank you.

3          THE COURT:  So in terms of the defense argument in its

4     opposition that you don't argue how the means and scrutiny

5     analysis works here, what's your -- what's your response to

6     that?  I'm looking at page 16, bottom of the page, page 24, the

7     electronic page.  How do you apply whatever level of scrutiny

8     the Court should apply to the statutes?

9          MS. BELLANTONI:  I would ask the Court to file the

10    reasoning of Justice Scalia and *Heller*.  This is a fundamental

11    core right protected by the Second Amendment.  There is no

12    balancing.  There is no other scrutiny than strict scrutiny.

13         THE COURT:  Also in terms of harm, what's the imminent

14    harm to the plaintiffs if a preliminary injunction does not

15    issue?

16         MS. BELLANTONI:  It's an existing harm that's been in

17    existence since open carry has been banned in the state as held

18    by the Ninth Circuit and cited in the core papers.

19         THE COURT:  But why the timing now?  Typically a court

20    looks at the time from when the harm began to the time it's

21    presented with the preliminary injunction in assessing how

22    strong the harm is, and I think you would say the ban went into

23    effect sometime ago, if I accept for sake of argument your

24    characterization of the law as a ban.

25         MS. BELLANTONI:  I don't believe there's a prohibitor

1  for my clients to, as far as the timing of when the action was

2  filed.  It's an existing harm that needs to be stopped.

3          THE COURT:  But they've been experiencing the harm in

4  your view since 2012, 2011?

5          MS. BELLANTONI:  Since 1967 when loaded carry in

6  public was outlawed by the Mulford Act.

7          THE COURT:  Any response to what you've just heard,

8  Mr. Wise?

9          MR. WISE:  Just to echo the point that we made in our

10  brief that there is no urgency in this case.  I mean, if it's

11  harm that's existed since 1967, then this wouldn't be an

12  appropriate case for a preliminary injunction.  The harm is

13  clearly based on the constitutional injury and not any other

14  sort of irreparable harm that the plaintiffs have suffered.

15          Also on the means and scrutiny, that's, you know,

16  certainly warranted by the Ninth Circuit law, *Chovan* and other

17  cases like it.

18          MS. BELLANTONI:  And respectfully, your Honor, the

19  case law is clear, constitutional injury is irreparable harm.

20          THE COURT:  I understand the argument.

21          I have no other questions on the preliminary

22  injunction.  If there's anything else on the preliminary

23  injunction before I move to the motion to dismiss, I would

24  entertain brief argument.  But again, please don't repeat

25  what's in your briefs -- I've read them -- or what we've just

13

1      discussed.

2           So let me just -- I'll give you the final word,

3      Ms. Bellantoni.

4           But anything further on the preliminary injunction,

5      Mr. Wise?

6           MR. WISE:  Your Honor, yes, only because there were

7      quite a few points that were addressed in plaintiff's reply

8      brief that I didn't get a chance to respond to, and I'd just

9      like to address two of the declarations that were submitted

10     with the reply brief because I think it might be helpful to the

11     Court's reading.

12          THE COURT:  All right.

13          MR. WISE:  So first, plaintiffs' claim on page 4, the

14     declaration they submitted from Clayton Cramer exposes

15     defendant's numerous errors of fact, false descriptions of

16     actual laws and citations to nonexistent laws.  And if I were

17     to go through Mr. Cramer's declaration point by point, we would

18     be here a long time, but I want to give one example of the type

19     of misleading statements that are representative of the

20     contents of this declaration.  Mr. Cramer claims on pages 4 and

21     5 of his declaration that the old North Carolina case, *State v.*

22     *Huntly*, quote, held that the North Carolina statute modeled

23     after the statute of Northampton was not in effect when that

24     case was decided.

25          And then based on Mr. Cramer's declaration, plaintiffs

1   argued on page 6 of their reply brief that the Statute of

2   Northampton was, quote, rejected by the North Carolina -- by

3   North Carolina in *State v. Huntly*.

4        If you read that case, specifically pages 420 to 421,

5   it's clear that the court states that, quote, the argument is

6   that the Statute of Northampton was not in effect when the case

7   was decided.  But the court didn't adopt that argument.

