1  Rob Bonta
   Attorney General of California
2  Mark R. Beckington
   Supervising Deputy Attorney General
3  R. Matthew Wise, State Bar No. 238485
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone: (916) 210-6046
6    Fax: (916) 324-8835
     E-mail: Matthew.Wise@doj.ca.gov
7  *Attorneys for Defendant Attorney General Rob Bonta*

8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

14 | **MARK BAIRD and RICHARD GALLARDO,** | Case No. 2:19-cv-00617-KJM-AC |
|---|---|
15 | Plaintiffs, | **DEFENDANT'S OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION** |
16 | v. | |
17 | | Date:      June 18, 2021 |
   | | Time:      10:00 a.m. |
18 | **ROB BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,[1]** | Dept:      3 |
   | | Judge:     Hon. Kimberly J. Mueller |
19 | Defendants. | Trial Date: None set |
20 | | Action Filed: April 9, 2019 |

21

22

23

24

25

26

27

---

28   [1] Defendant Rob Bonta, the current Attorney General of California, is automatically substituted for Xavier Becerra as a defendant. Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS

**Page**

Introduction .......................................................................................................... 1

Background ........................................................................................................... 2

    I.    California's Public Carry Laws ................................................................ 2

    II.   Related Legal Challenges ....................................................................... 3

    III.  The Present Lawsuit .............................................................................. 4

Legal Standard ..................................................................................................... 5

Argument .............................................................................................................. 5

    I.    Plaintiffs Have Not Shown a Likelihood of Success on the Merits ...................... 6

        A.   California's Public Carry Laws Are Consistent with Anglo-American Legal Tradition ........................................................ 6

            1.   Heller does not recognize a general right to public carry .............. 6

            2.   Restrictions on open carry date back centuries ........................... 8

                a.    Public carry restrictions in England ................................... 8

                b.    Public carry restrictions in the founding era.................... 10

                c.    Public carry restrictions in the antebellum era ................ 11

                d.    Public carry restrictions in the mid- to late-nineteenth century .............................................................. 12

            3.   California has adopted the tradition of regulating open carry ...... 14

        B.   California's Open Carry Laws Comport with the Second Amendment ........................................................................ 15

            1.   The challenged laws are presumptively lawful under Heller........ 15

            2.   The challenged laws are constitutional under any level of means-ends scrutiny .................................................................. 16

                a.    Intermediate scrutiny applies here ................................... 16

                b.    The challenged laws satisfy heightened constitutional scrutiny ................................................. 17

    II.   Plaintiffs Have Not Satisfied the Other Factors for Injunctive Relief................. 20

Conclusion........................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Alliance for the Wild Rockies v. Cottrell*
   632 F.3d 1127 (9th Cir. 2011) .................................................................... 5

*Andrews v. State*
   50 Tenn. 165 (1871) ................................................................................ 13

*Aymette v. State*
   21 Tenn. 154 (1840) ................................................................................ 12

*Bauer v. Becerra*
   858 F.3d 1216 (9th Cir. 2017) .................................................................. 17

*Chalk v. U.S. Dist. Court Cent. Dist. Cal.*
   840 F.2d 701 (9th Cir. 1988) .................................................................... 20

*District of Columbia v. Heller*
   554 U.S. 570 (2008) ......................................................................... *passim*

*Drake v. Filko*
   724 F.3d 426 (3d Cir. 2013) ............................................................... 16, 17

*English v. State*
   35 Tex. 473 (1871) .................................................................................. 13

*Fife v. State*
   31 Ark. 455 (1876) .................................................................................. 13

*Flanagan v. Harris*
   No. 18-55717 (9th Cir.) ..................................................................... 1, 3, 4

*Gould v. Morgan*
   907 F.3d 659 (1st Cir. 2018) .............................................................. 17, 18

*Hill v. State*
   53 Ga. 472 (1874) ................................................................................... 13

*Jackson v. City and Cty. of San Francisco*
   746 F.3d 953 (9th Cir. 2014) ............................................................... 6, 17

*Kachalsky v. Cty. of Westchester*
   701 F.3d 81 (2nd Cir. 2012) .............................................................8, 16, 17

## TABLE OF AUTHORITIES
### (continued)

Page

*Maryland v. King*
133 S. Ct. 1 (2012) ........................................................................... 20

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ............................................................................. 7

*New York State Rifle & Pistol Ass'n, Inc. v. Corlett*
No. 20-843 (U.S.) ................................................................................. 4

*Nichols v. Harris*
17 F. Supp. 3d 989 (C.D. Cal. 2014) ................................................. 3

*Nichols v. Newsom*
No. 14-55873 (9th Cir.) .................................................................. 1, 3

*Nken v. Holder*
556 U.S. 418 (2009) ......................................................................... 20

*Nunn v. State*
1 Ga. 243 (1846) .............................................................................. 12

*Peña v. Lindley*
898 F.3d 969 (9th Cir. 2018) ...................................................... 17, 19

*Peruta v. County of San Diego*
824 F.3d 919 (9th Cir. 2016) ..................................................... *passim*

*Silvester v. Harris*
843 F.3d 816 (9th Cir. 2016) ...................................................... 8, 17

*State v. Buzzard*
4 Ark. 18 (1842) .............................................................................. 12

*State v. Chandler*
5 La. Ann. 489 (1850) ..................................................................... 12

*State v. Duke*
42 Tex. 455 (1874) .......................................................................... 13

*State v. Huntly*
25 N.C. 418 (1843) .......................................................................... 10

*State v. Smith*
11 La. Ann. 633 (1856) .................................................................... 12

iii

Def.'s Opp'n to Pls.' Second Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Teixeira v. Cty. of Alameda*
   873 F.3d 670 (9th Cir. 2017) ............................................................. 15

*Tracy Rifle & Pistol LLC v. Harris*
   118 F. Supp. 3d 1182 (E.D. Cal. 2015) ............................................... 20

*United States v. Chovan*
   735 F.3d 1127 (9th Cir. 2013) ..................................................... 16, 17

*Walburn v. Territory*
   59 P. 972 (Okla. Terr. 1899) ............................................................. 13

*Williams-Yulee v. Florida Bar*
   135 S. Ct. 1656 (2015) ..................................................................... 19

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ............................................................................... 5

*Woollard v. Gallagher*
   712 F.3d 865 (4th Cir. 2013) ................................................. 17, 18, 19

*Wrenn v. District of Columbia*
   864 F.3d 650 (D.C. Cir. 2017) .................................................. 8, 10, 11

*Young v. Hawaii*
   992 F.3d 765 (9th Cir. 2021) ..................................................... *passim*

## TABLE OF AUTHORITIES
### (continued)

**Page**

**CALIFORNIA STATUTES**

California Penal Code

§ 17030 ........................................................................................................... 2
§ 25400 ........................................................................................................... 2
§ 25450 ........................................................................................................... 2
§ 25605 ........................................................................................................... 2
§ 25620 ........................................................................................................... 2
§ 25630 ........................................................................................................... 2
§ 25640 ........................................................................................................... 2
§ 25650 ........................................................................................................... 2
§ 25850 ........................................................................................... 1, 4, 5, 15
§ 25850(a) ................................................................................................... 2, 5
§ 25850(b) ....................................................................................................... 5
§ 25900 ........................................................................................................... 2
§ 26030 ........................................................................................................... 2
§ 26035 ........................................................................................................... 2
§ 26045 ...................................................................................................... 3, 14
§ 26050 ........................................................................................................... 3
§ 26055 ........................................................................................................... 2
§ 26150 ................................................................................................... *passim*
§ 26150(a)(2) .................................................................................................. 3
§ 26150(b)(2) .................................................................................................. 5
§ 26155 ................................................................................................... *passim*
§ 26155(a)(2) .................................................................................................. 3
§ 26155(b)(2) .................................................................................................. 3
§ 26160 ........................................................................................................... 3
§ 26350 ........................................................................................... 1, 4, 5, 15
§ 26350(a) ....................................................................................................... 2
§ 26350(a)(1) .................................................................................................. 5
§ 26350(a)(2) .................................................................................................. 5
§ 26400 ........................................................................................................... 2

