**EXHIBIT 5**

# Testimony of Eugene Volokh on the Second Amendment, Senate Subcommittee on the Constitution, Sept. 23, 1998.

## *reprinted as A Right of the People,* California Political Review, Nov./Dec. 1998, p. 23.

Prof. Eugene Volokh, UCLA Law School *

I.         Text of the Amendment and Related Contemporaneous Provisions
II.        Calls for the Right to Keep and Bear Arms from State Ratification Conventions
III.       "The Right of the People" in Other Bill of Rights Provisions
IV.        Some Other Contemporaneous Constitutional Provisions With a Similar Grammatical Structure
V.         18th- and 19th-Century Commentary
    A.     William Blackstone, Commentaries on the Laws of England (1765)
    B.     St. George Tucker, Blackstone's Commentaries (1803)
    C.     Joseph Story, Familiar Exposition of the Constitution of the United States (1840)
    D.     Thomas Cooley, Principles of Constitutional Law (1898)
VI.        Selected Supreme Court Cases
    A.     United States v. Miller, 307 U.S. 174 (1939)
    B.     Lewis v. United States, 445 U.S. 55, 65 (1980)
    C.     Casey v. Planned Parenthood, 505 U.S. 833, 848 (1992) (dictum)
    D.     List of Cases Mentioning the Second Amendment
VII.       Relevant Statutes
    A.     Militia Act of 1792
    B.     The currently effective Militia Act

Dear Mr. Chairman and Members of the Committee:

Eight years ago, I got into an argument with a nonlawyer acquaintance about the Second Amendment.  The Amendment, this person fervently announced, clearly protects an individual right.  Not so, I argued to him, thinking him to be something of a blowhard and even a bit of a kook.

Three years ago, I discovered, to my surprise and mild chagrin, that this supposed kook was entirely right.  In preparing to teach a law school seminar on firearms regulation (one of the only about half a dozen such classes that I know of at U.S. law schools), I found that the historical evidence -- much of which I set forth verbatim in the Appendix -- overwhelmingly points to one and only one conclusion:  The Second Amendment does indeed secure an individual right to keep and bear arms.

1. **The Text of the Amendment Refers to an Individual Right**

    The Second Amendment, like the First, Fourth, and Ninth Amendments, refers to a "right of the people," not a right of the states or a right of the National Guard. The First Amendment guarantees the people's right to assemble; the Fourth Amendment protects the people's right to be free from unreasonable searches and seizures; the Ninth Amendment refers to the people's unenumerated rights. [1] These rights are clearly individual -- they protect "the right of the people" by protecting the right of each person. This strongly suggests that the similarly-worded Second Amendment likewise secures an individual right.

    What about the seemingly odd two-clause construction, which some commentators have called "unusual," "special," and "nearly unique"? [2] It turns out that there's nothing odd about it at all. During the Framing Era, dozens of individual rights provisions in state constitutions were structured the same way, providing a justification clause explaining the right, and then an operative clause securing the right. The 1842 Rhode Island Constitution's Free Press Clause, for instance, reads

> The liberty of the press being essential to the security of freedom in a state, any person may publish his sentiments of any subject, being responsible for the abuse of that liberty . . . . [3]

Just as with the Second Amendment, the second clause secures a right, while the first justifies it to the public.

    And the two clauses of the Amendment are entirely consistent. The second clause guarantees a "right of the people," which is the right of each individual. The first clause explains that this right helps further a "well-regulated militia," a legal term of art that means "the body of the people capable of bearing arms" (here I quote from the New York Ratifying Convention's proposal that eventually became the Second Amendment [4]) -- the entire armed citizenry, not some small National Guard-type unit. The current Militia Act, enacted in 1956 and derived from the original 1792 Militia Act, defines the "militia" as including all able-bodied male citizens from 17 to 45; [5] given the Court's sex equality jurisprudence, I feel comfortable saying that every able-bodied citizen from age 17 to 45, male or female, is a member of the militia. This is quite consistent with the second clause's securing an individual right to every person.

