**EXHIBIT   7**

# ESSAY

## THE SECOND AMENDMENT AND THE PERSONAL RIGHT TO ARMS

WILLIAM VAN ALSTYNE†

### INTRODUCTION

Perhaps no provision in the Constitution causes one to stumble quite so much on a first reading, or second, or third reading, as the short provision in the Second Amendment of the Bill of Rights. No doubt this stumbling occurs because, despite the brevity of this amendment, as one reads, there is an apparent non sequitur—or disconnection of a sort—in midsentence. The amendment opens with a recitation about a need for "[a] well regulated Militia."[1] But having stipulated to the need for "[a] well regulated Militia," the amendment then declares that the right secured by the amendment—the described right that is to be free of "infringement"—is not (or not just) the right of a state, or of the United States, to provide a well regulated militia. Rather, it is "the right of the people to keep and bear Arms."

**A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall uot be infriuged.**[2]

---

† William R. and Thomas L. Perkins Professor of Law, Duke University School of Law.

1. The subject is that of "*A* well regulated Militia"—a militia the amendment declares to be "necessary to the security of a free State." U.S. CONST. amend. II. But it is hard to say on first reading whether the reference is to a well-regulated *national* militia or, instead, to a well-regulated *state* militia (i.e., a militia *in each state*). Perhaps, however, the reference is to both at once—a militia in each state, originally constituted under each state's authority, but subject to congressional authority to arm, to organize, and to make provision to call into national service, as a national militia. The possibility that this may be so tends to send one looking for other provisions in the Constitution that may help to clear this matter away. And a short search readily turns up several such provisions: Article I, section 8, clauses 15 and 16, and Article II, section 2, clause 1. *See infra* note 16.

2. U.S. CONST. amend. II.

1236

Case 2:19-cv-00617-KJM-AC Document 48-17 Filed 07/14/21   Page 3 of 21

The postulation of a "right of the people to keep and bear Arms" would make sense standing alone, however, even if it necessarily left some questions still to be settled.[3] It would make sense in just the same unforced way we understand even upon a first reading of the neighboring clause in the Bill of Rights, which uses the exact same phrase in describing something as "the right of the people" that "shall not be violated" (or "infringed"). Just as the Second Amendment declares that "the right of the people to keep and bear Arms[] shall not be infringed," so, too, the Fourth Amendment declares:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .[4]

Here, in the familiar setting of the Fourth Amendment, we are not at all confused in our take on the meaning of the amendment; it secures to each of us personally (as well as to all of us collectively) a certain right—even if we are also uncertain of its scope.[5] Nor are we confused in turning to other clauses. For example, the Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . .[6]

And so, too, the Seventh Amendment provides:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . .[7]

That each of these rights—that all of these rights—are examples of personal rights protected by the Bill of Rights seems perfectly clear. And, were it not for the opening clause in the Second Amendment, though there would still be much to thrash out, it is

---

3. For example, one might well still be uncertain of the breadth of the right to keep and bear arms (e.g., just what *kinds* of "Arms"?).

4. U.S. CONST. amend. IV.

5. For example, does the protection of "houses" and "effects" from unreasonable searches and seizures extend to trash one may have put outside in a garbage can? May it matter whether one has put the can itself outside one's garage or farther out, beside the street? *See* California v. Greenwood, 486 U.S. 35, 37 (1988).

6. U.S. CONST. amend. VI.

7. *Id.* amend. VII.

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 4 of 21

altogether likely the Second Amendment would be taken in the same way.

To be sure, as we have already once noted, were the Second Amendment taken in just this way, the scope of the right that *is* protected (namely, the right to keep and bear arms) would still remain to be defined.[8] But by itself, that sort of definitional determination would be of no unusual difficulty. For so much is true with respect to every right secured from government infringement, whether it be each person's freedom of speech (that freedom is not unbounded, either) or any other right specifically protected from infringement elsewhere in the Bill of Rights.[9] And in addressing this type of (merely general) problem, neither has the Supreme Court nor have other courts found it intractable and certainly none of these other clauses have been disparaged, much less have they been ignored. To the contrary, with respect to each,

---

8. For example, with respect to the kind of "Arms" one may have. Perhaps these include all arms as may be useful (though not exclusively so) as an incident of service in a militia—and indeed, this would make sense of the introductory portion of the amendment as well. *See* United States v. Miller, 307 U.S. 174, 178 (1939).

9. So, for example, though the Sixth Amendment provides a right to a "*speedy*" and "*public*" trial whenever one is accused of a (federal) crime, the amendment does not declare just *how* "speedy" the trial must be (i.e., exactly how soon following indictment the trial must be held) nor *how* "public" either (e.g., must it be televised to the world, or is an open courtroom, albeit with very limited seating, quite enough?). And the Fourth Amendment does not say there can be *no* searches and seizures—rather, only no "unreasonable" searches and seizures. Yet there is a very substantial body of highly developed case law that has given this genuine meaning and effect.

Likewise, when the Sixth and Seventh Amendments speak of the right to trial by "jury," then (even as is true of the Second Amendment in its reference to "Arms"?), though each of these amendments is silent as to what a jury means (a "jury" of how many people? a "jury" selected in what manner and by whom?), the provision means to be—and tends to be—given some real, some substantial, and some constitutionally significant effect. The point is, of course, that though there are questions of this sort with respect to *every* right furnished by the Bill of Rights, the expectation remains high that the right thus furnished will neither be ignored—treated as though it were not a right at all—nor so cynically misdefined or "qualified" in its ultimate description as to be reduced to an empty shell. It is only in the case of the Second Amendment that this is approximately the current state of the law. Indeed, it is only with respect to the Second Amendment that the current state of the law is roughly the same as was the state of the law with respect to the First Amendment's guarantees of freedom of speech and of the press as recently as 1904. As a restraint on the federal government, the First Amendment was deemed to be a restriction merely on certain kinds of prior restraint and hardly at all on what could be forbidden under threat of criminal sanction. *See, e.g.*, Patterson v. Colorado, 205 U.S. 454, 462 (1907). As to the states, the amendment was not known as necessarily furnishing any restraint at all. *See id.*

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 5 of 21

a strong, supportive case law has developed in the courts, albeit case law that has developed gradually, over quite a long time.

