COSCA LAW CORPORATION
CHRIS COSCA   SBN 144546
1007 7th Street, Suite 210
Sacramento, CA 95814
916-440-1010

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, NY 10583
Telephone: 914-367-0090
Facsimile:  888-763-9761
*Pro Hac Vice*

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK BAIRD and RICHARD GALLARDO,<br><br>                    Plaintiffs,<br><br>        v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California, and DOES 1-10,<br><br>                    Defendants. | Case No. 2:19-CV-00617<br><br>**DECLARATION OF CLAYTON CRAMER IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        October 8, 2019<br>Time:       10:00 a.m.<br>Room:      3<br>Judge:      Hon. Kimberly J. Mueller<br>Trial Date:  None set<br>Action Filed:  April 9, 2019 |

1

DECLARATION OF CRAMER CLAYTON IFSO MOTION FOR PRELIMINARY INJUNCTION

## DECLARATION OF CLAYTON CRAMER

I, Clayton Cramer, declare pursuant to 28 U.S.C. §1746 that:

1.      I have been asked to offer an expert opinion in the above-entitled case. I have personal knowledge of each fact stated in this declaration, and if called as a witness I could and would testify competently thereto.

I. BACKGROUND AND QUALIFICATIONS

2.      A copy of my *curriculum vitae* is attached to this Declaration as Exhibit 1.

3.      I attended Sonoma State University where I received a Bachelor of Arts and Master's Degree in History. My Master's Thesis was "Concealed Weapon Laws of the Early Republic".

4.      I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

5.      I am currently employed as an Adjunct Professor College of Western Idaho, Nampa, teaching Western Civilization I and U.S. History I.

6.      My publications include:

- *Lock, Stock, and Barrel: The Origins of America Gun Culture*, Praeger Press, 2018;
- *Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*, CreateSpace, 2016;
- *Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*, CreateSpace, 2016;
- *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*, CreateSpace, 2012;
- "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;
- *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*, Nelson Current, 2006;
- *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, Praeger Press, 1999;
- *Black Demographic Data, 1790-1860: A Sourcebook*, Greenwood Press, 1997;
- *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing, 1995;

2

- *For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;
- *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine*, Editor, Library Research Associates, Inc., 1990.

7.     My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesile's book contained quotations taken out of context, which completely reversed the author's original intent. Dates were altered and statutory text was changed to completely reversed the meaning of the law. The sheer volume of these errors, and their consistent direction, would seem to preclude honest error. Emory University conducted an investigation that strongly criticized Bellesiles' ethical standards; Bellesile resigned from his tenured position at Emory. Columbia University initially awarded Bellesiles the Bancroft prize for his book "Arming America", but revoked the award after my research proved that the book was fraudulent.

II. MATERIALS REVIEWED

8.     I have reviewed the following documents in connection with this matter, which were provided to me by counsel for the plaintiffs: the Complaint, Amended Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction, Declaration of Amy L. Bellantoni, Declaration of Mark Baird, Declaration of Richard Gallardo, Declaration of Chief Kim Raney, Declaration of Matthew Wise, and Defendant's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

9.     In addition to the above documents, I have also relied upon materials cited within the text of this Declaration.

3

III.    OPINIONS

10.    Plaintiffs' counsel has asked me to provide an opinion on the accuracy of the historical representations submitted by the Attorney General's Office in its Memorandum of Points and Authorities in opposition to Plaintiffs' motion for a preliminary injunction ("Defendant's Brief") and to provide a historical account of firearm ownership and the public carriage of firearms.

11.    I have identified errors of fact, citations to statutes that do not exist, and quotes that are so selective or out of context as to be misleading in Defendant's Brief. This Declaration also demonstrates that from the beginning of California's legal existence, a right to keep and bear arms was recognized as a limit on State action.  Subsequent effects of the 14th Amendment and recent case law establish this to be the law of the land.

12.    I am being compensated at a rate of $75 per hour for my time in the above-captioned matter. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

13.    Following is my report, consisting of a Table of Contents, Table of Authorities, substantive text of my report and findings and analysis, and an Appendix.

DECLARATION OF CLAYTON CRAMER IFSO MOTION FOR PRELIMINARY INJUNCTION

# Contents

1. **Purpose** ..................................................................................................... 1

2. **Errors in Defendant's Brief** ........................................................................ 1

   Statute of Northampton (1328) ............................................................................1
   
   The Right Protected by the English Bill of Right (1689)................................2
   
   Public Carry Restrictions in the Founding Era.......................................................4
   
   Citations to Non-Existent Laws....................................................................4
   
   Misleading Descriptions of Real Laws..........................................................6
   
   Literary & Newspaper Evidence of Firearms Carrying in the Founding Era...................8
   
   Race and Gun Control.........................................................................................12
   
   Slavery as the Cause of Carrying Arms.......................................................12
   
   The Unexamined Role of Race in Gun Control.............................................13

3. **Evidence That Defendants Missed** ........................................................... 17

   Public Carry Regulation in Colonial America.......................................................17

4. **Applicability of the Second Amendment** ................................................. 19

   Antebellum Viewpoints .......................................................................................19
   
   California History.................................................................................................20
   
   The California Constitutional Convention (1849) .........................................20
   
   The California Constitutional Convention (1878) .........................................21

5. **The Fourteenth Amendment** ..................................................................... 21

6. **Can Both Concealed Carry and Open Carry Be Banned?** ........................ 22

7. **Summary** ..................................................................................................... 23

8. **Appendix** .................................................................................................... 24

   2 Edw III Statute of Northampton (1328) ............................................................24
   
   7 Edw II (1313).....................................................................................................26
   
   1 *Winthrop's Journal* 191 (1908).........................................................................28

Sheridan, *A Complete Dictionary of the English Language* (1789) ................................................29

MacNally, 1 *The Justice of the Peace for Ireland* 32 (1808) ........................................................30

2 The *Encyclopaedia Londinesis* 201 (1810) .............................................................................31

Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their Duty* 147 (1689)........33

49 *London Magazine* 290 (1780) ...............................................................................................34

49 *London Magazine* 291 (1780) ...............................................................................................35

49 *London Magazine* 467 .........................................................................................................37

49 *London Magazine* 468 .........................................................................................................38

Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* iii (1792)..............................................................................................................39

Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* iv *(1792)*.............................................................................................................40

Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina 60 (1792)...........................................................................................................41

Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 61 (1792)...........................................................................................................42

12 Hening, *Statutes at Large* 278 ...............................................................................................43

12 Hening, *Statutes at Large* 279 ...............................................................................................44

*Resolves of the State of Maine, January Session, 1821* ch. 76 (1821)..............................................45

*State* v. *Simpson,* 13 Tenn. (5 Yer.) 356, 357, 358 (1833) .........................................................47

*State* v. *Simpson,* 13 Tenn. (5 Yer.) 358, 359, 360 (1833) .........................................................48

*A Manual of the Laws of North-Carolina* p.2, 31 (1808)..............................................................51

Bishop, *Commentaries on the Criminal Law* § 980 (3d ed. 1865)....................................................53

Bishop, *Commentaries on the Criminal Law* § 981 (3d ed. 1865)....................................................54

Davis, *The Massachusetts Justice* 202 (1847)...............................................................................56

*Acts and Resolves of Massachusetts 1794-95,* 436 (1795)..............................................................57

*Statutes of the Territory of Wisconsin* 381 (1838).........................................................................58

*Revised Statutes of the State of Michigan* 692, ch. 162 (1846). .....................................................60

*Acts and Resolves, Passed by the Twenty-First Legislature of the State of Maine* 532 (1841). .....................61

1853 Or. Laws 218-20..................................................................................................................62

1847 Va. Laws 15, 127, 129........................................................................................................65

1851 Minn. Laws 526-528.........................................................................................................68

1861 Pa. Laws 248, 250 ............................................................................................................71

# Table of Authorities

**CASES**

*Barron* v. *Baltimore*, 32 U.S. 243 (7 Pet.)(1833) ............................................................19
*Cockrum* v. *State*, 24 Tex. 394, 403, 404  (1859) ..........................................................19
*Dred Scott* v. *Sandford*, 60 US 393, 417 (1857)...........................................................19
*Ex parte Luening,* 3 Cal.App. 76, 78 (1906)....................................................................23
*Hill* v. *State*, 53 Ga. 472, 481 (1874). ..............................................................................22
*In re Brickey*, 8 Ida. 597,  70 P. 609, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902)........22
*McDonald* v. *Chicago,* 130 S.Ct. 3020, 3050 (2010)........................................................21
*Moore* v. *Madigan*, 702 F.3d 933, 940 (7th Cir. 2012)...................................................21
*Nunn* v. *State,* 1 Ga. 243 (1846).......................................................................................19
*Nunn* v. State, 1 Ga. 243 (1846).......................................................................................22
Simpson v. State (Tenn. 1833) .....................................................................................5, 6
*State* v. *Chandler*, 5 La. Ann. 489 (1850).......................................................................8, 19
*State* v. *Huntly*, 25 N.C. 418, 422 (1843)..........................................................................7
State v. *Jumel*, 13 La. Ann. 399 (1858).............................................................................19
*State* v. *Reid*, 1 Ala. 612, 614 (1840)................................................................................22
*State* v. *Smith*, 11 La. Ann. 633 (1856)..........................................................................8, 19


**STATUTES**

1846 Mich. Laws 690, 692, ch. 162...................................................................................6
2 Edw. III (1328). .............................................................................................................1
7 Edw. II (1313) ..............................................................................................................1
*Acts and Resolves of Massachusetts 1794-95* 436 (1795) ...............................................5
*Acts and Resolves of Massachusetts 1794-95, 436 (1795)* .............................................57
*Acts and Resolves, Passed by the Twenty-First Legislature of the State of Maine* 532, ch. 169 (1841). .................7
*Acts of the General Assembly of Virginia* 15, 127, 129 (1847).........................................7
Brigham, *The Compact with the Charter and Laws of the Colony of New Plymouth* (1836) ......................................18
Browne, 75 *Archives of Maryland* 268..............................................................................13
Candler, 19(part 1) *The Colonial Records of the State of Georgia*, 76-78 (1911). ..............14
Deering, *Supplement to the Codes and General Laws of the State of California*  (1917) ............14
Deering, *Supplement to the Codes and General Laws of the State of California* Act 889 § 7 (1917) ........................14
Hening, 1 *Statutes at Large* (1823) ..................................................................................13
Hening, 12 *Statutes at Large* 278 (1823) ...........................................................................5
Hoadly, *Records of the Colony and Plantation of New Haven, From 1638 to 1649* (1857) ........................18
Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* iii (1792) .........4
Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* iv (1792) .........4
Massachusetts, *The Perpetual Laws of the Commonwealth of Massachusetts* 240-241 (1789)................................8
McCord, *The Statutes at Large of South Carolina: Edited Under Authority of the Legislature* (1840) .......................17
*Resolves of the State of Maine, January Session, 1821*  95 (1821) ....................................5
*Revised Statutes of the State of Michigan* 692, ch. 162 (1846) ........................................6
Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (1853)....................17
Stats. 1923, ch. 339, p. 695, the Dangerous Weapons Control Law of 1923.....................16
 *The Statute Laws of the State of Tennessee, of a Public and General Nature* (1831)....................................5


**OTHER AUTHORITIES**

[San Francisco] *Daily Alta California*, February 19, 1856...................................................................14

Bartlett, *Records of the Colony of Rhode Island and Providence Plantations, in New England*, (1856) ......................18

Benton, [Wilmington] *Delaware Journal*, Apr. 25, 1828.................................................................11

Bernhard, *Travels Through North America* 61 (1828) .....................................................................10

Bishop, *Commentaries on the Criminal Law* § 980 (3d ed. 1865).....................................................8

Blackstone, *Commentaries on the Laws of England* (1838).........................................................1, 2

Blevins, *Dictionary of the American West* 166 (2001) ..................................................................14

Browne, *Report of the Debates in the Convention of California, on the Formation of the State Constitution* 47 (1850)
.........................................................................................................................20

Candler, *The Colonial Records of the State of Georgia* (1910).....................................................17

Cartwright, Autobiography of Peter Cartwright, *the Backwoods Preacher* (1856). ...............................9, 10

Chalmers, *Hooded Americanism: The History of the Ku Klux Klan* 124 (1981, 3rd ed.) ..............................16

Cramer, "The Racist Roots of Gun Control", *4 Kansas Journal of Law & Public Policy* .............................14

Cramer, *Black Demographic Data, 1790-1860: A Sourcebook* 32-35 (1997)..........................................20

Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999)......12

Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999). ....20

Cramer, Johnson and Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The
Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason
Law Review* 823-862 (2010)................................................................................................14

Cramer, *Race and Reporting: The Los Angeles Times in Early 1916, available at*
http://www.claytoncramer.com/unpublished/LATimesAndRace.pdf .......................................................15

Davis, *The Massachusetts Justice: A Treatise Upon the Powers and Duties of Justices of the Peace* (1847) ...............6

*Delaware Register,* Sep. 5, 1829 ................................................................................................11

Elliot, ed., *Debates on the Adoption of the Federal Constitution in the Convention Held at Philadelphia in
1787...* (1888)...............................................................................................................12

*Enumeration of the Inhabitants of the United States,* 1830 (1832)..................................................10

Fearon, *Sketches of America: A Narrative of a Journey of Five Thousand Miles Through the Eastern and Western
States* (1818) ..............................................................................................................12

Fordham, *Personal Narrative*  (1906) .........................................................................................9

Hall, *The New Purchase* (1843) ...............................................................................................10

Haywood, *A Manual of the Laws of North-Carolina pt.2* (1808). ...................................................7

Hening,  *The Statutes at Large* 127 (1823) ...............................................................................17

Hittell, *History of California* (1897)..........................................................................................21

Ireland, "Homicide in Nineteenth-Century Kentucky," 81 *Register of the Kentucky Historical Society* (1983)...........11

Janiskee & Masugi, *The California Republic: Institutions, Statesmanship, and Policies* 299 (2004)............................21

Jefferson, *Notes on the State of Virginia* (1787)..........................................................................12

Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their Duty* (1683)............................3

*Kentucky Constitutional Convention Debates 1849* ....................................................................11

*Los Angeles Times*, March 14, 1916..........................................................................................15

MacLachlan, *Anarchism and the Mexican Revolution: The Political Trials of Ricard Flores Magon in the United States*
64 (1991). ..................................................................................................................15

Malcolm, *To Keep And Bear Arms: The Origins of an Anglo-American Right* (1994).....................................3, 4

McEntire, *Residence and Race: Final and Comprehensive Report to the Commission on Race and Housing* (1960) ..21

Olmsted, *The Papers of Frederick Law Olmsted*, (1970).................................................................12

Romo, *East Los Angeles: History of a Barrio* 157 (1983) .............................................................16

*San Francisco Chronicle*, July 15, 1923 .....................................................................................16

Sheridan, *A Complete Dictionary of the English Language* (1789) ...................................................2

Smith, *Wealth of Nations* (1785) ............................................................................................12

Soennichsen, *The Chinese Exclusion Act of 1882* (2011) ...........................................................21

Weld, *Travels Through the States of North America, and the Provinces of Upper and Lower Canada, During the Years 1795, 1796, and 1797* (1800) ...................................................................................................................9

Wiel, *Water Rights in the Western States: The Law of Prior Appropriation* (3d ed. 1911).........................................21

Willis and Stockton, 1 *Debates and Proceedings of the Constitutional Convention of the State of California...* (1880) ...................................................................................................................................................................21

Winthrop, *Winthrop's Journal: "History of New England" 1630-1649* (1908).............................................1

Zackin, *Looking for Rights in All the Wrong Places: Why State Constitutions Contain America's Positive Rights* (2013) ...................................................................................................................................................................21

# 1. Purpose

This declaration identifies errors of fact, citations to statutes that do not exist, and quotes that are so selective or out of context as to be misleading in Def. Br.. It also demonstrates that from the beginning of California's legal existence, a right to keep and bear arms was recognized as a limit on state laws. Subsequent effects of the 14th Amendment and recent case law establish this to be the law of the land.

# 2.     Errors in Defendant's Brief

This section addresses errors of fact, and citations to statutes that are clearly in error.

### Statute of Northampton (1328)

Def. Br. At 9: "Parliament continued that tradition in 1328 by enacting the Statute of Northampton, which provided that 'no Man great nor small' was to 'go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere,' on pain of forfeiture of the arms or prison time." But this appears to be a mistranslation from the Norman French in which the statute of Northampton was originally written.

The words in Norman French translated as "force and arms" are "a force & armes." 2 Edw. III (1328). See Appendix pages 24 and following. What appears to be a predecessor statute sheds light on the proper translation of the Norman French word "armes." "A Statute Forbidding Bearing of Armour" 7 Edw. II (1313) decrees that "every man shall come without all force and armour, well and peaceably, to the honour of us, and to the peace of us and our realm....". It also uses the Norman French word "armes" but in this case translated as "armour," not "arms." 7 Edw. II (1313). Later in the statute it asserts that "to us it belongeth, and our part is, through our royal seignory, straitly to defend [force[9]] of armour..." with note 9 defining "force" as "wearing." 7 Edw. II (1313) n.9. See pages 26 and following.

Both legal and literary sources for several centuries show "a force & armes" meant "armour," not "arms." Blackstone's discussion of the Statute of Northampton compares it to "by the laws of Solon, every Athenian was finable who walked about the city in armour." Blackstone, 2 *Commentaries on the Laws of England* 110 (1838).

In at least one literary source, "armed" clearly means "wearing armor," not carrying arms. John Winthrop's description of a conflict with Indians describes soldiers as "some ten only (who had pieces would could reach [the Indians]) shot" and yet later, "they shot only one of ours, and he was armed, all the rest being without arms." Winthrop, 1 *Winthrop's Journal: "History of New England" 1630-1649* 191 (1908). Note 3 also clarifies that "Armed" means "with defensive armor." See Appendix page 28.

1

This definition continues to appear in dictionaries into the eighteenth century. "to arm" (To furnish with armour of defence, or weapons of offence") Sheridan, *A Complete Dictionary of the English Language* (1789) .  See Appendix page 29.

A nineteenth century manual for justices of the peace in Ireland discussing the Statute of Northampton explains that "A man cannot excuse the wearing of such armour in public." MacNally, 1 *The Justice of the Peace for Ireland: Containing the Authorities and Duties of That Officer* 32 (1808) .  Significantly the Statute punishes violators "upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure," with no mention of forfeiting arms. Even as to wearing arms in the modern sense, this volume is clear that "no wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people…" MacNally, 1 *The Justice of the Peace for Ireland: Containing the Authorities and Duties of That Officer* 32 n. 7 (1808). Concerning those wearing armor under their clothes: "And persons armed with privy coats of mail, to the intent to defend themselves, against their adversaries, are not within the meaning of this statute, because they do nothing in terror of the people." MacNally, 1 *The Justice of the Peace for Ireland: Containing the Authorities and Duties of That Officer* 32 n. 7 (180). Concealed armour was okay; to be openly armoured was not.  If the Statute has *any* applicability to the present dispute, it would appear to be a strong case for allowing concealed carrying of arms (which cannot terrify others).  This manual for justices of the peace, confirms that the original intent to prohibit the wearing of armor by knights and nobles other than royal officials, out of concern that wearing armor would terrify common people, by suggesting that combat was imminent.  See Appendix page 30.

Other sources confirm that "arms" in Statute of Northampton often meant "armour."  "Arms, in the understanding of the law, are extended to any thing that a man wears for his defence, or takes into his hands or useth in anger to strike or cast at another." 2 *The Encyclopaedia Londinesis* 201 (1810) Further, the same section explains that the Statute of Northampton and later versions, "Under these statutes none may wear (unusual) armor publicly…" *2 The Encyclopaedia Londinesis* 201 (1810).  See page 31.

**The Right Protected by the English Bill of Right (1689)**

Def. Br. At 9 quotes Blackstone with respect to 1 W &M., ch.2, § 7's guarantee against royal attempts to disarm Protestants to mean "as allowed by law" embraced restrictions on carrying firearms in public. 1 Blackstone, *Commentaries* 139 (1765)."  But if Blackstone meant that, it is hidden.  In the 1768 edition, "The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for defense, suitable to their condition and degree, and such as are allowed by law.  Which is declared by the same statute 1 W. & M. ft. 2, c.2 and is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." Blackstone, 1 *Commentaries* 143-4 (1768).

Def. Br. At 9-10:

> A popular seventeenth-century justice of the peace manual similarly explained
> that merely carrying such a weapon struck "fear upon others" who were

unarmed, and constituted a punishable affray even "without word or blow given." Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their Duty* 147 (1683).

The actual text contradicts Def. Br.'s claim:

> Affray, signifieth to terifie, or bring fear, which the Law understandeth to be a common wrong; ...

> Yet may an Affray be, without word or blow given; as if a man shall shew himself, furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed as he is; and therefore both the Statutes of *Northampton* (2 *Ed. 3.* 3.) made against wearing Armour, do speak of it, by the words, *Affay del pais ó in terrorem populi.* Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their Duty* 147 (1689).

The wearing of unusual arms or armour could produce and qualify as an affray, but again the Statute of Northampton did not prohibit carrying a weapon, but the wearing of armour. As to what qualifies as "not usually worn": if California prohibits the open carrying of firearms, then they are "not usually worn." In the absence of the ban, they might easily become "usually worn." The State seeks to prohibit an action, which makes it unusual, and therefore their prohibition is justified because it is unusual.

The Gordon Riots in 1780 London was one of those times when anarchy broke out, and if the Statute of Northampton prohibited private citizens from bearing arms in public, one would expect some mention of it in Parliamentary debate. In the aftermath of those riots, Members of Parliament faulted the government for actions it took and actions it did not take. Malcolm, *To Keep And Bear Arms: The Origins of an Anglo-American Right* 130 (1994). In particular, the Duke of Richmond objected to

> [T]he conduct of the Commander in Chief of the army, for the letters he sent to Colonel Twisleton, who commanded the military force in the City, ordering him to disarm the citizens, who had taken up arms, and formed themselves into associations, for the defence of their lives and properties. These letters he considered as a violation of the constitutional right of Protestant subjects to keep and bear arms for their own defence. Debates in the House of Lords, (emphasis added). See 49 *London Magazine* 290 (1780) for Lord Amherst's letter ordering disarming of citizens and the response of the Lord Mayor of London. See pages 34 and 35.

Lord Amherst ordering disarming of citizens, and agreed with the Lord Mayor that the disarming order was intended only for the rioters, "but no passage in his letter could be construed to mean, that the arms should be taken away from the associated citizens, who had very properly armed themselves for the defence of their lives and property." 49 *London Magazine* 467-468 (1780). See pages 37 and 38.

The duality of the contemporary usage was shown by a contemporaneous pronouncement by the Recorder of London—the city's chief legal officer—when asked if the right to *have arms* in the English Declaration of Rights protected armed defensive groups as well as armed individuals:

> The right of his majesty's Protestant subjects, to ***have*** arms for their own defence, and to ***use*** them for lawful purposes, is most clear and undeniable. It seems, indeed, to be considered, by the ancient laws of this kingdom, not only as a *right*, but as a *duty*; for all the subjects of the realm, who are able to ***bear arms***, are bound to be ready, at all times, to assist the sheriff, and other civil magistrates, in the execution of the laws and the preservation of the public peace. And ***that right, which every Protestant most unquestionably possesses,*** *individually, may, and in many cases must, be exercised collectively, is likewise a point which I conceive to be most clearly established* by the authority of judicial decisions and ancient acts of parliament, as well as by reason and common sense. Malcolm, *To Keep And Bear Arms: The Origins of an Anglo-American Right* 134 (*quoting William Blizard, Desultory Reflections on Police: With an Essay on the Means of Preventing Crime and Amending Criminals* 59-60 (1785)) [emphasis added].

## Public Carry Restrictions in the Founding Era

### Citations to Non-Existent Laws

Def. Br. At 10: "Shortly after the founding, for example, North Carolina adopted its own Northampton statute, making it illegal to 'go []or ride armed by night []or by day, in fairs, markets . . . [or] part[s] elsewhere,' 1792 N.C. Law 60, ch. 3..."  Some sources cite Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60-61 (Newbern 1792).  Martin had been tasked by the legislature to sift through all existing British statutes that might have some applicability to North Carolina.  "I began at *Magna* Charta.  The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant....  I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression." Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, iii (1792).  See page 39.  Concerning the translation issue discussed above:  "Many of the statutes were couched, at the time of their being enacted, in the latin [*sic*] or French language.  I have been advised to print the translation only."  Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* iv (1792).  See page 40.  At Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 60-61 (1792) is the Statute of Northampton as passed in 1328 and identified as 2 Edw. III, ch. 3.  North Carolina had *not* adopted the statute.   See Appendix pages 41 and 42.

Curiously, when *State* v. *Huntly* (N.C. 1843) decided a case involving the Statute of Northampton, the opinion held that "whether this statute was or was not formerly in force in this State, it certainly

4

has not been since the first of January, 1838, at which day it is declared in the Revised Statutes, (ch. 1st, sect. 2,) that the statutes of England or Great Britain shall cease to be of force and effect here." *State* v. *Huntly*, 418, 420 (N.C. 1843). One might expect that if this statute had been adopted legislatively, as Def. Br. alleges, that it might have merited mention.

Def. Br. then lists other states that had done so: "See, e.g., 1786 Va. Acts 33, ch. 21; 1795 Mass. Law 436, ch. 2; 1801 Tenn. Laws 259, 260-261, ch. 22, § 6; 1821 Me. Laws 285, ch. 76, § 1."

