```
                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
                              --oOo--

MARK BAIRD, ET AL.,           ) Docket No. 19-CV-617
                              ) Sacramento, California
              Plaintiffs,     ) July 16, 2021
                              ) 11:08 a.m.
         v.                   )
                              )
XAVIER BECERRA, in his        ) Re: Motion for preliminary
official capacity as the      )     injunction
Attorney General of the       )
State of California,          )
                              )
              Defendant.      )
```

                      TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE KIMBERLY J. MUELLER
                    UNITED STATES DISTRICT JUDGE

APPEARANCES (via Zoom):

For the Plaintiffs:       THE BELLANTONI LAW FIRM, PLLC by
                          MS. AMY L. BELLANTONI (pro hac vice)
                          2 Overhill Road, Suite 400
                          Scarsdale, NY 10583

For the Defendant:        OFFICE OF THE ATTORNEY GENERAL by
                          MR. R. MATTHEW WISE
                          Deputy Attorney General
                          P.O. Box 944255
                          Sacramento, CA 94244

Also present:             MARK BAIRD and RICHARD GALLARDO

                    JENNIFER COULTHARD, RMR, CRR
                       Official Court Reporter
                      501 I Street, Suite 4-200
                        Sacramento, CA 95814
                        jenrmrcrr2@gmail.com
                           (530)537-9312

Proceedings recorded via mechanical Steno - transcript produced via Computer-Aided Transcription

1          SACRAMENTO, CALIFORNIA, FRIDAY, JULY 16, 2021

2                         --o0o--

3        (In open court via Zoom.)

4            THE CLERK:  Calling civil case 19-617, Baird,

5   et al. v. Becerra.  This on for a motion for preliminary

6   injunction, Your Honor.

7            THE COURT:  All right.  For plaintiff?

8            MS. BELLANTONI:  Good morning, Your Honor; Amy

9   Bellantoni for Mark Baird and Richard Gallardo.

10           THE COURT:  All right.  And Mr. Baird is also

11  observing.

12           MS. BELLANTONI:  And Mr. Gallardo, I believe, will be

13  coming on again by telephone.

14           THE COURT:  All right.  I see Mr. Baird on the screen.

15           And for the defense?

16           MR. WISE:  Good morning, Your Honor; Matthew Wise,

17  Deputy Attorney General for the Attorney General.

18           THE COURT:  All right.  Good morning to you.

19           I have a question first on the standing question,

20  Ms. Bellantoni.  So if the limit on open carry permits applies

21  only in counties with populations larger than 200,000, if --

22  Mr. Baird and Mr. Gallardo each live in counties with

23  populations below 200,000, right?

24           MS. BELLANTONI:  That's correct.

25           THE COURT:  So how do they have standing based on the

1    limitations that apply to handgun permits in counties with

2    populations greater than 200,000?

3          MS. BELLANTONI:  Because there are no open carry

4    licenses being issued.  That's one reason.

5          So if we look at the penal code, it requires that all

6    applications for a public carry license be approved or be on

7    forms approved by the Department of Justice, and the Department

8    of Justice does not issue any applications for open carry

9    licenses, so no one can apply for an open carry license, and

10    they haven't since 2012.

11         In addition to that, the statute itself, even if there

12    were applications (inaudible) -- to issue an open carry

13    license --

14         THE COURT:  Ms. Bellantoni, wait.  Ms. Bellantoni?

15    Ms. Bellantoni?

16         MS. BELLANTONI:  Yes.

17         THE COURT:  Your Internet connection appears to be

18    flawed.

19         MS. BELLANTONI:  Yes.

20         THE COURT:  Madam Court Reporter, have you been able

21    to hear Ms. Bellantoni?

22         COURT REPORTER:  I lost her a little while back.  I'd

23    like to read to you what I had and then have her pick up from

24    there, if you don't mind.

25         THE COURT:  Yes, please.

1       (Record read.)

2       THE COURT: All right, Ms. Bellantoni. Please pick up
3  there.

4       MS. BELLANTONI: My apologies, Judge.

5       So even if there were forms for an individual to apply
6  for an open carry license, the statute itself is a "may issue"
7  statute, which places broad discretion in the licensing
8  official to either grant or deny the open carry license, which
9  removes the open carry from the realm of being within the scope
10 of the Second Amendment as a right guaranteed by the statute --
11 by the Amendment and places it in the realm of being a
12 privilege subject to the discretion of the government.

13      THE COURT: So Mr. Wise, just so I'm clear, on this
14 issue of DOJ forms, does that provide for standing, if I
15 understand the argument correctly, the unavailability of
16 required DOJ forms to issuing authorities in counties with
17 populations below 200,000? Does that cure any standing issue
18 that you raise?

