1    ROB BONTA
     Attorney General of California
2    MARK R. BECKINGTON
     Supervising Deputy Attorney General
3    R. MATTHEW WISE, State Bar No. 238485
     Deputy Attorney General
4      1300 I Street, Suite 125
       P.O. Box 944255
5      Sacramento, CA 94244-2550
       Telephone:  (916) 210-6046
6      Fax:  (916) 324-8835
       E-mail:  Matthew.Wise@doj.ca.gov
7    *Attorneys for Defendant Attorney General Rob Bonta*

8

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

14   **MARK BAIRD and RICHARD**          Case No. 2:19-cv-00617-KJM-AC
     **GALLARDO,**
15                                        **MEMORANDUM OF POINTS AND**
                            Plaintiffs,   **AUTHORITIES IN SUPPORT OF**
16                                        **DEFENDANT ATTORNEY GENERAL**
                   v.                     **ROB BONTA'S MOTION FOR**
17                                        **SUMMARY JUDGMENT**
     **ROB BONTA, in his official capacity as**
18   **Attorney General of the State of California,**   Date:        December 17, 2021
     **and DOES 1-10,**                   Time:        10:00 a.m.
19                                        Dept:        3
                            Defendants.   Judge:       Hon. Kimberly J. Mueller
20
                                          Trial Date:  None set
21                                        Action Filed:  April 9, 2019

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Background ............................................................................................................ 1

    I.     California's Public Carry Laws ............................................................. 1

    II.    Related Legal Challenges .................................................................... 3

    III.   The Present Lawsuit ........................................................................... 3

Legal Standard ...................................................................................................... 5

Argument .............................................................................................................. 5

    I.     Second Amendment Claims Are Governed by a Two-Step Inquiry ..................... 5

    II.    California's Open Carry Laws Do Not Burden Conduct Historically
         Understood to Be Protected by the Second Amendment ........................................ 6

        A.    California's Public Carry Laws Are Consistent with Anglo-
             American Legal Tradition ................................................................ 7

             1.     Heller does not recognize a general right to public carry ............... 7

             2.     Restrictions on open carry date back centuries ............................ 8

                  a.    Public carry restrictions in England ................................. 9

                  b.    Public carry restrictions in the founding era ..................... 10

                  c.    Public carry restrictions in the antebellum era ................. 11

                  d.    Public carry restrictions in the mid- to late-
                     nineteenth century ........................................................... 12

                  e.    California has adopted the tradition of regulating
                     open carry ....................................................................... 14

             2.     The challenged laws are constitutional under any level of
                 means-ends scrutiny ....................................................................... 16

                  a.    Intermediate scrutiny applies here ................................... 16

                  b.    The challenged laws satisfy heightened constitutional
                     scrutiny…………………………………………………………………...17

Conclusion............................................................................................................ 20

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:19-cv-00617-KJM-AC)

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3

C**ASES**

4

5
*Andrews v. State*
   50 Tenn. 165 (1871).............................................................................................. 13

6
*Aymette v. State*
   21 Tenn. 154 (1840).............................................................................................. 12

7

8
*Bauer v. Becerra*
   858 F.3d 1216 (9th Cir. 2017)............................................................................. 17

9

10
*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)............................................................................................... 5

11
*District of Columbia v. Heller*
   554 U.S. 570 (2008)................................................................................... *passim*

12

13
*Drake v. Filko*
   724 F.3d 426 (3d Cir. 2013) .......................................................................... 16, 17

14

15
*English v. State*
   35 Tex. 473 (1871)............................................................................................... 13

16
*Fife v. State*
   31 Ark. 455 (1876)............................................................................................... 13

17

18
*Flanagan v. Becerra*
   (9th Cir.), No. 18-55717......................................................................................... 3

19

20
*Flanagan v. Harris*
   2018 WL 2138462 (C.D. Cal. May 7, 2018)......................................................... 3

21
*Gould v. Morgan*
   907 F.3d 659 (1st Cir. 2018) .......................................................................... 17, 18

22

23
*Hill v. State*
   53 Ga. 472 (1874) ............................................................................................... 13

24

25
*Jackson v. City & Cty. of San Francisco*
   746 F.3d 953 (9th Cir. 2014).......................................................................... 6, 17

26
*Kachalsky v. Cty. of Westchester*
   701 F.3d 81 (2nd Cir. 2012).....................................................................8, 16, 17

27

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
475 U.S. 574 (1986)................................................................................................ 5

*McDonald v. City of Chicago*
561 U.S. 742 (2010)................................................................................................ 7

*New York State Rifle & Pistol Association, Inc. v. Bruen*
(U.S.), No. 20-843 ................................................................................................. 3

*Nichols v. Harris*
17 F. Supp. 3d 989 (C.D. Cal. 2014) ................................................................... 3

*Nichols v. Newsom*
(9th Cir.), No. 14-55873......................................................................................... 3

*Nunn v. State*
1 Ga. 243 (1846)................................................................................................... 12

*Pena v. Lindley*
898 F.3d 969 (9th Cir. 2018).......................................................................... 17, 20

*Peruta v. Cty. of San Diego*
824 F.3d 919 (9th Cir. 2016) .....................................................................3, 6, 9, 12

*Silvester v. Harris*
843 F.3d 816 (9th Cir. 2016)........................................................................ 5, 8, 17

*State v. Buzzard*
4 Ark. 18 (1842)................................................................................................... 12

*State v. Chandler*
5 La. Ann. 489 (1850)........................................................................................... 12

*State v. Duke*
42 Tex. 455 (1874)............................................................................................... 13

*State v. Huntly*
25 N.C. 418 (1843) .............................................................................................. 10

*State v. Smith*
11 La. Ann. 633 (1856)......................................................................................... 12

*Teixeira v. Cty. of Alameda*
873 F.3d 670 (9th Cir. 2017) ............................................................................... 15

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*United States v. Chovan*
    735 F.3d 1127 (9th Cir. 2013) ........................................................................ 17

4

5

*Walburn v. Territory*
    59 P. 972 (Okla. Terr. 1899) ........................................................................... 13

6

7

*Williams-Yulee v. Florida Bar*
    135 S. Ct. 1656 (2015) .................................................................................... 20

8

*Woollard v. Gallagher*
    712 F.3d 865 (4th Cir. 2013) .............................................................. 17, 18, 19

9

10

*Wrenn v. District of Columbia*
    864 F.3d 650 (D.C. Cir. 2017) ............................................................. 8, 10, 11

11

12

*Young v. Hawaii*
    992 F.3d 765 (9th Cir. 2021) .................................................................. *passim*

13

**STATUTES**

14

1813 Kentucky Acts 100
    Chapter 89, § 1 ................................................................................................ 11

15

16

1813 Louisiana Acts 172
    § 1 .................................................................................................................... 12

17

18

1821 Tennessee Public Acts 15
    Chapter 13 ....................................................................................................... 16

19

20

1836 Massachusetts Laws Titles 748, 750
    Chapter 134, § 16 ............................................................................................ 15

21

1869 New Mexico Laws 312
    Chapter 32, § 1 ................................................................................................ 13

22

23

1871 Texas General Laws
    1322, Article 6512 ........................................................................................... 15

24

1875 Wyoming Law 352
    Chapter 52, § 1 ................................................................................................ 16

25

26

1889 Arizona Laws 16
    Chapter 13, § 1 ................................................................................................ 13

