1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  R. MATTHEW WISE, State Bar No. 238485
   Supervising Deputy Attorney General
3  RYAN DAVIS, State Bar No. 266330
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone:  (916) 210-6050
6    Fax:  (916) 324-8835
     E-mail:  Ryan.Davis@doj.ca.gov
7  *Attorneys for Defendant Attorney General Rob Bonta*

8

9                IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13  **MARK BAIRD and RICHARD GALLARDO,**

          Case No. 2:19-cv-00617-KJM-AC

14                                    Plaintiffs,    **DEFENDANT'S OPPOSITION TO
                                                     PLAINTIFFS' THIRD MOTION FOR
15        v.                                         PRELIMINARY INJUNCTION**

16                                                   Date:        October 21, 2022
                                                     Time:        10:00 a.m.
17  **ROB BONTA, in his official capacity as**       Dept:        3
    **Attorney General of the State of California,** Judge:       Hon. Kimberly J. Mueller
18  **and DOES 1-10,**
                                                     Trial Date:  None set
19                                    Defendants.    Action Filed: April 9, 2019

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 2

    I.     Plaintiffs' Present Ability to Carry Firearms in Public ....................................... 2

    II.    Related Legal Challenge in *Nichols v. Harris* ...................................................... 3

    III.   The Present Lawsuit ............................................................................................. 3

Legal Standard .................................................................................................................... 5

Argument ............................................................................................................................ 6

    I.     Plaintiffs Have Not Shown a Likelihood of Success on the Merits ..................... 6

         A.    California's Open Carry Laws Are Consistent with *Bruen* ...................... 6

         B.    *Bruen* Struck Down Only One Requirement Within a Comprehensive and Constitutionally Permissible Licensing Scheme ...... 13

              1.    The Good Cause Requirement Is Severable from the Rest of California's Public-Carry Licensing Regime .............................. 13

              2.    The Remaining Public-Carry Licensing Requirements Pass Constitutional Muster Under *Bruen* ............................................ 16

    II.    Plaintiffs Have Not Satisfied the Other Factors for Injunctive Relief ................. 18

Conclusion ........................................................................................................................ 20

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott Lab'ys v. Franchise Tax Bd.*
  175 Cal. App. 4th 1346 (2009) .......................................................................... 14

*Abed v. United States*
  278 A.3d 114 (D.C. July 14, 2022) .................................................................... 12

*Alliance for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) ............................................................................. 5

*Cal. Redevelopment Ass'n v. Matosantos*
  53 Cal. 4th 231 (2011) ................................................................................. 14, 15

*Chalk v. U.S. Dist. Court Cent. Dist. Cal.*
  840 F.2d 701 (9th Cir. 1988) ............................................................................. 20

*District of Columbia v. Heller*
  553 U.S. 570 (2008) ................................................................................ 1, 6, 11

*Flanagan v. Bonta*
  No. 18-55717 (9th Cir. July 8, 2022) .................................................................. 1

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
  561 U.S. 477 (2010) .......................................................................................... 14

*Gould v. Morgan*
  907 F.3d 659 (1st Cir. 2018) ............................................................................. 19

*Hooks v. United States*
  (D.C. 2018) 191 A.3d 1141 ............................................................................... 17

*Maryland v. King*
  567 U.S. 1301 (2012) ........................................................................................ 20

*McDonald v. City of Chicago*
  561 U.S. 742 (2010) ...................................................................................... 6, 11

*Miller v. Becerra*
  No. 3:19-cv-1537-BEN-JLB (S.D. Cal. Aug. 29, 2022) .................................... 12

*New York State Rifle & Pistol Association, Inc. v. Bruen*
  142 S. Ct. 2111 (2022) ................................................................................ passim

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Newman v. United States*
258 A.3d 162 (D.C. 2021)...................................................................................... 17

*Nichols v. Harris*
17 F. Supp. 3d 989 (C.D. Cal 2014) ...................................................................... 3

*Nichols v. Newsom*
No. 14-55873 (9th Cir.)..................................................................................... 7, 13

*Nken v. Holder*
556 U.S. 418 (2009)............................................................................................. 18

*Norman v. State*
215 So. 3d 18 (Fla. 2017).................................................................................... 11

*Peruta v. Cty. of San Diego*
824 F.3d 919 (9th Cir. 2016)........................................................................... 8, 10

*Ramos v. Wolf*
974 F.3d 87 (9th Cir. 2020)................................................................................. 12

*Sam Francis Found. v. Christies, Inc.*
784 F.3d 1320 (9th Cir. 2015)............................................................................. 14

*Tracy Rifle & Pistol LLC v. Harris*
118 F. Supp. 3d 1182 (E.D. Cal. 2015)............................................................... 18

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008)........................................................................................ 5, 6, 13

*Woollard v. Gallagher*
712 F.3d 865 (4th Cir. 2013).......................................................................... 19, 20

*Wrenn v. District of Columbia*
864 F.3d 650 (D.C. Cir. 2017)............................................................................. 17

iii

Def.'s Opp'n to Pls.' Third Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

California Penal Code

§ 12050 .................................................................................................................. 15
§ 12050(a)(1) ........................................................................................................ 15
§ 12050(d) ............................................................................................................ 15
§ 21650(b)(1) ....................................................................................................... 10
§ 25400 ............................................................................................................. 4, 13
§ 25850 .......................................................................................................... 2, 4, 5
§ 25850(a) ............................................................................................................... 4
§ 25850(b) ............................................................................................................... 4
§ 26150 ........................................................................................................... passim
§ 26150(a) ...................................................................................................... 13, 15
§ 26150(b)(2) .................................................................................................... 4, 10
§ 26155 ........................................................................................................... passim
§ 26155(a) ...................................................................................................... 13, 15
§ 26155(b)(1) ....................................................................................................... 10
§ 26155(b)(2) ....................................................................................................... 10
§ 26185 ............................................................................................................ 14, 16
§ 26185(a) .............................................................................................................. 13
§ 26195 ...................................................................................................... 14, 15, 16
§ 26195(a) .............................................................................................................. 13
§ 26350 .......................................................................................................... 2, 4, 5
§ 26350(a)(1) .......................................................................................................... 4
§ 26350(a)(2) .......................................................................................................... 4
§ 26350(b) .............................................................................................................. 4

District of Columbia Code § 22-4506 ................................................................. 17

Federal Law Enforcement Officers Safety Act ................................................ 3, 9

