**EXHIBIT   1**

Kim Raney

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                       -o0o-

4

5    MARK BAIRD and RICHARD        )
     GALLARDO,                     )
6                                  )
                                   )
7         Plaintiffs,              )
                                   )
8    vs.                           )Case No. 2:19-cv-00617-KJM-AC
                                   )
9    ROB BONTA, in his official    )
     capacity as Attorney General of)
10   the State of California, and  )
     DOES 1-10,                    )November 29, 2021
11                                 )
                                   )
12        Defendants.              )
     _____)

13

14

15                      -o0o-

16

17            DEPOSITION OF KIM RANEY

18     TAKEN REMOTELY FROM LaQUINTA, CALIFORNIA

19

20                      -o0o-

21

22

23   Reported Remotely By:

24   Lynne A. Howe, CSR

25   License No. 13003

Kim Raney

Page 2

1                          INDEX

2

3

4    KIM RANEY                                        PAGE

5    Examination by Ms. Bellantoni.......................5

6

7

8

9

10                    INDEX OF EXHIBITS

11   Exhibit 1, Plaintiffs' Amended Notice of Deposition

12         of Expert Witness Kim Raney...................16

13   Exhibit 2, Expert Declaration and Report of Former

14         Covina Chief of Police Kim Raney..............17

15

16

17

18

19

20                          -o0o-

21

22

23

24

25

Kim Raney

Page 3

1                    REMOTE APPEARANCES

2

3   FOR THE PLAINTIFF:

4        THE BELLANTONI LAW FIRM, PLLC
         BY:  AMY L. BELLANTONI, ESQUIRE

5        2 Overhill Road, Suite 400
         Scarsdale, NY 10583

6        (914) 367-0090
         abell@bellantoni-law.com

7

8

9   FOR THE DEFENDANTS:

10       OFFICE OF THE ATTORNEY GENERAL
         BY:  R. MATTHEW WISE, DEPUTY ATTORNEY GENERAL

11       P.O. Box 944255
         Sacramento, California 94244-2550

12       (916) 210-6046
         matthew.wise@doj.ca.gov

13

14

15   Also Present:  Mark Baird

16

17

18

19

20

21

22

23

24

25

Kim Raney

Page 4

1

2

3

4

5                              -o0o-

6

7         BE IT REMEMBERED, that pursuant to Notice of this

8    deposition, and on Monday, the 29th day of November,

9    2021, commencing at the hour of 12:03 p.m. thereof, taken

10   remotely with the witness appearing in LaQuinta,

11   California, before me, LYNNE A. HOWE, a Certified

12   Shorthand Reporter in and for the State of California,

13   the following proceedings were held.

14

15

16

17

18

19

20

21

22

23

24

25

Kim Raney

Page 5

1                           KIM RANEY

2       having been first duly sworn, was examined and testified

3                          as follows:

4

5                          EXAMINATION

6       BY MS. BELLANTONI:

7            Q.   Good afternoon, Mr. Raney.

8            A.   Good afternoon.

9            Q.   My name is Amy Bellantoni and I am the attorney

10      representing the plaintiffs in this matter entitled Baird

11      v. Bonta, the plaintiffs being Mark Baird and Richard

12      Gallardo.  And I'll be asking you some questions today in

13      connection with your retention as an expert for the

14      defendants in this case.

15              Before we begin, can you state your full name

16      and spell your last name, please.

17           A.   Kimber James Raney, R-a-n-e-y.

18           Q.   Have you been deposed before?

19           A.   Yes.

20           Q.   So you're familiar with kind of the ground rules

21      in moving forward with a deposition.

22              There is a court reporter here who will be

23      taking down everything that we say.  So it's important

24      that we don't talk over one another, which can sometimes

25      happen in the course of the deposition.  You may

Page 6

1    anticipate once I'm halfway through a question what the

2    rest of my question might be and begin answering before

3    I'm finished, and likewise I may anticipate what the rest

4    of your answer's going to be and start on my next

5    question, which I've done many times in past depositions.

6              So I will make my best efforts not to speak over

7    you, and I would ask that you make your best efforts not

8    to speak over me so we can have a clear record.  Sound

9    good?

10        A.  I understand.

11        Q.  Do you understand that you've been sworn in to

12   tell the truth under the penalty of perjury and as such,

13   your testimony here in this deposition is the same as if

14   you would be testifying in a courtroom?

15        A.  Yes, I do.

16        Q.  If you need to take a break at any time, just

17   let me know.  I would only ask that if there is an open

18   question that you answer the question first before we

19   take a break and then if you -- after the break, you need

20   to clarify something about your testimony in answering

21   that question, you can feel free to do so.  All right?

22        A.  Okay.

23        Q.  If at any time during the deposition you think

24   back to an answer that you gave or one that you weren't

25   sure about or were unable to give at the time and you'd

Kim Raney

Page 7

1    like to clarify an earlier answer, please let me know so

2    that we can ensure that we have an accurate and clear

3    record.  All right?

4        A.  Okay.

5        Q.  At the end of the deposition you will be

6    provided with a copy of the transcript when it's been

7    prepared by the court reporter, and you'll have an

8    opportunity to review your testimony in that transcript

9    and to make any changes or corrections to your testimony

10   here today.

11            I would only let you know that in doing so, I

12   would be allowed to comment on any of the changes that

13   you made.  You understand?

14       A.  I understand.

15       Q.  From time to time your attorney may have an

16   objection to a question that I ask, maybe to the form of

17   the objection or to the substance, and your attorney will

18   state that objection on the record.

19            You will still be required to answer that

20   question unless your attorney specifically tells you not

21   to answer or instructs you not to answer that question.

22   Do you understand?

23       A.  I understand.

24       Q.  If at any time I ask you a question that you're

25   not sure what I'm asking or the form of the question just

Kim Raney

Page 8

1   is a little confusing -- that may happen because

2   sometimes my questions are lengthy and they're not meant

3   to confuse or to cause an unclear record.  But if that

4   does happen and you're unsure of what I'm asking, please

5   let me know and I'll try to rephrase the question or make

6   it a little more clearer.  Okay?

7        A.  Okay.

8        Q.  If I ask a question and you answer, I'm going to

9   assume that you understood what I was asking.  I want to

10  make sure we're both on the same page.  All right?

11       A.  Okay.

12       Q.  Is there anything that would affect your ability

13  as you sit here to understand and respond truthfully and

14  in a responsive manner to my questions today?

15       A.  No.

16       Q.  Have you ever testified in court before?

17       A.  Yes.

18       Q.  And is that in your capacity as a law

19  enforcement officer?

20       A.  A law enforcement officer and then after

21  retirement I've testified as an expert witness.

22       Q.  And how many -- in court?

23       A.  Yes.

24       Q.  How many times have you testified as an expert

25  witness in court?

Kim Raney

Page 9

1      A.   Once.

2      Q.   In what case was that?

3      A.   I think it was Moreno, et al, versus The City of

4  Beverly Hills.

5      Q.   And what was the scope of your expertise in that

6  case?

7      A.   A lawsuit was filed by several members of the

8  Beverly Hills Police Department command staff, and I was

9  retained as an expert witness by the city in regards to

10  police department management questions, leadership

11  questions, in that area.

12      Q.   And generally, just briefly, what was the issue

13  in that case?  What was the case about?  What were they

14  suing for?

15      A.   They were suing the chief of police for

16  discrimination, hostile work environment, inappropriate

17  comments.  Just there were I think 22 different

18  allegations.

19      Q.   Nothing in that case had to do with open carry

20  or open carry policies?

21      A.   No.

22      Q.   And so many times throughout of the course of

23  this deposition I will be using the term or the phrase

24  "open carry."  And by open carry, I'm referring to the

25  open --

Page 10

1          (Technical difficulties)

2          THE COURT REPORTER:  I'm sorry, Ms. Bellantoni.

3   You were breaking up.  I missed half that question.

4          MS. BELLANTONI:  All right.  Can you hear me

5   now?

6          THE COURT REPORTER:  Yes.

7   BY MS. BELLANTONI:

8      Q.  Mr. Raney, during the course of this deposition

9   I'll be using the phrase "open carry," and by that term I

10  mean the open carriage of a handgun that is holstered and

11  carried upon the person.

12          Can we agree on that definition of that term?

13     A.  I understand that, yes.

14     Q.  Were you retained as an expert for the defendant

15  in this case?

16     A.  Yes.

17     Q.  And were you also retained as an expert in the

18  case Flanagan versus Becerra?

19     A.  Yes.

20     Q.  And other than those two cases and the case

21  involving Beverly Hills, have you been retained as an

22  expert in any other case?

23     A.  Yes.

24     Q.  In which case?

25     A.  I don't know the name of the defendants.  One

Kim Raney

Page 11

1    was a case that commenced several command staff members

2    of the Buena Park Police Department making allegations of

3    discrimination against the chief of police for failure to

4    promote them.

5            I've been retained by the City of Ontario for a

6    case where two police volunteers are suing the police

7    department and chief of police for I guess discrimination

8    and unlawful termination.

9            I was retained by the City of Chandler, Arizona,

10   in a lawsuit filed by a motorcycle club against the city

11   for closing down a business.

12           And those are the only ones I can remember right

13   now.

14       Q.  Is the Chandler, Arizona, case in the nature of

15   First Amendment claim?

16       A.  No.  It was more of I think licensing

17   discrimination where they alleged that the City of

18   Chandler, Arizona, the police department, closed them

19   down because of their affiliation to the Hell's Angels.

20       Q.  Is it fair to say that your retention as an

21   expert has only been on behalf of the defendants in

22   litigation?

23       A.  Yes.

24       Q.  And you've not been retained as an expert for

25   plaintiffs in litigation; is that correct?

Kim Raney

Page 12

1          A.   That's correct.

2          Q.   Were you deposed in the Flanagan versus Becerra

3     case?

4          A.   I was.

5          Q.   And did you review your deposition in that

6     matter in preparation for your deposition here today?

7          A.   I did.

8          Q.   And when did you have the opportunity to review

9     that deposition?

10         A.   I believe it was two or three weeks ago before

11    the last deposition was canceled.

12         Q.   Has your opinion on open carry changed since you

13    gave that deposition?

14         A.   No.

15         Q.   And have you conducted any additional research

16    on the issue of open carry since you gave the deposition

17    in that matter?

18         A.   Well, I've read a lot of newspaper articles,

19    periodicals.  Just because for the last three or four

20    years since that deposition there's been a lot of public

21    information about Second Amendment issues, so I've tried

22    to stay contemporary.

23         Q.   And the research that you've conducted since

24    your deposition in the Flanagan case, was that research

25    specific to open carry?

Kim Raney

Page 13

1      A.  No.  And I wouldn't necessarily call it

2  research.  It's more of just reading information that was

3  available on Second Amendment issues, sometime the

4  conflict between Second Amendment and First Amendment

5  issues with all the public demonstrations that have

6  happened in the country the last two or three years.  So

7  more in that vein.

8      Q.  So what, if anything, have you read since that

9  time that was specifically addressing open carry or open

10  carry jurisdictions?

11      A.  I reviewed a report by I think it's Professor

12  John Donohue out of Stanford on open carry.  Another

13  document, and I don't remember what organization put it

14  out, dealt with I think research over from January 2020

15  until June 2021 kind of the dichotomy between First

16  Amendment and public demonstrations versus the Second

17  Amendment rights and some issues that have popped up

18  around the country.

19      Q.  And regarding that article, was that specific to

20  open carry?

21      A.  No.  It wasn't specific to open carry.  It was

22  more about the presence of firearms at First Amendment

23  demonstrations.

24      Q.  Do you recall who published that article --

25      A.  I don't.

Kim Raney

Page 14

1          Q.  -- or authored?

2          A.  I don't.

3          Q.  Would you be able to provide a copy of it if you

4    do remember to your counsel?

5          A.  Yes.

6          Q.  And the information that you read that had been

7    published by Mr. Donohue, was that specific to open

8    carry?

9          A.  Well, I believe it was from knowledge he used

10   was right to carry.  So I don't know if it was specific

11   to open carry in regards to handguns or open carry

12   regards to both handguns and long guns.

13         Q.  Aside from whether it referenced or was

14   pertaining to handguns versus long guns, I'm just going

15   to ask again just for clarification for myself and the

16   record, was that dealing with -- the Donohue periodical,

17   was that specific to open carry or was it geared towards

18   concealed carry?

19         A.  That was open carry.

20         Q.  Do you still have a copy of that periodical?

21         A.  Might have a link to it.

22         Q.  All right.  Do you think you could provide that

23   to your attorney?

24         A.  I could, yes.

25         Q.  Thank you very much.

Page 15

1           MS. BELLANTONI:  And Mr. Wise, I would just ask

2    if you could forward that along, I would appreciate that.

3           MR. WISE:  Sure.

4    BY MS. BELLANTONI:

5       Q.  Other than those two articles or publications,

6    do you recall anything else that you reviewed since the

7    Flanagan deposition that dealt specifically with open

8    carry of a handgun?

9       A.  Not specifically, no.

10      Q.  And are you being compensated for your time as

11   an expert for the defendants?

12      A.  I am.

13      Q.  How so?

14      A.  $250 an hour for document review, written

15   reports, et cetera, and $350 an hour for deposition and

16   trial testimony.

17      Q.  Have you read the complaint that was filed in

18   this matter and/or the amended complaint, because the

19   complaint was amended once as well?

20      A.  Yes.

21      Q.  Have you read both?

22      A.  I believe the amended complaint.

23      Q.  And what do you understand the plaintiffs'

24   claims to be?

25      A.  I understand that the plaintiffs are suing the

Kim Raney

Page 16

1   State of California for their inability to get a permit

2   from -- for them as rural counties, populations of less

3   than 200,000, to openly carry a handgun.  And I believe

4   they're contesting the lack of a process of an

5   application that they haven't been able to submit to

6   openly carry their handguns I think in those specific

7   counties and I believe one of them also mentioned

8   throughout the state of California.

9       Q.  Can you describe how you prepared for your

10  deposition today?

11      A.  I prepared my declaration for the attorney

12  general's office I think in August of this year.  I

13  reviewed the declaration of your expert witness.  I

14  reviewed his deposition transcripts.  I reviewed my

15  deposition transcripts in the Flanagan matter.  And I

16  reviewed the Penal Code sections in California regarding

17  the open carry codified sections.

18      Q.  I'm going to share my screen here to show you

19  Exhibit 1.

20      (Whereupon, Plaintiffs' Exhibit 1 was marked for

21       identification purposes only and attached hereto.)

22  BY MS. BELLANTONI:

23      Q.  Are you able to see this document on screen?

24      A.  Yes.

25      Q.  And this document, for the record, is entitled

Kim Raney

Page 17

1    Plaintiff's Amended Notice of Deposition of Expert

2    Witness Kim Raney.

3              And Mr. Raney, do you recognize the document as

4    being the notice for your deposition to bring you here

5    today?

6         A.  Yes.

7         Q.  All right.  And now having switched to the

8    second document, which will be marked as Exhibit 2, which

9    for the record is entitled Expert Declaration and Report

10   of Former Covina Chief of Police Kim Raney.

11        (Whereupon, Plaintiffs' Exhibit 2 was marked for

12        identification purposes only and attached hereto.)

13   BY MS. BELLANTONI:

14        Q.  Mr. Raney, can you see this document clearly?

15        A.  Yes.

16        Q.  I'm just going to scroll through.  Do you

17   recognize this as being the declaration that was

18   submitted in connection with this case on your behalf?

19              Is that your declaration, sir?

20        A.  Yes.

21        Q.  And is that your signature there on Page 9?

22        A.  Yes.

23        Q.  Did you prepare this declaration or was it

24   prepared for you?

25        A.  I prepared it.

Kim Raney

Page 18

1        Q.   Okay.  And when you prepared it, did you provide

2    a copy, a draft copy to Mr. Wise?

3        A.   Yes.

4        Q.   And is this the same -- is the document that

5    you're looking at here the same in substance and form as

6    the first draft that you had sent to Mr. Wise?

7        A.   Yes.

8        Q.   And going past Page 9 at Exhibit A, can we also

9    find a copy of your curriculum vitae?

10       A.   Yes.

11       Q.   And that CV is comprised of two pages?

12       A.   Yes.

13       Q.   And does this declaration here and your expert

14   report at Exhibit 2, does that document reflect your

15   opinions in this matter in regard to open carry?

16       A.   Yes, it does.

17       Q.   And what specifically were you assigned to do?

18   What were you asked to do in connection with this case?

19       A.   I was asked to comment as a municipal chief of

20   police my opinion on the concept or the laws around open

21   carry in the state of California.

22       Q.   And other than the documents that are referenced

23   in this declaration, were there any other documents or

24   information that you relied on in coming to your opinion?

25       A.   No.

Kim Raney

Page 19

1       Q.  Have you ever served as a law enforcement

2   officer in an open carry jurisdiction?

3       A.  No.

4       Q.  And what, if any, research, other than the

5   information that we discussed earlier from Mr. Donohue,

6   his publication, and the publication that you had

7   referenced regarding First Amendment issues and Second

8   Amendment issues surrounding protests, what, if any,

9   other research have you conducted regarding public safety

10  issues in connection with the open carriage of handguns

11  in public?

12      A.  As far as specific point of research, none other

13  than than what's been mentioned.  But in 39 years of law

14  enforcement in California and the last 15 years as a

15  chief of police, it was 15 years of being at the table

16  both at the municipal level, the county level, and the

17  state level, the majority of the public policy

18  conversations and decisions that were made in all those

19  jurisdictions, so I think quite extensive experience in

20  regard to public safety policy for the State of

21  California.

22      Q.  What personal experience do you have related to

23  public safety regarding the open carriage of handguns?

24      A.  The only personal experience again would be a

25  period in I believe in 2010 or 2011 when some people

Kim Raney

Page 20

1   associated with, and I'll just use my term, the open

2   carry or in the open carry movement were showing up at

3   places like Starbucks and different coffee shops

4   throughout Southern California, most of them in

5   possession of long guns openly exposed, just to create a

6   law enforcement response and then document that contact.

7       Q.  How many such occurrences were there?

8       A.  My jurisdiction was involved in several of

9   those, and it was the topic of discussion at Los Angeles

10  County Police Chiefs Association wherein there were

11  anywhere of a dozen or so throughout the jurisdictions in

12  Los Angeles County.

13      Q.  Over the course of what time period as far as

14  Covina is concerned?

15      A.  I would say a period of a month.

16      Q.  And during what time period?  In what year?

17      A.  Yeah, I believe it was 2010 or 2011, but I'm not

18  not quite sure of the exact time period.  There was just

19  a movement from a group in what's called the South Bay

20  Area of Los Angeles County where they were going out in

21  the region and just I think seeing what the law

22  enforcement response would be to a call for service if

23  they showed up at a Starbucks openly carrying rifles.

24      Q.  Were any of these individuals in Covina, were

25  any of them open carry handguns?

Kim Raney

Page 21

1      A.  I believe they were open carry of rifles.

2      Q.  Not handguns?

3      A.  I don't believe so.

4      Q.  And with regard to -- well, I'm going to

5   withdraw that.

6          Can you describe what you mean by the phrase

7   "open carry movement"?

8      A.  I believe there's a segment of the population

9   who actively are working to use their Second Amendment

10  rights, including in California as in this case, just

11  trying to do what they can to openly carry a handgun.  In

12  this case, it looks like in conformance with the state

13  laws.  And their claims, to my understanding, is that

14  they have been unable to get into the permit process in

15  the one or two counties that they have applied to.

16     Q.  I just want to back up.  So I'm asking you about

17  the open carry movement that you were describing in

18  Covina that involved only the possession of long guns.

19          What specifically were you referring to when you

20  say "open carry movement"?

