# EXHIBIT   2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF CALIFORNIA
 3
 4    MARK BAIRD and RICHARD
      GALLARDO,
 5
                   Plaintiff(s),
 6
                   vs.                   CASE NO.
 7                                       2:9-cv-00617-KJM-AC
      ROB BONTA, in his official
 8    capacity as Attorney
      General of the State of
 9    California, et al.,
10              Defendant(s).
11
12
      _____
13
14
15           DEPOSITION OF CHARLES D. HAGGARD
16        Appearing Remotely From Topeka, Kansas
17               Tuesday, October 19, 2021
18                     Volume I
19
20
21    Reported by:
      Carrie Pederson
22    CSR No. 4373, RMR, CRR
23    Job No. 4838109
24    Pages 1 - 104
25
                                               Page 1
```

```
1              IN THE UNITED STATES DISTRICT COURT
2           FOR THE EASTERN DISTRICT OF CALIFORNIA
3
4    MARK BAIRD and RICHARD
     GALLARDO,
5
             Plaintiff(s),
6
             vs.                     CASE NO.
7                                    2:9-cv-00617-KJM-AC
     ROB BONTA, in his official
8    capacity as Attorney
     General of the State of
9    California, et al.,
10           Defendant(s).
11
12   _____
13
14
15
16           Deposition of CHARLES D. HAGGARD, Volume I,
17   taken on behalf of the defendants, at Topeka, Kansas,
18   beginning at 9:06 a.m. and ending at 11:31 a.m. on
19   Tuesday, October 19, 2021, before Carrie Pederson,
20   Certified Shorthand Reporter No. 4373.
21
22
23
24
25
```

```
1    APPEARANCES:

2

3    For Plaintiff(s):

4              THE BELLANTONI LAW FIRM, PLLC

5              BY:  AMY L. BELLANTONI

6              Attorney at Law

7              2 Overhill Road

8              Suite 400

9              Scarsdale, New York 10583

10             914-367-0090

11             abell@bellantoni-law.com

12

13   For Defendant(s):

14             ATTORNEY GENERAL OF CALIFORNIA

15             BY:  R. MATTHEW WISE

16             Attorney at Law

17             1300 I Street

18             Suite 125

19             P.O. Box 944255

20             Sacramento California

21             94244-2550

22             Matthew.Wise@doj.ca.gov

23

24   Also Present:

25             Mark Baird
```

Page 3

1                          INDEX

   WITNESS:

2

      CHARLES D. HAGGARD

3

      Volume I

4

5

                                                        PAGE

6

           Examination By Mr. Wise                         7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          Veritext Legal Solutions
                              866 299-5127

1                              EXHIBITS

2      DEFENDANT'S

3                                  DESCRIPTION              PAGE

4      Exhibit 1      Expert Declaration and Report of      11

                      Charles "Chuck" Haggard

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

1
2
        CERTIFIED QUESTIONS/INSTRUCTED NOT TO ANSWER

3
                        PAGE        LINE

                         82          8
4
                         96          19
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                Page 6

```
1              Topeka, Kansas, Tuesday, October 19, 2021
2                    9:06 a.m. - 11:31 a.m.
3
4                    CHARLES D. HAGGARD,
5      having been administered an oath, was examined and
6      testified as follows:
7                         --o0o--
8                       EXAMINATION
9      BY MR. WISE:
10        Q.   Good morning.
11        A.   Morning.
12        Q.   My name's Matthew Wise.  I represent the
13     California Attorney General in this case which is
14     known as Baird v. Bonta.  Would you state your full
15     name and spell your last name for the record.
16        A.   My name is actually Charles, D as in David,
17     Haggard, H-a-g-g-a-r-d.  I go by Chuck.
18        Q.   Do you understand that you're testifying
19     here under the same oath that you would be testifying
20     under in a courtroom?
21        A.   I do.  Yes, I do.
22        Q.   You've been retained as an expert for
23     plaintiffs in this case?
24        A.   Yes, sir.
25        Q.   Have you ever had your deposition taken?
```

Page 7

1      A.    Not in this case, but previously in life,

2    yes, I have.

3      Q.    The court reporter's recording everything

4    that we say, so we need to try to have only one

5    person speak at a time.

6      A.    Sure.

7      Q.    I'll try to let you finish your answer when

8    I ask a question and before I ask another one.  I

9    just ask that you try to let me finish asking my

10   question before you start to give your answer.

11     A.    Certainly.

12     Q.    If you need to take a break at any time,

13   just let me know.  The only thing I'd ask is that if

14   there's a question pending, that you'd answer that

15   question before we take our break.

16     A.    Okie-doke.

17     Q.    After I ask a question, it's possible that

18   your attorney might have an objection to the

19   question.  You should still answer the question

20   unless your attorney advises you not to answer the

21   question.

22     A.    Okay.

23     Q.    If you don't understand a question, please

24   let me know, and I'll try to rephrase the question.

25   Do you understand that?

Veritext Legal Solutions
866 299-5127

