1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF CALIFORNIA
2              --oOo--

3  MARK BAIRD and RICHARD        )  Case No. 2:19-cv-00617-KJM-AC
   GALLARDO,                     )
4                                )  Sacramento, California
                                 )  November 4, 2022
5          Plaintiff,            )  10:53 a.m.
                                 )
6     vs.                        )  Re:  Plaintiffs' Third Motion
                                 )  for Preliminary Injunction
7  ROB BONTA, in his official    )
   capacity as Attorney General  )
8  of the State of California,   )
   and DOES 1-10,                )
9                                )
           Defendants.           )
10

11              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE KIMBERLY J. MUELLER
12        UNITED STATES CHIEF DISTRICT JUDGE

13 FOR THE PLAINTIFF:   THE BELLANTONI LAW FIRM, PLLC
                        Amy Bellantoni, Esq.
14                      2 Overhill Road, Suite 400
                        Scarsdale, New York  10583
15
   FOR THE DEFENDANT:   CALIFORNIA DEPARTMENT OF JUSTICE
16                      GOVERNMENT LAW SECTION
                        Ryan Richard Davis, Esq.
17                      1300 I Street
                        Sacramento, California  94814
18

19              MARYANN VALENOTI, RMR, CRR
                   Official Court Reporter
20              501 I Street, Suite 4-200
                   Sacramento, CA 95814
21              MValenotiRMRCRR@gmail.com
                     (916)930-4275
22

23 Proceedings reported via mechanical steno - transcript produced

24              via computer-aided transcription

25

SACRAMENTO, CALIFORNIA, FRIDAY, NOVEMBER 4, 2022

--oOo--

(In open venire.)

THE CLERK:  Come to order.  Court is back in session.
You may be seated.  Calling Civil Case 19-617 Baird, et al.,
versus Bonta.  This is on for Plaintiffs' Third Motion for
Preliminary Injunction.

THE COURT:  All right.  Good morning.  Appearances,
please, for plaintiffs.

MS. BELLANTONI:  Good morning, Your Honor.  Amy
Bellantoni for the plaintiffs.

THE COURT:  Good morning, Ms. Bellantoni.

For the Government, for the Attorney General?

MR. DAVIS:  Good morning, Your Honor.  Deputy Attorney
General Ryan Davis.  Here with me is Supervising Attorney
General Matthew Wise.

THE COURT:  All right, good morning to you each.

So this is Plaintiffs' Third Motion for Preliminary
Injunction.  Does it supersede the prior motion such that that
is no longer pending before the Court?

MS. BELLANTONI:  So I believe at the teleconference
during the summer, we had -- there had been no decision on
Plaintiffs' Second Motion for Preliminary Injunction, so we had
withdrawn that.

THE COURT:  I wanted to make certain that was

1    perfectly clear.

2              MS. BELLANTONI:  Yes.

3              THE COURT:  So that's what I understood as well.

4              And the pending Motion for Preliminary Injunction, do

5    I have this right, was filed before the operative Complaint,

6    but the operative Complaint defines the parameters of the case?

7              MS. BELLANTONI:  Yes, ma'am.  Yes, Your Honor.

8              THE COURT:  That's all understood, Mr. Davis?

9              MR. DAVIS:  Yes, Your Honor.

10             THE COURT:  So just clarifying some of the basics,

11   including some jurisdictional questions, Messrs. Baird and

12   Gallardo are not asserting claims about concealed firearms?

13             MS. BELLANTONI:  Correct.

14             THE COURT:  It's only open and exposed?

15             MS. BELLANTONI:  Yes.

16             THE COURT:  And limited to handguns?

17             MS. BELLANTONI:  Yes.

18             THE COURT:  And so can I conclude they are asserting

19   an as-applied challenge?

20             MS. BELLANTONI:  This would be a facial challenge as

21   well as as-applied, but from predominantly a facial challenge

22   to the two criminal statutes in the context of applying them to

23   individuals who open carry.

24             THE COURT:  So to the extent there is an as-applied

25   challenge in there, the plaintiffs are alleging there's no

1      application process for open carry licenses; is that right?

2              MS. BELLANTONI:  Well, the Complaint has been

3      narrowed, Your Honor, to challenges to Penal Code Sections

4      25850 and 26350, which are the two criminal statutes that would

5      be applicable and are being applied to the open carriage of

6      handguns, both loaded and unloaded, which constitutes the ban

7      on open carry.

8              THE COURT:  All right.  So I heard you say primarily

9      facial challenge, but I didn't see you take "as applied" off

10     the table.  So if there is an "as applied" there, how is there

11     standing for such a challenge?

