# EXHIBIT   1

| | |
|---|---|
| **From:** | Ritta Mashriqi |
| **To:** | Amy L. Bellantoni |
| **Cc:** | Matthew Wise |
| **Subject:** | Re: Baird, Mark v. Xavier Becerra (Case No. 2:19-cv-00617-KJM-AC) |
| **Date:** | Friday, August 27, 2021 5:22:57 PM |
| **Attachments:** | Expert Declaration and Report of Saul Cornell.pdf |
| | Expert Declaration and Report of Kim Raney - Signed.pdf |
| | AG Declaration of Service-Electronic.PDF |
| **Importance:** | High |

Dear Ms. Bellantoni,

Please find attached to this email **EXPERT DECLARATION AND REPORT OF PROFESSOR SAUL CORNELL, PH.D. & EXPERT DECLARATION AND REPORT OF FORMER COVINA CHIEF OF POLICE KIM RANEY** for the matter of **Baird, Mark v. Xavier Becerra (Case No. 2:19-cv-00617-KJM-AC).**

Thank you,

*Ritta Mashriqi*
Legal Secretary/Case Coordinator
California Department of Justice | Office of the Attorney General
Division of Operations/LSO
Government Law Section – Floor 17
1300 I Street
Sacramento, CA 95814
Phone: (916) 210-6510 | Email: Ritta.Mashriqi@doj.ca.gov



CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
R. MATTHEW WISE, State Bar No. 238485
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-6046
  Fax:  (916) 324-8835
  E-mail:  Matthew.Wise@doj.ca.gov
*Attorneys for Defendant Attorney General Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARK BAIRD and RICHARD GALLARDO,** | Case No. 2:19-cv-00617-KJM-AC |
| Plaintiffs, | **EXPERT DECLARATION AND REPORT OF PROFESSOR SAUL CORNELL, PH.D.** |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,** | Dept:        3<br>Judge:       Hon. Kimberly J. Mueller |
| Defendants. | Trial Date:   None set<br>Action Filed:  April 9, 2019 |

1

I, Dr. Saul Cornell, declare as follows:

1.    I am the Paul and Diane Guenther Chair in American History at Fordham University in New York City. Counsel of record for Defendant California Attorney General Rob Bonta asked me to offer an expert opinion in the above-entitled case. I have personal knowledge of the matters set forth herein and would so testify.

## I.    OPINIONS AND THE BASES FOR EACH OPINION

2.    Counsel for Defendant has asked me to express opinions about the history of open carry restrictions in England and America.  Attached hereto is my expert report, in which I provide the bases for the following opinions:

   a. Limits on armed travel in public, including open carry, are of ancient vintage, stretching back deep into Anglo-American law.

   b. In pre-Founding England prior to colonization, the open carry of firearms was generally prohibited in populous areas, with limited exceptions for community defense and law enforcement, and with a legally accepted exception for the political elite.  There is no historical evidence of an individual right for ordinary Britons to openly carry weapons.

   c. In the United States, prohibitions on the open carry of weapons were common in the Founding Era and throughout the nineteenth century.  While some states recognized an individual right to openly carry firearms, this view was largely restricted to the white citizens of slave-holding Southern states.

   d. Prohibitions on the open carry of weapons were commonly found throughout the West and in California as early as the nineteenth century.

3.    In my report, I cite to the scholarly articles, laws, and related materials on which I based my opinions.

## II.    BACKGROUND AND QUALIFICATIONS

4.    My scholarship on the regulation of firearms has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in the *Oxford Companion to the U.S. Constitution* and co-authored the chapter in *The Cambridge*

2

*History of Law in America* on the Founding Era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[1]  In addition to teaching constitutional history at Fordham College, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on this topic at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[2]

## III.   COMPENSATION

6.     I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports, $750 an hour for testimony and depositions, and $100 an hour for travel time.  My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

## IV.   MATERIALS REVIEWED

7.     Counsel for Defendant provided me with the complaint in this matter, the order denying Plaintiffs' first preliminary injunction motion, briefing in support of and in opposition to Plaintiffs' second preliminary injunction motion, and the declaration of Clayton Cramer in support of Plaintiff's second preliminary injunction motion.  Otherwise, my report is based on my independent research.  Counsel for Defendant did not provide me with any assumptions to be made in preparing my report.

---

[1] Saul Cornell, "The Right to Bear Arms," THE OXFORD HANDBOOK OF THE US CONSTITUTION, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759; Saul Cornell and Gerald Leonard, "Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008). *See also* Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS 73 (2020); Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[2] A full list of invited presentations and scholarly presentations is attached to my expert report.

3

1     I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct, to the best of my knowledge, and that this Declaration was executed

3   on August 25 2021, in  Reddy, , CT .

4
5                                                        Saul Cornell, Ph.D.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   SA2019101934
     35398037.docx
25
26
27
28

4

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

## <u>Expert Witness Report of Professor Saul Cornell, Ph.D</u>

### August 27, 2021

**Introduction**

I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of public (also referred to as "open") carry of arms at the national, and state level, with specific attention to California's regulatory history. My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts.[1] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in the *Oxford Companion to the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[2] In addition to teaching constitutional history at Fordham College, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on this topic at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.

Following *Heller*'s instruction to look to history for guideposts in evaluating the scope of permissible regulation under the Second Amendment, recent scholarship has uncovered a previously hidden history of arms regulation in the Anglo-American legal tradition.[3] Much of

---

[1] For a list of scholarship activity and court citations, see Attachment A.

[2] Saul Cornell, "The Right to Bear Arms," THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015) at739-759; Saul Cornell and Gerald Leonard, "Consolidation of the Early Federal System," Chapter 10 of the CAMBRIDGE HISTORY OF AMERICAN LAW (Cambridge University Press, 2008); *see also* Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS 73 (2020); Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004). For a full list of relevant publications over the last decade, see Attachment A.

[3] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

1

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

this material was largely unavailable to the *Heller* court because the sources were difficult to identify, search, and collect. The creation of powerful searchable digital "virtual" archives has transformed this sub-field and facilitated a more sophisticated understanding of the scope of gun regulation under Anglo-American law.

Many gun-rights advocates and legal scholars writing about the Second Amendment have not made use of these new sources and have ignored relevant scholarship in other fields of legal and constitutional history, particularly the history of criminal law in the Anglo-American world. Unfortunately, litigation continues to rely heavily on claims that have not been properly vetted by serious scholars and that do not meet the minimum standards set by professional legal historians.[4] Serious historical inquiry requires using the best methods available and the most reliable and extensive body of primary sources.[5] Only after dispassionately weighing an extensive body of evidence and exhaustively surveying the most recent scholarship can an expert offer an informed scholarly assessment. A characterization of "history" that is not the result of such rigorous analysis is often pseudo-historical and should be approached with considerable skepticism.

**The Limited Scope of the Pre-Existing English Right to Have Arms and Travel Armed**

Modern scholarship suggests that English law before the founding permitted only a limited right to have arms and travel armed.[6] Under English law, the monarchy and the English

---

[4] A good illustration of this problem is the unfounded claim that the Statute of Northampton only prohibited traveling with armor and did not prohibit arms. *See, e.g.*, Clayton E. Cramer, *The Statute of Northampton (1328) and Prohibitions on the Carrying of Arms* (September 19, 2015), *available at* SSRN: https://ssrn.com/abstract=2662910 or http://dx.doi.org/10.2139/ssrn.2662910, and Richard Gardiner, *The Meaning of 'Going Armed' in the 1328 English Statute of Northampton* (July 12, 2021), *available at* SSRN: https://ssrn.com/abstract=3885061 or http://dx.doi.org/10.2139/ssrn.3885061. Unfortunately, self-posted and unreviewed works on SSRN have begun to be treated as authority by legal scholars and some courts. SSRN postings range in quality from material that is little better than Wikipedia to published essays that have appeared in leading scholarly venues.

[5] For a discussion of the minimum standard for undergraduate history majors, see Mary Lynn Rampolla, A POCKET GUIDE TO WRITING IN HISTORY 8th ed., (2015) at 18 and Martha Howell & Walter Prevenier, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 128 (2001). On the methods of professional legal history, see Markus Dirk Dubber and Christopher L. Tomlins, eds., THE OXFORD HANDBOOK OF LEGAL HISTORY (2018).

[6] Tim Harris, *The Right to Bear Arms in English and Irish Historical Context, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019). The only English historian who continues to adhere to this interpretation, Joyce Lee Malcolm, holds an NRA-funded chair at George Mason Law School, and her work on this topic has been largely discredited. *See, e.g.*,

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

state enjoyed a monopoly on violence. Any arming—outside of a clear list of exceptions—was an encroachment on royal power and a violation of English law.[7] The claim that ordinary subjects had a right to travel armed would be legally incoherent under English theories of sovereignty and law. As Sir William Blackstone's *Commentaries* reminded its readers: "all offenses are either against the King's Peace or his crown and dignity."[8] Therefore, it followed that any "affront to that power, and breaches of those rights, are immediate offenses against [the King]."[9] Traveling armed was such an affront and was only justified in a limited set of circumstances.[10]

A key piece of legislation to enforce the King's Peace was the Statute of Northampton, which prohibited appearing armed before representatives of the King's authority and expressly banned traveling armed at "Fairs, Markets, or elsewhere."[11] Thus, the basic legal framework of English law created by the Statute of Northampton and applied by conservators of the peace in

---

Stanford British historian Priya Satia, *On Gun Laws, We Must Get the History Right*, Slate << http://www.slate.com/articles/news_and_politics/jurisprudence/2015/10/wrenn_v_d_c_gun_case_turns_on_english_laws_of_1328_and_1689.html>> (describing Malcolm's gun rights interpretation as conjured "out of thin air"); Tim Harris, *supra* note 6, at 23 ("The Glorious Revolution has been extensively studied and debated ever since it occurred, yet until the work of Joyce Lee Malcolm, no historian had ever sought to argue that one of its most significant accomplishments was to establish a new right for Protestants to bear arms."); Lois Schwoerer, GUN CULTURE IN EARLY MODERN ENGLAND 169–70 (2016); Priya Satia, *Who Had Guns in Eighteenth Century Britain?*, *in* A RIGHT TO BEAR ARMS?, *supra* note 6, at 37.

