1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  LARA HADDAD, State Bar No. 319630
   Deputy Attorney General
4    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
5    Telephone:  (213) 269-6250
     Fax:  (916) 731-2124
6    E-mail:  Lara.Haddad@doj.ca.gov
   *Attorneys for Defendant Rob Bonta in his official*
7  *capacity as Attorney General of California*

8                IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **MARK BAIRD and RICHARD**            2:19-cv-00617-KJM-AC
    **GALLARDO,**
14                                        **DEFENDANT'S MEMORANDUM OF**
                              Plaintiffs, **POINTS AND AUTHORITIES IN**
15                                        **SUPPORT OF MOTION FOR**
                                          **SUMMARY JUDGMENT**
       v.
16                                        Date:        September 22, 2023
                                          Time:        10:00 a.m.
17  **ROB BONTA, in his official capacity as**   Dept:        3
    **Attorney General of the State of California,**  Judge:       Hon. Kimberly J. Mueller
    **and DOES 1-10,**                     Trial Date:  None set.
18                                        Action Filed:  April 10, 2019
                              Defendants.
19

20

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    I.    California's Concealed and Open Carry Laws ....................................................... 2

    II.    Procedural History ............................................................................................... 4

LEGAL STANDARD ............................................................................................................. 4

ARGUMENT ........................................................................................................................... 4

    I.    Plaintiffs' Case Fails At the Outset Because the Second Amendment Does Not Require Unlicensed Open Carry ...................................................................... 5

    II.    California's Open Carry Restrictions are Consistent With the Nation's History of Firearms Regulation .............................................................................. 7

        A.    The Record Reflects a Historical Tradition of Regulating the Manner of Public Carry Under Any Historical Approach, Including the "More Nuanced" Analogical Approach ................................. 7

        B.    The Challenged Restrictions Are Relevantly Similar to Historical Analogues ....................................................................................................... 10

            1.    Governments Have Long Regulated the Public Carry of Weapons ................................................................................. 11

                a.    Medieval to Early Modern England (1300-1776) .............. 11

                b.    Colonial and Early Republic Periods (1642-1812) ........... 12

                c.    Antebellum and Reconstruction Periods (1813-1877) ...... 13

                d.    Late 19th and Early 20th Centuries (1878-1930s) ............ 16

            2.    The Tradition of Prohibiting the Public Carry of Weapons in More Populated Areas .......................................................... 17

            3.    The Surveyed Restrictions on Public Carry Are Relevantly Similar to California's Open-Carry Restrictions ......................... 17

                a.    Comparable Burden ........................................................... 18

                b.    Comparable Justification ................................................... 19

CONCLUSION ....................................................................................................................... 20

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3

C<small>ASES</small>

4

*Abed v. United States*
   278 A.3d 114 (D.C. Cir. July 14, 2022) ................................................................. 6

5

6

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ............................................................................................... 4

7

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
   2023 WL 2655150 (D. Del. Mar. 27, 2023) .......................................................... 8

8

9

*Ezell v. City of Chicago*
   651 F.3d 684 (7th Cir. 2011) ............................................................................... 16

10

11

*Flanagan v. Bonta*
   No. 18-55717 (9th Cir. Feb 1, 2023) ..................................................................... 3

12

*Frlekin v. Apple, Inc.*
   979 F.3d 639 (9th Cir. 2020) ................................................................................. 4

13

14

*Gould v. Morgan*
   907 F.3d 659 (1st Cir. 2018) ............................................................................... 20

15

16

*Hanson v. District of Columbia*
   __ F. Supp. 3d __ (D.D.C. Apr. 20, 2023) ............................................................ 7

17

*McDonald v. City of Chicago*
   561 U.S. 742 (2010) (plurality opinion) ................................................................ 5

18

19

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
   142 S. Ct. 2111 (2022) .................................................................................*passim*

20

21

*Norman v. State*
   215 So. 3d 18 (Fla. 2017) ...................................................................................... 6

22

*Oregon Firearms Federation v. Kotek*
   __ F. Supp. 3d __ (D. Or., July 14, 2023) ...................................................... 11, 18

23

24

*United States ex rel. Kelly v. Serco, Inc.*
   846 F.3d 325 (9th Cir. 2017) ................................................................................. 4

25

*United States v. Salerno*
   481 U.S. 739 (1987) ............................................................................................... 7

26

27

*Young v. Hawaii*
   992 F.3d 765 (9th Cir. 2021) ............................................................................... 12

28

ii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

**STATUTES**

4

California Penal Code

5
§ 26000............................................................................................................ 2
§ 26005............................................................................................................ 2

6
§§ 26010-26060 ............................................................................................. 2
§ 26045 .................................................................................................... 1, 3, 7

7
§ 26150(b)(1) .................................................................................................. 2
§ 26155 (b)(1) ................................................................................................. 2

8
§§ 26361-26392 ............................................................................................. 2

9

**CONSTITUTIONAL PROVISIONS**

10

Second Amendment ....................................................................................... *passim*

11

Fourteenth Amendment....................................................... 2, 8, 10, 13, 16

12

**OTHER AUTHORITIES**

13

English Bill of Rights of 1689, 1 Wm. & Mary 2d. Sess. ch. 2, § 6; 1 William
    Blackstone, Commentaries 139, ch. 1 (1765) ....................................... 11

14

15

Appendix of Laws ............................................... filed concurrently with brief

16

17

18

19

20

21

22

23

24

25

26

27

28

Type Footer Info Here 2 («Matter Primary Court Case #»)

**INTRODUCTION**

California authorizes the concealed-carry of weapons through shall-issue license laws. California also authorizes the open-carry of firearms in certain circumstances: by statute, local authorities may issue open carry licenses in counties of less than 200,000 people. California law otherwise prohibits the open carry of firearms, subject to certain exceptions, including where a person reasonably believes that the carrying of a firearm is necessary to prevent immediate danger to any person, or the property of any person. Cal. Penal Code § 26045.

Plaintiffs acknowledge that they are authorized to conceal carry firearms, and live in counties where state law authorizes local authorities to issue open carry licenses. Plaintiffs no longer challenge any particular aspect of the public carry licensing scheme, but contend that any licensing requirement is inconsistent with the Second Amendment. In Plaintiffs' view, the Second Amendment requires the State to tolerate unlicensed, open carriage of firearms. They allege that they have a "God-bestowed, preexisting right" to openly carry loaded firearms without "permission from the government, licensing, registration, or any other action." SAC, ¶ 8. The Second Amendment, they assert, protects this right from "*any encroachment*" by the government. *Id.* (emphasis in original).

