1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   R. MATTHEW WISE, State Bar No. 238485
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone:  (916) 210-6046
6     Fax:  (916) 324-8835
      E-mail:  Matthew.Wise@doj.ca.gov
7   *Attorneys for Defendant Attorney General Rob Bonta*

8

9                  IN THE UNITED STATES DISTRICT COURT

10                FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

14  | **MARK BAIRD and RICHARD GALLARDO,** | Case No. 2:19-cv-00617-KJM-AC |
    |---|---|

**MARK BAIRD and RICHARD GALLARDO,**

                                    Plaintiffs,

                v.

**ROB BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,**

                                    Defendants.

Case No. 2:19-cv-00617-KJM-AC

**EXPERT DECLARATION AND REPORT OF PROFESSOR SAUL CORNELL, PH.D.**

Dept:        3
Judge:       Hon. Kimberly J. Mueller

Trial Date:  None set
Action Filed:  April 9, 2019

21

22

23

24

25

26

27

28

                                1

I, Dr. Saul Cornell, declare as follows:

1.     I am the Paul and Diane Guenther Chair in American History at Fordham University in New York City. Counsel of record for Defendant California Attorney General Rob Bonta asked me to offer an expert opinion in the above-entitled case. I have personal knowledge of the matters set forth herein and would so testify.

## I.     OPINIONS AND THE BASES FOR EACH OPINION

2.     Counsel for Defendant has previously asked me to express opinions about the history of open carry restrictions in England and America.  Attached hereto is my updated expert report, in which I provide my opinions and the bases of those opinions, including taking into account recent U.S. Supreme Court precedent.

3.     In my report, I cite to the scholarly articles, laws, and related materials on which I based my opinions.

## II.     BACKGROUND AND QUALIFICATIONS

4.     My scholarship on the regulation of firearms has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in the *Oxford Companion to the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding Era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[1]  In addition to teaching constitutional history at Fordham College, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on this topic at Yale Law

---

[1] Saul Cornell, "The Right to Bear Arms," THE OXFORD HANDBOOK OF THE US CONSTITUTION, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759; Saul Cornell and Gerald Leonard, "Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008). *See also* Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS 73 (2020); Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

1  School, Harvard Law School, Stanford Law School, UCLA Law School, the University of

2  Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford,

3  Robinson College, Cambridge, Leiden University, and McGill University.[2]

4  **III.   COMPENSATION**

5       6.     I am being compensated for services performed in the above-entitled case at an

6  hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports, $750

7  an hour for testimony and depositions, and $100 an hour for travel time.  My compensation is not

8  in any way dependent on the outcome of this or any related proceeding, or on the substance of my

9  opinion.

10  **IV.   MATERIALS REVIEWED**

11       7.     Counsel for Defendant provided me with the complaint in this matter, the order

12  denying Plaintiffs' first preliminary injunction motion, briefing in support of and in opposition to

13  Plaintiffs' second preliminary injunction motion, and the declaration of Clayton Cramer in

14  support of Plaintiff's second preliminary injunction motion.  Otherwise, my report is based on my

15  independent research.  Counsel for Defendant did not provide me with any assumptions to be

16  made in preparing my report.

17       I declare under penalty of perjury under the laws of the United States of America that the

18  foregoing is true and correct, to the best of my knowledge, and that this Declaration was executed

19  on June 8, 2023, in Maui, HI.

20

21

22

23  _____

24  　　　　Saul Cornell, Ph.D.

25

26

27  _____

28  　　[2] A full list of invited presentations and scholarly presentations is included in an updated
CV attached to my expert report.

3

Exhibit A

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

## Expert Witness Report of Professor Saul Cornell, Ph.D

### June 9, 2023

**Introduction**

I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of public (also referred to as "open") carry of arms at the national and state levels, with specific attention to California's regulatory history. I have previously provided an expert report on this subject in this matter; this report is a shorter version of that previous report, and is updated in light of the U.S. Supreme Court's decision last year. This updated report does not contradict any of my previous writings. My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts.[1] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in the *Oxford Companion to the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[2] In addition to teaching constitutional history at Fordham College, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on this topic at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University. Thus, my expertise

---

[1] For a list of scholarship activity and court citations, see Attachment A.

[2] Saul Cornell, "The Right to Bear Arms," THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015) at 739-759; Saul Cornell and Gerald Leonard, "Consolidation of the Early Federal System," Chapter 10 of the CAMBRIDGE HISTORY OF AMERICAN LAW (Cambridge University Press, 2008); *see also* Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS 73 (2020); Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004). For a full list of relevant publications over the last decade, see Attachment A.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.

