1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  LARA HADDAD
   Deputy Attorney General
4  State Bar No. 319630
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6250
6    Fax:  (916) 731-2124
     E-mail:  Lara.Haddad@doj.ca.gov
7  *Attorneys for Defendant Attorney General Rob
   Bonta*

8                IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **MARK BAIRD and RICHARD GALLARDO,**          2:19-CV-00617-KJM-AC

14                               Plaintiff,      **EXPERT REPORT AND
                                                 DECLARATION OF FORMER COVINA**
15         v.                                    **CHIEF OF POLICE KIM RANEY**

16

17  **ROB BONTA, in his official capacity
    as Attorney General of the State of**
18  **California, and DOES 1-10,**

19                               Defendants.

20

21

22

23

24

25

26

27

28

                                    1

### EXPERT REPORT AND DECLARATION OF KIM RANEY

I am a retired Chief of Police of the Covina (California) Police Department. Counsel for Defendant Attorney General of California Rob Bonta has asked me to offer an expert opinion in the above-entitled case. I have previously submitted an expert report in this matter; this report contains the same substance as the previously-submitted report, and contains non-substantive edits.

## I.   BACKGROUND AND QUALIFICATIONS

In October 2016, I retired as the Chief of Police for the Covina Police Department (Department), after 39 years of law-enforcement service. I served as Chief of Police for 15 years, as a Captain for one year, as a Lieutenant for 10 years, as a Sergeant for seven years, and as a police officer for six years. I also served as interim city manager of the City of Covina for four months.

As Chief of Police, I was responsible for the delivery of public-safety services to a community of 50,000 residents, and the leadership of 100 employees of the Department. This work included compliance with all local, state, and federal mandates, and enforcement and implementation of existing and new policies, as well as ensuring that the Department was a leader in engaging with emerging issues or trends in the criminal-justice system. I was Chief of Police on December 24, 2008, when nine family members in my community were shot and killed at a family holiday celebration, and I provided leadership to the community during this tragedy.

As a Captain, I was responsible for the Department's Administrative Division, which included oversight of detectives, the 9-1-1 communications center, custody of suspects, and property/evidence.

As a Lieutenant, I served as a watch commander overseeing patrols on a daily basis, as well as the auditing, training, and compliance for Department employees. I also supervised the Detective Division, which was accountable for investigating all crimes reported to the Department. I also helped to create and supervise a

regional mutual-aid platoon comprised of 56 officers from 15 area police departments, responsible for activation and deployment in response to any regional emergency or disaster.  This work included the creation of a policy manual and activation protocols, and coordination of the training for over 100 police officers in topics such as riot response, crowd control, and command-and-control for team leaders.

As a Sergeant, I was responsible for the first-line supervision of police officers and detectives, including tactical leadership on critical service calls, daily training, evaluation of employees, and supervision of the field training program.

As a police officer, I was a first responder to all public-safety calls for service. When assigned as a detective, I worked narcotics investigations, regional surveillance, and undercover operations.

I am Past President of the California Police Chiefs Association.  In my role with the California Police Chiefs Association, I spent five years on the Executive Board of Directors, culminating in my service as President in 2013.  I was involved in discussions with state and local elected officials on all major legislative or ballot propositions involving law enforcement, including meetings with the Governor and Attorney General on major public-safety issues, legislation, and initiatives.  I am also Past President of the Los Angeles County Police Chiefs Association.  I was one of two California police chiefs to serve on the Stanford Executive Session on Public Safety Realignment, which refers to legislation passed in 2011, and sometimes known as Assembly Bill 109, that shifted responsibility for monitoring, tracking, and incarcerating non-serious, non-violent, non-sex offenders from California state to the counties.  A report based on the Executive Session's work was submitted to the California State Legislature and the Governor, and is available on the Internet at the following link:  https://law.stanford.edu/wp-content/uploads/2015/10/ES-Consensus-Report-final-report.pdf.

1      From 2013-2015, I served on the Executive Steering Committee for the
2    California Board of State and Community Corrections, which committee was
3    tasked with creating a new definition of the term "recidivism" for statewide use,
4    pursuant to Assembly Bill 1050.

5      More generally, I have lectured to law-enforcement leaders and elected
6    officials throughout California and the United States on issues such as leading a
7    community in dealing with a mass shooting, the decriminalization of marijuana and
8    its impact on communities, and public-safety realignment (Assembly Bill 109) in
9    California.

