1

COSCA LAW CORPORATION
CHRIS COSCA   SBN 144546

2

1007 7th Street, Suite 210

3

Sacramento, CA 95814
916-440-1010

4

5

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC

6

2 Overhill Road, Suite 400
Scarsdale, NY 10583

7

Telephone: 914-367-0090
Facsimile:  888-763-9761

8

*Pro Hac Vice*

9

Attorneys for Plaintiffs

10

11

12

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

13

14

15

MARK BAIRD and
RICHARD GALLARDO,

16

Plaintiffs,

17

v.

18

ROB BONTA, in his official capacity as
Attorney General of the State of California,

19

20

21

Defendant.

22

Case No. 2:19-CV-00617-KJM-AC

**MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IOT DEFENDANT'S MOTION**

Date:           November 3, 2023
Time:          10:00 a.m.
Courtroom:   3
Judge:         Hon. Kimberly J. Mueller
Trial Date:    None set
Action Filed:  April 9, 2019

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................ 1

UNDISPUTED MATERIAL FACTS ............................................................................... 1

LEGAL ARGUMENT ...................................................................................................... 3

Standard for Summary Judgment .................................................................................... 3

I. IN CALIFORNIA, THERE IS NO RECOGNIZED <u>RIGHT</u> TO BEAR ARMS:
   CONCEALED CARRY REMAINS A PRIVILEGE AND OPEN CARRY IS BANNED ........ 4

    A. The Plain Text Protects the Open and Concealed Carriage of 'Arms' ........................... 4

    B. California Bans the <u>Right</u> to Bear Arms ........................................................................ 4

II. BASED ON *HELLER*, AND *BRUEN*'S ESTABLISHMENT OF THE HISTORICAL
    ANALYSIS OF PUBLIC CARRY, THE OPEN CARRY BAN IS UNCONSTITUTIONAL ...... 6

III. THE *BRUEN* TEST REQUIRED TO BE APPLIED BY THIS COURT ................................ 8

    A. Plaintiffs' Conduct Falls Within The Plain Text and is Presumptively Protected ........... 8

    B. The Burden is on California to Justify Its Regulations ..................................................... 9

IV. SUPREME COURT JURISPRUDENCE LOOKS TO THE FOUNDING ERA TO
    DETERMINE THE SCOPE AND MEANING OF THE BILL OF RIGHTS .......................... 9

    A. "Not All History is Created Equal ..................................................................................... 9

    B. No Supreme Court Cases Look to 1868 to Interpret the Bill of Rights ......................... 11

    C. The Bill of Rights' Scope and Meaning Remain the Same in 1868 ............................... 11

    D. Post-Ratification Regulations That Conflict With the Plain Text of the Second
        Amendment Must Be Summarily Rejected .................................................................... 12

    E. *Bruen*: Public Carry in 1791 and 1868 Was "For all Relevant Purposes, The Same" ... 13

V. DEFENDANT'S 'SURVEY OF RELEVANT STATUTES' IS A NOT EVIDENCE IN
   ADMISSIBLE FORM AND SHOULD BE STRICKEN ........................................................ 14

VI. CATEGORIES OF IMMATERIAL AND IMPROPER INFORMATION .......................... 16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. Municipal Court,*
  73 Cal.App.3d 596 (1977) ................................................................................ 28

*Am. Civil Liberties Union of Nev. v. City of Las Vegas,*
  333 F.3d 1092 (9th Cir. 2003) ........................................................................... 3

*Andrews v. State,*
  50 Tenn. 6 ...................................................................................................... 66

*Baird v. Bonta,*
  2023 WL 5763345 (9th Cir. Sept. 7, 2023) ................................................ 2, 5, 9

*Barker v. Wingo,*
  407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ................................. 19, 22

*Benton v. Maryland,*
  395 U.S. 784 (1969) ........................................................................................ 11

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) .......................................................................................... 6

*Crawford v. Washington,*
  541 U.S. 36 (2004) .......................................................................................... 10

*D.C. v. Heller,*
  554 U.S. 570 (2008) .............................................................................. 1, 4, 6, 8

*Douglass v. Nippon Yusen Kabushiki Kaisha,*
  46 F.4th 226 (5th Cir. 2022) ......................................................................... 9, 12

*Duncan v. Louisiana,*
  391 U.S. 145 (1968) ........................................................................................ 11

*Freedman v. Maryland,*
  380 U.S. 51 (1965) .......................................................................................... 28

*Fulton v. City of Philadelphia,*
  141 S.Ct. 1868 (2021) ..................................................................................... 11

*Gamble v. United States,*
  139 S.Ct. 1960 (2019) ..................................................................................... 11

i

VII.  CALIFORNIA'S REGULATIONS ARE REPUGNANT TO THE CONSTITUTION ....... 20

VIII.  THE STATE FAILED TO JUSTIFY CALIFORNIA'S REGULATIONS ......................... 22

IX. THE STATE FAILED TO PROVE THAT FIREARMS LICENSING HAS AN
    HISTORICAL ANALOGUE ............................................................................................... 26

X.  AT LEAST ONE CALIFORNIA STATE SUPERIOR COURT AGREES THAT PENAL
CODE 25850 VIOLATES THE PLAIN TEXT OF THE SECOND AMENDMENT 76

CONCLUSION ....................................................................................................................... 27

*Hittle v. City of Stockton, California,*
  2023 WL 4985718 (9th Cir. Aug. 4, 2023) ................................................. 3

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.,*
  565 U.S. 171 (2012) ..................................................................... 11

*Hudson v. Michigan,*
  547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) ................................. 19

*In re Oliver,*
  333 U.S. 257 (1948) ..................................................................... 11

*Jim v. Cnty. of Hawaii,*
  33 F. App'x 857 (9th Cir. 2002) ......................................................... 14

*Klopfer v. North Carolina,*
  386 U.S. 213 (1967) ..................................................................... 11

*Lynch v. Donnelly,*
  465 U.S. 668 (1984) ..................................................................... 11

*Malloy v. Hogan,*
  378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ..................................... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ...................................................................... 3

*McDonald v. City of Chicago, Ill.,*
  561 U.S. 742 (2010) ................................................................. Passim

*Miranda v. Arizona,*
  384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ................................... 19

*Near v. Minnesota,*
  283 U.S. 697 (1931) ..................................................................... 11

*Nevada Comm'n on Ethics v. Carrigan,*
  564 U.S. 117 (2011) ..................................................................... 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) .............................................................. Passim

*Nunn v. State,*
  1 Ga. 243 (1846). ..................................................................... 6, 23

*Peruta v. City of San Diego,*
  824 F.3d 919 (9th Cir. 2016) ............................................................. 5

ii

*Powell v. Alabama*,
  287 U.S. 45 (1932)............................................................................................ 11

*Ramos v. Louisiana*,
  140 S.Ct. 1390 (2020)............................................................................... 11, 12

*Reynolds v. United States*,
  98 U.S. 145 (1878)............................................................................................ 11

*Rhode Island v. Massachusetts*,
  37 U.S. (12 Pet.) 67 (1838).......................................................................... 10

*Scott v. Sandford*,
  19 How. 393 (1857).............................................................................. 10, 12, 13

*Shuttlesworth v. City of Birmingham, Ala.*,
  394 U.S. 147 (1969).......................................................................................... 28

*South Carolina v. United States*,
  199 U.S. 437 (1905).......................................................................................... 10

*State v. Reid*,
  1 Ala. 612 (1840)................................................................................................. 6

