1  COSCA LAW CORPORATION
2  CHRIS COSCA   SBN 144546
   1007 7th Street, Suite 210
3  Sacramento, CA 95814
   916-440-1010
4
5  AMY L. BELLANTONI
   THE BELLANTONI LAW FIRM, PLLC
6  2 Overhill Road, Suite 400
   Scarsdale, NY 10583
7  Telephone: 914-367-0090
   Facsimile:  888-763-9761
8  *Pro Hac Vice*
9  Attorneys for Plaintiffs
10           **UNITED STATES DISTRICT COURT**
11          **EASTERN DISTRICT OF CALIFORNIA**
12
13  MARK BAIRD and                    Case No. 2:19-CV-00617
14  RICHARD GALLARDO,
15                                    **EXPERT DECLARATION AND REPORT**
                  Plaintiffs,         **OF CLAYTON CRAMER**
16       v.
                                      Judge:       Hon. Kimberly J. Mueller
17  ROB BONTA, in his official capacity as   Room:        3
18  Attorney General of the State of California,
                                      Trial Date:  None set
19               Defendants.          Action Filed: April 9, 2019
20
21
22
23
24
25
26
27
28                      1

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER

# DECLARATION OF CLAYTON CRAMER

I, Clayton Cramer, declare pursuant to 28 U.S.C. § 1746 that:

1.      I have been asked to offer an expert opinion in the above-entitled case in response to the Expert Reports of Robert Spitzer, Saul Cornell, and Brennan Rivas offered by the State of California. I have personal knowledge of each fact stated in this declaration, and if called as a witness, I could and would testify competently thereto.

2.      My background and qualifications, employment, publications, and awards are provided in the attached Expert Reports, which incudes my attendance and graduation from Sonoma State University where I received a Bachelor of Arts and Masters Degree in History. My Master's Thesis was "Concealed Weapon Laws of the Early Republic." I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

3.      I teach history at the College of Western Idaho, Nampa. My publications include:

- *Lock, Stock, and Barrel: The Origins of America Gun Culture*, Praeger Press, 2018;
- *Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*, CreateSpace, 2016;
- *Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*, CreateSpace, 2016;
- *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*, CreateSpace, 2012;
- "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;
- *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*, Nelson Current, 2006;
- *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, Praeger Press, 1999;
- *Black Demographic Data, 1790-1860: A Sourcebook*, Greenwood Press, 1997;
- *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing, 1995;
- *For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;
- *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine*, Editor, Library Research Associates, Inc., 1990.

2

---

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER

4.     My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesile's book contained quotations taken out of context, which completely reversed the author's original intent. Dates were altered and statutory text was changed to completely reversed the meaning of the law. The sheer volume of these errors, and their consistent direction, would seem to preclude honest error. Emory University conducted an investigation that strongly criticized Bellesiles' ethical standards; Bellesile resigned from his tenured position at Emory. Columbia University initially awarded Bellesiles the Bancroft prize for his book "Arming America", but revoked the award after my research proved that the book was fraudulent.

II. MATERIALS REVIEWED

5.     I am fully familiar with this litigation, having offered previous Expert Reports and Declarations in connection with the plaintiffs' previous applications for a preliminary injunction, and my deposition, which was taken by the State of California. Specific to this Declaration and Report, I have reviewed the following documents in connection with this matter, which were provided to me by counsel for the plaintiffs: the Expert Declarations and Reports of Robert J. Spitzer, Saul Cornell, and Brennan Rivas.

6.     In addition to the above documents, I have also relied upon materials cited within the text of this Declaration.

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER

III.    OPINIONS

7.    Plaintiffs' counsel has asked me to provide an opinion on the accuracy of the historical representations declared in the Expert Declarations and Reports of Robert J. Spitzer, Saul Cornell, and Brennan Rivas submitted by Attorney General Rob Bonta in the above-referenced matter.

8.    I have identified errors and omissions of fact in such Expert Reports, as set forth in the annexed Expert Report.

9.    I am being compensated at a rate of $150 per hour for my time. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

10.    Following are my Expert Reports, consisting of a Table of Contents, Table of Authorities, substantive text of my report and findings and analysis, and dated signature.

Dated: September 29, 2023

_____
Clayton Cramer

4

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER

# REBUTTAL TO EXPERT REPORT OF

# ROBERT J. SPITZER

# Table of Authorities

### Cases

McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.) ..................................................... 1

N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022). .................................. 3

N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2156 (2022). .................................. 8

New York State Rifle & Pistol Assn, Inc. v. Bruen 142 S.Ct. 2111, 2143 (2022). ...................... 12

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2138 (2022). ...................... 2

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022). ................... 13

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2145 (2022). ................... 16

New York State Rifle & Pistol Assn., Inc. v. Bruen, 142. S.Ct. 2111, 2124 (2022). ................... 3

*Nunn* v. State, 1 Ga. 243 (1846). ...................................................................................... 7

### Statutes

1 William B. Webb The Laws of the Corporation of Washington Digested and Arranged under
Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18,
1858. ......................................................................................................................... 8

12 Statutes at Large of Pennsylvania From 1682-1801 ch. 1248 at 313-314 (1786). ................. 12

1801 Tenn. Laws 259, 260-261, ch. 22, § 2 ............................................................................. 12

1801 Tenn. Laws 259, 260-261, ch. 22, § 6 ............................................................................. 12

1851 Pa. Laws 381-2, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To
Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of
Said Borough. .......................................................................................................... 7

3 A Compilation of the Statute Laws of the State of Tennessee 89-91 (1872) ............................ 9

A Manual of the Laws of North-Carolina ch. 14 § 3 at 264 (1814). .......................................... 11

Acts and Laws of the Commonwealth of Massachusetts ch. 38 at 87-88 (1893). .........................11

Acts of the General Assembly of Virginia, Passed at the Session of 1838 Ch. 101 at 76-77 (1838); ................................................................................................................... 4

Acts Passed at the Annual Session of the General Assembly of the State of Alabama ch. 77 at 67-68 (1838 [1839]). ............................................................................................ 4

An Act For Preventing and Suppressing of Riots, Routs, and Unlawful Assemblies, Charters and General Laws of the Colony and Province of Massachusetts Bay. ch. 239, at 574 (1814). ....... 3

Cal. P.C. § 417(a)(1). ................................................................................................. 13

Colony of Massachusetts, Charters and General Laws of the Colony and Province Of Massachusetts Bay ch. 11 § 1 at 237 (1814). ...........................................................11

Compilation of the Statutes of Tennessee, of a General and Permanent Nature ch. 14 at 549 (1836). ............................................................................................................11

Laws and Ordinances of New Netherland, 1638-1674 33 (1868). ............................................... 10

State of Georgia, Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837 90-91 (1838) ........................................ 4

Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, iii (1792). ................................................................................. 3, 12

Other Authorities

An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87, Bonham's, .......................................................................... 5

Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform (1999). ........................................................................................ 4

Declaration of Randolph Roth, 19-20, submitted in National Association for Gun Rights v. City of Highland Park, Ill. (N.D.Ill. 2023). ........................................................................................ 5

English Transitional Pepperbox Revolver, Forgotten Weapons,..................................................... 6

Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates 5

From the pages of The Bee, 1967: Armed Black Panthers invade Capitol, Sacramento Bee, May 2, 1967................................................................................................................................... 13

Hawai'i became a U.S. territory in 1898.  Hawaii's long road to statehood, National Archives ... 7

House of Representatives, Nashville Daily Republican, Dec. 29, 1837, 2................................... 4

House of Representatives, Nashville Daily Republican, Jan. 13, 1838, 2..................................... 4

Self-Cocking and Revolving Six Barrel Pocket Pistol [Washington, D.C.] The Madisonian, Dec. 22, 1838, 1................................................................................................................................. 6

# Spitzer Rebuttal

1.      My M.A. in History is from Sonoma State University in California. I teach history at the College of Western Idaho. I have nine published books, mostly scholarly histories of weapons regulation. My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert. granted by Young v. Hawaii, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); Senna v. Florimont, 196 N.J. 469 (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.      In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018). My work was also cited in the *McDonald* v. *Chicago* (2010) dissent.[1]

3.      I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert declarations. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## I.      Why Dates Matter

4.      Throughout Spitzer's declaration, he lists laws in many categories (concealed carry bans, concealed carry licenses, hunting regulations, gunpowder powder regulations) across

---

[1] McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

several centuries in the attempt to demonstrate that firearms regulation is an integral part of the American tradition of gun regulation, apparently in the hope that the courts will accept the idea that because *some* types of gun regulation in *some* centuries were present, then almost *any* regulation meets the standards of Bruen.

5.      While the Bruen opinion held that "[W]e have generally assumed that the  scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791,"[2] they also admitted that "that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope."[3]  In the dispute adjudicated in Bruen, the difference did not matter: "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."[4]  There is at least, a plausible argument that laws adopted between 1791 and 1868 *might* have some relevance to decisions controlled by Bruen; laws passed after 1868 not at all.

## II.      Restrictions on Concealed Carrying of Weapons

6.      Spitzer on pp. 6-7 purports to list "Restrictions on Concealed Carrying of Weapons."  He begins his list with a New Jersey statute that Bruen considered and rejected as irrelevant.[5]  Spitzer then starts listing open carry laws even though his next section claims to be about "Open Carry Weapons Restrictions."

7.      "Massachusetts followed in 1750, penalizing any assemblage of twelve or more persons, whether the weapons were concealed or openly carried, "being armed with clubs or

---

[2] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2138 (2022).
[3] Id., at 2139.
[4] Id.
[5] New York State Rifle & Pistol Assn., Inc. v. Bruen, 142. S.Ct. 2111, 2124 (2022).

other weapons."  The actual statute "If twelve or more persons, being armed with clubs or other dangerous weapons, or if thirty or more persons, whether armed or not, are unlawfully, riotously or tumultuously assembled in a city or town…"[6]  One person, or even eleven persons could lawfully be armed.  Even twelve armed persons was lawful unless "unlawfully, riotously or tumultuously assembled."

8.      Spitzer claims "Virginia and North Carolina passed similar laws incorporating penalties for openly carrying weapons in 1786 and 1792, respectively."  Virginia's law was not similar; it was the Statute of Northampton (1328).  Bruen rejected its relevance: "To be sure, the Statute of Northampton survived both Sir John Knight's Case and the English Bill of Rights, but it was no obstacle to public carry for self-defense in the decades leading to the founding"[7]

9.      North Carolina passed no such law.  His footnote for that claim "Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)" is not a list of statutes passed by North Carolina.  The legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[8]

10.     Martin included the Statute of Northampton (1328), already rejected as inapposite in Bruen.  (It appears that Spitzer is inviting the inferior courts to overrule the Supreme Court.)

---

[6] *An Act For Preventing and Suppressing of Riots, Routs, and Unlawful Assemblies*, Charters and General Laws of the Colony and Province of Massachusetts Bay. ch. 239, at 574 (1814).
[7] N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022).
[8] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).

11.     "In the 1800s, as interpersonal violence and gun carrying spread, 43 states (including the District of Columbia) joined the list; 3 more did so in the early 1900s."  Some of these laws might qualify by the pre-1868 standard set by Bruen, but 1800s includes a lot of post-1868 laws, and the early 1900s laws, all of which are irrelevant by Bruen's standards.

12.     "The rise in the circulation of handguns in society, along with the increased circulation of fighting knives (most notoriously the Bowie knife) and certain types of clubs was accompanied by the rapid spread of concealed carry restrictions, beginning in the early 1800s but then escalating in the post-Civil War period with the spread of multi-shot handguns, precisely because of their contribution to increasing interpersonal violence."  This is somewhat misleading.  The misuse of Bowie knives certainly provoked a burst of concealed weapon laws in the 1830s which often included other deadly weapons[9] but in some cases were narrowly focused on knives.

13.     The Bowie knife bill received its first reading in the Tennessee House on December 28 and its second reading on January 12.  At the second reading, Representative Warner added dirks to the prohibited weapons, but Representative Dean's attempt to add "sword canes and pistols" to the prohibited weapons list failed.[10]  There is a more complex history to these laws and why they were primarily Southern and concentrated in a narrow date range than Spitzer's portrayal.[11]  It appears Spitzer's knowledge is somewhat limited with respect to the literature on this subject.

---

[9] State of Georgia, ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED IN MILLEDGEVILLE AT AN ANNUAL SESSION IN NOVEMBER AND DECEMBER, 1837 90-91 (1838); REVISED STATUTES OF THE STATE OF ARKANSAS, ADOPTED AT THE OCTOBER SESSION OF THE GENERAL ASSEMBLY OF SAID STATE, A.D. 1837 DIV. VIII, Art. I, § 13, at. 280 (1838); ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, PASSED AT THE SESSION OF 1838 Ch. 101 at 76-77 (1838); ACTS PASSED AT THE ANNUAL SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA ch. 77 at 67-68 (1838 [1839]).

[10] House of Representatives, NASHVILLE DAILY REPUBLICAN, Dec. 29, 1837, 2; House of Representatives, NASHVILLE DAILY REPUBLICAN, Jan. 13, 1838, 2.

[11] Generally, see Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999).

14.     His claim that "the spread of multi-shot handguns" contributed to the rise of interpersonal violence may well come from his cited sources, but one of them, Randolph Roth, has elsewhere attributed the rise in homicide rates to not only "the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading" and "As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust."[12]

15.     The revolver was not particularly new with respect to multiple shot handguns. From the late 18th century, gun makers made repeating handguns called pepper-boxes.  The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[13]  The development of the percussion cap certainly made them more practical; while a percussion cap could certainly be detonated accidentally by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.

16.     47. Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges merely by pulling the trigger, placing a man with but one hand on an equality with six men, each

---

[12] Declaration of Randolph Roth, 19-20, submitted in National Association for Gun Rights v. City of Highland Park, Ill. (N.D.Ill. 2023).

[13] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, last accessed March 8, 2023;

with the ordinary pocket pistol."[14]  Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[15]

17.     Roth at least acknowledges that there were other factors in play besides advancing firearms technology.  Roth also describes an enormous range of increases in homicide rates by region with some regions suffering a 12x increase.  He fails to explain why murder rates rose so dramatically in some regions, but not others.  Roth also argues that Americans "were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own."[16]  Yet somehow, Roth and Spitzer know that the availability of revolvers was the important change.

18.     Most baffling is Roth's apparent indifference to the role of population density. "By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year."  New York City had 123,706 people at the 1820 census; Philadelphia 63,802.  These were the two largest cities in America.[17]  The anonymity of large cities makes it far easier for a murderer to escape justice; this is such a large oversight as to make me scratch my head in wonder that Roth could compare areas of such radically different densities with no apparent awareness that this might explain these murder rate differences.

19.     If Spitzer wants to rely on Roth, he should explain why Roth seems to have at best a single factor explanation for something that Roth acknowledges has many other contributions.

---

[14] *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.
[15]     *English      Transitional      Pepperbox      Revolver*,      FORGOTTEN      WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.
[16] Id., at 20.
[17]              U.S.           Census,              *1820           Fast           Facts*, https://www.census.gov/history/www/through_the_decades/fast_facts/1820_fast_facts.html, last accessed February 6, 2023.

## III.   Open Carry Weapons Restrictions

20.     Spitzer in his "Open Carry Weapons Restrictions" section from p. 7 lists an 1837

Georgia law but neglects to mention that the Georgia Supreme Court struck it down:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the [U.S.] Constitution.  *Nunn* v. State, 1 Ga. 243, 250, 251 (1846).

21.     Bruen observed that a small number of laws that a small number of outliers may

exist and these do not override the broad tradition of openly carrying firearms:

> "Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. " [18]

22.     Spitzer then proceeds to find *one* outlier.  Spitzer cites a very curiously titled law:

"1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To

Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said

Borough, § 4."  This prohibition of carrying deadly weapons is in between authorizing transfer of

real estate in §§ 1-3 and amending the charter of York to allow widening of sidewalks in § 5.[19]

At first glance, you might wonder if this was a publishing error.

23.     Spitzer cites an 1852 law from the independent Kingdom of Hawai'i.  It is hard to

see how a nation still four decades from being part of the United States can be considered part of

the American historical tradition.[20]

24.     Spitzer cites an 1858 D.C. law as prohibiting open carry.  But it does no such

thing.  "It shall not be lawful for any person or persons to carry or have *concealed* about their

persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or

---

[18] N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2156 (2022).

[19] 1851 Pa. Laws 381-2, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough.

