# EXHIBIT   1

**WORKING DRAFT – Subject to change**

## "Not all History is Created Equal":

## In the Post-*Bruen* World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868

Mark W. Smith

\*\*\*

Mark W. Smith is a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology, Oxford University; Presidential Scholar and Senior Fellow in Law and Public Policy, The King's College; Distinguished Scholar and Senior Fellow of Law and Public Policy, Ave Maria School of Law.  He also hosts the Four Boxes Diner YouTube Channel, which addresses Second Amendment scholarship, history, and issues.  He is the author of multiple books including *First They Came for the Gun Owners: The Campaign to Disarm You and Take Your Freedoms* (Bombardier Books 2019) and *#Duped: How the Anti-gun Lobby Exploits the Parkland School Shooting—and How Gun Owners Can Fight Back* (Post Hill Press 2018).

Electronic copy available at: https://ssrn.com/abstract=4248297

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

I.    1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL
      UNDERSTANDING OF THE SECOND AMENDMENT. ............................................ 7

      A.   The meaning and scope of each provision in the Bill of Rights is the same whether
           applied against the states or against the federal government. ...................................... 7

      B.   The meaning of a constitutional provision is fixed when it is adopted. ....................... 9

      C.   The public understanding of the Bill of Rights by ratifiers in the Founding period
           controls the meaning of its provisions. ...................................................................... 10

      D.   All three of the Supreme Court's substantive interpretations of the Second
           Amendment assess its meaning and scope by looking at the Founding period. ......... 15

      E.   Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the
           Founding Period, not 1868. ........................................................................................ 17

      F.   If later understandings contradict the original understanding of the text, the original
           understanding controls. .............................................................................................. 27

      G.   The Court of Appeals' decisions cited to support 1868 as the determinative year have
           been abrogated or rely on an obvious misreading of McDonald. ............................... 31

II.   1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE
      BILL OF RIGHTS. ......................................................................................................... 33

      A.   It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they
           were incorporating against the states all of the provisions of the first eight
           amendments. ............................................................................................................... 33

      B.   The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill
           of Rights through the Privileges or Immunities Clause. .............................................. 40

      C.   The individual right to bear arms in the Second Amendment was understood the same
           way in 1868 as in 1791. .............................................................................................. 41

III.  THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES
      NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION
      JURISPRUDENCE. ......................................................................................................... 45

      A.   Professor Lash's approach is theoretically unsound and unlikely to be adopted. ...... 46

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

B.  Professor Amar's approach contains similar flaws and his theories have been rejected by Heller.................................................................................................................. 51

CONCLUSION ................................................................................................................................. 57

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

## INTRODUCTION

In June of 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*,[1] its most significant case interpreting the scope of the Second Amendment since the landmark decision in *District of Columbia v. Heller* in 2008.[2]  *Bruen* was a major victory for the constitutional right to keep and bear arms.  One consequence of the decision has been to send the gun control movement scrambling for new ways to undercut the right to bear arms in a post-*Bruen* world.  Opponents of the Second Amendment have seized upon a short passage by Justice Thomas, author of the *Bruen* opinion, to argue in the lower courts that an originalist interpretation requires courts to look at the meaning of the Second Amendment (and thus, logically, all provisions of the Bill of Rights) when the Fourteenth Amendment was ratified in 1868, not in 1791 when the Bill of Rights was ratified.  This approach, if accepted, would revolutionize not only Second Amendment law, but also the Court's entire Bill of Rights jurisprudence.  It is nonsensical, contrary to the Supreme Court's precedents, and contradicts the express text of *Bruen*.

Before looking at what the *Bruen* opinion said (or did not say) on that subject, *Bruen* itself needs to be placed in context.  *Heller* held that the Second Amendment confirms an individual right to keep and bear arms for lawful purposes such as self-defense.  It also rejected the use of a means-ends balancing test, such as levels of scrutiny, and instead relied on a "text, history, and tradition" test.

In the fourteen years between *Heller* and *Bruen*, most of the lower federal courts largely disregarded *Heller*'s historical methodology and instead applied a two-part interest balancing

---

[1] 142 S.Ct. 2111 (2022).

[2] 554 U.S. 570 (2008).

1

Electronic copy available at: https://ssrn.com/abstract=4248297

test.  The first part of the test looked at whether a particular ban or restriction fell within the scope of the Second Amendment.  If it did, the second part of the test was invoked, and the lower courts usually applied an "intermediate scrutiny" balancing test to render the Second Amendment's protections ineffectual.  That remained true even after the Court held in *McDonald v. City of Chicago*[3] that the Second Amendment is a fundamental individual right that is incorporated against states and localities by the Fourteenth Amendment's Due Process Clause.

*Bruen* changed all of that.  The Court expressly rejected balancing tests.  In the words of the Court, the second step was "one step too many."[4]  *Heller* and *McDonald*, the Court stated, "do not support applying means-end scrutiny in the Second Amendment context."[5]  Rather, Second Amendment cases must be firmly rooted in the text and history of that Amendment.  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," the Court held.  To overcome that presumption, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[6]  That means that the government has the burden of showing that there were reasonably close historical analogues to the present-day restriction that is challenged.[7]

But at what point in history should courts look to determine if there were laws or restrictions analogous to those being challenged?  Immediately after *Bruen* was decided,

---

[3] 561 U.S. 742 (2010).

[4] *Bruen*, 142 S.Ct. at 2127.

[5] *Id.*

[6] *Id*. at 2127, 2130.

[7] *Bruen* established several important principles for the Second Amendment.  In addition to striking down the two-part test for the Second Amendment, it established that the Second Amendment protects the carrying of weapons outside the home.  It held that carry permit or license systems are unconstitutional if they vest discretion in state or local officials instead of being based on objective criteria. It also outlined the proper methodology for applying the Second Amendment based upon reasoning by historical analogy.

2

Electronic copy available at: https://ssrn.com/abstract=4248297

government defendants (and their anti-gun amici) in Second Amendment cases began to argue that in litigation against states and localities, as opposed to litigation against the federal government, the relevant time period is not 1791, when the Second Amendment was ratified, but 1868, when the Fourteenth Amendment was ratified.[8]

Here is the passage in *Bruen* on which they base this argument.  After reviewing the historical methodology to be employed by courts in future Second Amendment cases, the Court made a final observation that:

> Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. See, *e.g.*, *Barron ex rel. Tiernan v. Mayor of Baltimore*, 7 Pet. 243, 250–251 (1833) (Bill of Rights applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. [citations omitted] And we have *generally assumed* that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791*. See, *e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).

> We also *acknowledge* that there is an *ongoing scholarly debate* on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they

---

[8] See, *e.g.*, Br. of Def. John Harrington in Support of his Motion for Summary Judgment 24, *Worth v. Harrington*, No. 0:21-CV-01348,  Doc. 49 (D. Minn. Aug. 4, 2022) ("Especially relevant … are laws that were in effect around the time the Fourteenth Amendment, which made the Second Amendment applicable to the States, was ratified); Electronic Amicus Letter Br. of Everytown for Gun Safety 2, *Lara v. Commissioner Pennsylvania State Police*, No. 21-1832, Doc. 61 (3d Cir. Aug. 2, 2022) ("the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states."); [Proposed] Amicus Br. of Everytown for Gun Safety in Support of Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction 7, *Antonyuk v. Bruen*, No. 1:22-cv-00734, Doc. 33 (N.D.N.Y. Aug. 18, 2022) ("Thus, when the people chose to extend the Bill of Rights to the states in 1868, their understanding of the scope of each right should control the originalist analysis today.").  The specific arguments made in these and similar cases are discussed in Part G, below.

Electronic copy available at: https://ssrn.com/abstract=4248297

readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings").[9]

That portion of the opinion concluded that: "We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."[10]

That has led gun control advocates to treat the issue of whether 1791 or 1868 is the relevant time period as an open question and to argue for 1868. Undoubtedly that is because there were more laws concerning firearms on the books in 1868 than there were in 1791, and thus more opportunities to find historical "analogues" to restrict individual rights. Also, the Reconstruction period is unusual in American history because the North was occupying the South with military force, and the South was trying to disarm the newly freed blacks. Such actions during that period are therefore not representative of either the Founding period or of the American historical tradition.

But 1791 vs. 1868 is not an open question. That the Founding period is the correct time to determine the original public meaning of an individual right is not a mere "assumption," as Justice Thomas stated in his respectful nod to the "ongoing scholarly debate." It is an integral and controlling part of the Court's Bill of Rights jurisprudence. As shown in this article, when history must be consulted to determine meaning, it has been the universal practice of the Court to look at the Founding period and relevant antecedents to determine original public understanding. No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it

---

[9] *Bruen*, 142 S.Ct. at 2137-38 (emphasis added). The SSRN article by Professor Lash has now been published as Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (Summer 2022).

[10] *Id.* at 2138.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791.

The Supreme Court has held that the meaning of the Constitution, including the Bill of Rights, is fixed at the time it was adopted, not later.  A provision of the Bill of Rights has only one meaning, whether applied against the federal government or the states.  And the time period for determining that single meaning, when history must be examined, is 1791.  That is true of the three cases cited in the passage quoted above from *Bruen;* it is true of all of the Supreme Court's Second Amendment cases beginning with *Heller*, including *Bruen* itself; and it is true of Supreme Court cases examining other rights provisions of the Bill of Rights.  The Court has also clearly stated that if a later interpretation differs from the original meaning at the time of ratification of the Bill of Rights, the later interpretation must yield.

As shown in detail below, the cases cited by post-*Bruen* defendants or amici in Second Amendment litigation were either abrogated by *Bruen* itself, resulted from a misreading (later corrected) of the *McDonald* decision by a single Circuit Court of Appeals, or were those which cited to that mistaken decision.

Even if one examines the period of ratification of the Fourteenth Amendment, there is no evidence that the ratifiers thought the existing rights in the Bill of Rights somehow changed in meaning.  Rather, the Fourteenth Amendment's purpose was to include African Americans within the protections granted to citizens and to protect their rights against encroachments by the states.  In fact, it did not take long for the Supreme Court to decide that "privileges or immunities" of citizens of the United States were a very limited set of rights indeed.

This article concludes with a description of the scholarly positions of Professors Lash and Amar regarding use of the year 1868 to determine the meanings of the Bill of Rights.  Professor

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

Lash's position would require a complete overturning of Supreme Court's Bill of Rights

jurisprudence.  Professor Amar's position is different, and his concerns, especially regarding the

Second Amendment, may have been resolved by *Heller*, which was decided ten years after his

cited book was published.

6

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

## I.     1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL UNDERSTANDING OF THE SECOND AMENDMENT.

> *A.   The meaning and scope of each provision in the Bill of Rights is the same whether applied against the states or against the federal government.*

The key to understanding why *only* 1791 is the proper year for determining the original public meaning of the Second Amendment, or of any other right of individuals enumerated in the Bill of Rights, is found in *Bruen* itself: "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government."[11]  The Court does not apply two different versions of the Second Amendment, or two versions of other incorporated provisions of the first eight amendments in the Bill of Rights.  Specifically, it does not apply one meaning when invoked against potential federal infringement and a different meaning when invoked against a potential state or locality infringement.