8   Instead the court, in the context of this case and relying on

9   Blackstone and other authorities, concluded that the Statute of

10  Northampton emphasizes the common law understanding that going

11  armed with dangerous or unusual weapons including guns is a

12  crime.

13       And then Mr. Cramer a few pages later continues on

14  this point.  He states that the court in *State v. Huntly*,

15  quote, declared that a double-barreled gun or any other gun

16  cannot in this country come under the description of unusual

17  weapons.  Then plaintiffs echo this position on page 6 of their

18  reply brief.

19       But again, what the court said was different.  On page

20  422 the court said that, quote, it has been remarked that a

21  double-barreled gun or any other gun was not an unusual weapon.

22  In other words, that was the defendant's argument in that case.

23       The court makes its position clear in the very next

24  sentence, quote, but we do not feel the force of this

25  criticism.  Then the court goes on, quote:  A gun is an unusual

1   weapon; wherewith to be armed and clad.  No man amongst us

2   carries it about with him, as one of his every day

3   accoutrements - as part of the dress - and never we trust will

4   the day come when any deadly weapon will be worn or wielded in

5   our peace-loving and law-abiding state, as an appendage of

6   manly equipment.

7          So this is again just one example of how the

8   historical record we provided was mischaracterized by

9   Mr. Cramer and the plaintiffs.  And the takeaway message here

10  is that well-researched historical record that we presented in

11  our opposition brief provides an ample basis to find that the

12  laws challenged are constitutional.

13         One additional point, again since we didn't have an

14  opportunity --

15         THE COURT:  Which I would not find at this point.  The

16  question is is there a likelihood of success.

17         MR. WISE:  Right.

18         So one additional point for reference because

19  Mr. Cramer critiques a lot of the, you know, historical record,

20  and, you know, that's based on a lot of historians' work.  I

21  would refer the Court to at that time Patrick Charles' 2012

22  article titled "The Faces of the Second Amendment Outside of

23  the Home:  History versus Ahistorical Standards of Review."

24  That was an article that was cited by the Piruta en banc panel.

25  It has a lot of the old cases that we relied on.  Because of

1    space limitations, we cited Mr. Charles' follow-up to this

2    article but not that article itself.  But that initial piece by

3    Mr. Charles directly rebuts much of the plaintiffs' portrayal

4    of the historical record.

5            I want to address the declaration from Chuck Haggard

6    very briefly.  He was called by the plaintiffs to rebut the

7    declaration we submitted from former Covina Police Chief

8    Kim Raney.  Mr. Haggard suggests on pages 7 and 11 of his

9    declaration that allowing open carry should have no effect on

10   an officer's reaction to a high-stress situation and that good

11   communication and training will prevent unfortunate outcomes.

12           And then on page 8 he alleges that Kim Raney's

13   position is that open carry, quote, will cause panic among

14   police officers and the public, waste police resources, and

15   ultimately lead to police officers shooting civilians carrying

16   exposed.

17           That's of course an exaggeration of Mr. Raney's

18   position.  He has a well-founded concern as does the

19   Legislature that open carry would heighten the stress that

20   officers face when they arrive to a tense scene, that it would

21   increase the number of complaints law enforcement would

22   receive.

23           And so the point here is that, notwithstanding

24   Mr. Haggard's view, the Legislature had legitimate reasons to

25   enact the laws contested here, reasons that withstand both

1    intermediate and strict scrutiny.

2         THE COURT:  On the record with respect to what the

3    Legislature decided, I think it's only the Raney declaration

4    that references legislative history.  How much can I consider

5    legislative history at this stage given the record before me?

6         MR. WISE:  That's right.  I don't think there's a lot

7    of reference to the legislative history in my brief or in any

8    other briefs that Ms. Bellantoni has provided.

9         THE COURT:  All right.  Ms. Bellantoni, you get the

10   final word at this point on the preliminary injunction before

11   we move to the motion to dismiss.