**STATUTES FROM OTHER JURISDICTIONS**

1838 Wisconson Law, Title 381, § 16 ................................................................. 11

1870 West Virginia Laws 702, ch. 153, § 8 ....................................................... 13

1889 Idaho Laws 23, § 1 .................................................................................... 13

1786 Virginia Acts 33, ch. 21 ............................................................................. 10

1792 North Carolina Law 60, ch. 3 ..................................................................... 10

# TABLE OF AUTHORITIES
## (continued)

**Page**

1795 Massachusetts Law 436, ch. 2 .................................................................. 10

1801 Tennessee Laws 259, 260-261, ch. 22, § 6 ............................................. 10

1813 Kentucky Acts 100, Chapter 89, § 1 ....................................................... 11

1813 Louisiana Acts 172, § 1 ........................................................................... 11

1821 Maine Laws 285, Chapter 76, § 1 ........................................................... 10

1821 Tennessee Public Acts 15, Chapter 13 .................................................... 16

1836 Massachusetts Laws 748, 750, ch. 134, § 16 .................................... 11, 15

1841 Maine Laws 707, 709, Chapter 169, § 16 .............................................. 11

1846 Michigan Laws 690, 692, ch. 162, § 16 ................................................. 11

1847 Virginia Laws 127, 129, ch. 14, § 16 .................................................... 11

1851 Minnesota Laws 526, 528, Chapter 112, § 18 ........................................ 11

1853 Oregon Laws 218, 220, Chapter 16, § 17 .............................................. 11

1861 Pennsylvania Laws 248, 250, § 6 .......................................................... 11

1869 New Mexico Laws 312, Chapter 32, § 1 ................................................ 13

1869-1870 Tennessee Pub. Acts, 2d. Sess., ch. 13, § 1 .................................. 13

1870 South Carolina Laws 403, no. 288, § 4 .................................................. 13

1871 Texas General Laws 1322, Article 6512 .......................................... 13, 15

1875 Wyoming Laws 352, ch. 52, § 1 ....................................................... 13, 16

1881 Arkansas Laws 490, ch. 53, § 1907 .................................................... 13

1889 Arizona Laws 16, ch. 13, § 1 ............................................................... 13

1890 Oklahoma Laws 495, ch. 25, art. 47, §§ 2, 5 ......................................... 13

Connecticut General Statute § 29-28(b) ......................................................... 14

Delaware Penal Code, Title 11 § 1441 ........................................................... 14

Hawaii Revised Statutes § 134-9 .................................................................... 14

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3    Louisiana Revised Statutes § 40:1379.3 .................................................. 15

4    Maryland Public Safety Code § 5-306(a)(6)(ii) ....................................... 15

5    Massachusetts General Laws Chapter 140, § 131(d) ................................ 15

6    New Jersey Statute § 2C:58-4(c) ............................................................. 15

7    New York Penal Code § 400.00(2)(f) ...................................................... 15

8    Rhode Island General Assembly Laws § 11-47-11(a) .............................. 15

9    Texas Government Code
10        § 411.172 ........................................................................................... 15
          § 411.177 ........................................................................................... 15
11

12    **CONSTITUTIONAL PROVISIONS**

13    First Amendment ...................................................................................... 7

14    Second Amendment .......................................................................... *passim*

15    Fourth Amendment ............................................................................... 4, 7

16    Fourteenth Amendment ..................................................................... *passim*

17    Bill of Rights ............................................................................................ 9

18    **OTHER AUTHORITIES**

19    Alcohol, Tobacco, Firearms and Explosives, *2012 Summary: Firearms Reported*
20        *Lost and Stolen* (2013) ...................................................................... 18

21    Bishop, *Commentaries on the Criminal Law* § 980 (3d ed. 1865) ............ 10

22    Blocher & Miller, *The Positive Second Amendment* 16-42 (2018) ............ 15

23    Charles, *The Faces of the Second Amendment Outside the Home, Take Two*, 64
24        Clev. St. L. Rev. 373, 414 (2016) ....................................................... 12

25    Charles, *Take Two*, 64 Clev. St. L. Rev. ................................................. 13

26    Ewing, *A Treatise on the Office and Duty of the Justice of the Peace, Sheriff,*
          *Coroner, Constable* 546 (1805) .......................................................... 10

27    Gardiner, *The Compleat Constable* 18-19 (1708) .................................... 10

28

## TABLE OF AUTHORITIES
**(continued)**

Page

Haywood, *A Manual of the Laws of North Carolina* pt. 2, 40 (1814)........................................ 10

Hildreth, *Despotism in America* 89-90 (1854) ........................................................................ 12

Keble, *An Assistance to the Justices of the Peace for the Easier Performance of
    their Duty* 147 ............................................................................................................... 10

Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern
    Antebellum Case Law in Context*, 125 Yale L.J. Forum 121, 131 (2015) ...................... 11, 12

# INTRODUCTION

Last summer, this Court denied a motion for preliminary injunction filed by Plaintiffs Mark Baird and Richard Gallardo seeking to make the open carry of firearms in public available to all law-abiding individuals.  This Court denied the motion "without prejudice to plaintiff's re-filing their request after the Ninth Circuit decides one of the aforementioned stayed appeals, *if that decision affects plaintiffs' legal grounds for an injunction such that reconsideration is warranted*, and assuming an operative complaint asserts claims on which an injunction can rest."  ECF No. 33 at 10, emphasis added.  The "aforementioned stayed appeals" referenced in the Court's order were *Young v. Hawaii* (9th Cir.), No. 12-17808, *Nichols v. Newsom* (9th Cir.), No. 14-55873, and *Flanagan v. Harris* (9th Cir.), No. 18-55717.  ECF No. 33 at 6-7.

In March, an en banc panel of the Ninth Circuit issued an opinion in *Young v. Hawaii* upholding Hawaii's firearms-carry scheme and affirming the district court's judgment dismissing the case.  992 F.3d 765, 773 (9th Cir. 2021) (en banc).  As Plaintiffs concede, the Ninth Circuit held that the Second Amendment does not confer a "preexisting individual right to open carry." Second Mot. for Prelim. Inj. (Mot.) 8.  *Young* is thus not a "decision [that] affects plaintiffs' legal grounds for an injunction such that reconsideration is warranted."  *See* ECF No. 33 at 10.  Quite the opposite:  *Young* forecloses Plaintiffs' claims here.  Plaintiffs consider *Young*'s reasoning to be "intellectually dishonest and an affront to Supreme Court precedent," Mot. 9, but that is not a basis under this Court's order to bring a second motion for preliminary injunction.

If considered on its merits, Plaintiffs' second motion fails for the same reasons as their first motion.  Under California Penal Code sections 26150 and 26155, local law enforcement officials in less populated counties may issue licenses to openly carry firearms.  Other statutes, such as sections 26350 and 25850, protect the safety of the State's residents by prohibiting open carry in certain public places.  Together, these statutes properly balance the rights of private individuals and the State's interest in maintaining order.  Plaintiffs' sweeping contention that open carry is a constitutionally protected right does not square with over six centuries of Anglo-American law strictly limiting the open carry of firearms—or, therefore, with *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *See Young*, 992 F.3d at 813, 820-21, 825-26.