2. **Contemporaneous Constitutions and Commentaries Unanimously Treat the Right as an Individual Right**

    Contemporaneous evidence from the late 1700s and 1800s unanimously supports the individual rights reading of the text. It's widely agreed that the Second Amendment right to keep and bear arms was an expanded version of a similar right in the 1688 English Bill of Rights. England, of course, didn't have states, so the English right couldn't have been a states' right; Sir William Blackstone, whose 1765 Commentaries were tremendously influential in Revolutionary Era America, described the right as a "right of the subject," an obviously individual rights characterization. [6]

    Many early state Bills of Rights also protected the right to keep and bear arms; since these rights were protections *against* state governments, they surely must have protected individuals, not the states themselves. And many of the constitutions made this quite explicit. The 1790 Pennsylvania and the 1792 Kentucky Constitutions described the right as "the right of the citizens"; the 1796 Tennessee Constitution spoke of "the right of the freemen"; the 1817 Mississippi, 1818 Connecticut,

1819 Maine, and 1819 Alabama Constitution specifically referred to the right of "every citizen." The 1776 Pennsylvania, 1777 Vermont, 1802 Ohio, 1816 Indiana, and 1820 Missouri Constitutions spoke of "the people['s] right to bear arms for the defence of themselves," referring to the people individually ("themselves") rather than collectively ("itself"). 7  Throughout the 1800s, these unambiguously individual rights were seen as directly analogous to the Second Amendment. 8

The same goes for all the notable constitutional commentators of the 1800s. St. George Tucker (1803) treated the Second Amendment right as equivalent to Blackstone's "right of the subject"; 9 William Rawle (1829) did likewise. 10  Justice Joseph Story (1833 and 1840) called it a "right of the citizens." 11  Thomas Cooley (1880 and 1898) took exactly the same individual right view; 12 so did the 1866 Freedmen's Bureau Act, which specifically secured to "all the citizens" "the constitutional right to bear arms" as part of their "personal liberty." 13  A recent exhaustive study reveals that there was exactly *one* statement in the 1800s cases or commentaries supporting the collective rights view, a concurring opinion in an 1842 Arkansas state court case. 14

3.       **The U.S. Supreme Court Cases Do Not Treat the Right as a Collective Right**

The U.S. Supreme Court has said little about the Second Amendment, but it has certainly not said that the Amendment secures only a collective right.

Throughout the Court's history, the Justices have mentioned the Second Amendment, usually in passing, in 27 opinions. In 22 of these 27, the Justices quoted or paraphrased only "the right of the people to keep and bear arms" language, without even mentioning the Militia Clause. 15

One of the remaining five cases -- and the only extended 20th-century discussion of the right -- is *United States v. Miller* (1939), which held that the right extended only to weapons that were rationally related to the preservation of the militia. 16  But the Court emphatically did *not* hold that the right belonged only to the state or the National Guard. Rather, it reaffirmed that the "militia" referred to the entire armed citizenry, and considered on the merits a lawsuit that was brought by an individual (Miller), not by a state.

The only Supreme Court case that leans in the collective rights direction is *Lewis v. United States* (1980), which summarily rejected an ex-felon's claim of a right to possess a firearm, in passing citing some lower court cases that took a collective rights view. 17  But *Lewis* could equally well be explained as concluding only that *ex-felons* don't have a right to keep and bear arms (something that's also been held in the many states whose constitutions unambiguously guarantee an individual right to keep and bear arms). In any event, if one relies on passing mentions, *Casey v. Planned Parenthood* (1992) (quoting Justice Harlan) in passing described liberty as including "[freedom from] the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on" -- a description that treats the right to keep and bear arms as an individual right on par with the other individual rights. 18

Despite all the above evidence, the federal courts of appeal have unanimously subscribed to the states' right approach, though there are a few recent hints to the contrary in some opinions. 19  If the historical or textual evidence were in equipoise, and if the cases dealt carefully with the evidence and explained why the pro-states'-right evidence was more persuasive than the pro-individual-right evidence, then perhaps we might defer to these courts' views. But when the lower courts' decisions are contrary to the unanimous weight of the evidence, and do not really confront this evidence but rely

almost entirely on bald assertions or on citations to other lower court decisions, it seems to me that we must respectfully say that the lower courts are mistaken.