In startling contrast, during this same time, however, the Second Amendment has generated almost no useful body of law. Indeed, it is substantially accurate to say that the useful case law of the Second Amendment, even in 1994, is mostly just missing in action. In its place, what we have is roughly of the same scanty and utterly underdeveloped nature[10] as was characteristic of the equally scanty and equally underdeveloped case law (such as it then was) of the First Amendment in 1904, as of which date there was still to issue from the Supreme Court a single decision establishing the First Amendment as an amendment of any genuine importance at all.[11] In short, what was true of the First Amendment as of 1904 remains true of the Second Amendment even now.

The reason for this failure of useful modern case law, moreover, is not that there has been no occasion to develop such law. So much is true only of the Third Amendment.[12] In contrast, it is

---

10. The most one can divine from the Supreme Court's scanty decisions ("scanty" is used advisedly—essentially there are only two) is that such right to keep and bear arms as may be secured by this amendment may extend to such "Arms" as would be serviceable within a militia but not otherwise (so a "sawed-off" shotgun may not qualify, though presumably—by *this* test—heavy duty automatic rifles assuredly would). *See* United States v. Miller, 307 U.S. 174, 178 (1939); *see also* Lewis v. United States, 445 U.S. 55, 65 n.8 (1980) (noting that legislative restrictions on the right of felons to possess firearms do not violate any constitutionally protected liberty); Robertson v. Baldwin, 165 U.S. 275, 282 (1897) (referring to "the right of the people to keep and bear Arms" as a personal right). These casual cases aside ("casual," because in *Miller*, for example, there was not even an appearance entered by the defendant-appellant in the Supreme Court), there are a few 19th-century cases denying any relevance of the Second Amendment to the states; but these decisions, which have never been revisited by the Supreme Court, merely mimicked others of the same era in holding that *none* of the rights or freedoms enumerated in the Bill of Rights were made applicable by the Fourteenth Amendment to the states. *See, e.g.,* Presser v. Illinois, 116 U.S. 252, 265 (1886) (citing United States v. Cruikshank, 92 U.S. 542, 553 (1875)). The shaky foundation of these cases ("shaky" because the effect was to eviscerate the Fourteenth Amendment itself) has long since been recognized—and long since repudiated by the Court in general. Notwithstanding, the lower courts continue ritually to rely upon them, and the Supreme Court quite as regularly declines to find any suitable for review. *See, e.g.,* Quilici v. Village of Morton Grove, 695 F.2d 261, 269–70 (7th Cir. 1982) (holding that municipal handgun restrictions were constitutional), *cert. denied,* 464 U.S. 863 (1983). And why does one suppose that this is so?

11. *See supra* note 9.

12. Troops have not generally been quartered in private homes "in time of peace . . . without the consent of the Owner," nor even "in time of war," U.S. CONST. amend. III, for a very long time, and no Third Amendment case has ever been decided

no more true of the Second Amendment than of the First Amendment or the Fourth Amendment that we have lacked for appropriate occasions to join issue on these questions. The tendency in the twentieth century (though not earlier) of the federal government has been ever increasingly to tax, ever more greatly to regulate, and ever more substantially to prohibit various kinds of personal gun ownership and use.[13] This tendency, that is, is at least as commonplace as it was once equally the heavy tendency to tax, to regulate, and too often also to prohibit, various kinds of speech. The main reason there is such a vacuum of useful Second Amendment understanding, rather, is the arrested jurisprudence of the subject as such, a condition due substantially to the Supreme Court's own inertia—the same inertia that similarly afflicted the First Amendment virtually until the third decade of this twentieth century when Holmes and Brandeis finally were moved personally to take the First Amendment seriously[14] (as previously it scarcely ever was).

With respect to the larger number of state and local regulations (many of these go far beyond the federal regulations), moreover, the case law of the Second Amendment is even more arrested; and this for the reason that the Supreme Court has simply declined to reconsider its otherwise discarded nineteenth-century decisions—decisions holding that the Fourteenth Amendment enacted little protection of anything, and none (i.e., *no* protection) drawn from the Bill of Rights.[15]

---

by the Supreme Court. Evidently, a Third Amendment case has arisen only once in a lower federal court. *See* Engblom v. Carey, 677 F.2d 957 (2d Cir. 1982) (holding that the Third Amendment protects the legitimate privacy interests of striking correction officers in keeping their housing from being used for quartering National Guard troops).

13. For a comprehensive review of congressional action since 1934, see United States v. Lopez, 2 F.3d 1342, 1348–60 (5th Cir. 1993).

14. *See, e.g.,* Whitney v. California, 274 U.S. 357, 372 (1927) (Brandeis and Holmes, JJ., concurring); Gitlow v. New York, 268 U.S. 652, 672 (1925) (Holmes and Brandeis, JJ., dissenting); United States *ex rel.* Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 417 (1921) (Holmes and Brandeis, JJ., dissenting); Abrams v. United States, 250 U.S. 616, 624 (1919) (Holmes and Brandeis, JJ., dissenting). *See generally* SAMUEL J. KONEFSKY, THE LEGACY OF HOLMES AND BRANDEIS 181–256 (1956) (reviewing the Holmes-Brandeis legacy of the First Amendment).