But many of these citations are to laws not even *remotely* related to gun carrying.

Def. Br. At 11: "See, e.g., 1786 Va. Acts 33, ch. 21;" which is actually "An act for giving further time to officers, soldiers, sailors, and marines, to settle their arrears of pay and depreciation, with the auditor of public accounts." Hening, 12 *Statutes at Large* 278 (1823).  See page 39.

"1795 Mass. Law 436, ch. 2;" The cited statute "1795 Mass. Law 436, ch. 2" is in error.  Page 436 begins in the middle of Chap. 68, "An Act to Enable Sheriffs, Deputy Sheriffs, & Constables, to Require Aid in the Execution of Their Respective Offices in Criminal Cases," and starts Chap. 69: "An Act for Recording Births and Deaths by the Clerks of Towns & Districts." *Acts and Resolves of Massachusetts 1794-95* 436 (1795).  See page 57.

Def. Br. At 10: "1821 Me. Laws 285, ch. 76, § 1," is actually "Resolve appointing a Committee to examine certain accounts, and to report the same to the Governor and Council. March 22, 1821." *Resolves of the State of Maine, January Session, 1821* 95 (1821).  See page 45.

Amazingly Def. Br.'s list of such statutes actually has one match in our universe.  Def. Br. At 10: "1801 Tenn. Laws 259, 260-261, ch. 22."  There is indeed "An Act for the restraint of idle and disorderly persons." 1801 Tenn. Laws 259, 260-261, ch. 22, § 2.  Essentially this is a vagrancy law for "persons of ill fame or suspicious character."  § 6 does indeed contain the text of the Statute of Northampton.  1801 Tenn. Laws 259, 260-261, ch. 22, § 6.  However a search of an 1831 compilation of Tennessee laws for the phrase "ride armed" found no matches. 1 *The Statute Laws of the State of Tennessee, of a Public and General Nature* (1831).

Even more curiously, Simpson v. State (Tenn. 1833) involved a case where the defendant was indicted for "with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land."  Yet when the defendant appealed, he alleged "the record does not present any charge that is known to the law, as cognizable in our courts by indictment."  Simpson v. State, 13 Tenn. (5 Yer.) 356, 357 (Tenn. 1833).  While the Statute of Northampton was cited as the basis for this charge, there is no reference to any Tennessee statute. Simpson v. State, 13 Tenn. (5 Yer.) 356, 359 (Tenn. 1833).  See page 47.  The court eventually ruled that affray was required to qualify as an indictable crime, and Simpson being the only actor in this apparently drunken drama, "On the authorities, therefore, I am of opinion that this record of an indictment against the plaintiff in error does not contain the charge of an affray, or any other specific offence cognizable at common law by indictment."  Instead

the Court held that concerning the bearing of arms, "But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, or portion of the common law, our constitution has completely abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their common defence." *Article 11, sec. 26* [the Tenn. Const. "right to keep and bear arms" clause, emphasis in original]. Simpson v. State, 13 Tenn. (5 Yer.) 356, 359, 360 (Tenn. 1833). See pages 48. This absence of references to the Statute of Northampton suggests that the Statute of Northampton adopted in 1801 might have been repealed between 1801 and 1831.

**Misleading Descriptions of Real Laws**

Def. Br. At 11: "Massachusetts amended its law to prohibit going "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon" absent "reasonable cause to fear an assault, or other injury, or violence to . . . person, or to . . . family or property," on pain of being arrested and required to obtain "sureties for keeping the peace." 1836 Mass. Laws 748, 750, ch. 134, § 16.

We can assume such a statute exists *somewhere,* because another account gives a slightly different view which appears to be a less selectively edited form of the statute: "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided." Davis, *The Massachusetts Justice: A Treatise Upon the Powers and Duties of Justices of the Peace* 202 (1847). See page 56. There was only a requirement for a peace bond if someone complained that there was "a reasonable cause to fear injury."

Def. Br. At 11: "A person caught carrying a firearm in public could be arrested by the justice of the peace and required to pay sureties—often a hefty sum—in order to be released." But the Massachusetts law only allowed arrest if someone had demanded a peace bond against the armed person who had carried arms after posting such a bond. This was specific to an individual; it was not a generally applicable law.

Def. Br. At 11: "At least seven other states adopted similar 'reasonable cause' statutes. *See* 1838 Wisc. Laws 381, § 16; 1841 Me. Laws 707, 709, ch. 169, § 16; 1846 Mich. Laws 690, 692, ch. 162, § 16; 1847 Va. Laws 127, 129, ch. 14, § 16; 1851 Minn. Laws 526, 528, ch. 112, § 18; 1853 Or. Laws 218, 220, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6."

Many of these other cited statutes are word for word identical to the Massachusetts statute. Carrying a firearm would leads to arrest only if a person with "reasonable cause to fear an injury, or breach of the peace" requested a judge to require a peace-bond, and the person posting that bond carried a firearm. Def. Br. At 11: "*See* 1838 Wisc. Laws 381, § 16." See page 58.

"1846 Mich. Laws 690, 692, ch. 162, § 16." *Revised Statutes of the State of Michigan* 692, ch. 162 (1846). See page 59 and following. "1851 Minn. Laws 526, 528, ch. 112, § 18;" see page 68 and following. These statutes are word for word identical to the Massachusetts statute, with the same limitations that Def. Br. misstates.

6

Def. Br. At 11: "1841 Me. Laws 707, 709, ch. 169, § 16." The actual statute: "Resolve in relation to the Military road." *Acts and Resolves, Passed by the Twenty-First Legislature of the State of Maine* 532, ch. 169 (1841). See page 61.

Def. Br. At 11: "1853 Or. Laws 218, 220, ch. 16, § 17." Threats "against the person or property of another" could result in a judge ordering a security bond "to keep the peace." The language is different from the Massachusetts, Wisconsin, Michigan, and Maine statutes but again is not a general prohibition but specific to a person making threats against another. 1853 Or. Laws 218, 219, ch. 16, § 6. It does prohibit being armed "without reasonable cause to fear an assault, injury, or other violence to his person." Fortunately no resident of California need have any such fear. See page 62 and following pages.

Def. Br. At 11: "1847 Va. Laws 127, 129, ch. 14, § 16. Pages 127 and 129 are irrelevant. Ch. 14 appears on page 15: "An Act concerning the state courthouse." *Acts of the General Assembly of Virginia* 15, 127, 129 (1847). See pages 65 and following.

Def. Br. At 11: "1861 Pa. Laws 248, 250, § 6." This is an involuntary commitment statute: "A supplement to the several acts of the Assembly relative to the Pennsylvania State Lunatic Asylum." No mention of arms of any sort. See pages starting at 71.

Def. Br. At 10: "But the historical evidence shows that in America, as in England, a gun was considered "an 'unusual weapon,'" citing *State* v. *Huntly*, 25 N.C. 418, 422 (1843).

*Huntly* 422, 423 however declared "that a double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort." While later in the paragraph the defendant Huntly comes in for criticism from the judge, because Huntly had made death threats while armed, the decision ends with: "For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result-which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people." See page 47 and following. Unlike the previous citations to completely irrelevant session laws, this is a willful misrepresentation of the text.

Def. Br. At 10: "Law enforcement manuals from that time accordingly instructed constables to "arrest all such persons as in your sight shall ride or go armed." Citing Haywood, *A Manual of the Laws of North Carolina* pt. 2, 40 (1814)." The 1814 edition was not available to this author, but the 1808 edition suggests that words were excised from the quote that demonstrate intentional deception: "[Y]ou shall arrest all such persons as in your sight shall ride or go armed *offensively*, or shall commit or make any riot, affray or other breach of the peace..." [emphasis added] Haywood, *A Manual of the Laws of North-Carolina, pt.2,* 31 (1808). See page 51.

Def. Br. at 10: "Bishop, *Commentaries on the Criminal Law* § 980 (3d ed. 1865) (public carry restrictions did not require that the 'peace must actually be broken, to lay the foundation for a criminal proceeding')." True, but misleading. Bishop lists what he calls actions that are "unjustifiable and unlawful" including "sending a challenge, verbal or written, to fight a duel, going about armed with unusual and dangerous weapons, to the terror of the people, riotously driving in a carriage through the

7

streets of a populous city, so as to hazard the safety of the inhabitants, spreading false news; publishing libels; even in some cases uttering words, calculated to stir up resentments and quarrels; eavesdropping; being a common scold; and the like..."  Bishop has only included the previously discussed misunderstanding of the Statute of Northampton in his list, (which includes a number of actions that are now at most, civil matters) and again requiring "to the terror of the people..."  Bishop, *Commentaries on the Criminal Law* § 980 (3d ed. 1865)  See page 53.  To the extent that open carrying of a firearm is unlawful and therefore rare, the sight a firearm might well be "to the terror of the people" but if lawful, that terror might not be present.  That terror is not present when a police officer carries a firearm; therefore it is not the firearm which causes terror.

Def. Br. At 11: "even in those [Southern] States, open carry was uncommon. See, e.g., *State* v. *Smith*, 11 La. Ann. 633, 634 (1856) (it was 'extremely unusual' to carry weapons in 'full open view')."  But that is not what *Smith* says.  It discusses whether a pistol which is concealed but partially exposed is in open view.  "We must understand the district judge as speaking of weapons as ordinarily worn, and where the partial exposure is the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not to the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."  Carrying weapons in "full open view" was not unusual; "carrying a weapon in full open view, and partially covered by the pocket or clothes" was what was "extremely unusual." *State* v. *Smith*, 11 La. Ann. 633, 634 (1856).

Another Louisiana Supreme Court decision of this decade is more clear, or at least harder to quote out of context.  In a manslaughter case the ban on concealed carry was challenged as contrary to the Constitution [presumably the Second Amendment]: "It interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."  *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850).

A Massachusetts law of 1783 provided that within the city of Boston, it was unlawful to "take into any dwelling house, stable, barn, out house, ware house, store, shop or other building within the town of Boston, any cannon, swivel, mortar, howitzer, cohorn, or firearm, loaded with or having gunpowder in the same."  Why?  As the introduction explains, "the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in said town."  Massachusetts, *The Perpetual Laws of the Commonwealth of Massachusetts* 240-241 (1789). The clear objective was to make sure that you did not leave your firearm or artillery loaded where it might be a hazard to volunteer firefighters.  If it was rare or unlawful to carry a loaded firearm in Boston in 1783, why the need to prohibit taking loaded firearms inside?

## Literary & Newspaper Evidence of Firearms Carrying in the Founding Era

Isaac Weld's account of travels between 1795 and 1797 discussed how in the backcountry, "The people all travel on horseback, with pistols and swords…." Weld, 1 *Travels Through the States of*

8

*North America, and the Provinces of Upper and Lower Canada, During the Years 1795, 1796, and 1797* 234 (1800).

Elias Pim Fordham, a British traveler to America in 1817, while staying at Princeton, Indiana, in 1817-18, reported that, "Yesterday 8 men on foot armed with pistols and rifles came into the town from Harmony. They had been in pursuit of an absconded debtor from Vincennes." It was no problem to persuade eight men armed with pistols and rifles to pursue a mere debtor, and Fordham found nothing surprising about them being so armed. Fordham described an associate judge as carrying "a pair of pistols at his saddle bow; and altogether [he] looks more like a Dragoon Officer in plain clothes, than a Judge." The pistols themselves were not remarkable; what was remarkable, at least to a transplanted Englishman, was that a *judge* was carrying them. Fordham, *Personal Narrative*, 219-220 (1906).

Fordham, described a party he attended in the Illinois Territory in 1817 which had excluded some "vulgar" party-crashers. Some of Fordham's party "armed themselves with Dirks (poignards worn under the clothes)" to resist another such attempt, but later "In going away some of the gentlemen were insulted by the rabble, but the rumour that they [the gentlemen] were armed with dirks and pistols prevented serious mischief." Fordham, *Personal Narrative*, 219-220 (1906).

Peter Cartwright, an early Methodist preacher in the backwoods, gave a dramatic (perhaps even dramatized) description of two young men reduced to deadly enemies as a result of rivalry over a young lady:

> Both these young men were in the congregation, and the Holy Spirit had convicted each of them; their murderous hearts quailed under the mighty power of God, and with dreadful feelings they made for the altar. One entered on the right, the other on the left. Each was perfectly ignorant of the other being there. I went deliberately to each of them, and took their deadly weapons from their bosoms.... Cartwright, Autobiography of Peter Cartwright, *the Backwoods Preacher* 238 (1856).

Cartwright described a journey through the Allegheny Mountains to Baltimore in April, 1820 that shows pistols were not startling discoveries, even when found lying in the road:

> In passing on our journey going down the mountains, on Monday, we met several wagons and carriages moving west. Shortly after we had passed them, I saw lying in the road a very neat pocket-pistol. I picked it up, and found it heavily loaded and freshly primed. Supposing it to have been dropped by some of these movers, I said to brother Walker, "This looks providential;" for the road across these mountains was, at this time, infested by many robbers, and several daring murders and robberies had lately been committed. Cartwright, *Autobiography of Peter Cartwright, the Backwoods Preacher* 200-1 (1856).

Cartwright then recounted his use of this pistol shortly thereafter to defend himself against a robber. On his return trip, he described his carrying of a pistol to defend himself from robbery during a dispute at a toll gate. The owner of the tollgate "called for his pistols," apparently with

9

the intention of shooting at Cartwright.  Cartwright, *Autobiography of Peter Cartwright, the Backwoods Preacher* 205-6 (1856).

William Oliver Stevens described 1820s Georgia as a place so brutal and lawless that:

> [N]o adult male ever went abroad unarmed.  Whether it was to attend church, a social affair, or a political meeting, the Georgians carried loaded pistols, bowie knives, and sword canes.  The pistols rested in the breast pockets of the coat and could be drawn quickly by both hands. William Oliver Stevens, *Pistols at Ten Paces: The Story of the Code of Honor in America* 39-40 (1940).

Karl Bernhard, Duke of Saxe-Weimar-Eisenach, visited America in 1825 and 1826.  Bernhard attended a masked ball in New Orleans, and described how, "Two quarrels took place, which commenced in the ball-room with blows, and terminated in the vestibule, with pocket-pistols and kicking, without any interruption from the police."  Bernhard, Duke of Saxe-Weimar-Eisenach, *Travels Through North America* 61 (1828).

Baynard Rush Hall's memoir of frontier Indiana discussed the problem of stagecoach robberies and reported that a fellow traveler on the road to Indiana described an earlier journey: "I need hardly say I then traveled with weapons, and as we entered the mountainous country, a brace of pistols was kept loaded usually in a pocket of the carriage."  Highwaymen armed with hammers, axes, and bludgeons had interrupted the traveler's earlier journey; his threat to use a pistol had driven the robbers away.  Another traveler in the carriage told Hall of conflict at an inn in the South: "Of course, I barricaded the door as well as possible, and, without noise, examined my pistols—and got out my dirk…."  A third traveler described a journey from Charleston to Georgetown by stagecoach with slave-dealers, "Their diversion often was, to entice dogs near the stage and then to fire pistol-balls at them…." Hall, 1 *The New Purchase,* 23, 29-30, 32-33, 232-5. (1843).

Charles Haswell's memoir of New York City described a widely reported 1830 incident in the District of Columbia.  A prominent Washington newspaper editor, Duff Green, drew a concealed handgun to deter attack by a New York City newspaper editor at the U.S. Capitol.  Haswell's account of subsequent events suggests that instead of regarding this as dastardly, criminal, unrespectable, or surprising, Green's acquaintances good-naturedly ribbed him about the incident. Charles H. Haswell, *Reminiscences of New York by an Octogenarian* 244 (1896).  Green earned no infamy for his actions; two years later he published the 1830 census for the federal government. *Enumeration of the Inhabitants of the United States, 1830* (1832).

Searching newspapers from 1792 to 1830 finds a few references to guns being carried.  Whether these are concealed or openly carried is seldom clear.  Unsurprisingly, incidents worthy of reporting often involve criminal misuses, but with no evidence that the carrying itself was criminal or surprising.  The carrying of firearms without conflict would be unremarkable and thus unlikely to be reported, much as "dog bites man" is *not* news, but "man bites dog" *is* news.  There are some accounts that involve parties under attack defending themselves.  Sen. Thomas Hart Benton recounted a gun battle with Gen. Jackson in Nashville:

2. That the General and some of his friends came to the house where we had put up, commenced the attack by levelling a pistol at me, when 1 had no weapon drawn; and advancing upon me at quick pace, without giving me time to draw one.

3. That seeing this, my brother fired upon Gen. Jackson, when he had got within 8 or 10 feet of me. "

4. That four other pistols were fired in quick succession: one by Gen. Jackson at me, two by me at the General, and one by Colonel Coffee at me. In the course of this firing, Gen. Jackson was brought to the ground, but I received no hurt. Benton, [Wilmington] *Delaware Journal*, Apr. 25, 1828, 3.  [numbering in original]

Other accounts show that pistols were at least occasionally carried.  An account of a slave trader transporting 60 slaves describes how one of them, having obtained a file managed to free himself from handcuffs, and in the ensuing battle for freedom, somehow obtained a pistol (presumably from the master or his assistant): "Allen, who had come to his assistance, met a similar fate, from the contents of a pistol fired by another of the gang."  "Affray and Murder," *Delaware Register,* Sep. 5, 1829, 3.

Evidence of public carrying of arms as unsurprising appears in other places as well.  In spite of the 1849 Kentucky Constitutional Convention's amendment to allow the legislature to regulate the carrying of concealed weapons, no such statute was passed until 1854.  When it did so, the new law contained a large exemption: "Where the person has reasonable grounds to believe his person, or the person of some of his family, or his property, is in danger from violence or crime. . . ."  This exemption "severely limited its effectiveness." Ireland, "Homicide in Nineteenth-Century Kentucky," 81 *Register of the Kentucky Historical Society* 140-141 (1983).  It also brought it into conformity with Delegate Ben Hardin's apparent belief that it was the "the carrying of concealed weapons for aggressive purposes." *Kentucky Constitutional Convention Debates 1849*, 826 that should be criminal, not the carrying of concealed weapons for self-defense.  (Hardin never explained how the law would clearly distinguish the two cases.)

Francis Law Olmsted's description of a not completely concealed Colt revolver on a Kentucky railroad in 1853 strongly suggested that concealed carrying of handguns was at least common, if not widespread:

In the cars in Kentucky a modest young man was walking through with the hand[le] of a Colt out of his pocket-skirt behind.  It made some laugh & a gentleman with us called out, "You'll lose your Colt, Sir."  The man turned and after a moment joined the laugh and pushed the handle into the pocket.

John said, "There might be danger in laughing at him."  "Oh no," replied our companion, evidently supposing him serious, "he would not mind a laugh."  "It's the best place to carry your pistol, after all," said he.  "It's less in your way than

> anywhere else.  And as good a place for your knife as anywhere else is down your back, so you can draw over your shoulder."
>
> "Are pistols generally carried here?"
>
> "Yes, very generally."
>
> Allison said *commonly*, but he thought not generally [emphasis in original].  Olmsted, 2 *The Papers of Frederick Law Olmsted*, 232-233 (1970).

If this was indeed a widespread practice, it might explain why the 1854 statute had so many exemptions.  At the same time it raises the question of why representative governments would outlaw a practice that was either "general" or "common," depending on which of Olmsted's companions was correct.

## Race and Gun Control

### Slavery as the Cause of Carrying Arms

Def. Br. at 12, alludes to judges whose "embrace of slavery and honor[] contributed to an aggressive gun culture."  Both slave holders and critics of slavery agreed that slavery created a pervasive atmosphere of violence.  "The existence of slavery has a most visible effect upon the national character.  It necessarily brutalizes the minds of the southern and western inhabitants..."  Fearon, *Sketches of America: A Narrative of a Journey of Five Thousand Miles Through the Eastern and Western States* 382 (1818).  Thomas Jefferson eloquently described the effects that the slave system had on the raising of children: "The whole commerce between master and slave is a perpetual exercise of the most boisterous passions, the most unremitting despotism on the one part, and degrading submissions on the other.  Our children see this, and learn to imitate it; for man is an imitative animal." Jefferson, *Notes on the State of Virginia* 270 (1787).  George Mason at the Constitutional Convention presented much the same sentiment in his attack on the "infernal traffic" in slaves.  He complained that slavery produces "the most pernicious effect on manners.  Every master of slaves is born a petty tyrant." Elliot, ed., 5 *Debates on the Adoption of the Federal Constitution in the Convention Held at Philadelphia in 1787...* 458 (1888).  Economist Adam Smith criticized slavery's inefficiency: he observed that a slave worked as little as necessary to avoid mistreatment by the master: "Whatever work he does beyond what is sufficient to purchase his own maintenance can be squeezed out of him by violence only, and not by any interest of his own." Smith, 1 *Wealth of Nations* 385 (1785).

Slavery deserves at least *some* blame for high levels of violence in the South, where the earliest laws regulating firearms carrying and possession appear.  Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 17-45 (1999). examines many other explanations for high violence rates, including a surplus of young single men, the honor culture transplanted from the border counties of Scotland and England, high temperatures, and high alcohol consumption rates.

12

**The Unexamined Role of Race in Gun Control**

Raising the connection of slavery and gun carrying does an effective job of suggesting gun carrying has some antisocial connection to issues of race.  There is, however, another connection that is thus ignored: gun control has a racist history.  Gun regulation in the colonial period was intimately tied to issues of race.  Virginia, like most colonies, required every free man to own arms for militia duty; masters of indentured servants were similarly obligated, until 1639/40: "All persons except negroes to be provided with arms and ammunition or be fined at pleasure of the Governor and Council."  Hening, 1 *Statutes at Large* 226 (1823).  By 1680 Virginia felt a need to pass a law prohibiting "any negroe or other slave to carry or arme himselfe with any club, staffe, gunn, sword or any other weapon of defence or offence…" Hening, 2 *Statutes at Large*, 481-2 (1823).

By 1723, Virginia had become increasingly fearful of the growing black population of the colony, spurred by a series of slave conspiracies and uprisings in the period 1709-1722.  Virginia passed a law regulating gun ownership by free blacks and Indians.  While the 1680 statute had prohibited "any negroe or other slave" from carrying or acquiring a gun, the 1723 statute suggests that *free* blacks had still been allowed to own guns before its passage: "That every free negro, mulatto, or indian, being a house-keeper, or listed in the militia, may be permitted to keep one gun, powder, and shot…."  Those blacks and Indians who were "not house-keepers, nor listed in the militia" were required to dispose of their weapons by the end of October, 1723.  Blacks and Indians living on frontier plantations were required to obtain a license from a justice of the peace "to keep and use guns, powder, and shot." Hening, 4 *Statutes at Large*, 131.

Even the small number of blacks and Indians who were householders or members of the militia were apparently no longer trusted with guns in public by 1738.  They were still required to muster, but "shall appear without arms…." Hening, 5 *Statutes at Large*, 17 (1823).  Indians and blacks to appear unarmed for muster reiterated in 1757 at Hening, 7 *Statutes at Large* 95 (1823).  The 1738 statute did not *explicitly* prohibit free blacks from owning guns, but it seems a fair assumption that because the 1723 statute had tied gun ownership by free blacks and Indians to militia duty, that the 1738 law meant that free blacks no longer had any legal right to own guns.

Maryland echoed Virginia's 1680 law with a 1715 statute that ordered, "That no Negro or other slave, within this Province, shall be permitted to carry any Gun or any other offensive Weapon, from off their Master's Land, without Licence from their said Master...." Browne, 75 *Archives of Maryland* 268.  (Similar to Virginia's law, the text is ambiguous as to whether it applied to all blacks, or only to slaves—and unlike Virginia's 1723 statute, this author cannot find any later Colonial Maryland statute that clarifies who was prohibited from carrying a gun.)  Like Virginia, but somewhat later, Maryland went through a complex process of changing the status of blacks from indentured servants into hereditary slaves.

Half a century later, Georgia adopted a more complex regulatory scheme to control slave possession of firearms.  This 1768 Georgia statute's title explained that it was "Establishing and Regulating Patrols" for the purpose of "Searching and examining any Negroe house for Offensive Weapons Fire Arms and Ammunition."  While the body of the law regulating possession of firearms only referred to slaves, the title of the statute suggests that it applied to any black person,

slave or free.  The law prohibited slaves possessing or carrying "Fire Arms or any Offensive Weapon whatsoever, unless such Slave shall have a Ticket or License in Writing from his Master Mistress or Overseer to Hunt and Kill Game Cattle or Mischievous Birds or Birds of Prey…." Other provisions allowed a slave to possess a gun while in the company of a white person 16 years or older, or while actually protecting crops from birds.  Under no conditions was a slave allowed to carry "any Gun Cutlass Pistol or other Offensive Weapon" from Saturday sunset until sunrise Monday morning. Candler, 19(part 1) *The Colonial Records of the State of Georgia*, 76-78 (1911).

More detailed descriptions of the intersection of gun control laws and race can be found at Cramer, *Armed America* 30-40 (2006), Cramer, "The Racist Roots of Gun Control", 4 *Kansas Journal of Law & Public Policy*  17-25; and Cramer, Johnson and Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 823-862 (2010) (cited in *McDonald* v. *Chicago* (2010)) examines the substantial evidence that postbellum attempts to disarm the freedmen were a significant cause for the Fourteenth Amendment's introduction. Slaves and then freedmen were not trusted to carry arms; today, law-abiding Californians have been reduced to this same sad state.