19      MR. WISE: The sheriffs in those counties can issue
20 open carry licenses. I mean, they can use the forms that are
21 available to issue those licenses. So the form, you know, may
22 be geared toward concealed carry because that's what is allowed
23 throughout the State of California, but this particular issue
24 of forms, you know, shouldn't be viewed as, you know, a means
25 of denying open carry licenses. The law is very clear that

1  open carry licenses are allowed in the counties where
2  plaintiffs live.
3          THE COURT:  And the argument about the permissive
4  language in the statute, anything to say there?
5          MR. WISE:  No, Your Honor.  The permissive language
6  allows the sheriffs the discretion to grant an open carry
7  license, and that's entirely in the sheriffs' judgment.
8          THE COURT:  All right.  Ms. Bellantoni --
9          MS. BELLANTONI:  Yes.
10         THE COURT:  -- hold any thoughts.  You'll have a
11 chance for brief wrap-up.  I want to cover my questions.
12         Just so I'm clear, are there facts in the Amended
13 Complaint, the First Amended Complaint, that affect the Court's
14 decision now as compared to its prior decision that it made
15 without prejudice?  Are there specific allegations in the First
16 Amended Complaint that make a material difference here?
17         MS. BELLANTONI:  Your Honor, I believe that the
18 allegations are substantially the same as they were in the
19 initial complaint and provide enough of a factual basis for the
20 Court to render a decision on the instant motion.
21         THE COURT:  And how would you say that the arguments
22 now are materially different than when you were before me
23 before?
24         MS. BELLANTONI:  So when we first filed the motion for
25 a preliminary injunction, part of the Court's decision was

1   recognizing that there may be, in the Court's opinion, the
2   right to open carry, as covered and protected by the Second
3   Amendment.
4       And the Court's main concern, if I understand it
5   correctly, was that we were waiting to see what the Ninth
6   Circuit en banc decision would be in the *Young v. Hawaii* case.
7   Now that we've seen the decision in *Young v. Hawaii* and have
8   gotten over that hurdle, I would argue that the Court is able
9   to make a decision now with respect to this preliminary
10  injunction, and I would point out that the decision in *Young v.*
11  *Hawaii* is completely contrary to the plain language and holding
12  in the decision in *DC v. Heller*.
13      THE COURT:  All right.  I want to revisit that with
14  you in just a moment; but so, to further clarify the nature of
15  the exact challenge here, are you saying that you're advancing
16  both facial and as-applied challenges?
17      MS. BELLANTONI:  Yes.
18      THE COURT:  On the as-applied, is this a fair
19  characterization of your as-applied challenge; it is that the
20  licensing statutes are unconstitutional because the Attorney
21  General and the county sheriffs have not explained how to apply
22  for permits to carry handguns openly in public?  Is that a fair
23  characterization of your as-applied challenge?
24      MS. BELLANTONI:  No, Your Honor.  I would say that as
25  applied there is a bar to applying for an open carry license,

1    and that bar is Penal Code 26175, which requires that
2    applications for carry permits be only those that are issued by
3    the Department of Justice.
4            And Exhibit 2, the reply -- the reply motion or the
5    reply to the motion or to the opposition filed by the State
6    contains the concealed carry application, and it specifically
7    says "Concealed Carry Application," and there is no procedure
8    or form or application in which to apply for an open carry
9    license and, as such, no sheriff or chief of police can issue
10   an open carry based on the fact that they do not have a form
11   that allows them to so issue.
12           In addition to that, there was a response to a FOIA
13   request that was made of the State which indicates that, in
14   fact, no open carry licenses had been issued by 2012.
15           THE COURT:  Is there anything before me that allows me
16   to know exactly what the defendant here, the State, the
17   Attorney General, what actions it took with respect to the
18   named plaintiffs?
19           MS. BELLANTONI:  Well, I'm not alleging an equal
20   protection claim where they are, you know, a "class of one," so
21   to speak; but, as applied to my clients, this does violate
22   their constitutional rights in the -- to the extent that they
23   specifically are unable to apply for an open carry license.
24   And if they exercise their right to open carry, they would be
25   subject to criminal penalties and prosecution and potentially

1    the loss and forfeiture of that very right.