27

1889 Idaho Laws Title 23
    § 1 .................................................................................................................... 13

28

---

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

California Penal Code
§ 17030 ................................................................................................ 2
§ 25400 ................................................................................................ 2
§ 25450 ................................................................................................ 2
§ 25605 ................................................................................................ 2
§ 25620 ................................................................................................ 2
§ 25630 ................................................................................................ 2
§ 25640 ................................................................................................ 2
§ 25650 ................................................................................................ 2
§ 25850 ...................................................................................... 1, 4, 15
§ 25850(a) ............................................................................................ 2
§ 25850(b) ............................................................................................ 4
§ 25900 ................................................................................................ 2
§ 26030 ................................................................................................ 2
§ 26035 ................................................................................................ 2
§ 26045 ........................................................................................... 2, 14
§ 26050 ................................................................................................ 2
§ 26055 ................................................................................................ 2
§ 26150 ........................................................................................ *passim*
§ 26150(a)(2) ..................................................................................... 2, 4
§ 26155 ........................................................................................ *passim*
§ 26155(a)(2) ........................................................................................ 2
§ 26155(b)(2) ........................................................................................ 2
§ 26160 ................................................................................................ 3
§ 26350 ...................................................................................... 1, 4, 15
§ 26350(a) ............................................................................................ 2
§ 26350(a)(1) ........................................................................................ 4
§ 26350(a)(2) ........................................................................................ 4
§ 26366 ................................................................................................ 2
§ 26400 ................................................................................................ 2

Delaware Code, Title 11
§ 1441 ................................................................................................ 14

Connecticut General Statute
§ 29-28(b) ........................................................................................... 14

Hawaii Revised Statute, Title 10
§ 134-9 ............................................................................................... 14

Louisiana Revised Statutes
§ 40:1379.3 ......................................................................................... 15

Maryland Safety Code
§ 5-306(a)(6)(ii) ................................................................................. 15

v

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

Massachusetts General Laws
    Chapter 140, § 131(d) ................................................................. 15

4

New Jersey Statute
    § 2C:58-4(c) ............................................................................... 15

5

6

New York Penal Code
    § 400.00(2)(f) ............................................................................ 15

7

8

Rhode Island Laws
    § 11-47-11(a) ............................................................................ 15

9

10

Texas Government Code
    § 411.172 ................................................................................... 15
    § 411.177 ................................................................................... 15

11

12

**CONSTITUTIONAL PROVISIONS**

13

First Amendment ................................................................................ 7

14

Second Amendment .................................................................... *passim*

15

Fourth Amendment ........................................................................ 4, 7

16

Fourteenth Amendment ............................................................. *passim*

17

**COURT RULES**

18

Federal Rules of Civil Procedure
    Rule 56(a) .................................................................................... 5
    Rule 56(c) .................................................................................... 5

19

20

21

**OTHER SOURCES**

22

Bishop, *Commentaries on the Criminal Law* (3d ed. 1865) ..................... 11

23

Blocher & Miller, *The Positive Second Amendment* (2018) ..................... 16

24

Charles, *The Faces of the Second Amendment Outside the Home, Take Two*, 64
    Clev. St. L. Rev. 373 (2016) ................................................. 12, 13

25

26

Ewing, *A Treatise on the Office and Duty of the Justice of the Peace, Sheriff,
    Coroner, Constable* (1805) ........................................................ 10

27

Gardiner, *The Compleat Constable* (1708) .......................................... 10

28

# TABLE OF AUTHORITIES
### (continued)

Page

Haywood, *A Manual of the Laws of North Carolina* (1814) ........................................................ 11

Hildreth, *Despotism in America* (1854) ..................................................................................... 12

Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their Duty* (1683) ............................................................................................................ 10

Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121 (2015).............................. 11, 12

**INTRODUCTION**

California has delegated to county sheriffs and city police chiefs the authority to decide who may carry firearms in the streets, parks, plazas, or shopping centers of its cities and towns. Under California Penal Code sections 26150 and 26155, local law enforcement officials in less populated counties may issue licenses to openly carry firearms. Other statutes, such as California Penal Code sections 26350 and 25850, protect the safety of the State's residents by prohibiting open carry in certain public places. Together, these statutes properly balance the rights of private individuals and the State's interest in maintaining order.

The relief that Plaintiffs seek in this lawsuit—to make the open carry of firearms in public available to all law-abiding individuals—would upset this careful balance. Plaintiffs are not asserting a generalized right to carry a firearm in public in *some* manner for self-defense; indeed, even granting them an unconditional right to carry a concealed firearm in most public places would not, in their view, satisfy the Second Amendment. Instead, they ask this Court to declare for the first time that the Second Amendment guarantees them a right to openly carry firearms in nearly every public place. That sweeping contention cannot be squared with over six centuries of Anglo-American law strictly limiting the open carry of firearms—or, therefore, with *District of Columbia v. Heller*, 554 U.S. 570 (2008). *See Young v. Hawaii*, 992 F.3d 765, 813, 820-21, 825-26 (9th Cir. 2021) (en banc), *petition for cert. filed*, No. 20-1639 (U.S. May 25, 2021).

California's open carry laws are firmly rooted in this historical tradition. And if history alone is not dispositive, then these laws—which are appropriately fashioned to serve the State's compelling interest in public safety—meet any level of heightened constitutional scrutiny. Because there is no genuine issue of material fact as to whether Plaintiffs' Second Amendment rights were infringed, this Court should grant Defendant's motion for summary judgment.

**BACKGROUND**

**I.    CALIFORNIA'S PUBLIC CARRY LAWS**

California law permits the carrying of firearms in public under certain circumstances, commonly where a self-defense need might arise. A California resident who is over eighteen years old and not otherwise prohibited from possessing firearms may generally keep or carry a

1

loaded handgun not only in the person's home (as guaranteed by *Heller*) but also in the person's place of business. Cal. Penal Code §§ 25605, 26035. Carrying is also generally permitted at a temporary residence or campsite. *Id.* § 26055. A person generally may also carry a loaded handgun in public areas outside incorporated cities where it would be lawful to discharge the weapon. *See id.* §§ 25850(a), 17030. Licensed hunters and fishers may carry handguns while engaged in those activities. *Id.* §§ 25640, 26366. Certain types of individuals, such as peace officers, military personnel, and private security personnel, likewise may carry firearms in public under various circumstances. *See id.* §§ 25450, 25620, 25630, 25650, 25900, 26030.

State law generally prohibits the public carrying, whether open or concealed, of a loaded firearm (handgun or long gun) or unloaded handgun in "any public place or on any public street" in incorporated cities. Cal. Penal Code § 25850(a); *see id.* §§ 25400, 26350(a). A similar restriction applies in public places or on public streets in a "prohibited area" of unincorporated territory—that is, an area where it is unlawful to discharge a weapon. *Id.* §§ 25850(a), 26350(a); *see id.* § 17030. State law also generally precludes carrying an unloaded long gun in public places within the State's incorporated cities. *Id.* § 26400.

There is a focused self-defense exception to all of these restrictions, allowing the carrying of a loaded firearm by any individual who reasonably believes that doing so is necessary to preserve a person or property from an immediate, grave danger, while if possible notifying and awaiting the arrival of law enforcement. Cal. Penal Code § 26045. There is also an exception for a person making or attempting to make a lawful arrest. *Id.* § 26050. And invocations of these exceptions do not require a license or permit. *Id.* §§ 26045, 26050.