**CONSTITUTIONAL PROVISIONS**

Second Amendment ..................................................................................... passim

Fourth Amendment ............................................................................................... 3

Fourteenth Amendment ....................................................................................... 4

**OTHER AUTHORITIES**

Alcohol, Tobacco, Firearms and Explosives, *2012 Summary: Firearms Reported
Lost and Stolen* (2013) ..................................................................................... 19

iv

1

### TABLE OF AUTHORITIES
(continued)

2
**Page**

3    California Legislative Information, SB-918 Firearms. (2021-2022), Votes,
4        https://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id=
    202120220SB918...............................................................................................5

5    Office of the Attorney General, *Legal Alert: U.S. Supreme Court Decision in New*
6        *York State Rifle & Pistol Association v. Bruen, No. 20-843*
    (June 24, 2022), https://oag.ca.gov/system/files/media/legal-alert-oag-2022-
7        02.pdf........................................................................................................1, 13, 16

8    Sen. Bill 1080 (2009-2010 Reg. Sess.) § 6, https://leginfo.legislature.ca.gov/
9        faces/billTextClient.xhtml?bill_id=200920100SB1080 .......................................15

10   *Summary of the Law Enforcement Officers Safety Act (LEOSA) of 2004,*
    https://oag.ca.gov/sites/all/files//pdfs/firearms/forms/leosasummary.pdf ............................3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court rejected the familiar "two-step test" that the Ninth Circuit and most other federal courts had long applied to Second Amendment challenges to firearm regulations and held that *District of Columbia v. Heller*, 553 U.S. 570 (2008), "demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. Under the "text-and-history standard" announced and applied in *Bruen*, courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2130. If it does, courts are then tasked with determining whether the regulation in question "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-2130. Regarding the specific regulation at issue in *Bruen*, the Court concluded that New York's requirement that "proper cause" be demonstrated in order to obtain a concealed-carry permit is inconsistent with historical tradition and therefore unconstitutional. *Id.* at 2122.

The Attorney General did not delay in recognizing *Bruen*'s significance. The day after the Supreme Court announced its decision, the Attorney General issued a legal alert to explain *Bruen*'s implications for California's public-carry licensing scheme and to inform law enforcement that "[p]ermitting agencies may no longer require a demonstration of 'good cause' in order to obtain a concealed carry permit." *See* Office of the Attorney General, *Legal Alert:  U.S. Supreme Court Decision in New York State Rifle & Pistol Association v. Bruen, No. 20-843* (June 24, 2022), https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf. The Attorney General also acknowledged that *Bruen* directly controls the outcome in a case brought by plaintiffs who were unable to lawfully carry firearms in public because they were denied public-carry licenses for lack of "good cause." *See Flanagan v. Bonta*, No. 18-55717 (9th Cir. July 8, 2022), ECF No. 64.

But *Bruen* does not support the particular claims at issue in this case, which hinge on Plaintiffs' contention that the Second Amendment guarantees them the right to publicly carry firearms in a specific manner—*openly*. Plaintiffs already have the ability to carry concealed

1

without fear of legal repercussions.  Their claim is that they must *also* be permitted to carry open and exposed.  Yet *Bruen* explained that "[t]he historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation."  *Bruen*, 142 S. Ct. at 2150.  Eliminating or more closely regulating one kind of public carry while leaving another option available does nothing to "prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose," and so does not violate the Second Amendment.  *Id.*

Because Plaintiffs' Second Amendment rights have not been infringed, and Plaintiffs do not argue that they were otherwise injured, they cannot establish that they have met the factors that would justify a preliminary injunction.  The State and its residents, in contrast, would suffer irreparable harm if the laws challenged here, which are calculated to reduce gun violence, could not be enforced.  Accordingly, Plaintiffs' preliminary injunction motion should be denied.

## BACKGROUND

### I.   PLAINTIFFS' PRESENT ABILITY TO CARRY FIREARMS IN PUBLIC

Plaintiffs Mark Baird and Richard Gallardo, according to their deposition testimony, already have the ability to carry firearms in public without fear of arrest, prosecution, or any other legal injury.  Although Plaintiffs allege that "Mr. Baird does not hold a California firearm license and does not fall within any of the exemptions to California Penal Code sections 25850 and 26350 criminalizing the possession of firearms," ECF No. 68 at ¶ 20, Mr. Baird repeatedly acknowledged in his deposition that he *does* have a license, issued by the Siskiyou County Sheriff, to carry a concealed firearm.  See Wise Decl., Ex. 1 at 5-6, 8, Baird Dep., 13:9-23, 14:2-9, 20:6-7.  As Mr. Baird put it, "It's already legal for me to carry a firearm concealed throughout California with the single exception, I believe, of San Francisco County or parts of certain cities in the Bay Area."[1]  *Id.*, Ex. 1 at 8 (Baird Dep., 20:20-24).

Mr. Gallardo had a license to carry a concealed firearm for several years, but it was revoked in 2019 after he brought a firearm on state property and displayed it to co-workers.  *See* Wise

---

[1] Mr. Baird did not specify why he would not be permitted to use his concealed-carry license in San Francisco or other cities in the Bay Area.

2

Decl., Ex. 2 at 5-7, Gallardo Dep., 14:3-25, 15:1-3, 17:4-17; *see also* Wise Decl., Ex. 3, Letter from Shasta County Sheriff dated Sept. 17, 2019.  Nonetheless, Mr. Gallardo testified in his deposition that even without a license issued by the Shasta County Sheriff, he is still legally permitted to carry concealed as a retired military police officer under the federal Law Enforcement Officers Safety Act (LEOSA).  Wise Decl., Ex. 2 at 6, 8, Gallardo Dep., 15:11-17, 27:10-13; *see also Summary of the Law Enforcement Officers Safety Act (LEOSA) of 2004*, https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/leosasummary.pdf.  Mr. Gallardo does not allege that Defendant has disputed his ability to carry concealed under LEOSA.