21     A.  Well, I believe there's again a segment of

22  society who wants the ability to carry -- openly carry in

23  communities handguns and rifles pursuant to their

24  interpretation of the Second Amendment.

25     Q.  And during that time period, which I believe you

Kim Raney

Page 22

1    described as around 2010 or 2011, it was completely legal

2    in California to open carry a rifle or a handgun,

3    correct?

4        A.  I believe it was -- it wasn't illegal.  I think

5    there was a loophole or a gap in the law, and so I think

6    part of that was closed by legislation 2011, 2012.

7            But yes, I think there was -- it wasn't a

8    criminal act to openly carry a rifle in California.

9        Q.  And it was also not illegal to carry a handgun

10   open and exposed if it was unloaded at that point in

11   time, correct?

12       A.  Correct.

13       Q.  And putting Covina to the side, during that same

14   period you mentioned that there were certain gatherings

15   in Los Angeles County as well.

16           Were those events, did those involve long guns

17   or handguns or both?

18       A.  I don't know.  It was just -- the Los Angeles

19   Police Chiefs Association is made up of 45 municipal

20   police chiefs and we have a monthly meeting.  At that

21   meeting there's a round table conversation about any

22   issues going on in your jurisdiction, and several of the

23   chiefs just shared their experience when those situations

24   arose in their jurisdictions.  Basically is information

25   with other chiefs that seem to be an organized practice

Kim Raney

Page 23

1   that was starting throughout Los Angeles County.

2       Q.  Of individuals carrying openly in public?  That

3   was the movement?

4       A.  Well, it was more where they were going to a

5   Starbucks with several people and just seeing if there

6   was a law enforcement call for service and the reaction

7   of that call for services.

8       Q.  Well, how do you know that was their intention

9   or their motive --

10      A.  I don't know if that -- that just seemed to be

11  where the calls were coming from was coffee shops.

12      Q.  But you don't know if the individuals

13  specifically intended to see what the law enforcement

14  response would be or to cause a law enforcement response?

15      A.  Well, I don't know what their intent was.  I

16  know what happened because the chiefs shared that there

17  were calls for service.  And it seemed like there was

18  dialogue.

19          I know in our jurisdiction there was dialog with

20  the group that was there and I think it was basically --

21  it wasn't a confrontational situation.  It was more of

22  just what was going to be the law enforcement response,

23  what was the officers' knowledge of the law in California

24  at that time.

25      Q.  And what was the response in your jurisdiction?

Kim Raney

Page 24

1        A.  I wasn't there.  I was briefed on it.  It was a

2    call for service.  There was more than one person who was

3    at a Starbucks or a coffee shop location when they were

4    contacted by the police.  They just explained what they

5    were doing.  They weren't breaking any laws.  I think the

6    weapons were checked to ensure they weren't loaded.  I

7    think there was just an exchange of information and the

8    parties left and the law enforcement left.

9        Q.  Sounds pretty uneventful; would you agree?

10        A.  I wouldn't agree with the term "uneventful."  I

11    don't know what happened, how the call was dispatched.  I

12    think it was resolved appropriately.

13        Q.  Would you characterize it as being

14    nonconfrontational?

15        A.  Again I wasn't there.  I wasn't briefed that

16    there was a confrontation, so I'd have to make an

17    assumption.

18        Q.  Were you the chief of police at the time?

19        A.  Yes.

20        Q.  And you were briefed on the incident?

21        A.  Yes.

22        Q.  And no arrests were made, right?

23        A.  No.

24        Q.  And these people that were carrying the rifles,

25    were they creating a disturbance of the peace or charged

Kim Raney

Page 25

1    with any disturbance?

2         A.   I don't know what they were creating, but it did

3    generate a call for service.  As far as violating any

4    laws, no, they were not arrested.

5         Q.   So what was the major complaints at the chiefs

6    of police meeting regarding these events?

7         A.   It was more of a heads-up that, and again I'm

8    just going to paraphrase the information that came out

9    from the meeting, that this was an organized effort to

10   gauge the law enforcement response to see if law

11   enforcement was going to make an arrest, even though from

12   all the information we had it wasn't a codified criminal

13   act.  More of a gauge just to gauge the law enforcement

14   response to the calls.

15        Q.   Was it an uncodified criminal act?

16        A.   No.  It wasn't a criminal act.

17        Q.   Did these events have any -- well, withdrawn.

18             Did these events motivate the passing of the law

19   in I think it was 2012, 2013 to criminalize the open

20   carry of a loaded handgun?

21             MR. WISE:  Objection.  Calls for speculation.

22   BY MS. BELLANTONI:

23        Q.   Well, do you know any of the -- were you

24   involved in or do you know of the legislation behind such

25   a law?

Kim Raney

Page 26

1      A.   I'm familiar with the legislation, but I wasn't

2  involved in the formation or the discussions around that

3  legislation.

4      Q.   Did you have any discussions with individuals

5  who were involved in creating that legislation?

6      A.   No.

7      Q.   Was it an inconvenience to the police department

8  to respond to these handful of calls?

9      A.   I don't know if I'd use the word "inconvenient"

10  even though I don't disagree with that term.  I think it

11  was just unnecessary.

12      Q.   And why is that?

13      A.   Because I think the -- again this is my

14  opinion -- that the purpose of the conduct was to

15  generate a call from the public so there would be a

16  confrontation with the police to see how the police

17  handled it.

18      Q.   But you don't know that to be the actual

19  purpose?

20      A.   No.  I just said that was my opinion.  I don't

21  know what the persons involved in this or person involved

22  in this, I don't know what their motivation was.

23      Q.   Have you reviewed any law enforcement policies

24  in any jurisdictions in which open carry is lawful?

25      A.   No.

Kim Raney

Page 27

1      Q.  Have you spoken with anyone in law enforcement

2   in an open carry jurisdiction regarding their policies or

3   their procedures regarding open carry?

4      A.  No.

5      Q.  Have you spoken with anyone in law enforcement

6   in an open carry jurisdiction regarding whether open

7   carry has affected public safety in their communities?

8      A.  No.

9      Q.  You read the declaration of Chuck Haggard that

10  was submitted in this case I believe you testified to,

11  correct?

12     A.  Correct.

13     Q.  Have you reached out to Mr. Haggard to discuss

14  with him how the change in the open carry laws has

15  affected public safety in Kansas?

16     A.  No.

17     Q.  Can you describe or just clarify for me what a

18  man with a gun call is in terms of law enforcement?

19     A.  A man with a gun call is generated by a member

20  of the public calling 911 or their local police

21  department saying that there's a man with a gun in their

22  vicinity, whether it's in a business, whether it's in a

23  park.  But obviously, they've made an observation that

24  there is an armed person within their eyesight and

25  they're calling for law enforcement response.

Page 28

1        Q.  And were these -- I'm just going to call them I
2    guess the Starbucks incidents.  Were those considered man
3    with a gun call or responses?
4        A.  Yes.
5        Q.  And you know that's how they came in to the 911
6    dispatch?
7        A.  That's how I was told them came in as a 911.  It
8    was a 911 call was a man with a gun.  I haven't reviewed
9    the tapes.
10       Q.  And when the police responded, do you know if
11   the officer drew their weapons?
12       A.  I don't know what the officers' conduct was.
13       Q.  If the officers -- well, withdrawn.
14           In connection with the law enforcement response,
15   if an officer draws their weapon, is there necessarily a
16   certain procedure that takes place?
17       A.  I'm not sure what you mean by "procedure."
18       Q.  Well, is there -- withdrawn.
19           If an officer had drawn their firearm in
20   responding to that type of event, is that something that
21   you would have been alerted to?
22       A.  No.
23       Q.  Have you had the opportunity to speak with
24   anyone in law enforcement in an open carry jurisdiction
25   regarding how they handle man with a gun complaints?

Kim Raney

Page 29

1      A.   No.

2      Q.   In the context of this litigation here, what

3   exactly is your expertise?

4      A.   Again 39 years of municipal law enforcement

5   experience, increasing responsibility the last 15 years

6   as chief of police responsible for providing public

7   safety to a city of 50,000.

8           On top of that, president of the Los Angeles

9   County Police Chiefs Association where I represented the

10  45 police chiefs in 2008 in a majority, if not all, the

11  public regional public safety conversations that occurred

12  in Los Angeles.  And then from 2011 through 2014 on the

13  executive board of the California Police Chiefs

14  Association, including president in 2014, where we were

15  involved in the majority of the state-wide issues that

16  came up with public safety legislation.

17     Q.   Specific to open carry, what is your expertise?

18     A.   Again my expertise would be both working and

19  living in a community where if firearms are available and

20  openly carried in the public, from my experience and my

21  opinion, what that could create and especially in the

22  urban and suburban areas of California.

23     Q.   And how do you know that those results will

24  actually take place?

25           MR. WISE:  Objection.  Vague.

Kim Raney

Page 30

1    BY MS. BELLANTONI:

2        Q.  Well, you said you're giving your opinion on

3    what could possibly happen if your jurisdiction allowed

4    for lawful open carry.  And how do you know that the

5    events that you think are going to happen will actually

6    take place?

7        A.  I think by my experience as a resident of

8    California for 64 years, as my experience as a police

9    officer, it would be a seismic shift for the state of

10   California.  And in my opinion, it will create

11   unnecessary law enforcement responses.  It will create

12   unnecessary anxiety and concern in communities.  It would

13   be -- even if it were a legal practice, it would be an

14   unwise or an unsafe practice.  There would be a lot of

15   unanticipated consequences as a result of that, and I

16   think the risks outweigh the benefits.

17       Q.  What risks would those be?

18       A.  Well, I think they're multiple.  I think if you

19   go to an environment where you have open carry, you're

20   setting up an environment where there could be a

21   multitude of issues that have to be dealt with.

22           One is the person with open carry could very

23   well be the victim of an assault themselves.  Their gun

24   could be taken from them.  I'm not sure what their weapon

25   retention skills are, what the quality of their holsters

Kim Raney

Page 31

1   are.  If they were in a business where there's about to

2   be a robbery and they were openly carrying, there's a

3   likelihood or a possibility they would be the first

4   victim.  They would either be disarmed or the first

5   victim shot.

6        If they had to lock up that gun or put that gun

7   away, say there was restrictions on in what public places

8   you could carry that gun or areas you could carry that

9   gun, I would expect that most people then put the weapons

10  in their cars.  That could lead to a rash of guns being

11  stolen out of cars.

12        And the environment we have right now where

13  vehicle burglaries are on the rise in California, you

14  have people out there who you don't know what their

15  de-escalation skills are.  You don't know what their

16  emotional maturity is, you don't know what their

17  intoxication levels are, and now they're making decisions

18  and sometimes split-second decisions on whether they're

19  going to use deadly force or not.  And I think just the

20  risks far outweigh the benefits.

21     Q.  And what are the benefits?

22     A.  Well, I think the benefit would be if somebody

23  who was openly carrying and was going to be the immediate

24  victim of a violent crime or saw a violent crime

25  happening in their presence or a deadly crime, if it was

Kim Raney

Page 32

1    appropriate, they would have the option to, you know,

2    engage with that firearm to end the circumstances and the

3    contact.

4              But it's a lot of discretion to give somebody

5    who is -- you don't know again their training, their

6    maturity level, their intoxication, whether the incident

7    they perceive is really that incident or it's just a

8    perception issue and there's a way to retrieve or

9    de-escalate.  There's a lot of variables.

10        Q.  Can we agree that retreat is not always an

11   option to a victim of a violent confrontation?

12        A.  I think it's always an option.  It might not be

13   the best option, but it's always an option.

14        Q.  It's your opinion that retreat is always an

15   option?

16        A.  Unless you're barricaded or you have no means of

17   retreat.  I mean, I don't know what the physical

18   environment is you're describing, but I think retreat

19   would almost always be an option.  I don't know if it

20   would be the appropriate option, but it's always an

21   option.

22        Q.  Do you agree that every individual has the right

23   to self-defense?

24        A.  Yes.

25        Q.  Do you agree that that's a

Kim Raney

Page 33

1    Constitutionally-protected right?

2            MR. WISE:   Objection.   Calls for a legal

3    conclusion.

4    BY MS. BELLANTONI:

5        Q.   Is a law enforcement officer sworn to uphold the

6    Constitution?

7        A.   You broke up for a second.

8        Q.   As a law enforcement officer, were you sworn to

9    uphold the United States Constitution?

10       A.   Yes.

11       Q.   And were you also sworn to uphold the

12   Constitution of the State of California?

13       A.   Yes.

14       Q.   And can we agree that the Second Amendment of

15   the United States Constitution protects the right to keep

16   and carry firearms or weapons for self-defense?

17           MR. WISE:   Objection.   Calls for a legal

18   conclusion.

19           MS. BELLANTONI:   Well, he's testified that it

20   was his job to uphold the Constitution, to know the

21   Constitution.

22   BY MS. BELLANTONI:

23       Q.   So what is your understanding, Mr. Raney, of the

24   Second Amendment?

25       A.   I understand the Second Amendment to provide

Kim Raney

Page 34

1    people with the right to bear arms.

2         Q.   And what does that mean to you?

3         A.   For me, it means the right to own firearms, to

4    keep a firearm in your home for protection, and if

5    necessary, to use that firearm in your home to protect

6    yourself or your family.

7         Q.   Are you aware that there's no duty of law

8    enforcement to protect under the law, to protect any

9    particular individual?

10             MR. WISE:  Objection.  Calls for a legal

11   conclusion.

12   BY MS. BELLANTONI:

13        Q.   Are you aware of a statute in California that

14   absolves law enforcement for refusing or failing to

15   protect a specific individual?

16             MR. WISE:  Same objection.

17   BY MS. BELLANTONI:

18        Q.   You can answer.

19        A.   I'm not sure I understand your question.

20        Q.   Are you aware of the statute in California that

21   absolves or provides protection for law enforcement

22   officers from being sued for failing to protect an

23   individual resident of California?

24        A.   Well, I know there's -- I don't know if it's a

25   statute or if it's a case law decision, but I know

Kim Raney

                                                              Page 35

1    there's a mechanism that describes what you're talking

2    about.

3         Q.  And what is your understanding of that

4    mechanism?

5         A.  That the police don't have a duty to respond or

6    protect.

7         Q.  So how is an individual to protect themselves

8    from violent crime in public if they're not allowed to

9    carry a weapon for self-defense?

10            MR. WISE:  Objection --

11            THE WITNESS:  I don't agree --

12            MR. WISE:  -- I'm sorry.  Objection.  Calls for

13   speculation.

14   BY MS. BELLANTONI:

15        Q.  Well, it's your testimony, Mr. Raney, that your

16   understanding of the Second Amendment is that it only

17   protects the right to have a handgun in your home; is

18   that accurate?

19            MR. WISE:  Objection.  Misstates earlier

20   testimony.

21            MS. BELLANTONI:  Well, I'm asking him if it's

22   accurate.

23            THE WITNESS:  My understanding of the Second

24   Amendment is the right to bear arms.  I know there's

25   language in there about a militia.

Kim Raney

Page 36

1          So anyway, I think -- again I'm not a

2     Constitutional scholar, but I think that's the issue

3     that's going to the Supreme Court right now as far as

4     interpretation and application of the Second Amendment.

5     BY MS. BELLANTONI:

6          Q.  But it's your understanding that the scope of

7     the Second Amendment applies to possessing a handgun in

8     the home.  That's the extent of the right; is that

9     accurate?

10         A.  No.

11              MR. WISE:  Objection.  Misstates earlier

12     testimony.

13     BY MS. BELLANTONI:

14         Q.  So what is your understanding of the Second

15     Amendment?

16         A.  The Second Amendment allows a person to bear

17     arms.  I don't think it differentiates between a handgun

18     and a long gun.  I believe it just talks about the right

19     to bear arms.

20              And my interpretation of that and my

21     understanding of that is it's the right of gun ownership.

22     It's the right to maintain that gun in your home.

23         Q.  Okay.  So in your understanding of the Second

24     Amendment, it does not apply to maintaining or bearing a

25     handgun outside of the home; is that accurate?

Kim Raney

Page 37

1         A.  Well, I think it's accurate.  I think -- I think

2    what we're seeing right now is states across the country

3    with different applications or interpretations of the

4    Second Amendment.  Because there are a lot of states that

5    have authorized open carry and right to carry in public.

6    California is one of the few that hasn't done that.  And

7    I think that's the decision the Supreme Court's on track

8    to discuss.

9         Q.  I'm just trying to understand what your

10   understanding is because you now both times have limited

11   it to the home.  So I'm trying to understand what your

12   interpretation is.

13             Am I correct in understanding that your

14   understanding of the Second Amendment is that it's

15   limited to the home?

16             MR. WISE:  Objection.  Calls for a legal

17   conclusion.

18             MS. BELLANTONI:  I'm asking what his

19   understanding is.  He limited it to the home, so I want

20   know if that's his understanding.

21             MR. WISE:  Same objection.

22   BY MS. BELLANTONI:

23        Q.  You can answer.

24        A.  My understanding, it's the right to bear arms.

25             Again I don't want mean to argue with you.  I'm

Kim Raney

Page 38

1    not being disagreeable with you.  But I think my

2    understanding as applies to again the State of

3    California, it's the right to bear arms and own firearms

4    and maintain those in your residence.

5         Q.  Can we agree that crime rates are higher in the

6    urban areas of California than they are in rural areas?

7              MR. WISE:  Objection.  Calls for speculation.

8    BY MS. BELLANTONI:

9         Q.  When you were the chief of police did you have

10   access to crime statistics throughout the state?  Is that

11   part of your knowledge and your understanding in

12   reviewing law enforcement around the state of California?

13        A.  I didn't review every jurisdiction and every

14   county's crime statistics in the state of California.

15        Q.  Were you generally aware of the crime rates in

16   the urban areas of California and the suburban areas

17   versus the rural areas of California?

18        A.  No.

19        Q.  So we can agree that the urban areas of

20   California have a higher crime rate than the rural areas

21   of California?

22             MR. WISE:  Objection.  Calls for speculation.

23   BY MS. BELLANTONI:

24        Q.  You can answer.

25        A.  Based on my experience, I would think the more

Kim Raney

Page 39

1    people you have, the more densely populated you have, the

2    likelihood is that you would have higher crime rates than

3    you would in sparsely populated areas.

4         Q.  And does one's right to self-defense diminish

5    depending on the population size of their county in your

6    opinion?

7              MR. WISE:  Objection.  Calls for a legal

8    conclusion.

9    BY MS. BELLANTONI:

10        Q.  You can answer.

11        A.  I don't know if I'd agree with the term

12   "diminish."  I'm not sure what you mean by that term.

13        Q.  So reduces, is a reduction of the ability to

14   defend one's self depending on their location within the

15   state of California?  In other words, is someone's right

16   to self-defense the same in a rural area as it is in an

17   urban area?

18              MR. WISE:  Same objection.

19   BY MS. BELLANTONI:

20        Q.  You can answer.

21        A.  So is your question is someone's right to

22   self-defense different in an urban area as compared to a

23   rural area?

24        Q.  Yes.

25        A.  No.  I don't believe the right to self-defense

Kim Raney

Page 40

1   changes based upon that demographic.

2       Q.  Can we agree that criminals generally choose the

3   time, place, and manner in which they're going to commit

4   a crime?

5           MR. WISE:  Objection.  Vague, calls for

6   speculation.

7   BY MS. BELLANTONI:

8       Q.  You can answer.

9       A.  I don't know if I wholeheartedly agree with

10  that.  I think some criminals do preplan and I think some

11  criminals it's a crime of opportunity.

12      Q.  And in being a crime of opportunity, would you

13  agree that most criminals use the circumstances that are

14  best advantageous to them?

15          MR. WISE:  Objection.  Vague, calls for

16  speculation.

17  BY MS. BELLANTONI:

18      Q.  You can answer.

19      A.  I would think most do.  I'm not sure if all of

20  them have that tactical or reasoning process.