```
 1        A.    Yep, I do.
 2        Q.    You'll have an opportunity, after the
 3   deposition, to review the transcript that was made
 4   here today, and you'll be able to make corrections to
 5   the transcript, but you should know that there will
 6   be a record of the corrections that were made, and
 7   I'll be allowed to comment on any corrections that
 8   you make.
 9        A.    Okay.
10        Q.    Is there anything affecting you today that
11   would prevent you from thinking clearly and
12   testifying truthfully?
13        A.    No.
14        Q.    How did you prepare for today's deposition?
15        A.    I actually did not do any real formal
16   preparation for this deposition.  Ms. Bellantoni and
17   I had a casual phone conversation a couple of days
18   ago and wasn't -- actually hasn't been much more than
19   that.  Read through -- I forget the -- I don't have
20   it in front of me on the email.
21             There was the other expert that has been
22   retained.  He's a chief of police or former chief of
23   police.  I was able to read his declaration or his
24   statement and -- but that's been -- you know, this
25   has been set up for a few weeks now, so I was able to
```

Page 9

1   read that in the meantime, but that's about it.

2       Q.   Is that the declaration of Kim Raney?

3       A.   Yes.

4       Q.   And other than Ms. Bellantoni, did you speak

5   with anyone about this deposition?

6       A.   No, sir.

7       Q.   When did you first become involved in this

8   case?

9       A.   It's been awhile.  As far as pulling a date

10  up, I'd have to defer to Ms. Bellantoni for when she

11  first contacted me to talk about this.  It would be

12  really hard for me to say.  It seems like a year or

13  two now.

14      Q.   Okay.  And was it Ms. Bellantoni who

15  contacted you or someone else?

16      A.   Yes, she did.

17      Q.   Did anyone tell you what they wanted you to

18  do as an expert in this case?

19      A.   We had a conversation, Ms. Bellantoni and I,

20  on she was looking for an expert witness to speak

21  towards police training and practices as it pertained

22  to this case, so my understanding of my input, like,

23  here today would be as a law enforcement expert.

24      Q.   Have you reviewed the complaint in this

25  matter?

                                          Page 10

1      A.   Yes, sir.

2      Q.   Did you have a role in drafting the

3   complaint?

4      A.   No, I did not.

5      Q.   Are you being compensated for your work in

6   this case?

7      A.    I am, although I have yet to send a bill in

8   for anything, so, no, I have not been paid, but we --

9   Ms. Bellantoni and I agreed on a price.  Truthfully,

10  I volunteered to do this one pro bono, and she

11  insisted that I not do that, and so I believe it's in

12  my statement or in my declaration, I think we agreed

13  to 75 an hour or something like that.

14     Q.   Okay.  Let me share my screen.  I will try

15  to show you an exhibit here.  Could we go off the

16  record for just a moment?

17          (Discussion off the record)

18          MR. WISE:  Can we go back on the record now?

19  BY MR. WISE:

20     Q.   Okay.  We're back on the record.

21  Mr. Haggard, can you see Exhibit 1 on your screen?

22          (Exhibit 1 marked)

23          THE WITNESS:  Yes.

24  BY MR. WISE:

25     Q.   Okay.  Do you recognize this document?

Page 11

1        A.    I do.

2        Q.    What --

3        A.    This would be the declaration that you asked

4    me, in my preparation, what I had read.

5        Q.    Did you prepare this declaration?

6        A.    I did not.  I spoke to Ms. Bellantoni at

7    length and wrote up my thoughts, and then she made it

8    look real pretty on this document.

9        Q.    Does this declaration reflect your thoughts?

10        A.    Yes, sir.

11        Q.    Okay.  And did you sign a copy of this

12    declaration?

13        A.    Yes, I did, and then because of the nature

14    of what we're doing, I had to sign and then scan that

15    and then send that in so that you guys would have a

16    legal copy.

17        Q.    Okay.  Let's look just at page 14 here.  I

18    notice that the declaration that I have is not

19    signed, but you do have a signed version?

20        A.    Yes, sir, I do.

21        Q.    Okay.  Would you work with plaintiff's

22    counsel to provide me a signed copy of this

23    declaration?

24        MS. BELLANTONI:  Yeah, I'll get that over to

25    you, Matthew.

Page 12

1           MR. WISE:  Terrific.

2      BY MR. WISE:

3           Q.   Your declaration cites a number of

4      documents.  Besides the documents that you've cited,

5      did you rely on any other documents in reaching your

6      opinion on this case?

7           A.   I read the original -- my legal training is

8      failing me here -- the filing, the case that was put

9      forward, and then the other expert, Chief Raney, I

10     read those documents.

11          Q.   Did you conduct research to locate the

12     documents that form the basis of your opinion?

13          A.   I'm not sure how you mean that.  Which part

14     are you referring to?

15          Q.   Anything in the declaration itself.  Did you

16     conduct any research to try to come up with documents

17     that would support your opinion?

18          A.   Not really.  A big part of my declaration

19     would be personal observation and experience.

20          Q.   Did anyone else provide you with documents

21     that would support the basis of your opinion?

22          A.   I don't believe so.  Besides the documents

23     that Ms. Bellantoni provided to me that I've talked

24     about reading as far as, like, what's already

25     pertinent to this case, I don't believe so.  Like I

Page 13

1    say, we've been doing this for quite awhile.  I will

2    tell you that I do, you know, like, on a regular

3    basis, read up on things like news, gun control

4    issues, crime issues, things like that.  All of that

5    is still pertinent to my life.  I am still an active

6    duty police officer, so those are all things that I

7    pay attention to, but I don't recall being provided,

8    or, you know, anything like that, anything specific

9    for this case, no, sir.

10        Q.    Anyone other than plaintiff's counsel

11   assisted you in preparing this declaration?

12        A.    No.  Huh-uh.

13        Q.    Have you ever served as an expert witness?

14        A.    Yes, sir, I have.

15        Q.    How many times?

16        A.    It's hard to say.  Probably a good dozen.

17   I've been retained as an expert witness on police use

18   of force both in civil court and in criminal court.

19   I have been retained as a defense expert on firearms

20   and firearms training in a murder trial.  I have been

21   retained as an expert witness on firearms in a

22   series.  We had kind of a gang robbery homicide thing

23   that turned into a series of probably eight separate

24   trials because of the nature of that one, so I don't

25   have an -- I'd say probably 10 to 12 times at least.

Page 14

1      Q.   Have you ever testified as an expert on the

2   public carry of firearms?

3      A.   No, I have not.

4      Q.   Did you attend college?

5      A.   I did.

6      Q.   What college?

7      A.   Kansas State University.

8      Q.   Did you graduate?

9      A.   I did not.  The police department decided to

10   hire, and I had to weigh my options, so ended up

11   taking the job.

12      Q.   Besides college experience you had, did you

13   complete any other formal education courses?

14      A.   I've completed courses, Kan State

15   University, and then other courses through the

16   military that were adjunct to other colleges such as

17   Washington University, Emporia State, couple of those

18   that were out-of-state things like Louisiana State

19   University that were part of the course that I was

20   doing.  That was both in a police capacity and a --

21   or, when I was in the military, military capacity,

22   and those were classes that if you did that, you

23   could gain college credit for that.

24          I've also -- not pertinent to this, but also

25   completed Kansas -- not Kansas State University --

Page 15

1   Kansas University classes through things like fire

2   science and that sort of thing that all count

3   towards -- you know, so I've earned college credit in

4   a whole bunch of places but never coalesced that into

5   a degree as it were.

6       Q.   Any other formal education that we haven't

7   touched on?

8       A.   Quite a bit.  I'm assuming that you have a

9   copy of my CV.  A whole lot of what I've done is

10  things like Force Science Research Center as a force

11  analyst, training on excited delirium and things that

12  are pertinent to police use of force, human dynamic

13  factors, deescalation, verbal judo, etc., etc., as

14  all is preparation and, you know, on-the-job

15  improvement for the jobs that I was doing mainly at

16  the Topeka Police Department, which since I've

17  retired from, but then in my current roles, I'm still

18  a national trainer for National Law Enforcement

19  Training Center.  I have my own business.  I'm an

20  adjunct instructor for Strategos International,

21  adjunct instructor for Hardwire Tactical, and then

22  I'm a police captain here at my current job.

23      Q.   You mentioned that you served in the

24  military.  When did you serve in the military?

25      A.   It would have been 1982 to -- it's been

Veritext Legal Solutions
866 299-5127

1    awhile.  19 -- I'm going to -- I believe 1998, but I

2    might be off on that, but definitely started in '82.

3        Q.   What positions did you hold in the military?

4        A.   So I was a reconnaissance specialist, and

5    that's a fancy word for -- or fancy term for we go

6    out and find the bad guys and tell everybody else

7    where they are at.  So in those roles, I was vehicle

8    driver, I was a machine gunner, I was a squad leader,

9    I was a platoon sergeant.  At one point, I was an

10   acting platoon commander when we did not have a

11   lieutenant on who was assigned to our unit.

12       Q.   I think you just mentioned this, but did you

13   become familiar with firearms while in the military?

14       A.   Oh, yes.

15       Q.   Can you describe your experience with

16   firearms in the military?

17       A.   So actually in that role, in the job that I

18   had, we were required to train with and qualify on a

19   yearly basis more than most of the Army jobs.  If

20   you're, like, a truck driver or something like that,

21   it's very minimal.  Infantrymen, obviously you're

22   going to be more that, but just as an example, when I

23   first got into the job that I was in, I was required

24   to qualify -- train with, qualify with a .45 pistol,

25   M16a1 rifle, M60 machine gun, M2 50 caliber machine

Page 17

1    gun, the M203 40 millimeter grenade launcher, the LAW

2    antitank rocket, Claymore antipersonnel mines.

3         I'm probably leaving something out of the

4    list, but -- and then that -- as firearms changed

5    within the military, like they upgraded pistol, they

6    upgraded rifles, they added grenade launching machine

7    guns and things like that, we all got -- we got

8    trained on those as well.

9    Q.    You mentioned that you've had a career in

10   law enforcement.  At what point did you begin that

11   career?

12   A.    1987.

13   Q.    What department did you work for?

14   A.    The Topeka, Kansas Police Department.

15   Q.    What were your roles there?

16   A.    I started out as a patrolman.  I was a

17   patrol officer and eventually a patrol sergeant.  I

18   ended my career.  The last six years of my career, I

19   was a shift commander as a lieutenant, and then in

20   the interim, I was a member of our SWAT team for

21   little over 17 years, and so I was a breacher, I was

22   a sniper, I was a squad leader.

23        At one point I was the team leader when we

24   did not have a lieutenant assigned.  I was a firearms

25   trainer for the unit, a gas guy utilizing the grenade

                                             Page 18

1    launchers, and in the wider role for the department,

2    I was a field training officer.  Then when I

3    promoted, I was a field training sergeant supervising

4    field training officers.

5         I was a firearms instructor, use of force

6    instructor on things like batons, taser, Pepper

7    Spray, handcuffing, arrest and control tactics,

8    things like that, ground fighting, weapon retention.

9         So we had a regional academy that was

10   approved through our state CPOST, so we had -- we did

11   recruit training and in-service training.  At one

12   point, I was responsible for all of the use of force

13   and firearms training for the department, and for

14   about -- it was just about three years there, I was

15   the range master where my primary job was to do all

16   of the recruit in-service firearms training,

17   Maintenance, and then my role as a defensive tactic

18   instructor, I was basically in charge of our use of

19   force program where I had officers working for me who

20   assisted with that training.

21   Q.   Did you ever develop protocols on how to

22   respond to an incident involving a firearm?

23   A.   Yes, actually, and some of it very specific.

24   Right after Columbine, we had -- you know, there was

25   kind of a watershed event in law enforcement where

Page 19

1    people were like, "Oh, my God, we can't do that"

2    because the perception was that the officers there

3    kind of waited around, so you had to have what we

4    call a rapid response to an active shooter, and then,

5    of course, I don't know if you've ever seen pictures

6    coming outline of Columbine, but there was a wide

7    variety of officers.  There were detectives, there

8    were officers in plainclothes, there were officers

9    who showed up off duty, things like that, uniformed

10   police officer from multiple different departments.

11        So, you know, a big part of that would be

12   training the officers on what -- it's often called

13   PID or positive identification.  The last thing we

14   want to do is replicate tragedies that have happened

15   in the past in places like New York City where you

16   have a blue-on-blue, you have, like, say, a uniformed

17   officer shooting a plainclothes officer or something

18   like that, so a big part of our training was

19   responding to threat recognition and then proper

20   response, you know, to the scenario as you find it.

21        Q.   And what was your role in developing that

22   training?

23        A.   I actually developed it from scratch.  I was

24   given the job of -- because we wanted to have a rapid

25   response program, I was given the job of, "Hey, we

Veritext Legal Solutions
866 299-5127

1    need to come up with something for that."

2         So in my role as the primary firearms

3    trainer at that point, or one of the primary firearms

4    trainers at that point, I was given the role of

5    coming up with an in-service training package so that

6    we could run all our people through rapid response.

7         I would say Columbine was a watershed event

8    for law enforcement in recognition of this, but in my

9    career, I had already responded to two active shooter

10   events, so that was something that was, you know, the

11   type of training that, taken seriously, was really

12   near and dear to my heart, that I'm glad they finally

13   got the -- the command staff finally got the message

14   that that needed to happen.

15   Q.   After working at the Topeka Police

16   Department, did you work in any other capacity as a

17   law enforcement officer?

18   A.   Yes, sir.  Shortly after retiring, because

19   we have a -- we have a technicality in our

20   retirement, you can't do anything for 60 days for a

21   paycheck, otherwise it screws up, you know, the --

22   how the retirement fund works.  We have to take

23   60 days off before you're allowed to do anything else

24   or you get paid, so I took short vacation, and then

25   the county north of me, Jackson County Sheriff's

Page  21

1    Department, was shortly of people, so I became a

2    part-time deputy for them and was helping them out

3    with road patrol and training, and then approximately

4    almost exactly a year after I retired, I took the

5    current job that I have now with Metropolitan Topeka

6    Airport Authority Police and Fire.  I know that's a

7    mouthful.

8          And then since then, I am also -- I have --

9    I'm no longer working for Jackson County part-time,

10   but -- this is one of those you know, "You're getting

11   old when."  One of my recruit officers is now the

12   sheriff of the county that I live in, and he asked me

13   to come onboard as a part-time deputy, so I'm a sworn

14   deputy with the Shawnee County, Kansas Police

15   Department as well, and I'm currently doing that.

16   Q.   Got it.  Any other law enforcement roles

17   that we haven't touched on?

18   A.   No, sir.

19   Q.   Do you have any other current forms of

20   employment?

21   A.   Just my side business, and I do consulting.

22   Friend of mine's a retired officer, he has a security

23   company, so every once in awhile, I'll do the

24   qualifications for his guys and things like that, but

25   primarily my Agile Training consulting business.

Page 22

1    Q.   What is Agile Training and Consulting?

2    Would you describe it?

3    A.   So my business model is I try to meet

4    clients' needs instead of having a cookie cutter type

5    package like, you know, basic -- I have Basic

6    Pistol 1, Basic Pistol 2 or something like that.  I

7    kind of customize classes for people's needs.  I've

8    had people hit me up for things like -- I'm currently

9    going -- about to do a in-service package for

10   University Police Department over in Kansas City,

11   Missouri, and they want to have two hours of Pepper

12   Spray update, two hours of weapon retention update

13   and then four hours of arrest and control and a

14   handcuffing package just as an eight-hour day, "Can

15   you do" -- "Yeah, I can, you know, put together a

16   training package for your needs."

17        Much of what I've done lately has been

18   firearms training, and, quite frankly, the business

19   has been a lot better for civilian capacity training

20   than law enforcement training as far as people who

21   are paying for training.

22   Q.   Do you conduct any trainings that involve

23   how to respond to a person armed with a firearm?

24   A.   Yes.

25   Q.   An how do you train your clients to respond?

Veritext Legal Solutions
866 299-5127

1        A.    Are you talking a -- I'm assuming you mean a
2    nonsworn -- a non-police officer type person.
3        Q.    Yes.
4        A.    So part of the training I do is -- what we
5    look for in behavioral aspects of pre-criminal
6    assault behavior.  One of my friends put a very good
7    label on there, his name is Craig Douglas, and he
8    calls it MUC, M-U-C, managing unknown contacts.
9            Say you are approached by someone on the
10   street that you don't know.  How do you read that
11   type of encounter?  Is it threatening?  Are they
12   setting you up for, like, a mugging or a carjacking
13   or something like that?  And talk about the
14   behavioral aspects of what criminal assault looks
15   like.
16           So it comes as some surprise to some people
17   that bad guys can be very sneaky, and, you know,
18   they're not going to have a big sign or, you know,
19   something on the T-shirt that says "I'm a bad guy,"
20   so a big part of mine is the pre-criminal assault
21   behavior-type things, the recognition of what type of
22   scenario you may have found yourself in to -- and
23   then the how to respond correctly in those scenarios,
24   and I will do that with verbal skills, verbal
25   deescalation.

Page  24

1          Very popular part of my training has been

2    Pepper Spray, how to do something that's not -- you

3    know, what I call something between a harsh word and

4    a gun, and then recognition of is -- you know, in my

5    end of scenario that actually requires a firearms

6    response, you know and, if so, how to do that, what

7    that might that look like.

8         Q.    In those classes, do you recommend that your

9    clients carry a firearm?

10        A.    I never recommend to anybody that they carry

11   a firearm.  That's a very personal decision.  I can

12   speak to the pluses and minuses of carrying a

13   firearm, but I have clients that I have worked with

14   who -- like, one friend of mine who used to be an

15   ADA, and, as you can imagine, in that capacity

16   putting people in prison, you can -- you know, she

17   picked up a stalker, and then I helped her with a

18   security package as a friend, how to harden her house

19   and have some defensive options.

20          She was adamant she did not want a gun.  She

21   was just not a gun person.  I'm not going to push a

22   gun on her.  So we came up with non-gun home defense

23   options for her that made her feel more comfortable.

24          So if people want firearms training, I will

25   offer firearms training.  If people are adamant that

Page 25

1    they don't want firearms training, that they're

2    looking for something else, then, you know, that's

3    like anything else, like whether you drink or not,

4    that's an extremely personal decision.

5        Q.   And just for the record, when you said

6    "ADA," what were you referring to?

7        A.   Assistant district attorney.  I'm sorry.

8        Q.   Do you believe that carrying a gun in and of

9    itself makes a person safer?

10            MS. BELLANTONI:  Objection.

11            You can answer.

12            THE WITNESS:  Excuse me.  I've been talking

13    awhile.  My throat is dry.

14            I believe it can.  I have personally been

15    involved in scenarios where I was just another dude

16    off duty in which I know that if I had not had a

17    firearm, I would have been a victim of a violent

18    criminal assault or, you know, armed robbery, that

19    sort of thing.  I believe that having a firearm gives

20    one the option of being able to not leave oneself at

21    the other guy's mercy.

22    BY MR. WISE:

23        Q.   Would you consider a gun a tool of limited

24    utility in most situations?

25        A.   It is definitely a tool of deadly force,

Page 26

1    and, you know, one of the things that people need to

2    know is you can't legally shoot people a little bit.

3    It is a tool for managing situations that require a

4    deadly force option.

5         Q.   I think you were mentioning this earlier,

6    but are there particular steps that you recommend

7    that your clients take before they carry a firearm in

8    public?

9              MS. BELLANTONI:  Objection.

10             You can answer.

11             THE WITNESS:  I would -- it sounds

12   self-serving because I am in a training business, but

13   I obviously counsel people that they need to have

14   some sort of training and education both how to

15   safely handle firearms -- I mean, something as

16   simple -- even in a hunting capacity, most people

17   would want to go through -- like we -- here in

18   Kansas, we have a hunter safety course, you know,

19   that just seems like a very logical thing, but going

20   through some -- both the mechanics of how the firearm

21   works and then how to effectively mechanically shoot

22   the gun, what you would think of as marksmanship

23   training and then having some sort of education on

24   when that's appropriate.

25             I suppose smart people can do things like

Veritext Legal Solutions
866 299-5127

1   here in Kansas, you can pull up the state law, and

2   it's very clearly stated when defense of a person or

3   your domicile is allowed, but I counsel people that

4   they probably want to get some education, probably

5   want to get some training just like anything else.  I

6   counsel driver's ed before you get behind the wheel

7   of a car.  It just seems to make sense.

8   BY MR. WISE:

9      Q.   Before your clients carry a firearm in

10  public, do you recommend that they get physically

11  fit?

12          MS. BELLANTONI:  Objection.

13          You can answer.

14          THE WITNESS:  Was that, "Go ahead and

15  answer" or --

16          MS. BELLANTONI:  Go ahead and answer.

17          THE WITNESS:  Actually, I recommend

18  everybody get as physically fit as they can because

19  we know heart attacks kill a lot more people than

20  virtually anything else, you know, lifestyle.  I

21  don't want to get too deep in the whole COVID thing,

22  but when you look at what makes you susceptible to

23  COVID, the comorbidities are a very big deal.

24          However, comma, the most vulnerable

25  populations are the people who are elderly, less

Page 28

1    physically fit, you know, and I have some sympathy to

2    that.   In my prime when I was in my 30s and I could

3    run two miles in 12 and a half minutes and pick up

4    600 pounds off of the ground any time I felt like it

5    and I was a judo and Jujitsu guy, I could handle

6    virtually any grown man that I ran into.

7          Now I'm 57, and I have a bad knee, and I've

8    jumped out of too many airplanes, and I've

9    rub-marched too many times.  I have no cartilage in

10   one of my knees and little cartilage in the other,

11   and I need a hip replacement according to -- two out

12   of three orthos say I need a hip replacement.

13         So the thought occurs to me that people who

14   are less physically capable need more means to defend

15   themselves, and that often means that they need tools

16   to solve that problem.

17   BY MR. WISE:

18     Q.   Before your clients carry a firearm, would

19   you recommend that they carry other items to defend

20   themselves?

21     A.   So part of my training is -- I've obviously

22   already mentioned that I'm a big proponent of Pepper

23   Spray, I have taught it for a long time, and I've

24   used it in a law enforcement capacity hundreds of

25   times.  I'm a big believer in that as a less than

Page  29

1    lethal tool, and I point out that there are

2    situations -- like, I know as a police officer, there

3    are situations where if you use sufficient force

4    early, that you could interdict having to use more

5    force later.

6         The case of Kyle Dinkheller, who was a

7    deputy who was famously murdered on his -- on car

8    camera in a gun fight is one of those cases that's a

9    glaring example.  But Pepper Spray is a less than

10   deadly force option for in a case where you find

11   yourself subject to physical force.  Guns are a tool

12   of deadly force, and those are two different

13   scenarios.

14      Q.   Why do you train your clients to take these

15   other steps before when they carry a firearm in

16   public?

17         MS. BELLANTONI:  I'm going to ask for some

18   clarification on what other steps you're referring

19   to.

20         THE WITNESS:  I was about to do the same,

21   so --

22   BY MR. WISE:

23      Q.   Sure.  And the other steps I mean are

24   getting training, carrying Pepper Spray, reading up

25   on the law, the steps that you just mentioned.

Page 30

1          MS. BELLANTONI:  I'm going to object to that

2     as well because I don't believe there was testimony

3     that he recommends they carry Pepper Spray, but maybe

4     we could get clarification on that.

5          THE WITNESS:  So I'm a big believer in human

6     beings being as capable as possible, and that may be

7     an artifice of my time as a police officer.  I

8     believe that, as a cop, you're in the lifesaving

9     business, and now, you know, I'm also a firefighter

10    on the side, so I'm in another lifesaving business,

11    you should be as capable as you possibly can, so my

12    counsel to human beings in general is that we should

13    be working to be better human beings this week than

14    we were last week, if you will, and that's kind of an

15    off-take of that.

16          Also, the more capability -- the more

17    training, education and capability you have, the more

18    situations you are going to be able to overcome if

19    you find yourself in a bad place.  I think we could

20    agree if you were an Olympic class swimmer, when your

21    sailboat sinks, you're going to be a lot better off

22    than your average dude that falls off a sailboat.

23          So if looking at my experience with street

24    crime, things like muggings, purse snatchings,

25    carjackings, person robberies, things like that,

Page 31

1    those can have a -- they can be a large range of

2    circumstances, so recognition of the problem,

3    figuring out ways to try to deescalate that, if

4    possible, having options if it's not a deadly force

5    scenario, and then having options if it is a deadly

6    force scenario is my counsel to people on how to best

7    cover the range of possibilities that people find

8    themselves in.

9    BY MR. WISE:

10       Q.   Do you have concerns that some persons that

11   carry openly don't know how to properly handle their

12   firearm in public?

13       A.   I'm not sure how to tactfully word this, but

14   I have concerns, and I don't mean just the public, I

15   mean the police and the military.  I have concerns

16   about the quality and quantity of training available

17   to the human race in general.

18            I'm currently in a bit of a dispute with our

19   state academy over what I believe is not -- the

20   training they're offering could be better, I'll just

21   say that.  Do I worry about other people carrying

22   guns?  I've been around other people carrying guns my

23   entire life, so not that much.

24       Q.   You have already responded in part to this,

25   but would you agree that a factor that affects

Veritext Legal Solutions
866 299-5127

1    whether a person uses a firearm safely is their

2    training?

3        A.   Probably, yeah, yeah, I'd say that.  Just

4    like anything else, I mean, if you were to -- if

5    you've never used a chainsaw before and you go pick

6    one up and start it up, you know, that might not be

7    the safest way to do business.

8        Q.   Would you agree that a factor that affects

9    whether a person uses a firearm safely is their

10   ability to deescalate a situation?

11            MS. BELLANTONI:  Objection.

12            You can answer.

13            THE WITNESS:  I don't know that I'd agree

14   per se with that.  Deescalation is a two-way

15   communication process, and the other person has a say

16   in what you are doing.  We have to deal with that in

17   depth right now in law enforcement, "deescalation"

18   has been a whole big ugly buzz word, but let's say I

19   have somebody in a state of excited delirium or very

20   high on drugs.  You know, I can't communicate or

21   deescalate with another person who isn't -- doesn't

22   even realize I'm on the same planet with them.

23            I've had to deal with people who are -- you

24   know, you try verbal deescalation, and you realize

25   you're dealing with somebody who's profoundly

Page 33

1    paranoid schizophrenic on a psychotic break, can't

2    really talk to that person, so the onus, the -- you

3    know, the weight of the deescalation on the person

4    carrying the gun, I think, is only -- you can only do

5    so much.

6    BY MR. WISE:

7        Q.   Are there certain situations, though, when

8    the ability to deescalate a situation allows a person

9    to carry a firearm more safely?

10            MS. BELLANTONI:  Objection.

11            You can answer.

12            THE WITNESS:  So I would argue that in some

13    scenarios, like I was in a case where I was off duty,

14    and I was with my girlfriend, we missed the last

15    Metro, we missed the last subway back to our hotel,

16    had to walk back in the dark, got confronted for what

17    would have been a street robbery by three dudes who

18    were all my size, so that's a fight I cannot win,

19    can't fight three guys empty-handed.

20            I ended up pulling a snub nose revolver on

21    them, and a combination of having a gun and then

22    verbal commands was what allowed me to deescalate

23    that scenario and kept it from turning into -- either

24    into a robbery where I got beat down or a situation

25    where I had to shoot one or more of them.

Page 34

1          So I would say with a gun, that the use of

2     the gun can be part -- or the availability of the gun

3     can be in fact part of the deescalation process

4     where, if you have a criminal, they realize that you

5     have the capability to defeat their means of

6     assaulting you, and that becomes part of the

7     deescalation process whereas if you did not have that

8     with you, they would go ahead and carry on.

9     BY MR. WISE:

10    Q.   And so in that situation, your ability to

11    deescalate the situation prevented you from having to

12    fire your gun, for example?

13    A.   Well, in that case, the display of the gun

14    and then the verbal -- you know, my commands to them

15    to stop what they were doing was what allowed me --

16    those in concert was what allowed me to keep that