12             MS. BELLANTONI:  It would be as applied to individuals

13     who open carry.  So in other words, the Penal Code itself were

14     challenging facially in the context of a criminal statute for

15     the open carriage of handguns, but in the context of an

16     as-applied challenge, just being as-applied to the plaintiffs

17     in open carriage of a handgun.

18             THE COURT:  How is this defendant, the right defendant

19     for an as-applied challenge?

20             MS. BELLANTONI:  Because this defendant is the

21     individual who is the head law enforcement officer of law

22     enforcement throughout the state and would be the individual to

23     enjoin with regard to enforcement.  So this defendant and all

24     those acting in concert and at the direction of his

25     jurisdiction.

1        THE COURT:  So it's not that the Attorney General --

2   you're not saying he has the authority to create a licensing or

3   administrative process?

4        MS. BELLANTONI:  No, we're asking for the two criminal

5   statutes to be enjoined so that individuals who open carry will

6   not be subject to criminal enforcement.

7        THE COURT:  Just accepting the facial challenge, I

8   understand the facial challenge part of it.  I'm not certain I

9   understand to the extent there is an as-applied challenge

10  there.  Do you want to say anything on that, Mr. Davis?

11       MR. DAVIS:  I do want to say that my understanding, my

12  reading of the Second Amended Complaint, is that it is entirely

13  facial.  I think what my colleague is referring to are the

14  reasons for the facial challenge, which is that the law as

15  written prohibits either the normal law-abiding citizens from

16  open -- from carrying open and exposed without a license, and

17  their contention is that that's unlawful under the Second

18  Amendment, but it's a challenge to the law on its face as

19  written not as applied to any particular individual.

20       THE COURT:  So accepting the facial challenge, is the

21  allegation that the Second Amendment does not allow California

22  to place any restrictions on the right to carry handguns openly

23  in public?

24       MS. BELLANTONI:  So if we look to the *Bruen* test, in

25  the second part of that test, which is looking to the text in

1    history and tradition of the Second Amendment at the time of

2    the enactment, there were no criminal statutes to be enforced

3    against an individual who open carried.  In fact, the plain

4    text of the Second Amendment to keep and bear arms shall not be

5    infringed, would necessarily bear out the fact that open carry

6    and carrying in public for self-defense were not crimes; they

7    were specifically protected rights.  So having a criminal

8    statute enforced against people who are just exercising those

9    rights violates the Second Amendment.

10         THE COURT:  So it's not that the Second Amendment

11   doesn't allow the placement of any restrictions on the right to

12   carry handguns openly; is that what plaintiffs are alleging?

13         MS. BELLANTONI:  We're alleging that the criminal

14   statute should not be applied to individuals who open carry.

15         THE COURT:  So on the preliminary injunction, you

16   agree that the Court applies the *Winter* test?

17         MS. BELLANTONI:  I believe that the submissions -- I

18   have the legal standard in my submissions, Your Honor, so I

19   would rest on the standard that's set forth therein.

20         THE COURT:  Well, assuming it's the *Winter* test, and

21   you agree with that, Mr. Davis?

22         MR. DAVIS:  Yes, Your Honor.

23         THE COURT:  Noting it looks like an amendatory

24   injunction here, so I have some questions about that in just a

25   bit, but the *Winter* test has four parts.  I have to decide if

1   the balance of the equities tips in the plaintiffs' favor and

2   an injunction is in the public interest, two of the factors.

3           So I just want to make perfectly clear what plaintiffs

4   are saying the harm is they will face absent an injunction

5   given that the law is currently in effect.

6           So right now the law provides for persons being able

7   to keep guns at home and in their places of business.  And the

8   plaintiffs can carry concealed handguns in public, correct?

9   You agree with both of those points?

10          MS. BELLANTONI:  If individuals have a conceal carry

11  license, then they are allowed to conceal carry, yes.

12          THE COURT:  And California moved promptly, the

13  Attorney General moved promptly once *Bruen* issued to make clear

14  the State was no longer enforcing the good cause requirements

15  in the California regime; agreed?

16          MS. BELLANTONI:  Yes.

17          THE COURT:  So did that not conform California's

18  framework to *Bruen*?

19          MS. BELLANTONI:  With respect to open carry it did not

20  because there are still two criminal statutes that effectively

21  ban open carry, and while there is language in the licensing

22  statute that purportedly allows for open carry permits to be

23  issued, there is -- no license has been issued since 2012.

24  There's no application for an open carry.  There is no process

25  or procedure to apply for an open carry license.

1          But moreover, in 1791 there was no permission required

2     to open carry.  There was no licensing scheme.  There were no

3     criminal statutes to be enforced against people who were

4     exercising the right that is codified in the Second Amendment.

5     So all of those, the licensing scheme and the criminal

6     statutes, are inconsistent with the Second Amendment.