[7] *See* 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 258, 338 (Oxford, Eng., Clarendon Press 1765). For an elaboration of the common law framework described by Blackstone, see 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135–36 (London, Eliz. Nutt 1716). This was the conclusion of the Chief Justice of the King's Bench who wrote that, "It is likewise a great offence at the *common law,* [traveling armed] as if the King were not able or willing to protect his subjects," "Sir John Knight's Case" 87 *Eng. Rep.* 75 *K.B.* 1686. Arms were typically described as offensive, edged weapons and firearms, and defensive weapons, armor or shields. The suggestion made by some gun-rights advocates that the limits on armed travel only applied to armor and not to offensive weapons is contradicted by the clear exposition of the meaning of these terms in legal dictionaries popular in the Founding era. *See* Giles Jacob, A NEW LAW DICTIONARY (6th ed. 1750) (entry under "Armour and Arms," no pagination in original) and the discussion *infra* note 14.

[8] 1 BLACKSTONE, *supra* note 7 at 258.

[9] "Sir John Knight's Case" 87 *Eng. Rep.* 75 *K.B.* 1686, "It is likewise a great offence at the *common law,* [traveling armed] as if the King were not able or willing to protect his subjects."

[10] *Id.*

[11] 2 Edw. 3 c. 3 (1328), *reprinted in* 1 THE STATUTES OF THE REALM 258. On the importance of the Statute of Northampton to maintain the peace, see generally J. Musson, *Sub-Keepers and Constables: The Role of Local Officials in Keeping the Peace in Fourteenth-Century England*, 117 ENG. HIST. REV. 1 (2002).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

the centuries after it was enacted clearly excluded firearms from both sensitive places such as courts and crowded public spaces such as fairs and markets. The Statute also recognized the common law crime of affray as a separate violation of the King's Peace because traveling armed created an asymmetry of power between the armed individual and a law-abiding subject who followed the prohibition on traveling armed. This asymmetry was the source of the terror that violated the King's Peace. There was no subjective requirement that one establish an intent to terrify or that the action cause a public panic.  Simply arming, outside of the recognized legal exceptions, was a violation of the peace.[12]

Michael Dalton, the author of one of the most popular justice of the peace manuals in the eighteenth-century, summarized the orthodox legal view of the Statute of Northampton in the following manner: "All such as shall go or ride armed (offensively) in Fairs, Markets, or elsewhere; or shall wear or carry any guns, dags [sic] or pistols charged . . . any Constable, seeing this, may arrest them, and may carry them before the Justice of the Peace, and the Justice may bind them to the peace."[13] Although modern law approaches issues of criminal intent from a subjective psychological understanding, early modern English law adopted an objective view of criminality: the requisite *mens rea* needed to establish the commission of a crime could be deduced from the illegal action itself.[14] Furthermore, under English law firearms were always considered as offensive weapons independent of any intent or action. Defensive weapons were a different class of arms and included armor and shields.[15]

---

[12] J.P. Gent, A New Guide for Constables, Head-Boroughs, Tythingmen, Churchwardens 13 (1705); 4 Blackstone, *supra* note 7, at 148–49 (1803).  Under common law the requisite criminal intent at this period of English history "was presumed from the performance of the unlawful act." Guyora Binder, Criminal Law 140–41 (2016).

[13] Michael Dalton, The Country Justice, Containing the Practice of the Justices of the Peace Out of Their Sessions 30 (1618)  at 264. Under English law firearms were always treated as offensive weapons, but the law also acknowledged that even ordinary objects could in some circumstances be used as offensive weapons, William J. Hawkins, 1 Pleas of the Crown 6th edition (London 1777) at 227.

[14] For additional analysis of criminal *mens rea* in this period of Anglo-American law, including Blackstone's conception of this idea, see Simon Stern, *Blackstone's Criminal Law: Common-Law Harmonization and Legislative Reform*, *in* Foundational Texts in Modern Criminal Law 61 (Markus D. Dubber ed., 2014).

[15] Although a firearm was always an offensive weapon under English law, other items in certain circumstances could be treated as offensive arms. *The Complete Dictionary of Arts and Sciences* (1764) defined firearms as the quintessential offensive weapons in the eyes of the law: "GUN, fire-arm, a weapon of offense. . . ." Defensive weapons included shields and armor, see Charles James, A New and Enlarged Military Dictionary (1805). (entry under "Arms," no pagination in original).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

There were a small number of well-recognized exemptions to the general ban on armed travel embodied in the Statute of Northampton.[16] These exceptions aimed to facilitate community-based forms of law enforcement which preserved the King's Peace. Accordingly, one might arm oneself to put down riots, rebellions, or join the "hue and cry." Traditionally, the arms used to meet the public responsibility to meet one's obligation to the crown were determined by socio-economic class status so that during much of this period ownership of firearms was limited to members of the gentry elite. [17]

The notion that the Statute of Northampton was limited only to "punish people who go armed to terrify the King's subjects" is mistaken because it applies an anachronistic understanding of criminal law. The mere act of traveling armed was the source of the terror because it violated the peace. *Sir John Knight's Case*, the most significant legal interpretation of the Statute, makes this point clearly when it is read in context and the appropriate historical legal principles to the time are applied. Unfortunately, the case has been misinterpreted by gun-rights advocates to support the anachronistic claim that peaceable armed travel was permissible under English common law.[18] As the distinguished British historian Tim Harris has conclusively demonstrated, such a discredited ahistorical interpretation rests on serious interpretive errors and tendentious ideological distortions of the historical record.[19]  *Sir John Knight's Case* stands for the opposite proposition.[20]

---

[16] William Hawkins, A Summary of the Crown-Law by Way of Abridgment of Serjeant Hawkins's Pleas of the Crown 155–63 (1728).

[17] Traditionally, the arms used to meet this public responsibility were determined by social position so that during much of this period ownership of firearms was limited to members of the gentry. *See* Henry Summerson, *The Enforcement of the Statute of Winchester 1285–1327*, 13 J. Legal Hist. 232 (1992). On gun ownership in England during this period, see Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America,* in A Right to Bear Arms?, *supra* note 6.

[18] *See, e.g.*, Eugene Volokh, *The First and Second Amendments*, 109 Colum. L. Rev. Sidebar) (erroneously arguing that the Statute of Northampton only forbade the carrying of arms when it was "unusual and therefore terrifying.")  For additional discussion that is better historically informed, see Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. Ill. U.L. J. 61, 79 (2018).

[19] The idea of unfettered peaceable public carry is a modern invention of the gun rights movement. For a discussion of how this invented tradition was introduced into legal scholarship, see Patrick J. Charles, *The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship*, 2021 U. ILL. L. REV. ONLINE 195.

[20] (1686) 87 Eng. Rep. 75 (KB 97, 101 (2009).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

First, the reference to the Statute of Northampton having gone into "desuetude" in the Lord Chief Justice's opinion reflected not an understanding that there was a broad-based individual right to carry arms openly, but a legally recognized, class-based privilege, an exception enjoyed by members of the gentry elite. Members of the English gentry, not ordinary subjects, enjoyed a class privilege to travel armed in a manner appropriate to their station in life. Giles Jacob, perhaps the most prolific author of popular legal guidebooks in the Anglo-American world, including an influential legal dictionary, made this point clear. It is worth quoting the passage in full since it offers a concise statement of English law: "By the common law it is an Offense for Persons to go or ride armed with dangerous and unusual Weapons; But Gentlemen may wear common Armour according to their Quality." [21] Jacob went on to underscore the most basic principle at the core of English law: "The King may prohibit Force of Arms, and punish Offenders according to Law."[22] The idea of a right to peaceable travel would contravene the King's right to prohibit travel with force of arms. Individuals had no such right under common law.

Second, the fact that the Court emphasized Knight's evil intent ("*in malo animo*") did not mean that evil intent was a necessary element to violate the Statute of Northampton, and that ordinary individuals without evil intent could otherwise openly carry weapons. Once again, Harris offers the most historically accurate account of the case:

> [A]s the presiding judge at Knight's trial, Lord Chief Justice Herbert, observed, the statute had almost gone into desuetude, and there was "now … a general Connivance to *Gentlemen to ride armed for their Security*." Herbert felt it necessary to show that Knight had acted *mal animo* (with evil intent) for his alleged offense to come within the terms of the act, though significantly, he insisted that the things of which Knight stood accused were already offenses at common law.[23] [*emphasis added*]

The Chief Justice wrote that the prosecution should have charged Knight for a crime at common law which would have been a better legal strategy to bring him to justice than an indictment under the Statute of Northampton. It is true that Knight's jury refused to convict him

---

[21] *See* Jacob, *supra* note 7.

[22] *Id.*

[23] Harris, *supra* note 6 at 23.

of violating that statute, but Harris and others have interpreted this outcome as a politically motivated act of jury nullification, not an affirmation of a recognized English legal principle.[24] The jury likely refused to convict because of its political sympathies. The case reflected the bitter political and religious conflicts England experienced in the years immediately before the Glorious Revolution.[25] Knight had stoked anti-Catholic feeling in the city of Bristol and the local jury, sharing his prejudices, refused to convict him.[26] Conspiracy theories involving Catholic plots were rife in this period of English history.[27] Yet, despite being acquitted by a sympathetic jury who shared Knight's political and religious leanings, the Chief Justice bound Knight over with a peace bond, the only punishment available under law given the jury's decision.[28] Furthermore, the Chief Justice averred that Knight's actions were *per se* a violation of the King's Peace. Under English law, the monarchy enjoyed a monopoly of violence and any use of arms outside of a clear list of recognized exceptions was a challenge to the monarchy's sovereignty.[29] *Knight's Case* does not support the notion that a robust right to peaceable carry of firearms existed under English law; rather, it contradicts this claim.