The Second Amendment in no way requires the unfettered right that Plaintiffs assert, and certainly does not compel the unlicensed open carriage of firearms. California's licensing regime fully comports with the Second Amendment under the text-and-history standard announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Under that standard, Plaintiffs cannot show that their proposed course of conduct (the unlicensed open carriage of firearms) is conduct protected by the Second Amendment. While *Bruen* provides that the Second Amendment requires States to provide some means for persons to carry firearms outside the home, it also holds that States may regulate the manner of public carry. And California's laws adhere to those requirements: they authorize the concealed-carry of firearms, and Plaintiffs have acknowledged that they are able to carry firearms concealed throughout the State. The analysis should end here.

1

1      In any event, California's restrictions on the open-carry of weapons are "consistent with the

2  Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  To establish such

3  a tradition, the government need only identify a "well-established and representative historical

4  *analogue*"—not a "historical *twin*" or "dead ringer"—that is "relevantly similar" according to

5  "two metrics":  "how and why the regulations burden a law-abiding citizen's right to armed self-

6  defense."  *Id.* at 2132–33.  Defendant has met that burden here.  With respect to licensing

7  requirements in general, *Bruen* establishes that States may retain licensing regimes for the public

8  carry of firearms.  Indeed, *Bruen* expressly endorsed shall-issue licensing schemes that do not

9  deny public-carry licenses to ordinary citizens who fail to show that they have a special need for

10  one.  With respect to open carriage specifically, history reflects a tradition of regulating the

11  manner of public carry dating back to when the Second and Fourteenth Amendments were

12  ratified.  Moreover, for much of the Nation's history, the open carry of firearms, particularly

13  loaded firearms, was not a common practice due to the limits of then-existing technology and

14  then-prevailing social norms.  As the technology improved and practices changed, governments

15  regulated or prohibited the open carry of weapons—consistent with the longer tradition of

16  regulating when and how individuals could carry arms in public.  California's laws are consistent

17  with these historical laws, which imposed a comparably minimal burden on the right to armed

18  self-defense and were comparably justified by public-safety concerns prevalent at the time.

19      There are no triable issues of material fact going to the constitutionality of the challenged

20  laws, and this Court should enter judgment for Defendant.

21                         **BACKGROUND**

22  **I.    CALIFORNIA'S CONCEALED AND OPEN CARRY LAWS**

23      Under California law, a person may carry a gun in public under the State's concealed-carry

24  licensing regime.[1]  Cal. Pen. Code §§ 26150(b)(1), 26155 (b)(1).[2]  To obtain a concealed-carry

25  license, an applicant must establish that (1) "the applicant is of good moral character;" (2) the

26

---

27      [1] Additionally, peace officers, members of the military, persons using target ranges or hunting on a shooting club's premises, and security guards and government officers may carry a gun publicly.  *See* Cal. Pen. Code §§ 26000, 26005, 26010-26060, 26361-26392.

28      [2] All statutory references are to the California Penal Code unless otherwise noted.

1    applicant is a resident of the relevant county (or has their principal place of business or

2    employment there); and (3) the applicant has completed a course of training.  §§ 26150(a),

3    26155(a).  Issuing authorities may also require psychological testing.  § 26190(f).  As written,

4    those statutes presently include a good-cause requirement but it is no longer enforced post-

5    *Bruen*.[3]  SUF ¶ 1; Haddad Decl., Ex 1.

6        State law further provides that "fingerprints of each applicant shall be taken" and that upon

7    receipt of the fingerprints and requisite fees, the California Department of Justice "shall promptly

8    furnish the forwarding licensing authority a report of all data and information pertaining to any

9    applicant of which there is a record in its office, including information as to whether the person is

10   prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm."

11   § 26185(a).  Licenses "shall not be issued if the [DOJ] determines that the person is prohibited by

12   state or federal law from possessing, receiving, owning, or purchasing a firearm."  § 26195(a).

13       With respect to the open carry of firearms in public, local authorities are allowed to issue

14   licenses to carry "loaded and exposed" in counties with a population of less than 200,000 persons,

15   although any open-carry license that would be issued would not extend outside of the county in

16   which it was issued.  §§ 26150(b)(2), 26155(b)(2).  This is in contrast to concealed-carry permits,

17   which allow individuals to carry their weapons concealed throughout the State.  The same

18   requirements that apply to concealed-carry licenses apply to these licenses.

19       Absent a concealed-carry or open-carry license, a person is prohibited from carrying a

20   firearm in public, subject to several exceptions.  *See* §§ 25850(a), (b).  There is a focused self-

21   defense exception to California's public-carry restrictions, which authorizes the carrying of a

22   loaded firearm by any individual who reasonably believes that doing so is necessary to preserve a

23   person or property from an immediate, grave danger, while awaiting the arrival of law

24   enforcement, if it is reasonably possible to notify them.  § 26045.  There is also an exception for a

25   person making or attempting to make a lawful citizen's arrest.  § 26050.  Neither exception

26   requires a license or permit.  §§ 26045, 26050.  In addition, licensed hunters and fishers may

27

28       [3] *See Flanagan v. Bonta*, No. 18-55717 (9th Cir. Feb 1, 2023) (dismissing appeal involving good cause requirement as moot).

3

1  carry handguns while engaged in those activities.  §§ 25640, 26366.

2  **II.   PROCEDURAL HISTORY**

3       Plaintiffs Mark Baird and Richard Gallardo are authorized under state law to carry

4  concealed firearms in public.  *See* Statement of Undisputed Facts [SUF], Nos. 2, 6, 7.  Both

5  Plaintiffs also live in counties in which state law allows open carriage pursuant to its licensing

6  regime—Siskiyou County and Shasta County, respectively.  *See* SUF Nos. 4, 5, 9, 10.