I have provided expert witness testimony (either written or oral) previously in this matter, as well as in the following cases: *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Worth v. Harrington*, No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *B&L Productions, Inc. d/b/a Crossroads of the West v. Newsom*, No. 8:22-cv-01518-JWH (C.D. Cal.); *Renna v. Bonta*, No. 17-cv-00746-JSL-JDE (S.D. Cal.); *Boland v. Bonta*, No. 8:22-cv-01421-CJC-ADS (C.D. Cal.); and *Rupp v. Bonta*, 8:17-cv-00746-JLS-JDE (C.D. Cal.).

In *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. This report explores these issues in some detail. Finally, I have been asked to evaluate the statutes at issue in this case concerning the regulation and restriction of open-carry, particularly regarding their connection to the tradition of firearms regulation in American legal history.

**Summary of Opinions**

Understanding text, history, and tradition require a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding.

It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights claims. In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

survived the American Revolution, but there were important continuities between English law and the common law in America.[3] Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[4] No legal principle was more important to the common law than the concept of the peace.[5] As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[6] Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[7]

In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous terms that there was a "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[8] The dominant

---

[3] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[4] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[5] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[6] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[7] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[8] *District of Columbia v. Heller*, 554 U.S. 570, 626–627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms.  The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012.  It is also possible that the phrase was an example of an archaic grammatical and

3

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[9]

The right of the people to pass laws to promote public health and safety is one of the most fundamental rights in the pantheon of American rights. The idea of popular sovereignty, a core belief of the Founding generation, included a right of legislatures to enact laws to promote the common good. Although modern lawyers and jurists are accustomed to thinking of this concept under the rubric of state police power, the Founding generation viewed it as a right, not a power.[10] The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[11] Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them."[12] Included in this right was the most basic right of all: the right of the people to

_____

rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016).

[9] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S. 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[10] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[11] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[12] *Heller*, 554 U.S. at 634–35; William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

regulate their own internal police. Thus, if Justice Scalia's rule applies to the scope of the right to bear arms, it must also apply to the scope of the right of the people to regulate their internal police, a point that Chief Justice Roberts and Justice Kavanaugh have each asserted in their interpretations of *Heller* and subsequent jurisprudence. The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point.

In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased. Indeed, the individual states exercised their police powers to address longstanding issues and novel problems created by firearms in American society. Over the eighteenth and nineteenth centuries, American regulation increased as states grappled with advances in firearm technology and changes in American society. Regulation touched every aspect of guns from the manufacturing, storage, and sale of gunpowder, to regulating where firearms and other dangerous weapons might be carried in public.

**The Historical Inquiry Required by *Bruen*, *McDonald*, and *Heller***

The United States Supreme Court's decisions in *Heller*, *McDonald*,[13] and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment.  In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[14] Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past.  Similarly, a mechanistic strategy of digital searching for historical gun laws would be incapable of answering the historical inquiries required under *Bruen*.  Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts—how firearms technology has changed, how consumer demand has waxed and waned, and how the people,

---

[13] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

[14] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

5

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

acting through their representatives, respond to societal ills created by those changes.[15]

Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[16]  The Court acknowledged that when novel problems created by firearms are at issue, "a more nuanced approach" is appropriate.[17]  *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[18]  Indeed, such research is still ongoing: new materials continue to emerge; and since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[19]

As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights.[20]  Although "free-standing balancing" by judges is precluded by *Heller*, the plain meaning of the Second Amendment's text recognizes a role for regulation explicitly and further asserts that actions inimical to a free state fall outside of the scope of the right instantiated in the text.[21]  The Second Amendment states:  "A well

---

[15] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[16] *Bruen*, 142 S. Ct. 2111, 2133.

[17] *Id.* at 2132.

[18] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[19] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[20] *Bruen*, 142 S. Ct. at 2131; *Heller*, 554 U.S. at 635.

[21]  *Heller*, 554 U.S. at 635.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II. Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.  Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[22] In Founding-era American English, the word "infringement" meant to "violate" or "destroy." In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying *right*. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.