10      I have received numerous awards throughout my career, including the Joe
11    Malloy Award, the most prestigious award that the California Police Chiefs
12    Association presents.  This award is presented to one California police chief every
13    year, and is bestowed based upon the recipient's professionalism, leadership, and
14    contributions to and impacts on the profession of law enforcement.

15      I have a Bachelor of Science Degree in Organizational Leadership from Azusa
16    Pacific University.  I have a certificate for completing an eight-month law-
17    enforcement-oriented program at the University of Southern California School of
18    Public Policy, as well as a certificate for completing 40 hours of training at the FBI
19    Southwest Command College.

20      A copy of my current resume is attached to this declaration as Exhibit A.  This
21    lists all publications, including those publications authored by me within the last ten
22    years.  This includes an article that I wrote for the International Association of
23    Chiefs of Police, titled "Proposition 19:  California's Marijuana Legalization
24    Debate," which appeared in the October 2010 issue of *The Police Chief Magazine*.
25    A portion of this publication is available on the Internet at the following link:
26    http://www.policechiefmagazine.org/proposition-19-californias-marijuana-
27    legalization-debate.

28

I have testified as an expert in depositions or at trial in the following cases: *Flanagan v. Becerra* (C.D. Cal. No. 2:16-cv-06164-JAK-AS), *Forsyth, Holliday, and Shea v. City of Buena Park Police Department* (Orange County Super. Ct. BU010-037), *Moreno, et al. v. City of Beverly Hills* (Los Angeles Super. Ct. BC687003), and in this matter, *Baird v. Bonta* (E.D. Cal. No. 2:19-00617-KJM-AC.  I have also provided a written expert report in *Nichols v. Newsom* (C.D. Cal. No. 11-cv-09916-SJO-SS).

I am being compensated for services performed in the above-entitled case at an hourly rate of $250 for reviewing materials, participating in meetings, and preparing reports, and $350 for depositions and court appearances (including travel time).  My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

**Materials Reviewed**

Counsel for Defendant has provided me, and I have reviewed, the relevant pleadings in the above-entitled case.

I prepared an expert report in *Flanagan v. Becerra* (ECF No. 45-13) that is substantially similar to this declaration.  In the course of preparing that report, I reviewed the following materials:

- Papers filed in *Flanagan v. Becerra* (C.D. Cal. No. 2:16-cv-06164-JAK-AS):  Complaint for Declaratory and Injunctive Relief (ECF No. 1); Notice of Motion and Motion to Dismiss Complaint for Declaratory and Injunctive Relief (ECF No. 24).
- Papers filed in this matter, *Nichols v. Brown* (9th Cir. No. 14-55873): Appellees' Brief (ECF No. 36-1); Brady Center to Prevent Gun Violence's Motion for Leave to File Amicus Brief in Support of Defendants-Appellees (ECF No. 41-1); Motion for Leave to File Brief of Amicus Curiae Law Center to Prevent Gun Violence in Support of Appellees and Affirmance (ECF No. 44-1).

- Manny Fernandez, Alan Blinder, and David Montgomery, "Texas Open-Carry Laws Blurred Lines Between Suspects and Marchers," *N.Y. Times*, July 10, 2016.
- California Penal Code sections 25400, 25600, 25605, 25655, 25850, 26150, 26155, 26160, 26165, 26170, 26350, 26361, 26362, 26364, 26366, 26377, 26378, 26383, 26389, 26400, and 26405.
- Analyses of Assembly Bill 144 (2011-2012 Reg. Sess.):  Assembly Public Safety Committee Analysis (Apr. 12, 2011); Senate Public Safety Committee Analysis (Jun. 7, 2011); Senate Floor Analysis (Jun. 28, 2011).[1]
- Analyses of Assembly Bill 1527 (2011-2012 Reg. Sess.):  Assembly Public Safety Committee Analysis (Mar. 27, 2012); Assembly Appropriations Committee Analysis (Apr. 18, 2012); Senate Public Safety Committee Analysis (June 26, 2012); Senate Floor Analysis (Aug. 23, 2012).[2]
- San Mateo County Sheriff's Office, "Unloaded Open Carry" (Jan. 14, 2010).

Other than these materials, the materials that I have relied upon are cited in the notes accompanying the text of this report.

**Opinions**

Counsel for Defendant has asked me to express opinions on how restrictions on the open carry of firearms affect public safety.  My overall opinion on this question is that restrictions on the open carry of firearms greatly enhance public safety.