*Timbs v. Indiana*,
  139 S. Ct. 682 (2019).................................................................................. 11, 12

*United States v. Leon*,
  468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)............................ 19

*Virginia v. Moore*,
  553 U.S. 164 (2008).......................................................................................... 10

*Washington v. Texas*,
  388 U.S. 14 (1967)............................................................................................ 11

*Wilson v. Arkansas*,
  514 U.S. 927 (1995).......................................................................................... 11

*Wyoming v. Houghton*,
  526 U.S. 295 (1999).......................................................................................... 11

*Zweig v. Hearst Corp.*,
  521 F.2d 1129 (9th Cir.) ................................................................................... 3

iii

**Statutes**

Cal. Penal Code § 25850 ........................................................................................... 1, 2, 9
Cal. Penal Code § 26350 ............................................................................................... 1, 2
Cal. Penal Code § 26150 ............................................................................................ 1, 2, 5
Cal. Penal Code §  26155 ........................................................................................... 1, 2, 5

**Rules**

FRE 56(e), 901, 902 ...................................................................................................... 14
FRE 1002 ....................................................................................................................... 15

MEMORANDUM OF POINTS & AUTHORITIES ISO PLAINTIFFS' CROSS-MOTION
FOR SUMMARY JUDGMENT AND IOT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

> The right to self defence is the first law of nature: in most governments it has been the study of rulers to confine the right within the narrowest limits possible.
>
> Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.

*D.C. v. Heller*, 554 U.S. 570, 606 (2008) (citation omitted).

## PRELIMINARY STATEMENT

Plaintiffs Mark Baird and Richard Gallardo ("Plaintiffs") by and through their attorneys, The Bellantoni Law Firm, submit the following Memorandum of Points and Authorities, Statement of Undisputed Facts, and accompanying declarations and exhibits in support of their cross-motion for summary judgment and in opposition to Defendant's motion for summary judgment.

## UNDISPUTED MATERIAL FACTS[1]

The material facts are not in dispute.  For several years now, Plaintiffs have sought to peaceably open carry handguns for self-defense throughout the State of California. But the open carriage of a handgun in California is a crime -- whether loaded (Cal. Penal Code § 25850) or unloaded (Cal. Penal Code § 26350). Neither Plaintiff falls within any of the statutory exceptions to prosecution.[2] [See, Counterstatement of Facts ("COF") at Nos. 3-5, 7-27.

California implements a 'may issue' licensing scheme. On its face, the regime purports to offer concealed and, with geographical limitations, open carry licenses. California Penal Code sections 26150, 26155. In practice, the only type of license issued is concealed carry. COF at 20-27.

And even if imposing a licensing requirement for open carry was consistent with the plain text of the Second Amendment, which it is not, no such license has been issued by California since open carry was foreclosed by the State in 2012. COF at 21-22. Indeed, during the 4 years of this

---

[1] Plaintiffs' responses to Defendant's Statement of Facts, and their Counterstatement of Facts, are fully incorporated herein by reference.

[2] Plaintiffs do not hold California concealed carry licenses. Even if they did, the existence of alternative modality of exercising the rights protected by the Second Amendment is no defense to the State's constitutional violations.

1

litigation, Defendant has produced no evidence of any open carry license ever having been issued anywhere in the State. *Id.; see also, Baird v. Bonta*, No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023) (noting California's licensing regime "establishes a statewide ban on open carry by ordinary law-abiding Californians,' roughly 95% of state residents may not apply for an open-carry license due to geographical restrictions, and California "provided no evidence that any such license has ever been issued").

Plaintiffs seek to restore the citizens of California to the constitutionally aligned position that existed prior to the modern-day restrictions imposed by the Mulford Act of 1967. Until 1967, the free exercise of the right to carry a handgun open and exposed on one's person for self-defense in California was unregulated and largely unremarkable. [Baird Dec. at ¶ 11].

With the passage of the Mulford Act of 1967, the right to carry a loaded firearm in public for self-defense was banned under threat of criminal sanctions. Penal Code section 25850.

Open carry was eliminated altogether in 2012 with the passage of Penal Code section 26350, which  banned the open carriage of an unloaded handgun.

While both criminal statutes provide some narrow exemptions, no exemption brings the regulations into constitutional compliance, nor do the exemptions apply to Plaintiffs. COF at 18.

Plaintiffs object to having to seek permission from the government before being lawfully able to exercise a preexisting right; nonetheless, each Plaintiff has attempted to obtain an open carry license in his respective county. Neither county will issue an open carry license.

Even if Plaintiffs could obtain an open carry license, which [if issued] is [theoretically] only 'available' to people who reside in a county with a population less than 200,000 – such license would only be valid  in the county of issuance. Penal Code sections 26150, 26155. Once Plaintiffs stepped over the county line, their Right to open carry would be [magically] extinguished. *Id.*

There is an absolute ban on open carry in California.

The conduct being regulated by Penal Code sections 25850 and 26350 – Plaintiffs' peaceable carriage of handguns for self-defense – is protected by the plain text of the Second Amendment. And because California failed to prove that this Nation has an historical tradition of banning open carry, punishing peaceable open carry, or requiring citizens to apply for and obtain

2

permission from the government as a condition to its exercise, Plaintiffs are entitled to summary judgment.

## LEGAL ARGUMENT

### *Standard for Summary Judgment*

In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *Hittle v. City of Stockton, California*, No. 22-15485, 2023 WL 4985718, at *2 (9th Cir. Aug. 4, 2023) citing, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), cert. denied, 423 U.S. 1025 (1975).

Cross-motions for summary judgment are evaluated separately under the same standard, giving the nonmoving party in each instance the benefit of all reasonable inferences. *Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

The material facts are not in dispute. The only issue for this Court to decide - whether in the context of the State's motion or Plaintiffs' cross-motion - is whether the State has proven that banning the peaceable open carriage of a handgun for self-defense (and subjecting violators to criminal penalties) is consistent with the plain text, history, and tradition in this Nation.

Summary judgment in favor of Plaintiffs is required because (i) banning open carry is repugnant to the plain text of the Second Amendment, which declares that the right to 'bear Arms shall not be infringed"; (ii) the State failed to identify an historical analogue for its open carry ban; and (iii) the State failed to identify an historical analogue for requiring ordinary people to apply for and obtain a license to exercise the right to 'bear Arms.'

## I. IN CALIFORNIA, THERE IS NO RECOGNIZED <u>RIGHT</u> TO BEAR ARMS: CONCEALED CARRY REMAINS A PRIVILEGE AND OPEN CARRY IS BANNED

### A. The Plain Text Protects the Open and Concealed Carriage of 'Arms'

In *D.C. v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized the plain text of the Second Amendment 'guarantee[s] the individual right to possess and carry weapons in case of confrontation.' The Second Amendment, like the First and Fourth Amendments, 'codifies a pre-existing right.' The Court went on to declare the 'very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it shall not be infringed.' *Heller*, at 592 (cleaned up) (citation omitted). In *McDonald*, the Court held that the Second Amendment applies to the states through the Fourteenth Amendment. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010).

*Heller* involved a challenge to D.C. regulations banning handgun possession in the home. Using a text, tradition, and historical analysis, the Court held that the right to possess handguns in the home is protected by the Second Amendment.

*Heller* also defined 'bear Arms' as the right to 'wear, bear, or carry upon the person or in the clothing or in a pocket' for the 'purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.' *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2134 (2022) quoting, *Heller,* at 584.