[20] Hawai'i became a U.S. territory in 1898.  *Hawaii's long road to statehood*, National Archives, https://prologue.blogs.archives.gov/2017/08/21/hawaiis-long-road-to-statehood/, last accessed September 29, 2023/

dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington."[21] [emphasis added]    Did they perhaps mean unlawful to carry at all or carry concealed?    The margin notes describe the law as: "Unlawful to carry concealed weapons."[22]

25.    "In a pattern similar to the enactment of concealed carry laws, open carry restrictions increased in frequency in the latter half of the nineteenth century. From 1860 to 1900, 24 states enacted anti-open carry laws (see Exhibits E and H), and 9 states did so in the early 1900s (a few states enacted laws in both centuries)."    The states that did so in the 1900s are of course, irrelevant.    Looking through Spitzer's Exhibit H shows the misrepresented 1858 D.C. law, the overturned 1837 Georgia law, the 1852 law from a foreign country.    Spitzer cites an 1838 Florida law that he claims taxed open carry.    Review of the statute tells a different story.    It is primarily a tax on sellers of "dirks, pocket pistols, sword canes, or bowie knives."    There was a $200 per tax on vendors, so high as to be nearly prohibitive.    You were free to carry such weapons openly, but with a very high $10 tax per year.[23]    The purpose of this law was to discourage sale or possession of one class of weapons.    A full-sized pistol or long gun was perfectly legal to openly carry.

26.    Reading through Spitzer's Exhibit H and Exhibit E (a laborious process probably intended to discourage busy judges from actually reading the statutes) finds a number of difficulties.    Most of these laws are after 1868.    Going through Exhibit H and looking up the pre-1868 laws in Exhibit E finds many problems, some of which seem to be misrepresentations and others lazy "scholarship."

---

[21] 1 William B. Webb The Laws of the Corporation of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.

[22] Id.

[23] Fla. Laws no. 24 at 36 (1838).

27.     Tennessee 1867: Spitzer p. 78 says this is "William H. Bridges, DIGEST OF THE CHARTERS AND ORDINANCES OF THE CITY OF MEMPHIS, FROM 1826 TO 1867, INCLUSIVE, TOGETHER WITH THE ACTS OF THE LEGISLATURE RELATING TO THE CITY." Comparing his supplied text to A COMPILATION OF THE STATUTE LAWS OF THE STATE OF TENNESSEE  is an exact match.[24] This is why serious scholars look up primary sources.

28.     § 4746: "Any person who *carries under his clothes or concealed about his person*, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size…" emphasis added]  refers to concealed carry so irrelevant to Spitzer's claims about open carry.

29.     § 4753 restates the Statute of Northampton that Bruen termed irrelevant.

30.     § 4757 requires some categories of weapons to be openly carried both in public and private.  "No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

## IV.   No Carry Long Guns

31.     Spitzer p. 9 referencing Exhibit H provides us with a long list of states that supposedly restricted carry of long guns.  Only a very few are before 1868, and a number are not even what Spitzer misrepresents them as.

32.     As we saw previously, the 1858 D.C. law banned *concealed* carry only.

33.     The 1852 Hawai'i law is not from the U.S.

34.     The 1868 Kansas law prohibited carry by "Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who

---

[24] 3 A COMPILATION OF THE STATUTE LAWS OF THE STATE OF TENNESSEE 89-91 (1872).

has ever borne arms against the government of the United States…"  This is a restriction on Confederates, persons under the influence and what sounds like a vagrancy law.

35.     The odd 1851 York Borough ban previously discussed at ¶ 22.

36.     That is it.  Four laws; one that did not apply to long guns, only concealed carry; one from another nation; one applicable to drunks and traitors; one that is a clear outlier.

## V.     Weapons Brandishing and Display Laws

37.     Spitzer p. 11 next attempts to justify bans on open carry by laws prohibiting "the brandishing of weapons—that is, to display them in the presence of others and to do so in a menacing or threatening manner; and the mere display of weapons (i.e. that they simply can be seen) in the presence of others."  He quotes from a 1642 New Netherlands law: "No one shall presume to draw a knife much less to wound any person, under . . . penalty."  Spitzer asserts "This reference did not mention firearms but allowed for penalties for merely drawing or displaying a weapon, even if no brandishing or wounding occurred."

38.     The context matters.  The preceding paragraph:

> WHEREAS We hear daily, God help us, of many. Accidents, caused for the most part by quarrels, drawing of knives and fighting, and the multitude of Taverns and low Groggeries, badly conducted, together with the favorable opportunities which all turbulent persons, Murderers and other Lawless people have for running away and consequently escaping condign punishment, wherein we would willingly make provision so as to prevent, as much as possible, all harm;[25]

39.     Drawing a knife in a bar seems like brandishing to me, not merely "displaying a weapon."

40.     "Similarly, a 1786 Massachusetts law criminalized the mere assemblage of 'any persons to the number of twelve, or more, being armed with clubs or other weapons.' If they did not disperse within an hour of being warned, they could be subject to arrest."  What Spitzer left

---

[25] LAWS AND ORDINANCES OF NEW NETHERLAND, 1638-1674 33 (1868).

out is that being armed was only an issue if the group "shall be unlawfully, routously, riotously or tumultuously assembled."[26]

41.    "For example, the 1686 New Jersey "Act against wearing Swords, &c" was adopted as a reaction to "great complaints by the inhabitants of [the] Province, that several persons [were] wearing swords, daggers, pistols, dirks, stilladoes, skeines [small Irish-derived swords], or any other unusual or unlawful weapons."  Bruen rejected its significance:

> The law restricted only concealed carry, not all public carry, and its restrictions applied only to certain "unusual or unlawful weapons," including "pocket pistol[s]." *Ibid.* It also did not apply to all pistols, let alone all firearms. "Pocket pistols" had barrel lengths of perhaps 3 or 4 inches, far smaller than the 6-inch to 14-inch barrels found on the other belt and hip pistols that were commonly used for lawful purposes in the 1600s. [27]

42.    Spitzer again overrules the Court by citing a 1694 Massachusetts law that rephrases the Statute of Northampton.  That same "An Act for the Punishing of Criminal Offenders" also provides for punishment in the stocks "if any person or persons shall profanely swear or curse in the hearing of any justice of the peace, or shall be thereof convicted by the oaths of two witnesses, or confession of the party."[28]  Massachusetts was not an outlier on this: see Tennessee's identical 1741 statute,[29] and North Carolina's identical 1741 statute.[30] Pennsylvania's 1786 statute is similar: "Be it further enacted by the authorities aforesaid, That if any person of the age of six teen years and upwards from and after the first day of August next shall profanely swear or curse by the name of God, Christ Jesus, or the Holy Ghost, every person so offending being thereof convicted shall forfeit and pay the sum of five shillings for every

---

[26] ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS ch. 38 at 87-88 (1893).
[27] New York State Rifle & Pistol Assn, Inc. v. Bruen 142 S.Ct. 2111, 2143 (2022).
[28] Colony of Massachusetts, CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY ch. 11 § 1 at 237 (1814).
[29] COMPILATION OF THE STATUTES OF TENNESSEE, OF A GENERAL AND PERMANENT NATURE ch. 14 at 549 (1836).
[30] A MANUAL OF THE LAWS OF NORTH-CAROLINA ch. 14 § 3 at 264 (1814).

profane oath or curse…"[31]  I look forward to Spitzer's reinterpretation of the First Amendment based on this historical tradition.

43.    Spitzer cites a 1699 New Hampshire version of the Statute of Northampton, a 1795 Massachusetts version, and a Maine 1821 version.  Bruen rejected the relevance of these statutes: "Respondents, their amici, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself."[32]

44.    "North Carolina enacted a very similar measure in 1792, saying that no man shall 'go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere.'"  As discussed in ¶9, North Carolina passed no such law, which would have been obvious to anyone who actually read the work Spitzer cited.[33]

45.    "In 1801, Tennessee enacted a law saying that no one was to 'go armed to the terror of the people, or privately carry any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person.'"  This is "An Act for the restraint of idle and disorderly persons…  Whereas it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons… endeavoring to maintain himself by gaming or other undue means,"[34]  they passed a vagrancy law for "persons of ill fame or suspicious character."  Section 6 does indeed contain the text of the Statute of Northampton.[35]  Spitzer cited this as "1801 Tenn. Pub. Acts 260, ch. 22, § 6.  Quoted in Young v. Hawaii, 798."  Why not go to

---

[31] 12 STATUTES AT LARGE OF PENNSYLVANIA FROM 1682-1801 ch. 1248 at 313-314 (1786).
[32] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022).
[33] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).
[34] 1801 Tenn. Laws 259, 260-261, ch. 22, § 2.
[35] 1801 Tenn. Laws 259, 260-261, ch. 22, § 6.

the actual source?  In any case, it is clearly a brandishing statute, which requires more than open carry of arms.

46.    "Note that Virginia, Massachusetts, Tennessee, and Maine all invoked some version of the old British phrase 'to the terror of the people' with New Hampshire's law referencing the similar 'fear' of the public. And in the Tennessee law, concealed weapons carrying was also identified as a source of 'terror.'"  Brandishing necessarily involves more than the appearance of a weapon.  California defines this crime as "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner,"[36]

47.    The open carry of a firearm alone does not meet this definition.  The historical tradition of California law, which allowed open carry of firearms in cities until 1967 and in unincorporated areas of most counties, demonstrates this:

> Two dozen armed Negroes entered the state Capitol at noon today and 10 made their way to the back of the Assembly Chamber before they were disarmed and marched away by the state police…. After the state police questioned the men, they returned the weapons to them because the intruders had broken no law.[37]

48.    Spitzer p. 17 claims "The mere act of display is sufficient to warrant prosecution." However on p. 13 he admits that "Note the two key elements: the 'exhibit' or display of the weapon combined with doing so 'in a rude, angry and threatening manner,' revealing a criminal intent as invoked by the terms 'rude, angry, and threatening.'"  Why he made a point of listing brandishing laws in this context is mystifying, especially because he already acknowledged that more than the sight of a weapon is necessary to constitute brandishing.  No one is arguing for a right to wave a gun around in "a rude, angry and threatening manner."

---

[36] Cal. P.C. § 417(a)(1).
[37] *From the pages of The Bee, 1967: Armed Black Panthers invade Capitol*, Sacramento Bee, May 2, 1967, https://www.sacbee.com/news/local/history/article148667224.html, last accessed September 22, 2023.

# VI.   Weapons Licensing

49.     Spitzer under "Weapons Licensing" starting on p. 17 asserts "At least 48 states (including D.C.) utilized some type of weapons licensing or equivalent policy technique (see Exhibit G)."  But what was licensed?  By Spitzer's own words "firearms discharging," hunting, "the commercial sale, transport, or firing of weapons at locations like shooting galleries." All of these are actions separate from "keep and bear arms."

50.     Examining Exhibit G for laws that pre-date 1868 finds few matches.

## A.  Ownership

51.     P. 7 "At least 29 states enacted 61 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time.", the 'keep' of 'keep and bear arms'. Spitzer's 100+ page Exhibit F lists none that predate 1868. Spitzer Exhibit G does have laws that predate 1868, exclusively to disenfranchise blacks.

## B.  Licensing of Weapons Carrying or Possession

52.     Spitzer p. 19 also again seeks to overturn the Supreme Court by claiming "With regard to concealed carry of pistols and other dangerous weapons, as noted earlier, from the 1700s through the early 1900s virtually every state in the country restricted or criminalized such carrying."  Bruen's retort:

> Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime.[38]

53.     Spitzer's list of laws under "Licensing of Weapons Carrying or Possession" starting on p. 19 are entirely post-1868 laws and therefore meaningless by the Bruen standards.

---

[38] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2145 (2022).

### C.   Permits for Firearms Discharge or Use of Explosives

54.     Spitzer starting at p. 26 lists "Permits for Firearms Discharge or Use of Explosives." The challenged law in Baird v. Bonta does not regulate discharge of firearms. Also importantly, as Spitzer's own characterization of these laws admits, these laws licensed "firing and fireworks 'at times of public rejoicing' and at specified locations." This suggests that licensing was not a common practice but a general ban from which infrequent exceptions might be allowed.

### D.  Commercial Licensing

55.     Spitzer p. 29 provides a single law pre-dating 1868, "an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans, including guns or other weapons, unless they obtained a license from the governor." The challenged law does not regulate commercial, sale, or transport.

### E.  Licensing Restrictions on Gunpowder

56.     The challenged law does not regulate storage of gunpowder.

### F.  Weapons Sellers Recording Purchases

57.     The challenged law does not regulate weapons sellers recording purchases.   Even then, Spitzer's examples pp 30-31 are all post-1868.

### G. Licensing Pertaining to Named Groups

58.     Spitzer at pp. 31-32 seems to regard the racism of licensing of gun possession as a positive model for California, claiming that licensing possession by Indians and black Americans "reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited, controlled circumstances." It would appear that Spitzer believes that California

15

should use this racist model as a method for controlling California gun owners who might at any moment, raise the scalping knife or flee to Canada.

## VII.   Summary

59.     Spitzer cites at least one carry law as "passed" by a legislature that was not. See ¶9.

60.     Spitzer cites one outlier from York Borough, Pennsylvania that is so disconnected in its title and sections as to make me wonder if this was a clerical error. See para 20.

61.     Spitzer cites laws from the Kingdom of Hawai'i as indicative of American historical tradition. See ¶21.

62.     Spitzer claims that a D.C. law that prohibited concealed carry prohibited all carry of firearms. See para 22.

63.     Spitzer cites a restrictive Georgia law but neglects to mention that the Georgia Supreme Court overturned the carry ban as violating the Second Amendment. See para 23.

64.     Spitzer brings in brandishing laws, admits that brandishing requires more than just visibility of a weapon, then claims that visibility alone, such as open carry, qualifies as brandishing. See § V

65.     Spitzer lists a variety of forms of regulation that have no connection to the challenged law: permits for firearms discharge or use of explosives, commercial activity, recording weapons sales, licensing of gunpowder storage.

66.     Spitzer points to racist weapon regulations as a model to justify licensing of open carry.

67.     Spitzer cites laws that the Bruen decision specifically rejected as irrelevant to the Second Amendment.  Perhaps Spitzer imagines that at least five of the occupiers of the Supreme Court are named Robert Spitzer, and he therefore gets to overrule the Bruen decision.

# REBUTTAL TO EXPERT REPORT

# OF SAUL CORNELL

# Table of Authorities

Cases

Browne, Report of the Debates, 47. ........................................................................ 23

Cockrum v. State, 24 Tex. 394, 396, 401 (1859) ......................................................... 22

McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.) ................................... 1

Nunn. v. State, 1 Ga. 243, 250 (1846) .......................................................................... 22

State v. Chandler, 5 La. Ann. Rep. 489, 490 (1850) .................................................... 22

State v. Jumel, 13 La. Ann. Rep. 399, 400 (1858) ...................................................... 22

State v. Smith, 11 La. Ann. Rep. 638 (1856) ............................................................... 22

Statutes

1 The Public Records of the Colony of Connecticut, 1636-1776 15 (1850) .................... 6

Charles J. Hoadly, ed., Records Of The Colony And Plantation Of New Haven, From 1638 To
   1649  25-26 (1857) ................................................................................................ 6

Clayton          E.          Cramer,          Militia          Statutes,
   https://claytoncramer.com/primary/primary.html#MilitiaLaws ................................. 7

Other Authorities

"The Immigration and Nationality Act of 1952 (The McCarran-Walter Act)," U.S. Department of
   State, ................................................................................................................... 25

1 American State Papers. Class V. Military Affairs. 159-62 (1832). ............................. 6

An ACT to suppress the disorderly practice of FIRING GUNS, &c., Pennsylvania Gazette, Dec.
   28, 1774 ............................................................................................................... 14

Bernard E. Harcourt, From the Asylum to the Prison: Rethinking the Incarceration Revolution, 84 Texas Law Review 1766-75 (2006). .................................................................................. 27

Browne, Report of the Debates in the Convention of California, on the Formation of the State Constitution… 47 (1850). ......................................................................................................... 21

California Assembly Concurrent Resolution No. 42. https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42 ....... 20

Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database........................ 27

Clayton E. Cramer, Concealed Weapon Laws Of The Early Republic: Dueling, Southern Violence, And Moral Reform 52-62 (1999)............................................................................ 21

Clayton E. Cramer, Mental Illness and the Second Amendment, 46 Conn. L.R. 4:1301 (2014) . 26

Clayton E. Cramer, My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill (2012)....................................................................................................... 26, 27

David Alan Johnson, FOUNDING THE FAR WEST: CALIFORNIA, OREGON, AND NEVADA, 1840-1890, 129 (1992)........................................................................................................................... 23

David M. Chalmers, HOODED AMERICANISM: THE HISTORY OF THE KU KLUX KLAN 124 (1981, 3rd ed.). ................................................................................................................................... 25

Davis McEntire, RESIDENCE AND RACE: FINAL AND COMPREHENSIVE REPORT TO THE COMMISSION ON RACE AND HOUSING 269 (1960)........................................................................ 23

E.B. Willis and P.K. Stockton, 1 DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF CALIFORNIA… 285 (1880). ........................................................ 24

Emily J. Zackin, Looking for Rights in All the Wrong Places: Why State Constitutions Contain America's Positive Rights 200 (2013). ........................................................................................ 23

FBI, Crime in the United States 2019, Expanded Homicide Data Table 2 (2019) ......................... 8

Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the
Economic Development of the Small Arms Industry, 1798-1870 34 (1948) ........................... 10

Frank Klay, The Samuel E. Dyke Collection of Kentucky Pistols 4-15 (1972) ........................... 10

H. Richard Uviller & William G. Merkel, The Militia And The Right To Arms, Or, How The
Second Amendment Fell Silent 150 (2002). ............................................................................. 6

Harold L. Peterson, Arms and Armor in Colonial America: 1526-1783 213-14, 202, 205, 209
(1956).................................................................................................................................... 10

J. Ross Browne, Report Of The Debates In The Convention Of California, On The Formation Of
The State Constitution… 47 (1850). ....................................................................................... 20

Jean Isaac Rael and Virginia C. Armat, Madness In The Streets: How Psychiatry And The Law
Abandoned The Mentally Ill (1990) ........................................................................................ 27

John M. Dawson and Patrick A. Langan, Murder in Families, Bureau of Justice Statistics Special
Report 1 (Jul. 1994) ................................................................................................................. 8

John Robert Soennichsen, The Chinese Exclusion Act of 1882 127-128 (2011). ........................ 23

John Winthrop, 2 Winthrop's Journal: "History of New England", 27, 153, 180, 275 (1908)..... 12

John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England"*
*1630-1649* (1908), 83......................................................................................................... 15

Last Friday one Hunt, a lime seller in this…, Pennsylvania Gazette, Apr. 20, 1749.................... 12

Last Monday Capt. Tyng in the Massachusetts…, Pennsylvania Gazette, Aug. 15, 1745. .......... 13

Laurie Goodstein and William Glaberson, The Well-Marked Roads to Homicidal Rage, New
York Times, Apr. 10, 2000 ..................................................................................................... 26

Letter From Sacramento, [San Francisco] Daily Alta California, February 19, 1856, 2. ............. 24

M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 312 (1980) ......................................................................................................................... 10

Monday Evening last a very melancholy…, Pennsylvania Gazette, Oct. 31, 1745 ................... 12

Nelson Kempsky, A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings 19 (October, 1989), .......................................................... 26

*New Firearms Law Effective on August 7*, SAN FRANCISCO CHRONICLE, July 15, 1923, at 3, col. 1 ............................................................................................................................................ 25

Oregon, JOURNAL OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF OREGON: HELD AT SALEM 125 (1882) ................................................................................................................. 23

Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840) ..................................................... 10

Randolph Roth, American Homicide xii (2009) ............................................................................. 8

Ricardo Romo, EAST LOS ANGELES: HISTORY OF A BARRIO 157 (1983)....................................... 25

Richard Burn and John Burn, A New Law Dictionary 79 (1792).................................................... 5

Richard Maxwell Brown, The South Carolina Regulators 35, 40, 54 (1963) .............................. 12

Samuel Charles Wiel, 2 Water Rights in the Western States: The Law of Prior Appropriation .. 1166 (3d ed. 1911) ................................................................................................................... 23

Steven P. Segal, Civil Commitment Law, Mental Health Services, and US Homicide Rates, Social Psychiatry and Psychiatric Epidemiology, November 10, 2011 .................................... 28

Theodore H. Hittell, 4 HISTORY OF CALIFORNIA 615-17 (1897)................................................... 23

Win Blevins, Dictionary of the American West 166 (2001). ......................................................... 24

# Cornell Rebuttal

1.      My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert. granted by Young v. Hawaii, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); Senna v. Florimont, 196 N.J. 469 (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.      In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).  My work was also cited in the *McDonald* v. *Chicago* (2010) dissent.[1]

3.      I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert declarations.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## I.     Misrepresenting Common Law

4.      On p. 3: Cornell asserts:

---

[1] McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

No legal principle was more important to the common law than the concept of the peace. As one early American justice of the peace manual noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury." Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."

5.      Blackstone's quote is from a discussion of:

[S]ubordinate magistrates, whom I am to consider justices of the peace… Of these, some had, and still have, this power annexed to other offices which they hold; others had it merely by itself, and were thence named *custodes* or *conservatores pacis*. Those that were so *virtute officii* still continue: but the latter sort are superseded by the modern justices.[2]

6.      While perhaps an accurate statement of Blackstone's view of the common law, it seems a good case can be made that it is a retrospective description, already irrelevant to English law in Blackstone's time and therefore irrelevant to American law.

7.      When Blackstone listed the absolute rights that every Englishman enjoyed, peace was not on the list, but "5. THE fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence…"[3]  Blackstone does not identify peace as one of these "Rights of Persons" in Book I, ch. 1:

The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that residuum of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals.[4]

8.      If Blackstone is of great importance for determining what was important in English and therefore American law, this core right of self-defense deserves *at least* as much weight as Cornell's apparently out of context of quote from Blackstone.

9.      "In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous terms that there was a 'well established

---

[2] William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 143 (1775).
[3] Id., at 143.
    [4] Id., at 121.

historical tradition of prohibiting the carrying of dangerous and unusual weapons.'"  The footnote cites this to Heller not Bruen.  (Kavanaugh was not on the Court for Heller.)  Cornell is careless in his scholarship.

10.    Bruen quotes this phrase as part of *guaranteeing* the carrying of handguns:

> For example, we found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'"[5]

## II.    Misunderstanding Limits on Governmental Power

11.    Cornell next asserts:

> The right of the people to pass laws to promote public health and safety is one of the most fundamental rights in the pantheon of American rights. The idea of popular sovereignty, a core belief of the Founding generation, included a right of legislatures to enact laws to promote the common good. Although modern lawyers and jurists are accustomed to thinking of this concept under the rubric of state police power, the Founding generation viewed it as a right, not a power. The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms. Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."

12.    The Pennsylvania Constitution included a guarantee of a right to keep and bear arms,[6] a guarantee "[N]o part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives"[7] and a guarantee of "a right to freedom of speech, and of writing, and publishing their sentiments."[8]  These seem to be pretty large exceptions to Cornell's imagined right "to legislate for the common good."  Why bother including limits on the state's powers if "popular sovereignty,… included a right of legislatures to enact laws to promote the common good"?  Perhaps Cornell's understanding of state police power is wrong or at least more limited than he imagines?  Popular sovereignty would include the right of the people to criminalize whatever forms of sexual behavior they

---

[5]).
[6] Penn. Const. Art. 11 (1776).
[7] Penn. Const. Art. 8 (1776).
[8] Penn. Const. Art. 12  (1776).

abhorred, limit marriage to one man, one woman; prohibit abortions; prohibit contraception; prohibit obscene material; allow police to torture confessions out of suspects. All of these would be constitutional under Cornell's expansive police powers as long as they met what the public believed was "for the common good."

13.    On pp. 6-7:

> Although "free-standing balancing" by judges is precluded by *Heller*, the plain meaning of the Second Amendment's text recognizes a role for regulation explicitly and further asserts that actions inimical to a free state fall outside of the scope of the right instantiated in the text.21 The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.

14.    Heller is very clear that "well-regulated" means nothing like Cornell's misreading: "Finally, the adjective "well-regulated" implies nothing more than the imposition of proper discipline and training."[9]   Cornell's attempt to read this adjective as justifying strict regulation of arms might be an easy mistake for a person with limited knowledge of the subject (*e.g.,* someone just assigned the topic in high school debate club), but for an "expert" to think this is part of the discussion is embarrassing.

15.    Cornell continues down this mistaken path with the claim that "infringe" in the Second Amendment means something quite different from "abridge" in the First Amendment. In defense of this supposed difference Cornell pp. 7-8:

> John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty. Regulation was the indispensable correlate of rights in Founding era constitutionalism.

---

[9] D.C. v. Heller, 554 U.S. 570, 597 (2008).

16.    In support of this claim, Cornell's incomplete footnote 23 cites Burns' New Law Dictionary definition of "liberty," but it does not match any American concept of that term.  If anything, it is a profoundly anti-American concept: privilege granted to a select few:

> LIBERTY, is a privilege held by grant or prescription, by which men enjoy some benefit beyond the ordinary subject. [10]

17.    I suppose Burns' privilege idea fits well with California's defense of the challenged law in the same way that an aristocrat's privileges grant him advantages over the hoi polloi.

18.    At pp. 8-9, Cornell quoting a "patriotic revolutionary era orator," "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property."  The relevance of this quote to this case seems confused.  The plaintiffs in this case are not arguing for no government or a "destitution of all law," but a disagreement about *this* law.  Cornell's reasoning could be equally applied to laws prohibiting free speech, or opponents of warrantless searches; First Amendment or Fourth Amendment opponents of unlimited power to the government are not arguing for anarchy.

19.    At p. 9, Cornell quotes Jud Campbell that "Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."  What Cornell and perhaps Campbell seem to have missed is that the Bill of Rights limits democracy because a majority can, and often does, abuse its power.  The recent panic after 9/11 should be a reminder that even well-intentioned polities can blow it.  The internment of Americans of Japanese ancestry during World War II is another example.  Miscegenation laws and the segregation of public schools and public accommodations in many

---

[10] Richard Burn and John Burn, A NEW LAW DICTIONARY 79 (1792).

parts of America were done with "consent of the body politic." This is why we have a Bill of Rights, as a restraint on majority abuse of power.

## III.   Misrepresenting His Sources

20.     Cornell on pp. 9-10 continues: "In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order."   Cornell's source for this claim is: "H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002)." That page makes no such claim. It is a discussion of the meaning of the Second Amendment that directly contradicts Cornell's claims. Review of militia censuses cited in UVILLER & MERKEL,[11] shows that these militia censuses show the number of militiamen by state, broken down by rank.[12] There is no record of who was a member or what arms each person possessed. Cornell is just making this stuff up.

21.     Mustering the militia required no such recordkeeping. Colonial and state militia laws did not keep track of who was armed. They imposed a duty to be armed and to show up with those arms on muster day or face fines.[13] I am unaware of any safe storage laws of this period, and Cornell cites only a secondary source for a rather important claim. I have a pretty

---

[11] H. Richard Uviller & William G. Merkel, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002)

[12] 1 American State Papers. Class V. Military Affairs. 159-62 (1832).

[13] A few examples: 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) ("It, it is ordered that all persons shall beare Armes that are above the age of sixteene yeeres except they doe tender a sufficient excuse [to] the Corte & the Cort allowe the same."); Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649  25-26 (1857) ("It is ordered that every one that beares armes shall be compleatly furnished with armes (viz), a muskett, a sworde, bandaleers, a rest, a pound of powder, 20 bullets fitted to their muskett, or 4 pound of pistoll shott or swan shott att least, and be ready to show them in the markett place upon Munday the 16th of this Month before Captaine Turner and Leiutennant Seely under the penalty 20 s fine for every default or absen[ce].")

complete collection of colonial and Revolutionary militia laws[14] and there are no such provisions that I can find.

22.     Cornell's next strawman argument starting on p. 11: "The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework. The entire body of the common law was designed to preserve the peace and the right of self-defense existed within this larger framework."  Nor do the plaintiffs argue otherwise.  This challenge is not about the laws of self-defense, only about whether open carry may be subject to a license requirement.

### IV.    Misrepresenting Supreme Court Decisions

23.     Cornell at p. 11: "Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety."  His citation is to McDonald v. Chicago (2010) quoting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").  The actual quote is from the Brief for State of Texas et al. which was filed on behalf of the petitioner seeking overturn of Chicago's firearms regulations.   McDonald decided they were not only not "reasonable" but contrary to the Second Amendment.[15]

## V.    Misunderstanding Colonial Homicide

24.     Cornell tries to establish on pp. 11-12 that there was "no comparable societal ill to the modern gun violence problem for Americans" to solve. His explanation: "A combination of

---

[14] Clayton E. Cramer, *Militia Statutes*, https://claytoncramer.com/primary/primary.html#MilitiaLaws, last accessed July 15, 2023.

[15] McDonald v. Chicago, 561 U.S. 742, 785 (2010).

factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment." Spitzer relies heavily on the work of Randolph Roth. There are a host of problems with Roth's claims upon which Spitzer's claims piggyback.

25.    We need to examine Roth's definitions. In this section, I am analyzing Roth's claims from his expert declaration in Association Of New Jersey Rifle & Pistol Clubs, Inc., et al., v. Platkin (D.N.J. 2023) and Roth's book AMERICAN HOMICIDE. Roth's homicide rates are not *murder* rates, which makes comparison to current murder rates inapposite. Roth repeatedly indicates that he is looking at homicides by "unrelated adults."[16] About 6% of murder victims in 2019 were under 18.[17] It seems likely that of minor murder victims (which at that time would have included all under 21 years) would have been similarly common in colonial times. "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[18] This alone makes his homicide rates *at least* 16% below not only current *murder* rates, but even *homicide* rates (because every murder is also a homicide).

26.    Roth also tells us that his homicide numbers include "assaults that were legally justified or not meant to cause death."[19] About 6% of recent civilian homicides are either initially or subsequently (as the case moves from arrest through indictment and trial) classified as justifiable or excusable. Justifiable homicides are killings of a person engaged in a felony;

---

[16] Roth, AMERICAN HOMICIDE 61, Figure 2.3 at p. 95 (2009).
[17] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).
[18] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).
[19] Randolph Roth, AMERICAN HOMICIDE xii (2009).

excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")[20] Roth's homicide rates are thus likely at least 6% higher than murder rates.

27.     Roth's declaration at ¶17: "By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England."  These are rates not terribly different from current U.S. murder rates; we will return to this question later.  Roth's numbers thus understate murder rates relative to today.  This gives a warmer and cozier picture of colonial America than it was.

## VI.   Ignorance of Colonial Firearms Technology

28.     Cornell on p. 12 claims:

> Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America.  These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region….  Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.

29.     This single quote demonstrates how limited Cornell's expertise is.  Bayonets are not a firearms technologyThis case involve bayonet regulation.

---

[20] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).

30.     Cornell's assumption of who owned pistols and why reflects, I think, Cornell's single source, a book about dueling by people in national politics.  How common were pistols before the Revolution?  The evidence from archaeological digs, probate inventories, advertising, and from surviving pistols demonstrates that Americans made handguns before the Revolution; that there was a civilian market for them in at least some cities; and that pistol ownership was unremarkable.

31.     An analysis of all Plymouth Colony probate inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.[21]

32.     On August 22, 1775, the New-York Provincial Congress ordered the militia to arm themselves; Cavalrymen were obligated to provide themselves with "a case of pistols, and a carabine."  Every man 16 to 50 was to "furnish himself" with either a long gun or "a case of pistols."[22]

33.     While Americans made pistols early in the eighteenth century, most colonists preferred to buy pistols imported from Britain, perhaps because of price or prestige.  Only a few pre-Revolutionary War American-made pistols have survived.[23]  Surviving pistols made for William Smith of Farmington, Connecticut by Medad Hills in 1771, were equipped with American-made barrels, and apparently English locks.[24]

---

[21] Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony" (2002), Tables 1 and 4, available at https://www.plymoutharch.com/wp-content/uploads/2014/11/62869457-Firearms-in-Plymouth.pdf, last accessed March 1, 2023.

[22] Peter Force, ed., 3 AMERICAN ARCHIVES, 4th ser., 665-6 (1840).

[23] Harold L. Peterson, Arms and Armor in Colonial America: 1526-1783 213-14, 202, 205, 209 (1956); M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 312 (1980); Frank Klay, The Samuel E. Dyke Collection of Kentucky Pistols 4-15 (1972); Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798-1870 34 (1948).

[24] George A. Stickels, *The William Smith Pistols Made by Medad Hills*, THE GUN REPORT 10-12 (September, 1979).

34.     Advertising and news reports show that merchants offered pistols for sale in Colonial America.  Such ads appear in the *Boston Gazette* as early as 1720.  Sampling ads from the 1741-1742 period reveals at least two different merchants offering pistols for sale.[25]

35.     A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749.  A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having as they said, got the six Pair at some other Place."[26]  In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[27] as did Henry Deabarear, who sold "pistols for holsters and the pocket…."  Philadelphia merchants advertised pistols for sale repeatedly from 1744 onward.[28]  A 1745 ad in the Pennsylvania Gazette, offered "ship muskets, *pistols* , cutlashes and poleaxes, gunpowder, lead, shot and bullets, English and French gun flints."[29] [emphasis added]

36.     Pistols appear in journals and newspaper articles throughout the colonial period— and while the crimes committed with them are sometimes shocking, the *presence* of pistols is never remarkable.  Governor John Winthrop made several references to pistols in New England in the nineteen years that his journal covers.  One was a 1641 theological dispute at Pascataquack (now Dover, New Hampshire) that led the factions to arm themselves and march, at least one member identified as armed with a pistol.  There were murders with pistols at Stamford,

---

[25] Boston Gazette issues with one or more ads offering pistols: May 30, 1720, November 17, 1741, December 8, 1741, February 2, 1742, May 11, 1742, May 18, 1742, May 25, 1742, July 13, 1742, August 10, 1742, August 24, 1742, August 31, 1742, [September 13?], 1742.