This has been a fundamental principle of Bill of Rights jurisprudence for more than five decades.[12]  That an incorporated right has only a single meaning was made crystal clear in *McDonald*, which quoted *Malloy v. Hogan* as establishing that the Court has:

> abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court."[13]

Instead, as *McDonald* noted, the *Malloy* Court "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment

---

[11] *Bruen*, 142 S.Ct. at 2137 (emphasis added).

[12] The concept that the federal government and state governments are restrained equally by the First Amendment, and by the incorporated First Amendment, appears to go back even further. "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states *as incompetent as Congress* to enact such laws." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (emphasis added).

[13] *McDonald*, 561 U.S. at 765 (quoting *Malloy v. Hogan*, 378 U.S. 1, 5–6 (1964)).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

according to the same standards that protect those personal rights against federal encroachment.'"[14]  The meaning of a provision of the Bill of Rights is *identical* whether applied against the states or the federal government.  Similarly, the Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."[15]

*McDonald* discussed one anomalous case, *Apodaca v. Oregon*,[16] which when *McDonald* was decided allowed state criminal defendants to be convicted of a serious crime by a 10-2 vote rather than only by a unanimous jury as the Sixth Amendment requires in federal trials.  That case has since been overruled in *Ramos v. Louisiana*, with the Court noting that it has "long explained … that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government."[17]  As a case decided just one year earlier stated, "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."[18]  That means, however it is interpreted, the Second Amendment must apply *equally* against the states and the federal government.

---

[14] *McDonald*, 561 U.S. at 765-66 (quoting *Malloy*, 378 U.S. at 10, and further citing *Mapp v. Ohio*, 367 U.S. 643, 655–656 (1961); *Ker v. California*, 374 U.S. 23, 33–34 (1963); *Aguilar v. Texas*, 378 U.S. 108, 110 (1964); *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Duncan v. Louisiana*, 391 U.S. 145, 149, 157–158 (1968); *Benton v. Maryland*, 395 U.S. 784, 794–795 (1969); and *Wallace v. Jaffree*, 472 U.S. 38, 48–49 (1985)).

[15] *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

[16] 406 U.S. 404 (1972).

[17] *Ramos v. Louisiana,* 140 S.Ct. 1390, 1397 (2020).

[18] *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (incorporating the Excessive Fines Clause).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

*B.   The meaning of a constitutional provision is fixed when it is adopted.*

*Bruen* explained that the Constitution's "meaning is fixed according to the understandings of those who ratified it…."[19]  Since the Bill of Rights is part of the Constitution and was ratified just three years after the unamended Constitution went into effect, its meaning was fixed as of that time.  Noting that the "Constitution can, and must, apply to *circumstances* beyond those *the Founders* specifically anticipated,"[20] *Bruen* quoted from *United States v. Jones*,[21] which concluded that installation of a tracking device on a vehicle was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment *when it was adopted*") (emphasis added).[22] Circumstances may change, but the central meaning is fixed.

The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence.  As Justice Thomas noted in his concurrence in *McIntyre v. Ohio Elections Comm'n*:[23]

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now.*" *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] *the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions* ... in the several states." *Rhode Island v. Massachusetts,* 37 U.S. (12 Pet.) 657, 721 (1838).

---

[19] *Bruen,*142 S.Ct. at 2132.

[20] *Id.*

[21] 565 U.S. 400, 404–405 (2012).

[22] *Id*. (emphasis added).

[23] 514 U.S. 334, 359 (1995) (emphasis added).

9

Electronic copy available at: https://ssrn.com/abstract=4248297

Thus, as long ago as 1838, the concept of a "historically fixed meaning" was an accepted proposition. It remained an accepted proposition in 1905 when *South Carolina v. United States* was decided and has remained so to the present day.

    C.   *The public understanding of the Bill of Rights by ratifiers in the Founding period controls the meaning of its provisions.*

As the above passages demonstrate, the relevant time period for ascertaining the *single* meaning of a provision of the Bill of Rights, as applied to the states and to the federal government, is the ratification of those amendments at the time of the Founding, not the time of incorporation of the right into the Fourteenth Amendment. *Bruen* recognized that the "Second Amendment's *historically fixed meaning*" must date, like the Amendment itself, to 1791, when the Court reaffirmed *Heller*'s finding that the right applies to new circumstances, specifically that the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence *in the 18th century*.'"[24]

In the passage from *Bruen* quoted above regarding the "assumption" that 1791 is the relevant time period, the Court cited three cases, all of which looked to the time of ratification of specific amendments in 1791 to determine their original public meaning: *Crawford v. Washington*, 541 U.S. 36 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) (First Amendment). Those cases all involve applications against the states of incorporated provisions of the Bill of Rights. The *Bruen* opinion stated that the Court had "assumed" in those cases that the Founding was the relevant time period. But, as those cases show, the Founding period is

---

[24] *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

expressly stated to be the period to be examined to determine the meaning of the provisions in question.[25]

*Crawford* is a Confrontation Clause case.  Finding that the text alone did not resolve the specific meaning and purposes of that Clause, the Court observed that "[w]e must therefore turn to the historical background of the Clause to understand its meaning."[26]  The Court then examined pertinent English legal history, colonial laws and practices, the common law as understood at the time of the Founding, comparable provisions in eighteenth century state constitutions, and some early nineteenth century cases and commentary to determine its meaning.  Throughout its historical review, the Court repeatedly used expressions such as:

- "…*the Framers* would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify..."

- "The *founding generation's* immediate source of the concept, however, was the common law..."

- referring to certain evils "…that English law's assertion of a right to confrontation was meant to prohibit; and that the *founding-era rhetoric* decried. The Sixth Amendment must be interpreted with this focus in mind."

- "…ex parte examinations might sometimes be admissible under modern hearsay rules, but *the Framers* certainly would not have condoned them."

---

[25] See also *Heller*, 554 U.S. at 576-77 (stating that the normal meaning of the words in the Second Amendment excludes meanings "that would not have been known to ordinary citizens *in the founding generation.*" (emphasis added).

[26] *Crawford*, 541 U.S. at 43.

11

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

- [the Sixth Amendment] "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established *at the time of the founding...*"

- "…the *common law in 1791* conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations."

- "We do not infer from these that *the Framers* thought exceptions would apply even to prior testimony."

- "Our cases have thus remained faithful to *the Framers' understanding:*"

- "…we do not think *the Framers* meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence..." [27]

There is no indication whatsoever in *Crawford* that when the Sixth Amendment is applied through the Fourteenth Amendment to a state, the public understanding of the Sixth amendment at the time of ratification of the Fourteenth Amendment determines its meaning or changes the 1791 meaning.  And the Supreme Court's reliance on Founding-era history in *Crawford* was not a mere "assumption"; it was inseparable from its holding.

The second case cited is *Virginia v. Moore,*[28] a Fourth Amendment case, where the protection of that Amendment was asserted against a state's actions.  The issue was whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law.[29]  The Court looked to the Founding era for guidance:

---

[27] *Id.* at 36, 43, 50, 51, 54, 56, 59, 61 (emphasis added).

[28] 553 U.S. 164 (2008).

[29] *Id.* at 166 (2008).

Electronic copy available at: https://ssrn.com/abstract=4248297

In determining whether a search or seizure is unreasonable, we begin with history. We look to the *statutes and common law of the founding era* to determine the norms that the Fourth Amendment was meant to preserve.[30]

The Court stated that it was "aware of no historical indication that *those who ratified the Fourth Amendment* understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted."[31]  Instead, the "immediate object of the Fourth Amendment was to prohibit the general warrants and writs of assistance that *English judges had employed against the colonists*."[32]  Emphasizing the focus on the Founding period, the Court continued, "[n]o early case or commentary, to our knowledge, suggested the Amendment was intended to incorporate subsequently enacted statutes," and "[n]one of the early Fourth Amendment cases that scholars have identified sought to base a constitutional claim on a violation of a state or federal statute concerning arrest."[33]

According to the Court, this is "not a case in which the claimant can point to 'a clear *answer [that] existed in 1791* and has been generally adhered to by the traditions of our society ever since.'"[34]  As with *Crawford*, there was no indication in *Virginia v. Moore* that the understanding of the ratifiers of the Fourteenth Amendment was relevant or should even be considered.

In the third case, *Nevada Comm'n on Ethics v. Carrigan*,[35] the issue was whether a provision of the state's Ethics in Government Law requiring legislators to recuse themselves from voting on certain measures violated the First Amendment.  The Court held that it did not

---

[30] *Id.* at 168 (emphasis added).

[31] *Id.* (emphasis added).

[32] *Id.* at 166-69 (citations omitted) (emphasis added).

[33] *Id.* at 169.

[34] *Id.* at 170-71 (quoting *Atwater v. Lago Vista*, 532 U.S. 318, 345 (2001) (cleaned up) (emphasis added).

[35] 564 U.S. 117 (2011).

13

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

because voting by legislators does not implicate a personal right of free speech, but is an exercise of legislative power on behalf of the citizenry.  One of the arguments in support of that conclusion was that such recusal laws had existed at the time of the Founding and were not considered to be restraints on speech.

As with *Crawford* and *Moore*, the Court never even considered whether the scope of the First Amendment meaning should be determined by the understanding of the ratifiers of the Fourteenth Amendment.  Instead, it looked to the Founding period to determine whether a law requiring recusal violated the right to freedom of speech or expression.  The Court noted that "Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws *existed in 1791* and have been in place ever since."[36]  The Court found that recusal rules like the one at issue in the case have existed since the founding of the Republic:

> "*[E]arly congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning,*'" *Printz v. United States*, 521 U.S. 898, 905 (1997) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723–724 (1986)). *That evidence is dispositive here. Within 15 years of the founding*, both the House of Representatives and the Senate adopted recusal rules. The House rule—to which no one is recorded as having objected, on constitutional or other grounds, see D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, p. 10 (1997)—was adopted within a week of that chamber's first achieving a quorum.[37]

The Court observed that "The first Senate rules did not include a recusal requirement, but Thomas Jefferson adopted one when he was President of the Senate" in 1801.[38]  It also looked to recusal requirements for federal judges as early as 1792.[39]

---

[36] *Id*. at 122 (emphasis added).

[37] *Id.* (emphasis added).

[38] *Id.* at 123.

[39] *Id.*

14

Electronic copy available at: https://ssrn.com/abstract=4248297

When the Supreme Court looks at history to determine the intent of ratifiers, it always looks to the Founding era as the period of sole or primary relevance.  In addition to the three cases cited by *Bruen*, decisions under the Second Amendment, and all of the other amendments that have been incorporated, look to the Founding period.[40]

### D.  All three of the Supreme Court's substantive interpretations of the Second Amendment assess its meaning and scope by looking at the Founding period.

There have been three Supreme Court cases—*Heller*, *Caetano*, and *Bruen*—that have applied the substantive meaning of the Second Amendment.  *McDonald* surveyed the importance of the right to keep and bear arms over our nation's history to determine if it should be incorporated through the Fourteenth Amendment.  But *McDonald* did not attempt to expound on its exact substantive meaning because Chicago's handgun ban was clearly unconstitutional under *Heller* if the Second Amendment was incorporated.  *Heller*, *Caetano*, and *Bruen* all used the Founding period to determine the scope and meaning of the Second Amendment.