12        MS. BELLANTONI:  Thank you.  With regard to counsel's

13   comments on the declaration of Chuck Haggard, Officer Haggard

14   is an actual law enforcement officer in a jurisdiction that

15   overnight went from no carry to open carry without a license,

16   and Mr. Raney has no experience in jurisdictions with open

17   carry.  His declaration is not based on any fact at all and is

18   entirely speculative, akin to a Chicken Little argument, and I

19   would ask the Court to consider that when, you know, deciding

20   the motion for preliminary injunction.

21        Justice Scalia specifically in the *Heller* decision

22   rejected the public safety argument that was put forth by the

23   dissent in saying that constitutional rights cannot be trampled

24   upon because of a concern that individuals are going to either

25   commit crime with firearms or that they may cause public chaos.

1     It's all speculation.  Nothing happens.  There's no anarchy

2     when the statute in Officer Haggard's jurisdiction in Kansas

3     was changed.  And whether it's an individual civilian carrying

4     openly or a police officer off duty or a plainclothes officer

5     or detective, if the training is that poor in one's

6     jurisdiction that seeing someone in plain clothes with an open

7     carry with a firearm exposed on their person is going to

8     trigger them into a panic, then that is a direct reflection on

9     the lack of proper training in their jurisdiction.

10          THE COURT:  All right.  Anything further on

11    preliminary injunction?

12          MS. BELLANTONI:  Just as a reminder, your Honor, and

13    the papers are reflective of this, public area in the statute

14    and in the case law in this jurisdiction is applied to my

15    clients and actually any other resident in the state.  It only

16    includes areas -- it includes -- it encompasses areas outside

17    of their front door.  So unless my clients lived in a gated

18    property, unless there's a fence around their property, which

19    there is not in Mr. Baird's case.  And the fence in

20    Mr. Gallardo's -- on his property does not completely encompass

21    his entire property.  As soon as he steps out of his front

22    door, my client's committing a crime if he's carrying exposed

23    on his person.  There is no duty of law enforcement to protect.

24    That's been established clearly through the courts.  And so

25    really it's up to the individual to be responsible for their

1    own protection, and the only way for them to be able to do that

2    in this jurisdiction is to be able to carry in public openly.

3    Other than that, no, your Honor.

4              THE COURT:  I did see that issue briefed.

5              All right.  Let's move on to the motion to dismiss.

6    Just so I'm clear on the plaintiffs' argument about factual

7    challenge, I'm not certain I understand that.  When I look at

8    the complaint, I look at the briefing, I don't see that the

9    defense is so much challenging the facts as pled.  I think

10   they're pointing out what they believe to be in cases

11   threadbare and conclusory allegations.  So am I missing

12   something about your factual challenge argument?  You come out

13   pretty strongly on that.

14             MS. BELLANTONI:  Sure.  Well, in looking at the

15   complaint, the standard is whether the allegations in the

16   complaint make out a cause of action.

17             THE COURT:  Right, subject to *Twombly* and *Iqbal*.

18             MS. BELLANTONI:  Yes, ma'am.

19             THE COURT:  Which require plausibility.

20             MS. BELLANTONI:  Yes, exactly.

21             THE COURT:  And I think I read the defense brief as

22   raising that issue, plausibility.

23             MS. BELLANTONI:  Right.  And so with the defense

24   argument in their motion is bring in issues of fact that really

25   we haven't even had the opportunity to talk about.  They're

1    talking about public safety arguments and other examples of

2    how, you know, it's bad for the public if people are carrying

3    exposed and how there are different areas, you know, in the

4    state where people are able to carry, those are all issues that

5    can be fleshed out during discovery or during the course of the

6    case.  But that's -- unless there is absolutely no legal basis

7    for the causes of actions in the complaint, then their motion

8    should be denied.

9         THE COURT:  All right.  So to the extent it's an

10   argument that I shouldn't consider facts beyond the allegations

11   properly pled, I understand that, and I know how to apply the

12   law related to that argument.

13        On the travel, intrastate travel claim, here are two

14   questions really.  Are the plaintiffs ultimately conceding?  I

15   see the cases you cite.  I see references to *Bell* and *Haig*.