1

1    California's open carry laws are firmly rooted in this historical tradition.  And if history

2    alone is not dispositive, then these laws—which are narrowly tailored to serve the State's

3    compelling interest in protecting public safety—meet any level of heightened constitutional

4    scrutiny.  Because Plaintiffs' Second Amendment rights were not infringed, and Plaintiffs do not

5    argue that they, or anyone else, were otherwise injured, they cannot establish that they have met

6    any of the factors that would justify a preliminary injunction.  The State and its residents, in

7    contrast, would suffer irreparable harm if the laws challenged here, which are calculated to reduce

8    gun violence, could not be enforced.  Plaintiffs' motion should be denied.

9                                          **BACKGROUND**

10   **I.    CALIFORNIA'S PUBLIC CARRY LAWS**

11   California law permits the carrying of firearms in public under certain circumstances,

12   commonly where a self-defense need might arise.  A California resident who is over eighteen

13   years old and not otherwise prohibited from possessing firearms may generally keep or carry a

14   loaded handgun not only in the person's home (as guaranteed by *Heller*) but also in the person's

15   place of business.  Cal. Penal Code §§ 25605, 26035.  Carrying is also generally permitted at a

16   temporary residence or campsite.  *Id*. § 26055.  A person generally may also carry a loaded

17   handgun in public areas outside incorporated cities where it would be lawful to discharge the

18   weapon.  *See id.* §§ 25850(a), 17030.  Licensed hunters and fishers may carry handguns while

19   engaged in those activities.  *Id.* §§ 25640, 26366.  Certain types of individuals, such as peace

20   officers, military personnel, and private security personnel, likewise may carry firearms in public

21   under various circumstances.  *See id.* §§ 25450, 25620, 25630, 25650, 25900, 26030.

22   State law generally prohibits the public carrying, whether open or concealed, of a loaded

23   firearm (handgun or long gun) or unloaded handgun in "any public place or on any public street"

24   in incorporated cities.  Cal. Penal Code § 25850(a); *see id.* §§ 25400, 26350(a).  A similar

25   restriction applies in public places or on public streets in a "prohibited area" of unincorporated

26   territory—that is, an area where it is unlawful to discharge a weapon.  *Id.* §§ 25850(a), 26350(a);

27   *see id.* § 17030.  State law also generally precludes carrying an unloaded long gun in public

28   places within the State's incorporated cities.  *Id*. § 26400.

2

Def.'s Opp'n to Pls.' Second Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

1   There is a focused self-defense exception to all of these restrictions, allowing the carrying

2   of a loaded firearm by any individual who reasonably believes that doing so is necessary to

3   preserve a person or property from an immediate, grave danger, while if possible notifying and

4   awaiting the arrival of law enforcement.  Cal. Penal Code § 26045.  There is also an exception for

5   a person making or attempting to make a lawful arrest.  *Id.* § 26050.  And invocations of these

6   exceptions do not require a license or permit.  *Id.* §§ 26045, 26050.

7       California law also accommodates the need or desire of some individuals to carry a

8   handgun in public in situations not otherwise provided for by law.  State law allows any otherwise

9   qualified resident to seek a permit to carry a handgun, even in an urban or residential area, for

10  "[g]ood cause."  Cal. Penal Code §§ 26150(a)(2), 26155(a)(2).  Such a permit authorizes the

11  carrying of a handgun in a concealed manner, although in counties with populations of less than

12  200,000 persons, the permit may alternatively allow the carrying of a handgun in an "exposed"

13  (i.e., open) manner.  *Id.* §§ 26150(b)(2), 26155(b)(2).  The California Legislature has delegated to

14  local authorities (county sheriffs or city police chiefs) the authority to determine what constitutes

15  "good cause" for the issuance of such a permit in local areas.  *See id.* §§ 26150, 26155, 26160.

16  **II.   RELATED LEGAL CHALLENGES**

17      California's public carry laws have been subject to several Second Amendment challenges:

18  •   In *Peruta v. County of San Diego*, the plaintiffs' challenge to California's regulation of

19      the concealed carry of firearms in public places was rejected by a Ninth Circuit en banc

20      panel, which held that the Second Amendment "does not protect in any degree the right

21      to carry concealed firearms in public."  824 F.3d 919, 939 (9th Cir. 2016) (en banc).

22  •   In *Nichols v. Harris*, the district court rejected the same claim advanced here—that the

23      Second Amendment guarantees a right to openly carry a firearm in public places.  17 F.

24      Supp. 3d 989, 993-94, 1004-05 (C.D. Cal. 2014).  The Ninth Circuit stayed the appeal

25      pending issuance of the mandate in *Young v. Hawaii*.  *Nichols v. Newsom* (9th Cir.), No.

26      14-55873, ECF No. 119.

27  •   In *Flanagan v. Harris*, the district court rejected the plaintiffs' argument that the

28      Second Amendment guarantees them *some* ability to carry a firearm—either concealed

3

or openly—in most public places.  2018 WL 2138462, at *10 (C.D. Cal. May 7, 2018). The Ninth Circuit stayed the appeal pending resolution of *Young* or further order of the Court.  *Flanagan v. Becerra* (9th Cir.), No. 18-55717, ECF No. 57.

In addition, the Supreme Court recently granted certiorari in *New York State Rifle & Pistol Association, Inc. v. Corlett* (U.S.), No. 20-843, to decide whether the State of New York's denial of petitioners' applications for concealed-carry licenses for self-defense violated the Second Amendment.[2]

### III.   THE PRESENT LAWSUIT

On April 9, 2019, Plaintiffs Mark Baird and Richard Gallardo filed a complaint for declaratory and injunctive relief against former Attorney General Xavier Becerra alleging that California's statutory firearms licensing scheme violates Plaintiffs' constitutional rights under the Second, Fourth, and Fourteenth Amendments to the Constitution.  ECF No. 1.  Plaintiffs also brought a motion for preliminary injunction, which this Court denied.  ECF No. 33 at 10.  While the Court, recognizing the evolving legal landscape, determined that Plaintiffs had "raised 'serious questions' going to the merits of their Second Amendment claim," it declined to issue a preliminary injunction because "the balance of equities [did] not tip 'sharply' in [Plaintiffs'] favor."  *Id.*

The Court also largely granted Defendant's motion to dismiss Plaintiffs' Fourth and Fourteenth Amendment claims.  ECF No. 33 at 18.  Following the Court's order, Plaintiffs filed an amended complaint bringing only Second Amendment claims.  ECF No. 34.  Plaintiffs again allege that when each of them sought an open carry license, their respective local county sheriffs denied their requests.  ECF No. 34 at ¶¶ 39, 80.  Defendant timely answered the amended complaint.  ECF No. 38.

As they did previously, Plaintiffs argue in their second motion for preliminary injunction that four state laws—California Penal Code sections 26150, 26155, 26350, and 25850—violate the Second Amendment.  Sections 26150 and 26155 state that, in a county of less than 200,000

---

[2] Because *Corlett* raises issues closely related to this case, this Court may want to consider staying these proceedings, pending any decision from the Supreme Court in *Corlett*.

4

Def.'s Opp'n to Pls.' Second Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

1   persons, the county sheriff or city police chief within the county "may issue . . . a license to carry

2   loaded and exposed in only that county a pistol, revolver, or other firearm capable of being

3   concealed upon the person" if "good cause exists for issuance of the license." Cal. Penal Code

4   §§ 26150(b)(2) (county sheriff), 26155(b)(2) (city police chief). Section 26350 prohibits a person

5   from "openly carrying an unloaded handgun" outside or inside a vehicle in public places. Cal.