### 4. The Precise Scope of the Right Is a Matter of Considerable Debate

While the evidence that the right is an individual right is extremely strong, the precise scope of the right is a matter of considerable debate. This of course is true of all individual rights: Everyone agrees that the First Amendment, the Fourth Amendment, and other provisions secure individual rights, but reasonable minds differ on exactly what speech the First Amendment protects and exactly what searches the Fourth Amendment prohibits.

Thus, recognizing that the Second Amendment secures an individual right tells us little about most moderate gun controls, for instance background checks, waiting periods, or modest restrictions on the kinds of brands that may be marketed. I don't know how these laws should be treated; I suspect that many would be upheld, like many modest speech restrictions are upheld despite the existence of the First Amendment.

But our concern about these problems can't blind us to the clear verdict of the constitutional text and the constitutional history: The Framers of the Bill of Rights (and of the Fourteenth Amendment [20]) saw the right to keep and bear arms as an individual right, entitled to the same sort of dignity and protection as the freedom of speech, the privacy of the home, the right to trial by jury, and our other constitutionally secured protections.

As the Court said when defending another often unpopular right -- the privilege against self-incrimination --

> If it be thought that [a right] is outmoded in the conditions of this modern age, then the thing to do is to take it out of the Constitution [by constitutional amendment], not to whittle it down by the subtle encroachments of judicial opinion. [21]

Constitutional rights may be respected, repealed, or modified; but they must never be ignored.

---

## Appendix: Original Sources Relevant to the Second Amendment

## I.   Text of the Amendment and Related Contemporaneous Provisions

(I include here all the state rights to keep and bear arms enacted in 1820 or before, plus the provision from the first [1842] Constitution of Rhode Island, the last of the original states to set up a constitution.)

*Second Amendment:*  A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

*English Bill of Rights:*  That the subjects which are protestants may have arms for their defence suitable to their conditions and as allowed by law (1689). [22]

*Alabama:*  That every citizen has a right to bear arms in defence of himself and the state (1817). 23

*Connecticut:*  Every citizen has a right to bear arms in defense of himself and the state (1818). 24

*Indiana:* That the people have a right to bear arms for the defense of themselves and the State, and that the military shall be kept in strict subordination to the civil power (1816). 25

*Kentucky:*  [T]he right of the citizens to bear arms in defense of themselves and the State shall not be questioned (1792). 26

*Maine:* Every citizen has a right to keep and bear arms for the common defence; and this right shall never be questioned (1819). 27

*Massachusetts:*  The people have a right to keep and to bear arms for the common defence (1780). 28

*Mississippi:* Every citizen has a right to bear arms, in defence of himself and the State (1817). 29

*Missouri:* That the people have the right peaceably to assemble for their common good, and to apply to those vested with the powers of government for redress of grievances by petition or remonstrance; and that their right to bear arms in defence of themselves and of the State cannot be questioned (1820). 30

*North Carolina:*  [T]he people have a right to bear arms, for the defence of the State; and, as standing armies, in time of peace, are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power (1776). 31

*Ohio:*  That the people have a right to bear arms for the defence of themselves and the State; and as standing armies, in time of peace, are dangerous to liberty, they shall not be kept up, and that the military shall be kept under strict subordination to the civil power (1802). 32

*Pennsylvania:*  That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination, to, and governed by, the civil power (1776). 33

The right of the citizens to bear arms in defence of themselves and the State shall not be questioned (1790). 34

*Rhode Island:*  The right of the people to keep and bear arms shall not be infringed (1842). 35

*Tennessee:*  [T]he freemen of this State have a right to keep and bear arms for their common defence (1796). 36

*Vermont:*  [T]he people have a right to bear arms for the defence of themselves and the State -- and as standing armies in time of peace are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to and governed by the civil power (1777). 37

*Virginia:*  That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state; that standing armies, in time of peace, should be avoided as dangerous to liberty; and that in all cases the military should be under strict subordination to, and governed by, the civil power (1776). 38  [The Virginia Constitution didn't mention a right to keep and bear arms until 1971.]

## II.        Calls for the Right to Keep and Bear Arms from State Ratification Conventions

39

Five of the states that ratified the Constitution also sent demands for a Bill of Rights to Congress.  All these demands included a right to keep and bear arms.  Here, in relevant part, is their text:

*New Hampshire:*  Twelfth[:] Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion.