15. *See* Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1873); GERALD GUNTHER, CONSTITUTIONAL LAW 408–10 (12th ed. 1991). The *Slaughter-House Cases* denied that the Privileges and Immunities Clause of the Fourteenth Amendment extended any protection from the Bill of Rights against the states. Within three decades, however, the Court began the piecemeal abandonment of that position (albeit by relying on the Due Process Clause instead). *See* Chicago, B. & Q. R.R. v. Chicago, 166 U.S. 226 (1897) (applying

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 7 of 21

To trust to this arrested treatment of the Second Amendment—and of the Fourteenth Amendment—in 1994, in short, is as though one were inclined so to trust to the arrested treatment of the First Amendment in 1904. The difficulty in such a starting place is perfectly plain. No convincing jurisprudence is itself really possible under such circumstances. In the case of the First Amendment, we know quite well that such a jurisprudence effectively became possible only rather late, in the 1920s (but, one may add, better late than never). In the case of the Second Amendment, in an elementary sense, that jurisprudence is even now not possible until something more in the case law of the Second Amendment begins finally to fall into place. That "something more," I think, requires one to consider what one might be more willing to think about in the following way—that *perhaps the NRA is not wrong, after all, in its general Second Amendment stance*—a stance we turn here briefly to review.

## I

The stance of those inclined to take the Second Amendment seriously reverts to the place we ourselves thought to be somewhat worthwhile to consult—namely, the express provisions of the Second Amendment—and it offers a series of suggestions fitting the respective clauses the amendment contains. Here is how these several propositions run:

1. The reference to a "well regulated *Militia*" is in the first as well as the last instance a reference to the ordinary citizenry. It is not at all a reference to regular armed soldiers as members of

---

the Fifth Amendment prohibition against the taking of private property for public use without just compensation and holding it to be equally a restraint against the states). In 1925, the Court proceeded in like fashion with respect to the Free Speech Clause of the First Amendment, *see Gitlow*, 268 U.S. at 666, and subsequently with respect to most of the rights enumerated in the Bill of Rights (exclusive, however, of the right to keep and bear arms). As already noted, the Court has declined to reexamine its 19th century cases (*Presser* and *Cruikshank*) that merely relied on the *Slaughter-House Cases* for their rationale. *Cf.* discussion *infra* Part IV.

*DUKE LAW JOURNAL*

some standing army.[16] And quite obviously, neither is it a reference merely to the state or to the local police.

2. The very assumption of the clause, moreover, is that ordinary citizens (rather than merely soldiers, or merely the police) *may* themselves possess arms, for it is from these ordinary citizens who as citizens have a right to keep and bear arms (as the second clause provides) that such well regulated militia as a state may provide for, is itself to be drawn.

3. Indeed, it is more than merely an "assumption," however, precisely because "the right of the people to keep and bear Arms" is itself stipulated in the second clause. It is *this* right that is expressly identified as "*the* right" that is not to be ("*shall not be*") infringed. That right is made the express guarantee of the clause.[17] There is thus no room left for a claim that, despite this language, the amendment actually means to reserve to Congress some power to contradict its very terms (e.g., that "the Congress may, if it thinks it proper, forbid the people to keep and bear arms to such extent Congress sees fit to do").[18]

4. Nor is there any basis so to read the Second Amendment as though it said anything like the following: "Congress may, if it thinks it proper, forbid the people to keep and bear arms if, notwithstanding that these restrictions it may thus enact are inconsistent with the right of the people to keep and bear arms, they are not inconsistent with the right of each state to maintain some kind

---

16. Article I vests power in Congress "[t]o raise and support Armies," i.e., to provide for a national standing army as such, *see* U.S. CONST. art. I, § 8, cl. 12. It is pursuant to two different clauses that Congress is given certain powers with respect to the militia, such as the power "for *calling forth the Militia* to execute the Laws of the Union, suppress Insurrections and repel Invasions," *id.* cl. 15 (emphasis added), and the power "[t]o provide for organizing, arming, and disciplining, *the Militia*, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of *training the Militia* according to the discipline prescribed by Congress," *id.* cl. 16 (emphasis added). So, too, the description of the executive power carries over the distinction between the regular armed forces of the United States in a similar fashion. Accordingly, Article II, section 2 provides that "[t]he President shall be Commander in Chief of the Army and Navy of the United States, *and of the Militia* of the several States, when called into the actual Service of the United States." *Id.* art. II, § 2, cl. 1 (emphasis added).

17. And it is from the people, whose right this is, that such militia as the state may (as a free state) compose and regulate, shall be drawn—just as the amendment expressly declares.

18. Compare the utter incongruity of this suggestion with the actual provisions the Second Amendment enacts.

Case 3:19-cv-00617-KJM-AC  Document 48-7  Filed 07/14/21  Page 9 of 21

of militia as it may deem necessary to its security as a free state."[19]

Rather, the Second Amendment adheres to the guarantee of the right of the people to keep and bear arms as the predicate for the other provision to which it speaks, i.e., the provision respecting a militia, as distinct from a standing army separately subject to congressional regulation and control. Specifically, it looks to an ultimate reliance on the common citizen who has a right to keep and bear arms rather than only to some standing army, or only to some other politically separated, defined, and detached armed cadre, as an essential source of security of a free state.[20] In relating these propositions within one amendment, moreover, it does not disparage, much less does it subordinate, "the right of the people to keep and bear arms." To the contrary, it expressly *embraces* that right and indeed it erects the very scaffolding of a free state upon *that* guarantee. *It derives its definition of a well-regulated militia in just this way for a "free State"*: The militia to be well-