California's history is also replete in gun control as race control.  The legislature debated a ban on concealed carry throughout the 1850s.  Even those who supported such laws often had a narrow notion of whose carrying of arms needed to be controlled.  During debates in February of 1856, the state senator who represented Nevada County (appropriately, a derringer-shaped county in California's foothills) indicated that he was in support of a bill to ban concealed carry if it were for the purpose of disarming "Greasers."  "Letter From Sacramento," [San Francisco] *Daily Alta California*, February 19, 1856, 2.   "Greasers" was a slang term used throughout the nineteenth and early twentieth century for Mexicans. Blevins, *Dictionary of the American West* 166 (2001). However, the concealed carry ban did not pass the legislature that year.

In 1917, California again passed statewide a concealed weapon statute.  Instead of completely prohibiting concealed carry (as the 1863 law had done), this law made it a misdemeanor to carry concealed firearms in cities without a license—and a felony for those previously convicted of a felony.  (It was still legal to carry concealed in unincorporated areas.)  James H. Deering, *Supplement to the Codes and General Laws of the State of California* Act 889 §§ 3, 6 (1917).  Also for the first time, California required registration of handgun sales, with a "Dealers' Record of Sale" mailed to local law enforcement. Deering, *Supplement to the Codes and General Laws of the State of California* Act 889 § 7 (1917).

What provoked the legislature to again pass a statewide law?  I spent a bit of time trying to find the reason, without finding completely persuasive evidence, but what was there suggests that racism played a role.  In the previous year, California experienced a burst of anti-Mexican sentiment as a result of Pancho Villa's cross-border raid on Columbus, New Mexico.  Even conservative Republican newspapers such as the *Los Angeles Times* (this was obviously a long time ago), which was far less prejudiced about race than most newspapers of the era, went off the deep end in their fear and hatred of Mexicans, many of whom were refugees from the Mexican

14

Revolution. Cramer, *Race and Reporting: The Los Angeles Times in Early 1916*, *available at* http://www.claytoncramer.com/unpublished/LATimesAndRace.pdf.

In Los Angeles, Police Chief Snively feared that Mexicans sympathetic to Pancho Villa might take up arms, and gave orders that lacked any legal authority:

> Acting under orders from Chief Snively, the police department yesterday took drastic action to prevent any local outburst on the part of Villa sympathizers. The cordon of officers thrown about the Mexican quarter was extended and reinforced and the embargo against the sale of arms and liquor to Mexicans amplified and made general…. "Draw Teeth of War Breeders," *Los Angeles Times*, March 14, 1916, 2:1.

The article described the measures taken as being

> for the benefit of Mexicans who have become excited over the action of the Federal government against Villa and who have made threats of vengeance and violence…
>
> No liquor will be sold to Mexicans showing the least sign of intoxication.
>
> No guns can be sold to Mexicans and all dealers who have used guns for window displays have been ordered to take them from the windows and to show them to no Mexican until the embargo is lifted.

At least part of what might have provoked Chief Snively unlawful actions was that:

> Three admitted anarchists, priding themselves upon being disciples of the Magon brothers and all heavily armed, were taken into custody on charges of carrying concealed weapons and were given sixty-day sentences by Police Judge White…. "Draw Teeth of War Breeders," *Los Angeles Times*, March 14, 1916, 2:1.

The Magon brothers had no connection to Villa. Quite the opposite: the Magon brothers regarded Villa as "just another parasite" preventing a socialist revolution in Mexico. MacLachlan, *Anarchism and the Mexican Revolution: The Political Trials of Ricard Flores Magon in the United States* 64 (1991). Chief Snively seems to have missed these distinctions. Nonetheless, there were some significant political demonstrations of pro-Villa support among Mexicans living in Los Angeles, and it appears that Mexicans immigrants were buying guns in what appeared to be unusual numbers.

News accounts suggest that these purchases, primarily of "heavy revolvers," might have been for defensive purposes. The Villa raid had inflamed anti-Mexican sentiment among Americans all along the border, and many Mexicans appeared to be buying handguns because they were afraid of being attacked, not to be aggressive. *"Draw Teeth of War Breeders," Los Angeles Times*, March 14, 1916, at 2:1, 2:2; "State Troops Ready for War*," Los Angeles Times,* March 27, 1916, at 1:9; "For the Safety of Los Angeles," *Los Angeles Times,* March 16, 1916, at 2:4. Was the statewide

15

concealed weapon permit law—and the handgun registration requirement—driven by the somewhat understandable concern about Pancho Villa supporters in California? It is an interesting question, and one that requires more research. A search of California newspapers from 1915 to 1917 for "concealed handgun" or "concealed weapon" found no matches. Search strings in *California Digital Newspaper Collection:* http://cdnc.ucr.edu/cgi-bin/cdnc?a=q&hs=1&r=1&results=1&txq=concealed+handgun&txf=txIN&ssnip=txt&o=20&dafdq=&dafmq=&dafyq=1915&datdq=&datmq=&datyq=1917&puq=&e=--1915---1917--en--20--1--txt-txIN-concealed+weapon------, and http://cdnc.ucr.edu/cgi-bin/cdnc?a=q&hs=1&r=1&results=1&txq=%22concealed+weapon%22&txf=txIN&ssnip=txt&o=20&dafdq=&dafmq=&dafyq=1915&datdq=&datmq=&datyq=1917&puq=&e=--1915---1917--en--20--1--txt-txIN-concealed+handgun------, last accessed April 7, 2015.

What is far more certain is what motivated the next revision of California's gun control laws, a package passed in 1923 that included the ancestor of California's current discretionary concealed weapon permit law. This was a variation of the Uniform Revolver Act passed in several American states in the 1920s. This law enhanced the punishments for various crimes committed with a handgun. It made carrying a handgun without a permit evidence of intention to commit a felony. Stats. 1923, ch. 339, p. 695, the Dangerous Weapons Control Law of 1923. It also required a concealed weapon permit anywhere in the state (not just in cities), Stats. 1923, ch. 339, § 5. and it prohibited possession of concealable handguns by anyone who was not a U.S. citizen. Stats. 1923, ch. 339, § 2.

What motivated passage of this law? Legislative reports are sparse on the reasons, but as is often the case, newspaper coverage is more forthcoming. Governor Friend W. Richardson signed the law after R. T. McKissick, "president of the Sacramento Rifle and Revolver Club," argued that this law preserved the "rights of those using firearms for competition or hunting or for protection in outing trips." McKissick was concerned that a more stringent gun control law might be passed if Governor Richardson vetoed this one. McKissick admitted that the provision prohibiting handgun ownership by non-citizens was of questionable constitutionality, but that he believed that if it was upheld, it would have a beneficial effect "in checking *tong* [gang] wars among the Chinese and vendettas among our people who are of Latin descent." "New Firearms Law Effective on August 7," *San Francisco Chronicle*, July 15, 1923, at 3, col. 1.

Why did Richardson sign a law with racist intentions? When Richardson ran for governor in 1922, he would not answer the question of whether he was a member of the Ku Klux Klan—but the Klan enthusiastically endorsed Richardson. Chalmers, *Hooded Americanism: The History of the Ku Klux Klan* 124 (1981, 3rd ed.).

With such blunt statements of racist intent, not surprisingly, the discriminatory effect of the new law was immediately recognized. The Mexican consul in Los Angeles protested the alien handgun ban, since "a large proportion of the foreigners in California were of Mexican descent." Romo, *East Los Angeles: History of a Barrio* 157 (1983). Mexican immigrants, being white, could at least apply for citizenship. Asian immigrants were ineligible for naturalization—and therefore were breaking the law if they owned a handgun.

In addition, Assembly Concurrent Resolution No. 42, July 17, 2009, "Among other things, these laws denied the Chinese in California the right to own land or property, the right to vote, and the right to marry a white person, denied children of Chinese descent access to public schools, denied Chinese immigrants the right to bear arms."   Assembly Concurrent Resolution No. 42. https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42.

## 3.      Evidence That Defendants Missed

### Public Carry Regulation in Colonial America

The defendant's brief makes no reference to colonial restrictions on carrying of firearms is significant.  Colonial restrictions on the carrying of firearms generally appear to consist of mandates that nearly all free men *carry* firearms.  (I recently read through *all* Revolutionary era state codes on contract several years ago — a pretty major task — and found no laws regulating or prohibiting the carrying of firearms, except for wartime disarming of those refusing to swear loyalty to the Revolutionary state governments.)

In 1619, Virginia directed "That no man go or send abroad without a sufficient parte will armed".  That go not to worke in the ground without their arms (and a centinell upon them.)" Hening,  1 *Statutes at Large* 127 (1823).

South Carolina's 1743 statute required militia members to carry guns to church:

> [E]very white male inhabitant of this Province... who shall, on any Sunday or Christmas day in the year, go and resort to any church or any other public place of divine worship within this Province, and shall not carry with him a gun or a pair of horse pistols, in good order and fit for service, with at least six charges of gun-powder and ball, and shall not carry the same into the church or other place of divine worship as aforesaid, every such person shall forfeit and pay the sum of twenty shillings, current money, for every neglect of the same." McCord, 7 *The Statutes at Large of South Carolina: Edited Under Authority of the Legislature* 417 (1840).

Georgia adopted a very similar statute in 1770: "An act for the better security of the inhabitants by obliging the male white persons to carry fire arms to places of public worship."  Candler, 19 (part 1), *The Colonial Records of the State of Georgia* 137-40 (1910).

Massachusetts in 1636/7 ordered that every person above eighteen years of age (except magistrates and elders of the churches) to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12d. for every default" ... "And no person shall travel above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12d. for every default."  Shurtleff, 1 *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (1853). This order for carrying to church (but, not apparently while traveling) was repealed in 1637: "The

order for bringing armes to the meeting house is repealed."  Shurtleff, 1 *Records of the Governor and Company of the Massachusetts Bay in New England* 210 (1853).

New Haven Colony (not yet absorbed into Connecticut) in 1644 directed that when militiamen were called by the beating of the drum "to the publique worship of God" they were to show up "with their armes compleat, their guns ready charged, with their match for their matchlocks and flints ready fitted in their firelocks." Hoadly, *Records Of the Colony and Plantation of New Haven, From 1638 to 1649* (1857).

In 1649, New Haven imposed fines on several men "for not bringing ther armes to the meeting [church] on day when it was their turne" and failure to bring slowmatch (for matchlock guns), bullets, flints, and other accessories.  Hoadly, *Records of the Colony and Plantation of New Haven, From 1638 to 1649*  132 (1857).  The same year, a William Paine requested "that he might be freed from bringing his armes [on] the Lord's day and lecture dayes, because he lives farr of and hath three small children, and his wife is lame and cannot help to bring the children."  Hoadly, *Records of the Colony and Plantation of New Haven, From 1638 to 1649* 501 (1857).

Plymouth Colony in 1641 ordered "It is enacted That every Towneship within this Government do carry a competent number of pieeces fixd and compleate with powder shott and swords every Lord's day to the meetings--one of a house from the first of September to the middle of November, except their be some just & lawfull impedyment."   Brigham, *The Compact with the Charter and Laws of the Colony of New Plymouth* 70 (1836).  This was revised in 1658: ordering that 1/4 of the militia "carry theire armes" to church every Sunday, defined as "some serviceable peece and sword and three charges of powder and bullets" or be fined "2 shillings and six pence...."  Brigham, *The Compact with the Charter and Laws of the Colony of New Plymouth* 115 (1836).  Again, in 1675: "That during the time of publicke danger every one that comes to the meeting on the Lords day bring his Armes with him and furnished with att least six charges of powder and shott untill further order shall be given" with a two shilling fine for failure to do so. Brigham, *The Compact with the Charter and Laws of the Colony of New Plymouth* 176 (1836).

Some local governments imposed their own ordinances requiring the carrying of arms, such as Portsmouth, N.H.'s 1643 order "for every man to have so much powder, and so many bullets, and so the forwarning is to stand still in force; and also that every man do come armed unto the meeting upon every sixth day..." Bartlett, 1 *Records of the Colony of Rhode Island and Providence Plantations, in New England*, 79-80 (1856).

Now, the presence of mandates is not evidence that all other carrying was lawful, but certainly suggests that the carrying of firearms was a common part of colonial life, and not considered "to the terror of the people."

# 4.    Applicability of the Second Amendment

## Antebellum Viewpoints

Def. Br. At 12: "Some of those decisions [supporting a right to openly carry] do reflect a local preference for permissive open carry laws. *See*, *e.g.*, *Nunn v. State*, 1 Ga. 243 (1846). But these authorities do not establish any national consensus on the meaning of the Second Amendment in this period."

It is certainly true that state supreme courts recognizing the Second Amendment as a protection from state laws are in the minority: *Nunn* v. *State,* 1 Ga. 243 (1846). Besides *Nunn*, the only other decisions known to this author holding that the Second Amendment protected the carrying of firearms from state laws are *State* v. *Chandler*, 5 La. Ann. 489, 52 Am. Dec. 599 (1850) ("This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."), *State* v. *Smith*, 11 La. Ann. 633, 66 Am. Dec. 208 (1856) ("The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States. The arms there spoken of are such as are borne by a people in war, or at least carried openly."). State v. *Jumel*, 13 La. Ann. 399 (1858) ("It is urged that the law is repugnant to that provision of the Constitution of the United States which declares, that the right of the people to keep or bear arms shall not be infringed. Amendments, art. 2," followed by citations to *Chandler* and *Smith.*

Another case addressing this question is *Cockrum* v. *State*, 24 Tex. 394, 403, 404  (1859) ("The object of the clause first cited [the Second Amendment], has reference to the perpetuation of free government, and is based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed.")  *Cockrum* references the Second Amendment as associated with the idea that "the people cannot be effectually oppressed and enslaved, who are not first disarmed" so perhaps only relevant to the rebellion model of the Second Amendment; nonetheless, the Texas Supreme Court recognized the Second Amendment as a limitation on state laws.

That this was a minority opinion of state supreme courts is no surprise; *Barron* v. *Baltimore*, 32 U.S. 243 (7 Pet.)(1833) had established that the Bill of Rights limited only the national government.  In light of Rep. James Madison's efforts to have at least parts of the Bill of Rights as limits on state power the language used in the final version sent to the states for ratification appears to have been intended as a limitation on national governmental power alone ("Congress shall make no law..."). U.S. Const., Am. 1 (1789).  Nonetheless, it establishes that this idea of the Bill of Rights as a limitation on the states had some currency in antebellum America, as we will later see in the discussion of the California Constitutional Convention (1850).

That the Second Amendment was recognized as a protection of an individual right to carry arms, at least as a limitation on the national government's powers, can be seen in the infamous *Dred Scott* v. *Sandford* (1857) case.  "It would give to persons of the negro race, who were recognised as citizens in any one State of the Union, the right ... to keep and carry arms wherever they went." *Dred Scott* v. *Sandford*, 60 US 393, 417 (1857) .

# California History

## The California Constitutional Convention (1849)

The delegates discussed what individual rights should be listed in the state constitution's bill of rights. Delegate Ord proposed, "Every person has a right to bear arms for the defence of himself and the State." Delegate McCarver wanted to add, "provided that they are not concealed arms." This is not surprising; in the period before the Civil War, many states passed laws either prohibiting or restricting the *concealed* carrying of deadly weapons. State constitutional conventions often added such restrictions to existing arms guarantees to make sure that the legislature could ban what was increasingly regarded as a cowardly way of fighting—the use of "secret arms." Concerning such laws *see generally* Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999).

McCarver, however, also believed that it would be best if there were *no* provision preventing "the Legislature from regulating matters of this kind." Browne, *Report of the Debates in the Convention of California, on the Formation of the State Constitution* 47 (1850). He thought guaranteeing a right to bear arms was not "a proper subject for the Constitution." Other delegates agreed with McCarver that there should be no arms provision in the state bill of rights—but not because the state should have the power to regulate the carrying of weapons. Delegate Sherwood argued that denying an individual the right to bear arms "would be null and void, inasmuch as it would be in opposition to the Constitution of the United States," and then quoted the Second Amendment. Sherwood thought an arms guarantee was unnecessary because the Second Amendment *already* protected such a right.

Delegate Botts argued against adding the arms guarantee in this *particular* location in the state constitution because he feared that it might not be a strong enough protection; such a guarantee belonged in the section that specified the powers of the legislature. Even Delegate Sherwood was persuaded by this argument, admitting that the arms provision "directly touches the rights of every citizen." When the convention voted on both Ord's proposal for a right to bear arms, and McCarver's amendment that the right not apply to concealed weapons, both proposals died—and with it, any possibility of adding a right to keep and bear arms to the California Constitution's bill of rights. "The question was then taken, and both the amendment, and amendment to the amendment, were rejected." Browne, *Report of the Debates in the Convention of California, on the Formation of the State Constitution* 47 (1850).

You cannot draw too strong a message from this series of back and forth discussions, but it appears that at least some delegates argued that there was no need for an individual right to keep and bear arms in California's Constitution, because the Second Amendment already protected such a right, and other delegates arguing that the right needed to be located elsewhere to be better protected.

The only delegate who clearly spoke against a right to bear arms was McCarver. Today, he is most remembered for another proposal he made a few minutes later: that blacks would be forever banned from living in California. Browne 44. McCarver also proposed a provision to require Legislature to prohibit "free persons of color" from settling in California. Browne 137-38. (Such provisions were added to other state constitutions of the period; McCarver even played a part in Oregon adopting such a ban.) In spite of considerable support from other delegates, this proposal did not pass. Cramer, *Black Demographic Data, 1790-1860: A Sourcebook* 32-35 (1997).

**The California Constitutional Convention (1878)**

California held another constitutional convention in 1878. The 1849 constitution seemed increasingly inadequate because of questions about water rights and the "Chinese problem." Wiel, 2 *Water Rights in the Western States: The Law of Prior Appropriation* 1166 (3d ed. 1911); Soennichsen, *The Chinese Exclusion Act of 1882* 127-128 (2011).

The 1878 convention seems not to have even discussed the question of a right to keep and bear arms—except for one startling provision. The convention was divided between a conservative, generally wealthy group, and what became known as "the Workingmen," who represented a populist collection of white laborers, intent on driving Asian immigrants from California. Zackin, *Looking for Rights in All the Wrong Places: Why State Constitutions Contain America's Positive Rights* 200 (2013). They had a number of proposals that are horrifying in their racism today, and were made part of the 1879 California Constitution.

Of most relevance to gun control was their demand that aliens who could not become citizens would be prohibited from bearing arms. Hittell, 4 *History of California* 615-17 (1897). Delegate O'Donnell introduced this request as a constitutional provision: "No alien who cannot become a citizen of the United States shall be allowed to bear arms." Janiskee & Masugi, *The California Republic: Institutions, Statesmanship, and Policies* 299 (2004). What sort of aliens could not become citizens of the United States? Until 1952, no Oriental (as persons of East Asian ancestry were then described) could become a naturalized citizen. McEntire, *Residence and Race: Final and Comprehensive Report to the Commission on Race and Housing* 269 (1960). If you were born in the United States, you were a natural-born citizen, but an immigrant from the Far East would always be an alien. O'Donnell's proposed was "Referred to Committee on Chinese" where it seems to have silently died. Willis and Stockton, 1 *Debates and Proceedings of the Constitutional Convention of the State of California...* 285 (1880).

## 5.   The Fourteenth Amendment

That the Second Amendment's right to keep and *bear* arms is incorporated against the states is no longer open to debate. Heller "held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of stare decisis counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States." *McDonald* v. *Chicago,* 130 S.Ct. 3020, 3050 (2010).

The question of whether this extends to firearms *carry* was answered in *Moore* v. *Madigan*, 702 F.3d 933, 940 (7th Cir. 2012): "A blanket prohibition on carrying gun in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public might benefit on balance from such a curtailment, though there is no proof it would."

As to whether a complete ban on carrying of guns is constitutional, *Madigan* observed that "Remarkably, Illinois is the *only* state that maintains a flat ban on carrying ready-to-use guns

outside the home, though many states used to ban carrying concealed guns outside the home," *Madigan,* 702 F.3d 933, 941 (7th Cir. 2012)  Of course, California has since banned open carry, inconsistent with the test *Madigan* imposed..

## 6.    Can Both Concealed Carry and Open Carry Be Banned?

Precedents from other states *and* California have either explicitly or implicitly held that *concealed* carry could be banned as long as *open* carry remained lawful:

> "Has not a subsequent Legislature (if the statute in question be constitutional) the right to prohibit the carrying of arms openly, and both acts being in force, the right of carrying arms at all, might be taken away. Such a state of things, all will admit, cannot exist without a violation of the constitution." *State* v. *Reid*, 1 Ala. 612, 614 (1840) (decided based on Alabama Constitution's bear arms guarantee.  The defendant was Sheriff Reid of Montgomery County/)  *State* v. *Reid*, 1 Ala. 612, 614 (1840).

While not as explicit, the Georgia Supreme Court held:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the [U.S.] Constitution.  *Nunn* v. State, 1 Ga. 243, 250, 251 (1846).

> "The manner of bearing arms includes not only the particular way they may be carried upon the person, that is openly or secretly, on the shoulder or in the hand, loaded or unloaded, cocked or uncocked, capped or uncapped, but it includes, also, the time when, and the place where, they may be borne. It is no reply to this view of the subject to say that if the legislature may do this, they may, in effect, prohibit the carrying them altogether. The same reply may be made to the admitted right to prescribe the manner of carrying arms upon the person. If the legislature were to say arms shall not be borne on the shoulder, nor in the hands, or on the arms, but they shall only be borne strapped or fastened upon the back, this would be prescribing only the manner, and yet, it would, in effect, be a denial of the right to bear arms altogether." *Hill* v. *State*, 53 Ga. 472, 481 (1874).

> "A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state. But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages."  *In re Brickey*, 8 Ida. 597,  70 P. 609, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902) (decided based on the Idaho Constitution's RKBA provision).

> "Whatever may be the source of the right to bear arms, in the general acceptation of such term, it does not follow as a natural consequence that such right extends to every conceivable manner in which arms may be borne. The habit of carrying concealed weapons is one of the most fruitful sources of crime, and, in our opinion, may be entirely prohibited by the proper authorities." *Ex parte Luening,* 3 Cal.App. 76, 78 (1906).

Without identifying from where this right came, the court recognized that such a right existed, and was a limitation on state (or in this case) local governments. If a right to bear arms exists and analogous to the preceding examples, that concealed carry could be prohibited, implies open carry must be allowed.

## 7.   Summary

Def. Br.'s claims about the Statute of Northampton are demonstrated to be a translation error, albeit, a widely shared error. Even if it were relevant in 1328 to carrying of arms, the English Bill of Rights clearly renders it void. It might be amusing to see what other 14th century statutes are still relevant to American law, such as, The Manner of doing Homage and Fealty. 17 Edw. II.

Defendant's claims about public carry restrictions in the early Republic are often utterly false, citing session laws with no relation to the claim.

Defendant's claims about peace bonds as general prohibitions on carrying of arms are deceptive, as reading entire sentences of the statutes demonstrate.

Some of defendant's claims concerning early court decisions involve such careful and selective quotation as to not be simply out of context but actually changing the meaning of the cited decision.

There is evidence that the Second Amendment was recognized as a limitation on state authority to regulate the carrying of arms. It might allow a ban on concealed carry, but this necessarily admits of a right to open carry, or the right is thereby meaningless. This was a minority viewpoint, but one shared by at least some of the 1850 California Constitutional Convention delegates, who clearly recognized that the Second Amendment protected *something* against state action; there was no recorded dispute about this claim. The 1878 Constitutional Convention, in its discussion of prohibiting Chinese from bearing arms, hints that this specific restriction required constitutional sanction. If there was no general right to carry arms, why bother to specifically limit Chinese?

Clearly, if there is some right to bear arms, hence to carry them, then either concealed carry might be prohibited or at least restricted, or open carry might be prohibited or at least restricted, but not both.

# 8.  Appendix

## 2 Edw III Statute of Northampton (1328)

144                    2 EDWARD III.   *Stat. Northampt.*              A.D. 1328.

**II.**
**Pardons for felony.**

Item, whereas offenders have been greatly encouraged, because [the [1]] charters of pardon have been so easily granted in times past, of manslaughters, robberies, felonies, and other trespasses against the peace ; it is ordained and enacted, that such charter shall not be granted, but only where the King may do it by his oath, that is to say, where a man slayeth another in his own defence, or by misfortune : [Rep., Stat. Law Rev. Act, 1863.] And also they have been encouraged, because that [[2] the justices of gaol-delivery, and of oyer and terminer, have been procured by great men [2]] against the form of the statute made in the **xxvij** year of the reign

**27 Ed. I. c. 3.**

of King Edward, grandfather to our lord the King that now is, wherein is contained, that justices assigned to take assises, if they be laymen, shall make deliverance ; and if the one be a clerk, and the other a layman, that the lay judge, with another of the country associate to him, shall deliver

**Justices of assise and gaol delivery.**

the gaols : Wherefore it is enacted, that such [justices [3]] shall not be made against the form of the said statute ; and that the assises, attaints, and certifications be taken before the justices commonly assigned, which should be good men and lawful, having knowledge of the law, and none other, after the form of another statute made in the time of the said [King Edward

**Oyers and terminers.**

the First ;[4]] and that the oyers and terminers shall not be granted but before justices of the one bench or the other, or the justices errants, and that for great [hurt,] or horrible trespasses, and of the King's special grace, after the form of the statute thereof ordained in time of the said grandfather, and none otherwise.