2          THE COURT: So it's the omission of provisions that is
3    the -- underlies the as-applied challenge?

4          MS. BELLANTONI: I'm sorry. I didn't hear the
5    beginning of your sentence, Your Honor.

6          THE COURT: It's the absence of provisions that
7    underlies the as-applied, the absence of affirmative provisions
8    that underlies the as-applied. That's how it affects your --

9          MS. BELLANTONI: It's the existence of a criminal --
10   yeah. It's the existence of a criminal statute that prevents
11   and prohibits the free exercise of the right in the first
12   instance. It's the "may issue" requirement that requires
13   permission before exercising a constitutional right. And even
14   if they were to subject themselves to the licensing scheme,
15   there is no procedure in which to even apply for an open carry
16   license, nor is there an ability of the licensing authority to
17   issue one.

18         THE COURT: All right. Mr. Wise, to the extent that
19   you're hearing some clarification here, is there anything more
20   you have to say in response to the nature of the as-applied
21   challenge?

22         MR. WISE: Well, I'm not following how it's an
23   as-applied challenge, frankly. I think, from what I can tell,
24   plaintiffs are challenging the statute. They believe there
25   should be open carry throughout the State of California. They

1  believe that there shouldn't be a "may issue" provision in the
2  statute.
3      The plaintiffs went to their sheriffs and, for
4  whatever reason -- I mean, what's alleged is that they went to
5  their sheriffs. You know, we haven't fully fleshed out all the
6  facts, but they've alleged that they went to their local county
7  sheriffs -- they live in counties where they can get an open
8  carry license -- and those sheriffs denied them that license
9  for whatever reason. And we don't know what the reason is.
10 It's not alleged that the sheriffs said, "Oh, well, we talked
11 to the Attorney General's Office and this license can only be
12 used -- this application can only be used for, you know, for a
13 concealed carry permit." There's no allegation of that. So
14 again, this looks like a facial challenge to us.
15     THE COURT: All right. I understand that argument.
16     So Ms. Bellantoni, on *Young*, you're saying I should
17 follow the Supreme Court only and basically disregard *Young*,
18 right?
19     MS. BELLANTONI: Yes, Your Honor. That's exactly what
20 I'm saying because the --
21     THE COURT: What's your authority? What's your
22 authority for a trial court in the Ninth Circuit disregarding
23 an en banc decision of the circuit court?
24     MS. BELLANTONI: I would say that I would direct the
25 Court to *Hutto v. Davis*, which is at 454 U.S. 370, in which the

1  Supreme Court specifically addressed this issue. And in
2  Justice Rehnquist's decision, he said "Federal courts are bound
3  to adhere to the controlling decisions of the Supreme Court."
4  　　　　　In that case there was an issue of Eighth Amendment
5  protections. It was a habeas issue in the district court. The
6  allegation was that the defendant had been sentenced to, you
7  know, 40 years, which was cruel and unusual, and the district
8  court agreed and granted the habeas; and then the Fourth
9  Circuit reversed, basing it on the legislature's prerogative to
10 set sentencing guidelines. And they sat en banc and then they
11 reversed the Fourth Circuit and said that, you know, it was
12 cruel and unusual.
13 　　　　　And when it went up to the Supreme Court, they cited
14 the *Rummel v. Estelle* case at 445 U.S. 263 and sent the case
15 back down to the Fourth Circuit en banc to reconsider based on
16 the holding in that case.
17 　　　　　THE COURT: Where does the Court say a trial court can
18 disregard -- this Court often is looking to Ninth Circuit
19 authority, which I understand to be controlling unless or until
20 overruled by the Supreme Court, of course.
21 　　　　　MS. BELLANTONI: So the Supreme Court has already
22 spoken.
23 　　　　　THE COURT: But where does the Supreme Court say a
24 trial judge can disregard her appellate court's en banc
25 decision?

1           MS. BELLANTONI:  Yeah.  In *Hutto v. Davis*, Justice
2    Rehnquist --
3           THE COURT:  You just pointed me to that.  You just
4    pointed me to that.
5           MS. BELLANTONI:  -- specifically says the federal
6    courts could be viewed as having ignored, consciously or
7    unconsciously, the hierarchy of the federal system created by
8    the Constitution and Congress.
9           This Court is bound by the Supreme Court, which has
10   spoken on the issue of the scope of the Second Amendment and
11   the fact that the Ninth Circuit has decided to become an
12   outlier and issue a rogue decision that violates and goes
13   contrary to the plain language of the Second Amendment as well
14   as the Court's decision in *Heller* defining the scope of the
15   Second Amendment as being the guaranteed -- guaranteeing this
16   individual right to possess and carry weapons in case of
17   confrontation.  That's *Heller* at 512.
18          THE COURT:  So the implications are any time this
19   Court thinks the Ninth Circuit got it wrong, I can write the
20   appellate court out of existence --
21          MS. BELLANTONI:  Not at all, Your Honor.
22          THE COURT:  -- and not respect the hierarchy that
23   Congress has established?  That's the implication, right?
24          MS. BELLANTONI:  Congress established the hierarchy,
25   and at the top of that pyramid is the Supreme Court.  So the

1  federal courts --

2  THE COURT: So appellate courts -- a trial judge, in
3  your view, can be arrogated the authority to simply disregard
4  her appellate court? That does not turn the system on its
5  head?