California law also accommodates the need or desire of some individuals to carry a handgun in public in situations not otherwise provided for by law. State law allows any otherwise qualified resident to seek a permit to carry a handgun, even in an urban or residential area, for "[g]ood cause." Cal. Penal Code §§ 26150(a)(2), 26155(a)(2). Such a permit authorizes the carrying of a handgun in a concealed manner, although in counties with populations of less than 200,000 persons, the permit may alternatively allow the carrying of a handgun in an "exposed" (i.e., open) manner. *Id.* §§ 26150(b)(2), 26155(b)(2). The California Legislature has delegated to

2

1 local authorities (county sheriffs or city police chiefs) the authority to determine what constitutes

2 "good cause" for the issuance of such a permit in local areas.  *See id.* §§ 26150, 26155, 26160.

3 As of January 1, 2021, thirty of California's fifty-eight counties have populations of less than

4 200,000, according to estimates by the California Department of Finance.  RJN, Ex. 1.

5 **II.    RELATED LEGAL CHALLENGES**

6     California's public carry laws have been subject to several Second Amendment challenges:

7 • In *Peruta v. County of San Diego*, the plaintiffs' challenge to California's regulation of the

8     concealed carry of firearms in public places was rejected by a Ninth Circuit en banc panel,

9     which held that the Second Amendment "does not protect in any degree the right to carry

10     concealed firearms in public."  824 F.3d 919, 939 (9th Cir. 2016) (en banc).

11 • In *Nichols v. Harris*, the district court rejected the same claim advanced here—that the

12     Second Amendment guarantees a right to openly carry a firearm in public places.  17 F.

13     Supp. 3d 989, 993-94, 1004-05 (C.D. Cal. 2014).  The Ninth Circuit has stayed the appeal

14     pending a decision by the Supreme Court on the petition for a writ of certiorari in *Young v.*

15     *Hawaii*.  *Nichols v. Newsom* (9th Cir.), No. 14-55873, ECF No. 124.

16 • In *Flanagan v. Harris*, the district court rejected the plaintiffs' argument that the Second

17     Amendment guarantees them *some* ability to carry a firearm—either concealed or openly—

18     in most public places.  2018 WL 2138462, at *10 (C.D. Cal. May 7, 2018).  The Ninth

19     Circuit has stayed the appeal pending resolution of *Young* or further order of the Court.

20     *Flanagan v. Becerra* (9th Cir.), No. 18-55717, ECF No. 57.

21     In addition, the Supreme Court recently heard argument in *New York State Rifle & Pistol*

22 *Association, Inc. v. Bruen* (U.S.), No. 20-843, which addresses whether the State of New York's

23 denial of petitioners' applications for concealed-carry licenses for self-defense violated the

24 Second Amendment.

25 **III.    THE PRESENT LAWSUIT**

26     On April 9, 2019, Plaintiffs Mark Baird and Richard Gallardo filed a complaint for

27 declaratory and injunctive relief against former Attorney General Xavier Becerra alleging that

28 California's statutory firearms licensing scheme violates Plaintiffs' constitutional rights under the

3

Second, Fourth, and Fourteenth Amendments to the Constitution.  ECF No. 1.  Plaintiffs

challenge four state laws—California Penal Code sections 26150, 26155, 26350, and 25850.

Sections 26150 and 26155 state that, in a county of less than 200,000 persons, the county sheriff

or city police chief within the county "may issue . . . a license to carry loaded and exposed in only

that county a pistol, revolver, or other firearm capable of being concealed upon the person" if

"good cause exists for issuance of the license."  Cal. Penal Code §§ 26150(b)(2) (county sheriff),

26155(b)(2) (city police chief).  Section 26350 prohibits a person from "openly carrying an

unloaded handgun" in certain public places either outside or inside a vehicle.  *Id.* § 26350(a)(1),

(a)(2).  Section 25850 prohibits a person from "carrying a loaded firearm" outside or inside a

vehicle in public places, and, "for the purpose of enforcing this section," allows peace officers to

examine a firearm "to determine whether or not [the] firearm is loaded."  *Id.* § 25850(a), (b).

Shortly after filing their complaint, Plaintiffs brought a motion for preliminary injunction,

which this Court denied.  ECF No. 33 at 10.  While the Court, recognizing the evolving legal

landscape, determined that Plaintiffs had "raised 'serious questions' going to the merits of their

Second Amendment claim," it declined to issue a preliminary injunction because "the balance of

equities [did] not tip 'sharply' in [Plaintiffs'] favor."  *Id.*  The Court also largely granted

Defendant's motion to dismiss Plaintiffs' Fourth and Fourteenth Amendment claims.  *Id.* at 18.

Following the Court's order, Plaintiffs filed an amended complaint bringing only Second

Amendment claims.  ECF No. 34 (Am. Compl.).  Plaintiffs again alleged that when each of them

sought an open carry license, their respective local county sheriffs denied their requests, *id.* at ¶¶

39, 80, and suggested that Defendant had effectively instituted an open carry "ban" by not

requiring the California Department of Justice to create a distinct open carry license application,

*id.* at ¶¶ 114, 116.  Plaintiffs reiterated their intent to carry a firearm, "loaded and exposed," in

their county of residence "and throughout the State of California, with or without a license to

carry."  *Id.* at ¶¶ 53, 92 (similar).  Defendant timely answered the amended complaint.  ECF No.

38.  Plaintiffs then filed a second motion for preliminary injunction, raising similar arguments to

those made in their first motion.  ECF No. 40.  The Court has not yet issued a ruling on the

second motion.

1

## LEGAL STANDARD

2   Summary judgment is proper where no genuine issue of material fact exists and the moving

3   party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  While the Court must draw

4   all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co., Ltd. v.*

5   *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), "the plain language of Rule 56(c) mandates the

6   entry of summary judgment . . . against a party who fails to make a showing sufficient to establish

7   the existence of an element essential to that party's case, and on which that party will bear the

8   burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

9

## ARGUMENT

10   California's open carry laws are constitutionally sound.  As underscored by *Young*, the

11   Second Amendment does not confer, as Plaintiffs assert, a general right to carry a firearm openly

12   in public for self-protection.  California's firearms regulations are consistent with the Second

13   Amendment as it has been historically understood; like Anglo-American firearms regulations

14   dating back centuries, California's statutes have embraced a tradition of permitting the public

15   carry of firearms in certain circumstances, based on local needs, and with reasonable public safety

16   restrictions.  Even if California's open carry laws were to implicate the Second Amendment, they

17   would readily withstand any level of scrutiny, given the important public safety interests they

18   protect.  And expert opinion, social science research, and common sense confirm that there is a

19   reasonable fit between these laws and the fulfillment of those interests.