Although Plaintiffs both testify that they have the ability to carry concealed, they seek to carry open and exposed.  Plaintiffs allege that each of them "has a present intention to carry a handgun *open and exposed* for self-defense, loaded or unloaded, throughout the State of California, today and every day for the remainder of his natural life."  ECF No. 68 at ¶¶ 21, 33 (emphasis added); *see also* ECF No. 65-1, Baird Decl. in Support of Third Mot. for Prelim. Inj., ¶ 5; ECF No. 65-2, Gallardo Decl. in Support of Third Mot. for Prelim. Inj., ¶ 5.  That is why Mr. Baird brought this lawsuit, because he is "hoping to achieve the unpermitted and unrestricted open carry of a loaded firearm in the State of California . . . ."  Wise Decl., Ex. 1 at 7, Baird Dep., 16:6-8.  Like Mr. Baird, Mr. Gallardo "hope[s] to achieve the ability to open carry without government permission."  Wise Decl., Ex. 2 at 10, Gallardo Dep., 29:2-3.

## II.   RELATED LEGAL CHALLENGE IN *NICHOLS V. HARRIS*

In *Nichols v. Harris*, the district court rejected the same claim advanced here—that the Second Amendment guarantees a right to openly carry a firearm in public places.  17 F. Supp. 3d 989, 993-94, 1004-05 (C.D. Cal. 2014).  On September 12, 2022, the Ninth Circuit remanded the case back to the district court for further proceedings consistent with *Bruen*.  *Nichols v. Newsom*, No. 14-55873 (9th Cir.), ECF No. 133.

## III.   THE PRESENT LAWSUIT

On April 9, 2019, Plaintiffs filed a complaint for declaratory and injunctive relief against former California Attorney General Xavier Becerra, alleging that they had each requested open-carry licenses from their respective local sheriffs and had been denied, and that various aspects of

3

Def.'s Opp'n to Pls.' Third Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

California law pertaining to open carry violate their constitutional rights under the Second, Fourth, and Fourteenth Amendments to the Constitution.  ECF No. 1.  Plaintiffs also brought a motion for preliminary injunction, which this Court denied.  ECF No. 33 at 10.  Although the Court acknowledged the evolving legal landscape and determined that Plaintiffs had "raised 'serious questions' going to the merits of their Second Amendment claim," it declined to issue a preliminary injunction because "the balance of equities [did] not tip 'sharply' in [Plaintiffs'] favor."  *Id.*  The Court also largely granted Defendant's motion to dismiss Plaintiffs' Fourth and Fourteenth Amendment claims.  ECF No. 33 at 18.

Plaintiffs then filed an amended complaint raising only Second Amendment claims, again alleging that they had been denied open-carry licenses and that four state laws—California Penal Code sections 25850, 26350, 26150, and 26155—violate the Second Amendment.  ECF No. 34. Section 25850 prohibits a person from "carrying a loaded firearm" outside or inside a vehicle in public places, and, "for the purpose of enforcing this section," allows peace officers to examine a firearm "to determine whether or not [the] firearm is loaded."  Cal. Penal Code § 25850(a), (b). Section 26350 prohibits a person from "openly carrying an unloaded handgun" outside or inside a vehicle in public places.  Cal. Penal Code § 26350(a)(1), (a)(2).  Sections 26150 and 26155 concern the issuance of public-carry licenses.  Regarding open carry, sections 26150 and 26155 provide that in a county of less than 200,000 persons, the county sheriff or city police chief within the county "may issue . . . a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person."  Cal. Penal Code §§ 26150(b)(2) (county sheriff), 26155(b)(2) (city police chief).[2]  Plaintiffs also filed a second preliminary injunction motion, ECF No. 40, which the Court heard on July 16, 2021, ECF No. 50. That motion remains pending.  On December 2, 2021, pursuant to a stipulation by the parties, this Court stayed this matter pending the Supreme Court's decision in *Bruen*.  This Court lifted the stay on July 7, 2022.

---

[2] Plaintiffs do not challenge Penal Code section 25400, which generally prohibits carrying a concealed firearm.

1       In a joint status report filed on July 21, 2022, Plaintiffs requested 30 days by which to file a

2   Second Amended Complaint and indicated their intention to file a third preliminary injunction

3   motion in light of *Bruen*.  ECF No. 63 at 5.  Defendant suggested the Court provide Plaintiffs

4   additional time to file their amended complaint, so that possible new legislation could be taken

5   into account.[3]  *Id.* at 4.  At the hearing on July 28, 2022, the Court ordered Plaintiffs to file a

6   Second Amended Complaint within 60 days, or by September 26, 2022.  ECF No. 64.  Plaintiffs

7   filed the Second Amended Complaint on September 27, 2022.  ECF No. 68.  Plaintiffs no longer

8   challenge any provisions of California's licensing scheme under Penal Code sections 26150 and

9   26155, but continue to allege that Penal Code sections 25850 and 26350 violate the Second

10  Amendment.  ECF No. 68 at 16-17.  On August 8, 2022, before filing the Second Amended

11  Complaint, Plaintiffs filed their third motion for preliminary injunction, in which they continue to

12  seek an order "enjoining Defendant [and others] from the enforcement of Penal Codes §§ 26350

13  and 25850 against individuals who carry a handgun open and exposed in public throughout the

14  State of California."  ECF No. 65 at 2.

15  **LEGAL STANDARD**

16      "A preliminary injunction is an extraordinary remedy never awarded as a matter of right."

17  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To prevail, "a plaintiff must

18  show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to

19  plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and

20  (4) that an injunction is in the public interest."  *Id.* at 7, 20.  Alternatively, "[a] preliminary

21  injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits

22  were raised and the balance of hardships tips sharply in the plaintiff's favor."  *Alliance for the*

23  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted).

24

25  _____

26      [3] The California Legislature recently considered S.B. 918 (2021-2022 Reg. Sess.) (S.B. 918), which would have made substantial changes to California's statutory scheme governing

27  public-carry licenses.  Because it included an urgency clause, S.B. 918 required a two-thirds majority to pass.  It fell just short.  *See* California Legislative Information, SB-918 Firearms.

28  (2021-2022), Votes, https://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id= 202120220SB918.

1    Plaintiffs must make a showing of all four *Winter* factors even under the alternative sliding scale

2    test.  *Id.* at 1132, 1135.

3                                    **ARGUMENT**

4    **I.    PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS**

5          Rather than supporting Plaintiffs' motion, *Bruen* undermines any likelihood that Plaintiffs

6    will succeed on the merits.  Because California's open carry laws are consistent with the Second

7    Amendment as interpreted in *Bruen*, Plaintiffs' motion should be denied.  This Court should not

8    be persuaded by the order cited by Plaintiffs in which the Sacramento Superior Court sustained a

9    demurrer in a criminal case based on the mistaken view that *Bruen* declared California's licensing

10   scheme for carrying firearms in public to be unconstitutional.  *See* ECF No. 65-3 at 17-26.[4]

11   *Bruen* does not support, and indeed specifically rejects, such a sweeping view.  This Court should

12   not grant the "extraordinary remedy" of a preliminary injunction, *Winter*, 555 U.S. at 24, based

13   on the scant historical evidence plaintiffs offer in support their motion.  Because Plaintiffs cannot

     show they are likely to succeed on the merits, their motion should be denied.