21      Q.  Would you agree that most violent crime is

22  committed outside the presence of a police officer?

23      A.  Yes.

24      Q.  Would you agree that most violent criminals

25  choose a victim who is vulnerable?

Kim Raney

Page 41

1           MR. WISE:  Objection.  Calls for speculation,

2   vague.

3   BY MS. BELLANTONI:

4        Q.  You can answer.

5        A.  I'm not sure if I'd use the term or agree with

6   the term "vulnerable."

7        Q.  What term would you agree with?

8           MR. WISE:  Same objection.

9           THE WITNESS:  Again I think -- I'd have to try

10  to get in the mind of a criminal.  I think in a lot of

11  cases it's more of which victim's available.

12  BY MS. BELLANTONI:

13       Q.  Would you agree that most victims have no

14  advance knowledge of being attacked?

15          MR. WISE:  Objection.  Calls for speculation.

16  BY MS. BELLANTONI:

17       Q.  You can answer.

18       A.  I'd agree.

19       Q.  Would you agree that law enforcement is trained

20  to determine the behavior of individuals and assess a

21  specific threat level when responding to an incident or a

22  scene?

23       A.  I don't understand your question as far as who's

24  the individual?

25       Q.  Just generally in the course of law enforcement,

1   in performing law enforcement duties, would you agree

2   that police officers are trained to assess various levels

3   of threat depending on the nature of the events, whether

4   they're patrolling or whether they're responding to an

5   actual call?

6           MR. WISE:  Objection.  Vague.

7           THE WITNESS:  If I understand your question, I

8   think what you're asking me is do law enforcements have

9   the training, the intuition, the experience to assess the

10  threat or dangers in a situation or environment that

11  they're entering or exposed to?

12  BY MS. BELLANTONI:

13      Q.  Yes.

14      A.  I'd agree with that.

15      Q.  And what factors do law enforcement officers

16  take into consideration in making those assessments?

17      A.  There's a myriad of factors that come in.  It

18  could be the location, the time of day, the behavior of

19  the person you're coming in contact with, access or --

20  the access to something that might cause you injury or

21  danger, their ability to flee.

22          There's a variety of factors that would come

23  into any situation that you'd have to assess.

24      Q.  When you were working either as a patrolman or

25  as a sergeant did you have any assignments involving gang

Kim Raney

Page 43

1   activity?

2        A.   Yes.

3        Q.   And can we agree that most gang activity is drug

4   related and/or related to crimes of violence?

5             MR. WISE:  Objection.  Calls for speculation.

6             MS. BELLANTONI:  It's his experience.

7   BY MS. BELLANTONI:

8        Q.   In your experience, is the gang activity that

9   you investigated or been involved in related to drugs

10  and/or violent criminal activity?

11       A.   I'd say the majority of that is either drug

12  activity or some type of criminal enterprise, yes.

13       Q.   That you would describe as violent?

14       A.   Some are violent, yes.

15       Q.   Can we agree that most gang activity is geared

16  towards violence or is of a violent culture?

17            MR. WISE:  Objection.  Calls for speculation.

18  BY MS. BELLANTONI:

19       Q.   In your experience.  You can answer.

20       A.   Not that I agree with the term of "most," but

21  it's not unusual that there's violence associated with

22  gang members.

23       Q.   And what was the scope of your experience with

24  gang-related activity?

25       A.   I was a sergeant in charge of the detective

Kim Raney

Page 44

1  division, which included a gang unit.  When I was a

2  lieutenant I was in charge of our entire criminal

3  investigations department, which included the gang unit.

4  Even back into the '80s I was working narcotics in the

5  cocaine trade in Southern California that dealt with both

6  the Columbian and the crack cocaine epidemic.

7      Q.  And in your experience, have you ever come

8  across a gang member who was carrying a handgun openly in

9  a holster?

10      A.  Yes.

11      Q.  And approximately how many occasions did you

12  encounter that?

13      A.  I think just a handful.

14      Q.  Can we agree that most gang members or violent

15  criminals will carry their firearm concealed on their

16  person?

17          MR. WISE:  Objection.  Calls for speculation.

18  BY MS. BELLANTONI:

19      Q.  In your experience.

20          In your experience in law enforcement, I think

21  it's over 40 years now maybe, has it been your experience

22  that criminals will carry their firearms concealed on

23  their person?

24      A.  It's my experience is they would carry it either

25  concealed on their person, concealed in their car, or

Page 45

1   have a female member of their gang or group carry it.

2        Q.  And would the female member of their gang or

3   group carry it concealed as well?

4        A.  Yes.

5        Q.  And in your experience, is it -- is the purpose

6   of carrying such weapons concealed to provide an

7   advantage to the criminal over law enforcement and/or a

8   victim?

9        A.  Can you repeat your question?

10       Q.  Sure.

11            MS. BELLANTONI:  Could you read that back,

12   please?

13   (Whereupon, the requested portion of the record was read

14                    back by the Reporter.)

15            THE WITNESS:  I don't know what their intent is.

16   I don't know if it's to provide them an advantage.  It's

17   just to conceal it so it's not probable cause for

18   contact.  I'd have to guess.

19   BY MS. BELLANTONI:

20       Q.  Can we agree that it would provide a criminal an

21   advantage, either advantage against law enforcement or an

22   advantage against a victim, to carry a firearm concealed

23   on their person as to open?

24       A.  Sure, it could.  Yes.

25       Q.  Can we also agree that the conduct and behavior

Kim Raney

Page 46

1   and emotional reaction of a criminal will differ markedly

2   from that of a law-abiding person?

3           MR. WISE:  Objection.  Calls for speculation,

4   vague.

5           THE WITNESS:  Yeah, I'm not sure I understand

6   your question.

7   BY MS. BELLANTONI:

8       Q.  Well, in the course of your law enforcement

9   experience, have you ever come across an individual who

10  was in lawful -- in public in lawful possession of a

11  handgun?

12      A.  Yes.

13      Q.  And can we agree that a person who is in lawful

14  possession of a handgun will have different behavior or

15  conduct or emotional reaction to police contact than a

16  criminal or a gang member?

17          MR. WISE:  Objection.  Calls for speculation.

18  BY MS. BELLANTONI:

19      Q.  You can answer.

20      A.  I would agree generally with that, yes.

21          MS. BELLANTONI:  Does anyone need a break?

22  We've been going for a little while here.  Lynne?

23          THE COURT REPORTER:  Do you mind just five

24  minutes?

25          MS. BELLANTONI:  Not at all.

Page 47

```
 1              THE COURT REPORTER:  Thank you.
 2              MS. BELLANTONI:  Back in five.
 3                  (Whereupon, a recess was taken.)
 4    BY MS. BELLANTONI:
 5         Q.  Mr. Raney, back on the record after a short
 6    break.  Is there anything about your prior testimony up
 7    to this point that you'd like to clarify or change?
 8         A.  No.
 9         Q.  During what period of time did you serve as the
10    chief of police in Covina?
11         A.  From 2001 through 2016.
12         Q.  And I know I'm going back a little ways.  Do you
13    have a sense of how many murders were committed or how
14    many arrests, charges of murder were there during the
15    time that you were a police chief?
16         A.  I don't have a total number for the entire 15
17    years.  Each year was different.  Some years we would
18    have two or three, some years we would have 12.  One year
19    we had a mass murder in 2008 where we had nine people
20    killed at a Christmas Eve event.
21              So each year was different.
22         Q.  And so you mentioned a Christmas Eve event in
23    your declaration; is that right?
24         A.  Yes.
25         Q.  And were you one of the -- did you respond to
```

Kim Raney

Page 48

1    the scene of that event?

2         A.   The incident started about 11:30 on Christmas

3    Eve.  I got a phone call at home about 11:40 and came in,

4    so I was probably there within 20 minutes.

5         Q.   And with regard to the scope of your expertise

6    in this case on the issue of open carry, was that

7    particular incident -- is that particular incident

8    relevant to the issue of open carry?

9         A.   No.

10        Q.   Were -- did the homeowners or the individuals

11   that were the victims, did they know the person that had

12   attacked them?

13        A.   Yes.  It was their former son-in-law.

14        Q.   This was not gang-related activity; is that

15   correct?

16        A.   No.

17        Q.   And the individuals in the home, do you know if

18   they had access to either a handgun or a rifle or

19   shotgun?

20        A.   I don't know.

21        Q.   Do you recall whether there was any attempt to

22   defend with the use of a firearm?

23        A.   No.  There was no attempt to defend themselves.

24        Q.   And so how ultimately was the attacker -- was he

25   caught or how did it resolve itself?

Page 49

1      A.   So he dressed up as Santa Claus.  Because the

2   family had a tradition at Christmas Eve where a neighbor

3   would dress up as Santa Claus and come to the house and

4   distribute gifts to the children at the event.  It was a

5   large family tradition.

6           So there had been a contentious divorce with one

7   of the daughters.  And the son-in-law, he started his

8   planning months earlier, had a Santa Claus suit designed

9   and tailored where he could conceal four handguns.  And

10   then he prepared a compressor with a hose and the ability

11   to mix oxygen and racing fuel and wrapped that as a

12   Christmas present and carried that to the front porch and

13   put it down and knocked on the door.

14           So a little girl opened the door.  She was

15   immediately shot in the face by the suspect, who then

16   went inside the house and executed nine family members

17   sitting around a table.  Went back to the porch and now

18   retrieved his flamethrowing device and went in the house

19   and started distributing the oxygenated-racing fuel.

20           The flaw in his plan was he didn't anticipate

21   either the fireplace or candles to be lit, and the house

22   exploded and blew him up and he suffered third degree

23   thermal burns, but he survived.

24           So he fled to a car and then fled the scene and

25   drove to an area, his brother's house in the northern

Kim Raney

Page 50

1    part of Los Angeles County about an hour away, and

2    sometime before seven or eight o'clock the next morning

3    he committed suicide.

4        Q.   Do you know in what manner did he commit

5    suicide?

6        A.   Put a gun in his mouth, pulled the trigger.

7        Q.   At the time in 2008 it was against the

8    California Penal Code to carry a loaded firearm, correct?

9        A.   Yes.

10       Q.   Can we agree that criminals who seek to do harm

11   to others, if they're intent on doing harm, are going to

12   just disregard the law?

13            MR. WISE:   Objection.   Calls for speculation.

14   BY MS. BELLANTONI:

15       Q.   You can answer.

16       A.   I'd agree with that.

17       Q.   I mean, the very definition, can we agree, of

18   criminal is someone who is violating established laws,

19   right?

20       A.   They commit a crime.

21       Q.   Right.   Of the homicides that were committed

22   during the time you were chief of police, do you recall

23   any that were committed by individuals who were in lawful

24   possession of a handgun?

25       A.   Is your question was the victim or any of the

Kim Raney

Page 51

1    victims in lawful possession of a handgun?

2         Q.  Apologies, no.

3              Was the criminal, was the perpetrator of the

4    homicide, in lawful possession of the handgun that was

5    used to commit the crime?

6         A.  Not that I recall, no.

7         Q.  And going to the victim side of the equation, in

8    your experience in law enforcement, not just as chief but

9    the entire law enforcement experience in Covina, have you

10   had occasion to learn of or be involved in a circumstance

11   where the victim was able to defend themselves from a

12   violent attack by using a handgun?

13        A.  I don't specifically remember one where the

14   victim defended themselves with a firearm.

15        Q.  Are you aware just through reading publications

16   and announcements from other law enforcement agencies,

17   either in California or from other jurisdictions, of

18   circumstances where a victim has survived a violent

19   attack through the use of their own handgun?

20        A.  Yes.  I have read of instances where that has

21   happened.

22        Q.  Of the homicides that were committed during the

23   time where you were chief of police, were the majority of

24   those homicides committed in the context of gang-related

25   activity?

Kim Raney

Page 52

1      A.  I would guess maybe 20 percent were gang

2   activity, some were domestic, and some were random acts

3   of violence.

4      Q.  And I know you're just approximating here, so

5   I'm just trying to get an approximation as well.

6          If 20 percent was roughly related to gang

7   activity, do you know or can you recall how the remaining

8   80 percent was calculated?  Did it fall into domestic

9   circumstances or just random --

10     A.  Some -- some were in commission of other crimes,

11  commission of robberies.  And some were just the results

12  of an argument or disagreement, some other event that led

13  up to a homicide.

14     Q.  And when we speak of domestics or the robberies

15  or arguments, are these generally shootings -- withdrawn.

16          How many, if you can recall, what's the

17  percentage in your experience that were related to

18  firearms as opposed to another means of homicide?

19     A.  I would say over 90 to 95 percent were firearms.

20  The other 5 percent were either blunt force or

21  sharp-edged weapons.

22     Q.  And of the 90 percent that utilized a firearm,

23  can you think back as to what percentage generally

24  occurred inside of a home as opposed to outside of a home

25  in public?

Kim Raney

Page 53

1      A.   I'd be guessing.  Maybe 50, 60 percent inside a

2    home, 40, 50 percent outside the home.

3      Q.   And when we talk about the incidents of firearm

4    use in a criminal matter inside of a home, in your

5    experience as chief of police, were these domestic-type

6    situations or were they more a random like a break-in

7    burglary or robbery in a home or rape?

8      A.   Almost I wouldn't say exclusively but the vast

9    majority were either domestic or a former family member.

10   But there were occasional homicides during the course of

11   a break-in for sexual assault.  We did have a rash, a

12   handful of those that occurred in a series.

13     Q.   And can we agree in your experience, has it been

14   that violent crime can take place either in the home or

15   out in public?

16     A.   I'm sorry?  I missed that.

17     Q.   Is it the case that violent crime can take place

18   in the home or outside of the home in public?

19     A.   Yes.

20     Q.   In California under the California Penal Code,

21   from your experience in law enforcement, is it lawful to

22   use deadly force in defense of certain types of crimes?

23   In other words, in defense of a rape or a kidnapping or

24   attempted murder.

25     A.   I don't believe there's a catalog of crimes that

Page 54

1    automatically allow you to resort to deadly force.  I
2    think it's described as the use of deadly force to
3    prevent immediate death or serious injury.
4        Q.  So just as an example, based on your experience,
5    if a woman was being raped and shot her rapist, is that
6    one of the types of crimes that would provide the defense
7    of her use of deadly force?
8        A.  Yes.  I think that would provide a defense.
9        Q.  Are you aware of California's history prior to
10   1976 open carry being legal in the state?
11       A.  You know, I've read I wouldn't say a lot of that
12   but some of that, but I don't remember the particulars.
13   But I couldn't disagree with that.
14       Q.  Do you have any knowledge of what specifically
15   happened in and around 1967 to cause a change in the law
16   in California?
17       A.  No.  I don't know the specific reason.
18       Q.  Have you heard of the Mulford Act?  Is that
19   familiar to you?
20       A.  No.
21       Q.  And in the course of your law enforcement
22   experience, possibly even specifically as the chief of
23   police, did you become aware of trends or particular
24   issues relating to law enforcement in other jurisdictions
25   in other states?

Kim Raney

Page 55

1     A.   In regards to what?

2     Q.   Anything.  I mean, is that within the scope of

3     your employment as the chief of police that you would

4     either in getting a bulletin or subscribing to an email

5     service that you would just see what, for instance, use

6     of force trends are happening or specific, you know,

7     drug-related courier activities are taking place

8     throughout the country?

9          Did you have an opportunity to learn of other

10    law enforcement issues that were happening around the

11    country?

12          MR. WISE:  Objection.  Vague, compound.

13          MS. BELLANTONI:  Very compound.

14    BY MS. BELLANTONI:

15    Q.   Did you understand the question?

16    A.   I think I understand it.  Now was there a formal

17    service that we got information from that was shared

18    either nationally?  No, except for information that would

19    come from the FBI.

20          There is an association called the International

21    Association of Chiefs of Police.  They do have a

22    conference every year.  We would attend that conference.

23    So within that, again it's a conference environment where

24    there are programs or seminars or presentations that are

25    put on from different agencies across the country and

Kim Raney

Page 56

1    across the world on things that are either relative, that

2    are significant, that are trending, or that are things

3    that the planners of the event feel that the profession

4    could benefit from.

5         Q.   Did you attend any of those events?

6         A.   Yes.  I was a presenter at two of them.

7         Q.   What topic did you present on?

8         A.   Medical marijuana.

9         Q.   Yeah, so I was reading that you had engaged in

10   some publications in your declaration.  Were you --

11   didn't know what side of the fence you ended up being on.

12         Were you a proponent of -- you're not medical

13   marijuana.  I'm talking about the legalization of

14   marijuana.  Two different things.

15         A.   Well, medical marijuana was a Trojan horse for

16   legalization.  So it started as medical marijuana and

17   then it evolved into the legalization of marijuana.  So

18   that was one of the topics I was involved with for six

19   years.

20         Q.   So I guess my curiosity was which side of the

21   fence did you find yourself on?  Were you a proponent of

22   legalizing marijuana or an opponent?

23         A.   So I was personally an opponent, and the Police

24   Chiefs Association was an opponent and we were very

25   active in 2010 when Proposition 19 was on the ballot and

Kim Raney

Page 57

1    we defeated that.  That was for the legalization of I

2    think it was termed "medical marijuana" or "marijuana,"

3    but we defeated that.

4          But we could see -- and this is the hypocrisy of

5    it.  We could see through the state legislature, every

6    year California state legislature was trying to legalize

7    marijuana and every year we would defeat it.  Even got to

8    the point where they would pass something, meet with the

9    governor, and he would veto.  Then we had to get

10   strategic.

11         So the analogy was it's going to be like playing

12   hockey and eventually they're going to get one in the

13   net.  They're going to sneak one by the goal.  So we

14   thought strategically eventually the California State

15   legislature is going to pass some marijuana legislation

16   that is really problematic to the community and the

17   public safety.

18         So we worked with other law enforcement

19   associations and with State Senator Lou Correa, who's now

20   a Congressman Lou Correa, and he carried the bill, the

21   outline on the legalization or decriminalization of

22   marijuana in California.  It was a two year process.

23   Eventually that bill was signed I think in 2015.  2015 or

24   2016.  And we were the sponsor of that.

25         Q.  So --

Kim Raney

Page 58

1        A.  -- responsible for legislation because we knew

2    it was coming.

3        Q.  So what were the I guess benefits versus the

4    downside when you were the opponent and then ultimately

5    what led you to the conclusion that it would be

6    beneficial or that the benefits would outweigh the

7    detriments?

8        A.  Because we knew it was going to pass.  We knew

9    just based upon the state legislature that they were

10   eventually going to pass some legislation.  So we wanted

11   to ensure that not only law enforcement but community

12   stakeholders, the California League of Cities, other

13   people are stakeholders in communities had a voice in the

14   drafting and creation of this legislation to provide

15   safeguards to the community.

16           So that was our focus on that to ensure that the

17   safeguards were in place before -- and I think the term

18   was decriminalize.  They couldn't legalize it because of

19   the federal issue, but decriminalize certain amounts of

20   marijuana in the state of California.

21       Q.  And specifically, what safeguards were put in

22   place?

23       A.  It's been a long time.

24       Q.  If you can recall.  Generally.

25       A.  You know, it was more about the regulation of

Kim Raney

                                                      Page 59

1    it, cities being involved in the approval and permitting

2    process of dispensaries or not approving.  So cities

3    would have the ability to say yes or no to a marijuana

4    dispensary in their jurisdiction, not leave that up to

5    the state, override cities.  Because the vast majority of

6    cities were against that.

7            So we ensured that the cities had the ability to

8    either to approve, deny, license or regulate marijuana

9    distribution within their cities.  And most cities have

10   opted not to do that.