17    from turning into either a beat-down on my part or a

18    shooting on their part.

19    Q.   Let me just circle back again and just make

20    sure I'm understanding correctly.

21    A.   Okay.

22    Q.   So are there any situations where a person's

23    ability to deescalate a situation allows them to

24    carry a firearm more safely?

25          MS. BELLANTONI:  I just want to just

Page 35

1    clarify, I should have a couple of questions ago, but

2    when we talk about deescalation, are we talking in

3    terms of a uniformed police officer attempting a

4    deescalation or civilian?

5           MR. WISE:  Yeah.  I was talking about a

6    civilian.  Thanks for clarifying.

7           MS. BELLANTONI:  I object.

8           But you can go ahead and answer.

9           THE WITNESS:  I'm having trouble thinking of

10   a scenario where that would fit.

11   BY MR. WISE:

12      Q.   Okay.  Do you agree that a factor that

13   affects whether a person uses a firearm safely is

14   their decision making process under stress?

15      A.   I could agree with that.

16      Q.   Would you agree that a factor that affects

17   whether a person uses a firearm safely is their

18   marksmanship?

19           MS. BELLANTONI:  I'm going to object to

20   that, and I'm going to ask for clarification on

21   distance, if you can provide more of a scenario-based

22   circumstance because there's a lot of factors that go

23   into that decision.

24           THE WITNESS:  May I interject on that?  So

25   my answer was going to be not as much as people would

                                              Page 36

1    suspect.  So in an overall view of most nonpolice

2    defensive shootings, if you take anecdotal databases

3    like the one that -- the ones we get off of the news

4    that go into the NRA magazine that's out every

5    month -- and they have an article called The Armed

6    Citizen.

7         The vast majority of the people involved in

8    these cases where you see, like, "78-year-old Grandma

9    Shoots Burglar Used Alleging .22 rifle."  Vast

10   majority of those people have very little or no

11   formal training.

12        And then the marksmanship issue that we see

13   in a -- on the street -- I'm not talking about a home

14   defense scenario, although that could -- it's pretty

15   similar, but in a street, what I would consider a

16   civilian street encounter or street crime encounter,

17   let's say a mugging or carjacking or something like

18   that, these encounters tend to be incredibly close.

19        The vast majority of bad guys, when they go

20   to do things like mug you or car jack you, things

21   like that, are within touching distance of the

22   victim.  Even in police encounters, we see that the

23   vast majority of police officers, when they're

24   feloniously killed with a firearm or killed within

25   three feet to three yards of the suspect, so if we

                                             Page 37

1   look at the -- there's an old saying in pistol fights

2   that it's three yards, three shots, three seconds,

3   and if you look at a lot of these encounters, they

4   fit right into what we're talking about, is the

5   marksmanship issue actually isn't that tough.

6   BY MR. WISE:

7        Q.   Would you agree that a factor that affects

8   whether a civilian uses a firearm safely is their

9   mental state?

10            MS. BELLANTONI:   Objection.

11            You can answer.

12            THE WITNESS:   So I'm going to assume -- by

13   "mental state," do you mean their mental health or,

14   like, their emotional state at the moment, or what do

15   we mean?

16   BY MR. WISE:

17        Q.   Sure.   Let's just take that one-by-one then.

18   Their mental health.

19        A.   Well, I would hope that people who have

20   significant mental health issues would not be running

21   around with a gun.   We're kind of supposed to screen

22   for that.   But then as far as their current mental

23   state, having been in that scenario, being criminally

24   victimized is obviously a very exciting, and, you

25   know, it's an event in which it's going to be

Veritext Legal Solutions
866 299-5127

1    emotionally charged, so I don't think that you can

2    put somebody in a scenario like that and not have a

3    significant emotional response out of just human

4    beings in general.

5        Q.   Let's assume that they're not being

6    victimized by just their carrying a firearm, okay,

7    and so my question is would you agree that a factor

8    that affects whether a person uses a firearm safely

9    is, let's just say, their emotional state?

10            MS. BELLANTONI:  Objection.  So using a

11   firearm, but they're not being victimized, so if I

12   could just get more clarity on that question.

13   BY MR. WISE:

14       Q.   Let's say that -- I'm sorry.  I should just

15   say carrying a firearm.

16       A.   I'm not sure exactly how to quantify that

17   one.  I think like a lot of things that human beings

18   do like driving cars, you should probably --

19   utilizing chainsaws, you should probably be a mature

20   adult if you will.  There's a reason why we, you

21   know, don't give 13-year-olds driver's licenses and

22   things like that.  So that, I guess, emotional

23   stability or emotional maturity kind of comes with

24   that, so I guess I'm kind of agreeing with you.

25       Q.   Would you agree that a factor that affects

Page 39

1    whether a civilian uses a firearm safely is whether

2    they're intoxicated?

3        A.    Certainly.

4        Q.    Would you agree that in general, an off duty

5    officer is more likely to be prepared to use a

6    firearm safely than the average civilian?

7              MS. BELLANTONI:   Objection.

8              You can answer.

9              THE WITNESS:   I'm on the fence on that one.

10   I'm really on the fence on that one.   It's hard for

11   me to mentally average law enforcement officers.

12   It's also hard for me to mentally average non- -- I

13   know -- I can think of quite a few people who are not

14   cops that I would rather have backing me up on

15   something bad happening than some of the cops that I

16   know, and, of course, the flip side is also there, so

17   that would be one I would have to ponder.   I really

18   can't give you an answer on that one.

19   BY MR. WISE:

20       Q.    Would you agree that in general, an

21   undercover officer is more likely to be prepared to

22   use a firearm safely than the average person?

23             MS. BELLANTONI:   Objection.

24             You can answer.

25             THE WITNESS:   I'd have to have the caveat of

Page 40

1    having to know what some of their training is.  Like,

2    here in my state, unfortunately, there's no

3    requirement for police officers to do anything but

4    shoot the qualification course from their police duty

5    belt, so there's no formal instruction in the police

6    system here in my state on, like, how to carry a gun

7    concealed or how to deploy a gun concealed.

8         Officers who are doing those things and are

9    very competent at them are either working that

10   problem themselves or seeking training outside of

11   their department to get that, or they have a very

12   progressive training department who is offering that

13   sort of training to their people.  So, again, I'm not

14   sure I can say that I agree with that.

15   BY MR. WISE:

16      Q.   Would you agree that in general, a retired

17   officer is more likely to be prepared to use a

18   firearm safely than the average person?

19         MS. BELLANTONI:  Objection.

20         You can answer.

21         THE WITNESS:  I would say that if you've got

22   a good street cop and they've had a lot of years on

23   the job, what they're going to be good at, because

24   they've been in a bunch of them, is handling critical

25   incidents, so potentially, yes.

Page 41

1    BY MR. WISE:

2        Q.   Would you agree that in general, a person

3    who a law enforcement agency has determined to have

4    good cause to possess a firearm is more likely to be

5    prepared to use a firearm safely than the average

6    civilian?

7              MS. BELLANTONI:   Objection.

8              You can answer.

9              THE WITNESS:   So I'm assuming, like, in a,

10   you know, show cause type of state, if -- like, in

11   New York, I know you have to prove that you have a

12   good reason to have a gun before they'll give you a

13   permit or something like that, so I assume you're

14   speaking to that type of paradigm.

15   BY MR. WISE:

16       Q.   That's right.

17       A.   I can't say that's the case.  You know, it

18   would entirely depend upon the criteria.  You know,

19   they could make a -- depending on the criteria, but

20   generally I disagree with that.  I know a lot of the

21   people who get permits, and I'll pick on New York.  I

22   have a little bit of knowledge of that, particularly

23   New York City.

24             Your cause has to do with things like, you

25   know, you're a high end jeweler and you carry a lot

Page 42

1    of cash or you do cash transports or jewelry

2    transports or things like that, so the official

3    perception of your threat level wouldn't really have

4    anything to do with your ability to respond to that.

5        Q.   Do you train your clients on how to prevent

6    their firearm from being stolen?

7        A.   Yes, I do.

8            MS. BELLANTONI:  Objection.  Can I just get

9    more clarification on what you mean by "stolen"?

10   Like, from the person?  From their home?

11   BY MR. WISE:

12       Q.   Stolen from their person, from their home,

13   their car, wherever.

14       A.   Actually, all of the above.  I talk about --

15   let's say you have a concealed carry, but you go to

16   some someplace that has one of those no gun signs.

17   Like, here in my state, you can lock your gun up in

18   your car legally in the parking lot of that property,

19   but, you know, you're not supposed to go -- like,

20   let's say it's a department store.  You're not

21   supposed to go in the store with a gun, but you can

22   lock your gun up legally on the parking lot, so they

23   clarified that in the law.

24           You don't just want to leave your gun in

25   someplace like the glove box, that's ill-advised, so

Page  43

1    I advise things on like how to secure a gun in a car,

2    how to secure a gun in the home, how to avoid having,

3    like, your toddler get ahold of your gun or something

4    like that, but then also one of my specialties is

5    weapon retention and disarming skills.  I've been

6    teaching that for a very long time.  So how to keep

7    your gun from being taken away from you.

8        Q.    Why is it important for your clients not to

9    allow their firearms to be stolen?

10       A.    You don't want the bad guys to have your

11   guns, or, you know, something like leaving it out

12   where a toddler can get it or, you know, whatever the

13   case may be.  I can point to specific cases.  One

14   of -- the last officer that was killed on my old job

15   was a friend of mine, and he was shot in a gun stolen

16   out of a home burglary.  So somebody had an unsecured

17   loaded pistol laying around their house, and he was

18   shot dead with it during the course of a speeding --

19   a car stopped for speeding.

20            So those are the type of things that, you

21   know, I never -- I've worked a couple of cases where

22   small children were shot over playing with guns, and

23   those are pictures that are stuck in my head that are

24   never going to go away, so I counsel people on the

25   importance of things like safe storage but then also,

                                              Page  44

1    you know, if you have the gun on your person, how to
2    go about safely doing that as well.
3       Q.   Have you ever published any articles on
4    topics related to the public carry of firearms?
5       A.   I have.
6       Q.   What articles did you publish?
7       A.   It's been a few.  So I've written for Recoil
8    Magazine which is a paper, you know, type magazine.
9    I have written for the Tactical Wire, which is a
10   strictly online type of thing, and I have talked
11   about, like, carriage of smaller guns, utilizing
12   revolvers, things like that.  So, yeah, I've dabbled
13   in that.
14      Q.   Were any of these articles based on
15   independent research that you conducted?
16      A.   I can't say formal research.  Like, I did
17   not do a scholarly-type paper or something like that,
18   no, sir.  It would be more things that I've read,
19   things that I've studied up on and then personal
20   observation and experience through my travels.
21      Q.   Do you have any academic background in
22   conducting research?
23      A.   Minimal.
24      Q.   Besides what we've discussed today, do you
25   have any other experience that informs your views on

Page 45

1    the public carry of firearms?

2        A.   I have quite a bit of experience with being

3    around it.  My state, of course, with Kansas, if you

4    go back, we had Wyatt Earp, Bat Masterson, things

5    like that, we had the Frontier Days, the cattle

6    drives, Oregon-California Trail, things like that

7    going on.  I'm a big history buff.

8             And then if you go back to when I started my

9    time in law enforcement, there was no way for anyone

10   besides a commissioned law enforcement officer to

11   carry a gun in the State of Kansas outside of, like,

12   hunt -- they had an exception for hunting and

13   fishing, you could carry a concealed handgun, and,

14   obviously, if you're hunting, you could do things

15   like carry your shotgun or your deer rifle, things

16   like that, but that's -- it was allowed -- the state

17   allowed individual cities to ban carry of firearms,

18   things like that.

19            It was legal to have a loaded gun in your

20   car but not on your person, weirdly enough, but then

21   a lot of the cities banned loaded guns in cars.  So

22   that's where I started my time in law enforcement,

23   and then since then, there's been decisions, legal

24   precedents, things like that, particularly after

25   Heller, the Kansas attorney general who came down

Veritext Legal Solutions
866 299-5127

1    with an opinion that certain Kansas laws were

2    unconstitutional.  Some of those laws were changed.

3         There were several court cases where cities

4    tried to go back to the old way of doing business,

5    and they were disallowed from that, so in my time as

6    a cop, we went from nobody could carry, and including

7    retired law enforcement officers could not carry a

8    gun.  The only people who could carry was on duty

9    cops or off duty cops but only with the permission of

10   their chief law enforcement officer, so some off duty

11   cops couldn't carry.

12        And then we went to a rather strict conceal

13   carry permit system, then a much looser conceal carry

14   permit system and then an attorney general's opinion

15   that allowed what people would call the

16   constitutional carry, if you will, where you could

17   carry concealed or open carry without a license, and

18   there were several lawsuits over -- like, I know

19   Overland Park, Kansas tried to ban open carry, and

20   the attorney general's office took them to court over

21   that or was at least part of those proceedings.

22        And so in my state, it is legal to carry

23   concealed, it is legal to carry unconcealed, it is

24   legal to -- you can get a conceal carry permit which

25   a lot of people do if that allows reciprocity.  Like,

                                    Page 47

1    if you have a Kansas permit, you can carry in

2    Missouri, Nebraska, Oklahoma, Colorado, Texas.

3    There's a litany of places you could carry.

4            So some -- a lot of people will get the

5    permit because, you know, you can travel, but also a

6    lot of people don't.  So it's very common for me to

7    deal with nonpolice firearms carriers or to see

8    people carrying a gun in public.

9        Q.   Over the course of your career, have you

10   served in any law enforcement command positions?

11       A.   Yes, sir.  I was a lieutenant shift

12   commander for my department.  At one point, we had a

13   hiring freeze, and we had a promotion freeze, so I

14   was simultaneously the first shift and second shift

15   patrol commanders, and I was in charge of the

16   motorcycle unit and the school resource officers.

17       Q.   And what department were you working for?

18   What timeframe?

19       A.   That was Topeka, Kansas PD, and that would

20   have been approximately -- I'm doing the math here.

21   So I retired in December of 2014, and that would have

22   been about -- I believe I got promoted in 2008 to

23   lieutenant.  I'm going to have to look that one up.

24   It might have been '06, but it could have been '08,

25   but I did approximately right about -- would be about

Page 48

1   eight years, just under eight years as a lieutenant.

2          And then my current job, I'm the captain for

3   the Airport Police and Fire here in the south part of

4   Topeka at the airport, and so I'm in charge of all

5   three of the lieutenants.  I have all three of the

6   shifts that we have.  We have 24-hour shifts, so we

7   have an A, B and C shift, I'm in charge of them, and

8   then I'm also in charge of all of our firearms and

9   other police training.  We have another captain

10  that's in charge of all the fire part of the

11  organization.

12      Q.   How long have you served in that role as

13  captain?

14      A.   About a year.

15      Q.   Have you ever served as a deputy chief of

16  police?

17      A.   No, sir.

18      Q.   Have you ever served as a chief of police?

19      A.   No, sir.

20      Q.   And I should go to the sheriff's department

21  too.  Have you served in any similar capacity,

22  sheriff?

23      A.   No.  Just as a deputy.

24      Q.   Do you have any background in public policy?

25      A.   I have a background in police policy.  I

Veritext Legal Solutions
866 299-5127

1   have written a number of policy papers, what you

2   would think of as general orders, things like that,

3   but if you mean a larger -- like, the grandest thing

4   I have done is written a municipal ordinance as far

5   as, like, an overarching public policy.

6        Q.   What was that municipal ordinance?

7        A.   It was a Topeka city code on -- had to do

8   with protests, and it bans masks and body armor while

9   you're in the middle of a protest.  I could pull up

10  the number for you if you ever want to look at it.

11       Q.   That's okay for now.  Any other work that

12  you've done creating a municipal ordinance or similar

13  work?

14       A.   Not on that.  Mainly I -- I was the author

15  of some of the general orders that we had at Topeka

16  Police Department.  My current department, I have

17  written general orders, use of force policy, things

18  like that.  I have assisted in policy writing for the

19  IACP.

20            Like, I was part of the model policy for

21  response to excited delirium for International

22  Association for Chiefs of Police organization.  So

23  the vast majority of the stuff I've done in that

24  regard has all been cop stuff.

25       Q.   Have you ever worked with a policy maker in

                                              Page 50

1  the creation of public safety policy?

2      A.   If you mean like state laws or something

3  like that, not more than lobbying or that sort of

4  thing, no.

5      Q.   Have you ever worked with a community

6  stakeholder in the creation of public safety policy?

7      A.   On the police level, yes, we had input.

8  Like, things like our chase policy and our police use

9  of force, things like that, we did take -- that

10 wasn't all in-house.  There was other people involved

11 in that, mayor's office, city council members, other

12 community -- I'll use the "stakeholder" word.

13     Q.   Any other examples besides what you've just

14 reviewed?

15     A.   No, sir, none that I can think of.

16     Q.   Have you ever worked with a researcher in

17 the creation of public safety policy?

18     A.   No, not really, no.

19     Q.   Okay.  Let's turn to your opinions.  What

20 field would you consider yourself an expert in?

21          MS. BELLANTONI:  Objection.

22          You can answer.

23          THE WITNESS:  Personally, I think the term

24 "expert" is overused, but the courts have said I'm an

25 expert in police use of force, use of force decision

Veritext Legal Solutions
866 299-5127

1  making, firearms, firearms training and ballistics,

2  terminal ballistics, firearms identification, police

3  use of force other than firearms, Pepper Spray,

4  taser, arrest and control tactics.  I've been

5  utilized as an expert on police response tactics.  At

6  any rate, those are the things that I've been

7  court-recognized as an expert.

8  BY MR. WISE:

9      Q.   What is the basis for your opinions in this

10  case?

11     A.   Basically the totality of my training and

12  experience as a police officer.

13     Q.   Okay.  Let's look at page seven of your

14  report.

15     A.   I have to find my glasses for this one.

16     Q.   Can you see the screen okay?

17     A.   Yes, sir.

18     Q.   Okay.  Great.

19     A.   I can now.

20     Q.   Let's look at paragraph 20.  You state "The

21  implementation of laws that allow open carry in

22  public does not have a negative impact on public

23  safety.  The act itself, a lawful person openly

24  carrying a firearm in public does not have any

25  negative or detrimental effect on public safety, does

Page 52

1    not itself create a safety hazard, and is not the

2    cause of accidental or mistake-of-fact shootings of

3    civilians by police officers."  Is this your opinion?

4         A.   Yes.

5         Q.   Okay.  Would you explain what you mean?

6         A.   So just the mere fact that somebody's

7    carrying a gun -- and I'll go with a holstered

8    handgun, let's say, in and of itself.  It just is

9    what it is.  It isn't a negative or doesn't have an

10   effect on public safety.

11        The idea that the police would show up and

12   be, "Oh, my God, that guy's got a gun, we better

13   shoot him" borders on the ridiculous in my mind, that

14   -- and a bunch of that is personal observation.

15        Both here in Kansas and part of the business

16   that I do both as a police trainer and in my own

17   business as a -- we'll just say civilian firearm

18   trainer, is travelling to other states.  You know,

19   just this year, I've been to -- I've conducted

20   training or been at training in Texas, Oklahoma,

21   Missouri, Utah, Wyoming.  I'm leaving something out.

22        But at any rate, I see -- I go to a lot of

23   places, see a lot of stuff, and this is something

24   that -- part of the reason in conversation when I

25   talk to Ms. Bellantoni, you know, what's my personal

Page 53

1    observations, like I guarantee you I can walk out of

2    here now and go to someplace like Walmart here in my

3    town and find somebody carrying a pistol in a holster

4    visible on their belt or, quite frankly, carrying

5    concealed poorly where everybody can tell that

6    they're carrying a pistol, but, you know, you can see

7    that there's an obvious bulge and things like that.

8           I can find somebody -- I can walk out of

9    here and find somebody in 15 or 20 minutes, and it's

10   just -- it just is what it is.  It's like saying,

11   "It's a sunny day out, that guy's carrying a gun."

12   It's not a positive, it's not a negative, it just is.

13          I haven't noted, in observation in my time

14   as a cop in dealing with people on the street, that

15   open carry does anything that doesn't bring any

16   detriment to the public safety realm.

17     Q.   Besides your personal observations, what

18   else did you rely on to reach this opinion?

19     A.   Primarily, that was it.  One of my big

20   things that I do is every chance that I get, I delve

21   into anything that involves the police.  A lot of

22   things that are out there in the police world get

23   write-ups.  There are famous things that we have to

24   look at.

25          Obviously, you know, the George Floyd thing

Page 54

1    last year, that was a botched arrest and control

2    scenario, and that's right in the middle of my

3    bailiwick on, you know, teaching cops how to avoid

4    things like in custody deaths; and then, you know,

5    less well known but pretty famous, the bad shooting

6    that turned into a riot that came out of Atlanta PD,

7    which was, you know, basically another arrest and

8    control scenario with a taser.

9         So I try to stay on top of those trends

10   absolutely as much as I can, and I also pay attention

11   to anything in the police publications or any of the

12   newsletters, any of the stuff that comes through my

13   email.  My email lists are fairly extensive.

14        So I'm always looking for after actions on

15   incidents as much as possible, both to support my

16   business and helping, you know, regular people not be

17   the victims of crime, look for criminal, crime

18   trends, look for trends in law enforcement.  We know

19   in the past couple of years, ambushes has been a

20   thing that has been up, so trying to stay on top of

21   that sort of thing as well.

22     Q.   Did you rely on any research to support your

23   opinion?

24        MS. BELLANTONI:  Other than what he

25   testified to?

Page 55

1          THE WITNESS:  I can't point you to a

2    specific paper or anything like that, no, sir.

3    BY MR. WISE:

4       Q.   You continue on page eight, paragraph 21 --

5       A.   Uh-huh.

6       Q.   -- stating "The lack of proper police

7    training creates or can lead to a public safety

8    hazard and the accidental shooting of civilians,

9    whether unarmed, carrying concealed, or carrying

10   exposed open carry."  Would you explain what you

11   mean?

12      A.   So if you don't have -- you know, and this

13   is something that is deep in the training that good

14   law enforcement firearms instructors find themselves

15   in.  If we look at some of the court cases that are

16   out there like, you know, the places lost big

17   lawsuits, Zuchel v. Denver is an example that is

18   glaring in the police world that is brought up.

19          If you look at Popow v. Margate and we look

20   at what do the courts say valid police training

21   should look like versus what had happened -- you

22   know, if you look at the Popow case, they were

23   shooting at a man that was running, and gentleman

24   came out on his porch to see what was going on, and

25   then as the suspect was running past the gentleman on

                                        Page 56

1    his porch, he got shot by the police because he was
2    downrange of where the bad guy was.
3          So that would be a glaring historical
4    example of incorrect or improper or nonexistent
5    police training contributing to a public safety
6    hazard that, quite frankly, didn't exist before the
7    police showed up.  So avoiding mistake-of-fact
8    shootings is a big deal in the police world and the
9    training that is done right.
10   Q.   Is it your opinion that proper law
11   enforcement training is the most important factor to
12   prevent civilian shootings by law enforcement
13   officers?
14   A.   If you mean mistake-of-fact or not shooting,
15   shooting the wrong people, then I would say yes.
16   Q.   Incidentally, is that one of the reasons you
17   founded your company, Agile Tactical?
18   A.   So I founded the company because I was
19   getting -- I had been a police trainer for so long,
20   and then that was mainly what I did, and as I reached
21   retirement, I had so many people asking me outside of
22   the police world for training, I thought, well, I
23   should kind of formalize this thing.
24   Q.   Do you believe that a person who is carrying
25   a firearm in public, a civilian who's carrying a

Page 57

1    firearm in public is more likely, all things being

2    equal, to be shot than a civilian is who is unarmed?

3              MS. BELLANTONI:  Objection.

4              You can answer if you can.

5              THE WITNESS:  So historically, if you look

6    at people who are big crime victims according to --

7    and this is according to national stats, which, of

8    course, fluctuate every -- year to year, things like

9    that, but if you look at people who resist things

10   like robberies, that sort of thing, the safest way to

11   do that is to utilize a firearm.  Statistically,

12   that's the case, and that's been the case for quite

13   some time.

14             So I'm not exactly sure how to quantify your

15   question on are they more likely to be shot or not be

16   shot, but I think it's pretty clear statistically if

17   they resist being a crime victim through the use of a

18   firearm, then they're less likely to suffer any

19   injury at all.  That's been the running statistic

20   coming from the feds every year.

21   BY MR. WISE:

22      Q.   And when you're referring to the statistics,

23   what in particular are you referring to?

24      A.   The national -- so I'm going to look up the

25   formal name of that so I don't -- it's Bureau of

                                            Page 58

1    Justice Statistics.  I don't want to misstate the

2    name of what I'm talking about.  I'm firing up my

3    other magic Google box.

4        Q.   If that would refresh your recollection, go

5    ahead.

6        A.   Okay.  So the formal name for that page is

7    Bureau of Justice Statistics.  I was having a little

8    Alzheimer's on the name of that one.

9        Q.   Thank you.  Okay.  Do you believe that a

10   civilian who's carrying a firearm in public is more

11   likely, all things being equal, to be shot by a law

12   enforcement officer than a person or a civilian who's

13   unarmed?

14            MS. BELLANTONI:  Objection.

15            You can answer if you can.

16            THE WITNESS:  I don't because a lot of the

17   mistake-of-fact shootings, particularly the ones that

18   are very high profile, we can point to demonstrate

19   they did not have a firearm on their person, and they

20   were shot in a mistake-of-fact shooting because they

21   had something as innocuous as a cellphone or

22   something else.

23            If you look at the famous case out of NYPD,

24   I can't pronounce the gentleman's name or -- well,

25   it's something like Diallo, where their street crimes

Page 59

1    unit fired the -- you know, the famous 47 rounds that

2    Bruce Springsteen spoke of, he had a wallet in his

3    hand when he was shot.

4    BY MR. WISE:

5        Q.   I just want to make sure I'm understanding

6    you because you mentioned a few examples.  Are you

7    talking in general or just examples that come to

8    mind?  And what I'm trying to --

9        A.   I --

10       Q.   Yeah.

11       A.   I don't believe that you would be more

12   likely to be mistakenly shot by the police, and I'm

13   assuming someone who is not a criminal actor, but,

14   you know, just an average Joe, I don't think you're

15   more likely to be shot by the police whether you have

16   a gun or you don't have a gun.

17       Q.   Let's look at paragraph 24, still on

18   page eight.

19       A.   Okay.

20       Q.   You state "Mr. Raney's opinions are based on

21   speculation and a generalized fear that law-abiding

22   individuals, simply by the act of carrying their

23   firearm exposed, will cause panic among police

24   officers and the public, waste political" -- excuse

25   me -- "waste police resources and ultimately lead to

Page 60

1    police officers shooting civilians carrying exposed."

2        A.    Okay.

3        Q.    Is that your opinion?

4        A.    Yes.

5        Q.    Okay.  Do you understand Mr. Raney to have

6    the opinion that police officers will panic when

7    responding to a call about a person who is carrying a

8    firearm openly?

9        A.    What he describes in his declaration sure

10   appears to color it that way.

11       Q.    Do you understand Mr. Raney to have the

12   opinion that police officers are likely to shoot a

13   person simply because they are carrying a firearm

14   openly?

15       A.    He also seemed to hint at that in his

16   opinion.

17       Q.    Do you understand those things to be his

18   opinion, or are you saying that --

19       A.    That's what I believe I read from his

20   opinion.

21       Q.    Okay.  Let's look at page 26.  We're still

22   on page eight.  I'm sorry.  Paragraph 26.  You state

23   that "When open carry without a permit became allowed

24   in Kansas, no instant mayhem was created"; is that

25   right?

Veritext Legal Solutions
866 299-5127

1    A.    Yes.

2    Q.    Okay.  Do you understand Mr. Raney to have

3    the opinion that instant mayhem will result if open

4    carry were allowed in California?

5    A.    Without rereading his opinion on the spot,

6    I'm not sure that I would -- I could say he said

7    those exact words, but his opinion that I read, the

8    impression of his opinion that I got from him was

9    people couldn't open carry because it would make