7          THE COURT:  So thinking about the harms, the way I

8     need to think about it in consideration of a Motion for

9     Preliminary Injunction, so one of the harms is that the

10    plaintiffs would have to conceal any handguns they choose to

11    carry in public, right, that's one of the harms?

12         MS. BELLANTONI:  If they had a license to carry

13    concealed, they would be required to conceal their handguns,

14    that's correct, but the carry concealed licensing scheme is

15    still a may-issue scheme.  So it's still -- *Peruta II* clearly

16    held the en banc Ninth Circuit opinion that conceal carry is

17    merely a privilege.  So I would find that not to be

18    analogous --

19         THE COURT:  To the harm is twofold:  The need to apply

20    for a license and the need to conceal any handguns carried in

21    public.  Those are the harms.

22         MS. BELLANTONI:  The harm is the ban on the ability to

23    open carry.  The harm is the complete violation and inability

24    at all to exercise the right to open carry.  It's been

25    terminated.  So that would be the harm.

1                And for those who go forward to open carry, they're

2    subject to arrest and incarceration and potentially the

3    permanent loss of Second Amendment rights.

4           THE COURT:  So in terms of the public interest

5    specifically, you are making clear, as clear from your

6    briefing, the plaintiffs are asking the Court to enjoin the

7    Attorney General from enforcing the Penal Code sections while

8    this case is pending, right?

9           MS. BELLANTONI:  Yes.

10          THE COURT:  So that would mean the state would not be

11   able to prosecute persons who carry loaded or unloaded handguns

12   in public; right?

13          MS. BELLANTONI:  They would not be able to prosecute

14   individuals who merely open carry, whether loaded or unloaded.

15          I say "merely" as a qualification because that's

16   specific to self defense.  An individual who has a handgun

17   holstered on their person, you know, open and exposed in that

18   regard, merely carrying for self-defense, yes, they would not

19   be able to prosecute that individual.  If there was a crime

20   being committed, certainly, you know, there are Penal Code

21   statutes to address any criminal activity.

22          THE COURT:  Help me understand.  Suppose a person had

23   attempted and failed to obtain a license to carry a concealed

24   handgun based on the history of violent crime or a refusal to

25   complete a training course, so that person could carry a

1      handgun openly in public if I grant the motion?

2              MS. BELLANTONI:  The way the law is written now is

3      that it's very broad-based, so anyone, even nonprohibited

4      individuals like my clients who have no disqualifiers under

5      state or federal law to possessing firearms, those individuals

6      are criminalized for exercising their rights under the Second

7      Amendment.

8              If there was a felon, convicted felon, which is a

9      recognized, at this point, disqualifier to firearm possession

10     at all, who is carrying openly, there should be -- there is a

11     federal statute they could be arrested under for possessing a

12     firearm if they're a disqualified person under

13     18 U.S.C. 922 (g), and if California has other penal codes that

14     address prohibited people and punish them for possessing a

15     firearm when they're disqualified, they could certainly be

16     prosecuted under those statutes.  But if they have a broad

17     statute that criminalizes law-abiding, nonprohibited, you know,

18     people from exercising a constitutionally protected right, it

19     violates the constitution.

20             THE COURT:  Do you identify all those other penal

21     codes in your briefing?

22             MS. BELLANTONI:  I do not.

23             THE COURT:  But you're saying if I grant the

24     injunction, the State is not prevented from carrying out some

25     restriction on open carry that do recognize the possibility

1  that someone has a history of violent crime or refuses to

2  complete basic training.

3      MS. BELLANTONI:  I don't know that refusing to or

4  being unable to complete basic training is a recognized

5  disqualifier to the possession of firearms.  But if an

6  individual is disqualified from possessing firearm and falls

7  under criminal statute, then certainly, or is committing a

8  crime and not just carrying for self-defense like a law abiding

9  person, then certainly they would be exposed to being

10  prosecuted under the relevant criminal codes, and if California

11  doesn't have codes that addresses disqualified individuals,

12  then I'm sure they could swiftly enact such codes; most states

13  do.

14      THE COURT:  You are agreeing *Bruen* did not eliminate

15  ability to regulate open carry in the interest of public

16  safety?

17      MS. BELLANTONI:  Oh, no, I think public safety is

18  completely off the table, as does the Court in *Bruen* and

19  *Caetano* and *McDonald* and in *Heller* clearly have taken public

20  safety off the table, but with respect to individuals who are,

21  from a State's perspective, disqualified in the first instance

22  from possessing firearms, certainly those statutes could be

23  written and passed if they're not already in place.  I know

24  various other states and certainly the federal government has

25  such laws, but even those are open to constitutional challenge.

1          THE COURT:  Mr. Davis, can you assist the Court, what

2     other tools does the State have to keep handguns, open carry in

3     particular, out of the hands of those who would put others in

4     danger in public?