The principle that the English State (whether represented by agents of the King or individuals acting in accord with acts of Parliament) could control every aspect of the ownership and use of firearms, including the open carry of firearms, was later reaffirmed by the language employed in the English Declaration of Rights (1688), which stated "[t]hat the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law."[30] Rather than entrench a strong rights claim, this act reaffirmed Parliament's plenary

---

[24] *See Sir John Knights Case* 87 Eng. Rep. 75 K.B. 1686 For an excellent summary of the political climate in England during the era of the Glorious Revolution, see Tim Harris, *James II, the Glorious Revolution, and the Destiny of Britain*, 51 HIST. J. 763, 768 (2008).

[25] On the difference between the common law crime of affray, the specific prohibitions in the Statute of Northampton, see the treatment by 4 WILLIAM BLACKSTONE, COMMENTARIES *184.

[26] Tim Harris, *The Right to Bear Arms in English and Irish Historical Context*, in A RIGHT TO BEAR ARMS?, *supra* note **Error! Bookmark not defined.**, at 23

[27] *Id*.

[28] *Id*.

[29] (1686) 87 Eng. Rep. 75 (K.B.).

[30] 1 W. & M. 2, ch. 2 (1689); 1 WILLIAM BLACKSTONE, COMMENTARIES *139.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

power to regulate in this area.[31]   Parliament's power over the regulation of arms was not restrained by the act, and efforts to secure a general free standing right for a subject to have arms in their homes for reasons of self-defense were rebuffed at this time as a threat to public order and safety.[32]   In short, despite tendentious efforts to read the act as a gun rights provision, virtually every English historian views the act as an affirmation of legislative power to regulate arms. Indeed, as historian Tim Harris notes: "The Glorious Revolution has been extensively studied and debated ever since it occurred, yet until the work of Joyce Lee Malcolm, no historian had ever sought to argue that one of its most significant accomplishments was to establish a new right for Protestants to bear arms."[33]

In sum, there is no compelling historical evidence that there was ever a general free-standing right to armed travel for ordinary Britons; rather, the general rule was that open carry and concealed carry of firearms was prohibited, with a class-based exception for the political and economic elite.

---

[31] Tim Harris, REVOLUTION: THE GREAT CRISIS OF THE BRITISH MONARCHY, 1685–1720, at 343 (2006) ("It has been claimed that the Declaration of Rights established a new right to bear arms. In fact, clause seven does not use the term 'right' and seems to clearly state that no new legal privilege is being granted here. It explicitly confirms existing limitations on who could possess arms and, if anything, should more accurately be seen as a gun-control measure.").

[32] On the plenary power of Parliament during this period, see David J. Lieberman, THE PROVINCE OF LEGISLATION DETERMINED (1989) and John Phillip Reid, *In Our Contracted Sphere: The Constitutional Contract, the Stamp Act Crisis, and the Coming of the American Revolution*, 76 COLUM. L. REV. 21 (1976); Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 CHI. KENT L. REV. 27, 35 (2000) (discussing the failed effort to amend the game laws to allow subjects to keep arms). English courts eventually reinterpreted the game laws to allow guns in the home in a series of cases in the middle of the eighteenth century. These decisions occurred fifty years after the adoption of the English Bill of Rights, *See Rex v. Gardner*, 2 Strange 1098, 93 Eng. Rep. 1056 (K.B. 1739) and *Wingfield v. Stratford*, Sayer 15, 96 Eng. Rep. 787 (K.B. 1752).

[33] Malcolm posited that arms possession and carrying was a fundamental right that Americans inherited from England.  Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 Hastings Const. L.Q. 285 (1983).  Yet neither the sources cited by Malcolm nor recent historical scholarship support her account of the English past. *See* Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward*, 39 FORDHAM URB. L.J. 1727 (2012) at 1795 (describing how gun-rights advocates, supporters of the so-called Standard Model, "fell into line as they imported Malcolm's research and conclusions into their own writings"). For works challenging Malcolm's claims about gun ownership and usage in England, see Lois G. Schwoerer, GUN CULTURE IN EARLY MODERN ENGLAND 169–70 (2016), and Priya Satia, *Who Had Guns in Eighteenth Century Britain*, in A RIGHT TO BEAR ARMS, *supra* note 6 at 37.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

## The Absorption and Transformation of the Common Law in Early America

The strong continuities between earlier English law and colonial American law on the issue of public carry are evident in the extant sources from early America.[34] To be sure, living on the edge of the British empire, facing French and Spanish imperial power on its borders, and dealing with an almost constant state of war with Indian tribes, Americans were far better armed than their English brethren. In some instances, colonies required individuals to arm themselves in other circumstances, including church going and when working beyond the fortified stockades that protected the early settlements of colonial America. Few of these provisions were carried forward after the American Revolution.[35]

The militia was far more important in the colonies given the needs of public defense. Apart from Quaker Pennsylvania, every colony required a broad swath of the free white male adult population to submit to militia training and participate in a well-regulated militia. Yet, militia obligations did not create a modern-style rights' claim that could be asserted against early American governments; it imposed a legal obligation on the King's subjects. Under English law, all subjects were obligated to assist agents of the King to put down rebellions and enforce the peace. This obligation did not create a right to own or carry a weapon, but simply meant that individuals had to appear with whatever weapons they were legally entitled to possess under English law. In the colonies, the standard militia weapon was a musket. For most English subjects outside of the colonies, this obligation would not have created a right to firearms, which were prohibited to all but the gentry elite.[36]

---

[34] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11 (2017); Joseph Blocher & Darrell H. Miller, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER* 100–17 (2018).

[35] As historian David Konig observed, laws compelling private citizens to carry arms to church and other similar enactments were more common during the colonial era and fell out of favor after Independence. *See* David T. Konig, *Arms and the Man: What Did the Right to Keep Arms Mean in the Early Republic* 5 LAW & HIST. REV. 177 (2007). During the era of the Fourteenth Amendment, states began expressly prohibiting arms in places where people gathered, including places of worship. *See* George Washington Paschal, 2 REPORTER – A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST. CAREFULLY ANNOTATED. 3rd ed., at 1322 (Washington D.C., 1873); Leander G. Pitman, THE STATUTES OF OKLAHOMA, 1890, at 496 (Guthrie, 1891).

[36] In colonial America, firearms ownership was mandated by law for the segment of the population required to bear arms. *See* Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11 (2017). But the imposition of a militia obligation does not create a right. This legal confusion is pervasive in discussion of minors and the right to bear arms. *See, e.g.*, David

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

A good illustration of how the Statute of Northampton and common limits on armed travel were understood in colonial America are evidenced in a popular early American Justice of the Peace manual published just before the American Revolution. Echoing earlier English writers, the prohibition on armed travel in public was summarized as follows:

> Justices of the Peace, upon their own View, or upon Complaint, may apprehend any Person who shall go or ride armed with unusual and offensive weapons, in an Affray, or among any great Concourse of the People, or who shall appear, so armed, before the King's Justices sitting in Court.[37]

Contrary to the claims of many gun-rights advocates, widespread open carry was not the norm in the era of the Second Amendment and the early Republic.[38] The fact that some of the individual state constitutions and the Second Amendment protected arms bearing tells us little about armed travel in public outside of the context of militia service and musters. Indeed, states regulated the public carry of arms even in the context of militia service, banning the firing of guns, and in some instances prohibiting traveling to and from muster with a loaded weapon.[39]

In 1795, Massachusetts enacted its own version of the Statute of Northampton using language drawn from prior English commentators. The law forbade anyone who "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[40] This was a common gloss on the Statute of Northampton used in many of the popular English Justice of the

---

B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S.ILL.U.L.J. 495 (2019). Simply put, rights and duties are not the same. Modern constitutional theory typically treats them as correlatives, not synonyms. Accordingly, while the existence of a right may impose a duty on *another* legal actor (such as a duty to refrain from interfering with the right), *duties* do not automatically confer individual *rights* and did not do so on those who were required by law to participate in the militia.

[37] JAMES DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (Newbern, James Davis 1774) (citing DALTON, *supra* note 13**Error! Bookmark not defined.**, at 37). Fairs and markets were centers of commerce and were typically the location for the placement of important public announcements, facts which mark them as almost the antithesis of "sensitive places." The proper analogy to sensitive places would be the prohibition on coming armed before the King's servants and courts. *See* Chris R. Kyle*, Monarch and Marketplace: Proclamations as News in Early Modern England* 78 HUNTINGTON LIBRARY QUARTERLY 771 (2015).

[38] For a recent effort to support this dubious claim, see David B. Kopel and George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's Young v. State of Hawaii*, 2021 U. ILL. L. REV. ONLINE 172. For a critique of this argument, see Charles, *supra* note 17.

[39] Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695 (2012).

[40] Asahel Stearns & Lemuel Shaw, THE GENERAL LAWS OF MASSACHUSETTS 454 (Theron Metcalf ed., 1823).

Peace manuals of the previous century. It framed the prohibition in terms of traveling with offensive weapons. The mere act of traveling armed with offensive weapons demonstrated the evil intent required by law and caused the terror the law prohibited.  Both the term "armed offensively" and the phrase "fear or terror of the good citizens" tracked closely the traditional common law usage of these terms.[41]

The terror requirement under Anglo-American law has often been read with a modern bias, leading some to assert, erroneously, that only action with specific evil intent was prohibited. This reading is neither consistent with the text of the Statute of Northampton nor later American variants of it.  When read in the context of criminal law norms appropriate to the eighteenth century, the meaning of this legal term of art does not support the modern subjective psychological model of *mens rea* and its focus on actual intent. The notion of intent undergirding criminal law in this period was objective, not subjective. Intent was inferred from the illegal act. These were crimes against the peace and as such the mere act of arming was the cause of the terror.[42]

A key to understanding how Anglo-American law understood the meaning of offensive travel and affray may be gleaned from an influential 1689 Justice of the Peace manual, authored by Joseph Keble. Written in the era of the Glorious Revolution, it offered a lucid account of why armed travel violated the King's peace irrespective of any specific malicious intent: "Yet may an Affray be, without word or blow given; as if a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed as he is; and therefore both the Statutes of Northampton made against wearing Armour, do speak of it."[43]

---

[41] *See* George Fletcher, RETHINKING CRIMINAL LAW 208 (1978); Guyora Binder, *supra* note 12, at 139–42. Many discussions of the terror requirement read backward from the 19th century subjective standard. *See, e.g.*, Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009) (erroneously taking the holding in *State v. Huntley*, 25 N.C. 418, 423 (1843), as dispositive of Anglo-American criminal law assumptions from preceding centuries, using a method that essentially reads history backwards).