7       In April 2019, Plaintiffs filed a complaint against the California Attorney General for

8  declaratory and injunctive relief, challenging California's restrictions on open carry, and

9  subsequently amended their complaint.  The case was subsequently stayed pending the Supreme

10  Court's decision in *Bruen*.  *See* ECF 58.  After the Supreme Court issued its decision in *Bruen*,

11  this Court lifted the stay and Plaintiffs filed a motion for preliminary injunction, as well as a

12  Second Amended Complaint.  *See* ECF 68.  The operative complaint raises facial challenges to

13  sections 25850 and 26350 (criminalizing the open carry of loaded and unloaded firearms).  This

14  Court denied the preliminary injunction motion, and Plaintiffs appealed; the Ninth Circuit held

15  argument on June 29, 2023.  Meanwhile, the Attorney General completed discovery in this

16  matter, serving multiple expert reports.  Plaintiffs served rebuttal reports, and the Attorney

17  General served sur-rebuttal reports before discovery closed on August 4.

18                                  **LEGAL STANDARD**

19       "A grant of summary judgment is appropriate when there is no genuine dispute as to any

20  material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*,

21  979 F.3d 639, 643 (9th Cir. 2020).  "If the evidence is merely colorable, or is not significantly

22  probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

23  249–50 (1986).  Moreover, to survive summary judgment, a party "must establish *evidence* on

24  which a reasonable jury could find for" that party.  *United States ex rel. Kelly v. Serco, Inc.*, 846

25  F.3d 325, 330 (9th Cir. 2017).

26                                     **ARGUMENT**

27       In *Bruen*, the Supreme Court announced a new standard for adjudicating Second

28  Amendment claims, one "centered on constitutional text and history." *Id.* at 2128–29.  Under this

4

text-and-history approach, courts must first determine that "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129–30. If it does, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Under the text-and-history standard, the Second Amendment is not a "regulatory straightjacket." *Id.* It does not prevent states from adopting a "'variety' of gun regulations," *id.* at 2162 (Kavanaugh, J., concurring), and "experiment[ing] with reasonable firearms regulations" to address threats to the public, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion).

## I.   PLAINTIFFS' CASE FAILS AT THE OUTSET BECAUSE THE SECOND AMENDMENT DOES NOT REQUIRE UNLICENSED OPEN CARRY

As a threshold matter, the text of the Second Amendment does not compel *unlicensed* open carry, conduct that plaintiffs contend is protected by the plain text. And *Bruen* instructs that States may retain licensing regimes for the public carry of firearms. Although *Bruen* invalidated one aspect of New York's licensing scheme (the proper-cause requirement), the Supreme Court explicitly approved of the practice of requiring a permit to carry a firearm in public so long as ordinary citizens who fail to show a special need for one are not denied those licenses. *See Bruen*, 142 S. Ct. at 2123-24 (citing approvingly the licensing schemes of 43 States); *id.* at 2138 n.9 ("nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" or other licensing requirements that are "'narrow, objective, and definite'"); *see also id.* at 2161 (Kavanaugh, J., concurring). Both the majority opinion and Justice Kavanaugh's concurring opinion approved of states continuing to require that a public carry license applicant first pass a background check—as California's law does, in section 26185 and 26195—and pass a firearms safety course—as found in sections 26150(a)(4) and 26155(a)(4). *See Bruen*, 142 S. Ct. at 2123-24, 2161. Thus, *Bruen* reflects that restrictions on the carrying and possession of firearms are permissible under the Second Amendment, and implicitly endorsed "reasonable, well-defined" restrictions on the public carrying of firearms, *Bruen*, 142 S. Ct. at 2156, with "narrow, objective, and definite standards." *Id.* at p. 2138 n.9.

5

1    States may therefore prohibit the carrying of firearms by those who do not secure a license in the

2    first instance.

3         Moreover, the plain text of the Second Amendment does not require any right to *openly*

4    carry when concealed carry (and open carry under more limited circumstances) is authorized.

5    *Bruen* observed that "history reveals a consensus that States could *not* ban public carry

6    altogether . . . concealed-carry prohibitions were constitutional only if they did not similarly

7    prohibit *open* carry." *Bruen*, 142 S. Ct. at 2146 (emphasis in original).  This is in keeping with

8    the Second Amendment's text: the term "bear" in "to keep and bear arms" requires some form of

9    public carry but does not require open carry.  *Id.* at 2134.  For this reason, Florida's highest court

10   upheld the state's open carry restrictions against federal and state constitutional challenges in

11   2017.  *See Norman v. State*, 215 So. 3d 18 (Fla. 2017).  Although that decision applied the now-

12   defunct two-step test, its reasoning remains persuasive.  It observed that so long as right to public

13   carry is accommodated in some manner, the legislature may choose between open and concealed

14   carry because limitations on open carriage do "not diminish an individual's ability to carry a

15   firearm for self-defense, so long as the firearm is carried in a concealed manner and the individual

16   has received a concealed-carry license."  *Id.* at 27-28.  Another state court similarly observed that

17   "nothing in the [*Bruen*] opinion implies that a State must allow open carry."  *Abed v. United*

18   *States*, 278 A.3d 114, 129 n.27 (D.C. Cir. July 14, 2022) (observing that *Bruen* could be read only

19   to "suggest that a State would be required to allow open carry of a handgun for self-defense if it

20   were to broadly prohibit concealed carry").

21        Here, Plaintiffs acknowledge that they may carry weapons concealed throughout the State,

22   *infra* at 4, and they do not challenge the State's concealed-carry licensing regime.  *See* SAC, ¶¶

23   75-91.  And while Plaintiffs do not hold licenses to openly carry, as discussed above, they have

24   not alleged that they applied for such licenses and were denied.  Moreover, California law

25   exempts all persons from criminal prosecution under the challenged statutes, regardless of

26   locality, if they reasonably believe it necessary to openly carry to prevent an immediate and grave

27

28

danger to any person or property.[4]  § 26045.  Taken together, California's law amply

accommodates the right to publicly carry.  States "could not altogether prohibit the public carry of

'arms' protected by the Second Amendment or state analogues," *Bruen*, 142 S. Ct. at 2147, and

California does not do so.  Because California accommodates the right to public carry through its

concealed carry licensing regime, the reasonable restrictions that California imposes on the open-

carry of weapons, and the licensing requirements in place in the counties where Plaintiffs reside,

do not interfere with the plain text of the Second Amendment.

## II.   CALIFORNIA'S OPEN CARRY RESTRICTIONS ARE CONSISTENT WITH THE NATION'S HISTORY OF FIREARMS REGULATION

Even if Plaintiffs could show that California's open-carry restrictions implicate the Second

Amendment, these restrictions are consistent with the Nation's tradition of firearms regulation.