John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty. Regulation was the

---

[22] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation:  "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

indispensable correlate of rights in Founding era constitutionalism.[23]

Burn's conception of the close connection between liberty and regulation was widely shared by others in the Anglo-American world. Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[24] And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[25] Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[26] Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[27] And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[28]

For the framers, ratifiers, and other relevant legal actors in the Founding era, regulation, including robust laws, was not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[29] As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the

---

[23] *Liberty,* A NEW LAW DICTIONARY (1792); *See  also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[24] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[25] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[26] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[27] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[28] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

[29] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

laws, according as they effect [*sic*] our persons and property."[30] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[31]

The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty are both hard wired into the Amendment's text. The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[32] Rather than limit rights, regulation was the essential means of preserving rights, including self-defense.[33] In fact, without robust regulation of arms, it

---

[30] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[31] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[32] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[33] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017). Campbell's work is paradigm-shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic. This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[34] The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties. Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[35]

In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety. The proper metric for deciding if such laws were constitutional was and remains the same today: whether a regulation infringes on the right protected by the Second Amendment.[36]

**From Muskets to Pistols: Change and Continuity in Early American Firearms Regulation**

Guns have been regulated from the dawn of American history.[37] At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[38] Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[39]

---

[34] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[35] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[36] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[37] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[38] *Id.*

[39] Ruben & Miller, *supra* note 19, at 1.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework. The entire body of the common law was designed to preserve the peace and the right of self-defense existed within this larger framework.[40] Statutory law, both in England and America functioned to further secure the peace and public safety. Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[41] In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[42]

*Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[43] Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[44]

Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem.  In contrast to modern America, homicide was not the problem that government firearm policy

---

[40] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[41] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[42]  *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[43] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[44] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

needed to address at the time of the Second Amendment.[45]

The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[46]  Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region.  The data presented in Figure 1 is based on the pioneering research of Ohio State historian Randolph Roth. It captures one of the essential facts necessary to understand what fears motivated American gun policy in the era of the Second Amendment.  The pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military style weapons which were relatively expensive and had little utility in a rural society.  Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[47] Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life.  Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[48]

Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period.  Eighteenth-century muzzle-loading

---

[45] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[46] It is important to recognize that there were profound regional differences in early America. *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE (1988).  These differences also had important consequences for the evolution of American law.  *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

[47] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[48] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes.  Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge.  Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume.  As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded.  Why do they always show the gun over the fireplace?  Because that's the warmest, driest place in the house."[49]  Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses.  Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[50]



Figure 2.3  Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment.  Nor were guns the primary weapon of choice for those with evil intent during this period.[51] The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that these types of firearms were less likely to be used in

---

[49] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[50] Sweeney, *supra* note 48.

[51] HAAG, *supra* note 44.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

crimes of passion. The preference for storing them unloaded also meant they posed fewer
dangers to children from accidental discharge.

In short, the Founding generation did not confront a gun violence problem similar in nature
or scope to the ills that plague modern America.

**Gun Regulation in the North and South in Antebellum America**

The genius of the common law was its adaptability, and its absorption in America proved
no exception to this general pattern. Following the Founding era, early American firearms law
evolved differently in each of the newly independent states, but important regional patterns also
emerged.[52] Southern slavery was an important contributing factor to this process of regional
differentiation. Indeed, many gun-rights advocates focus primarily on a string of Southern cases
decided by slave-holding judges to ascertain the public meaning of the right to bear arms. Yet
there is broad agreement among historians of early American law that generalizing from a single
region's experiences ignores the diversity of early American law.[53]

The Southern tradition has figured prominently in post-*Heller* scholarship and law, but
despite this fact, there remains considerable confusion about what this tradition embodied. The
distortion of Southern jurisprudence remains one of the most pervasive problems in post-*Heller*
jurisprudence.[54] In the slave South a more expansive view of open carry developed, while
prohibitions on concealed carry, a dastardly and cowardly practice to most Americans in
antebellum America, posed no constitutional problems. In Massachusetts, a different model
emerged and gained judicial notice. This model also expanded the scope of self-defense and gun
rights beyond the narrow confines of English common law, but it did so in a more narrowly

---

[52] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of
Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[53] On the importance of early American regional differences in the evolution of the common law,
see Ellen Holmes Pearson, REMAKING CUSTOM: LAW AND IDENTITY IN THE EARLY AMERICAN
REPUBLIC (2011) (arguing that the American colonists adapted English common law to their
local conditions and that to understand the evolution of common law in America we must
recognize that it evolved among multiple paths of development) and Lauren Benton & Kathryn
Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal
Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[54] Michael O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition
and the Scope of "Bearing Arms" for Self-Defense*, 61 AM. U. L. REV. 585 (2012).