From a law-enforcement perspective, the restrictions on the open carry of firearms in California have been critical to the safety of law-enforcement officers,

---

[1] Available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201120120AB144.

[2] Available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201120120AB1527.

our communities, and those people who would want to openly carry firearms in public. Law-enforcement officers are taught that guns can be a dangerous and deadly threat to their safety and the safety of the public they serve. Throughout a police officer's career, his or her training emphasizes officer-safety tactics that place the officer in positions of advantage when dealing with incidents involving firearms. Police officers understand that any encounter involving a firearm can be both dangerous and grave. When police respond to a "man with a gun" call, officers typically are responding to a situation about which they have few details, other than that a person is at a location; the person is armed; and perhaps a description of the person. At least two police officers will be dispatched to each of these types of calls, which are of the highest priority. Upon arrival, the officers must rapidly assess the armed person's behavior in regards to the public's safety, the armed person's safety, and the officers' own safety. The officers may have no idea about the armed person's motives, intent, mental condition, or emotional stability. The armed person's behavior and ability or failure to comply with law enforcement's instructions will have great bearing on the outcome of the contact. Should the armed person fail to comply with an officer's instructions or move in a way that could be construed as threatening, the results could be deadly.

In the event of a call for service regarding a violent crime involving a firearm, an environment that allows the open carry of firearms complicates the police response, and could unnecessarily divert critical police resources from the primary event. On a call about an armed robbery, officers will be given the location of the event as well as a description of the suspect, if that information is obtainable from any witnesses. Any person in, around, or leaving the area of the crime who matches the description provided has a high likelihood of being detained by responding law-enforcement personnel. The current restrictions on open carry in California help ensure that law-enforcement resources are not unnecessarily

1  diverted or distracted by people who are in the vicinity and carrying firearms, and

2  may generally match the description provided by witnesses.

3      When police officers encounter a person with a firearm, even one that may be

4  legally possessed, officers usually have few details to help them quickly determine

5  the armed person's intent or whether that person is a threat to the officer, the public,

6  or the armed person.  Split-second decisions sometimes have to be made, and

7  unintended consequences can and do occur.  The split-second decision police

8  officers have to make may be judged by other people who have the luxury of time,

9  additional information, and a controlled environment that the police officers did not

10  have.

11      In the event of an active shooter, the presence of civilians openly carrying

12  firearms has the potential to create deadly scenarios, as well as delaying first

13  responders from the primary mission, to stop the shooter and save lives.  As

14  appropriately stated by Dallas Chief of Police David Brown in the aftermath of an

15  active shooter in Dallas at a community protest that included the presence of openly

16  carrying civilians—where the shooter caused the deaths of five police officers and

17  the wounding of nine officers and two civilians—"We don't know who the good

18  guy is versus the bad guy when everyone starts shooting."[3]

19      The criminal-justice system in California is currently recalibrating itself, and

20  law-enforcement resources are both limited and at a premium.  After years of

21  declining crime rates, violent crime in California has ticked upward in recent

22  years.[4]  This trend requires law-enforcement resources to be reevaluated and

23  deployed for maximum effectiveness in their communities, to slow or stop this

24  troubling trend.  In addition, law-enforcement officers have increasingly become

25  _____

26  [3] Molly Hennessy-Fiske, "Dallas Police Chief: Open Carry Makes Things
   Confusing During Mass Shootings," *Los Angeles Times* (Jul. 11, 2016).

27  [4] Public Policy Institute of California, "Crime Trends in California" (Aug. 2016),
   This study defines "violent crimes" as "homicide, rape, robbery and aggravated
28  assault."  *See* https://www.ppic.org/data-set/crime-rates-in-california/.

1    the safety net and first responders for a myriad of social issues, including

2    homelessness and mental-health calls for service.  The restrictions currently in

3    place on the open carry of firearms ensure that critical law-enforcement resources

4    are not being diverted for unnecessary calls for service at incidents of the public

5    display of firearms, which incidents, again, would receive a priority response

6    involving multiple officers.

7         As law-enforcement executives, police chiefs and sheriffs across California

8    are constantly working to improve and enhance the relationship between law

9    enforcement and the communities we serve.  The restrictions on open carry in

10   California help ensure that law-enforcement personnel are not unnecessarily

11   spending time on public contacts involving the open carrying of firearms.  Police

12   are very sensitive to seeing a gun in public or on open display, even if allowed by

13   law.  In an era where law enforcement is spending considerable time and resources

14   to improve mutual trust and respect with our communities, an open-carry

15   environment would lead to increased tensions.