*Heller*'s articulated scope of the term 'bear' encompasses open carry ('carry upon the person') and concealed carry ('in the clothing or in a pocket'). *Id.*

So, open carry and concealed carry are ***both*** guaranteed, preexisting rights that are presumptively protected by the plain text of the Second Amendment.

### B. California Bans the <u>Right</u> to Bear Arms

California's 'outlier' licensing scheme remains one of just a handful of may-issue regimes in the country.[3] Concealed carry licenses - the only carry license available in California - are governed by Penal Code sections 26150 and 26155: licensing officers 'may issue' a concealed carry

---

[3] See, *Bruen*, at 2161 (Kavanaugh, J., and The Chief Justice, concurring) (discussing the 'unusual discretionary licensing regimes, known as "may-issue" regimes' including California's, characterizing them as 'constitutionally problematic' because they grant 'open-ended discretion to licensing officials').)

1  license 'if' the applicant first proves they are not immoral, have satisfied the State's training
2  requirements and, if a particular licensing authority feels the applicant should have a mental health
3  evaluation, proves they are sane to the satisfaction of another government employee by taking and
4  passing a psychological test.[4]

5         California's requirement that individuals obtain permission from the government before
6  exercising a 'preexisting right' effectively reduces the Right to a mere privilege. So, concealed
7  carry in California is a privilege - and open carry is banned.  Stated differently, California does not
8  recognize the Second Amendment Right of its citizens to peaceably carry a handgun for self-
9  defense.

10        Like the D.C. ban on possessing handguns in *Heller*, California bans the Right to carry
11 handguns. The State's arbitrary delineation of the modality of carrying handguns violates the plain
12 text. [5] 'Shall not be infringed' leaves no room for the government to dictate how an individual
13 chooses to peaceably carry their Arms for self-protection.

14        In *Bruen*, which involved a challenge to concealed carry restrictions. Reaching its decision,
15 the Supreme Court made no distinction between concealed and open carry. Bearing arms is
16 presumptively protected by the plain text of the Second Amendment. Full stop.[6] *C.f.*, *Peruta v.*
17 *Cnty. of San Diego*[7], 824 F.3d 919 (9th Cir. 2016) (en banc) abrogation by *NYSRPA* v. *Bruen*, 142
18 S.Ct. 2111 (2022) recognized by *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345 (9th Cir. Sept.
19 7, 2023).

20

21

22 [4] https://giffords.org/lawcenter/state-laws/concealed-carry-in-
23 california/#:~:text=Under%20current%20California%20law%2C%20local%20law%20enforcement%20of
   ficials,below%29%3B%20and%20%284%29%20Meets%20relevant%20residency%20requirements.%20
   2
24 [5] One problem with criminalizing open carry versus concealed carry is that the difference between being
   law abiding and becoming a criminal can come down to which way the wind blows, reaching for an object
25 on the top shelf, removing one's jacket on a hot day, and opening one's fanny pack. And, for many women,
   effectively concealing a firearm on their person can be a difficult task, as they wear a wide variety of clothing
26 styles from form-fitting stretch pants to loose tunics or dresses.
   [6] *Bruen*, at 2134 (the Court had 'little difficulty' concluding that 'the plain text of the Second Amendment
27 protected Koch's and Nash's proposed course of conduct- carrying handguns publicly for self-defense').
   [7] "The Second Amendment does not protect, in any degree, the right of a member of the general public to
28 carry a concealed weapon in public." *Peruta*, at 942. 5

The en banc *Peruta* court **conceded** that if the Second Amendment does protect a right of a member of the general public to carry a firearm in public (which the plain text, *Heller*, *McDonald*, *Caetano*[8], and *Bruen* reveal there *is*) "it is **only a right to carry a firearm openly**." *Peruta*, at 942. ("The Second Amendment may or may not protect to some degree a right of a member of the general public to carry a firearm in public. If there is such a right, it is only a right to carry a firearm openly.").

Under *Heller* and *Bruen*, the <u>Right</u> to 'bear Arms' means just that. In the same manner that confining the right to 'bear Arms' to the home 'would make little sense' given that self-defense is 'the central component of the Second Amendment right itself'[9], mandating the modality of how an individual may carry their handgun publicly for self-defense makes little sense.

Just as individuals are free to choose to exercise political speech or commercial speech, worship, or artistic expression under the First Amendment, there is freedom to choose how to exercise the Rights protected by the Second Amendment. Concealed carry and open carry each have their purpose and usefulness – from a tactical advantage, legal perspective, and personal preference – choices that are guaranteed by the plain text– and best left to the individual, not the government.

## II.  BASED ON *HELLER*, AND *BRUEN*'S ESTABLISHMENT OF THE HISTORICAL ANALYSIS OF PUBLIC CARRY, THE OPEN CARRY BAN IS UNCONSTITUTIONAL

Just as *Heller* foreclosed any idea that the right to 'keep' arms was anything less than a 'guaranteed individual right,'[10, 11] *Bruen* foreclosed the idea that the right to 'bear' arms was

---

[8] Stun guns – like handguns – are "Arms" protected by the plain text of the Second Amendment. See, *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns).

[9] *Bruen*, at 2135.

[10] *Heller*, at 592.

[11] Recognizing that the right of self-defense is 'central to the Second Amendment right,' banning from the home the 'most preferred firearm in the nation to 'keep' and use for protection of one's home and family would fail constitutional muster.' *Heller*, at 628-29. *Heller*, went on to note that 'few laws in the history of

6

anything but 'presumptively protected by the Second Amendment.' *Bruen*, at 2135 ("The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense").

*Bruen*'s historical analysis revealed that it was only after the ratification of the Second Amendment in 1791 that public-carry restrictions proliferated.[12] Even then, the means of public carry that was restricted was *concealed* carry, not open carry. To the extent that post-ratification bans of concealed carry in a few states existed, such restrictions never swelled into a 'National tradition' of banning open carry.

California may argue that, because concealed carry is 'available' under its may-issue scheme, the open carry ban is justified. But it is no answer to say that because the government 'allows' discretionary concealed carry, it is permissible to ban open carry. Any ban on a right protected by the plain text violates the Second Amendment. See, e.g., *Heller* ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.")

The guaranteed right to be "armed and ready for offensive or defensive action in a case of conflict with another person" provides individuals with the freedom to choose how to carry, bear, and/or wear his handgun to effectively deploy it in case of violent confrontation.

---

our Nation have come close to the severe restriction of the District's handgun ban' including *Nunn v. State*, 1 Ga., at 251 (Georgia Supreme Court struck down a prohibition on carrying pistols openly), *Andrews v. State*, 50 Tenn., at 187 (Tennessee Supreme Court held statute forbidding open carry, violated the state constitutional provision (which the court equated with the Second Amendment), and *State v. Reid*, 1 Ala. 612, 616–617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional") See, *Heller*, 628–29.
[12] *Bruen*, at 2145.

7

1   **III.  THE *BRUEN* TEST REQUIRED TO BE APPLIED BY THIS COURT**

2           In *Bruen*, the Supreme Court struck the application of means-end scrutiny in Second

3   Amendment challenges[13] and replaced it with the requirement that the government affirmatively

4   prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of

5   the right to keep and bear arms. *Bruen*, at 2127.

6           The test required to be applied by this Court is as follows:

7                   In keeping with *Heller*, we hold that when the Second Amendment's
                    plain text covers an individual's conduct, the Constitution
8                   presumptively protects that conduct.