[26] Pennsylvania Gazette, August 31, 1749.

[27] September 4, 1772 and September 14, 1773, Wochtenlichter Pennsylvanische Staatsbote, translated and quoted in James Whisker, The Gunsmith's Trade 159-160 (Lewiston, N.Y.: Edwin Mellen Press, 1992).

[28] Pennsylvania Gazette, November 1, 1744; September 26, 1745; October 3, 1745; October 17, 1745; February 11, 1746; July 17, 1746; July 30, 1747; May 12, 1748; September 15, 1748; October 25, 1750; November 27, 1755; August 2, 1759; February 11, 1762; April 14, 1763; May 19, 1763; April 12, 1764; April 19, 1764; August 16, 1770; May 28, 1772; February 17, 1773; September 15, 1773.

[29] *Just imported by Hamilton, Wallace and Company, in the Ship*, Pennsylvania Gazette, Sep. 26, 1745, Oct. 3, 1745.

Connecticut and at Penobscott in 1644, and an attempted murder with a pistol at Cape Sable in 1646.[30]  Pistols appear in other places in Winthrop's Journal.[31]  Winthrop never expressed any surprise over the presence of pistols.

37.     An accident in New York City in 1745: "a young Gentleman having been on board the Clinton Privateer, then going out, had a Pair of *Pistols* given him; which on his coming on Shore he carried into a Publick House, among some of his Acquaintance, where one of them was found to be loaded; upon which several Attempts were made to discharge it; but it missing Fire, he sat down in order to amend the Flint; in doing of which, the *Pistol* unhappily went off, and shot Mr. Thomas Cox, Butcher, through the Head…"[32] [emphasis in original]

38.     Other eighteenth century accounts mention pistols.  Eliza Lucas Pinckney described the suicide of Anne LeBrasseur with a pistol as "melancholy and shocking," but newspaper accounts suggest that what was shocking was not the weapon, but that she was "a Disciple of Mr. Whitefield's" (the noted evangelist).[33]  In 1749, the PENNSYLVANIA GAZETTE reported that, "Sunday night last, about eight a Clock, Richard Green, coming to Town from Kensington, was stopt on the Road, and his Money demanded, by two Men with Pistols…."[34] There are other examples available in the PENNSYLVANIA GAZETTE of the criminal misuse of and accidental deaths from pistols; they are never described as surprising.[35]  Pistols appear among the South Carolina Regulators and the criminals to whom they administered frontier justice.[36] Nor was there any surprise when pistols appear in the hands of the law-abiding, such as a

---

[30] John Winthrop, 2 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND", 27, 153, 180, 275 (1908).

[31] Id., at 95, 151.

[32] *NEW YORK, October 28. Monday Evening last a very melancholy*, PENNSYLVANIA GAZETTE, OCT. 31, 1745.

[33] Eliza Lucas Pinckney, Elise Pinckney, ed., THE LETTERBOOK OF ELIZA LUCAS PINCKNEY 42, 42 n. 55 (1997).

[34] *By the last Post from New York…*, PENNSYLVANIA GAZETTE, Aug. 31, 1749.

[35] *Monday Evening last a very melancholy…*, PENNSYLVANIA GAZETTE, Oct. 31, 1745; Last Friday one Hunt, a lime seller in this…, PENNSYLVANIA GAZETTE, Apr. 20, 1749.

[36] Richard Maxwell Brown, THE SOUTH CAROLINA REGULATORS 35, 40, 54 (1963).

description of Rev. Whitfield preaching in Massachusetts, "he was attended by many Friends with Muskets and Pistols on Account of the Indians…."[37]

39.    Pistols appear in news reports: This came from New York in 1775, describing events before March 23 (so before the Revolutionary War started):

> The sheriff came to the courthouse, and demanded entrance, which was refused him; and whilst struggling to enter the door, he received a blow upon his head, which leveled him with the ground: Having recovered a little, he arose and discharged a *pistol* among the opposers, and commanded the Court party to fire also; which was, as Mr. Langdon supposes, about five of them fired. Mr. French, one of the opposers, was killed by a ball's being lodged in his head, and two more of the same party were also wounded. The sheriff and the Court party then entered the courthouse. The populace without discharged a gun and two *pistols* .[38] [emphasis added]

40.    Many news accounts report pistols being used by people far removed from "wealthy, powerful, and influential."[39]

41.    A London gun-maker complained in the SOUTH CAROLINA GAZETTE that "a Person in the Country in putting my Name and *London* on some parcels of Guns and Pistols" apparently not proofed (as English law required) thus creating a risk to his reputation.[40]  A 1766 ad in the SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL offered "brass barrel pistols."[41]

42.    Enough pistols were present in private hands in Pennsylvania in 1774 for the legislature to include handguns in a law regulating New Year's Day festivities.  This statute made it illegal for "any person or persons shall, on any thirty-first day of December, or first or second day of January, in every year, wantonly, and without reasonable occasion, discharge and fire off

---

[37] *Last Monday Capt. Tyng in the Massachusetts…,* PENNSYLVANIA GAZETTE, Aug. 15, 1745.
[38] *MR. Mark Langdon, from Westminster, in the…, Virginia Gazette*, Apr. 22, 1775.
[39] BY THE LAST POST FROM NEW YORK…, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[40] *To the Publick,*  SOUTH CAROLINA GAZETTE, DEC. 26, 1743.
[41] *GUERIN & WILLIAMSON,Have just imported in the London*, SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL, Jun. 24, 1766,  Jul. 1, 1766, Jul. 8, 1766

any handgun, pistol, or other firearms, or shall cast, throw or fire any squibs, rockets or other fireworks, within the inhabited parts of this province…."[42]



Paul Revere's Very Compact Pocket Pistol [43]

43.    My search through newspapers from the 1730s through 1760s at Accessible Archives for "pistol" showed 2,962 matches.[44]   Some of these are militia use references, some are references to a coin of that time, and some to a type of cloth called pistol. A few are references to foreign news events; some news accounts appear in multiple newspapers.  Still it is pretty apparent that Cornell's claim about the scarcity of pistols outside of those being used by the elite for dueling is utterly wrong and shows a limited knowledge of the period for which he has "expert" opinions.

## VII.  Ignorance of Colonial Sources

44.    66. At pp. 12-13:

---

[42] *An ACT to suppress the disorderly practice of FIRING GUNS, &c.,* PENNSYLVANIA GAZETTE, Dec. 28, 1774.
[43] Photograph by Clayton E. Cramer at the Massachusetts Historical Society.
[44] Accessible Archives is a proprietary data base.  I searched for "pistol" in all newspapers for the 1730s through 1760s.

14

> Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge…. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

45.    A preference for storing firearms unloaded seems sensible, but the documents left by colonial Americans show that they did not follow it very consistently.  As mentioned above, people sometimes unloaded firearms in public places with tragic results.  (The successful unloads would not have made the newspapers; "Three Million Children Made it to School Today Without Injury," is a headline you will never see.)  Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to follow this very logical action:

> At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[45]

46.    More evidence that black powder arms were often kept loaded, and not just when ready for use:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.46

> It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[47] [emphasis added]

47.    And:

> One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle ; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one, ) stand in the chimney, took it and laid it upon a stool, as he had seen

---

[45] John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.

[46] Id. 2:55.

[47] Id., 2:317.

his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then
went to the other end and blowed in the mouth of the piece, as he had seen his father also do,
and with that stirring the piece, being charged, it went off, and shot the child into the mouth
and through his head.[48]

48.     These four incidents of firearms kept loaded when not in active use resulting in
serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their
place, never accidentally discharging?  How many incidents are in books that I have not read?
Perhaps Cornell was as well-should read more colonial documents before declaring himself an
expert on colonial practices.   The relevance of this claim to the proposed law is unclear.  Did
Cornell just copy and paste this section from a declaration where this was relevant?

49.     Finally, there is one more piece of evidence that Americans kept firearms loaded
when not ready for use.  In 1783, Massachusetts passed a statute that shows firearms were kept
loaded regularly enough to justify a law regulating the practice.  The preamble "WHEREAS the
depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those
who are disposed to exert themselves when a fire happens to break out in the said town"
establishes that it was a fire safety measure.

> Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars,
> howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any
> dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged
> with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of
> the Firewards of the said town… [49]

50.     The law clearly believed that private parties kept small arms, cannon, small
artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for
such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a
law today ordering that you not leave children unsupervised at a pool if no one did this?

---

[48]  Id., 2:72.
[49]  City of Boston, Charter of the City of Boston, and Ordinances Made and Established by the Mayor, Aldermen, and Common Council, With Such Acts of the Legislature of Massachusetts, As Relate to the Government of Said City. ch. 24 at 137 (1827).

# VIII. Credulous Acceptance of Roth's Claims

51.     Back to Cornell and Roth's claims about low homicide rates.  At p. 13 "As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment."   Cornell's Figure 2.3 shows "Unrelated-adult homicide rates in New England by race, 1677-1797 (per 100,000 persons per year)."  New England European-American unrelated-adult homicide rates from 1750 to 1797 are below 2/100,000.  This figure itself is a bit mystifying.  It shows murder rates by race, yet the earliest census in Massachusetts appears to be 1754.[50]  Connecticut's first census was in 1756; Maine 1764-65; New Hampshire, 1772; Rhode Island, 1768; Vermont, 1771.[51]  How censuses would have counted often unfriendly Indians before 1700 is a mystery.

52.     Keep in mind that Roth's homicide rates include only "unrelated adults."  Yet today, with access to all the evils of modern firearm technology, Vermont's 2019 *murder* rate (which includes minor victims and victims related to the murderer) was 1.8/100,000; in 2018 an LCM Ban was adopted; in 2017, the year before the LCM Ban, it was 2.2/100,000.  Other fairly laissez faire states with respect to gun regulation have similarly low murder rates.  My home state, Idaho, which does not even require a license to carry and has no machine gun regulation is 2.0/100,000; South Dakota (1.9); Wyoming (2.2).[52]  And these 2019 murder rates include related adults and minor victims.  If the lack of modern firearms explains low murder rates in the colonial period, why are murder rates in some New England states and other states awash in modern firearms still so low?  Perhaps Cornell and Roth are refusing to face that other factors might be more important than firearms technology?

---

[50] Robert V. Wells, Population of the British colonies in America Before 1776: A Survey of Census Data Table 1-1 at 9 (1975);

[51] Historical Statistics of the United States, Colonial Times to 1970, Bicentennial Edition, Part 1 Series Z 24-132 at 1170 (1975).

[52] FBI, Crime in the United State: 2019, Table 4; FBI, Crime in the United State: 2017, Table 4.

# IX. Misreading of Nineteenth Century Court Decisions

53.      At p. 15: "[T]he application of the police power to regulating firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*." There are multiple difficulties with Cornell's argument. The first is that these gunpowder storage laws refer to gunpowder not firearms. If a state wishes for fire safety reasons to prohibit storing *large* quantities of gunpowder or smokeless powder in residential or commercial districts, the Second Amendment does not impair such laws. Gunpowder is not an "arm." These storage laws regulated substantial quantities: 30 pounds in Pennsylvania; [53] 28 pounds in New York; such limits imposed no barrier to use of firearms for self-defense. A pound of black powder provides hundreds of shots. Would a law prohibiting storage of a thousand gallons of gasoline in a residential neighborhood imply authority to prohibit gasoline powered lawnmowers?

54.      Cornell's quote from Brown v. Maryland (1827) is also severely out of context. The dispute in that case involved a state requirement for a license to import "foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spiritous liquors." "The principle, then, for which the plaintiffs in error contend, that the importer acquires a right, not only to bring the articles into the country, but to mix them with the common mass of property, does not interfere with the necessary power of taxation which is acknowledged to reside in the States…" Cornell's quote from Brown is *dictum*, far removed from the meaning of the decision.

55.      At p. 16:

> One case featured in *Heller*, *State v. Reid* offers an excellent illustration of the way police
> power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and

---

[53] 11 Pennsylvania Statutes at Large 209-12; 12 Pennsylvania Statutes at Large 416-23.

the right of the people to regulate.  The *Reid* Court observed that the state's concealed carry prohibition was a legitimate exercise of police power authority. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."

56.    This is a major misrepresentation of Reid:

We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. *A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence*, would be clearly unconstitutional.[54] [emphasis added]

57.    Cornell at p. 22:

By the end of the century, Americans residing in urban areas, particularly those dwelling in the nation's most populous cities, were likely to be living under some form of restrictive public carry legal regime: bans on concealed carry, good cause permit schemes, or broad restrictions on public carry with good cause and affirmative self-defense exceptions.

58.    As Bruen observed:

In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. That was true in Alabama. See *State v. Reid* , 1 Ala. 612, 616, 619–621 (1840). It was also true in Louisiana. See *State v . Chandler* , 5 La. 489, 490 (1850). Kentucky, meanwhile, went one step further— the State Supreme Court *invalidated* a concealed-carry prohibition. See *Bliss v. Commonwealth* , 12 Ky. 90 (1822).[55] [emphasis in original]

# X. Local Concealed Weapon Laws Irrelevant to This Case

59.    Cornell's discussion of California gun laws starting on p. 20 is largely an exercise in distraction.  That many local governments banned concealed carry is of no relevance to this case.

# XI. Ignorance of the Racist Roots of California Gun Law

60.    Cornell at p. 27 claims that "Perhaps the most well-known and controversial example of such a regulation was the adoption of the Mulford Act shortly after the Black Panther Party  staged a high-profile protest that included a prominent open carry display. In response to

---

[54] State v. Reid, 1 Ala. 612, 616, 617, 35 Am. Dec. 44 (1840).
[55] N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2146, 2147 (2022).

this action, California adopted a new more restrictive law prohibiting open carry." Cornell has reversed the order here. The Mulford Act was already under debate; their arrival was in protest of the proposed Mulford Act. The Black Panthers demonstrated their finely honed political skills by a dozen armed "with loaded rifles pistols and shotguns," barging "in a 'flying wedge' into the Assembly while debate was in process."[56]

61.    Cornell at p. 27 claims: "Some gun-rights advocates have cited this incident to argue that all gun regulation is inherently racist, a dubious historical claim that conflates different periods of gun regulation from different regions of the nation with the history of the Jim Crow South and the experience of the Black Panthers during the tumultuous social unrest of the 1960s." Without question, arms regulation sometimes had other motivations, as my book Concealed Weapon Laws of the Early Republic demonstrates.[57] California's history on this is so blatant that the California State Assembly formally apologized in 2009:

> Among other things, these laws denied the Chinese in California the right to own land or property, the right to vote, and the right to marry a white person, denied children of Chinese descent access to public schools, denied Chinese immigrants *the right to bear arms…*[58] [emphasis added]

## A. The 1849 Convention

62.    California's two state constitutional conventions are also interesting. When delegates met at the 1849 Convention, they debated what individual rights should be listed in the state constitution's bill of rights. Delegate Ord proposed, "Every person has a right to bear arms for the defence of himself and the State." Delegate McCarver wanted to add, "provided that they are not concealed arms."[59] This is not surprising; in the period before the Civil War, many states

---

[56] Capitol Security Hearing, San Bernardino County Sun, May 5, 1967, 3.

[57] Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform (1999).

[58] California Assembly Concurrent Resolution No. 42. https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42

[59] J. Ross Browne, REPORT OF THE DEBATES IN THE CONVENTION OF CALIFORNIA, ON THE FORMATION OF THE STATE CONSTITUTION… 47 (1850).

passed laws either prohibiting or restricting the *concealed* carrying of deadly weapons.  State constitutional conventions often added such restrictions to existing arms guarantees to make sure that the legislature could ban what was increasingly regarded as a cowardly way of fighting—the use of "secret arms."[60]

63.     Delegate McCarver, however, also believed that it would be best if there were *no* provision preventing "the Legislature from regulating matters of this kind."   He thought guaranteeing a right to bear arms was not "a proper subject for the Constitution."   Other delegates agreed with McCarver that there should be no arms provision in the state bill of rights—but not because the state should have the power to regulate the carrying of weapons. Delegate Sherwood argued that denying an individual the right to bear arms "would be null and void, inasmuch as it would be in opposition to the Constitution of the United States," and then quoted the Second Amendment.  Sherwood thought an arms guarantee was unnecessary because the Second Amendment already protected such a right. [61]  This may seem a pretty astonishing claim, because only with the *McDonald* v. *Chicago* (2010) decision did the U.S. Supreme Court hold that the Second Amendment restricted the power of the states to regulate the keeping and bearing of arms.  And then only through incorporation of the Second Amendment via the 14th Amendment.  The 14th Amendment was ratified in 1868, almost twenty years after the California constitutional delegates debated the applicability of the Second Amendment to state law. However, the notion that states were bound by the Second Amendment directly was a minority

---

[60] Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM 52-62 (1999).
[61] Browne, REPORT OF THE DEBATES IN THE CONVENTION OF CALIFORNIA, ON THE FORMATION OF THE STATE CONSTITUTION… 47 (1850).

viewpoint endorsed by several state supreme courts in the antebellum period, so this is not as anachronistic as it first sounds.[62]

64.     Delegate Botts argued against adding the arms guarantee to the state constitution's bill of rights because he feared that it might not be a strong enough protection; such a guarantee belonged in the section that specified the powers of the legislature.