*Heller* first analyzed the meaning of the text of the Second Amendment by examining sources that either preceded 1791 or were close enough in time thereafter to validly ascertain what the language meant to the Founding generation.[41]

While it is unnecessary to review every citation by *Heller* as evidence of meaning in the Founding era, a few examples will illustrate the point.  The Court stated that in interpreting the Second Amendment's text, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'  Normal meaning may of course include an idiomatic

---

[40] The Seventh Amendment has not been incorporated generally against the states because it is a provision governing trials in federal courts.

[41] *Heller*, 554 U.S. 577-592.

15

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

meaning, but it excludes secret or technical meanings that would not have been known to *ordinary citizens in the founding generation*."[42]

To ascertain the meaning of "militia," the Court stated: "As we will describe below, the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range."[43]  *Heller* looked at the *colonial* militia, not the militia as it existed in 1868 or some later period.

For the meaning of "arms," *Heller* looked exclusively at mid- to late eighteenth-century dictionaries and sources, such as Samuel Johnson's famed dictionary.[44]  It concluded that "The term was applied, *then as now*, to weapons that were not specifically designed for military use…."[45]  "Then" refers to the Founding period.  The Court concluded that "Although one *founding-era* thesaurus limited 'arms' (as opposed to 'weapons') to 'instruments of offence generally made use of in war,' even that source stated that all firearms constituted 'arms.'"[46]

Regarding the meaning of "keep," the Court again cited Johnson's Dictionary, with a confirmatory reference to the early Webster definition.  The opinion noted that "The phrase 'keep arms' was not prevalent in the written documents *of the founding period* that we have found," but cited three examples, all of which preceded 1791.[47]  The Court construed "bear" in the same way, stating, "from our review of *founding-era sources*, we conclude that this natural meaning [which the Court had adopted] was also the meaning that 'bear arms' had in the 18th

---

[42] *Id.* at 576-77 (citations omitted) (emphasis added).

[43] *Id.* at 580.

[44] The opinion did contain a "see also" reference to Noah Webster's 1828 dictionary, but it was merely cited as "similar."  It also cited *State v. Duke*, 42 Tex. 455, 458 (1874), but noted only that that case cited state court decisions construing "arms."

[45] *Heller*, 554 U.S. at 581 (emphasis added).

[46] *Id.* (emphasis added).

[47] *Id.* at 583 (emphasis added).

16

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

century."[48] In the end, the Court concluded that it was "adopt[ing] . . . the original understanding of the Second Amendment" as its definitive interpretation.[49] That can only mean the understanding that prevailed at its ratification.

*Caetano* applied the Second Amendment against the Commonwealth of Massachusetts.[50] Although this *per curiam* opinion did not itself engage in historical analysis, it expressly relied on *Heller*'s language and reasoning, which were rooted in the Founding period.  There was no suggestion by the Court that 1868 was the proper date, or that the understanding of the ratifiers of the Fourteenth Amendment was even pertinent, much less controlling.

*Bruen* again confirmed that the time of ratification of the Bill of Rights is the pertinent period.  Addressing New York's historical arguments from medieval times to the end of the nineteenth century, the Court observed that "not all history is created equal" and then reaffirmed *Heller*'s statement that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[51]  The Second Amendment was adopted in 1791, so that should be conclusive.

E.   *Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868.*

As described in *Bruen*, the meaning of a constitutional provision is fixed when adopted. That includes the provisions of the Bill of Rights, which have the same meaning when incorporated against the states as when they apply directly to the federal government.  In numerous cases involving all of the amendments in the Bill of Rights that have been incorporated, the relevant time period has been held to be the Founding period.  None has looked

---

[48] *Id.* at 584 (emphasis added).

[49] *Id.* at 625.

[50] *Caetano v. Massachusetts*, 577 U.S. 411 (2016).

[51] *Bruen*, 142 S.Ct. at 2136.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

primarily to the post-Civil War period to determine the scope of a provision within the Bill of Rights.  To the extent late 19th century interpretations have been discussed in these cases, it was never because the understandings of the ratifiers of the Fourteenth Amendment were found to prevail over those of the Founders in 1791.  Instead, discussions of late 19th century history are treated as confirmation of the 1791 understanding.  While the list here cannot be exhaustive, some examples will illustrate.

*First Amendment:*

The *Nevada Commission on Ethics* case was one of the three cases cited by Justice Thomas as showing that the Court had "assumed" that 1791 is the proper period for determining the scope and meaning of a provision of the Bill of Rights.[52]  As described above, it was alleged in that case that Nevada had infringed on respondent's right of freedom of speech.  The Court looked to the Founding period, and an unbroken tradition since then, to determine that the conduct in question was not speech protected by the First Amendment.

In *Near v. Minnesota,*[53] applying the principles of the First Amendment regarding freedom of the press against a state, the Court heavily emphasized the historical understanding of freedom of the press in 1791 when striking down a state law that imposed prior restraint on a publication deemed a "public nuisance."  The Court stated that "The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as *historically conceived and guaranteed.*"[54]  It alluded to the struggle in England over prior restraints before the Founding era, quoted from Blackstone's *Commentaries* on the nature of the right, cited an early Massachusetts case regarding the meaning of the right, relied on

---

[52] *Id.* at 2137-38.

[53] 283 U.S. 697 (1931).

[54] *Near*, 283 U.S. at 713.

18

Electronic copy available at: https://ssrn.com/abstract=4248297

Madison's Report on the Virginia Resolutions to show differences between the right in England and in America, and included an extensive excerpt from that Report.[55]  This was, of course, a case relying on incorporation against a state, but there was no mention of 1868 as purportedly being the relevant time period for ascertaining the meaning of freedom of the press.

The famous case of *Reynolds v. United States*[56] presented the question of whether a federal statute governing the Territory of Utah could prohibit bigamy without violating the Free Exercise Clause.  Although the case was purely federal, the Supreme Court turned to history at the time of the Founding and before, to determine the meaning of religion and the scope of the right.  The Court noted that:

> The word 'religion' is not defined in the Constitution. We must go elsewhere, therefore, to ascertain its meaning, and nowhere more appropriately, we think, than to *the history of the times in the midst of which the provision was adopted*. The precise point of the inquiry is, what is the religious freedom which has been guaranteed.[57]

The Court then reviewed some colonial history in which religious freedom was circumscribed, and considered in detail a dispute concerning a bill in Virginia in 1784, regarding which James Madison:

> prepared a 'Memorial and Remonstrance,' which was widely circulated and signed, and in which he demonstrated 'that religion, or the duty we owe the Creator,' was not within the cognizance of civil government. [citation omitted]. At the next session the proposed bill was not only defeated, but another, 'for establishing religious freedom,' drafted by Mr. Jefferson, was passed.[58]

The Court considered Jefferson's bill and his views about religious freedom and reviewed the treatment of that subject in the Constitutional Convention and during the period of

---

[55] *Id*. at 713-17.

[56] 98 U.S. 145 (1878).

[57] *Reynolds*, 98 U.S. at 163.

[58] *Id*.

19

Electronic copy available at: https://ssrn.com/abstract=4248297

ratification of the Bill of Rights.[59]  There was no hint that the public understanding of the First Amendment in 1868 was important, let alone that passage of the Fourteenth Amendment somehow retroactively changed the meaning of the Free Exercise Clause.

In *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,[60] a case involving a dispute between a religious school and a teacher who was a "minister" at the school, the EEOC brought suit against the school, alleging that the minister had been unlawfully terminated because she had threatened litigation under the Americans with Disabilities Act.[61] The Court reviewed English, colonial, and Founding era evidence as to the extent to which American governments could be involved in personnel decisions in religious institutions.[62]  It noted that "It was against this background that the First Amendment was *adopted.*"[63]  Among other things, "the *founding generation* sought to foreclose the possibility of a national church…."[64] "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own."[65]

In a recent free exercise case, *Fulton v. City of Philadelphia*,[66] the Court's majority opinion found it unnecessary to perform a historical analysis to determine the meaning of the First Amendment's text because the case could be decided under existing precedents.  However,

---

[59] *Id.*

[60] 565 U.S. 171 (2012).

[61] *Id.* at 179-80.

[62] *Id.* at 182-83.

[63] *Id*. at 183

[64] *Id.*

[65] *Id*. at 184.

[66] 141 S.Ct. 1868 (2021).

20

Electronic copy available at: https://ssrn.com/abstract=4248297

Justice Alito, joined by Justices Thomas and Gorsuch, concurred in the judgment, and wrote a lengthy analysis of the text and historical meaning of the Free Exercise Clause, which focused nearly entirely on the meaning in 1791.[67]  After quoting key words from the First Amendment, the concurrence noted that those "words had essentially the same meaning *in 1791* as they do today."[68] Justice Alito wrote that, following *Heller*'s lead, "we must ask whether the Free Exercise Clause protects a right that was known *at the time of adoption to have defined dimensions.*"[69]  He noted that "critical state ratifying conventions approved the Constitution on the understanding that it would be amended to provide express protection for certain fundamental rights, and the right to religious liberty was unquestionably one of those rights."[70] Because of deeper constitutional scholarship in recent years, "we are now in a good position to examine how the free-exercise right was understood *when the First Amendment was adopted.*"[71]

*Lynch v. Donnelly*, a case involving whether a municipality could include a creche as part of its Christmas display, said that interpretation of the Establishment Clause should comport with "what history reveals was the contemporaneous understanding of its guarantees."[72]  It looked to the actions of the First Congress in 1789 in determining the meaning of that clause:  "In the very week that Congress approved the Establishment Clause as part of the Bill of Rights for submission to the states, it enacted legislation providing for paid chaplains for the House and

---

[67] *Fulton*, 141 S.Ct. at 1894-912.

[68] *Id*. at 1896.

[69] *Id*. at 1899.

[70] *Id*. at 1901.

[71] *Id.* at 1899.

[72] *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984).

Electronic copy available at: https://ssrn.com/abstract=4248297

Senate."[73]  The time of the ratification of the Fourteenth Amendment played no such role in interpreting the right.

*Fourth Amendment:*

As described above, another of the three cases cited by Justice Thomas in support of the Court's looking to the time of the Founding was *Virginia v. Moore*, a Fourth Amendment case. As noted, that case relied on the "statutes and common law of the founding era," and sought to determine the understanding of "those who ratified the Fourth Amendment."[74]  Other cases applying the Fourth Amendment against the states have similarly looked to the Founding period, not the time of ratification of the Fourteenth Amendment.

In *Wyoming v. Houghton*, the Court said that to determine whether government action violates Fourth Amendment rights, "we inquire first whether the action was regarded as an unlawful search or seizure under the common law *when the Amendment was framed.*"[75] Similarly, in *Wilson v. Arkansas*,  the Court stated that in evaluating the scope of Fourth Amendment rights, "we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law *at the time of the framing*."[76]  *Houghton* and *Wilson*, like *Moore*, both applied the Fourth Amendment to states, but not a word was mentioned regarding 1868 being the proper time for assessing the scope or meaning of the right.

---

[73] *Id.* at 674.