16   The defense points out *Soto-Lopez*.  But ultimately I think

17   you're ultimately conceding there's no case on point thus

18   squarely supporting the intrastate travel being burdened.  Am I

19   right about that?

20        MS. BELLANTONI:  It was difficult to find something.

21   And perhaps, your Honor, I submit that it was difficult to find

22   a case that said you have a right to intrastate travel when

23   there are cases specifically saying you have a right to

24   interstate travel, and arguably why would you have less rights

25   in your own state than you would in another state.

1          THE COURT:  Well, they're different.  Isn't this

2     question in fact before the Supreme Court along with an

3     interstate travel question?  Does the *New York State* case

4     before the Supreme Court raise intrastate travel issues?

5          MS. BELLANTONI:  It does raise intrastate travel

6     issues.  However, that case -- there is a high probability that

7     that New York case would be decided based on the fact that

8     there are already federal laws permitting firearm owners to

9     travel from one point where they're lawfully in possession of

10    their firearm to a second point where they're lawfully in

11    possession of their firearm as long as the firearm was unloaded

12    and locked and the ammunition was kept separately.  But they

13    could raise -- you know, they could decide obviously on a

14    broader issue.

15         THE COURT:  So just to test your arguments, I'm pretty

16    certain I understand them, but you're arguing that the statutes

17    penalize the plaintiffs for traveling outside of their counties

18    by denying them the right to continue open carry if they could

19    even contain an open carry license outside of their current

20    counties.  But the statutes would allow for concealed carry in

21    all places.

22         MS. BELLANTONI:  I would ask that we not even consider

23    concealed carry because it's not recognized as a right.  And

24    similar to my arguments in criticizing the state's use and

25    interchanging terms and using open carry, concealed carry,

22

1    public carry, concealed carry is apparently in the Ninth

2    Circuit not deemed to be a right.  So yes, if my clients were

3    even able to obtain an open carry permit, the right to bear

4    arms which attaches to the individual wherever they go would be

5    infringed, terminated because as soon as they left their county

6    they would be committing a crime.

7            THE COURT:  This is all theoretical because on the one

8    hand you say there's a ban.  So if there's a ban, then the

9    suggestion that someone could obtain an open carry permit in

10   his or her own county is illusory, right?  That's essentially

11   your position?

12           MS. BELLANTONI:  I'm not sure what you're asking.

13           THE COURT:  Because the intrastate claim can only make

14   sense if someone could obtain an open carry license in his or

15   her own county alone, right?  That has no effect in a

16   neighboring county.

17           MS. BELLANTONI:  So correct.  There are layers of

18   arguments to be made here.  The first being that there is a ban

19   on open carry, but once that -- once we get beyond that, if

20   there is a shall issue, you know, statute created by a

21   legislature based on the fact that their statute has been

22   enjoined, once it's shall issue, they're still restricted to

23   the county of issuance under the statute.  So there are several

24   issues within the language of the statutes that is violative of

25   the Second Amendment.  So yes, if they had a shall issue, an

1  open carry, then likewise they should have the no restriction

2  on geography or the population limit which is 200,000 which

3  coincides with the geographical restriction by county.

4          THE COURT:  Is there a ripeness problem there on the

5  intrastate claim?

6          MS. BELLANTONI:  I'm not sure how there would be a

7  ripeness issue, Judge.

8          THE COURT:  Anything on this point, Mr. Wise?

9          MR. WISE:  No, your Honor, other than as we said in

10  our briefing we believe that the standards in *Soto-Lopez* would

11  apply, and that under the three ways that interstate travel --

12  it's not even clear that intrastate travel would be recognized

13  here.  But under that test, the plaintiffs haven't met it.

14          THE COURT:  Is it possible that the Supreme Court is

15  on the verge of addressing an issue such that a claim should be

16  allowed to proceed?

17          MR. WISE:  I don't want to misrepresent what the

18  Supreme Court is considering.  I don't recall that being the

19  way that the issues are framed in that case.