6   Penal Code § 26350(a)(1), (a)(2). Section 25850 prohibits a person from "carrying a loaded

7   firearm" outside or inside a vehicle in public places, and, "for the purpose of enforcing this

8   section," allows peace officers to examine a firearm "to determine whether or not [the] firearm is

9   loaded." Cal. Penal Code § 25850(a), (b).

## LEGAL STANDARD

11      "A preliminary injunction is an extraordinary remedy never awarded as a matter of right."

12   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To prevail, "a plaintiff must

13   show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to

14   plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and

15   (4) that an injunction is in the public interest." *Id.* at 7, 20. Alternatively, "[a] preliminary

16   injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits

17   were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the*

18   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted).

19   Plaintiffs must make a showing of all four *Winter* factors even under the alternative sliding scale

20   test. *Id.* at 1132, 1135.

## ARGUMENT

22      Plaintiffs' motion rehashes the same arguments made in their first motion, and in doing so,

23   disregards *Young*'s holding and fails to apply the proper test for a Second Amendment claim. It

24   should be denied on this basis alone. Contrary to Plaintiffs' assertions, Mot. 1—and as

25   underscored by *Young*—the Second Amendment does not confer a general "right to the open

26   carriage of a firearm for self-protection in public." Because the challenged laws are

27   constitutionally sound, Plaintiffs are not likely to succeed on the merits. And given the absence

28   of any constitutional injury, Plaintiffs cannot satisfy the other *Winter* factors.

5

Def.'s Opp'n to Pls.' Second Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

1   **I.**     **PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS**

2           In *Heller*, the Supreme Court confirmed that the Second Amendment recognizes a pre-

3   existing right to keep and bear arms.  554 U.S. at 592.  That understanding led the Court to strike

4   down a statute that "totally ban[ned] handgun possession in the home."  554 U.S. at 628-29.  But

5   the Court did not "purport to 'clarify the entire field' of Second Amendment jurisprudence" or

6   "provide explicit guidance on the constitutionality of regulations which are less restrictive than

7   the near-total ban at issue in that case."  *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953,

8   959 (9th Cir. 2014) (quoting *Heller*, 554 U.S. at 635); *Young*, 992 F.3d at 783.

9           This case involves such "less restrictive" regulations.  Far from eradicating firearm

10  possession or use, California's open carry laws restrict most individuals from engaging in specific

11  conduct—openly carrying firearms in public.  Plaintiffs argue that these restrictions, which allow

12  sheriffs the discretion, upon a showing of good cause, to issue an open carry license operable in

13  the county of issuance, "unlawfully implicate and burden a core Second Amendment right and are

14  therefore unconstitutional."  Mot. 7.  Given how Plaintiffs have framed their challenge, this case

15  does not raise the broader question of whether the Second Amendment "protect[s], to some

16  degree, a right of a member of the general public to carry a firearm in public," either concealed or

17  openly.  *Peruta*, 824 F.3d at 927.  Even if the Second Amendment guarantees ordinary, law-

18  abiding citizens some right to carry a firearm outside the home, it does not require California to

19  accommodate that right by allowing individuals to carry openly in public, as Plaintiffs suggest.

20  *Young*, 992 F.3d at 773, 813, 821 ("There is no right to carry arms openly in public; nor is any

21  such right within the scope of the Second Amendment.").

22      **A.**     **California's Public Carry Laws Are Consistent with Anglo-American**
                **Legal Tradition**

23

24          **1.**     ***Heller* does not recognize a general right to public carry**

25      *Heller* holds that the Second Amendment protects an individual right to keep and bear

26  arms.  554 U.S. at 636.  "[T]he most natural reading of 'keep Arms'" is "to 'have weapons,'" *id.*

27  at 582, while "bear arms" is most naturally read to mean "'wear, bear, or carry upon the person or

28

---

6

1   in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive

2   action in a case of conflict with another person,'" *id.* at 584 (ellipses omitted).

3       *Heller* did not "undertake an exhaustive historical analysis . . . of the full scope of the

4   Second Amendment," 554 U.S. at 626, but it did recognize that the right to bear arms must be

5   construed and applied with careful attention to its "historical background." *Id.* at 592; *see id.* at

6   576-626; *Young*, 992 F.3d at 785. This is critical because "it has always been widely understood

7   that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing*

8   right"; indeed, the Second Amendment's text "declares only that it 'shall not be infringed.'"

9   *Heller*, 554 U.S. at 592; *Young*, 992 F.3d at 786. Nothing about its enumeration in the

10   Constitution changed the right to bear arms into anything more comprehensive or absolute than

11   would have been understood and expected by "ordinary citizens in the founding generation."

12   *Heller*, 554 U.S. at 577.

13       *Heller* also acknowledged that this right was and is "not unlimited." 554 U.S. at 595, 626.

14   It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and for

15   whatever purpose," *id.* at 626, or "to carry arms for *any sort* of confrontation," *id.* at 595. The

16   core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth

17   and home." 554 U.S. at 635; *see also McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)

18   (plurality op.) (*Heller*'s "central holding" was that "the Second Amendment protects a personal

19   right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

20       That does not mean that the right to "bear" has no scope or application beyond the home.

21   But nothing in *Heller* suggests that this right applies in exactly the same way in all places, or

22   dictates, as Plaintiffs claim, *see*, *e.g.*, Mot. 5-11, that the Second Amendment embodies an

23   individual right to carry a gun in almost any public place. Instead, *Heller* makes clear that

24   Second Amendment rights are subject to many reasonable regulations. *See* 554 U.S. at 636. The

25   Court even identified a list of "presumptively lawful regulatory measures," while underscoring

26   that the list was "not . . . exhaustive." *Id.* at 627 n.26.

27       Plaintiffs thus overreach when they suggest that *Heller* stands for the proposition that

28   reasonable public regulation of the right to bear arms—such as the statutory scheme at issue

7

here—"amounts to a destruction of that right" and "is clearly unconstitutional."  Mot. 5.  *Heller* does not recognize an unfettered right to carry firearms in the crowded public squares of cities and towns, based solely on an individual's stated desire to be "'armed and ready for offensive or defensive action in a case of conflict with another person.'"  554 U.S. at 584.  The challenge here must instead be evaluated, in the first instance, by examining "the historical understanding of the scope of the right."  *Id.* at 625.  Plaintiffs cannot prevail on the merits if the State's restrictions are a type of reasonable public regulation that has long been considered consistent with a private right to bear arms.  *Cf. id.* at 626-27; *Young*, 992 F.3d at 785-86 (observing that "restrictions on carrying arms openly have long been part of our legal tradition"); *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) ("Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis.").

### 2.   Restrictions on open carry date back centuries

The Supreme Court viewed four historical periods as instructive to the analysis in *Heller*: English history pre-dating the founding, *see* 554 U.S. at 592-95, and American history at the time of the founding, *see id.* at 605-10, during the antebellum period, *see id.* at 610-14, and after the Civil War, *see id.* at 614-19.  Few would dispute that these are "dense historical weeds."  *Wrenn v. District of Columbia*, 864 F.3d 650, 659 (D.C. Cir. 2017).  In some respects, however, the history is not debatable.  For more than six centuries, authorities have restricted the carrying of guns by private parties in public places—including, at times, flatly prohibiting it.

True, such restrictions were not universal.  *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 91 (2nd Cir. 2012) ("What history demonstrates is that states often disagreed as to the scope of the right to bear arms . . .").  But the persistent regulation of public carry across more than half a millennium of Anglo-American law cannot be reconciled with Plaintiffs' expansive claim to a Second Amendment right to carry their guns in virtually any public place.