*Virginia:*  . . .  Seventeenth, That the people have a right to keep and bear arms; that a well regulated Militia composed of the body of the people trained to arms is the proper, natural and safe defence of a free State.  That standing armies in time of peace are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the Community will admit; and that in all cases the military should be under strict subordination to and governed by the Civil power.

*New York:*  . . .  That the People have a right to keep and bear Arms; that a well regulated Militia, including the body of the People capable of bearing Arms, is the proper, natural and safe defence of a free State; That the Militia should not be subject to Martial Law except in time of War, Rebellion or Insurrection.  That Standing Armies in time of Peace are dangerous to Liberty, and ought not to be kept up, excess in Cases of necessity; and that at all times, the Military should be under strict Subordination to the civil Power.

*North Carolina:*  Almost identical to Virginia demand, but with "the body of the people, trained to arms" instead of "the body of the people trained to arms."

*Rhode Island:*  Almost identical to Virginia demand, but with "the body of the people capable of bearing arms" instead of "the body of the people trained to arms," and with a "militia shall not be subject to martial law" proviso as in New York.

## III.        "The Right of the People" in Other Bill of Rights Provisions

*First Amendment:*  Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

*Fourth Amendment:*  The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .

*Ninth Amendment:*  The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people.

*Tenth Amendment:*  [Speaking of "the powers . . . of the people" rather than "the right . . . of the people"] The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

## IV.	Some Other Contemporaneous Constitutional Provisions With a Similar Grammatical Structure

40

*Rhode Island Free Press Clause:*  The liberty of the press being essential to the security of freedom in a state, any person may publish sentiments on any subject, being responsible for the abuse of that liberty . . . . 41

*Massachusetts Free Press Clause:*  The liberty of the press is essential to the security of freedom in a state it ought not, therefore, to be restricted in this commonwealth. 42

*Massachusetts Speech and Debate Clause:*  The freedom of deliberation, speech and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation of prosecution, action or complaint, in any other court or place whatsoever. 43

*New Hampshire Venue Clause:*  In criminal prosecutions, the trial of the facts in the vicinity where they happen is so essential to the security of the life, liberty, and estate of the citizen, that no crime or offence ought to be tried in any other county than that in which it is committed . . . . 44

## V.	18th- and 19th-Century Commentary

### A.	*William Blackstone, Commentaries on the Laws of England (1765)* 45

In the three preceding articles we have taken a short view of the principal absolute rights [personal security, personal liberty, private property] which appertain to every Englishman.  But in vain would these rights be declared, ascertained, and protected by the dead letter of the laws, if the constitution had provided no other method to secure their actual enjoyment.  It has therefore established certain other auxiliary subordinate rights of the subject, which serve principally as outworks or barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property.

1. The constitution, powers, and privileges of parliament . . . .

2. The limitation of the king's prerogative . . . .

3. . . . [A]pplying to the courts of justice for redress of injuries.

4. . . . [T]he right of petitioning the king, or either house of parliament, for the redress of grievances.

5. The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence, suitable to their condition and degree, and such as are allowed by law.  Which is also declared by the same statute . . . and is indeed a public allowance, under due

restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression.

. . . [T]o vindicate [the three primary rights], when actually violated or attacked, the subjects of England are entitled, in the first place, to the regular administration and free course of justice in the courts of law; next, to the right of petitioning the king and parliament for redress of grievances; and, lastly, to the right of having and using arms for self-preservation and defence.

**B.      St. George Tucker, Blackstone's Commentaries (1803)**

46

[Annotation to Blackstone's discussion of the right to have arms as the fifth and last auxiliary right:]

The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence [fn40] suitable to their condition and degree, and such as are allowed by law. [fn41]

[fn40] The right of the people to keep and bear arms shall not be infringed, and this without any qualification as to their condition or degree, as is the case in the British government.

[fn41] Whoever examines the forest, and game laws in the British code, will readily perceive that the right of keeping arms is effectually taken away from the people of England.  The commentator himself informs us, "that the prevention of popular insurrections and resistence [*sic*] to government by disarming the bulk of the people, is a reason oftener meant than avowed by the makers of the forest and game laws."

[A separate discussion in an Appendix, specifically about the Second Amendment.]