---

19. Compare this incompatible language and thought with the actual provisions of the amendment. Were the Second Amendment a mere federalism ("States' rights") provision, as it is not, it would assuredly appear in a place appropriate to that purpose (i.e., not in the same list with the First through the Eighth Amendments, but nearby the Tenth Amendment), and it would doubtless reflect the same federalism style as the Tenth Amendment; for example, it might read: "*Congress shall make no law impairing the right of each state to maintain such well regulated militia as it may deem necessary to its security as a free state.*" But it neither reads in any such fashion nor is it situated even to imply such a thought. Instead, it is cast in terms that track the provisions in the neighboring personal rights clauses of the Bill of Rights. Just as the Fourth Amendment provides that "*[t]he right of the people to be secure in their persons, houses, papers, and effects . . . shall not be violated,*" U.S. CONST. amend. IV (emphasis added), so, too, the Second Amendment matches that language and likewise provides that "*the right of the people to keep and bear Arms, shall not be infringed,*" *id.* amend. II (emphasis added); *see also* United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990) ("The Second Amendment protects 'the right of the people to keep and bear Arms' . . . ."). In further response to the suggestion that the Second Amendment is a mere States' rights clause in analogy with the Tenth Amendment (by, e.g., Keith A. Ehrman & Dennis A. Henigan, *The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?*, 15 U. DAYTON L. REV. 5, 57 (1989)), see STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED: THE EVOLUTION OF A CONSTITUTIONAL RIGHT (1984). As Halbrook notes,

> In recent years it has been suggested that the Second Amendment protects the "collective" right of states to maintain militias, while it does not protect the right of "the people" to keep and bear arms. If anyone entertained this notion in the period during which the Constitution and Bill of Rights were debated and ratified, it remains one of the most closely guarded secrets of the eighteenth century, for *no known writing surviving from the period between 1787 and 1791 states such a thesis.*

*Id.* at 83 (emphasis added).

20. *See supra* note 16 and accompanying text.

Case 2:19-cv-00617-KJM-AC    Document 48-7    Filed 07/14/21    Page 10 of 21

regulated is a militia to be drawn from just such people (i.e., people with a right to keep and bear arms) rather than from some other source (i.e., from people without rights to keep and bear arms).

II

There is, to be sure, in the Second Amendment, an express reference to the security of a *"free* State."[21] It is not a reference to *the* security of THE STATE.[22] There are doubtless certain national constitutions that put a privileged emphasis on the security of "the state," but such as they are, they are all *unlike* our Constitution and the provisions they have respecting their security do not appear in a similarly phrased Bill of Rights. Accordingly, such constitutions make no reference to any right of the people to keep and bear arms, apart from state service.[23] And why do they not do so? Because, in contrast with the premises of constitutional government in this country, they reflect the belief that recognition of any such right "in the people" might well pose a threat to the security of "the state." In the view of these different constitutions, it is commonplace to find that no one within the state other than its own authorized personnel has any right to keep and bear arms[24]—a view emphatically rejected, rather than embraced, however, by the Second Amendment to the Constitution of the United States.

This rather fundamental difference among kinds of government was noted by James Madison in *The Federalist Papers*, even prior to the subsequent assurance expressly furnished by the Sec-

---

21. U.S. CONST. amend. II (emphasis added). In James Madison's original draft of the amendment, moreover, the reference is to "a free country" (and not merely to "a free State"). *See* BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 1026 (1971).

22. Once again, see the amendment. and compare the difference in thought conveyed in these different wordings as they might appear, in contrast, in actual print.

23. *See, e.g.,* XIANFA (1982) [Constitution] art. 55, cl. 2 (P.R.C.), *translated in* THE CONSTITUTION OF THE PEOPLE'S REPUBLIC OF CHINA 41 (1983); *infra* note 44.

24. A position evidently preferred by many today in this country as well, with the apparent approval even of the ACLU. *See* AMERICAN CIVIL LIBERTIES UNION, POLICY GUIDE OF THE AMERICAN CIVIL LIBERTIES UNION 95 (1986) ("Except for lawful police and military purposes, the possession of weapons by individuals is not constitutionally protected."). It is quite beyond the scope of this brief Essay to attempt to account for the ACLU's stance—which may even now be undergoing some disagreement and internal review.

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 11 of 21

ond Amendment in new and concrete terms. Thus, in *The Federalist* No. 46, Madison contrasted the "advantage . . . the Americans possess" (under the proposed constitution) with the circumstances in "several kingdoms of Europe . . . [where] the governments are afraid to trust the people with arms."[25] Here, in contrast, as Madison noted, they were, and no provision was entertained to empower Congress to abridge or to violate that trust, any more than, as Alexander Hamilton noted, there was any power proposed to enable government to abridge the freedom of the press.[26]

To be sure, in the course of the ratification debates, doubts were expressed respecting the adequacy of this kind of assurance (i.e., the assurance that no power was affirmatively proposed for Congress to provide any colorable claim of authority to take away or to abridge these rights of freedom of the press and of the right of the people to keep and bear arms).[27] And the quick resolve to add the Second Amendment, so to confirm that right more expressly, as not subject to infringement by Congress, is not difficult to understand.