**III.**
**Riding or going armed in affray of the peace.**

Item, it is enacted, that no man great nor small, of what condition

[1] that
[2] *commissions of gaol delivery and of oier and terminer have been granted to persons procured*
[3] *commissions*       [4] *grandfather*

Ensement p[r] ceo q̃ meffesours ont este esbauditz de ce q̃ chartres de pdoun ont este si leg̃ment g•ntees avant ces heurs, des homicides, robies, felonies & autres trespas countre la pees ; acorde est & establi q̃ tiels chartres ne soient mes g•ntees fors qen cas ou le Roi le poet faire p son s̃ment, cest assavoir en cas ou home tue autre soi defendant, ou p infortune : [Rep., Stat. Law Rev. Act, 1863.] Et auxint ont este esbauditz de ceo q̃ Justiceries as deliv̂ances des gaoles, & a oier & ĩminer, ont estez g•ntees as gentz pcurez countre forme de lestatut fait en temps le Roi Edward, ael nr̃e Seign[r] le Roi qore est, en quele est contenuz q̃ les Justices as assises p̃ndre assignez sils soient lais, facent les deliv̂ances ; et si lun soit clerc, & lautre lais, q̃ le dit lais, associe a lui un autre du pais, facent la deliv̂ance des gaols ; p qoi acorde est & establi, q̃ tiels Justiceries ne soient mes g•ntees countre la forme du dit estatut, & q̃ les assises, atteintes, & ĉtifications soient p̃ses devant les Justices cõmunement assignez, q̃ soient bones gentz & loialx & conissantz de la lei, & nemie autres ; solonc la forme dun autre statut fait en temps meisme le ael ; et q̃ les oiers & ĩminers ne soient grantees forsq, - - - - devant les Justices de lun Baunk & de lautre, ou les Justices errantz ; & ce p[r] led & orrible trespas, & de lespeciale g•ce le Roi, solonc forme de statut de ce ordene en t•mps meisme le ael ; & nemie autrement.

Ensement acorde est & establi, q̃ nul, g•nt ne petit de quele condicion

24

A.D. 1328.    2 EDWARD III.   *Stat. Northampt.*    145

qil soit, sauve les ŝjantz le Roi en la p̃sence le Roi, & les Ministres le Roi, enfesantz execucion des mandementz le Roi, ou de lour office, & ceux qi sont en lour compaignies, eidantz as ditz ministres, & auxint au cri de fait darmes de pees, & ce en lieux ou tielx faitz se ferront, soit si hardi de venir devant les Justices le Roi, ou autres Ministres le Roi enfesant lour office, a force & armes ; ne force mesner en affrai de la pees, ne de chivaucher ne daler arme, ne de nuit ne de jour, en faires, marchees, nen p̃sence des Justices, ne dautres Ministres, ne nule part aillours, sur peine de pdre lour armures au Roi & de lour corps a la prisone a la volunte le Roi. Et q̃ Justices le Roi en lour p̃sences, viscountes & autres Ministres le Roi en lour baillies, seignʳs des fraunchises & lour baillifs en yceles, & Meire & Baillifs des Citees & Burghs deinz meismes les Citees & Burghs, Burghaldres, conestables, & gardeins de la pees deinz lour gardes, eient poair affaire execucion de cest acord. Et q̃ les Justices assignez, a lour venu en pais, eient poair denquere coment tielx Ministres & seignʳs ont use lour office en ce, & de punir ceux qils trovont, qi nount mie fait ce q̃ a lour office appent.

Et pʳce q̃ la pees ne poet mie estre bien garde sauntz bons ministres, come

soever he be, except the King's servants in his presence, and his ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,[1] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's justices in their presence, sheriffs, and other ministers ([2]) in their bailiwicks, lords of franchises, and their bailiffs in the same, and mayors and bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables, and wardens of the peace within their wards, shall have power to execute this act. And that the justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertained to their office.

Item, because the peace cannot be well kept without good ministers, as [1] upon a proclamation of deeds of arms in time of peace, and that in places where such deeds are to be done, —See Lib. Rub. Scac. Westm̃. fo. 122 b. a writ reciting a grant of K. Richard I. "qd Torneam̃ta sint in Angł in v. placias : Inł Sarr̃ & Wiltoñ : Inł Warrewich & Kenelingworth : Inł Stanford & Warneford : Inł Brakele & Mixebł : Inł Blie & Tykehiłł. Ita qd pax łre nr̃e nõ infringetʳ, nᵉ potestas Justiciaria minorabitʳ Nec de forestis nr̃is dãpnũ inferetʳ."
[2] *of the King*

IV.
The Statute of
Lincoln,
9 Edw. II.
concerning
sheriffs, &c.
confirmed.

K

**7 Edw II (1313)**

( 113 )

## STATUTES OF KING EDWARD THE SECOND.

### 7 EDWARD II. A.D. 1313.

### $\mathfrak{S}$tatutū sup' Aportam'to Armor'.*

A STATUTE FORBIDDING BEARING OF ARMOUR.

*Ex Rot. Pat. 7 Ed. II. P. 1. m. 14.
in Cedula.*

LE Roy, au Lieutenant, le Tresorier, & as Barons del Eschekier, Salutz. Come nadguaires devant ℮teines psones deputees a treter sr ascun debatz, euz, entre noᵒ & ascun de gᵃntz de nr̃e Roiaume, entre autres choses feust accordez, q̃ en nr̃e pchein plement ap̃s, p̃rveaunce se feist p noᵒ & le cõmun assentement des Prelatz, Contes, & Barons, q̃ en touz plementz, tretementz, & autres assembletz, q̃ se ferront en roiaume Denglet̃re a tuz jours, q̃ home veigne santz tote force & saunz armes, bien & peisiblement al honur de noᵒ, & a la pays de noᵒ & de nr̃e roiaume ; et ja en nr̃e [pchein¹] plement a Westm̃ ap̃s le ditz tretiz, les Prelatz, Contes, Barons, & la Cõmunalte de nr̃e Roiaume illoeq̃s assemblez, eu avisement de ceste bosoigne, noᵒ aient dit q̃ a noᵒ apent, & devons p nr̃e roiale Seignurie, defendre [portement²] darmes, & tote autre force contre nr̃e pais, a totes

¹ Old printed copies omit.

² fortement *old printed copies.*

THE King [to the justices of his bench,¹] sendeth greeting. Whereas of late before certain persons deputed to treat upon sundry debates had between us and certain great men of our realm, amongst other things it was accorded, that in our next Parliament after, provision [shall ²] be made by us, and the common assent of the prelates, earls, and barons, that in all Parliaments, [treatises,³] and other assemblies, which should be made in the realm of England [for ever,⁴] that every man shall come without all force and (⁵) armour, well and peaceably, to the honour of us, and the peace of us and our realm ; and now in our [next ⁶] Parliament at Westminster, after the said treatise, the prelates, earls, barons, and the commonalty of our realm, there assembled [to take ⁷] advice of this business, have said, that to us it belongeth, and our part (⁸) is, through our royal seigniory, straitly to defend [force ⁹] of armour, and all other force against our peace, at all

The King forbids the coming armed to Parliament, &c.

¹ *to the lieutenant, the treasurer and the barons of the Exchequer,*

² should          ³ treaties
⁴ *at all times,*    ⁵ without
⁶ Old translations omit.    ⁷ *taking*
⁸ jt                ⁹ *wearing*

* This title is in the margin of the roll. In the old printed copies this is intituled "Statutum de Defensione portandi Arma ;" and is ascribed to the seventh year of King Edward I. The English title is from the old translations.

H

114       7 EDWARD II. *Stat. sup. Apor. Arm.*      A.D. 1313.

times when it shall please us, and to punish them which shall do contrary, according to [our [1]] laws and usages of our realm; and ([2]) hereunto they are bound to aid us as their sovereign lord at all seasons, when need shall be: We command you, that ye cause these things to be read afore you in the said [bench,[3]] and there to be enrolled. Given at Westminster, the thirtieth day of October.

[1] the    [2] *that*    [3] *Exchequer*

les foiz q̄ nous plerra, & punir ceux q̄ contre vendront, selonc les leys & les usages de nr̄e roiaume; E q̄ a ce sont il tenuz de no⁰ aider cōme leur bon Seignr, totes les foiz q̄ mester r̄a; Vo⁰ mandons q̄ cestes choses facetz lire devant vo⁰ en le dit Eschekier, & illoeq̄s enrouler. Doñ a Westm̄ le xxx. jour Doctobr̄.

---

## 9 EDWARD II.   A.D. 1315–16.

### Articuli Cleri.

#### ARTICLES FOR THE CLERGY.*

*Ex magno Rot. Stat. in Turr.*
*·Lond. m.* 34. *d.*

STATUTE THE FIRST.

Of divers liberties granted to the clergy.

THE King to all to whom, &c. sendeth, greeting. Understand ye, that whereas of late ([1]) times of our progenitors sometimes Kings of England, in divers their Parliaments, and likewise after that we had undertaken the governance of the realm, in our Parliaments, many articles containing divers grievances, committed ([2]) against the Church of England, the prelates and clergy, were propounded by the prelates and clerks of our realm; and further, great instance was made that convenient remedy might be provided therein: and of late in our Parliament holden at Lincoln, the ninth year of our reign, we caused the articles underwritten, with certain answers made to some of them heretofore, to be rehearsed before our council, and made certain answers to be corrected; and to the residue of the articles underwritten, answers were made by us and our council; of

[1] *in the*    [2] *as it was therein asserted*

R. Om̄ib₃ ad quos, &c. Saltm. Sciatis q̄d cum dudum tempib₃ pgenitoɀ nr̄oɀ quondam Regū Angl̄, in div̄sis pliamentis suis, et simili⁊ postqᵃm regni nr̄i gubernacula suscepim⁰ in pliamentis nr̄is, p p̄latos & clerū regni nr̄i, plures articuli continentes gᵃvamina aliqua ecc̄lie Anglicane & ip̄is p̄latis & clero illata, ut in eisdem asserebatʳ, porrecti fuissent, & cū instancia supplicatū, ut inde appon̄etur remediū oportunū: Ac nup in pliamento nr̄o apud Lincolñ anno regni nr̄i nono, articulos subscriptos, & quasdam responsiones ad aliquos eoɀ prius f̄cas, corā consilio nr̄o recitari, ac quasdam responsiones corrigi, & cet̄is articulis subscⁱptis p nos & dc̄m consiliū nr̄m fecerim⁰

De div̄sis libt̄atib₃ clero concessis

* These titles are from the old printed copies and translations: The various readings in the notes marked *Rot. Pat.* are from an entry of this statute on the Patent Roll, 10 *Edw.* II. P. 2, *m.* 34.

**1** *Winthrop's Journal* **191** (1908)

## A CONTINUATION OF THE HISTORY OF NEW ENGLAND[1]

---

## 1636

8ber (*October*).] AFTER Mr. Endecott and our men were departed from the Pequod,[2] the twenty men of Saybrook lay wind-bound there, and went to fetch some of the Indians' corn; and having fetched every man one sackful to their boat, they returned for more, and having loaded themselves, the Indians set upon them. So they laid down their corn and gave fire upon them, and the Indians shot arrows at them. The place was open for the distance of musket shot, and the Indians kept the covert, save when they came forth, about ten at a time, and discharged their arrows. The English put themselves into a single file, and some ten only (who had pieces which could reach them) shot; the others stood ready to keep them from breaking in upon our men. So they continued the most part of the afternoon. Our men killed some of them, as they supposed, and hurt others; and they shot only one of ours, and he was armed, all the rest being without arms.[3] He was shot through the leg. Their arrows were all shot compass,[4]

[1] The manuscript of this, the second, part of the *Journal*, after having been copied by Savage, while still in his possession was destroyed by fire in 1825. Though his transcript, as he tells us, had not undergone "perfect verification" beyond 1639, there is no reason to think that his usual faithfulness is lacking; while therefore the loss is greatly to be regretted, we can be confident of having an accurate story.          [2] Now the Thames River.

[3] "Armed," that is, provided with defensive armor.

[4] "To keep compass" is in archery, according to the *Century Dictionary*, "to preserve a due elevation." To reach the distant foe the arrows, of necessity, described a high arc within view of the soldiers, who had time to dodge. The helplessness of the savages before fire-arms is very apparent.

191

Digitized by Google

**Sheridan,** *A Complete Dictionary of the English Language* (1789)

## ARE

ARCHIDIACONAL, àr-ký-dî-âk'-ô-nâl. a. Belonging to an archdeacon.

ARCHIEPISCOPAL, àr-ký-ê-pîs'-kô-pâl. a. Belonging to an archbishop.

ARCHITECT, âr'-ký-têkt. f. A profeffor of the art of building; a builder; the contriver of any thing.

ARCHITECTIVE, âr-ký-têk'-tîv. a. That performs the work of architecture.

ARCHITECTONICK, âr-ký-têk-tôn'-nîk. a. That which has the power or fkill of an architect.

ARCHITECTURE, âr'-ký-têk-thûr. f. The art or science of building; the effect or performance of the fcience of building;

ARCHITRAVE, âr'-ký-tràve. f. That part of a column which lies immediately upon the capital, and is the loweft member of the entablature.

ARCHIVES, âr'-kîvz. f. The places where records or ancient writings are kept.

ARCHWISE, ârtfh-wîze. a. In the form of an arch.

ARCTATION, ârk-tâ'-fhûn. f. Confinement.

ARCTICK, âr'-tîk. a. Northern.

ARCUATE, âr-kû-âte. a. Bent in the form of an arch.

ARCUATION, âr-kû-â'-fhûn. f. The act of bending any thing, incurvation; the ftate of being bent, curvity, or crookednefs.

ARCUBALISTER, âr-kû-bâl'-îf-tûr. f. A crofs-bow man.

ARDENCY, âr'-dên-fý. f. Ardour, eagernefs.

ARDENT, âr'-dênt. a. Hot, burning, fiery; fierce, vehement; paffionate, affectionate.

ARDENTLY, âr'-dênt-lý. ad. Eagerly, affectionately.

ARDOUR, âr'-dûr. f. Heat; heat of affection, as love, defire, courage.

ARDUITY, âr-dû'-î-tý. f. Height, difficulty.

ARDUOUS, âr'-dû-ùs. a. Lofty, hard to climb; difficult.

ARDUOUSNESS, âr'-dû-ùf-nês. f. Height, difficulty.

ARE, âr'. The plural of the prefent tenfe of the verb To be.

AREA, âr'-rýâ. f. The furface contained between any lines or boundaries; any open furface.

To AREAD, â-rê'd. v. a. To advife, to direct. Little ufed.

AREFACTION, âr-rê-fâk'-fhûn. f. The ftate of growing dry, the act of drying.

## ARI

To AREFY, âr'-rê-fý. v. a. To dry.

ARENACEOUS, â-rê-nâ'-fhûs. a. Sandy.

ARENOSE, â-rê-nôfe. a. Sandy.

ARENULOUS, â-rên'-û-lûs. a. Full of fmall fand, gravelly.

AREOTICK, â-rê-ôt'-îk. a. Such medicines as open the pores.

ARGENT, âr-jênt. a. Having the white colour ufed in the armorial coats of gentlemen, knights, and baronets; filver, bright like filver.

ARGIL, âr'-jîll f. Potters clay.

ARGILLACEOUS, âr-jîl-lâ'-fhûs. a. Clayey, confifting of argil, or potters clay.

ARGILLOUS, âr-jîl'-lûs. a. Confifting of clay, clayifh.

ARGOSY, âr'-gô-fý. f. A large veffel for merchandife, a carrack.

To ARGUE, âr-gû. v. n. To reafon, to offer reafons; to perfuade by argument; to difpute.

To ARGUE, âr-gû. v. a. To prove any thing by argument; to debate any queftion; to charge with as a crime; with *of.*

ARGUER, âr'-gû-ûr. f. A reafoner, a difputer.

ARGUMENT, âr-gû-mênt. f. A reafon alleged for or againft any thing; the fubject of any difcourfe or writing; the contents of any work fummed up by way of abftract; controverfy.

ARGUMENTAL, âr-gû-mên'-tâl. a. Belonging to argument

ARGUMENTATION, âr-gû-mên-tâ'-fhûn. f. Reafoning, the act of reafoning.

ARGUMENTATIVE, âr-gû-mên'-tâ-tîv. a. Confifting of argument, containing argument.

ARGUTE, âr-gû'te. a. Subtile, witty, fharp, fhrill.

ARID, âr'-rîd. a. Dry, parched up.

ARIDITY, â-rîd'-dî-tý. f. Drynefs, ficcity; a kind of infenfibility in devotion.

ARIES, â'-rýêz. f. The ram, one of the twelve figns of the zodiack.

To ARIETATE, â'-rýê-tâte. v. n. To butt like a ram.

ARIETATION, â-rýê-tâ'-fhûn. f. The act of butting like a ram; the act of battering with an engine called a ram.

ARIETTA, â-rý-êt'-tâ. f. A fhort air, fong, or tune.

ARIGHT, â-rî'te. ad. Rightly, without errour; rightly, without crime; rightly, without failing of the end defigned.

ARIOLATION, â-rý-ô-lâ'-fhûn. f. Soothfaying.

## ARM

To ARISE, â-rî'ze. v. n. pret. arofe, part. arifen. To mount upward as the fun; to get up as from fleep, or from reft; to revive from death; to enter upon a new ftation; to commence hoftility.

ARISTOCRACY, â-rîf-tôk'-krâ-fý. f. That form of government which places the fupreme power in the nobles.

ARISTOCRATICAL, â-rîf-tô-krât'-tl-kâl. a. Relating to ariftocracy.

ARISTOCRATICALNESS, â-rîf-tô-krât'-îl-kâl-nês. f. An ariftocratical ftate.

ARITHMANCY, â-rîth'-mân-fý. f. A foretelling of future events by numbers.

ARITHMETICAL, â-rîth-mêt'-tl-kâl. a. According to the rules or method of arithmetick.

ARITHMETICALLY, â-rîth-mêt'-tl-kâl-lý. ad. In an arithmetical manner.

ARITHMETICIAN, â-rîth-mê-tîfh'-ân. f. A mafter of the art of numbers.

ARITHMETICK, â-rîth'-mê-tîk. f. The fcience of numbers; the art of computation.

ARK, âr'k. f. A veffel to fwim upon the water, ufually applied to that in which Noah was preferved from the univerfal deluge; the repofitory of the covenant of God with the Jews.

ARM, ârm. f. The limb which reaches from the hand to the fhoulder; the large bough of a tree; an inlet of water from the fea; power, might, as the fecular arm.

To ARM, â'rm. v. a. To furnifh with armour of defence, or weapons of offence; to plate with any thing that may add ftrength; to furnifh, to fit up.

To ARM, â'rm. v. n. To take arms; to provide againft.

ARMADA, âr-mâ'-dâ. f. An armament for fea.

ARMADILLO, âr-mâ-dîl'-lô. f. A four-footed animal of Brafil.

ARMAMENT, âr'-mâ-mênt. f. A naval force.

ARMATURE, âr'-mâ-tûre. f. Armour.

ARMENTAL, âr-mên'-tâl. }  a.
ARMENTINE, âr-mên-tîne. } Belonging to a drove or herd of cattle.

ARMGAUNT, â'rm-gâ'nt. a. Slender as the arm; or rather, flender with want.

ARM-HOLE, â'rm-hôle. f. The cavity under the fhoulder.

ARMI-

Digitized by Google


MacNally, 1 *The Justice of the Peace for Ireland* 32 (1808)

## Affrays.

either *en officio*, or by force of a writ out of chancery, formed upon the statute, and that if he find any person in arms contrary to the statute, he may seize the arms, and commit the offender to prison; and, that he ought also to make a record of his whole proceedings, and certify the same into the chancery, where he proceeds by force of the said writ, or into the exchequer where he proceeds *ex officio.* 1 *Hawk. c.* 63. *f.* 5.

2. That where a justice of peace, or other person empowered to execute the statute, proceeds upon the said writ, he may not only imprison those whom he shall find offending against the statute in his own view, but also those who shall be found by an inquest taken before him, to have offended in such manner in his absence: and he may do the same where he proceeds *ex officio;* for as the writ hath no other foundation than the statute, and is the most authentic explication thereof, it seems that the rules therein prescribed, should be the best direction for all proceedings upon that statute. 1 *Hawk. c.* 63. *f.* 6·

3. That when the writ is directed to the sheriff by the name of his office, and not by a particular name, nor doth expresly command him to do it in person, the under sheriff may do it. *Levett against Farrer. Croke Eliz.* 294.

4. That a man cannot excuse the wearing of such armour in public, by alledging that such a one threatened him, and that he wears it for the safety of his person from his assault; but no one shall incur the penalty of the statute, for assembling his neighbours and friends in his own house, against those who threaten to do him any violence therein, because a man's house is as his castle. 1 *Hawk. c.* 63. *f.* 8.

5. That no wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people; therefore, persons of quality are in no danger of offending against this statute by wearing common weapons, or having their usual number of attendants with them, for their ornament or defence, in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace. And persons armed with privy coats of mail, to the intent to defend themselves, against their adversaries, are not within the meaning of this statute, because they do nothing in terror of the people. 1 *Hawk. c.* 63. *f.* 9.

6. That·

## 2 The *Encyclopaedia Londinesis* 201 (1810)

### ARM

appear to have been ufed before they came to iron and fteel. Jofephus affures us, that the patriarch Jofeph firft taught the ufe of iron arms in Egypt, arming the troops of Pharaoh with a cafque and buckler. What contributed moft to render the Romans mafters of the world, was, that, having fucceffively warred againft all nations, they conftantly renounced their own methods, arms, &c. whenever they met with better. Thus Romulus during his war with the Sabines, a bold and warlike nation, adopted their broad buckler in lieu of the fmall Argian buckler, which he had ufed till that time.

The principal arms of the ancient Britons were hatchets, fcythes, lances, fwords, and bucklers: the Saxons, &c. brought in the halberd, bow, arrows, arbalifts, &c. By the ancient laws of England, every man was obliged to bear arms, except the judges and clergy. Under Henry VIII. it was exprefsly enjoined on all perfons to be regularly inftructed, even from their tender years, in the exercife of the arms then in ufe; viz. the long bow and arrows; and to be provided with a certain number of them. 33 Hen. VIII.

ARMS, in the underftanding of the law, are extended to any thing that a man wears for his defence, or takes into his hands, or ufeth in anger to ftrike or caft at another. *Cromp. Juft. 65.* Arms are alfo what we call *infignia*, enfigns of honour; as to the original of which, it was to diftinguifh commanders in war; for the ancient defenfive armour being a coat of mail, &c. which covered the perfons, they could not be diftinguifhed, and therefore a certain badge was painted on their fhields, which was called *arms*; but not made hereditary in families till the time of Richard I. on his expedition to regain Jerufalem from the Turks: and, befides fhields with *arms*, they had a filk coat drawn over their armour, and afterwards a ftiff coat, on which their *arms* were painted all over, now the herald's coat of *arms. Sid. 352.* By ftat. 13 Rich. II. c. 1. The conftable (lord high conftable) fhall have cognizance of contracts touching deeds of arms done out of the realm; but it feems he cannot punifh for painting coats of arms, &c. 2 *Hawk. P. C. c. 4. f. 5. 8.* By the common law it is an offence for perfons to go or ride *armed* with dangerous and *unufual* weapons: but gentlemen may wear common armour, according to their quality. 3 *Inft. 160.* By ftatute 7 Edw. I. fl. 1. The king may prohibit force of *arms*, and punifh offenders according to law; and herein every fubject is bound to be aiding. And by ftat. 2 Edw. III. c. 3. enforced by ftatutes 7 Rich. II. c. 13. and 20 Rich. II. c. 1. None fhall come with *force* and *arms* before the king's juftices, nor ride nor go *armed* in affray of the peace, on pain to forfeit their armour, and fuffer imprifonment, &c. Under thefe ftatutes none may wear (unufual) armour publicly upon pretence of protecting his *perfon*; but a man may affemble his neighbours to protect his *houfe*, without tranfgreffing the act. 1 *Hawk. P. C. 267.* But no wearing of arms is within the ftatute, unlefs they are fuch as *terrify*, therefore the weapons of fafhion, as fwords, &c. or privy coats of mail, may be worn. *Id.* ib. And one may arm to fupprefs riots or dangerous infurrections. *Id. 268.* By the Bill of Rights, 1 Will. & Mary, fl. 2. c. 2. it is declared, that " the fubjects which are Proteftants may have arms for their defence fuitable to their conditions as allowed by law." 33 Hen. VIII. c. 6. Embezzeling the king's armour or arms, felony; ftat. 31 Eliz. c. 4. Armr may be exported, unlefs prohibited by proclamation; ftat. 12 Car. II. c. 4. Importing arms or ammunition prohibited; 1 Jac. II. c. 8.

FIRE-ARMS, are thofe charged with powder and ball: fuch are cannon, mortars, and other ordnance; mufkets, carabines, piftols, and even bombs, granadoes, carcaffes, &c.

ARMS, *faft of*, was a kind of combat in ufe among the ancient cavaliers.

ARMS, *ftand of*. A ftand of arms fignifies a mufket, a bayonet, a fword, belt, and cartridge-box.

ARMS *of parade, or courtefy*, were thofe ufed in the ancient jufts and tournaments; which were commonly unfhod lances, fwords without edge or point, wooden fwords, and even canes.