6  MS. BELLANTONI: What turns the system on its head is
7  when the district and appellate courts don't follow the law
8  that's been set out by the Supreme Court.

9  So I think that Your Honor would be following her duty
10 and would be following the hierarchy by disregarding and not
11 following off the cliff an appellate court that is completely
12 contrary to the holding of the Supreme Court, which has already
13 spoken to the issue of the scope of the Second Amendment.

14 THE COURT: Well, I think that's a stunning and
15 troubling argument and potentially frivolous. I'll have to
16 think hard about what you're saying here. And I'll go back and
17 check the exact language, but characterizing the Ninth
18 Circuit's en banc decision as rogue is also very troubling to
19 this Court.

20 I've looked at Judge Bybee's decision, a thorough
21 going, explaining his reasoning. Reasonable judges can
22 disagree, there are dissenters on that en banc court, but Judge
23 Bybee is no rogue, and he carefully explains, as is a federal
24 judge's duty, his reading of *Heller*, what he draws from that
25 and what it means in terms of the en banc court's resolution of

1   the question before it.

2   　　　　The Ninth Circuit is not the final stop if the Supreme
3   Court decides to take a case, and I do have a question about
4   the *New York State Rifle* case, but I understand your position.
5   It is very troubling to this one judge.

6   　　　　Let me just ask if there's anything you want to say on
7   this point, Mr. Wise?  I'm not asking you to weigh in, but if
8   you want to say something, you may.

9   　　　　MR. WISE:  Well, *Young* is binding, of course.  And I
10  would just add, and we said this initially in our opposition,
11  that we don't believe that this motion was properly brought.
12  We believe that this Court, when it indicated that the motion
13  could be renewed, was envisioning a scenario where the Ninth
14  Circuit or another court came to the opposite of the conclusion
15  in *Young*.

16  　　　　THE COURT:  All right.  Final question.  First
17  Mr. Wise and then Ms. Bellantoni.  Should I stay -- even if I
18  resolve the motion pending before me, should I then stay the
19  case pending the Supreme Court's decision in *New York State*
20  *Rifle v. Corlett*, Mr. Wise?

21  　　　　MR. WISE:  We believe that this Court should stay the
22  case.  The Supreme Court is obviously taking a closer look at
23  firearms issues and guidance, you know, on the scope of *Heller*
24  and what *Heller* means in the Ninth Circuit -- and, excuse me,
25  the Second Amendment, you know, could guide this Court's

1   decision-making.

2       You know, I think that plaintiff's counsel views the
3   Court as saying something in *Heller* that obviously we don't
4   agree with and I think is taking maybe hints from some of
5   Justice Thomas's language and cert petition denials, but, you
6   know, I think this Court would be well served by waiting to see
7   what the Supreme Court does in some of these cases.  It might
8   guide decision-making in this case.

9       THE COURT:  All right.  And I saw you nodding your
10  head, Ms. Bellantoni, so you agree?

11      MS. BELLANTONI:  No, I don't agree.  No, I was not.  I
12  was thinking of a completely different outcome here, Your
13  Honor.  No.

14      The New York State case -- actually, the question
15  presented was -- it was narrowed by the Supreme Court not to
16  cover the entirety of public hearings but specifically to the
17  New York statute and those statutes that require proper cause
18  or good cause, like New York does, like California and I
19  believe New Jersey.  And that's specific to concealed carry.
20  So the outcome -- and by narrowing the question presented, I
21  would argue that the Supreme Court is and will be addressing
22  only concealed carry.  And I also would argue that they will be
23  taking a plea on case - on its petition for cert and granting
24  that and reversing the Ninth Circuit in their decision and
25  maybe will address -- obviously will address open carry, you

1    know, in that respect.  But the New York case I don't believe

2    will have any bearing on this case.

3          THE COURT:  All right.  I have what I need, so the

4    matter is submitted.  You may sign off.

5       (Concluded at 11:29 a.m.)

6

7               C E R T I F I C A T E

8

9     I certify that the foregoing is a true and correct

10    transcript of the record of proceedings in the above-entitled

11    matter.

12

13    JENNIFER L. COULTHARD, RMR, CRR       July 19, 2021
      Official Court Reporter                 DATE

14

15

16

17

18

19

20

21

22

23

24

25