20   **I.    SECOND AMENDMENT CLAIMS ARE GOVERNED BY A TWO-STEP INQUIRY**

21   The Ninth Circuit uses a two-step inquiry for Second Amendment claims.  The first step

22   considers whether the challenged law burdens conduct protected by the Second Amendment,

23   based on a "historical understanding of the scope of the right."  *Silvester v. Harris*, 843 F.3d 816,

24   820 (9th Cir. 2016) (quoting *Heller*, 554 U.S. at 625).  If the law falls outside the historical scope

25   of the Second Amendment, then that law "may be upheld without further analysis."  *Id.* at 821

26   (citation omitted).  If, on the other hand, "the regulation is subject to Second Amendment

27   protection . . . the court then proceeds to the second step of the inquiry to determine the

28   appropriate level of scrutiny to apply," and then to apply that level of scrutiny.  *Id.* (citation

5

1  omitted).  This process requires the court to consider "(1) how close the challenged law comes to

2  the core of the Second Amendment right, and (2) the severity of the law's burden on that right."

3  *Id.* (citation omitted).  If the law either does not come close to the core or otherwise does not

4  "substantially" burden the right, then intermediate scrutiny applies.  *Jackson v. City & Cty. of San*

5  *Francisco*, 746 F.3d 953, 961 (9th Cir. 2014).

6  **II.   CALIFORNIA'S OPEN CARRY LAWS DO NOT BURDEN CONDUCT HISTORICALLY**
   **UNDERSTOOD TO BE PROTECTED BY THE SECOND AMENDMENT**
7

8      In *Heller*, the Supreme Court confirmed that the Second Amendment recognizes a pre-

9  existing right to keep and bear arms.  554 U.S. at 592.  That understanding led the Court to strike

10  down a statute that "totally ban[ned] handgun possession in the home."  554 U.S. at 628-29.  But

11  the Court did not "purport to 'clarify the entire field' of Second Amendment jurisprudence" or

12  "provide explicit guidance on the constitutionality of regulations which are less restrictive than

13  the near-total ban at issue in that case."  *Jackson*, 746 F.3d at 959 (quoting *Heller*, 554 U.S. at

14  635); *Young*, 992 F.3d at 783.

15      This case involves such "less restrictive" regulations.  Far from eradicating firearm

16  possession or use, California's open carry laws restrict most individuals from engaging in specific

17  conduct—openly carrying firearms in public.  Plaintiffs argue that these restrictions, which allow

18  sheriffs in some counties the discretion, upon a showing of good cause, to issue an open carry

19  license operable in the county of issuance, unlawfully burden a "core right of the Second

20  Amendment" for a "law-abiding individual to carry a firearm [] outside of the home."  Am.

21  Compl. ¶ 218.  Given how Plaintiffs have framed their challenge, this case does not raise the

22  broader question of whether the Second Amendment "protect[s], to some degree, a right of a

23  member of the general public to carry a firearm in public," either concealed or openly.  *Peruta*,

24  824 F.3d at 927.  Even if the Second Amendment guarantees ordinary, law-abiding citizens some

25  right to carry a firearm outside the home, it does not require California to accommodate that right

26  by allowing individuals to carry openly in public, as Plaintiffs suggest.  *Young*, 992 F.3d at 773,

27  813, 821 ("There is no right to carry arms openly in public; nor is any such right within the scope

28  of the Second Amendment.").

6

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:19-cv-00617-KJM-AC)

**A.    California's Public Carry Laws Are Consistent with Anglo-American Legal Tradition**

**1.    *Heller* does not recognize a general right to public carry**

*Heller* holds that the Second Amendment protects an individual right to keep and bear arms.  554 U.S. at 636.  "[T]he most natural reading of 'keep Arms'" is "to 'have weapons,'" *id.* at 582, while "bear arms" is most naturally read to mean "'wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person,'" *id.* at 584 (ellipses omitted).

While *Heller* did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," 554 U.S. at 626, it did recognize that the right to bear arms must be construed and applied with careful attention to its "historical background."  *Id.* at 592; *see id.* at 576-626; *Young*, 992 F.3d at 785.  This is critical because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right"; indeed, the Second Amendment's text "declares only that it 'shall not be infringed.'" *Heller*, 554 U.S. at 592; *Young*, 992 F.3d at 786.  Nothing about its enumeration in the Constitution changed the right to bear arms into anything more comprehensive or absolute than would have been understood and expected by "ordinary citizens in the founding generation." *Heller*, 554 U.S. at 577.

*Heller* also acknowledged that this right was and is "not unlimited."  554 U.S. at 595, 626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626, or "to carry arms for *any sort* of confrontation," *id.* at 595.  The core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth and home." 554 U.S. at 635; *see also McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality op.) (*Heller*'s "central holding" was that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

That does not mean that the right to "bear" has no scope or application beyond the home. But nothing in *Heller* suggests that this right applies in exactly the same way in all places, or dictates, as Plaintiffs claim, *see*, *e.g.*, Am. Compl. ¶¶ 214-217, that the Second Amendment

7

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:19-cv-00617-KJM-AC)

1  embodies an individual right to carry a gun in almost any public place.  Instead, *Heller* makes

2  clear that Second Amendment rights are subject to many reasonable regulations.  *See* 554 U.S. at

3  636.  The Court even identified a list of "presumptively lawful regulatory measures," while

4  underscoring that the list was "not . . . exhaustive."  *Id.* at 627 n.26.

5       Plaintiffs thus overreach when they suggest that *Heller* stands for the proposition that the

6  Second Amendment bars reasonable regulations of the right to bear arms because an "individual's

7  right to self-defense is as critical and fundamental *outside* of the home as it is *inside* of the home."

8  Am Compl. ¶ 137.  *Heller* does not recognize an unfettered right to carry firearms in the crowded

9  public squares of cities and towns, based solely on an individual's stated desire to be "'armed and

10  ready for offensive or defensive action in a case of conflict with another person.'"  554 U.S. at

11  584.  The challenge here must instead be evaluated, in the first instance, by examining "the

12  historical understanding of the scope of the right."  *Id.* at 625.  Plaintiffs cannot prevail if the laws

13  they challenge fall within the tradition of reasonable public regulation that has long been

14  considered consistent with a private right to bear arms.  *Cf. id.* at 626-27; *Young*, 992 F.3d at 785-

15  86 (observing that "restrictions on carrying arms openly have long been part of our legal

16  tradition"); *Silvester*, 843 F.3d at 821 ("Laws restricting conduct that can be traced to the

17  founding era and are historically understood to fall outside of the Second Amendment's scope

18  may be upheld without further analysis.").

19          **2.**     **Restrictions on open carry date back centuries**

20       The Supreme Court viewed four historical periods as instructive to the analysis in *Heller*:

21  English history pre-dating the founding, *see* 554 U.S. at 592-95, and American history at the time

22  of the founding, *see id.* at 605-10, during the antebellum period, *see id.* at 610-14, and after the

23  Civil War, *see id.* at 614-19.  Few would dispute that these are "dense historical weeds."  *Wrenn*

24  *v. District of Columbia*, 864 F.3d 650, 659 (D.C. Cir. 2017).  In some respects, however, the

25  history is not debatable.  For more than six centuries, authorities have restricted the carrying of

26  guns by private parties in public places—including, at times, flatly prohibiting it.

27       True, such restrictions were not universal.  *Kachalsky v. Cty. of Westchester*, 701 F.3d 81,

28  91 (2nd Cir. 2012) ("What history demonstrates is that states often disagreed as to the scope of

8

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:19-cv-00617-KJM-AC)

1   the right to bear arms . . ."). But the persistent regulation of public carry across more than half a

2   millennium of Anglo-American law cannot be reconciled with Plaintiffs' expansive claim to a

3   Second Amendment right to carry their guns in virtually any public place.

a.      **Public carry restrictions in England**

5         As *Peruta* and *Young* describe in detail, "the right to bear arms in England has long been

6   subject to substantial regulation." *Peruta*, 824 F.3d at 929; *Young*, 992 F.3d at 786; *see also* Wise

7   Decl., Ex. 1 at 2-8. Starting in the thirteenth century, the Crown repeatedly issued edicts

8   prohibiting individuals from "going armed" with concealed or open weapons in public places.