14

15        **A.    California's Open Carry Laws Are Consistent with *Bruen***

          In *Bruen*, the Supreme Court considered the constitutionality of New York's requirement

16   that individuals show "proper cause" as a condition of securing a license to carry a firearm in

17   public.  142 S. Ct. at 2123.  Before turning to the merits, the Court addressed the proper

18   methodology for analyzing Second Amendment claims.  It recognized that the lower courts had

19   "coalesced around a 'two-step' framework for analyzing Second Amendment challenges" after its

20   earlier decisions in *Heller*, *supra*, 554 U.S. 570, and *McDonald v. City of Chicago*, 561 U.S. 742

21   (2010).  *Id.* at 2125.  That approach "combine[d] history with means-end scrutiny."  *Id.*  At the

22   first step of that approach, the government could "justify its regulation by establishing that the

23   challenged law regulates activity falling outside the scope of the [Second Amendment] right as

24   originally understood."  *Id.* at 2126 (brackets and quotation marks omitted).  If that inquiry

25   showed that the regulation did not implicate conduct protected by the Second Amendment, lower

26

27          [4] Because Plaintiffs filed the memorandum of points and authorities in support of their
     motion and an attachment as one document, see ECF No. 65-3, Defendant cites to the page
28   numbers supplied by the Court at the top of each page for sake of clarity.

                                        6

1    courts would uphold it without further analysis.  *Id.*  Otherwise, courts would proceed to the

2    second step, which asked "how close[ly] the law c[ame] to the core of the Second Amendment

3    right and the severity of the law's burden on the right," applying intermediate scrutiny unless the

4    law severely burdened the "'core' Second Amendment right" of self-defense of the home, in

5    which case strict scrutiny applied.  *Id.*

6          In *Bruen*, the Supreme Court "decline[d] to adopt" this approach.  *Id.* at 2126.  Instead, the

7    Supreme Court announced a new framework for analyzing Second Amendment claims.  *Id.* at

8    2125-2126.  In lieu of the "two-step test," *Bruen* held that courts must apply a standard "rooted in

9    the Second Amendment's text, as informed by history."  *Id.* at 2127.  Under that approach, courts

10   must initially assess whether the "Second Amendment's plain text covers" the regulated conduct,

11   *id.* at 2129-30—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or

12   "bear[ing]" "Arms," U.S. Const. amend. II.  If the answer to that question is yes, then the burden

13   shifts to the government to show that the challenged law is "consistent with the Nation's

14   historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.

15         *Bruen* provides that, in some cases, this historical inquiry will be "fairly straightforward,"

16   such as when a challenged law addresses a "general societal problem that has persisted since the

17   18th century."  *Bruen*, 142 S. Ct. at 2131.  But in others—particularly those where the challenged

18   laws address "unprecedented societal concerns or dramatic technological changes"—this

19   historical analysis requires a "more nuanced approach."  *Id.* at 2132.  Governments can justify

20   regulations of that sort by "reasoning by analogy," a process that requires the government to show

21   that its regulation is "'relevantly similar'" to a "well-established and representative historical

22   analogue."  *Id.* at 2333 (emphasis omitted).  While the Court did not "provide an exhaustive

23   survey of the features that render regulations relevantly similar under the Second Amendment," it

24   did identify "two metrics:  how and why the regulations burden a law-abiding citizen's right to

25   armed self-defense," *id.* at 2132-33, as "'*central*' considerations," *id.* at 2133 (quoting *McDonald*,

26   561 U.S. at 767).  Under *Bruen*, a modern regulation is consistent with the Second Amendment if

27   it "impose[s] a comparable burden on the right of armed self-defense" as its historical

28   predecessors, and the modern and historical laws are "comparably justified."  *Id.* at 2133.

7

Although *Bruen* dramatically changed the way Second Amendment claims are analyzed, it undermines Plaintiffs' argument that they are likely to succeed on the merits in this litigation.  In particular, *Bruen* recognizes that so long as a State allows law-abiding residents to carry firearms in public, it may reasonably regulate the manner in which they do so.  *Bruen*'s understanding of the Anglo-American history of public carry regulations thus forecloses Plaintiffs' claim that the Second Amendment guarantees them the right to carry *openly*.

Similar to California, *see generally Peruta v. Cty. of San Diego*, 824 F.3d 919, 925-927 (9th Cir. 2016) (en banc), New York prohibits most people from carrying firearms in most public places unless they obtain a license, *Bruen*, 142 S. Ct. at 2123.  Before *Bruen*, to get a license in New York applicants had to meet certain criteria, including that "'proper cause exist[ed]' to issue" a license.  *Id.*  New York law defined proper cause as a showing that an applicant had a "special need for self-protection distinguishable from that of the general community."  *Id.*  This was a "demanding" standard, *id.* at 2123, that made it "virtually impossible for most New Yorkers" to secure a license, *id.* at 2156 (Alito, J., concurring).

In *Bruen*, the Supreme Court held that the "proper cause" requirement violated the Second Amendment.  142 S. Ct. at 2156.  Applying its new text-and-history approach, the Court had "little difficulty" concluding that the "plain text of the Second Amendment protect[ed]" the conduct that the plaintiffs wished to engage in—"carrying handguns publicly for self-defense." *Id.* at 2134.  The Court then conducted a survey of "the Anglo-American history of public carry," and concluded that this history showed that the Second Amendment guaranteed a right to bear "commonly used arms" in public, "subject to certain reasonable, well-defined restrictions," which had not historically included a requirement that "law-abiding, responsible citizens … 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public.'"  *Id.* at 2156.  The Court held that New York failed to meet its burden "to identify an American tradition justifying . . . [its] proper-cause requirement."  *Bruen*, 142 S. Ct. at 2130.  Although they were not directly before it, the Court also observed that six other states—including California—have adopted "analogues to the 'proper

8

cause' standard," *id.* at 2124; *see also id.* at 2161 (Kavanaugh, J., concurring) (similar), which would presumably be unsustainable under the standard announced by *Bruen*.