11       Q.  In the I believe it was the International

12   Association...

13       A.  International Association of Chiefs of Police.

14       Q.  Chiefs of Police, yeah.  In the times that you

15   attended those conferences, was the topic of open carry

16   ever raised or was that -- to your recollection.  I'm

17   sure there are many courses given.  To your recollection,

18   is that an issue that was brought up?

19       A.  I don't recall open carry being an issue.  I

20   think more it got into the issue of ammunition stamping,

21   waiting periods, gun shows, things like that.

22       Q.  Do you recall seeing any law enforcement

23   announcements that related to addressing public safety

24   issues regarding open carry of handguns?

25       A.  I don't know.

Kim Raney

Page 60

1      Q.  Are you aware that only five states of the 50

2    states including the District of Columbia, so six

3    jurisdictions, only six of them banned open carry?

4          MR. WISE:  Objection.  Lacks foundation.

5    BY MS. BELLANTONI:

6      Q.  Are you aware of that?

7      A.  Yes, I am.

8      Q.  Are you familiar with the term "Constitutional

9    carry"?

10     A.  I've heard of the term, yes.

11     Q.  What is your understanding of Constitutional

12   carry?

13     A.  I'm not sure I understand it.  So I don't want

14   to be wrong, I don't want to guess.

15     Q.  Are you aware that over 20 states have approved

16   Constitutional carry?  And that means to be able to carry

17   concealed or open without needing a license?

18          MR. WISE:  Objection.  Lacks foundation.

19          THE WITNESS:  No.  I'm not aware of that.

20   BY MS. BELLANTONI:

21     Q.  And -- withdrawn.

22          Is it your opinion that police officers in an

23   open carry jurisdiction are better trained to deal with

24   public safety issues regarding open carry?

25     A.  So is your question are police officers --

Page 61

1   that's what I understand, are they better trained in open

2   carry issues compared to police officers that don't allow

3   open carry?

4       Q.   Right.   And I guess I'm asking that in the

5   context of your declaration speaking to the myriad of

6   problems that would be posed to law enforcement officers

7   in California if open carry were legalized.

8            So I'm just wondering if it's your opinion that

9   the law enforcement officers in open carry jurisdictions

10  are better trained to deal with those issues that would

11  rise as a result of open carry being legal?

12           MR. WISE:   Objection.   Vague.

13  BY MS. BELLANTONI:

14      Q.   You can answer.

15      A.   I don't know if I'd agree with the term

16  "better."   I would agree that they have received some

17  training since those jurisdictions have implemented open

18  carry.   I think then they have experience with open

19  carry.   So on those things I'd agree with that component

20  of it.

21      Q.   Can we agree that if law enforcement officers in

22  California were properly trained to deal with the change

23  in the law to allow open carry that they would rise to

24  the challenge and respond appropriately in an open carry

25  jurisdiction?

Page 62

```
1              MR. WISE:  Objection.  Vague.

2              THE WITNESS:  Yeah --

3     BY MS. BELLANTONI:

4         Q.  Sorry, I didn't get your answer.

5         A.  Sure.  Law enforcement would rise to the

6     occasion, law enforcement would be trained.  But law

7     enforcement training is only one component of the global

8     issue of open carry, so that's my concern.

9         Q.  Okay.

10        A.  And that was my complaint with your expert

11    witness's report is that he's a training expert, he's a

12    firearms expert, but he was singley focused for the most

13    part on the training component, and that is just one

14    piece of this global issue on open carry.

15        Q.  And by global, what do you mean by "global"?

16        A.  Law enforcement training is one component.  You

17    have the complete change of environment in communities

18    where now people who are going to restaurants, going to

19    theaters, going to parks with their kids are now having

20    to deal with somebody who they don't know who's openly

21    carrying and possessing a firearm.

22        Q.  So let's stop right there for a moment.

23             So how do you think that's going to change

24    anything in the community if open carry is allowed, is

25    legalized?  What do you anticipate is going to happen?
```

Kim Raney

Page 63

1          A.   I think there's potential for increased volume

2     of service.   Because people are going to see that and

3     either (1) not be aware that it's been legalized, or (2)

4     in spite of it being legalized, they are just

5     uncomfortable with having somebody with a handgun sitting

6     next to them in a theater or a restaurant or on the

7     playground with their kids and they're going to call 911

8     for law enforcement response.

9               That's my concern.   That's my estimate that will

10    happen.

11         Q.   And do you base that on any actual events or is

12    that just a concern that you have?

13         A.   I think just -- I'm not using this term

14    flippant -- I think just wisdom.   Just I've lived here

15    all my life.   I'm familiar with the communities.   I'm

16    familiar with especially in the suburban/urban

17    environment there will be a public reaction to that.

18         Q.   So it's only been about I would say less than

19    ten years since open unloaded carry has been

20    criminalized.   How was it dealt with before 2013?

21         A.   How was open unloaded carry?

22         Q.   Yes.   In other words, you mentioned a concern

23    that there would be chaos and people would be

24    uncomfortable and there would be a lot of law enforcement

25    response and certain other unknown events and reactions.

Kim Raney

Page 64

1    But to your knowledge and your experience as a law

2    enforcement officer prior to 2012, 2013, open carry,

3    albeit unloaded, was lawful.  So how was it dealt with

4    then?

5              MR. WISE:  Objection.  Misstates earlier

6    testimony.

7    BY MS. BELLANTONI:

8         Q.  Go ahead.  You can respond.

9         A.  I don't think I've used the term "chaos."

10        Q.  Okay, so the reaction that you anticipate --

11        A.  -- I'm concerned that -- as a resident even

12   though I'm a retired cop, I would have that same concern.

13             Why is it different now than it was in 2010,

14   2008, or whatever?  Because I don't think the publicity,

15   the awareness, just the volume of this issue was

16   prevalent in our society as much as it is today, as much

17   as the last few years.  So 2007, 2008, 2010, those were

18   very rare occurrences.  Not saying they didn't happen,

19   but they were rare.

20             But I think as society is changing I think there

21   will be a lot more people who would take the opportunity

22   to openly carry a firearm if it was legalized in

23   California.  And because of that volume, I'm concerned

24   that, I'll use the word, the anxiety level of people

25   would rise, which would then generate a law enforcement

Kim Raney

Page 65

1   response.  Not that law enforcement response is going to

2   create a crisis, but it's going to create a law

3   enforcement response to a gun call.  It's going to

4   create --

5        Q.  Why is --

6        A.  -- it's going to --

7        Q.  -- a problem?

8        A.  Is that a problem?  No, it's not a problem.

9   It's a resource issue, number one.  It's a quality of

10  life issue, number two.  And again I'm speaking just as a

11  retired cop who has the ability to carry a concealed

12  weapon, but I'm not clairvoyant.  I can't -- if someone's

13  openly carrying a gun sitting next to me, I don't know

14  what's going through their mind.  I don't know what

15  they're processing.  I don't know where they're at.

16          And I use the term that the majority of people

17  are law-abiding citizens, law-abiding citizens until

18  they're not.  And it's when that crosses the line when

19  they're not that creates the problem.

20       Q.  How do you know you're not sitting next to a

21  person who has a concealed weapon and could be thinking

22  something criminal or could be plotting to do something

23  violent sitting next to you at the movie theater?  At

24  least if there's an open -- openly-carried handgun you

25  would know that the person's armed, right?

Kim Raney

Page 66

1        A.  I'd agree with that last part.  I'd know that
2   they were armed, yeah.
3        Q.  As you sit next to anyone anywhere --
4   restaurant, movie theater, park -- you have no idea who's
5   carrying.  Is that a fair statement, correct?
6        A.  I don't know if it's a fair statement.  I think
7   it's a possibility.
8        Q.  We don't know who's carrying concealed unless
9   you can actually see a handgun, right, or some printing
10  or have an idea or from a statement that they made that
11  they have a firearm on them, right?
12       A.  Right.
13       Q.  Have you taken any steps to conduct research or
14  a poll in the community to see whether people would
15  actually feel uncomfortable with other people carrying a
16  handgun in a holster on their person?
17       A.  No.
18       Q.  Do you know if there had been any polls
19  conducted in the state of California as to whether
20  individuals, residents would be opposed to allowing for
21  open carry?
22       A.  I'm not aware of any.
23       Q.  I mean, the legislature provided a statute,
24  right, for open carry permits to be issued, correct?
25       A.  Correct.

Kim Raney

Page 67

1      Q.  When you were chief of police, were you in

2   charge of issuing or reviewing applications for carry

3   permits?

4      A.  For CCW permits?

5      Q.  Let's start with, yeah, concealed carry.

6          Were you able to issue concealed carry permits?

7      A.  Yes.

8      Q.  Did there come a point in time when your

9   department no longer -- I guess no longer reviewed those

10  applications and they were left to the sheriff's

11  department?

12     A.  My successor did that.  I did not.

13     Q.  And did you issue any concealed carry permits?

14     A.  I did not.

15     Q.  Did you have any applications for a concealed

16  carry permit to consider --

17     A.  I did not.

18     Q.  -- during your time as chief?

19     A.  I did not.

20     Q.  Nobody applied?

21     A.  No application reached my desk.

22     Q.  Does that mean people applied, but it just

23  didn't get to you --

24     A.  People might have inquired, but nobody ever

25  followed through with a completed application process

Kim Raney

Page 68

1    that I had to do.

2         Q.  Did you have a policy or make any public

3    statements during your tenure or otherwise that you were

4    an opponent of issuing concealed carry permits?

5         A.  No.

6         Q.  Do you believe that self-defense -- when you

7    were chief of police, was it your opinion that

8    self-defense was a valid reason for good cause to issue a

9    concealed carry permit?

10        A.  Solely self-defense?

11        Q.  Yes.

12        A.  No.

13        Q.  And why is that?

14        A.  Because I think anybody can make that claim.  So

15   my parameters, and again I never had to review one or

16   deal with one, was there had to be extenuating

17   circumstances.

18              For me, say hypothetically a district attorney

19   was prosecuting a high profile gang crime that received

20   threats and wasn't either going to get the level of

21   protection from the district attorney's investigator's

22   office, then I would consider a CCW for a district

23   attorney, for a judge, and not solely just self-defense.

24        Q.  Doesn't everyone have the right to self-defense?

25              MR. WISE:  Objection.  Argumentative.

Kim Raney

Page 69

1    BY MS. BELLANTONI:

2        Q.   In your opinion does every individual have the

3    right to defend themselves against a violent attack?

4        A.   Yes.

5        Q.   Then how is it that self-defense was not enough

6    to issue a concealed carry permit while you were chief of

7    police?

8        A.   Because for me, there had to be a more

9    significant threat.  Because anybody could come in and

10   say I want it for self-defense.  And there had to be a

11   higher threshold for that for me.

12       Q.   In your position as the chief of police, was

13   that an appointed position or an elected position?

14       A.   Appointed

15       Q.   Appointed?  I'm sorry?

16       A.   Appointed.

17       Q.   And who were -- not the person's name, but who

18   were you appointed by?

19       A.   The city manager.

20       Q.   Is that akin to like the mayor of the city or

21   the executive of the city?

22       A.   That's the paid executive.  Not the elected, the

23   paid executive.

24       Q.   Is the city manager who appoints you also

25   appointed?

Kim Raney

Page 70

1          A.   Yes.

2          Q.   And who appoints that person?

3          A.   City council.

4          Q.   And your concealed carry permit philosophy or

5    policy when you were the chief of police, was that yours

6    alone or was that a view that was reached in connection

7    or in conjunction with the city manager or the city

8    council?

9          A.   That was mine.  I did have discussions with the

10   city manager.  I did not discuss it with the city

11   council.

12         Q.   And were you and the city manager of the same

13   mind-set with regard to the issuance of the concealed

14   carry weapons permits?

15         A.   I worked for four different city managers.  So

16   the only one who brought the topic up was the first city

17   manager.  The last three never brought the topic up.

18         Q.   And did the first city manager indicate to you

19   their preference for not issuing concealed carry

20   licenses?

21         A.   No.  Just I had to go through a testing process,

22   competitive testing process, and then there were two of

23   us that were left and then we each had an interview with

24   the city manager.  During the course of that interview

25   that was one of the questions he asked as far as our

Kim Raney

Page 71

1   philosophy about that.  That was the extent of it.

2        Q.  Do you know if your philosophy was different

3   than the other person who interviewed for the job?

4        A.  Don't know.

5        Q.  Did the city manager share that same philosophy?

6        A.  Well, he never disagreed with me.  We didn't get

7   into it, but he never disagreed with me on that topic.

8        Q.  Did anyone apply for an open carry permit during

9   your tenure as chief of police?

10       A.  There was no open carry as far as permit

11  process.  I retired in 2016 and I believe it was limited

12  to counties under 200,000 in population.

13       Q.  And just for the record, what county was your

14  jurisdiction located in?

15       A.  Los Angeles County.

16       Q.  And roughly, what's the population of LA County?

17  Is it over 200,000?

18       A.  About five to six million.

19       Q.  And during your tenure as the chief of police

20  did you have meetings with executive law enforcement from

21  counties throughout the state?

22       A.  Yes.

23       Q.  And did that include sheriffs' offices as well

24  as police departments?

25       A.  My situation was unique.  California Police

Page 72

1    Chiefs Association is made up of 330 municipal police

2    chiefs.  So we had our own association and the board of

3    directors had quarterly meetings and we had an annual

4    symposium, seminar, whatever the word of the month is.

5            Sheriff's department, the California State

6    Sherriffs Association had their own association.  It's

7    made up of the 57 or 58 county sheriffs in the state of

8    California.  So the two don't meet together.

9            But as the president of the Police Chiefs

10   Association I was invited to all of their regional

11   meetings.  So I'd attended five of their quarterly

12   meetings, if that makes sense, where I would be at the

13   table as they discussed policies, legislative issues,

14   political issues, and we'd have an exchange of

15   information.

16       Q.  Is it fair to say that the sheriffs are the

17   agencies that are the executive law enforcement for the

18   counties that have populations of 200,000 people or less?

19   Does it break down that way?

20       A.  So is your question are they the executive law

21   enforcement?

22       Q.  I'm going to rephrase that.  That was messy.

23            For counties -- generally, for counties in

24   California that have a population of 200,000 people or

25   less, is the licensing authority in those jurisdictions

```
1    typically a sheriff's agency?
2         A.  I believe it is the sheriff or the chief of
3    police.
4         Q.  So it would be either one, is that --
5         A.  I believe that, yes.
6         Q.  And in attending the sheriffs' meetings, do you
7    recall any discussions during any of those meetings with
8    regard to the open carry process or issuing open carry
9    licenses?
10        A.  Not so much open carry.  There were
11   conversations about concealed carry because the sheriffs
12   are involved in issuance of CWWs as well, so there were
13   conversations about that.  But open carry, I was at table
14   with them in 2013, so that legislation hadn't quite
15   ripened yet.
16        Q.  And with regard to the chiefs of police for the
17   counties that are under the 200,000 population, do you
18   recall any view or approach to issuing or not issuing
19   open carry licenses subsequent to 2013?
20        A.  No.  I don't remember having any conversations
21   or big focused issues or conversations about that.
22            MS. BELLANTONI:  Can we take a five minute
23   break?  I want to go over my notes.  I think I'm pretty
24   much ready to wrap it up.  Is that okay?
25            THE WITNESS:  Yes.
```

Kim Raney

Page 74

1                    (Whereupon, a recess was taken.)

2        BY MS. BELLANTONI:

3             Q.  We are back on the record, and Mr. Raney, I just

4        want to take a look at your declaration.  I'm going to go

5        to Page 7 and can you see the document all right?

6             A.  Yes.  There's a lot of lines and then 25 percent

7        is covered by the images.

8             Q.  Let me see if I can... hold on.  Let me see if I

9        can resolve that.

10            A.  I can read it if you want to make it a little

11       bit smaller.  I'm not that blind yet.

12            Q.  There it is.  Sorry.  You okay?

13            A.  Yeah.

14            Q.  So if you're looking at Paragraph 25, I just

15       want to talk a little bit about the Dallas shooting that

16       you referenced in the declaration just to clarify it a

17       little bit.

18                 Paragraph 25 addresses a mass shooting that

19       occurred in Dallas, Texas; is that correct?

20            A.  Yes.

21            Q.  And this is information that you learned as a

22       result of an article, or did you have conversations with

23       anyone who was present and/or law enforcement in Dallas

24       at the time?

25            A.  No.  It was from an article.

Kim Raney

Page 75

1      Q.  All right.  And with regard to this mass

2   shooting, is it fair to say that the people in the crowd

3   who were attending whatever gathering was taking place

4   outside were armed with long guns?  They had rifles,

5   AR-15s specifically?

6      A.  In my understanding, they were long guns.

7      Q.  So this is not a case where the crowd was

8   engaged in open carry of a handgun in a holster, correct?

9      A.  That's not my understanding, that they were in

10   possession of long guns or AR-15s or M4s or whatever you

11   have.

12      Q.  And are you aware of whether law enforcement

13   actually shot anybody who was at the gathering?

14      A.  I'm not aware that they shot anybody at the

15   gathering.

16      Q.  So then is it fair to say that when police

17   responded to the mass shooting at this location where

18   numerous people in the crowd were carrying AR-15s, that

19   the police did not arrive and then began shooting the

20   demonstrators, the people who were demonstrating, simply

21   because they were armed; is that fair?

22          MR. WISE:  Object as to form.

23          THE COURT REPORTER:  Was there an answer?

24          THE WITNESS:  That's fair.

25

Kim Raney

Page 76

1    BY MS. BELLANTONI:

2        Q.  Are you aware of whether Texas has legalized

3    open carry of a handgun?

4        A.  I believe they have, yes.

5        Q.  And the quote that's indicated at the bottom of

6    Paragraph 25, quote, "We don't know" -- and this was a

7    quote from the Dallas chief of police; is that correct?

8        A.  That's my understanding, yes.

9        Q.  And his quote is, "We don't know who the good

10   guy is versus the bad guy when everyone starts shooting."

11           Is that what the quote is in your declaration?

12       A.  Yes.

13       Q.  But in fact, it was not the case that everyone,

14   quote, "started shooting."  In other words, the people in

15   the crowd, the people demonstrating, didn't start

16   shooting anyone; is that accurate?

17       A.  Yes, that's accurate.  I believe the shooter was

18   the gunman.

19       Q.  Right.  So there was one gunman who was

20   shooting.  But when the shooting began and thereafter,

21   the people in the crowd who had guns were not shooting

22   anyone; is that accurate to say?

23       A.  Not that I'm aware of, no.

24       Q.  So that's a double negative.  So yes, it is

25   accurate?

Page 77

1        A.  Can you repeat your question?

2        Q.  Sure.

3            MS. BELLANTONI:  Can you read that back, please?

4    (Whereupon, the requested portion of the record was read

5                    back by the Reporter.)

6            THE WITNESS:  That's my understanding, yes.

7    BY MS. BELLANTONI:

8        Q.  In your opinion and based on your experience as

9    a law enforcement officer, if there's an uptick or an

10   increase in crime, should that result in more restrictive

11   measures on individual Constitutional rights?

12       A.  No.

13       Q.  I'm referencing Paragraph 26 here in your

14   declaration, which in the second sentence indicates that

15   after years of declining crime rates, violent crime in

16   California has ticked upward in recent years.

17           It has ticked upward, correct?

18       A.  Yes, as has property crimes.

19       Q.  And I just want to reconcile -- and I'm going to

20   shop sharing the screen here.

21           I just want to reconcile some earlier testimony,

22   and that is with regard to the issuance of the concealed

23   carry permits and it was a hypothetical.

24           You gave a hypothetical about if there was an

25   assistant district attorney whose investigators couldn't

Kim Raney

Page 78

1  protect him or her in relation to whatever case was going

2  on at the time.  That's someone that you would consider

3  giving a concealed carry permit to.

4          Is that accurate depiction of your prior

5  testimony?