10   things much more chaotic, you know, the police would

11   have all kinds of problems differentiating good guys

12   from bad guys for, you know, cops and robbers, from

13   want of a better term, and that it would cause -- you

14   know, he'd almost colored it as though it would cause

15   some sort of mass public hysteria.

16   Q.    Let's look at page nine, paragraph 28.  You

17   state that "When open carry became allowed in Kansas,

18   our police officers were not spontaneously shooting

19   members of the public they observed carrying a

20   firearm exposed on their body in public;" is that

21   right?

22   A.    Was that a -- I'm assuming that was the

23   upper part.  You said -- 28 now talks about banning

24   open carry.

25   Q.    Yeah.  Let me see here.  One second.

Veritext Legal Solutions
866 299-5127

1      A.    I think you were on the previous --

2      Q.    Oh, sorry.  I meant paragraph 26 on

3   page eight still.

4      A.    Sure.

5      Q.    Is that your opinion in paragraph 26?

6      A.    That police officers were not shooting

7   members of the public?

8      Q.    Correct.

9      A.    Absolutely.

10     Q.    Do you understand Mr. Raney had the opinion

11  that if open carry were allowed in California, police

12  officers would spontaneously shoot members of the

13  public who were openly carrying firearms?

14     A.    His opinion read to me as though he believed

15  that open carry could not be allowed in the State of

16  California because it would pose too great of risk of

17  police officers shooting the wrong people merely for

18  carrying a gun in the open.  That is what I took from

19  part of his opinion.

20     Q.    Okay.  Now let's go to paragraph 28.

21     A.    Okay.

22     Q.    You state "Banning open carry does not

23  greatly enhance public safety, nor does it cure

24  deficiencies in departmental training of police

25  officers."  Would you explain what you mean?

Page 63

1       A.   Well, as I said, in my experience in the

2   world, I went from a place where nobody could carry

3   except the cops legally.  A lot of people did it, but

4   nobody could legally carry a gun beside the cops, and

5   you certainly couldn't run around open carrying to a

6   world where you could get a permit to a world to

7   where you could open carry or conceal carry as you

8   see fit.

9          During that period of time, we actually had

10   a great -- quite a bit of a -- and I cannot point to

11   a statistical cause and effect relationship, but I

12   did note that locally, you know, when I first started

13   in the police world with things like gang violence

14   and that sort of thing, our crime was significant.

15          There was a port in my career where I looked

16   up crime stats for the United States early in the

17   '90s, and that's when things were still banned, and

18   Topeka had a per capita crime rate greater than

19   Los Angeles, and now we come to a point where you can

20   carry a gun as you see fit, if you want to be open

21   carry or conceal carry without a permit, or you can

22   get a permit, and there was -- you know, that

23   coincided with no uptick in crime.

24          In fact, for the longest time, we had a

25   Leave It to Beaver era level crime where it was so --

                                          Page 64

1    crime had dropped so much, everybody kind of forgot

2    what that was like, but there was certainly no uptick

3    in things like police shootings or, you know, other

4    crimes relevant to -- I see -- and I guess I'm -- I

5    don't know if I'm speaking out of turn here because

6    it's more of a larger than this case, but there's

7    people who push the opinion that if you allow people

8    to carry guns, they're just going to run around

9    killing people over things like parking lot disputes

10   or, you know, "You took my parking space" or

11   something like that.  We just didn't see it.  We

12   didn't see any of that.

13       Q.   When you state that "Banning open carry does

14   not cure deficiencies in law enforcement training,"

15   are you emphasizing, as we've discussed before, the

16   critical importance of training in public safety?

17       A.   Yes, and whether or not you're going to have

18   mistake-of-fact shootings, things like that.

19       Q.   Setting aside training for the moment, does

20   banning open carry enhance public safety at least to

21   some extent?

22       A.   I don't believe so.  I don't believe so.

23       Q.   When you state that banning open carry does

24   not, quote, "greatly enhance public safety," do you

25   mean that banning open carry improves public safety

Page 65

1   to some degree?

2      A.   I don't believe it does.  I don't believe it

3   does.  I see no -- I have personally noticed no cause

4   and effect relationship.  I have noticed no

5   difference in police-citizen encounters.

6           One could argue that there's a possibility,

7   although it's always -- it's impossible to measure in

8   negative.  Have people with an open carry firearm not

9   been targeted for a crime because a criminal could

10  see that that person is armed?  We won't know.  Those

11  things are nebulous.

12          So I can't point to an exact cause and

13  effect relationship or put statistics on that, but

14  what I haven't noticed is we had open carry, and

15  then, oh, my God, all of this bad stuff started

16  happening.  That was clearly not the case and hasn't

17  been the case, and it hasn't been the case for years

18  now.  I know I'm kind of generalizing on that.

19     Q.   I appreciate that.  And the reason I'm

20  asking is I'm just looking at your language, your

21  report that says "Banning open carry does not greatly

22  enhance public safety."  It doesn't say, for example,

23  banning open carry does not enhance public safety.

24  That's why I was asking whether it enhances public

25  safety to some extent.

Page 66

1      A.    I totally get where you're coming from, and

2    I don't believe it does either way, either one of

3    those ways of wording that sentence.

4      Q.    Let's look at page nine, paragraph 31.

5            (Discussion off the record)

6            (Recess)

7    BY MR. WISE:

8      Q.    Okay.  Let's go back on the record and look

9    at page nine, paragraph 31.  You observed that Kim

10   Raney's report states that when an officer comes upon

11   a scene where a person is carrying openly, the

12   officer must rapidly assess a person's behavior,

13   paragraph 22?

14     A.    Yes.

15     Q.    Split-second decisions sometimes have to be

16   made, paragraph 24, where the results could be

17   deadly, paragraph 22; is that right?

18     A.    Yes.

19            MS. BELLANTONI:  I'm going to ask that you

20   read that back.  Are you saying that that's what

21   Mr. Haggard is saying or that's what he's referring

22   to Mr. Raney's declaration?

23            MR. WISE:  Yeah.

24   BY MR. WISE:

25     Q.    You're referring to Mr. Raney's declaration;

Page 67

1    correct?

2        A.    Yes.

3        Q.    Okay.  Do you understand Mr. Raney to have

4    the opinion that it is uncommon in police work for an

5    officer to have to rapidly assess a person's

6    behavior?

7        A.    I can't say that exactly, but it appears as

8    though he tries to paint a picture that if you don't

9    have open carry, then you won't have all of that

10   going on.

11       Q.    Do you understand Mr. Raney to have the

12   opinion that it is uncommon in police work for an

13   officer to have to make a split-second decision where

14   the results could be deadly?

15       A.    I can't say that he would have that opinion.

16   Again, he appears to color his opinion as though if

17   we were to eliminate open carry, that that would

18   somehow solve that problem.

19       Q.    Do you understand Mr. Raney to have the

20   opinion that allowing open carry would increase the

21   circumstances in which an officer would have to

22   rapidly assess a person's behavior and make a

23   split-second decision where the results could be

24   deadly?

25       A.    He appears to have that opinion to me.

1    That's what I gather from reading his opinion.

2        Q.   Do you agree that an officer that comes upon

3    a scene where a civilian is carrying openly is more

4    likely to have to rapidly assess that person's

5    behavior?

6             MS. BELLANTONI:  Objection.

7             You can answer.

8             THE WITNESS:  I do not.

9    BY MR. WISE:

10       Q.   Why not?

11       A.   So something that is standard practice in

12   the police world and has been by progressive

13   departments who train hard since, if we get into the

14   history of very tragic incidents, late '60s, early

15   '70s, events such as the Newhall massacre there in

16   California, the incidents that were written up in the

17   famous book "Officer Down, Code 3," what we look at

18   is that officers should be assessing, "Just because I

19   can't see a gun doesn't mean somebody should have

20   one."

21            Standard officer safety practice is if you

22   pull somebody over for speeding or if you pull

23   somebody -- you make a stop for whatever, the only

24   safe assumption is to assume that a person is armed

25   and that you comport yourself and your tactics and

Page 69

1    your approach and things like that with the

2    assumption that a person could pull out a concealed

3    weapon and utilize that weapon, and then, you know,

4    if you run with that assumption, your tactics, your

5    decision making, things like that, that it keeps you

6    in the best frame of mind for good officer safety.

7          So in my mind, if we think that we're

8    solving a problem by banning open carry -- so let's

9    say I could push a magic button and there was no open

10   carry.  I've never had to deal with that problem.

11   That doesn't solve the problem that we see in police

12   work.

13   Q.   Let's go to your example of the routine

14   traffic stop.  Would the presence of a firearm

15   heighten the danger for the officer?

16          MS. BELLANTONI:  Objection.

17          Can I get more -- can you be more specific

18   in that scenario?

19          MR. WISE:  I can ask the question again.

20   BY MR. WISE:

21   Q.   In a routine traffic stop, would the

22   presence of a firearm by the civilian in a car

23   heighten the danger for the officer?

24          MS. BELLANTONI:  Objection.

25          You can answer it if you can.

1           THE WITNESS:  It would depend on that

2     person's intent.  I can tell you personally I've

3     never really had to worry about the guns that I could

4     see.  I've walked up on car stops where I've had

5     people with shotguns and rifles in the back window of

6     a pickup truck, guns in consoles, guns laying on

7     seats, I've dealt with people who are wearing

8     holstered guns on their hip, that sort of thing, and,

9     quite frankly, the guns that I can see, the weapons

10    that I can see, I was never very worried about.

11           I was worried about the behavior of the

12    people who were, you know, literally being furtive,

13    who were trying to conceal what they were up to.  It

14    was more behavior-focused, you know, "Is this person

15    in the middle of a crime and, thus, might try to take

16    me out because they want to make an escape and

17    utilize a weapon as part of that escape process?"

18           And literally the guns that I could see, I

19    was never worried about.  It's what you don't know

20    that is a problem.

21    BY MR. WISE:

22      Q.   In a routine traffic stop, would the

23    presence of a firearm in the car make it more likely

24    that an officer would have to make a split-second

25    decision where the results could be deadly?

Page 71

1          MS. BELLANTONI:  Objection.

2          You can answer it if you can.

3          THE WITNESS:  Again, I don't believe so.  I

4    have seen people do things like reach under the seat

5    of the car, reach into a glove compartment, reach

6    into a console in between the seats, bags, things

7    like that.

8          Again, it's the things you don't know, it's

9    the things you can't see that are the most worrisome,

10   and that's where the split-second decision really

11   comes into play, and then that becomes a

12   behavioral -- reading the behavior of the person

13   versus if they have, you know, a visible firearm or

14   not, you know, and then it becomes reading the

15   behavior and the scenario that you find yourself in.

16         Quite frankly, if I know -- let's say I have

17   an actual bad guy, I know he's a bad guy, he's a

18   suspect that we -- say we have a picture of the guy

19   or video of the guy and I know that's the guy and I

20   see he's got a gun on him, that's kind of a gimme on

21   the decision making process.

22         It's when you don't know and you have to

23   make those split second decisions because is he

24   armed?  Is he not armed?  I don't know.  That's where

25   things become very worrisome.

1    BY MR. WISE:

2       Q.   Let me just drill down on that for a moment

3    then.  So what if you don't know the person's a bad

4    guy, as you were saying, and they have a firearm?

5    Does that affect the way that you approach that

6    person?

7            MS. BELLANTONI:  Objection.

8            You can answer if you can.

9            THE WITNESS:  It --

10           MS. BELLANTONI:  Can we get more clarity on

11   where this firearm is?  Very situational thing.  It's

12   very, like, amorphous scenario without much detail.

13           MR. WISE:  Sure.  I was going off the

14   scenario he was talking about.

15           THE WITNESS:  So I can point to -- I think

16   more pertinent to what we're talking about, I can

17   point to after we legalized the conceal carry, we had

18   a gentleman come into the state who believed he was

19   going to -- he was kind of antipolice, and he was

20   going to do a conceal carry, what he called an

21   audit -- or I mean a gun rights audit -- and see how

22   we would react.

23           So he was wearing a visible -- a very large

24   handgun in a holster visible, and he was walking up

25   and down the sidewalk, on a public sidewalk in front

                                          Page 73

1    of a very well-to-do subdivision, small gated

2    community, and somebody thought he was acting kooky,

3    so they called police.

4            We made contact with the guy.  He was

5    carrying a gun.  We could see he had a gun, you know.

6    I would instruct the gentleman, you know, "Don't

7    reach for the gun that's clearly there," you know.

8    "What's going on?  We got a call."

9            And basically he was trying to turn it into

10   a, "See, the police are antigun" confrontation type

11   of thing, and the whole thing diffused because, you

12   know, quite frankly, we didn't overreact.  We had a

13   guy pacing back and forth on a sidewalk, you know, so

14   we have to ascertain, "is this a guy -- maybe he's

15   suffering from mental illness, or, you know, why is

16   he here?"

17           Because his behavior, his pacing back and

18   forth did alarm people more than anything, you know,

19   "Why is that guy acting kooky out here?"

20           And then when it turned out to be a

21   specific -- kind of a public, you know, "We're going

22   to get gotcha video on the police" type of a stunt

23   that he was pulling and he didn't get the reaction he

24   was hoping for, then the whole thing was over with.

25           And I've had to deal with a few things like

Page 74

1    that, but overall, you know, if I were to have to

2    make an approach on somebody, part of that approach

3    would be, "What are the circumstances?" you know.

4         Is this guy in an alley behind a business in

5    the middle of the night, or is this guy just walking

6    down the sidewalk or -- you know, I guarantee you,

7    like I say, I could go someplace in town here, like

8    go to our Walmart, and I could find somebody with a

9    gun on their hip, and, you know, they're in the green

10   bean aisle and it's just an innocuous thing.

11   BY MR. WISE:

12        Q.   Let's go to page 12, paragraph 40.

13        A.   Again, it's silly, but every time you start

14   to do that, I reach for my own mouse, and I feel like

15   an idiot.

16        Q.   Okay.  Paragraph 40, you state "The behavior

17   and demeanor of a person exercising his right to open

18   carry will be markedly different than that of an

19   individual posing a threat to the public.  Any

20   experienced honest law enforcement officer knows that

21   to be the truth."  Would you explain what you mean?

22        A.   So it's a whole behavioral package.  If you

23   have a guy who's got a gun on his hip walking his

24   dog, you got a guy, gun on his hip, shopping for

25   groceries, whatever the case may be, there's no

                                          Page  75

1     criminalistic behavior involved in any of those
2     activities that would lead you -- like, whether he
3     had a gun on his hip or not, this is not something
4     that I could have probable cause for a stop, it is
5     not something that I could do a Terry stop on a
6     person over, you know, because it doesn't -- they're
7     not -- if they're -- if they just exist and they
8     happen to be carrying a gun and are going about their
9     business and there's no behavioral indicators that
10    would indicate criminal activity is afoot, then it
11    just isn't an issue.

12          If you look at -- well, if you look at the
13    classic case of Terry v. Ohio that speaks exactly
14    what I'm talking about, the criminals in that case
15    had handguns that were deeply concealed, but whether
16    they saw -- whether Detective McFadden saw the guns
17    or didn't see the guns, he obviously did not, it was
18    the behavior manifest that they were displaying in
19    that that led to the stop, the classic what we know
20    as a Terry stop nowadays.  Somebody just having a gun
21    on their hip isn't -- it's -- the totality of the
22    behavior is what a good cop is going to look at.

23    Q.    And what is the behavior that you're looking
24    for to be able to determine whether a person carrying
25    openly does not pose a threat to the public?

Page 76

1              MS. BELLANTONI:  Objection.

2              You can answer.

3              THE WITNESS:  That's wide open.  You know,

4    it has everything to do with the location, is their

5    activity congruent with the location, the time of

6    day, things like that.  You know, I mentioned

7    previously do I have a guy behind a business after

8    dark after it's closed?  You know, that would be a

9    guy that I'm going to take a second look at.  Is this

10   guy up to no good?  You know, is he looking to

11   burglarize this establishment?  That sort of thing.

12   So it's, you know, demeanor, their actual activity,

13   the time of day, the location.  All of that goes into

14   play.

15   BY MR. WISE:

16       Q.   And what's the basis for your opinion?

17            MS. BELLANTONI:  Which one?

18   BY MR. WISE:

19       Q.   In paragraph 40.

20       A.   Thirty-four years of law enforcement and

21   dealing with people both pre- and post-open carry

22   being legal, that's just -- I would call that good

23   police work at the street level is being able to read

24   human beings and then evaluate their behavior.

25       Q.   Let's talk about active shooter events.

                                        Page 77

1    What is an active shooter event?

2       A.   I'm actually not a big -- so that's a term

3    of common usage that so many people utilize now.  I'm

4    not a fan of it, but if we want to talk about -- you

5    know, something I prefer is, like, a mass murder or

6    serial murder in progress where you have somebody

7    actively -- you know, and I know of cases where they

8    have been -- instead of an active shooter, they're an

9    active stabber, you know.

10           You know, we've had cases in the literature

11   of knives, swords.  They just had one in Norway the

12   other day that he was -- the dude was killing people

13   with a bow and arrow.  So I would call it a rabid

14   serial murder in progress if you want a more precise

15   term.

16      Q.   So during such an event, an active shooter,

17   mass shooting event, is the shooter always easily

18   identifiable?

19      A.   Well, at both of the ones that I went to, he

20   sure was.  Often if you don't know exactly where the

21   person is, then what we teach our tactics for

22   movement to contact, but the important part of an

23   active shooter is it's active.

24           You have some -- if you don't see that's the

25   guy shooting people or that's the guy stabbing

Veritext Legal Solutions
866 299-5127

1   people, or in one case I was involved in, the guy

2   was -- he was an active shooter, active bomber.  He

3   was throwing pipe bombs, what you would think of

4   nowadays as IEDs, inside the building.  If.

5        You don't see that or hear some stimulus to

6   draw you where the person is, then it's not really an

7   active shooter if you will.

8   Q.   So in the scenario where you're not

9   immediately able to identify where the shooting is

10  coming from, what is the -- can you describe the

11  atmosphere at such an event?

12       MS. BELLANTONI:  I'm going to object.

13       You can answer, but I think we're going

14  outside the scope of this case and causes of action

15  that are being brought.  But you can go ahead and

16  answer.

17       THE WITNESS:  In a word, it's going to be

18  pretty tense.  At the attack on our federal

19  courthouse here in Topeka, we had a gentleman that

20  was doing an active shooting, active bombing.  He was

21  throwing IEDs all over the building when I showed up.

22  Things had gotten real quiet, and we had to

23  transition from what you would think of now as a

24  rapid response to what we believed we had was a

25  hostage scenario in progress.

Page 79

1        So that's part of what we do in the training

2    is classically things like dealing with hostage

3    negotiations, dealing with barricaded gunmen, things

4    like that.  You want to slow the scenario down and

5    then utilize things like SWAT teams and negotiators

6    and things like that.

7        So part of what you do in police training is

8    a recognition of has the situation transitioned from

9    one type of scenario to another, because that's

10   entirely possible, but what you're looking for is

11   either identifying the suspect or a stimulus that

12   draws you to a location to where you can try to

13   identify the suspect.

14   BY MR. WISE:

15     Q.   In a scene like that, can the sensation be

16   chaotic or, you know, distort your perception, I

17   guess?

18     A.   Well, any --

19        MS. BELLANTONI:  Objection.  I'm going to

20   object again.  Same objection, that this is outside

21   the scope of the causes of action that are being

22   brought.

23        You can answer.

24        THE WITNESS:  Any critical incident I've

25   been involved in has been tense, and human beings are

1    subject to their perceptions under duress.

2    BY MR. WISE:

3        Q.   If a person who's not immediately

4    identifiable as a cop is openly carrying a firearm

5    during an active shooter event, how are the on duty

6    law enforcement officers likely to react to that

7    person?

8            MS. BELLANTONI:  Objection.

9            You can answer if you can.

10            THE WITNESS:  Well, I would hope that they

11    were extraordinarily well trained because in my

12    experience, every cop that knows about it is going to

13    go regardless of their equipment and their mode of

14    dress.

15            So if you look at photos of Columbine as an

16    example, you have people with guns wearing suit and

17    ties, you have people with guns -- there was one

18    gentleman wearing gym shorts.  If you look at video

19    of the very famous North Hollywood event, one of the

20    SWAT guys is wearing gym shorts and carrying an M-16.

21            So part of my assertion and my opinion on

22    this paper was if you're going to have well-trained

23    officers, they're going to have to allow for positive

24    identification of -- you know, have some training on

25    can't just see a gun and start shooting at that

Page 81

1    person because odds are pretty good it could be an

2    off duty or undercover cop or some other person who

3    is not in uniform who is not in fact your problem.

4    BY MR. WISE:

5        Q.   What if that civilian is openly carrying

6    their truck gun, let's say an AR-15?  How are the on

7    duty law enforcement officers likely to react?

8            MS. BELLANTONI:  I'm going to object and ask

9    you not to respond to that because we're not talking

10   about the open carriage of ARs and long guns.

11   Specifically about handguns here, so that's

12   completely outside the scope of this case and this

13   deposition.

14   BY MR. WISE:

15       Q.   You may recall that Dallas Chief of Police

16   David Brown, in the aftermath of an active shooter

17   event at a community protest that included the

18   presence of openly carrying civilians, stated, "We

19   don't know who the good guy is versus the bad guy

20   when everyone starts shooting."  Do you recall that?

21       A.   I do.

22       Q.   Do you agree with Chief Brown?

23       A.   I do not.

24       Q.   Why not?

25       A.   So I have a little bit of insider baseball

1   on the Dallas Police Department, and they used to be,

2   used to be one of the most extraordinarily

3   well-trained police departments on the planet, and I

4   can't say that that is any longer the case.

5         Their firearms training, their use of force

6   training, their defensive tactics training, in my

7   opinion and observation, has suffered from politics

8   and neglect.  He may have found it to be problematic,

9   or he may have been making it as a political

10   statement for it to be problematic, but everything

11   that I have seen -- and I have studied that incident

12   at length because part of that incident was there was

13   a lot of controversy on the manner in which they took

14   that bad guy out, you know.

15         They utilized a police bomb to kill the

16   gunman in that case, delivered by a robot, so there

17   was a lot of controversy about that.  I think the

18   police officers who were right there on the scene

19   immediately knew who the bad guy was.

20         If you see people running away who happen to

21   be carrying -- and I know I'm dangerously segueing

22   into what Ms. Bellantoni stated she didn't want me to

23   answer because I knew people had long guns at that

24   event as part of their -- the political part of the

25   protest.  If you have people leaving the vicinity in

Page 83

1    a hurry, you can tell by demeanor and their carriage,

2    how they're acting, that, "Yeah, that's not the guy

3    I'm looking for."

4        Q.   And by "demeanor" and "carriage," are you

5    talking about the same factors you were saying

6    earlier, behavior and demeanor, or are there other

7    factors that we haven't discussed?

8        A.   People who look like they're trying to kill

9    you don't look like people who are afraid and trying

10   to get out of someplace.  That's been my experience.

11       Q.   What if somebody is running toward the scene

12   instead of away from the scene?

13       A.   Well, then you'd have to evaluate, "Is that

14   a good guy?  Is that a bad guy?  Is that an off duty

15   SWAT cop that had his gear in the car and he hasn't

16   had time to change clothes?  Etc., etc.

17       Q.   And how can you go about evaluating that?

18       A.   It's going to be right there in the moment,

19   you know.  If the guy is running towards the scene,

20   then I know he's not -- he hasn't been part of the

21   scene.  Is he -- do I look at that guy?  What is his

22   demeanor?  What is his body posture?  How does his

23   facial expressions look?  What is his movement like?

24   Is he trying to get -- you know, is he putting a

25   muzzle on people that are perceived to be victims?

1     That sort of thing.  It all plays into that.

2        Q.   Let's look at pages 12 and 13, paragraph 42.

3     You state "There is, however, historical precedent to

4     note that citizen non-law enforcement interdiction of

5     active shooter suspects happens more frequently than

6     interdiction by law enforcement officers."  Would you

7     explain what you mean?

8        A.   So post-Columbine, the trend was to have

9     what we would call a rapid response team approach

10    where you would get -- depending on who was doing the

11    training, typically it was a four-officer team, would

12    gather together and then move in.

13           Let's take, for an example, because

14    everybody's familiar with the Columbine event, that

15    if you showed up at Columbine in the middle of that

16    event, that you would wait for three other officers

17    to show up, and then you would move in as a team in a

18    particular set of tactics and then attempt to make

19    contact with the suspects and do that as rapidly as

20    possible.

21           What we found -- so -- excuse me.  Sorry.

22    Ragweed is bad right now, and my allergies are acting

23    up.

24           So I wrote an article on solo response by

25    officers to an active shooter event because I'm a big

                                              Page 85

1    believer that you don't have time to wait for a team.

2    One of the active shooter events that I went to, I

3    had to respond by myself.  I didn't have anybody who

4    was there, going to be there in a timely manner to

5    assist me.  I couldn't wait for backup.

6              So in doing my research for these events,

7    what we find is is that more often than a law

8    enforcement officer -- in any kind of team or normal

9    police response that you would think of, more often

10   than not, that there's more events that are

11   interdicted by armed citizens than there are teams of

12   police officers showing up on the scene.

13             If you extrapolate that paradigm to include,

14   like, the Trolley Square mall shooting in Utah where

15   it was an off duty officer on his own time,

16   plainclothes, carrying a gun just like anybody else

17   would be carrying, that was another event where we

18   have off duty officer, but there are many events

19   where we have civilian.

20             And I use a generic term "conceal carrier"

21   but a civilian with a gun that's not -- somebody who

22   is not a cop is the person that is right there on the

23   scene and successfully interdicts or stops the bad

24   guy versus a law enforcement response putting an end

25   to it.

Veritext Legal Solutions
866 299-5127

1    Q.   Are the events that you just mentioned the

2  historical precedent you're referring to, or are you

3  referring to other historical precedent?

4    A.   If you take a history of active shooters in

5  the United States as a modern study, that's what I'm

6  referring to.

7    Q.   And are you aware of research that supports

8  this opinion?

9    A.   I am.

10    Q.   Okay.  What is that research?

11    A.   There's going to be a little bit of a pile

12  of that.  What we're talking about is -- what we're

13  talking about is when you actually quantify active

14  shooter events, you know, beyond the famous ones like

15  Columbine, etc., and you look at the factors involved

16  in those events, what has been successful, what has

17  not been successful, which has led to things like my

18  advocacy for police solo response versus waiting for

19  a team approach.

20        You know, one of the reasons, and I'm a big

21  advocate of that, is that's where the research,

22  that's where the data points to is what is

23  successful, what is not successful.  Team approach

24  takes too long.  It hasn't been successful.

25        The last I checked into that, there was one,

Page 87

1    maybe two of these events that were successful by the

2    team approach.  Vast majority of the time, the cops

3    show up too late if they utilize that model.

4            So one of the reasons I'm a big advocate for

5    solo response on the police part is because that's

6    been the model for success because it's more rapid,

7    and if you look at these incidents on an anecdotal

8    basis, if you have an armed good guy, whether they

9    have a badge or not, immediately on the scene that

10   takes action, that tends to be a successful

11   interdiction.

12           As far as, like, titles to papers like a

13   specific paper on the subject, I would definitely

14   have to get back to you on that.

15       Q.   Yeah.  If there's any specific research you

16   have in mind, would you work with Ms. Bellantoni to

17   provide that to me?

18       A.   Absolutely.

19       Q.   Thank you.  I appreciate that.

20           Do you mind if we go off the record for just

21   a moment?  I'm going to need 30 seconds to make sure

22   my computer does not turn off.

23           (Discussion off the record)

24           MR. WISE:  Thank you.  I appreciate that.

25   We can go back on the record.

Page 88