5          MR. DAVIS:  There are no tools other than the

6     prohibitions on possessing a firearm at all that would continue

7     to exist.  The convicted felon, certain convictions for

8     domestic violence for a period of years, so there are the laws

9     both under federal and state law that prohibit some categories

10    of people from even possessing weapons, so those would continue

11    to exist.  But what the State uses, and like many other

12    jurisdictions, to regulate public carry in particular as

13    opposed to just possession, is the licensing scheme.

14         So plaintiffs' position, and what they're asking for

15    with this injunction, is to do away with the licensing scheme

16    entirely so that there is no licensing scheme in effect, and

17    anyone who wants to, whether it sought previously or they

18    haven't ever sought a public carry license, is -- would then be

19    permitted to carry open and exposed throughout the State of

20    California.

21         THE COURT:  All right.  Thank you, that's helpful.

22         For you, Ms. Bellantoni, I mentioned the possibility

23    of a mandatory injunction.  It appears you are seeking a

24    mandatory injunction because it's not seeking to preserve the

25    status quo.  So the bar is raised when a party seeks a

1    mandatory injunction such that the plaintiffs need to

2    demonstrate that they will suffer extreme or very serious

3    damage.  Do you agree that that's the way to think about this

4    as a mandatory injunction?

5         MS. BELLANTONI:  I could see how the Court would view

6    this as a mandatory injunction with respect to the status quo,

7    but the status quo only came into effect in 1967, which is

8    relatively during the modern times, and only by virtue of the

9    fact that those modern regulations are in direct conflict with

10   of the Second Amendment as it was understood when it was passed

11   in 1791.  And as we've learned now from *Heller* and *Bruen*, that

12   the relevant time period to look at with regard to these

13   challenges is 1791, not to the modern day regulation.

14        So I would submit that the Mulford Act that was passed

15   in 1967 and then the 2012 amendments -- excuse me, statute with

16   regard to an unloaded handgun, carriage of a unloaded handgun

17   in public are the status quo to the extent that they are in

18   existence since then, but really should never have been.  So

19   plaintiffs shouldn't suffer an increased burden in that respect

20   because the State chose the wrong path and an unconstitutional

21   path.

22        And with regard to balancing, *Bruen* made clear that

23   balancing the interests in the context of a Second Amendment

24   challenge is off the table.

25        THE COURT:  That's on the ultimate merits of the case.

1          MS. BELLANTONI:  Yes, yes, Your Honor.

2          THE COURT:  On the question of what's the status quo,

3     does *Bruen* alter -- I hesitate to even use the word

4     "traditional" -- does it alter what the courts should

5     understand what qualifies as the status quo such as something

6     as recent as 1967 is not the status quo anymore?

7          MR. DAVIS:  No, Your Honor.  If anything, I mean *Bruen*

8     speaks to the standards that courts should use in analyzing

9     Second Amendment claims, and it speaks specifically to the good

10    cause requirement.  It certainly does not undermine otherwise

11    States' abilities to regulate public carry, to use licenses

12    schemes to do that, etc.  Those things are in place, have been

13    in place for a long while.  Undoing them would be upsetting the

14    status quo.

15         THE COURT:  Also for you, Mr. Davis, on the burdens,

16    moving on to the burden at this stage.  Thinking about *Bruen*,

17    the Court there did look to the burden of proof in First

18    Amendment cases, and say there is an analogy in Second

19    Amendment cases, there is, of course, a significant burden on

20    the Government to justify restrictions with First Amendment.

21    So you do acknowledge in your briefing ultimately the need to

22    meet that burden.  Why is not the burden imposed at this stage

23    of the case?

24         MR. DAVIS:  Because at this stage it is the

25    plaintiff's motion and under the *Winter* factors, it is the

1  plaintiffs who must show a substantial likelihood of success on

2  the merits.

3        So in a world where *Bruen* was recently decided,

4  upsetting what had been the law and the framework the courts

5  used to analyze Second Amendment claims, the plaintiffs have a

6  tough road rode to hoe because they need to establish that

7  under this brand new framework, the State will not be able to

8  establish that the historical record, and on *Bruen* itself,

9  allows for regulating open carry and allows for licensing to be

10  a part of that, because again, under the Second Amended

11  Complaint, and they make this perfectly clear too in the papers

12  on the motion, the licensing scheme is now what they are

13  arguing is entirely out the window; that anyone who wants to,

14  with or without license, needs to be permitted to carry open

15  and exposed.  So they have to establish -- it is their burden

16  now, and I do think that gets lost somewhat in the papers,

17  particularly in the reply brief filed by the plaintiffs, that

18  they fault the Government for having failed at this stage in

19  the proceedings to establish what the historical record shows.

20  It is their burden, though, to establish a substantial

21  likelihood of success.