[42] *See, e.g.*, Binder, *supra* note 12, at 140–41.

[43] Joseph Keble, AN ASSISTANCE TO JUSTICES OF THE PEACE, FOR THE EASIER PERFORMANCE OF THEIR DUTY 147, 224 (1683).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

In short, apart from recognized exceptions, armed travel in populous areas was *per se* a violation of the peace under Anglo-American law.[44]

**Gun Regulation in the North and South in Antebellum America**

The genius of the common law was its adaptability, and its absorption in America proved no exception to this general pattern. Following the Founding era, early American firearms law evolved differently in each of the newly independent states, but important regional patterns also emerged.[45] Southern slavery was an important contributing factor to this process of regional differentiation. Indeed, many gun-rights advocates focus primarily on a string of Southern cases decided by slave-holding judges to ascertain the public meaning of the right to bear arms. Yet there is broad agreement among historians of early American law that generalizing from a single region's experiences ignores the diversity of early American law.[46]

The Southern tradition has figured prominently in post-*Heller* scholarship and law, but despite this fact, there remains considerable confusion about what this tradition embodied. The distortion of Southern jurisprudence remains one of the most pervasive problems in post-*Heller* jurisprudence.[47]  In the slave South a more expansive view of open carry developed, while prohibitions on concealed carry, a dastardly and cowardly practice to most Americans in antebellum America, posed no constitutional problems. In Massachusetts, a different model emerged and gained judicial notice. This model also expanded the scope of self-defense and gun rights beyond the narrow confines of English common law, but it did so in a more narrowly

---

[44] For a good illustration of the persistence of this understanding of the law, see Samuel Freeman, THE MASSACHUSETTS JUSTICE 149 (1795). The realities of life in early America, low population density, an agrarian economy, and almost incessant warfare with the tribal populations of the eastern United States meant that there were many more situations in which Americans would have carried arms in public, but these conditions did not change the continuing importance of traditional limits on armed travel in populous areas. *See* Cornell, *supra* note 34.

[45] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[46] On the importance of early American regional differences in the evolution of the common law, see Ellen Holmes Pearson, REMAKING CUSTOM: LAW AND IDENTITY IN THE EARLY AMERICAN REPUBLIC (2011) (arguing that the American colonists adapted English common law to their local conditions and that to understand the evolution of common law in America we must recognize that it evolved among multiple paths of development) and Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[47] Michael O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 AM. U. L. REV. 585 (2012).

tailored fashion than the Southern model. Thus, pre-Civil War American firearms law did not speak with a single voice on firearms; rather, antebellum American law spoke with a different and distinctive regional accent.[48]

Unfortunately, the antebellum Southern cases cited in *Heller* have consistently been misinterpreted by gun-rights advocates. Understanding this body of law requires a deep immersion in the culture of antebellum jurisprudence. This line of cases was shaped by the emerging police power jurisprudence that was developed by the Marshall Court and various state judges.[49] The failure to appreciate the relevance of this tradition is understandable given the fact that much legal scholarship on the police power typically focuses on Reconstruction, particularly on doctrinal developments in police power jurisprudence following the *Slaughterhouse Cases* and leading up to *Lochner*.[50] Yet what has been lost in this approach to the history of the police power is the recognition that the right of the people to regulate their internal police was central to Founding era constitutional thought, a direct outgrowth of the theory of popular sovereignty at the core of American constitutionalism. Given this fact, the texts of the first state constitutions clearly articulated—alongside more familiar rights such as the right to bear arms—a right of the people to regulate their internal police.

Indeed, under *Heller's* own framework, the right to regulate is central to interpreting the scope of the right to keep and bear arms. "Constitutional Rights," Justice Scalia wrote in *Heller*,

---

[48] Young v. Hawaii: *Ninth Circuit Panel Holds Open-Carry Law Infringes Core Right to Bear Arms in Public*, 132 HARV. L. REV. 2066, 2070–71 (2019) (discussing the emerging scholarly consensus that history supports "restrictions on concealed and open carry that enjoyed "widespread acceptance" in many states."); James E. Fleming & Linda C. McClain, *Ordered Gun Liberty: Rights with Responsibilities and Regulation* 94 BOSTON UNIV. L. REV. 849 (2014).

[49] On *Heller*'s heavy reliance on antebellum Southern case law, see generally Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121 (2015).

[50] *See generally Slaughter-House Cases*, 83 U.S. 36 (1872). The Founding era's conception of "police" was rooted in popular sovereignty and was seen as necessary to the preservation of rights. *See* Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115 (2019); Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017). Gun rights advocates have turned this historical understanding on its head, arguing that the police power stands in tension with the concept of rights. *See* Randy E. Barnett & Evan D. Bernick, *No Arbitrary Power: An Originalist Theory of the Due Process of Law*, 60 WM. & MARY L. REV. 1599, 1663-66 (2019).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

"are enshrined with the scope they were thought to have when the people adopted them."[51] This would apply with equal force to the right of the people to regulate the internal police of a state as much as it applies to the right to bear arms. Antebellum jurists understood this vital point, and the concept of police power was part of their effort to frame a coherent jurisprudence that addressed the need for the police power in America's rapidly changing society and economy. The first modern-style gun control laws aimed at limiting the access and use of handguns emerged during the period of the market revolution, when American industry mass produced not only wooden clocks and Currier and Ives prints, but reliable and cheap handguns. Courts seeking to interpret these laws and address unprecedented threats posed by easily concealed weapons turned to the emerging body of police power jurisprudence to sort the rival claims of those seeking tighter regulations of guns from those opposed to such policies.  Understanding the police power is therefore essential to make sense of the antebellum cases *Heller* treats as probative of the Second Amendment's meaning.[52]

Although the concept of a police right did not disappear from American law in the years before the Civil War, this legal concept was slowly overshadowed by an evolving  jurisprudence focused on police power.[53] Antebellum jurists developed this body of law to address the complex issues that regulation posed for a rapidly changing society—and no issue was more vexing than firearms regulation.  Indeed, the application of the police power to regulating firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in *Brown v. Maryland*, in which the Court observed that "[t]he power to direct the removal of gunpowder is a branch of the police power."[54] The scope of the police power was

---

[51] *District of Columbia v. Heller*, 554 U.S. 570 (2008) at 684.

[52] Post-*Heller* scholarship generally has not examined this important element of antebellum jurisprudence. For a notable exception to this general silence, see generally Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms,* 32 L. & CONTEMP. PROBS. 31 (2020). Campbell's essay is paradigm shifting, recasting the entire debate over the Second Amendment in terms that genuinely reflect the distinctive and radically different way Founding era law conceptualized the problem of rights and regulation. For an effort to expand upon Campbell's important insight, see Saul Cornell, *The Police Power and the Authority to Regulate Firearms in Early America,* https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf.

[53] *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008); Cornell and Leonard, *supra* note 2.

[54] 25 U.S. (12 Wheat.) 419, 442-43 (1827); *see generally Thurlow v. Massachusetts* (The License Cases), 46 U.S. (5 How.) 504 (1847).

14

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

later analyzed by the Supreme Court in the *License Cases*, where Justice John McClean formulated this guiding principle: "It is not susceptible of an exact limitation but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied."[55] The police power—in particular, the right of the people to regulate themselves in the interest of public safety—was thus dynamic, adaptable to the changing needs of American society.

One case featured in *Heller*, *State v. Reid* offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[56] The *Reid* Court observed that the state's concealed carry prohibition was a legitimate exercise of police power authority. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[57]

*State v. Reid* relied on the emerging body of police power jurisprudence that Marshall and others pioneered.  When ripped out of context, *Reid* might seem to support a modern-type permissive conception of public carry, but when read closely and in the context of antebellum police power jurisprudence, the case supports the opposite conclusion. *Reid* does not vindicate a permissive conception of the right to carry in public; rather, it forcefully articulates a more limited notion of purposive carry. In short, to justify arming in public, one had to have good cause—a specified reason to do so.  This requirement applied to open carry as much as it applied to concealed carry. Most public carry cases in the antebellum South, apart from rare outlier decisions, such as *Bliss v. Commonwealth*, adopted this approach to firearms regulation.[58]

---

[55] *License Cases*, 46 U.S. (5 How.) at 592.

[56] *See generally State v. Reid*, 1 Ala. 612 (1840).

[57] *Id*. at 616.

[58] *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) adopted an absolutist view of the right to bear arms, but the decision was overturned by a revision of the state constitution. For a useful discussion of *Bliss* in terms of the police power, see Ernst Freund, The Police Power:  Public Policy and Constitutional Rights (1904) at 91.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

*Reid*, it is worth recalling, was a case in which a sheriff carried a concealed pistol in violation of Alabama's prohibition on public carry of arms. The fact that a peace officer was prosecuted for carrying a weapon might seem odd given that police in modern America are typically armed with guns. This was not the case for the first half century after the adoption of the Second Amendment and its state analogues. It is also vital to read *Reid* against the background of an inherited common law tradition. "If the emergency is pressing," the *Reid* Court declared, "there can be no necessity of concealing the weapon, and if the threatened violence will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail."[59] But the *Reid* Court rejected the idea of permissive public carry.[60] *Reid* acknowledged a fact that many modern gun rights activists and some judges have ignored—the imposition of a peace bond was central to the powers of justices of the peace, constables, and sheriffs, who all continued to function as conservators of the peace under American law. The appropriate legal response to the danger posed by someone traveling armed in public was to impose a peace bond, a surety of the peace. Only if circumstances precluded following this course of action would a sheriff be justified in arming—and in that case, the correct decision was not to carry the weapon concealed but in the open. Thus, the Sheriff-defendant in *Reid* could be prosecuted, the court reasoned, because there was no necessity to arm. If a gun was needed, it should have been carried openly. Thus, the state could not categorically ban open carry in cases where an individual had a specified need for self-defense, but it could limit carry to those with good cause and punish those who carried without good cause.