### A.   The Record Reflects a Historical Tradition of Regulating the Manner of Public Carry Under Any Historical Approach, Including the "More Nuanced" Analogical Approach

In *Bruen*, the Supreme Court described "fairly straightforward" historical analyses and a

"more nuanced" approach to that inquiry.  *See Bruen*, 142 S. Ct. at 2131-32.  The Supreme Court

noted that when a challenged law addresses either "unprecedented societal concerns or dramatic

technological changes," a "more nuanced approach" is warranted because "[t]he regulatory

challenges" of today would not be "the same as those that preoccupied the Founders in 1791 or

the Reconstruction generation in 1868."  *Id.* at 2132.  Governments generally regulate problems

as they arise, and thus prior generations cannot be expected to have anticipated concerns that

were not prevalent at the time.  *See, e.g., Hanson v. District of Columbia*

__ F. Supp. 3d __, 2023 WL 3019777 at *16 (D.D.C. Apr. 20, 2023) (discussing the non-

---

[4] The existence of this exception suggests that Plaintiffs cannot sustain their burden on their facial Second Amendment challenge.  A facial challenge to a statute is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987). Relevant here, the Second Amendment does not protect an unfettered right to "keep and carry any weapon whatsoever in any manner or for whatever purpose," rather, it protects the right of law-abiding citizens to possess firearms for self-defense.  *Bruen*, 142 S. Ct. at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).  Because the challenged statutes exclude instances where a person reasonably believes it necessary to openly carry a loaded firearm for self-defense, plaintiffs cannot meet that high burden.

1  regulation of jetpacks despite their existence and "obvious safety issues and dangers"), *appeal*

2  *docketed*, No. 23-7061 (D.C. Cir. May 17, 2023).

3        While a "fairly straightforward" historical analysis supports California's limits on the

4  unlicensed open carriage of firearms, a more nuanced analogical approach is proper and confirms

5  that the law is constitutional under the text-and-history standard.  This is because, as Defendant's

6  experts explain, the open carry of firearms, particularly loaded firearms, was not a common

7  practice in the Revolutionary era and during the times around the ratification of the Second and

8  Fourteenth Amendments, for several reasons.  First, open carry was not prevalent given the

9  limited technology of the day.  "Eighteenth-century muzzle-loading weapons, especially muskets,

10  took too long to load and were therefore seldom used to commit crimes.  Nor was keeping guns

11  loaded a viable option because the black powder used in these weapons was not only corrosive,

12  but it attracted moisture like a sponge."  Cornell Decl., Ex. 1, p. 13.  These weapons were stored

13  unloaded, *id.* at pp. 13, 14, which "limited the utility of muzzle-loading pistols as practical tools

14  for self-defense or criminal offenses."  *Id.* at p. 13.  During this period, weapons could generally

15  be categorized as either "arms suitable for militia service or hunting," and "concealable weapons

16  associated with interpersonal violence[.]"  Rivas Decl., p. 5.  The latter were not usually firearms,

17  given their limitations: "Rifles, muskets, and shotguns that could not readily be concealed on a

18  person were not likely to be used in the commission of crimes," *id.*, and would not be carried

19  loaded, as described above.  "[A]t the time of the Second Amendment, over 90% of the [guns]

20  owned by Americans were long guns, not pistols."  Cornell Decl. at p. 13.  And the concealable

21  weapons used to commit crimes included dirks and Bowie knives, swords, daggers, stilettoes,

22  skeins, and—when owned—pistols.  *See* A 5 (1686 New Jersey law, "An Act Against Wearing

23  Swords, Etc."); *see also* Spitzer Decl., Ex. E, p. 56 (same); *Del. State Sportsmen's Ass'n v. Del.*

24  *Dep't of Safety & Homeland Sec.*, 2023 WL 2655150 at *13 (D. Del. Mar. 27, 2023) (concluding

25  that the burden imposed by restrictions on assault long guns and concealable weapons is

26  comparably justified), *appeal docketed*, No. 23-1641 (3d Cir. Apr. 7, 2023).

27        Even when advances in firearms technology made it practical to openly carry firearms, it

28  was not considered socially appropriate or acceptable to do so, outside of emergencies.  Despite

the eventual development of smaller guns and innovations to ammunition, open carry remained a relatively rare practice for decades.  "Americans generally condemned the habitual carrying of weapons for preemptive self-defense—even if those weapons were carried openly."  Rivas Decl., p. 4; *see also id.*, p. 19 ("[T]he everyday open carrying of deadly weapons was not particularly common in the nineteenth century, and primary source evidence shows that it was not socially acceptable outside of emergency circumstances.").  Thus, "[n]ineteenth-century public carry laws explicitly prohibited *concealed* weapons because the primary mode of carrying . . . deadly weapons was concealed in one's pocket."  Rivas Decl., p. 3.  "These were weapons designed for concealment, not open-carry[.]"  *Id.*  This is because "[t]o carry a pistol or knife openly was to invite the intervention of local officers of the law and would have been an indication of an emergency[.]"  *Id.* at p. 4.

In addition, the issues and problems faced by American society have changed since the time that the Second Amendment was ratified.  Because long guns, which were not suited for offensive use, were the primary weapons owned by Americans when the Second Amendment was ratified, firearms were not the "primary weapon of choice for those with evil intent during this period."  Cornell Decl., p. 13.  And even when firearms did evolve to be smaller and could be carried loaded, they were not carried habitually or regularly carried openly, but instead were "carried concealed—in fact, they were designed for such a purpose."  Rivas Decl., p. 6; *see also id.*, pp. 15-16 (describing attitudes towards concealed carry of weapons, which was widely associated with violence).  Considering these factors, it is unsurprising that governments crafting regulations on firearms "tended to focus upon readily concealable 'deadly weapons' like knives and pistols rather than firearms used for militia and hunting purposes, which were openly carried."  *Id.*  That these regulations often authorized open carry, while prohibiting concealed carry—*see, e.g.,* Rivas Decl., p. 31 (citing 1835 Florida law)—is in keeping with the fact that the open carry of weapons was associated almost exclusively with government functions or an emergency setting, or as needed for defense by people traveling in isolated areas (discussed further below), unlike today.  Rivas Decl., p. 40.

9

1    Accordingly, the primary concerns of California's open-carry restrictions—such as

2  prohibiting the "potential to create panic and chaos," Raney Decl., p. 9, as well as preventing

3  violence—are concerns that have become even more significant in the modern era due to

4  technological advances and changing societal norms.  Even so, many historical laws applied to

5  both the concealed and open carry of weapons: there existed "the extensive regulation of open

6  weapons carrying, in that more than half of the states restricted, partially or completely, open

7  weapons carrying or any weapons carrying."  Spitzer Decl., p. 6.  These restrictions and

8  regulations increased as the circulation of handguns increased in American society, as well as

9  knives and other weapons, because of their contribution to "increasing interpersonal violence."