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

tailored fashion than the Southern model. Thus, pre-Civil War American firearms law did not speak with a single voice on firearms; rather, antebellum American law spoke with a different and distinctive regional accent.[55]

Although the concept of a police right did not disappear from American law in the years before the Civil War, this legal concept was slowly overshadowed by an evolving jurisprudence focused on police power.[56] Antebellum jurists developed this body of law to address the complex issues that regulation posed for a rapidly changing society—and no issue was more vexing than firearms regulation. Indeed, the application of the police power to regulating firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in *Brown v. Maryland*, in which the Court observed that "[t]he power to direct the removal of gunpowder is a branch of the police power."[57] The scope of the police power was later analyzed by the Supreme Court in the *License Cases*, where Justice John McClean formulated this guiding principle: "It is not susceptible of an exact limitation but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied."[58] The police power—in particular, the right of the people to regulate themselves in the interest of public safety—was thus dynamic, adaptable to the changing needs of American society.

---

[55] Young v. Hawaii: *Ninth Circuit Panel Holds Open-Carry Law Infringes Core Right to Bear Arms in Public*, 132 HARV. L. REV. 2066, 2070–71 (2019) (discussing the emerging scholarly consensus that history supports "restrictions on concealed and open carry that enjoyed "widespread acceptance" in many states.); James E. Fleming & Linda C. McClain, *Ordered Gun Liberty: Rights with Responsibilities and Regulation* 94 BOSTON UNIV. L. REV. 849 (2014).

[56] *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008); Cornell and Leonard, *supra* note 2.

[57] 25 U.S. (12 Wheat.) 419, 442-43 (1827); *see generally Thurlow v. Massachusetts* (The License Cases), 46 U.S. (5 How.) 504 (1847).

[58] *License Cases*, 46 U.S. (5 How.) at 592.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

One case featured in *Heller*, *State v. Reid* offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[59] The *Reid* Court observed that the state's concealed carry prohibition was a legitimate exercise of police power authority. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[60]

*Reid*, it is worth recalling, was a case in which a sheriff carried a concealed pistol in violation of Alabama's prohibition on public carry of arms. The fact that a peace officer was prosecuted for carrying a weapon might seem odd given that police in modern America are typically armed with guns. This was not the case for the first half century after the adoption of the Second Amendment and its state analogues. It is also vital to read *Reid* against the background of an inherited common law tradition. "If the emergency is pressing," the *Reid* Court declared, "there can be no necessity of concealing the weapon, and if the threatened violence will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail."[61] But the *Reid* Court rejected the idea of permissive public carry.[62] *Reid* acknowledged a fact that many modern gun rights activists and some judges have ignored—the imposition of a peace bond was central to the powers of justices of the peace, constables, and sheriffs, who all continued to function as conservators of the peace under American law. The appropriate legal response to the danger posed by someone traveling armed in public was to impose a peace bond, a surety of the peace. Only if circumstances precluded following this course of action would a sheriff be justified in arming—and in that case, the correct decision was not to carry the weapon concealed but in the open.

---

[59] *See generally State v. Reid*, 1 Ala. 612 (1840).

[60] *Id.* at 616.

[61] *Reid*, 1 Ala. at 621.

[62] *Id.* (noting that the state constitutional right to bear arms "neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guaranteed to the citizen, is not to bear arms upon all occasions and in all places . . . .")

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

**Reconstruction, the Progressive Era, and the Rise of the Modern Regulatory State**

The Civil War and post-War developments had a profound impact on gun culture in American and the legal response to the proliferation of arms. Rather than mark an end to robust regulation of public carry, Reconstruction witnessed an intensification of such efforts. Republicans sought to protect the rights of African Americans to bear arms, but were equally insistent on enacting strong racially neutral regulations aimed at public safety.[63] Indeed, the necessity of racially neutral gun regulations of this sort eventually was recognized by both Republicans and Democrats in Texas, a state in which paramilitary violence threatened public order and post-war stability.[64] In *English v. State*, the Texas Supreme Court confidently affirmed that restrictions on public carry were "not peculiar to our own State."[65] Indeed, it concluded that "it [was] safe to say that almost, if not every one of the States of this union [had] a similar law upon their statute books, and, indeed, so far as we [had] been able to examine them, they [were] more rigorous than the act under consideration."[66] Even after the adoption of the Fourteenth Amendment, the court reasoned that good cause laws were entirely consistent with protections for the right to bear arms.[67]

The most important regulations on public carry were bans on concealed carry. An Evanston, Illinois ordinance was typical: "It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol,

---

[63] For a discussion of the importance of such broad racially neutral laws aimed at demilitarizing the public sphere, see Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. F. 238 (2014).