16        From a community-safety perspective, California's restrictions on the open

17   carry of firearms is critical to a healthy, vibrant, and safe environment for our

18   residents to live, shop, dine, worship, and enjoy recreational opportunities.

19   Inserting firearms carried openly into a community setting, especially in urban or

20   suburban communities, would create a highly stressful and unsafe environment for

21   everyone, including the person in possession of the firearm.  Unfortunately, in

22   today's society, shootings, including mass shootings, have become fairly

23   commonplace.  The presence of a firearm carried openly, or (sometimes) concealed,

24   in places visited by the public, including parks, open retail or entertainment venues,

25   theaters, restaurants, or community or political events, has the high potential to

26   create panic and chaos, and would result in an immediate law-enforcement

27   response.

28

9

People including families want to feel safe, whether at home or in a public setting.  Parents want safe parks for their children, and the presence of an unknown (or maybe even known) person in possession of a firearm will have a chilling effect.  In a community setting where a person openly carries a firearm, the likelihood is that no one else in that setting knows the armed person's intention, mental condition, or emotional state or stability, creating an environment of extreme uneasiness or fear.

Regarding the person with the firearm, what are his or her qualifications, training, marksmanship, mental state, emotional maturity, decision-making process under stress—all the components and more that come with making a decision to use a firearm?  Is there an intoxicant involved?  If so, the ability to make sound decisions is sometimes greatly compromised.  If put in a situation where the armed person feels the need to deploy the firearm, what is his or her ability to de-escalate the situation?  A person in legal possession of a firearm may perceive a threat in a situation where a threat is non-existent; the presence of a firearm serves only to escalate the situation.  A person armed with a firearm may decide to use deadly force where it is not clearly required, creating a deadly situation that did not exist before.  People in our communities will demand answers to these questions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 6, 2023, at Kailua-Kona, Hawaii.

KIM RANEY
Former Chief of Police, Covina, CA

10

Exhibit A

**Qualifications**

In October 2016, I retired as the Chief of Police for the Covina (California) Police Department (the "Department"), after 39 years of law-enforcement service. I served as Chief of Police for 15 years, as a Captain for one year, as a Lieutenant for 10 years, as a Sergeant for seven years, and as a police officer for six years. I also served as interim City Manager of the City of Covina for four months.

As Chief of Police, I was responsible for the delivery of public-safety services to a community of 50,000 residents, and the leadership of 100 employees of the Department. This work included compliance with all local, state, and federal mandates, and enforcement and implementation of existing and new policies, as well as ensuring that the Department was a leader in engaging with emerging issues or trends in the criminal-justice system. I was Chief of Police on December 24, 2008, when nine family members in my community were shot and killed at a family holiday celebration, and I provided leadership to the community during this tragedy.

As a Captain, I was responsible for the Department's Administrative Division, which included oversight of detectives, the 9-1-1 communications center, custody of suspects, and property/evidence.

As a Lieutenant, I served as a watch commander overseeing patrols on a daily basis, as well as the auditing, training, and compliance for Department employees. I also supervised the Detective Division, which was accountable for investigating all crimes reported to the Department. I also helped to create and supervise a regional mutual-aid platoon comprised of 56 officers from 15 area police departments, responsible for activation and deployment in response to any regional emergency or disaster. This work included the creation of a policy manual and activation protocols, and coordination of the training for over 100 police officers in topics such as riot response, crowd control, and command-and-control for team leaders.

As a Sergeant, I was responsible for the first-line supervision of police officers and detectives, including tactical leadership on critical service calls, daily training, evaluation of employees, and supervision of the field training program.

As a police officer, I was a first responder to all public-safety calls for service. When assigned as a detective, I worked narcotics investigations, regional surveillance, and undercover operations.

I am Past President of the California Police Chiefs Association. In my role with the California Police Chiefs Association, I spent five years on the Executive Board of Directors, culminating in my service as President in 2013. I was involved in discussions with state and local elected officials on all major legislative or ballot propositions involving law enforcement,

including meetings with the Governor and Attorney General on major public-safety issues, legislation, and initiatives.

I am Past President of the Los Angeles County Police Chiefs Association, serving as President in 2008.