9                   To justify its regulation, the government may not simply posit that
                    the regulation promotes an important interest.
10

11                  Rather, the government must demonstrate that the regulation is
                    consistent with this Nation's historical tradition of firearm
12                  regulation.

13                  Only if a firearm regulation is consistent with this Nation's historical
                    tradition may a court conclude that the individual's conduct falls
14                  outside the Second Amendment's 'unqualified command.'"

    *Bruen*, at 2126.
15

16

17          **A.  Plaintiffs' Conduct Falls Within The Plain Text and is Presumptively Protected**

            Conduct that falls within the plain text of the Second Amendment is presumptively
18
    protected by the Constitution. *Bruen*, at 2126.[14, 15]
19

20          Plaintiffs' conduct - the peaceable open carriage of a handgun for self-defense - is protected

21  by the plain text of the Second Amendment. *Bruen*, at 2135 ("The Second Amendment's plain text

22  thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-

23  defense").

24

25  [13] "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."
    *Bruen*, at 2127.
26  [14] "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the
    Constitution presumptively protects that conduct." *Bruen*, at 2126.
27  [15] The Second Amendment "codified a *pre-existing right*. The very text of the Second Amendment implicitly
    recognizes the pre-existence of the right and declares only that it "shall not be infringed"…it "not a right granted by
    the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *Heller*, at 592 (emphasis
28  supplied).

8

California Penal Code sections 25850 and 26350 make it a crime to carry a handgun in public. If the State fails to identify an historical analogue for its regulations, summary judgment must be determined in Plaintiffs' favor.

### B. The Burden is on California to Justify Its Regulations

Under the *Bruen* test, the State must justify criminalizing the peaceable open carriage of handguns for self-defense.

> "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.
>
> *Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.'"

*Bruen*, at 2126 (emphasis added) (citation omitted).

As other circuits have consistently recognized, the *Bruen* standard for identifying a closely analogous historical regulation is a "demanding one." *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *8 (9th Cir. Sept. 7, 2023).

## IV. SUPREME COURT JURISPRUDENCE LOOKS TO THE FOUNDING ERA TO DETERMINE THE SCOPE AND MEANING OF THE BILL OF RIGHTS

### A. "Not All History is Created Equal"

Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Bruen*, at 2136 (emphasis supplied) citing, *Heller*, at 634–635 (2008); see also, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 245 (5th Cir. 2022) (Ho, J. concurring) ("Bill of Rights protections like the Second Amendment must be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.") quoting *McDonald*, 561 U.S. at 765 (cleaned up) (emphasis supplied); *Bruen*, 142 S.Ct. 2111 (same).

Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868. The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence. The Court has always been guided by the Amendments'

9

1   "original meaning [which] does not alter. That which it meant when adopted, it means now." *South*

2   *Carolina v. United States*, 199 U.S. 437, 448 (1905) (interpreting Free Speech and Press Clauses).[16]

3

4

5

6
> We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions ... in the several states." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 721 (1838).

7

8
  As Mr. Chief Justice Taney stated in *Scott v. Sandford*, 19 How. 393, 426:

9

10

11
> 'It is not only the same in words, but the same in meaning, and delegates the same powers to the government, and reserves and ***secures the same rights and privileges*** to the citizen; and as long as it continues to exist in its present form, it speaks not only in the same words, but with ***the same meaning and intent*** with which it spoke ***when it came from the hands of its framers***, ***and was voted on and adopted*** by the people of the United States.

12

13
> ***Any other rule*** of construction would abrogate the judicial character of this court, and make it the ***mere reflex of the popular opinion or passion of the day***.'

14

15 (emphasis added).

16   Recognizing that "the scope of the protection applicable to the Federal Government and

17 States is *pegged to the public understanding of the right when the Bill of Rights was adopted in*

18 *1791*," *Bruen* pointed to *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment);

19 *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); and *Nevada Comm'n on*

20 *Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment). *Bruen*, at 2137–38

21 (emphasis added).

22   Just a few of the "numerous cases involving all of the amendments in the Bill of Rights that

23 have been incorporated" in which the Founding Period was the temporal focal point, not when the

24 amendments were incorporated into the Fourteenth Amendment in 1868 are <u>First Amendment</u>:

25 *Near v. Minnesota*, 283 U.S. 697 (1931), *Reynolds v. United States*, 98 U.S. 145 (1878), *Hosanna-*

26 *Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012), *Fulton v. City*

27

28
---
[16] Smith, Mark W., "Not All History Is Created Equal," October 1, 2022 [Bellantoni Dec. at Ex. 1 at p. 9] (emphasis supplied). See, biographical information at https://www.tkc.edu/people/mark-w-smith/.

*of Philadelphia*, 141 S.Ct. 1868 (2021), *Lynch v. Donnelly*, 465 U.S. 668 (1984); <u>Fourth Amendment</u>: *Wyoming v. Houghton*, 526 U.S. 295 (1999), *Wilson v. Arkansas*, 514 U.S. 927 (1995): <u>Fifth Amendment</u>: *Benton v. Maryland*, 395 U.S. 784 (1969), *Gamble v. United States*, 139 S.Ct. 1960 (2019); <u>Sixth Amendment</u>: *Ramos v. Louisiana*,140 S.Ct. 1390 (2020), *Powell v. Alabama*, 287 U.S. 45 (1932), *Klopfer v. North Carolina*, 386 U.S. 213 (1967), *In re Oliver*, 333 U.S. 257 (1948), *Duncan v. Louisiana*, 391 U.S. 145 (1968), *Washington v. Texas*, 388 U.S. 14 (1967); <u>Eighth Amendment</u>: *Timbs v. Indiana*, 139 S. Ct. 682 (2019). [Bellantoni Ex. 1 at 17-30].

"[I]n the discourse that led to the Fourteenth Amendment, the right to keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding. The focus of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states. Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866."[17]

### B. No Supreme Court Cases Look to 1868 to Interpret the Bill of Rights

Much ink is spilled by the State and its historians to press the same post-ratification time-periods the *Bruen* Court found unreliable for determining the original meaning of the Bill of Rights. They fail to identify a single Supreme Court case in which the Court looked to the ratification of the Fourteenth Amendment as the principal period for determining the scope or meaning of a provision of the Bill of Rights. See also, Bellantoni Ex. 1 at p. 27 (litigants in post-*Bruen* litigation).

### C. The Bill of Rights' Scope and Meaning Remain the Same in 1868

The Bill of Rights does not have one meaning at its ratification but another, different meaning in 1868. The post-ratification/1868 theory "candidly contradicts and seeks to overturn, at least in principle and methodology, every case in which history has been used to determine the meaning of an incorporated provision of the Bill of Rights." [Bellantoni Dec. Ex. 1 at 46].

---

[17] Bellantoni Dec. Ex. 1 at 42-45, discussing the debates leading to the Freedmen's Bureau Act and the Civil Rights Act of 1866.

11

1      The Supreme Court held on numerous occasions that, whether we define the right as it

2  existed in 1791 or in 1868, the right is the same against the federal government and the states alike.