65.     Even Delegate Sherwood was persuaded by this argument, admitting that the arms provision "directly touches the rights of every citizen."[63]   When the convention voted on both Ord's proposal for a right to bear arms, and McCarver's amendment that the right should not apply to concealed weapons, both proposals died—and with it, any possibility of adding a right to keep and bear arms to the California Constitution's bill of rights.

66.     You cannot draw too strong a message from this series of back-and-forth discussions, but it appears that some delegates argued that there was no need for an individual right to keep and bear arms in California's Constitution, because the Second Amendment already protected such a right; other delegates argued that the right needed to be located elsewhere than in the bill of rights to be better protected.[64]

67.     The only delegate who clearly spoke against a right to bear arms was McCarver. Today, he is most remembered for another proposal he made a few minutes later: that blacks would be forever banned from living in California.[65]  (Such provisions were added to many other

---

[62] Nunn. v. State, 1 Ga. 243, 250 (1846) (striking down a ban on open carrying of horseman's pistols); State v. Chandler, 5 La. Ann. Rep. 489, 490 (1850) (upholding a ban on concealed carry while observing that the "right to carry arms" is a "right guaranteed by the Constitution of the United States.); State v. Smith, 11 La. Ann. Rep. 638 (1856) (upholding a ban on concealed carry because that law "does not contravene the second article of the amendments of the Constitution of the United States.  The arms there spoken of are such as are.. at least carried openly."); State v. Jumel, 13 La. Ann. Rep. 399, 400 (1858) (rejecting a Second Amendment challenge to a concealed weapon law because the laws prohibited "only a particular mode of bearing arms…."); Cockrum v. State, 24 Tex. 394, 396, 401 (1859) (appears to have accepted defendant's argument that the Second Amendment "is applicable to state legislation.")
[63] Browne, REPORT OF THE DEBATES, 47.
[64] Id.
[65] Id., 49-50.

state constitutions of the period; McCarver even played a part in Oregon adopting such a ban; he got around.[66])  In spite of considerable support from other delegates, this proposal did not pass.

### B. The 1878 Convention

68.    California held another constitutional convention in 1878.  The 1849 Constitution seemed increasingly inadequate because of questions about water rights and the "Chinese problem."[67]   The 1878 convention seems not to have even discussed the question of a right to keep and bear arms—except for one startling provision.  The convention was divided between a conservative, generally wealthy group, and what became known as "the Workingmen," who represented a populist collection of white laborers, intent on driving Asian immigrants from California.[68]   They had several proposals that are shocking in their racism today (but nevertheless were made part of the 1879 California Constitution).

69.    Of most relevance to gun control was the Workingmen's demand that aliens who could not become citizens would be prohibited from bearing arms.[69]   Delegate O'Donnell introduced this request as a constitutional provision: "No alien who cannot become a citizen of the United States shall be allowed to bear arms."  What sort of aliens could not become citizens of the United States?  Until 1952, no "Oriental" (as persons of East Asian ancestry were then described) could become a naturalized citizen.[70]  If you were born in the United States, you were a natural-born citizen, but an immigrant from the Far East would always be an alien.

---

[66] David Alan Johnson, FOUNDING THE FAR WEST: CALIFORNIA, OREGON, AND NEVADA, 1840-1890, 129 (1992); Oregon, JOURNAL OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF OREGON: HELD AT SALEM 125 (1882).

[67] Samuel Charles Wiel, 2 WATER RIGHTS IN THE WESTERN STATES: THE LAW OF PRIOR APPROPRIATION .. 1166 (3d ed. 1911); John Robert Soennichsen, THE CHINESE EXCLUSION ACT OF 1882 127-128 (2011).

[68] Emily J. Zackin, LOOKING FOR RIGHTS IN ALL THE WRONG PLACES: WHY STATE CONSTITUTIONS CONTAIN AMERICA'S POSITIVE RIGHTS 200 (2013).

[69] Theodore H. Hittell, 4  HISTORY OF CALIFORNIA 615-17 (1897).

[70] Davis McEntire, RESIDENCE AND RACE: FINAL AND COMPREHENSIVE REPORT TO THE COMMISSION ON RACE AND HOUSING 269 (1960).

O'Donnell's proposed was "Referred to Committee on Chinese" where it seems to have silently died.[71]

## C. Legislative Acts

70.    The California Legislature debated a ban on concealed carry throughout the 1850s.  Even those who supported such laws often had a narrow notion of who needed to be restricted.  During debates in February of 1856, the state senator who represented Nevada County (appropriately, a derringer-shaped county in California's foothills) indicated that he was in support of a bill to ban concealed carry if it were for the purpose of disarming "Greasers."[72] ("Greasers" was a slang term used throughout the nineteenth and early twentieth century for Mexicans[73]).

71.    The direct ancestor of California's current concealed weapon license law was a variant of the Uniform Revolver Act passed in several American states in the 1920s; the 1923 California law enhanced the punishments for various crimes committed with a handgun,[74] made carrying a handgun without a permit evidence of intention to commit a felony,[75] required a concealed weapon permit anywhere in the state (not just in cities),[76] and also prohibited possession of concealable handguns by anyone who was not a U.S. citizen.[77]

72.    What motivated passage of this law?  Legislative documents are astonishingly sparse on the reasons, but as is often the case, newspaper coverage is more forthcoming. Governor Friend W. Richardson signed the law after R. T. McKissick, "president of the Sacramento Rifle and Revolver Club," argued that this law preserved the "rights of those using

---

[71] E.B. Willis and P.K. Stockton, 1 DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF CALIFORNIA… 285 (1880).
[72] *Letter From Sacramento*, [San Francisco] DAILY ALTA CALIFORNIA, February 19, 1856, 2.
[73] Win Blevins, DICTIONARY OF THE AMERICAN WEST 166 (2001).
[74] Stats. 1923, ch. 339, § 3.
[75] *Id.*
[76] Stats. 1923, ch. 339, § 5.
[77] Stats. 1923, ch. 339, § 2.

firearms for competition or hunting or for protection in outing trips."  McKissick was concerned that a more stringent gun control law might be passed if Governor Richardson vetoed this one. McKissick admitted that the provision prohibiting handgun ownership by non-citizens was of questionable constitutionality, but that he believed that if it was upheld, it would have a beneficial effect "in checking *tong* [gang] wars among the Chinese and vendettas among our people who are Latin descent."[78]

73.     Why did Richardson sign a law with racist intentions?  When Governor Richardson ran for re-election in 1922, he would not answer the question of whether he was a member of the Ku Klux Klan—but the Klan enthusiastically endorsed Richardson.[79]

74.     With such blunt statements of racist intent, not surprisingly, the discriminatory effect of the new law was immediately recognized.  The Mexican consul in Los Angeles protested the alien handgun ban, since "a large proportion of the foreigners in California were of Mexican descent."[80]  Mexican immigrants, being white, could at least apply for citizenship. Asian immigrants were ineligible for naturalization[81]—and therefore were breaking the law if they owned a handgun.

## XII. Ignorance (Or Willful Blindness) to the Mental Illness Part of the Problem

75.     Cornell on p. 23: "The next major turning point in the debate over firearms regulation in California was the ban on "assault weapons" enacted after the Stockton School Massacre."  While true, this is irrelevant to this case.  What makes this incident important in a

---

[78] *New Firearms Law Effective on August 7*, SAN FRANCISCO CHRONICLE, July 15, 1923, at  3, col. 1.
[79] David M. Chalmers, HOODED AMERICANISM: THE HISTORY OF THE KU KLUX KLAN 124 (1981, 3rd ed.).
[80] Ricardo Romo, EAST LOS ANGELES: HISTORY OF A BARRIO 157 (1983).
[81] *The Immigration and Nationality Act of 1952 (The McCarran-Walter Act),* U.S. Department of State, https://history.state.gov/milestones/1945-1952/immigration-act, last accessed January 17, 2023.

larger sense was, why did this tragedy happen?  The mass murder at Cleveland School, Stockton in 1989 that started the current focus on assault weapons and LCMs involved a mentally ill drifter with a history of involuntary commitment and a spotty record of outpatient treatment.  As the California Dept. of Justice's official report observed:

> In an ideal world, ample resources would have been available to detect his problems, identify them as potentially dangerous and likely to result in his life being uselessly wasted, and to provide for a type of intervention with a reasonable prospect of making a difference. However, in a world in which government spending has to recognize realistic limits set by the public, such resources will never be plentifully available.[82]

76.     This unfortunately is at the core of the mass murder problem that drove and still drives much of the current contentious gun ban debate.  Untreated severe mental illness is at the core of most of the recent mass murders.  These problems have often been ignored, or laws or policies made involuntary commitment impossible.[83]

77.     A 2000 New York Times examination of mass murderers concluded:

> The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.

> Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population.

> However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [84]

---

[82] Nelson Kempsky, *A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings* 19 (October, 1989), https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf, last accessed November 26, 2022.

[83] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 CONN. L.R. 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012*)* for how we got here.

[84] Laurie Goodstein and William Glaberson, *The Well-Marked Roads to Homicidal Rage*, NEW YORK TIMES, Apr. 10, 2000.

78.     Deinstitutionalization of the mentally ill starting with New York in 1964 and California in 1969 played significant roles in increased homelessness and violent crime rates.[85]

79.     Professor Bernard E. Harcourt points out that the rise in murder rates in the 1960s, and their decline in the 1990s, correlated with the change in the percentage of the population that was institutionalized.  (The institutionalized include those who were confined to either a mental hospital or prison.)   According to Harcourt, sociologists examining the expansion of imprisonment in the 1990s, the so-called "incarceration revolution," missed the even more important component of institutionalization: mental hospitals.  When adding mental hospital inmates to prisoners, Harcourt found an astonishingly strong negative correlation between the institutionalization rate, and the murder rate: -0.78.  Harcourt found that even when adjusting for changes in unemployment and the changing fraction of the population that was at their peak violent crime ages, the negative correlation remained strong, and did a better job of predicting both the 1960s rise and the 1990s decline in murder rates than other models.[86]

80.     Steven P. Segal of the University of California, Berkeley studied state-to-state variations in murder rates and mental health care, controlling for socioeconomic, demographic, and geographic data. He concluded that "[l]ess access to psychiatric inpatient-beds and more poorly rated mental health systems were associated with increases in the homicide rates of 1.08 and 0.26 per 100,000, respectively." (Since the national average homicide rate was 7.4 per 100,000 people for 2020,[87] more access to beds is clearly quite important in reducing homicide

---

[85] See Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) and Jean Isaac Rael and Virginia C. Armat, MADNESS IN THE STREETS: HOW PSYCHIATRY AND THE LAW ABANDONED THE MENTALLY ILL (1990) for how beautiful abstract theories and fanaticism created the tragic urban landscape of modern America.

[86] Bernard E. Harcourt, *From the Asylum to the Prison: Rethinking the Incarceration Revolution*, 84 TEXAS LAW REVIEW 1766-75 (2006).

[87] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10.html on Nov 3, 2022 12:51:23 PM

rates; "poorly rated mental health systems" matter, but not as dramatically.   This *might* affect suicides after release, although that problem was not in the scope of Segal's work.)

81.     Segal observed an even greater difference from the variation in involuntary civil commitment (ICC) laws. "Broader ICC-criteria were associated with 1.42 less homicides per 100,000" or bit more than one-fourth of the national homicide rate. In short, states where involuntary commitment of the mentally ill was relatively easy had significantly fewer murders than states where it was very hard.[88]

82.     Of course, California's politicians would rather focus on guns rather than ask how deinstitutionalization in the 1960s created cities awash in homeless often mentally ill drug addicts, sidewalks with discarded hypodermic needles and human feces and random acts of mass murder.

## XIII. Summary

83.     Cornell repeatedly misrepresents his sources.

84.     Cornell fails to understand what we were supposed to have learned in high school Civics classes: Constitutions have bills of rights because majorities make mistakes, sometimes out of malice, more often by ignorance.

85.     Cornell misreads court decisions to fit his desired outcome.

86.     Cornell attacks strawmen to deflect attention from his failure to provide sources that actually match what he claims.

87.     Cornell's ignorance of the limitations of Roth's study of American homicide leads him into the false conclusion that firearms technology explains why colonial New England had

---

[88] Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*, SOCIAL PSYCHIATRY AND PSYCHIATRIC EPIDEMIOLOGY, November 10, 2011, https://web.archive.org/web/20170323153646/http://kendras-law.org/national-studies/commitmenthomiciderates.pdf, last accessed August 19, 2022.

homicide rates comparable to many American states today.  He is also unaware that many states have similar homicide rates with modern firearms and few gun regulations of any sort.

88.     Cornell's ignorance of California gun control history lets him create a rosier picture of its origins than newspaper reports show.

29

# REBUTTAL TO EXPERT REPORT OF

# BRENNAN RIVAS

# Table of Authorities

Cases

Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840). ................................................ 22

Bliss v. Commonwealth, 3 Littel 90 (Ky. 1822). ........................................................................... 21

Carlton v. Commonwealth, 13 Ky.Law.Rep. 162, 163 (1892)......................................................... 2

Cockrum v. State, 24 Tex. 394, 396 (1859) ................................................................................... 16

Cockrum v. State, 24 Tex. 394, 403 (1859). ................................................................................... 3

Commonwealth v. Duncan, 13 Ky.Law.Rep. 162, 163 (1891) ........................................................ 2

Dabbs v. State, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882)................................................... 28

District of Columbia v. Heller, 128 S.Ct. 2783, 2788 (2008). ....................................................... 16

Dred Scott v. Sandford, 60 U.S. 393, 417 (1857) ......................................................................... 25

Dred Scott v. Sandford, 60 U.S. 393, 417 (1857). ......................................................................... 9

English v. State, 35 Tex. 473, 476 (Tex. 1872) .............................................................................. 4

Fife v. State, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876) .............................................................. 26

Fife v. State, 31 Ark. 455, 25 Am.Rep. 556 (1876) ........................................................................ 4

Holland v. State, 33 Ark. 560, 561 (1878) ..................................................................................... 28

In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902) ................................. 29

N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2146, 2147 (2022) ........................... 8

New York State Rifle & Pistol Assn v. Bruen 142 S.Ct. 2111,  2121. (2022). .............................11

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022) ..................... 30

New York v. Miln, 36 U.S. 102, 103 (1837). ................................................................................. 17

Nunn v. State, 1 Ga. 243 (1846).................................................................................................. 9, 21

Nunn v. State, 1 Ga. 243, 248 (1846)............................................................................................. 5

Owen v. State, 31 Ala. 387, 388, 389 (1858). .................................................................. 23

Page v. State, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871) .................................................. 26

Simpson v. State, 5 Yerg. 356, 359, 360 (Tenn. 1833)...................................................... 22

Smith v. State, 11 La. An. 633, 634 (1856) ...................................................................... 25

State v. Chandler, 5 La. An. 489, 490 (1850)..................................................................... 9

State v. Chandler, 5 La. An. 489, 490, 491 (1850) ........................................................... 24

State v. Chandler, 5 La. An. 489, 491 (1850) ................................................................... 24

State v. Chandler, 5 La. Ann. 489, 490, 52 Am. Dec. 599 (1850)...................................... 3

State v. Duke, 42 Tex. 455, 458 (1875)............................................................................. 8

State v. Duke, 42 Tex. 455, 458, 459 (1875) .................................................................... 8

State v. Herron, 12 Mont. 230, 13 Am.St.Rep. 576, 577 (1893).......................................... 2

State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843)........................................ 23

State v. Jumel, 13 La. An. 399, 400 (1858).................................................................. 9, 25

State v. Mitchell, 3 Blackford 229 (Ind. 1833) ................................................................ 21

State v. Reid, 1 Ala. 612 (1840) ...................................................................................... 21

State v. Reid, 1 Ala. 612, 615, 616, 617 (1840) ................................................................ 8

State v. Wilburn, 7 Tenn. 61 (1872). ............................................................................... 20

Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878)................................................ 27

Statutes

1 Ohio Stats. Ch. 6 § 6 (1833) ........................................................................................ 5

1 Penn. Penal Code 207 n.1 (1883)................................................................................... 2

1871 Tex. Laws ch. 34. ................................................................................................. 14

Black Code Of The District Of Columbia 11 (1848) ...................................................... 6

Cal. Laws ch. 385 (1863). ................................................................................................. 4

Compilation of the Public Acts of the Legislative Council of the Territory of Florida , Passed Prior
    to 1840 423 (1839) ....................................................................................................... 29

Fla. Acts ch. 75 § 3 (1846). ........................................................................................... 10

Ga. Acts 90-91 (1838) ..................................................................................................... 5

Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in
    Force in this State: From the Year 1715 to the Year 1820 ch. 22 § 6 at 710 (1801). ............... 10