[74] *Virginia v. Moore*, 553 U.S. at 168.

[75] 526 U.S. 295, 299 (1999) (emphasis added).

[76] 514 U.S. 927, 931 (1995) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

*Fifth Amendment:*

In *Benton v. Maryland*,[77] the case that incorporated the Fifth Amendment's Double Jeopardy Clause against the states, the Court performed a brief review of the history of that concept's inclusion in American law, especially noting the Founding period.  The right to be free of multiple prosecutions:

> became established in the *common law of England long before this Nation's independence*. [citations omitted].  As with many other elements of the common law, it was carried into the jurisprudence of this Country through the medium of Blackstone, who codified the doctrine in his Commentaries…. Today, every State incorporates some form of the prohibition in its constitution or common law…. [The underlying principle against double jeopardy] has *from the very beginning been part of our constitutional tradition*.[78]

Similarly, in *Gamble v. United States*,[79]  the Court recently examined the meaning of the "dual-sovereignty" doctrine in Fifth Amendment double jeopardy jurisprudence.  The text of the Fifth Amendment protects individuals from being twice put in jeopardy "for the same offence."  Accordingly, the Court looked at the meaning of the word "offence" in the Founding period and found that it "was commonly understood *in 1791* to mean 'transgression,' that is, 'the Violation or Breaking of a Law.'"[80]  The Court continued, "As *originally understood*, then, an 'offence' is defined by a law, and each law is defined by a sovereign. So where there are two sovereigns, there are two laws, and two 'offences.'"[81]  Although *Gamble* was a federal case, the Court

---

[77] 395 U.S. 784 (1969).

[78] *Id.* at 795-96 (emphasis added).

[79] 139 S.Ct. 1960 (2019) (citations omitted, emphasis added).

[80] *Id.* at 1965 (emphasis added).

[81] *Id*.

23

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

recognized that through incorporation the very same principles applied to the state court proceedings under which Gamble had already been convicted.[82]

*Sixth Amendment:*

        *Crawford v. Washington*,[83] described above, was a Sixth Amendment Confrontation Clause case and one of the three cases noted by Justice Thomas in *Bruen* to have "assumed" that the Founding period is the relevant time for determining the scope of provisions of the Bill of Rights.  It repeatedly relied on evidence regarding the Framers, 1791, and the Founding period.

        In *Ramos v. Louisiana*,[84] the Court considered whether the incorporated Sixth Amendment right to a jury trial in state criminal cases requires a unanimous verdict.  The Court looked at precedents arising from before the Founding period, and practices around the time the Sixth Amendment was ratified:

> The requirement of juror unanimity emerged in 14th century England and was soon accepted as a vital right protected by the common law. As Blackstone explained, no person could be found guilty of a serious crime unless "the truth of every accusation ... should ... be confirmed by the unanimous suffrage of twelve of his equals and neighbors...."[85]

> This same rule applied in the *young American States.* Six State Constitutions explicitly required unanimity. Another four preserved the right to a jury trial in more general terms. But the variations did not matter much; consistent with the common law, state courts appeared to regard unanimity as an essential feature of the jury trial.[86]

The Court further recognized that it was the original time of ratification that was pertinent for determining the meaning of trial by jury, explaining that:

---

[82] *Gamble*, 139 S.Ct. at 1963, 1979.

[83] *Crawford v. Washington*, 541 U.S. 36 (2004).

[84] 140 S.Ct. 1390 (2020).

[85] *Id*. at 1395.

[86] *Id*. at 1396 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

It was against this backdrop that James Madison drafted and *the States ratified the Sixth Amendment in 1791.* By that time, unanimous verdicts had been required for about 400 years. If the term "trial by an impartial jury" carried any meaning at all, it surely included a requirement as long and widely accepted as unanimity.[87]

In other Sixth Amendment cases, the Court has also looked to the Founding period to determine the scope, meaning, or importance of various provisions of that Amendment. *See*, *e.g.*, *Powell v. Alabama,*[88] (right to counsel; examining scope of right at English law in Founding period, Blackstone's rejection of English limitations on the right, and inclusion of right to counsel in early American constitutions); *Klopfer v. North Carolina*[89] (right to speedy trial; reviewing early English law, Magna Carta, Coke's *Institutes* and the American familiarity with them at the time of the Founding, Virginia's 1776 Declaration of Rights, and early state constitutions); *In re Oliver,*[90] (right to public trial; relying on "our English common law heritage" and state constitutions in most of the original states); *Duncan v. Louisiana,*[91] (right to jury trial in all state criminal cases in which such right would exist in federal court; reviewing early English history and English Bill of Rights, Blackstone, Stamp Act Congress, First Continental Congress, Declaration of Independence, and constitutions of original states); *Washington v. Texas,*[92] (Compulsory Process Clause; stating that the Framers included this clause to overcome certain limits on who could testify at common law).

---

[87] *Id.* (emphasis added).

[88] 287 U.S. 45, 60-67 (1932).

[89] 386 U.S. 213, 223-25 (1967).

[90] 333 U.S. 257, 266–268 (1948).

[91] 391 U.S. 145, 151-54 (1968).

[92] 388 U.S. 14, 20, 23 (1967).

Electronic copy available at: https://ssrn.com/abstract=4248297

*Eighth Amendment:*

In *Timbs v. Indiana*, to determine whether the Excessive Fines Clause was incorporated against the states, the Court examined early English legal history from the time of Magna Carta, Blackstone, the abuses by the Stuart kings, the English Bill of Rights, and colonial and state constitutions.[93]  It noted that the statements in the English Bill of Rights that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted," were adopted almost verbatim first by the Virginia Declaration of Rights and then in the Eighth Amendment itself.[94]  The Court did discuss the period around ratification of the Fourteenth Amendment, but only to note that then 35 of the 37 states had prohibitions against excessive fines, but that abuses of fines to control black people nevertheless continued.[95]  As in *McDonald*, the inclusion of post-bellum nineteenth century developments in the Court's historical review was aimed only at determining that the right is "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition."[96]  There was no suggestion that 1868 was the primary period to determine the meaning of the clause, or that its meaning was somehow changed by the process of incorporation.  Indeed, given the deep roots into English and American history not only of the principle but the very language prohibiting excessive fines, that would have been an untenable exercise.

The author has not found, and litigants in post-*Bruen* litigation have so far not pointed to, a *single* Supreme Court case in which in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or

---

[93] 139 S.Ct. 682, 687-88 (2019).

[94] *Timbs,* 139 S. Ct. at 688.

[95] *Id*. at 688-99.

[96] *Id.* at 687 (quoting *McDonald*).

26

Electronic copy available at: https://ssrn.com/abstract=4248297

meaning of a provision of the Bill of Rights. [97]   The Second Amendment is not a "second class right"[98] and there is no reason for it to be treated differently from the other provisions of the Bill of Rights in this respect.  In addition, adoption of 1868 as the proper focus for determining the meaning of the Second Amendment would mean that the Supreme Court was utterly wrong in looking to the Founding period in *Heller*, *Caetano*, and *Bruen*.

> F.  *If later understandings contradict the original understanding of the text, the original understanding controls.*

*Heller*, *McDonald*, and *Bruen* all considered some amount of 19th century history. *McDonald* did so not to discern the meaning or scope of the right to keep and bear arms, but rather to determine whether it has historically been considered "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."[99]  *Caetano* relied on the Founding-era research and principles announced in *Heller*.  But both *Heller* and *Bruen* engaged in extensive historical analysis and provided some clear guideposts regarding the proper uses of post-Civil War history.

The post Founding-era history examined by *Heller* and *Bruen* was used by the Court only to confirm rather than to contradict the Founding era understanding. Regarding *Heller*, the *Bruen* Court observed that:

> we made clear in *Gamble*[100] that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." In other words, this 19th-century

---

[97] Litigants have cited lower court decisions that they claim have done this, and I discuss the errors in those claims in Part IG.

[98] *McDonald*, 561 U.S. at 780, 781-87.

[99] *McDonald*, 561 U.S. at 767.

[100] *Gamble v. United States,* 139 S.Ct. 1960 (2019).

Electronic copy available at: https://ssrn.com/abstract=4248297

evidence was "treated as mere confirmation of what the Court thought had already been established."[101]

*Bruen* itself found that the text of the Second Amendment plainly covers the right to carry arms in public.[102]  It also carefully noted that "to the extent later history contradicts what the text says, the text controls."[103]  It adopted the view of then-Judge Kavanaugh in a D.C. Circuit Second Amendment case that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."[104]  And, obviously, the insistence by some scholars and advocates that 1868 should control, is only of importance if they believe they can show that the 1868 understanding was *different* from the 1791 understanding.  But if the 1868 understanding is different from that of 1791, it must be rejected because it is inconsistent with the text and the original meaning that "is fixed according to the understandings of those who ratified it."[105]

But even if the arguments that 1868 trumps 1791 did not conflict with *Heller*, *Caetano*, and *Bruen*, and the Court's entire incorporation jurisprudence—which they plainly do—the Court would give them little weight in any event, due to the sheer remoteness in time of any post-Civil War statements, understandings, or legal developments.  The Court warned against giving "post-enactment history more weight than it can rightly bear," and reaffirmed *Heller*'s observation that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much

---

[101] *Bruen*, 142 S.Ct. at 2137 (quoting *Gamble*, 139 S.Ct. at 1975-76).

[102] *Id.* at 2134.

[103] *Id*. at 2137.

[104] *Id*. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

[105] 142 S. Ct. at 2132.

Electronic copy available at: https://ssrn.com/abstract=4248297

insight into its original meaning as earlier sources."[106]  In fact, faced with twentieth-century

evidence that *did* contradict the Founding-era evidence, the *Bruen* Court rejected that evidence,

stating that the Court will not:

> address any of the 20th-century historical evidence brought to bear by
> respondents or their *amici*. As with their late-19th-century evidence, the 20th-
> century evidence presented by respondents and their *amici* does not provide
> insight into the meaning of the Second Amendment when it contradicts earlier
> evidence.[107]

Justice Barrett, concurring in *Bruen*, also cautioned that "today's decision should not be

understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th

century to establish the original meaning of the Bill of Rights."[108]  That is quite right—*Bruen*'s

analysis forecloses that type of reasoning.

An example of the errors that can occur when courts engage in such "freewheeling

reliance" on mid-to late 19th century analogues is contained in a recent temporary restraining

order enjoining enforcement of some of New York State's new restrictions on carry enacted after

the *Bruen* decision.[109]  In that case, the District Court let stand a ban on carrying concealed

firearms in places of worship, with some exceptions for keeping the peace, despite the fact that

*Bruen* did not include places of worship in its list of "sensitive places."[110]  The District Court

relied on only six "analogues," which were state statutes enacted between 1870 and 1890.[111] But

these alleged analogues come far too late, as indicated by *Bruen* itself and by Justice Barrett's

concurrence in *Bruen*.  To illustrate, in 1740, South Carolina required that "every white male

---

[106] *Id.* at 2136–37 (quoting *Heller*, 554 U.S. at 614).

[107] *Id.* at 2154 n.28.

[108] *Id.* at 2163 (Barrett, J., concurring).

[109] *Antonyuk v. Hochul*, No. 1:22-CV-0986, Doc. 27 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*").