20          THE COURT:  The question presented is whether the

21  city's ban on transporting a licensed locked and unloaded

22  handgun to a home or shooting range outside city limits is

23  consistent with the Second Amendment, the Commerce Clause, and

24  the constitutional right to travel.  It's the outside city

25  limits that suggests some intrastate issue there.  I don't

1    know.  I'm thinking about that.

2          On the Fourth Amendment claim, I don't think you've

3    pointed me to any authority that is on all fours,

4    Ms. Bellantoni, that is addressing whether or not a regulation

5    affecting the precise means or manner of use of property

6    constitutes a seizure, certainly not a handgun or a gun.

7          MS. BELLANTONI:  So, you know, there is nothing that

8    is on all fours with our position, your Honor.  And it's not

9    the use of the property.  It's the manner in which it is worn

10    on the body.  So in other words, the plaintiffs have property,

11    and there is an infringement and an interference with their use

12    and possession of that property by the government in dictating

13    and demarcating, separating out the way that they wear and

14    carry their property.

15          THE COURT:  Are you saying wearing is not a use?

16          MS. BELLANTONI:  Well, when we're talking about, you

17    know, a firearm, it just -- use didn't seem that it would be

18    the most reflective of the argument that we were representing.

19          THE COURT:  I was trying to understand if there's some

20    precise -- because at one point you said not use -- precise

21    manner of wearing is possession, use, donning, wearing.

22          MS. BELLANTONI:  I see.

23          THE COURT:  Right?

24          MS. BELLANTONI:  Right.

25          THE COURT:  It's all of that.

1          MS. BELLANTONI:  So it's really the concealed carry

2     versus the open carry that there really is no rational argument

3     for under the Fourth Amendment for the interference.  And the

4     burden is on the government.  There is a property interest

5     here.

6          You know, I wanted to point out it was a little

7     confusing in the government's papers where they say that we

8     have not pointed to or that the state statute does not create a

9     property interest.  So I wasn't really sure what that meant

10    because there is already a property interest here, personal

11    property, handguns, and that is a recognized property.

12         THE COURT:  That's getting into the procedural due

13    process, is it not?  I'm going to ask you that question when we

14    get to procedural due process.

15         MS. BELLANTONI:  Sure.

16         THE COURT:  So hold that, hold that thought.

17         So on Fourth Amendment, it's *Presley* and *Cedar Point*

18    that are the most analogous, and the Court looks at whether or

19    not there's a meaningful interference with possessory interest

20    and whether or not the character of the property is changed; is

21    that the test?

22         MS. BELLANTONI:  Yeah.  So the meaningful interference

23    with their property is the state's requirement that they wear

24    or carry the property in a specific manner.

25         THE COURT:  So Mr. Wise, on the Fourth Amendment

1    claim, how can I decide there's no possibility of

2    unreasonableness as used in that amendment at this stage?

3    Isn't there a factual issue that would need to be resolved

4    through dispositive motion practice or at a bench trial?

5          MR. WISE:  So that would only be of course if the

6    Court got through the first prong of finding that there was a

7    meaningful interference.  Then we would look at the

8    reasonableness of the seizure, right?  But if the Court is just

9    considering whether there was a meaningful interference,

10   *Shiroma* is dispositive here, as long as there's an

11   appropriately tailored law which, as we've said in our

12   briefing, that open carry licensing and prohibitions are

13   specifically tailored to allow for exceptions, then the Court

14   can dispose of the Fourth Amendment claim on that basis.

15          In terms of the reasonableness, the Court can rely on

16   *Heller* itself which indicates that the government has a variety

17   of tools for combating the problem of gun violence so that

18   balancing can be done based on existing case law.

19          MS. BELLANTONI:  Respectfully, your Honor --

20          THE COURT:  Hold on one second.

21          Here on this claim could the dominoes fall in

22   plaintiffs' favor depending on the New York decision and then

23   whatever the circuit does with the cases it's deferred?

24          MR. WISE:  I mean, theoretically there could be either

25   that case or other cases that come out all different sorts of

1    ways and could influence a lot of different cases that have

2    been heard or are being heard.  Based on existing case law, you

3    know, what we've cited in our brief, we don't believe that the

4    plaintiffs have stated a plausible claim, and that goes for

5    the, you know, intrastate travel claim as well.