### a.   Public carry restrictions in England

As *Peruta* and *Young* describe in detail, "the right to bear arms in England has long been subject to substantial regulation."  *Peruta*, 824 F.3d at 929; *Young*, 992 F.3d at 786.  Starting in

8

the thirteenth century, the Crown repeatedly issued edicts prohibiting individuals from "going armed" with concealed or open weapons in public places.  *Young*, 992 F.3d at 786; *Peruta*, 824 F.3d at 929.  Parliament continued that tradition in 1328 by enacting the Statute of Northampton, which provided that "no Man great nor small" was to "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere," on pain of forfeiture of the arms or prison time.  *Young*, 992 F.3d at 787 (quoting 2 Edw. 3, 258, ch. 3 (1328)).  Northampton became "the foundation for firearms regulation in England for the next several centuries," and was "widely enforced."  *Peruta*, 824 F.3d at 930.

English authorities extended these restrictions to portable firearms as soon as they emerged on the scene.  In 1579, Queen Elizabeth I called for a robust enforcement of Northampton's prohibition on carrying "Dagge[r]s, Pistol[s], and such like, not only in Cities and Towns, [but] in all parts of the Realm[] in common high[ways]," to combat the "danger" that accompanied the carrying of such "offensive weapons."  By the Queene Elizabeth I: A Proclamation Against the Common Use of Dagges, Handgunnes, Etc., 1-2 (London, Christopher Barker 1579).  When Parliament enacted the English Bill of Rights in 1689, it provided that certain subjects "may have arms for their defence suitable to their conditions and as allowed by law."  *Young*, 992 F.3d at 793 (quoting 1 W. & M., ch. 2, § 7 (1689)).  As Blackstone later explained, as "allowed by law" embraced restrictions on carrying firearms in public.  *Id.* at 793-94 (quoting 1 Blackstone, *Commentaries* 139 (1765)).

Some modern judges have suggested that Northampton barred only the public carry of firearms with the "intent to terrorize the local townsfolk."  *Young*, 992 F.3d at 842-43 (O'Scannlain, J., dissenting).  The historical evidence undermines that interpretation.  Queen Elizabeth I explained that it was the very act of carrying "pistols" that caused "'terrour of all people professing to travel and live peaceably.'"  By the Queene Elizabeth I:  A Proclamation Against the Carriage of Dags, and for Reformation of Some Other Great Disorders 1 (London, Christopher Barker 1594); *Young*, 992 F.3d at 793 n.13.  A popular seventeenth-century justice of the peace manual similarly explained that merely carrying such a weapon struck "fear upon others" who were unarmed, and constituted a punishable affray even "without word or blow

9

1   given."  Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their*

2   *Duty* 147 (1683); *Young*, 992 F.3d at 792-93.  That is why constables were instructed to "[a]rrest

3   all such persons as they shall find to carry Dags or Pistols," without regard to intent or purpose.

4   Keble, at 224; *see also* Gardiner, *The Compleat Constable* 18-19 (1708).

5                    **b.      Public carry restrictions in the founding era**

6          Similar restrictions on carrying weapons were found on the American side of the Atlantic in

7   the period that "preceded and immediately followed adoption of the Second Amendment."

8   *Heller*, 554 U.S. at 600-601.  Shortly after the founding, for example, North Carolina adopted its

9   own Northampton statute, making it illegal to "go []or ride armed by night []or by day, in fairs,

10  markets . . . [or] part[s] elsewhere," 1792 N.C. Law 60, ch. 3, and Virginia, Massachusetts,

11  Tennessee, and other states soon followed suit.  *See, e.g.*, 1786 Va. Acts 33, ch. 21; 1795 Mass.

12  Law 436, ch. 2; 1801 Tenn. Laws 259, 260-261, ch. 22, § 6; 1821 Me. Laws 285, ch. 76, § 1; *see*

13  *also Young*, 992 F.3d at 794-96.  Several of the states adopting these restrictions did so in the face

14  of state constitutions that "secured an individual right to bear arms for defensive purposes."

15  *Heller*, 554 U.S. at 602.

16         Some modern courts have concluded that founding-era prohibitions on public carry applied

17  only to carrying "'dangerous and unusual weapons'" in a manner that "'naturally diffuse[d] a

18  terrour among the people.'"  *Young*, 992 F.3d at 843 (O'Scannlain, J., dissenting); *see Wrenn*, 864

19  F.3d at 660.  But the historical evidence shows that in America, as in England, a gun was

20  considered "an 'unusual weapon,'" *State v. Huntly*, 25 N.C. 418, 422 (1843), and arrests for

21  carrying firearms in populated areas were made whether or not the offender "threatened any

22  person in particular" or "committed any particular act of violence," Ewing, *A Treatise on the*

23  *Office and Duty of the Justice of the Peace, Sheriff, Coroner, Constable* 546 (1805).  Law

24  enforcement manuals from that time accordingly instructed constables to "arrest all such persons

25  as in your sight shall ride or go armed."  Haywood, *A Manual of the Laws of North Carolina* pt.

26  2, 40 (1814); *see also* Bishop, *Commentaries on the Criminal Law* § 980 (3d ed. 1865) (public

27  carry restrictions did not require that the "peace must actually be broken, to lay the foundation for

28  a criminal proceeding").

10

Def.'s Opp'n to Pls.' Second Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

### c.   Public carry restrictions in the antebellum era

States continued to regulate the carrying of firearms in public places during the period preceding the adoption of the Fourteenth Amendment.  In 1821, Tennessee made it a crime to carry "pocket pistols" or other weapons.  *Young*, 992 F.3d at 799 (quoting 1821 Tenn. Pub. Acts 15, ch. 13).  In 1836, Massachusetts amended its law to prohibit going "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon" absent "reasonable cause to fear an [assault] or other injury, or violence to his person, or to his family or property," on pain of being arrested and required to obtain "sureties for keeping the peace."  *Id.* (quoting 1836 Mass. Laws 748, 750, ch. 134, § 16).  At least seven other states adopted similar "reasonable cause" statutes.  *See* 1838 Wisc. Laws 381, § 16; 1841 Me. Laws 707, 709, ch. 169, § 16; 1846 Mich. Laws 690, 692, ch. 162, § 16; 1847 Va. Laws 127, 129, ch. 14, § 16; 1851 Minn. Laws 526, 528, ch. 112, § 18; 1853 Or. Laws 218, 220, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6; *see also Young*, 992 F.3d at 799-801.

Some judges have discounted the significance of these laws, describing them as akin to "'minor public-safety infractions'" because they were enforced by requiring offenders to post surety bonds.  *Young*, 992 F.3d at 845 (O'Scannlain, J., dissenting); *see also Wrenn*, 864 F.3d at 661.  But sureties were a common way of enforcing criminal prohibitions in "rural society before the age of police forces or an administrative state."  Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121, 131 (2015).  A person caught carrying a firearm in public could be arrested by the justice of the peace and required to pay sureties—often a hefty sum—in order to be released.  *Id.* at 130.  The widespread existence of this sort of regulation does not suggest that there was a common understanding at the time that ordinary citizens under ordinary circumstances had a fundamental right to carry guns in public.  *Young*, 992 F.3d at 820.