A well regulated militia being necessary to the security of a free state, the right of the people to keep, and bear arms, shall not be infringed.

This may be considered as the true palladium of liberty . . . .  The right of self defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible.  Wherever standing armies are kept up, and the right of the people to keep and bear arms, is under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.

In England, the people have been disarmed, generally, under the specious pretext of preserving the game: a never failing lure to bring over the landed aristocracy to support any measure, under that mask, though calculated for very different purposes.  True it is, their bill of rights seems at first view to counteract this policy: but the right of bearing arms is confined to protestants, and the words suitable to their condition and degree, have been interpreted to authorise the prohibition of keeping a gun or other engine for the destruction of game, to any farmer, or inferior tradesman, or other person not qualified to kill game.  So that not one man in five hundred can keep a gun in his house without being subject to a penalty.  [Editorial note:  I understand that this last sentence is considered by some historians to be an exaggeration. 47]

C.	Joseph Story, Familiar Exposition of the Constitution of the United States (1840)

48

The next amendment is, "A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."  One of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms, and by substituting a regular army in the stead of a resort to the militia.  The friends of a free government cannot be too watchful, to overcome the dangerous tendency of the public mind to sacrifice, for the sake of mere private convenience, this powerful check upon the designs of ambitious men.

The importance of this article will scarcely be doubted by any persons, who have duly reflected upon the subject.  The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rulers.  It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses, with which they are attended, and the facile means, which they afford to ambitious and unprincipled rulers, to subvert the government, or trample upon the rights of the people.  The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.  And yet, though this truth would seem so clear, and the importance of a well regulated militia would seem so undeniable, it cannot be disguised, that among the American people there is a growing indifference to any system of militia discipline, and a strong disposition, from a sense of its burthens, to be rid of all regulations.  How it is practicable to keep the people duly armed without some organization, it is difficult to see.  There is certainly no small danger, that indifference may lead to disgust, and disgust to contempt; and thus gradually undermine all the protection intended by this clause of our National Bill of Rights.

D.	Thomas Cooley, Principles of Constitutional Law (1898)

49

Section IV. -- The Right to Keep and Bear Arms.

*The Constitution.* -- By the Second Amendment to the Constitution it is declared that "a well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."

The amendment, like most other provisions in the Constitution, has a history.  It was adopted with some modification and enlargement from the English Bill of Rights of 1688, where it stood as a protest against arbitrary action of the overturned dynasty in disarming the people, and as a pledge of the new rulers that this tyrannical action should cease.  The right declared was meant to be a strong moral check against the usurpation and arbitrary power of rulers, and as a necessary and efficient means of regaining rights when temporarily overturned by usurpation.

*The Right is General.* -- It may be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent.  The militia, as has been elsewhere explained, consists of those persons who,

under the law, are liable to the performance of military duty, and are officered and enrolled for service when called upon.  But the law may make provision for the enrolment of all who are fit to perform military duty, or of a small number only, or it may wholly omit to make any provision at all; and if the right were limited to those enrolled, the purpose of this guaranty might be defeated altogether by the action or neglect to act of the government it was meant to hold in check.  The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms, and they need no permission or regulation of law for the purpose.  But this enables the government to have a well regulated militia; for to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order.

*Standing Army.* -- A further purpose of this amendment is, to preclude any necessity or reasonable excuse for keeping up a standing army.  A standing army is condemned by the traditions and sentiments of the people, as being as dangerous to the liberties of the people as the general preparation of the people for the defence of their institutions with arms is preservative of them.

*What Arms may be kept.* -- The arms intended by the Constitution are such as are suitable for the general defence of the community against invasion or oppression, and the secret carrying of those suited merely to deadly individual encounters may be prohibited.

## VI.     Selected Supreme Court Cases

### A.     *United States v. Miller, 307 U.S. 174 (1939)*

[This is the only extensive modern discussion of the Amendment.]

An indictment in the District Court Western District Arkansas, charged that Jack Miller and Frank Layton "did unlawfully, knowingly, wilfully, and feloniously transport in interstate commerce from the town of Claremore in the State of Oklahoma to the town of Siloam Springs in the State of Arkansas a certain firearm, to-wit, a double barrel 12-gauge Stevens shotgun having a barrel less than 18 inches in length [contrary to the National Firearms Act] . . . ."