The original constitutional provisions regarding the militia[28] placed major new powers in Congress beyond those previously conferred by the Articles of Confederation. These new powers not only included a wholly new power to provide for a regular, standing, national army even in peacetime,[29] but also powers for "calling forth the Militia,"[30] for "*organizing, arming, and disciplining,* the Militia,"[31] and for "governing such Part of them as may be employed in the Service of the United States."[32] Indeed, all that was *expressly* reserved from Congress's reach was "the Appointment of the officers" of this citizen militia, for even "the Authority of training the Militia," though reserved in the first instance from Congress, was itself subordinate to Congress in the

---

25. THE FEDERALIST NO. 46, at 299 (James Madison) (Clinton Rossiter ed., 1961).
26. *Id.* NO. 84 at 513–14 (Alexander Hamilton).
27. *See, e.g.,* Leonard W. Levy, *Bill of Rights (United States), in* 1 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 113, 114–15 (Leonard W. Levy et al. eds., 1986).
28. *See supra* note 16.
29. U.S. CONST. art. I, § 8, cls. 12–13.
30. *Id.* cl. 15.
31. *Id.* cl. 16 (emphasis added).
32. *Id.*

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 12 of 21

important sense that such training was to be "according to the discipline prescribed *by Congress*."[33]

These provisions were at once highly controversial, respecting their scope and possible implications of congressional power. In attempting to counter anti-ratification objections to the proposed constitution—objections that these lodgments of powers would concentrate excessive power in Congress in derogation of the rights of the people—Hamilton and Madison argued essentially three points:[34] (a) the appointment of militia officers was exclusively committed to state hands;[35] (b) the localized civilian-citizen nature of the militia would secure its loyalty to the rights of the people;[36] and (c) the people otherwise possessed a right to keep and bear arms—which right Congress was given no power whatever to regulate or to forbid.[37] And, as to the argument that the plan was defective insofar as it left the protection of the rights of the people insecure because no *express* prohibition on Congress was *separately* provided in respect to those rights (rather, the powerlessness of Congress to infringe them was solely a deduction from the doctrine of enumerated powers alone), Hamilton insisted that to specify anything further—to provide an *express* listing of particular prohibitions on Congress—was not only unnecessary but itself would be deeply problematic, because the implication of such a list would be that anything not named in the list might somehow be thought therefore in fact to be subject to regulation or prohibition by Congress though no enumerated power to affect any such subject was provided by the Constitution itself.[38] In brief, Hamilton maintained that to do anything in the nature of adding a Bill of Rights would cast doubt upon the doctrine of enumerated powers itself.

These several explanations were deemed insufficient, however, and to meet the objections of those in the state ratifying conventions unwilling to leave the protection of certain rights to mere inference from the doctrine of enumerated powers, objections raised in the course of several state ratification debates, the Bill of

---

33. *Id.* (emphasis added).
34. *See* THE FEDERALIST NOS. 28, 29, 84 (Alexander Hamilton); *id.* No. 46 (James Madison) (Clinton Rossiter ed., 1961).
35. *Id.* NO. 29 at 182, 186 (Alexander Hamilton) (emphasizing this point).
36. *See id.* at 185–87.
37. *See id.* NO. 46 at 299–300 (James Madison).
38. *Id.* NO. 84 at 512–14 (Alexander Hamilton).

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 13 of 21

Rights was promptly produced by Madison, in the first Congress to assemble under the new Constitution, in 1789. Accordingly, as with "the freedom of the press," the protection of "the right of the people to keep and bear arms" was thus made *doubly* secure in the Bill of Rights.[39] Thomas Cooley quite accurately recapitulated the controlling circumstances in the leading nineteenth century treatise on constitutional law:

> The [Second] [A]mendment, like most other provisions in the Constitution, has a history. It was adopted with some modification and enlargement from the English Bill of Rights of 1688, where it stood as a protest against arbitrary action of the overturned dynasty in disarming the people, and as a pledge of the new rulers that this tyrannical action should cease. . . .
> *The Right is General.* . . . The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose.[40]

Cooley's reference to English history, moreover, in illuminating the Second Amendment right (as personal to the citizen as such), is useful as well. For in this, he merely followed William Blackstone, from Blackstone's general treatise from 1765.

In chapter 1, appropriately captioned "Of The Rights of Persons," Blackstone divided what he called natural personal rights into two kinds: "primary" and "auxiliary."[41] The distinction was between those natural rights primary to each person intrinsically and those inseparable from their protection (thus themselves indispensable, "auxiliary" personal rights). Of the first kind, generically, are "the free enjoyment of personal security, of personal liberty,

---

39. *See* JOYCE L. MALCOLM, TO KEEP AND BEAR ARMS 164 (1994). William Rawle, George Washington's candidate for the nation's first attorney general, made the same point. *See* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 125–26 (2d ed. 1829).

40. THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 270–71 (1880). To be sure, Cooley went on to note that the Second Amendment had, as a "further" purpose (not the chief purpose—which, as he says, was to confirm the citizen's personal right to keep and bear arms—but as a "further purpose"), the purpose to preclude any excuse of alleged need for a large standing army. *Id.*; *see also* PA. CONST. of 1776, art. VIII ("That the people have a right to bear arms for the defence of themselves, and the state; and as standing armies in the time of peace, are dangerous to liberty, they ought not to be kept up: and that the military should be kept under strict subordination to, and governed by the civil power.").

41. 1 WILLIAM BLACKSTONE, COMMENTARIES *129, *141.

and of private property."[42] Of the latter are rights possessed "to vindicate" one's primary rights; and among these latter, Blackstone listed such things as access to "courts of law," and, so, too, "the right of petition[]," and "*the right of having and using arms for self-preservation and defence.*"[43]

In contrast with all of this, the quite different view—the view of "the secure state" we were earlier considering—of countries *different* from the United States—assumes no right of the people to keep and bear arms. Rather, these differently constituted states put their own first stress on having a well regulated army (and also, of course, an internal state police). To be sure, such states also may provide for some kind of militia, but insofar as they may (and several do),[44] one can be quite certain that it will *not* be a

---

42. *Id.* at *144.