VOL. II. No. 66.

### ARM

ARMS denote the natural weapons, or parts of defence, of beafts: as claws, teeth, tufks of elephants, beaks of birds, &c.

ARMS are alfo ufed figuratively for the profeffion of a foldier. Thus we fay, He was bred to arms.

ARMS, or *Armories*, are alfo ufed in heraldry for marks of dignity and honour, regularly compofed of certain figures and colours, given or authorifed by fovereigns, and borne in banners, fhields, coats, &c. for the diftinction of perfons, families, and ftates; and paffing by defcent to pofterity. They are called *arms*, in regard they are borne principally on the buckler, cuirafs, banners, and other apparatus of war. They are alfo called *coats of arms, coat armour, &c.* becaufe anciently embroidered on furcoats, &c. See HERALDRY. Some will have the name to have been firft occafioned by the ancient knights, who in their jufts and tournaments bore certain marks (which were frequently their miftrefs's favours) in their armour, i. e. their helmet or fhield, to diftinguifh them from each other.

ARMS, at prefent, follow the nature of titles, which being made hereditary, thefe are alfo become fo, being the feveral marks for diftinguifhing families and kindreds, as names are of perfons and individuals.

ARMS are varioufly diftinguifhed by the heralds, as appertaining to different events, great and noble acquifitions, alliances of ftates or families, of communities, focieties, &c. for all which fee HERALDRY.

ARMS, in falconry, denote the legs of a hawk, from the thigh to the foot. See FALCONRY.

ARM'SEN, a mount of Germany, in the circle of Weftphalia, and county of Verden, feven miles eaft-fouth-eaft of Verden.

ARM'STRONG (Dr. John), an eminent phyfician, poet, and mifcellaneous writer, was born in Caftleton parifh, Roxburghfhire, where his father and brother were minifters; completed his education in the univerfity of Edinburgh, where he took his degree in phyfic, Feb. 4, 1732. It has been obferved of Dr. Armftrong, that his works have great inequalities, fome of them being poffeffed of every requifite to be fought after in the moft perfect compofition, while others can hardly be confidered as fuperior to the productions of mediocrity. " The Art of preferving Health," his beft performance, which was publifhed in 1744, will tranfmit his name to pofterity, as one of the beft Englifh writers. In 1750, Dr. Armftrong publifhed his Mifcellanies, in two vols. An Epiftle to a young Critic, 1753. Imitations of Shakefpeare and Spenfer. The Univerfal Almanac, by Noureddin Ali. And, in 1771, he publifhed, A fhort Ramble through fome Parts of France and Italy; and a quarto pamphlet, under the title of Medical Effays. He died in September, 1779.

ARMUY'DEN, or ARNEMU'DEN, a ftrong fea-port town of Zealand, fituated on the eaftern fide of the ifland of Walcheren. It was anciently fo confiderable as to be divided into the Old and New town; the conveniences of the port, with the depth of water, and its proximity to the fea, drawing a great deal of commerce to it. The fea has feveral times done confiderable damage, particularly in 1438. In 1571, it was furrounded with walls, and had the privileges of a city granted; the trade, chiefly in falt, is now not confiderable. Its harbour being choked up, the fea is made navigable by means of a canal to Middleburg, from which city Armuyden is diftant one league eaft, and two north-north-eaft from Fluffing. Lat. 51. 31. N. lon. 3. 42. E. Greenwich.

A'RMY, f. [*armée*, Fr.] A collection of armed men, obliged to obey one man. *Locke.*—Number itfelf imparteth not much in armies, where the people are of weak courage. *Bacon.*—The meaneft foldier, that has fought often in an *army*, has a truer knowledge of war, than he that has writ whole volumes, but never was in any battle. *South.* A great number.—The fool hath planted in his memory an army of good words. *Shakefpeare.*

Armies were anciently a fort of militia, compofed chiefly of the vaffals and tenants of the lords, or of people chofen

3 F                                              by



**Keble,** *An Assistance to the Justices of the Peace for the Easier Performance of their Duty* 147 (1689)

---

### Affray. 147

without fuch Addition as is put in the Original Pannel or Tales, wherein fuch Juror fhall be fo returned.

XVI. *Cromp.* J. P. 101. §. 10. a Perfon was Indicted *Mich:* 25 Eliz. in *B. R.* by the name of *A. B.* Parfon of *Dale,* and it was Ruled to be a void Indictment becaufe he may be Parfon of *Dale,* and yet he may abide elfewhere *Lamb,* 4. cap. 5. pag. 482. *Cromp.* 110. §. 25. [Incumbent.]

XIX. *Cromp.* J. P. 102. §. 25. the Addition and other things according to the Statute of 1 H, 5, 5. fhall be in the premifes of the Bill, and not in the *alias dictus;* 1 Ed, 4. 1. *Cromp.* 109. §. 5. 13. 17. 36 H 8. 28. [Nofine.]

#### Affearment, fee Amerciament.

#### Affray.

*Affault, Trefpafs, Battery, Force, Menace, Riot, Threats, Violence, Striking, Quarrels, Behaviour.*

I. *Lamb.* 2. cap. 3. page 125. Affray fignifieth to terifie, or bring fear, which the Law underftandeth to be a common wrong; and therefore it is ( ⅓ Inft. 158. ) inquirable, and punifhable in the turn of the Sheriff, and in a Leet, 4 *H.* 6. 10. & 8 *Ed.* 4. 5. *Dalt.* J. P. 35. otherwife it is of an Affault, as it feemeth by thofe very Books. [Menace.]

II. *Lamb.* 126. *Ibidem.* Yet may an Affray be, without word or blow given; as if a man fhall fhew himfelf furnifhed with Armour or Weapon which is not ufually worn; it will ftrike a fear upon others that be not armed as he is; and therefore both the Statutes of *Northampton* (2 *Ed.* 3. 3.) made againft wearing Armour, do fpeak of it, by the words, *Affray del pair & in terrorem populi, furety. Br.* 12. *Bolt.* J. P. 249. §. 14. [Peace.]

III. *Lamb.* 126. But an Affault, &c. cannnot be performed without the offer of fome hurtful blow, or at the leaft of fome fearful Speech. [Trefpafs.]

IV. *Lamb.* 127. Menacing, Affrays, Affaults, and injurious and violent Handlings and Mif-intreatings of the perfon, Batteries and malicious Strikings, &c. be breaches of the Peace, and do draw after them the forfeiture of a Recognizance knowledged for the keeping of the Peace. *Lamb.* 111. [Menace.]

V. *Lamb.* 2. cap. 3. page 130. A Juftice of Peace is undoubtedly for this purpofe endowed with no lefs Power than every private man Mafter, Kindred, School-mafter, or any Conftable hath, as it is plain by 14 *H.* 7. 8. & 9 *Ed.* 4. 3. [Juftices.]

VI. *Lamb.* 130, 131. The Law looketh that every private perfon who fhall happen to be prefent at an Affray, Affault, or Battery, ( for now I will, with other men, confound their names ) fhould do his part to part them that fight together; and it doth to that end enable him alfo with fome portion of Authority. [Aid.]

VII. *Lamb.* 131. If two be fighting, every ftander-by may lawfully, and fhall do well to put them in funder; and if he take hurt thereby, he fhall have his remedy by action againft him that did the hurt: but yet he being but a private man, may do no hurt, if they refift, for they alfo fhall then have action againft him, wherein his Cafe differeth from the Cafe of an Officer, *Lamb.* 132. *Dalt.* 33. cap. 1. [Action fup. caf.]

VIII. *Lamb.* 131. *Ibid.* If an Affray be in the high ftreet, and one cometh towards it with Harnefs or Weapon, to joyn with the one, or other party, every one that feeth it may ftay him till the Affray be ended. *Dalt.* 33. cap. 8. *Cromp.* 146. [Officer.]

Bb 2                                    IX.

Digitized by Google

**49** *London Magazine* **290 (1780)**

part, and threw the man over a wall into St. James's church-yard. They then proceeded to demolishing the windows and doors, and entering the chapel, threw every thing that was moveable into the street, and burnt them. While this was transacting, a party of the Bath volunteers came armed, and endeavoured to disperse the mob; one of them fired, and killed an officer. This instead of having the desired effect, served only to enrage them still more. They immediately set fire to the chapel, which in a short time was burnt down, together with fix or seven new-built houses adjoining, the property of Roman Catholicks. Their numbers by this time were encreased to 8000 or 10,000. We do not hear that they committed any further mischief.

WEDNESDAY, 14.

Yesterday judgement was moved for in the Court of King's Bench against the persons concerned in obstructing the workmen employed by the city of London in making a horse towing-path at Richmond. Some objections were made in point of law to the indictment, and over-ruled by the unanimous opinion of the court, which set the right of the corporation to improve the navigation of the river in the clearest light; for the court said, that the city was authorised by act of parliament to complete the navigation by all ways and means in their discretion; but as the city of London meant merely to establish their right, and not to insist on exemplary punishment, a nominal fine only was inflicted of 6s. 8d.

THURSDAY, 15.

At a court of aldermen held on Tuesday at Guildhall, the Lord Mayor laid before the court a letter he had received from the president of the privy council, acknowledging the zeal and attention the court had shown in their resolutions of Saturday last, to suppress and prevent tumultuous assemblies in the city.

On Tuesday the Lord Mayor received the following orders:

*Adjutant-General-Office, June 7, 1780.*

" In obedience to an order of the king in council, the military is set without waiting for directions from the civil magistrates, and to use force for dispersing the illegal and tumultuous assemblies of the people.

WM. AMHERST, Adjutant-gen."

On Tuesday night, at 10 o'clock, the Lord-Mayor was waited on by the commanding officer of the troops in this city, with a letter from a general officer, setting forth, that the military and militia, under the direction of the court of lieutenancy, might guard the city; whereupon the Lord-Mayor summoned a court of aldermen, also the recorder and city counsel, and yesterday they met at Guildhall, where some debates ensued, when the recorder and counsel gave their opinions that every housekeeper was a militia-man, and had a right to bear arms, and the court being of the

same opinion, it was resolved to send a polite answer to the general officer's letter, signifying the same.

FRIDAY, 16.

On Tuesday night, at ten o'clock, the Lord Mayor was waited on by the commanding officer of the troops in this city, with the following letter:

*Copy of a letter from Lord Amherst to Colonel Twisleton, a copy of which was on the same day officially sent to the several aldermen of the city of London.*

*Whitehall, June 13, 1780.*

" S I R,

" I received the favour of your letter of this date, on the subject of the inhabitants of this city being permitted to carry arms, and I cannot say more on the general subject than I mentioned in my letter to you of yesterday's date, which was a clear disapprobation of that part of the Lord-Mayor's plan which regards the arms.

" If, therefore, any arms are found in the hands of persons, except they are of the city militia, or are persons authorised by the king to be armed, you will please to order the arms to be delivered up to you to be safely kept until further orders. I am, Sir, &c.            AMHERST."

Lieutenant-Colonel Twisleton.

In clearing away the rubbish from the houses burnt down at Holborn-Bridge, dead bodies are daily found, supposed to be persons who were so stupidly drunk, that they had not power to get away when the buildings were on fire.

MONDAY, 19.

A letter from Hull, dated Monday, June 12, says, " That on Sunday night last a riot happened at that place; it began by a parcel of boys, set on by some riotous people; they began by destroying the popish Chapel by fire, and breaking the shutters, windows, and effects of Mr. Williams, druggist, a Catholick; they continued till twelve o'clock at night, when Lord Euston, Colonel of the Suffolk militia, by order of the civil power, posted guards at every place that appeared in danger, and by proper care they are dispersed at present.

TUESDAY, 20.

The following is the answer of the lord president of the council to a letter received from the lord-mayor on Wednesday last:

*Whitehall, Council-chamber, June 15.*

MY LORD,

" I have been honoured with your lordship's letter of yesterday's date, and have laid the same before the lords of the privy-council, and am to inform your lordship, that we apprehend Lord Amherst's letter to your lordship of the 13th instant has not been properly understood; for when he speaks of the arms in the hands of the city militia, or other persons authorised by the king to be armed, he certainly includes the arms in

Digitized by Google

**49** *London Magazine* **291 (1780)**

in the hands of the citizens and houfekeep-pers, who, by virtue of an order of the court of licutenancy, are required to keep them in their houfes; and Colonel Twiflet, has put the proper conftruct on on thofe letters, by only taking arms from fufpected perfons, or thofe who could not give a good account of themfelves. While the militia, neceffary for the prefervation of the publick peace, remain in the city, it will, no doubt, be proper that the order of the ad utant general for their acting without waiting for the direction of the civil magiftrate fhould continue in force. The attention paid by the inhabitants in prefeving the peace of the feveral wards is extremely commendable; yet the greateft care fhould be taken that any armed houfekeepers do not expofe themfelves to the military, who in a tumult might not be able to diftinguifh them from the rioters. I have the honour to be, my lord, your lordfhip's moft obedient humble fervant,       BATHURST, P.

THURSDAY, 22.

Certain advice is received from Macoa, a fettlement of the Portuguefe in the river Canton, of the arrival of the Revolution and Difcovery in great diftrefs, and in want of provifions. Upon the death of Capt. Cook, Capt. Clerke fucceeded in the command of the two fhips, and Lieutenant Gore to be captain of the Difcovery; but on the death of Captain Clerke, a fatal misfortune to the world in general, and his friends in particular, Lieutenant King fucceeded to his place.

SATURDAY, 24.

The difpatches of the late circumnavigators, Cook and Clerke, brought by the laft fhips from China, were carried to the king on Thurfday laft, with a complete journal of the procedure of both the captains in their purfuit of difcoveries, down to Captain Clerke's death, which is faid to have been in confequence of a confumptive complaint.

MONDAY 26.

On Saturday at one o'clock came on at Guildhall the annual election for the city officers. The bufinefs was opened by the recorder, who told the livery that much depended on their choice at this critical time, and therefore defired them to be very particular in their men. The following were the names put up for fheriff, viz. Meff. Kirkman, Wooldridge. Sainfbury, Aldermen; Meff. Mackreth, Taylor, and Bloxam, commoners; when the aldermen Kirkman and Sainfbury were chofen by a great majority. Mr. Bloxam had a good fhow of hands, Mr. Wilkes was then put up for chamberlain, when much haffling enfued, and fome perfons cried out "off, off, no popifh chamberlain".

Mr. Wilkes repeatedly attempted, but in vain, to addrefs the livery at large: the fpeech which he at length made was only heard,

and that imperfectly, by the few individuals around him. The report of it was, that as he had hitherto, fince his election to the office of chamberlain for he now promifed in future to devote every hour of his life to the duties of that office, and the welfare of his fellow citizens.

Mr. Pinhorn mounted the huftings, and demanded of Mr. Wilkes why he did not refign his alderman's gown?

Mr. Wilkes with fome difficulty was at laft permitted to fay, "that as he had declared his refolution three years ago of retaining his gown for the fole purpofe of protecting the rights and privileges of the city againft the arbitrary wanton of the lords and commons; fo he was determined now, whether he was permitted to retain the chamberl infhip or not (as fimilar occafions for his fervices might probably again occur) he never would lay down his gown but with his life."

He then proceeded: "If any gentleman will ftand forth, and accufe me of any abufe in my power, or neglect of my duty in any of the various publick offices with which I have been honoured, I am ready and willing here to anfwer fuch accufations, even if they fhould detain me till tomorrow morning."

A gentleman then faid he nominated Mr. James as a candidate for the chamberlainfhip. This occafioned a new tumult; at the clofe of which Mr. Wilkes's name was announced for the office of chamberlain, received with great fhouts, and a very large fhow of hands; and no other name being put up, the fheriffs declared him duely elected chamberlain for the enfuing year.

The thanks of the hall were afterwards voted to Mr. Bull, for his upright and uniform conduct in parliament, as one of the reprefentatives of this city, on the motion of Mr. John Reynolds, attorney, and the town clerk was ordered to wait on Mr. Bull with them.

On Saturday morning all the guards were drawn off, on account of the common-hall being held that day, from Guildhall, and were placed in the Royal-Exchange

On Thurfday the city remembrancer waited on Mr. Juftice Gould, at his houfe in Lincon's Inn Fields, with the thanks of the common council, when we hear the learned judge declined accepting the freedom, which was voted him in a gold box.

## COUNTRY NEWS.

Birmingham, June 5.

On Monday laft in the afternoon, about five o'clock, there was a terrible ftorm of hail, attended with thunder and lightning, at Loughborough, which did confiderable damage. Some hail ftones were meafured, and found to be three inches in circumference. The hail broke a number of windows

Digitized by Google

**49 London Magazine 467**

Thefe refolutions were carried almoft una-nimoufly.

*Mr. Burke* then made a fevere fpeech on the conduct of minifters, in not taking proper meafures to collect the civil power in time, to prevent the mifchief that had happened; he bewailed in the moft pathetic terms, the deplorable fituation of parliament, having a bludgeond mob waiting for them in the ftreets, and a military force with their bayonets fixed at their doors, to guard the freedom of debate.

*Sir George Savile* fpoke to the fame purport; at length, *General Conway* moved, "That as foon as the prefent tumults fub-fide, which are now fubfifting, the Houfe will proceed to take into confideration the petitions from many of his majefty's Proteftant fubjects."

*Lord George Gordon* preffed the naming a fixed day, and faid, the people would difperfe upon knowing for a certainty, on what day they fhould receive fatisfaction. After a confufed debate, and intelligence received of the conflagrations in the city, the Houfe haftily adjourned. The next day the committee fat upon an examination of Lord George Gordon's advertifement, by which the people were illegally affembled in St. George's-Fields. They alfo examined the door-keepers of the Houfe, refpecting the tumults in the Lobby, on Friday the 2d inft. and afterwords broke up.

*Friday, June 8.*

The Speaker, attended by upwards of forty members, which number conftitutes a Houfe, took the chair, and immediately, *The Lord Advocate for Scotland,* after expatiating on the horrors of the two preceding days, fhowed the expediency of adjourning till public tranquillity fhould be reftored. Accordingly he moved an adjournment till Monday the 19th, when he hoped they fhould all meet in peace, which motion was carried unanimoufly.

**HOUSE OF LORDS.**

*Monday, June 19.*

BOTH Houfes being met, his majefty (unexpected by the public) came to the Houfe of Lords, and being feated on the throne, with the ufual folemnity, fent for the Commons; upon whofe appearance, with their Speaker, at the bar, his majefty made the following moft gracious fpeech.

"My Lords and Gentlemen,

"THE outrages committed by bands of defperate and abandoned men, in various parts of this metropolis, broke forth with violence into acts of felony and treafon, had fo far overthrow all civil authority, and threatened fo directly the immediate fubverfion of all legal power, the deftruction of all property, and the confufion of every order in the ftate, that I found myfelf obliged, by every tie of duty and affection to my people, to fupprefs, in every part, thofe rebellious infurrections, and to provide for the public fafety, by the moft effectual and immediate application of the force entrufted to me by parliament.

"I have directed copies of the proclamations iffued upon that occafion to be laid before you.

"Proper orders have been given for bringing the authors and abettors of thefe infurrections, and the perpetrators of fuch criminal acts, to fpeedy trial, and to fuch condign punifhment as the laws of their country prefcribe, and as the vindication of public juftice demands.

"Though I truft it is not neceffary, yet I think it is right at this time, to renew to you my folemn affurances, that I have no other object but to make the laws of the realm, and the principles of our excellent conftitution in church and ftate, the rule and meafure of my conduct; and I fhall ever confider it as the firft duty of my ftation, and the chief glory of my reign, to maintain and preferve the eftablifhed religion of my kingdoms, and, as far as in me lies, to fecure and to perpetuate the rights and liberties of my people."

After the king left the Houfe, an addrefs of thanks was moved by the *Duke of Dorfet,* expreffing the ftrongeft approbation of the meafures taken to fupprefs the late riots. The motion was feconded by *Lord Dudley Ward,* who expreffed his fenfe of the wifdom and lenity fhown by his majefty upon this occafion.

*The Duke of Richmond* objected to fome parts of the addrefs, which was as ufual, a re-verberation of the fpeech: in his opinion, an immediate application had not been made of the force entrufted to his majefty by parliament; his grace likewife doubted the abfolute neceffity there was for making ufe of the military; if the magiftrates had done their duty, the civil power would have been fufficient; and as upon their failure the military came too late, it could not be faid, that immediate relief had been given to the fubjects in the hour of their greateft diftrefs. His next object of cenfure was the conduct of the Commander in Chief of the army, for the letters he fent to Colonel Sulleton, who commanded the military force in the City, ordering him to difarm the citizens, who had taken up arms, and formed themfelves into affociations, for the defence of their lives and properties. Thefe letters he confidered as a violation of the conftitutional right of Proteftant fubjects, to keep and bear arms for their own defence.

*Lord Amberft* replied, that what he had done was in confequence of a reprefentation from the Lord Mayor and court of aldermen to the Privy-council, that the mob had got poffeffion of various kinds of arms, and

N n n 2                among

Case 2:19-cv-00617-KJM-AC   Document 29-2   Filed 07/02/29   Page 48 of 91

among the rest, of firelocks, with which they were doing great mischief, and defiring that the military might be ordered to take them from the rioters, but no paffage in his letters could be construed to mean, that the arms fhould be taken away from the affociated citizens, who had very properly armed themfelves for the defence of their lives and property.

*Earl Bathurft* ftated the difference between the right of bearing arms for perfonal defence, and that of bodies of the fubjects arraying themfelves, without a commiffion from the king; the latter he declared to be unlawful.

The *Duke of Manchefter* called upon the lords in adminiftration to inform the Houfe how long the town was to be furrounded by a military force; concurred with his grace of Richmond in opinion, that the deliberations of parliament could not be faid to be carried on with freedom, while an army was almoft at their doors; and wifhed to know if at that moment they were under the government of martial law, or the law of the land.

*Earl Talbot* befought the Houfe to be unanimous in their addrefs, that foreign countries might know, that the Houfe really difapproved, and condemned thofe outrages which had brought upon us a national difgrace never to be defaced.

*Earl Mansfield* now made an excellent fpeech, which, as it explained the law, and may ferve as a rule of conduct upon any fimilar emergency, we fhall give at large, and nearly in the words of the learned lord.

To prevent any mifreprefentations going forth to the public concerning the late proceedings, he faid, he thought it his duty to ftate to the Houfe what is the law of the land, and to declare that every thing that had been done for the fuppreffion of the late riots had been done not by virtue of the royal prerogative, but exactly in conformity to the law of the land, and all the proceedings he maintained muft be juftified or condemned by the law of the land. No command from the king, no order from the privy-council, can make that lawful which is not fo by the law of the land. Neither can the military plead any fuch command or order for acts of violence not authorifed by law; they cannot be tried for them by a court-martial, they are accountable to the laws of their country.

There are circumftances in which there is no diftinction between the civil and the military men. Such was the prefent cafe; a banditti, a numerous mob, proceeding by a regular plan, on a fudden grow too powerful for the civil magiftrates and the peace officers under them; under a fpecious pretext of religion, they proceed to acts of felony and treafon, fubverfive of all government; they fet open prifons, burn down houfes, attack

courts of juftice, and public offices, no way concerned in the bill in queftion. For my own part, faid his lordfhip, it happened by accident that I never attended while the bill was before the Houfe; I never opened my lips about it; I fay by accident, becaufe as there was no oppofition, and I had other duty, I was not in the Houfe when it was paffed. But my opinion is well known; I have always thought it agreeable to the laws of God, and of nations, to fuffer every man, to enjoy religious toleration; I have expreffed it upon many occafions in favour of the Proteftant Diffenters, and have fupported the Methodifts, when they have been obliged to profecute perfons for difturbing them in their worfhip.

As to this bill, if an abufe has been made of it, if the Roman Catholics do not confine themfelves to educating their own children at home, inftead of fending them abroad, which was more detrimental, but will undertake to educate Proteftant children, fome ftep may be taken to alter the bill, and prevent it; the wifdom of parliament will provide for that; the Romifh fchools may be regiftered, and the number of their children, and returns be made to the bifhop of every diocefe. It may alfo be made criminal in them to undertake the education of. Proteftant children; but this is a matter of confideration for another day.

His lordfhip then ftated, that in cafes of rebellion, or of fuch infurrections of the people, wherein felony or treafon is actually committing or committed, every man has a right to interfere, to fupprefs or prevent it. His lordfhip then defcribed various acts of felony and treafon committed by the late mobs, fuch as pulling down and fetting fire to houfes, breaking open prifons, attacking the bank, &c. all of which amounted to levying war againft the king's perfon and government; and he particularly dwelt upon infurrections, to oblige the legiflature to repeal laws en Ďed, or to enact any laws by compulfion, as acts of high treafon.

The conclufion he drew was, that in all thefe cafes any fubject, whether civil or military, has a right to apprehend and fecure the offenders; and if he cannot, he may proceed to the extremeft violence; he may put them to death; and this is the law of the land; the military therefore did not act by the prerogative of the crown, but by the law of the land.

The addrefs was then voted *nemine contradicente*.

*The Duke of Richmond* next moved an addrefs to his majefty, "That he would be pleafed to order the two letters from Lord Amherft to Colonel Twifleton, dated June the 12th and 13th, to be laid before the Houfe.