9   *Young*, 992 F.3d at 786; *Peruta*, 824 F.3d at 929. Parliament continued that tradition in 1328 by

10  enacting the Statute of Northampton, which provided that "no Man great nor small" was to "go

11  nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other

12  Ministers, nor in no part elsewhere," on pain of forfeiture of the arms or prison time. *Young*, 992

13  F.3d at 787 (quoting 2 Edw. 3, 258, ch. 3 (1328)). Northampton became "the foundation for

14  firearms regulation in England for the next several centuries," and was "widely enforced."

15  *Peruta*, 824 F.3d at 930.

16        English authorities extended these restrictions to portable firearms as soon as they emerged

17  on the scene. In 1579, Queen Elizabeth I called for a robust enforcement of Northampton's

18  prohibition on carrying "Dagge[r]s, Pistol[s], and such like, not only in Cities and Towns, [but] in

19  all parts of the Realm[] in common high[ways]," to combat the "danger" that accompanied the

20  carrying of such "offensive weapons." By the Queene Elizabeth I: A Proclamation Against the

21  Common Use of Dagges, Handgunnes, Etc., 1-2 (London, Christopher Barker 1579). When

22  Parliament enacted the English Bill of Rights in 1689, it provided that certain subjects "may have

23  arms for their defence suitable to their conditions and as allowed by law." *Young*, 992 F.3d at

24  793 (quoting 1 W. & M., ch. 2, § 7 (1689)). As Blackstone later explained, as "allowed by law"

25  embraced restrictions on carrying firearms in public. *Id*. at 793-94 (quoting 1 Blackstone,

26  *Commentaries* 139 (1765)); Wise Decl., Ex. 1 at 7-8.

27        Some modern judges have suggested that Northampton barred only the public carry of

28  firearms with the "intent to terrorize the local townsfolk." *Young*, 992 F.3d at 842-43

9

1   (O'Scannlain, J., dissenting).  The historical evidence undermines that interpretation.  Queen

2   Elizabeth I explained that it was the very act of carrying "pistols" that caused "'terrour of all

3   people professing to travel and live peaceably.'"  By the Queene Elizabeth I:  A Proclamation

4   Against the Carriage of Dags, and for Reformation of Some Other Great Disorders 1 (London,

5   Christopher Barker 1594); *Young*, 992 F.3d at 793 n.13.  A popular seventeenth-century justice

6   of the peace manual similarly explained that merely carrying such a weapon struck "fear upon

7   others" who were unarmed, and constituted a punishable affray even "without word or blow

8   given."  Keble, *An Assistance to the Justices of the Peace for the Easier Performance of their*

9   *Duty* 147 (1683); *Young*, 992 F.3d at 792-93.  That is why constables were instructed to "[a]rrest

10  all such persons as they shall find to carry Dags or Pistols," without regard to intent or purpose.

11  Keble, at 224; *see also* Gardiner, *The Compleat Constable* 18-19 (1708); Wise Decl., Ex. 1 at 11.

### b.   Public carry restrictions in the founding era

13       Similar restrictions on carrying weapons were found on the American side of the Atlantic in

14  the period that "preceded and immediately followed adoption of the Second Amendment."

15  *Heller*, 554 U.S. at 600-601.  Shortly after the founding, for example, North Carolina adopted its

16  own Northampton statute, making it illegal to "go []or ride armed by night []or by day, in fairs,

17  markets . . . [or] part[s] elsewhere,"  RJN Ex. 2 at 7-8, and Virginia, Massachusetts, Tennessee,

18  and Maine followed suit.  *Id*. at 4, 10, 12, 15; *see also Young*, 992 F.3d at 794-96.  Several states

19  adopting these restrictions did so in the face of state constitutions that "secured an individual right

20  to bear arms for defensive purposes."  *Heller*, 554 U.S. at 602.

21       Some modern judges have concluded that founding-era prohibitions on public carry applied

22  only to carrying "'dangerous and unusual weapons'" in a manner that "'naturally diffuse[d] a

23  terrour among the people.'"  *Young*, 992 F.3d at 843 (O'Scannlain, J., dissenting); *see Wrenn*, 864

24  F.3d at 660.  But the historical evidence shows that in America, as in England, a gun was

25  considered "an 'unusual weapon,'" *State v. Huntly*, 25 N.C. 418, 422 (1843), and arrests for

26  carrying firearms in populated areas were made whether or not the offender "threatened any

27  person in particular" or "committed any particular act of violence," Ewing, *A Treatise on the*

28  *Office and Duty of the Justice of the Peace, Sheriff, Coroner, Constable* 546 (1805).  *See also*

10

1   Wise Decl., Ex. 1 at 11.  Law enforcement manuals from that time accordingly instructed

2   constables to "arrest all such persons as in your sight shall ride or go armed."  Haywood, *A*

3   *Manual of the Laws of North Carolina* pt. 2, 40 (1814); *see also* Bishop, *Commentaries on the*

4   *Criminal Law* § 980 (3d ed. 1865) (public carry restrictions did not require that the "peace must

5   actually be broken, to lay the foundation for a criminal proceeding").

6                    **c.      Public carry restrictions in the antebellum era**

7            States continued to regulate the carrying of firearms in public places during the period

8   preceding the adoption of the Fourteenth Amendment.  In 1821, Tennessee made it a crime to

9   carry "pocket pistols" or other weapons.  *Young*, 992 F.3d at 799 (quoting 1821 Tenn. Pub. Acts

10  15, ch. 13).  In 1836, Massachusetts amended its law to prohibit going "armed with a dirk,

11  dagger, sword, pistol, or other offensive and dangerous weapon" absent "reasonable cause to fear

12  an [assault] or other injury, or violence to his person, or to his family or property," on pain of

13  being arrested and required to obtain "sureties for keeping the peace."  *Id.* (quoting 1836 Mass.

14  Laws 748, 750, ch. 134, § 16).  At least seven other states adopted similar "reasonable cause"

15  statutes.  RJN, Ex. 2 at 21, 25, 29, 33, 35, 41, 45; *Young*, 992 F.3d at 799-801.

16           Some judges have discounted the significance of these laws, describing them as akin to

17  "'minor public-safety infractions'" because they were enforced by requiring offenders to post

18  surety bonds.  *Young*, 992 F.3d at 845 (O'Scannlain, J., dissenting); *see also Wrenn*, 864 F.3d at

19  661.  But sureties were a common way of enforcing criminal prohibitions in "rural society before

20  the age of police forces or an administrative state."  Ruben & Cornell, *Firearm Regionalism and*

21  *Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121, 131

22  (2015).  A person caught carrying a firearm in public could be arrested by the justice of the peace

23  and required to pay sureties—often a hefty sum—in order to be released.  *Id.* at 130.  The

24  widespread existence of this sort of regulation does not suggest that there was a common

25  understanding at the time that ordinary citizens under ordinary circumstances had a fundamental

26  right to carry guns in public.  *Young*, 992 F.3d at 820; Wise Decl., Ex. 1 at 18-20.