But neither the good-cause requirement nor any other provision of California law actually prevents Plaintiffs from carrying firearms in public for purposes of self-defense.  As explained above, both Plaintiffs testified that they *can* carry a firearm in public for self-defense without risking arrest, prosecution, incarceration, and fines.  Mr. Baird can do so because he has a public-carry license, which are available to ordinary citizens who meet the statutory requirements under Penal Code sections 26150 or 26155.  Wise Decl., Ex. 1 at 5-6, 8, Baird Dep., 13:9-23, 14:2-9, 20:6-7.  Mr. Gallardo can do so as a retired military police officer under the federal Law Enforcement Officers Safety Act.  Wise Decl., Ex. 2 at 6, 8, Gallardo Dep., 15:11-17, 27:10-13.

This case is entirely about *open* carry.  Accordingly, what is most relevant for purposes of Plaintiffs' preliminary injunction motion is *Bruen*'s discussion of the limits that States may continue to impose on the manner in which firearms are carried in public.  Although the Court invalidated New York's "proper cause" requirement, its analysis demonstrates that, throughout this Nation's history, States have been allowed to prohibit certain methods of carry so long as they do not bar public carry altogether.  In rejecting New York's assertion that public carry regulations adopted in antebellum America supported the proper cause requirement, the Court reasoned that these laws demonstrated only "that the *manner* of public carry was subject to reasonable regulation."  *Bruen*, 142 S. Ct. at 2150.  Indeed, the Court identified historical restrictions on the manner of carry, i.e., either concealed or open, as part of the American tradition of firearms regulation.

In particular, the Court reviewed several cases from the antebellum era considering laws regulating the manner of carry and concluded that those decisions "agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry."  *Id.* at 2146 (citing cases from Alabama, Louisiana and Kentucky).  The Court also noted a colonial New Jersey law that "prohibited only the *concealed* carry of pocket pistols . . . [and] presumably did not by its terms touch the open carry of larger [weapons]."  *Id.* at 2144.  These cases, and the state laws they considered, reflected "a consensus view that States could not *altogether prohibit* the

9

1  public carry of arms protected by the Second Amendment or state analogues," *id.* at 2147

2  (emphasis added), but that reasonable restrictions on the *manner* of carry were permissible.

3  Indeed, the Court noted that state courts after the Civil War "continued the antebellum tradition of

4  upholding concealed carry regimes that seemingly provided for open carry." *Id.* at 2155 n.30.

5       Elsewhere, the Court held that New York's proper cause requirement was not supported by

6  English and early American laws that prohibited the "bearing of arms in a way that spreads 'fear'

7  or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. These laws demonstrated only that

8  States could prohibit the carrying of "deadly weapons in a *manner* likely to terrorize others." *Id.*

9  at 2150. Similarly, the Court held that "surety statutes" adopted by several States in the mid-19th

10 century did not support New York's proper cause restriction. *Id.* at 2148-2150. Those statutes

11 required individuals who were "reasonably likely to 'breach the peace'" and could not "prove a

12 special need for self-defense" to post a bond before carrying in public. *Id.* at 2148. The Court

13 explained that these statutes were distinguishable because they were "not *bans* on public carry,"

14 *id.*, but instead provided only "financial incentives for responsible arms carrying," *id.* at 2150.

15      The recognition in *Bruen* that States may limit the manner in which firearms are carried in

16 public runs directly counter to the notion that California's restrictions on open carry violate the

17 Second Amendment. Most Californians who obtain a license may carry firearms in most public

18 places, but must carry concealed. *See* Cal. Penal Code §§ 21650(b)(1), 26155(b)(1).[5] Because

19 concealed carry in most public places is an option for those Californians who obtain a license,

20 California's open carry laws do not function as a ban on public carry. That is why Plaintiffs are

21 wrong to suggest that *Peruta v. County of San Diego*, supports their position. See ECF No. 65-3

22 at 12. The Court there held only that that concealed carry is not protected by the Second

23 Amendment, 824 F.3d at 939, and specifically declined to address whether the Second

24 Amendment protects a right to open carry, *see id.* at 927. Regardless, because the ability to

25

26

27      [5] As noted above, in counties with less than 200,000 people, local licensing authorities
   have the option of issuing a license to residents that allows them to carry openly "only in that
28 county." Cal. Penal Code §§ 26150(b)(2), 26155(b)(2).

lawfully carry concealed *is* available to Plaintiffs, the demands of the Second Amendment under *Bruen* are satisfied.

To be sure, *Bruen* does not expressly pass upon state prohibitions on open carry, because that question was not before the Court, and the statutory scheme challenged in that case was the regulation of concealed carry. *See Bruen*, 142 S. Ct. at 2123. But the clear import of *Bruen* is that the Second Amendment merely requires States to allow qualified, law-abiding residents to carry firearms in *some* manner *publicly*. *See, e.g., id.* at 2122 (holding that "ordinary, law-abiding citizens have a . . . right to carry handguns publicly for their self-defense"); *id.* (finding a Second Amendment violation because "New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense"); *id.* at 2134 (finding that the "the plain text of the Second Amendment protects [plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense"). Nothing in *Bruen* suggests that the right to carry handguns publicly can be satisfied only through open carry. On the contrary, *Bruen* shows that, throughout our Nation's history, "*the manner* of public carry was subject to reasonable regulation," *id.* at 2150, including regulation of open or concealed carry, *see supra* p. 11-13.

The conclusion that the Second Amendment does not require states to accommodate the right to public carry via open carry is consistent with decisions that both pre- and post-date *Bruen*. In *Norman v. State*, 215 So. 3d 18 (Fla. 2017), Florida's highest court upheld the state's open carry restrictions against federal (and state) constitutional challenges. *Id.* at 22. The Court applied the now-defunct two-step test. *See id.* at 28-41. But its reasoning is consistent with *Bruen*'s emphasis that so long as the right to public carry is accommodated in some manner, the legislature may choose between open and concealed carry. The Florida Supreme Court explained that the open carry restrictions did not violate the Second Amendment because they did "not diminish an individual's ability to carry a firearm for self-defense, so long as the firearm is carried in a concealed manner and the individual has received a concealed-carry license." *Id.* at 27–28; *see also id.* at 37 ("Significantly, unlike the laws at issue in *Heller* and *McDonald*, which completely banned the possession of handguns in one's home, Florida's Open Carry Law regulates only <u>how</u> firearms are borne in public.").