6      A.  I believe so.  I might have also indicated if

7  they were doing a high profile or a violent gang crime

8  and there had been threats on their life or again as the

9  district attorney's office, the investigators, couldn't

10  provide protection, then that would be one I would

11  consider.

12      Q.  And can we agree that not every individual is

13  going to have the ability to have personal protection 24

14  hours a day or a personal bodyguard?  Is that a fair

15  statement?

16      A.  Yes.

17      Q.  And you did earlier testify, but correct me if

18  I'm wrong, that everyone has the right to self-defense.

19  You did agree with that statement; is that accurate to

20  say?

21      A.  Yes.

22      Q.  And so then I'm trying to reconcile this with is

23  it your opinion that the right to self-defense only --

24  for everyone, regular people, only exists inside the

25  house or in their home or is their right to defend

Kim Raney

Page 79

1    themselves from violent attack, does that right travel
2    with them wherever they are?
3         A.  I think the right travels with them.
4         Q.  I have no further questions.
5              Is there anything about your testimony that you
6    would need to clarify or change?
7         A.  Not change.  Maybe clarify.
8              I'm not sure if I was clear or was misunderstood
9    on I think I talked about the Donohue study, and I
10   believe that was his terminology was right to carry.  So
11   it wasn't restricted to open carry with his research, it
12   was right to carry states.
13        Q.  Okay.  Thank you.
14             Oh, and I was mistaken.  The last thing:  You
15   referenced a San Mateo County Sheriff's Office
16   publication, quote, "Unloaded Open Carry."  And that
17   was -- I can refer to the declaration if you don't recall
18   that, but if you recall that then I won't.
19        A.  I recall.
20        Q.  Okay.  And so what was the substance of that
21   writing?
22        A.  I believe that was at the time when again law
23   enforcement were getting calls for service when
24   individuals would show up at a business in their
25   communicates openly caring a rifle.

Page 80

1      Q.  So that's the events that we were talking about
2   the Starbucks and other places --
3      A.  -- training bulletin in regards to that.
4      Q.  And do you have copies of the -- do you still
5   have access to that publication or the training
6   bulletins?
7      A.  I believe so.
8      Q.  If you could locate your documents and provide
9   them to Mr. Wise?
10      A.  Okay.
11      Q.  Would you kindly do that, sir?
12      A.  Yes.
13          MS. BELLANTONI:  All right.  I have no further
14   questions.
15          And like we had indicated before, you will
16   receive a copy of the transcript to review and make any
17   corrections or changes.  I will have an opportunity to
18   comment on the changes, but that's it.  Okay?
19          Thank you for your time today.  I appreciate
20   that.
21          THE COURT REPORTER:  Mr. Wise, do you wish to
22   purchase a copy of the transcript?
23          MR. WISE:  Yes.  We would like a copy of the
24   transcript and we'd like to review it.  I think you had
25   mentioned to Mr. Raney earlier, we would like to review

Kim Raney

**Page 81**

1   it and sign it.  Thanks.

2            MS. BELLANTONI:  Thank you, Lynne.

3            THE COURT REPORTER:  You're welcome.

4        (Whereupon, the deposition concluded at 2:09 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kim Raney

Page 82

1

2                    DECLARATION UNDER PENALTY OF PERJURY

3                                  ***

4         I, KIM RANEY, the witness herein, declare under

5    penalty of perjury that I have read the foregoing

6    deposition in its entirety and that the testimony

7    contained therein, as corrected by me, is a true and

8    accurate transcription of my testimony elicited at said

9    time and place.

10

11        Dated this        day of                         ,

12    20    , at                     , California.

13

14

15

16

17                        KIM RANEY

18

19

20

21

22

23

24

25

Kim Raney

Page 83

1    State of California,

2    County of Fresno.

3         I, LYNNE A. HOWE, License No. 13003, a Certified

4    Shorthand Reporter of the State of California, do hereby

5    certify:

6         That the witness in the foregoing deposition named

7    was present at the time and place herein specified;

8         That the said proceeding was taken before me as a

9    Certified Shorthand Reporter at the said time and place

10   and was taken down in shorthand writing by me;

11        That the said proceeding was thereafter, under my

12   direction, transcribed with the use of computer-assisted

13   transcription, and that the foregoing transcript

14   constitutes a full, true, and correct report of the

15   proceedings which then and there took place;

16        That I am a disinterested person to the said action.

17        IN WITNESS WHEREOF, I have hereunto subscribed my

18   hand this 10th day of December 2021.

19

20                                *Lynne A. Howe*

21

22

                          Lynne A. Howe, CSR

23                        License No. 13003

24

25

Kim Raney

```
                                                      Page 84

1                        ERRATA SHEET
                  VERITEXT/NEW YORK REPORTING, LLC
2

     CASE NAME: Baird, Mark And Richard Gallardo v. Bonta, Rob, et al
3    DATE OF DEPOSITION: 11/29/2021
     WITNESSES' NAME: Kim Raney
4
5     PAGE   LINE (S)        CHANGE              REASON
      ____|_____|_____|_____
6
      ____|_____|_____|_____
7
      ____|_____|_____|_____
8
      ____|_____|_____|_____
9
      ____|_____|_____|_____
10
      ____|_____|_____|_____
11
      ____|_____|_____|_____
12
      ____|_____|_____|_____
13
      ____|_____|_____|_____
14
      ____|_____|_____|_____
15
      ____|_____|_____|_____
16
      ____|_____|_____|_____
17
      ____|_____|_____|_____
18
      ____|_____|_____|_____
19
      ____|_____|_____|_____
20
21                                    _____
                                      Kim Raney
22   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS ____ DAY OF _____, 20__.
23
24
     _____              _____
25   (NOTARY PUBLIC)                   MY COMMISSION EXPIRES:
```

**[00617 - ahead]**                                                              Page 1

**0**

**00617**   1:8

**1**

**1**   2:11 16:19,20
63:3
**1-10**   1:10
**10583**   3:5
**10th**   83:18
**11/29/2021**   84:3
**11:30**   48:2
**11:40**   48:3
**12**   47:18
**12:03**   4:9
**13003**   1:25 83:3,23
**15**   19:14,15 29:5
47:16
**15s**   75:5,10,18
**16**   2:12
**17**   2:14
**19**   56:25
**1967**   54:15
**1976**   54:10

**2**

**2**   2:13 3:5 17:8,11
18:14 63:3
**20**   48:4 52:1,6
60:15 82:12 84:22
**200,000**   16:3 71:12
71:17 72:18,24
73:17
**2001**   47:11
**2007**   64:17
**2008**   29:10 47:19
50:7 64:14,17
**2010**   19:25 20:17
22:1 56:25 64:13
64:17
**2011**   19:25 20:17
22:1,6 29:12

**2012**   22:6 25:19
64:2
**2013**   25:19 63:20
64:2 73:14,19
**2014**   29:12,14
**2015**   57:23,23
**2016**   47:11 57:24
71:11
**2020**   13:14
**2021**   1:10 4:9
13:15 83:18
**210-6046**   3:12
**22**   9:17
**24**   78:13
**25**   74:6,14,18 76:6
**250**   15:14
**25307**   83:20
**26**   77:13
**29**   1:10
**29th**   4:8
**2:09**   81:4
**2:19**   1:8

**3**

**330**   72:1
**350**   15:15
**367-0090**   3:6
**39**   19:13 29:4

**4**

**40**   44:21 53:2
**400**   3:5
**45**   22:19 29:10

**5**

**5**   2:5 52:20
**50**   53:1,2 60:1
**50,000**   29:7
**57**   72:7
**58**   72:7

**6**

**60**   53:1
**64**   30:8

**7**

**7**   74:5

**8**

**80**   52:8
**80s**   44:4

**9**

**9**   17:21 18:8
**90**   52:19,22
**911**   27:20 28:5,7,8
63:7
**914**   3:6
**916**   3:12
**94244-2550**   3:11
**944255**   3:11
**95**   52:19

**a**

**abell**   3:6
**abiding**   46:2 65:17
65:17
**ability**   8:12 21:22
39:13 42:21 49:10
59:3,7 65:11
78:13
**able**   14:3 16:5,23
51:11 60:16 67:6
**absolves**   34:14,21
**ac**   1:8
**access**   38:10 42:19
42:20 48:18 80:5
**accurate**   7:2 35:18
35:22 36:9,25
37:1 76:16,17,22
76:25 78:4,19
82:8
**act**   22:8 25:13,15
25:16 54:18

**action**   83:16
**active**   56:25
**actively**   21:9
**activities**   55:7
**activity**   43:1,3,8
43:10,12,15,24
48:14 51:25 52:2
52:7
**acts**   52:2
**actual**   26:18 42:5
63:11
**additional**   12:15
**addresses**   74:18
**addressing**   13:9
59:23
**advance**   41:14
**advantage**   45:7,16
45:21,21,22
**advantageous**
40:14
**affect**   8:12
**affiliation**   11:19
**afternoon**   5:7,8
**agencies**   51:16
55:25 72:17
**agency**   73:1
**ago**   12:10
**agree**   10:12 24:9
24:10 32:10,22,25
33:14 35:11 38:5
38:19 39:11 40:2
40:9,13,21,24 41:5
41:7,13,18,19 42:1
42:14 43:3,15,20
44:14 45:20,25
46:13,20 50:10,16
50:17 53:13 61:15
61:16,19,21 66:1
78:12,19
**ahead**   64:8

akin  69:20
al  9:3 84:2
albeit  64:3
alerted  28:21
allegations  9:18
  11:2
alleged  11:17
allow  54:1 61:2,23
allowed  7:12 30:3
  35:8 62:24
allowing  66:20
allows  36:16
amended  2:11
  15:18,19,22 17:1
amendment  11:15
  12:21 13:3,4,4,16
  13:17,22 19:7,8
  21:9,24 33:14,24
  33:25 35:16,24
  36:4,7,15,16,24
  37:4,14
ammunition  59:20
amounts  58:19
amy  3:4 5:9
analogy  57:11
angeles  20:9,12,20
  22:15,18 23:1
  29:8,12 50:1
  71:15
angels  11:19
announcements
  51:16 59:23
annual  72:3
answer  6:18,24
  7:1,19,21,21 8:8
  34:18 37:23 38:24
  39:10,20 40:8,18
  41:4,17 43:19
  46:19 50:15 61:14
  62:4 75:23

answer's  6:4
answering  6:2,20
anticipate  6:1,3
  49:20 62:25 64:10
anxiety  30:12
  64:24
anybody  68:14
  69:9 75:13,14
anyway  36:1
apologies  51:2
appearances  3:1
appearing  4:10
application  16:5
  36:4 67:21,25
applications  37:3
  67:2,10,15
applied  21:15
  67:20,22
applies  36:7 38:2
apply  36:24 71:8
appointed  69:13
  69:14,15,16,18,25
appoints  69:24
  70:2
appreciate  15:2
  80:19
approach  73:18
appropriate  32:1
  32:20
appropriately
  24:12 61:24
approval  59:1
approve  59:8
approved  60:15
approving  59:2
approximately
  44:11
approximating
  52:4
approximation
  52:5

ar  75:5,10,18
area  9:11 20:20
  39:16,17,22,23
  49:25
areas  29:22 31:8
  38:6,6,16,16,17,19
  38:20 39:3
argue  37:25
argument  52:12
argumentative
  68:25
arguments  52:15
arizona  11:9,14,18
armed  27:24
  65:25 66:2 75:4
  75:21
arms  34:1 35:24
  36:17,19 37:24
  38:3
arose  22:24
arrest  25:11
arrested  25:4
arrests  24:22
  47:14
arrive  75:19
article  13:19,24
  74:22,25
articles  12:18 15:5
aside  14:13
asked  18:18,19
  70:25
asking  5:12 7:25
  8:4,9 21:16 35:21
  37:18 42:8 61:4
assault  30:23
  53:11
assess  41:20 42:2,9
  42:23
assessments  42:16
assigned  18:17

assignments  42:25
assistant  77:25
assisted  83:12
associated  20:1
  43:21
association  20:10
  22:19 29:9,14
  55:20,21 56:24
  59:12,13 72:1,2,6
  72:6,10
associations  57:19
assume  8:9
assumption  24:17
attached  16:21
  17:12
attack  51:12,19
  69:3 79:1
attacked  41:14
  48:12
attacker  48:24
attempt  48:21,23
attempted  53:24
attend  55:22 56:5
attended  59:15
  72:11
attending  73:6
  75:3
attorney  1:9 3:10
  3:10 5:9 7:15,17
  7:20 14:23 16:11
  68:18,23 77:25
attorney's  68:21
  78:9
august  16:12
authored  14:1
authority  72:25
authorized  37:5
automatically
  54:1
available  13:3
  29:19 41:11

Kim Raney

[aware - carry]                                                    Page 3

**aware**  34:7,13,20
38:15 51:15 54:9
54:23 60:1,6,15,19
63:3 66:22 75:12
75:14 76:2,23
**awareness**  64:15

**b**

**back**  6:24 21:16
44:4 45:11,14
47:2,5,12 49:17
52:23 74:3 77:3,5
**bad**  76:10
**baird**  1:5 3:15
5:10,11 84:2
**ballot**  56:25
**banned**  60:3
**barricaded**  32:16
**base**  63:11
**based**  38:25 40:1
54:4 58:9 77:8
**basically**  22:24
23:20
**bay**  20:19
**bear**  34:1 35:24
36:16,19 37:24
38:3
**bearing**  36:24
**becerra**  10:18
12:2
**began**  75:19 76:20
**behalf**  11:21 17:18
**behavior**  41:20
42:18 45:25 46:14
**believe**  12:10 14:9
15:22 16:3,7
19:25 20:17 21:1
21:3,8,21,25 22:4
27:10 36:18 39:25
53:25 59:11 68:6
71:11 73:2,5 76:4
76:17 78:6 79:10

79:22 80:7
**bellantoni**  2:5 3:4
3:4,6 5:6,9 10:2,4
10:7 15:1,4 16:22
17:13 25:22 30:1
33:4,19,22 34:12
34:17 35:14,21
36:5,13 37:18,22
38:8,23 39:9,19
40:7,17 41:3,12,16
42:12 43:6,7,18
44:18 45:11,19
46:7,18,21,25 47:2
47:4 50:14 55:13
55:14 60:5,20
61:13 62:3 64:7
69:1 73:22 74:2
76:1 77:3,7 80:13
81:2
**beneficial**  58:6
**benefit**  31:22 56:4
**benefits**  30:16
31:20,21 58:3,6
**best**  6:6,7 32:13
40:14
**better**  60:23 61:1
61:10,16
**beverly**  9:4,8
10:21
**big**  73:21
**bill**  57:20,23
**bit**  74:11,15,17
**blew**  49:22
**blind**  74:11
**blunt**  52:20
**board**  29:13 72:2
**bodyguard**  78:14
**bonta**  1:9 5:11
84:2
**bottom**  76:5

**box**  3:11
**break**  6:16,19,19
46:21 47:6 53:6
53:11 72:19 73:23
**breaking**  10:3
24:5
**briefed**  24:1,15,20
**briefly**  9:12
**bring**  17:4
**broke**  33:7
**brother's**  49:25
**brought**  59:18
70:16,17
**buena**  11:2
**bulletin**  55:4 80:3
**bulletins**  80:6
**burglaries**  31:13
**burglary**  53:7
**burns**  49:23
**business**  11:11
27:22 31:1 79:24

**c**

**calculated**  52:8
**california**  1:2,10
1:18 3:11 4:11,12
16:1,8,16 18:21
19:14,21 20:4
21:10 22:2,8
23:23 29:13,22
30:8,10 31:13
33:12 34:13,20,23
37:6 38:3,6,12,14
38:16,17,20,21
39:15 44:5 50:8
51:17 53:20,20
54:16 57:6,14,22
58:12,20 61:7,22
64:23 66:19 71:25
72:5,8,24 77:16
82:12 83:1,4

**california's**  54:9
**call**  13:1 20:22
23:6,7 24:2,11
25:3 26:15 27:18
27:19 28:1,3,8
42:5 48:3 63:7
65:3
**called**  20:19 55:20
**calling**  27:20,25
**calls**  23:11,17
25:14,21 26:8
33:2,17 34:10
35:12 37:16 38:7
38:22 39:7 40:5
40:15 41:1,15
43:5,17 44:17
46:3,17 50:13
79:23
**canceled**  12:11
**candles**  49:21
**capacity**  1:9 8:18
**car**  44:25 49:24
**caring**  79:25
**carriage**  10:10
19:10,23
**carried**  10:11
29:20 49:12 57:20
65:24
**carry**  9:19,20,24
9:24 10:9 12:12
12:16,25 13:9,10
13:12,20,21 14:8
14:10,11,11,17,18
14:19 15:8 16:3,6
16:17 18:15,21
19:2 20:2,2,25
21:1,7,11,17,20,22
21:22 22:2,8,9
25:20 26:24 27:2
27:3,6,7,14 28:24
29:17 30:4,19,22

[carry - compressor]                                                     Page 4

31:8,8 33:16 35:9
37:5,5 44:15,22,24
45:1,3,22 48:6,8
50:8 54:10 59:15
59:19,24 60:3,9,12
60:16,16,23,24
61:2,3,7,9,11,18
61:19,23,24 62:8
62:14,24 63:19,21
64:2,22 65:11
66:21,24 67:2,5,6
67:13,16 68:4,9
69:6 70:4,14,19
71:8,10 73:8,8,10
73:11,13,19 75:8
76:3 77:23 78:3
79:10,11,12,16
**carrying** 20:23
23:2 24:24 31:2
31:23 44:8 45:6
62:21 65:13 66:5
66:8,15 75:18
**cars** 31:10,11
**case** 1:8 5:14 9:2,6
9:13,13,19 10:15
10:18,20,22,24
11:1,6,14 12:3,24
17:18 18:18 21:10
21:12 27:10 34:25
48:6 53:17 75:7
76:13 78:1 84:2
**cases** 10:20 41:11
**catalog** 53:25
**caught** 48:25
**cause** 8:3 23:14
42:20 45:17 54:15
68:8
**ccw** 67:4 68:22
**certain** 22:14
28:16 53:22 58:19
63:25

**certified** 4:11 83:3
83:9
**certify** 83:5
**cetera** 15:15
**challenge** 61:24
**chandler** 11:9,14
11:18
**change** 27:14 47:7
54:15 61:22 62:17
62:23 79:6,7 84:5
**changed** 12:12
**changes** 7:9,12
40:1 80:17,18
**changing** 64:20
**chaos** 63:23 64:9
**characterize** 24:13
**charge** 43:25 44:2
67:2
**charged** 24:25
**charges** 47:14
**checked** 24:6
**chief** 2:14 9:15
11:3,7 17:10
18:19 19:15 24:18
29:6 38:9 47:10
47:15 50:22 51:8
51:23 53:5 54:22
55:3 67:1,18 68:7
69:6,12 70:5 71:9
71:19 73:2 76:7
**chiefs** 20:10 22:19
22:20,23,25 23:16
25:5 29:9,10,13
55:21 56:24 59:13
59:14 72:1,2,9
73:16
**children** 49:4
**choose** 40:2,25
**christmas** 47:20
47:22 48:2 49:2
49:12

**chuck** 27:9
**circumstance**
51:10
**circumstances**
32:2 40:13 51:18
52:9 68:17
**cities** 58:12 59:1,2
59:5,6,7,9,9
**citizens** 65:17,17
**city** 9:3,9 11:5,9
11:10,17 29:7
69:19,20,21,24
70:3,7,7,10,10,12
70:15,16,18,24
71:5
**claim** 11:15 68:14
**claims** 15:24 21:13
**clairvoyant** 65:12
**clarification** 14:15
**clarify** 6:20 7:1
27:17 47:7 74:16
79:6,7
**claus** 49:1,3,8
**clear** 6:8 7:2 79:8
**clearer** 8:6
**clearly** 17:14
**closed** 11:18 22:6
**closing** 11:11
**club** 11:10
**cocaine** 44:5,6
**code** 16:16 50:8
53:20
**codified** 16:17
25:12
**coffee** 20:3 23:11
24:3
**columbia** 60:2
**columbian** 44:6
**come** 42:17,22
44:7 46:9 49:3
55:19 67:8 69:9