```
 1              THE WITNESS:  Okay.
 2      BY MR. WISE:
 3         Q.   Let's look at page 13, paragraph 43.  You
 4      state "Allowing open carry will not create a danger
 5      to public safety"; is that right?
 6         A.   Yes, sir.
 7         Q.   Are you familiar with research finding that
 8      right to carry laws are associated with higher
 9      aggregate violent crime rates?
10              MS. BELLANTONI:  Objection.
11              You can answer.
12              THE WITNESS:  I have read some of that, yes,
13      sir.
14      BY MR. WISE:
15         Q.   And what is your view of those studies in
16      terms of your opinion on whether open carry of
17      firearms in public --
18         A.   It directly contradicts my firsthand
19      observation in multiple states.  I believe that those
20      papers -- it is easy to utilize statistics to come to
21      a prearranged opinion and to make opinion -- or to
22      push an opinion towards a political end.
23         Q.   And so have you evaluated the basis for that
24      research?
25              MS. BELLANTONI:  I'm going to object.
```

Page 89

1          You can answer.

2          THE WITNESS:  Depends on how you mean

3     "evaluate," but in my opinion of observing -- and I

4     don't know specifically which one you're -- which --

5     because there's been a couple of such studies that

6     have been pushing that idea.  I put it up there with

7     the same research that people like Kellerman were

8     pushing that if you have a gun in your home, you're

9     43 times more likely to be killed than if you don't

10    have a gun in your home which was statistically

11    cooking the books.

12          If you look at the realities of crime and

13    street crime and the people -- people will talk.

14    They'll push an alarming statement like, "You're more

15    likely to be killed by somebody you know than

16    somebody you don't."

17          Well, that's certainly my experience as far

18    as, like, gang crime because most people don't just

19    up and kill people they don't know.  They have a

20    specific beef with them.  You know, your rival drug

21    dealer whom you know by name, you're going to go

22    whack because he's coming -- he's, like, selling in

23    your territory, things like that.

24          So you have to take -- you have to look at

25    these things in context and, you know, look at the

Veritext Legal Solutions
866 299-5127

1    numbers, where the numbers come from, what's the

2    context of the numbers and that sort of thing because

3    it's very, very easy to come to false conclusions on

4    this sort of thing.

5    BY MR. WISE:

6        Q.   You've reviewed the preliminary injunction

7    submissions in this case?

8        A.   Okay.  I think so.  I believe that's part of

9    the -- Amy, was that all part of the paperwork that

10   you gave me, or was that not?

11           MS. BELLANTONI:  I'm not entirely sure.  I'd

12   have to look and see what I sent over.

13           THE WITNESS:  Okay.  I guess --

14           MS. BELLANTONI:  We could refer to your

15   declaration.  It says that there's something that was

16   turned over that you relied on.

17           MR. WISE:  I believe it does.  That's why I

18   was asking the question.

19   BY MR. WISE:

20       Q.   And the reason I'm asking is you had

21   mentioned you're familiar with a few of the studies.

22   Are you familiar with the peer reviewed studies

23   conducted by Professor John Donahue about right to

24   carry laws and the association with higher aggregate

25   violent crime rates?

Page 91

1          MS. BELLANTONI:  I'm going to object because

2     he's not a statistical expert, so that wouldn't have

3     been in the purview of what he reviewed.

4          MR. WISE:  He just mentioned he was familiar

5     with a few studies, so I was trying to know which

6     studies those might be.

7          MS. BELLANTONI:  And I'm going to object

8     because he's not a statistician, so I'm not going to

9     have him giving testimony on -- it's not his

10    expertise.

11         MR. WISE:  Uh-huh.

12         MS. BELLANTONI:  He's not a statistician,

13    so --

14    BY MR. WISE:

15    Q.    So just so I'm clear on what your opinion

16    is, then, you're indicating that the findings of

17    those studies are not consistent with your personal

18    observations in the field; is that right?

19    A.    Yes.

20    Q.    But to be clear, you haven't relied on

21    studies that -- for your opinion in this case at

22    least, that support your opinion or that contradict

23    the studies that we were just discussing?

24    A.    So a big part of why I am here is both to

25    speak to the law enforcement part of this and

Page 92

1    personal experience that I can point to in living in

2    the reality of an open carry state and not only my

3    state but other states that I travel to, other states

4    that I do business in and, you know, states where I

5    am commonly in an open carry environment, if you

6    will.

7           So a big part of why I'm here and we're

8    talking is that firsthand observation and experience

9    over a number of years as it deals with the open

10   carry and the dynamic of police involvement with open

11   carry people.

12   Q.   Let's look at paragraph 44.  We're still on

13   page 13.  You refer to U.S. News and World Reports

14   public safety rankings and note that the top three

15   states, in terms of public safety, Maine,

16   New Hampshire and Idaho, allow a broader right to

17   public carry than California; is that right?

18   A.   That was certainly true at that time, yes,

19   and then it's easy to look that up, the U.S. News and

20   World Report part of that.

21   Q.   Are you aware of how U.S. News and World

22   Report determined these rankings?

23   A.   I am not.  Again, I can't say, you know, did

24   they hire a statistician, did they look up Bureau of

25   Justice Statistics or what their research methodology

Veritext Legal Solutions
866 299-5127

1    was.

2        Q.   Do you know whether U.S. News and World

3    Report compared factors such as population density

4    that might account for the difference in crime rates

5    between states such as Maine versus California?

6        A.   I don't, nor do I know if they looked at

7    things like sentencing guidelines or a variety of

8    other factors.

9        Q.   Do you agree that regional differences are

10   an important factor to consider in developing an

11   effective public safety response?

12           MS. BELLANTONI:   Objection.   And

13   specifically what public safety response are you

14   referring to?

15           MR. WISE:   Well, response that includes open

16   carry policy.

17           MS. BELLANTONI:   Could you be more specific?

18   I'm not understanding the question.

19           MR. WISE:   Sure.   Well, this case is about

20   California, and the expert here is from Kansas, and

21   I'm asking if he agrees.   Let me restate the

22   question.

23   BY MR. WISE:

24       Q.   Do you agree that regional differences are

25   an important factor to consider in developing an

Page 94

1  effective public safety response with regard to

2  firearms?

3     A.   And --

4          MS. BELLANTONI:  I object.

5          You can go ahead and answer.

6          THE WITNESS:  I'm going to say in this case,

7  it does not, just as, you know, if we look at police

8  use of force, everybody in the United States is bound

9  by things like Graham v. Conner, Garr versus

10  Tennessee.  It is what it is.  Is my First Amendment

11  right to free speech different in the State of

12  California versus the State of Kansas?  It is not.

13          Is my freedom of religion different in the

14  State of California versus the State of Kansas?  It

15  is not.  So as far as that context, we're still

16  talking about the United States of America.  So, no,

17  I don't believe so.

18  BY MR. WISE:

19     Q.   Do you agree that demographic differences

20  are an important factor to consider in developing an

21  effective public safety response, again, with regard

22  to firearms?

23          MS. BELLANTONI:  Objection.

24          You can answer.

25          THE WITNESS:  I don't.  I don't because I

                                          Page 95

1  believe that public safety factors response policy

2  are all far, far, far broader than that.

3  BY MR. WISE:

4      Q.   Have you ever been to California?

5      A.   Yes.

6      Q.   Have you ever served as a law enforcement

7  officer in California?

8      A.   I have not.

9      Q.   Are you familiar with open carry laws in

10  California?

11      A.   Just from what I have been able to read as

12  far as what is publicly available and then what I

13  have been briefed on in this case by Ms. Bellantoni.

14      Q.   Would you describe your understanding of

15  where, if at all, open carry is permitted in

16  California?

17          MS. BELLANTONI:  Objection.  He's not

18  testifying as an expert in that area.  I'm going to

19  ask him not to answer that question.

20          MR. WISE:  So is he an expert in open carry

21  in Kansas only?  I'm confused.

22          MS. BELLANTONI:  He's an expert and a law

23  enforcement officer in open carry jurisdiction.  It's

24  kind of irrelevant since it's banned in California

25  anyway, so --

Veritext Legal Solutions
866 299-5127

1    BY MR. WISE:

2       Q.   Are you aware that open carry is allowed in

3    certain circumstances in the State of California?

4            MS. BELLANTONI:   Objection.   That's actually

5    not true.

6    BY MR. WISE:

7       Q.   Are you aware that there are laws permitting

8    open carry in certain circumstances in California?

9            MS. BELLANTONI:   Objection.

10           THE WITNESS:   Frankly, at this point, with

11   the two attorneys arguing about that, I believe that

12   that would be the type of thing that you guys would

13   be the experts in.   It appears that you guys are at

14   an impasse on whether it's legal or not.   That would

15   certainly leave a layperson at a disadvantage to know

16   whether they were breaking the law or not.

17   BY MR. WISE:

18      Q.   Let's look at paragraph 45, same page, still

19   on page 13.   You state "People who legally possess

20   and carry firearms are generally compliant and

21   law-abiding, statistically speaking among the most

22   law-abiding group of persons in our country."   Would

23   you explain what you mean?

24      A.   So if you take people with -- and I'm going

25   to go with the statistics because we can nail those

Page 97

1  down on persons with a concealed carry license

2  because we can actually quantify that because, quite

3  frankly, on a day-to-day basis, if nobody tells

4  anybody that they're carrying a gun, we're not --

5  who's going to know about it?

6       So if we look at statistically people with a

7  concealed carry license, they are more law-abiding

8  than virtually any other demographic in the United

9  States, and that includes police officers.

10      When you look at things like -- even minor

11 things like DUI arrests, that sort of thing, they

12 tend to have a far lower criminal rate than any other

13 demographic you would pluck out of whatever pool you

14 want to look at, if you want to look at a certain

15 profession or whatever the case may be.

16      And then, you know, the rest of that

17 paragraph, if you will, my experience is is that

18 people who are going to unlawfully do things don't

19 look for permission, they don't get concealed carry,

20 whether it's banned or not, you know.

21      In Kansas, when we banned all carry, even

22 retired officers could not carry a gun, and that

23 didn't slow down the gang members one little bit, you

24 know.  My belief, what we're talking about here is

25 law-abiding citizens trying to gain access to the

Page 98

1    ability to open carry legally within your state,

2    clearly trying to go about doing thing the right way

3    and stay within the boundaries of the law.

4        Q.   What is the basis for your opinion?

5        A.   Again, 34 years of street level police work

6    and then some consultation of things like, you know,

7    research that has been done in this area as far as,

8    you know -- in particular, one of the things I look

9    at is police use of force, and then I have been

10   involved extensively in internal affairs

11   investigations on police officers and then

12   investigation on, like, officer-involved shootings,

13   use of force, things like that.

14       So I've had occasion to look at the

15   statistics that are out there that are available

16   on -- if you look at how my profession stacks up to

17   other professions where actually, you know, we do a

18   lot better than a lot of other professions that are

19   out there even though we -- you know, we are commonly

20   demonized for violating people's rights and that sort

21   of thing.

22       And then having looked into that as somebody

23   in the past who I actually advocated for concealed

24   carry in Kansas, which was -- didn't make me real

25   popular in some law enforcement circles, but you have

Page 99

1   to make sure you have your ducks in a row if you're

2   going to advocate for something and make statements

3   like that.

4           And in other places before Kansas had

5   concealed carry, like Florida was very famous for

6   that beginning in the '80s, the states of

7   New Hampshire and Vermont were very, very liberal,

8   and, in fact, my belief is Vermont has always had no

9   permit carry within the state.  I may have switched

10  that with New Hampshire, but one of those two has

11  always, like, historically had no permit carry, and

12  if you look at the demographics of people with

13  concealed carry, they tend to be extraordinarily

14  law-abiding.

15      Q.   And I think you were mentioning research

16  this supports your opinion.  What is that research

17  specifically?

18      A.   Some of it would be -- I can point to John

19  Lott, the famous gun rights researcher, but then to

20  another of -- pardon me -- a number of other sources

21  as far as, like, the actual titles of that, again, I

22  would have to research that and get back with you.

23      Q.   Yeah, that'd be great if you could work with

24  plaintiff's counsel to provide me any research that

25  supports that opinion.  I'd appreciate it.

Page 100

1          Do you agree that there are incidents in
2   which a previously law-abiding person engages in
3   criminal behavior?
4      A.   Well, I would argue, counselor, that
5   everybody that doesn't have a criminal record who
6   becomes a criminal was previously not, I mean,
7   law-abiding.
8      Q.   That's all the questions.
9          Ms. Bellantoni, are you on mute?
10         MS. BELLANTONI:  Yeah, I was.  I'm sorry.
11  Can we just take a brief break?  Just need to -- is
12  that okay?
13         MR. WISE:  Of course.  I'm done with my
14  questions.  That was my last one.
15         MS. BELLANTONI:  Can we just hold on one
16  second before we wrap up?
17         MR. WISE:  Of course.
18         MS. BELLANTONI:  All right.  Thanks.
19         THE WITNESS:  I'm over here making myself a
20  note on looking back at what we've been talking about
21  so I can get back to Amy.
22         MR. WISE:  Thank you.
23         (Recess)
24         MS. BELLANTONI:  So I guess we're done.  I
25  don't have any questions.

                                        Page 101

1           MR. WISE:  Let's go back on the record

2    briefly.

3           Okay.  I am done with my questions.

4           THE REPORTER:  And, Ms. Bellantoni, do you

5    want a copy?

6           MS. BELLANTONI:  Mr. Wise, will you be

7    sending a copy to the witness for him to review?

8           THE REPORTER:  That's why I got his email.

9    Veritext will send him a locked PDF.

10          MS. BELLANTONI:  That's fine.  I'll take a

11   copy.

12          And also, Mr. Wise, can you just put some

13   requests -- I know there were some requests made.

14   Can you just put them in writing for me so I can

15   refer to them and properly have whatever additional

16   documents provided to you?

17          MR. WISE:  Sure, of course.  How formal

18   would you like me to make the request?

19          MS. BELLANTONI:  Email.

20          MR. WISE:  Email?  Okay.

21          MS. BELLANTONI:  Email.

22          MR. WISE:  Thank you.

23

24

25

                                        Page 102

1

2

3

4

5

6

7

8

9

10            I, CHARLES D. HAGGARD, do hereby declare

11    under penalty of perjury that I have read the

12    foregoing transcript; that I have made any

13    corrections as appear noted, in ink, initialed by me,

14    or attached hereto; that my testimony as contained

15    herein, as corrected, is true and correct.

16              EXECUTED this _____ day of _____,

17    20_____, at _____  _____,_____.
                        (City)              (State)

18

19

20

21              _____

              CHARLES D. HAGGARD

22

23

24

25

                                    Page 103

1            I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4            That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given.

12           Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review of

15   the transcript [  ] was [  ] was not requested.

16           I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or party to this action.

19           IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: 10/30/2021

23

                         CARRIE PEDERSON

24                       CSR No. 4373

25

                                        Page 104

1    CHARLES D. HAGGARD

2    chuck@agiletactical.com

3                                    November 1, 2021

4    RE: BAIRD vs. BONTA

5    October 19, 2021, CHARLES D. HAGGARD, JOB NO. 4838109

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived – Reading & Signature was waived at the

24       time of the deposition.

25

                                              Page 105

1   _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2      Transcript - The witness should review the transcript and

3      make any necessary corrections on the errata pages included

4      below, notating the page and line number of the corrections.

5      The witness should then sign and date the errata and penalty

6      of perjury pages and return the completed pages to all

7      appearing counsel within the period of time determined at

8      the deposition or provided by the Federal Rules.

9   __ Federal R&S Not Requested - Reading & Signature was not

10     requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 106

1   BAIRD vs. BONTA

2   CHARLES D. HAGGARD (#4838109)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____     _____

24  WITNESS                               Date

25

                                          Page 107

**[& - agiletactical.com]**

| & |
| --- |
| **&**   105:23 106:9 |

| 0 |
| --- |
| **00617**   1:7 2:7 |
| **06**   48:24 |
| **08**   48:24 |

| 1 |
| --- |
| **1**   1:24 5:4 11:21 |
| 11:22 23:6 105:3 |
| 106:1 |
| **10**   14:25 |
| **10/30/2021**   104:22 |
| **104**   1:24 |
| **10583**   3:9 |
| **11**   5:4 |
| **11:31**   2:18 7:2 |
| **12**   14:25 29:3 |
| 75:12 85:2 |
| **125**   3:18 |
| **13**   39:21 85:2 89:3 |
| 93:13 97:19 |
| **1300**   3:17 |
| **14**   12:17 |
| **15**   54:9 82:6 |
| **16**   81:20 |
| **17**   18:21 |
| **19**   1:17 2:19 6:4 |
| 7:1 17:1 105:5 |
| **1982**   16:25 |
| **1987**   18:12 |
| **1998**   17:1 |

| 2 |
| --- |
| **2**   3:7 23:6 |
| **20**   52:20 54:9 |
| 103:17 |
| **2008**   48:22 |
| **2014**   48:21 |
| **2021**   1:17 2:19 7:1 |
| 105:3,5 |

| 2025.520   105:9,12 |
| --- |
| **21**   56:4 |
| **22**   37:9 67:13,17 |
| **24**   49:6 60:17 |
| 67:16 |
| **26**   61:21,22 63:2,5 |
| **28**   62:16,23 63:20 |
| **2:9**   1:7 2:7 |

| 3 |
| --- |
| **3**   69:17 |
| **30**   88:21 106:1 |
| **30s**   29:2 |
| **31**   67:4,9 |
| **34**   99:5 |

| 4 |
| --- |
| **40**   18:1 75:12,16 |
| 77:19 |
| **400**   3:8 |
| **42**   85:2 |
| **43**   89:3 90:9 |
| **4373**   1:22 2:20 |
| 104:24 |
| **44**   93:12 |
| **45**   17:24 97:18 |
| **47**   60:1 |
| **4838109**   1:23 |
| 105:5 107:2 |

| 5 |
| --- |
| **50**   17:25 |
| **57**   29:7 |

| 6 |
| --- |
| **60**   21:20,23 |
| **600**   29:4 |
| **60s**   69:14 |
| **6995**   104:23 |

| 7 |
| --- |
| **7**   4:6 |
| **70s**   69:15 |

| 75   11:13 |
| --- |
| **78**   37:8 |

| 8 |
| --- |
| **8**   6:3 |
| **80s**   100:6 |
| **82**   6:3 17:2 |

| 9 |
| --- |
| **90s**   64:17 |
| **914-367-0090**   3:10 |
| **94244-2550**   3:21 |
| **944255**   3:19 |
| **96**   6:4 |
| **9:06**   2:18 7:2 |

| a |
| --- |
| **a.m.**   2:18,18 7:2,2 |
| **abell**   3:11 |
| **abiding**   60:21 |
| 97:21,22 98:7,25 |
| 100:14 101:2,7 |
| **ability**   33:10 34:8 |
| 35:10,23 43:4 |
| 99:1 |
| **able**   9:4,23,25 |
| 26:20 31:18 76:24 |
| 77:23 79:9 96:11 |
| **absolutely**   55:10 |
| 63:9 88:18 |
| **ac**   1:7 2:7 |