22        THE COURT:  Why is that not the case, Ms. Bellantoni,

23  at this early stage of the case, particularly if it's a

24  mandatory injunction?

25        MS. BELLANTONI:  Sure, within the framework of

1    establishing likelihood of success on the merits, is the burden

2    that we would have under the Second Amendment challenge itself,

3    which is we've shown that the open carriage, which is the

4    conduct that my clients are seeking to engage in, falls

5    directly and squarely within the plain text of the Second

6    Amendment.  And at that point, the burden shifts entirely to

7    the Government to show that their regulations are consistent

8    with the text, history and tradition of firearm regulation.  So

9    their burden is still within that framework of the likelihood

10   of success on the merits.  Plaintiffs will succeed on the

11   merits of this case.

12         THE COURT:  But you reject the suggestion that what

13   you have to show to satisfy likelihood of success is the

14   defense cannot meet its burden, that's what Mr. Wise --

15   Mr. Davis said.  I'll just say you disagree with that

16   characterization of that burden at this stage?

17         MS. BELLANTONI:  I do, because within the framework of

18   the plaintiffs' burden is the likelihood of success on the

19   merits, and to be successful on the merits of the case, we

20   would need to -- we would need to engage in the two-step *Bruen*

21   test, which is plaintiff showed that the conduct falls within

22   the plain text of the Second Amendment, which it does.

23         Then the burden shifts entirely to the Government to

24   show that their regulation is consistent with the text, history

25   and tradition of the Second Amendment, which it's not.

1          THE COURT:  To the extent -- if I bought that

2     argument, then the State effectively has said we don't have

3     that at this point.  We're prepared to assemble it.  It's going

4     to take time.  It's complicated; right?

5          MR. DAVIS:  That's true, Your Honor, with respect

6     to -- well, two things:  It's true with respect to open carry

7     itself.  But the Second Amended Complaint, as Your Honor

8     pointed out, was filed after the initial preliminary injunction

9     motion that's at issue here.  It actually clarified things in

10    this lawsuit.  It clarified that the plaintiffs are seeking to

11    both open carry and without a license.

12          So, actually, on that second point, I think they have

13    an even harder time showing they have a substantial likelihood

14    of success on the merits.

15          In *Bruen* itself, Justice Kavanaugh, joined by Justice

16    Roberts, so two justices needed to count to five, said, quote,

17    "The Court's decision does not prohibit states from imposing

18    licensing requirements for carrying a handgun for

19    self-defense."

20          THE COURT:  Understood.

21          MS. BELLANTONI:  May I, Your Honor?

22          THE COURT:  Hold that thought, and you will have a

23    chance to wrap up the argument.

24          In the public interest, I'm not seeing in the record

25    currently before me on this preliminary motion, any information

1 about how often persons are charged with violating the penal

2 codes that plaintiffs challenge, is that right, there's nothing

3 there for me to evaluate?

4 MR. DAVIS:  There is nothing there to evaluate.

5 THE COURT:  And you've already reviewed the other

6 tools the State has.

7 Just so I am a clear, under the current -- the current

8 statutes, you mentioned prior felony, felony-in-possession

9 statute is out there.  Domestic violence can be a disqualifier,

10 at least for a period of time.

11 So, let's say that a person had previously attempted

12 and failed to obtain a license to carry a concealed handgun

13 based on either violent crime or failure to participate in

14 training.  If I granted the motion, would a person like that

15 now be able to carry a handgun openly in public?

16 MR. DAVIS:  Yes, Your Honor, unless they are

17 prohibited from possessing a firearm anywhere, then they would

18 be permitted to carry openly if the injunction that's been

19 requested is granted.

20 THE COURT:  So a felon, is that a permanent -- under

21 state law, that's a permanent disqualifier?

22 MR. DAVIS:  That is, Your Honor.

23 THE COURT:  As in federal law.

24 MR. DAVIS:  Yes, Your Honor.

25 THE COURT:  All right.  I'll allow brief wrap-up

1    argument, and then I want to talk a bit more about the pending

2    summary judgment motion and scheduling going forward.

3         So any wrap-up argument, Ms. Bellantoni?

4         MS. BELLANTONI:  Yes, Your Honor, thank you.

5         So, just briefly, with regard to the status quo, I

6    believe the *Bruen* case speaks to the deference that is

7    generally afforded to the legislatures and the lawmakers when

8    reviewing certain challenges to various statutes, but it makes

9    clear that in Second Amendment challenges, no deference is due

10   because specifically for this reason, we have modern-day

11   regulations, such as California's ban on open carry, which are

12   similar to New York's regulations that were constructed in the

13   modern day and should have no deference because they were built

14   on and passed under the false belief that the Second Amendment

15   only applied to the collective and it didn't apply to the

16   states.