*State v. Huntley*, another favorite case of modern gun-rights advocates, adopted a broader conception of the scope of public carry, but it, too, clearly articulated a theory of purposive carry and rejected the ideal of permissive open carry.[61] *Huntley* marked a bolder departure from the

---

[59] *Reid*, 1 Ala. at 621.

[60] *Id.* (noting that the state constitutional right to bear arms "neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guaranteed to the citizen, is not to bear arms upon all occasions and in all places . . . ."

[61] *State v. Huntley*, 25 N.C. 418, 423 (1843).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

traditional English common law limits on armed travel in public.[62] Yet even this case drew a sharp distinction between purposive carry and permissive carry. In *Huntley,* the court wrote:

> No man amongst us carries [a pistol] about with him, as one of his every day accoutrements — as a part of his dress — and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment. But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun per se constitutes no offence. For any lawful purpose — either of business or amusement — the citizen is at perfect liberty to carry his gun.[63]

Carrying weapons for a specified lawful purpose openly was protected; carrying weapons with no specific purpose—*habitual carry*—was not. "Lawful purpose" was defined as a specific activity that merited being armed: hunting, target practice, traveling beyond one's community, or self-defense in response to a clear and specific threat.[64] The phrase "business or amusement" was not synonymous with carrying a weapon every day as one might carry a watch, the court observed; it was an action that had to be grounded in some specified reason.[65] Thus, even in one of the most expansive interpretations of gun rights in the antebellum South, the region of the new nation with the most tolerant view of public carry, the right asserted was purposive in nature and not permissive.

Outside of the antebellum South, a different and more restrictive tradition of regulation took hold. Although this alternative model recognized a more expansive right than under English law, it was more limited than the Southern approach espoused in *Reid* and *Huntley*. First developed in Massachusetts, this approach soon spread to other locations across the nation before

---

[62] Ruben and Cornell, *supra* note 49.

[63] *Huntley*, 25 N.C. at 423.

[64] Modern American self-defense law has specified a variety of qualifications limiting the use of deadly force, and thus, this body of law is in tension with the idea of permissive carry championed by gun-rights advocates. This issue has not received sufficient attention by jurists and scholars; for a notable exception to this general scholarly neglect, see Eric Ruben, *An Unstable Core: Self-Defense and the Second Amendment*, 108 CALIFORNIA LAW REVIEW 63 (2020).

[65] Kopel and Mocsary, *supra* note 38, mistakenly claim that "business or amusement" was a legal term of art that included all lawful activity, but the text of *Huntley* makes clear that wearing a gun habitually without good cause was not lawful.

the Civil War.[66]  Both the Southern purposive model and the new Massachusetts model departed from traditional English common law. The earlier tradition prohibited armed carry outside of a well-defined list of exceptions, mostly situations in which individuals were required by law to assist in keeping the peace. The key innovation in the Massachusetts law was the recognition of a good cause exception that allowed individuals to preemptively arm for reasons of self-defense. Building on developments in American law after the American Revolution, particularly Enlightenment ideas, the new Massachusetts model was a significant expansion of gun rights and embodied a more individualistic conception of the scope of legitimate self-defense. It is important to note that under common law, there was no right to arm oneself preemptively, even in situations where one faced an imminent threat.[67]  The proper response was a peace bond.

The adaptation of the common law in America in both the South and North abandoned some aspects of this model of the peace, but it did not reject every aspect of the older legal framework. This community-based model of policing continued in America until the rise of modern police forces in the nineteenth century. Any justice of the peace could bind an individual to the peace. Similarly, any member of the community who felt threatened could have a justice of the peace impose a surety to conserve the peace.  Gun-rights scholars and a few judges have erroneously claimed that a surety required an individual to come forward and that individuals were otherwise free to travel armed in the public square.[68]  What they have ignored is that the powers of the justice of the peace as a conservator of the peace remained unchanged after the American Revolution. As conservators of the peace, justices of the peace, sheriffs, and

---

[66] Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1720 & n.134 (2012).

[67] Cornell, *supra* note 34 at 24. The notable exception to this rule was the "castle doctrine" covering deadly force in the home against intruders.  *See Semayne's Case*, 77 Eng. Rep. 194, 195 (1604) (KB), and more generally Darrell A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 LAW & CONTEMP. PROBS. 85 (2017).

[68] *See generally* Steve Hindle, THE STATE AND SOCIAL CHANGE IN EARLY MODERN ENGLAND, at 1550–1640 (2000). For unreliable historical accounts that ignore the role of the justice of the peace as conservators of the peace, see Kopel and Mocsary, *supra* note 33.  See also the unpublished essay by Robert Leider, *Constitutional Liquidation, Surety Laws, and the Right to Bear Arms* 13 (George Mason University Legal Studies Research Paper Series No. LS 21-06, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3697761 [https://perma.cc/RV6P-RS88]. Leider's analysis rests on anachronistic interpretations of the evidence and ignores the express statements of leading jurists about the meaning of Massachusetts law. He also reads backwards from post-Civil War developments and imposes those later understandings on antebellum evidence. Finally, Leider ignores the relevant scholarship in the history of criminal law and as a result distorts the norms governing prosecution in pre-Civil War America.

constables maintained their broad powers to enforce the peace, including the power to preemptively disarm, bind over with sureties of the peace or good behavior, and imprison those who violated the prohibition on armed travel.[69]

The claim that in America the peace was not enforced against those traveling armed has also gained some judicial notice, but this, too, rests on dubious historical arguments, mostly inferences from silences in the historical record, including the absence of prosecutions and a body of case law challenging the restrictions. The lack of evidence of prosecutions can support two opposing interpretations: either broad compliance with the law or absence of enforcement. Simply asserting that the silences in the record demonstrate lack of enforcement rests on conjecture and anachronistic assumptions about the way the peace functioned in the early republic.[70]

First, it is important to recognize that records of local justices of the peace, particularly in rural areas, are rare. Evidence about the enforcement of prohibitions on armed carry in urban areas such as Boston, however, are well documented.[71] Arms carrying in New England was far less common than in the slave South, so the absence of prosecution more likely suggests high levels of compliance with the law. Additional confirmation is provided by the practices of the Boston police, who did not routinely carry firearms until the Civil War period. Nor were criminals likely to be armed with guns during this period. Most assaults occurred without weapons.[72]

Even more problematic for the argument about non-enforcement is the clear exposition of the meaning of the Massachusetts ordinances by the state's leading criminal law expert, the distinguished jurist Peter Oxenbridge Thacher, who described the law in forceful terms: "In our own Commonwealth [of Massachusetts], no person may armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or

---

[69] Laura F. Edwards, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH, at 100 (2009).

[70] *See supra,* Kopel and Mocsary, note 38.

[71] ANNUAL REPORT – THE CHIEF OF POLICE, at 8-9 (Boston, 1864).

[72] Roger Lane, POLICING THE CITY: BOSTON, 1822-1885 (1967) at 103-4.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

violence to his person, family, or property."[73] Thacher's assessment of his state's law was echoed by Judge Abel Cushing, who served on the Roxbury Police Court.[74] Both jurists agree that there was no right of peaceable armed carry outside of situations where one faced a specific threat.

### Reconstruction, the Progressive Era, and the Rise of the Modern Regulatory State

The Civil War and post-War developments had a profound impact on gun culture in American and the legal response to the proliferation of arms. Rather than mark an end to robust regulation of public carry, Reconstruction witnessed an intensification of such efforts. Republicans sought to protect the rights of African Americans to bear arms, but were equally insistent on enacting strong racially neutral regulations aimed at public safety.[75] Indeed, the necessity of racially neutral gun regulations of this sort eventually was recognized by both Republicans and Democrats in Texas, a state in which paramilitary violence threatened public order and post-war stability.[76] In *English v. State*, the Texas Supreme Court confidently affirmed that restrictions on public carry were "not peculiar to our own State."[77] Indeed, it concluded that "it [was] safe to say that almost, if not every one of the States of this union [had] a similar law upon their statute books, and, indeed, so far as we [had] been able to examine them, they [were] more rigorous than the act under consideration."[78] Even after the adoption of the Fourteenth Amendment, the court reasoned that good cause laws were entirely consistent with protections for the right to bear arms.[79]

---

[73] *See* Peter Oxenbridge Thacher, as quoted in Cornell, *supra* note 34 at 40.

[74] See also the comments of Judge Abel Cushing, *Arrests for Carrying Concealed Weapons*, THE LIBERATOR, April 11, 1851.

[75] For a discussion of the importance of such broad racially neutral laws aimed at demilitarizing the public sphere, see Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. F. 238 (2014).

[76] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900* 121 SOUTHWESTERN HISTORICAL QUARTERLY 284 (2020).

[77] *English v. State* 35 Tex. 473, 479 (1871).

[78] *Id.*

[79] For a discussion of this case in the context of Reconstruction, see Frassetto, *supra* note 50 at 113–17 (2016).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

The most important regulations on public carry were bans on concealed carry. An Evanston, Illinois ordinance was typical: "It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot."[80] States in every region of the nation adopted similar bans.[81] Some localities enacted more stringent bans on public carry.[82] Nashville, Tennessee passed a comprehensive ban on public carry in 1873:

> Section 1:   That every  person  found  carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or  other  deadly weapon,  shall be  deemed  guilty of a misdemeanor, and,  upon  conviction  of  such   first offense, shall be fined  from ten to fifty  dollars, at the discretion of the  court,  but  upon  conviction of every  such subsequent offense, shall be  fined   fifty   dollars; Provided, however, That no ordinary pocket knife and common  walking-canes shall  be  construed  to  be  deadly weapons.[83]

By the end of the century, Americans residing in urban areas, particularly those dwelling in the nation's most populous cities, were likely to be living under some form of restrictive public carry legal regime: bans on concealed carry, good cause permit schemes, or broad restrictions on public carry with good cause and affirmative self-defense exceptions.[84]

---

[80] George W. Hess, *Revised Ordinances of the City of Evanston: Also Special Laws and Ordinances of General Interest*, at 131-132 (1893).