10  Spitzer Decl., pp. 6-7; *see also* Rivas Decl., p. 5.  "The post-Civil War period became the

11  country's first experience with rampant gun violence, leading Americans to discourage the

12  carrying and use of guns through state and local regulations."  Rivas Decl., p. 15.  By the start of

13  the twentieth century, every state in the country except New Hampshire prohibited or severely

14  restricted concealed gun and other weapons carrying, in addition to those laws that restricted the

15  open carry of weapons.  Spitzer Decl., p. 7.

16    Thus, because of the changes in weapons technology and societal norms with respect to the

17  open carry of weapons from the time of the ratification of the Second and Fourteenth

18  Amendments, the more nuanced approach envisioned by the Supreme Court is warranted when

19  evaluating California's open-carry laws.

20    **B.    The Challenged Restrictions Are Relevantly Similar to Historical
        Analogues**

21

22    Defendant has identified nearly a hundred laws from over half the states, as well as

23  additional restrictions imposed by local governments, from pre-founding England and colonial

24  America through the 1930s, including clusters of laws enacted around the time that the Second

25  and Fourteenth Amendments were ratified, that restricted, regulated, or otherwise discouraged the

26  open carry of weapons, including firearms.[5]  These historical analogues include restrictions and

27    _____
        [5] These laws are compiled in the Appendix filed concurrently with Defendant's motion, as
28  well as referenced in Defendant's expert declarations.  Citations to the Appendix are denoted as
    A[table number].

1   regulations on not just the open carry of weapons, but also the brandishing and display of

2   weapons (discussed further below), as well as licensing and taxation requirements: "[L]icensing

3   and registration requirements were commonly and ubiquitously applied to guns and other

4   dangerous weapons, extending to gun ownership as well as every aspect of sales."  Spitzer Decl.,

5   p. 32.  Plaintiffs are therefore wrong to assert that they have a "God-given" right to unfettered

6   open carry of weapons or that the State cannot require a license.  *See* SAC, ¶ 8; SUF Nos. 3, 8; *cf.*

7   *Bruen*, 142 S. Ct. at 2156.

8        Governments also often imposed greater restrictions on the public carry of weapons in more

9   populated areas.  These analogues represent "significant historical evidence to overcome the

10  presumption of unconstitutionality of a measure that infringes upon conduct covered by the

11  Second Amendment."  *Oregon Firearms*, 2022 WL 17454829, at *12.

12       **1.    Governments Have Long Regulated the Public Carry of Weapons**

13            **a.    Medieval to Early Modern England (1300-1776)**

14       In pre-founding England, the English Bill of Rights recognized as the fifth and final

15  auxiliary right a right to keep and bear arms "as allowed by law."  A 6 (English Bill of Rights of

16  1689, 1 Wm. & Mary 2d. Sess. ch. 2, § 6; 1 William Blackstone, Commentaries 139, ch. 1

17  (1765)).  This auxiliary right was the "predecessor to our Second Amendment."  *Bruen*, 142 S. Ct.

18  at 2141 (quoting *Heller*, 554 U.S. at 593).  "In England prior to [America's] colonization, the

19  public carry of firearms was generally prohibited in populous areas, with limited exceptions for

20  community defense and law enforcement, and with a legally sanctioned exception for the gentry

21  elite."  Cornell Decl., Ex. 1, p. 24.  The accompanying restrictions enacted with that right to keep

22  arms as allowed by law are part of the tradition inherited from England when the Second

23  Amendment was ratified.  *See Bruen*, 142 S. Ct. at 2127 (noting that the Second Amendment

24  "codified a right inherited from our English ancestors" (quoting *Heller*, 554 U.S. at 599)).

25       These pre-ratification English authorities are relevant because they are consistent with laws

26  that existed when the Second and Fourteenth Amendments were ratified.  *Id.* at 2136 (suggesting

27  that it is permissible for "courts to 'reach back to the 14th century' for English practices that

28

'prevailed up to the 'period immediately before and after the framing of the Constitution'" (cleaned up)).

### b.   Colonial and Early Republic Periods (1642-1812)

During the colonial period and the early Republic, multiple jurisdictions enacted restrictions or prohibitions on the public carry of weapons, many of which included the open carry of weapons, due to dangers to public safety.[6]  Moreover, states enacted both laws penalizing the mere display of weapons in the presence of others, and laws prohibiting the brandishing of weapons—"to display them in the presence of others and to do so in a menacing or threatening manner."  Spitzer Decl., p. 11; *see also id.*, p. 15, Table 1, "Colonial, State, and Territorial Weapons Brandishing and Display Laws in 36 States, 1642-1931."

For example, in 1642, a provision in the colony of New Netherland (later New York) prohibited the drawing or displaying of knives.  Spitzer Decl., p. 11 (citing 1642 N.Y. Laws 33, in *Young v. Hawaii*, 992 F.3d 765, 794-795 (9th Cir. 2021)).  In 1686, New Jersey enacted a law against wearing weapons "privately," but it also levied penalties for the open carrying of weapons.  A 5; Spitzer Decl, pp. 6, 11-12, Ex. E, pp. 53-54.  In 1694, Massachusetts enacted a law subjecting to arrest any who "shall ride or go armed Offensively" in before government officials.  A 7; Spitzer Decl., p. 12.  Similarly, in 1699 (and in 1708) New Hampshire enacted a law punishing anyone who "went armed offensively" or "put his Majesty's subjects in fear."  Spitzer Decl., p. 12 (citing 1699 N.H. Laws, 1, in *Young v. Hawaii*, 992 F.3d at 794-795.  In 1750, Massachusetts enacted a statute penalizing any group of 12 or more individuals "being armed with clubs or other weapons," regardless of whether they were concealed or openly carried.[7]  A 11; Spitzer Decl., p. 6, Ex. E, pp. 40-41.  In 1795, Massachusetts passed another law empowering justices of the peace to arrest anyone who "shall ride or go armed offensively"— therefore, carrying any weapon.  Rivas Decl., p. 25; Spitzer Decl., p. 12 (citing 1795 Mass. Acts 436, ch. 2, in *Young v. Hawaii*, 992 F.3d at 799).  In 1786 and 1792, Virginia and North Carolina passed laws each prohibiting the open carry of weapons, stating that no man was to "go nor ride

---

[6] In addition to regulating the carrying of weapons, governments heavily regulated the keeping of gunpowder.  *See* Spitzer Decl., pp. 29-30.

[7] Massachusetts passed another law with the same language in 1786.  A 13; Spitzer Decl., p. 11, citing 1786 Mass. Sess. Laws, § 1.