[64] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900* 121 SOUTHWESTERN HISTORICAL QUARTERLY 284 (2020).

[65] *English v. State* 35 Tex. 473, 479 (1871).

[66] *Id.*

[67] For a discussion of this case in the context of Reconstruction, see Frassetto, *supra* note 50 at 113–17 (2016).

colt or slung shot."[68] States in every region of the nation adopted similar bans.[69] Some localities enacted more stringent bans on public carry.[70] Nashville, Tennessee passed a comprehensive ban on public carry in 1873:

> Section 1:  That every  person  found  carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or  other  deadly weapon,  shall be  deemed  guilty of a misdemeanor, and,  upon  conviction of such  first offense, shall be fined  from ten to fifty  dollars, at the discretion of  the  court,  but  upon  conviction of every  such subsequent offense, shall be  fined  fifty   dollars; Provided, however, That no ordinary pocket knife and common  walking-canes shall  be  construed  to  be  deadly weapons.[71]

By the end of the century, Americans residing in urban areas, particularly those dwelling in the nation's most populous cities, were likely to be living under some form of restrictive public carry legal regime: bans on concealed carry, good cause permit schemes, or broad restrictions on public carry with good cause and affirmative self-defense exceptions.[72]

The rise of permit schemes reflected profound changes in both the law and the nature of law enforcement.[73] The traditional surety model of enforcing the peace was rooted in common

---

[68] George W. Hess, *Revised Ordinances of the City of Evanston: Also Special Laws and Ordinances of General Interest*, at 131-132 (1893).

[69] 1871 Ky. Acts 89, An Act to Prohibit the Carrying of Concealed Deadly Weapons, ch. 1888, §§ 1-2, 5; 1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefor, § 1; 1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

[70] Ordinance No.  9: Carrying Deadly Weapons, Jan. 28, 1873, reprinted in ARIZONA CITIZEN, Feb. 8, 1873, at  2 (Tucson, Arizona); An Ordinance to Prevent the Carrying of Concealed Weapons, Feb. 4, 1882, reprinted in THE WORTHINGTON ADVANCE, Feb. 9, 1882, at 3 (Worthington, Minnesota); An Ordinance Prohibiting the Unlawful Carrying of Arms, May  4, 1880, reprinted in DAILY DEMOCRATIC STATESMAN, May 9, 1880, at 2 (Austin, TX).

[71] Chapter 108:  Carrying Pistols, Bowie-Knives, Etc., Dec.  26, 1873, reprinted in ORDINANCES OF THE CITY OF NASHVILLE 340-41 (William K. McAlister, Jr. ed., 1881).

[72] See John Forrest Dillion*, The Right to Keep and Bear Arms for Public and Private Defense*, 1 CENT. L.J. 259 (1874); 3 THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 408 (1887). For modern confirmation of these assessments, see Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights* 80 *Law and Contemporary Problems* 55, 68 (2017).

[73] On the transformation of American law and the rise of the modern regulatory state, see William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061 (1994); Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

law and reflected the realities of life in the early modern Anglo-American world. This approach was well suited to a pre-industrial society in which members of the local gentry elite could count on the mechanisms of deference and a web of patron-client relationships to help them maintain social order.[74] Slowly over the course of the nineteenth century, as America modernized, urbanized, and became a more diverse and highly mobile society, traditional community-based mechanisms of law enforcement eroded. Sureties were less effective at securing the peace in America's growing metropolitan cities. New institutions and processes were necessary to police large, heterogeneous cities. Professional police forces, special police courts, and new administrative agencies were better suited to maintaining social order and the peace in the urban world of nineteenth-century America.[75] Thus, by end of the nineteenth century, permit schemes that took advantage of these new institutions and practices had largely supplanted the traditional common law mechanisms of sureties or peace bonds as the dominant method for dealing with the dangers posed by gun violence.

      The culmination of this process of enforcing the peace in modern America occurred in the Progressive era with the enactment of New York's Sullivan Law, a comprehensive gun control measure that imposed limits on both the sale and ability to carry arms in public.[76] The adoption of this law ushered in a wave of similar laws by states and localities.[77] In contrast to

---

301 (2015); Herbert Hovenkamp, *Appraising the Progressive State* 102 IOWA L. REV. 1063 (2017).

[74] Steve Hindle, *supra* note 61, at 100.

[75] Eric H. Monkkonen, AMERICA BECOMES URBAN: THE DEVELOPMENT OF U.S. CITIES AND TOWNS, 1780-1980. at 98-108 (1995).