I was one of two California police chiefs to serve on the Stanford Executive Session on Public Safety Realignment, which refers to legislation passed in 2011, and sometimes known as Assembly Bill 109, that shifted responsibility for monitoring, tracking, and incarcerating non-serious, non-violent, non-sex offenders from California state to the counties. A report based on the Executive Session's work was submitted to the California State Legislature and the Governor, and is available on the Internet at the following link: https://www-cdn.law.stanford.edu/wp-content/uploads/2015/10/ES-Consensus-Report-final-report.pdf. 10. I served on the Executive Steering Committee for the California Board of State and Community Corrections, which committee was tasked with creating a new definition of the term "recidivism" for statewide use, pursuant to Assembly Bill 1050. A description of this work is available on the Internet at the following link: http://www.bscc.ca.gov/downloads/Recidivism%20Defintion%20Press%20Release.pdf.

I have lectured to law-enforcement leaders and elected officials throughout California and the United States on issues such as leading a community in dealing with a mass shooting, the decriminalization of marijuana and its impact on communities, and public-safety realignment (Assembly Bill 109) in California. I have been a speaker for both the California Police Chiefs Association and the Los Angeles County Police Chiefs Association for their courses on Role of the Police Chief.

I have received numerous awards throughout my career, including the Joe Malloy Award, the most prestigious award that the California Police Chiefs Association presents. This award is presented to one California police chief every year, and is bestowed based upon the recipient's professionalism, leadership, and contributions to and impacts on the profession of law enforcement.

I have a Bachelor of Science Degree in Organizational Leadership from Azusa Pacific University. I have a certificate for completing an eight-month law-enforcement-oriented program at the University of Southern California School of Public Policy, as well as a certificate for completing 40 hours of training at the FBI Southwest Command College.

Past Publications - International Association of Chiefs of Police, *The Police Chief Magazine*, "Proposition 19: California's Marijuana Legalization Debate," October 2010. A portion of this publication is available on the Internet at the following link: http://www.policechiefmagazine.org/proposition-19-californias-marijuana-legalization-debate.

# Kim Raney

**Summary of qualifications**

- Accomplished and experienced Chief of Police - skilled at leading, directing, and managing sworn and civilian personnel
- Approachable, forthright, and fair – adept at establishing an environment that facilitates individual and organizational success and requires accountability
- Provide excellent law enforcement services with limited fiscal resources
- Possess the confidence and experience to make sound policy decisions and resolve problems
- Effective communication, presentation and public speaking skills
- Respected Law Enforcement Leader at the local, regional, and state level

**Professional Experience**

**City of Covina Police Department**

**Chief of Police** (2001-2016)

- Provide excellent, proactive law enforcement service to a community of 50,000
- Leadership of a Police Department with 60 sworn personnel, 50 civilian employees, and 40 volunteers
- Effectively manage a $20 million budget
- Led a cultural change within the organization
- Led an internal reorganization of department structure
- Established excellent relationships with all community stakeholders, including business, education, and residential constituents
- Work with other Department Heads in a team environment
- Past President – California Police Chiefs Association
- Past President - Los Angeles County Police Chiefs Association

**Police Captain** (2000-2001)

**Police Lieutenant** (1990-2000)

**Police Sergeant** (1984-2000)

**Police Officer** (1977-1984)

**Education/ Certificates**

Azusa Pacific University – Azusa, CA
  Bachelor of Science, Organizational Leadership
POST Certificates – Executive, Management, Supervisory, Advanced,   Basic
FBI Southwest Command College
USC School of Public Policy

| | |
|---|---|
| **Professional memberships** | California Police Chiefs Association – President 2013-14 |
| | Los Angeles County Police Chiefs Association – President 2008-09 |
| | San Gabriel Valley Police Chiefs Association – President 2005 |
| | International Association of Chiefs of Police |
| | Stanford University Law School – Steering Committee on AB 109 |
| | Board of State and Community Corrections – Executive Steering Committee |
| | Los Angeles Regional Interoperable Communications System (LA-RICS) – Board of Directors |
| **Community activities** | Covina Chamber of Commerce |
| | Covina Sunrise Rotary Club |
| | San Gabriel Valley YMCA Board of Directors |
| | Citrus Valley Health Partners – Ethics Committee |

# CERTIFICATE OF SERVICE

Case Name:  **Baird, Mark v. Rob Bonta**          No.   **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>August 18, 2023,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**EXPERT REPORT AND DECLARATION OF FORMER COVINA CHIEF OF POLICE KIM RANEY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 18, 2023,</u> at Los Angeles, California.

<table>
<tr><td>Lara Haddad</td><td><i>Lara Haddad</i></td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2019101934
66167952.docx