3  *Douglass v. Nippon*, at 245. "[W]e have made clear that individual rights enumerated in the Bill of

4  Rights and made applicable against the States through the Fourteenth Amendment have the same

5  scope as against the Federal Government." *Ibid.* (emphasis supplied) quoting *Bruen*, at 2137 citing,

6  *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020) ("This Court has long explained ... that incorporated

7  provisions of the Bill of Rights bear the same content when asserted against States as they do when

8  asserted against the federal government.") (emphasis added); *Timbs v. Indiana*, 586 U.S. ——, —

9  —, 139 S.Ct. 682, 203 L.Ed.2d 11 (2019) ("[I]f a Bill of Rights protection is incorporated, there is

10  no daylight between the federal and state conduct it prohibits or requires.") (emphasis supplied);

11  *Malloy v. Hogan*, 378 U.S. 1, 10–11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("The Court thus has

12  rejected the notion that the Fourteenth Amendment applies to the States only a watered-down,

13  subjective version of the individual guarantees of the Bill of Rights.") (quotations omitted).

14  *Douglass*, at 245.

15      "Even before the Civil War commenced in 1861, this Court indirectly affirmed the

16  importance of the right to keep and bear arms in public. Writing for the Court in *Dred Scott v.

17  Sandford*, 19 How. 393, 15 L.Ed. 691 (1857), Chief Justice Taney offered what he thought was a

18  parade of horribles that would result from recognizing that free blacks were citizens of the United

19  States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and

20  immunities of citizens, including the right 'to keep and carry arms wherever they went.' *Id.* at 417

21  (emphasis added). Thus, even Chief Justice Taney recognized (albeit unenthusiastically in the case

22  of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks

23  were often denied in antebellum America." *Bruen*, at 2150–51.

### D.  Post-Ratification Regulations That Conflict With the Plain Text of the Second Amendment Must Be Summarily Rejected

26      The Supreme Court has "[n]ever looked to 1868 as the principal period for determining the

27  meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is

12

only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791."

*McDonald* made clear that the Supreme Court "decades ago abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *McDonald*, at 785–86. Incorporated Bill of Rights guarantees are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.*, at 765 (internal quotation marks omitted). [Bellantoni Dec. Ex. 1 at 7-8].

"But to the extent later history contradicts what the text says, the text controls. *Bruen*, at 2137. Where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision. Bruen, at 2137 (citations omitted).

"Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137 (citation omitted) (emphasis added).

**E. *Bruen*: Public Carry in 1791 and 1868 Was "For all Relevant Purposes, The Same"**

While the *Bruen* Court acknowledged an 'ongoing scholarly debate' between two historians concerning 1868, the Court adhered to Supreme Court jurisprudence, which looks to the Founding era as the period of sole or primary relevance. [Bellantoni Dec. Ex. 1 at 11-15]. The Court went on to state

> We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.

*Bruen*, at 2138.

13

*Bruen* held that there was no historical tradition of requiring individuals to prove 'proper cause' to lawfully carry handguns in public. So, where New York's *restriction* on concealed carry is deemed unconstitutional, then California's *ban* of open carry is also unconstitutional.

## V. DEFENDANT'S 'SURVEY OF RELEVANT STATUTES' IS A NOT EVIDENCE IN ADMISSIBLE FORM AND SHOULD BE STRICKEN

Before examining the merits of the State's Expert Reports, Defendant's compilation of regulations must be addressed. In its motion, the State proffered a self-serving narrative entitled 'Survey of Relevant Statutes' (the "Summary"), which purports to list various statutes that support its position that the challenged regulations are 'justified'.

Rather than provide the Court with the text of the regulations, which would reveal the language and context in which the regulations existed, Defendant created a 'chart' containing summaries, opinions, and (mis)characterizations of the cited regulations. For several reasons, the Summary should be stricken.

*First,* the Summary is an unsworn document created by defense counsel and is not evidence in admissible form. While the attorney Declaration to which the Summary is annexed is a sworn document, the attorney Declaration only avers that the Summary is annexed as an exhibit. The attorney Declaration does not aver under the penalty of perjury to the accuracy or truthfulness of the *contents* of the Summary. Unsworn documents are inadmissible evidence and should not be considered. *Jim v. Cnty. of Hawaii*, 33 F. App'x 857, 858 (9th Cir. 2002) citing, FRE 56(e), 901, 902.

*Second,* the only reliable evidence of whether the statutes establish an historical analogue is production of the statutes themselves[18] - not a 'summary' of what counsel believes the statutes mean. Unlike other Second Amendment challenges where the government produces for the court a

---

[18] C.f., FRE 1002 (An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise).

copy of the statutes upon which they rely,[19] Defendant provided no statutes – only a 'summary' of what it wants the Court to believe the regulations mean.

*Third,* the contents of the Summary are patently unreliable and mischaracterize the language of the statutes cited. Deceptively titled as an "Appendix of Laws" [see, Dec. of Lara Haddad, ¶5] the Summary is not an "appendix." It neither contains true and accurate copies of the statutes nor reproduces the exact language thereof. Instead, a "Description of Regulation" accompanies each entry, which purports to 'summarize' the statutes in an effort to *create* history favorable to the State – an illusion swiftly dispelled by reference to the actual statutes.

Written laws consist of words. Their *meaning* is something that attorneys, judges, and the general public have debated throughout the ages.  But the *words* are immutable and unchanging.

Arguments concerning the meaning and import of the statutes on which the State relies is properly contained in a memorandum of law. A written summary describing the conduct the State *believes* the statute regulates is decidedly *not* an "Appendix."

For example, the unreliability of the Summary is borne out in entry No. 16, which references a Virginia statute from 1786. Under the category "Description of Regulation," the Summary indicates "Imposed penalties for openly carrying weapons."

But a plain read of the statute reveals the State's description is patently false. The "Act Forbidding and Punishing Affrays" forbade "rid[ing] armed by night nor by the day, in fairs or markets, or in other places, *in terror of the country*" – not peaceable open carry. [Bellantoni Dec. Ex. 2, p. 2].

The Supreme Court acknowledged that it, and other state courts, "recognized that the common law did not punish the carrying of deadly weapons *per se*, but only the carrying of such

---

[19] See, e.g., *Frey v. Bruen*, 21 Civ. 5334 (SDNY) at ECF Doc. 65: https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?796894101383112-L_1_0-1

15

weapons 'for the purpose of an affray, and in such manner as to strike terror to the people.' Therefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so." *Bruen*, at 2146. The very title of the Virginia statute is "An Act Forbidding and Punishing *Affrays*" not "Punishing Open Carry." [Bellantoni Dec. Ex. 2].

And the Virginia Act did not "impose penalties for openly carrying weapons" as the State claims. It imposed penalties for "affraying" – terrorizing the public and breaching the peace.[20] The punishment for an "affray" was limited to one month in jail – unlike the one year incarceration imposed for violating 25850 and 26350. Virginia's law is an analogue for the crime of 'brandishing', not peaceable open carry. See, Penal Code 417 (exhibit or draw a deadly weapon in the presence of another person in a rude, angry, or threatening manner that was not in a situation of self-defense or defense of another person).

Also, the prejudice to Plaintiffs is that the Court will not review the text of the statutes relied on (as none were provided by the State), which is what this Court is required to do, and will instead rely on the State's *interpretation* of the regulations.

The State's failure to provide the text of the regulations upon which they are relying is, itself, a failure to meet its burden; and it would be improper for the Court to blindly accept the State's interpretation without review of the statutes themselves.

## VI. CATEGORIES OF IMMATERIAL AND IMPROPER INFORMATION[21]

Before this Court can assess the information proffered by the State's experts, numerous entries and information must be categorically omitted from consideration.

---

[20] *Bruen*, at 2140.
[21] See also, the Declaration and Expert Report of Clayton Cramer for a similar discussion.