Laws of Maryland Ch. 44, § 32 (1715) ........................................................................... 6

Louisiana Terr. Laws ch. 1 § 6 (1804) ............................................................................ 5

State v. Reams, 27 S.E. 1004 (N.C. 1897) ..................................................................... 18

Va. Acts ch. 101 § 1 (1838). ............................................................................................ 11

Va. Laws ch. 41, § 8 (1792). .............................................................................................. 6

Other Authorities

An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg,
    London, circa 1781-87, Bonham's, .............................................................................. 12

Antique Pepperbox Pistol 1850's Washington Arms Co, .............................................. 12

Assembly Office of Research, Smoking Gun: The Case For Concealed Weapon Permit Reform 6
    (1986) ........................................................................................................................... 4

Bill Barring Loaded Weapons In Public Clears Senate 29-7, Sacramento Bee, Jul. 27, 1967, A6. 4

Capitol Is Invaded, Sacramento Bee, May 2, 1967, A1, A10 ......................................... 4

Colonel Bowie and His Knife, 2 Temple Bar 124 (Jul. 1861) ........................................ 9

Concealed Weapons, 8:4 Criminal Law Magazine and Reporter 409, 412 (Oct. 1886). ............. 18

David A. Hounshell, From the American System to Mass Production 1800-1932: The Development of Manufacturing Technology in the United States 47 (1984). ......................... 15

English Transitional Pepperbox Revolver, Forgotten Weapons, ................................................... 12

Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates ................................................................................................................................................ 12

Immigration and Nationality Act (104th Cong., 1st sess.) 581 (10th ed. May 1995). ...................... 7

James E. Serven, Colt Firearms: 1846-1954 13, 30 (1954). ......................................................... 14

Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder, 36 J. Am. Acad. Psychiatry & Law 82 (2008) ...................................................................................................................... 17

Philip J. Cook, Jens Ludwig, and Anthony Braga, Criminal Records of Homicide Offenders, 294(5) JAMA 598-601 (Sep. 2005). ........................................................................................ 17

Pollard's History of Firearms 114 (1983). ................................................................................... 11

Raymond L. Cohn, Mass Migration Under Sail: European Immigration to the Antebellum United States 15 (2009). .................................................................................................................. 16

Self-Cocking and Revolving Six Barrel Pocket Pistol [Washington, D.C.] The Madisonian, Dec. 22, 1838, 1 .............................................................................................................................. 12

Studies in History, Economics, And Public Law 20 (1899) ............................................................ 7

The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It iii (1875). .................................................................................................................... 16

# Rivas Rebuttal

1.      My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.      In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

3.      I am being compensated for services performed in the above-entitled case at an hourly I rate of $150 for expert declarations.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## I. Deadly Weapons

4. Rivas at pp. 4-5 claims that there was a distinction between deadly weapons and "hunting knives, rifles, muskets, and shotguns."  Even her n.1 on p. 5 admits that "There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols…"  She then gives what she considers an exceptional case that established "a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." The phrase "other firearm" is pretty general, and would include all "rifles, muskets, and shotguns."   The supposed exceptions are *not*

1

exceptions.  There is no shortage of laws that include firearms of all types in a list of deadly weapons to be regulated.

> Act 10 April, 1873, Sec. 1, P. L., 659. -Any person within the limits of the county of Northampton, who shall carry *any firearms*, slung- shot, dirk-knife, or other deadly weapon, concealed upon his person, with intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed. guilty of a misdemeanor…[1] [emphasis added]
>
> Act 18 March, 1875, Sec. 1, P. L., 33.-Any person within this Commonwealth who shall carry *any firearms*, slung-shot, hand-billy, dirk-knife, razor, or other deadly weapon, concealed upon his person, with the intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed guilty of a misdemeanor…[2] [emphasis added]

5. State supreme court decisions are also at variance with Dr. Rivas' supposed distinction: "It is not questioned but *a loaded rifle is a deadly weapon*. In this case a rifle was used."[3]  A Kentucky Supreme Court decision decided that a rock was a *deadly weapon* as would a shot-gun*:*

> The statute does not say what shall constitute a deadly weapon. It merely punishes for a wilful and malicious wounding with one. If one man maliciously wounds another with a rock, with which he might have killed him, there exists no reason why the same punishment should not be meted out to him *as if he had done it with a shot-gun*; and undoubtedly the Legislature, in enacting this statute, so intended.[4] [emphasis added]
>
> The offense of which appellant was convicted and sentenced to the penitentiary for four years is maliciously beating and wounding Charles Brown with a car coupling-pin, a deadly weapon, with intention to kill him.[5]

6. Rivas' claim is so counterlogical that citing hundreds of statutes and decisions seems unnecessary.  A search of the phrase "deadly weapons" in published 19th century books and cases rapidly demonstrates that the term did not have such a precise meaning, as the following paragraphs demonstrate.

7. There *were* distinctions by weapons type in 19th century law but not such a simple distinction as Rivas claims on p. 3: "Nineteenth-century public carry laws explicitly prohibited *concealed* weapons because the primary mode of carrying bowie knives, pocket pistols, brass

---

[1] 1 Penn. Penal Code 207 n.1 (1883).
[2] Id.
[3] State v. Herron, 12 Mont. 230, 13 Am.St.Rep. 576, 577 (1893).
[4] Commonwealth v. Duncan, 13 Ky.Law.Rep. 162, 163 (1891).
[5] Carlton v. Commonwealth, 13 Ky.Law.Rep. 162, 163 (1892).

knuckles, and other deadly weapons was concealed in one's pocket." [emphasis in original] Decisions repeatedly accepted the constitutionality of bans on concealed carry of a variety of weapons because those laws banned only *concealed* carry and left open carry legal:

> The act of the 25th of March, 1813, makes it a misdemeanor to be "found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full view." This law became absolutely necessary counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. *It interfered with no man's right to carry arms (to use its words) "in full open view,"* which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.[6] [emphasis added]

8. When the Texas Supreme Court heard a challenge to a sentence enhancement law for manslaughter committed with a Bowie-knife, the question of whether it was concealed or openly carried was not relevant: "The right to carry a bowie-knife for lawful defense is secured, and must be admitted. It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill."[7]

9. There were distinctions similar to Rivas' but I doubt California wishes to follow that tangent. The Texas Supreme Court a few years later decided that: the arms protected by the Second Amendment are weapons of war:

> The word "arms" "in the connection we find it in the Constitution of the United States, *refers to the arms of a militiaman or soldier*, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.[8] [emphasis added]

10. The Arkansas Supreme Court similarly defined arms as "arms as are *used for purposes of war*; and does not prevent the legislature from prohibiting the wearing of such weapons as are

---

[6] State v. Chandler, 5 La. Ann. 489, 490, 52 Am. Dec. 599 (1850)
[7] Cockrum v. State, 24 Tex. 394, 403 (1859).
[8] English v. State, 35 Tex. 473, 476 (Tex. 1872).

not used in civilized warfare…"[9]  If California wishes to argue that the Second Amendment protects possession and carry of weapons of war, go for it!

11. Regardless, Rivas' attempt to distinguish handguns from long guns as protected arms is a waste of time.  Handguns as protected arms left the station with D.C. v. Heller; denying a right carry them was the train whistle of Bruen.

12. Rivas at p. 4 seeks to establish that open carry was restricted by California law in the 19th century:

> Public carry laws, for both concealed weapons and the open-carry of weapons, have often reserved special exemptions for "travelers" as defined under state law, reinforcing the idea that population density was a factor in developing and enforcing weapon policies in the nineteenth century.

13. The problem with this argument is that the "travelers" exemption appeared in California's 1863 ban on *concealed* carry of deadly weapons:

> Section 1.  Every person, not being a peace officer or *traveller*, who shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed, shall, upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the County Jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars.
>
> Sec. 2.  Such persons, and no others, *shall be deemed travellers within the meaning of this Act, as may be actually engaged in making a journey at the time*.[10] [emphasis added]

14. California imposed no ban on open carry of loaded firearms in cities until 1967.  The legislature passed the ban in response to a series of confrontations between Oakland Police and the Black Panthers.  The Panthers attending a State Senate hearing carrying loaded shotguns and pistols certainly sped up the debate.[11]

15. Rivas asserts on p. 6 that:

---

[9] Fife v. State, 31 Ark. 455, 25 Am.Rep. 556 (1876).
[10] Cal. Laws ch. 385 (1863).
[11] Assembly Office of Research, *Smoking Gun: The Case For Concealed Weapon Permit Reform 6* (1986); *Capitol Is Invaded*, SACRAMENTO BEE, May 2, 1967, A1, A10; *Bill Barring Loaded Weapons In Public Clears Senate 29-7*, SACRAMENTO BEE, Jul. 27, 1967, A6.

> The other feature shared by deadly weapons was their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.

16. Yet her following quote claims that "prohibited weapons… were not to be carried upon the person or concealed."  Few states attempted to ban possession of deadly weapons in one's home and only a few banned open carry.  One that did was Georgia's 1837 law that prohibited sale of pocket pistols; the Georgia Supreme Court overturned it as contrary to the Second Amendment.[12]

17. The act which Nunn overturned was also quite explicit that it only prohibited *concealed* carry: "*Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view."[13] [emphasis in original]

18. Few states until the 20th century prohibited open carry of pistols or most other *deadly weapons*.  The laws that prohibited carry either banned concealed carry or banned carrying a weapon while committing some other criminal act.  Two examples of laws banning being armed while committing another crime.  Ohio (1833):

> Burglary with theft…. If the person or persons *so breaking and entering any dwelling-house*, shop , store or vessel and violence, as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or *shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention*…[14] [emphasis added]

### Louisiana Territory (1804):

> If any person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall actually steal and purloin therefrom any money, goods or chattels and shall commit or attempt to commit any personal abuse, force or violence, or *shall be so armed with any dangerous weapon or weapons*, or clearly to indicate a violent intention …[15] [emphasis added]

---

[12] Nunn v. State, 1 Ga. 243, 248 (1846).
[13] Ga. Acts 90-91 (1838).
[14] 1 Ohio Stats. Ch. 6 § 6 (1833).
[15] Louisiana Terr. Laws ch. 1 § 6 (1804).

19. One set of laws that broadly prohibited possession or carry were explicitly aimed at slaves and free blacks:

> No negro or other slave within this province shall be permitted to carry any gun or any other offensive weapon from off their master's land, without license from their said master, and if any negro or other slave shall presume to do so, he shall be liable to be carried before a Justice of the Peace and be whipped, and his gun or other offensive weapon shall be forfeited to him that shall seize the same and carry such negro so offending before a Justice of the Peace.[16]

> No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive…[17]

The 13th and 14th Amendments preclude such laws today.

20. On p. 5: "A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely to publicly carry and use deadly weapons such as dirks, bowie knives, and pocket pistols. Rates of homicide, violence, and crime were rising in many parts of the country, and weapon technology rose in tandem." Rose in tandem? Which caused which? The normal response of people who feel as though they are at risk is to arm for self-defense. Establishing the direction of causality for two events except in a controlled laboratory environment is difficult. When Rivas says a "series of socio-economic and political factors," she really should say, "A huge number of social changes took place simultaneously, and which ones might be factors in rising violent crime rates is uncertain." The 19th century had many major social changes that likely contributed to rising violent crime rates. Large-scale immigration is the most obvious:

> The mass migration of the 19th century was the result of a near perfect match between the needs of a new country and overcrowded Europe. Europe at this time was undergoing drastic social change and economic reorganization, severely compounded by overpopulation. An extraordinary increase in population coincided with the breakup of the old agricultural order which had been in place since medieval times throughout much of Europe. Commonly held lands were broken up into individually owned farms, resulting in landless status for peasants from Ireland to Russia. At approximately the same time, the industrial revolution was underway, moving from Great Britain to Western Europe, and then to Southern and Eastern Europe. *For Germany, Sweden, Russia, and Japan, the highest points of emigration coincided with the beginnings of industrialization and the ensuing general disruption of employment patterns.* The artisans joined the peasants evicted from their land as immigrants to the United States.

---

[16] Laws of Maryland Ch. 44, § 32 (1715) quoted in BLACK CODE OF THE DISTRICT OF COLUMBIA 11 (1848).
[17] Va. Laws ch. 41, § 8 (1792).

> Population pressure and related economic problems, sometimes in the extreme form of famine, are generally cited as being the major causes of the mass migration of this long period, followed by religious persecution and the desire for political freedom.[18] [emphasis added]

21. America was also changing from a nation of small towns to one of big cities:

> The urban population is defined in the United States census reports as the population of cities or towns having at least 8,000 inhabitants. Table II, column 3, shows *the growth of the urban population from 210,873 persons residing in six cities in 1800 , to 18,284,385 inhabitants of 448 cities in 1890*. That is, the urban population has increased eighty-seven fold in the century, while the population of the entire country has increased only twelve-fold.[19] [emphasis added]

22. The transition from largely self-employed farmers and craftsmen to employees is another obvious factor, as was the increasing political polarization concerning the abolition of slavery. A detailed examination of other social changes in the 19th century would make this declaration a book. IIt seems at least as plausible that fear of violent crime in an increasingly urban America increased demand for and carry of concealed weapons.

23. Throughout p. 6, Rivas conflates *deadly weapons* with their ease of concealment by citing laws that prohibited *concealed* carrying of weapons. It was not the weapons that these laws tried to eliminate, but the *concealed* carry of deadly weapons. In n.5: "It is worth noting that these provisions prohibited not only carrying concealed, but carrying about the person generally. See *Ex parte Thomas*, 1908 OK 155." While this statement accurately describes Oklahoma at the start of the 20th century, it misrepresents the state of American law in the 19th century. According to Bruen:

> In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. That was true in Alabama. See *State v. Reid* , 1 Ala. 612, 616, 619–621 (1840). It was also true in Louisiana. See *Statev . Chandler* , 5 La. 489, 490 (1850). Kentucky, meanwhile, went one step further—the State Supreme Court *invalidated* a concealed-carry prohibition. See *Bliss v. Commonwealth* , 12 Ky. 90 (1822).[20] [emphasis in original]

---

[18] IMMIGRATION AND NATIONALITY ACT (104th Cong., 1st sess.) 581 (10th ed. May 1995).
[19] STUDIES IN HISTORY, ECONOMICS, AND PUBLIC LAW 20 (1899).
[20] N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2146, 2147 (2022).

24. Other decisions classified some of Rivas' putative *deadly weapons* with Rivas' arms apparently protected because they could not be concealed:

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State. *If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection. But beyond question, the dragoon or holster pistol is part of the arms of a soldier in that branch of the service.* (Coldwell *v.* The State, 3 Heiskell, 166,[21] and English *v.* The State, 35 Texas, 476). [22] [emphasis added]

25. Decisions throughout the 19th century recognized that concealed carry could be prohibited only if open carry remained lawful. An 1840 Alabama Supreme Court decision:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. *A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.* But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[23] [emphasis added]

An 1846 Georgia Supreme Court decision:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*...[24] [emphasis in the original]

An 1850 Louisiana Supreme Court decision:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's *right to carry arms (to use its own words), "in full open view,"* which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[25] [emphasis added]

---

21 State v. Duke, 42 Tex. 455, 458 (1875). *Coldwell* v. *The State* is incorrect; the location cited is *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 8 Am. Rep. 8 (1871).
22 State v. Duke, 42 Tex. 455, 458, 459 (1875).
23 State v. Reid, 1 Ala. 612, 615, 616, 617 (1840).
24 Nunn v. State, 1 Ga. 243, 250, 251 (1846).
25 State v. Chandler, 5 La. An. 489, 490 (1850).

26. Again, in 1858:

> The statute in question does not infringe the right of the people to keep or bear arms.  It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society.[26]

27.  With enough time and space, I could provide many other decisions that upheld *concealed* carry regulation because *open* carry remained lawful.   The quote from Bruen above demonstrates that Rivas is making a claim already rejected by the Court.

28.  In Dred Scott, the U.S. Supreme Court acknowledged that *whites* at least enjoyed a right to carry weapons:

> It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night without molestation, unless they committed some violation of law for which a white man would be punished; and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, *and to keep and carry arms wherever they went.*[27] [emphasis added]

## A. Knives

29.  Rivas' discussion of knives contains one fascinating quote… from somewhere, but not apparently from where she claims: "This was especially notable in southern areas, where 'so certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow."  Her citation is to "'The Bowie-Knife In the South,' *San Francisco Evening Bulletin* (San Francisco, California), October 18, 1861."   I attempted to find that article, but the SAN FRANCISCO EVENING BULLETIN does not appear in either the Library of Congress' Chronicling America[28] or the California Digital Newspaper Collection.[29]  That article does appear in a London magazine in 1861.[30]  The truth or falsity of the

---

[26] State v. Jumel, 13 La. An. 399, 400 (1858).
[27] Dred Scott v. Sandford, 60 U.S. 393, 417 (1857).
[28] Chronicling America, https://chroniclingamerica.loc.gov/, last accessed Jul. 5, 2023.
[29] Browse by title, California Digital Newspaper Collection , https://cdnc.ucr.edu/?a=cl&cl=CL1&e=-------en--20--1--txt-txIN--------#E, last accessed Jul. 5, 2023.
[30] Colonel Bowie and His Knife, 2 TEMPLE BAR 124 (Jul. 1861).

claim could be questioned in either publication, but a reader might have a bit more skepticism of such a claim in a British publication that was still skeptical of Americans as a bunch of uncouth colonials.  It should also make you wonder about the accuracy are Rivas' other citations.