[110] *Bruen*, 142 S.Ct. at 2133.

[111] *Antonyuk II* at 33 n.25.

29

Electronic copy available at: https://ssrn.com/abstract=4248297

inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who…is…liable to bear arms in the militia of this Province," who shall "go and resort to any church or any other public place of divine worship," must "carry with him a gun or a pair of horse-pistols…with at least six charges of gunpowder and ball."[112]  In 1770, Georgia required that "every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia…and resorting…to any church…shall carry with him a gun, or a pair of pistols." Each man was required to "take the said gun or pistols with him to the pew or seat," and these arms were to "be fit for immediate use and service."[113]

      As discussed, all Supreme Court cases on the Bill of Rights have looked to the Founding Period for determining meaning, not to the late 19th century.  If there is no analogue in the Founding period, one cannot jump—as the New York court did—to the late 19th century to look for analogues in the first place.  Justice Barrett in her concurrence pointedly quoted from *Espinoza v. Montana Dept. of Revenue,* 140 S.Ct. 2246, 2258-2259 (2020), which stated that a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" informing our understanding of the First Amendment.[114]  If such a practice cannot establish a pertinent American tradition for the First Amendment, it cannot do so for the Second Amendment, either.

---

[112] 7 David J. McCord, Statutes at Large of South Carolina 417-19 (Columbia, S.C.: A.S. Johnston, 1840) (enacted 1740, re-enacted 1743).

[113] Horatio Marbury and William A. Crawford, Digest of the Laws of the State of Georgia, 241-42 (1802) (law of Feb. 27, 1770, § 1).

[114] *Bruen*, 142 S.Ct. at 2163.

Electronic copy available at: https://ssrn.com/abstract=4248297

    *G.  The Court of Appeals' decisions cited to support 1868 as the determinative year have been abrogated or rely on an obvious misreading of McDonald.*

The briefs supporting the pro-gun control litigants in the *Worth*, *Lara*, and *Antonyuk* cases, *supra* n.8, rely on Court of Appeals cases that supposedly establish that the time of ratification of the Fourteenth Amendment is the key time period for determining the scope and meaning of the Second Amendment.  Even a cursory review of those cases belies that contention.

The amicus brief by Everytown for Gun Safety in *Lara* offers a more robust argument than the defendant's brief in *Worth*.  It contends that for the historical inquiry:

> the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. Several circuits reached this conclusion in applying the first step of the pre-*Bruen* framework.[115]

For this proposition, it provides the following footnote:

> *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is [to] a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *criticized on other grounds by Bruen,* 142 S. Ct. at 2124, 2126-27; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp*., 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)); *Binderup v. Att'y Gen.*, 836 F.3d 336, 362 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and in the judgments) (quoting *Ezell*).[116]

Taking these in order, *Gould* was not "criticized on other grounds" by *Bruen*.  *Gould* was entirely abrogated by *Bruen*.  It is a legal nullity.  The *Ezell* quote is accurate.  The problem there is that *McDonald* did not state that if the claim involves a state or local law where the "scope"

---

[115] Amicus Letter Br. of Everytown for Gun Safety, *Lara v. Comm'r Pa. State Police*, No. 21-1832, Doc. 61, at 2 (3d Cir. Aug. 2, 2022).

[116] *Id.* at 2–3.

Electronic copy available at: https://ssrn.com/abstract=4248297

question asks how the right was understood when the Fourteenth Amendment was proposed and ratified. The Seventh Circuit in Ezell simply got it wrong. For this proposition, it cites "*McDonald*, 130 S.Ct. at 3038–47."[117] But there is no such holding in those pages of *McDonald*. They are simply part of the Court's historical survey of why the right is "fundamental," and do not specify 1868 as the time period to determine the extent of the right. *Bruen* certainly did not read *McDonald* that way and instead focused on 1791 in an approach that it asserted was consistent with all its other Second Amendment precedents, *McDonald* included. And the Seventh Circuit changed course shortly after *Ezell* was decided, observing that "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago*."[118]

*Greeno* simply quoted the mistaken language in *Ezell*, apparently without investigating its accuracy.[119] It was also a somewhat cursory "plain error" review in a criminal case because the defendant had not raised the Second Amendment issue at trial.[120] The *Drummond* case did not hold that 1868 is the proper date. It merely stated, without any elaboration or citation of authority, that "[f]or the rim-fire rifle rule, the question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted."[121] It then cited authorities from 1825, 1885, and 1895 as part of its analysis, but did not attempt to determine what the ratifiers of the Fourteenth Amendment may have understood the right's scope to be in 1868.[122] The citation to

---

[117] *Ezell*, 651 F.3d at 702.

[118] *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

[119] 679 F.3d at 518.

[120] *Id*. at 516.

[121] 9 F.4th at 227.

[122] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

*Binderup* is to a concurrence, not the Court's opinion, and it, too, merely recites the mistaken language of *Ezell*.[123]

In short, litigants arguing for 1868 as the proper date for historical inquiry in incorporation cases would have the lower courts overlook the unbroken line of Supreme Court cases that the right must be the same against both the federal government and the states; that the right is fixed when the relevant Bill of Rights provision is adopted; and that the Founding period is the relevant period for determining the meaning of the Constitution generally and for particular provisions of the Bill of Rights.  In opposition to these firm and consistent holdings by the Supreme Court, they offer one abrogated opinion by one Court of Appeals, a single Court of Appeals opinion that clearly made a mistake that was later corrected, and a series of cases that relied on that mistake apparently without further investigation.

## II.    1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE BILL OF RIGHTS.

A.    *It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they were incorporating against the states all of the provisions of the first eight amendments.*

If those who advocate for 1868 as the proper year for determining the meaning of the Second Amendment were to prevail, an important consequence must be faced.  There is no reason for the Second Amendment to be different from any other provision of the Bill of Rights in this respect.  It is not a "second class right" as *McDonald* pointedly observed.[124]  So, if those advocates were to be successful, consistent application of the doctrine of incorporation must look to 1868 for the public meaning of all of the provisions of the Bill of Rights, not just the Second

---

[123] 836 F.3d at 362.

[124] 561 U.S. at 780, 781–87.

33

Electronic copy available at: https://ssrn.com/abstract=4248297

Amendment.  Furthermore, those meanings must displace the original understandings of 1791. As shown above, both of these propositions are flatly contradicted by well-settled Supreme Court lines of precedent.

But there is a further problem.  If the understanding of the ratifiers of the Fourteenth Amendment of each provision of the Bill of Rights must take precedence, then we must be certain that those ratifiers understood that they were incorporating all of the provisions of the Bill of Rights against the states, and that those rights had a particular, different meaning to them at the time.  This is not only contrary to logic and precedent, but as a practical matter impossible, or nearly so.

The Fourteenth Amendment does not state that it is applying the first eight amendments against the states.  It does not even mention the Bill of Rights. Furthermore, the Due Process Clause was not the principal or stated means by which the Fourteenth Amendment sought to give protection to black freedmen to exercise the right to keep and bear arms.  The operative language considered critical at the time was the Citizenship Clause in the first sentence of Section 1 of the Fourteenth Amendment, coupled with the Privileges or Immunities Clause in the second sentence.  Together, they read:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States….[125]

The first sentence was arguably necessary to overcome the holding of the infamous *Dred Scott* case, which held that African Americans were not citizens of the United States and

---

[125] U.S. CONST. AMEND. XIV, § 1.

Electronic copy available at: https://ssrn.com/abstract=4248297

therefore could not bring suit in federal courts, among other things.[126]  The second sentence was to protect the privileges or immunities of citizens against state infringement.

But what did "privileges or immunities of citizens of the United States" mean? Throughout the Congressional debates on the Fourteenth Amendment, the Civil Rights Act of 1866, and other Congressional enactments for which the Fourteenth Amendment was intended to provide constitutional authority, contradictory and vague accounts were given by members of Congress and others of the Amendment's meaning and effect.

Let us recall the state of the law regarding the Bill of Rights then.  In *Barron v. Baltimore*, the Supreme Court held that the Fifth Amendment's Takings Clause provided a limit only on the federal government and not on actions by state or local governments.[127]  It was widely, though not universally, assumed thereafter that none of the provisions of the first eight amendments in the Bill of Rights applied against the states.  In fact, that had been the prevailing view even before *Barron*.  At the time of ratification of the Fourteenth Amendment, was it clear that that Amendment was meant to reverse *Barron* and apply all of the protections in the Bill of Rights against the states? If that was not clear at the time, the ratifiers of the Fourteenth Amendment would have had no occasion to reconsider their understandings of the Bill of Rights, including the Second Amendment.

The first difficulty in looking at the likely understanding of the ratifiers of 1868 is that "privileges and immunities" already had a widely accepted meaning.  Article IV, Sec. 2, the Comity Clause of the Constitution, provides that "[t]he Citizens of each State shall be entitled to

---

[126] *Dred Scott v. Sandford*, 60 U.S. 393 (1857).  Also, had African Americans been considered citizens, *Dred Scott* presented a parade of horribles that would have ensued, including that it would give them the right "to keep and carry arms wherever they went." *Id.* at 417. As Justice Thomas observed for the Court in *Bruen*, "even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America." *Bruen*, 142 S.Ct. at 2151.

[127] *Barron ex rel. Tiernan v. City of Baltimore*, 32 U.S. 243, 250–51 (1833).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

all Privileges and Immunities of Citizens in the several States."[128]  The opinion of Supreme

Court Associate Justice Bushrod Washington, sitting as a member of a circuit court, was widely

quoted to interpret the meaning of "privileges and immunities."  In *Corfield v. Coryell* he wrote:

> The inquiry is, what are the privileges and immunities of citizens in the several
> states? We feel no hesitation in confining these expressions to those privileges
> and immunities which are, in their nature, fundamental; which belong, of right, to
> the citizens of all free governments; and which have, at all times, been enjoyed by
> the citizens of the several states which compose this Union, from the time of their
> becoming free, independent, and sovereign. What these fundamental principles
> are, it would perhaps be more tedious than difficult to enumerate. They may,
> however, be all comprehended under the following general heads: Protection by
> the government; the enjoyment of life and liberty, with the right to acquire and
> possess property of every kind, and to pursue and obtain happiness and safety;
> subject nevertheless to such restraints as the government may justly prescribe for
> the general good of the whole. The right of a citizen of one state to pass through,
> or to reside in any other state, for purposes of trade, agriculture, professional
> pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to
> institute and maintain actions of any kind in the courts of the state; to take, hold
> and dispose of property, either real or personal; and an exemption from higher
> taxes or impositions than are paid by the other citizens of the state; may be
> mentioned as some of the particular privileges and immunities of citizens, which
> are clearly embraced by the general description of privileges deemed to be
> fundamental: to which may be added, the elective franchise, as regulated and
> established by the laws or constitution of the state in which it is to be exercised.
> These, and many others which might be mentioned, are, strictly speaking,
> privileges and immunities….[129]

Notably absent from this list is any direct reference to the provisions making up the Bill

of Rights.  Of course, the Bill of Rights was not written or ratified until after the adoption of the

Constitution.  But Justice Washington wrote this passage in 1823. If "privileges and immunities"

encompassed all of the provisions in the first eight amendments, it seems at least somewhat

---

[128] U.S. CONST. art. IV, § 2.