6            THE COURT:  All right.  Ms. Bellantoni.

7            MS. BELLANTONI:  Yes, your Honor.  None of the cases

8    that are cited, the *Heller* case, the *New York City* case, those

9    are all cases that are Second Amendment cases under Second

10   Amendment analysis, not a Fourth Amendment analysis.  It's a

11   completely different analysis.  There is a property interest,

12   and the burden is not on the plaintiff.  The burden is on the

13   government to identify whether their interference with the

14   property rights is reasonable.

15           THE COURT:  Ultimately the burden -- the question is

16   at this point have plaintiffs pled a claim adequately.

17           MS. BELLANTONI:  Right.  And the Second Amendment

18   cases cited are not dispositive of that issue.

19           THE COURT:  *Shiroma* is a Fourth Amendment case.

20           MS. BELLANTONI:  *Heller* is not, and there are

21   fact-based issues here because the government hasn't put forth

22   a Fourth Amendment argument on the firearms issue.  We don't

23   know what their reasoning is for demarcating open carry versus

24   concealed carry.

25           THE COURT:  Well, they're attacking your pleadings at

1   this point.

2          On procedural due process, the question is what

3   language in the statute creates a liberty or a property

4   interest.  And you don't think you need to point to statutory

5   language on the procedural due process claim to satisfy that?

6          MS. BELLANTONI:  On procedural due process?  On

7   procedural due process, there is a property interest because

8   it's personal property.  It's an actual thing.  It's not like,

9   for instance, a job where you may not have a possessory

10  interest or property interest in your employment.  This is a --

11  this is a piece of property, so there -- procedurally there is

12  no notice before -- the statute is what it is.  I mean,

13  everyone has to be subjected to it.  And my clients, there's

14  no -- there was no basis for the restriction on my clients and

15  how they can carry their firearms or where they can carry their

16  firearms outside of their county.

17         THE COURT:  And that's rooted in the Second Amendment.

18  You say it's completely separate from the Second Amendment,

19  right?

20         MS. BELLANTONI:  The 14th Amendment, yes, because the

21  statute itself has been created without an opportunity to be

22  heard.

23         THE COURT:  I'm not talking about the statute.  The

24  interest, the property interest.

25         MS. BELLANTONI:  The property interest in their

1      handguns?

2                    THE COURT:  Uh-huh.

3                    MS. BELLANTONI:  Is existing separate and apart from

4      the 14th Amendment or any statute.

5                    THE COURT:  And it preexists the Second Amendment,

6      that's your argument?  Is it preexisting?  Is this your

7      preexisting argument?

8                    MS. BELLANTONI:  For a property interest?

9                    THE COURT:  Yes.

10                   MS. BELLANTONI:  Yes.  I don't think that the property

11     interest is an argument.

12                   THE COURT:  On the property interest, just so -- I

13     mean, isn't it the case that there is a pretty good chance that

14     plaintiffs have a protected property interest, Mr. Wise, in the

15     procedural due process context?

16                   MR. WISE:  Not for purposes of procedural due process.

17     So I guess I'm having trouble understanding what procedure

18     plaintiffs --

19                   THE COURT:  I'm getting to that next.  That's a

20     separate question.

21                   MR. WISE:  It is a separate question, and I understand

22     we're addressing the threshold issue.

23                   THE COURT:  It's the first prong.

24                   MR. WISE:  Yes, exactly.  So we're looking at whether

25     there's mandatory or permissive language in the statute

1    providing for a process here, and so, you know, we looked at

2    the statutes.  The criminal statutes have penalties.  They

3    don't create an interest.  The open carry licensing statutes

4    use permissive language that allows the sheriff or police chief

5    the option of issuing an open carry license.

6         THE COURT:  So your focus is on the language creating

7    the procedure.

8         MR. WISE:  Right.

9         THE COURT:  So what is the procedure that's been

10   denied, Ms. Bellantoni?