Some mostly southern states took a more permissive approach, prohibiting the carrying of concealed firearms but generally allowing open carry.  *See, e.g.*, 1813 Ky. Acts 100, ch. 89, § 1; 1813 La. Acts 172, § 1.  That choice reflected local customs and concerns.  In those states, guns were sometimes carried "partly as a protection against the slaves," and partly to be used "in

11

Def.'s Opp'n to Pls.' Second Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

1    quarrels between freemen."  Hildreth, *Despotism in America* 89-90 (1854); *see also* Ruben &

2    Cornell, *Firearm Regionalism*, 125 Yale L.J. Forum at 123-126 (documenting Southern concerns

3    about slavery and the violent nature of life in the South).  And open carry was seen as the more

4    "noble" and "manly" way of serving those purposes.  *State v. Chandler*, 5 La. Ann. 489, 490

5    (1850).  But evidently, even in those States, open carry was uncommon.  *See*, *e.g.*, *State v. Smith*,

6    11 La. Ann. 633, 634 (1856) (it was "extremely unusual" to carry weapons in "full open view");

7    *see also Young*, 992 F.3d at 804-05.

8          In their only reference to history, Plaintiffs cherry-pick a few cases from this era to suggest

9    that the "may issue" language in California Penal Code sections 26150 and 26155, which gives

10   sheriffs the discretion to determine the appropriate circumstances to issue open carry licenses,

11   "unlawfully implicate[s] and burden[s] a core Second Amendment right and [is] therefore

12   unconstitutional."  Mot. 7.  Some of those decisions do reflect a local preference for permissive

13   open carry laws.  *See*, *e.g.*, *Nunn v. State*, 1 Ga. 243 (1846).  But these authorities do not establish

14   any national consensus on the meaning of the Second Amendment in this period.  They were

15   decided by judges "immersed in a social and legal atmosphere unique to the South," whose

16   "embrace of slavery and honor[] contributed to an aggressive gun culture."  Ruben & Cornell,

17   *Firearm Regionalism*, 125 Yale L.J. Forum at 128.  And even other southern courts disagreed,

18   suggesting that legislatures could generally ban public carry consistent with the Second

19   Amendment or a state constitutional equivalent.  *See State v. Buzzard*, 4 Ark. 18, 27 (1842);

20   *Aymette v. State*, 21 Tenn. 154, 161-162 (1840); *see generally Young*, 992 F.3d at 817 n.39.

21              **d.    Public carry restrictions in the mid- to late-nineteenth century**

22         In the years immediately surrounding the adoption of the Fourteenth Amendment, states

23   and local governments adopted still more restrictions on the public carry of firearms, often in

24   response to an increase in lawlessness and violence.  Charles, *The Faces of the Second*

25   *Amendment Outside the Home, Take Two*, 64 Clev. St. L. Rev. 373, 414 (2016).  The post-Civil

26   War constitutions of six States gave their "state legislatures broad power to regulate the manner in

27   which arms could be carried."  *Peruta*, 824 F.3d at 937.  Five others specified that legislatures

28   could prohibit the carrying of concealed weapons.  *Id.* at 936-937.  Several state legislatures

                                                      12

1   proceeded to make it illegal to carry weapons in public places.  1870 S.C. Laws 403, no. 288, § 4;

2   1869-1870 Tenn. Pub. Acts, 2d. Sess., ch. 13, § 1; 1881 Ark. Laws 490, ch. 53, § 1907; 1890

3   Okla. Laws 495, ch. 25, art. 47, §§ 2, 5.  Texas and West Virginia banned public carry without

4   good cause.  1870 W. Va. Laws 702, ch. 153, § 8; 1871 Tex. Gen. Laws 1322, art. 6512.  And

5   other States and territories made it illegal to carry firearms "concealed or openly" within the

6   "limits of any city, town, or village."  1875 Wyo. Laws 352, ch. 52, § 1; *see also* 1869 N.M. Laws

7   312, ch. 32, § 1; 1889 Ariz. Laws 16, ch. 13, § 1; 1889 Idaho Laws 23, § 1.

8       This era saw several constitutional challenges to laws restricting public carry, but none

9   succeeded.  The Tennessee Supreme Court held that the legislature could broadly restrict the

10   carrying of firearms "among the people in public assemblages where others are to be affected,"

11   although not "where it was clearly shown they were worn *bona fide* to ward off or meet imminent

12   and threatened danger to life or limb, or great bodily harm."  *Andrews v. State*, 50 Tenn. 165, 186,

13   191 (1871).  The Texas Supreme Court upheld that State's prohibition on the carrying of firearms

14   unless the carrier had "'reasonable grounds for fearing an unlawful attack,'" calling the law "a

15   legitimate and highly proper regulation."  *State v. Duke*, 42 Tex. 455, 459 (1874).  Other courts

16   reached similar results.  *See English v. State*, 35 Tex. 473, 480 (1871); *Hill v. State*, 53 Ga. 472,

17   474 (1874); *Fife v. State*, 31 Ark. 455, 461 (1876); *Walburn v. Territory*, 59 P. 972, 973 (Okla.

18   Terr. 1899) (Mem).

19       Although *Heller* found such historical evidence "instructive," 554 U.S. at 614, Plaintiffs

20   ignore it.  Some modern judges have concluded that this era supports a broad right to public carry,

21   reasoning that the Fourteenth Amendment was largely a response to southern "Black Codes,"

22   including laws barring African-Americans from keeping or bearing arms.  *See Young*, 992 F.3d at

23   840 (O'Scannlain, J., dissenting).  No doubt, the Amendment's framers were concerned about

24   *discriminatory* laws aimed at disarming freed slaves.  *See id.*.  But they were surely also aware of

25   the tradition of imposing race-neutral restrictions on carrying firearms in populated areas,

26   including outside the South.  The historical record shows that people of all races were prosecuted

27   for violating those laws, *see* Charles, *Take Two*, 64 Clev. St. L. Rev. at 430 n.288 (collecting

28   newspaper reports), and nothing in the Fourteenth Amendment disapproved of that tradition.

13

### 3.   California has adopted the tradition of regulating open carry

Reasonable people can debate how exactly the Statute of Northampton was understood in seventeenth-century England, or where exactly the colonists were allowed to carry firearms in eighteenth-century America.  But no one can seriously dispute that restrictions on the public carrying of firearms—including regulation of open carry—were commonplace throughout each of the historical periods that *Heller* considered in construing the Second Amendment.  Those restrictions were particularly prevalent in populated places, where the routine carrying of firearms by private parties threatened public safety, and where local sheriffs and justices of the peace were generally available to provide protection.  They were less prevalent in outlying areas, where firearms were more important in part because public officials typically were not available to assist unarmed settlers or travelers.  And, at least in America, local governments had substantial discretion to regulate the carrying of guns—or to ban it entirely—based on conditions and public preferences in their jurisdictions.  *Young*, 992 F.3d at 821 (observing that "for centuries we have accepted that, in order to maintain the public peace, the government must have the power to determine whether and how arms may be carried in public places").

California's system for regulating public carry is a part of this tradition.  Californians may carry guns without a license under many circumstances—including at their homes and in their places of business, on much private property with the permission of the owner, in more remote parts of the State, at many campsites, hunting grounds, or target ranges, while traveling to and from those and other authorized locations, and in emergencies when public officials are not on the scene.  *See ante* Background I.  On the other hand, California limits the public carrying of guns in cities and towns under ordinary circumstances, with local sheriffs generally determining whether a qualified resident has "good cause" for seeking a license to carry a concealed weapon.  Cal. Penal Code §§ 26150, 26155; *cf. id.* § 26045 ("immediate, grave danger" exception).  This is similar to the approach used by many other States, which also restrict public carry in populated places to those who can make an individualized showing of good cause (or meet some similar standard).  *See* Conn. Gen. Stat. § 29-28(b); Del. Code Ann. tit. 11, § 1441; Haw. Rev. Stat.