A duly interposed demurrer alleged:  The National Firearms Act is not a revenue measure but an attempt to usurp police power reserved to the States, and is therefore unconstitutional.  Also, it offends the inhibition of the Second Amendment to the Constitution -- "A well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed."  The District Court held that section eleven of the Act violates the Second Amendment.  It accordingly sustained the demurrer and quashed the indictment.

. . .

In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.  Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.  Aymette v. State, 2 Humphreys (Tenn.) 154, 158.

The Constitution as originally adopted granted to the Congress power -- "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."  With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made.  It must be interpreted and applied with that end in view.

The Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress.  The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia -- civilians primarily, soldiers on occasion.

The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators.  These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense.  "A body of citizens enrolled for military discipline."  And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.  [Citing further sources, e.g., the Virginia Act of October 1785 providing for a Militia of "all free male persons between the ages of eighteen and fifty years," with certain exceptions.]

Most if not all of the States have adopted provisions touching the right to keep and bear arms. Differences in the language employed in these have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed.  But none of them seem to afford any material support for the challenged ruling of the court below.

**B.**      **Lewis v. United States, 445 U.S. 55, 65 (1980)**

[Lewis was convicted of being a felon in possession of a firearm, and challenged the conviction on various statutory grounds, on the ground that his prior felony conviction was uncounseled and therefore shouldn't be considered, and on constitutional grounds.  The Court held:]

The firearm regulatory scheme at issue here is consonant with the concept of equal protection embodied in the Due Process Clause of the Fifth Amendment if there is "some þrational basis' for the statutory distinctions made . . . or . . .  they þhave some relevance to the purpose for which the classification is made." [fn1]

Section 1202(a)(1) clearly meets that test. . . .

[fn1] These legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties.  See United States v. Miller, 307 U.S. 174, 178, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939) (the Second Amendment guarantees no right to keep and bear a firearm that does not have "some reasonable relationship to the preservation or efficiency of a well regulated militia"); United States v. Three Winchester 30-30 Caliber Lever Action Carbines, 504 F.2d 1288, 1290, n. 5 (CA7 1974); United States v. Johnson, 497 F.2d 548 (CA4 1974); Cody v. United States, 460 F.2d 34 (CA8), cert. denied, 409 U.S. 1010, 93 S.Ct. 454, 34 L.Ed.2d 303 (1972) (the latter three cases holding, respectively, that § 1202(a)(1), § 922(g), and § 922(a)(6) do not violate the Second Amendment).

C.        **Casey v. Planned Parenthood, 505 U.S. 833, 848 (1992) (dictum)**

Neither the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the outer limits of the substantive sphere of liberty which the Fourteenth Amendment protects.  See U.S. Const., Amdt. 9.  As the second Justice Harlan recognized:  "[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution.  This þliberty´ is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on.  It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment."  *Poe v. Ullman,* [367 U.S. 497, 543 (1961)] (opinion dissenting from dismissal on jurisdictional grounds).

D.        **List of Cases Mentioning the Second Amendment**

U.S. Supreme Court cases that refer to the right to keep and bear arms and also quote the militia clause:

1.        Houston v. Moore, 18 U.S. 1 (1820).
2.        United States v. Miller, 307 U.S. 174 (1939).
3.        Adams v. Williams, 407 U.S. 143, 149-51 (1972) (Justice Douglas's dissent).
4.        Lewis v. United States, 445 U.S. 55, 65 (1980).
5.        Printz v. United States, 117 S. Ct. 2365, 2385-86 (1997) (Justice Thomas's concurrence).