43. *Id.* (emphasis added). Against this background, incidentally, the Supreme Court's decision in DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189 (1989), may be important to take into account in understanding the underpinnings of the personal right to keep and bear arms in the Blackstone minimal sense of the right to keep arms for self-preservation itself. To the extent that there is no enforceable constitutional obligation imposed on government in fact to protect every person from force or violence—and also no liability for a per se failure to come to any threatened person's aid or assistance (as *DeShaney* declares altogether emphatically)—the idea that the same government could nonetheless threaten one with criminal penalties merely "for having and using arms for self-preservation and defense" becomes impossibly difficult to sustain consistent with any plausible residual view of auxiliary natural rights. *See also* Nicholas Johnson, *Beyond the Second Amendment: An Individual Right to Arms Viewed Through The Ninth Amendment*, 24 RUTGERS L.J. 1, 64–67 (1992) (collecting prior articles and references to the strong natural rights history of the personal right to possess essential means of self defense).

An impressive number of authors, whose work Nicholas Johnson reports (and to which he adds in this article), have sought to locate the right to keep and bear arms in the Ninth Amendment. They note that the Ninth Amendment provides precautionarily that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. CONST. amend. IX. And they go forward to show that the right to bear arms was a right of just this sort, i.e., that "the right to keep and bear Arms" was itself so utterly taken for granted, and so thoroughly accepted, that it fits the Ninth Amendment's description very aptly. *See* Johnson, *supra*, at 34–37. Unsurprisingly, however, the sources relied upon to show that this was so, strong as they are (and they are quite strong), are essentially just the very same sources that inform the Second Amendment with respect to the predicate clause on the right of the people to keep and bear arms. That is, they are the same materials that also show that there was a widespread understanding of a common right to keep and bear arms, which is itself the express right the Second Amendment expressly protects. Recourse to the same materials to fashion a Ninth Amendment ("unenumerated") right is not only largely replicative of the Second Amendment inquiry, but also singularly inappropriate under the circumstances—the right to bear arms is not left to the vagaries of Ninth Amendment disputes at all.

44. *E.g.*, XIANFA [Constitution] art. 55, cl.2 (P.R.C.), *translated in* THE CONSTITUTION

militia drawn from the people with a "right to keep and bear Arms." For in these kinds of states, there is assuredly no such right. To the contrary, such a state is altogether likely to forbid the people to keep and bear arms unless and until they are conscripted into the militia, after which—to whatever extent they are deemed suitably "trustworthy" by the state—they might then (and only then) have arms fit for some assigned task.

But, again, the point to be made here is that the Second Amendment represented not an adoption, but a rejection, of this vision—a vision of the security state. It did not concede to any such state. Rather, it speaks to sources of security within a free state, within which (to quote the amendment itself still again) *"the right of the people to keep and bear Arms[] shall not be infringed."* The precautionary text of the amendment refutes the notion that the "well regulated Militia" the amendment contemplates is somehow a militia drawn from a people "who have no right to keep and bear arms." Rather, the opposite is what the amendment enacts.[45]

---

OF THE PEOPLE'S REPUBLIC OF CHINA 41 (1983) ("It is the honourable duty of citizens of the People's Republic of China to perform military service and join the militia in accordance with the law.").

45. *See* MALCOLM, *supra* note 39, at 135–64 (tracing the English antecedents and reviewing the full original history of the Second Amendment). Professor Malcolm concludes, exactly as Thomas Cooley did a century earlier, *see supra* note 40, that

> [t]he Second Amendment was meant to accomplish two distinct goals, each perceived as crucial to the maintenance of liberty. First, it was meant to guarantee the individual's right to have arms for self-defence and self-preservation. Such an individual right was a legacy of the English Bill of Rights [broadened in scope in America from the English antecedent]. . . .
>
> . . . .
>
> The clause concerning the militia was not intended to limit ownership of arms to militia members, or return control of the militia to the states, but rather to express the preference for a militia over a standing army.

MALCOM, *supra*, at 162–63. For other strongly confirming reviews, see, e.g., SUBCOMMITTEE ON THE CONSTITUTION OF THE COMM. ON THE JUDICIARY, THE RIGHT TO KEEP AND BEAR ARMS, 97th Cong., 2d Sess. (1982); HALBROOK, *supra* note 19, at 67–80; David I. Caplan, *Restoring the Balance: The Second Amendment Revisited*, 5 FORDHAM URB. L.J. 31, 33–43 (1976); Stephen P. Halbrook, *The Right of the People or the Power of the State: Bearing Arms, Arming Militias, and the Second Amendment*, 26 VAL. U. L. REV. 131 (1991); David T. Hardy, *Armed Citizens, Citizen Armies: Toward a Jurisprudence of the Second Amendment*, 9 HARV. J.L. & PUB. POL'Y 559, 604–15 (1986); David T. Hardy, *The Second Amendment and the Historiography of the Bill of Rights*, 4 J.L. & POL. 1, 43–62 (1987); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 206, 211–45 (1983); Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637, 645–51 (1989); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 LAW & CONTEMP. PROBS., Winter 1986, at 125, 133–41. *But see* Ehrman & Henigan, *supra* note 19; Dennis A. Henigan,

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 16 of 21

## III

The Second Amendment of course does not assume that the right of the people to keep and bear arms will not be abused. Nor is the amendment insensible to the *many* forms which such abuses may take (e.g., as in robbing banks, in settling personal disputes, or in threatening varieties of force to secure one's will). But the Second Amendment's answer to the avoidance of abuse is to support such laws as are directed to those who threaten or demonstrate such abuse and to no one else. Accordingly, those who do neither—who neither commit crimes nor threaten such crimes—are entitled to be left alone.