*Lord Amherft* faid, there was a third letter to the Lord Mayor, explanatory of the others,

2        which

Digitized by Google

**Francois Xavier Martin,** *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* **iii (1792)**



**Francois Xavier Martin,** *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* **iv** *(1792)*



( iv )

that species of tenure, I have thought it improper to reject, as a great deal of property in this state is still secured under them: and in a few instances, an obsolete statute has been retained, having been deemed necessary for the illustration of others.

By such additions the collection has been swoln a little: but this inconvenience, I trust, will be fully compensated by the advantages that will result from it. The bar will have the opportunity of making their own application, and the bench will be able to judge with more safety.

I MADE use of *Hawkins'* and *Ruffhead's* editions. The former being generally allowed to be the more respectable, I printed after it, except in very few instances indeed, when, not finding the translation in that, I resorted to the latter.

MANY of the statutes were couched, at the time of their being enacted, in the latin or French language. I have been advised to print the translation only. I presume it will be deemed sufficient. Its long use seems to have given it a sort of prescriptive authority, and it is said to have been done, for the most part, with great learning and correctness.

I HAVE prefixed to the work a table of chapters, containing, after the title of each, a reference to such statutes and acts of assembly on the same subject, as were proper to be considered. Should it fail in a few instances to give satisfaction, by recurring to the index, the reader will, no doubt, find what he vainly sought for in the table. I have endeavoured to make them both as copious and correct, as all the attention and accuracy it was in my power to command could render them.

SUCH is the plan which I thought would best answer the intentions of the legislature. I have prosecuted it in the best manner I was able. How far my endeavours have been attended with success remains to be decided. I cherish the hope that the necessity there was for such a publication will render it acceptable—even from the hands of one, who does not possess the talents which the importance of the subject required. It will at least serve to disseminate the knowledge of a number of laws by which the people of this state are to be governed, until, substituting acts of their own legislature to those their forefathers brought over from Great-Britain, they will shake off this last seeming badge, and mortifying memento, of dependence on her.

F. X. MARTIN.

*Newbern, July 15, 1792.*

40

**Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina 60 (1792)**

( 60 )

## C H A P.  VIII.

*Nothing fhall be taken for Beaupleader.*

ITEM, Whereas fome of the realm have grievoufly complained, that they be grieved by Sheriffs, naming themfelves the King's approvers, which take money by extortion for Beaupleader, the King will, that the ftatute of Marlebridge fhall be obferved and kept in this point.

## C H A P.  XIV.

*None fhall commit Maintenance.*

ITEM, Becaufe the King defireth that common right be adminiftered to all perfons, as well poor as rich, he commandeth and defendeth, that none of his Counfellors, nor of his houfe, nor none other of his Minifters, nor no great man of the realm by himfelf, nor by other, by fending of letters, nor otherwife, nor none other in this land, great nor fmall, fhall take upon them to maintain quarrels nor parties in the country, to the let and difturbance of the common law.

Statutes made at Northampton, tribus Septimanis Pafchae, in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328.

## C H A P.  I.

*A Confirmation of the Great Charter and the Charter of the Foreft.*

[Unnecefary to be inferted.]

## C H A P.  III.

*No Man fhall come before the Juftices, or go or ride armed.*

ITEM, It is enacted, that no man great nor fmall, of what condition foever he be, except the King's fervants in his prefence, and his Minifters in executing of the King's precepts, or of their office, and fuch as be in their company affifting them, and alfo upon a cry made for arms to keep the peace, and the fame in fuch places where fuch acts happen, be fo hardy to come before the King's Juftices, or other of the King's

41

**Francois Xavier Martin,** *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* **61 (1792)**

( 61 )

Ministers doing their office with force and arms, nor bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.   And that the King's Justices in their presence, Sheriffs and other ministers, in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables and wardens of the peace within their wards shall have power to execute this act. And that the Justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

---

C H A P.  V.

*The Manner how Writs shall be delivered to the Sheriff to be executed.*

ITEM where it was ordained by the statute of Westminster the second, that they which will deliver their writs to the Sheriff shall deliver them in the full county, or in the rere county, and that the Sheriff or Under-Sheriff shall thereupon make a bill : it is accorded and established, that at what time or place in the county a man doth deliver any writ to the Sheriff or to the Under Sheriff, that they shall receive the same writs, and make a bill after the form contained in the same statute, without taking any thing therefore.   And if they refuse to make a bill, others that be present shall set to their seals, and if the Sheriff or Under-Sheriff do not return the said writs, they shall be punished after the form contained in the said statute.   And also the Justices of Assize shall have power to enquire thereof at every man's complaint, and to award damages, as having respect to the delay, and to the loss and peril that might happen.

---

C H A P.  VI.

*Justices shall have Power to punish Breakers of the Peace.*

ITEM, as to the keeping of the peace in time to come, it is ordained and enacted that the statutes made in time past, with the statute of Winchester, shall be observed and kept in every point : and where it is contained in the end of said statute of Winchester, that the Justices assigned shall have power to enquire of defaults, and to report to the King in his next parliament, and the King to remedy it, which no man hath yet seen, the same Justices shall have power to punish the offenders and disobeyers.

Q

**12 Hening,** *Statutes at Large* **278**

278   LAWS OF VIRGINIA,

## CHAP. XX.

*An act for reviving and continuing the act for adjusting claims for property impressed or taken for public service.*

Act for adjusting claims for property impressed for public service revived and continued.

I. WHEREAS the act of assembly, passed in the year one thousand seven hundred and eighty one, intitled "An act for adjusting claims for property impressed or taken for public service," which has been continued by several subsequent acts, expired on the first day of September last, and it is expedient that the same should be revived and continued:

II. *Be it therefore enacted,* That the said recited act shall be revived, and continue and be in force until the first day of September next.

III. *And be it further enacted,* That the auditors shall issue certificates on claims audited by the county courts since the first day of September last, in like manner as if the before recited act had not expired.

## CHAP. XXI.

*An act for giving further time to officers, soldiers, sailors, and marines, to settle their arrears of pay and depreciation, with the auditor of public accounts.*

Further time allowed to settle claims of officers, soldiers and marines, for pay and depreciation.

I. BE *it enacted by the General Assembly,* That it shall and may be be lawful for the auditor of public accounts, and he is hereby required, to liquidate all just claims of officers, soldiers, sailors, and marines, and of those of the staff department, who are entitled by law to arrears of pay and depreciation, that shall be pre-

**12 Hening,** *Statutes at Large* **279**

OCTOBER 1786—11th of COMMONWEALTH.          279

sented to him on or before the first day of December, one thousand seven hundred and eighty-seven, and to grant certificates as usual for what shall be due thereon; the said claims having been first allowed by the commissioner or commissioners appointed to examine the same. *Provided always*, That application for such certificates be made by the claimant in person, or by his written order, assignment, or his legal representative.

———

## CHAP. XXII.

*An act concerning the claims to full pay of certain officers, and to half pay of the widows and orphans of officers that died in the service.*

I. *BE it enacted by the General Assembly*, That the auditor of public accounts is hereby authorised and required to issue warrants to widows and orphans, entitled thereto under the act of assembly passed in October session, one thousand seven hundred and eighty, for making good the future pay of the army, and for other purposes; any law to the contrary notwithstanding   And whereas by the construction of an act, intituled " An act to amend the act concerning pensioners," a few meritorious disabled officers, in indigent circumstances, who, on full proof of their merits and necessities, had been by a preceding assembly directed to receive full pay for life, are deprived thereof;

II. *Be it therefore enacted*, That so much of the said recited act as is construed to deprive those officers, who were before entitled to full pay, from receiving the same, shall be and is hereby repealed.

*Full pay to certain officers and half pay to widows and orphans directed.*

44

*Resolves of the State of Maine, January Session, 1821* **ch. 76 (1821)**

### CHAPTER LXXVI.

Resolve appointing a Committee to examine certain accounts, and to report the same to the Governor and Council. *March 22, 1821.*

*Resolved,* That Messrs. Bixby, of Cornville, Irish, of Gorham, and Vose, of Augusta, be a committee to examine the several accounts of sheriffs and coroners, the miscellaneous accounts, and the pauper accounts, as reported by the joint standing committee on accounts, and allowed by this Legislature, with leave to report on the same to the Governor and Council; and the Governor is hereby authorized to draw his warrant on the Treasurer of this State, for the payment of such part of said accounts only, as said Committee shall report to be justly due and ought now to be paid; and the remainder of such accounts shall be referred to the first session of the next Legislature for their consideration : *Provided,* That said committee shall not be allowed to hold their session longer than five days next after the adjournment of this Legislature.

### CHAPTER LXXVII.

Resolve apportioning the Representatives on the several Counties, Towns, Plantations and Classes, on the first apportionment. *March 22, 1821.*

*Resolved,* That the county of York shall choose twenty three Representatives, apportioned in the following manner : viz. The town of York, one; Kittery, one; Elliot, one; South Berwick, one; Berwick, one; Saco, one; Hollis, one; Biddeford, one; Kennebunk Port, one; Kennebunk, one; Wells, one; Limington, one; Buxton, one; Lyman, one; Sanford, one; Alfred, one; Shapleigh, one; Limerick, one; Parsonsfield, one; Waterborough, one; Newfield, one; Cornish, one; Lebanon, one :—County of Cumberland shall choose twenty five Representatives : viz. Portland, three; Brunswick, one; Durham, one; Freeport, one; North Yarmouth, one; Cumberland, one; Falmouth, one; Scarborough, one; Westbrook, one; Standish, one; Gorham, one; Windham, one; New-Gloucester, one; Minot, one; Harpswell, one; Poland, one; Gray, one; Raymond and Thompson Pond [Plantation] one; Bridgton, one; Baldwin, one; Cape-Elizabeth, one; Otisfield and Harrison, one; Danville and Pownal, one, to send alternately, Danville first:—The County of Lincoln shall have twenty six Representatives : viz. The town of Bath, one; Bowdoin, one; Bowdoinham, one; Litchfield, one; Lisbon, one; Wiscasset, one; Edgcomb, one; Jefferson, one; Nobleborough, one; Boothbay, one; Warren, one; Thomaston, one; Camden, one; Waldoborough, one; Bristol, one; Topsham, one; Whitefield, one; Lewiston, one, for the years 1822, 1824 and 1826; and Wales, one, for 1823 and 1825; Georgetown, one, for 1822, 1824, and 1826; and

46

## *State* v. *Simpson,* 13 Tenn. (5 Yer.) 356, 357, 358 (1833)

shall be deemed murder in the second degree. Here the terms used in the indictment cannot reach an offence the description of which is not reached by common law definition, unless, indeed, we intend after conviction that the finding contrary to what the jury have expressed shall reach another crime neither in the bill of indictment nor verdict; for the finding is "guilty of murder in manner and form as charged in the bill of indictment." If, then, the verdict refers us to the indictment for the facts found, it must be seen by reference to the indictment, that it can be but murder in the second degree; for it is nowhere supported by the terms used in the indictment, or in the finding of the jury, when compared with the description of murder in the first degree as given in the statute.

I will admit for the sake of argument, that the charge in the bill of indictment, aided, as some suppose it is, [356] by the 72d section, will be sufficient; still to justify a judgment for the most heinous of the two murders, the jury should find in their verdict the manner. If by poison, say so; if willful, deliberate, malicious and premeditated, say so; and the like of any other one of the different species of murders in the first degree.

Surely the court will require certainty from some quarter, before they will give a judgment affecting life; and in any aspect in which this case can be viewed, upon the pleadings, the charge of the court or finding thereon, there is no such certainty, and not enough to justify the judgment rendered.

Where he pleads guilty, the law have had two objects in view: 1. In tenderness to the accused; and 2d. To prevent one getting off by pleading guilty of the lesser offence when in fact he was guilty of the higher offence. I am for reversing the judgment.

Judgment reversed.

---

### SIMPSON *v.* THE STATE OF TENNESSEE.

#### Sparta, December, 1833.

CRIMINAL LAW—AFFRAY—INDICTMENT. An affray is the fighting together of two or more persons in a public place, and an indictment which charges that the defendant "an affray did make," without stating the facts which constitute an affray, is fatally defective. [Acc. State *v.* Priddy, 2 Hum. 161, citing this case.]

At the May term of the circuit court for the county of White, an indictment was found against the plaintiff in error, in substance as follows: The grand jurors for the state, etc., upon their oath, present that William Simpson, [357] laborer, on the first day of April, in the year of our Lord, 1833, with force and arms, at the county of White, aforesaid, being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land, to the evil example of all others in the like case offending, and against the peace and dignity of the state. To this indictment the plaintiff in error pleaded not guilty; upon which issue was joined, and the cause submitted to a jury, who found him guilty in manner and form as charged in the indictment. The plaintiff in error moved in arrest of judgment, and filed his reasons, which upon argument was overruled by the court, and a bill of exceptions taken thereto. The court gave judgment that the plaintiff in error pay a fine of $20 for his offence, and also pay the costs of the prosecution. From this judgment, an appeal in error is taken to this court.

*Wm. B. Campbell,* Attorney-general for the State.

WHYTE, J. On the argument in this case, it is contended by the counsel for the plaintiff in error, that the record does not present any charge that is known to the law, as cognizable in our courts by indictment. On the part of the state, the attorney-general contends that the offence of an affray is sufficiently charged in and by the indictment. Authorities have been cited on this question, and books of forms of indictments for affrays have also been referred to, for the purpose of showing that the form of the charge in the present indictment is a valid one for the offence of an affray, which will now be noticed. Blackstone, in the fourth volume of his Commentaries, page 145, says, "Affrays, from *affrayer,* to terrify, are the fighting of two or more persons, in some public place, to the terror of his majesty's subjects; for [358] if the fighting be in private, it is no affray, but an assault." It will be observed, that according to this definition of an affray by Blackstone, three things are necessary to constitute it. First. There must be fighting. Second. This fighting must be by or

*State* v. *Simpson*, 13 Tenn. (5 Yer.) 358, 359, 360 (1833)



358, 359    YERGER'S REPORTS.

between two or more persons. And, Third. It must be in some public place to cause terror to the people. Hence it must follow, that if either of these requisites are wanting, an affray does not exist. In the charge in this indictment, which is assumed to amount to an affray by its constitution, the two first of the above requisites are wanting, to wit, fighting or actual violence, and the number of persons necessary for the constitution of it. To obviate this, and to prove that these particulars are not essential, Serjeant Hawkins is cited and relied upon, book 1, ch. 28, sec. 4, where he says, "But granting that no bare words in the judgment of law carry in them so much terror as to amount to an affray, yet it seems certain, that in some cases there may be an affray where there is no actual violence, as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people, which is said always to have been an offence at common law, and is strictly prohibited by many statutes." It is to be remembered on this citation, that if the whole of the section, and the following ones of the chapter, are looked into, it will be found that the doctrine of the citation depends upon ancient English statutes, enacted in favor of the king, his ministers and other servants, especially upon the statute of the 2d Edward III, which enacts, that no man, great nor small, of what condition soever he be, except the king's servants, etc., shall go or ride armed by night or by day, etc. The book goes on and says, that persons of quality are in no danger of offending against this statute by wearing their common weapons, or having their usual number of attendants with them, for their ornament or defence, in such places and upon occasions in which it is the common fashion [359] to make use of them without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace. It may be remarked here, that ancient English statutes, from their antiquity and from long usage, were cited as common law; and though our ancestors, upon their emigration, brought with them such parts of the common law of England, and the English statutes, as were applicable and suitable to their exchanged and new situation and circumstances, yet most assuredly the common law and statutes, the subject-matter of this fourth section, formed no part of their selection. The true construction of the portion of the fourth

294

SIMPSON U. THE STATE.    359, 360

section above cited is giving it an application to particular persons in particular places, under particular circumstances; this is proved by what Serjeant Hawkins has laid down previously in the first and second sections of the same chapter, under the same head, where he gives the general rule, concurring in substance with Blackstone. He says: "From this definition, it seems clearly to follow, that there may be an assault which will not amount to an affray, as where it happens in a private place, out of the hearing or seeing of any except the parties concerned, in which case it cannot be said to be to the terror of the people; and for this cause, such private assault seems not to be enquirable in a court, but as all affrays certainly are, as being common nuisances." This passage concurs with and supports Blackstone in the above two particulars of actual violence, and the plurality of the persons concerned as actors, which it was assumed the citation from this fourth section will abrogate. The like deduction may be drawn from the second section, where it is laid down, "that no quarrelsome or threatening words whatsoever shall amount to an affray, and that no one can justify laying his hands on those who shall barely quarrel with angry words, without coming to blows." But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, [360] or portion of the common law, our constitution has completely abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their common defence." Article 11, sec. 26. It is submitted, that this clause of our constitution fully meets and opposes the doctrine that a man's arming himself with dangerous and unusual weapons, as being an independent ground of affray, so as of itself to constitute the offence cognizable by indictment. By this clause of the constitution, an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature; and it is conceived, that it would be going much too far, to impair by construction or abridgment a constitutional privilege which is so declared; neither, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed such a necessarily consequent operation as terror to the people

295

State v. Huntly, 25 N.C. 418, 422 (1843)

422                    IN THE SUPREME COURT.

June 1843 mon law, and ought to be of the law of all regulated socie-
———      ties, to preserve inviolate—and they lead almost necessarily
State     to actual violence.   Nor can it for a moment be supposed,
v.        that such acts are less mischievous here or less the proper
Huntly.   subjects of legal reprehension, than they were in the coun-
try of our ancestors.   The bill of rights in this State se-
cures to every man indeed, the right to "bear arms for
the defence of the State." While it secures to him a *right* of
which he cannot be deprived, it holds forth the *duty* in exe-
cution of which that right is to be exercised.   If he employ
those arms, which he ought to wield for the safety and pro-
tection of his country, to the annoyance and terror and dan-
ger of its citizens, he deserves but the severer condemnation
for the abuse of the high privilege, with which he has been
invested.

It was objected below, and the objection has been also
urged here, that the court erred in admitting evidence of
the declarations of the defendant, set forth in the case, be-
cause those, or some of them at least, were acknowledgments
of a different offence from that charged.   But these declara-
tions were clearly proper, because they accompanied, ex-
plained, and characterized the very acts charged.   They
were not received at all as *admissions* either of the offence
under trial, or any other offence.   They were constituent
parts of that offence.

It has been remarked, that a double-barrelled gun, or any
other gun, cannot in this country come under the description
of "unusual weapons," for there is scarcely a man in the
community who does not own and occasionally use a gun
of some sort.   But we do not feel the force of this criticism.
A gun is an "unusual weapon," wherewith to be armed
and clad.   No man amongst us carries it about with him, as
one of his every day accoutrements—as a part of his dress—
and never we trust will the day come when any deadly
weapon will be worn or wielded in our peace loving and
law-abiding State, as an appendage of manly equipment.—
But although a gun is an "unusual weapon," it is to be re-
membered that the carrying of a gun *per se* constitutes no

## OF NORTH CAROLINA.
423

offence.   For any lawful purpose—either  of business or a- June 1843
musement—the citizen is at perfect liberty to carry his gun.
It is the wicked purpose—and the mischievous result—which
essentially constitute the crime. He shall not carry about this
or any other weapon of death to terrify and alarm, and in such
manner as naturally will terrify and  alarm, a peaceful  peo-
ple.

State
v
Huntly.

Oour opinion is, that there is  no error in  the sentence be-
low.   This decision will be certified  to the Superior Court
of Anson accordingly.


PER CURIAM.                        Ordered accordingly.

*A Manual of the Laws of North-Carolina* p.2, 31 (1808)

## OATHS AND AFFIRMATIONS. 31

and by all other persons who shall hereafter be chosen or appointed to any office of trust or profit within this State, before they enter upon the execution of the office to which they have been chosen or appointed: "I, A. B. do solemnly swear or affirm (as the case may be) that I will support the Constitution of the United States."

*The oath to be taken by a Jury for laying off a Road.*

XXII.  I, A. B. do solemnly swear, that I will lay out the road now directed to be laid out by the court of pleas and quarter sessions, to the greatest ease and advantage of the inhabitants, and with as little prejudice to inclosures as may be, without favor or affection, malice or hatred, and to the best of my skill and knowledge.—So help me God. *Of a jury to lay off a road.*

*The oath of a Constable.*

XXIII.  You shall swear that you will well and truly serve the State of North Carolina in the office of a constable, you shall see and cause the peace of the State to be well and duly preserved and kept according to your power, you shall arrest all such persons as in your sight shall ride or go armed offensively, or shall commit or make any riot, affray or other breach of the peace ; you shall do your best endeavor, upon complaint to you made, to apprehend all felons, and rioters, or persons riotously assembled ; and if any such offender shall make resistence with force, you shall make hue and cry, and shall pursue them according to law : You shall faithfully, and without delay, execute and return all lawful precepts to you directed : You shall well and duly, according to your knowledge, power and ability, do and execute all other things belonging to the office of a constable, so long as you shall continue in this office.  So help you God.

*The oath of a Processioner.*

XXIV.  I, A. B. do solemnly swear or affirm (as the case may be) that I will well and truly execute the duty and trust enjoined by the acts for processioning land in this State, according to the best of my skill and ability, without favor or partiality to any person or persons whatsoever.— So help me God.

*The oath of a Standard-Keeper.*

XXV.  You shall swear that you will not stamp, seal, or give any certificate, for any steel-yards, weights or measures, but such as shall, as near as possible, agree with the standard in your keeping ; and that you will in all respects truly and faithfully discharge and execute the power and trust by this act reposed in you, to the best of your ability and capacity.  So help you God.

52

# Bishop, *Commentaries on the Criminal Law* § 980 (3d ed. 1865)

•

demonstration, say the courts, must be in the presence of an actual possessor, from whom it is taken away.[1]

§ 978 [398]. In like manner, the riotous entry into a house by the landlord, on the termination of a lease, or for the enforcement of a forfeiture;[2] the riotous pulling down of inclosures, even under a claim of right;[3] the breaking, with wood and stones, of the windows of a dwelling-house in the night, to the terror of the occupants;[4] the unlawful throwing down of the roof and chimney of a dwelling-house in the peaceable possession, and actual occupancy, of another, who is put in fear;[5] the riotous breaking into another's dwelling-house, and making a great noise, whereby a woman in the house miscarries;[6] are severally indictable at the common law, as either forcible entries, or other breaches of the peace.

§ 979 [399]. In these cases, the trespass is not alone indictable, for the thing done must go further;[7] while the terror may be excited as well by numbers[8] as by other means. Therefore a landlord, for example, cannot be held criminally for taking an excessive distress;[9] neither can any individual, for being merely in the frequent practice of going to the house of another, and so in words abusing his family as to make their lives uncomfortable; the injury being only of a civil nature.[10]

§ 980 [400]. But we should mistake to suppose, that the peace must actually be broken, to lay the foundation for a criminal proceeding. If what is done is unjustifiable and unlawful, tending also with sufficient directness to break the peace, no more is

[1] The State *v.* McDowell, 1 Hawks, 449; The State *v.* Watkins, 4 Humph. 256; The State *v.* Mills, 2 Dev. 420; The State *v.* Farnsworth, 10 Yerg. 261; Reg. *v.* Harris, 11 Mod. 113. And see Rex *v.* Gardiner, 1 Russ. Crimes, Grea. Ed. 53; The State *v.* Flowers, 1 Car. Law Repos. 97. See, as to real estate, The State *v.* Fort, 4 Dev. & Bat. 192.

[2] Rex *v.* Stroude, 2 Show. 150.

[3] Rex *v.* Wyvill, 7 Mod. 286. And see The State *v.* Tolever, 5 Ire. 452; Reg. *v.* Harris, 11 Mod. 113.

[4] The State *v.* Batchelder, 5 N. H. 549.

[5] The State *v.* Wilson, 3 Misso. 125; The State *v.* Morris, 3 Misso. 127.

[6] Commonwealth *v.* Taylor, 5 Binn. 277.

[7] The State *v.* Phipps, 10 Ire. 17; Henderson *v.* Commonwealth, 8 Grat. 708; Commonwealth *v.* Keeper of Prison, 1 Ashm. 140; Rex *v.* Bake, 3 Bur. 1731; Rex *v.* Smyth, 5 Car. & P. 201; 1 Moody

& R. 155; The State *v.* Pollok, 4 Ire. 305; The State *v.* Ray, 10 Ire. 39; The State *v.* Mills, 2 Dev. 420; The State *v.* Watkins, 4 Humph. 256; The State *v.* Armfield, 5 Ire. 207; Rex *v.* Gardiner, 1 Russ. Crimes, Grea. Ed. 53; 6 Mod. 175, note; 2 Mod. 306, note; Kilpatrick *v.* People, 5 Denio, 277; Rex *v.* Storr, 3 Bur. 1698; Rex *v.* Atkins, 3 Bur. 1706; Rex *v.* Gillet, 3 Bur. 1707; The State *v.* Flowers, 1 Car. Law Repos. 97.

[8] The State *v.* Fisher, 1 Dev. 504; Milner *v.* Maclean, 2 Car. & P. 17; Commonwealth *v.* Shattuck, 4 Cush. 141; Rex *v.* Jopson, cited 3 Bur. 1702. And see The State *v.* Wilson, 3 Misso. 125.

[9] Rex *v.* Lesingham, T. Raym. 205, 1 Mod. 71.

[10] Commonwealth *v.* Edwards, 1 Ashm. 46. See The State *v.* Caldwell, 2 Jones, N. C. 468; The State *v.* Bordeaux, 2 Jones, N. C. 241.