27           Some mostly southern states took a more permissive approach, prohibiting the carrying of

28  concealed firearms but generally allowing open carry.  *See, e.g.*, 1

                                                    11

813 Ky. Acts 100, ch. 89, § 1; 1813 La. Acts 172, § 1.  That choice reflected local customs and concerns.  In those states, guns were sometimes carried "partly as a protection against the slaves," and partly to be used "in quarrels between freemen."  Hildreth, *Despotism in America* 89-90 (1854); *see also* Ruben & Cornell, *Firearm Regionalism*, 125 Yale L.J. Forum at 123-126 (documenting Southern concerns about slavery and the violent nature of life in the South).  And open carry was seen as the more "noble" and "manly" way of serving those purposes.  *State v. Chandler*, 5 La. Ann. 489, 490 (1850).  But evidently, even in those States, open carry was uncommon.  *See*, *e.g.*, *State v. Smith*, 11 La. Ann. 633, 634 (1856) (it was "extremely unusual" to carry weapons in "full open view"); *see also Young*, 992 F.3d at 804-05.

While some decisions from this era reflect a local preference for more permissive open carry laws, *see*, *e.g.*, *Nunn v. State*, 1 Ga. 243 (1846), these authorities do not establish a permissive conception of public carry throughout the region, let alone a national consensus on the meaning of the Second Amendment in this period.  They were decided by judges "immersed in a social and legal atmosphere unique to the South," whose "embrace of slavery and honor[] contributed to an aggressive gun culture."  Ruben & Cornell, *Firearm Regionalism*, 125 Yale L.J. Forum at 128.  In general, southern courts favored "purposive" carry—that one had to have a specific reason to justify being armed in public, Wise Decl., Ex. 1 at 15-17—and some courts even suggested that legislatures could ban public carry consistent with the Second Amendment or a state constitutional equivalent, *see State v. Buzzard*, 4 Ark. 18, 27 (1842); *Aymette v. State*, 21 Tenn. 154, 161-162 (1840); *see generally Young*, 992 F.3d at 817 n.39.

### d.   Public carry restrictions in the mid- to late-nineteenth century

In the years immediately surrounding the adoption of the Fourteenth Amendment, states and local governments adopted still more restrictions on the public carry of firearms, often in response to an increase in lawlessness and violence.  Charles, *The Faces of the Second Amendment Outside the Home, Take Two*, 64 Clev. St. L. Rev. 373, 414 (2016).  The post-Civil War constitutions of six States gave their "state legislatures broad power to regulate the manner in which arms could be carried."  *Peruta*, 824 F.3d at 937.  Five others specified that legislatures could prohibit the carrying of concealed weapons.  *Id.* at 936-937.  South Carolina, Tennessee,

12

Arkansas, and Oklahoma proceeded to make it illegal to carry weapons in public places.  RJN, Ex. 2 at 48-49, 50, 59, 61.  West Virginia and Texas banned public carry without good cause.  *Id.* at 52, 54.  And Wyoming, among other States and territories, made it illegal to carry firearms "concealed or openly" within the "limits of any city, town, or village."  *Id.* at 58; *see also* 1869 N.M. Laws 312, ch. 32, § 1; 1889 Ariz. Laws 16, ch. 13, § 1; 1889 Idaho Laws 23, § 1.

This era saw several constitutional challenges to laws restricting public carry, but none succeeded.  The Tennessee Supreme Court held that the legislature could broadly restrict the carrying of firearms "among the people in public assemblages where others are to be affected," although not "where it was clearly shown they were worn *bona fide* to ward off or meet imminent and threatened danger to life or limb, or great bodily harm."  *Andrews v. State*, 50 Tenn. 165, 186, 191 (1871).  The Texas Supreme Court upheld that State's prohibition on the carrying of firearms unless the carrier had "'reasonable grounds for fearing an unlawful attack,'" calling the law "a legitimate and highly proper regulation."  *State v. Duke*, 42 Tex. 455, 459 (1874).  Other courts reached similar results.  *See English v. State*, 35 Tex. 473, 480 (1871); *Hill v. State*, 53 Ga. 472, 474 (1874); *Fife v. State*, 31 Ark. 455, 461 (1876); *Walburn v. Territory*, 59 P. 972, 973 (Okla. Terr. 1899) (Mem); *see also* Wise Decl., Ex. 1 at 20-23.

Although *Heller* found such historical evidence "instructive," 554 U.S. at 614, Plaintiffs ignore it.  Some modern judges have concluded that this era supports a broad right to public carry, reasoning that the Fourteenth Amendment was largely a response to southern "Black Codes," including laws barring African-Americans from keeping or bearing arms.  *See Young*, 992 F.3d at 840 (O'Scannlain, J., dissenting).  No doubt, the Amendment's framers were concerned about *discriminatory* laws aimed at disarming freed slaves.  *See id.*.  But they were surely also aware of the tradition of imposing race-neutral restrictions on carrying firearms in populated areas, including outside the South.  The historical record shows that people of all races were prosecuted for violating those laws, *see* Charles, *Take Two*, 64 Clev. St. L. Rev. at 430 n.288 (collecting newspaper reports), and nothing in the Fourteenth Amendment disapproved of that tradition.

1

**e.     California has adopted the tradition of regulating open carry**

2      Reasonable people can debate how exactly the Statute of Northampton was understood in

3  seventeenth-century England, or where exactly the colonists were allowed to carry firearms in

4  eighteenth-century America.  But no one can seriously dispute that restrictions on the public

5  carrying of firearms—including regulation of open carry—were commonplace throughout each of

6  the historical periods that *Heller* considered in construing the Second Amendment.  Those

7  restrictions were particularly prevalent in populated places, where the routine carrying of firearms

8  by private parties threatened public safety, and where local sheriffs and justices of the peace were

9  generally available to provide protection.  They were less prevalent in outlying areas, where

10  firearms were more important in part because public officials typically were not available to assist

11  unarmed settlers or travelers.  And, at least in America, local governments had substantial

12  discretion to regulate the carrying of guns—or to ban it entirely—based on conditions and public

13  preferences in their jurisdictions.  *Young*, 992 F.3d at 821 (observing that "for centuries we have

14  accepted that, in order to maintain the public peace, the government must have the power to

15  determine whether and how arms may be carried in public places").

16      California's system for regulating public carry embraced this tradition.  Wise Decl., Ex. 1 at

17  23-27.  Californians may carry guns without a license under many circumstances—including at

18  their homes and in their places of business, on much private property with the permission of the

19  owner, in more remote parts of the State, at many campsites, hunting grounds, or target ranges,

20  while traveling to and from those and other authorized locations, and in emergencies when public

21  officials are not on the scene.  *See ante* Background I.  On the other hand, California limits the

22  public carrying of guns in cities and towns under ordinary circumstances, with local sheriffs

23  generally determining whether a qualified resident has "good cause" for seeking a license to carry

24  a concealed weapon.  Cal. Penal Code §§ 26150, 26155; *cf. id.* § 26045 ("immediate, grave

25  danger" exception).  This is similar to the approach of many other States, which restrict public

26  carry in populated places to those who can make an individualized showing of good cause (or

27  meet a similar standard).  *See* Conn. Gen. Stat. § 29-28(b); Del. Code Ann. tit. 11, § 1441; Haw.