Consistent with *Norman*, the first and thus far only appellate court to comment on *Bruen*'s application to open carry regulations noted that "nothing in the [*Bruen*] opinion implies that a State must allow open carry." *Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. July 14, 2022). Although the defendant in that case did not directly challenge the constitutionality of a law prohibiting open carry, the court read *Bruen* as merely "suggest[ing] that a State would be required to allow open-carry of a handgun for self-defense *if* it were to broadly prohibit concealed carry." *Id.* (emphasis added).

In sum, *Bruen* makes clear that a State may reasonably regulate the manner of public carry—including by restricting open carry—so long as it provides some manner, *e.g.*, concealed carry, in which qualified, law-abiding persons may publicly carry firearms. Even if this Court concludes that *Bruen* does not directly foreclose Plaintiffs' claim, and that there is still an open question whether California's restrictions on open carry are "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, it does not follow that Plaintiffs have demonstrated a strong likelihood of success on the merits. To be sure, *Bruen* has dramatically changed the way in which lower courts should proceed with the historical analysis. *See ante* Argument I. And it would ultimately be Defendant's burden to put forth the relevant historical evidence to prevail at final judgment. *See Bruen*, 142 S. Ct. at 2135. But it is Plaintiffs' burden at *this* stage of the preliminary injunction analysis to show that they are likely to prevail on the merits. *See, e.g.*, *Ramos v. Wolf*, 974 F.3d 87, 899 (9th Cir. 2020).

Compiling the historical record required by *Bruen* is no easy task. It must be undertaken by trained historians through painstaking efforts just to identify the sources available to answer a particular historical inquiry. *See* Declaration of Zachary Schrag, *Miller v. Becerra*, No. 3:19-cv-1537-BEN-JLB (S.D. Cal. Aug. 29, 2022), ECF No. 129-1 at 2-5. Even identifying which sources are available does not necessarily mean that those sources are available to be accessed, read, and analyzed. *Id.* at 5-10. Once those sources are accessed, the process of putting together findings is also incredibly time consuming, comprising potentially hundreds or even thousands of hours depending on the inquiry. *Id.* at 10-12. Accordingly, especially because *Bruen* was so recently decided, and because *Bruen* announced a new framework for approaching Second

12

1  Amendment claims—and provided guidance as to how the historical analysis, when necessary,

2  should proceed—Plaintiffs cannot possibly show (and certainly have not shown) that they are

3  entitled to the "extraordinary remedy" of a preliminary injunction.  *Winter*, 555 U.S. at 24.[6]

4  **B.   *Bruen* Struck Down Only One Requirement Within a Comprehensive and
        Constitutionally Permissible Licensing Scheme**

5

6  Plaintiffs refer to an order from the Sacramento Superior Court concluding that Penal Code

   sections 25400 (carrying concealed in public) and 25850 (carrying a loaded weapon in public) are

7  no longer public offenses because *Bruen* "invalidated California's concealed carry licensing

8  statutes . . . ."  ECF No. 65-3 at 18.  But the Supreme Court's decision in *Bruen* did not generally

9  invalidate California's public-carry licensing scheme.  The good cause requirement is severable

10 from the rest of the licensing scheme, which remains constitutional and enforceable.

11 **1.   The Good Cause Requirement Is Severable from the Rest of
           California's Public-Carry Licensing Regime**

12

13 Several prerequisites to obtaining a public-carry license remain valid post-*Bruen*,

14 including:  (1) passing a background check to determine whether the applicant is eligible to

15 possess a firearm under state and federal law; (2) demonstrating residency within the county of

16 the licensing authority; (3) passing a firearms safety training course; and (4) demonstrating good

17 moral character.  *See* Cal. Penal Code, §§ 26150(a), 26155(a), 26185(a), 26195(a).  As noted

18 above, the day after *Bruen* was decided, the Attorney General issued an alert explaining that, after

19 *Bruen*, "[p]ermitting agencies may no longer require a demonstration of 'good cause' in order to

20 obtain a concealed carry permit."  *See* Office of the Attorney General, *Legal Alert:  U.S. Supreme
   Court Decision in New York State Rifle & Pistol Association v. Bruen, No. 20-843* (June 24,

21 2022), https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf.  With that provision no

22 longer being enforced, there is no constitutional flaw in California's public carry laws.  And the

23 good cause requirement is severable from these other requirements, thereby preserving the

24 remainder of California's licensing scheme.

25 When encountering a constitutional flaw in a statute, the goal of the severability doctrine

26

27 ─────────────────────
   [6] Indeed, as noted above, the Ninth Circuit had a similar claim pending before it in *Nichols*
28 but chose to remand for further proceedings.  *Nichols v. Newsom*, No. 14-55873 (9th Cir.), ECF
   No. 133.

13

is to "limit the solution to the problem" by severing "problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (internal quotation marks and citation omitted).  Because "'[s]everabilty is . . . a matter of state law," California's severability rules apply here.  *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir. 2015) (quoting *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996)).  An invalid provision is severable if it is "grammatically, functionally, and volitionally separable" from the remainder of the statute.  *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (internal quotation marks and citation omitted).  The good cause requirement in Penal Code sections 26150 and 26155 meets all three criteria.

"Grammatical separability, also known as mechanical separability, depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains."  *Matosantos*, 53 Cal. 4th at 271 (citation omitted).  "[T]he valid and invalid parts of the statute can be separated by paragraph, sentence, clause, phrase, or even single words."  *Abbott Lab'ys v. Franchise Tax Bd.*, 175 Cal. App. 4th 1346, 1358 (2009).  The good cause requirement is one of four prerequisites listed, in an identical manner, in Penal Code sections 26150 and 26155—the only difference being that the former applies to sheriffs and the latter applies to police chiefs.  The good cause requirement is separated from the other three requirements in paragraphs (1), (3), and (4) of subdivision (a).  Each requirement is followed by a period. Removing the good cause requirement at paragraph (2) does not impair the wording or coherence of the other three prerequisites.  Moreover, because the background check requirement for public-carry licenses is contained within entirely different statutes, Penal Code sections 26185 and 26195, there is no question that the background check requirement is also grammatically separable from the good cause requirement.