**coming** 18:24
23:11 42:19 58:2
**command** 9:8 11:1
**commenced** 11:1
**commencing** 4:9
**comment** 7:12
18:19 80:18
**comments** 9:17
**commission** 52:10
52:11 84:25
**commit** 40:3 50:4
50:20 51:5
**committed** 40:22
47:13 50:3,21,23
51:22,24
**communicates**
79:25
**communities**
21:23 27:7 30:12
58:13 62:17 63:15
**community** 29:19
57:16 58:11,15
62:24 66:14
**compared** 39:22
61:2
**compensated**
15:10
**competitive** 70:22
**complaint** 15:17
15:18,19,22 62:10
**complaints** 25:5
28:25
**complete** 62:17
**completed** 67:25
**completely** 22:1
**component** 61:19
62:7,13,16
**compound** 55:12
55:13
**compressor** 49:10

Kim Raney

**[comprised - danger]**

**comprised** 18:11
**computer** 83:12
**conceal** 45:17 49:9
**concealed** 14:18
  44:15,22,25,25
  45:3,6,22 60:17
  65:11,21 66:8
  67:5,6,13,15 68:4
  68:9 69:6 70:4,13
  70:19 73:11 77:22
  78:3
**concept** 18:20
**concern** 30:12
  62:8 63:9,12,22
  64:12
**concerned** 20:14
  64:11,23
**concluded** 81:4
**conclusion** 33:3,18
  34:11 37:17 39:8
  58:5
**conduct** 26:14
  28:12 45:25 46:15
  66:13
**conducted** 12:15
  12:23 19:9 66:19
**conference** 55:22
  55:22,23
**conferences** 59:15
**conflict** 13:4
**conformance**
  21:12
**confrontation**
  24:16 26:16 32:11
**confrontational**
  23:21
**confuse** 8:3
**confusing** 8:1
**congressman**
  57:20

**conjunction** 70:7
**connection** 5:13
  17:18 18:18 19:10
  28:14 70:6
**consequences**
  30:15
**consider** 67:16
  68:22 78:2,11
**consideration**
  42:16
**considered** 28:2
**constitutes** 83:14
**constitution** 33:6
  33:9,12,15,20,21
**constitutional**
  36:2 60:8,11,16
  77:11
**constitutionally**
  33:1
**contact** 20:6 32:3
  42:19 45:18 46:15
**contacted** 24:4
**contained** 82:7
**contemporary**
  12:22
**contentious** 49:6
**contesting** 16:4
**context** 29:2 51:24
  61:5
**conversation**
  22:21
**conversations**
  19:18 29:11 73:11
  73:13,20,21 74:22
**cop** 64:12 65:11
**copies** 80:4
**copy** 7:6 14:3,20
  18:2,2,9 80:16,22
  80:23
**correa** 57:19,20

**correct** 11:25 12:1
  22:3,11,12 27:11
  27:12 37:13 48:15
  50:8 66:5,24,25
  74:19 75:8 76:7
  77:17 78:17 83:14
**corrected** 82:7
**corrections** 7:9
  80:17
**council** 70:3,8,11
**counsel** 14:4
**counties** 16:2,7
  21:15 71:12,21
  72:18,23,23 73:17
**country** 13:6,18
  37:2 55:8,11,25
**county** 19:16
  20:10,12,20 22:15
  23:1 29:9 39:5
  50:1 71:13,15,16
  72:7 79:15 83:2
**county's** 38:14
**courier** 55:7
**course** 5:25 9:22
  10:8 20:13 41:25
  46:8 53:10 54:21
  70:24
**courses** 59:17
**court** 1:1 5:22 7:7
  8:16,22,25 10:2,6
  36:3 46:23 47:1
  75:23 80:21 81:3
**court's** 37:7
**courtroom** 6:14
**covered** 74:7
**covina** 2:14 17:10
  20:14,24 21:18
  22:13 47:10 51:9
**crack** 44:6
**create** 20:5 29:21
  30:10,11 65:2,2,4

**creates** 65:19
**creating** 24:25
  25:2 26:5
**creation** 58:14
**crime** 31:24,24,25
  35:8 38:5,10,14,15
  38:20 39:2 40:4
  40:11,12,21 50:20
  51:5 53:14,17
  68:19 77:10,15,15
  78:7
**crimes** 43:4 52:10
  53:22,25 54:6
  77:18
**criminal** 22:8
  25:12,15,16 41:10
  43:10,12 44:2
  45:7,20 46:1,16
  50:18 51:3 53:4
  65:22
**criminalize** 25:19
**criminalized**
  63:20
**criminals** 40:2,10
  40:11,13,24 44:15
  44:22 50:10
**crisis** 65:2
**crosses** 65:18
**crowd** 75:2,7,18
  76:15,21
**csr** 1:24 83:22
**culture** 43:16
**curiosity** 56:20
**curriculum** 18:9
**cv** 1:8 18:11
**cwws** 73:12

**d**

**dallas** 74:15,19,23
  76:7
**danger** 42:21

Kim Raney

**[dangers - double]** Page 6

dangers 42:10
date 84:3
dated 82:11
daughters 49:7
day 4:8 42:18
78:14 82:11 83:18
84:22
de 31:15 32:9
deadly 31:19,25
53:22 54:1,2,7
deal 60:23 61:10
61:22 62:20 68:16
dealing 14:16
dealt 13:14 15:7
30:21 44:5 63:20
64:3
death 54:3
december 83:18
decision 34:25
37:7
decisions 19:18
31:17,18
declaration 2:13
16:11,13 17:9,17
17:19,23 18:13,23
27:9 47:23 56:10
61:5 74:4,16
76:11 77:14 79:17
82:2
declare 82:4
declining 77:15
decriminalization
57:21
decriminalize
58:18,19
defeat 57:7
defeated 57:1,3
defend 39:14
48:22,23 51:11
69:3 78:25

defendant 10:14
defendants 1:12
3:9 5:14 10:25
11:21 15:11
defended 51:14
defense 32:23
33:16 35:9 39:4
39:16,22,25 53:22
53:23 54:6,8 68:6
68:8,10,23,24 69:5
69:10 78:18,23
definition 10:12
50:17
degree 49:22
demographic 40:1
demonstrating
75:20 76:15
demonstrations
13:5,16,23
demonstrators
75:20
densely 39:1
deny 59:8
department 9:8,10
11:2,7,18 26:7
27:21 44:3 67:9
67:11 72:5
departments
71:24
depending 39:5,14
42:3
depiction 78:4
deposed 5:18 12:2
deposition 1:17
2:11 4:8 5:21,25
6:13,23 7:5 9:23
10:8 12:5,6,9,11
12:13,16,20,24
15:7,15 16:10,14
16:15 17:1,4 81:4
82:6 83:6 84:3

depositions 6:5
deputy 3:10
describe 16:9 21:6
27:17 43:13
described 22:1
54:2
describes 35:1
describing 21:17
32:18
designed 49:8
desk 67:21
detective 43:25
determine 41:20
detriments 58:7
device 49:18
dialog 23:19
dialogue 23:18
dichotomy 13:15
differ 46:1
different 9:17 20:3
37:3 39:22 46:14
47:17,21 55:25
56:14 64:13 70:15
71:2
differentiates
36:17
difficulties 10:1
diminish 39:4,12
direction 83:12
directors 72:3
disagree 26:10
54:13
disagreeable 38:1
disagreed 71:6,7
disagreement
52:12
disarmed 31:4
discretion 32:4
discrimination
9:16 11:3,7,17

discuss 27:13 37:8
70:10
discussed 19:5
72:13
discussion 20:9
discussions 26:2,4
70:9 73:7
disinterested
83:16
dispatch 28:6
dispatched 24:11
dispensaries 59:2
dispensary 59:4
disregard 50:12
distribute 49:4
distributing 49:19
distribution 59:9
district 1:1,2 60:2
68:18,21,22 77:25
78:9
disturbance 24:25
25:1
division 44:1
divorce 49:6
document 13:13
15:14 16:23,25
17:3,8,14 18:4,14
20:6 74:5
documents 18:22
18:23 80:8
doing 7:11 24:5
50:11 78:7
doj.ca.gov 3:12
domestic 52:2,8
53:5,9
domestics 52:14
donohue 13:12
14:7,16 19:5 79:9
door 49:13,14
double 76:24

Kim Raney

**downside** 58:4
**dozen** 20:11
**draft** 18:2,6
**drafting** 58:14
**drawn** 28:19
**draws** 28:15
**dress** 49:3
**dressed** 49:1
**drew** 28:11
**drove** 49:25
**drug** 43:3,11 55:7
**drugs** 43:9
**duly** 5:2
**duties** 42:1
**duty** 34:7 35:5

**e**

**e** 5:17
**earlier** 7:1 19:5
  35:19 36:11 49:8
  64:5 77:21 78:17
  80:25
**eastern** 1:2
**edged** 52:21
**effort** 25:9
**efforts** 6:6,7
**eight** 50:2
**either** 31:4 42:24
  43:11 44:24 45:21
  48:18 49:21 51:17
  52:20 53:9,14
  55:4,18 56:1 59:8
  63:3 68:20 73:4
**elected** 69:13,22
**elicited** 82:8
**email** 55:4
**emotional** 31:16
  46:1,15
**employment** 55:3
**encounter** 44:12
**ended** 56:11

**enforcement** 8:19
  8:20 19:1,14 20:6
  20:22 23:6,13,14
  23:22 24:8 25:10
  25:11,13 26:23
  27:1,5,18,25 28:14
  28:24 29:4 30:11
  33:5,8 34:8,14,21
  38:12 41:19,25
  42:1,15 44:20
  45:7,21 46:8 51:8
  51:9,16 53:21
  54:21,24 55:10
  57:18 58:11 59:22
  61:6,9,21 62:5,6,7
  62:16 63:8,24
  64:2,25 65:1,3
  71:20 72:17,21
  74:23 75:12 77:9
  79:23
**enforcements** 42:8
**engage** 32:2
**engaged** 56:9 75:8
**ensure** 7:2 24:6
  58:11,16
**ensured** 59:7
**entering** 42:11
**enterprise** 43:12
**entire** 44:2 47:16
  51:9
**entirety** 82:6
**entitled** 5:10 16:25
  17:9
**environment** 9:16
  30:19,20 31:12
  32:18 42:10 55:23
  62:17 63:17
**epidemic** 44:6
**equation** 51:7
**errata** 84:1

**escalate** 32:9
**escalation** 31:15
**especially** 29:21
  63:16
**esquire** 3:4
**established** 50:18
**estimate** 63:9
**et** 9:3 15:15 84:2
**eve** 47:20,22 48:3
  49:2
**event** 28:20 47:20
  47:22 48:1 49:4
  52:12 56:3
**events** 22:16 25:6
  25:17,18 30:5
  42:3 56:5 63:11
  63:25 80:1
**eventually** 57:12
  57:14,23 58:10
**evolved** 56:17
**exact** 20:18
**exactly** 29:3
**examination** 2:5
  5:5
**examined** 5:2
**example** 54:4
**exchange** 24:7
  72:14
**exclusively** 53:8
**executed** 49:16
**executive** 29:13
  69:21,22,23 71:20
  72:17,20
**exhibit** 2:11,13
  16:19,20 17:8,11
  18:8,14
**exhibits** 2:10
**exists** 78:24
**expect** 31:9
**experience** 19:19
  19:22,24 22:23

29:5,20 30:7,8
  38:25 42:9 43:6,8
  43:19,23 44:7,19
  44:20,21,24 45:5
  46:9 51:8,9 52:17
  53:5,13,21 54:4,22
  61:18 64:1 77:8
**expert** 2:12,13
  5:13 8:21,24 9:9
  10:14,17,22 11:21
  11:24 15:11 16:13
  17:1,9 18:13
  62:10,11,12
**expertise** 9:5 29:3
  29:17,18 48:5
**expires** 84:25
**explained** 24:4
**exploded** 49:22
**exposed** 20:5
  22:10 42:11
**extensive** 19:19
**extent** 36:8 71:1
**extenuating** 68:16
**eyesight** 27:24

**f**

**face** 49:15
**fact** 76:13
**factors** 42:15,17
  42:22
**failing** 34:14,22
**failure** 11:3
**fair** 11:20 66:5,6
  72:16 75:2,16,21
  75:24 78:14
**fall** 52:8
**familiar** 5:20 26:1
  54:19 60:8 63:15
  63:16
**family** 34:6 49:2,5
  49:16 53:9

Kim Raney

**[far - handguns]**                                                    Page 8

far  19:12 20:13 25:3 31:20 36:3 41:23 70:25 71:10
fbi  55:19
federal  58:19
feel  6:21 56:3 66:15
female  45:1,2
fence  56:11,21
filed  9:7 11:10 15:17
find  18:9 56:21
finished  6:3
firearm  28:19 32:2 34:4,5 44:15 45:22 48:22 50:8 51:14 52:22 53:3 62:21 64:22 66:11
firearms  13:22 29:19 33:16 34:3 38:3 44:22 52:18 52:19 62:12
fireplace  49:21
firm  3:4
first  5:2 6:18 11:15 13:4,15,22 18:6 19:7 31:3,4 70:16,18
five  46:23 47:2 60:1 71:18 72:11 73:22
flamethrowing  49:18
flanagan  10:18 12:2,24 15:7 16:15
flaw  49:20
fled  49:24,24
flee  42:21
flippant  63:14

focus  58:16
focused  62:12 73:21
followed  67:25
following  4:13
follows  5:3
force  31:19 52:20 53:22 54:1,2,7 55:6
foregoing  82:5 83:6,13
form  7:16,25 18:5 75:22
formal  55:16
formation  26:2
former  2:13 17:10 48:13 53:9
forward  5:21 15:2
foundation  60:4 60:18
four  12:19 49:9 70:15
free  6:21
fresno  83:2
front  49:12
fuel  49:11,19
full  5:15 83:14
further  79:4 80:13

**g**

gallardo  1:5 5:12 84:2
gang  42:25 43:3,8 43:15,22,24 44:1,3 44:8,14 45:1,2 46:16 48:14 51:24 52:1,6 68:19 78:7
gap  22:5
gathering  75:3,13 75:15
gatherings  22:14

gauge  25:10,13,13
geared  14:17 43:15
general  1:9 3:10 3:10
general's  16:12
generally  9:12 38:15 40:2 41:25 46:20 52:15,23 58:24 72:23
generate  25:3 26:15 64:25
generated  27:19
getting  55:4 79:23
gifts  49:4
girl  49:14
give  6:25 32:4
given  59:17
giving  30:2 78:3
global  62:7,14,15 62:15
go  30:19 64:8 70:21 73:23 74:4
goal  57:13
going  6:4 8:8 14:14 16:18 17:16 18:8 20:20 21:4 22:22 23:4,22 25:8,11 28:1 30:5 31:19,23 36:3 40:3 46:22 47:12 50:11 51:7 57:11 57:12,13,15 58:8 58:10 62:18,18,19 62:23,25 63:2,7 65:1,2,3,6,14 68:20 72:22 74:4 77:19 78:1,13
good  5:7,8 6:9 68:8 76:9

governor  57:9
ground  5:20
group  20:19 23:20 45:1,3
guess  11:7 28:2 45:18 52:1 56:20 58:3 60:14 61:4 67:9
guessing  53:1
gun  27:18,19,21 28:3,8,25 30:23 31:6,6,8,9 36:18 36:21,22 50:6 59:21 65:3,13
gunman  76:18,19
guns  14:12,14 20:5 21:18 22:16 31:10 75:4,6,10 76:21
guy  76:10,10

**h**

haggard  27:9,13
half  10:3
halfway  6:1
hand  83:18
handful  26:8 44:13 53:12
handgun  10:10 15:8 16:3 21:11 22:2,9 25:20 35:17 36:7,17,25 44:8 46:11,14 48:18 50:24 51:1 51:4,12,19 63:5 65:24 66:9,16 75:8 76:3
handguns  14:11 14:12,14 16:6 19:10,23 20:25 21:2,23 22:17 49:9 59:24

Kim Raney

**handle**  28:25
**handled**  26:17
**happen**  5:25 8:1,4
  30:3,5 62:25
  63:10 64:18
**happened**  13:6
  23:16 24:11 51:21
  54:15
**happening**  31:25
  55:6,10
**harm**  50:10,11
**heads**  25:7
**hear**  10:4
**heard**  54:18 60:10
**held**  4:13
**hell's**  11:19
**hereto**  16:21 17:12
**hereunto**  83:17
**high**  68:19 78:7
**higher**  38:5,20
  39:2 69:11
**hills**  9:4,8 10:21
**history**  54:9
**hockey**  57:12
**hold**  74:8
**holster**  44:9 66:16
  75:8
**holstered**  10:10
**holsters**  30:25
**home**  34:4,5 35:17
  36:8,22,25 37:11
  37:15,19 48:3,17
  52:24,24 53:2,2,4
  53:7,14,18,18
  78:25
**homeowners**
  48:10
**homicide**  51:4
  52:13,18
**homicides**  50:21
  51:22,24 53:10

**horse**  56:15
**hose**  49:10
**hostile**  9:16
**hour**  4:9 15:14,15
  50:1
**hours**  78:14
**house**  49:3,16,18
  49:21,25 78:25
**howe**  1:24 4:11
  83:3,22
**hypocrisy**  57:4
**hypothetical**
  77:23,24
**hypothetically**
  68:18

**i**

**idea**  66:4,10
**identification**
  16:21 17:12
**illegal**  22:4,9
**images**  74:7
**immediate**  31:23
  54:3
**immediately**  49:15
**implemented**
  61:17
**important**  5:23
**inability**  16:1
**inappropriate**
  9:16
**incident**  24:20
  32:6,7 41:21 48:2
  48:7,7
**incidents**  28:2
  53:3
**include**  71:23
**included**  44:1,3
**including**  21:10
  29:14 60:2
**inconvenience**
  26:7

**inconvenient**  26:9
**increase**  77:10
**increased**  63:1
**increasing**  29:5
**index**  2:1,10
**indicate**  70:18
**indicated**  76:5
  78:6 80:15
**indicates**  77:14
**individual**  32:22
  34:9,15,23 35:7
  41:24 46:9 69:2
  77:11 78:12
**individuals**  20:24
  23:2,12 26:4
  41:20 48:10,17
  50:23 66:20 79:24
**information**  12:21
  13:2 14:6 18:24
  19:5 22:24 24:7
  25:8,12 55:17,18
  72:15 74:21
**injury**  42:20 54:3
**inquired**  67:24
**inside**  49:16 52:24
  53:1,4 78:24
**instance**  55:5
**instances**  51:20
**instructs**  7:21
**intended**  23:13
**intent**  23:15 45:15
  50:11
**intention**  23:8
**international**
  55:20 59:11,13
**interpretation**
  21:24 36:4,20
  37:12
**interpretations**
  37:3

**interview**  70:23,24
**interviewed**  71:3
**intoxication**  31:17
  32:6
**intuition**  42:9
**investigated**  43:9
**investigations**
  44:3
**investigator's**
  68:21
**investigators**
  77:25 78:9
**invited**  72:10
**involve**  22:16
**involved**  20:8
  21:18 25:24 26:2
  26:5,21,21 29:15
  43:9 51:10 56:18
  59:1 73:12
**involving**  10:21
  42:25
**issuance**  70:13
  73:12 77:22
**issue**  9:12 12:16
  32:8 36:2 48:6,8
  58:19 59:18,19,20
  62:8,14 64:15
  65:9,10 67:6,13
  68:8 69:6
**issued**  66:24
**issues**  12:21 13:3,5
  13:17 19:7,8,10
  22:22 29:15 30:21
  54:24 55:10 59:24
  60:24 61:2,10
  72:13,14 73:21
**issuing**  67:2 68:4
  70:19 73:8,18,18