| **academic**   45:21 |
| **academy**   19:9 |
| 32:19 |
| **access**   98:25 |
| **accidental**   53:2 |
| 56:8 |
| **account**   94:4 |
| **act**   52:23 60:22 |
| **acting**   17:10 74:2 |
| 74:19 84:2 85:22 |
| **action**   79:14 80:21 |
| 88:10 104:17,18 |

| **actions**   55:14 |
| --- |
| **active**   14:5 20:4 |
| 21:9 77:25 78:1,8 |
| 78:9,16,23,23 79:2 |
| 79:2,7,20,20 81:5 |
| 82:16 85:5,25 |
| 86:2 87:4,13 |
| **actively**   78:7 |
| **activities**   76:2 |
| **activity**   76:10 77:5 |
| 77:12 |
| **actor**   60:13 |
| **actual**   72:17 77:12 |
| 100:21 |
| **ada**   25:15 26:6 |
| **adamant**   25:20,25 |
| **added**   18:6 |
| **additional**   102:15 |
| **adjunct**   15:16 |
| 16:20,21 |
| **administered**   7:5 |
| **adult**   39:20 |
| **advise**   44:1 |
| **advised**   43:25 |
| **advises**   8:20 |
| **advocacy**   87:18 |
| **advocate**   87:21 |
| 88:4 100:2 |
| **advocated**   99:23 |
| **affairs**   99:10 |
| **affect**   73:5 |
| **afoot**   76:10 |
| **afraid**   84:9 |
| **aftermath**   82:16 |
| **agency**   42:3 |
| **aggregate**   89:9 |
| 91:24 |
| **agile**   22:25 23:1 |
| 57:17 |
| **agiletactical.com** |
| 105:2 |

Page 1

**[ago - avoid]**

| | | | |
|---|---|---|---|
| **ago** 9:18 36:1 | **america** 95:16 | **approached** 24:9 | **assist** 86:5 |
| **agree** 31:20 32:25 | **amorphous** 73:12 | **appropriate** 27:24 | **assistant** 26:7 |
| 33:8,13 36:12,15 | **amy** 3:5 91:9 | **approved** 19:10 | **assisted** 14:11 |
| 36:16 38:7 39:7 | 101:21 | **approximately** | 19:20 50:18 |
| 39:25 40:4,20 | **analyst** 16:11 | 22:3 48:20,25 | **associated** 89:8 |
| 41:14,16 42:2 | **anecdotal** 37:2 | **ar** 82:6 | **association** 50:22 |
| 69:2 82:22 94:9 | 88:7 | **area** 96:18 99:7 | 91:24 |
| 94:24 95:19 101:1 | **angeles** 64:19 | **argue** 34:12 66:6 | **assume** 38:12 39:5 |
| **agreed** 11:9,12 | **answer** 6:1 8:7,10 | 101:4 | 42:13 69:24 |
| **agreeing** 39:24 | 8:14,19,20 26:11 | **arguing** 97:11 | **assuming** 16:8 |
| **agrees** 94:21 | 27:10 28:13,15,16 | **armed** 23:23 | 24:1 42:9 60:13 |
| **ahead** 28:14,16 | 33:12 34:11 36:8 | 26:18 37:5 66:10 | 62:22 |
| 35:8 36:8 59:5 | 36:25 38:11 40:8 | 69:24 72:24,24 | **assumption** 69:24 |
| 79:15 95:5 | 40:18,24 41:20 | 86:11 88:8 | 70:2,4 |
| **ahold** 44:3 | 42:8 51:22 58:4 | **armor** 50:8 | **atlanta** 55:6 |
| **airplanes** 29:8 | 59:15 69:7 70:25 | **army** 17:19 | **atmosphere** 79:11 |
| **airport** 22:6 49:3 | 72:2 73:8 77:2 | **arrest** 19:7 23:13 | **attached** 103:14 |
| 49:4 | 79:13,16 80:23 | 52:4 55:1,7 | **attack** 79:18 |
| **aisle** 75:10 | 81:9 83:23 89:11 | **arrests** 98:11 | **attacks** 28:19 |
| **al** 1:9 2:9 | 90:1 95:5,24 | **arrow** 78:13 | **attempt** 85:18 |
| **alarm** 74:18 | 96:19 | **ars** 82:10 | **attempting** 36:3 |
| **alarming** 90:14 | **antigun** 74:10 | **article** 37:5 85:24 | **attend** 15:4 |
| **alleging** 37:9 | **antipersonnel** | **articles** 45:3,6,14 | **attention** 14:7 |
| **allergies** 85:22 | 18:2 | **artifice** 31:7 | 55:10 |
| **alley** 75:4 | **antipolice** 73:19 | **ascertain** 74:14 | **attorney** 1:8 2:8 |
| **allow** 44:9 52:21 | **antitank** 18:2 | **aside** 65:19 | 3:6,14,16 7:13 |
| 65:7 81:23 93:16 | **anybody** 25:10 | **asked** 12:3 22:12 | 8:18,20 26:7 |
| **allowed** 9:7 21:23 | 86:3,16 98:4 | **asking** 8:9 57:21 | 46:25 47:14,20 |
| 28:3 34:22 35:15 | **anyway** 96:25 | 66:20,24 91:18,20 | 104:18 |
| 35:16 46:16,17 | **appear** 103:13 | 94:21 | **attorneys** 97:11 |
| 47:15 61:23 62:4 | **appearances** 3:1 | **aspects** 24:5,14 | **audit** 73:21,21 |
| 62:17 63:11,15 | **appearing** 1:16 | **assault** 24:6,14,20 | **author** 50:14 |
| 97:2 | 105:18 106:7 | 26:18 | **authority** 22:6 |
| **allowing** 68:20 | **appears** 61:10 | **assaulting** 35:6 | **availability** 35:2 |
| 89:4 | 68:7,16,25 97:13 | **assertion** 81:21 | **available** 32:16 |
| **allows** 34:8 35:23 | **appreciate** 66:19 | **assess** 67:12 68:5 | 96:12 99:15 |
| 47:25 | 88:19,24 100:25 | 68:22 69:4 | **average** 31:22 |
| **alzheimer's** 59:8 | **approach** 70:1 | **assessing** 69:18 | 40:6,11,12,22 |
| **ambushes** 55:19 | 73:5 75:2,2 85:9 | **assigned** 17:11 | 41:18 42:5 60:14 |
| **amendment** 95:10 | 87:19,23 88:2 | 18:24 | **avoid** 44:2 55:3 |

**[avoiding - bulge]**

**avoiding** 57:7
**aware** 87:7 93:21
  97:2,7
**awhile** 10:9 14:1
  17:1 22:23 26:13

**b**

**b** 49:7 106:1
**back** 11:18,20
  34:15,16 35:19
  46:4,8 47:4 67:8
  67:20 71:5 74:13
  74:17 88:14,25
  100:22 101:20,21
  102:1
**background** 45:21
  49:24,25
**backing** 40:14
**backup** 86:5
**bad** 17:6 24:17,19
  29:7 31:19 37:19
  40:15 44:10 55:5
  57:2 62:12 66:15
  72:17,17 73:3
  82:19 83:14,19
  84:14 85:22 86:23
**badge** 88:9
**bags** 72:6
**bailiwick** 55:3
**baird** 1:4 2:4 3:25
  7:14 105:4 107:1
**ballistics** 52:1,2
**ban** 46:17 47:19
**banned** 46:21
  64:17 96:24 98:20
  98:21
**banning** 62:23
  63:22 65:13,20,23
  65:25 66:21,23
  70:8
**bans** 50:8

**barricaded** 80:3
**baseball** 82:25
**based** 36:21 45:14
  60:20
**basic** 23:5,5,6
**basically** 19:18
  52:11 55:7 74:9
**basis** 13:12,21
  14:3 17:19 52:9
  77:16 88:8 89:23
  98:3 99:4
**bat** 46:4
**batons** 19:6
**bean** 75:10
**beat** 34:24 35:17
**beaver** 64:25
**beef** 90:20
**beginning** 2:18
  100:6
**behalf** 2:17
**behavior** 24:6,21
  67:12 68:6,22
  69:5 71:11,14
  72:12,15 74:17
  75:16 76:1,18,22
  76:23 77:24 84:6
  101:3
**behavioral** 24:5
  24:14 72:12 75:22
  76:9
**beings** 31:6,12,13
  39:4,17 77:24
  80:25
**belief** 98:24 100:8
**believe** 11:11
  13:22,25 17:1
  26:8,14,19 31:2,8
  32:19 48:22 57:24
  59:9 60:11 61:19
  65:22,22 66:2,2
  67:2 72:3 89:19

91:8,17 95:17
  96:1 97:11
**believed** 63:14
  73:18 79:24
**believer** 29:25
  31:5 86:1
**bellantoni** 3:4,5,11
  9:16 10:4,10,14,19
  11:9 12:6,24
  13:23 26:10 27:9
  28:12,16 30:17
  31:1 33:11 34:10
  35:25 36:7,19
  38:10 39:10 40:7
  40:23 41:19 42:7
  43:8 51:21 53:25
  55:24 58:3 59:14
  67:19 69:6 70:16
  70:24 72:1 73:7
  73:10 77:1,17
  79:12 80:19 81:8
  82:8 83:22 88:16
  89:10,25 91:11,14
  92:1,7,12 94:12,17
  95:4,23 96:13,17
  96:22 97:4,9
  101:9,10,15,18,24
  102:4,6,10,19,21
**belt** 41:5 54:4
**best** 32:6 70:6
**better** 23:19 31:13
  31:21 32:20 53:12
  62:13 99:18
**beyond** 87:14
**big** 13:18 20:11,18
  24:18,20 28:23
  29:22,25 31:5
  33:18 46:7 54:19
  56:16 57:8 58:6
  78:2 85:25 87:20
  88:4 92:24 93:7

**bill** 11:7
**bit** 16:8 27:2 32:18
  42:22 46:2 64:10
  82:25 87:11 98:23
**blue** 20:16,16
**body** 50:8 62:20
  84:22
**bomb** 83:15
**bomber** 79:2
**bombing** 79:20
**bombs** 79:3
**bono** 11:10
**bonta** 1:7 2:7 7:14
  105:4 107:1
**book** 69:17
**books** 90:11
**borders** 53:13
**botched** 55:1
**bound** 95:8
**boundaries** 99:3
**bow** 78:13
**box** 3:19 43:25
  59:3
**breacher** 18:21
**break** 8:12,15 34:1
  101:11
**breaking** 97:16
**brief** 101:11
**briefed** 96:13
**briefly** 102:2
**bring** 54:15
**broader** 93:16
  96:2
**brought** 56:18
  79:15 80:22
**brown** 82:16,22
**bruce** 60:2
**buff** 46:7
**building** 79:4,21
**bulge** 54:7

[bunch - chuck]

**bunch** 16:4 41:24
53:14
**bureau** 58:25 59:7
93:24
**burglar** 37:9
**burglarize** 77:11
**burglary** 44:16
**business** 16:19
22:21,25 23:3,18
27:12 31:9,10
33:7 47:4 53:15
53:17 55:16 75:4
76:9 77:7 93:4
**button** 70:9
**buzz** 33:18

**c**

**c** 24:8 49:7
**ca** 105:9,12,20
**caliber** 17:25
**california** 1:2,9
2:2,9 3:14,20 7:13
46:6 62:4 63:11
63:16 69:16 93:17
94:5,20 95:12,14
96:4,7,10,16,24
97:3,8 104:2
**call** 20:4 25:3
47:15 61:7 74:8
77:22 78:13 85:9
**called** 20:12 37:5
73:20 74:3
**calls** 24:8
**camera** 30:8
**capability** 31:16
31:17 35:5
**capable** 29:14
31:6,11
**capacity** 1:8 2:8
15:20,21 21:16
23:19 25:15 27:16
29:24 49:21

**capita** 64:18
**captain** 16:22 49:2
49:9,13
**car** 28:7 30:7
37:20 43:13,18
44:1,19 46:20
70:22 71:4,23
72:5 84:15
**career** 18:9,11,18
18:18 21:9 48:9
64:15
**carjacking** 24:12
37:17
**carjackings** 31:25
**carriage** 45:11
82:10 84:1,4
**carrie** 1:21 2:19
104:23
**carrier** 86:20
**carriers** 48:7
**carry** 15:2 25:9,10
27:7 28:9 29:18
29:19 30:15 31:3
32:11 34:9 35:8
35:24 41:6 42:25
43:15 45:4 46:1
46:11,13,15,17
47:6,7,8,11,13,13
47:16,17,17,19,22
47:23,24 48:1,3
52:21 54:15 56:10
61:23 62:4,9,17,24
63:11,15,22 64:2,4
64:7,7,20,21,21
65:8,13,20,23,25
66:8,14,21,23 68:9
68:17,20 70:8,10
73:17,20 75:18
77:21 89:4,8,16
91:24 93:2,5,10,11
93:17 94:16 96:9

96:15,20,23 97:2,8
97:20 98:1,7,19,21
98:22 99:1,24
100:5,9,11,13
**carrying** 25:12
26:8 30:24 32:21
32:22 34:4 39:6
39:15 48:8 52:24
53:7 54:3,4,6,11
56:9,9 57:24,25
59:10 60:22 61:1
61:7,13 62:19
63:13,18 64:5
67:11 69:3 74:5
76:8,24 81:4,20
82:5,18 83:21
86:16,17 98:4
**cars** 39:18 46:21
**cartilage** 29:9,10
**case** 1:6 2:6 7:13
7:23 8:1 10:8,18
10:22 11:6 13:6,8
13:25 14:9 30:6
30:10 34:13 35:13
42:17 44:13 52:10
56:22 58:12,12
59:23 65:6 66:16
66:17,17 75:25
76:13,14 79:1,14
82:12 83:4,16
91:7 92:21 94:19
95:6 96:13 98:15
104:14
**cases** 30:8 37:8
44:13,21 47:3
56:15 78:7,10
**cash** 43:1,1
**casual** 9:17
**cattle** 46:5
**cause** 42:4,10,24
53:2 60:23 62:13

62:14 64:11 66:3
66:12 76:4
**causes** 79:14 80:21
**caveat** 40:25
**ccp** 105:9,12
**cellphone** 59:21
**center** 16:10,19
**certain** 34:7 47:1
97:3,8 98:14
**certainly** 8:11
40:3 64:5 65:2
90:17 93:18 97:15
**certified** 2:20 6:1
104:1
**certify** 104:3,16
**chainsaw** 33:5
**chainsaws** 39:19
**chance** 54:20
**change** 84:16
107:4,7,10,13,16
107:19
**changed** 18:4 47:2
**chaotic** 62:10
80:16
**charge** 19:18
48:15 49:4,7,8,10
**charged** 39:1
**charles** 1:15 2:16
4:2 5:4 7:4,16
103:10,21 105:1,5
107:2
**chase** 51:8
**checked** 87:25
**chief** 9:22,22 13:9
47:10 49:15,18
82:15,22
**chiefs** 50:22
**children** 44:22
**chuck** 5:4 7:17
105:2

Veritext Legal Solutions
866 299-5127

[circle - contacted]

circle  35:19
circles  99:25
circumstance
    36:22
circumstances
    32:2 68:21 75:3
    97:3,8
cited  13:4
cites  13:3
cities  46:17,21
    47:3
citizen  37:6 66:5
    85:4
citizens  86:11
    98:25
city  20:15 23:10
    42:23 50:7 51:11
    103:17
civil  14:18 105:19
    105:20
civilian  23:19 36:4
    36:6 37:16 38:8
    40:1,6 42:6 53:17
    57:12,25 58:2
    59:10,12 69:3
    70:22 82:5 86:19
    86:21
civilians  53:3 56:8
    61:1 82:18
clarification  30:18
    31:4 36:20 43:9
clarified  43:23
clarify  36:1
clarifying  36:6
clarity  39:12
    73:10
class  31:20
classes  15:22 16:1
    23:7 25:8
classic  76:13,19

classically  80:2
claymore  18:2
clear  58:16 92:15
    92:20
clearly  9:11 28:2
    66:16 74:7 99:2
clients  23:4,25
    25:9,13 27:7 28:9
    29:18 30:14 43:5
    44:8
close  37:18
closed  77:8
clothes  84:16
coalesced  16:4
code  50:7 69:17
    105:9,12,19,20
coincided  64:23
college  15:4,6,12
    15:23 16:3
colleges  15:16
color  61:10 68:16
colorado  48:2
colored  62:14
columbine  19:24
    20:6 21:7 81:15
    85:8,14,15 87:15
combination
    34:21
come  13:16 21:1
    22:13 60:7 64:19
    73:18 89:20 91:1
    91:3
comes  24:16 39:23
    55:12 67:10 69:2
    72:11
comfortable  25:23
coming  20:6 21:5
    58:20 67:1 79:10
    90:22
comma  28:24

command  21:13
    48:10
commander  17:10
    18:19 48:12
commanders
    48:15
commands  34:22
    35:14
comment  9:7
commissioned
    46:10
common  48:6 78:3
commonly  93:5
    99:19
communicate
    33:20
communication
    33:15
community  51:5
    51:12 74:2 82:17
comorbidities
    28:23
company  22:23
    57:17,18
compared  94:3
compartment  72:5
compensated  11:5
competent  41:9
complaint  10:24
    11:3
complete  15:13
completed  15:14
    15:25 105:7,17
    106:6
completely  82:12
completion  104:14
    106:10
compliant  97:20
comport  69:25
computer  88:22

conceal  47:12,13
    47:24 64:7,21
    71:13 73:17,20
    86:20
concealed  41:7,7
    43:15 46:13 47:17
    47:23 54:5 56:9
    70:2 76:15 98:1,7
    98:19 99:23 100:5
    100:13
concerns  32:10,14
    32:15
concert  35:16
conclusions  91:3
conduct  13:11,16
    23:22
conducted  45:15
    53:19 91:23
conducting  45:22
confrontation
    74:10
confronted  34:16
confused  96:21
congruent  77:5
conner  95:9
consider  26:23
    37:15 51:20 94:10
    94:25 95:20
consistent  92:17
console  72:6
consoles  71:6
constitutional
    47:16
consultation  99:6
consulting  22:21
    22:25 23:1
contact  74:4 78:22
    85:19 105:9
contacted  10:11
    10:15

[contacts - deescalate]

contacts 24:8
contained 103:14
context 90:25 91:2
  95:15
continue 56:4
contradict 92:22
contradicts 89:18
contributing 57:5
control 14:3 19:7
  23:13 52:4 55:1,8
controversy 83:13
  83:17
conversation 9:17
  10:19 53:24
cookie 23:4
cooking 90:11
cop 31:8 41:22
  47:6 50:24 54:14
  76:22 81:4,12
  82:2 84:15 86:22
cops 40:14,15 47:9
  47:9,11 55:3
  62:12 64:3,4 88:2
copy 12:11,16,22
  16:9 102:5,7,11
correct 63:8 68:1
  103:15
corrected 103:15
corrections 9:4,6,7
  103:13 105:14,15
  106:3,4
correctly 24:23
  35:20
council 51:11
counsel 12:22
  14:10 27:13 28:3
  28:6 31:12 32:6
  44:24 100:24
  105:18,21 106:7
counselor 101:4

count 16:2
country 97:22
county 21:25,25
  22:9,12,14
couple 9:17 15:17
  36:1 44:21 55:19
  90:5
course 15:19 20:5
  27:18 40:16 41:4
  44:18 46:3 48:9
  58:8 101:13,17
  102:17
courses 15:13,14
  15:15
court 1:1 2:1 8:3
  14:18,18 47:3,20
  52:7 56:15
courthouse 79:19
courtroom 7:20
courts 51:24 56:20
cover 32:7
covid 28:21,23
cpost 19:10
craig 24:7
create 53:1 89:4
created 61:24
creates 56:7
creating 50:12
creation 51:1,6,17
credit 15:23 16:3
crime 14:4 31:24
  37:16 55:17,17
  58:6,17 64:14,16
  64:18,23,25 65:1
  66:9 71:15 89:9
  90:12,13,18 91:25
  94:4
crimes 59:25 65:4
criminal 14:18
  24:5,14,20 26:18
  35:4 55:17 60:13

66:9 76:10 98:12
  101:3,5,6
criminalistic 76:1
criminally 38:23
criminals 76:14
criteria 42:18,19
critical 41:24
  65:16 80:24
crr 1:22
csr 1:22 104:24
cure 63:23 65:14
current 16:17,22
  22:5,19 38:22
  49:2 50:16
currently 22:15
  23:8 32:18
custody 55:4
customize 23:7
cutter 23:4
cv 1:7 2:7 16:9

d

d 1:15 2:16 4:2 7:4
  7:16,17 103:10,21
  105:1,5 107:2
dabbled 45:12
dallas 82:15 83:1
danger 70:15,23
  89:4
dangerously 83:21
dark 34:16 77:8
data 87:22
databases 37:2
date 10:9 104:19
  105:16 106:5
  107:24
dated 104:22
david 7:16 82:16
day 23:14 54:11
  77:6,13 78:12
  98:3,3 103:16

days 9:17 21:20,23
  46:5
dead 44:18
deadly 26:25 27:4
  30:10,12 32:4,5
  67:17 68:14,24
  71:25
deal 28:23 33:16
  33:23 48:7 57:8
  70:10 74:25
dealer 90:21
dealing 33:25
  54:14 77:21 80:2
  80:3
deals 93:9
dealt 71:7
dear 21:12
deaths 55:4
december 48:21
decided 15:9
decision 25:11
  26:4 36:14,23
  51:25 68:13,23
  70:5 71:25 72:10
  72:21
decisions 46:23
  67:15 72:23
declaration 5:4
  9:23 10:2 11:12
  12:3,5,9,12,18,23
  13:3,15,18 14:11
  61:9 67:22,25
  91:15
declare 103:10
deep 28:21 56:13
deeply 76:15
deer 46:15
deescalate 32:3
  33:10,21 34:8,22
  35:11,23

[deescalation - early]

**deescalation** 16:13
24:25 33:14,17,24
34:3 35:3,7 36:2,4
**defeat** 35:5
**defend** 29:14,19
**defendant** 1:10
2:10 3:13
**defendant's** 5:2
**defendants** 2:17
**defense** 14:19
25:22 28:2 37:14
**defensive** 19:17
25:19 37:2 83:6
**defer** 10:10
**deficiencies** 63:24
65:14
**definitely** 17:2
26:25 88:13
**degree** 16:5 66:1
**delirium** 16:11
33:19 50:21
**delivered** 83:16
**delve** 54:20
**demeanor** 75:17
77:12 84:1,4,6,22
**demographic**
95:19 98:8,13
**demographics**
100:12
**demonized** 99:20
**demonstrate**
59:18
**density** 94:3
**denver** 56:17
**department** 15:9
16:16 18:13,14
19:1,13 21:16
22:1,15 23:10
41:11,12 43:20
48:12,17 49:20
50:16,16 83:1

**departmental**
63:24
**departments**
20:10 69:13 83:3
**depend** 42:18 71:1
**depending** 42:19
85:10
**depends** 90:2
**deploy** 41:7
**deposition** 1:15
2:16 7:25 9:3,14
9:16 10:5 82:13
104:13 105:19,22
105:24 106:8,10
**depth** 33:17
**deputy** 22:2,13,14
30:7 49:15,23
**describe** 17:15
23:2 79:10 96:14
**describes** 61:9
**description** 5:3
**detail** 73:12
**detective** 76:16
**detectives** 20:7
**determine** 76:24
**determined** 42:3
93:22 105:18,22
106:7
**detriment** 54:16
**detrimental** 52:25
**develop** 19:21
**developed** 20:23
**developing** 20:21
94:10,25 95:20
**diallo** 59:25
**difference** 66:5
94:4
**differences** 94:9
94:24 95:19
**different** 20:10
30:12 75:18 95:11

95:13
**differentiating**
62:11
**diffused** 74:11
**dinkheller** 30:6
**direction** 104:10
**directly** 89:18
**disadvantage**
97:15
**disagree** 42:20
**disallowed** 47:5
**disarming** 44:5
**discussed** 45:24
65:15 84:7
**discussing** 92:23
**discussion** 11:17
67:5 88:23
**display** 35:13
**displaying** 76:18
**dispute** 32:18
**disputes** 65:9
**distance** 36:21
37:21
**distort** 80:16
**district** 1:1,2 2:1,2
26:7
**document** 11:25
12:8
**documents** 13:4,4
13:5,10,12,16,20
13:22 102:16
**dog** 75:24
**doing** 12:14 14:1
15:20 16:15 22:15
33:16 35:15 41:8
45:2 47:4 48:20
79:20 85:10 86:6
99:2
**doj.ca.gov** 3:22
**doke** 8:16

**domicile** 28:3
**donahue** 91:23
**douglas** 24:7
**downrange** 57:2
**dozen** 14:16
**drafting** 11:2
**draw** 79:6
**draws** 80:12
**dress** 81:14
**drill** 73:2
**drink** 26:3
**driver** 17:8,20
**driver's** 28:6
39:21
**drives** 46:6
**driving** 39:18
**dropped** 65:1
**drug** 90:20
**drugs** 33:20
**dry** 26:13
**ducks** 100:1
**dude** 26:15 31:22
78:12
**dudes** 34:17
**dui** 98:11
**duly** 104:7
**duress** 81:1
**duty** 14:6 20:9
26:16 34:13 40:4
41:4 47:8,9,10
81:5 82:2,7 84:14
86:15,18
**dynamic** 16:12
93:10

**e**

**e** 105:9,12 106:1
107:3,3,3
**earlier** 27:5 84:6
**early** 30:4 64:16
69:14

Veritext Legal Solutions
866 299-5127

[earned - famous]

**earned**  16:3
**earp**  46:4
**easily**  78:17
**eastern**  1:2 2:2
**easy**  89:20 91:3
  93:19
**ed**  28:6
**education**  15:13
  16:6 27:14,23
  28:4 31:17
**effect**  52:25 53:10
  64:11 66:4,13
**effective**  94:11
  95:1,21
**effectively**  27:21
**eight**  14:23 23:14
  49:1,1 56:4 60:18
  61:22 63:3
**either**  34:23 35:17
  41:9 67:2,2 80:11
**elderly**  28:25
**eliminate**  68:17
**email**  9:20 55:13
  55:13 102:8,19,20
  102:21
**emotional**  38:14
  39:3,9,22,23
**emotionally**  39:1
**emphasizing**
  65:15
**employee**  104:17
**employment**  22:20
**emporia**  15:17
**empty**  34:19
**encounter**  24:11
  37:16,16
**encounters**  37:18
  37:22 38:3 66:5
**ended**  15:10 18:18
  34:20

**enforcement**
  10:23 16:18 18:10
  19:25 21:8,17
  22:16 23:20 29:24
  33:17 40:11 42:3
  46:9,10,22 47:7,10
  48:10 55:18 56:14
  57:11,12 59:12
  65:14 75:20 77:20
  81:6 82:7 85:4,6
  86:8,24 92:25
  96:6,23 99:25
**engages**  101:2
**enhance**  63:23
  65:20,24 66:22,23
**enhances**  66:24
**entire**  32:23
**entirely**  42:18
  80:10 91:11
**environment**  93:5
**equal**  58:2 59:11
**equipment**  81:13
**era**  64:25
**errata**  105:14,16
  106:3,5
**escape**  71:16,17
**establishment**
  77:11
**et**  1:9 2:9
**evaluate**  77:24
  84:13 90:3
**evaluated**  89:23
**evaluating**  84:17
**event**  19:25 21:7
  38:25 78:1,16,17
  79:11 81:5,19
  82:17 83:24 85:14
  85:16,25 86:17
**events**  21:10 69:15
  77:25 86:2,6,10,18
  87:1,14,16 88:1

**eventually**  18:17
**everybody**  17:6
  28:18 54:5 65:1
  95:8 101:5
**everybody's**  85:14
**exact**  62:7 66:12
**exactly**  22:4 39:16
  58:14 68:7 76:13
  78:20
**examination**  4:6
  7:8
**examined**  7:5
**example**  17:22
  30:9 35:12 56:17
  57:4 66:22 70:13
  81:16 85:13
**examples**  51:13
  60:6,7
**exception**  46:12
**excited**  16:11
  33:19 50:21
**exciting**  38:24
**excuse**  26:12
  60:24 85:21
**executed**  103:16
**exercising**  75:17
**exhibit**  5:4 11:15
  11:21,22
**exhibits**  5:1
**exist**  57:6 76:7
**experience**  13:19
  15:12 17:15 31:23
  45:20,25 46:2
  52:12 64:1 81:12
  84:10 90:17 93:1
  93:8 98:17
**experienced**  75:20
**expert**  5:4 7:22
  9:21 10:18,20,23
  13:9 14:13,17,19
  14:21 15:1 51:20

**51:24,25 52:5,7
  92:2 94:20 96:18
  96:20,22
**expertise**  92:10
**experts**  97:13
**explain**  53:5 56:10
  63:25 75:21 85:7
  97:23
**exposed**  56:10
  60:23 61:1 62:20
**expressions**  84:23
**extensive**  55:13
**extensively**  99:10
**extent**  65:21 66:25
**extraordinarily**
  81:11 83:2 100:13
**extrapolate**  86:13
**extremely**  26:4

**f**

**facial**  84:23
**fact**  35:3 53:2,6
  57:7,14 59:17,20
  64:24 65:18 82:3
  100:8
**factor**  32:25 33:8
  36:12,16 38:7
  39:7,25 57:11
  94:10,25 95:20
**factors**  16:13
  36:22 84:5,7
  87:15 94:3,8 96:1
**failing**  13:8
**fairly**  55:13
**falls**  31:22
**false**  91:3
**familiar**  17:13
  85:14 89:7 91:21
  91:22 92:4 96:9
**famous**  54:23 55:5
  59:23 60:1 69:17
  81:19 87:14 100:5

[famous - give]

100:19
**famously** 30:7
**fan** 78:4
**fancy** 17:5,5
**far** 10:9 13:24
 23:20 38:22 50:4
 88:12 90:17 95:15
 96:2,2,2,12 98:12
 99:7 100:21
**fear** 60:21
**federal** 79:18
 104:13 106:1,8,9
**feds** 58:20
**feel** 25:23 75:14
**feet** 37:25
**feloniously** 37:24
**felt** 29:4
**fence** 40:9,10
**field** 19:2,3,4
 51:20 92:18
**fight** 30:8 34:18,19
**fighting** 19:8
**fights** 38:1
**figuring** 32:3
**filing** 13:8
**finally** 21:12,13
**financially** 104:16
**find** 17:6 20:20
 30:10 31:19 32:7
 52:15 54:3,8,9
 56:14 72:15 75:8
 86:7
**finding** 89:7
**findings** 92:16
**fine** 102:10
**finish** 8:7,9
**fire** 16:1 22:6
 35:12 49:3,10
**firearm** 19:22
 23:23 25:9,11,13
 26:17,19 27:7,20

28:9 29:18 30:15
32:12 33:1,9 34:9
35:24 36:13,17
37:24 38:8 39:6,8
39:11,15 40:1,6,22
41:18 42:4,5 43:6
52:24 53:17 57:25
58:1,11,18 59:10
59:19 60:23 61:8
61:13 62:20 66:8
70:14,22 71:23
72:13 73:4,11
81:4
**firearms** 14:19,20
 14:21 15:2 17:13
 17:16 18:4,24
 19:5,13,16 21:2,3
 23:18 25:5,24,25
 26:1 27:15 44:9
 45:4 46:1,17 48:7
 49:8 52:1,1,2,3
 56:14 63:13 83:5
 89:17 95:2,22
 97:20