17        THE COURT:  With a focus on probable cause, good

18   cause.

19        MS. BELLANTONI:  No, generally.

20        THE COURT:  That part of the requirement.

21        MS. BELLANTONI:  No, generally.  Generally, that these

22   are modern-day statutes, and the only focus under a Second

23   Amendment challenge is what was understood at the time that the

24   founding fathers enacted the Bill of Rights and so that focus

25   is squarely upon 1791.  And at that period of time people

1   were -- which is the plain text of the Second Amendment -- free

2   to keep and bear arms, weapons, not just handguns, but weapons,

3   which shall not be infringed.  So open carry certainly falls

4   squarely within the text and history there.

5          There is no license available, so open carry is not an

6   option through any licensing scheme in California.  And despite

7   *Bruen*, California still remains a may-issue state with regard

8   to licensing, which the Justices did address.  They talked

9   about the shall-issue states can continue on, but even in the

10  shall-issue states where there are lengthy wait times or other

11  manipulations that are infringing or violating the Second

12  Amendment right and the exercise of that right, even the

13  shall-issue states may come under constitutional scrutiny, but

14  certainly they also said that the may-issue states may continue

15  as long as their criteria is objective, and nothing in

16  California has changed to make their licensing scheme

17  objective.

18          THE COURT:  I'm thinking more about what you said

19  earlier about the goal here is to vindicate the rights of

20  persons who merely carry handguns in public.

21          Just so I understand the difference between open carry

22  and concealed carry, I mean, I see your references in the

23  briefing that concealed carry is cowardly.  Is it that there's

24  a deterrent effect associated by otherwise someone, you know,

25  with no prior felonies, no history of violence, there is a

1  deterrent effect to the open carry that has a greater

2  self-defense value?

3  MS. BELLANTONI:  Your Honor, there are many different

4  reasons why an individual would choose to open carry:  One

5  would be the deterrent effect.  Another being the access to

6  your firearm under duress in split-second decision making;

7  whereas, a concealed carry, it may be more difficult to draw

8  your weapon in that respect, Your Honor.

9  When I use the term "cowardly," certainly they're not

10  my terms.  That is the view that society took back in the 17

11  and 1800s when concealed carry started to come about, and there

12  were a few laws in the Antebellum period that were passed to

13  prevent conceal carry because it was at the time viewed as, you

14  know, slinky or cowardly, or, you know, more along the lines of

15  something that a criminal would do.  Whereas, a gentleman would

16  open carry so the adversary would know that he was armed, a

17  criminal might not do that because they don't want -- they're

18  predatory in nature, all right, so they want to have the upper

19  hand when it comes to victimization.  So they're going to

20  conceal their firearm so that they have the best advantage over

21  the person that they're trying to victimize, and that was the

22  general view on concealed carry at the time.

23  THE COURT:  All right.  Mr. Davis, just checking,

24  anything further?

25  MR. DAVIS:  I do have a couple --

1          THE COURT:  Plaintiff as the movant -- plaintiffs, as

2     the movant, I would still give the final word, but anything

3     else you want to say?

4          MR. DAVIS:  Yes, please, Your Honor.  Thank you.

5          So the Second Amended Complaint, again, I've said this

6     part, makes it very clear that what plaintiffs are seeking is

7     to, one, carry handguns open and exposed throughout the state,

8     and, two, to do so without a license.  So I don't know, you

9     know, why it's continuing -- why plaintiffs' counsel continues

10    to press points about the licensing scheme, but plaintiffs'

11    reply brief on the motion says that the licensing scheme is

12    irrelevant.  Their position now, that's in the Complaint, is

13    that no licensing scheme -- that the licensing scheme can

14    simply be ignored, that it does not matter.  It violates the

15    Second Amendment to prohibit anyone from open carry, and it

16    violates the Second Amendment to require people to seek a

17    license before they carry openly and in public.

18         So because that's their claim, they need to show that

19    they're likely to succeed in establishing that the Second

20    Amendment both demands that states cannot establish the manner

21    of carry and that states can't require those who carry in

22    public to get a license to do so.

23         The point about the Second Amendment not prohibiting

24    states from regulating the manner of carry and how the *Bruen*

25    decision is consistent with our view, I think is laid out in

1   the briefs.

2           The point I wanted to emphasize here, and maybe I'd

3   done so already, but the point is that the Second Amendment

4   allows -- the point is that the Second Amendment allows states

5   to require those who carry in public to obtain and follow the

6   conditions of a license is entirely clear from Bruen itself.

7   Again, Justice Kavanaugh says it explicitly in his concurrent

8   opinion.

9           My last point is just that because there's some sort

10  of confusion of the standards as to the ultimate merits as

11  opposed to this early stage in the proceedings, plaintiffs take

12  a view that this Court should not even consider public safety

13  in reaching its decision on the injunction and that is just

14  entirely false.