[81] 1871 Ky. Acts 89, An Act to Prohibit the Carrying of Concealed Deadly Weapons, ch. 1888, §§ 1-2, 5; 1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefor, § 1; 1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

[82] Ordinance No.  9: Carrying Deadly Weapons, Jan. 28, 1873, reprinted in ARIZONA CITIZEN, Feb. 8, 1873, at  2 (Tucson, Arizona); An Ordinance to Prevent the Carrying of Concealed Weapons, Feb. 4, 1882, reprinted in THE WORTHINGTON ADVANCE, Feb. 9, 1882, at 3 (Worthington, Minnesota); An Ordinance Prohibiting the Unlawful Carrying of Arms, May  4, 1880, reprinted in DAILY DEMOCRATIC STATESMAN, May 9, 1880, at 2 (Austin, TX).

[83] Chapter 108:  Carrying Pistols, Bowie-Knives, Etc., Dec.  26, 1873, reprinted in ORDINANCES OF THE CITY OF NASHVILLE 340-41 (William K. McAlister, Jr. ed., 1881).

[84] See John Forrest Dillion*, The Right to Keep and Bear Arms for Public and Private Defense*, 1 CENT. L.J. 259 (1874); 3 THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 408 (1887). For modern confirmation of these assessments, see Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights* 80 *Law and Contemporary Problems* 55, 68 (2017).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

The rise of permit schemes reflected profound changes in both the law and the nature of law enforcement.[85] The traditional surety model of enforcing the peace was rooted in common law and reflected the realities of life in the early modern Anglo-American world. This approach was well suited to a pre-industrial society in which members of the local gentry elite could count on the mechanisms of deference and a web of patron-client relationships to help them maintain social order.[86] Slowly over the course of the nineteenth century, as America modernized, urbanized, and became a more diverse and highly mobile society,  traditional community-based mechanisms of law enforcement eroded. Sureties were less effective at securing the peace in America's growing metropolitan cities. New institutions and processes were necessary to police large, heterogeneous cities. Professional police forces, special police courts, and new administrative agencies were better suited to maintaining social order and the peace in the urban world of nineteenth-century America.[87]  Thus, by end of the nineteenth century, permit schemes that took advantage of these new institutions and practices had largely supplanted the traditional common law mechanisms of sureties or peace bonds as the dominant method for dealing with the dangers posed by gun violence.

The culmination of this process of enforcing the peace in modern America occurred in the Progressive era with the enactment of New York's Sullivan Law, a comprehensive gun control measure that imposed limits on both the sale and ability to carry arms in public.[88]  The adoption of this law ushered in a wave of similar laws by states and localities.[89] In contrast to

---

[85] On the transformation of American law and the rise of the modern regulatory state, see William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061 (1994); Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301 (2015); Herbert Hovenkamp, *Appraising the Progressive State* 102 IOWA L. REV. 1063 (2017).

[86] Steve Hindle, *supra* note 61, at 100.

[87] Eric H. Monkkonen, AMERICA BECOMES URBAN:  THE DEVELOPMENT OF U.S. CITIES AND TOWNS, 1780-1980. at 98-108 (1995).

[88]  For the historical context of the enactment of the Sullivan law, see Alexander Deconde, GUN VIOLENCE IN AMERICA: THE STRUGGLE FOR CONTROL (2001).

[89] 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 1, § 3-A, § 4, § 4-A, § 4-B, § 4-C; 917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

earlier efforts at regulating public carry that relied on common law tools such as sureties of the peace and good behavior, the new modern regulatory model employed license and permitting schemes, an approach to regulation consistent with other reform efforts during the Progressive era. In addition to limits on pistols, several states enacted new laws banning dangerous and unusual weapons, most notably machines guns and some semi-automatic weapons.[90]

**Public Carry Limits in California in the Era of the Fourteenth Amendment**

California embraced the new model of gun regulation. Although a potent mythology about guns in the American West has defined popular culture since the region was settled, the historical reality is far more complex than dime novels and Hollywood movies suggest.[91] Guns were an important part of the western experience, but the region also enacted some of the most robust firearms' regulations in American history.[92] California was no exception to this general pattern.[93]

The law adopted by Los Angeles illustrates the region's commitment to enacting broad gun regulations.  The ordinance adopted was comprehensive in scope, and it prohibited public carry, "concealed or otherwise." It also gave the Mayor some discretion in prosecuting violators, although it did not establish a formal permit scheme.

> [N]o persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of

---

and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, §§ 3-4; 1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: § § 1, 4, 5 and 6.

[90] *See, e.g.*, An Act to amend the penal law, in relation to the sale and carrying of dangerous weapons, 1911 N.Y. LAW S Ch. 195. For a general discussion of the expansion of regulation after the passage of the Sullivan Act, see Spitzer, *supra* note 83.

[91] Karen Jones & John Wills, THE AMERICAN WEST: COMPETING VISIONS, at 69 (2009); Richard Slotkin, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH CENTURY AMERICA (1992).

[92] Adam Winkler, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (2011).

[93] *See* Exhibit 1.

this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey.[94]

Sacramento enacted a permit ordinance for public carry in 1876.[95] Ordinance No. 84 prohibited concealed carry without a permit. The punishment for violating the law was a steep fine. The law also made clear that the primary justification for arming was job-related travel at night:

> Section 1:   It shall be unlawful for any person, not being a public officer or traveler, or not having a permit from  the  Police Commissioners of the City of Sacramento, to wear or carry, concealed, any pistol, dirk, or other dangerous or deadly weapon.

> Section 2:   Any person violating the provisions of this ordinance shall be punished by a fine not exceeding five hundred dollars, or by imprisonment in the city prison not exceeding ten days, or by both such  fine and imprisonment.

> Section 3:   The Police Commissioners of the City of Sacramento may grant written permission to  any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his protection.

The list of municipalities that followed the lead of Sacramento grew in the ensuing decades, included tiny towns such as Lompoc, and the state's largest city San Francisco.  Table 1 lists some of the municipalities that adopted permit schemes between 1876-1892.[96]

---

[94] Ordinances of the City of Los Angeles, § 36, William. M. Caswell, *Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles* 85, (1878)

[95] Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in CHARTER AND ORDINANCES OF THE CITY OF SACRAMENTO 173 (R.M. Clarken ed., 1896) (Sacramento, California).

[96] Research on this topic is still ongoing and this list is not exhaustive, but a summary of what is known based on existing scholarship.

Table 1: Municipal Permit Schemes in California, 1876-1892[97]

| Location | Year |
|---|---|
| Sacramento | 1876 |
| Napa | 1880 |
| San Francisco | 1880 |
| Santa Barbara | 1881 |
| Alameda | 1882 |
| St. Helena | 1884 |
| Fresno | 1885 |
| Lompoc | 1888 |
| Marysville | 1889 |
| Oakland | 1890 |
| Monterey | 1892 |

The dawn of the new century did little to diminish California's interest in enacting strong gun regulations.[98] A 1917 state law extended the limits on concealed carry in urban areas to include "the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person." It also provided "for the destruction of certain dangerous weapons as nuisances."[99] The state enacted a comprehensive ban on machine guns in 1927.[100]

---

[97] For the full text of these local permit ordinances, see Exhibit 1. Information on population statistics may be found in *Population of the 100 Largest Cities and Other Urban Places in the United States: 1790 to 1990*, Working Paper No. 27, *available at* https://www.census.gov/library/working-papers/1998/demo/POP-twps0027.html, and *Twelfth Census of the Unites States – Population of California by Counties and Minor Civil Divisions*, Census Bulletin No. 10, Washington, D.C., October 24, 1900, *available at* https://www.census.gov/library/publications/decennial/1900/bulletins/demographic/10-population-ca.pdf.  If one calculates the number of municipalities that enacted such laws and compares that figure to the population of the state, more than half the state was living under a regulatory scheme that required permits to travel, or banned travel except for limited exceptions.

[98] Spitzer, *supra* note 83, at 55.

[99] 1917 Cal. Sess. Laws 221-225, §§ 3-4 ("An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another.")

[100] An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Cal. Stat. 938, ch. 552, §§ 1–2 (1927); Spitzer, *supra* note 83.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

Gun regulations in California in subsequent decades of the twentieth century remained robust. Local and state governments responded to the problems posed by gun violence by enacting new laws when necessary. Perhaps the most well-known and controversial example of such a regulation was the adoption of the Mulford Act shortly after the Black Panther Party staged a high-profile protest that included a prominent open carry display.  In response to this action, California adopted a new more restrictive law prohibiting open carry.[101] Some gun-rights advocates have cited this incident to argue that all gun regulation is inherently racist, a dubious historical claim that conflates different periods of gun regulation from different regions of the nation with the history of the Jim Crow South and the experience of the Black Panthers during the tumultuous social unrest of the 1960s.[102] The decision of civil rights activists to arm themselves in the Jim Crow South and the actions of the Panthers reflected local circumstances. These examples do not demonstrate the existence of a broad national  consensus on the right of peaceful public carry, nor do they show that all efforts at gun regulation are inherently racist. What these examples show is that in situations where racially motivated interpersonal violence is common, state-sanctioned terrorism is accepted, and general lawlessness is tolerated, individuals and communities have responded by arming themselves.  Generalizing from the facts on the ground in these situations is therefore both problematic and perilous. The Jim Crow South hardly serves as a paradigmatic example of how government and law should be structured in America. Gun laws in this region were notoriously lax, and enforcement of the few gun laws that did exist was overtly discriminatory. Local police forces were closely connected to white supremacist organizations such as the Ku Klux Klan and made little effort to enforce laws in neutral manner. Given these historical facts, claims that open-carry practices during this period in this region shed light on public carry in California today are misplaced and misleading.