1   armed by night nor by day," upon pain of being arrested.  A 16, 18; Spitzer Decl., pp. 6, 12 & n.

2   29, Exs. B, C.

3         In addition, in 1801, Tennessee enacted a law providing that anyone who "shall ride or go

4   armed to the terror of the people, or privately carry any . . . dangerous weapon to the fear or terror

5   of any person" would be punished or jailed.  A 23; Rivas Decl., pp. 27-28; Spitzer Decl., pp. 12-

6   13.  In 1812, Kentucky passed a law barring the concealed carry of weapons.  A 30.

7         Moreover, during this period, multiple states required permits in order to discharge

8   firearms.  For example, in 1713, Philadelphia penalized "firing a Gun without license."  A 8;

9   Spitzer Decl., p. 27.  In 1721, the entire colony imposed penalties on anyone who fired any

10  firearm without license; it did so again in 1750.  A 9; Spitzer Decl., p. 27.  In 1802, Charleston,

11  South Carolina, enacted a similar licensing ordinance.  A 24; Spitzer Decl., pp. 27-28.

12        Such pre-ratification restrictions should "guide [this Court's] interpretation" of the Second

13  Amendment.  *Bruen*, 142 S. Ct. at 2137.  And laws enacted after ratification of the Second

14  Amendment during this period are relevant in showing the continuing tradition of regulating

15  certain enumerated weapons.[8]

16                    **c.    Antebellum and Reconstruction Periods (1813-1877)**

17        During the antebellum and postbellum period, including around the time that the Fourteenth

18  Amendment was ratified, states and municipalities continued to restrict the public carry of

19  weapons, including the open carry, display, and brandishing of such weapons.  In the latter half of

20  the nineteenth century in particular, the enactment of open carry restrictions increased as the

21  population—and rates of interpersonal violence—grew.  *See* Rivas Decl., pp. 4, 28, 29.

22        Tennessee updated its public carry statute in 1821 to penalize the carrying of weapons

23  either openly or concealed.  A 38; Rivas Decl., p. 28.  Similarly, in 1838, Florida criminalized the

24  concealed carrying of certain weapons, but also assessed a considerable penalty on "all persons

25  carrying said weapons openly."  A 50; Spitzer Decl., p. 8.  In 1868, Florida enacted an even

26

27         [8] Indeed, post-ratification practice can "liquidate" indeterminacies in the meaning of a
28  constitutional text.  *Bruen*, 142 S. Ct. at 2136 (citation omitted).

1    stricter law, prohibiting not only the concealed carry of arms, but also carry of "any dirk, pistol or

2    other arm or weapon."  A 108; Spitzer Decl., p. 10.

3        In 1851, a law in the Pennsylvania borough of York defined as a felony the carrying of any

4    firearm or deadly weapon, concealed or open.  A 68; Spitzer Decl., p. 8.  In 1852, a Hawaii law

5    similarly criminalized the carrying of any weapon, A 71, as did the District of Columbia in 1858.

6    A 83; Spitzer Decl., p. 8.  Many other states and cities prohibited the open carry of weapons, or

7    the public carry of any weapons altogether: Kansas (1868) (A 110); Memphis, Tennessee (1867,

8    1869) (A 103); Louisiana (1870) (A 116); New Jersey (1871, 1873) (A 123); Texas (1871) (A

9    125); Nebraska (1872) (A 127); Arkansas (1875) (A 137); South Dakota (1877) (A 152); and

10    Utah (1877) (A 153).  *See also* Spitzer Decl., Exs. E, H.  In addition, many of these states enacted

11    or incorporated into their laws restrictions specifically restricting the carrying of long guns or any

12    kind of firearm.  Spitzer Decl., p. 9; *id.*, Ex. H; *see also*, Ex. E.

13        States continued to penalize the display of weapons during this period, including the

14    wearing of firearms or the "pointing" of firearms at others, with exceptions for weapons transport,

15    travelers passing through, law enforcement, the military, militias, and cases of self-defense.

16    Spitzer Decl., pp. 16-17.  For example, in 1821, Maine passed such a statute.  A 37, Spitzer Decl.,

17    p. 15, Table 1.  States also continued to target the brandishing of weapons, by prohibiting the

18    manner of display of the weapon, most frequently prohibiting behavior that was "rude, angry, and

19    threatening."  Spitzer Decl., pp. 13-14; *see also* Spitzer Decl., p. 13, n.33 (listing statutes).  For

20    example, an 1840 Mississippi law prohibited any individuals who were carrying deadly weapons

21    from, "in the presence of three or more persons, exhibit[ing] the same in a rude, angry and

22    threatening manner, not in self-defense."  A 54; Spitzer Decl., p. 13.  Other states enacting

23    brandishing laws include: Washington (1854, 1859) (A 75); California (1855) (A 77); Idaho

24    (1864, 1870); Arizona (1867) (A 101); Arkansas (1871) (A 119); Washington (1869) (A 114);

25    Nevada (1873) (A 130); Texas (1871) (A 125); Indiana (1875) (A 139).  *See* Spitzer Decl., Ex. E.

26        Moreover, where states did not restrict the open carry of weapons, they continued to

27    regulate concealed carry.  In 1813, at a time of dramatic population growth, Louisiana and

28    Kentucky penalized the concealed carry of weapons.  A 31; Rivas Decl., p. 28.  Many other states

14

and territories followed suit with similar prohibitions on the concealed carry of weapons: Indiana (1820) (A 35), Florida (1835) (A 40), Georgia (1837) (A 44), Virginia (1838) (A 51), Alabama (1839) (A 52), Ohio (1859) (A 88), and New Mexico (1859) (A 87). *See also* Rivas Decl., pp. 28-29. The city of Sacramento similarly adopted a permitting scheme prohibiting concealed carry without a permit. A 143; Cornell Decl., Ex. 1, p. 21. Notably, the only exceptions were for public officers or travelers, and permits could be issued for individuals whose occupation may require them to be out late at night, and so could "carry concealed deadly weapons for [their] protection." *Id.*

In addition, states continued to enact licensing schemes for the carry or possession of weapons, among other actions. *See* Spitzer Decl., pp. 17-18, Ex. G; *see also id.*, Ex. H. And some states imposed licensing requirements on marginalized groups, such as Native Americans or non-citizens, and in the pre-Civil War period, at least a dozen states imposed licensing requirements on enslaved persons or free Blacks.[9] Spitzer Decl., p. 18.