[76] For the historical context of the enactment of the Sullivan law, see Alexander Deconde, GUN VIOLENCE IN AMERICA: THE STRUGGLE FOR CONTROL (2001).

[77] 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 1, § 3-A, § 4, § 4-A, § 4-B, § 4-C; 917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state;

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

earlier efforts at regulating public carry that relied on common law tools such as sureties of the peace and good behavior, the new modern regulatory model employed license and permitting schemes, an approach to regulation consistent with other reform efforts during the Progressive era. In addition to limits on pistols, several states enacted new laws banning dangerous and unusual weapons, most notably machines guns and some semi-automatic weapons.[78]

**Public Carry Limits in California in the Era of the Fourteenth Amendment**

California embraced the new model of gun regulation. Although a potent mythology about guns in the American West has defined popular culture since the region was settled, the historical reality is far more complex than dime novels and Hollywood movies suggest.[79] Guns were an important part of the western experience, but the region also enacted some of the most robust firearms' regulations in American history.[80] California was no exception to this general pattern.[81]

The law adopted by Los Angeles illustrates the region's commitment to enacting broad gun regulations.  The ordinance adopted was comprehensive in scope, and it prohibited public carry, "concealed or otherwise." It also gave the Mayor some discretion in prosecuting violators, although it did not establish a formal permit scheme.

> [N]o persons, except peace officers, and persons actually traveling, and
> immediately passing through Los Angeles city, shall wear or carry any dirk,
> pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon,
> concealed or otherwise, within the corporate limits of said city, under a penalty of

---

providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, §§ 3-4; 1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: § § 1, 4, 5 and 6.

[78] *See, e.g.*, An Act to amend the penal law, in relation to the sale and carrying of dangerous weapons, 1911 N.Y. LAW S Ch. 195. For a general discussion of the expansion of regulation after the passage of the Sullivan Act, see Spitzer, *supra* note 83.

[79] Karen Jones & John Wills, THE AMERICAN WEST: COMPETING VISIONS, at 69 (2009); Richard Slotkin, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH CENTURY AMERICA (1992).

[80] Adam Winkler, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (2011).

[81] *See* Exhibit 1.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

not more than one hundred dollars fine, and imprisonment at the discretion of the
Mayor, not to exceed ten days. It is hereby made the duty of each police officer of
this city, when any stranger shall come within said corporate limits wearing or
carrying weapons, to, as soon as possible, give them information and warning of
this ordinance; and in case they refuse or decline to obey.[82]

Sacramento enacted a permit ordinance for public carry in 1876.[83] Ordinance No. 84
prohibited concealed carry without a permit. The punishment for violating the law was a steep
fine. The law also made clear that the primary justification for arming was job-related travel at
night:

> Section 1:    It shall be unlawful for any person, not being a public officer or traveler, or
> not having a permit from  the  Police Commissioners of the City of Sacramento, to wear
> or carry, concealed, any pistol, dirk, or other dangerous or deadly weapon.
>
> Section 2:    Any person violating the provisions of this ordinance shall be punished by a
> fine not exceeding five hundred dollars, or by imprisonment in the city prison not
> exceeding ten days, or by both such fine and imprisonment.
>
> Section 3:    The Police Commissioners of the City of Sacramento may grant written
> permission to any peaceable person, whose profession or occupation may require him to
> be out at late hours of the night, to carry concealed deadly weapons for his protection.

The list of municipalities that followed the lead of Sacramento grew in the ensuing decades,
included tiny towns such as Lompoc, and the state's largest city San Francisco.  Table 1 lists some
of the municipalities that adopted permit schemes between 1876-1892.[84]

Table 1: Municipal Permit Schemes in California, 1876-1892[85]

---

[82] Ordinances of the City of Los Angeles, § 36, William. M. Caswell, *Revised Charter and
Compiled Ordinances and Resolutions of the City of Los Angeles* 85, (1878)

[83] Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876,
reprinted in CHARTER AND ORDINANCES OF THE CITY OF SACRAMENTO 173 (R.M.
Clarken ed., 1896) (Sacramento, California).

[84] Research on this topic is still ongoing and this list is not exhaustive, but a summary of what is
known based on existing scholarship.