16

### A.  Improper Conflation of Handguns and 'Dangerous and Unusual Weapons'

As a matter of law, regulations banning 'dangerous and unusual weapons' are immaterial to the issue before this Court.

It is well-established that the Second Amendment protects all weapons in common use -and handguns are weapons in common use. *Bruen*, at 2119.[22] Restrictions on knives, brass knuckles and other "dangerous and unusual weapons" cannot constitute an historical analogue for a ban involving handguns.

The Supreme Court has already distinguished handguns (pistols and revolvers) from 'dangerous and unusual weapons.' In its historical analysis, the *Heller* Court declared that handguns are weapons "in common use" today for self-defense – and ***not*** 'dangerous and unusual' weapons. *Heller*, at 627, 629 (observing the "historical tradition of prohibiting the carrying of "dangerous and unusual weapons" while observing that "handguns are the most popular weapon chosen by Americans for self-defense"); see also, *Bruen*, at 2119.

Thus, to the extent that any of the regulations cited by the State and its experts lump handguns (pistols) into the same category as 'dangerous and unusual weapons,' their opinions and the regulations upon which they rely must be rejected.

### B.  Laws of England and Other Improper and Immaterial Information

#### i.  Laws of England and Pre-Ratification History

*Heller* noted that constitutional rights are "enshrined with the scope they were understood to have when the people adopted them" [*Heller*, at 634–635] and *Bruen* recognized that, under Supreme Court jurisprudence, "the scope of the protection applicable to the Federal Government

---

[22] Rivas' characterization of firearms as 'deadly weapons' is frivolous. All weapons are 'deadly' – the historical issue is whether an object is 'dangerous and unusual.' Handguns *as a matter of law* are not – rendering those portions of her Report improper and unusable. See also, Cramer Rebuttal to Rivas' Report at Point I.

17

and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, at 2137. Historical evidence that "long predates" 1791 is not a reliable source for interpreting the meaning of the Bill of Rights, nor is reliance on "ancient" practices that were obsolete in England at the time of the adoption of the Constitution and/or never acted upon or accepted in the colonies. *Bruen*, at 2136.

### ii.  Post-Civil War Statutes – Only to 'Confirm' the 1791 Meaning

Because 'when it comes to interpreting the Constitution, not all history is created equal' post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, at 2137 (citation omitted).  The Supreme Court only looked to 19th-century evidence as a "mere confirmation of what the Court thought had already been established." *Id.*

Even then, to the extent later history contradicts what the text says, the text controls. Liquidating indeterminacies in written laws is far removed from expanding or altering them. The post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text. *Bruen*, at 2137 (internal citations omitted).  And firearm restrictions after 1900 are so far removed from the ratification and original meaning of the Bill of Rights as to be summarily rejected.

### iii.  Statutes Based on Race and/or Color

The State's reliance on race-specific firearm regulations is rendered obsolete by the Fourteenth Amendment and must be summarily rejected. See, Point IV, supra.

### iv. Statutes Banning 'Affray', Brandishing, and Other Disorderly Conduct

There appears to be a mental disconnect – feigned or otherwise - with the 'Gun Violence' crowd's ability to comprehend (or admit) that no one is taking the position that *criminal acts* are

18

protected by the Second Amendment. Terrorizing people, using firearms in the commission of other

crimes, mass killings, shooting another person when not in defense of self or a third person – are

obviously *not* the 'peaceable carriage of a handgun for self-defense'; such conduct falls outside of

the scope of the Second Amendment and into the realm of criminal activity.

The peaceable carriage of handguns for self-defense is, on the other hand, non-criminal and

constitutionally protected. Any proffered regulations that criminalize threatening and criminal

behavior including randomly shooting firearms in cities (unrelated to self-defense), dueling,

brandishing, etc. are in no way 'historical analogues' for peaceable open carry.

*v. Public Safety, Means-End Arguments*

*Bruen* made clear that means-end, public safety arguments like those pressed by the dissent

in *Heller*, were rejected by *Heller* – and *Bruen* followed suit. *Bruen*, at 2160–61. And *McDonald*

observed that the right to keep and bear arms "is not the only constitutional right that has

controversial public safety implications."

> All of the constitutional provisions that impose restrictions on law
> enforcement and on the prosecution of crimes fall into the same
> category. See, e.g., *Hudson v. Michigan*, 547 U.S. 586, 591, 126
> S.Ct. 2159, 165 L.Ed.2d 56 (2006) ("The exclusionary rule generates
> 'substantial social costs,' *United States v. Leon*, 468 U.S. 897, 907,
> 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which sometimes include
> setting the guilty free and the dangerous at large"); *Barker v. Wingo*,
> 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (reflecting
> on the serious consequences of dismissal for a speedy trial violation,
> which means "a defendant who may be guilty of a serious crime will
> go free"); *Miranda v. Arizona*, 384 U.S. 436, 517, 86 S.Ct. 1602, 16
> L.Ed.2d 694 (1966) (Harlan, J., dissenting); *id.*, at 542, 86 S.Ct. 1602
> (White, J., dissenting) (objecting that the Court's rule "[i]n some
> unknown number of cases ... will return a killer, a rapist or other
> criminal to the streets ... to repeat his crime"); *Mapp*, 367 U.S., at
> 659, 81 S.Ct. 1684.
>
> Municipal respondents cite no case in which we have refrained from
> holding that a provision of the Bill of Rights is binding on the States
> on the ground that the right at issue has disputed public safety
> implications.

19

1  *McDonald*, at 783.

2      The State's experts lean heavily on public safety claims in their attempt to justify

3  California's open carry ban, which have no place in the determination of Second Amendment

4  challenges and must be rejected by this Court.

5

6          *vi. Concealed Carry Regulations*

7      The Ninth Circuit held that California must identify a historical analogue that curtails the

8  right to peaceably carry handguns openly for self-defense to a comparable degree, with a

9  comparable severity, and with a comparable blanket enforcement to California's open-carry ban; a

10  "well-established and representative historical analogue" to its open carry ban that was in force

11  when the Second or Fourteenth Amendment was ratified. *Baird*, at *8 quoting, *Bruen*, at 2130-31,

12  2133, 2136-38.

13      And California cannot satisfy the requirement for a closely analogous historical regulation

14  by reference to "any general firearm regulation California might unearth." *Baird*, at *8.

15      Statutes that banned *concealed* carry are not historical analogues for California's ban of

16  *open carry*.

17

18  **VII. CALIFORNIA'S REGULATIONS ARE REPUGNANT TO THE CONSTITUTION**

19      Banning open carry is repugnant to the plain text of the Second Amendment which, under

20  *Heller*'s historical analysis, warrants summary judgment in Plaintiffs' favor. Licensing is also

21  repugnant to the plain text of the Second Amendment, which declares that the Right 'shall not be

22  infringed.' Just as it would be unconstitutional to require an individual to first apply for, and then

23  obtain a license before they could lawfully attend church or hand out political flyers on the

24  sidewalk, it is also unconstitutional to impose such a requirement on Second Amendment-protected

25  conduct.

26

27

28                                    20

1

> The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780, 130 S.Ct. 3020 (plurality opinion).

2

3

> We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need.

4

5

> That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense.

6

7

8

9

*Bruen*, at 2156.

10

11    And because the open carry ban is inconsistent with the plain text of the Second

12    Amendment, there could not be an historical analogue. Indeed, the Framers would not have

13    painstakingly debated and caucused over the words to be used to comprise the Second Amendment,

14    rejecting all other suggestions, and finally declaring that 'the right to keep and bear Arms shall not

15    be infringed.' Even the Fourth Amendment only protects the right to be secure in one's papers and

16    home from *unreasonable* searches and seizures.