30. Rivas on p.8 n.11 cites "Tenn. 1801 ch. 22 § 6 (prohibiting 'privately' carrying 'any dirk, large knife, pistol or any other dangerous weapon.')."  But that is a carefully selected quote. What § 6 prohibits is "That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person…"[31]  This prohibition on riding "to the terror of the people" is directly contradictory to the ban on concealed carry.  If you cannot see that someone is armed, how does this cause terror?  Bruen specifically rejects the relevance of such laws:

> As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.[32]

31. The rest of her list of statutes in n.11 regulating the carrying of knives in public places are not as she represents bans of carrying of knives in public places but bans on *concealed* carry. Rivas misrepresents these laws by quoting bits and pieces.  Examples: "Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ('any dirk, pistol or other arm or weapon, except a common pocket knife . . . .'"  The full text:

> That hereafter it shall not be lawful for any person in this State to carry arms of any kind whatsoever secretly, on or about their person, and if any dirk, pistol or other arm or weapon, except a common pocket knife, shall be seen or known to be secreted upon the person of any one in this State, such person so offending, shall on conviction, be fined not exceeding five hundred dollars and not less than five dollars, or imprisoned not exceeding six months and not less than ten days, at the discretion of the court: Provided, however, That this law shall not be so construed *as to prevent any person from carrying arms openly, outside of all their clothes* …[33] [emphasis added]

---

[31] Judge Edward Scott, LAWS OF THE STATE OF TENNESSEE: INCLUDING THOSE OF NORTH CAROLINA NOW IN FORCE IN THIS STATE: FROM THE YEAR 1715 TO THE YEAR 1820 ch. 22 § 6 at 710 (1801).

[32] New York State Rifle & Pistol Assn v. Bruen 142 S.Ct. 2111, 2121. (2022).

[33] Fla. Acts ch. 75 § 3 (1846).

32. Still in n.11: "Virginia, *see* 1838 Vir., ch. 101 ('any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . .');"  The full text which shows Rivas' dishonest editing:

> That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, *and the same be hidden or concealed from common observation.*[34] [emphasis added]

33. This misrepresentation of laws banning *concealed* carry as being bans on open carry should cast serious doubts as to the accuracy and scholarship of Rivas' work.

### B. Pistols

34. On p. 9: "Another weapon that came to be associated with lawless violence in the antebellum period was the 'pocket pistol.'  Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzleloading pistols modeled after designs that appeared in the eighteenth century."   Her supposed source: "Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116."

35. The only text referencing the United States and pistols in that page range:

> "America normally followed the British or French patterns over the decided time lag of perhaps as much as 10 or 20 years. There are also many other details of design and craftsmanship on these and other features of firearms which enable a specialist to identify the area and area of origin of a given specimen.[35]

> Probably the most unusual of all the special flint locks, however, with those the cock under the barrel. The theory, apparently, was to remove the cock from the line of sight and to shift the flash from the priming to a position where it would be of less of a distraction to the shooter. Both German and American versions of this unusual arrangement are known, and the date ranges from the mid 18th century to the early years of the 19th.[36]

36. That is it: every paragraph that references America in that page range.  Nothing that she claims appears in those pages of Pollard's.  Even then, she is wrong.  Percussion cap handguns

---

[34] Va. Acts ch. 101 § 1 (1838).
[35] POLLARD'S HISTORY OF FIREARMS 114 (1983).
[36] Id. at 116.

11

were an innovation of the 19th century that rapidly replaced flintlock firearms.[37]  An "expert" knows this.

37. From the late 18th century, gun makers made repeating handguns called pepper-boxes. The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[38]  The development of the percussion cap certainly made them more practical; while a percussion cap could certainly be detonated accidentally by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.  On YouTube you can see examples of antique percussion pepperboxes being fired without any injuries or death to the shooter.[39]

38. Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges merely by pulling the trigger, placing a man with but one hand on an equality with six men, each with the ordinary pocket pistol."[40]  Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[41]

39. Rivas has offered seemingly contradictory expert declarations to this in other cases. See DECLARATION OF BRENNAN G. RIVAS in OREGON FIREARMS FEDERATION, INC.,

---

37 Id. at 62.

38 Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber [sic], Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

39 *Antique Pepperbox Pistol 1850's Washington Arms Co*, https://www.youtube.com/watch?v=jiSkuUmKW5E, last accessed March 9, 2023.

40 *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.

41 *English Transitional Pepperbox Revolver*, FORGOTTEN WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.

v. Kotek (D.Ore. 2023).  In that expert declaration Rivas' p. 16: "Some multishot pistols were in existence prior to the patenting of Samuel Colt's revolver in 1836, but they were not widely available in the United States."  On p. 16, n. 32 tells us "Pepperbox pistols had multiple rotating barrels. See Blair, Pollard's History, 210."  Rivas in p. 16, n.31 points to an ad offering pepperboxes for sale.  Clearly, they could not have been terribly rare if Rivas can find ads for them and there are surviving American pepperboxes in use in YouTube videos.

40. On p. 10: "While pocket pistols were less frequently the targets of popular outrage in the early nineteenth century, they were still regulated alongside other deadly weapons like bowie knives."  If by "regulated" Rivas means states *prohibited concealed carry*, this was *generally* true, but by no means universal.  There were no general prohibitions on open carry or possession in the antebellum period.  I notice Rivas cites none.

41. Tennessee is one exception to Rivas' claim about "regulated alongside."  The legislative journal shows that a variety of amendments were proposed to the law that prohibited sale of Bowie knives and Arkansas toothpicks.[42]  It also prohibited concealed carry but did not prohibit open carry.[43]  These amendments reveal that the bill at that point was narrowly focused, applying only to Bowie knives, and extreme in its goals: it made criminal *any* use against a person, and not just concealed carrying.  Senator Anderson attempted to amend the bill to allow the use of a Bowie knife for self-defense, but this amendment was rejected.[44]

---

[42] "That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick…" 1838 Tenn. Laws ch. 138 § 1.

[43] "That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person…" 1838 Tenn. Laws ch. 138 § 2.  § 3 criminalized drawing from concealment such knives and § 4 criminalized cutting or stabbing someone with such knives.

[44] *Senate*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 29, 1837, 2.

42. Amendments that were accepted that day broadened the ban on sale or use to cover not only Bowie-knives, but also Arkansas toothpicks and Spanish stilettos. Any use, "whether for self-defense or otherwise," subjected the offender to three to five years in prison.[45]  The following day, the Senate gave the bill its third reading, the "Spanish stilettos" were removed, and the bill passed, 17-8.[46]

43. The Bowie knife bill received its first reading in the Tennessee House on December 28 and its second reading on January 12.  At the second reading, Representative Warner added dirks to the prohibited weapons, but Representative Dean's attempt to add "sword canes and *pistols*" to the prohibited weapons list failed.[47]  [emphasis added]

44. On p. 10, Rivas again claims: "Public carry laws generally included 'pistols' within their purview, and other regulatory strategies attempted to discourage their presence in public spaces."  She cites no laws to support this claim.  I am aware of no laws until Texas' 1871 statute that prohibited open carry.[48]

45. On p. 10, Rivas makes a rather curious claim: "The year 1836 proved to be a turning point in the history of firearm development and a major catalyst for both a proliferation of interpersonal violence and intensification of firearm regulation in the nineteenth century," and claims this year was because "Samuel Colt patented his first revolver design."  Colt's production at his Paterson, N.J. factory was never huge before bankruptcy in 1843; Colt made 1,189 pistols by March of 1839.  Colt only sold 441 by that date.[49]  Many of these early sales appear to have

---

[45] *General Assembly*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 29, 1837, 2; *Senate*, NASHVILLE DAILY REPUBLICAN BANNER, Dec. 2, 1837, 2.
[46] *General Assembly*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 30, 1837, 2.
[47] *House of Representatives*, NASHVILLE DAILY REPUBLICAN BANNER, Dec. 29, 1837, 2; *House of Representatives*, NASHVILLE DAILY REPUBLICAN BANNER, Jan. 13, 1838, 2.
[48] 1871 Tex. Laws ch. 34.
[49] James E. Serven, COLT FIREARMS: 1846-1954 13, 30 (1954).

been to military units, some to the U.S., others to the Republic of Texas.[50]  Colt made revolvers

for the commercial market starting in 1848.[51]

46. If Rivas had used 1848 as the turning point, there might be some argument as to the

effect of Colt's revolvers.  Starting at 1836 simply shows that Rivas is no expert.

47. Rivas also distinguished the Colt revolver as "it provided … multiple shots without

reloading…"  As discussed previously, and in an ad cited by Rivas, multishot pistols were already

for sale before Colt started commercial sales of revolvers in 1848.

### C. Other Deadly Weapons

48. Rivas on p. 11 discusses several other deadly weapons of the era and how they were

"associated with crime and interpersonal violence rather than militia service or communal

policing; they were typically concealed when worn."  She provides no source for this claim.  Even

if true, the Heller decision identified that arms are protected by the Second Amendment "for the

lawful purpose of self-defense."[52]  The association with criminal behavior might well describe a

perception that indicated an economic class distinction between weapons that a poor person might

carry for self-defense and a middle-class American's choice of a pistol.  Cockrum's defense

attorney in Cockrum v. State (Tex. 1859) crisply argued this discrepancy.

> A bowie-knife, or dagger, as defined in the Code, is an ordinary weapon, one of the cheapest
> character, accessible even to the poorest citizen.  *A common butcher-knife, which costs not more
> than half a dollar, comes within the description given of a bowie-knife or dagger*, being very
> frequently worn on the person.  To prohibit such a weapon, is substantially to take away the right
> of bearing arms, from him who has not money enough to buy a gun or a pistol.[53] [emphasis
> added]

49. All of these lower-class weapons, like the pistol, were intended for short-range use

where a person under physical attack most needs a deadly weapon.

---

[50] Id. at 9-12.
[51] David A. Hounshell, FROM THE AMERICAN SYSTEM TO MASS PRODUCTION 1800-1932: THE DEVELOPMENT OF MANUFACTURING TECHNOLOGY IN THE UNITED STATES 47 (1984).
[52] District of Columbia v. Heller, 128 S.Ct. 2783, 2788 (2008).
[53] Cockrum v. State, 24 Tex. 394, 396 (1859).

15

50. At p. 11: "Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors."  There were profound social changes during this time, with rapid expansion to the West, large factories employing workers far removed from the traditional and more paternalistic employer/employee arrangements of colonial America, and increasing immigration from Europe (803,158 non-slave immigrants between 1790 and 1835).[54]  Many of these immigrants arrived so destitute that New York passed a law requiring ship captains to report all immigrant arrivals; the law was "intended to prevent the state's being burdened with an influx of foreigners and to prevent their becoming paupers, and who would be chargeable as such."[55]  This dramatic wave of immigration, some of it quite poor, would seem to qualify as "profound social changes."  It hardly seems sensible to explain an increase in violence (gun or non-gun), as caused by handgun availability alone with so many other plausible causes.

51. At pp. 12-13: "The proliferation of revolvers during the same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before."  While it seems logical to make this assumption, Rivas provides no source for this claim.  Homicide includes both criminal deaths (murder and manslaughter) but also lawful killings (justifiable and excusable homicide).  That some of this increase in homicides might be in the latter category because victims were more likely to successfully defend themselves against multiple attackers, or even stronger individual criminals, is at least as plausible explanation as Rivas' claim.  One of Rivas' sources on p. 13, n. 29 argues this will sometimes be the case:

> But let us look at the other aspect of the case. The house of one man is attacked, and because he either has no weapons, or does not know how to use them, his property is carried off and his wife, perhaps, outraged [raped] before his eyes. Under very different circumstances the same ruffians, emboldened by previous impunity, attack another house.[56]

---

[54] Calculated from Raymond L. Cohn, MASS MIGRATION UNDER SAIL: EUROPEAN IMMIGRATION TO THE ANTEBELLUM UNITED STATES 15 (2009).
[55] New York v. Miln, 36 U.S. 102, 103 (1837).
[56] THE PISTOL AS A WEAPON OF DEFENCE IN THE HOUSE AND ON THE ROAD: HOW TO CHOOSE IT AND HOW TO USE IT iii (1875).

52. At p. 14, Rivas attributes the carrying of pocket pistols to rising homicide rates because "having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families." This is the "finger pulls the trigger" model of gun homicide causation: what are otherwise normal people "lose it" in a moment of anger. The evidence from the modern era shows that murderers are disproportionately people with histories of antisocial behavior or mental illness. One study of Illinois "homicide offenders" found "For 1990-2000, 42.6% of 884 cases had at least 1 felony conviction compared with 3.9% of nearly 7.9 million controls."[57]

53. A study of Indiana murder convicts found that 18 percent were severely mentally ill, suffering from "schizophrenia or other psychotic disorder, major depression, mania, or bipolar disorder."[58] Of the Indiana murder convicts "73 percent of offenders had diagnoses of major depression, bipolar disorder, or mania, while a psychotic disorder including schizophrenia, was diagnosed in only 41 percent, although there was some overlap among the diagnoses."[59] Furthermore, "studies that used hospitalized samples tended to have a higher proportion of persons with a diagnosis of schizophrenia and persons who were experiencing psychotic symptoms at the time of the murder than was found in the present study."[60]

54. It seems unlikely that 19th century murderers were fundamentally different than today. Availability of pocket pistols is thus an unlikely proximate cause of 19th century homicides.

55. At p. 14 Rivas claims: "Eventually, legal opinion coalesced around the idea that having deadly weapons upon one's person 'raises a presumption of guilt,' regardless of whether they were

---

[57] Philip J. Cook, Jens Ludwig, and Anthony Braga, *Criminal Records of Homicide Offenders*, 294(5) JAMA 598-601 (Sep. 2005).
[58] Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, *Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder*, 36 J. AM. ACAD. PSYCHIATRY & LAW 82 (2008).
[59] *Id.* at 80.
[60] Id. at 83-84.

17

openly carried or concealed, and regardless of whether the carrier intended to use them in an assault or not". Review of the sources she cites shows a different story. Her evidence of legal opinion is one decision, State v. Reams (N.C. 1897). One decision is hardly evidence that "legal opinion coalesced" around this idea. A citation to a standard legal text, or even a dozen similar decisions would be a *lot* more persuasive.

56. Even then, Reams is clear that it was the carrying of a *concealed* weapon that raised a presumption of guilt: "The offense of carrying a *concealed* weapon about one's person and off his own premises consists in the guilty intent to carry it *concealed* and not upon the intent to use it; and the possession of the weapon raises the presumption of guilt."[61] [emphasis added] In n.35 Rivas does actually cite a legal journal in defense of her claim. The title of the article clearly states the concern: "Concealed Weapons." Along with the discussion on p. 412 of mischievous intent for carrying concealed weapons, that article on p. 409 refers to a decision upholding open carry:

> In Stockdale v. State, carrying a pistol in the waist-band, with butt and cock exposed, was held not within the statute. This, however, is put upon the ground that it is lawful to bear arms openly, and impossible to carry a pistol without part of it concealed.[62]

57. Most of Rivas' other sources in n. 35 condemned *concealed* carry. Many are newspaper articles. While Rivas may be correct that the chattering classes supported banning at least concealed carry, they are not evidence that support for bans on open carry enjoyed widespread support.

### D. Right to Keep and Bear Arms Decisions

58. At pp. 16-17, Rivas claims that modern interpretations of 19th century open carry are wrong because: "This idea is largely a result of simplified interpretations of the nineteenth-century

---

[61] State v. Reams, 27 S.E. 1004 (N.C. 1897).
[62] *Concealed Weapons*, 8:4 CRIMINAL LAW MAGAZINE AND REPORTER 409, 412 (Oct. 1886).

case law surrounding public carry statutes that emphasize judges' protection of openly carrying deadly weapons without considering the narrow context in which such behavior would have occurred." Yet even the more restrictive decisions, such as State v. Wilburn (Tenn. 1872) acknowledged that a *complete* prohibition on carrying revolvers had some constitutional limits. The 1871 Tennessee statute prohibited carrying various weapons included "belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[63] So, only the most terrifying way to carry a handgun was lawful, because open carry was protected.