[129] 6 F. Cas. 546, 551–52 (E.D. Pa. 1823).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

strange that he did not describe any of the specific rights named in the Bill of Rights or state analogues to those rights.[130]

In debating the Civil Rights Bill of 1866, 42 U.S.C. § 1981, Senator Lyman Trumbull of Illinois (co-author of the Thirteenth Amendment and Chairman of the Senate Judiciary Committee) quoted the portion of the *Corfield* decision set forth above.[131]  The Fourteenth Amendment, of course, was thought by some to be necessary to provide constitutional authority for the Civil Rights Act.  Trumbull described the first section of the bill, which declared all persons of African descent to be citizens of the United States, and noted that there "shall be no discrimination in civil rights or immunities" among the inhabitants of any state "on account of race, color, or previous condition of slavery," as "the basis for the whole bill."[132]  The other provisions contained only "necessary machinery" for enforcement.  After reading aloud the passage from *Corfield*, Trumbull stated that it enumerates "the very rights belonging to a citizen of the United States which are set forth in the first section of this bill."[133]  It was anything but clear from Trumbull's speech that "privileges or immunities" or "civil rights or immunities" was meant to include wholesale the first eight amendments in the Bill of Rights.

When the Fourteenth Amendment itself was presented to the Senate on behalf of a Joint House and Senate Committee, Senator Jacob Howard took a contrasting position.  He again quoted the passage from *Corfield* as constituting "privileges and immunities," but then said that "to these should be added the personal rights guaranteed and secured by the first eight

---

[130] The Comity Clause of Art. IV, Sec. 2, was meant to preclude states from denying to citizens of other states the rights, processes, and privileges afforded its own citizens within its boundaries. That would mean only those privileges or rights held by citizens as part of state law and would not include provisions such as those in the federal Bill of Rights that were designed to prevent federal overreach.

[131] CONG. GLOBE, 39th Cong., 1st Sess. 474–75 (1866).

[132] *Id.*

[133] *Id.*

37

Electronic copy available at: https://ssrn.com/abstract=4248297

amendments of the Constitution; such as the freedom of speech and of the press; the right of the

people to peaceably assemble and petition the government for a redress of grievances; … the

right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house

without the consent of the owner," and so forth down through the remaining amendments.[134]  He

continued:  "The great object of the first section of this amendment is, therefore, to restrain the

power of the States and compel them at all times to respect these great fundamental

guarantees."[135]

Howard's opinion that "privileges or immunities" embraced the first eight amendments

was by no means universal.[136]  Sen. Thomas Hendricks of Indiana stated that he had not "heard

any Senator accurately define, what are the rights and immunities of citizenship" or that "any

statesman has very accurately defined them."  He described the terms as "not very certain" and

"vague."[137]  Senator Reverdy Johnson of Maryland favored the citizenship and due process

clauses, but stated that "I think it quite objectionable to provide that 'no State shall make or

enforce any law which shall abridge the privileges or immunities of citizens of the United

States,' simply because I do not understand what will be the effect of that."[138]  Rep. Benjamin

Boyer of Pennsylvania found Section 1 "objectionable also in its phraseology, being open to

ambiguity and admitting of conflicting constructions."[139]

---

[134] *Id*. at 2765.

[135] *Id*. at 2766.

[136] Indeed, that was news to Justice Felix Frankfurter in 1947.  In his concurring opinion in *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 467–68 (1947), Justice Frankfurter wrote: "Not until recently was it suggested that the Due Process Clause of the Fourteenth Amendment was merely a compendious reference to the Bill of Rights whereby the States were now restricted in devising and enforcing their penal code precisely as is the Federal Government by the first eight amendments."

[137] CONG. GLOBE, 39th Cong., 1st Sess. 3039 (1866).

[138] *Id.* at 3041.

[139] *Id*. at 2467.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

If the very members of Congress that were debating the Fourteenth Amendment disagreed as to its meaning, or found it "vague" and open to "conflicting constructions," then determining how the ratifiers in the states in 1868 understood the meanings of each of the provisions of the first eight amendments in 1868, particularly when it was unclear that those eight amendments were being incorporated wholesale against the states, is a very fraught endeavor (as well as an unjustified one).

There is also a practical difficulty in determining what the state ratifiers in 1868 may have understood.  There were thirty-seven states in 1868.  Few records exist on the ratification of the Fourteenth Amendment.  What little exists is found in messages of governors who submitted the Fourteenth Amendment to their state legislatures, legislative debates (which were recorded in only Pennsylvania and Indiana), and committee reports (Massachusetts, Texas, and Wisconsin).  One controversy was whether the Constitution already protected basic rights versus whether the Fourteenth Amendment was necessary.  Voting rights were discussed, which had generally been held to be a political right conferred by a constitution or statute, rather than a natural civil right.[140]

Finally, whatever the meaning of "privileges or immunities," it is clear that the Fourteenth Amendment, and legislation that preceded and followed it, were meant to curb abuses of the rights of African Americans.  It is also clear that the drafters and ratifiers of the Fourteenth Amendment wanted to enforce those rights *against the states*.  They were not inventing new rights or changing what those rights meant.  The proponents of the Fourteenth Amendment simply wanted the same civil rights that white people already had to be extended to African

---

[140] See STEPHEN P. HALBROOK, SECURING CIVIL RIGHTS 67–70 (Updated ed. 2010).

Electronic copy available at: https://ssrn.com/abstract=4248297

Americans and to prevent states from denying or infringing those rights or applying the laws in a discriminatory fashion.

None of this is intended to cast doubt on the doctrine of incorporation, the Court's incorporation through the Due Process clause, or incorporation of the Second Amendment, all of which have been decided.  It is only to point out that anyone seeking to determine the specific understanding by ratifiers of the Fourteenth Amendment in 1868 of each provision of Bill of Rights is likely to be chasing a chimera.  Using a time period so long after the Founding should not be done for the Second Amendment or for any other specific rights in the first eight amendments.

> B.  *The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill of Rights through the Privileges or Immunities Clause.*

Although there was disagreement in Congress about what "privileges or immunities" meant, the biggest disagreement was with the Supreme Court.  In fact, the Supreme Court rejected the proposition that the Amendment incorporated the Bill of Rights at the first opportunity it had to do so.  In the *Slaughter-House Cases*, the Court held that the "privileges or immunities" language in the Fourteenth Amendment included only rights that depended on federal citizenship, including:

> to come to the seat of government to assert any claim he may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions. He has the right of free access to its seaports, through which all operations of foreign commerce are conducted, to the subtreasuries, land offices, and courts of justice in the several States.[141]

The Court further stated that:

> Another privilege of a citizen of the United States is to demand the care and protection of the Federal government over his life, liberty, and property when on

---

[141] *Slaughter-House Cases*, 83 U.S. 36, 79 (1872).

Electronic copy available at: https://ssrn.com/abstract=4248297

the high seas or within the jurisdiction of a foreign government. Of this there can
be no doubt, nor that the right depends upon his character as a citizen of the
United States. The right to peaceably assemble and petition for redress of
grievances, the privilege of the writ of habeas corpus, are rights of the citizen
guaranteed by the Federal Constitution. The right to use the navigable waters of
the United States, however they may penetrate the territory of the several States,
all rights secured to our citizens by treaties with foreign nations, are dependent
upon citizenship of the United States, and not citizenship of a State. One of
these privileges is conferred by the very article under consideration. It is that a
citizen of the United States can, of his own volition, become a citizen of any State
of the Union by a bona fide residence therein, with the same rights as other
citizens of that State.[142]

Although the First Amendment right to peaceably assemble and petition for redress of grievances
is included, no other rights under the Bill of Rights are mentioned, and the Court did not suggest
that all of the rights in the first eight amendments are protected from violation by the states.

Even though there was widespread agreement in Congress that the Fourteenth
Amendment and contemporaneous legislation was meant to prevent the disarming of African
Americans, there is little evidence that the ratifiers of that amendment had in mind specific
meanings for all of the first eight amendments, much less that those meanings differed from the
original meanings of 1791.  There wasn't even agreement on which rights in the Bill of Rights
would be incorporated.  Thus, any attempt to shift the relevant period for determining the
meaning of the Bill of Rights from 1791 to 1868 will be fraught with difficulty, as well as having
no basis in logic or in the Supreme Court's incorporation jurisprudence.

C.  The individual right *to bear arms in the Second Amendment was understood the same
way in 1868 as in 1791.*

The debate about whether 1791 or 1868 is the critical year ultimately only has
significance if there were important differences in the understandings of the ratifiers between
those two time periods.  But in the discourse that led to the Fourteenth Amendment, the right to

---

[142] *Id.* at 79–80.

41

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding. The focus of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states.

Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866. Rep. Thomas Eliot, sponsor of the former, explained that the bill would invalidate laws like that of Opelousas, Louisiana, providing that no freedman "shall be allowed to carry fire-arms" without permission of his employer and as approved by the board of police.[143] He noted that in Kentucky "[t]he civil law prohibits the colored man from bearing arms…."[144] Accordingly, the Freedmen's Bureau bill guaranteed the right "to have full and equal benefit of all laws and proceedings for the security of person and estate, including the constitutional right to bear arms."[145]

Senator Garret Davis said that the Founding Fathers "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense."[146] Senator Samuel Pomeroy counted among the "safeguards of liberty" "the right to bear arms for the defense of himself and family and his homestead."[147] The Amendment was needed, Rep. George W. Julian argued, because Southern courts declared the Civil Rights Act void and some states made it "a misdemeanor for colored men to carry weapons without a license."[148]

---

[143] CONG. GLOBE, 39th Cong., 1st Sess. 517 (1866).

[144] *Id*. at 657.

[145] *Id.* at 654.

[146] *Id.* at 371.

[147] *Id.* at 1182.

[148] *Id.* at 3210.

Electronic copy available at: https://ssrn.com/abstract=4248297

A common theme in the media was that freedmen had the right to bear arms because they were part of "the people."  The *American Citizen*, a Pennsylvania newspaper, quoted the Second Amendment and wrote: "Now what is here meant by 'the people' – Webster defines it as 'the body of persons who compose a community, town, city or nation….'"  So defined, "not a black person in the South, or anywhere else in the country, can be excluded under it from the right to bear arms," and "if the negro be not included in the militia, they are peculiarly the 'people' of the nation, and under the words of the Constitution are entitled to bear arms."[149]

Far from changing the meaning of the right to keep and bear arms, the Civil Rights Act and the Freedmen's Bureau Act, precursors of the Fourteenth Amendment, used phraseology taken from Blackstone with which the Founders were familiar.  Representative James Wilson, Chairman of the Judiciary Committee, explained the background to the Civil Rights Bill's phraseology "civil rights and immunities" and "full and equal benefit of all laws and proceedings for the security of person and property …."[150]  He equated those rights and immunities with those enumerated by Blackstone, on which the Founders also relied:

> Blackstone classifies them under three articles, as follows:
>
> 1.      The right of personal security; which, he says, "Consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation."
>
> 2.      The right of personal liberty; and this, he says, "Consists in the power of locomotion, of changing situation, or moving one's person to whatever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law."
>
> 3.      The right of personal property; which he defines to be, "The free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the law of the land."[151]

---

[149] *The Right to Bear Arms*, AMERICAN CITIZEN (Butler, Pa.), Nov. 7, 1866, at 4.