11        MS. BELLANTONI:  The procedure that's been denied is

12   there is no procedure at all for my clients or anyone else to

13   be heard prior to their rights being violated, their Second

14   Amendment right, well, which is not a part of this motion, but

15   their Fourth Amendment right to the enjoyment of their property

16   and how they choose to carry or wear their property.  In other

17   words, if --

18        THE COURT:  But there's a procedural due process

19   claim, right?

20        MS. BELLANTONI:  Correct.  And the argument is --

21        THE COURT:  So what's the procedure?

22        MS. BELLANTONI:  There is no procedure.  That's the

23   problem.

24        THE COURT:  No procedure?

25        MS. BELLANTONI:  Because it's already mandated by the

1   statute.  It's already dictated by the government how an

2   individual can wear their property and carry their property.

3   In other words, with an open carry --

4           THE COURT:  So what's the best case?  What's your best

5   case to support your argument that you have a procedural due

6   process claim when the statutes provide no procedure, if that's

7   the right way to read the statute?

8           MS. BELLANTONI:  The statutes provide no procedure

9   which is the violation in and of itself because they, by virtue

10  of their existence, remove from my clients the ability to wear

11  their firearms whether exposed or concealed.  They remove the

12  ability of my clients to travel outside of their county and/or

13  travel to an area of more than 200,000 people.

14          THE COURT:  All right.  I understand the argument.  On

15  substantive due process, is it fair to say substantive due

16  process is based on the deprivation of Second Amendment and

17  Fourth Amendment rights, or is there a separate constitutional

18  right on which the substantive due process claim is based?

19          MS. BELLANTONI:  The substantive due process claim is

20  primarily based on the Second Amendment but additionally the

21  enforcement amendment as well.  That is in the papers.  You've

22  read the papers.  It's an inherent right of the individual

23  innately from birth to self-protection, and the statutes, the

24  statutory scheme is infringing upon that and violating that and

25  removing any ability of the individual to decide how they can

1   defend their safety and their bodies from confrontation in

2   public.

3           THE COURT:  So looking at the ninth and the tenth

4   claims, are you disputing that the Court can dismiss those

5   claims in part to the extent they cite the 14th Amendment, or

6   do you concede that?

7           MS. BELLANTONI:  Are you asking me?

8           THE COURT:  Yes, Ms. Bellantoni.

9           MS. BELLANTONI:  Can you make that a little clearer.

10   I'm not understanding what you're asking me.

11          THE COURT:  I just said I'm looking at your claims 9

12   and 10, and they are based -- I just asked you what they were

13   based on, and you just told me they were based on the Second

14   and the Fourth.  And I'm looking at the complaint itself, and

15   they say Second, Fourth, and 14th.

16          MS. BELLANTONI:  No.  You were asking a moment ago --

17          THE COURT:  Don't put words in my mouth.  Just answer

18   my question.

19          MS. BELLANTONI:  Well, on count 10 there are

20   allegations in the cause of action under the Second, Fourth,

21   and 14th Amendment.  If the question is substantively under the

22   14th Amendment substantive due process issue, then those issues

23   are also tied into the right of the individual to defend

24   themselves and to determine how they will defend themselves in

25   public in the face of a confrontation and having to protect

1    their lives and their security.

2          THE COURT:  All right.  Anything in response to what

3    you just heard, Mr. Wise?

4          MR. WISE:  No, your Honor.  I think our briefing has

5    addressed these issues.

6          THE COURT:  All right.  I have no other questions on

7    the motion to dismiss.  So again, I give the movant the last

8    word.  So on the motion to dismiss, anything not covered by the

9    discussion or the briefing, Ms. Bellantoni?

10         MS. BELLANTONI:  No, your Honor.

11         THE COURT:  Mr. Wise?

12         MR. WISE:  No, your Honor.  Thank you.

13         THE COURT:  All right.  On scheduling, I have looked

14    at the joint status report.  Here's my main question.  I'll

15    issue an order as quickly as I can on the preliminary

16    injunction.  What -- I mean, can you tell me now what's the

17    likelihood that regardless of how I order a party is going to

18    appeal?  Because it could -- there's a suggestion that -- well,

19    assuming a party appeals my order on preliminary injunction,

20    regardless of which way I go, would the parties then agree that

21    a discovery stay should be put in place, Ms. Bellantoni?