1   § 134-9; Mass. Gen. Laws ch. 140, § 131(d); Md. Pub. Safety Code § 5-306(a)(6)(ii); N.J. Stat.

2   § 2C:58-4(c); N.Y. Penal Code § 400.00(2)(f); R.I. Gen. Laws § 11-47-11(a).

3       Other States take a different approach, generally permitting public carry.  *See, e.g.*, La. Rev.

4   Stat. § 40:1379.3; Tex. Gov't Code §§ 411.172, 411.177.  Whatever the modern policy debate,

5   the historical record simply does not support Plaintiffs' suggestion that a permissive approach to

6   public carry is *required* by the pre-existing, common-law right to bear arms incorporated into the

7   Constitution by the Second and Fourteenth Amendments.  *See Heller*, 554 U.S. at 592; *Young*,

8   992 F.3d at 825-26.  A resident of England before the founding, or of America during the

9   founding or in the nineteenth century, would have been quite perplexed by Plaintiffs' contention

10  that the right to bear arms includes a right of ordinary people under ordinary circumstances to

11  carry guns in the public places of cities or towns.  *Compare, e.g.*, Mot. 9-11 *to* 2 Edw. 3, 258, ch.

12  3 (1328); 1836 Mass. Laws 748, 750, ch. 134, § 16; 1871 Tex. Gen. Laws 1322, art. 6512.

13      **B.    California's Open Carry Laws Comport with the Second Amendment**

14          **1.    The challenged laws are presumptively lawful under *Heller***

15      Where text, history, and tradition show that a law is consistent with the Second

16  Amendment, the restriction "'passes constitutional muster'" and this Court's inquiry "'is

17  complete.'"  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017); *see Heller*, 554 U.S.

18  at 626, 627 n.26; *Young*, 992 F.3d at 783, 826.  History and tradition demonstrate that the laws

19  contested here comport with the "historical understanding" of the right to bear arms.  *See Heller*,

20  554 U.S. at 625; *Young*, 992 F.3d at 826.

21      Plaintiffs challenge laws that allow local authorities—who are most familiar with the needs

22  and desires of their own communities—the discretion to grant open carry licenses, operable in the

23  county of issuance, to qualified individuals, on a showing of "good cause."  Mot. 5-9 (contesting

24  Cal. Penal Code §§ 26150 and 26155).  Plaintiffs also challenge laws that levy criminal penalties

25  on individuals that carry firearms, whether unloaded or loaded, in a public place without a valid

26  license.  Mot. 9-11 (contesting Cal. Penal Code §§ 26350 and 25850).

27      California's system—including its regulation of open carry—"stands well within our

28  traditions."  *Young*, 992 F.3d at 826; *see generally* Blocher & Miller, *The Positive Second*

15

1 *Amendment* 16-42 (2018).  Indeed, "it does not go as far as some of the historical bans on public

2 carrying." *Drake v. Filko*, 724 F.3d 426, 433 (3d Cir. 2013); *see, e.g.*, 1821 Tenn. Pub. Acts 15,

3 ch. 13 (categorically banning the carry of "pocket pistols" in all parts of the state); 1875 Wyo.

4 Law 352, ch. 52, § 1 (banning all carry, whether "concealed or openly," within the "limits of any

5 city, town, or village"); *see also Kachalsky*, 701 F.3d at 90 (discussing nineteenth-century laws

6 that "banned the carrying of pistols and similar weapons in public, both in a concealed or an open

7 manner").  Given the historical record, California's system is "within the state's legitimate police

8 powers and [is] not within the scope of the right protected by [the] Second Amendment." *Young*,

9 992 F.3d at 826.

> **2.     The challenged laws are constitutional under any level of means-ends scrutiny**
>
> **a.     Intermediate scrutiny applies here**

13       Plaintiffs fail not only to address the historical evidence, but also to apply any form of

14 means-ends scrutiny to the laws they challenge.  *Heller* does not suggest that limitations on the

15 right to bear arms should be rejected outright.  While *Heller* does not instruct how heightened

16 scrutiny should apply when reviewing laws under the Second Amendment, 554 U.S. at 628-29 &

17 n.27, the Ninth Circuit and other courts of appeals have developed a two-part inquiry to determine

18 the appropriate level of scrutiny.  *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1138 (9th

19 Cir. 2013).  If, under this inquiry, the historical analysis does not demonstrate that a law is

20 presumptively constitutional, then the law is subject to intermediate scrutiny unless it

21 substantially burdens the "core" Second Amendment right.  *Id.*

22       Plaintiffs argue that *Heller* stands for the principle that "bearing" arms "categorically

23 includes carrying arms in public," and that "[t]o find otherwise is intellectually dishonest."

24 Mot. 4.  They misread *Heller*, which declared that the Second Amendment elevates "above all

25 other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and

26 home," but recognized that other questions about the scope or application of the right must be

27 "le[ft] to future evaluation."  554 U.S. at 635.  The Ninth Circuit's later cases have repeatedly

28 held that, for purposes of determining an appropriate level of scrutiny, the "core" of the Second

16

Def.'s Opp'n to Pls.' Second Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

1   Amendment right is limited to what *Heller* identified:  the right to keep and carry "in defense of

2   hearth and home."  *Id.*; *see Young*, 992 F.3d at 782-83; *Chovan*, 735 F.3d at 1138; *Silvester v.*

3   *Harris*, 843 F.3d 816, 821 (9th Cir. 2016); *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir.

4   2017); *Peña v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018).  And every other circuit to consider

5   the proper level of scrutiny for similar public carry laws has agreed that "intermediate scrutiny is

6   appropriate" because "the core Second Amendment right is limited to self-defense in the home."

7   *Gould v. Morgan*, 907 F.3d 659, 671, 673 (1st Cir. 2018); *see also Kachalsky*, 701 F.3d at 94, 96;

8   *Drake*, 724 F.3d at 436; *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013).  This case—

9   which addresses open carry outside the home—is no exception.  Because the laws challenged

10  here do not burden the core of the Second Amendment right, intermediate scrutiny applies.

### b.      The challenged laws satisfy heightened constitutional scrutiny

12      When reviewing a law under intermediate scrutiny, courts ask whether the law promotes a

13  "significant, substantial, or important government objective," and whether there is a "'reasonable

14  fit' between the challenged law and the asserted objective."  *Peña*, 898 F.3d at 979.  While the

15  State must show that the law "promotes a substantial government interest that would be achieved

16  less effectively absent the regulation," it need not demonstrate that the regulation is the "least

17  restrictive means of achieving the government interest."  *Id.* (citations and quotation marks

18  omitted).  A court's only obligation is to "'assure that, in formulating its judgments, [the State]

19  has drawn reasonable inferences based on substantial evidence,'" an inquiry that must accord

20  "'substantial deference to the predictive judgments'" of the legislature.  *Id.* at 979-980 (quoting

21  *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)).

22      Here, it is "'self-evident'" that California has a compelling interest in protecting public

23  safety and reducing gun violence.  *Jackson*, 746 F.3d at 965 (quoting *Chovan*, 735 F.3d at 1139).

24  And empirical evidence, in addition to common sense, establishes a "'reasonable fit'" between

25  that interest and restrictions on open carry.  *Peña*, 898 F.3d at 979.

26      This evidence includes a study conducted by Professor John Donohue and two other

27  scholars comparing the crime rates of the 33 states that have adopted "right-to-carry" laws—

28  under which most residents have the right to carry a firearm in most public places—to those of

17

Def.'s Opp'n to Pls.' Second Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

1  states that have not.  Wise Decl., Ex. 1.  Using 37 years of FBI crime statistics, the study ran four

2  separate models analyzing the impact of right-to-carry laws on crime rates, finding that right-to-

3  carry laws "are associated with *higher* rates of overall violent crime, property crime, or murder.