U.S. Supreme Court cases that refer to the right to keep and bear arms without even mentioning the militia clause:

1.        Dred Scott v. Sandford, 60 U.S. 393, 416-17, 449-51 (1857).
2.        United States v. Cruikshank, 92 U.S. 542, 551 (1876).
3.        Presser v. Illinois, 116 U.S. 252, 264-66 (1886).
4.        Logan v. United States, 144 U.S. 263, 286-87 (1892).
5.        Miller v. Texas, 153 U.S. 535, 538-39 (1894).
6.        Brown v. Walker, 161 U.S. 591, 635 (1896) (Justice Field's dissent).
7.        Robertson v. Baldwin, 165 U.S. 275, 280 (1897).
8.        Maxwell v. Dow, 176 U.S. 581, 597 (1900).
9.        Kepner v. United States, 195 U.S. 100, 123-24 (1904).
10.        Trono v. United States, 199 U.S. 521, 528 (1905).
11.        Twining v. New Jersey, 211 U.S. 78, 98 (1908).
12.        Adamson v. California, 332 U.S. 46, 78 (1947) (Justice Black's dissent).
13.        Johnson v. Eisentrager, 339 U.S. 763, 784 (1950).
14.        Knapp v. Schweitzer, 357 U.S. 371, 378 n.5 (1958).
15.        Konigsberg v. State Bar, 366 U.S. 36, 49 & n.10 (1961).
16.        Poe v. Ullman, 367 U.S. 497, 543 (1961) (Justice Harlan's dissent).
17.        Roe v. Wade, 410 U.S. 113, 169 (1973) (Justice Stewart's concurrence) (quoting Justice Harlan's dissent in *Poe v. Ullman*).
18.        Moore v. City of East Cleveland, 431 U.S. 494, 502 (1977) (plurality opinion) (quoting Justice Harlan's dissent in *Poe v. Ullman*).

19.	United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990).
20.	Casey v. Planned Parenthood, 505 U.S. 833, 848 (1992) (quoting Justice Harlan's dissent in *Poe v. Ullman*).
21.	Albright v. Oliver, 510 U.S. 266, 306-07 (1994) (Justice Stevens's dissent) (quoting Justice Harlan's dissent in *Poe v. Ullman*).
22.	Muscarello v. United States, 118 S. Ct. 1911, 1921 (1998) (Justice Ginsburg's dissent).

# VII.    Relevant Statutes

### A.    *Militia Act of 1792*

Sec. 1.  *Be it enacted* . . . .  That each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia . . . .  That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder. . . .

Sec. 2.  [Exempting the Vice President, federal judicial and executive officers, congressmen and congressional officers, custom-house officers and clerks, post-officers and postal stage drivers, ferrymen on post roads, export inspectors, pilots, merchant mariners, and people exempted under the laws of their states.] 50

### B.    The currently effective Militia Act

 (a)  The militia of the United States consists of all able-bodied males at least 17 years of age and . . . under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.

(b) The classes of the militia are --

(1) the organized militia, which consists of the National Guard and the Naval Militia; and

 (2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia. 51

---

1.    See Appendix, Part III.

2.    *See, e.g.,* Geoffrey R. Stone, Louis M. Seidman, Cass R. Sunstein & Mark V. Tushnet, Constitutional Law Supp. 53-54 (3rd ed., Supp. 1997) (describing it as "unusual"); L. Tribe, American Constitutional Law 299 n.6 (2nd ed. 1988) (describing it as "nearly unique"); Sanford Levinson, *The Embarrassing Second Amendment,* 99 Yale L.J. 637, 644 (1989) (describing it as "special," though concluding that it secures an individual right).

3. I give some more examples in the Appendix, Part IV; Eugene Volokh, *The Commonplace Second Amendment,* 73 NYU L. Rev. 793, 814-21 (1998) (collecting examples).

4. The various states' proposals are set forth in the Appendix, Part II.

5. Both Acts are set forth in the Appendix, Part VII.

6. Quoted extensively in the Appendix, Part V.A.

7. All these provisions are set forth in full in the Appendix, Part I.

8. *See, e.g.,* David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment,* 101 Yale L.J. 551, 590 (1991) ("the Second Amendment was copied from right to arms provisions in state constitutions, and the debates at the time reveal no suggestion that the scope of the right changed when adopted into the federal Bill of Rights"; Professor Williams says this even though he believes the Second Amendment does *not* secure an individual right).

9. Quoted extensively in the Appendix, Part V.B.

10. *See infra* William Rawle, A View of the Constitution of the United States of America 126 (1829).

11. Quoted extensively in the Appendix, Part V.C.

12. Quoted extensively in the Appendix, Part V.D.

13. Freedmen's Bureau Act, ch. 200, 14 Stat. 173, sec. 14 (1866) (re-enacting and extending Act of Mar. 3, 1865, ch. 90, 13 Stat. 507) ("the full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens of such state or district without respect to race or color, or previous condition of slavery.").