To put the matter most simply, the governing principle here, in the Second Amendment, is not different from the same principle governing the First Amendment's provisions on freedom of speech and the freedom of the press. A person may be held to account for an abuse of that freedom (for example, by being held liable for using it to publish false claims with respect to the nutritional value of the food offered for public sale and consumption). Yet, no one today contends that just because the publication of such false statements is a danger one might in some measure reduce if, say, *licenses* also could be required as a condition of owning a newspaper or even a mimeograph machine, that therefore licensing can be made a requirement of owning either a newspaper or a mimeograph machine.[46]

The Second Amendment, like the First Amendment, is thus not mysterious. Nor is it equivocal. Least of all is it opaque. Rather, one may say, today it is simply unwelcome in any community that wants no one (save perhaps the police?) to keep or bear arms at all. But assuming it to be so, i.e., assuming this is how some now want matters to be, it is for them to seek a repeal of this amendment (and so the repeal of its guarantee), in order to have their way. Or so the Constitution itself assuredly appears to require, if that is the way things are to be.

---

*Arms, Anarchy and the Second Amendment*, 26 VAL. U. L. REV. 107, 111 n.17 (1991) (listing additional articles by others).

46. Compare the claim of a power in government to require "licensing" the right to keep arms.

## IV

In the first instance, enacted as it was as part of the original Bill of Rights of 1791, the Second Amendment merely was addressed to Congress and not to the states. The mistrust and uncertainty of how *Congress* might presume to construe its new powers—powers newly enumerated in Article I of the Constitution—resulted in the Bill of Rights inclusive of the Second Amendment, proposed in the very first session of the new Congress in 1789. As it was then apprehended that although Congress was never given any power to preempt state constitutional provisions respecting freedom of speech or of the press, Congress might nonetheless presume to regulate those subjects to its own liking under pretext of some other authority if not barred from doing so by amendment, the Second Amendment—and the other amendments composing the original Bill of Rights—reflected the same mistrust and were adopted for the same reason as well. But, to be sure, neither the First nor the Second Amendment,[47] nor any of the other amendments in the Bill of Rights were addressed as limits on the states.[48]

In 1866, however, this original constitutional toleration of state differences with respect to their internal treatment of these rights came to an end, in the aftermath of the Civil War. The immunities of citizens with respect to rights previously secured only from abridging acts of Congress were recast in the Fourteenth Amendment as immunities secured also from any similar act by any state.[49] It was precisely in this manner that the citizen's right to

---

47. The Second Amendment was originally the fourth amendment of twelve approved by the requisite two-thirds of both houses of Congress in 1789 and at once submitted for ratification by the state legislatures. Because only six states approved either the first or second of these twelve amendments during the ensuing two years (1789–1791), however, neither of these was adopted (since, unlike the others, they failed to be confirmed by three-fourths of the states). So, what was originally proposed as the third amendment became the First Amendment and what was originally proposed as the fourth amendment became the Second Amendment in turn. (On May 22, 1992, however, the original proposed second amendment of 1789 was declared by Congress to have acquired sufficient state resolutions of ratification as of May 7, 1992, as also itself to have become effective as well. The result is that what was originally submitted as the second amendment has become the Twenty-Seventh Amendment instead.) *See* William Van Alstyne, *What Do You Think About the Twenty-Seventh Amendment?*, 10 CONST. COMMENTARY 9 (1993).

48. *See* Barron v. Mayor of Baltimore, 32 U.S. (7 Pet.) 243, 249 (1833) ("These amendments demanded security against the apprehended encroachments of the general government—not against those of the local governments.").

49. *See* U.S. CONST. amend. XIV.

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 18 of 21

keep and bear arms, formerly protected only from acts of Congress, came to be equally protected from abridging acts of the states as well.

So, in reporting the Fourteenth Amendment to the Senate on behalf of the Joint Committee on Reconstruction in 1866, Senator Jacob Meritt Howard of Michigan began by detailing the "first section" of that amendment, i.e., the section that "relates to the privileges and immunities of citizens."[50] He explained that the first clause of the amendment (the "first section"), once approved and ratified, would "restrain the power of the States"[51] even as Congress was already restrained (by the Bill of Rights) from abridging

> the personal rights guarantied and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right appertaining to each and all the people; *the right to keep and to bear arms*; the right to be exempted from the quartering of soldiers in a house without the consent of the owner; the right to be exempt from unreasonable searches and seizures[; etc., through the Eighth Amendment].[52]

In the end, Senator Howard concluded his remarks as follows: "*The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees.*"[53] There was no dissent from this description of the clause.

Following ratification of the Fourteenth Amendment, therefore, some state constitutions might presume to provide even *more* protection of these same rights than the Fourteenth Amendment (and some continue even now to do so[54]), but none could there-

---

50. CONG. GLOBE, 39th Cong., 1st Sess. 2765 (1866) (statement of Sen. Jacob Meritt Howard). Senator Howard is speaking here—and in his ensuing remarks—in explanation of the "first section" of the Fourteenth Amendment that provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ."

51. *Id*. at 2766.

52. *Id*. at 2765 (emphasis added).

53. *Id*. at 2766 (emphasis added). For the most recent review of this matter, with useful references to the previous scholarship on the same subject, and reaching the same conclusion still again, see Richard L. Aynes, *On Misreading John Bingham and the Fourteenth Amendment*, 103 YALE L.J. 57 (1993).