[ 550 ]

# Bishop, *Commentaries on the Criminal Law* § 981 (3d ed. 1865)

•

§ 980   WHAT CONSTITUTES CRIME, CONSIDERED, ETC.   [BOOK IX.

demonstration, say the courts, must be in the presence of an actual possessor, from whom it is taken away.[1]

§ 978 [398]. In like manner, the riotous entry into a house by the landlord, on the termination of a lease, or for the enforcement of a forfeiture;[2] the riotous pulling down of inclosures, even under a claim of right;[3] the breaking, with wood and stones, of the windows of a dwelling-house in the night, to the terror of the occupants;[4] the unlawful throwing down of the roof and chimney of a dwelling-house in the peaceable possession, and actual occupancy, of another, who is put in fear;[5] the riotous breaking into another's dwelling-house, and making a great noise, whereby a woman in the house miscarries;[6] are severally indictable at the common law, as either forcible entries, or other breaches of the peace.

§ 979 [399]. In these cases, the trespass is not alone indictable, for the thing done must go further;[7] while the terror may be excited as well by numbers[8] as by other means. Therefore a landlord, for example, cannot be held criminally for taking an excessive distress;[9] neither can any individual, for being merely in the frequent practice of going to the house of another, and so in words abusing his family as to make their lives uncomfortable; the injury being only of a civil nature.[10]

§ 980 [400]. But we should mistake to suppose, that the peace must actually be broken, to lay the foundation for a criminal proceeding. If what is done is unjustifiable and unlawful, tending also with sufficient directness to break the peace, no more is

[1] The State v. McDowell, 1 Hawks, 449; The State v. Watkins, 4 Humph. 256; The State v. Mills, 2 Dev. 420; The State v. Farnsworth, 10 Yerg. 261; Reg. v. Harris, 11 Mod. 113. And see Rex v. Gardiner, 1 Russ. Crimes, Grea. Ed. 53; The State v. Flowers, 1 Car. Law Repos. 97. See, as to real estate, The State v. Fort, 4 Dev. & Bat. 192.

[2] Rex v. Stroude, 2 Show. 150.

[3] Rex v. Wyvill, 7 Mod. 286. And see The State v. Tolever, 5 Ire. 452; Reg. v. Harris, 11 Mod. 113.

[4] The State v. Batchelder, 5 N. H. 549.

[5] The State v. Wilson, 3 Misso. 125; The State v. Morris, 3 Misso. 127.

[6] Commonwealth v. Taylor, 5 Binn. 277.

[7] The State v. Phipps, 10 Ire. 17; Henderson v. Commonwealth, 8 Grat. 708; Commonwealth v. Keeper of Prison, 1 Ashm. 140; Rex v. Bake, 3 Bur. 1731; Rex v. Smyth, 5 Car. & P. 201; 1 Moody

& R. 155; The State v. Pollok, 4 Ire. 305; The State v. Ray, 10 Ire. 39; The State v. Mills, 2 Dev. 420; The State v. Watkins, 4 Humph. 256; The State v. Armfield, 5 Ire. 207; Rex v. Gardiner, 1 Russ. Crimes, Grea. Ed. 53; 6 Mod. 175, note; 2 Mod. 306, note; Kilpatrick v. People, 5 Denio, 277; Rex v. Storr, 3 Bur. 1698; Rex v. Atkins, 3 Bur. 1706; Rex v. Gillet, 3 Bur. 1707; The State v. Flowers, 1 Car. Law Repos. 97.

[8] The State v. Fisher, 1 Dev. 504; Milner v. Maclean, 2 Car. & P. 17; Commonwealth v. Shattuck, 4 Cush. 141; Rex v. Jopson, cited 3 Bur. 1702. And see The State v. Wilson, 3 Misso. 125.

[9] Rex v. Lesingham, T. Raym. 205, 1 Mod. 71.

[10] Commonwealth v. Edwards, 1 Ashm. 46. See The State v. Caldwell, 2 Jones, N. C. 468; The State v. Bordeaux, 2 Jones, N. C. 241.

[ 550 ]

Digitized by Google

required. Thus, sending a challenge, verbal or written, to fight a duel;[1] going about armed, with unusual and dangerous weapons, to the terror of the people;[2] riotously driving in a carriage through the streets of a populous city, so as to hazard the safety of the inhabitants;[3] spreading false news,[4] publishing libels,[5] even in some extreme cases uttering words,[6] calculated to stir up resentments and quarrels; eavesdropping;[7] being a common scold;[8] and the like; are cognizable criminally by the common law. For we have seen, that every man is presumed to intend the natural and even probable consequences of his act; also, that usually if one attempts unsuccessfully to do a criminal thing, — intending to do it, and performing an act toward the doing, — he is indictable therefor.[9]

§ 981 [401]. We have also that triangle of analogous offences, barratry, maintenance, and champerty; which are rather actual than attempted disturbances of the repose of the community. The gist of them severally is, that they embroil men in lawsuits and other like quarrels. Blackstone defines barratry to be the "frequently exciting and stirring up of suits and quarrels between his majesty's subjects, either at law or otherwise;"[10] maintenance, "an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it;"[11] champerty, "a bargain with a plaintiff or defendant to divide the land or other matter sued for between them, if they prevail at law, whereupon the champetor is to carry on the party's suit at his own expense."[12]

[1] 4 Bl. Com. 150; Rex v. Newdigate, Comb. 10; Reg. v. Langley, 2 Ld. Raym. 1029, 1031; Smith v. The State, 1 Stew. 506.

[2] The State v. Huntly, 3 Ire. 418; Sir John Knight's case, 3 Mod. 117, Comb. 38.

[3] United States v. Hart, Pet. C. C. 390.

[4] 4 Bl. Com. 149; ante, § 923 et seq.

[5] Commonwealth v. Clap, 4 Mass. 163, 168, 169; Commonwealth v. Chapman, 13 Met. 68; Rex v. Topham, 4 T. R. 126; Reg. v. Collins, 9 Car. & P. 456; Rex v. Kinnersley, 1 W. Bl. 294; Reg. v. Lovett, 9 Car. & P. 426; Rex v. Pain, Comb. 358; The State v. Burnham, 9 N. H. 34.

[6] Reg. v. Taylor, 2 Ld. Raym. 879; Ex parte Marlborough, 1 New Sess. Cas. 195, 13 Law J. N. S. M. C. 105, 8 Jur. 664; ante, § 921.

[7] The State v. Williams, 2 Tenn. 108, 4 Bl. Com. 168.

[8] 4 Bl. Com. 168; Reg. v. Foxby, 6 Mod. 11; James v. Commonwealth, 12 S. & R. 220; United States v. Royall, 3 Cranch C. C. 620.

[9] Ante, § 657 et seq. 665.

[10] 4 Bl. Com. 134; Case of Barratry, 8 Co. 36 b, 37 b; Rex v. ——, 3 Mod. 97; The State v. Chitty, 1 Bailey, 379; Commonwealth v. McCullock, 15 Mass. 227.

[11] 4 Bl. Com. 134; Brown v. Beauchamp, 5 T. B. Monr. 413.

[12] 4 Bl. Com. 135; Thurston v. Percival, 1 Pick. 415; Rust v. Larue, 4 Litt. 411, 417; Douglass v. Wood, 1 Swan, Tenn. 393; Knight v. Sawin, 6 Greenl. 361; Byrd v. Odem, 9 Ala. 755; Key v. Vattier, 1 Ohio, 132; McMullen v. Guest, 6 Texas, 275; Lathrop v. Amherst Bank, 9 Met. 489; Holloway v. Lowe, 7 Port. 488.

[ 551 ]

Davis, *The Massachusetts Justice* 202 (1847)

record, make an affray, or threaten to kill or beat another, or commit any violence or outrage against his person or property, and every person, who, in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of good behavior, for a term not exceeding three months, and in case of refusal, may be committed, as before directed.[1]

When any person shall be brought before a magistrate, upon a charge of any offence mentioned in the fifth section of the one hundred and forty-third chapter of the Revised Statutes, except persons who shall be committed for stealing money or goods not exceeding the value of five dollars, such magistrate, or the court before which such cause may be carried by appeal, may, in any stage of the proceedings, direct the respondent or appellant to be discharged, upon his entering into a recognizance, in such sum as the magistrate or court shall direct, with sufficient sureties, for his good behavior for a term not less than six months, nor more than two years, and paying the costs of prosecution, or such part thereof as the magistrate or court shall direct.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.[2]

Whenever, upon a suit brought upon any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty, on the petition of any defendant, as the circumstances of the case shall render just and reasonable.[3]

Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have the same authority and right to take and surrender his principal, as if he had been bail for him in a civil cause, and upon such surrender shall be discharged, and exempt from all liability, for any act of the principal subsequent to such surrender, which would be a breach of the condition of the

---

[1] Ib. § 15.          [2] Ib. § 16.          [3] Ib. § 17.

**Acts and Resolves of Massachusetts 1794-95**, 436 (1795)

436                    ACTS, 1795. — CHAPTER 69.

*Justices author-ized upon view of breach of peace, &c to re-quire the arrest of offenders.*

SECT. 3.   *Be it further Enacted*, that any Justice of the Peace, for the preservation thereof, or upon view of the breach thereof, or upon view of any other transgression of Law, proper to his Cognizance, done or committed by any person or persons whatever, shall have authority, (in the absence of the Sheriff, Deputy Sheriff, or Constable) to require any person or persons to apprehend & bring before him such offender or offenders :  And every person

*Penalty for disobeying Justice's order.*

so required who shall refuse or neglect to obey the said Justice, shall be punished in the same manner as for re-fusing or neglecting to assist any Sheriff, Deputy Sheriff, or Constable in the execution of his office as aforesaid. And no person who shall refuse or neglect to obey such Justice, to whom he shall be known, or declare himself to be a Justice of the peace shall be admitted to plead excuse on any pretence of ignorance of his office.

*Constables authorized to convey prison-ers beyond the limits of their own town or district.*

SECT. 4.   Whereas doubts have arisen whether a Con-stable, unless empowered by Statute, can lawfully convey any person by him apprehended, or things taken by writ or warrant to him directed any farther than thro' his Town or District ; *Be it further Enacted*, that any Constable of any Town or District within this Commonwealth, shall have authority in the execution of the warrant or writ to him directed by lawful authority, to convey as well any Prisoner or Prisoners, as things that they may have taken into their Custody, either to the Justice issuing such war-rant or writ or to the Common Goal or house of Correction of the County where such Constable is an Inhabitant, according as in the writ or warrant may be directed.

*Acts repealed.*

SECT. 5.   *Be it further Enacted*, that all laws enacted in this Commonwealth, before the first of November, A. D. seventeen hundred & eighty, the subject matter whereof is included in this Act, be and the same are hereby repealed.                    *Approved February 26, 1796.*

---

**1795.—Chapter 69.**

[January Session, ch. 43.]

AN ACT FOR RECORDING BIRTHS AND DEATHS BY THE CLERKS OF TOWNS & DISTRICTS.

*Be it Enacted by the Senate and House of Representa-tives in General Court assembled and by the authority*

*Clerks of Towns and Districts to record all births and deaths.*

*of the same*, that it shall be the duty of every Town Clerk, and every District Clerk, within this Commonwealth, to

57

*Statutes of the Territory of Wisconsin* **381** (1838)

STATUTES OF WISCONSIN.                    **381**

the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

§ 13. Any person committed for not finding sureties, or refusing to recognize as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required. *Not recognizing, how discharged.*

§ 14. Every recognizance taken in pursuance of the foregoing provisions shall be transmitted by the magistrate to the district court for the county on or before the first day of the next term, and shall be there filed of record by the clerk. *Recognizances transmitted to court.*

§ 15. Any person who shall, in the presence of any magistrate mentioned in the first section of this statute, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such court or magistrate, shall contend, with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace and being of good behavior, for a term not exceeding six months, and in case of refusal may be committed as before directed. *When required to view of court, &c.*

§ 16. If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family, or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided. *Persons going armed to give security, &c.*

§ 17. Whenever, upon a suit brought on any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty on the petition of any defendant, as the circumstances of the case shall render just and reasonable. *Part of penalty remitted.*

§ 18. Any surety in a recognizance to keep the peace or for good behavior or both, shall have the same authority and right to take and surrender his principal as if he had been bail for him in a civil cause, and upon such surrender shall be discharged and exempt from all liability for any act of the principal subsequent to such surrender, which would be a breach of the condition of the recognizance; and the person so surrendered may recognize anew, with sufficient sureties, before any justice of the peace for the residue of the term, and thereupon shall be discharged. *Surety may surrender principal.*

## AN ACT making general provisions concerning crimes and punishments.

§ 1. That every person who shall be aiding in the commission of any offence, which shall be a felony either at common law or by any statute now made, or which shall be hereafter made, or who shall be accessory thereto before the fact, by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the same manner as is or shall be prescribed for the punishment of the principal felon. *Accessory to felony before the fact, how punished.*

Digitized by Google

692                       ARREST &c. OF OFFENDERS.

TITLE XXXI.
CHAPTER 163.

Breach of peace
in presence of
magistrate, &c.

Sec. 15. Every person who shall, in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, for a term not exceeding six months, and in case of refusal, may be committed as before directed.

Person going
armed to find su-
reties for the
peace.

Sec. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

Court may remit
part of penalty.
7 Mass., 357.

Sec. 17. Whenever upon a suit brought on any recognizance entered into in pursuance of this chapter, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty, on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

Surety may sur-
render his prin-
cipal, effect of
surrender.

Sec. 18. Any surety in a recognizance to keep the peace, shall have the same authority and right to take and surrender his principal as in other criminal cases, and upon such surrender shall be discharged and exempt from all liability for any act of the principal subsequent to such surrender, which would be a breach of the condition of the recognizance; and the person so surrendered may recognize anew, with sufficient sureties, before any justice of the peace or circuit court commissioner for the residue of the term, and shall thereupon be discharged.

---

## CHAPTER 163.

### OF THE ARREST AND EXAMINATION OF OFFENDERS, COMMITMENT FOR TRIAL AND TAKING BAIL.

What officers
may issue pro-
cess for the arrest
of offenders, &c.

Section 1. For the apprehension of persons charged with offences, excepting such offences as are cognizable by justices of the peace, the justices of the supreme court, judges of the county courts, circuit court commissioners, mayors and recorders of cities, and all justices of the peace, shall have power to issue process and to carry into effect the provisions of this chapter.

Complainant, &c.
to be examined.

Sec. 2. Whenever complaint shall be made to any such magistrate, that a criminal offence, not cognizable by a justice of the peace, has been committed, he shall examine on oath the complainant, and any witnesses who may be produced by him.

Proceedings if it
appear that an
offence has been
committed.

Sec. 3. If it shall appear from such examination, that any criminal offence, not cognizable by a justice of the peace, has been committed, the magistrate shall issue a warrant, directed to the sheriff or any constable of the county, reciting the substance of the accusation, and

*Revised Statutes of the State of Michigan* **692**, ch. 162 (1846).

692                          ARREST &c. OF OFFENDERS.

TITLE XXXI.
CHAPTER 161.

Breach of peace in presence of magistrate, &c.

SEC. 15. Every person who shall, in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, for a term not exceeding six months, and in case of refusal, may be committed as before directed.

Person going armed to find sureties for the peace.

SEC. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

Court may remit part of penalty. 7 Mass., 207.

SEC. 17. Whenever upon a suit brought on any recognizance entered into in pursuance of this chapter, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty, on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

Surety may surrender his principal, effect of surrender.

SEC. 18. Any surety in a recognizance to keep the peace, shall have the same authority and right to take and surrender his principal as in other criminal cases, and upon such surrender shall be discharged and exempt from all liability for any act of the principal subsequent to such surrender, which would be a breach of the condition of the recognizance ; and the person so surrendered may recognize anew, with sufficient sureties, before any justice of the peace or circuit court commissioner for the residue of the term, and shall thereupon be discharged.

---

CHAPTER 163.

OF THE ARREST AND EXAMINATION OF OFFENDERS, COMMITMENT FOR
TRIAL AND TAKING BAIL.

What officers may issue process for the arrest of offenders, &c.

SECTION 1. For the apprehension of persons charged with offences, excepting such offences as are cognizable by justices of the peace, the justices of the supreme court, judges of the county courts, circuit court commissioners, mayors and recorders of cities, and all justices of the peace, shall have power to issue process and to carry into effect the provisions of this chapter.

Complainant, &c. to be examined.

SEC. 2. Whenever complaint shall be made to any such magistrate, that a criminal offence, not cognizable by a justice of the peace, has been committed, he shall examine on oath the complainant, and any witnesses who may be produced by him.

Proceedings if it appear that an offence has been committed.

SEC. 3. If it shall appear from such examination, that any criminal offence, not cognizable by a justice of the peace, has been committed, the magistrate shall issue a warrant, directed to the sheriff or any constable of the county, reciting the substance of the accusation, and

*Acts and Resolves, Passed by the Twenty-First Legislature of the State of Maine 532 (1841).*

532          ROAD TO MOOSEHEAD LAKE—MILITARY ROAD.

### Chapter 168.

RESOLVE providing for the repair of the State road from Wilson to Moosehead Lake.

*For repairing and finishing road, $500.*

*Proviso.*
*—Wilson pay $100—*
*—Greenville $100—*
*and Shirley $50.*

*Gov. and Council to appoint Agent*

*Agent may receive in money or labor, from towns.*

*—not to expend until towns pay.*

*Resolved,* That for the purpose of repairing and finishing the State road from Wilson to Moosehead Lake, in the County of Piscataquis, there be and hereby is appropriated the sum of five hundred dollars: *Provided,* the towns of Wilson and Greenville will raise the sum of one hundred dollars each, and the town of Shirley the sum of fifty dollars, to be expended for the like purpose under an agent appointed by the Governor and Council. And the Governor and Council are hereby authorized to appoint an agent to superintend the repair of said road, at a compensation not exceeding two dollars per day. And the said agent may receive the said sums mentioned, from the said towns in money, or the said towns may pay the same in labor at a fair cash value, to be worked under the superintendence of said agent. And the said agent shall be instructed not to expend the sum appropriated in this Resolve, until the towns aforesaid, shall place funds available to said agent, for the payment of their portions aforesaid.

[*Approved April* 16, 1841.]

### Chapter 169.

RESOLVE in relation to the Military road.

*For repair of bridges and road, $2500.*

*Gov. and Council to appoint Agent*

*Resolved,* That the sum of twenty-five hundred dollars be and the same is hereby appropriated, for the repair of the military road and the bridges upon the same, from the Penobscot river to Houlton; and the Governor and Council are hereby authorized to appoint an Agent to superintend the expending of the same, at a compensation not exceeding two dollars per day, upon such bridges and such portions of said road, as he shall think best for the interest of the State.

[*Approved April* 16, 1841.]

# 1853 Or. Laws 218-20

## CHAPTER XVI.

### PROCEEDINGS TO PREVENT COMMISSION OF CRIMES.

SEC. 1. Certain officers conservators of the public peace.
2. Proceedings when complaint is made to magistrate.
3. Magistrate when to issue warrant.
4. Proceedings on examination before magistrate.
5. Privilege of defendant.
6. Recognizance, when required.
7. Defendant, when to be committed.
8. Discharge of defendant; complainant, when to pay costs.
9. In other cases, costs, how and when paid.
10. Appeal, when allowed.
11. When magistrate may require witnesses to recognize.
12. Proceedings on appeal by district court.
13. Consequence of appellant failing to prosecute appeal.
14. After commitment, defendant may be discharged on giving security.
15. Recognizance to be transmitted to district court.
16. When person may be ordered to recognize without warrant.
17. Armed persons, when required to find sureties.
18. Suit on recognizance.
19. Surety may surrender principal.

**Keeping the peace.**   SEC. 1. The judges of the several courts of record, in vacation as well as in open court, and all justices of the peace, shall have power to cause all laws made for the preservation of the public peace, to be kept, and in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, either both, in the manner provided in this chapter.

**When sureties may be required. 17 Wen. 181: 23 do. 689.**   SEC. 2. Whenever complaint shall be made to any such magistrate, that any person has threatened to commit an offence against the person or property of another, the magistrate shall examine the complainant, and any witness who may be produced on oath, and reduce such complaint to writing, and cause the same to be subscribed by the complainant.

**Warrant to issue.**   SEC. 3. If, upon examination, it shall appear that there is just cause to fear that such offence may be committed, the magistrate shall issue a warrant under his hand, reciting the substance of the complaint, and requiring the officer to whom it may be directed, forthwith to apprehend the person complained of, and bring him before such magistrate, or some other magistrate or court having jurisdiction of the cause.

**Examination**   SEC. 4. The magistrate before whom any person is brought upon charge of having made threats as aforesaid, shall, as soon as may be, examine the complainant, and the witnesses to support the prosecution, on oath, in the presence of the party charged, in relation to any matters connected with such charge, which may be deemed pertinent.

**Privilege of defendant.**   SEC. 5. After the testimony to support the prosecution, the witnesses for the prisoner, if he have any, shall be sworn and examined, and he may be assisted by counsel in such examination, and also in the cross-examination of the witnesses in support of the prosecution.

**Recognizance when required.**   SEC. 6. If, upon examination, it shall appear that there is just cause to fear that any such offence will be committed by the party

CHAP. 16.

complained of, he shall be required to enter into recognizance with sufficient sureties, in such sum as the magistrate shall direct, to keep the peace towards all the people of this territory, and especially towards the person requiring such security, for such term as the magistrate shall order, not exceeding six months; but he shall not be ordered to recognize for his appearance at the district court, unless he is charged with some offence for which he ought to be held to answer at said court.

SEC. 7. If the person so ordered to recognize, shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognize, stating in the warrant the cause of commitment, with the sum and time for which security was required.

*When to be committed. 23 Wen. 689.*

SEC. 8. If, upon examination, it shall not appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be forthwith discharged; and if the magistrate shall deem the complaint unfounded, frivolous or malicious, he shall order the complainant to pay the costs of prosecution, who shall thereupon be answerable to the magistrate and the officer for their fees, as for his own debt.

*Complainant when to pay costs.*

SEC. 9. When no order respecting the costs is made by the magistrate, they shall be allowed and paid in the same manner as costs before justices in criminal prosecutions; but in all cases where a person is required to give security for the peace, or for his good behavior, the magistrate may further order the costs of prosecution, or any part thereof, to be paid by such person, who shall stand committed until such costs are paid, or he is otherwise legally discharged.

*Costs.*

SEC. 10. Any person aggrieved by the order of any justice of the peace, requiring him to recognize as aforesaid, may, within ten days after the decision of the justice, on giving the security required, appeal to the district court, next to be holden in the same county, or that county to which said county is attached for judicial purposes.

*Appeal.*

SEC. 11. The magistrate, from whose order an appeal is to be taken, shall require such witnesses as he may deem necessary to support the complaint, to recognize for their appearance at the court to which appeal is made.

*Witnesses when to recognize.*

SEC. 12. The court before which such appeal is prosecuted, may affirm the order of the justice, or discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution, as it may deem just and reasonable.

*Power of appellate court*

SEC. 13. If any party appealing, shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as security for any cost which shall be ordered by the court appealed to, to be paid by the appellant.

*Failing to prosecute appeal.*

SEC. 14. Any person committed for not finding sureties, or refusing to recognise as required by the court or magistrate, may be discharge of party committed.

*Discharge of party committed.*

220              ARRESTS.

CHAP. IT. charged by any judge or justice of the peace, on giving such security as was required.

Recognizances when to be transmitted.
SEC. 15. Every recognizance taken in pursuance of the foregoing provisions, shall be transmitted by the magistrate to the district court for the county, on or before the first day of the next term, and shall be there filed of record by the clerk.

Order to recognize without warrant.
SEC. 16. Any person, who shall, in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record, make an affray, or threaten to kill, or beat another, or to commit any violence or outrage against his person or property, and every person, who, in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, and being of good behavior for a term not exceeding six months, and in case of a refusal, may be committed as before directed.

Armed persons, when required to find sureties.
SEC. 17. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault, injury, or other violence to his person, or to his family or property, he may, on complaint of any other person, having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

Suit on recognizance.
SEC. 18. Whenever on a suit brought on any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

Surety may surrender principal.
SEC. 19. Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have the same authority and right to take and surrender his principal, as if he had been bail for him in a civil case, and upon such surrender, shall be discharged and exempted from all liability for any act of the principal, subsequent to such surrender, which would be a breach of the condition of the recognizance; and the person so surrendered, may recognize anew with sufficient sureties, before any justice of the peace for the residue of the term, and thereupon shall be discharged.

# CHAPTER XVII.

## ARRESTS.

SEC. 1. Arrest defined.
    2. Arrest, how and by whom made.
    3. Every person must aid officer in making arrest, if required.
    4. Arrest for felony and misdemeanor, when may be made.
      5. As to what constitutes arrest.
    6. Officer may pursue fugitive into other counties.
    7. When an officer or private person may arrest without warrant.
    8. Arrest, how made in such case.
    9. Escape and capture of prisoner.

Arrest.
SEC. 1. Arrest is the taking a person into custody, that he may be held to answer for a public offence.

## 1847 Va. Laws 15, 127, 129

*Weights and Measures.—Public Buildings.* 15

river; thence along the Southern branch of the Elizabeth river to the centre of a creek which separates this land from the land belonging to the estate of Henry Tatem, deceased; thence along the centre of said creek to a point on the road leading from Washington point to the Southern branch of the Elizabeth river; thence along said road north twenty and three quarter degrees east nine hundred and seventy-six feet two inches, to the beginning.