28

1   Rev. Stat. § 134-9; Mass. Gen. Laws ch. 140, § 131(d); Md. Pub. Safety Code § 5-306(a)(6)(ii);

2   N.J. Stat. § 2C:58-4(c); N.Y. Penal Code § 400.00(2)(f); R.I. Gen. Laws § 11-47-11(a).

3         Other States take a different approach, generally permitting public carry.  *See, e.g.*, La. Rev.

4   Stat. § 40:1379.3; Tex. Gov't Code §§ 411.172, 411.177.  Whatever the modern policy debate,

5   the historical record simply does not support Plaintiffs' suggestion that a permissive approach to

6   public carry is *required* by the pre-existing, common-law right to bear arms incorporated into the

7   Constitution by the Second and Fourteenth Amendments.  *See Heller*, 554 U.S. at 592; *Young*,

8   992 F.3d at 825-26.  A resident of England before the founding, or of America during the

9   founding or in the nineteenth century, would have been quite perplexed by Plaintiffs' contention

10  that the right to bear arms includes a right of ordinary people under ordinary circumstances to

11  carry guns in the public places of cities or towns.  *Compare, e.g.*, Am. Compl. ¶¶ 120-127 *to* 2

12  Edw. 3, 258, ch. 3 (1328); 1836 Mass. Laws 748, 750, ch. 134, § 16; 1871 Tex. Gen. Laws 1322,

13  art. 6512; *see also* Wise Decl., Ex. 1 at 1-2, 27-28.

14         **B.      California's Open Carry Laws Comport with the Second Amendment**

15               **1.      The challenged laws are presumptively lawful under *Heller***

16         Where text, history, and tradition show that a law is consistent with the Second

17  Amendment, the restriction "'passes constitutional muster'" and this Court's inquiry "'is

18  complete.'"  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017); *see Heller*, 554 U.S.

19  at 626, 627 n.26; *Young*, 992 F.3d at 783, 826.  History and tradition demonstrate that the laws

20  contested here comport with the "historical understanding" of the right to bear arms.  *See Heller*,

21  554 U.S. at 625; *Young*, 992 F.3d at 826.

22         Plaintiffs challenge laws that allow local authorities—who are most familiar with the needs

23  and desires of their own communities—the discretion to grant open carry licenses, operable in the

24  county of issuance, to qualified individuals, on a showing of "good cause."  Am. Compl. ¶¶ 236-

25  259 (contesting Cal. Penal Code §§ 26150 and 26155).  Plaintiffs also challenge laws that levy

26  criminal penalties on individuals that carry firearms, whether unloaded or loaded, in a public

27  place without a valid license.  *Id.* ¶¶ 260-268 (contesting Cal. Penal Code §§ 26350 and 25850).

28

California's system—including its regulation of open carry—"stands well within our traditions." *Young*, 992 F.3d at 826; Wise Decl., Ex. 1 at 23; *see generally* Blocher & Miller, *The Positive Second Amendment* 16-42 (2018). Indeed, "it does not go as far as some of the historical bans on public carrying." *Drake v. Filko*, 724 F.3d 426, 433 (3d Cir. 2013); *see, e.g.*, 1821 Tenn. Pub. Acts 15, ch. 13 (categorically banning the carry of "pocket pistols" in all parts of the state); 1875 Wyo. Law 352, ch. 52, § 1 (banning all carry, whether "concealed or openly," within the "limits of any city, town, or village"); *see also Kachalsky*, 701 F.3d at 90 (discussing nineteenth-century laws that "banned the carrying of pistols and similar weapons in public, both in a concealed or an open manner"). Given the historical record, California's system is "within the state's legitimate police powers and [is] not within the scope of the right protected by [the] Second Amendment." *Young*, 992 F.3d at 826.

### 2. The challenged laws are constitutional under any level of means-ends scrutiny

#### a. Intermediate scrutiny applies here

Plaintiffs fail not only to address the historical evidence, but also to apply any form of means-ends scrutiny to the laws they challenge. *Heller* does not suggest that limitations on the right to bear arms should be rejected outright. While *Heller* does not instruct how heightened scrutiny should apply when reviewing laws under the Second Amendment, 554 U.S. at 628-29 & n.27, the Ninth Circuit and other courts of appeals have developed a two-part inquiry to determine the appropriate level of scrutiny. *See ante* Argument I. If, under this inquiry, the historical analysis does not demonstrate that a law is presumptively constitutional, then the law is subject to intermediate scrutiny unless it substantially burdens the "core" Second Amendment right. *Id.*

Plaintiffs argue that the Second Amendment, as understood under *Heller*, stands for the principle that "bearing" arms "encompass[es] the right to carry in public." Am. Compl. ¶ 126. They misread *Heller*, which declared that the Second Amendment elevates "above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," but recognized that other questions about the scope or application of the right must be "le[ft] to future evaluation." 554 U.S. at 635. The Ninth Circuit has repeatedly held that, for purposes of

16

1   determining an appropriate level of scrutiny, the "core" of the Second Amendment right is limited

2   to what *Heller* identified:  the right to keep and carry "in defense of hearth and home."  *Id.*; *see*

3   *Young*, 992 F.3d at 782-83; *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013);

4   *Silvester*, 843 F.3d at 821; *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017); *Pena v.*

5   *Lindley*, 898 F.3d 969, 977 (9th Cir. 2018).  And every other circuit to consider the proper level

6   of scrutiny for similar public carry laws has agreed that "intermediate scrutiny is appropriate"

7   because "the core Second Amendment right is limited to self-defense in the home."  *Gould v.*

8   *Morgan*, 907 F.3d 659, 671, 673 (1st Cir. 2018); *see also Kachalsky*, 701 F.3d at 94, 96; *Drake*,

9   724 F.3d at 436; *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013).  This case—which

10  addresses open carry outside the home—is no exception.  Because the laws challenged here do

11  not burden the core of the Second Amendment right, intermediate scrutiny applies.

**b.    The challenged laws satisfy heightened constitutional scrutiny**

13  When reviewing a law under intermediate scrutiny, courts ask whether the law promotes a

14  "significant, substantial, or important government objective," and whether there is a "'reasonable

15  fit' between the challenged law and the asserted objective."  *Pena*, 898 F.3d at 979.  While the

16  State must show that the law "promotes a substantial government interest that would be achieved

17  less effectively absent the regulation," it need not demonstrate that the regulation is the "least

18  restrictive means of achieving the government interest."  *Id.* (citations and quotation marks

19  omitted).  A court's only obligation is to "'assure that, in formulating its judgments, [the State]

20  has drawn reasonable inferences based on substantial evidence,'" an inquiry that must accord

21  "'substantial deference to the predictive judgments'" of the legislature.  *Id.* at 979-980 (quoting

22  *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)).

23  Here, it is "'self-evident'" that California has a compelling interest in protecting public

24  safety and reducing gun violence.  *Jackson*, 746 F.3d at 965 (quoting *Chovan*, 735 F.3d at 1139).

25  And empirical evidence, in addition to common sense, establishes a "'reasonable fit'" between

26  that interest and restrictions on open carry.  *Pena*, 898 F.3d at 979.