The good cause requirement is also functionally separable because the remainder of Penal Code sections 26150 and 26155 is "complete in itself and capable of independent application." *Abbott Lab'ys*, 175 Cal. App. 4th at 1358.  The factors supporting grammatical separability equally support functional separability.  Without the good cause requirement, a sheriff or police chief can easily apply the remaining three requirements for a public-carry license in Penal Code sections 26150 and 26155, as well as the background check requirement in Penal Code sections

14

26185 and 26195.

The final criterion, volitional separability, is also met.  When assessing volitional separability, the question "is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid."  *Matosantos*, 53 Cal.4th at 273.  Applying this test here, the question is whether the Legislature would have preferred having some prerequisites for a public-carry license (i.e., the remaining requirements in Penal Code section 26150, subdivision (a) and the background check requirement), or none at all, without the good cause requirement.  The Legislature certainly would not have preferred the latter scenario.  The requirements now codified in Penal Code section 26150, subdivision (a), have long existed as separate and distinct requirements.  Prior to 2012, former Penal Code section 12050 listed them in one paragraph with the requirements separated by commas.  Cal. Penal Code § 12050(a)(1)(A) (repealed by Stats. 2010, c. 711 (S.B. 1080), § 4, eff. Jan. 1, 2012).  That changed after the Legislature passed a bill in 2010 to "reorganize without substantive change the provisions of the Penal Code relating to deadly weapons."  See Sen. Bill 1080 (2009-2010 Reg. Sess.) § 6, https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100SB1080.  Although the Legislature indicated that its changes were non-substantive, S.B. 1080 listed the requirements in the newly enacted Penal Code sections 26150 and 26155 as they are now, in separate paragraphs followed by periods.  Cal. Pen. Code §§ 26150(a), 26155(a).  Similarly, a provision related to the background check, providing that a license shall not issue if the Department of Justice determines the applicant is prohibited from possessing firearms, was previously included in former Penal Code section 12050, subdivision (d), but the Legislature placed that provision in the newly added Penal Code section 26195, separate from the other requirements now listed in sections 26150 and 26155.  *See* Cal. Penal Code § 12050(d) (repealed by Stats. 2010, c. 711 (S.B. 1080), § 4, eff. Jan. 1, 2012).  Accordingly, the Legislature's enactment of S.B. 1080 both made its preference more

clear, *and*, by characterizing its amendments as non-substantive, indicated that it had *already* intended for these requirements to be treated as separate and distinct from one another.[7]

Accordingly, the good cause requirement is grammatically, functionally, and volitionally separable from the other public-carry license requirements.  Because it is severable from the still-valid prerequisites of the licensing regime, the Attorney General has advised licensing authorities to "continue to apply and enforce all other aspects of California law with respect to public-carry licenses and the carrying of firearms in public."  *See* Office of the Attorney General, *Legal Alert: U.S. Supreme Court Decision in New York State Rifle & Pistol Association v. Bruen*, No. 20-843 (June 24, 2022), https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf.

### 2. The Remaining Public-Carry Licensing Requirements Pass Constitutional Muster Under *Bruen*

The four public-carry licensing requirements aside from "good cause"—background check, firearms safety course, residency, and good moral character—survive *Bruen*, and two were specifically endorsed by *Bruen*.  Both the majority opinion and Justice Kavanaugh's concurring opinion approved of states continuing to require that a public-carry license applicant first pass a background check—as provided for in Penal Code sections 26185 and 26195—and pass a firearms safety course—as provided for in subdivision (a)(4) of Penal Code sections 26150 and 26155.  *Bruen*, 142 S. Ct. at 2138 n.9; *id*. at 2161 (conc. opn. of Kavanaugh, J.).  Additionally, the requirement that an applicant be a resident of the county in which he or she is applying for the public-carry license easily meets the mandate that a licensing scheme's prerequisites must be

---

[7] The Legislature's preference is also evident from the legislative findings in S.B. 918, which would have amended the requirements for a public-carry license as a result of *Bruen*.  As noted above, *supra* footnote 3, S.B. 918 did not pass, but it was supported by a clear majority of the Legislature.  In S.B. 918, the Legislature cited numerous reasons why a public-carry license was necessary in California, including "protect[ing] its residents' rights to keep and bear arms while also protecting the public's health and safety in the state by reducing the number of people killed, injured, and traumatized by gun violence; protecting the exercise of other fundamental rights, including the right to worship, attain an education, vote, and peaceably assemble and demonstrate; ensuring that law enforcement is able to effectively do its job; and combating terrorism."  S.B. 918 (2021-2022 Reg. Sess.).  The Legislature thus continues to view a public-carry license as vital to protecting public safety, and Plaintiffs have not presented any evidence to the contrary.

16

Def.'s Opp'n to Pls.' Third Mot. for Prelim. Inj. (2:19-cv-00617-KJM-AC)

objective and definite.  *See Bruen*, 142 S.Ct. at 2138 n.9; *id*. at p. 2161 (conc. opn. of Kavanaugh, J.).

*Bruen* also acknowledged, but did not disturb, the good moral character requirement in New York's public-carry licensing scheme.  *Bruen*, 142 S.Ct. at 2122-2123.  Under *Bruen*, "good moral character" and "good cause" are not one and the same.  *Bruen* refers to 43 states as "shall issue" jurisdictions, which it describes as jurisdictions "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability."  *Id*. at 2123.  The list of 43 includes some jurisdictions that have a suitability or moral-character requirement—including Connecticut, Delaware, and Rhode Island—and the Court explains that those states do not grant licensing officials unfettered discretion to deny licenses.  *Id.* at 2123 n.1.

This is consistent with the findings of another court that considered "good moral character" in the wake of an unconstitutional "good cause" requirement.  In *Wrenn v. District of Columbia* 864 F.3d 650 (D.C. Cir. 2017), the D.C. Circuit took up the constitutionality of a D.C. statute providing that a license to carry may issue "if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed."  D.C. Code § 22-4506.  The D.C. Circuit concluded that the D.C. statute, and its reference to a "proper reason," impermissibly banned most D.C. residents from exercising a constitutional right because it prevented them from carrying "absent a special need for self-defense."  *Wrenn*, 864 F.3d at 667.