Kim Raney

**[james - long]**                                                          Page 10

**j**

**james** 5:17
**january** 13:14
**job** 33:20 71:3
**john** 13:12
**judge** 68:23
**june** 13:15
**jurisdiction** 19:2
  20:8 22:22 23:19
  23:25 27:2,6
  28:24 30:3 38:13
  59:4 60:23 61:25
  71:14
**jurisdictions**
  13:10 19:19 20:11
  22:24 26:24 51:17
  54:24 60:3 61:9
  61:17 72:25

**k**

**kansas** 27:15
**keep** 33:15 34:4
**kidnapping** 53:23
**kids** 62:19 63:7
**killed** 47:20
**kim** 1:17 2:4,12,14
  5:1 17:2,10 82:4
  82:17 84:3,21
**kimber** 5:17
**kind** 5:20 13:15
**kindly** 80:11
**kjm** 1:8
**knew** 58:1,8,8
**knocked** 49:13
**know** 6:17 7:1,11
  8:5 10:25 14:10
  22:18 23:8,10,12
  23:15,16,19 24:11
  25:2,23,24 26:9,18
  26:21,22 28:5,10
  28:12 29:23 30:4

31:14,15,16 32:1,5
32:17,19 33:20
34:24,24,25 35:24
37:20 39:11 40:9
45:15,16 47:12
48:11,17,20 50:4
52:4,7 54:11,17
55:6 56:11 58:25
59:25 61:15 62:20
65:13,14,15,20,25
66:1,6,8,18 71:2,4
76:6,9
**knowledge** 14:9
  23:23 38:11 41:14
  54:14 64:1

**l**

**l** 3:4
**la** 71:16
**lack** 16:4
**lacks** 60:4,18
**language** 35:25
**laquinta** 1:18 4:10
**large** 49:5
**law** 3:4 8:18,20
  19:1,13 20:6,21
  22:5 23:6,13,14,22
  23:23 24:8 25:10
  25:10,13,18,25
  26:23 27:1,5,18,25
  28:14,24 29:4
  30:11 33:5,8 34:7
  34:8,14,21,25
  38:12 41:19,25
  42:1,8,15 44:20
  45:7,21 46:2,8
  48:13 49:7 50:12
  51:8,9,16 53:21
  54:15,21,24 55:10
  57:18 58:11 59:22
  61:6,9,21,23 62:5
  62:6,6,16 63:8,24

64:1,25 65:1,2,17
65:17 71:20 72:17
72:20 74:23 75:12
77:9 79:22
**law.com** 3:6
**lawful** 26:24 30:4
  46:10,10,13 50:23
  51:1,4 53:21 64:3
**laws** 18:20 21:13
  24:5 25:4 27:14
  50:18
**lawsuit** 9:7 11:10
**lead** 31:10
**leadership** 9:10
**league** 58:12
**learn** 51:10 55:9
**learned** 74:21
**leave** 59:4
**led** 52:12 58:5
**left** 24:8,8 67:10
  70:23
**legal** 22:1 30:13
  33:2,17 34:10
  37:16 39:7 54:10
  61:11
**legalization** 56:13
  56:16,17 57:1,21
**legalize** 57:6 58:18
**legalized** 61:7
  62:25 63:3,4
  64:22 76:2
**legalizing** 56:22
**legislation** 22:6
  25:24 26:1,3,5
  29:16 57:15 58:1
  58:10,14 73:14
**legislative** 72:13
**legislature** 57:5,6
  57:15 58:9 66:23
**lengthy** 8:2

**level** 19:16,16,17
  32:6 41:21 64:24
  68:20
**levels** 31:17 42:2
**license** 1:25 59:8
  60:17 83:3,23
**licenses** 70:20 73:9
  73:19
**licensing** 11:16
  72:25
**lieutenant** 44:2
**life** 63:15 65:10
  78:8
**likelihood** 31:3
  39:2
**likewise** 6:3
**limited** 37:10,15
  37:19 71:11
**line** 65:18 84:5
**lines** 74:6
**link** 14:21
**lit** 49:21
**litigation** 11:22,25
  29:2
**little** 8:1,6 46:22
  47:12 49:14 74:10
  74:15,17
**lived** 63:14
**living** 29:19
**llc** 84:1
**loaded** 24:6 25:20
  50:8
**local** 27:20
**locate** 80:8
**located** 71:14
**location** 24:3
  39:14 42:18 75:17
**lock** 31:6
**long** 14:12,14 20:5
  21:18 22:16 36:18
  58:23 75:4,6,10

**[longer - ny]**                                                        Page 11

| | | | |
|---|---|---|---|
| **longer** 67:9,9 | 58:20 59:3,8 | **mentioned** 16:7 | **murder** 47:14,19 |
| **look** 74:4 | **mark** 1:5 3:15 | 19:13 22:14 47:22 | 53:24 |
| **looking** 18:5 74:14 | 5:11 84:2 | 63:22 80:25 | **murders** 47:13 |
| **looks** 21:12 | **marked** 16:20 | **messy** 72:22 | **myriad** 42:17 61:5 |
| **loophole** 22:5 | 17:8,11 | **militia** 35:25 | **n** |
| **los** 20:9,12,20 | **markedly** 46:1 | **million** 71:18 | **n** 5:17 |
| 22:15,18 23:1 | **mass** 47:19 74:18 | **mind** 41:10 46:23 | **name** 5:9,15,16 |
| 29:8,12 50:1 | 75:1,17 | 65:14 70:13 | 10:25 69:17 84:2 |
| 71:15 | **mateo** 79:15 | **mine** 70:9 | 84:3 |
| **lot** 12:18,20 30:14 | **matter** 5:10 12:6 | **minute** 73:22 | **named** 83:6 |
| 32:4,9 37:4 41:10 | 12:17 15:18 16:15 | **minutes** 46:24 | **narcotics** 44:4 |
| 54:11 63:24 64:21 | 18:15 53:4 | 48:4 | **nationally** 55:18 |
| 74:6 | **matthew** 3:10 | **missed** 10:3 53:16 | **nature** 11:14 42:3 |
| **lou** 57:19,20 | **matthew.wise** | **misstates** 35:19 | **necessarily** 13:1 |
| **lynne** 1:24 4:11 | 3:12 | 36:11 64:5 | 28:15 |
| 46:22 81:2 83:3 | **maturity** 31:16 | **mistaken** 79:14 | **necessary** 34:5 |
| 83:22 | 32:6 | **misunderstood** | **need** 6:16,19 46:21 |
| **m** | **mayor** 69:20 | 79:8 | 79:6 |
| **m4s** 75:10 | **mean** 10:10 21:6 | **mix** 49:11 | **needing** 60:17 |
| **maintain** 36:22 | 28:17 32:17 34:2 | **moment** 62:22 | **negative** 76:24 |
| 38:4 | 37:25 39:12 50:17 | **monday** 4:8 | **neighbor** 49:2 |
| **maintaining** 36:24 | 55:2 62:15 66:23 | **month** 20:15 72:4 | **net** 57:13 |
| **major** 25:5 | 67:22 | **monthly** 22:20 | **never** 68:15 70:17 |
| **majority** 19:17 | **means** 32:16 34:3 | **months** 49:8 | 71:6,7 |
| 29:10,15 43:11 | 52:18 60:16 | **moreno** 9:3 | **new** 84:1 |
| 51:23 53:9 59:5 | **meant** 8:2 | **morning** 50:2 | **newspaper** 12:18 |
| 65:16 | **measures** 77:11 | **motivate** 25:18 | **nine** 47:19 49:16 |
| **making** 11:2 31:17 | **mechanism** 35:1,4 | **motivation** 26:22 | **nonconfrontatio...** |
| 42:16 | **medical** 56:8,12 | **motive** 23:9 | 24:14 |
| **man** 27:18,19,21 | 56:15,16 57:2 | **motorcycle** 11:10 | **northern** 49:25 |
| 28:2,8,25 | **meet** 57:8 72:8 | **mouth** 50:6 | **notary** 84:25 |
| **management** 9:10 | **meeting** 22:20,21 | **movement** 20:2,19 | **notes** 73:23 |
| **manager** 69:19,24 | 25:6,9 | 21:7,17,20 23:3 | **notice** 2:11 4:7 |
| 70:7,10,12,17,18 | **meetings** 71:20 | **movie** 65:23 66:4 | 17:1,4 |
| 70:24 71:5 | 72:3,11,12 73:6,7 | **moving** 5:21 | **november** 1:10 |
| **managers** 70:15 | **member** 27:19 | **mulford** 54:18 | 4:8 |
| **manner** 8:14 40:3 | 44:8 45:1,2 46:16 | **multiple** 30:18 | **number** 47:16 |
| 50:4 | 53:9 | **multitude** 30:21 | 65:9,10 |
| **marijuana** 56:8,13 | **members** 9:7 11:1 | **municipal** 18:19 | **numerous** 75:18 |
| 56:14,15,16,17,22 | 43:22 44:14 49:16 | 19:16 22:19 29:4 | **ny** 3:5 |
| 57:2,2,7,15,22 | | 72:1 | |

Kim Raney

**[o'clock - performing]**                                   Page 12

**o**

o'clock  50:2
o0o   1:3,15,20 2:20
   4:5
object  75:22
objection   7:16,17
   7:18 25:21 29:25
   33:2,17 34:10,16
   35:10,12,19 36:11
   37:16,21 38:7,22
   39:7,18 40:5,15
   41:1,8,15 42:6
   43:5,17 44:17
   46:3,17 50:13
   55:12 60:4,18
   61:12 62:1 64:5
   68:25
observation  27:23
obviously  27:23
occasion  51:10
   62:6
occasional  53:10
occasions  44:11
occurred  29:11
   52:24 53:12 74:19
occurrences  20:7
   64:18
office  3:10 16:12
   68:22 78:9 79:15
officer  8:19,20
   19:2 28:11,15,19
   30:9 33:5,8 40:22
   64:2 77:9
officers  23:23
   28:12,13 34:22
   42:2,15 60:22,25
   61:2,6,9,21
offices  71:23
official  1:9
oh  79:14

okay  6:22 7:4 8:6
   8:7,11 18:1 36:23
   62:9 64:10 73:24
   74:12 79:13,20
   80:10,18
once  6:1 9:1 15:19
one's  39:4,14
ones  11:12
ontario  11:5
open  6:17 9:19,20
   9:24,24,25 10:9,10
   12:12,16,25 13:9,9
   13:12,20,21 14:7
   14:11,11,17,19
   15:7 16:17 18:15
   18:20 19:2,10,23
   20:1,2,25 21:1,7
   21:17,20 22:2,10
   25:19 26:24 27:2
   27:3,6,6,14 28:24
   29:17 30:4,19,22
   37:5 45:23 48:6,8
   54:10 59:15,19,24
   60:3,17,23,24 61:1
   61:3,7,9,11,17,18
   61:23,24 62:8,14
   62:24 63:19,21
   64:2 65:24 66:21
   66:24 71:8,10
   73:8,8,10,13,19
   75:8 76:3 79:11
   79:16
opened  49:14
openly  16:3,6 20:5
   20:23 21:11,22
   22:8 23:2 29:20
   31:2,23 44:8
   62:20 64:22 65:13
   65:24 79:25
opinion  12:12
   18:20,24 26:14,20

   29:21 30:2,10
   32:14 39:6 60:22
   61:8 68:7 69:2
   77:8 78:23
opinions  18:15
opponent  56:22,23
   56:24 58:4 68:4
opportunity  7:8
   12:8 28:23 40:11
   40:12 55:9 64:21
   80:17
opposed  52:18,24
   66:20
opted  59:10
option  32:1,11,12
   32:13,13,15,19,20
   32:21
organization
   13:13
organized  22:25
   25:9
outline  57:21
outside  36:25
   40:22 52:24 53:2
   53:18 75:4
outweigh  30:16
   31:20 58:6
overhill  3:5
override  59:5
ownership  36:21
oxygen  49:11
oxygenated  49:19

**p**

p.m.  4:9 81:4
p.o.  3:11
page  2:4 8:10
   17:21 18:8 74:5
   84:5
pages  18:11
paid  69:22,23

paragraph  74:14
   74:18 76:6 77:13
parameters  68:15
paraphrase  25:8
park  11:2 27:23
   66:4
parks  62:19
part  22:6 38:11
   50:1 62:13 66:1
particular  34:9
   48:7,7 54:23
particulars  54:12
parties  24:8
pass  57:8,15 58:8
   58:10
passing  25:18
patrolling  42:4
patrolman  42:24
peace  24:25
penal  16:16 50:8
   53:20
penalty  6:12 82:2
   82:5
people  19:25 23:5
   24:24 31:9,14
   34:1 39:1 47:19
   58:13 62:18 63:2
   63:23 64:21,24
   65:16 66:14,15
   67:22,24 72:18,24
   75:2,18,20 76:14
   76:15,21 78:24
perceive  32:7
percent  52:1,6,8
   52:19,20,22 53:1,2
   74:6
percentage  52:17
   52:23
perception  32:8
performing  42:1

period 19:25
20:13,15,16,18
21:25 22:14 47:9
periodical 14:16
14:20
periodicals 12:19
periods 59:21
perjury 6:12 82:2
82:5
permit 16:1 21:14
67:16 68:9 69:6
70:4 71:8,10 78:3
permits 66:24
67:3,4,6,13 68:4
70:14 77:23
permitting 59:1
perpetrator 51:3
person 10:11 24:2
26:21 27:24 30:22
36:16 42:19 44:16
44:23,25 45:23
46:2,13 48:11
65:21 66:16 70:2
71:3 83:16
person's 65:25
69:17
personal 19:22,24
78:13,14
personally 56:23
persons 26:21
pertaining 14:14
philosophy 70:4
71:1,2,5
phone 48:3
phrase 9:23 10:9
21:6
physical 32:17
piece 62:14
place 28:16 29:24
30:6 40:3 53:14
53:17 55:7 58:17

58:22 75:3 82:9
83:7,9,15
places 20:3 31:7
80:2
plaintiff 3:3
plaintiff's 17:1
plaintiffs 1:7 2:11
5:10,11 11:25
15:23,25 16:20
17:11
plan 49:20
planners 56:3
planning 49:8
playground 63:7
playing 57:11
please 5:16 7:1 8:4
45:12 77:3
pllc 3:4
plotting 65:22
point 19:12 22:10
47:7 57:8 67:8
police 2:14 9:8,10
9:15 11:2,3,6,6,7
11:18 17:10 18:20
19:15 20:10 22:19
22:20 24:4,18
25:6 26:7,16,16
27:20 28:10 29:6
29:9,10,13 30:8
35:5 38:9 40:22
42:2 46:15 47:10
47:15 50:22 51:23
53:5 54:23 55:3
55:21 56:23 59:13
59:14 60:22,25
61:2 67:1 68:7
69:7,12 70:5 71:9
71:19,24,25 72:1,9
73:3,16 75:16,19
76:7

policies 9:20 26:23
27:2 72:13
policy 19:17,20
68:2 70:5
political 72:14
poll 66:14
polls 66:18
popped 13:17
populated 39:1,3
population 21:8
39:5 71:12,16
72:24 73:17
populations 16:2
72:18
porch 49:12,17
portion 45:13 77:4
posed 61:6
position 69:12,13
69:13
possessing 36:7
62:21
possession 20:5
21:18 46:10,14
50:24 51:1,4
75:10
possibility 31:3
66:7
possibly 30:3
54:22
potential 63:1
practice 22:25
30:13,14
preference 70:19
preparation 12:6
prepare 17:23
prepared 7:7 16:9
16:11 17:24,25
18:1 49:10
preplan 40:10
presence 13:22
31:25 40:22

present 3:15 49:12
56:7 74:23 83:7
presentations
55:24
presenter 56:6
president 29:8,14
72:9
pretty 24:9 73:23
prevalent 64:16
prevent 54:3
printing 66:9
prior 47:6 54:9
64:2 78:4
probable 45:17
probably 48:4
problem 65:7,8,8
65:19
problematic 57:16
problems 61:6
procedure 28:16
28:17
procedures 27:3
proceeding 83:8
83:11
proceedings 4:13
83:15
process 16:4 21:14
40:20 57:22 59:2
67:25 70:21,22
71:11 73:8
processing 65:15
profession 56:3
professor 13:11
profile 68:19 78:7
programs 55:24
promote 11:4
properly 61:22
property 77:18
proponent 56:12
56:21

Case 2:19-cv-00617-KJM-AC   Document 73-2   Filed 10/11/22   Page 99 of 106
Kim Raney
[proposition - remember]                                                    Page 14

**proposition** 56:25
**prosecuting** 68:19
**protect** 34:5,8,8
  34:15,22 35:6,7
  78:1
**protected** 33:1
**protection** 34:4,21
  68:21 78:10,13
**protects** 33:15
  35:17
**protests** 19:8
**provide** 14:3,22
  18:1 33:25 45:6
  45:16,20 54:6,8
  58:14 78:10 80:8
**provided** 7:6
  66:23
**provides** 34:21
**providing** 29:6
**public** 12:20 13:5
  13:16 19:9,11,17
  19:20,23 23:2
  26:15 27:7,15,20
  29:6,11,11,16,20
  31:7 35:8 37:5
  46:10 52:25 53:15
  53:18 57:17 59:23
  60:24 63:17 68:2
  84:25
**publication** 19:6,6
  79:16 80:5
**publications** 15:5
  51:15 56:10
**publicity** 64:14
**published** 13:24
  14:7
**pulled** 50:6
**purchase** 80:22
**purpose** 26:14,19
  45:5

**purposes** 16:21
  17:12
**pursuant** 4:7
  21:23
**put** 13:13 31:6,9
  49:13 50:6 55:25
  58:21
**putting** 22:13

**q**

**quality** 30:25 65:9
**quarterly** 72:3,11
**question** 6:1,2,5
  6:18,18,21 7:16,20
  7:21,24,25 8:5,8
  10:3 34:19 39:21
  41:23 42:7 45:9
  46:6 50:25 55:15
  60:25 72:20 77:1
**questions** 5:12 8:2
  8:14 9:10,11
  70:25 79:4 80:14
**quite** 19:19 20:18
  73:14
**quote** 76:5,6,7,9
  76:11,14 79:16

**r**

**r** 3:10 5:17
**racing** 49:11,19
**raised** 59:16
**random** 52:2,9
  53:6
**raney** 1:17 2:4,12
  2:14 5:1,7,17 10:8
  17:2,3,10,14 33:23
  35:15 47:5 74:3
  80:25 82:4,17
  84:3,21
**rape** 53:7,23
**raped** 54:5

**rapist** 54:5
**rare** 64:18,19
**rash** 31:10 53:11
**rate** 38:20
**rates** 38:5,15 39:2
  77:15
**reached** 27:13
  67:21 70:6
**reaction** 23:6 46:1
  46:15 63:17 64:10
**reactions** 63:25
**read** 12:18 13:8
  14:6 15:17,21
  27:9 45:11,13
  51:20 54:11 74:10
  77:3,4 82:5
**reading** 13:2
  51:15 56:9
**ready** 73:24
**really** 32:7 57:16
**reason** 54:17 68:8
  84:5
**reasoning** 40:20
**recall** 13:24 15:6
  48:21 50:22 51:6
  52:7,16 58:24
  59:19,22 73:7,18
  79:17,18,19
**receive** 80:16
**received** 61:16
  68:19
**recess** 47:3 74:1
**recognize** 17:3,17
**recollection** 59:16
  59:17
**reconcile** 77:19,21
  78:22
**record** 6:8 7:3,18
  8:3 14:16 16:25
  17:9 45:13 47:5
  71:13 74:3 77:4