**fired** 60:1
**firefighter** 31:9
**firing** 59:2
**firm** 3:4
**first** 10:7,11 17:23
 48:14 64:12 95:10
**firsthand** 89:18
 93:8
**fishing** 46:13
**fit** 28:11,18 29:1
 36:10 38:4 64:8
 64:20
**flip** 40:16
**florida** 100:5
**floyd** 54:25
**fluctuate** 58:8

**focused** 71:14
**follows** 7:6 105:8
**force** 14:18 16:10
 16:10,12 19:5,12
 19:19 26:25 27:4
 30:3,5,10,11,12
 32:4,6 50:17 51:9
 51:25,25 52:3
 83:5 95:8 99:9,13
**foregoing** 103:12
 104:4,6,10,12
**forget** 9:19
**forgot** 65:1
**form** 13:12
**formal** 9:15 15:13
 16:6 37:11 41:5
 45:16 58:25 59:6
 102:17
**formalize** 57:23
**former** 9:22
**forms** 22:19
**forth** 74:13,18
 104:5
**forward** 13:9
**found** 24:22 83:8
 85:21
**founded** 57:17,18
**four** 23:13 77:20
 85:11
**frame** 70:6
**frankly** 23:18 54:4
 57:6 71:9 72:16
 74:12 97:10 98:3
**frcp** 106:1
**free** 95:11
**freedom** 95:13
**freeze** 48:13,13
**frequently** 85:5
**friend** 22:22 25:14
 25:18 44:15

**friends** 24:6
**front** 9:20 73:25
**frontier** 46:5
**full** 7:14
**fund** 21:22
**further** 104:12,16
**furtive** 71:12

---

**g**

**g** 7:17,17
**gain** 15:23 98:25
**gallardo** 1:4 2:4
**gang** 14:22 64:13
 90:18 98:23
**garr** 95:9
**gas** 18:25
**gated** 74:1
**gather** 69:1 85:12
**gear** 84:15
**general** 1:8 2:8
 3:14 7:13 31:12
 32:17 39:4 40:4
 40:20 41:16 42:2
 46:25 50:2,15,17
 60:7
**general's** 47:14,20
**generalized** 60:21
**generalizing** 66:18
**generally** 42:20
 97:20
**generic** 86:20
**gentleman** 56:23
 56:25 73:18 74:6
 79:19 81:18
**gentleman's** 59:24
**george** 54:25
**getting** 22:10
 30:24 57:19
**gimme** 72:20
**girlfriend** 34:14
**give** 8:10 39:21
 40:18 42:12

Page 9

**given**  20:24,25
  21:4 104:11
**gives**  26:19
**giving**  92:9
**glad**  21:12
**glaring**  30:9 56:18
  57:3
**glasses**  52:15
**glove**  43:25 72:5
**go**  7:17 11:15,18
  17:5 27:17 28:14
  28:16 33:5 35:8
  36:8,22 37:4,19
  43:15,19,21 44:24
  45:2 46:4,8 47:4
  49:20 53:7,22
  54:2 59:4 63:20
  67:8 70:13 75:7,8
  75:12 79:15 81:13
  84:17 88:20,25
  90:21 95:5 97:25
  99:2 102:1
**god**  20:1 53:12
  66:15
**goes**  77:13
**going**  17:1,22 23:9
  24:18 25:21 27:19
  30:17 31:1,18,21
  36:19,20,25 38:12
  38:25 41:23 44:24
  46:7 48:23 56:24
  58:24 65:8,17
  67:19 68:10 73:13
  73:19,20 74:8,21
  76:8,22 77:9
  79:12,13,17 80:19
  81:12,22,23 82:8
  84:18 86:4 87:11
  88:21 89:25 90:21
  92:1,7,8 95:6
  96:18 97:24 98:5

98:18 100:2
**good**  7:10 14:16
  24:6 41:22,23
  42:4,12 56:13
  62:11 70:6 76:22
  77:10,22 82:1,19
  84:14 88:8
**google**  59:3
**gotcha**  74:22
**gotten**  79:22
**graduate**  15:8
**graham**  95:9
**grandest**  50:3
**grandma**  37:8
**great**  52:18 63:16
  64:10 100:23
**greater**  64:18
**greatly**  63:23
  65:24 66:21
**green**  75:9
**grenade**  18:1,6,25
**groceries**  75:25
**ground**  19:8 29:4
**group**  97:22
**grown**  29:6
**guarantee**  54:1
  75:6
**guess**  39:22,24
  65:4 80:17 91:13
  101:24
**guidelines**  94:7
**gun**  14:3 17:25
  18:1 25:4,20,21,22
  25:22 26:8,23
  27:22 30:8 34:4
  34:21 35:1,2,2,12
  35:13 38:21 41:6
  41:7 42:12 43:16
  43:17,21,22,24
  44:1,2,3,7,15 45:1
  46:11,19 47:8

48:8 53:7,12
  54:11 60:16,16
  63:18 64:4,20
  69:19 72:20 73:21
  74:5,5,7 75:9,23
  75:24 76:3,8,20
  81:25 82:6 86:16
  86:21 90:8,10
  98:4,22 100:19
**gunman**  83:16
**gunmen**  80:3
**gunner**  17:8
**guns**  18:7 30:11
  32:22,22 44:11,22
  45:11 46:21 65:8
  71:3,6,6,8,9,18
  76:16,17 81:16,17
  82:10 83:23
**guy**  18:25 24:19
  29:5 57:2 72:17
  72:17,18,19,19
  73:4 74:4,13,14,19
  75:4,5,23,24 77:7
  77:9,10 78:25,25
  79:1 82:19,19
  83:14,19 84:2,14
  84:14,19,21 86:24
  88:8
**guy's**  26:21 53:12
  54:11
**guys**  12:15 17:6
  22:24 24:17 34:19
  37:19 44:10 62:11
  62:12 81:20 97:12
  97:13
**gym**  81:18,20

**h**

**h**  7:17 107:3
**haggard**  1:15 2:16
  4:2 5:4 7:4,17
  11:21 67:21

103:10,21 105:1,5
  107:2
**half**  29:3
**hampshire**  93:16
  100:7,10
**hand**  60:3
**handcuffing**  19:7
  23:14
**handed**  34:19
**handgun**  46:13
  53:8 73:24
**handguns**  76:15
  82:11
**handle**  27:15 29:5
  32:11
**handled**  105:8
**handling**  41:24
**happen**  21:14 76:8
  83:20
**happened**  20:14
  56:21
**happening**  40:15
  66:16
**happens**  85:5
**hard**  10:12 14:16
  40:10,12 69:13
**harden**  25:18
**hardwire**  16:21
**harsh**  25:3
**hazard**  53:1 56:8
  57:6
**head**  44:23
**health**  38:13,18,20
**hear**  79:5
**heart**  21:12 28:19
**heighten**  70:15,23
**heller**  46:25
**helped**  25:17
**helping**  22:2 55:16
**hereto**  103:14

Veritext Legal Solutions
866 299-5127

**[hey - job]**

hey  20:25
high  33:20 42:25
  59:18
higher  89:8 91:24
hint  61:15
hip  29:11,12 71:8
  75:9,23,24 76:3,21
hire  15:10 93:24
hiring  48:13
historical  57:3
  85:3 87:2,3
historically  58:5
  100:11
history  46:7 69:14
  87:4
hit  23:8
hold  17:3 101:15
hollywood  81:19
holster  54:3 73:24
holstered  53:7
  71:8
home  25:22 37:13
  43:10,12 44:2,16
  90:8,10
homicide  14:22
honest  75:20
hope  38:19 81:10
hoping  74:24
hostage  79:25 80:2
hotel  34:15
hour  11:13 23:14
  49:6
hours  23:11,12,13
house  25:18 44:17
  51:10
huh  14:12 56:5
  92:11
human  16:12 31:5
  31:12,13 32:17
  39:3,17 77:24
  80:25

hundreds  29:24
hunt  46:12
hunter  27:18
hunting  27:16
  46:12,14
hurry  84:1
hysteria  62:15

**i**

iacp  50:19
idaho  93:16
idea  53:11 90:6
identifiable  78:18
  81:4
identification
  20:13 52:2 81:24
identify  79:9
  80:13
identifying  80:11
idiot  75:15
ieds  79:4,21
illness  74:15
imagine  25:15
immediately  79:9
  81:3 83:19 88:9
impact  52:22
impasse  97:14
implementation
  52:21
importance  44:25
  65:16
important  44:8
  57:11 78:22 94:10
  94:25 95:20
impossible  66:7
impression  62:8
improper  57:4
improvement
  16:15
improves  65:25
incident  19:22
  80:24 83:11,12

incidentally  57:16
incidents  41:25
  55:15 69:14,16
  88:7 101:1
include  86:13
included  82:17
  105:14 106:3
includes  94:15
  98:9
including  47:6
incorrect  57:4
increase  68:20
incredibly  37:18
independent  45:15
index  4:1
indicate  76:10
indicating  92:16
indicators  76:9
individual  46:17
  75:19
individuals  60:22
infantrymen
  17:21
informs  45:25
initialed  103:13
injunction  91:6
injury  58:19
ink  103:13
innocuous  59:21
  75:10
input  10:22 51:7
inside  79:4
insider  82:25
insisted  11:11
instant  61:24 62:3
instruct  74:6
instructed  6:1
instruction  41:5
instructor  16:20
  16:21 19:5,6,18

instructors  56:14
intent  71:2
interdict  30:4
interdicted  86:11
interdiction  85:4,6
  88:11
interdicts  86:23
interested  104:17
interim  18:20
interject  36:24
internal  99:10
international
  16:20 50:21
intoxicated  40:2
investigation
  99:12
investigations
  99:11
involve  23:22
involved  10:7
  26:15 37:7 51:10
  76:1 79:1 80:25
  87:15 99:10,12
involvement  93:10
involves  54:21
involving  19:22
irrelevant  96:24
issue  37:12 38:5
  76:11
issues  14:4,4 38:20
items  29:19

**j**

jack  37:20
jackson  21:25
  22:9
jeweler  42:25
jewelry  43:1
job  1:23 15:11
  16:14,22 17:17,23
  19:15 20:24,25
  22:5 41:23 44:14

Veritext Legal Solutions
866 299-5127

[job - lists]

49:2 105:5
**jobs**  16:15 17:19
**joe**  60:14
**john**  91:23 100:18
**judo**  16:13 29:5
**jujitsu**  29:5
**jumped**  29:8
**jurisdiction**  96:23
**justice**  59:1,7
   93:25

**k**

**kan**  15:14
**kansas**  1:16 2:17
   7:1 15:7,25,25
   16:1 18:14 22:14
   23:10 27:18 28:1
   46:3,11,25 47:1,19
   48:1,19 53:15
   61:24 62:17 94:20
   95:12,14 96:21
   98:21 99:24 100:4
**keep**  35:16 44:6
**keeps**  70:5
**kellerman**  90:7
**kept**  34:23
**kill**  28:19 83:15
   84:8 90:19
**killed**  37:24,24
   44:14 90:9,15
**killing**  65:9 78:12
**kim**  10:2 67:9
**kind**  14:22 19:25
   20:3 23:7 31:14
   38:21 39:23,24
   57:23 65:1 66:18
   72:20 73:19 74:21
   86:8 96:24
**kinds**  62:11
**kjm**  1:7 2:7
**knee**  29:7

**knees**  29:10
**knew**  83:19,23
**knives**  78:11
**know**  8:13,24 9:5
   9:24 14:2,8 16:3
   16:14 19:24 20:5
   20:11,20 21:10,21
   22:6,10 23:5,15
   24:10,17,18 25:3,4
   25:6,6 26:2,16,18
   27:1,2,18 28:19,20
   29:1 30:2 31:9
   32:11 33:6,13,20
   33:24 34:3 35:14
   38:25 39:21 40:13
   40:16 41:1 42:10
   42:11,17,18,20,25
   43:19 44:11,12,21
   45:1,8 47:18 48:5
   53:18,25 54:6,25
   55:3,4,7,16,18
   56:12,16,22 60:1
   60:14 62:10,12,14
   64:12,22 65:3,5,10
   66:10,18 70:3
   71:12,14,19 72:8
   72:13,14,16,17,19
   72:22,24 73:3
   74:5,6,7,12,13,15
   74:18,21 75:1,3,6
   75:9 76:6,19 77:3
   77:6,8,10,12 78:5
   78:7,7,9,10,20
   80:16 81:24 82:19
   83:14,21 84:19,20
   84:24 87:14,20
   90:4,15,19,20,21
   90:25 92:5 93:4
   93:23 94:2,6 95:7
   97:15 98:5,16,20
   98:24 99:6,8,17,19

102:13
**knowledge**  42:22
**known**  7:14 55:5
**knows**  75:20 81:12
**kooky**  74:2,19
**kyle**  30:6

**l**

**l**  3:5
**label**  24:7
**lack**  56:6
**language**  66:20
**large**  32:1 73:23
**larger**  50:3 65:6
**late**  69:14 88:3
**lately**  23:17
**launcher**  18:1
**launchers**  19:1
**launching**  18:6
**law**  3:4,6,16 10:23
   16:18 18:1,10
   19:25 21:8,17
   22:16 23:20 28:1
   29:24 30:25 33:17
   40:11 42:3 43:23
   46:9,10,22 47:7,10
   48:10 55:18 56:14
   57:10,12 59:11
   60:21 65:14 75:20
   77:20 81:6 82:7
   85:4,6 86:7,24
   92:25 96:6,22
   97:16,21,22 98:7
   98:25 99:3,25
   100:14 101:2,7
**law.com**  3:11
**lawful**  52:23
**laws**  47:1,2 51:2
   52:21 89:8 91:24
   96:9 97:7
**lawsuits**  47:18
   56:17

**laying**  44:17 71:6
**layperson**  97:15
**lead**  56:7 60:25
   76:2
**leader**  17:8 18:22
   18:23
**leave**  26:20 43:24
   64:25 97:15
**leaving**  18:3 44:11
   53:21 83:25
**led**  76:19 87:17
**legal**  12:16 13:7
   46:19,23 47:22,23
   47:24 77:22 97:14
   105:7
**legalized**  73:17
**legally**  27:2 43:18
   43:22 64:3,4
   97:19 99:1
**length**  12:7 83:12
**lethal**  30:1
**level**  43:3 51:7
   64:25 77:23 99:5
**liberal**  100:7
**license**  47:17 98:1
   98:7
**licenses**  39:21
**lieutenant**  17:11
   18:19,24 48:11,23
   49:1
**lieutenants**  49:5
**life**  8:1 14:5 32:23
**lifesaving**  31:8,10
**lifestyle**  28:20
**limited**  26:23
**line**  6:2 105:15
   106:4 107:4,7,10
   107:13,16,19
**list**  18:4
**lists**  55:13

Veritext Legal Solutions
866 299-5127

[litany - military]

litany 48:3
literally 71:12,18
literature 78:10
little 18:21 27:2
  29:10 37:10 42:22
  59:7 82:25 87:11
  98:23
live 22:12
living 93:1
loaded 44:17
  46:19,21
lobbying 51:3
locally 64:12
locate 13:11
location 77:4,5,13
  80:12
lock 43:17,22
locked 102:9
  105:12 106:1
logical 27:19
long 29:23 44:6
  49:12 57:19 82:10
  83:23 87:24
longer 22:9 83:4
longest 64:24
look 12:8,17 24:5
  25:7 28:22 38:1,3
  48:23 50:10 52:13
  52:20 54:24 55:17
  55:18 56:15,19,19
  56:21,22 58:5,9,24
  59:23 60:17 61:21
  62:16 67:4,8
  69:17 76:12,12,22
  77:9 81:15,18
  84:8,9,21,23 85:2
  87:15 88:7 89:3
  90:12,24,25 91:12
  93:12,19,24 95:7
  97:18 98:6,10,14
  98:14,19 99:8,14

99:16 100:12
looked 64:15 94:6
  99:22
looking 10:20 26:2
  31:23 55:14 66:20
  76:23 77:10 80:10
  84:3 101:20
looks 24:14
looser 47:13
los 64:19
lost 56:16
lot 16:9 23:19
  28:19 31:21 36:22
  38:3 39:17 41:22
  42:20,25 43:18,22
  46:21 47:25 48:4
  48:6 53:22,23
  54:21 59:16 64:3
  65:9 83:13,17
  99:18,18
lott 100:19
louisiana 15:18
lower 98:12

m

m 24:8 81:20
m16a1 17:25
m2 17:25
m203 18:1
m60 17:25
machine 17:8,25
  17:25 18:6 104:8
magazine 37:4
  45:8,8
magic 59:3 70:9
maine 93:15 94:5
maintenance
  19:17
majority 37:7,10
  37:19,23 50:23
  88:2

maker 50:25
making 36:14 52:1
  70:5 72:21 83:9
  101:19
mall 86:14
man 29:6 56:23
managing 24:8
  27:3
manifest 76:16
manner 83:13
  86:4
marched 29:9
margate 56:19
mark 1:4 2:4 3:25
marked 11:22
markedly 75:18
marksmanship
  27:22 36:18 37:12
  38:5
masks 50:8
mass 62:15 78:5
  78:17
massacre 69:15
master 19:15
masterson 46:4
math 48:20
matter 10:25
matthew 3:15 7:12
  12:25
matthew.wise
  3:22
mature 39:19
maturity 39:23
mayhem 61:24
  62:3
mayor's 51:11
mcfadden 76:16
mean 13:13 24:1
  27:15 30:23 32:14
  32:15 33:4 38:13
  38:15 43:9 50:3

51:2 53:5 56:11
  57:14 63:25 65:25
  69:19 73:21 75:21
  85:7 90:2 97:23
  101:6
means 29:14,15
  35:5
meant 63:2
measure 66:7
mechanically
  27:21
mechanics 27:20
meet 23:3
member 18:20
members 51:11
  62:19 63:7,12
  98:23
mental 38:9,13,13
  38:18,20,22 74:15
mentally 40:11,12
mentioned 16:23
  17:12 18:9 29:22
  30:25 60:6 77:6
  87:1 91:21 92:4
mentioning 27:5
  100:15
mercy 26:21
mere 53:6
merely 63:17
message 21:13
methodology
  93:25
metro 34:15
metropolitan 22:5
middle 50:9 55:2
  71:15 75:5 85:15
miles 29:3
military 15:16,21
  15:21 16:24,24
  17:3,13,16 18:5
  32:15

[millimeter - officer]

**millimeter** 18:1
**mind** 53:13 60:8
  70:6,7 88:16,20
**mine** 24:20 25:14
  44:15
**mine's** 22:22
**mines** 18:2
**minimal** 17:21
  45:23
**minor** 98:10
**minuses** 25:12
**minutes** 29:3 54:9
**missed** 34:14,15
**missouri** 23:11
  48:2 53:21
**misstate** 59:1
**mistake** 53:2 57:7
  57:14 59:17,20
  65:18
**mistakenly** 60:12
**mode** 81:13
**model** 23:3 50:20
  88:3,6
**modern** 87:5
**moment** 11:16
  38:14 65:19 73:2
  84:18 88:21
**month** 37:5
**morning** 7:10,11
**motorcycle** 48:16
**mouse** 75:14
**mouthful** 22:7
**move** 85:12,17
**movement** 78:22
  84:23
**muc** 24:8
**mug** 37:20
**mugging** 24:12
  37:17
**muggings** 31:24

**multiple** 20:10
  89:19
**municipal** 50:4,6
  50:12
**murder** 14:20
  78:5,6,14
**murdered** 30:7
**mute** 101:9
**muzzle** 84:25

**n**

**nail** 97:25
**name** 7:15,15,16
  24:7 58:25 59:2,6
  59:8,24 90:21
  104:20
**name's** 7:12
**national** 16:18,18
  58:7,24
**nature** 12:13
  14:24
**near** 21:12
**nebraska** 48:2
**nebulous** 66:11
**necessary** 105:14
  106:3
**need** 8:4,12 21:1
  27:1,13 29:11,12
  29:14,15 88:21
  101:11
**needed** 21:14
**needs** 23:4,7,16
**negative** 52:22,25
  53:9 54:12 66:8
**neglect** 83:8
**negotiations** 80:3
**negotiators** 80:5
**neither** 104:16
**never** 16:4 25:10
  33:5 44:21,24
  70:10 71:3,10,19

**new** 3:9 20:15
  42:11,21,23 93:16
  100:7,10
**newhall** 69:15
**news** 14:3 37:3
  93:13,19,21 94:2
**newsletters** 55:12
**night** 75:5
**nine** 62:16 67:4,9
**non** 24:2 25:22
  40:12 85:4
**nonexistent** 57:4
**nonpolice** 37:1
  48:7
**nonsworn** 24:2
**normal** 86:8
**north** 21:25 81:19
**norway** 78:11
**nose** 34:20
**notating** 105:15
  106:4
**note** 64:12 85:4
  93:14 101:20
**noted** 54:13
  103:13
**notice** 12:18
**noticed** 66:3,4,14
**november** 105:3
**nowadays** 76:20
  79:4
**nra** 37:4
**number** 13:3 50:1
  50:10 93:9 100:20
  105:15 106:4
**numbers** 91:1,1,2
**nypd** 59:23

**o**

**o0o** 7:7
**oath** 7:5,19
**object** 31:1 36:7
  36:19 79:12 80:20

82:8 89:25 92:1,7
  95:4
**objection** 8:18
  26:10 27:9 28:12
  33:11 34:10 38:10
  39:10 40:7,23
  41:19 42:7 43:8
  51:21 58:3 59:14
  69:6 70:16,24
  72:1 73:7 77:1
  80:19,20 81:8
  89:10 94:12 95:23
  96:17 97:4,9
**observation** 13:19
  45:20 53:14 54:13
  83:7 89:19 93:8
**observations** 54:1
  54:17 92:18
**observed** 62:19
  67:9
**observing** 90:3
**obvious** 54:7
**obviously** 17:21
  27:13 29:21 38:24
  46:14 54:25 76:17
**occasion** 99:14
**occurs** 29:13
**october** 1:17 2:19
  7:1 105:5
**odds** 82:1
**offer** 25:25
**offering** 32:20
  41:12
**office** 47:20 51:11
  105:11
**officer** 14:6 18:17
  19:2 20:10,17,17
  21:17 22:22 24:2
  30:2 31:7 36:3
  40:5,21 41:17
  44:14 46:10 47:10

[officer - particularly]

52:12 59:12 67:10
67:12 68:5,13,21
69:2,17,21 70:6,15
70:23 71:24 75:20
85:11 86:8,15,18
96:7,23 99:12
**officers** 19:4,19
20:2,7,8,8,12
22:11 37:23 40:11
41:3,8 47:7 48:16
53:3 57:13 60:24
61:1,6,12 62:18
63:6,12,17,25
69:18 81:6,23
82:7 83:18 85:6
85:16,25 86:12
98:9,22 99:11
**official** 1:7 2:7
43:2
**oh** 17:14 20:1
53:12 63:2 66:15
**ohio** 76:13
**okay** 8:22 9:9
10:14 11:14,20,25
12:11,17,21 35:21
36:12 39:6 50:11
51:19 52:13,16,18
53:5 59:6,9 60:19
61:2,5,21 62:2
63:20,21 67:8
68:3 75:16 87:10
89:1 91:8,13
101:12 102:3,20
**okie** 8:16
**oklahoma** 48:2
53:20
**old** 22:11 37:8
38:1 44:14 47:4
**olds** 39:21
**olympic** 31:20

**onboard** 22:13
**once** 22:23
**ones** 37:3 59:17
78:19 87:14
**oneself** 26:20
**online** 45:10
**onus** 34:2
**open** 47:17,19
52:21 54:15 56:10
61:23 62:3,9,17,24
63:11,15,18,22
64:5,7,20 65:13,20
65:23,25 66:8,14
66:21,23 68:9,17
68:20 70:8,9
75:17 77:3,21
82:10 89:4,16
93:2,5,9,10 94:15
96:9,15,20,23 97:2
97:8 99:1
**openly** 32:1
52:23 61:8,14
63:13 67:11 69:3
76:25 81:4 82:5
82:18
**opinion** 13:6,12,17
13:21 47:1,14
53:3 54:18 55:23
57:10 61:3,6,12,16
61:18,20 62:3,5,7
62:8 63:5,10,14,19
65:7 68:4,12,15,16
68:20,25 69:1
77:16 81:21 83:7
87:8 89:16,21,21
89:22 90:3 92:15
92:21,22 99:4
100:16,25
**opinions** 51:19
52:9 60:20

**opportunity** 9:2
**option** 26:20 27:4
30:10
**options** 15:10
25:19,23 32:4,5
**orders** 50:2,15,17
**ordinance** 50:4,6
50:12
**oregon** 46:6
**organization**
49:11 50:22
**original** 13:7
104:13 105:10,21
**orthos** 29:12
**outline** 20:6
**outside** 41:10
46:11 57:21 79:14
80:20 82:12
**overall** 37:1 75:1
**overarching** 50:5
**overcome** 31:18
**overhill** 3:7
**overland** 47:19
**overreact** 74:12
**overused** 51:24

**p**

**p.o.** 3:19
**pacing** 74:13,17
**package** 21:5 23:5
23:9,14,16 25:18
75:22
**page** 4:5 5:3 6:2
12:17 52:13 56:4
59:6 60:18 61:21
61:22 62:16 63:3
67:4,9 75:12 89:3
93:13 97:18,19
105:15 106:4
107:4,7,10,13,16
107:19

**pages** 1:24 85:2
105:14,17,17
106:3,6,6
**paid** 11:8 21:24
**paint** 68:8
**panic** 60:23 61:6
**paper** 45:8,17 56:2
81:22 88:13
**papers** 50:1 88:12
89:20
**paperwork** 91:9
**paradigm** 42:14
86:13
**paragraph** 52:20
56:4 60:17 61:22
62:16 63:2,5,20
67:4,9,13,16,17
75:12,16 77:19
85:2 89:3 93:12
97:18 98:17
**paranoid** 34:1
**pardon** 100:20
**park** 47:19
**parking** 43:18,22
65:9,10
**part** 13:13,18
15:19 20:11,18
22:2,9,13 24:4,20
25:1 29:21 32:24
35:2,3,6,17,18
47:21 49:3,10
50:20 53:15,24
62:23 63:19 71:17
75:2 78:22 80:1,7
81:21 83:12,24,24
84:20 88:5 91:8,9
92:24,25 93:7,20
**particular** 27:6
58:23 85:18 99:8
**particularly** 42:22
46:24 59:17

[party - police]

party 104:18
patrol 18:17,17
  22:3 48:15
patrolman 18:16
pay 14:7 55:10
paycheck 21:21
paying 23:21
pd 48:19 55:6
pdf 102:9 105:12
  106:1
pederson 1:21
  2:19 104:23
peer 91:22
penalty 103:11
  105:16 106:5
pending 8:14
people 20:1 21:6
  22:1 23:8,20
  24:16 25:16,24,25
  27:1,2,13,16,25
  28:3,19,25 29:13
  32:6,7,21,22 33:23
  36:25 37:7,10
  38:19 40:13 41:13
  42:21 44:24 47:8
  47:15,25 48:4,6,8
  51:10 54:14 55:16
  57:15,21 58:6,9
  62:9 63:17 64:3
  65:7,7,9 66:8 71:5
  71:7,12 72:4
  74:18 77:21 78:3
  78:12,25 79:1
  81:16,17 83:20,23
  83:25 84:8,9,25
  90:7,13,13,18,19
  93:11 97:19,24
  98:6,18 100:12
people's 23:7
  99:20

pepper 19:6 23:11
  25:2 29:22 30:9
  30:24 31:3 52:3
perceived 84:25
perception 20:2
  43:3 80:16
perceptions 81:1
period 64:9
  105:18 106:7
perjury 103:11
  105:17 106:6
permission 47:9
  98:19
permit 42:13
  47:13,14,24 48:1,5
  61:23 64:6,21,22
  100:9,11
permits 42:21
permitted 96:15
permitting 97:7
person 8:5 23:23
  24:2 25:21 26:9
  28:2 31:25 33:1,9
  33:15,21 34:2,3,8
  36:13,17 39:8
  40:22 41:18 42:2
  43:10,12 45:1
  46:20 52:23 57:24
  59:12,19 61:7,13
  66:10 67:11 69:24
  70:2 71:14 72:12
  73:6 75:17 76:6
  76:24 78:21 79:6
  81:3,7 82:1,2
  86:22 101:2
person's 35:22
  67:12 68:5,22
  69:4 71:2 73:3
personal 13:19
  25:11 26:4 45:19
  53:14,25 54:17

92:17 93:1
personally 26:14
  51:23 66:3 71:2
persons 32:10
  97:22 98:1
pertained 10:21
pertains 104:12
pertinent 13:25
  14:5 15:24 16:12
  73:16
phone 9:17
photos 81:15
physical 30:11
physically 28:10
  28:18 29:1,14
pick 29:3 33:5
  42:21
picked 25:17
pickup 71:6
picture 68:8 72:18
pictures 20:5
  44:23
pid 20:13
pile 87:11
pipe 79:3
pistol 17:24 18:5
  23:6,6 38:1 44:17
  54:3,6
place 31:19 64:2
  104:5
places 16:4 20:15
  48:3 53:23 56:16
  100:4
plainclothes 20:8
  20:17 86:16
plaintiff 1:5 2:5
  3:3
plaintiff's 12:21
  14:10 100:24
plaintiffs 7:23

planet 33:22 83:3
platoon 17:9,10
play 72:11 77:14
playing 44:22
plays 85:1
please 8:23
pllc 3:4
pluck 98:13
pluses 25:12
point 17:9 18:10
  18:23 19:12 21:3
  21:4 30:1 44:13
  48:12 56:1 59:18
  64:10,19 66:12
  73:15,17 93:1
  97:10 100:18
points 87:22
police 9:22,23
  10:21 14:6,17
  15:9,20 16:12,16
  16:22 18:14 20:10
  21:15 22:6,14
  23:10 24:2 30:2
  31:7 32:15 36:3
  37:22,23 41:3,4,5
  49:3,9,16,18,25
  50:16,22 51:7,8,25
  52:2,5,12 53:3,11
  53:16 54:21,22
  55:11 56:6,18,20
  57:1,5,7,8,19,22
  60:12,15,23,25
  61:1,6,12 62:10,18
  63:6,11,17,24
  64:13 65:3 66:5
  68:4,12 69:12
  70:11 74:3,10,22
  77:23 80:7 82:15
  83:1,3,15,18 86:9
  86:12 87:18 88:5
  93:10 95:7 98:9

[police - putting]

99:5,9,11
**policy** 49:24,25
  50:1,5,17,18,20,25
  51:1,6,8,17 94:16
  96:1
**political** 60:24
  83:9,24 89:22
**politics** 83:7
**ponder** 40:17
**pool** 98:13
**poorly** 54:5
**popow** 56:19,22
**popular** 25:1
  99:25
**population** 94:3
**populations** 28:25
**porch** 56:24 57:1
**port** 64:15
**pose** 63:16 76:25
**posing** 75:19
**positions** 17:3
  48:10
**positive** 20:13
  54:12 81:23
**possess** 42:4 97:19
**possibilities** 32:7
**possibility** 66:6
**possible** 8:17 31:6
  32:4 55:15 80:10
  85:20
**possibly** 31:11
**post** 77:21 85:8
**posture** 84:22
**potentially** 41:25
**pounds** 29:4
**practice** 69:11,21
**practices** 10:21
**pre** 24:5,20 77:21
**prearranged**
  89:21

**precedent** 85:3
  87:2,3
**precedents** 46:24
**precise** 78:14
**prefer** 78:5
**preliminary** 91:6
**preparation** 9:16
  12:4 16:14
**prepare** 9:14 12:5
**prepared** 40:5,21
  41:17 42:5
**preparing** 14:11
**presence** 70:14,22
  71:23 82:18
**present** 3:24
**pretty** 12:8 37:14
  55:5 58:16 79:18
  82:1
**prevent** 9:11 43:5
  57:12