15          At this stage, it's true that public safety may not

16  belong in the ultimate merits question anymore, and so as to

17  whether they could establish a substantial likelihood of

18  success on the merits, that's not where it belongs, but it

19  absolutely belongs in this Court's analysis in balancing the

20  harms to the public interest versus the plaintiffs.

21          One final point in regards to the harm of the

22  plaintiffs, I think when asked about it, plaintiffs' counsel, I

23  think there was some blurring between the plaintiffs' harms

24  that would emerge out of the plaintiffs as opposed to the

25  public interest more generally.  Both plaintiffs in this case

1    do have ability to carry and do carry concealed, so they

2    already have what *Bruen* ultimately requires, which is the

3    ability to carry for self-defense.

4              THE COURT:  All right.  I understand those arguments.

5              Any final word on the motion itself, Ms. Bellantoni?

6              MS. BELLANTONI:  Only to the extent that the licensing

7    scheme wasn't at issue in *Bruen*; that was brought up in a

8    concurrence opinion.  And that in looking to 1791, there

9    weren't no licensing schemes, nor was there any permission

10   required, which is why the language of the Second Amendment is

11   what it is, but nothing further, Your Honor.

12             I would just reiterate that with regard to the public

13   safety issue, it's a conflation of the standards required, and

14   it just goes directly in conflict with the whole purpose of the

15   *Heller* decision and the *Bruen* decision, that public safety is

16   never balanced against the individual rights of law-abiding

17   individuals to be able to protect themselves in public, and

18   it's the public and the people for whom the Constitution and

19   the Bill of Rights was passed.  They're being harmed, and the

20   State has a conflict of interest here in seeking to preserve

21   the control that they have over the People, and the People's

22   right to freely exercise their constitutionally protected

23   rights.

24             THE COURT:  All right.  I understand those arguments.

25             Just a couple of questions.  The State had filed a

1    Motion for Summary Judgment that the Court stayed.  Is the

2    State withdrawing that motion, or does it seek to supplement

3    it; can that get set for hearing now?

4               MR. DAVIS:  Your Honor, could I take one moment?

5               THE COURT:  You may.

6               MR. DAVIS:  In light of *Bruen*, Your Honor, that motion

7    is withdrawn because it's based on the standards that no one

8    would apply.

9               THE COURT:  All right.  Then the Court notes that

10   Motion for Summary Judgment at Docket Number 56 is withdrawn.

11              I'm prepared to give you a schedule to move the case

12   forward.  I'll resolve the motions before me as promptly as I

13   can.

14              One question I've had, I believe I surfaced it at the

15   last hearing, should the Court, given the decision in *Bruen*,

16   look to appoint its own neutral expert to evaluate the relevant

17   historical evidence under Federal Rule of Evidence 706?

18              MS. BELLANTONI:  No, Your Honor, it should not

19   because, you know, *Bruen* was a carry case.  It was all about

20   public carry.  *Bruen* and *Heller* have extensively discussed the

21   history throughout, you know, from the time of England up

22   until, you know, the more recent time period and have

23   pinpointed 1791 as the date to look to with regard to Second

24   Amendment challenges.

25              This is an open carry case.  It's a public carry case

1    to an extent. *Bruen* was also a public carry case in that

2    respect, and so the Court itself, the Supreme Court has already

3    gone through the analysis and the scope and history and

4    tradition of public carry, and it clearly shows that the only

5    type of public carry that was constrained was conceal carry,

6    and even at that, only during the antebellum period, not

7    directly around the point in time of the founding era.

8         THE COURT: So *Bruen*, even though it wasn't considered

9    in the California laws at issue here, has everything the Court

10   needs to reach the conclusions that it needs to as the trial

11   court of record?

12        MS. BELLANTONI: Yes, it does. And if the Court had

13   doubts on that, the Court itself said that judges like yourself

14   have the -- in your judicial role you do not need an expert.

15   This doesn't have to be reinventing history here, that you can

16   look to the statutes and the history itself and come to a

17   determination of whether the challenged regulations are

18   consistent with the Second Amendment. But I would say that

19   Bruen itself speaks to the claims and the challenges here.

20        THE COURT: It's not reinventing history, it's trying

21   to determine what the relevant history is.

22        MS. BELLANTONI: Which they've done.

23        THE COURT: What does the Attorney General say on

24   whether or not the Court, in trying to do its job properly,

25   should it be looking for its own neutral expert or rely on the

1  parties to develop any record, that more is needed than what

2  *Bruen* says.

3      MR. DAVIS:  Well, Your Honor, certainly more is needed

4  than what *Bruen* says, because Bruen was about the good cause

5  requirement in particular.  It did not decide the question.