---

[101] Adam Winkler, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (2011); Katherine J. King, *Heller As Popular Constitutionalism? The Overlooked Narrative of Armed Black Self-Defense*, 20 U. PA. J. CONST. L. 1237 (2018).

[102] Patrick J. Charles*, Racist History and the Second Amendment: A Critical Commentary*, 43 CARDOZO L. REV., (2022, forthcoming).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

The next major turning point in the debate over firearms regulation in California was the ban on "assault weapons" enacted after the Stockton School Massacre.[103] This moment in the struggle between gun rights and gun regulation typified a more general historical phenomenon: a cycle of tragedy, outrage, regulation, and backlash. The politics of modern gun regulation in recent years have followed this predictable cycle: sensational shootings (typically mass shootings) prompt new legislation, an increase in firearms sales, and a rise of gun-rights activism. If history is any guide to future practices and controversies, it appears likely that the same pattern of violence, legislation, and litigation will continue into the foreseeable future. This pattern continues to define much of the modern gun debate in America, including the debate within California.

One final point about history and firearms regulation is worth noting. Gun regulation and gun rights have been closely connected for most of American history: laws are enacted when a particular firearms technology achieves sufficient market penetration to create a new social problem requiring legislative intervention. The enactment of new laws often produces litigation, and courts either defer to the legislature, or in rare cases, strike down these laws as impermissible violations of the right to bear arms. There is usually a lag between the time when a technological innovation  incorporated into a new type of firearm generates enough enthusiasm among gun owners to cause a rise in sales. Thus, until a particular gun achieves a certain level of popularity, it is unlikely to become associated with criminal or anti-social behavior. Legislatures and courts must then play catch-up to address the impact of such weapons and enact laws to address negative consequences.[104]

**Conclusion**

Limits on armed travel in public, including open carry, are of ancient vintage, stretching back deep into Anglo-American law. In England prior to colonization, the public carry of

---

[103] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut and Collin M. Carr , *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020); Antonis Katsiyannis, Denise K. Whitford, Robin Parks Ennis, *Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society*, 27 JOURNAL OF CHILD AND FAMILY STUDIES 2562 (2018).

[104] As Robert Spitzer notes, "So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted." *See supra* note 83 at 55, 68.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

firearms was generally prohibited in populous areas, with limited exceptions for community defense and law enforcement, and with a legally sanctioned exception for the gentry elite. There is no historical evidence of an individual right for ordinary Britons to openly carry weapons outside of a narrow range of exceptions. In the United States, limitations on the open carry of weapons in populous areas were common in the Founding era and throughout the nineteenth century. While some states recognized an individual right to openly carry firearms for specific purposes, this view was largely restricted to the white citizens of slave-holding Southern states. In other parts of pre-Civil War America, there was a more limited right to carry for reasons of self-defense when a specified threat existed. During the era of the Fourteenth Amendment, the level of firearms regulation intensified. States and localities enacted a variety of limits on public carry, including bans on open carry, concealed carry, and permit schemes. Changes in law enforcement and the administration of justice, particularly in urban areas, produced greater convergence in the approach to firearms regulation than had been possible in antebellum America. By the end of the century, good cause permitting had emerged as the dominant model for regulating arms in public. In short, history supports robust regulation of public carry of firearms, including discretionary permit schemes tied to good cause requirements.

Signed: August 27, 2021

_____

Dr. Saul Cornell

# ATTACHMENT A

Saul Cornell
Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road,
Bronx, NY 10458
Phone:
203 826-6608 (c)
 scornell1@fordham.edu

Education:

University of Pennsylvania, Ph.D. (1989)
Dissertation: "The Political Thought and Culture of the Anti-Federalists" University of Pennsylvania, MA in History (1985)
Amherst College, BA, Magna Cum Laude in History (1982)
University of Sussex, Brighton, England (1980-81)

Teaching Experience:

Paul and Diane Guenther Chair in American History (2009-2020)
Professor of History, Department of History, The Ohio State University, (2005-2008)
Associate Professor, Department of History, The Ohio State University (1997– 2005)
Thomas Jefferson Chair, University of Leiden, The Netherlands (1995)
Assistant Professor, Department of History, The Ohio State University (1991-1997)
Assistant Professor, Department of History, College of William and Mary (1989-1991)

Fellowships:

The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University (2019-2020)
Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School (2018-2019)
Senior Research Scholar in Residence, University of Connecticut Law School (2014)
Senior Research Scholar in Residence, Yale Law School (2011)
NEH Fellowship, (2003-2004) Gilder-Lehrman Fellowship (2002)
American Council of Learned Societies (ACLS) (2001)
Thomas Jefferson Memorial Foundation, Research Fellowship (1998)
Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award (1995)
Ohio State University Seed Grant (1994)
Ohio State University Special Research Assignment (1993)
Ohio State University Grant-In-Aid (1992)
NEH Post-Doctoral Fellow, Institute of Early American History and Culture (1989-1991)

Prizes and Awards:

Langum Prize in Legal History, (2006)
History News Network, Book of the Month, (2006)
History News Network, Top Young Historian, (2006)
Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era, (2001)
Choice Outstanding Academic Book, (2000)

Book Publications:

The Partisan Republic:  Democracy, Exclusion, and the Demise of the Founders Constitution; *New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019) [With Gerry Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller (University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009), (second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000), (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999),   (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

Interviews, Editorials, Essays, Podcasts:

"Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
https://slate.com/news-and-politics/2021/06/joe-biden-cannons-wrong-guns-right.html

"Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021  Slate https://slate.com/news-and-politics/2021/04/barrett-gorsuch-heller-originalism-scalia-guns.html

"What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021

"Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019

"Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019

"The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019

"The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.

"Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018

"Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017

"The State of the Second Amendment," National Constitution Center, Podcast October, 2017

"Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffaler On-line* October 2017

"Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017

"Half Cocked," *Book Forum* April 2016

"Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016

"Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015

"The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]

PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013

"All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

"What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court,"  *Christian Science Monitor* May 20, 2010

"Gun Points,"  *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)

"What's Happening to Gun Control," T o  the Point, NPR. March 11, 2010

"Getting History Right," *National Law Journal*, March 1, 2010

"History and the Second Amendment," *The Kojo Nnamdi Show*, WAMU (NPR) March 17, 2008

"The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008

"Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007

"A Well Regulated Militia,"" *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV  (2006)

"Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005

"Gun Control," Odyssey, Chicago NPR September 8, 2004

"Loaded Questions" *Washington Post Book World* February 2, 2003

"The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002

"Real and Imagined," *New York Times*, June 24, 1999

Scholarly Articles, Book Chapters, and Essays:

Saul Cornell, "President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 *FORDHAM LAW REVIEW (*2021): 1761-1781.

Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868," 83 *Law and Contemporary Problems* (2020):  73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." <u>Law and History Review</u> 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in <u>Firearms and Freedom: The Second Amendment in the Twenty-First Century</u> <u>Controversies in American Constitutional Law Series</u> (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and Keeping the Peace,"  80 <u>Law and Contemporary Problems</u> (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 <u>Northwestern Journal of Criminal Law</u>  107 (2017): 203-218

"The  1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," <u>Wisconsin Law Review Forward</u>  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History," American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal Forum 125 (2015-16): 121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae 84 (2015): 1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in the History of Constitutional Ideas: The Intellectual History Alternative to Originalism" Fordham Law Review 82 (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009):
406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u> (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u>  (2007): 883--903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," <u>Law and History Review</u>  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u>  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  <u>Stanford Law and Policy Review</u>  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  <u>Fordham Law Review</u> 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> <u>History of the Early Republic</u> (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom in a Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals? The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the 'Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

Book Reviews:

Journal of American History, William and Mary Quarterly, American Studies Journal of the Early Republic,  Pennsylvania Magazine of History and Biography, American Quarterly, American Journal of Legal History, Law and History Review

Invited Lectures:

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA ( 2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

Reference Papers and Scholarly Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania (2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School (2007)

"*District of Columbia* v. *Heller* and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia (2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Students For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual n or Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club, Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for Us on the Web," OAH,  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University (Spring 1997)

"Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

Grants:

Joyce Foundation, Second Amendment Center Grant (2003-2008) $575,000

Department of Education, Teaching American History Grant, History works (2002-2005) $2,000,000

Joyce Foundation Planning Grant, (2001-2002) $40,000

Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute (1999-2000) $100,000

Amicus Briefs:

Amicus Brief, *Young v. State of Hawaii* NO. 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief, *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [Fourteenth Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [Second Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal (9th  Circuit 2003) [Second Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [Second Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [First Amendment]

Expert Witness Testimony:

Expert Witness, *Chambers v. City of Boulder* (Colorado Appeals Court 2000)

Expert Witness, *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper* (Colorado District Court, 2016)

Expert Witness, *Zeleny v. Newsom*, No. 17-CV-07357-RS (TSH) (N.D. Cal. 2020)

Other Professional Activities:

Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)

Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)

Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008

Editorial Board, <u>American Quarterly</u> (2004-2007)

Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007

Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001-2004

Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003

Project Gutenberg Prize Committee, American Historical Association, 2004,  2002

Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001

Co-Founder Ohio Early American Studies Seminar

NEH Fellowship Evaluator, New Media Projects, Television Projects

Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

Journal Manuscript Referee:

Journal of American History, William and Mary Quarterly Diplomatic History, Pennsylvania Magazine of History and Biography, Law and History Review, Harvard Law Review, Stanford Law Review, Yale Law Journal

Book Manuscript Reviewer:

University Press of Virginia, University of North Carolina Press, Stanford University Press, University of Massachusetts Press, Oxford University Press, Cambridge University Press, University of Michigan Press, Harvard University Press

Court Citations:

**U.S. Supreme Court**

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44 (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts**

*Young v. Hawaii*, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. City. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom. United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom. United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

# EXHIBIT 1

Exhibit 1:  California Municipal Permit Schemes


Ordinance No. 84:   Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in CHARTER AND ORDINANCES OF THE CITY OF SACRAMENTO 173 (R.M. Clarken ed., 1896) (Sacramento, California).