Some states also annually taxed owners of deadly weapons if they carried those weapons, which provided a further method of regulation or discouraged the carrying of weapons altogether, especially when those taxes were quite high. Rivas Decl., pp. 31, 32. For example, an 1850 North Carolina measure included a one-dollar tax on all pistols and other weapons to be worn by the owner—the same tax rate as that for buggies and carriages. A 68; Rivas Decl. pp. 32-33. The tax could be avoided by leaving the weapon at home. *Id.* at p. 33. In 1838, Florida imposed an annual tax of $10 to be able to carry weapons openly—an equivalent of $320 today. A 50; Rivas Decl., p. 32.[10]

---

[9] The Attorney General notes his strong disagreement with racial and other improper discrimination that existed in some such laws, which stands in stark contrast to California's commonsense firearm laws that are generally applicable and designed to justly and equitably protect all Californians. These historical laws are provided only as additional examples of laws identifying certain weapons for heightened regulation, and they are consistent in this respect with the other generally applicable laws. The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other improper characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees. *See Bruen*, 142 S. Ct. at 2150–51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)); *see also* Appendix, n.1.

[10] That same law imposed an annual tax of $200 on those who wished to sell deadly weapons, including pocket pistols—the equivalent of $6,300 today. Rivas Decl., p. 32.

1       All of these laws further demonstrate a national tradition of regulating the public carriage of

2   deadly weapons.  These regulations bear particular importance, because as noted in *Bruen*, the

3   Second Amendment was made applicable to the states not in 1791, but in 1868, with the

4   ratification of the Fourteenth Amendment.  143 S. Ct. at 2138; *see also Ezell v. City of Chicago*,

5   651 F.3d 684, 704 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government

6   action is challenged, the focus of the original-meaning inquiry is carried forward in time; the

7   Second Amendment's scope as a limitation on the States depends on how the right was

8   understood *when the Fourteenth Amendment was ratified*." (emphasis added)).

9               **d.      Late 19th and Early 20th Centuries (1878-1930s)**

10      From the end of Reconstruction to the early 20th century, states and localities continued to

11  restrict the open carry of weapons, including the brandishing and display of weapons, as well as

12  imposing licensing and taxation schemes for the possession or use of weapons.

13      In 1878, the city of Los Angeles enacted a broad ordinance prohibiting all public carry,

14  "concealed or otherwise."  A 155; Cornell Decl., Ex. 1, pp. 20-21.  In 1890, an Oklahoma law

15  prohibited the carry of any weapons, openly or concealed.  A 229; Spitzer Decl., p. 10.  Other

16  states prohibiting the open-carry—or any public carry at all—of weapons during this period

17  include: Mississippi (1878) (A 156); Tennessee (1879, 1881, 1893) (A 163); Arizona (1889,

18  1901) (A 219); Arkansas (1881) (A 167); Maryland (1886) (A 205); Connecticut (1890) (A 223);

19  Oklahoma (1890) (A 229); West Virginia (1882, 1891, 1925) (A 185); Wyoming (1893) (A 244);

20  North Dakota (1895) (A 246); Vermont (1895) (A 247); Oregon (1898, 1917) (A 257); Hawaii

21  (1896) (A 248); California (1917) (A 287); Missouri (1923) (A 294); and Michigan (1927, 1929)

22  (A 311).  *See also* Spitzer Decl., Ex. H.

23      States and territories also continued to enact display laws during this period: Georgia

24  (1880); Indiana (1883); New Mexico (1886); Oregon (1893); Alabama (1897); Kansas (1899);

25  Wyoming (1899); Arkansas (1907); South Carolina (1910); and Hawaii (1927).  Spitzer Decl., p.

26  15, Table 1.  And, they continued to enact brandishing laws: Missouri (1881); New Mexico

27  (1882); Illinois (1883); Wyoming (1884); Montana (1885); Florida (1897); Oklahoma (1899);

28  West Virginia (1925); and Michigan (1931).  *Id.*

16

These 20th century analogues are relevant under *Bruen* because they are consistent with earlier-enacted laws restricting the public carry of weapons. *Cf. Bruen*, 142 S. Ct. at 2154 n.28 (discounting probative value of 20th century laws that "contradict[ed] earlier evidence").

### 2. The Tradition of Prohibiting the Public Carry of Weapons in More Populated Areas

In American history, it has been common for governments to apply stricter requirements concerning the public carry of weapons in more urban centers versus rural locales. *See* Rivas Decl., p. 38. For example, laws restricting the public carry of weapons often made exceptions for "long-distance travelers venturing beyond the safety of their local communities." Rivas Decl., p. 38. Such travel exceptions were narrow, however: they typically required the travel to last overnight, be of a significant distance (e.g., across county lines), or "otherwise take a person beyond 'his circle of neighbors.'" Rivas Decl., p. 38. And the exception was typically limited to travel only: "Another requirement was often that a traveler check his weapons upon arriving to a town or to depart town as soon as his business was finished without visiting shops or restaurants." Rivas Decl., p. 38. Moreover, persons traveling long distances and subject to attack "would be much more likely to turn to a rifle for self-preservation than a pistol." Rivas Decl., p. 40 (discussion regarding benefits of carrying rifles versus pistols during post-Civil War period). Thus, such weapons would necessarily be carried openly.

In addition, in the American West, different rules often applied to population centers than in rural areas. For example, from 1852-1889, Colorado, Idaho, Montana, Arizona, New Mexico, and Wyoming prohibited the concealed carry of weapons in towns and settlements. Rivas Decl., pp. 39-40. Cities and towns such as Dodge City, Kansas, and others located near western railheads prohibited the carrying of any weapons within city and town limits. Rivas Decl., p. 40.

### 3. The Surveyed Restrictions on Public Carry Are Relevantly Similar to California's Open-Carry Restrictions

The surveyed public carry laws and open-carry restrictions enacted from the pre-founding era through the early 20th century are relevantly similar to California's open-carry restrictions in light of their comparable burdens and justifications in several significant ways. Here, the government need only identify a "well-established and representative historical *analogue*"—not a

17

1   "historical *twin*" or "dead ringer"—to the challenged laws, which is "relevantly similar" in terms

2   of "how and why the regulations burden a law-abiding citizen's right to armed self-defense."

3   *Bruen*, 142 S. Ct. at 2133; *see also Oregon Firearms Federation v. Kotek*, __ F. Supp. 3d __,

4   2023 WL 4541027 at *36 (D. Or., July 14, 2023), appeal docketed, July 17, 2023.  Thus, the

5   historical comparator must have "impose[d] a comparable burden on the right of armed self-

6   defense" that is also "comparably justified."  *Id*.