[85] For the full text of these local permit ordinances, see Exhibit 1. Information on population
statistics may be found in *Population of the 100 Largest Cities and Other Urban Places in the
United States: 1790 to 1990*, Working Paper No. 27, *available at*
https://www.census.gov/library/working-papers/1998/demo/POP-twps0027.html, and *Twelfth
Census of the Unites States – Population of California by Counties and Minor Civil Divisions*,

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

| Location | Year |
|---|---|
| Sacramento | 1876 |
| Napa | 1880 |
| San Francisco | 1880 |
| Santa Barbara | 1881 |
| Alameda | 1882 |
| St. Helena | 1884 |
| Fresno | 1885 |
| Lompoc | 1888 |
| Marysville | 1889 |
| Oakland | 1890 |
| Monterey | 1892 |

The dawn of the new century did little to diminish California's interest in enacting strong gun regulations.[86] A 1917 state law extended the limits on concealed carry in urban areas to include "the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person." It also provided "for the destruction of certain dangerous weapons as nuisances."[87] The state enacted a comprehensive ban on machine guns in 1927.[88]

Gun regulations in California in subsequent decades of the twentieth century remained robust. Local and state governments responded to the problems posed by gun violence by

---

Census Bulletin No. 10, Washington, D.C., October 24, 1900, *available at* https://www.census.gov/library/publications/decennial/1900/bulletins/demographic/10-population-ca.pdf. If one calculates the number of municipalities that enacted such laws and compares that figure to the population of the state, more than half the state was living under a regulatory scheme that required permits to travel, or banned travel except for limited exceptions.

[86] Spitzer, *supra* note 83, at 55.

[87] 1917 Cal. Sess. Laws 221-225, §§ 3-4 ("An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another.")

[88] An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Cal. Stat. 938, ch. 552, §§ 1–2 (1927); Spitzer, *supra* note 83.

enacting new laws when necessary. Perhaps the most well-known and controversial example of such a regulation was the adoption of the Mulford Act shortly after the Black Panther Party staged a high-profile protest that included a prominent open carry display.  In response to this action, California adopted a new more restrictive law prohibiting open carry.[89] Some gun-rights advocates have cited this incident to argue that all gun regulation is inherently racist, a dubious historical claim that conflates different periods of gun regulation from different regions of the nation with the history of the Jim Crow South and the experience of the Black Panthers during the tumultuous social unrest of the 1960s.[90] The decision of civil rights activists to arm themselves in the Jim Crow South and the actions of the Panthers reflected local circumstances. These examples do not demonstrate the existence of a broad national consensus on the right of peaceful public carry, nor do they show that all efforts at gun regulation are inherently racist. What these examples show is that in situations where racially motivated interpersonal violence is common, state-sanctioned terrorism is accepted, and general lawlessness is tolerated, individuals and communities have responded by arming themselves.  Generalizing from the facts on the ground in these situations is therefore both problematic and perilous. The Jim Crow South hardly serves as a paradigmatic example of how government and law should be structured in America. Gun laws in this region were notoriously lax, and enforcement of the few gun laws that did exist was overtly discriminatory. Local police forces were closely connected to white supremacist organizations such as the Ku Klux Klan and made little effort to enforce laws in neutral manner. Given these historical facts, claims that open-carry practices during this period in this region shed light on public carry in California today are misplaced and misleading.

The next major turning point in the debate over firearms regulation in California was the ban on "assault weapons" enacted after the Stockton School Massacre.[91] This moment in the

---

[89] Adam Winkler, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (2011); Katherine J. King, *Heller As Popular Constitutionalism? The Overlooked Narrative of Armed Black Self-Defense*, 20 U. PA. J. CONST. L. 1237 (2018).

[90] Patrick J. Charles*, Racist History and the Second Amendment: A Critical Commentary*, 43 CARDOZO L. REV., (2022, forthcoming).

[91] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut and Collin M. Carr , *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

struggle between gun rights and gun regulation typified a more general historical phenomenon: a cycle of tragedy, outrage, regulation, and backlash. The politics of modern gun regulation in recent years have followed this predictable cycle: sensational shootings (typically mass shootings) prompt new legislation, an increase in firearms sales, and a rise of gun-rights activism. If history is any guide to future practices and controversies, it appears likely that the same pattern of violence, legislation, and litigation will continue into the foreseeable future. This pattern continues to define much of the modern gun debate in America, including the debate within California.