17    From men who just won independence from an oppressive ruling force – the British Empire

18    -- it is beyond cavil that the Framers intended to cement the right to be armed into this Nation's

19    core. As *Heller* recognized, "when the able-bodied men of a nation are trained in arms and

20    organized, they are better able to resist tyranny." *Heller*, at 598. The Framers would not have

21    accepted – to any degree – the government's control over the people's access to, and possession

22    and carriage of Arms.

23    Immediately prior to the commencement of the Revolutionary War, England had begun

24    seizing the colonists gun powder[23]; when the armed colonists began to revolt, the Redcoats began

25    "general warrantless searches for arms and ammunition" prompting England to block all arms and

26    ammunition shipments to the colonies. *Id.* at 294, 297-98.

27    _____

[23] Kopel, David, *How the British Gun Control Program Precipitated the American Revolution*, Charleston Law Review, Vol. 2, Winter 2012, NO. 2, at p. 291, a copy of which is provided at Bellantoni Dec. Ex. 3.

28

21

The ideology underlying all forms of American resistance to British usurpations and infringements was explicitly premised on the right of self-defense of all inalienable rights; from the self-defense foundation was constructed a political theory in which the people were the masters and government the servant, so that the people have the right to remove a disobedient servant.

First, by disarming the Americans, the British were attempting to make the practical exercise of the right of personal self-defense much more difficult. Second, and more fundamentally, the Americans made no distinction between self-defense against a lone criminal or against a criminal government.

To the Americans (and to their British Whig ancestors), the right of self-defense necessarily implied the right of armed self-defense against tyranny.

*Id.*, at 301.

The Framers knew all too well that those who forget history are doomed to repeat it. While a great deal of ground has been lost since the ratification, the words codified by the Founding Fathers -- and currently enforced by 27 "constitutional carry states"[24] – remain in effect.

## VIII. THE STATE FAILED TO JUSTIFY CALIFORNIA'S REGULATIONS

None of the State's experts have identified an historical tradition of banning the general public from carrying handguns open and exposed for self-defense – at the risk of criminal penalties.

### A. State Expert, Brennan Rivas

Rivas' attempt to draw a distinction between 'types' of weapons and her belief about their 'use' must be summarily rejected. [25] Public carry was unregulated until after the ratification in 1791; and none of the limitations on the right to bear arms operated to prevented regular people from carrying arms in public for self-defense. *Bruen*, at 2120.

Within the first 4 pages of her declaration, Brennan Rivas admits that open carry was a way of life in the colonial days but attempts to qualify this reality by suggesting that firearms were only used for hunting or 'driving birds away from their crops.' Rivas historical account of American firearm regulations begins in the 1880s – approximately 100 years after the ratification of the Second Amendment [see, Brennan Dec. at footnote 1] – a timeframe too remote to be indicative of

---

[24] https://worldpopulationreview.com/state-rankings/constitutional-carry-states
[25] Rivas' conflation of firearms with 'deadly weapons' is frivolous. All weapons are, by definition, deadly and the Supreme Court has already declared that handguns are weapons in common use protected by the Second Amendment.

22

1    the intent and meaning of the Second Amendment.

2         Rivas cites regulations restricting *concealed* carry, noting that during the Antebellum Period

3    pistols were carried in holsters attached to a saddle, on a belt, or "in the pocket of a greatcoat"[26]

4    and were carried "for defensive purposes while traveling." *Id.* She also notes the handful of states

5    that banned concealed carry while allowing open carry to continue but fails to identify any historical

6    tradition of banning open carry. [27]

7         Additional analysis of the inconsistencies and inaccuracies in Rivas' Expert Report are

8    found in the Declaration and Expert Report of Clayton Cramer accompanying Plaintiffs'

9    submissions herein.

10        **B.  State Expert, Robert Spitzer**

11        The scope of Spitzer's report far exceeds the issues to be decided herein – the peaceable

12   open carriage of handguns for self-defense. As with Rivas, Spitzer's inclusion of anecdotes

13   regarding concealed carry, long arms, bans on brandishing, and licensing of 'dangerous weapons'

14   including explosives, fighting knives, and handguns, commercial sale, and public safety-based

15   restrictions on Second Amendment rights are improper for this Court's consideration as discussed

16   in detail in Point VI above.

17        On the issue of open carry, Spitzer also cites the *Nunn v. State,* [see, n. 26] - yet neglects to

18   mention that the Georgia Supreme Court struck down the law because banning open carry violates

19   the Constitution. See also, Cramer Declaration at Spitzer Rebuttal, section III.

20        Spitzer also cites an 1851 Florida law that only banned concealed carry[28], proffers a

21   "Pennsylvania" statute from 1852, which was actually a local ordinance passed in the borough of

22   York and only concerned 'willful and malicious' carrying. Spitzer's reliance on an 1852 law from

23   the independent Kingdom of Hawai'I is, likewise, not an historical analogue. Because Hawaii was

24

---

[26] Rivas represents that such pistols measured between seven to 12+ inches in length. [Rivas at p. 9].

25   [27] In *Nunn v. State*, 1 Ga. 243 (1846), the Georgia Supreme Court held that its 1837 statute, which broadly
     prohibited "wearing" or "carrying" pistols "as arms of offence or defence" without distinguishing between

26   concealed and open carry, was void to the extent that it prohibited "bearing arms openly," which was in
     violation of the Constitution. *Bruen,* at 2147.

27   [28] The Florida outlier also imposed an annual tax of $10 for those seeking to open carry "dirks, pocket pistols,
     sword canes, or bowie knives." A full-sized pistol or long gun was perfectly legal to openly carry. Cramer,

28   at Spitzer Rebuttal, Section III.

23

1  not annexed as an American territory until four decades later, the law unquestionably ***does not***

2  contribute to the argument that it was part of an American historical tradition.[29, 30]

3        Spitzer proffers an 1858 D.C. law as prohibiting open carry, but the text of the law reads:

4  "It shall not be lawful for any person or persons to carry or have concealed about their persons any

5  deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt,

6  slungshot, or brass or other metal knuckles within the City of Washington" and the margin notes

7  describe the law as: "Unlawful to carry concealed weapons." See, Cramer, at Spitzer Rebuttal,

8  Section III.

9        Additional analysis of the inconsistencies and inaccuracies in Spitzer's Expert Report are

10  found in the Declaration and Expert Report of Clayton Cramer accompanying Plaintiffs'

11  submissions herein. Particularly, Cramer's review of Exhibit H to Spitzer's Report reveals "many

12  problems, some of which seem to be misrepresentations and others lazy 'scholarship.'"

13        Spitzer failed to identify any National tradition of banning open carry and/or punishing its

14  exercise with severe criminal penalties.

15

16  **C.  State Expert, Saul Cornell**

17        Cornell also offers no information to justify the State's open carry ban. Cornell's distortion

18  of the Supreme Court's text, history, and tradition analysis for determining the scope and meaning

19  of the Bill of Rights is patently frivolous and his disregard for God-given individual rights in favor

20  of instilling *the government* with constitutional rights is abhorrent.

21        Cornell appears to create his own Amendment to the Bill of Rights, which he describes as

22  "the most basic right of all: the right of the people to regulate their own internal police."[31] Stripped

23  down, this means – the power of the government to control the People and strip away individual

24

25

---

26  [29] Cramer, at Spitzer Rebuttal, Section III.