59. The Wilburn decision involved a clearly spurious indictment. The first count charged him with carrying "a belt and pocket pistol and revolver pistol, the same being an arm such as is not commonly carried and used in the United States army." The second count charged that Wilburn did "unlawfully and willfully carry an *army pistol* privately and concealed, and not openly in his hands..."[64] [emphasis added] which contradicts the claim in the first charge, since the Act of 1871 had defined an "army pistol" to be something other than "a belt or pocket pistol." Yes, this was a mandatory brandishing law, which would seem especially effective as causing terror. This demonstrates that both the Tennessee Legislature and Tennessee Supreme Court recognized that the bearing arms could not be completely extinguished by statute even if it required something absurdly dangerous. Importantly, this decision was made based on the Tennessee Constitution's "for the common defence" right to keep and bear arms provision which included authorization for

---

[63] State v. Wilburn, 7 Tenn. 61 (1872).
[64] Id. at 58, 59.

legislative regulation of "the wearing of arms,"[65] not the broader guarantee of the Second Amendment.

60. At p. 17, Rivas argues that the dominant view of in the early 19th century was "that concealed carry laws were constitutional because the Second Amendment and state analogues protected appropriate uses of militia arms, not the carrying of deadly weapons." She cites Aymette v. State (Tenn. 1840); State v. Buzzard (Tex. 1872); Hill v. State (1874); and Ex parte Thomas (Okla. 1908). (Only one of these is even in the first half of the 19th century, and one is in the 20th century.) She dismissed three decisions: one that recognized a right to carry concealed[66] and two decisions upholding concealed carry bans because open carry remained lawful.[67] For some reason four decisions that agree with her claim are the dominant view vs. three decisions that disagree with her.

61. It would appear that Rivas has no knowledge of the enormous variety of decisions in this period concerning both state constitutional and Second Amendment guarantees of the right to keep and bear arms, some of which I will now list. Most do indeed acknowledge that the state had authority to regulate concealed carry of arms, but often not for Rivas' reasons.

62. Some decisions are silent as to why the legislature had the authority to ban concealed carry in spite of state constitutional guarantees of a right to keep and bear arms.[68] Some, such as Simpson v. State (Tenn. 1833) recognize that the state constitution protected the right to carry deadly weapons (even while "then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make.") The Simpson v. State (Tenn. 1833) decision is quite

---

[65] Id. at 58, 59.
[66] Bliss v. Commonwealth, 3 Littel 90 (Ky. 1822).
[67] Nunn v. State, 1 Ga. 243 (1846); State v. Reid, 1 Ala. 612 (1840).
[68] State v. Mitchell, 3 Blackford 229 (Ind. 1833).

interesting and utterly contrary to Rivas' supposed consensus.  Denying the validity of the Statute

of Northampton banning the carrying of "dangerous and unusual arms," Simpson found:

> But suppose it to be assumed on any ground, that our ancestors adopted and brought over with
> them this English statute, or portion of the common law, our constitution has completely
> abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their
> common defence."  Article 11, sec. 26.  It is submitted, that this clause of our constitution fully
> meets and opposes the passage or clause in Hawkins, of "a man's arming himself with dangerous
> and unusual weapons," as being an independent ground of affray, so as of itself to constitute the
> offence cognizable by indictment.  By this clause of the constitution, an express power is given
> and *secured to all the free citizens of the state to keep and bear arms for their defence*, without
> any qualification what-ever as to their kind or nature. [69] [emphasis added]

63. Rivas represents Aymette v. State (Tenn. 1840) as guaranteeing "appropriate uses of

militia arms, not the carrying of deadly weapons."  The decision is a bit more *interesting* than that:

> [E]very free white man may keep and bear arms.  But to keep and bear arms for what?  If the
> history of the subject had left in doubt the object for which the rights is secured, the words that
> are employed must completely remove that doubt.  It is declared that they may keep and bear
> arms for their common defence...  The object, then, for which the right of keeping and bearing
> arms is secured is the defence of the public.  *The free white men may keep arms to protect the
> public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws
> and the constitution.* [70] [emphasis added]

64. What sort of arms?  "[T]he *arms the right to keep which is secured are such as are

usually employed in civilized warfare*, and that constitute the ordinary military equipment."

[emphasis added]  The arms protected are weapons of war.  If Rivas wants to cite Aymette as an

authority, I look forward to her defense of the right to keep and bear semiautomatic detachable

magazine rifles.

65. Owen v. State (Ala. 1858) upheld a conviction for carrying a concealed pistol.  While

doing so, the decision analyzed the meaning of the Alabama Constitution's arms guarantee:

> That section was not designed to destroy the right, guarantied by the constitution to every citizen,
> "to bear arms in defense of himself and the State"; *nor to require them to be so borne, as to
> render them useless for the purpose of defense*.  It is a mere regulation of the manner in which
> certain weapons are to be borne... [71] [emphasis added]

---

[69] Simpson v. State, 5 Yerg. 356, 359, 360 (Tenn. 1833).
[70] Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840).
[71] Owen v. State, 31 Ala. 387, 388, 389 (1858).

21

66. State v. Buzzard (Ark. 1842) is as Rivas describes it.  It denied a right to carry arms, and held that the state constitution's guarantee was a guarantee that the state militia would be armed.

67. State v. Huntley (N.C. 1843) involved prosecution of a bully:

> His Honor instructed the jury, that if the facts charged in the indictment were proven to their satisfaction, the defendant had been guilty of a violation of the law, and that they ought to render their verdict accordingly. In the investigation before the jury it appeared, among other things, that *the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in the indictment), armed with a double-barrelled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him"*; on some, that "he had waylaid the house of James H. Ratcliff in the night about daybreak, and if he had shown himself he would have killed him; that he showed himself once, but for too short a time to enable him to do so, and that *he mistook another man for him, and was very near shooting him*."[72] [emphasis added]

68. Huntley was not simply armed, but also making death threats; he came close to shooting someone he mistook for the object of his wrath.  To call this "to the terror of the people" seems quite clear.  Yet the North Carolina Supreme Court while upholding the conviction made it clear that riding around armed violated no laws:

> [I]t is to be remembered that the carrying of a gun per se constitutes no offence.  *For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun*.  It is the wicked purpose—and the mischievous result—which essentially constitute the crime.  He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people.[73]  [emphasis added]

69. Nunn v. State (Ga. 1846) struck down a poorly written statute as contrary to the Second Amendment:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*...[74] [emphasis in the original]

---

[72] State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843).

[73] State v. Huntly, 3 Iredell 418, 420, 421, 422, 423 (N.C. 1843).  This case has been frequently miscited as State v. Huntley, perhaps because the name is spelled both ways in the decision.

[74] Nunn v. State, 1 Ga. 243, 250, 251 (1846).

70. State v. Chandler (La. 1850) involved a defendant convicted of manslaughter. The prosecution appears to have used his concealed carry of a Bowie knife to suggest criminal intent. In response to Chandler's claim that the Constitution protected his right to carry concealed, the Louisiana Supreme Court ordered a new trial for manslaughter, based on errors related to the charge to the jury with respect to the law of self-defense.[75]

71. Chandler explained the reason Louisiana banned concealed carry in 1813:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with *no man's right to carry arms (to use its own words), "in full open view,"* which places men upon an equality. This is the right guaranteed by the *Constitution of the United States*, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[76] [emphasis added]

72. The Smith v. State (La. 1856) decision continues to recognize that open carry was protected by the Second Amendment:

> The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States. The arms there spoken of are such as are borne by a people in war, *or at least carried openly.* The article explains itself. It is in these words: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." This was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke.[77] [emphasis added]

73. Again, military weapons were protected arms, and openly carried arms were lawful. Rivas p. 19 also misrepresents Smith: "In 1856, a Louisiana court reasoned that partially exposed weapons were 'the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes.'"

---

[75] State v. Chandler, 5 La. An. 489, 491 (1850).
[76] State v. Chandler, 5 La. An. 489, 490, 491 (1850).
[77] Smith v. State, 11 La. An. 633, 634 (1856).

What was unusual was not open carry, but a person carrying a "weapon in full open view, and partially covered by the pocket or clothes."[78]

74. State v. Jumel (La. 1858) again involved a Second Amendment challenge to a concealed weapon ban. Again, the Louisiana Supreme Court argued: "The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."[79] The Louisiana Supreme Court then cited the *State* v. *Chandler* (1850) and *State* v. *Smith* (1856) decisions. The *Jumel* decision implied that *because* "only a particular mode of bearing arms" (concealed) was restricted, it was not an infringement on the right protected by the Second Amendment.

75. Dred Scott v. Sandford (1857) clearly recognized a right to carry arms. Contrasting the status of free blacks to white citizens:

> It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, … *and to keep and carry arms wherever they went.* [emphasis added][80]

76. Rivas p. 18 cites Bishop's claim that "dirks, bludgeons, revolvers and other weapons which are not used in war," were therefore not protected arms. This ignores that revolvers by the time of the Civil War *were* used in military service. Shortly into the Civil War, the Ordnance Department gave Colt their first order for the 1860 army models, later they received contracts for the same revolvers and eventually delivered over one hundred thousand before losing the

---

[78] Id., at 634.
[79] State v. Jumel, 13 La. An. 399, 400 (1858).
[80] Dred Scott v. Sandford, 60 U.S. 393, 417 (1857).

contract."[81]  Pictures of the Colt Model 1851 Navy Revolver, Model 1861 Revolver, 1860 Army Revolver can be found in works describing Civil War equipment.[82]

77. This is why decisions such as Page v. State (Tenn. 1871) recognized the right to carry at least military revolvers, even if the law required them to be carried in a manner that would be called brandishing today.[83]

78. Similarly, Fife v. State (Ark. 1876) decided that only weapons:

> What then, is he protected in the right to keep and thus to use?  Not every thing that may be useful for offense or defense, *but what may properly be included or understood under the title of "arms," taken in connection with the fact that the citizen is to keep them, as a citizen.*  Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State.  *Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater* [revolver]*, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the legislature.*[84]  [emphasis added]

79. Two years later, in *Wilson* v. *State of Arkansas* (Ark. 1878), the Arkansas Supreme Court once again defined what arms the state arms provision protected.  Chancy Wilson was indicted on the grounds that he did "unlawfully carry a pistol as a weapon, contrary to the statute such case made and provided, and against the peace and dignity of the State..."  Wilson had borrowed "a large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting.  Upon reaching his destination, Wilson spoke with his host, "pulled the pistol out of his boot, cocked it a few times to see if it would revolve, and then put it around under his coat, and went into dinner."  It is not clear if the revolver was concealed in his boot, but it certainly was concealed under his coat.  The trial court refused to allow a statement either by the owner of the pistol or Wilson as to the purpose of

---

[81] Donald L. Ware, REMINGTON ARMY AND NAVY REVOLVERS: 1861-1888 xvii (2007).
[82] Eric Fein, WEAPONS, GEAR, AND UNIFORMS OF THE CIVIL WAR 18-19 (2012).
[83] Page v. State, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871).
[84] Fife v. State, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876).

having the revolver.  The trial court also refused to instruct the jury that "an army size pistol" was not subject to the restriction of the Arkansas law.

80. The Arkansas Supreme Court, citing *Fife*, agreed that regulation was acceptable, but:

> No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections, etc.  *Andrews* v. *State*, 3 *Heiskell*, 182.
>
> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.
>
> *If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.*[85] [emphasis added]

81. In the same session, the Arkansas Supreme Court decided another weapons case, *Holland* v. *State* (1878):

> James Holland was indicted in the Circuit Court of Yell county, for carrying a pistol as a weapon.
>
> On the trial but one witness was examined.  He stated, in substance, that the first time he ever saw defendant, was on the 1st of October, 1875, in Yell county.  He had two large sized six shooting pistols, one of them a Remington, navy size and loaded, and the other a Colt's army pistol.  The pistols were such as are commonly used in the United States military and naval service.  Defendant was carrying them in his saddle-bags, and stated he was from Texas.  Witness did not know whether he was on a journey or not.

82. Not surprisingly, Holland

> asked the court to charge the jury that if they found from the evidence that the pistols, proven to have been carried, were army sized pistols, and were such as are commonly used in the United States military and naval service, they must acquit defendant.
>
> The court refused this instruction, defendant was convicted, a new trial refused him, he took a bill of exceptions and appealed.[86]

83. Chief Justice English again delivered the opinion of the Arkansas Supreme Court: "The court erred in refusing to instruct the jury as moved by appellant."  After citing *Fife* v. *State* (1876) and *Wilson* v. *State of Arkansas* (1878), the Arkansas Supreme Court reversed the conviction, and ordered a new trial.  The pistols in question were apparently concealed "in his saddle-bags," but

---

[85] Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878).
[86] Holland v. State, 33 Ark. 560, 561 (1878).

the defense of the pistols being standard U.S. military models was sufficient to justify their concealed carriage.

84. In Dabbs v. State (Ark. 1882), the Arkansas Supreme Court upheld the third section of the Act of April 1, 1881, which prohibited the sale of any pistol other than those "used in the army or navy of the United States and known as the navy pistol." The heart of the dispute is addressed in the last paragraph of the decision:

> The law was enacted as a measure of precaution for the prevention of crimes and calamities. It is leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It does not abridge t*he constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare.* Fife v. State, 31 Ark., 455.[87] [emphasis added]

85. Other 19th century and early 20th century decisions recognized a right to carry handguns. *In Re Brickey* (Ida. 1902) involved a man named Brickey who was convicted of carrying a loaded revolver within the city limits of Lewiston, Idaho. On appeal, the Idaho Supreme Court raised federal and state constitutional provisions:

> The second amendment to the federal constitution is in the following language: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." The language of section 11, article 1 of the constitution of Idaho is as follows: "the people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right of law." Under these constitutional provisions, *the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho,* whether within or without the corporate limits of cities, towns, and villages. The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it. A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state. But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages. We are compelled to hold this statute void.[88] [emphasis added]

86. There is overwhelming evidence of later decisions recognizing a right to carry handguns, even if the state could prohibit *concealed* carry.

---

[87] Dabbs v. State, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882).
[88] In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902).

27

87. Why this lengthy discussion of obscure 19th century decisions?  To emphasize that Rivas' expertise on this subject is limited, and her conclusions are therefore flawed.

88. On p. 19 n. 51, Rivas quotes from the *Phrenological Journal and Science of Health* that, "It is common now-a-days for trousers to be made with a pocket placed little below the band in the back part of the garment. It is commonly termed the hip or pistol pocket."  Either this suggests that concealed carry was common enough and considered sufficiently respectable behavior that clothes were made anticipating the practice.  Or if Rivas had read a couple sentences beyond:

> But the pistol pocket has grown into favor for other and more benign purposes than carrying a deadly weapon. Friends tell us it is a very safe repository for the wallet or memorandum book, and we have noticed on certain rare holiday outings that some of our youth who affect short jackets or fancy shirts as becoming warm-day recreations, use the back pocket for their handkerchiefs, commonly permitting a liberal section of colored border to dangle loosely outside.[89]

89. Rivas at pp. 25-27 discusses surety bond laws which Bruen specifically rejects as irrelevant.[90]  Much of the rest of Rivas' declaration consists of similarly misleading "evidence" including such marvels as, at p.30: "Hawaii, which became a territory in 1900, had enforced public carry regulations since 1852."  In 1852, Hawaii was a *kingdom*, not under U.S. law.  Its laws as an independent kingdom are of no relevance to the American tradition of gun rights.

90. Even if Rivas' alternate reality version was correct, Bruen recognized a right to bear arms in public places.[91]  All previous decisions taking a narrower view are obsolete.

### E. Misrepresenting Statutes

91. At p. 31: "Sometimes taxes were straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its

---

[89] *The Hygiene Of Pockets*, PHRENOLOGICAL JOURNAL AND SCIENCE OF HEALTH 176 (March 1886).
[90] Bruen op cit. at 2144, 2145.
[91] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022).

territorial phase and remained a policy option for much of the nineteenth century.89 In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for 'carrying arms openly, outside of all their clothes.'"  What Rivas missed in the paragraph on the same page: "Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes."[92]  This understanding was confirmed in Sutton v. Florida (Fla. 1869):

> The statute was not intended to infringe upon the rights of any citizen to bear arms for the "common defense."  It merely directs how they shall be carried, and prevents individuals from carrying *concealed weapons* of a dangerous and deadly character, on our about the person, for the purpose of committing some malicious crime, or of taking some undue advantage over an unsuspecting adversary."[93] [emphasis added]

## II. Summary

92. The evidence presented by Rivas:

- makes extensive misrepresentation of 19th century laws that prohibited *concealed* carry as being bans on *all* forms of public carry;

- purports expert knowledge of early 19th century case law on this subject that she fails to demonstrate;

- pretends that there was a consistent definition of deadly weapons to include all concealable weapons (including handguns) but excluding the far more deadly rifle and shotgun;

- attempts to tie rising murder rates to the introduction of the revolver, while admitting that there was a long list of other factors that might explain this problem in part or perhaps even in full.

---

[92] COMPILATION OF THE PUBLIC ACTS OF THE LEGISLATIVE COUNCIL OF THE TERRITORY OF FLORIDA , PASSED PRIOR TO 1840 423 (1839).
[93] Sutton v. Florida, 12 Fla. 135, 136 (1869).