[150] CONG. GLOBE, 39th Cong., 1st Sess. 1117 (1866).

[151] *Id*. at 1118.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

Representative Wilson had the Second Amendment partly in mind when he stated that every right enumerated in the federal Constitution is "embodied in one of the rights I have mentioned, or results as an incident necessary to complete defense and enjoyment of the specific right."[152]  Indeed, the Freedmen's Bureau Act explicitly declared that:

> the right…to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color, or previous condition of slavery.[153]

The same Blackstonian concepts basic to the Founders, including the right to bear and use arms, were thus inherited and applied by the drafters of the Fourteenth Amendment.  There was no change in the meaning of the right itself; instead, there was a change to who could exercise the right and who was prevented from restricting its exercise.

That the nature of the right was viewed as unchanging in 1868 is well illustrated by the Supreme Court's nearly contemporaneous decision in *United States v. Cruikshank*.[154]  There the Court explained that private infringement of the right to assemble was not a subject for federal enforcement:

> The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States. In fact, it is, and always has been, one of the attributes of citizenship under a free government…. It was not, therefore, a right granted to the people by the Constitution. The government of the United States when established found it in existence, with the obligation on the part of the States to afford it protection. As no direct power over it was granted to Congress, it remains … subject to State jurisdiction.[155]

---

[152] *Id*. at 1118–19.

[153] Freedmen's Bureau Act of 1866, §14, 14 Stat. 173, 176–77 (1866) (emphasis added).

[154] 92 U.S. 542 (1875).

[155] *Id*. at 551.

44

Electronic copy available at: https://ssrn.com/abstract=4248297

The Court found the counts of the indictment alleging private infringement of the right to bear arms under the Second Amendment to be "equally defective," explaining:

> The right there specified is that of 'bearing arms for a lawful purpose.' This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the Amendments that has no other effect than to restrict the powers of the national government….[156]

Like the right to assemble, the right to bear arms was a pre-existing and unchanged right not "granted" by the Constitution but guaranteed against infringement.

Thus, the Supreme Court in 1875 viewed the right to keep and bear arms as having the same contours as at the Founding period, which saw the right in the same terms. Just as the authors or ratifiers of the Second Amendment sought to guarantee a pre-existing right, the ratifiers of the Fourteenth Amendment sought only to *extend* that protection, not change the right itself.

## III.   THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION JURISPRUDENCE.

As previously noted, the *Bruen* opinion stated that the Court has "assumed" that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. The opinion went on to acknowledge that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."[157] The only two sources cited for the existence of this debate were Kurt Lash,

---

[156] *Id*. at 553.

[157] *Bruen*, 142 S. Ct. at 2138.

45

Electronic copy available at: https://ssrn.com/abstract=4248297

*Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1439 (2022) and A.

AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

As described below, Professor Lash frankly seeks to use 1868 as the definitive period for

determining the meaning and scope of all incorporated provisions of the Bill of Rights.  His

proposal is not just a radical departure from the Supreme Court's incorporation jurisprudence

that has been so carefully fought over and eventually worked out over a period of many decades.

Instead, it candidly contradicts and seeks to overturn, at least in principle and methodology,

every case in which history has been used to determine the meaning of an incorporated provision

of the Bill of Rights.

Professor Amar's approach is more nuanced.  In the work cited, he proposes to rely more

heavily on what he believes to be the changed 1868 meaning of the Second Amendment in

particular.  But any necessity for that is undermined by the decision in *Heller* (2008), a decade

after Professor Amar's book was published (1998).

*A.  Professor Lash's approach is theoretically unsound and unlikely to be adopted.*

Professor Lash believes that if a provision of the Bill of Rights meant something different

to the ratifiers of the Fourteenth Amendment than it did to the ratifiers of the Bill of Rights, the

1868 meaning must control.  At the outset of his article, he describes the conundrums that

positing a different meaning in 1868 would create.  "Do incorporated rights have the same

meaning and scope as their counterparts in the 1791 amendments, or does the original Free

Speech Clause have a different meaning and scope than the 'incorporated' Free Speech

Clause?"[158]  He contends that if the meanings are different, originalists "seem forced to either

abandon originalism or accept a world in which we have two Bills of Rights, one applicable

---

[158] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1440 (2022).

46

Electronic copy available at: https://ssrn.com/abstract=4248297

against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings."[159]  This is simply not the case.  If it turns out that a later meaning has ostensibly departed from the original meaning, one must reject the later meaning, as Supreme Court principles discussed above instruct, and apply the original meaning to the states.

Noting, as set forth in Part IA, above, that the Supreme Court has definitively and repeatedly held that the rights against the federal government and the states must be the same, Lash inquires:  If the meanings must be the same, "are the original 1791 meanings carried *forward* into the 1868 amendment, or are the understandings of the people of 1868 carried *backward* into the original Bill of Rights and applied against the federal government by way of 'reverse incorporation'?"[160]  But as just explained, this is a problem exclusively of Lash's own making, which is divorced from the actual intentions of the ratifiers of the Fourteenth Amendment. They did not intend to alter the content of the Second Amendment—they just wanted to extend its protections to all citizens against encroachments by state governments.

Lash's answer to his own question is that rights as understood in 1868 must be "reverse incorporated" into the Bill of Rights.  He states that there is only "one Freedom of Speech Clause—the one the people spoke into existence in 1791 but then *respoke* in 1868."[161]  The drafters' views are secondary at best, according to Lash, because "the legally operative understanding must be that of the ratifiers.  Only the latter counts as the voice of the people."[162] He argues that "[w]hen the people adopted the Fourteenth Amendment, they readopted the

---

[159] *Id.* at 1441.

[160] *Id.* at 1440 (emphasis in original).

[161] *Id.* at 1441.

[162] *Id.* at 1443.

Electronic copy available at: https://ssrn.com/abstract=4248297

original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."[163]

There are many issues with this approach.  Until now, "reverse incorporation" has never involved using 1868 meanings of incorporated Bill of Rights provisions to revise or replace the original meanings of the Bill of Rights at the time of the Founding.  In *Brown v. Bd. of Educ. of Topeka, Kan.*,[164] the Court declared school segregation unconstitutional based on the Fourteenth Amendment's Equal Protection Clause.  But a companion case, *Bolling v. Sharpe,*[165] concerned school segregation in the District of Columbia, a federal enclave.  The original Bill of Rights lacked an equal protection clause.  So, the Warren Court read the Fourteenth Amendment's Equal Protection Clause back into the Due Process Clause of the Fifth Amendment.  It was, plainly, a limited, *ad hoc* device for sidestepping a constitutional impediment to reaching the desired result.[166]  So, "reverse incorporation" doesn't have much of a pedigree and it has not been applied in other contexts.

There are at least five major problems with Professor Lash's approach.

First, his analysis is completely contrary to Supreme Court precedents.  As noted in Part IB, above, constitutional meanings are fixed when they are ratified, and that includes the Bill of Rights, which was ratified in 1791.  Further, when it has been necessary to consult history to determine the meaning of incorporated provisions of the Bill of Rights, every Supreme Court case has considered the Founding era to be the determinative period even though later evidence

---

[163] *Id.* at 1441.

[164] 347 U.S. 483 (1954).

[165] 347 U.S. 497 (1954).

[166] Note that the Equal Protection Clause of the Fourteenth Amendment was an express protection spelled out in Section 1.  The Court did not use the ostensible meaning of an incorporated provision of the Bill of Rights to change the original meaning of that provision.  Reverse incorporation has not extended past inserting "equal protection" into the Fifth Amendment's Due Process Clause.  See *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995).

48

Electronic copy available at: https://ssrn.com/abstract=4248297

is sometimes examined for confirmation.  And if later practice or understanding conflicts with the original understanding, the original understanding must prevail.

Second, there is no compelling, principled basis for concluding that the 1868 meaning, if different, ought to prevail.  Is it just because 1868 is later in time than 1791?  That does not preclude using the original meaning of the Bill of Rights, and simply applying those meanings to additional persons and entities: that is, in favor of African Americans, and against the states.  And in fact, that is what the debates in 1868, to the extent they mentioned the first eight amendments, seemed to contemplate.  See Part IIC, above.

Third, it is untrue that the ratifiers "spoke into existence" Bill of Rights provisions in 1791, but then "respoke" them in 1868.  Although "spoke into existence" and "respoke" are intriguing metaphors, that is not what happened.  Most of the provisions of the first eight amendments were either considered natural rights or rights inherited by Englishmen at common law and then carried forward, possibly somewhat modified, into the new Republic.  The Bill of Rights was largely a confirmation of existing rights, not an original grant of rights.  And the drafters of the Fourteenth Amendment did not "respeak" them; they extended their protections to people who had previously been denied them and guaranteed them against governments that had previously not been limited by them.

In fact, "speaking" is a particularly inapt metaphor for Lash to choose, when there is *no* textual evidence in the Fourteenth Amendment that it was revising the Bill of Rights.  As the Court explained in *Heller*, constitutional provisions must be given their "normal and ordinary" meaning, which "may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation."[167]

---

[167] 554 U.S. at 576–77.

Electronic copy available at: https://ssrn.com/abstract=4248297

Lash is essentially arguing for a secret, unspoken meaning, hidden in the Fourteenth Amendment.

Fourth, Lash's "reverse incorporation" relies on the Privileges or Immunities Clause of the Fourteenth Amendment to incorporate the provisions of the Bill of Rights against the states. The *Slaughterhouse Cases*[168] relegated the Privileges or Immunities Clause to a relative backwater, and *Cruikshank*[169] declined to use that Clause to incorporate First and Second Amendment rights. Although there is respectable opinion that regards the Privileges or Immunities Clause as a better vehicle for incorporation than the Fourteenth Amendment Due Process Clause, the Court has refused the invitation to recast its incorporation jurisprudence under the rubric of the Privileges or Immunities Clause. When counsel proposed during oral argument in *McDonald* that the Privileges or Immunities Clause was the proper vehicle for incorporation, Chief Justice Roberts warned that, "Of course, this argument is contrary to the Slaughter-House Cases, which have been the law for 140 years … it's a heavy burden for you to carry to suggest that we ought to overrule that decision."[170]

Finally, Lash himself suggests the reason his proposal is unlikely to find acceptance. He writes that the "1868 respeaking of the Bill of Rights…transforms 'reverse incorporation' from a proposition about equal protection and a single clause of the Fifth Amendment into a proposition about the entire content of the Bill of Rights."[171] One suspects that the Supreme Court will not want to have the entirety of its Bill of Rights jurisprudence "transformed" retroactively based

---

[168] 83 U.S. at 79.

[169] 92 U.S. at 554–57.

[170] Transcript of Oral Argument at 4, *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ( No. 08-1521).

[171] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1441–42 (2022).

50

Electronic copy available at: https://ssrn.com/abstract=4248297

upon an unnecessary, unjustified, and unprecedented reliance on 1868 as the focus for determining meaning and scope of the Bill of Rights.