22         MS. BELLANTONI:  I would not agree to that, your

23    Honor, no, because the preliminary injunction is based on the

24    Second Amendment issue, and the other causes of action can

25    certainly proceed.  There really -- I don't anticipate there

1  being much fact-based discovery.  The plan that we put forth is

2  relatively brief and concise, and I don't think that the

3  preliminary injunction determination will affect discovery in

4  that case.  And waiting for an appeal on the preliminary

5  injunction will delay justice for my clients in moving forward

6  on the rest of their claims.

7          THE COURT:  All right.  I think that's a fair point,

8  Mr. Wise.  It's probably not too fact intensive, agreed?

9          MR. WISE:  I think that's right.

10         THE COURT:  I mean, legislative history might be

11 developed and some limited deposition practice.

12         MR. WISE:  Right.  Our only point is that these issues

13 I think are likely to get fleshed out in the, you know, cases

14 that are up on appeal right now and that there are a number of

15 cases that are addressing similar issues and that when it comes

16 time to -- you know, in our view we think it should be stayed,

17 and when it comes time to litigate these issues, it wouldn't

18 take very long to get through them.  So just in the interest of

19 judicial economy, our view is that our case should be stayed

20 pending the outcome of any appeal on the preliminary injunction

21 motion and any of these other cases that are up on appeal right

22 now.

23         THE COURT:  Just help me understand, if Young is

24 decided at the Ninth Circuit -- if the New York case is decided

25 and the Young case is decided, do those effectively decide this

1   case or not?

2           MR. WISE:  We think that it's very likely they will.

3           THE COURT:  Ms. Bellantoni?

4           MS. BELLANTONI:  It's really hard to say, but they are

5   not guaranteed to be entirely dispositive of our case.  And

6   even if Young -- the en banc court ends up determining that

7   there is a right to open carry, it still doesn't change the

8   fact that there are statutory limitations on the ability to get

9   an open carry permit or the good cause requirement which may or

10  may not be addressed by the Young court and then as well as the

11  geographical population restrictions in the statute.

12          THE COURT:  Because that does not involve the

13  California statutes at all.

14          MS. BELLANTONI:  Right.  And nor does it take care of

15  the Fourth Amendment argument.

16          THE COURT:  How could Young resolve the -- would the

17  defense -- if Young were decided in favor of open carry, would

18  the defense end up conceding the statutes here are

19  unconstitutional?  There would be a petition for cert filed no

20  doubt in Young.

21          MR. WISE:  Yeah.  I mean -- right.  It's hard to

22  answer that in the abstract.

23          THE COURT:  All right.  I do understand that

24  plaintiffs are seething the Dormant Commerce Clause claim,

25  correct, Ms. Bellantoni?

1          MS. BELLANTONI:  Yes.

2          THE COURT:  All right.

3          What I'll do is at the same time that I issue the

4     order, my inclination is not to stay discovery at this point

5     but to indicate initial disclosures within 21 days after I

6     issue my orders on preliminary injunction, motion to dismiss,

7     and I'll issue them at the same time.  And then I'll set a

8     schedule for fact discovery and expert discovery that follows.

9     So you'll have specific dates once I issue the order on the

10    pending motions.  And I'll set through dispositive motion

11    practice.  It's only if the case gets past dispositive motion

12    practice that I would then set a trial date.

13         So anything else on scheduling, Ms. Bellantoni?

14         MS. BELLANTONI:  No, your Honor.

15         THE COURT:  Mr. Wise?

16         MR. WISE:  No, your Honor.

17         THE COURT:  All right.  I think I have what I need.

18    Thank you very much.  The matter is submitted.

19         THE CLERK:  Court is in recess.

20         (The proceedings adjourned at 11:55 a.m.)

21                         --oOo--

22    I certify that the foregoing is a correct transcript from the

23    record of proceedings in the above-entitled matter.

24                    /s/ Kacy Parker Barajas

25                    _____
                      KACY PARKER BARAJAS
                      CSR No. 10915, RMR, CRR, CRC