4  *Id.*, Ex. 1 at 2.  Indeed, under each model, states experienced a 13-15 percent increase in violent

5  crime in the decade after adopting a right-to-carry law.  *Id.*, Ex. 1 at 3.

6       In a more recent study, Donohue confirmed that "there is consistent evidence that [right-to-

7  carry] laws elevate violent crime in the decade after adoption," regardless of the model used, as

8  long as the model is properly weighted and the data is properly coded.  Wise Decl., Ex. 2 at 14-

9  15.  Donohue concluded that "[p]olicymakers and citizens should recognize that the best available

10  empirical data to date supports the view that [right-to-carry] laws have resulted in statistically

11  significant increases in violent crime in the ten-year period after adoption."  *Id.*, Ex. 2 at 15.

12       Another peer-reviewed study conducted by Dr. Michael Siegel and other scholars shows a

13  similar link between permissive public carry regimes and higher murder rates.  It reviewed data

14  from 1991 through 2005 and found a "significant[] associat[ion]" between right-to-carry states

15  and higher homicide rates.  Wise Decl., Ex. 3 at 5.  Those states experienced a 6.5 percent

16  increase in the overall homicide rate, an 8.6 percent rise in "firearm-related" homicide rates, and a

17  10.6 percent increase in the "handgun-specific" homicide rate.  *Id.*, Ex. 3 at 5; *see also Gould*,

18  907 F.3d at 675 (collecting additional studies).

19       This research supports a legislative judgment that an increase in guns carried by private

20  persons in public places increases the risk that "'basic confrontations between individuals [will]

21  turn deadly.'"  *Woollard*, 712 F.3d at 879.  The Legislature could also conclude that widespread

22  open carry increases the "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at

23  879, and that such guns would then be used to "commit violent crimes" or be transferred to

24  "others who commit crimes," U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and

25  Explosives, *2012 Summary: Firearms Reported Lost and Stolen* (2013) at 2.

26       Widespread open carry can also endanger police and other law enforcement officials. The

27  former president of the California Police Chiefs Association, Chief Kim Raney, explains in a

28  declaration that when law enforcement is responding to an active shooter, carrying of firearms by

18

other individuals can have deadly consequences, including by "delaying first responders from [their] primary mission" of stopping the shooter and saving lives.  Raney Decl. ¶ 25.  In the aftermath of a shooting that left five police officers dead and nine others wounded, Dallas Police Chief David Brown complained that officers "'don't know who the good guy is versus the bad guy when everyone starts shooting.'"  *Id.*  Similarly, when police officers respond to reports that there is a "man with a gun," or encounter an armed civilian on the streets, they often know little about the person's intent or mental state, or whether the person is authorized to carry a gun.  *Id.* ¶ 22.  These encounters can have fatal consequences.  *Id.*  Restrictions on public carry also reduce the amount of time that police must spend investigating handgun sightings, and help police quickly identify those persons carrying firearms who pose a threat.  *Id.* ¶ 23; *accord Woollard*, 712 F.3d at 879-880 (recounting similar policing benefits).

In light of the many public safety risks the Legislature could reasonably deem to be associated with widespread open carry, there is a "'reasonable fit'" between California's calibrated regime governing open carry and the important interests that it serves.  *Peña*, 898 F.3d at 979.  Indeed, given the compelling public safety interests at stake, and the narrowly tailored laws allowing sheriffs of less populated counties to issue open carry licenses for good cause, this regime satisfies not only intermediate scrutiny, but strict scrutiny.  *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1664 (2015) (setting forth strict scrutiny standard).  Plaintiffs have not presented any countervailing evidence that would undermine the conclusion that the laws they challenge satisfy any level of heightened scrutiny.  The reasonable measures at issue here are not among those the Constitution has taken "off the table."  *See Heller*, 554 U.S. at 636.

Plaintiffs instead complain that the Attorney General has instituted a "*de facto*" ban on open carry because, in their web search of the California Department of Justice and county websites, they were unable to locate a separate open carry application for the type of license described in California Penal Code sections 26150 and 26155.  Mot. 11-14.  But sheriffs and police chiefs— not the Attorney General—issue licenses, and Plaintiffs do not suggest that the Attorney General, or anyone else, has interfered with the implementation of these statutes by prohibiting the issuance of open carry licenses.  As even Plaintiffs concede, the California Department of

19

1  Justice's standard application states that a license to carry openly may be issued to individuals

2  living in a county of less than 200,000 persons.  Mot. 12-13.  Plaintiffs' grievances appear to stem

3  primarily from how the Siskiyou County and Shasta County sheriffs have chosen to exercise their

4  discretion—and yet, Plaintiffs have not named the sheriffs parties to this action.  In any event, the

5  sheriffs have not taken—or failed to take—any action that would render the laws challenged here

6  unconstitutional.

7  **II.     PLAINTIFFS HAVE NOT SATISFIED THE OTHER FACTORS FOR INJUNCTIVE RELIEF**

8      Plaintiffs do not suggest that they have suffered harm on any basis other than the alleged

9  violation of their Second Amendment rights.  Plaintiffs do not claim, for example, that they need

10  urgent relief to protect themselves against a specific threat.  Nor is there any urgent need to

11  resolve the legal questions raised here, particularly given the Ninth Circuit's recent decision in

12  *Young*.  Absent any constitutional violation, *see ante* Argument I, Plaintiffs cannot establish that

13  they have suffered irreparable harm.

14      The balance of equities and the public interest also militate against issuing an injunction.

15  These factors merge when the government is the party opposing the injunction.  *Nken v. Holder*,

16  556 U.S. 418, 435 (2009).  Here, an injunction would inflict harm upon the State because "[a]ny

17  time a State is enjoined by a court from effectuating statutes enacted by representatives of its

18  people, it suffers a form of irreparable injury."  *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts,

19  C.J., in chambers) (quotation and citation omitted).  The public interest likewise favors preserving

20  the State's duly enacted laws designed to protect the public safety and reduce gun violence.  *See*

21  *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193-94 (E.D. Cal. 2015).  Enjoining

22  these laws would instead upend the status quo, contrary to the purpose of an injunction.  *Chalk v.*

23  *U.S. Dist. Court Cent. Dist. Cal.*, 840 F.2d 701, 704 (9th Cir. 1988).  Having failed to show that

24  they—or anyone else—will suffer any harm if the laws that they challenge remain in effect,

25  Plaintiffs have not established that the equities and public interest favor an injunction.

26  **CONCLUSION**

27      Plaintiffs' second motion for preliminary injunction should be denied.

28

20

1    Dated:  June 4, 2021                          Respectfully Submitted,

2                                                  ROB BONTA
                                                   Attorney General of California
3                                                  MARK R. BECKINGTON
                                                   Supervising Deputy Attorney General
4
                                                   **/s/ *R. Matthew Wise***
5
                                                   R. MATTHEW WISE
6                                                  Deputy Attorney General
                                                   *Attorneys for Defendant Attorney General*
7                                                  *Rob Bonta*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     SA2019101934
24   35065691.docx

25

26

27

28

---

21

# CERTIFICATE OF SERVICE

Case Name:   **Baird, Mark v. Xavier Becerra**         No.   **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>June 4, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>June 4, 2021</u>, at Sacramento, California.

| | |
|---|---|
| Ritta Mashriqi | /s/*Ritta Mashriqi* |
| Declarant | Signature |

SA2019101934
35167264.docx