14. David B. Kopel, *The Second Amendment in the Nineteenth Century,* 1998 BYU L. Rev. (forthcoming).  The lone case was State v. Buzzard, 4 Ark. 18 (1842).

15. I give a comprehensive list in the Appendix, Part VI.D.

16. Quoted extensively in the Appendix, Part VI.A.

17. Quoted extensively in the Appendix, Part VI.B.

18. Quoted extensively in the Appendix, Part VI.C.

19. *See, e.g,* Fraternal Order of Police v. United States, 1998 WL 543822, *3 (Aug. 28) (acknowledging the debate but concluding that it needs not be resolved in the particular case); Runnebaum v. Nationsbank of Maryland, 123 F.3d 156, 171 (4th Cir. 1997) (en banc) (dictum) ("individuals have the constitutional right to peaceably assemble, see U.S. Const. amend. I; and to 'keep and bear Arms,´ U.S. Const. amend. II").

20. *See generally* Stephen Halbrook, *Personal Security, Personal Liberty, And "The Constitutional Right To Bear Arms": Visions Of The Framers Of The Fourteenth Amendment,* 5 Seton Hall Const. L.J. 431 (1995).

21. Ullmann v. United States, 350 U.S. 422, 427-28 (1956) (Frankfurter, J.).

22. 1 Wm. & Mary sess. 2, ch. 2 (1689).

23. Ala. Const. art. I, § 23 (1819).

24. Ct. Const. art. I, § 17 (1818).  Connecticut had no Constitution until 1818.

25. Ind. Const. art. I, § 20 (1817).

26. Ky. Const. art. XII, § 23 (1792).

27. Maine Const. art. I, § 16 (1819).

28. Mass. Const. pt. 1, art. 17 (1780).

29. Miss. Const. art. I, § 23 (1817).

30. Missouri Const. art. XIII, § 3 (1820).

31. N.C. Const. Bill of Rights, § XVII (1776).

32. Ohio Const. art. VIII, § 20 (1802).

33. Penn. Const. Declaration of Rights, cl. XIII (1776).

34. Penn. Const. art. IX, § 21 (1790).

35. R.I. Const. art. I, § 22 (1842).  Rhode Island had no Constitution until 1842.

36. Tenn. Const. art. XI, § 26 (1796).

37. Vt. Const. ch. I, art. 16 (1777).

38. Va. Const. art. I, § 13 (1776).

39. *See* The Complete Bill of Rights 181-83 (Neil H. Cogan ed. 1997).

40. *See generally* Eugene Volokh, *The Commonplace Second Amendment,* 73 NYU L. Rev. 793 (1998) (giving more such provisions, and discussing them in more detail).

41. R.I. Const. art. I, § 20 (1842).

42. Mass. Const. pt. I, art. XVI (1780); *see also* N.H. Const. pt. I, art. XXII (1784) ("The Liberty of the Press is essential to the security of freedom in a state; it ought, therefore, to be inviolably preserved").

43. Mass. Const. pt. I, art. XXI (1780); *see also* N.H. Const. pt. I, art. XXX (1784) (same); Vt. Const. chap. I, art. XVI (1786) (same, but with "either house of" omitted).

44. N.H. Const. pt. I, art. XVII (1784).

45. William Blackstone was the leading British legal commentator of the 1700s, and was widely read in the Colonies; he was writing about the more limited right found in the English Bill of Rights.

46. St. George Tucker's Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia (1803), contained the earliest prominent commentary on the U.S. Constitution.  Tucker taught law at the University of William and Mary, and was a Virginia state judge.  This material is from p. 143 of book 1 and p. 300 of the Appendix.

47. *See, e.g.,* Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 122-34 (1994).

48. U.S. Supreme Court Justice Joseph Story was, of course, the leading constitutional commentator of the early 1800s.

49. Michigan Supreme Court Justice Thomas Cooley was probably the leading constitutional commentator of the late 1800s.

50. 2nd Cong. sess. I, ch. 33 (1792).

51. 10 U.S.C. § 311 (enacted 1956, amended 1958).

☐