54. *See* Robert Dowlut, *Federal and State Constitutional Guarantees to Arms*, 15 U.

after presume to provide any less—whether the object of regulation was freedom of speech and of the press or of the personal right to arms. And it is quite clear that in the ratification debates of the Fourteenth Amendment, no distinction whatever was drawn between the "privileges and immunities" Congress was understood already to be bound to respect (pursuant to the Bill of Rights) and those now uniformly also to bind the states. Each was given the same constitutional immunity from abridging acts of state government as each was already recognized to possess from abridgment by Congress. What was previously forbidden only to Congress to do was, by the passage of the Fourteenth Amendment, made equally forbidden to any state. Moreover, the point was acknowledged to be particularly important in settling the Second Amendment right as a citizen's personal right, i.e., personal to each citizen as such.[55]

## V

Again, however, one does not derive from these observations that each citizen has an uncircumscribable personal constitutional right to acquire, to own, and to employ any and all such arms as one might desire so to do, or necessarily to carry them into any place one might wish. To the contrary, restrictions generally con-

---

DAYTON L. REV. 59, 79 (1989) ("State courts have on at least 20 reported occasions found arms laws to be unconstitutional."); Robert Dowlut & Janet A. Knoop, *State Constitutions and the Right to Keep and Bear Arms*, 7 OKLA. CITY U. L. REV. 177 (1982) (reviewing state constitutional clauses and the right to keep and bear arms).

55. The inclusion of this entitlement for personal protection is, in the Fourteenth Amendment, even more clear than as provided (as a premise) in the Second Amendment itself. It was, after all, the defenselessness of Negroes (denied legal rights to keep and bear arms by state law) from attack by night riders—even to protect their own lives, their own families, and their own homes—that made it imperative that they, as citizens, could no longer be kept defenseless by a regime of state law denying them the common right to keep and bear arms. Note the description of the right as a personal right in the report by Senator Howard. *See supra* text accompanying note 52. For confirming references, see also the examples provided in MICHAEL K. CURTIS, NO STATE SHALL ABRIDGE 24, 43, 56, 72, 138–41, 164, 203 (1986); HALBROOK, *supra* note 19, at 107–23; Skayoko Blodgett-Ford, *Do Battered Women Have a Right to Bear Arms?*, 11 YALE L. & POL'Y REV. 509, 513–24 (1993); Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991); Kates, *supra* note 45, at 254–57. For an overall responsible general review, see also Levinson, *supra* note 45. For the most recent critical review, however, see Raoul Berger, *Constitutional Interpretation and Activist Fantasies*, 82 KY. L.J. 1 (1993–1994) (with additional references to previous books and articles).

Case 2:19-cv-00617-KJM-AC   Document 48-7   Filed 07/14/21   Page 20 of 21

sistent merely with safe usage, for example, or restrictions even of a particular "Arms" kind, are not all per se precluded by the two constitutional amendments and provisions we have briefly reviewed. There is a "rule of reason" applicable to the First Amendment, for example, and its equivalent will also be pertinent here. It is not the case that one may say whatever one wants and however one wants, wherever one wants, and whenever one likes— location, time, and associated circumstances do make a difference, consistent even with a very strong view of the freedom of speech and press accurately reflected in conscientious decisions of the Supreme Court. The freedoms of speech and of the press, it has been correctly said, are not absolute.

Neither is one's right to keep and bear arms absolute. It may fairly be questionable, for example, whether the type of arms one may have a "right to keep" consistent with the Second Amendment extend to a howitzer.[56] It may likewise be questionable whether the "arms" one *does* have a "right to keep" are necessarily arms one also may presume to "bear" wherever one wants, e.g., in courtrooms or in public schools. To be sure, each kind of example one might give will raise its own kind of question. And serious people are quite willing to confront serious problems in regulating "the right to keep and bear arms," as they are equally willing to confront serious problems in regulating "the freedom of speech and of the press."[57]

The difference between these serious people and others, however, was a large difference in the very beginning of this country and it remains as a large difference in the end. The difference is that such serious people begin with a constitutional understanding that declines to trivialize the Second Amendment or the Fourteenth Amendment, just as they likewise decline to trivialize any other right expressly identified elsewhere in the Bill of Rights. It is difficult to see why they are less than entirely right in this unremarkable view. That it has taken the NRA to speak for them, with respect to the Second Amendment, moreover, is merely inter-

---

56. In contrast, the suggestion that it does not extend to handguns (in contrast to howitzers) is quite beyond the pale (i.e., it is wholly inconsistent with any sensible understanding of a meaningful right to keep arms as a personal right).

57. Such questions, moreover, are hardly on that account (merely as questions) necessarily hard or difficult to answer in reasonable ways, even fully conceding a strong view of the right to keep and bear arms (e.g., rules of tort or of statutory liability for careless storage endangering minors or others foreseeably put at unreasonable risk).

Case Document Filed 02/54/21   Page 21 of 21

esting—perhaps far more as a comment on others, however, than on the NRA.

For the point to be made with respect to Congress and the Second Amendment[58] is that the essential claim (certainly not every claim—but the essential claim) advanced by the NRA with respect to the Second Amendment is extremely strong. Indeed, one may fairly declare, it is at least as well anchored in the Constitution in its own way as were the essential claims with respect to the First Amendment's protection of freedom of speech as first advanced on the Supreme Court by Holmes and Brandeis, seventy years ago.[59] And until the Supreme Court manages to express the central premise of the Second Amendment more fully and far more appropriately than it has done thus far, the constructive role of the NRA today, like the role of the ACLU in the 1920s with respect to the First Amendment (as it then was), ought itself not lightly to be dismissed.[60] Indeed, it is largely by the "unreasonable" persistence of just such organizations in this country that the Bill of Rights has endured.

---

58. And equally with respect to the states, pursuant to the Fourteenth Amendment.

59. *See supra* notes 9–14 and accompanying text.

60. Unless, of course, one holds the view that it is really desirable after all that the Constitution should indeed be construed—the Second and Fourteenth Amendments to the contrary notwithstanding—to say that the right to keep and bear arms is the right to keep and bear arms as it is sometimes understood (i.e., as though it had the added words, "but only according to the sufferance of the state").