2. *Be it further enacted,* That whenever, by the conditions on which Gosport was conveyed by the state of Virginia to the United States, jurisdiction over the territory of Gosport shall revert to Virginia, or whenever the United States shall fail for five years to use the lands in this act mentioned for the purposes hereinbefore recited, in either case the jurisdiction hereby directed to be vested in the United States shall revert to and be in this commonwealth in like manner as if this act had not been passed. *[margin: When land ceded to revert to state. See 1 R. C. 1819, c. 10, § 9, p. 46.]*

3. This act shall be in force from the passing thereof. *[margin: Commencement.]*

CHAP. 13.—An ACT providing for the preservation and use of the standard weights and measures received from the general government.

[Passed March 19, 1847.]

1. *Be it enacted by the general assembly,* That the standard of weights and measures which have been or shall be received by the executive of this commonwealth, under an act of congress passed June the fourteenth, eighteen hundred and thirty-six, shall be placed in a suitable room of the capitol, and that the clerk of the council be required to take charge of the same, and shall be known as the superintendent of the standard of weights and measures. *[margin: Standard of weights and measures, where to be located. Who to be superintendent.]*

2. *Be it further enacted,* That each county and corporation court have the power to apply for and obtain from the superintendent of weights and measures verified standards of the same; and when so obtained, to be kept in the clerk's office of each county or corporation, or at such other place as the county or corporation courts may designate. *[margin: County and corporation courts to obtain verified standards. Where to be kept.]*

3. *Be it further enacted,* That the county or corporation courts may at any time refer to the standards under the care of the superintendent of state standards for verification. *[margin: Authority to verify county standards.]*

4. This act shall be in force from the passing thereof. *[margin: Commencement.]*

CHAP. 14.—An ACT concerning the state courthouse.

[Passed March 23, 1847.]

1. *Be it enacted by the general assembly,* That when the state courthouse shall be ready for use, the court of appeals, general court, and the superior court of chancery holden in the City of Richmond, may sit therein. The governor shall designate the several rooms in which the said courts respectively shall sit, also rooms in the said courthouse to be used as a conference room for the court of appeals, as an office for the attorney general of the commonwealth, and as clerks' offices for the said courts. The governor may also permit the circuit superior court holden in the City of Richmond to sit, and its clerk's office to be kept in the said courthouse, if it be found that it will not interfere with the other courts before mentioned. *[margin: What courts to sit in state courthouse. Rooms and offices, how designated and assigned. Circuit court of Richmond to sit therein. Clerk's office therefor.]*

2. The governor shall cause the conference room or some adjoining apartment, to be fitted up for a court library, and it shall be lawful for the court of appeals to make all needful orders for the use and preservation of such books as may be therein deposited, always providing that they shall not at any time be removed or carried out of the said library or conference room. On being satisfied that such *[margin: Court library room. Rules for use and preservation of books.]*

Digitized by Google

*Navigation Companies.* 127

8. *Be it further enacted,* That if the president and directors of said company shall not commence their work within five years from the passage of this act, and complete the same within ten years thereafter, then the interest of the said company in the navigation and the tolls aforesaid shall be forfeited and cease. {Time for commencing and completing work.}

9. This act shall be in force from its passage. {Commencement.}

CHAP. 145.—An ACT supplementary to the act incorporating the Monongahela navigation company.

[Passed March 19, 1847.]

1. *Be it enacted by the general assembly,* That it shall be lawful for the president and directors of the Monongahela navigation company to open books at such times and places as they may think proper for the purpose of receiving additional subscriptions to an amount not exceeding one hundred thousand dollars, for the purpose of improving the navigation of Cheat river : *Provided,* That the said company shall commence their improvement of Cheat river at the Pennsylvania line, and extend the same upward from that point. {Additional capital to improve Cheat river. Subscriptions therefor. Improvement where to commence and how extended.}

2. *Be it further enacted,* That when the sum of fifty thousand dollars shall have been subscribed and paid, or secured to be paid by individuals, then the Board of public works shall subscribe on the part of the commonwealth two fifths of the sum of which the above fifty thousand dollars are three fifths ; and as often thereafter as a like sum shall be subscribed and paid, or secured to be paid, on the part of individuals, a like subscription by the Board of public works shall be made on the part of the state, until the whole sum appropriated by this act, and the act to which this is a supplement, shall have been subscribed and paid. {Subscription by state.}

3. This act shall be in force from its passage. {Commencement.}

CHAP. 146.—An ACT to incorporate the Little Kanawha navigation company.

[Passed March 9, 1847.]

1. *Be it enacted by the general assembly,* That it shall be lawful to open books of subscription at Parkersburg in the county of Wood, under the superintendence of J. Dickerson, Alfred Beauchamp, Hiram Pribble, Peyton Butcher, Willis Leech, Abraham Enoch, Peter G. Vanwinkle and Jefferson Gibbons, or a majority of them, for the purpose of receiving subscriptions to the amount of fifty thousand dollars, in shares of fifty dollars each, to constitute a joint capital stock for opening and improving the navigation of Little Kanawha river, from its mouth to Bulltown in the county of Braxton. {Books of subscription where and by whom to be opened. Capital. Improvement of Little Kanawha river.}

2. The said books shall be opened, and the subscriptions received in the manner provided in such cases by the act, entitled "an act prescribing certain general regulations for the incorporation of turnpike companies ;" and ten dollars shall be paid on each share at the time of subscribing, and all the provisions of said act relative to keeping open the books of subscription, the payment of subscriptions, the general or annual meetings of the company, the ratio of votes, the incorporation of the company, the transfer of stock, the election and removal of the president and directors, and their powers and duties, shall be held and deemed to apply as effectually to this act, and to the company hereby incorporated, as if they were specially recited herein. {General regulations. See 2 R. C. 1819, c. 234, p. 211.}

3. *Be it further enacted,* That as soon as two thousand shares of the capital stock shall have been subscribed, the subscribers shall be and are hereby incorporated into a company by the name and style of {Company incorporated.}

Digitized by Google

the power and force of steam, of animals, or of any mechanic, or other power, or of any combination of them, which the said company may choose to employ; and by that name, they and their successors shall be and they are hereby vested with the right and privilege of constructing, erecting, building, making and using a canal or slackwater navigation, or both combined, for the purpose aforesaid, for the time of fifty years from the passage of this act. <span style="float:right">Duration of char-<br>ter.</span>

2. *And be it further enacted,* That if the corporation hereby created shall not, within twelve months from the passage of this act, make a survey of the North branch of the Potomac river, and file a map thereof in the clerk's office of the county of Hampshire, and within two years from the passage of this act, commence, and within four years from the passage of this act, construct, finish and put in operation the said canal or slackwater navigation, then the said corporation shall thenceforth forever cease, and this act shall be null and void. <span style="float:right">Charter forfeited<br>for failing to<br>commence and<br>complete works.</span>

3. *And be it further enacted,* That the capital stock of the said company shall be two millions of dollars, and the stock shall be divided into shares of one hundred dollars each, and shall be deemed personal property, transferrable in such manner as the by-laws of said corporation shall direct. The commissioners are hereby authorized to proceed to organize the said company whenever two thousand shares of the capital stock shall be subscribed. <span style="float:right">Capital.<br><br>Stock personal<br>estate.<br>How transfer-<br>rable.<br>Company when<br>to be organized.</span>

4. *And be it further enacted,* That Alexander Hamilton, John A. Stemmler and Henry Hopkins, shall be commissioners, the duty of whom it shall be at some suitable place or places, to open books to receive subscriptions to the capital stock of the said corporation, and twenty days public notice shall be given by the said commissioners, of the time and place of opening such books in the City of Washington, in the District of Columbia, and said books shall be left open for five days; and within thirty days after the said stock shall be subscribed to, they shall give a like notice for a meeting of the stockholders, at such time and place as the said commissioners shall appoint, to choose five directors, and such election shall be then and there made, by such of the stockholders as shall attend for that purpose, either in person or by proxy, each share of the capital stock entitling the stockholder to one vote, and the said commissioners shall be inspectors of the first election of directors of the said corporation, and the time and place of holding the first meeting of the first directors shall be fixed by the said directors. <span style="float:right">Books for sub-<br>scriptions by<br>whom opened.<br><br>Notice to be<br>given.<br><br><br><br>First general<br>meeting of stock-<br>holders.<br><br>Directors to be<br>elected.<br><br>Ratio of votes.<br><br>Inspectors of<br>election.<br><br>First meeting of<br>directors.</span>

5. *And be it further enacted,* That the said commissioners shall proceed to distribute the capital stock of the said corporation among the subscribers thereto; and in case there should be subscriptions to more than the amount of such stock within the time above described, it shall be the duty of said commissioners to apportion the same among the subscribers thereto, in such manner as they shall deem most advantageous to the interest of the corporation, and if at the expiration of the fifth day on which the subscription books shall have been kept open, the whole amount of the capital stock shall not have been subscribed, then the commissioners may subscribe for the remaining shares. <span style="float:right">If subscription be<br>too much how<br>reduced.<br><br><br><br>If too little, com-<br>missioners may<br>subscribe resi-<br>due.</span>

6. *And be it further enacted,* That the said board of directors to be chosen at such meeting, or at any annual election, shall, as soon as may be after any election, choose out of their own number one president, and one other person to be vice-president; and in case of the death, resignation or absence of the president, the vice-president <span style="float:right">President and<br>vice-president<br>how chosen.<br><br>When vice-presi-<br>dent to act.</span>

17

Digitized by Google

# 1851 Minn. Laws 526-528.

## MINNESOTA TERRITORIAL STATUTES 1851

526                    PROCEEDINGS TO PREVENT CRIMES.

as are necessary to bring the case within the provisions of law, issue a warrant to bring the person so charged before the same, or some other court or magistrate within the territory, to answer such complaint as in other cases.

**When person charged to give recognizance.**   SEC. 4.  If, upon examination of the person charged, it shall appear to the court or magistrate, that there is reasonable cause to believe that the complaint is true, and that such person may be lawfully demanded of the governor, he shall, if not charged with a capital crime, be required to recognize with sufficient sureties, in a reasonable sum, to appear before such court or magistrate at a future day, allowing a reasonable time to obtain the warrant of the executive, and to abide the order of the court or magistrate; and if such person shall not so recognize, he **When to be committed.** shall be committed to prison, and be there detained until such day, in like manner as if the offence charged had been committed within this territory; and if the person so recognizing shall fail to appear according **Forfeiture of recognizance.** to the condition of his recognizance, he shall be defaulted, and the like proceedings shall be had as in the case of other recognizances entered into before such court or magistrate; but if such person be charged with a capital crime, he shall be committed to prison, and there detained until the day so appointed for his appearance before the court or magistrate.

**When discharged.**   SEC. 5.  If the person so recognized or committed, shall appear before the court or magistrate upon the day ordered, he shall be discharged unless he be demanded by some person authorized by the war- **May be delivered on warrant of executive, &c.** rant of the executive to receive him, or unless the court or magistrate shall see cause to commit him, or to require him to recognize anew, for his appearance at some other day and if, when ordered, he shall not so recognize, he shall be committed and detained as before provided; whether the person so discharged shall be recognized, committed, or discharged, any person authorized by the warrant of the executive, may at all times, take him into custody, and the same shall be a discharge of the recognizance, if any, and shall not be deemed an escape.

**Complainant liable for costs, &c.**   SEC. 6.  The complainant in such case, shall be answerable for the actual costs and charges, and for the support in prison, of any person so committed, and shall advance to the jailor one week's board, at the time of commitment, and so from week to week, so long as such person shall remain in jail, and if he fail so to do, the jailor may forthwith discharge such person from his custody.

---

## CHAPTER 112.

### OF PROCEEDINGS TO PREVENT THE COMMISSION OF CRIMES.

SECTION
1. What officers to cause public peace to be kept.
2. Proceedings when complaint is made to magistrate.

SECTION
3. Magistrate when to issue warrant.
4. Proceedings upon examination, before magistrate.
5. Defendant may have counsel.

# MINNESOTA TERRITORIAL STATUTES 1851

## PROCEEDINGS TO PREVENT CRIMES.

527

SECTION

6. Defendant when to enter into recognizance.
7. Defendant when to be discharged.
8. Defendant when to be committed.
9. Defendant when to be discharged.
10. Costs by whom paid.
11. Appeal when allowed.
12. When magistrate may require witnesses to recognize.
13. District court how to proceed upon such appeal.
14. When appellant fails to prosecute appeal, recognizance to be in force.

SECTION

15. After commitment, how defendant may be discharged.
16. Recognizance to be transmitted to district court.
17. When person may be ordered to recognize without warrant.
18. Persons carrying offensive weapons, how punished.
19. Suit brought on recognizance.
20. Surety may take and surrender principal in recognizance.

SEC. 1. The judges of the several courts of record, in vacation as well as in open court, and all justices of the peace, shall have power to cause all laws made for the preservation of the public peace, to be kept, and in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, or both, in the manner provided in this chapter. [*What officers to cause public peace to be kept.*]

SEC. 2. Whenever complaint shall be made to any such magistrate, that any person has threatened to commit an offence against the person or property of another, the magistrate shall examine the complainant and any witness who may be produced, on oath, and reduce such complaint to writing and cause the same to be subscribed by the complainant. [*Proceedings when complaint is made to magistrate.*]

SEC. 3. If upon examination, it shall appear that there is just cause to fear that any such offence may be committed, the magistrate shall issue a warrant under his hand, reciting the substance of the complaint, and requiring the officer to whom it may be directed, forthwith to apprehend the person complained of, and bring him before such magistrate or some other magistrate or court, having jurisdiction of the cause. [*Magistrate when to issue warrant.*]

SEC. 4. The magistrate before whom any person is brought upon charge of having made threats as aforesaid, shall as soon as may be, examine the complainant and the witnesses to support the prosecution, on oath, in the presence of the party charged, in relation to any matters connected with such charge, which may be deemed pertinent. [*Proceedings upon examination before magistrate.*]

SEC. 5. After the testimony to support the prosecution, the witnesses for the prisoner, if he have any, shall be sworn and examined, and he may be assisted by counsel in such examination, and also in the cross examination of the witnesses in support of the prosecution. [*Defendant may have counsel.*]

SEC. 6. If upon examination it shall appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be required to enter into a recognizance and with sufficient sureties, in such sum as the magistrate shall direct, to keep the peace towards all the people of this territory, and especially towards the persons requiring such security, for such term as the magistrate shall order, not exceeding six months; but he shall not be ordered to recognize for his appearance at the district court, unless he is charged with some offence for which he ought to be held to answer at said court. [*Defendant when to enter into recognizance.*]

SEC. 7. Upon complying with the order of the magistrate, the party complained of shall be discharged. [*Defendant when to be discharged.*]

SEC. 8. If the person so ordered to recognize shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognize, stating in the warrant the cause of commitment, with the sum and time for which security was required. [*Defendant when to be committed.*]

SEC. 9. If, upon examination, it shall not appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be forthwith discharged; and if the magistrate shall [*Defendant when to be discharged.*]

69

# MINNESOTA TERRITORIAL STATUTES 1851

deem the complaint unfounded, frivolous, or malicious, he shall order the complainant to pay the costs of prosecution, who shall thereupon be answerable to the magistrate and the officer for their fees as for his own debt.

**Costs by whom paid**

SEC. 10.   When no order respecting the costs is made by the magistrate, they shall be allowed and paid in the same manner as costs before justices in criminal prosecutions; but in all cases where a person is required to give security for the peace or for his good behavior, the magistrate may further order the costs of prosecution or any part thereof to be paid by such person, who shall stand committed until such costs are paid, or he is otherwise legally discharged.

**Appeal when allowed.**

SEC. 11.   Any person aggrieved by the order of any justice of the peace requiring him to recognize as aforesaid, may, on giving the security required, appeal to the district court next to be holden in the same county, or that county to which said county is attached for judicial purposes.

**When magistrate may require witness to recognize.**

SEC. 12.   The magistrate from whose order an appeal is so taken, shall require such witnesses as he may think necessary to support the complaint, to recognize for their appearance at the court to which appeal is made.

**District court how to proceed upon such appeal.**

SEC. 13.   The court before which such appeal is prosecuted, may affirm the order of the justice or discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution as he may deem just and reasonable.

**When appellant fails to prosecute appeal, recognizance to be in force.**

SEC. 14.   If any party appealing, shall fail to prosecute his appeal, his recognizance shall remain in full force and effect as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

**After commitment, how defendant may be discharged.**

SEC. 15.   Any person committed for not finding sureties, or refusing to recognize as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required.

**Recognizance to be transmitted to district court.**

SEC. 16.   Every recognizance taken in pursuance of the foregoing provision, shall be transmitted by the magistrate to the district court for the county, on or before the first day of the next term, and shall be there filed of record by the clerk.

**When person may be ordered to recognize without warrant.**

SEC. 17.   Any person who shall in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person, who, in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered without process or any other proof, to recognize for keeping the peace, and being of good behavior, for a term not exceeding six months, and in case of a refusal, may be committed as before directed.

**Persons carrying offensive weapons how punished.**

SEC. 18.   If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family, or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

**Suit brought on recognizance.**

SEC. 19.   Whenever upon a suit brought on any such recognizances, the penalty thereof shall be adjudged forfeited, the court may remit such

**1861 Pa. Laws 248, 250**

which they are by law entitled, without an extravagant and unnecessary expenditure of money in each of said school districts; therefore,

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That all that portion of the said townships of Weisenburg and Upper Macungie, in Lehigh county, and of the township of Maxatawny, in the county of Berks, included within and bounded by the following lines, viz: Beginning at a corner on the division line between Maxatawny and Longswamp townships, Berks county, on lands of Peter Merkle, one hundred perches southwest of the division line between Berks and Lehigh counties; thence parallel with said county line six hundred and thirty perches to a corner on lands of George Smith, in said Maxatawny township; thence parallel with the division line between Upper Macungie and Weisenburg townships, Lehigh county, north-east three hundred and sixty perches to a corner on Jonathan Kline's land, in said Weisenburg township; thence south eighty-five and a half degrees east three hundred and seventy perches to a corner on lands of Sem Grim, in Upper Macungie township; thence in a straight line four hundred perches to a corner on lands of Sem Grim, of Upper Macungie township, Lehigh county, one hundred and twenty perches distant from the division line of said counties; and thence in a straight line two hundred and fifty perches to the place of beginning, shall, from and after the passage of this act, be a new and separate school district, subject to the provisions of the several acts of assembly now in force for the regulation and continuance of a system of education by common schools.

ELISHA W. DAVIS,
*Speaker of the House of Representatives.*

JOHN P. PENNEY,
*Speaker of the Senate pro tem.*

APPROVED—The eighth day of April, Anno Domini one thousand eight hundred and sixty-one.

A. G. CURTIN.

---

No. 254.

## A SUPPLEMENT

To the several acts of Assembly relative to the Pennsylvania State Lunatic Hospital.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That

Digitized by Google

OF THE SESSION OF 1861.                                  249

when application shall be made under the fourteenth section of *Court to inquire* the act of the fourteenth of April, one thousand eight hundred *into fact of in-* and forty-five, to which this is supplementary, to any court of *sanity.* this commonwealth, for the commitment of any person to the Pennsylvania State Lunatic hospital, it shall be lawful for such court to either inquire into the fact of insanity, in a summary way, after giving the notice required by law to the alleged lunatic, and his or her friends or kindred, or by avoiding an inquest at the option of the court; and in all cases it shall be lawful for the several courts of this commonwealth to use their discretion in sending insane persons, who are unsafe to be at large, to said hospital, or cause them to be confined elsewhere, *Discretion as to* as the said courts shall believe the case to be curable or other- *unsafe persons.* wise.

Section 2. No person shall hereafter be sent to said lunatic *Persons acquit-* hospital under the tenth section of the act of the fourteenth of *ted on the ground* April, one thousand eight hundred and forty-five, or any other *of insanity, rela-* law of this commonwealth, who shall have been charged with homicide, or having endeavored or attempted to commit the same, or to commit any arson, rape, robbery, or burglary, and have been acquitted of any such offences on the ground of insanity, or been proceeded against under the fifty-ninth or sixtieth sections of the act of the thirteenth of June, one thousand eight hundred and thirty-six, relative to lunatics and habitual drunkards, where the court trying such person, or hearing the case, shall be satisfied that it is dangerous for said lunatic to be at large on account of having committed, or attempted to commit either of the crimes aforesaid, but such persons shall be continued in the penitentiary of the proper district, or the prison of the proper county : *Provided,* That said court shall still have *Proviso.* power to order any such person to be confined in the said lunatic hospital, if, on full examination, it shall be satisfied that there is reason to believe that a cure of the insanity may be speedily effected by sending him or her thereto.

Section 3. In every case where a lunatic has been, or shall *Powers of the* be committed to said hospital, after an acquittal of any crime *trustees and* on the ground of insanity, or after an investigation in court, *physician in cer-* under the fifty-ninth and sixtieth sections of the act of the thir- *tain cases.* teenth of June, one thousand eight hundred and thirty-six, or on account of it been adjudged dangerous for such lunatic to be at large; and in all cases where any lunatic has been, or shall be removed thereto from either of the penitentiaries, or any prison of this commonwealth, under the order of a judge, or of any court, it shall be lawful for the trustees of said hospital, with the aid of the superintending physician, to inquire carefully into the situation of such lunatic, and if a majority of the board, including the physician, shall be satisfied that there is no reasonable prospect of a cure of the insanity being effected by a retention of the lunatic in the hospital, they shall, at the expense of the proper city or county, cause him or her to be removed to the prison of the proper county, or the penitentiary from which he or she was sent.

Section 4. That whenever an indigent insane person shall *Liability of city,* hereafter be sent to said hospital, the city or county from which *county and town-* he or she was sent, shall be liable to the trustees of the hospital *ship for indigent* *insane.*

Digitized by Google

250                                LAWS OF PENNSYLVANIA,

for his or her maintenance, and shall have remedy over against the proper township, where by existing laws the township is liable for the support of such pauper, and the overseers of the poor of the township shall have remedy over against the property of the pauper, or against any relative required by law to maintain him or her, to the extent of their liability under the poor laws.

**Recovery of money due hospital, mode of proceeding.**

SECTION 5. That in all cases where money is now, or hereafter shall become due to said hospital from any township or county, on account of the maintenance of any person sent there by the proper legal authorities, and no suit is now pending for the recovery thereof, it shall be lawful for the treasurer of the hospital to cause a statement of the account, with notice of the amount claimed, to be served on the commissioners of the proper county, or the overseers of the poor of the township, and if the same is not paid within thirty days after such notice and demand, to place such claim in the hands of the attorney general of the commonwealth, whose official duty it shall be to cause suit to be brought therefor in the name of the corporation, in the court of common pleas of Dauphin county; and the whole proceeding for the recovery of such debt shall be conducted in the manner, and the action have like precedence as suits for claims due the commonwealth ; and sections one and two of the act of the eighth of May, one thousand eight hundred and fifty-five, pamphlet laws, page five hundred and fifteen, be and the same are hereby repealed.

**Repeal.**

**Delivery of lunatics to friends or relatives.**

SECTION 6. That on the application of the friends or relatives of any insane person now, or who may hereafter be confined in said hospital, to the court of common pleas of Dauphin county, or to the president judge of said court in vacation, it shall be lawful for said court or judge, where the same may be done with safety to the community, to deliver over to such friends or relatives the person so confined ; but before so delivering over such lunatic, said court or judge may require sufficient security to be given in the name of the commonwealth, that such lunatic shall do no injury to the person or property of any one when at large, to continue during such term of time as the court or judge may direct.

**Security to be given.**

**Provisions of this act extended to Western Pennsylvania hospital**

SECTION 7. That all the provisions of this act be and they are hereby applied to the Western Pennsylvania hospital ; and further, that the provisions of sections fifth and sixth, in relation to suits in the courts of Dauphin county, shall be and are hereby changed to the district court of Allegheny county, so far as may relate to claims and proceedings touching said Western Pennsylvania hospital.

ELISHA W. DAVIS,
*Speaker of the House of Representatives.*

ROBT. M. PALMER,
*Speaker of the Senate.*

APPROVED—The eighth day of April, Anno Domini one thousand eight hundred and sixty-one.

A. G. CURTIN.

Digitized by Google

73

# EXHIBIT   1

# Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

|  | |
|---|---|
| | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
| | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
| | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

| | |
|---|---|
| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
| | First Place, Undergraduate Division |

**TEACHING EXPERIENCE:**

| | |
|---|---|
| Fall, 2017 – present | ***Adjunct Faculty***: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2014 – Spring, 2017 | Recovering from stroke |
| Spring, 2010 – Spring, 2014 | ***Adjunct Faculty***: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2009 – Summer 2010 | ***Adjunct Faculty***: ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | ***Adjunct Faculty***: Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**. |

1996          ***Teaching Assistant***: Assisted Professor Peter Mellini in his course
              "Twentieth Century World."  I graded quizzes, exams, and answered
              weekly written questions from students.  I also prepared and lectured
              about the rise of totalitarianism in the period between the world wars.


**BOOKS:**

*Lock, Stock, and Barrel: The Origins of America Gun Culture*
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

## SELECTED PUBLICATIONS:

"Belleiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" Southern Illinois University Law Journal Spring 2017 Forthcoming "

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241. Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997. "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

**WORKS CITED IN COURT DECISIONS:**

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance.  I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   October 1, 2019

Clayton Cramer

1

DECLARATION OF CRAMER CLAYTON IFSO MOTION FOR PRELIMINARY INJUNCTION