27  This evidence includes a study conducted by Professor John Donohue and two other

28  scholars comparing the crime rates of the 33 states that have adopted "right-to-carry" laws—

17

under which most residents have the right to carry a firearm in most public places—to those of states that have not.  Wise Decl., Ex. 2.  Using 37 years of FBI crime statistics, the study ran four separate models analyzing the impact of right-to-carry laws on crime rates, finding that right-to-carry laws "are associated with *higher* rates of overall violent crime, property crime, or murder. *Id.*, Ex. 2 at 2.  Indeed, under each model, states experienced a 13-15 percent increase in violent crime in the decade after adopting a right-to-carry law.  *Id.*, Ex. 2 at 3.

In a more recent study, Donohue confirmed that "there is consistent evidence that [right-to-carry] laws elevate violent crime in the decade after adoption," regardless of the model used, as long as the model is properly weighted and the data is properly coded.  Wise Decl., Ex. 3 at 14-15.  Donohue concluded that "[p]olicymakers and citizens should recognize that the best available empirical data to date supports the view that [right-to-carry] laws have resulted in statistically significant increases in violent crime in the ten-year period after adoption."  *Id.*, Ex. 3 at 15.

Another peer-reviewed study conducted by Dr. Michael Siegel and other scholars shows a similar link between permissive public carry regimes and higher murder rates.  It reviewed data from 1991 through 2005 and found a "significant[] associat[ion]" between right-to-carry states and higher homicide rates.  Wise Decl., Ex. 4 at 5.  Those states experienced a 6.5 percent increase in the overall homicide rate, an 8.6 percent rise in "firearm-related" homicide rates, and a 10.6 percent increase in the "handgun-specific" homicide rate.  *Id.*; *see also Gould*, 907 F.3d at 675 (collecting additional studies).

This research supports a legislative judgment that an increase in guns carried by private persons in public places increases the risk that "'basic confrontations between individuals [will] turn deadly.'"  *Woollard*, 712 F.3d at 879.  The Legislature could also conclude that widespread open carry increases the "availability of handguns to criminals via theft," *id.*, and that such guns would then be used to "commit violent crimes" or be transferred to "others who commit crimes," RJN, Ex. 3 at 2.

Widespread open carry can also endanger police and other law enforcement officials. The former president of the California Police Chiefs Association, Chief Kim Raney, explains in his expert report that "restrictions on the open carry of firearms greatly enhance public safety" and

18

1    "have been critical to the safety of law enforcement officers, our communities, and those people

2    who would want to openly carry firearms in public."  Wise Decl., Ex. 5, ¶¶ 21, 22.  For example,

3    when law enforcement is responding to an active shooter, carrying of firearms by other

4    individuals can have deadly consequences, including by "delaying first responders from [their]

5    primary mission" of stopping the shooter and saving lives.  *Id.* ¶ 25.  In the aftermath of a

6    shooting that left five police officers dead and nine others wounded, Dallas Police Chief David

7    Brown complained that officers "'don't know who the good guy is versus the bad guy when

8    everyone starts shooting.'"  *Id.*  Similarly, when police officers respond to reports that there is a

9    "man with a gun," or encounter an armed civilian on the streets, they often know little about the

10   person's intent or mental state, or whether the person is authorized to carry a gun.  *Id.* ¶ 22.

11   These encounters can have fatal consequences.  *Id.*  Restrictions on public carry also reduce the

12   amount of time that police must spend investigating handgun sightings, and help police quickly

13   identify those persons carrying firearms who pose a threat.  *Id.* ¶ 23; *accord Woollard*, 712 F.3d

14   at 879-880 (recounting similar policing benefits).

15          Chief Raney's testimony is consistent with California's objective, as reflected in the

16   legislative record, in enacting its open carry laws:  to prevent or at least reduce the danger to

17   public safety created by firearms in public places.  RJN, Ex. 4 at 48.  California's regulation of

18   open carry, which was backed by the California Police Chiefs Association, among others, was

19   animated by the concern that when someone exposes a loaded or unloaded firearm in public,

20   other people often become alarmed and call for peace officers to defuse the situation.  *Id.* at 48-

21   49.  Regulating open carry is designed not only to prevent the deadly confrontations that may

22   ensue between the person openly carrying a firearm and the responding peace officer, but to

23   reduce calls to overtaxed police and sheriff's departments.  *Id.* at 48.  At the same time,

24   California's firearms licensing scheme recognizes the distinct interests of persons living in a rural

25   environment, such as cattle ranchers, and accordingly, allows for the issuance of open carry

26   permits in less populated counties.  RJN, Ex. 5 at 3-4, 7.  To ensure local control over the

27   permitting process, the authority to issue such licenses is vested with police chiefs and county

28   sheriffs.  RJN, Ex. 6 at 2-3.

19

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (2:19-cv-00617-KJM-AC)

1    In light of the many public safety risks the Legislature could reasonably deem to be

2    associated with widespread open carry, there is a "'reasonable fit'" between California's

3    calibrated regime governing open carry and the important interests that it serves. *Pena*, 898 F.3d

4    at 979. Indeed, given the compelling public safety interests at stake, and the narrowly tailored

5    laws allowing sheriffs of less populated counties to issue open carry licenses for good cause, this

6    regime satisfies not only intermediate scrutiny, but strict scrutiny. *See Williams-Yulee v. Florida*

7    *Bar*, 135 S. Ct. 1656, 1664 (2015) (setting forth strict scrutiny standard). Plaintiffs have not

8    presented any countervailing evidence that would undermine the conclusion that the laws they

9    challenge satisfy any level of heightened scrutiny. The reasonable measures at issue here are not

10   among those the Constitution has taken "off the table." *See Heller*, 554 U.S. at 636.

11   Plaintiffs complain that the Attorney General and the California Department of Justice have

12   "collectively consented to, and effectuated, a [statewide] ban on the open carriage of handguns"

13   by choosing not to create a separate open carry application for the type of license described in

14   California Penal Code sections 26150 and 26155. Am. Compl. ¶ 115. But sheriffs and police

15   chiefs—not the Attorney General—issue licenses, and Plaintiffs do not suggest that the Attorney

16   General, or anyone else, has interfered with the implementation of these statutes by prohibiting

17   the issuance of open carry licenses. *See, e.g.*, *id.* at ¶ 35 ("By filling in the 'type of license'

18   section on the DOJ Application, the Siskiyou County Sheriff's Office purposely conceals from its

19   residents their right to choose the type of handgun license to apply for, to wit, open carry."), ¶ 75

20   ("The Shasta County application instructions entitled, 'Concealed Weapon Permit Application

21   Process' only pertains to applying for a concealed carry license. Shasta County has no

22   instructions pertaining to applying for an open carry license."); Def.'s Statement of Undisputed

23   Facts, pp. 2-3. Plaintiffs' grievances thus appear to stem primarily from how the Siskiyou County

24   and Shasta County sheriffs have chosen to exercise their discretion—and yet, Plaintiffs have not

25   named the sheriffs parties to this action. In any event, the sheriffs have not taken—or failed to

26   take—any action that would render the laws challenged here unconstitutional.

27   **CONCLUSION**

28   This Court should grant Defendant's motion for summary judgment.

Dated:  November 19, 2021

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General

/s/ *R. Matthew Wise*

R. MATTHEW WISE
Deputy Attorney General
*Attorneys for Defendant Attorney General*
*Rob Bonta*

SA2019101934
35623625.docx

21