Shortly thereafter, the D.C. Court of Appeals (not the D.C. Circuit) confronted an argument that *Wrenn* generally invalidated the District of Columbia's public-carry law.  The court disagreed, holding that, "[a]ny statutory language not encompassed by *Wrenn's* definition of 'good reason law' remains undisturbed," and that "[o]n its face, [the] statute remains operative, including the requirement that a person be 'suitable' to qualify of a concealed carry license."  *Hooks v. United States* (D.C. 2018) 191 A.3d 1141, 1145-1146; *see also Newman v. United States* 258 A.3d 162, 166 (D.C. 2021).  This reasoning demonstrates that the constitutionality of a good-cause requirement is distinct from the constitutionality of a moral-character requirement; the

17

1   rejection of the former does not require the rejection of the latter.  Good moral character, along

2   with the other remaining requirements in California's public-carry license scheme, thus are

3   constitutional post-*Bruen*.

4        Although the Supreme Court's reasoning in *Bruen* invalidated one *aspect* of California's

5   scheme, the Court generally approved of the practice of requiring a permit to carry a firearm in

6   public so long as States do not deny public-carry licenses to ordinary citizens who fail to show

7   that they have a special need for one.  *Bruen*, 142 S. Ct. at 2123-2124 (citing approvingly the

8   licensing schemes of 43 States).  It is thus still the law in California that licenses are required to

9   carry firearms in public, notwithstanding the Sacramento Superior Court order cited by Plaintiffs,

10  which erroneously concluded that California's licensing scheme had been *entirely* invalidated and

11  that the defendants did not need to even attempt to obtain a license before proceeding to carry in

12  public.  *See* ECF No. 65-3 at 24-25.  In any event, the order ultimately has no bearing in this case,

13  in which Plaintiffs *do* have the ability to carry in public and the only question is whether they

14  have the right to do so in the specific manner of their choosing.

15  **II.    PLAINTIFFS HAVE NOT SATISFIED THE OTHER FACTORS FOR INJUNCTIVE RELIEF**

16       Plaintiffs do not suggest that they have suffered harm on any basis other than the alleged

17  violation of their Second Amendment rights.  Absent any constitutional violation, Plaintiffs

18  cannot establish that they have suffered irreparable harm.  The balance of equities and the public

19  interest also militate against issuing an injunction.  These factors merge when the government is

20  the party opposing the injunction.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

21       The public interest favors preserving the State's duly enacted laws designed to protect the

22  public safety and reduce gun violence.  *See Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d

23  1182, 1193-94 (E.D. Cal. 2015).  There is evidence that expanding public carry risks public

24  safety.  This evidence includes a study conducted by Professor John Donohue and two other

25  scholars comparing the crime rates of the 33 states that have adopted "right-to-carry" laws—

26  under which most residents have the right to carry a firearm in most public places—to those of

27  states that have not.  Wise Decl., Ex. 4.  Using 37 years of FBI crime statistics, the study ran four

28  separate models analyzing the impact of right-to-carry laws on crime rates, finding that right-to-

18

carry laws "are associated with *higher* rates of overall violent crime, property crime, or murder." *Id.*, Ex. 4 at 2, emphasis in original. Indeed, under each model, states experienced a 13 to 15 percent increase in violent crime in the decade after adopting a right-to-carry law. *Id.*, Ex. 4 at 3.

In a more recent study, Donohue confirmed that "there is consistent evidence that [right-to-carry] laws elevate violent crime in the decade after adoption," regardless of the model used, as long as the model is properly weighted and the data is properly coded. Wise Decl., Ex. 5 at 14-15. Donohue concluded that "[p]olicymakers and citizens should recognize that the best available empirical data to date supports the view that [right-to-carry] laws have resulted in statistically significant increases in violent crime in the ten-year period after adoption." *Id.*, Ex. 5 at 15.

Another peer-reviewed study conducted by Dr. Michael Siegel and other scholars shows a similar link between permissive public carry regimes and higher murder rates. It reviewed data from 1991 through 2005 and found a "significant[] associat[ion]" between right-to-carry states and higher homicide rates. Wise Decl., Ex. 6 at 5. Those states experienced a 6.5 percent increase in the overall homicide rate, an 8.6 percent rise in "firearm-related" homicide rates, and a 10.6 percent increase in the "handgun-specific" homicide rate. *Id.*, Ex. 6 at 5; *see also Gould v. Morgan*, 907 F.3d 659, 671, 675 (1st Cir. 2018) (collecting additional studies).

This research supports a legislative judgment that an increase in guns carried by private persons in public places increases the risk that "'basic confrontations between individuals [will] turn deadly.'" *Woollard v. Gallagher*, 712 F.3d 865, 879 (4th Cir. 2013). The Legislature could also conclude that widespread open carry increases the "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns would then be used to "commit violent crimes" or be transferred to "others who commit crimes," U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary: Firearms Reported Lost and Stolen* (2013) at 2.

Widespread *open* carry, in particular, creates special risks, including to police and other law enforcement officials. The former president of the California Police Chiefs Association, Chief Kim Raney, explains in a declaration that when law enforcement is responding to an active shooter, carrying of firearms by other individuals can have deadly consequences, including by

19

"delaying first responders from [their] primary mission" of stopping the shooter and saving lives. Raney Decl. ¶ 25.  In the aftermath of a shooting that left five police officers dead and nine others wounded, Dallas Police Chief David Brown complained that officers "'don't know who the good guy is versus the bad guy when everyone starts shooting.'"  *Id.*  Similarly, when police officers respond to reports that there is a "man with a gun," or encounter an armed civilian on the streets, they often know little about the person's intent or mental state, or whether the person is authorized to carry a gun. *Id.* ¶ 22.  These encounters can have fatal consequences.  *Id.* Restrictions on public carry also reduce the amount of time that police must spend investigating handgun sightings, and help police quickly identify those persons carrying firearms who pose a threat. *Id.* ¶ 23; *accord Woollard*, 712 F.3d at 879-880 (recounting similar policing benefits).

Here, an injunction would also inflict harm upon the State because "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quotation and citation omitted).  Enjoining the laws in question would instead upend the status quo, contrary to the purpose of an injunction.  *Chalk v. U.S. Dist. Court Cent. Dist. Cal.*, 840 F.2d 701, 704 (9th Cir. 1988).  Having failed to show that they—or anyone else—will suffer any harm if the laws that they challenge remain in effect, Plaintiffs have not established that the equities and public interest favor an injunction.

## CONCLUSION

Plaintiffs' third motion for a preliminary injunction should be denied.

Dated: September 30, 2022               Respectfully Submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General

**/s/ *Ryan R. Davis***

RYAN R. DAVIS
Deputy Attorney General
*Attorneys for Defendant Attorney General Rob Bonta*