**reduces** 39:13
**reduction** 39:13
**refer** 79:17
**referenced** 14:13
  18:22 19:7 74:16
  79:15
**referencing** 77:13
**referring** 9:24
  21:19
**reflect** 18:14
**refusing** 34:14
**regard** 18:15
  19:20 21:4 48:5
  70:13 73:8,16
  75:1 77:22
**regarding** 13:19
  16:16 19:7,9,23
  25:6 27:2,3,6
  28:25 59:24 60:24
**regards** 9:9 14:11
  14:12 55:1 80:3
**region** 20:21
**regional** 29:11
  72:10
**regular** 78:24
**regulate** 59:8
**regulation** 58:25
**related** 19:22 43:4
  43:4,9,24 48:14
  51:24 52:6,17
  55:7 59:23
**relating** 54:24
**relation** 78:1
**relative** 56:1
**relevant** 48:8
**relied** 18:24
**remaining** 52:7
**remember** 11:12
  13:13 14:4 51:13
  54:12 73:20

**remembered** 4:7
**remote** 3:1
**remotely** 1:18,23
  4:10
**repeat** 45:9 77:1
**rephrase** 8:5
  72:22
**report** 2:13 13:11
  17:9 18:14 62:11
  83:14
**reported** 1:23
**reporter** 4:12 5:22
  7:7 10:2,6 45:14
  46:23 47:1 75:23
  77:5 80:21 81:3
  83:4,9
**reporting** 84:1
**reports** 15:15
**represented** 29:9
**representing** 5:10
**requested** 45:13
  77:4
**required** 7:19
**research** 12:15,23
  12:24 13:2,14
  19:4,9,12 66:13
  79:11
**residence** 38:4
**resident** 30:7
  34:23 64:11
**residents** 66:20
**resolve** 48:25 74:9
**resolved** 24:12
**resort** 54:1
**resource** 65:9
**respond** 8:13 26:8
  35:5 47:25 61:24
  64:8
**responded** 28:10
  75:17

**responding** 28:20
  41:21 42:4
**response** 20:6,22
  23:14,14,22,25
  25:10,14 27:25
  28:14 63:8,25
  65:1,1,3
**responses** 28:3
  30:11
**responsibility**
  29:5
**responsible** 29:6
  58:1
**responsive** 8:14
**rest** 6:2,3
**restaurant** 63:6
  66:4
**restaurants** 62:18
**restricted** 79:11
**restrictions** 31:7
**restrictive** 77:10
**result** 30:15 61:11
  74:22 77:10
**results** 29:23
  52:11
**retained** 9:9 10:14
  10:17,21 11:5,9,24
**retention** 5:13
  11:20 30:25
**retired** 64:12
  65:11 71:11
**retirement** 8:21
**retreat** 32:10,14
  32:17,18
**retrieve** 32:8
**retrieved** 49:18
**review** 7:8 12:5,8
  15:14 38:13 68:15
  80:16,24,25
**reviewed** 13:11
  15:6 16:13,14,14

  16:16 26:23 28:8
  67:9
**reviewing** 38:12
  67:2
**richard** 1:5 5:11
  84:2
**rifle** 22:2,8 48:18
  79:25
**rifles** 20:23 21:1
  21:23 24:24 75:4
**right** 6:21 7:3 8:10
  10:4 11:12 14:10
  14:22 17:7 24:22
  31:12 32:22 33:1
  33:15 34:1,3
  35:17,24 36:3,8,18
  36:21,22 37:2,5,24
  38:3 39:4,15,21,25
  47:23 50:19,21
  61:4 62:22 65:25
  66:9,11,12,24
  68:24 69:3 74:5
  75:1 76:19 78:18
  78:23,25 79:1,3,10
  79:12 80:13
**rights** 13:17 21:10
  77:11
**ripened** 73:15
**rise** 31:13 61:11
  61:23 62:5 64:25
**risks** 30:16,17
  31:20
**road** 3:5
**rob** 1:9 84:2
**robberies** 52:11
  52:14
**robbery** 31:2 53:7
**roughly** 52:6
  71:16
**round** 22:21

**rules** 5:20
**rural** 16:2 38:6,17
  38:20 39:16,23

**s**

**s** 84:5
**sacramento** 3:11
**safeguards** 58:15
  58:17,21
**safety** 19:9,20,23
  27:7,15 29:7,11,16
  57:17 59:23 60:24
**san** 79:15
**santa** 49:1,3,8
**saw** 31:24
**saying** 27:21 64:18
**scarsdale** 3:5
**scene** 41:22 48:1
  49:24
**scholar** 36:2
**scope** 9:5 36:6
  43:23 48:5 55:2
**screen** 16:18,23
  77:20
**scroll** 17:16
**second** 12:21 13:3
  13:4,16 17:8 19:7
  21:9,24 31:18
  33:7,14,24,25
  35:16,23 36:4,7,14
  36:16,23 37:4,14
  77:14
**sections** 16:16,17
**see** 16:23 17:14
  23:13 25:10 26:16
  55:5 57:4,5 63:2
  66:9,14 74:5,8,8
**seeing** 20:21 23:5
  37:2 59:22
**seek** 50:10
**segment** 21:8,21

Kim Raney

**[seismic - stop]**

| | | | |
|---|---|---|---|
| **seismic** 30:9 | **shooter** 76:17 | **sneak** 57:13 | **split** 31:18 |
| **self** 32:23 33:16 | **shooting** 74:15,18 | **society** 21:22 | **spoken** 27:1,5 |
| 35:9 39:4,14,16,22 | 75:2,17,19 76:10 | 64:16,20 | **sponsor** 57:24 |
| 39:25 68:6,8,10,23 | 76:14,16,20,20,21 | **solely** 68:10,23 | **staff** 9:8 11:1 |
| 68:24 69:5,10 | **shootings** 52:15 | **somebody** 31:22 | **stakeholders** |
| 78:18,23 | **shop** 24:3 77:20 | 32:4 62:20 63:5 | 58:12,13 |
| **seminar** 72:4 | **shops** 20:3 23:11 | **someone's** 39:15 | **stamping** 59:20 |
| **seminars** 55:24 | **short** 47:5 | 39:21 65:12 | **stanford** 13:12 |
| **senator** 57:19 | **shorthand** 4:12 | **son** 48:13 49:7 | **starbucks** 20:3,23 |
| **sense** 47:13 72:12 | 83:4,9,10 | **sorry** 10:2 35:12 | 23:5 24:3 28:2 |
| **sent** 18:6 | **shot** 31:5 49:15 | 53:16 62:4 69:15 | 80:2 |
| **sentence** 77:14 | 54:5 75:13,14 | 74:12 | **start** 6:4 67:5 |
| **sergeant** 42:25 | **shotgun** 48:19 | **sound** 6:8 | 76:15 |
| 43:25 | **show** 16:18 79:24 | **sounds** 24:9 | **started** 48:2 49:7 |
| **series** 53:12 | **showed** 20:23 | **south** 20:19 | 49:19 56:16 76:14 |
| **serious** 54:3 | **showing** 20:2 | **southern** 20:4 | **starting** 23:1 |
| **serve** 47:9 | **shows** 59:21 | 44:5 | **starts** 76:10 |
| **served** 19:1 | **side** 22:13 51:7 | **sparsely** 39:3 | **state** 1:10 4:12 |
| **service** 20:22 23:6 | 56:11,20 | **speak** 6:6,8 28:23 | 5:15 7:18 16:1,8 |
| 23:17 24:2 25:3 | **sign** 81:1 | 52:14 | 18:21 19:17,20 |
| 55:5,17 63:2 | **signature** 17:21 | **speaking** 61:5 | 21:12 29:15 30:9 |
| 79:23 | 83:20 | 65:10 | 33:12 38:2,10,12 |
| **services** 23:7 | **signed** 57:23 | **specific** 12:25 | 38:14 39:15 54:10 |
| **set** 70:13 | **significant** 56:2 | 13:19,21 14:7,10 | 57:5,6,14,19 58:9 |
| **setting** 30:20 | 69:9 | 14:17 16:6 19:12 | 58:20 59:5 66:19 |
| **seven** 50:2 | **simply** 75:20 | 29:17 34:15 41:21 | 71:21 72:5,7 83:1 |
| **sexual** 53:11 | **singley** 62:12 | 54:17 55:6 | 83:4 |
| **share** 16:18 71:5 | **sir** 17:19 80:11 | **specifically** 7:20 | **statement** 66:5,6 |
| **shared** 22:23 | **sit** 8:13 66:3 | 13:9 15:7,9 18:17 | 66:10 78:15,19 |
| 23:16 55:17 | **sitting** 49:17 63:5 | 21:19 23:13 51:13 | **statements** 68:3 |
| **sharing** 77:20 | 65:13,20,23 | 54:14,22 58:21 | **states** 1:1 33:9,15 |
| **sharp** 52:21 | **situation** 23:21 | 75:5 | 37:2,4 54:25 60:1 |
| **sheet** 84:1 | 42:10,23 71:25 | **specified** 83:7 | 60:2,15 79:12 |
| **sheriff** 73:2 | **situations** 22:23 | **speculation** 25:21 | **statistics** 38:10,14 |
| **sheriff's** 67:10 | 53:6 | 35:13 38:7,22 | **statute** 34:13,20 |
| 72:5 73:1 79:15 | **six** 56:18 60:2,3 | 40:6,16 41:1,15 | 34:25 66:23 |
| **sheriffs** 71:23 72:7 | 71:18 | 43:5,17 44:17 | **stay** 12:22 |
| 72:16 73:6,11 | **size** 39:5 | 46:3,17 50:13 | **steps** 66:13 |
| **sherriffs** 72:6 | **skills** 30:25 31:15 | **spell** 5:16 | **stolen** 31:11 |
| **shift** 30:9 | **smaller** 74:11 | **spite** 63:4 | **stop** 62:22 |

Kim Raney

[strategic - training]                                                    Page 17

**strategic** 57:10
**strategically** 57:14
**study** 79:9
**submit** 16:5
**submitted** 17:18
  27:10
**subscribed** 83:17
  84:22
**subscribing** 55:4
**subsequent** 73:19
**substance** 7:17
  18:5 79:20
**suburban** 29:22
  38:16 63:16
**successor** 67:12
**sued** 34:22
**suffered** 49:22
**suicide** 50:3,5
**suing** 9:14,15 11:6
  15:25
**suit** 49:8
**suite** 3:5
**supreme** 36:3 37:7
**sure** 6:25 7:25
  8:10 15:3 20:18
  28:17 30:24 34:19
  39:12 40:19 41:5
  45:10,24 46:5
  59:17 60:13 62:5
  77:2 79:8
**surrounding** 19:8
**survived** 49:23
  51:18
**suspect** 49:15
**switched** 17:7
**sworn** 5:2 6:11
  33:5,8,11 84:22
**symposium** 72:4

**t**
**table** 19:15 22:21
  49:17 72:13 73:13
**tactical** 40:20
**tailored** 49:9
**take** 6:16,19 29:24
  30:6 42:16 53:14
  53:17 64:21 73:22
  74:4
**taken** 1:18 4:9
  30:24 47:3 66:13
  74:1 83:8,10
**takes** 28:16
**talk** 5:24 53:3
  74:15
**talked** 79:9
**talking** 35:1 56:13
  80:1
**talks** 36:18
**tapes** 28:9
**technical** 10:1
**tell** 6:12
**tells** 7:20
**ten** 63:19
**tenure** 68:3 71:9
  71:19
**term** 9:23 10:9,12
  20:1 24:10 26:10
  39:11,12 41:5,6,7
  43:20 58:17 60:8
  60:10 61:15 63:13
  64:9 65:16
**termed** 57:2
**termination** 11:8
**terminology** 79:10
**terms** 27:18
**testified** 5:2 8:16
  8:21,24 27:10
  33:19
**testify** 78:17

**testifying** 6:14
**testimony** 6:13,20
  7:8,9 15:16 35:15
  35:20 36:12 47:6
  64:6 77:21 78:5
  79:5 82:6,8
**testing** 70:21,22
**texas** 74:19 76:2
**thank** 14:25 47:1
  79:13 80:19 81:2
**thanks** 81:1
**theater** 63:6 65:23
  66:4
**theaters** 62:19
**thereof** 4:9
**thermal** 49:23
**thing** 79:14
**things** 56:1,2,14
  59:21 61:19
**think** 6:23 9:3,17
  11:16 13:11,14
  14:22 16:6,12
  19:19 20:21 22:4
  22:5,7 23:20 24:5
  24:7,12 25:19
  26:10,13 30:5,7,16
  30:18,18 31:19,22
  32:12,18 36:1,2,17
  37:1,1,1,7 38:1,25
  40:10,10,19 41:9
  41:10 42:8 44:13
  44:20 52:23 54:2
  54:8 55:16 57:2
  57:23 58:17 59:20
  61:18 62:23 63:1
  63:13,14 64:9,14
  64:20,20 66:6
  68:14 73:23 79:3
  79:9 80:24
**thinking** 65:21

**third** 49:22
**thought** 57:14
**threat** 41:21 42:3
  42:10 69:9
**threats** 68:20 78:8
**three** 12:10,19
  13:6 47:18 70:17
**threshold** 69:11
**ticked** 77:16,17
**time** 6:16,23,25
  7:15,15,24 13:9
  15:10 20:13,16,18
  21:25 22:11 23:24
  24:18 40:3 42:18
  47:9,15 50:7,22
  51:23 58:23 67:8
  67:18 74:24 78:2
  79:22 80:19 82:9
  83:7,9
**times** 6:5 8:24
  9:22 37:10 59:14
**today** 5:12 7:10
  8:14 12:6 16:10
  17:5 64:16 80:19
**told** 28:7
**top** 29:8
**topic** 20:9 56:7
  59:15 70:16,17
  71:7
**topics** 56:18
**total** 47:16
**track** 37:7
**trade** 44:5
**tradition** 49:2,5
**trained** 41:19 42:2
  60:23 61:1,10,22
  62:6
**training** 32:5 42:9
  61:17 62:7,11,13
  62:16 80:3,5

[transcribed - wise]                                                                Page 18

transcribed  83:12
transcript  7:6,8
 80:16,22,24 83:13
transcription  82:8
 83:13
transcripts  16:14
 16:15
travel  79:1
travels  79:3
trending  56:2
trends  54:23 55:6
trial  15:16
tried  12:21
trigger  50:6
trojan  56:15
true  82:7 83:14
truth  6:12
truthfully  8:13
try  8:5 41:9
trying  21:11 37:9
 37:11 52:5 57:6
 78:22
two  10:20 11:6
 12:10 13:6 15:5
 18:11 21:15 47:18
 56:6,14 57:22
 65:10 70:22 72:8
type  28:20 43:12
 53:5
types  53:22 54:6
typically  73:1

u

ultimately  48:24
 58:4
unable  6:25 21:14
unanticipated
 30:15
unclear  8:3
uncodified  25:15
uncomfortable
 63:5,24 66:15

understand  6:10
 6:11 7:13,14,22,23
 8:13 10:13 15:23
 15:25 33:25 34:19
 37:9,11 41:23
 42:7 46:5 55:15
 55:16 60:13 61:1
understanding
 21:13 33:23 35:3
 35:16,23 36:6,14
 36:21,23 37:10,13
 37:14,19,20,24
 38:2,11 60:11
 75:6,9 76:8 77:6
understood  8:9
uneventful  24:9
 24:10
unique  71:25
unit  44:1,3
united  1:1 33:9,15
unknown  63:25
unlawful  11:8
unloaded  22:10
 63:19,21 64:3
 79:16
unnecessary  26:11
 30:11,12
unsafe  30:14
unsure  8:4
unusual  43:21
unwise  30:14
uphold  33:5,9,11
 33:20
uptick  77:9
upward  77:16,17
urban  29:22 38:6
 38:16,19 39:17,22
 63:16
use  20:1 21:9 26:9
 31:19 34:5 40:13
 41:5 48:22 51:19

53:4,22 54:2,7
 55:5 64:24 65:16
 83:12
utilized  52:22

v

v  5:11 84:2
vague  29:25 40:5
 40:15 41:2 42:6
 46:4 55:12 61:12
 62:1
valid  68:8
variables  32:9
variety  42:22
various  42:2
vast  53:8 59:5
vehicle  31:13
vein  13:7
veritext  84:1
versus  9:3 10:18
 12:2 13:16 14:14
 38:17 58:3 76:10
veto  57:9
vicinity  27:22
victim  30:23 31:4
 31:5,24 32:11
 40:25 45:8,22
 50:25 51:7,11,14
 51:18
victim's  41:11
victims  41:13
 48:11 51:1
view  70:6 73:18
violating  25:3
 50:18
violence  43:4,16
 43:21 52:3
violent  31:24,24
 32:11 35:8 40:21
 40:24 43:10,13,14
 43:16 44:14 51:12
 51:18 53:14,17

65:23 69:3 77:15
 78:7 79:1
vitae  18:9
voice  58:13
volume  63:1 64:15
 64:23
volunteers  11:6
vs  1:8
vulnerable  40:25
 41:6

w

waiting  59:21
want  8:9 21:16
 37:19,25 60:13,14
 69:10 73:23 74:4
 74:10,15 77:19,21
wanted  58:10
wants  21:22
way  32:8 72:19
ways  47:12
we've  46:22
weapon  28:15
 30:24 35:9 65:12
 65:21
weapons  24:6
 28:11 31:9 33:16
 45:6 52:21 70:14
weeks  12:10
welcome  81:3
went  49:16,17,18
whereof  83:17
wholeheartedly
 40:9
wide  29:15
wisdom  63:14
wise  3:10 15:1,3
 18:2,6 25:21
 29:25 33:2,17
 34:10,16 35:10,12
 35:19 36:11 37:16
 37:21 38:7,22

| | **y** |
|---|---|
| 39:7,18 40:5,15 | **y**   5:17 |
| 41:1,8,15 42:6 | **yeah**   20:17 46:5 |
| 43:5,17 44:17 |   56:9 59:14 62:2 |
| 46:3,17 50:13 |   66:2 67:5 74:13 |
| 55:12 60:4,18 | **year**   16:12 20:16 |
| 61:12 62:1 64:5 |   47:17,18,21 55:22 |
| 68:25 75:22 80:9 |   57:6,7,22 |
| 80:21,23 | **years**   12:20 13:6 |
| **wish**   80:21 |   19:13,14,15 29:4,5 |
| **withdraw**   21:5 |   30:8 44:21 47:17 |
| **withdrawn**   25:17 |   47:17,18 56:19 |
| 28:13,18 52:15 |   63:19 64:17 77:15 |
| 60:21 |   77:16 |
| **witness**   2:12 4:10 | **york**   84:1 |
| 8:21,25 9:9 16:13 | |
| 17:2 35:11,23 | |
| 41:9 42:7 45:15 | |
| 46:5 60:19 62:2 | |
| 73:25 75:24 77:6 | |
| 82:4 83:6,17 | |
| **witness's**   62:11 | |
| **witnesses'**   84:3 | |
| **woman**   54:5 | |
| **wondering**   61:8 | |
| **word**   26:9 64:24 | |
| 72:4 | |
| **words**   39:15 53:23 | |
| 63:22 76:14 | |
| **work**   9:16 | |
| **worked**   57:18 | |
| 70:15 | |
| **working**   21:9 | |
| 29:18 42:24 44:4 | |
| **world**   56:1 | |
| **wrap**   73:24 | |
| **wrapped**   49:11 | |
| **writing**   79:21 | |
| 83:10 | |
| **written**   15:14 | |
| **wrong**   60:14 78:18 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.