**prevented** 35:11
**previous** 63:1
**previously** 8:1
  77:7 101:2,6
**price** 11:9
**primarily** 22:25
  54:19
**primary** 19:15
  21:2,3
**prime** 29:2
**prior** 104:7
**prison** 25:16
**pro** 11:10
**probable** 76:4
**probably** 14:16,23
  14:25 18:3 28:4,4
  33:3 39:18,19
**problem** 29:16
  32:2 41:10 68:18
  70:8,10,11 71:20
  82:3

**problematic** 83:8
  83:10
**problems** 62:11
**procedure** 105:19
  105:20
**proceedings** 47:21
  104:4,6,8,14
**process** 33:15 35:3
  35:7 36:14 71:17
  72:21
**profession** 98:15
  99:16
**professions** 99:17
  99:18
**professor** 91:23
**profile** 59:18
**profoundly** 33:25
**program** 19:19
  20:25
**progress** 78:6,14
  79:25
**progressive** 41:12
  69:12
**promoted** 19:3
  48:22
**promotion** 48:13
**pronounce** 59:24
**proper** 20:19 56:6
  57:10
**properly** 32:11
  102:15
**property** 43:18
**proponent** 29:22
**protest** 50:9 82:17
  83:25
**protests** 50:8
**protocols** 19:21
**prove** 42:11
**provide** 12:22
  13:20 36:21 88:17
  100:24

**provided** 13:23
  14:7 102:16
  105:19 106:8
**psychotic** 34:1
**public** 15:2 27:8
  28:10 30:16 32:12
  32:14 45:4 46:1
  48:8 49:24 50:5
  51:1,6,17 52:22,22
  52:24,25 53:10
  54:16 56:7 57:5
  57:25 58:1 59:10
  60:24 62:15,19,20
  63:7,13,23 65:16
  65:20,24,25 66:22
  66:23,24 73:25
  74:21 75:19 76:25
  89:5,17 93:14,15
  93:17 94:11,13
  95:1,21 96:1
**publications** 55:11
**publicly** 96:12
**publish** 45:6
**published** 45:3
**pull** 28:1 50:9
  69:22,22 70:2
**pulling** 10:9 34:20
  74:23
**purse** 31:24
**purview** 92:3
**push** 25:21 65:7
  70:9 89:22 90:14
**pushing** 90:6,8
**put** 13:8 23:15
  24:6 39:2 66:13
  90:6 102:12,14
**putting** 25:16
  84:24 86:24

[qualification - research]

| q | | | |
|---|---|---|---|

**qualification** 41:4
**qualifications** 22:24
**qualify** 17:18,24 17:24
**quality** 32:16
**quantify** 39:16 58:14 87:13 98:2
**quantity** 32:16
**question** 8:8,10,14 8:15,17,19,19,21 8:23,24 39:7,12 58:15 70:19 91:18 94:18,22 96:19
**questions** 6:1 36:1 101:8,14,25 102:3
**quiet** 79:22
**quite** 14:1 16:8 23:18 40:13 46:2 54:4 57:6 58:12 64:10 71:9 72:16 74:12 98:2
**quote** 65:24

| r | | | |
|---|---|---|---|

**r** 3:15 7:17 107:3,3
**r&s** 106:1,9
**rabid** 78:13
**race** 32:17
**ragweed** 85:22
**ran** 29:6
**raney** 10:2 13:9 61:5,11 62:2 63:10 68:3,11,19
**raney's** 60:20 67:10,22,25
**range** 19:15 32:1,7
**rankings** 93:14,22
**rapid** 20:4,24 21:6 79:24 85:9 88:6

**rapidly** 67:12 68:5 68:22 69:4 85:19
**rate** 52:6 53:22 64:18 98:12
**rates** 89:9 91:25 94:4
**reach** 54:18 72:4,5 72:5 74:7 75:14
**reached** 57:20
**reaching** 13:5
**react** 73:22 81:6 82:7
**reaction** 74:23
**read** 9:19,23 10:1 12:4 13:7,10 14:3 24:10 45:18 61:19 62:7 63:14 67:20 77:23 89:12 96:11 103:11
**reading** 13:24 30:24 69:1 72:12 72:14 105:23 106:9
**real** 9:15 12:8 79:22 99:24
**realities** 90:12
**reality** 93:2
**realize** 33:22,24 35:4
**really** 10:12 13:18 21:11 34:2 40:10 40:17 43:3 51:18 71:3 72:10 79:6
**realm** 54:16
**reason** 39:20 42:12 53:24 66:19 91:20 107:6,9,12 107:15,18,21
**reasons** 57:16 87:20 88:4

**recall** 14:7 82:15 82:20
**recess** 67:6 101:23
**reciprocity** 47:25
**recognition** 20:19 21:8 24:21 25:4 32:2 80:8
**recognize** 11:25
**recognized** 52:7
**recoil** 45:7
**recollection** 59:4
**recommend** 25:8 25:10 27:6 28:10 28:17 29:19
**recommends** 31:3
**reconnaissance** 17:4
**record** 7:15 9:6 11:16,17,18,20 26:5 67:5,8 88:20 88:23,25 101:5 102:1 104:7,11
**recording** 8:3
**recruit** 19:11,16 22:11
**refer** 91:14 93:13 102:15
**referenced** 105:6
**referring** 13:14 26:6 30:18 58:22 58:23 67:21,25 87:2,3,6 94:14
**reflect** 12:9
**refresh** 59:4
**regard** 50:24 95:1 95:21
**regardless** 81:13
**regional** 19:9 94:9 94:24
**regular** 14:2 55:16

**related** 45:4
**relationship** 64:11 66:4,13
**relative** 104:17
**released** 105:21
**relevant** 65:4
**relied** 91:16 92:20
**religion** 95:13
**rely** 13:5 54:18 55:22
**remotely** 1:16
**rephrase** 8:24
**replacement** 29:11 29:12
**replicate** 20:14
**report** 5:4 52:14 66:21 67:10 93:20 93:22 94:3
**reported** 1:21
**reporter** 2:20 102:4,8 104:2
**reporter's** 8:3
**reports** 93:13
**represent** 7:12
**request** 102:18
**requested** 104:15 106:1,9,10
**requests** 102:13 102:13
**require** 27:3
**required** 17:18,23
**requirement** 41:3
**requires** 25:5
**rereading** 62:5
**research** 13:11,16 16:10 45:15,16,22 55:22 86:6 87:7 87:10,21 88:15 89:7,24 90:7 93:25 99:7 100:15 100:16,22,24

Veritext Legal Solutions
866 299-5127

[researcher - see]

**researcher** 51:16
100:19
**resist** 58:9,17
**resource** 48:16
**resources** 60:25
**respond** 19:22
23:23,25 24:23
43:4 82:9 86:3
**responded** 21:9
32:24
**responding** 20:19
61:7
**response** 20:4,20
20:25 21:6 25:6
39:3 50:21 52:5
79:24 85:9,24
86:9,24 87:18
88:5 94:11,13,15
95:1,21 96:1
**responsible** 19:12
**rest** 98:16
**restate** 94:21
**result** 62:3
**results** 67:16
68:14,23 71:25
**retained** 7:22 9:22
14:17,19,21
**retention** 19:8
23:12 44:5
**retired** 16:17 22:4
22:22 41:16 47:7
48:21 98:22
**retirement** 21:20
21:22 57:21
**retiring** 21:18
**return** 105:17
106:6
**review** 9:3 102:7
104:14 105:8,10
105:13 106:2

**reviewed** 10:24
51:14 91:6,22
92:3
**revolver** 34:20
**revolvers** 45:12
**richard** 1:4 2:4
**ridiculous** 53:13
**rifle** 17:25 37:9
46:15
**rifles** 18:6 71:5
**right** 19:24 33:17
38:4 42:16 48:25
55:2 57:9 61:25
62:21 67:17 75:17
83:18 84:18 85:22
86:22 89:5,8
91:23 92:18 93:16
93:17 95:11 99:2
101:18
**rights** 73:21 99:20
100:19
**riot** 55:6
**risk** 63:16
**rival** 90:20
**rmr** 1:22
**road** 3:7 22:3
**rob** 1:7 2:7
**robberies** 31:25
58:10
**robbers** 62:12
**robbery** 14:22
26:18 34:17,24
**robot** 83:16
**rocket** 18:2
**role** 11:2 17:17
19:1,17 20:21
21:2,4 49:12
**roles** 16:17 17:7
18:15 22:16
**rounds** 60:1

**routine** 70:13,21
71:22
**row** 100:1
**rub** 29:9
**rules** 106:8
**run** 21:6 29:3 64:5
65:8 70:4
**running** 38:20
56:23,25 58:19
83:20 84:11,19

**s**

**s** 1:5,10 2:5,10 3:3
3:13 107:3
**sacramento** 3:20
**safe** 44:25 69:24
**safely** 27:15 33:1,9
34:9 35:24 36:13
36:17 38:8 39:8
40:1,6,22 41:18
42:5 45:2
**safer** 26:9
**safest** 33:7 58:10
**safety** 27:18 51:1
51:6,17 52:23,25
53:1,10 54:16
56:7 57:5 63:23
65:16,20,24,25
66:22,23,25 69:21
70:6 89:5 93:14
93:15 94:11,13
95:1,21 96:1
**sailboat** 31:21,22
**saw** 76:16,16
**saying** 38:1 54:10
61:18 67:20,21
73:4 84:5
**says** 24:19 66:21
91:15
**scan** 12:14
**scarsdale** 3:9

**scenario** 20:20
24:22 25:5 32:5,6
34:23 36:10,21
37:14 38:23 39:2
55:2,8 70:18
72:15 73:12,14
79:8,25 80:4,9
**scenarios** 24:23
26:15 30:13 34:13
**scene** 67:11 69:3
80:15 83:18 84:11
84:12,19,21 86:12
86:23 88:9
**schedule** 105:10
**schizophrenic**
34:1
**scholarly** 45:17
**school** 48:16
**science** 16:2,10
**scope** 79:14 80:21
82:12
**scratch** 20:23
**screen** 11:14,21
38:21 52:16
**screws** 21:21
**se** 33:14
**seat** 72:4
**seats** 71:7 72:6
**second** 48:14
62:25 67:15 68:13
68:23 71:24 72:10
72:23 77:9 101:16
**seconds** 38:2
88:21
**secure** 44:1,2
**security** 22:22
25:18
**see** 11:21 37:8,12
37:22 48:7 52:16
53:22,23 54:6
56:24 62:25 64:8

Veritext Legal Solutions
866 299-5127

[see - sort]

64:20 65:4,11,12
66:3,10 69:19
70:11 71:4,9,10,18
72:9,20 73:21
74:5,10 76:17
78:24 79:5 81:25
83:20 91:12
**seeking** 41:10
**seen** 20:5 72:4
83:11
**segueing** 83:21
**self** 27:12
**selling** 90:22
**send** 11:7 12:15
102:9
**sending** 102:7
**sensation** 80:15
**sense** 28:7
**sent** 91:12
**sentence** 67:3
**sentencing** 94:7
**separate** 14:23
**sergeant** 17:9
18:17 19:3
**serial** 78:6,14
**series** 14:22,23
**seriously** 21:11
**serve** 16:24
**served** 14:13
16:23 48:10 49:12
49:15,18,21 96:6
**service** 19:11,16
21:5 23:9
**serving** 27:12
**set** 9:25 85:18
104:5
**setting** 24:12
65:19
**seven** 52:13
**share** 11:14

**shawnee** 22:14
**sheriff** 22:12
49:22
**sheriff's** 21:25
49:20
**shift** 18:19 48:11
48:14,14 49:7
**shifts** 49:6,6
**shirt** 24:19
**shoot** 27:2,21
34:25 41:4 53:13
61:12 63:12
**shooter** 20:4 21:9
77:25 78:1,8,16,17
78:23 79:2,7 81:5
82:16 85:5,25
86:2 87:14
**shooters** 87:4
**shooting** 20:17
35:18 55:5 56:8
56:23 57:14,15
59:20 61:1 62:18
63:6,17 78:17,25
79:9,20 81:25
82:20 86:14
**shootings** 37:2
53:2 57:8,12
59:17 65:3,18
99:12
**shoots** 37:9
**shopping** 75:24
**short** 21:24
**shorthand** 2:20
104:1,9
**shortly** 21:18 22:1
**shorts** 81:18,20
**shot** 44:15,18,22
57:1 58:2,15,16
59:11,20 60:3,12
60:15

**shotgun** 46:15
**shotguns** 71:5
**shots** 38:2
**show** 11:15 42:10
53:11 85:17 88:3
**showed** 20:9 57:7
79:21 85:15
**showing** 86:12
**side** 22:21 31:10
40:16
**sidewalk** 73:25,25
74:13 75:6
**sign** 12:11,14
24:18 105:16
106:5
**signature** 104:23
105:21,23,23
106:9
**signed** 12:19,19,22
**significant** 38:20
39:3 64:14
**signs** 43:16
**silly** 75:13
**similar** 37:15
49:21 50:12
**simple** 27:16
**simply** 60:22
61:13
**simultaneously**
48:14
**sinks** 31:21
**sir** 7:24 10:6 11:1
12:10,20 14:9,14
21:18 22:18 45:18
48:11 49:17,19
51:15 52:17 56:2
89:6,13
**situation** 33:10
34:8,24 35:10,11
35:23 80:8

**situational** 73:11
**situations** 26:24
27:3 30:2,3 31:18
34:7 35:22
**six** 18:18
**size** 34:18
**skills** 24:24 44:5
**slow** 80:4 98:23
**small** 44:22 74:1
**smaller** 45:11
**smart** 27:25
**snatchings** 31:24
**sneaky** 24:17
**sniper** 18:22
**snub** 34:20
**solo** 85:24 87:18
88:5
**solutions** 105:7
**solve** 29:16 68:18
70:11
**solving** 70:8
**somebody** 33:19
33:25 39:2 44:16
54:3,8,9 69:19,22
69:23 74:2 75:2,8
76:20 78:6 84:11
86:21 90:15,16
99:22
**somebody's** 53:6
**someplace** 43:16
43:25 54:2 75:7
84:10
**sorry** 26:7 39:14
61:22 63:2 85:21
101:10
**sort** 16:2 26:19
27:14,23 41:13
51:3 55:21 58:10
62:15 64:14 71:8
77:11 85:1 91:2,4
98:11 99:20

Veritext Legal Solutions
866 299-5127

[sounds - susceptible]

sounds   27:11
sources   100:20
south   49:3
space   65:10
speak   8:5 10:4,20
   25:12 92:25
speaking   42:14
   65:5 97:21
speaks   76:13
specialist   17:4
specialties   44:4
specific   14:8 19:23
   44:13 56:2 70:17
   74:21 88:13,15
   90:20 94:17
specifically   82:11
   90:4 94:13 100:17
speculation   60:21
speech   95:11
speeding   44:18,19
   69:22
spell   7:15
split   67:15 68:13
   68:23 71:24 72:10
   72:23
spoke   12:6 60:2
spontaneously
   62:18 63:12
spot   62:5
spray   19:7 23:12
   25:2 29:23 30:9
   30:24 31:3 52:3
springsteen   60:2
squad   17:8 18:22
square   86:14
stabber   78:9
stabbing   78:25
stability   39:23
stacks   99:16
staff   21:13

stakeholder   51:6
   51:12
stalker   25:17
standard   69:11,21
start   8:10 33:6
   75:13 81:25
started   17:2 18:16
   46:8,22 64:12
   66:15
starts   82:20
state   1:8 2:8 7:14
   15:7,14,17,18,18
   15:25 19:10 28:1
   32:19 33:19 38:9
   38:13,14,23 39:9
   41:2,6 42:10
   43:17 46:3,11,16
   47:22 51:2 52:20
   60:20 61:22 62:17
   63:15,22 65:13,23
   73:18 75:16 85:3
   89:4 93:2,3 95:11
   95:12,14,14 97:3
   97:19 99:1 100:9
   103:17 104:2
   105:9,12
stated   28:2 82:18
   83:22
statement   9:24
   11:12 83:10 90:14
statements   100:2
states   1:1 2:1
   53:18 64:16 67:10
   87:5 89:19 93:3,3
   93:4,15 94:5 95:8
   95:16 98:9 100:6
stating   56:6
statistic   58:19
statistical   64:11
   92:2

statistically   58:11
   58:16 90:10 97:21
   98:6
statistician   92:8
   92:12 93:24
statistics   58:22
   59:1,7 66:13
   89:20 93:25 97:25
   99:15
stats   58:7 64:16
stay   55:9,20 99:3
steps   27:6 30:15
   30:18,23,25
stimulus   79:5
   80:11
stipulation   105:20
stolen   43:6,9,12
   44:9,15
stop   35:15 69:23
   70:14,21 71:22
   76:4,5,19,20
stopped   44:19
stops   71:4 86:23
storage   44:25
store   43:20,21
strategos   16:20
street   3:17 24:10
   31:23 34:17 37:13
   37:15,16,16 41:22
   54:14 59:25 77:23
   90:13 99:5
stress   36:14
strict   47:12
strictly   45:10
stuck   44:23
studied   45:19
   83:11
studies   89:15 90:5
   91:21,22 92:5,6,17
   92:21,23

study   87:5
stuff   50:23,24
   53:23 55:12 66:15
stunt   74:22
subdivision   74:1
subject   30:11 81:1
   88:13
submissions   91:7
subscribed   104:20
subway   34:15
success   88:6
successful   87:16
   87:17,23,23,24
   88:1,10
successfully   86:23
suffer   58:18
suffered   83:7
suffering   74:15
sufficient   30:3
suit   81:16
suite   3:8,18
sunny   54:11
supervising   19:3
support   13:17,21
   55:15,22 92:22
supports   87:7
   100:16,25
suppose   27:25
supposed   38:21
   43:19,21
sure   8:6 13:13
   30:23 32:13 35:20
   38:17 39:16 41:14
   58:14 60:5 61:9
   62:6 63:4 73:13
   78:20 88:21 91:11
   94:19 100:1
   102:17
surprise   24:16
susceptible   28:22

Page 21

[suspect - tool]

**suspect** 37:1,25
56:25 72:18 80:11
80:13
**suspects** 85:5,19
**swat** 18:20 80:5
81:20 84:15
**swimmer** 31:20
**switched** 100:9
**swords** 78:11
**sworn** 22:13 104:7
**sympathy** 29:1
**system** 41:6 47:13
47:14

**t**

**t** 24:19 107:3,3
**tactfully** 32:13
**tactic** 19:17
**tactical** 16:21 45:9
57:17
**tactics** 19:7 52:4,5
69:25 70:4 78:21
83:6 85:18
**take** 8:12,15 21:22
27:7 30:14 31:15
37:2 38:17 51:9
71:15 77:9 85:13
87:4 90:24 97:24
101:11 102:10
**taken** 2:17 7:25
21:11 44:7 104:4
**takes** 87:24 88:10
**talk** 10:11 24:13
34:2 36:2 43:14
53:25 77:25 78:4
90:13
**talked** 13:23 45:10
**talking** 24:1 26:12
36:2,5 37:13 38:4
59:2 60:7 73:14
73:16 76:14 82:9
84:5 87:12,13

93:8 95:16 98:24
101:20
**talks** 62:23
**targeted** 66:9
**taser** 19:6 52:4
55:8
**taught** 29:23
**teach** 78:21
**teaching** 44:6 55:3
**team** 18:20,23
85:9,11,17 86:1,8
87:19,23 88:2
**teams** 80:5 86:11
**technicality** 21:19
**tell** 10:17 14:2
17:6 54:5 71:2
84:1
**tells** 98:3
**tend** 37:18 98:12
100:13
**tends** 88:10
**tennessee** 95:10
**tense** 79:18 80:25
**term** 17:5 51:23
62:13 78:2,15
86:20
**terminal** 52:2
**terms** 36:3 89:16
93:15
**terrific** 13:1
**territory** 90:23
**terry** 76:5,13,20
**testified** 7:6 15:1
55:25
**testifying** 7:18,19
9:12 96:18 104:7
**testimony** 31:2
92:9 103:14
104:11
**texas** 48:2 53:20

**thank** 59:9 88:19
88:24 101:22
102:22
**thanks** 36:6
101:18
**that'd** 100:23
**thing** 8:13 14:22
16:2 20:13 26:19
27:19 28:21 45:10
50:3 51:4 54:25
55:20,21 57:23
58:10 64:14 71:8
73:11 74:11,11,24
75:10 77:11 85:1
91:2,4 97:12
98:11 99:2,21
**things** 14:3,4,6
15:18 16:1,10,11
18:7 19:6,8 20:9
22:24 23:8 24:21
27:1,25 31:24,25
37:20,20 39:17,22
41:8 42:24 43:2
44:1,20,25 45:12
45:18,19 46:4,6,14
46:15,18,24 50:2
50:17 51:8,9 52:6
54:7,20,22,23 55:4
58:1,8,9 59:11
61:17 62:10 64:13
64:17 65:3,9,18
66:11 70:1,5 72:4
72:6,8,9,25 74:25
77:6 79:22 80:2,3
80:5,6 87:17
90:23,25 94:7
95:9 98:10,11,18
99:6,8,13
**think** 11:12 17:12
27:5,22 31:19
34:4 39:1,17

40:13 50:2 51:15
51:23 58:16 60:14
63:1 70:7 73:15
79:3,13,23 83:17
86:9 91:8 100:15
**thinking** 9:11 36:9
**thirty** 77:20
**thought** 29:13
57:22 74:2
**thoughts** 12:7,9
**threat** 20:19 43:3
75:19 76:25
**threatening** 24:11
**three** 19:14 29:12
34:17,19 37:25,25
38:2,2,2 49:5,5
85:16 93:14
**throat** 26:13
**throwing** 79:3,21
**ties** 81:17
**time** 8:5,12 22:2,9
22:13 29:4,23
31:7 44:6 46:9,22
47:5 54:13 58:13
64:9,24 75:13
77:5,13 84:16
86:1,15 88:2
93:18 104:5
105:10,18,24
106:7
**timeframe** 48:18
**timely** 86:4
**times** 14:15,25
29:9,25 90:9
**titles** 88:12 100:21
**today** 9:4,10 10:23
45:24
**today's** 9:14
**toddler** 44:3,12
**tool** 26:23,25 27:3
30:1,11

[tools - utah]

**tools**  29:15
**top**  55:9,20 93:14
**topeka**  1:16 2:17
7:1 16:16 18:14
21:15 22:5 48:19
49:4 50:7,15
64:18 79:19
**topics**  45:4
**totality**  52:11
76:21
**totally**  67:1
**touched**  16:7
22:17
**touching**  37:21
**tough**  38:5
**town**  54:3 75:7
**traffic**  70:14,21
71:22
**tragedies**  20:14
**tragic**  69:14
**trail**  46:6
**train**  17:18,24
23:25 30:14 43:5
69:13
**trained**  18:8 81:11
81:22 83:3
**trainer**  16:18
18:25 21:3 53:16
53:18 57:19
**trainers**  21:4
**training**  10:21
13:7 14:20 16:11
16:19 19:2,3,4,11
19:11,13,16,20
20:12,18,22 21:5
21:11 22:3,25
23:1,16,18,19,20
23:21 24:4 25:1
25:24,25 26:1
27:12,14,23 28:5
29:21 30:24 31:17

32:16,20 33:2
37:11 41:1,10,12
41:13 49:9 52:1
52:11 53:20,20
56:7,13,20 57:5,9
57:11,22 63:24
65:14,16,19 80:1,7
81:24 83:5,6,6
85:11
**trainings**  23:22
**transcribed**  104:9
**transcript**  9:3,5
103:12 104:10,13
104:15 105:6,8,10
105:13,13,21
106:2,2
**transition**  79:23
**transitioned**  80:8
**transports**  43:1,2
**travel**  48:5 93:3
**travelling**  53:18
**travels**  45:20
**trend**  85:8
**trends**  55:9,18,18
**trial**  14:20
**trials**  14:24
**tried**  47:4,19
**tries**  68:8
**trolley**  86:14
**trouble**  36:9
**truck**  17:20 71:6
82:6
**true**  93:18 97:5
103:15 104:10
**truth**  75:21
**truthfully**  9:12
11:9
**try**  8:4,7,9,24
11:14 13:16 23:3
32:3 33:24 55:9
71:15 80:12

**trying**  55:20 60:8
71:13 74:9 84:8,9
84:24 92:5 98:25
99:2
**tuesday**  1:17 2:19
7:1
**turn**  51:19 65:5
74:9 88:22
**turned**  14:23 55:6
74:20 91:16
**turning**  34:23
35:17
**two**  10:13 21:9
23:11,12 29:3,11
30:12 33:14 88:1
97:11 100:10
**type**  21:11 23:4
24:2,11,21,21
42:10,14 44:20
45:8,10,17 74:10
74:22 80:9 97:12
**typically**  85:11

## u

**u**  24:8
**u.s.**  93:13,19,21
94:2
**ugly**  33:18
**uh**  14:12 56:5
92:11
**ultimately**  60:25
**unarmed**  56:9
58:2 59:13
**uncommon**  68:4
68:12
**unconcealed**  47:23
**unconstitutional**
47:2
**undercover**  40:21
82:2
**undersigned**  104:1

**understand**  7:18
8:23,25 61:5,11,17
62:2 63:10 68:3
68:11,19
**understanding**
10:22 35:20 60:5
94:18 96:14
**unfortunately**
41:2
**uniform**  82:3
**uniformed**  20:9,16
36:3
**unit**  17:11 18:25
48:16 60:1
**united**  1:1 2:1
64:16 87:5 95:8
95:16 98:8
**university**  15:7,15
15:17,19,25 16:1
23:10
**unknown**  24:8
**unlawfully**  98:18
**unsecured**  44:16
**update**  23:12,12
**upgraded**  18:5,6
**upper**  62:23
**ups**  54:23
**uptick**  64:23 65:2
**usage**  78:3
**use**  14:17 16:12
19:5,12,18 30:3,4
35:1 40:5,22
41:17 42:5 50:17
51:8,12,25,25 52:3
58:17 83:5 86:20
95:8 99:9,13
**uses**  33:1,9 36:13
36:17 38:8 39:8
40:1
**utah**  53:21 86:14

**[utility - works]**

**utility** 26:24
**utilize** 58:11 70:3
 71:17 78:3 80:5
 88:3 89:20
**utilized** 52:5 83:15
**utilizing** 18:25
 39:19 45:11

**v**

**v** 7:14 56:17,19
 76:13 95:9
**vacation** 21:24
**valid** 56:20
**variety** 20:7 94:7
**vast** 37:7,9,19,23
 50:23 88:2
**vehicle** 17:7
**verbal** 16:13 24:24
 24:24 33:24 34:22
 35:14
**veritext** 102:9
 105:7,9,11
**vermont** 100:7,8
**version** 12:19
**versus** 56:21 72:13
 82:19 86:24 87:18
 94:5 95:9,12,14
**vicinity** 83:25
**victim** 26:17 37:22
 58:17
**victimized** 38:24
 39:6,11
**victims** 55:17 58:6
 84:25
**video** 72:19 74:22
 81:18
**view** 37:1 89:15
**views** 45:25
**violating** 99:20
**violence** 64:13
**violent** 26:17 89:9
 91:25

**virtually** 28:20
 29:6 98:8
**visible** 54:4 72:11
 73:23,24
**volume** 1:18 2:16
 4:3
**volunteered** 11:10
**vs** 1:6 2:6 105:4
 107:1
**vulnerable** 28:24

**w**

**wait** 85:16 86:1,5
**waited** 20:3
**waiting** 87:18
**waived** 105:23,23
**waiving** 105:20
**walk** 34:16 54:1,8
**walked** 71:4
**walking** 73:24
 75:5,23
**wallet** 60:2
**walmart** 54:2 75:8
**want** 20:14 23:11
 25:20,24 26:1
 27:17 28:4,5,21
 35:25 43:24 44:10
 50:10 59:1 60:5
 62:13 64:20 71:16
 78:4,14 80:4
 83:22 98:14,14
 102:5
**wanted** 10:17
 20:24
**washington** 15:17
**waste** 60:24,25
**watershed** 19:25
 21:7
**way** 33:7,14 46:9
 47:4 58:10 61:10
 67:2 73:5 99:2

**ways** 32:3 67:3
**we've** 14:1 45:24
 65:15 78:10
 101:20
**weapon** 19:8
 23:12 44:5 70:3,3
 71:17
**weapons** 71:9
**wearing** 71:7
 73:23 81:16,18,20
**week** 31:13,14
**weeks** 9:25
**weigh** 15:10
**weight** 34:3
**weirdly** 46:20
**went** 47:6,12 64:2
 78:19 86:2
**whack** 90:22
**wheel** 28:6
**whereof** 104:19
**wide** 20:6 77:3
**wider** 19:1
**win** 34:18
**window** 71:5
**wire** 45:9
**wise** 3:15 4:6 7:9
 7:12 11:18,19,24
 13:1,2 26:22 28:8
 29:17 30:22 32:9
 34:6 35:9 36:5,11
 38:6,16 39:13
 40:19 41:15 42:1
 42:15 43:11 52:8
 56:3 58:21 60:4
 67:7,23,24 69:9
 70:19,20 71:21
 73:1,13 75:11
 77:15,18 80:14
 81:2 82:4,14
 88:24 89:2,14
 91:5,17,19 92:4,11

 92:14 94:15,19,23
 95:18 96:3,20
 97:1,6,17 101:13
 101:17,22 102:1,6
 102:12,17,20,22
**witness** 4:1 10:20
 11:23 14:13,17,21
 26:12 27:11 28:14
 28:17 30:20 31:5
 33:13 34:12 36:9
 36:24 38:12 40:9
 40:25 41:21 42:9
 51:23 56:1 58:5
 59:16 69:8 71:1
 72:3 73:9,15 77:3
 79:17 80:24 81:10
 89:1,12 90:2
 91:13 95:6,25
 97:10 101:19
 102:7 104:19
 105:13,16 106:2,5
 107:24
**witnesses** 104:6
**word** 17:5 25:3
 32:13 33:18 51:12
 79:17
**wording** 67:3
**words** 62:7
**work** 11:5 12:21
 18:13 21:16 50:11
 50:13 68:4,12
 70:12 77:23 88:16
 99:5 100:23
**worked** 25:13
 44:21 50:25 51:5
 51:16
**working** 19:19
 21:15 22:9 31:13
 41:9 48:17
**works** 21:22 27:21

Veritext Legal Solutions
866 299-5127

**[world - zuchel]**

| | |
|---|---|
| **world** 54:22 56:18 57:8,22 64:2,6,6 64:13 69:12 93:13 93:20,21 94:2 | **z** |
| | **zuchel** 56:17 |
| **worried** 71:10,11 71:19 | |
| **worrisome** 72:9 72:25 | |
| **worry** 32:21 71:3 | |
| **wrap** 101:16 | |
| **write** 54:23 | |
| **writing** 50:18 102:14 | |
| **written** 45:7,9 50:1,4,17 69:16 | |
| **wrong** 57:15 63:17 | |
| **wrote** 12:7 85:24 | |
| **wyatt** 46:4 | |
| **wyoming** 53:21 | |

| |
|---|
| **x** |
| **x** 106:1 |

| |
|---|
| **y** |
| **yards** 37:25 38:2 |
| **yeah** 12:24 23:15 33:3,3 36:5 45:12 60:10 62:25 67:23 84:2 88:15 100:23 101:10 |
| **year** 10:12 22:4 37:8 39:21 49:14 53:19 55:1 58:8,8 58:20 |
| **yearly** 17:19 |
| **years** 18:18,21 19:14 41:22 49:1 49:1 55:19 66:17 77:20 93:9 99:5 |
| **yep** 9:1 |
| **york** 3:9 20:15 42:11,21,23 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.