6  We're very open about this in our briefs, we think it supports

7  our view that the State can regulate the manner of carrying and

8  so, therefore, regulate open carry, but the case was not about

9  that.  The case -- the *Bruen* decision does not answer it, and

10 it does not answer the question it wasn't before whether

11 licensing schemes themselves are unconstitutional as a way of

12 regulating public carry.  So *Bruen* does not contain all of the

13 answers.

14      As to whether the Court should apply its own neutral

15 expert, that may well be wise.  I would appreciate the

16 opportunity to answer the Court's question in a supplemental

17 short brief, if the Court would deem that appropriate.

18      Of course -- well, I think that's the answer; that's

19 my answer to that question.  Either way, I think, the

20 Government needs some time here to continue the historical

21 analysis that *Bruen* does require.  And I would disagree that

22 the Court said in *Bruen* that the Courts do not need to consult

23 expert historians.

24      What it said is that Courts are equipped to make

25 ultimate decisions that rest on, you know, findings about

1  historical traditions, but certainly it's required to assess,

2  to do the fact finding necessary before those decisions are

3  made.

4          THE COURT:  All right.  I'll let you know if I need

5  supplemental briefing on that, and I'll give equal opportunity.

6          On Rule 16 going forward, here's what I'd like to set

7  in terms of deadlines:  A fact discovery cut off of

8  May 12, 2023.

9          Expert reports by June 9.

10          Rebuttal July 14.

11          Expert discovery closed August 4.

12          Dispositive motions heard by September 15, 2023.

13          I'll put those dates on the docket.  Any initial

14  concern with those, Ms. Bellantoni?

15          MS. BELLANTONI:  Yes, Your Honor, fact discovery is

16  closed.  There have been no new factual allegations or

17  occurrences that have taken place.

18          Expert discovery is closed.  We've had an expert.

19  They've been deposed.

20          Defense counsel had chosen an expert.  They've put

21  their expert declaration or information in their Motion for

22  Summary Judgment.

23          There have been -- there's no new -- there's no new --

24  what is it -- "framework" I guess is the word that was used,

25  there's no need for any additional expert discovery here.

1          THE COURT:  Do you agree with that?

2          MR. DAVIS:  No, Your Honor.  I think the notion there

3     is *Bruen* changed everything and nothing at once.  It changed,

4     it absolutely changed the analytic framework the courts need to

5     follow in Second Amendment cases.

6          Everything that came prior to *Bruen* was based on very,

7     at the time, clearly established law under the Ninth Circuit

8     precedent and other circuits of how these questions are to be

9     approached and answered.  And *Bruen* did absolutely dramatically

10    change that.

11         MS. BELLANTONI:  May I be heard, Your Honor?

12         THE COURT:  Agreed.

13         MS. BELLANTONI:  I do not agree with that at all, no.

14         *Heller* was very clear in going through the historical

15    analysis.  To go now, like as in -- respectfully -- in the

16    *Young* case and put forth a whole new historical perspective

17    which was aggregated and reversed by the *Bruen* case is

18    improper.

19         To hire experts that are going to attempt to make

20    arguments that go opposite of what the Supreme Court now has

21    said twice both in *Heller* and in *Bruen*, and they've clearly

22    delineated the relevant time period and whatever regulations

23    existed, which there were none until the Antebellum period at

24    the time with regard to Second Amendment claims.  This is not

25    that kind of case.

1      By way of analogy, Your Honor, respectfully --

2      THE COURT:  Well, let's do this, I'm going to set the

3 schedule.  You may file objections and I'll rule on the

4 objections.

5      I'm going to put that schedule on the docket in light

6 of what the Court believes are changed circumstances, but I'll

7 allow you to file objections, as is always the case with the

8 schedule, 14 days, and then I'll rule on those objections.  But

9 for now I thought it prudent to provide some sense of how the

10 case will move forward.

11     MS. BELLANTONI:  But, Your Honor, the fact discovery,

12 the fact discovery, there's no -- there's no argument that you

13 will need additional fact discovery, it's a 2019 case.

14     THE COURT:  What I said, ma'am, is that you may file

15 written objections now, and I will rule on those objections.

16 So your record will be made, and I may sustain the objections.

17     So with that, the matter is submitted.  We're taking

18 another short break to get set up for virtual proceedings in

19 the last matter.

20     MR. DAVIS:  Thank you, Your Honor.

21     (Adjourned at 11:37 a.m.)

22

23

24

25

1   C E R T I F I C A T E

2

3       I certify that the foregoing is a true and correct

4   transcript of the proceedings in the above-entitled matter.

5

6   _____          11/12/2022

7   MARYANN VALENOTI, RMR, CRR                  DATE
    Official Court Reporter
8   CA CSR #11266

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25