> Section 1:   It shall be unlawful for any person, not being a public officer or traveler, or not having a permit from the Police Commissioners of the City of Sacramento, to wear or carry, concealed, any pistol, dirk, or other dangerous or deadly weapon.

> Section 2:   Any person violating the provisions of this ordinance shall be punished by a fine not exceeding five hundred dollars, or by imprisonment in the city prison not exceeding ten days, or by both such fine and imprisonment.

> Section 3:   The Police Commissioners of the City of Sacramento may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his protection.


Ordinance No. 55:   Prohibiting the Carrying of Concealed Weapons, Nov. 6, 1878, reprinted in CHARTER AND REVISED ORDINANCES OF THE CITY OF EUREKA  251 (1905) (Eureka, California).

> Section 1:   It shall be unlawful for any person not being a public officer, or traveler, or not having a permit from the Mayor of this city, to wear or carry concealed, within the corporate limits of this city, any pistol, dirk, or any other dangerous or deadly weapon.

> Section 2:   Every person violating any of the provisions of this Ordinance shall be deemed guilty of a misdemeanor, and upon due proof thereof, shall be fined in a sum not to exceed one hundred dollars, or imprisonment in the city prison not exceeding ten (10) days, or by both such fine and imprisonment. Such persons, and no others, shall be termed travelers within the meaning of this Ordinance as may be actually engaged in making a journey at the time.

> Section 3:   The Mayor of the city may grant writ- ten permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed weapons for his own protection.

Prohibiting the Carrying of Concealed Deadly Weapons, Sep. 17, 1880, reprinted in GENERAL ORDERS OF THE BOARD OF SUPERVISORS PROVIDING REGULATIONS FOR THE GOVERNMENT OF THE CITY AND COUNTY OF SAN FRANCISCO 8 (1884) (San Francisco, California).

>Section 22:   It shall be unlawful for any person, not being a public officer or traveler, or not having a permit from the Police Commissioners of this city and county, to wear or carry concealed, in this city and county, any pistol, dirk or other dangerous or deadly weapon.

>Every person violating any of the provisions of this Order shall be deemed guilty of a misdemeanor, and punished accordingly.  Such persons and no others shall be termed "travelers," within the meaning of this Order as may be actually engaged in making a journey at the time.

>The Police Commissioners may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection.

Concealed Weapons, undated 1880, reprinted in THE NAPA DAILY REGISTER, Nov. 10, 1880, at 2 (Napa, California).

>Section 1:   Every person not being a peace officer, who shall within the corporate limits of the City of Napa, carry or wear any dirk, pistol, sword-in-cane, sling-shot, or other dangerous or deadly weapon concealed, except by special permission in writing from the President of the Board of Trustees of said city, shall upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be fined in any sum not less than Ten nor more than One Hundred Dollars, and be imprisoned until such fine be paid, not exceeding one day for each dollar of such fine.

Ordinance No. 85:   To Prevent the Carrying of Concealed Deadly Weapons, Jan. 6, 1881, reprinted in THE DAILY INDEPENDENT, Mar. 10, 1888, at 3 (Santa Barbara, California).

>Section 1:   It shall be unlawful for any person not being a public officer or a traveler, or not having a permit from the Mayor, to wear or carry concealed, in said City, any pistol, revolver, knife, dirk or other deadly weapon

>Section 2:   The Mayor may grant written permission to any peaceable person whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection; and such persons and not others shall be deemed travelers within the meaning of this Ordinance, except such as may be actually engaged in making a journey at the time.

Town Ordinances:   Concerning Concealed Weapons, undated 1882, reprinted in ALAMEDA DAILY EVENING ENCINAL, May 3, 1882, at 3 (Alameda, California).

> Section 1:   It shall be unlawful for anyone, not being a public officer, or not having a permit from the President of the Board of Trustees, countersigned by the Chief of Police, to wear or carry concealed weapons about his person in the Town of Alameda, or any pistol, slungshot, brass or iron knuckles, or iron bars such as are usually carried by Chinamen, sand clubs, dirk or bowie knife, or dangerous or deadly weapon.

> Section 2:   The President of the Board of Trustees may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection. Such permit shall be countersigned by the Chief of Police before it shall be issued, and the Chief of Police shall number the same and keep a registered list of the persons to whom issued, with their residences and occupations.

> Section 3:   Any person violating this ordinance shall be punished by a fine not exceeding one hundred dollars, or by imprisonment in the jail of Alameda county not exceeding fifty days, or by both such fine and imprisonment.

Ordinance No. 62:   An Ordinance to Prohibit the Carrying of Concealed Deadly Weapons, Dec. 9 1884, re-printed in ST. HELENA STAR, Dec. 11, 1884, at 2 (St. Helena, California).

> Section 1:   Every person, not being a peace officer, who shall within the corporate limits of the town of St. Helena, carry or wear concealed any pistol, dirk, sword, slung-shot or other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor and shall be fined in any sum not less than ten nor more than fifty dollars or by imprisonment not less than one day nor more than thirty days.

> Section 2:   Provided the President of the Board of Trustees may grant written permission to any peaceable person whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection, such permission not to extend beyond one year.

Ordinance No. 6, Nov. 5, 1885, reprinted in THE FRESNO WEEKLY REPUBLICAN, Nov. 7, 1885, at 3 (Fresno, California).

> Section 25:   No person except peace officers and travelers shall carry concealed upon his person any pistol or firearm, slungshot, dirk or Bowie knife, or other deadly weapon, without a written permission from the President of the Board of Trustees; provided, said President shall have power to revoke such permission at any time.

Ordinance No. 10:   An Ordinance Prohibiting the Carrying of Concealed Deadly Weapons, and Fixing the Penalty Therefor, Aug. 21, 1888, reprinted in LOMPOC RECORD, Aug. 25, 1888, at 2 (Lompoc, California).

> Section 1:   It shall be unlawful for any person not being a public officer or traveler, not having a written permit from the President of the Board of Trustees of the Town of Lompoc, to wear or carry concealed, within the corporate limits of the Town of Lompoc, any pistol, revolver, dirk, stiletto or other dangerous or deadly weapon.

> Section 2:   Every person violating any of the provisions of this Ordinance shall be deemed guilty of a misdemeanor and be punished by a fine not exceeding one hundred dollars, or by imprisonment in the town jail, if there be one, and if not, then by imprisonment in the county jail of Santa Barbara county, for not exceeding thirty days, or by both such fine and imprisonment.

> Section 3:   Such persons, and no others, shall be termed "travelers" within the meaning of this Ordinance, as may be actually engaged in making a journey at the time.

> Section 4:   The President of the Board of Trustees of the Town of Lompoc may grant written permission to any peaceable person whose profession or occupation may require him to be out at late hours of the night within the corporate limits of the said Town of Lompoc, to carry concealed deadly weapons for his own protection.

An Ordinance:   An Ordinance to Prohibit the Carrying of Concealed Deadly Weapons, Feb.  4, 1889, re- printed in MARYSVILLE DAILY DEMOCRAT, Feb. 7, 1889, at 4 (Marysville, California).

> Section 1:   It shall be unlawful for any person, not being a public officer or traveler, or not having a writ- ten permit from the Marshal of the city of Marysville, to wear or carry concealed, or otherwise, within the limits of the city of Marysville, any pistol, dirk, or other dangerous or deadly weapon.

> Section 2:   Such person and no others shall be termed "travelers" within the meaning of this ordinance as may be actually engaged in making a journey at the time. Any person violating the provisions of the ordinance upon conviction thereof shall be punished by a fine not to exceed five hundred dollars or by imprisonment not to exceed ten days, or by both.

> Section 3:   The Marshal may grant written permission to any person whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection. The Marshal may at any time revoke any permit, and after notice to the person holding a permit and a demand for the return thereof, such permit shall immediately become void.

> Section 4:   The Marshal shall keep, or cause to be kept, a book in which shall be recorded, the name of the person to whom a permit is granted. The date of such permit and the time the permit continues; the date when the permit is discontinued, and the date when the permit is revoked.

Ordinance No.  1141:   An Ordinance to Prohibit the Carrying of Concealed Weapons, May 15, 1890, re- printed in CHARTER OF THE CITY OF OAKLAND 332-33 (W.A. Dow ed., 1898) (Oakland, California).

> Section 1:   It shall be unlawful for any person in the City of Oakland, not being  a public officer or a traveler actually engaged in  making a journey, to wear or carry concealed about  his  person without a permit, as hereinafter provided, any  pistol, slung-shot, brass or iron knuckles, sand club, dirk or bowie knife, or iron bar  or other dangerous or deadly weapon, or any sling or other contrivance by which shot  or other missiles are or may be hurled or projected. A written permit may be granted by the Mayor for a period of not to exceed one year to any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person.

> Section 2:   Every person violating any provision of this ordinance is guilty of a misdemeanor, and upon conviction thereof shall be punished by fine of not to exceed one hundred dollars; and in case such fine be not paid, then by imprisonment at the rate of one day for every two dollars of the fine so imposed.

Ordinance No. 49:    To Prohibit the Carrying of Concealed Weapons, Jan. 5, 1892, reprinted in THE ORDINANCES AND CHARTER OF THE CITY OF MONTEREY 112 (1913) (Monterey, California).

Section 1:    Every person not being a peace officer, who shall, within the corporate limits of the City of Monterey, carry or wear any dirk, pistol, sword in cane, slung-shot or other dangerous or deadly weapon concealed, except by special permission in writing from the President of the Board of Trustees of said City, shall, upon conviction thereof before any Court of competent jurisdiction be deemed guilty of a misdemeanor and  shall be fined in any sum not Less  than Twenty- five nor more  than Three Hundred Dollars, or by imprisonment not exceeding ninety days, or by both such fine and  imprisonment

Section 2:    Ordinance No. 9 of the City of Monterey, passed by the Board of Trustees on the 16th day of July, 1889, and all ordinances and pats of ordinances in conflict herewith, are hereby repealed.