7                        **a.    Comparable Burden**

8          The laws restricting or prohibiting the open-carry of weapons, including the display and

9   brandishing of weapons, as well as the restrictions on concealed-carry and use of licensing,

10  taxation, and permitting, imposed a comparable burden on the right to armed defense as the

11  challenged open-carry laws here.  Like California's open-carry restrictions, many laws prohibited

12  the open-carry of weapons.  Many of these prohibitions were significantly more burdensome than

13  California's open carry scheme, in that they applied without regard to the size of the locality, and

14  did not include exceptions for cases of self-defense.   Display and brandishing laws also present

15  burdens comparable to those presented by California's laws restricting the open-carry of

16  weapons: as discussed above, these laws frequently prohibited the wearing of weapons on one's

17  person ("displaying"), or wearing weapons openly and displaying them in a certain manner.

18  These brandishing laws typically prohibited "threatening" gestures or actions with weapons, *infra*

19  at 12.  Similarly, California's restrictions reflect a modern-day understanding that the open carry

20  of weapons, where not worn by a police officer or similar individual, is itself threatening.  *See*,

21  *e.g.*, Raney Decl., pp. 6-8.

22         Moreover, the division between rural and urban counties in California's open-carry laws is

23  comparable to divisions in the historical record: individuals were often prohibited from carrying

24  weapons altogether once they entered a town or city.  *Infra* at 17.

25         Similarly, the historical prohibitions on concealed-carry only barred one method of carry,

26  while often permitting another method—the open carry of weapons—in certain contexts,

27  particularly for long-distance travelers.  Today, California only prohibits one method of carry in

28

1    populated areas—the open-carry of firearms, subject to exceptions—while permitting the

2    concealed carry of those weapons in those same areas (and throughout the state).

3         California's permitting scheme for the open carry of weapons in counties with less than

4    200,000 people—including the counties where Plaintiffs reside—imposes comparable burdens as

5    imposed by the historical licensing and permitting schemes, which often acted to restrict outright

6    the public carry of weapons.  For example, one historical scheme permitted open-carry licenses

7    only if required by an individual's occupation, where that individual worked at night and needed

8    to carry a weapon for self-defense.  *Infra* at 15.  Here, individuals in less-populated counties may

9    apply for permits to openly carry firearms.  The requirements are similar, although arguably more

10   flexible, than the historical restriction cited above: here, for example, there is no requirement that

11   an individual have a night occupation.

12        In sum, California's restrictions on the open carry of firearms impose a modest burden on

13   Second Amendment rights, especially as compared to the historical analogues surveyed here.

14                          **b.    Comparable Justification**

15        The modest burdens imposed by California's open-carry laws and its analogues are

16   comparably justified by pressing public-safety concerns.  In response to potential interpersonal

17   violence, population growth, and rapid technological advances in firearms, states and localities

18   acted to restrict or prohibit the open-carry of weapons.  These laws are justified by the public-

19   safety concerns of the threats posed by the open-carry of weapons, when not worn by government

20   officials or officers.  As this Court has observed, the public-carry restrictions are also the state's

21   primary means of limiting public handgun carrying to "'ordinary, law-abiding citizens.'"  ECF 83

22   at 12 (quoting *Bruen*, 142 S. Ct. at 2122).  Individuals who could not obtain a concealed-carry

23   license may seek to "circumvent the state's laws by carrying the same gun openly."  *Id.*

24        In addition, expanding public carry laws beyond the limits recognized in *Bruen* risks public

25   safety.  *See* Raney Decl., pp. 9-10.  *Bruen* held that some level of right-to-carry is required by the

26   Second Amendment, but noted that not *all* right-to-carry is necessary.  *Bruen*, 142 S. Ct. at 2146.

27   Here, California permits the concealed-carry of weapons, but if its open-carry laws were to be

28   invalidated, this would present great danger to the public.  A study using 37 years of FBI crime

                                              19

1   statistics concluded that right-to-carry laws "are associated with *higher* rates of overall violent

2   crime, property crime, or murder."  ECF 69-1 at 28 (emphasis in original).  Other studies have

3   shown similar correlations between right-to-carry laws and the increase in violent crime.  *See*

4   ECF 69-1 at 100; *Gould v. Morgan*, 907 F.3d 659, 671, 675 (1st Cir. 2018) (collecting additional

5   studies).  If this Court were to expand California's public-carry laws beyond what already is in

6   place, public safety would be at great risk.

7          In addition, the open-carry of weapons in particular creates special risks, including to police

8   and other law enforcement officials.  When law enforcement responds to an active shooter,

9   carrying of firearms by other individuals can have deadly consequences, including by delaying

10  first responders.  Raney Decl., p. 8.  When police officers respond to reports that there is a "man

11  with a gun," or encounter an armed civilian on the streets, they often know little about the

12  person's intent or mental state, or whether the person is authorized to carry a gun.  *Id.* at 7.

13         As with California's restrictions on public-carry, the historical analogues surveyed by

14  Defendant were similarly enacted in response to public-safety dangers at the time.  As today,

15  governments hoped to curb crime and maintain the peace.  *See, e.g.,* Spitzer Decl., Ex. E, p. 37

16  (1883 Maine law prohibiting the public carry of any weapon without just cause as requiring

17  penalty to "keep the peace").  In addition, as today, the open-carry of weapons was permissible

18  for government officials or officers of the law, but not acceptable elsewhere, and restrictions

19  ensured that only those with the proper authority could openly carry weapons.

20         In sum, California's restrictions on the open-carry of weapons are consistent with the

21  Nation's tradition of firearms regulation, including the "how' and "why" of relevantly similar

22  analogues.  Accordingly, they do not violate the Second Amendment.

23                                    **CONCLUSION**

24         For the foregoing reasons, the Court should enter summary judgment in favor of Defendant.

25

26

27

28

20

Dated:  August 18, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General


*s/ Lara Haddad*
LARA HADDAD
Deputy Attorney General
*Attorneys for Defendant Rob Bonta,*
*in his official capacity as Attorney General*
*of the State of California*

21

# CERTIFICATE OF SERVICE

Case Name: **Baird, Mark v. Rob Bonta**          No.    **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>August 18, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 18, 2023</u>, at Los Angeles, California.


|  Lara Haddad  |  *Lara Haddad*  |
| :---: | :---: |
| Declarant | Signature |

SA2019101934
66172195.docx