One final point about history and firearms regulation is worth noting. Gun regulation and gun rights have been closely connected for most of American history: laws are enacted when a particular firearms technology achieves sufficient market penetration to create a new social problem requiring legislative intervention. The enactment of new laws often produces litigation, and courts either defer to the legislature, or in rare cases, strike down these laws as impermissible violations of the right to bear arms. There is usually a lag between the time when a technological innovation incorporated into a new type of firearm generates enough enthusiasm among gun owners to cause a rise in sales. Thus, until a particular gun achieves a certain level of popularity, it is unlikely to become associated with criminal or anti-social behavior. Legislatures and courts must then play catch-up to address the impact of such weapons and enact laws to address negative consequences.[92]

**Conclusion**

Limits on armed travel in public, including open carry, are of ancient vintage, stretching back deep into Anglo-American law. In England prior to colonization, the public carry of firearms was generally prohibited in populous areas, with limited exceptions for community defense and law enforcement, and with a legally sanctioned exception for the gentry elite. There

---

(2020); Antonis Katsiyannis, Denise K. Whitford, Robin Parks Ennis, *Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society*, 27 JOURNAL OF CHILD AND FAMILY STUDIES 2562 (2018).

[92] As Robert Spitzer notes, "So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted." *See supra* note 83 at 55, 68.

*Baird v. Bonta*
No. 2:19-cv-00617-KJM-AC

is no historical evidence of an individual right for ordinary Britons to openly carry weapons outside of a narrow range of exceptions. In the United States, limitations on the open carry of weapons in populous areas were common in the Founding era and throughout the nineteenth century. While some states recognized an individual right to openly carry firearms for specific purposes, this view was largely restricted to the white citizens of slave-holding Southern states. In other parts of pre-Civil War America, there was a more limited right to carry for reasons of self-defense when a specified threat existed. During the era of the Fourteenth Amendment, the level of firearms regulation intensified. States and localities enacted a variety of limits on public carry, including bans on open carry, concealed carry, and permit schemes. Changes in law enforcement and the administration of justice, particularly in urban areas, produced greater convergence in the approach to firearms regulation than had been possible in antebellum America. By the end of the century, good cause permitting had emerged as the dominant model for regulating arms in public. In short, history supports robust regulation of public carry of firearms, including discretionary permit schemes tied to good cause requirements.

Signed:

_____

Dr. Saul Cornell

25

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✱ Bronx, NY 10458 ✱ 203 826-6608 (c) ✱ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
  2006 Pulitzer Nomination, History
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book
- 2000 Pulitzer Nomination History

| **Book Publications** |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55* University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*, 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and *C*ontemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The  1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique,"  Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story" American Quarterly</u> (1998): 349-357

"The Anti-Federalists," in  <u>The Blackwell Companion to American Thought</u>, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u>New York in the Age  of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

## Book Reviews:

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>American Studies</u> <u>Journal of the Early Republic</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>American Quarterly</u>
- <u>American Journal of Legal History</u>
- <u>Law and History Review</u>

## Journal Manuscript Referee:

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>Diplomatic History</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>Law and History Review</u>
- <u>Harvard Law Review</u>
- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**<u>Interviews, Editorials, Essays, Podcasts:</u>**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
      SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

United States of America,  v. Graylan Steve Johnson,United States District Court, S.D. Florida. February 20, 2023 Slip Copy 2023 WL 2308792

United States v. Posey, United States District Court, N.D. Indiana, Hammond Division. February 09, 2023 Slip Copy 2023 WL 1869095

United States v. Combs, United States District Court, E.D. Kentucky, Central Division., (at Lexington). February 02, 2023 Slip Copy 2023 WL 1466614

United States v. Barber, United States District Court, E.D. Texas, Sherman Division. January 27, 2023 Slip Copy 2023 WL 1073667

Range v. Att'y Gen. United States, No. 21-2835, 2022 WL 16955670 (3d Cir. Nov. 16, 2022).

Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).

United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022).

United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022)
.
United States v. Medrano, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122650

United States v. Coleman, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122401

United States v. Goins, United States District Court, E.D. Kentucky, Central Division., Lexington. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17836677

Reese v. Bureau of Alcohol Tobacco Firearms & Explosives, United States District Court, W.D. Louisiana, Lafayette Division. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17859138

South Bay Rod & Gun Club, Inc. v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811113

Miller v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811114

Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022).

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:
Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th  Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th  Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]


## Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).


## Law Review Symposia Organized

**Second Amendment:**

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

**New Originalism:**

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).

# CERTIFICATE OF SERVICE

Case Name:  **Baird, Mark v. Rob Bonta**          No.    **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>August 18, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## EXPERT DECLARATION AND REPORT OF PROFESSOR SAUL CORNELL, PH.D.

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 18, 2023</u>, at Los Angeles, California.

|  |  |
|---|---|
| Lara Haddad | *Lara Haddad* |
| Declarant | Signature |

SA2019101934
66168201.docx