27  [30] The Hawaii regulation also lumped handguns in with sword canes and slungshots, only punished an offender with a fine between $10-30, and contained a "good cause" provision similar to the New York restriction struck down in *Bruen*.

28  [31] Cornell Report at 4-5.

rights. The term "the people" as used by Cornell means "the people" working in the government, and not "the People" referred to in the Constitution – the citizens of America for whom the Constitution was codified to protect from Cornell's 'people.' Cornell's underlying theme also includes placing the 'needs of the many over the rights of the individual'[32] – a

Cornell's twisted view of reality cannot be reconciled with the plain text, historical traditions, or *any* Second Amendment jurisprudence -- and must be flatly rejected. A discussion of Cornell's misunderstanding of the limits on governmental power can be found in Cramer Report at Section II.[33]

Cornell goes on to rely on other like-minded writers in an echo-chamber of sorts, but eventually cites actual regulations, none of which demonstrate a National tradition of banning open carry or punishing its exercise with severe criminal penalties.

Additional analysis of the inconsistencies and inaccuracies in Cornell's Expert Report are found in the Declaration and Expert Report of Clayton Cramer accompanying Plaintiffs' submissions herein.

**D. State Expert, Kim Raney**

The Expert Report of former Covina Chief of Police Kim Raney is improper and should be precluded. *First,* Raney has no experience as a law enforcement officer in an open carry jurisdiction. All of Raney's anecdotes and opinions about how legalizing open carry will be 'dangerous' for the public generally and police officers specifically, are entirely speculative and lack personal knowledge, experience, and/or fact. *Second,* the Supreme Court in *Heller*, *McDonald*, and *Bruen* flatly rejected 'public safety' justifications for restrictions of conduct protected by the Second Amendment. *Third*, even if 'public safety' were properly before this Court, the State failed to provide any evidence that the legalization of open carry itself poses an increased risk to public

---

[32] Cornell Report at 4 opining that the "right of the people to pass laws to promote public health and safety is one of the most fundamental rights in the pantheon of American rights" despite the absence of any such language in the Constitution.

[33] At page 11, Cornell also falsely attributes a quote to the decision in *McDonald v. Chicago*, which is nowhere to be found in the Supreme Court's decision. See, Cramer at Section IV.

1   safety.

2          To the contrary, the Expert Declarations of Charles "Chuck" Haggard submitted in support

3   of Plaintiffs' prior motions for a preliminary injunction[34], as well as his deposition transcript taken

4   by the State in this litigation[35] demonstrate that open carry -- as opposed to the lack of proper law

5   enforcement training -- has no negative affect on the public welfare.

6   **IX. THE STATE FAILED TO PROVE THAT FIREARMS LICENSING HAS AN
       HISTORICAL ANALOGUE**
7

8          In its response to Plaintiffs' 2022 application for a preliminary injunction, the State argued

9   that granting an injunction would deprive California of its "primary means of limiting public

    handgun carrying to 'ordinary, law-abiding citizens.'" *Baird*, at n. 1.
10

11         Throughout thus litigation, the State has never provided any evidence that its licensing

12  scheme has "limited," to any extent, the possession of handguns to only "law-abiding" individuals.

13  Individuals disqualified from firearms possession under state and/or federal law, and/or those

14  seeking to use a firearm to commit crime, do not apply for firearm licenses – and therefore are not

    issued firearm licenses.
15

16         The absence of a license is no deterrent to the violent individual seeking to obtain and carry

17  a firearm.[36,37]   In fact, just four days ago, and on September 25, 2023, a report from the Public

18  Policy Institute of California[38] revealed that, despite having "the strictest gun laws in the United

    States,"[39] the number of aggravated assaults with a gun have increased by 61%, homicides by 38%,
19

20  and robberies by 13% since 2019. *Id.*

21

22  ────────────
    [34] ECF Doc. 27-2, 49-1.
    [35] ECF Doc. 73-3.

23  [36] See, e.g., https://www.rand.org/research/gun-policy/analysis/license-to-own/violent-crime.html
    (examination of 12 different studies led to the conclusion that "evidence of the effect of licensing and

24  permitting requirements on total homicides and firearm homicides was 'inconclusive.'"
    [37] See, Bellantoni Dec. at Ex. 4: A survey of inmates in state and federal correctional facilities conducted by

25  the United States Department of Justice in 2001 revealed that in 1997 fewer than 2% purchased the firearm
    from a flea market or gun show, 12% from a retail store or pawn shop, and 80% from family, friends, a street

26  buy, or an illegal source. The 80% of state inmates who acquired a firearm were neither deterred nor unable
    to obtain such firearm as a result of any licensing requirement.

27  [38] https://www.ppic.org/blog/gun-incidents-drive-a-climb-in-violent-crime-rates/
    [39] https://www.msn.com/en-us/news/us/gun-violence-drives-up-crime-in-california-despite-most-stringent-

28  gun-laws-in-the-country/ar-AA1hiyqP                    26

Concerning licensing requirements, the State's experts failed to identify any National historical tradition of requiring the People to seek and obtain permission from the government before being able to lawfully exercise the right to openly carry a handgun. All licensing regulations referenced by Rivas, Cornell, and Spitzer are grounded in the late 1800s-1900s – a time period well-past the ratification of the Second Amendment and lacking insight into the Second Amendment's original meaning. And because government licensing is inconsistent with the demand that the Right "shall not be infringed," 19th- and 20th-century licensing regulations cannot be considered a "confirmation" of the meaning and scope of the Second Amendment. See, e.g., *Bruen*, at 2137.

## X.  AT LEAST ONE CALIFORNIA STATE SUPERIOR COURT AGREES THAT PENAL CODE 25850 VIOLATES THE PLAIN TEXT OF THE SECOND AMENDMENT

At least one California Superior Court has sustained the demurrer of felony firearm charges post-*Bruen*. In *People v. Tony Diaz*, (Case No. 21FE019850, Sup. Ct. Sacramento), the court found that the People's argument that Penal Code sections 25850 and 25400 were 'constitutional' was "impossible to square with the statute's plain language" particularly because § 25850 "subjects anyone in a public place carrying a loaded firearm on the person or in a vehicle to criminal prosecution. This amounts to a total ban on public carry", which "cannot survive *Bruen's* holding that public carry is presumptively legal." [Bellantoni Dec. at Ex. 6].

According to Judge White, the "[d]efendant may exercise his right with impunity." Relying on *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147 (1969), *Freedman v. Maryland*, 380 U.S. 51 (1965), and at least one California appellate court, *Aaron v. Municipal Court*, 73 Cal.App.3d 596 (1977), Judge White held that "an individual cannot be prosecuted for exercising a constitutionally protected right." While those cases involved First Amendment violations, "there is no reason to believe these holdings do not apply when the Second Amendment is at issue. As *Bruen* stated: The constitutional right to bear arms in public for self-defense is not a 'second-class right, subject to an entirely different body of rules than other Bill of Rights Guarantees'." [Ex. 6].

1

**CONCLUSION**

2

Plaintiffs' cross-motion for summary judgment should be granted in its entirety.

3

4

Dated:  September 29, 2023

5

Respectfully submitted,

6

THE BELLANTONI LAW FIRM, PLLC

7

/s/ Amy L. Bellantoni, Esq.
Amy L. Bellantoni

8

*Counsel for Plaintiffs*
Email: abell@bellantoni-law.com

9

*Pro Hac Vice*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28