> B.  *Professor Amar's approach contains similar flaws and his theories have been rejected by Heller.*

Turning to Professor Amar's book,[172] his emphasis on 1868[173] is more subtle and less drastic than the wholesale reverse incorporation proposed by Lash.  Amar proposes a theory of "refined incorporation" that would allegedly reconcile the different approaches to incorporation proposed by Justices Hugo Black, William Brennan, and Felix Frankfurter.[174]  He commends Justice Black's view "that *all* of the privileges and immunities of citizens recognized in the Bill of Rights" are incorporated through the Fourteenth Amendment.[175]  But he does not recognize all of the provisions of the Bill of Rights as "privileges or immunities of citizens," stating that some are more akin to rights of states, and others are "alloyed provisions," part citizen right and part state right, that may have to undergo "refinement and filtration" before their citizen-right elements can be "absorbed" by the Fourteenth Amendment.[176]  He also contends that other provisions of the Bill of Rights may become "less majoritarian and populist, and more libertarian, as they are repackaged in the Fourteenth Amendment as liberal civil rights—'privileges or immunities' of individuals—rather than republican political 'right[s] of the people' as in the original Bill."[177]  He disagrees with the formulation by Justice Brennan that the key

---

[172] A. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

[173] Professor Amar typically refers to 1866, the year the Fourteenth Amendment was drafted and proposed by Congress to the states for ratification.

[174] Amar at xiv.

[175] Amar at xiv (emphasis in original).

[176] *Id.*

[177] *Id.* at xiv-xv.

51

Electronic copy available at: https://ssrn.com/abstract=4248297

question for incorporation is whether the right is "fundamental."[178]  He also disagrees with Justice Frankfurter's "insistence" that incorporation turned on "abstract conceptions of 'fundamental fairness' and 'ordered liberty' as the sole litmus tests for incorporation."[179]  Thus, his "refined incorporation" differs in critical respects from the Court's current test, as stated in *McDonald*: whether the right "is fundamental to our scheme of ordered liberty, or as we have said in a related context, whether this right is 'deeply rooted in this Nation's history and tradition.'"[180]

Amar observes that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment," that provisions in the Bill of Rights may be "transformed when they come into contact with the Fourteenth Amendment," and that in some cases, "the gravitational pull of the Fourteenth Amendment has altered the trajectory of the original Bill."[181]  This is contrary to *Bruen*'s asseverations that the Constitution's "meaning is fixed according to the understandings of those who ratified it."[182]

Moreover, Amar's book was written ten years before *Heller* was decided, and his specific analysis of the Second Amendment rests on foundations that were rejected by *Heller*.  In his book, Amar spends eighteen pages summarizing his view on "the military amendments" (Second and Third Amendments) as he thinks they were seen at the time of the Founding.  He writes that:

> As with our First Amendment, the text of the Second is broad enough to protect rights of private individuals and discrete minorities; but, as with the First, the Second's core concerns are populism and federalism. At heart, the amendment reflects a deep anxiety about a potentially abusive federal military….[183]

---

[178] *Id*. at xiv.

[179] *Id.*

[180] 561 U.S. at 767 (citations omitted) (emphasis omitted).

[181] Amar at xv.

[182] 142 S. Ct. at 2132.

[183] Amar at 46.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

He goes on to discuss standing armies and the Founders' distrust of them.  He states unequivocally that "[t]he ultimate right to keep and bear arms belongs to 'the people,' not the states," and that "'the people' at the core of the Second Amendment are the same people at the heart of the Preamble and the First Amendment."[184]  Thus, he recognizes the individual right to arms, but claims that at the time of the Founding protection of such rights was not the main purpose.  Indeed, "to see the un-Reconstructed amendment as primarily concerned with an individual right to hunt or to protect one's home is like viewing the heart of the speech and assembly clauses as the right of persons to meet to play bridge or to have sex."[185]  The contrast between *Heller*'s conclusion that protecting one's home was a central component of the right, and Amar's view, is stark.

Like Lash, he believes that the meaning of the right to keep and bear arms had been transformed by the time of the Fourteenth Amendment.  Originally, the right was "intimately connected with federalism concerns about a federally controlled standing army that might seek to overawe state-organized militias."[186]  He observes that, "By contrast, in 1866, John Bingham, Jacob Howard, Thaddeus Stevens and company were hardly in the mood to rail against a federal standing army; these men, after all, wanted to use precisely such an army to reconstruct recalcitrant southern states."[187]  Furthermore, "the people" in Amar's view corresponded roughly with the militia, and "political rights" such as voting rights, service on juries, and eligibility for public office, were (like service in the militia) largely limited to white males.  But the Privileges

---

[184] Amar at 51.

[185] Amar at 49.

[186] Amar at 216.

[187] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

or Immunities Clause "spoke of all citizens, pointedly including women and children…."[188]

Thus, the rights protected by the Privileges or Immunities Clause focused on "civil rights," not

"political rights."  Even though the right to keep and bear arms was a paradigmatic "privilege" of

"citizens of the United States," the "right in 1789 and the right in 1866 meant different things,"

according to Amar.[189]

He concludes:

Indeed, as the Second Amendment illustrates, the very same words "the right…to keep and bear arms" take on a different coloration and nuance when they are relabeled "privileges or immunities of citizens" rather than "the right of the people," and when they are severed from their association with a well-regulated militia.  To recast the textual point as a historical one, the core applications and central meanings of the right to keep and bear arms and other key rights were very different in 1866 than in 1789.  Mechanical incorporation [Amar's term for due process incorporation as advocated by Justice Black] obscured all this and, indeed, made it easy to forget *that when we "apply" the Bill of Rights against the states today, we must first and foremost reflect on the meaning and the spirit of the amendment of 1866, not the Bill of 1789.*[190]

Thus, in a more subtle and less extreme way, Amar agrees with Lash that the time of the

Fourteenth Amendment is more important than the Founding period for determining the meaning

of incorporated provisions of the Bill of Rights.

It is unclear, at best, whether Amar's distinction between 1868's relabeling the right as a

privilege or immunity of citizens, and 1791's the "right of the people" in connection with the

militia, has any continuing relevance in Second Amendment interpretation.  At the time of

Amar's book, the Second Amendment had not been incorporated, and was generally held by

lower courts to relate only to militia service.  The Court's opinion in *Heller* carefully recognized

the role of the citizen militia in the colonies and early Republic, but it accurately determined that

---

[188] *Id.*

[189] Amar at 257.

[190] Amar at 223 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

the right was an individual right for self-defense as well, the position for which Amar seems to be contending.  Thus, *Heller* may have largely dispelled Amar's concerns about the nature of the right.  Critically, however, these findings in *Heller* did not depend in any way on the understandings of the ratifiers in 1868, but looked to that general time period only as confirmation of the nature of the right as both militia-related and individual, just as it considered some antebellum interpretations as confirmation.

Amar's analysis may be rejected on grounds similar to (though not identical with) those on which Lash's may be rejected:  he relies on the Privileges or Immunities Clause for incorporation; that reliance leads him to differ from the Supreme Court as to what, exactly, is incorporated; and the test for incorporation is different from the Supreme Court's test.  He does not directly address whether the provisions of the Bill of Rights differ in substance when applied against the federal government or against the states, though he seemingly believes that they may be different, stating that it is "[h]arder to understand" Brennan's "insistence that once a provision of the Federal Bill was deemed incorporated, it applied identically in state and federal proceedings."[191]  But that question has long ago been resolved by the Court.

So both Lash and Amar would shift the focus to 1868 rather than 1791, though Amar doesn't expressly state, as Lash does, that the 1868 understanding must displace the 1791 understanding.  Gun control proponents will undoubtedly latch on to these positions, as the briefs cited above do, to argue that more extensive restrictions on firearms in 1868 (and no doubt thereafter) as opposed to the Founding are the proper historical analogues when evaluating the constitutionality of present-day gun laws.  But the reasoning behind the approaches of both of these scholars flies in the face of many decades of settled Supreme Court precedent.  The Court

---

[191] Amar at 222.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

is unlikely to reverse itself on its fundamental incorporation doctrine principles and case law, and the lower courts are bound by those decisions.  The alleged "scholarly dispute" about the proper time for determining the meaning of an incorporated provision of the Bill of Rights really consists of one scholarly dissent and one partial scholarly dissent from Supreme Court jurisprudence that has definitively resolved this issue.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

**CONCLUSION**

The Supreme Court has held that provisions of the Bill of Rights have only a single meaning, whether applied against the federal government or against the states. That meaning is fixed at the time of adoption; that is, in 1791. What a provision of the Constitution meant then, it means now, even though circumstances might change.

The three cases cited by the *Bruen* opinion for the "assumption" that 1791 is the critical period all relied on Founding era history extensively and as an integral part of their analyses. All Supreme Court cases that have engaged in historical review of the Second Amendment to determine its meaning have looked to 1791 as the primary period. Any examination of later periods has been done only to confirm the conclusion already reached regarding the original meaning at the Founding. As the review in this article of Supreme Court cases construing other provisions of the Bill of Rights shows, the Founding period is the exclusive period for determining meaning. The Supreme Court has never looked to 1868 as the primary period for determining the meaning of provisions of the Bill of Rights, and its decisions generally do not even mention that period. Neither litigants nor the scholars mentioned in the Court's reference to the "ongoing scholarly debate" have pointed to a single Supreme Court case which determined the meaning of a provision of the Bill of Rights based primarily on the time of ratification of the Fourteenth Amendment, and to the exclusion of the 1791 understanding.

The lower court cases cited by litigants in current litigation were either abrogated by *Bruen* or relied on a mistake (later corrected) in the Seventh Circuit's *Ezell* decision.

Reliance on the ostensible public understanding of the Fourteenth Amendment when it was ratified—even if such an approach did not contradict existing Supreme Court precedent regarding the determinative period—is fraught with difficulty. It is unclear that the ratifiers of the Fourteenth Amendment thought that they were incorporating all of the first eight

Electronic copy available at: https://ssrn.com/abstract=4248297

amendments against the states.  The Fourteenth Amendment doesn't mention the Bill of Rights, and there were conflicting interpretations at the time regarding what that amendment meant and did.  Most notably, the Supreme Court in the *Slaughterhouse Cases* and the *Cruikshank* case immediately disagreed with what some of the proponents of the Fourteenth Amendment believed to be its effect.  In any event, there is little or no evidence that the ratifiers of the Fourteenth Amendment believed that the Second Amendment meant anything different than it had meant since the Founding.

The "ongoing scholarly debate" about whether 1868 is the proper year amounts to little.  Professor Lash's approach, in addition to being theoretically unsupported, would upset the entire Supreme Court jurisprudence on the Bill of Rights.  Professor Amar's approach has likely been rendered unnecessary by *Heller.*

In short, it can be said with confidence that the Supreme Court will not adopt 1868 as the primary or determinative period for construing the meaning of the Second Amendment or any other provisions of the Bill of Rights.  For that reason, it is inadvisable, to say the least, for the lower courts to look to 1868 --rather than 1791-- when searching for historical analogues to justify modern-day gun control laws.

Electronic copy available at: https://ssrn.com/abstract=4248297