# EXHIBIT  2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF CALIFORNIA
 3
 4    MARK BAIRD and RICHARD
      GALLARDO,
 5
                  Plaintiff(s),
 6
                  vs.                    CASE NO.
 7                                       2:9-cv-00617-KJM-AC
      ROB BONTA, in his official
 8    capacity as Attorney
      General of the State of
 9    California, et al.,
10                Defendant(s).
11
12

13    _____
14
15           DEPOSITION OF CHARLES D. HAGGARD
16        Appearing Remotely From Topeka, Kansas
17               Tuesday, October 19, 2021
18                      Volume I
19
20
21    Reported by:
      Carrie Pederson
22    CSR No. 4373, RMR, CRR
23    Job No. 4838109
24    Pages 1 - 104
25
```

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4    MARK BAIRD and RICHARD
     GALLARDO,

5
              Plaintiff(s),

6
              vs.                    CASE NO.

7                                    2:9-cv-00617-KJM-AC
     ROB BONTA, in his official

8    capacity as Attorney
     General of the State of

9    California, et al.,

10            Defendant(s).

11

12   _____

13

14

15

16           Deposition of CHARLES D. HAGGARD, Volume I,

17   taken on behalf of the defendants, at Topeka, Kansas,

18   beginning at 9:06 a.m. and ending at 11:31 a.m. on

19   Tuesday, October 19, 2021, before Carrie Pederson,

20   Certified Shorthand Reporter No. 4373.

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

```
 1    APPEARANCES:

 2

 3    For Plaintiff(s):

 4              THE BELLANTONI LAW FIRM, PLLC

 5              BY:  AMY L. BELLANTONI

 6              Attorney at Law

 7              2 Overhill Road

 8              Suite 400

 9              Scarsdale, New York 10583

10              914-367-0090

11              abell@bellantoni-law.com

12

13    For Defendant(s):

14              ATTORNEY GENERAL OF CALIFORNIA

15              BY:  R. MATTHEW WISE

16              Attorney at Law

17              1300 I Street

18              Suite 125

19              P.O. Box 944255

20              Sacramento California

21              94244-2550

22              Matthew.Wise@doj.ca.gov

23

24    Also Present:

25              Mark Baird
```

Page 3

```
 1                          INDEX
      WITNESS:

 2

         CHARLES D. HAGGARD

 3

         Volume I

 4

 5
                                                    PAGE
 6
            Examination By Mr. Wise               7
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                         Page 4
```

```
 1                          EXHIBITS
 2    DEFENDANT'S
 3                          DESCRIPTION                PAGE
 4    Exhibit 1      Expert Declaration and Report of    11
                     Charles "Chuck" Haggard
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                   Page  5
```

1

 CERTIFIED QUESTIONS/INSTRUCTED NOT TO ANSWER

2

 PAGE    LINE

3

 82        8

4

 96       19

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

```
 1              Topeka, Kansas, Tuesday, October 19, 2021
 2                   9:06 a.m. - 11:31 a.m.
 3
 4                   CHARLES D. HAGGARD,
 5     having been administered an oath, was examined and
 6     testified as follows:
 7                        --o0o--
 8                      EXAMINATION
 9     BY MR. WISE:
10        Q.   Good morning.
11        A.   Morning.
12        Q.   My name's Matthew Wise.  I represent the
13     California Attorney General in this case which is
14     known as Baird v. Bonta.  Would you state your full
15     name and spell your last name for the record.
16        A.   My name is actually Charles, D as in David,
17     Haggard, H-a-g-g-a-r-d.  I go by Chuck.
18        Q.   Do you understand that you're testifying
19     here under the same oath that you would be testifying
20     under in a courtroom?
21        A.   I do.  Yes, I do.
22        Q.   You've been retained as an expert for
23     plaintiffs in this case?
24        A.   Yes, sir.
25        Q.   Have you ever had your deposition taken?
```

Veritext Legal Solutions
866 299-5127

1     A.   Not in this case, but previously in life,
2   yes, I have.
3     Q.   The court reporter's recording everything
4   that we say, so we need to try to have only one
5   person speak at a time.
6     A.   Sure.
7     Q.   I'll try to let you finish your answer when
8   I ask a question and before I ask another one.  I
9   just ask that you try to let me finish asking my
10  question before you start to give your answer.
11    A.   Certainly.
12    Q.   If you need to take a break at any time,
13  just let me know.  The only thing I'd ask is that if
14  there's a question pending, that you'd answer that
15  question before we take our break.
16    A.   Okie-doke.
17    Q.   After I ask a question, it's possible that
18  your attorney might have an objection to the
19  question.  You should still answer the question
20  unless your attorney advises you not to answer the
21  question.
22    A.   Okay.
23    Q.   If you don't understand a question, please
24  let me know, and I'll try to rephrase the question.
25  Do you understand that?

Veritext Legal Solutions
866 299-5127

1    A.    Yep, I do.

2    Q.    You'll have an opportunity, after the

3    deposition, to review the transcript that was made

4    here today, and you'll be able to make corrections to

5    the transcript, but you should know that there will

6    be a record of the corrections that were made, and

7    I'll be allowed to comment on any corrections that

8    you make.

9    A.    Okay.

10    Q.    Is there anything affecting you today that

11    would prevent you from thinking clearly and

12    testifying truthfully?

13    A.    No.

14    Q.    How did you prepare for today's deposition?

15    A.    I actually did not do any real formal

16    preparation for this deposition.  Ms. Bellantoni and

17    I had a casual phone conversation a couple of days

18    ago and wasn't -- actually hasn't been much more than

19    that.  Read through -- I forget the -- I don't have

20    it in front of me on the email.

21         There was the other expert that has been

22    retained.  He's a chief of police or former chief of

23    police.  I was able to read his declaration or his

24    statement and -- but that's been -- you know, this

25    has been set up for a few weeks now, so I was able to

Veritext Legal Solutions
866 299-5127

1    read that in the meantime, but that's about it.

2        Q.   Is that the declaration of Kim Raney?

3        A.   Yes.

4        Q.   And other than Ms. Bellantoni, did you speak

5    with anyone about this deposition?

6        A.   No, sir.

7        Q.   When did you first become involved in this

8    case?

9        A.   It's been awhile.  As far as pulling a date

10   up, I'd have to defer to Ms. Bellantoni for when she

11   first contacted me to talk about this.  It would be

12   really hard for me to say.  It seems like a year or

13   two now.

14       Q.   Okay.  And was it Ms. Bellantoni who

15   contacted you or someone else?

16       A.   Yes, she did.

17       Q.   Did anyone tell you what they wanted you to

18   do as an expert in this case?

19       A.   We had a conversation, Ms. Bellantoni and I,

20   on she was looking for an expert witness to speak

21   towards police training and practices as it pertained

22   to this case, so my understanding of my input, like,

23   here today would be as a law enforcement expert.

24       Q.   Have you reviewed the complaint in this

25   matter?

Veritext Legal Solutions
866 299-5127

1    A.   Yes, sir.

2    Q.   Did you have a role in drafting the

3    complaint?

4    A.   No, I did not.

5    Q.   Are you being compensated for your work in

6    this case?

7    A.    I am, although I have yet to send a bill in

8    for anything, so, no, I have not been paid, but we --

9    Ms. Bellantoni and I agreed on a price.  Truthfully,

10   I volunteered to do this one pro bono, and she

11   insisted that I not do that, and so I believe it's in

12   my statement or in my declaration, I think we agreed

13   to 75 an hour or something like that.

14   Q.   Okay.  Let me share my screen.  I will try

15   to show you an exhibit here.  Could we go off the

16   record for just a moment?

17        (Discussion off the record)

18        MR. WISE:  Can we go back on the record now?

19   BY MR. WISE:

20   Q.   Okay.  We're back on the record.

21   Mr. Haggard, can you see Exhibit 1 on your screen?

22        (Exhibit 1 marked)

23        THE WITNESS:  Yes.

24   BY MR. WISE:

25   Q.   Okay.  Do you recognize this document?

                                        Page 11

```
 1        A.   I do.

 2        Q.   What --

 3        A.   This would be the declaration that you asked

 4   me, in my preparation, what I had read.

 5        Q.   Did you prepare this declaration?

 6        A.   I did not.  I spoke to Ms. Bellantoni at

 7   length and wrote up my thoughts, and then she made it

 8   look real pretty on this document.

 9        Q.   Does this declaration reflect your thoughts?

10        A.   Yes, sir.

11        Q.   Okay.  And did you sign a copy of this

12   declaration?

13        A.   Yes, I did, and then because of the nature

14   of what we're doing, I had to sign and then scan that

15   and then send that in so that you guys would have a

16   legal copy.

17        Q.   Okay.  Let's look just at page 14 here.  I

18   notice that the declaration that I have is not

19   signed, but you do have a signed version?

20        A.   Yes, sir, I do.

21        Q.   Okay.  Would you work with plaintiff's

22   counsel to provide me a signed copy of this

23   declaration?

24        MS. BELLANTONI:  Yeah, I'll get that over to

25   you, Matthew.
```

Page 12

```
 1              MR. WISE:  Terrific.
 2     BY MR. WISE:
 3         Q.   Your declaration cites a number of
 4     documents.  Besides the documents that you've cited,
 5     did you rely on any other documents in reaching your
 6     opinion on this case?
 7         A.   I read the original -- my legal training is
 8     failing me here -- the filing, the case that was put
 9     forward, and then the other expert, Chief Raney, I
10     read those documents.
11         Q.   Did you conduct research to locate the
12     documents that form the basis of your opinion?
13         A.   I'm not sure how you mean that.  Which part
14     are you referring to?
15         Q.   Anything in the declaration itself.  Did you
16     conduct any research to try to come up with documents
17     that would support your opinion?
18         A.   Not really.  A big part of my declaration
19     would be personal observation and experience.
20         Q.   Did anyone else provide you with documents
21     that would support the basis of your opinion?
22         A.   I don't believe so.  Besides the documents
23     that Ms. Bellantoni provided to me that I've talked
24     about reading as far as, like, what's already
25     pertinent to this case, I don't believe so.  Like I
```

Page 13

```
 1    say, we've been doing this for quite awhile.  I will
 2    tell you that I do, you know, like, on a regular
 3    basis, read up on things like news, gun control
 4    issues, crime issues, things like that.  All of that
 5    is still pertinent to my life.  I am still an active
 6    duty police officer, so those are all things that I
 7    pay attention to, but I don't recall being provided,
 8    or, you know, anything like that, anything specific
 9    for this case, no, sir.
10         Q.    Anyone other than plaintiff's counsel
11    assisted you in preparing this declaration?
12         A.    No.  Huh-uh.
13         Q.    Have you ever served as an expert witness?
14         A.    Yes, sir, I have.
15         Q.    How many times?
16         A.    It's hard to say.  Probably a good dozen.
17    I've been retained as an expert witness on police use
18    of force both in civil court and in criminal court.
19    I have been retained as a defense expert on firearms
20    and firearms training in a murder trial.  I have been
21    retained as an expert witness on firearms in a
22    series.  We had kind of a gang robbery homicide thing
23    that turned into a series of probably eight separate
24    trials because of the nature of that one, so I don't
25    have an -- I'd say probably 10 to 12 times at least.
```

Page 14

1    Q.   Have you ever testified as an expert on the

2    public carry of firearms?

3    A.   No, I have not.

4    Q.   Did you attend college?

5    A.   I did.

6    Q.   What college?

7    A.   Kansas State University.

8    Q.   Did you graduate?

9    A.   I did not.  The police department decided to

10   hire, and I had to weigh my options, so ended up

11   taking the job.

12   Q.   Besides college experience you had, did you

13   complete any other formal education courses?

14   A.   I've completed courses, Kan State

15   University, and then other courses through the

16   military that were adjunct to other colleges such as

17   Washington University, Emporia State, couple of those

18   that were out-of-state things like Louisiana State

19   University that were part of the course that I was

20   doing.  That was both in a police capacity and a --

21   or, when I was in the military, military capacity,

22   and those were classes that if you did that, you

23   could gain college credit for that.

24        I've also -- not pertinent to this, but also

25   completed Kansas -- not Kansas State University --

1    Kansas University classes through things like fire
2    science and that sort of thing that all count
3    towards -- you know, so I've earned college credit in
4    a whole bunch of places but never coalesced that into
5    a degree as it were.
6       Q.   Any other formal education that we haven't
7    touched on?
8       A.   Quite a bit.  I'm assuming that you have a
9    copy of my CV.  A whole lot of what I've done is
10   things like Force Science Research Center as a force
11   analyst, training on excited delirium and things that
12   are pertinent to police use of force, human dynamic
13   factors, deescalation, verbal judo, etc., etc., as
14   all is preparation and, you know, on-the-job
15   improvement for the jobs that I was doing mainly at
16   the Topeka Police Department, which since I've
17   retired from, but then in my current roles, I'm still
18   a national trainer for National Law Enforcement
19   Training Center.  I have my own business.  I'm an
20   adjunct instructor for Strategos International,
21   adjunct instructor for Hardwire Tactical, and then
22   I'm a police captain here at my current job.
23      Q.   You mentioned that you served in the
24   military.  When did you serve in the military?
25      A.   It would have been 1982 to -- it's been

Veritext Legal Solutions
866 299-5127

1    awhile.  19 -- I'm going to -- I believe 1998, but I
2    might be off on that, but definitely started in '82.
3         Q.   What positions did you hold in the military?
4         A.   So I was a reconnaissance specialist, and
5    that's a fancy word for -- or fancy term for we go
6    out and find the bad guys and tell everybody else
7    where they are at.  So in those roles, I was vehicle
8    driver, I was a machine gunner, I was a squad leader,
9    I was a platoon sergeant.  At one point, I was an
10   acting platoon commander when we did not have a
11   lieutenant on who was assigned to our unit.
12        Q.   I think you just mentioned this, but did you
13   become familiar with firearms while in the military?
14        A.   Oh, yes.
15        Q.   Can you describe your experience with
16   firearms in the military?
17        A.   So actually in that role, in the job that I
18   had, we were required to train with and qualify on a
19   yearly basis more than most of the Army jobs.  If
20   you're, like, a truck driver or something like that,
21   it's very minimal.  Infantrymen, obviously you're
22   going to be more that, but just as an example, when I
23   first got into the job that I was in, I was required
24   to qualify -- train with, qualify with a .45 pistol,
25   M16a1 rifle, M60 machine gun, M2 50 caliber machine

Page 17

1    gun, the M203 40 millimeter grenade launcher, the LAW
2    antitank rocket, Claymore antipersonnel mines.
3              I'm probably leaving something out of the
4    list, but -- and then that -- as firearms changed
5    within the military, like they upgraded pistol, they
6    upgraded rifles, they added grenade launching machine
7    guns and things like that, we all got -- we got
8    trained on those as well.
9         Q.   You mentioned that you've had a career in
10   law enforcement.  At what point did you begin that
11   career?
12        A.   1987.
13        Q.   What department did you work for?
14        A.   The Topeka, Kansas Police Department.
15        Q.   What were your roles there?
16        A.   I started out as a patrolman.  I was a
17   patrol officer and eventually a patrol sergeant.  I
18   ended my career.  The last six years of my career, I
19   was a shift commander as a lieutenant, and then in
20   the interim, I was a member of our SWAT team for
21   little over 17 years, and so I was a breacher, I was
22   a sniper, I was a squad leader.
23              At one point I was the team leader when we
24   did not have a lieutenant assigned.  I was a firearms
25   trainer for the unit, a gas guy utilizing the grenade

Page 18

1    launchers, and in the wider role for the department,
2    I was a field training officer.  Then when I
3    promoted, I was a field training sergeant supervising
4    field training officers.
5           I was a firearms instructor, use of force
6    instructor on things like batons, taser, Pepper
7    Spray, handcuffing, arrest and control tactics,
8    things like that, ground fighting, weapon retention.
9           So we had a regional academy that was
10   approved through our state CPOST, so we had -- we did
11   recruit training and in-service training.  At one
12   point, I was responsible for all of the use of force
13   and firearms training for the department, and for
14   about -- it was just about three years there, I was
15   the range master where my primary job was to do all
16   of the recruit in-service firearms training,
17   Maintenance, and then my role as a defensive tactic
18   instructor, I was basically in charge of our use of
19   force program where I had officers working for me who
20   assisted with that training.
21   Q.   Did you ever develop protocols on how to
22   respond to an incident involving a firearm?
23   A.   Yes, actually, and some of it very specific.
24   Right after Columbine, we had -- you know, there was
25   kind of a watershed event in law enforcement where

Veritext Legal Solutions
866 299-5127

1  people were like, "Oh, my God, we can't do that"

2  because the perception was that the officers there

3  kind of waited around, so you had to have what we

4  call a rapid response to an active shooter, and then,

5  of course, I don't know if you've ever seen pictures

6  coming outline of Columbine, but there was a wide

7  variety of officers.  There were detectives, there

8  were officers in plainclothes, there were officers

9  who showed up off duty, things like that, uniformed

10 police officer from multiple different departments.

11         So, you know, a big part of that would be

12 training the officers on what -- it's often called

13 PID or positive identification.  The last thing we

14 want to do is replicate tragedies that have happened

15 in the past in places like New York City where you

16 have a blue-on-blue, you have, like, say, a uniformed

17 officer shooting a plainclothes officer or something

18 like that, so a big part of our training was

19 responding to threat recognition and then proper

20 response, you know, to the scenario as you find it.

21     Q.   And what was your role in developing that

22 training?

23     A.   I actually developed it from scratch.  I was

24 given the job of -- because we wanted to have a rapid

25 response program, I was given the job of, "Hey, we

1    need to come up with something for that."
2          So in my role as the primary firearms
3    trainer at that point, or one of the primary firearms
4    trainers at that point, I was given the role of
5    coming up with an in-service training package so that
6    we could run all our people through rapid response.
7          I would say Columbine was a watershed event
8    for law enforcement in recognition of this, but in my
9    career, I had already responded to two active shooter
10   events, so that was something that was, you know, the
11   type of training that, taken seriously, was really
12   near and dear to my heart, that I'm glad they finally
13   got the -- the command staff finally got the message
14   that that needed to happen.
15   Q.    After working at the Topeka Police
16   Department, did you work in any other capacity as a
17   law enforcement officer?
18   A.    Yes, sir.  Shortly after retiring, because
19   we have a -- we have a technicality in our
20   retirement, you can't do anything for 60 days for a
21   paycheck, otherwise it screws up, you know, the --
22   how the retirement fund works.  We have to take
23   60 days off before you're allowed to do anything else
24   or you get paid, so I took short vacation, and then
25   the county north of me, Jackson County Sheriff's

                                            Page 21

1    Department, was shortly of people, so I became a

2    part-time deputy for them and was helping them out

3    with road patrol and training, and then approximately

4    almost exactly a year after I retired, I took the

5    current job that I have now with Metropolitan Topeka

6    Airport Authority Police and Fire.  I know that's a

7    mouthful.

8         And then since then, I am also -- I have --

9    I'm no longer working for Jackson County part-time,

10   but -- this is one of those you know, "You're getting

11   old when."  One of my recruit officers is now the

12   sheriff of the county that I live in, and he asked me

13   to come onboard as a part-time deputy, so I'm a sworn

14   deputy with the Shawnee County, Kansas Police

15   Department as well, and I'm currently doing that.

16        Q.  Got it.  Any other law enforcement roles

17   that we haven't touched on?

18        A.  No, sir.

19        Q.  Do you have any other current forms of

20   employment?

21        A.  Just my side business, and I do consulting.

22   Friend of mine's a retired officer, he has a security

23   company, so every once in awhile, I'll do the

24   qualifications for his guys and things like that, but

25   primarily my Agile Training consulting business.

Veritext Legal Solutions
866 299-5127

1      Q.   What is Agile Training and Consulting?

2   Would you describe it?

3      A.   So my business model is I try to meet

4   clients' needs instead of having a cookie cutter type

5   package like, you know, basic -- I have Basic

6   Pistol 1, Basic Pistol 2 or something like that.  I

7   kind of customize classes for people's needs.  I've

8   had people hit me up for things like -- I'm currently

9   going -- about to do a in-service package for

10   University Police Department over in Kansas City,

11   Missouri, and they want to have two hours of Pepper

12   Spray update, two hours of weapon retention update

13   and then four hours of arrest and control and a

14   handcuffing package just as an eight-hour day, "Can

15   you do" -- "Yeah, I can, you know, put together a

16   training package for your needs."

17      Much of what I've done lately has been

18   firearms training, and, quite frankly, the business

19   has been a lot better for civilian capacity training

20   than law enforcement training as far as people who

21   are paying for training.

22      Q.   Do you conduct any trainings that involve

23   how to respond to a person armed with a firearm?

24      A.   Yes.

25      Q.   An how do you train your clients to respond?

Veritext Legal Solutions
866 299-5127

1     A.    Are you talking a -- I'm assuming you mean a
2     nonsworn -- a non-police officer type person.
3     Q.    Yes.
4     A.    So part of the training I do is -- what we
5     look for in behavioral aspects of pre-criminal
6     assault behavior.  One of my friends put a very good
7     label on there, his name is Craig Douglas, and he
8     calls it MUC, M-U-C, managing unknown contacts.
9          Say you are approached by someone on the
10    street that you don't know.  How do you read that
11    type of encounter?  Is it threatening?  Are they
12    setting you up for, like, a mugging or a carjacking
13    or something like that?  And talk about the
14    behavioral aspects of what criminal assault looks
15    like.
16         So it comes as some surprise to some people
17    that bad guys can be very sneaky, and, you know,
18    they're not going to have a big sign or, you know,
19    something on the T-shirt that says "I'm a bad guy,"
20    so a big part of mine is the pre-criminal assault
21    behavior-type things, the recognition of what type of
22    scenario you may have found yourself in to -- and
23    then the how to respond correctly in those scenarios,
24    and I will do that with verbal skills, verbal
25    deescalation.

1      Very popular part of my training has been

2   Pepper Spray, how to do something that's not -- you

3   know, what I call something between a harsh word and

4   a gun, and then recognition of is -- you know, in my

5   end of scenario that actually requires a firearms

6   response, you know and, if so, how to do that, what

7   that might that look like.

8      Q.   In those classes, do you recommend that your

9   clients carry a firearm?

10     A.   I never recommend to anybody that they carry

11  a firearm.  That's a very personal decision.  I can

12  speak to the pluses and minuses of carrying a

13  firearm, but I have clients that I have worked with

14  who -- like, one friend of mine who used to be an

15  ADA, and, as you can imagine, in that capacity

16  putting people in prison, you can -- you know, she

17  picked up a stalker, and then I helped her with a

18  security package as a friend, how to harden her house

19  and have some defensive options.

20       She was adamant she did not want a gun.  She

21  was just not a gun person.  I'm not going to push a

22  gun on her.  So we came up with non-gun home defense

23  options for her that made her feel more comfortable.

24       So if people want firearms training, I will

25  offer firearms training.  If people are adamant that

1    they don't want firearms training, that they're

2    looking for something else, then, you know, that's

3    like anything else, like whether you drink or not,

4    that's an extremely personal decision.

5        Q.   And just for the record, when you said

6    "ADA," what were you referring to?

7        A.   Assistant district attorney.  I'm sorry.

8        Q.   Do you believe that carrying a gun in and of

9    itself makes a person safer?

10           MS. BELLANTONI:  Objection.

11           You can answer.

12           THE WITNESS:  Excuse me.  I've been talking

13    awhile.  My throat is dry.

14           I believe it can.  I have personally been

15    involved in scenarios where I was just another dude

16    off duty in which I know that if I had not had a

17    firearm, I would have been a victim of a violent

18    criminal assault or, you know, armed robbery, that

19    sort of thing.  I believe that having a firearm gives

20    one the option of being able to not leave oneself at

21    the other guy's mercy.

22    BY MR. WISE:

23        Q.   Would you consider a gun a tool of limited

24    utility in most situations?

25        A.   It is definitely a tool of deadly force,

Page 26

```
 1    and, you know, one of the things that people need to
 2    know is you can't legally shoot people a little bit.
 3    It is a tool for managing situations that require a
 4    deadly force option.
 5        Q.   I think you were mentioning this earlier,
 6    but are there particular steps that you recommend
 7    that your clients take before they carry a firearm in
 8    public?
 9             MS. BELLANTONI:  Objection.
10             You can answer.
11             THE WITNESS:  I would -- it sounds
12    self-serving because I am in a training business, but
13    I obviously counsel people that they need to have
14    some sort of training and education both how to
15    safely handle firearms -- I mean, something as
16    simple -- even in a hunting capacity, most people
17    would want to go through -- like we -- here in
18    Kansas, we have a hunter safety course, you know,
19    that just seems like a very logical thing, but going
20    through some -- both the mechanics of how the firearm
21    works and then how to effectively mechanically shoot
22    the gun, what you would think of as marksmanship
23    training and then having some sort of education on
24    when that's appropriate.
25             I suppose smart people can do things like
```

Page 27

1   here in Kansas, you can pull up the state law, and

2   it's very clearly stated when defense of a person or

3   your domicile is allowed, but I counsel people that

4   they probably want to get some education, probably

5   want to get some training just like anything else.  I

6   counsel driver's ed before you get behind the wheel

7   of a car.  It just seems to make sense.

8   BY MR. WISE:

9      Q.   Before your clients carry a firearm in

10  public, do you recommend that they get physically

11  fit?

12          MS. BELLANTONI:  Objection.

13          You can answer.

14          THE WITNESS:  Was that, "Go ahead and

15  answer" or --

16          MS. BELLANTONI:  Go ahead and answer.

17          THE WITNESS:  Actually, I recommend

18  everybody get as physically fit as they can because

19  we know heart attacks kill a lot more people than

20  virtually anything else, you know, lifestyle.  I

21  don't want to get too deep in the whole COVID thing,

22  but when you look at what makes you susceptible to

23  COVID, the comorbidities are a very big deal.

24          However, comma, the most vulnerable

25  populations are the people who are elderly, less

1　　physically fit, you know, and I have some sympathy to

2　　that.  In my prime when I was in my 30s and I could

3　　run two miles in 12 and a half minutes and pick up

4　　600 pounds off of the ground any time I felt like it

5　　and I was a judo and Jujitsu guy, I could handle

6　　virtually any grown man that I ran into.

7　　　　　　　Now I'm 57, and I have a bad knee, and I've

8　　jumped out of too many airplanes, and I've

9　　rub-marched too many times.  I have no cartilage in

10　　one of my knees and little cartilage in the other,

11　　and I need a hip replacement according to -- two out

12　　of three orthos say I need a hip replacement.

13　　　　　　　So the thought occurs to me that people who

14　　are less physically capable need more means to defend

15　　themselves, and that often means that they need tools

16　　to solve that problem.

17　　BY MR. WISE:

18　　　Q.　　Before your clients carry a firearm, would

19　　you recommend that they carry other items to defend

20　　themselves?

21　　　A.　　So part of my training is -- I've obviously

22　　already mentioned that I'm a big proponent of Pepper

23　　Spray, I have taught it for a long time, and I've

24　　used it in a law enforcement capacity hundreds of

25　　times.  I'm a big believer in that as a less than

Page 29

1    lethal tool, and I point out that there are

2    situations -- like, I know as a police officer, there

3    are situations where if you use sufficient force

4    early, that you could interdict having to use more

5    force later.

6              The case of Kyle Dinkheller, who was a

7    deputy who was famously murdered on his -- on car

8    camera in a gun fight is one of those cases that's a

9    glaring example.  But Pepper Spray is a less than

10   deadly force option for in a case where you find

11   yourself subject to physical force.  Guns are a tool

12   of deadly force, and those are two different

13   scenarios.

14      Q.   Why do you train your clients to take these

15   other steps before when they carry a firearm in

16   public?

17             MS. BELLANTONI:  I'm going to ask for some

18   clarification on what other steps you're referring

19   to.

20             THE WITNESS:  I was about to do the same,

21   so --

22   BY MR. WISE:

23      Q.   Sure.  And the other steps I mean are

24   getting training, carrying Pepper Spray, reading up

25   on the law, the steps that you just mentioned.

Page 30

 1          MS. BELLANTONI:  I'm going to object to that

 2     as well because I don't believe there was testimony

 3     that he recommends they carry Pepper Spray, but maybe

 4     we could get clarification on that.

 5          THE WITNESS:  So I'm a big believer in human

 6     beings being as capable as possible, and that may be

 7     an artifice of my time as a police officer.  I

 8     believe that, as a cop, you're in the lifesaving

 9     business, and now, you know, I'm also a firefighter

10     on the side, so I'm in another lifesaving business,

11     you should be as capable as you possibly can, so my

12     counsel to human beings in general is that we should

13     be working to be better human beings this week than

14     we were last week, if you will, and that's kind of an

15     off-take of that.

16          Also, the more capability -- the more

17     training, education and capability you have, the more

18     situations you are going to be able to overcome if

19     you find yourself in a bad place.  I think we could

20     agree if you were an Olympic class swimmer, when your

21     sailboat sinks, you're going to be a lot better off

22     than your average dude that falls off a sailboat.

23          So if looking at my experience with street

24     crime, things like muggings, purse snatchings,

25     carjackings, person robberies, things like that,

                                              Page 31

1   those can have a -- they can be a large range of

2   circumstances, so recognition of the problem,

3   figuring out ways to try to deescalate that, if

4   possible, having options if it's not a deadly force

5   scenario, and then having options if it is a deadly

6   force scenario is my counsel to people on how to best

7   cover the range of possibilities that people find

8   themselves in.

9   BY MR. WISE:

10       Q.   Do you have concerns that some persons that

11   carry openly don't know how to properly handle their

12   firearm in public?

13       A.   I'm not sure how to tactfully word this, but

14   I have concerns, and I don't mean just the public, I

15   mean the police and the military.  I have concerns

16   about the quality and quantity of training available

17   to the human race in general.

18           I'm currently in a bit of a dispute with our

19   state academy over what I believe is not -- the

20   training they're offering could be better, I'll just

21   say that.  Do I worry about other people carrying

22   guns?  I've been around other people carrying guns my

23   entire life, so not that much.

24       Q.   You have already responded in part to this,

25   but would you agree that a factor that affects

Veritext Legal Solutions
866 299-5127

1   whether a person uses a firearm safely is their

2   training?

3       A.   Probably, yeah, yeah, I'd say that.  Just

4   like anything else, I mean, if you were to -- if

5   you've never used a chainsaw before and you go pick

6   one up and start it up, you know, that might not be

7   the safest way to do business.

8       Q.   Would you agree that a factor that affects

9   whether a person uses a firearm safely is their

10  ability to deescalate a situation?

11          MS. BELLANTONI:  Objection.

12          You can answer.

13          THE WITNESS:  I don't know that I'd agree

14  per se with that.  Deescalation is a two-way

15  communication process, and the other person has a say

16  in what you are doing.  We have to deal with that in

17  depth right now in law enforcement, "deescalation"

18  has been a whole big ugly buzz word, but let's say I

19  have somebody in a state of excited delirium or very

20  high on drugs.  You know, I can't communicate or

21  deescalate with another person who isn't -- doesn't

22  even realize I'm on the same planet with them.

23          I've had to deal with people who are -- you

24  know, you try verbal deescalation, and you realize

25  you're dealing with somebody who's profoundly

Page 33

1  paranoid schizophrenic on a psychotic break, can't

2  really talk to that person, so the onus, the -- you

3  know, the weight of the deescalation on the person

4  carrying the gun, I think, is only -- you can only do

5  so much.

6  BY MR. WISE:

7      Q.   Are there certain situations, though, when

8  the ability to deescalate a situation allows a person

9  to carry a firearm more safely?

10         MS. BELLANTONI:  Objection.

11         You can answer.

12         THE WITNESS:  So I would argue that in some

13  scenarios, like I was in a case where I was off duty,

14  and I was with my girlfriend, we missed the last

15  Metro, we missed the last subway back to our hotel,

16  had to walk back in the dark, got confronted for what

17  would have been a street robbery by three dudes who

18  were all my size, so that's a fight I cannot win,

19  can't fight three guys empty-handed.

20         I ended up pulling a snub nose revolver on

21  them, and a combination of having a gun and then

22  verbal commands was what allowed me to deescalate

23  that scenario and kept it from turning into -- either

24  into a robbery where I got beat down or a situation

25  where I had to shoot one or more of them.

Veritext Legal Solutions
866 299-5127

1           So I would say with a gun, that the use of
2   the gun can be part -- or the availability of the gun
3   can be in fact part of the deescalation process
4   where, if you have a criminal, they realize that you
5   have the capability to defeat their means of
6   assaulting you, and that becomes part of the
7   deescalation process whereas if you did not have that
8   with you, they would go ahead and carry on.
9   BY MR. WISE:
10      Q.   And so in that situation, your ability to
11  deescalate the situation prevented you from having to
12  fire your gun, for example?
13      A.   Well, in that case, the display of the gun
14  and then the verbal -- you know, my commands to them
15  to stop what they were doing was what allowed me --
16  those in concert was what allowed me to keep that
17  from turning into either a beat-down on my part or a
18  shooting on their part.
19      Q.   Let me just circle back again and just make
20  sure I'm understanding correctly.
21      A.   Okay.
22      Q.   So are there any situations where a person's
23  ability to deescalate a situation allows them to
24  carry a firearm more safely?
25           MS. BELLANTONI:  I just want to just

Page 35

1 clarify, I should have a couple of questions ago, but

2 when we talk about deescalation, are we talking in

3 terms of a uniformed police officer attempting a

4 deescalation or civilian?

5    MR. WISE:  Yeah.  I was talking about a

6 civilian.  Thanks for clarifying.

7    MS. BELLANTONI:  I object.

8    But you can go ahead and answer.

9    THE WITNESS:  I'm having trouble thinking of

10 a scenario where that would fit.

11 BY MR. WISE:

12  Q. Okay.  Do you agree that a factor that

13 affects whether a person uses a firearm safely is

14 their decision making process under stress?

15  A. I could agree with that.

16  Q. Would you agree that a factor that affects

17 whether a person uses a firearm safely is their

18 marksmanship?

19    MS. BELLANTONI:  I'm going to object to

20 that, and I'm going to ask for clarification on

21 distance, if you can provide more of a scenario-based

22 circumstance because there's a lot of factors that go

23 into that decision.

24    THE WITNESS:  May I interject on that?  So

25 my answer was going to be not as much as people would

Veritext Legal Solutions
866 299-5127

```
1    suspect.  So in an overall view of most nonpolice
2    defensive shootings, if you take anecdotal databases
3    like the one that -- the ones we get off of the news
4    that go into the NRA magazine that's out every
5    month -- and they have an article called The Armed
6    Citizen.
7         The vast majority of the people involved in
8    these cases where you see, like, "78-year-old Grandma
9    Shoots Burglar Used Alleging .22 rifle."  Vast
10   majority of those people have very little or no
11   formal training.
12        And then the marksmanship issue that we see
13   in a -- on the street -- I'm not talking about a home
14   defense scenario, although that could -- it's pretty
15   similar, but in a street, what I would consider a
16   civilian street encounter or street crime encounter,
17   let's say a mugging or carjacking or something like
18   that, these encounters tend to be incredibly close.
19        The vast majority of bad guys, when they go
20   to do things like mug you or car jack you, things
21   like that, are within touching distance of the
22   victim.  Even in police encounters, we see that the
23   vast majority of police officers, when they're
24   feloniously killed with a firearm or killed within
25   three feet to three yards of the suspect, so if we
```

Page 37

1    look at the -- there's an old saying in pistol fights

2    that it's three yards, three shots, three seconds,

3    and if you look at a lot of these encounters, they

4    fit right into what we're talking about, is the

5    marksmanship issue actually isn't that tough.

6    BY MR. WISE:

7       Q.  Would you agree that a factor that affects

8    whether a civilian uses a firearm safely is their

9    mental state?

10         MS. BELLANTONI:  Objection.

11         You can answer.

12         THE WITNESS:  So I'm going to assume -- by

13    "mental state," do you mean their mental health or,

14    like, their emotional state at the moment, or what do

15    we mean?

16    BY MR. WISE:

17       Q.  Sure.  Let's just take that one-by-one then.

18    Their mental health.

19       A.  Well, I would hope that people who have

20    significant mental health issues would not be running

21    around with a gun.  We're kind of supposed to screen

22    for that.  But then as far as their current mental

23    state, having been in that scenario, being criminally

24    victimized is obviously a very exciting, and, you

25    know, it's an event in which it's going to be

Veritext Legal Solutions
866 299-5127

1    emotionally charged, so I don't think that you can

2    put somebody in a scenario like that and not have a

3    significant emotional response out of just human

4    beings in general.

5        Q.    Let's assume that they're not being

6    victimized by just their carrying a firearm, okay,

7    and so my question is would you agree that a factor

8    that affects whether a person uses a firearm safely

9    is, let's just say, their emotional state?

10        MS. BELLANTONI:  Objection.  So using a

11    firearm, but they're not being victimized, so if I

12    could just get more clarity on that question.

13    BY MR. WISE:

14        Q.    Let's say that -- I'm sorry.  I should just

15    say carrying a firearm.

16        A.    I'm not sure exactly how to quantify that

17    one.  I think like a lot of things that human beings

18    do like driving cars, you should probably --

19    utilizing chainsaws, you should probably be a mature

20    adult if you will.  There's a reason why we, you

21    know, don't give 13-year-olds driver's licenses and

22    things like that.  So that, I guess, emotional

23    stability or emotional maturity kind of comes with

24    that, so I guess I'm kind of agreeing with you.

25        Q.    Would you agree that a factor that affects

Page 39

1    whether a civilian uses a firearm safely is whether
2    they're intoxicated?
3        A.    Certainly.
4        Q.    Would you agree that in general, an off duty
5    officer is more likely to be prepared to use a
6    firearm safely than the average civilian?
7              MS. BELLANTONI:  Objection.
8              You can answer.
9              THE WITNESS:  I'm on the fence on that one.
10   I'm really on the fence on that one.  It's hard for
11   me to mentally average law enforcement officers.
12   It's also hard for me to mentally average non- -- I
13   know -- I can think of quite a few people who are not
14   cops that I would rather have backing me up on
15   something bad happening than some of the cops that I
16   know, and, of course, the flip side is also there, so
17   that would be one I would have to ponder.  I really
18   can't give you an answer on that one.
19   BY MR. WISE:
20       Q.    Would you agree that in general, an
21   undercover officer is more likely to be prepared to
22   use a firearm safely than the average person?
23             MS. BELLANTONI:  Objection.
24             You can answer.
25             THE WITNESS:  I'd have to have the caveat of

                                              Page 40

1    having to know what some of their training is.  Like,

2    here in my state, unfortunately, there's no

3    requirement for police officers to do anything but

4    shoot the qualification course from their police duty

5    belt, so there's no formal instruction in the police

6    system here in my state on, like, how to carry a gun

7    concealed or how to deploy a gun concealed.

8         Officers who are doing those things and are

9    very competent at them are either working that

10   problem themselves or seeking training outside of

11   their department to get that, or they have a very

12   progressive training department who is offering that

13   sort of training to their people.  So, again, I'm not

14   sure I can say that I agree with that.

15   BY MR. WISE:

16   Q.   Would you agree that in general, a retired

17   officer is more likely to be prepared to use a

18   firearm safely than the average person?

19        MS. BELLANTONI:  Objection.

20        You can answer.

21        THE WITNESS:  I would say that if you've got

22   a good street cop and they've had a lot of years on

23   the job, what they're going to be good at, because

24   they've been in a bunch of them, is handling critical

25   incidents, so potentially, yes.

                                              Page 41

BY MR. WISE:

Q.   Would you agree that in general, a person who a law enforcement agency has determined to have good cause to possess a firearm is more likely to be prepared to use a firearm safely than the average civilian?

MS. BELLANTONI:  Objection.

You can answer.

THE WITNESS:  So I'm assuming, like, in a, you know, show cause type of state, if -- like, in New York, I know you have to prove that you have a good reason to have a gun before they'll give you a permit or something like that, so I assume you're speaking to that type of paradigm.

BY MR. WISE:

Q.   That's right.

A.   I can't say that's the case.  You know, it would entirely depend upon the criteria.  You know, they could make a -- depending on the criteria, but generally I disagree with that.  I know a lot of the people who get permits, and I'll pick on New York.  I have a little bit of knowledge of that, particularly New York City.

Your cause has to do with things like, you know, you're a high end jeweler and you carry a lot

Veritext Legal Solutions
866 299-5127

1   of cash or you do cash transports or jewelry
2   transports or things like that, so the official
3   perception of your threat level wouldn't really have
4   anything to do with your ability to respond to that.
5        Q.   Do you train your clients on how to prevent
6   their firearm from being stolen?
7        A.   Yes, I do.
8             MS. BELLANTONI:  Objection.  Can I just get
9   more clarification on what you mean by "stolen"?
10   Like, from the person?  From their home?
11   BY MR. WISE:
12        Q.   Stolen from their person, from their home,
13   their car, wherever.
14        A.   Actually, all of the above.  I talk about --
15   let's say you have a concealed carry, but you go to
16   some someplace that has one of those no gun signs.
17   Like, here in my state, you can lock your gun up in
18   your car legally in the parking lot of that property,
19   but, you know, you're not supposed to go -- like,
20   let's say it's a department store.  You're not
21   supposed to go in the store with a gun, but you can
22   lock your gun up legally on the parking lot, so they
23   clarified that in the law.
24             You don't just want to leave your gun in
25   someplace like the glove box, that's ill-advised, so

Veritext Legal Solutions
866 299-5127

1    I advise things on like how to secure a gun in a car,
2    how to secure a gun in the home, how to avoid having,
3    like, your toddler get ahold of your gun or something
4    like that, but then also one of my specialties is
5    weapon retention and disarming skills.  I've been
6    teaching that for a very long time.  So how to keep
7    your gun from being taken away from you.
8        Q.   Why is it important for your clients not to
9    allow their firearms to be stolen?
10       A.   You don't want the bad guys to have your
11   guns, or, you know, something like leaving it out
12   where a toddler can get it or, you know, whatever the
13   case may be.  I can point to specific cases.  One
14   of -- the last officer that was killed on my old job
15   was a friend of mine, and he was shot in a gun stolen
16   out of a home burglary.  So somebody had an unsecured
17   loaded pistol laying around their house, and he was
18   shot dead with it during the course of a speeding --
19   a car stopped for speeding.
20            So those are the type of things that, you
21   know, I never -- I've worked a couple of cases where
22   small children were shot over playing with guns, and
23   those are pictures that are stuck in my head that are
24   never going to go away, so I counsel people on the
25   importance of things like safe storage but then also,

1    you know, if you have the gun on your person, how to
2    go about safely doing that as well.
3         Q.   Have you ever published any articles on
4    topics related to the public carry of firearms?
5         A.   I have.
6         Q.   What articles did you publish?
7         A.   It's been a few.  So I've written for Recoil
8    Magazine which is a paper, you know, type magazine.
9    I have written for the Tactical Wire, which is a
10   strictly online type of thing, and I have talked
11   about, like, carriage of smaller guns, utilizing
12   revolvers, things like that.  So, yeah, I've dabbled
13   in that.
14        Q.   Were any of these articles based on
15   independent research that you conducted?
16        A.   I can't say formal research.  Like, I did
17   not do a scholarly-type paper or something like that,
18   no, sir.  It would be more things that I've read,
19   things that I've studied up on and then personal
20   observation and experience through my travels.
21        Q.   Do you have any academic background in
22   conducting research?
23        A.   Minimal.
24        Q.   Besides what we've discussed today, do you
25   have any other experience that informs your views on

                                              Page 45

1    the public carry of firearms?

2       A.   I have quite a bit of experience with being

3    around it.  My state, of course, with Kansas, if you

4    go back, we had Wyatt Earp, Bat Masterson, things

5    like that, we had the Frontier Days, the cattle

6    drives, Oregon-California Trail, things like that

7    going on.  I'm a big history buff.

8            And then if you go back to when I started my

9    time in law enforcement, there was no way for anyone

10   besides a commissioned law enforcement officer to

11   carry a gun in the State of Kansas outside of, like,

12   hunt -- they had an exception for hunting and

13   fishing, you could carry a concealed handgun, and,

14   obviously, if you're hunting, you could do things

15   like carry your shotgun or your deer rifle, things

16   like that, but that's -- it was allowed -- the state

17   allowed individual cities to ban carry of firearms,

18   things like that.

19           It was legal to have a loaded gun in your

20   car but not on your person, weirdly enough, but then

21   a lot of the cities banned loaded guns in cars.  So

22   that's where I started my time in law enforcement,

23   and then since then, there's been decisions, legal

24   precedents, things like that, particularly after

25   Heller, the Kansas attorney general who came down

Page 46

1     with an opinion that certain Kansas laws were

2     unconstitutional.  Some of those laws were changed.

3          There were several court cases where cities

4     tried to go back to the old way of doing business,

5     and they were disallowed from that, so in my time as

6     a cop, we went from nobody could carry, and including

7     retired law enforcement officers could not carry a

8     gun.  The only people who could carry was on duty

9     cops or off duty cops but only with the permission of

10    their chief law enforcement officer, so some off duty

11    cops couldn't carry.

12         And then we went to a rather strict conceal

13    carry permit system, then a much looser conceal carry

14    permit system and then an attorney general's opinion

15    that allowed what people would call the

16    constitutional carry, if you will, where you could

17    carry concealed or open carry without a license, and

18    there were several lawsuits over -- like, I know

19    Overland Park, Kansas tried to ban open carry, and

20    the attorney general's office took them to court over

21    that or was at least part of those proceedings.

22         And so in my state, it is legal to carry

23    concealed, it is legal to carry unconcealed, it is

24    legal to -- you can get a conceal carry permit which

25    a lot of people do if that allows reciprocity.  Like,

Page 47

1    if you have a Kansas permit, you can carry in
2    Missouri, Nebraska, Oklahoma, Colorado, Texas.
3    There's a litany of places you could carry.
4         So some -- a lot of people will get the
5    permit because, you know, you can travel, but also a
6    lot of people don't.  So it's very common for me to
7    deal with nonpolice firearms carriers or to see
8    people carrying a gun in public.
9    Q.   Over the course of your career, have you
10   served in any law enforcement command positions?
11   A.   Yes, sir.  I was a lieutenant shift
12   commander for my department.  At one point, we had a
13   hiring freeze, and we had a promotion freeze, so I
14   was simultaneously the first shift and second shift
15   patrol commanders, and I was in charge of the
16   motorcycle unit and the school resource officers.
17   Q.   And what department were you working for?
18   What timeframe?
19   A.   That was Topeka, Kansas PD, and that would
20   have been approximately -- I'm doing the math here.
21   So I retired in December of 2014, and that would have
22   been about -- I believe I got promoted in 2008 to
23   lieutenant.  I'm going to have to look that one up.
24   It might have been '06, but it could have been '08,
25   but I did approximately right about -- would be about

Veritext Legal Solutions
866 299-5127

1    eight years, just under eight years as a lieutenant.
2            And then my current job, I'm the captain for
3    the Airport Police and Fire here in the south part of
4    Topeka at the airport, and so I'm in charge of all
5    three of the lieutenants.  I have all three of the
6    shifts that we have.  We have 24-hour shifts, so we
7    have an A, B and C shift, I'm in charge of them, and
8    then I'm also in charge of all of our firearms and
9    other police training.  We have another captain
10   that's in charge of all the fire part of the
11   organization.
12       Q.   How long have you served in that role as
13   captain?
14       A.   About a year.
15       Q.   Have you ever served as a deputy chief of
16   police?
17       A.   No, sir.
18       Q.   Have you ever served as a chief of police?
19       A.   No, sir.
20       Q.   And I should go to the sheriff's department
21   too.  Have you served in any similar capacity,
22   sheriff?
23       A.   No.  Just as a deputy.
24       Q.   Do you have any background in public policy?
25       A.   I have a background in police policy.  I

Veritext Legal Solutions
866 299-5127

1    have written a number of policy papers, what you

2    would think of as general orders, things like that,

3    but if you mean a larger -- like, the grandest thing

4    I have done is written a municipal ordinance as far

5    as, like, an overarching public policy.

6        Q.   What was that municipal ordinance?

7        A.   It was a Topeka city code on -- had to do

8    with protests, and it bans masks and body armor while

9    you're in the middle of a protest.  I could pull up

10   the number for you if you ever want to look at it.

11       Q.   That's okay for now.  Any other work that

12   you've done creating a municipal ordinance or similar

13   work?

14       A.   Not on that.  Mainly I -- I was the author

15   of some of the general orders that we had at Topeka

16   Police Department.  My current department, I have

17   written general orders, use of force policy, things

18   like that.  I have assisted in policy writing for the

19   IACP.

20            Like, I was part of the model policy for

21   response to excited delirium for International

22   Association for Chiefs of Police organization.  So

23   the vast majority of the stuff I've done in that

24   regard has all been cop stuff.

25       Q.   Have you ever worked with a policy maker in

1    the creation of public safety policy?

2         A.   If you mean like state laws or something

3    like that, not more than lobbying or that sort of

4    thing, no.

5         Q.   Have you ever worked with a community

6    stakeholder in the creation of public safety policy?

7         A.   On the police level, yes, we had input.

8    Like, things like our chase policy and our police use

9    of force, things like that, we did take -- that

10   wasn't all in-house.  There was other people involved

11   in that, mayor's office, city council members, other

12   community -- I'll use the "stakeholder" word.

13        Q.   Any other examples besides what you've just

14   reviewed?

15        A.   No, sir, none that I can think of.

16        Q.   Have you ever worked with a researcher in

17   the creation of public safety policy?

18        A.   No, not really, no.

19        Q.   Okay.  Let's turn to your opinions.  What

20   field would you consider yourself an expert in?

21             MS. BELLANTONI:  Objection.

22             You can answer.

23             THE WITNESS:  Personally, I think the term

24   "expert" is overused, but the courts have said I'm an

25   expert in police use of force, use of force decision

Page 51

1   making, firearms, firearms training and ballistics,

2   terminal ballistics, firearms identification, police

3   use of force other than firearms, Pepper Spray,

4   taser, arrest and control tactics.  I've been

5   utilized as an expert on police response tactics.  At

6   any rate, those are the things that I've been

7   court-recognized as an expert.

8   BY MR. WISE:

9       Q.   What is the basis for your opinions in this

10  case?

11      A.   Basically the totality of my training and

12  experience as a police officer.

13      Q.   Okay.  Let's look at page seven of your

14  report.

15      A.   I have to find my glasses for this one.

16      Q.   Can you see the screen okay?

17      A.   Yes, sir.

18      Q.   Okay.  Great.

19      A.   I can now.

20      Q.   Let's look at paragraph 20.  You state "The

21  implementation of laws that allow open carry in

22  public does not have a negative impact on public

23  safety.  The act itself, a lawful person openly

24  carrying a firearm in public does not have any

25  negative or detrimental effect on public safety, does

Page 52

```
 1    not itself create a safety hazard, and is not the
 2    cause of accidental or mistake-of-fact shootings of
 3    civilians by police officers."  Is this your opinion?
 4        A.    Yes.
 5        Q.    Okay.  Would you explain what you mean?
 6        A.    So just the mere fact that somebody's
 7    carrying a gun -- and I'll go with a holstered
 8    handgun, let's say, in and of itself.  It just is
 9    what it is.  It isn't a negative or doesn't have an
10    effect on public safety.
11            The idea that the police would show up and
12    be, "Oh, my God, that guy's got a gun, we better
13    shoot him" borders on the ridiculous in my mind, that
14    -- and a bunch of that is personal observation.
15            Both here in Kansas and part of the business
16    that I do both as a police trainer and in my own
17    business as a -- we'll just say civilian firearm
18    trainer, is travelling to other states.  You know,
19    just this year, I've been to -- I've conducted
20    training or been at training in Texas, Oklahoma,
21    Missouri, Utah, Wyoming.  I'm leaving something out.
22            But at any rate, I see -- I go to a lot of
23    places, see a lot of stuff, and this is something
24    that -- part of the reason in conversation when I
25    talk to Ms. Bellantoni, you know, what's my personal
```

Page 53

1   observations, like I guarantee you I can walk out of

2   here now and go to someplace like Walmart here in my

3   town and find somebody carrying a pistol in a holster

4   visible on their belt or, quite frankly, carrying

5   concealed poorly where everybody can tell that

6   they're carrying a pistol, but, you know, you can see

7   that there's an obvious bulge and things like that.

8           I can find somebody -- I can walk out of

9   here and find somebody in 15 or 20 minutes, and it's

10  just -- it just is what it is.  It's like saying,

11  "It's a sunny day out, that guy's carrying a gun."

12  It's not a positive, it's not a negative, it just is.

13          I haven't noted, in observation in my time

14  as a cop in dealing with people on the street, that

15  open carry does anything that doesn't bring any

16  detriment to the public safety realm.

17      Q.   Besides your personal observations, what

18  else did you rely on to reach this opinion?

19      A.   Primarily, that was it.  One of my big

20  things that I do is every chance that I get, I delve

21  into anything that involves the police.  A lot of

22  things that are out there in the police world get

23  write-ups.  There are famous things that we have to

24  look at.

25          Obviously, you know, the George Floyd thing

1    last year, that was a botched arrest and control

2    scenario, and that's right in the middle of my

3    bailiwick on, you know, teaching cops how to avoid

4    things like in custody deaths; and then, you know,

5    less well known but pretty famous, the bad shooting

6    that turned into a riot that came out of Atlanta PD,

7    which was, you know, basically another arrest and

8    control scenario with a taser.

9            So I try to stay on top of those trends

10   absolutely as much as I can, and I also pay attention

11   to anything in the police publications or any of the

12   newsletters, any of the stuff that comes through my

13   email.  My email lists are fairly extensive.

14           So I'm always looking for after actions on

15   incidents as much as possible, both to support my

16   business and helping, you know, regular people not be

17   the victims of crime, look for criminal, crime

18   trends, look for trends in law enforcement.  We know

19   in the past couple of years, ambushes has been a

20   thing that has been up, so trying to stay on top of

21   that sort of thing as well.

22     Q.   Did you rely on any research to support your

23   opinion?

24           MS. BELLANTONI:  Other than what he

25   testified to?

```
 1              THE WITNESS:  I can't point you to a
 2      specific paper or anything like that, no, sir.
 3      BY MR. WISE:
 4          Q.   You continue on page eight, paragraph 21 --
 5          A.   Uh-huh.
 6          Q.   -- stating "The lack of proper police
 7      training creates or can lead to a public safety
 8      hazard and the accidental shooting of civilians,
 9      whether unarmed, carrying concealed, or carrying
10      exposed open carry."  Would you explain what you
11      mean?
12          A.   So if you don't have -- you know, and this
13      is something that is deep in the training that good
14      law enforcement firearms instructors find themselves
15      in.  If we look at some of the court cases that are
16      out there like, you know, the places lost big
17      lawsuits, Zuchel v. Denver is an example that is
18      glaring in the police world that is brought up.
19              If you look at Popow v. Margate and we look
20      at what do the courts say valid police training
21      should look like versus what had happened -- you
22      know, if you look at the Popow case, they were
23      shooting at a man that was running, and gentleman
24      came out on his porch to see what was going on, and
25      then as the suspect was running past the gentleman on
```

Page 56

```
 1    his porch, he got shot by the police because he was
 2    downrange of where the bad guy was.
 3           So that would be a glaring historical
 4    example of incorrect or improper or nonexistent
 5    police training contributing to a public safety
 6    hazard that, quite frankly, didn't exist before the
 7    police showed up.  So avoiding mistake-of-fact
 8    shootings is a big deal in the police world and the
 9    training that is done right.
10    Q.   Is it your opinion that proper law
11    enforcement training is the most important factor to
12    prevent civilian shootings by law enforcement
13    officers?
14    A.   If you mean mistake-of-fact or not shooting,
15    shooting the wrong people, then I would say yes.
16    Q.    Incidentally, is that one of the reasons you
17    founded your company, Agile Tactical?
18    A.    So I founded the company because I was
19    getting -- I had been a police trainer for so long,
20    and then that was mainly what I did, and as I reached
21    retirement, I had so many people asking me outside of
22    the police world for training, I thought, well, I
23    should kind of formalize this thing.
24    Q.    Do you believe that a person who is carrying
25    a firearm in public, a civilian who's carrying a
```

1      firearm in public is more likely, all things being

2      equal, to be shot than a civilian is who is unarmed?

3              MS. BELLANTONI:  Objection.

4              You can answer if you can.

5              THE WITNESS:  So historically, if you look

6      at people who are big crime victims according to --

7      and this is according to national stats, which, of

8      course, fluctuate every -- year to year, things like

9      that, but if you look at people who resist things

10     like robberies, that sort of thing, the safest way to

11     do that is to utilize a firearm.  Statistically,

12     that's the case, and that's been the case for quite

13     some time.

14              So I'm not exactly sure how to quantify your

15     question on are they more likely to be shot or not be

16     shot, but I think it's pretty clear statistically if

17     they resist being a crime victim through the use of a

18     firearm, then they're less likely to suffer any

19     injury at all.  That's been the running statistic

20     coming from the feds every year.

21     BY MR. WISE:

22      Q.   And when you're referring to the statistics,

23     what in particular are you referring to?

24      A.   The national -- so I'm going to look up the

25     formal name of that so I don't -- it's Bureau of

Page 58

1    Justice Statistics.  I don't want to misstate the

2    name of what I'm talking about.  I'm firing up my

3    other magic Google box.

4         Q.   If that would refresh your recollection, go

5    ahead.

6         A.   Okay.  So the formal name for that page is

7    Bureau of Justice Statistics.  I was having a little

8    Alzheimer's on the name of that one.

9         Q.   Thank you.  Okay.  Do you believe that a

10   civilian who's carrying a firearm in public is more

11   likely, all things being equal, to be shot by a law

12   enforcement officer than a person or a civilian who's

13   unarmed?

14              MS. BELLANTONI:  Objection.

15              You can answer if you can.

16              THE WITNESS:  I don't because a lot of the

17   mistake-of-fact shootings, particularly the ones that

18   are very high profile, we can point to demonstrate

19   they did not have a firearm on their person, and they

20   were shot in a mistake-of-fact shooting because they

21   had something as innocuous as a cellphone or

22   something else.

23              If you look at the famous case out of NYPD,

24   I can't pronounce the gentleman's name or -- well,

25   it's something like Diallo, where their street crimes

Veritext Legal Solutions
866 299-5127

1    unit fired the -- you know, the famous 47 rounds that
2    Bruce Springsteen spoke of, he had a wallet in his
3    hand when he was shot.
4    BY MR. WISE:
5        Q.   I just want to make sure I'm understanding
6    you because you mentioned a few examples.  Are you
7    talking in general or just examples that come to
8    mind?  And what I'm trying to --
9        A.   I --
10       Q.   Yeah.
11       A.   I don't believe that you would be more
12   likely to be mistakenly shot by the police, and I'm
13   assuming someone who is not a criminal actor, but,
14   you know, just an average Joe, I don't think you're
15   more likely to be shot by the police whether you have
16   a gun or you don't have a gun.
17       Q.   Let's look at paragraph 24, still on
18   page eight.
19       A.   Okay.
20       Q.   You state "Mr. Raney's opinions are based on
21   speculation and a generalized fear that law-abiding
22   individuals, simply by the act of carrying their
23   firearm exposed, will cause panic among police
24   officers and the public, waste political" -- excuse
25   me -- "waste police resources and ultimately lead to

Veritext Legal Solutions
866 299-5127

1    police officers shooting civilians carrying exposed."

2        A.    Okay.

3        Q.    Is that your opinion?

4        A.    Yes.

5        Q.    Okay.  Do you understand Mr. Raney to have

6    the opinion that police officers will panic when

7    responding to a call about a person who is carrying a

8    firearm openly?

9        A.    What he describes in his declaration sure

10   appears to color it that way.

11       Q.    Do you understand Mr. Raney to have the

12   opinion that police officers are likely to shoot a

13   person simply because they are carrying a firearm

14   openly?

15       A.    He also seemed to hint at that in his

16   opinion.

17       Q.    Do you understand those things to be his

18   opinion, or are you saying that --

19       A.    That's what I believe I read from his

20   opinion.

21       Q.    Okay.  Let's look at page 26.  We're still

22   on page eight.  I'm sorry.  Paragraph 26.  You state

23   that "When open carry without a permit became allowed

24   in Kansas, no instant mayhem was created"; is that

25   right?

Veritext Legal Solutions
866 299-5127

1     A.   Yes.

2     Q.   Okay.  Do you understand Mr. Raney to have

3     the opinion that instant mayhem will result if open

4     carry were allowed in California?

5     A.   Without rereading his opinion on the spot,

6     I'm not sure that I would -- I could say he said

7     those exact words, but his opinion that I read, the

8     impression of his opinion that I got from him was

9     people couldn't open carry because it would make

10    things much more chaotic, you know, the police would

11    have all kinds of problems differentiating good guys

12    from bad guys for, you know, cops and robbers, from

13    want of a better term, and that it would cause -- you

14    know, he'd almost colored it as though it would cause

15    some sort of mass public hysteria.

16    Q.   Let's look at page nine, paragraph 28.  You

17    state that "When open carry became allowed in Kansas,

18    our police officers were not spontaneously shooting

19    members of the public they observed carrying a

20    firearm exposed on their body in public;" is that

21    right?

22    A.   Was that a -- I'm assuming that was the

23    upper part.  You said -- 28 now talks about banning

24    open carry.

25    Q.   Yeah.  Let me see here.  One second.

Veritext Legal Solutions
866 299-5127

1    A.   I think you were on the previous --

2    Q.   Oh, sorry.  I meant paragraph 26 on

3  page eight still.

4    A.   Sure.

5    Q.   Is that your opinion in paragraph 26?

6    A.   That police officers were not shooting

7  members of the public?

8    Q.   Correct.

9    A.   Absolutely.

10   Q.   Do you understand Mr. Raney had the opinion

11 that if open carry were allowed in California, police

12 officers would spontaneously shoot members of the

13 public who were openly carrying firearms?

14   A.   His opinion read to me as though he believed

15 that open carry could not be allowed in the State of

16 California because it would pose too great of risk of

17 police officers shooting the wrong people merely for

18 carrying a gun in the open.  That is what I took from

19 part of his opinion.

20   Q.   Okay.  Now let's go to paragraph 28.

21   A.   Okay.

22   Q.   You state "Banning open carry does not

23 greatly enhance public safety, nor does it cure

24 deficiencies in departmental training of police

25 officers."  Would you explain what you mean?

Veritext Legal Solutions
866 299-5127

1      A.   Well, as I said, in my experience in the

2  world, I went from a place where nobody could carry

3  except the cops legally.  A lot of people did it, but

4  nobody could legally carry a gun beside the cops, and

5  you certainly couldn't run around open carrying to a

6  world where you could get a permit to a world to

7  where you could open carry or conceal carry as you

8  see fit.

9       During that period of time, we actually had

10  a great -- quite a bit of a -- and I cannot point to

11  a statistical cause and effect relationship, but I

12  did note that locally, you know, when I first started

13  in the police world with things like gang violence

14  and that sort of thing, our crime was significant.

15       There was a port in my career where I looked

16  up crime stats for the United States early in the

17  '90s, and that's when things were still banned, and

18  Topeka had a per capita crime rate greater than

19  Los Angeles, and now we come to a point where you can

20  carry a gun as you see fit, if you want to be open

21  carry or conceal carry without a permit, or you can

22  get a permit, and there was -- you know, that

23  coincided with no uptick in crime.

24       In fact, for the longest time, we had a

25  Leave It to Beaver era level crime where it was so --

Page 64

1    crime had dropped so much, everybody kind of forgot

2    what that was like, but there was certainly no uptick

3    in things like police shootings or, you know, other

4    crimes relevant to -- I see -- and I guess I'm -- I

5    don't know if I'm speaking out of turn here because

6    it's more of a larger than this case, but there's

7    people who push the opinion that if you allow people

8    to carry guns, they're just going to run around

9    killing people over things like parking lot disputes

10   or, you know, "You took my parking space" or

11   something like that.  We just didn't see it.  We

12   didn't see any of that.

13       Q.   When you state that "Banning open carry does

14   not cure deficiencies in law enforcement training,"

15   are you emphasizing, as we've discussed before, the

16   critical importance of training in public safety?

17       A.   Yes, and whether or not you're going to have

18   mistake-of-fact shootings, things like that.

19       Q.   Setting aside training for the moment, does

20   banning open carry enhance public safety at least to

21   some extent?

22       A.   I don't believe so.  I don't believe so.

23       Q.   When you state that banning open carry does

24   not, quote, "greatly enhance public safety," do you

25   mean that banning open carry improves public safety

Veritext Legal Solutions
866 299-5127

1    to some degree?

2    A.   I don't believe it does.  I don't believe it

3    does.  I see no -- I have personally noticed no cause

4    and effect relationship.  I have noticed no

5    difference in police-citizen encounters.

6         One could argue that there's a possibility,

7    although it's always -- it's impossible to measure in

8    negative.  Have people with an open carry firearm not

9    been targeted for a crime because a criminal could

10   see that that person is armed?  We won't know.  Those

11   things are nebulous.

12        So I can't point to an exact cause and

13   effect relationship or put statistics on that, but

14   what I haven't noticed is we had open carry, and

15   then, oh, my God, all of this bad stuff started

16   happening.  That was clearly not the case and hasn't

17   been the case, and it hasn't been the case for years

18   now.  I know I'm kind of generalizing on that.

19   Q.   I appreciate that.  And the reason I'm

20   asking is I'm just looking at your language, your

21   report that says "Banning open carry does not greatly

22   enhance public safety."  It doesn't say, for example,

23   banning open carry does not enhance public safety.

24   That's why I was asking whether it enhances public

25   safety to some extent.

```
 1        A.   I totally get where you're coming from, and
 2   I don't believe it does either way, either one of
 3   those ways of wording that sentence.
 4        Q.   Let's look at page nine, paragraph 31.
 5             (Discussion off the record)
 6             (Recess)
 7   BY MR. WISE:
 8        Q.   Okay.  Let's go back on the record and look
 9   at page nine, paragraph 31.  You observed that Kim
10   Raney's report states that when an officer comes upon
11   a scene where a person is carrying openly, the
12   officer must rapidly assess a person's behavior,
13   paragraph 22?
14        A.   Yes.
15        Q.   Split-second decisions sometimes have to be
16   made, paragraph 24, where the results could be
17   deadly, paragraph 22; is that right?
18        A.   Yes.
19             MS. BELLANTONI:  I'm going to ask that you
20   read that back.  Are you saying that that's what
21   Mr. Haggard is saying or that's what he's referring
22   to Mr. Raney's declaration?
23             MR. WISE:  Yeah.
24   BY MR. WISE:
25        Q.   You're referring to Mr. Raney's declaration;
```

Veritext Legal Solutions
866 299-5127

1   correct?

2        A.   Yes.

3        Q.   Okay.  Do you understand Mr. Raney to have

4   the opinion that it is uncommon in police work for an

5   officer to have to rapidly assess a person's

6   behavior?

7        A.   I can't say that exactly, but it appears as

8   though he tries to paint a picture that if you don't

9   have open carry, then you won't have all of that

10  going on.

11       Q.   Do you understand Mr. Raney to have the

12  opinion that it is uncommon in police work for an

13  officer to have to make a split-second decision where

14  the results could be deadly?

15       A.   I can't say that he would have that opinion.

16  Again, he appears to color his opinion as though if

17  we were to eliminate open carry, that that would

18  somehow solve that problem.

19       Q.   Do you understand Mr. Raney to have the

20  opinion that allowing open carry would increase the

21  circumstances in which an officer would have to

22  rapidly assess a person's behavior and make a

23  split-second decision where the results could be

24  deadly?

25       A.   He appears to have that opinion to me.

Veritext Legal Solutions
866 299-5127

1    That's what I gather from reading his opinion.

2       Q.   Do you agree that an officer that comes upon

3    a scene where a civilian is carrying openly is more

4    likely to have to rapidly assess that person's

5    behavior?

6            MS. BELLANTONI:  Objection.

7            You can answer.

8            THE WITNESS:  I do not.

9    BY MR. WISE:

10      Q.   Why not?

11      A.   So something that is standard practice in

12   the police world and has been by progressive

13   departments who train hard since, if we get into the

14   history of very tragic incidents, late '60s, early

15   '70s, events such as the Newhall massacre there in

16   California, the incidents that were written up in the

17   famous book "Officer Down, Code 3," what we look at

18   is that officers should be assessing, "Just because I

19   can't see a gun doesn't mean somebody should have

20   one."

21           Standard officer safety practice is if you

22   pull somebody over for speeding or if you pull

23   somebody -- you make a stop for whatever, the only

24   safe assumption is to assume that a person is armed

25   and that you comport yourself and your tactics and

Page 69

1    your approach and things like that with the

2    assumption that a person could pull out a concealed

3    weapon and utilize that weapon, and then, you know,

4    if you run with that assumption, your tactics, your

5    decision making, things like that, that it keeps you

6    in the best frame of mind for good officer safety.

7           So in my mind, if we think that we're

8    solving a problem by banning open carry -- so let's

9    say I could push a magic button and there was no open

10   carry.  I've never had to deal with that problem.

11   That doesn't solve the problem that we see in police

12   work.

13      Q.   Let's go to your example of the routine

14   traffic stop.  Would the presence of a firearm

15   heighten the danger for the officer?

16           MS. BELLANTONI:  Objection.

17           Can I get more -- can you be more specific

18   in that scenario?

19           MR. WISE:  I can ask the question again.

20   BY MR. WISE:

21      Q.   In a routine traffic stop, would the

22   presence of a firearm by the civilian in a car

23   heighten the danger for the officer?

24           MS. BELLANTONI:  Objection.

25           You can answer it if you can.

```
 1            THE WITNESS:  It would depend on that
 2    person's intent.  I can tell you personally I've
 3    never really had to worry about the guns that I could
 4    see.  I've walked up on car stops where I've had
 5    people with shotguns and rifles in the back window of
 6    a pickup truck, guns in consoles, guns laying on
 7    seats, I've dealt with people who are wearing
 8    holstered guns on their hip, that sort of thing, and,
 9    quite frankly, the guns that I can see, the weapons
10    that I can see, I was never very worried about.
11            I was worried about the behavior of the
12    people who were, you know, literally being furtive,
13    who were trying to conceal what they were up to.  It
14    was more behavior-focused, you know, "Is this person
15    in the middle of a crime and, thus, might try to take
16    me out because they want to make an escape and
17    utilize a weapon as part of that escape process?"
18            And literally the guns that I could see, I
19    was never worried about.  It's what you don't know
20    that is a problem.
21    BY MR. WISE:
22       Q.   In a routine traffic stop, would the
23    presence of a firearm in the car make it more likely
24    that an officer would have to make a split-second
25    decision where the results could be deadly?
```

Page 71

1          MS. BELLANTONI:  Objection.

2          You can answer it if you can.

3          THE WITNESS:  Again, I don't believe so.  I

4     have seen people do things like reach under the seat

5     of the car, reach into a glove compartment, reach

6     into a console in between the seats, bags, things

7     like that.

8          Again, it's the things you don't know, it's

9     the things you can't see that are the most worrisome,

10    and that's where the split-second decision really

11    comes into play, and then that becomes a

12    behavioral -- reading the behavior of the person

13    versus if they have, you know, a visible firearm or

14    not, you know, and then it becomes reading the

15    behavior and the scenario that you find yourself in.

16         Quite frankly, if I know -- let's say I have

17    an actual bad guy, I know he's a bad guy, he's a

18    suspect that we -- say we have a picture of the guy

19    or video of the guy and I know that's the guy and I

20    see he's got a gun on him, that's kind of a gimme on

21    the decision making process.

22         It's when you don't know and you have to

23    make those split second decisions because is he

24    armed?  Is he not armed?  I don't know.  That's where

25    things become very worrisome.

BY MR. WISE:

    Q.   Let me just drill down on that for a moment
then.  So what if you don't know the person's a bad
guy, as you were saying, and they have a firearm?
Does that affect the way that you approach that
person?

            MS. BELLANTONI:  Objection.

            You can answer if you can.

            THE WITNESS:  It --

            MS. BELLANTONI:  Can we get more clarity on
where this firearm is?  Very situational thing.  It's
very, like, amorphous scenario without much detail.

            MR. WISE:  Sure.  I was going off the
scenario he was talking about.

            THE WITNESS:  So I can point to -- I think
more pertinent to what we're talking about, I can
point to after we legalized the conceal carry, we had
a gentleman come into the state who believed he was
going to -- he was kind of antipolice, and he was
going to do a conceal carry, what he called an
audit -- or I mean a gun rights audit -- and see how
we would react.

            So he was wearing a visible -- a very large
handgun in a holster visible, and he was walking up
and down the sidewalk, on a public sidewalk in front

Veritext Legal Solutions
866 299-5127

1  of a very well-to-do subdivision, small gated

2  community, and somebody thought he was acting kooky,

3  so they called police.

4       We made contact with the guy.  He was

5  carrying a gun.  We could see he had a gun, you know.

6  I would instruct the gentleman, you know, "Don't

7  reach for the gun that's clearly there," you know.

8  "What's going on?  We got a call."

9       And basically he was trying to turn it into

10  a, "See, the police are antigun" confrontation type

11  of thing, and the whole thing diffused because, you

12  know, quite frankly, we didn't overreact.  We had a

13  guy pacing back and forth on a sidewalk, you know, so

14  we have to ascertain, "is this a guy -- maybe he's

15  suffering from mental illness, or, you know, why is

16  he here?"

17       Because his behavior, his pacing back and

18  forth did alarm people more than anything, you know,

19  "Why is that guy acting kooky out here?"

20       And then when it turned out to be a

21  specific -- kind of a public, you know, "We're going

22  to get gotcha video on the police" type of a stunt

23  that he was pulling and he didn't get the reaction he

24  was hoping for, then the whole thing was over with.

25       And I've had to deal with a few things like

Veritext Legal Solutions
866 299-5127

1    that, but overall, you know, if I were to have to

2    make an approach on somebody, part of that approach

3    would be, "What are the circumstances?" you know.

4           Is this guy in an alley behind a business in

5    the middle of the night, or is this guy just walking

6    down the sidewalk or -- you know, I guarantee you,

7    like I say, I could go someplace in town here, like

8    go to our Walmart, and I could find somebody with a

9    gun on their hip, and, you know, they're in the green

10   bean aisle and it's just an innocuous thing.

11   BY MR. WISE:

12      Q.   Let's go to page 12, paragraph 40.

13      A.   Again, it's silly, but every time you start

14   to do that, I reach for my own mouse, and I feel like

15   an idiot.

16      Q.   Okay.  Paragraph 40, you state "The behavior

17   and demeanor of a person exercising his right to open

18   carry will be markedly different than that of an

19   individual posing a threat to the public.  Any

20   experienced honest law enforcement officer knows that

21   to be the truth."  Would you explain what you mean?

22      A.   So it's a whole behavioral package.  If you

23   have a guy who's got a gun on his hip walking his

24   dog, you got a guy, gun on his hip, shopping for

25   groceries, whatever the case may be, there's no

1    criminalistic behavior involved in any of those
2    activities that would lead you -- like, whether he
3    had a gun on his hip or not, this is not something
4    that I could have probable cause for a stop, it is
5    not something that I could do a Terry stop on a
6    person over, you know, because it doesn't -- they're
7    not -- if they're -- if they just exist and they
8    happen to be carrying a gun and are going about their
9    business and there's no behavioral indicators that
10   would indicate criminal activity is afoot, then it
11   just isn't an issue.
12         If you look at -- well, if you look at the
13   classic case of Terry v. Ohio that speaks exactly
14   what I'm talking about, the criminals in that case
15   had handguns that were deeply concealed, but whether
16   they saw -- whether Detective McFadden saw the guns
17   or didn't see the guns, he obviously did not, it was
18   the behavior manifest that they were displaying in
19   that that led to the stop, the classic what we know
20   as a Terry stop nowadays.  Somebody just having a gun
21   on their hip isn't -- it's -- the totality of the
22   behavior is what a good cop is going to look at.
23   Q.   And what is the behavior that you're looking
24   for to be able to determine whether a person carrying
25   openly does not pose a threat to the public?

Page 76

1      MS. BELLANTONI:  Objection.

2      You can answer.

3      THE WITNESS:  That's wide open.  You know,

4   it has everything to do with the location, is their

5   activity congruent with the location, the time of

6   day, things like that.  You know, I mentioned

7   previously do I have a guy behind a business after

8   dark after it's closed?  You know, that would be a

9   guy that I'm going to take a second look at.  Is this

10  guy up to no good?  You know, is he looking to

11  burglarize this establishment?  That sort of thing.

12  So it's, you know, demeanor, their actual activity,

13  the time of day, the location.  All of that goes into

14  play.

15  BY MR. WISE:

16     Q.   And what's the basis for your opinion?

17          MS. BELLANTONI:  Which one?

18  BY MR. WISE:

19     Q.   In paragraph 40.

20     A.   Thirty-four years of law enforcement and

21  dealing with people both pre- and post-open carry

22  being legal, that's just -- I would call that good

23  police work at the street level is being able to read

24  human beings and then evaluate their behavior.

25     Q.   Let's talk about active shooter events.

Page 77

1    What is an active shooter event?

2        A.   I'm actually not a big -- so that's a term

3    of common usage that so many people utilize now.  I'm

4    not a fan of it, but if we want to talk about -- you

5    know, something I prefer is, like, a mass murder or

6    serial murder in progress where you have somebody

7    actively -- you know, and I know of cases where they

8    have been -- instead of an active shooter, they're an

9    active stabber, you know.

10        You know, we've had cases in the literature

11   of knives, swords.  They just had one in Norway the

12   other day that he was -- the dude was killing people

13   with a bow and arrow.  So I would call it a rabid

14   serial murder in progress if you want a more precise

15   term.

16        Q.   So during such an event, an active shooter,

17   mass shooting event, is the shooter always easily

18   identifiable?

19        A.   Well, at both of the ones that I went to, he

20   sure was.  Often if you don't know exactly where the

21   person is, then what we teach our tactics for

22   movement to contact, but the important part of an

23   active shooter is it's active.

24        You have some -- if you don't see that's the

25   guy shooting people or that's the guy stabbing

1      people, or in one case I was involved in, the guy
2      was -- he was an active shooter, active bomber.  He
3      was throwing pipe bombs, what you would think of
4      nowadays as IEDs, inside the building.  If.
5              You don't see that or hear some stimulus to
6      draw you where the person is, then it's not really an
7      active shooter if you will.
8      Q.   So in the scenario where you're not
9      immediately able to identify where the shooting is
10     coming from, what is the -- can you describe the
11     atmosphere at such an event?
12             MS. BELLANTONI:  I'm going to object.
13             You can answer, but I think we're going
14     outside the scope of this case and causes of action
15     that are being brought.  But you can go ahead and
16     answer.
17             THE WITNESS:  In a word, it's going to be
18     pretty tense.  At the attack on our federal
19     courthouse here in Topeka, we had a gentleman that
20     was doing an active shooting, active bombing.  He was
21     throwing IEDs all over the building when I showed up.
22     Things had gotten real quiet, and we had to
23     transition from what you would think of now as a
24     rapid response to what we believed we had was a
25     hostage scenario in progress.

Veritext Legal Solutions
866 299-5127

1           So that's part of what we do in the training

2    is classically things like dealing with hostage

3    negotiations, dealing with barricaded gunmen, things

4    like that.  You want to slow the scenario down and

5    then utilize things like SWAT teams and negotiators

6    and things like that.

7           So part of what you do in police training is

8    a recognition of has the situation transitioned from

9    one type of scenario to another, because that's

10   entirely possible, but what you're looking for is

11   either identifing the suspect or a stimulus that

12   draws you to a location to where you can try to

13   identify the suspect.

14   BY MR. WISE:

15      Q.   In a scene like that, can the sensation be

16   chaotic or, you know, distort your perception, I

17   guess?

18      A.   Well, any --

19           MS. BELLANTONI:  Objection.  I'm going to

20   object again.  Same objection, that this is outside

21   the scope of the causes of action that are being

22   brought.

23           You can answer.

24           THE WITNESS:  Any critical incident I've

25   been involved in has been tense, and human beings are

1    subject to their perceptions under duress.

2    BY MR. WISE:

3       Q.   If a person who's not immediately

4    identifiable as a cop is openly carrying a firearm

5    during an active shooter event, how are the on duty

6    law enforcement officers likely to react to that

7    person?

8            MS. BELLANTONI:  Objection.

9            You can answer if you can.

10           THE WITNESS:  Well, I would hope that they

11   were extraordinarily well trained because in my

12   experience, every cop that knows about it is going to

13   go regardless of their equipment and their mode of

14   dress.

15           So if you look at photos of Columbine as an

16   example, you have people with guns wearing suit and

17   ties, you have people with guns -- there was one

18   gentleman wearing gym shorts.  If you look at video

19   of the very famous North Hollywood event, one of the

20   SWAT guys is wearing gym shorts and carrying an M-16.

21           So part of my assertion and my opinion on

22   this paper was if you're going to have well-trained

23   officers, they're going to have to allow for positive

24   identification of -- you know, have some training on

25   can't just see a gun and start shooting at that

                                              Page 81

1    person because odds are pretty good it could be an

2    off duty or undercover cop or some other person who

3    is not in uniform who is not in fact your problem.

4    BY MR. WISE:

5        Q.   What if that civilian is openly carrying

6    their truck gun, let's say an AR-15?  How are the on

7    duty law enforcement officers likely to react?

8            MS. BELLANTONI:  I'm going to object and ask

9    you not to respond to that because we're not talking

10   about the open carriage of ARs and long guns.

11   Specifically about handguns here, so that's

12   completely outside the scope of this case and this

13   deposition.

14   BY MR. WISE:

15       Q.   You may recall that Dallas Chief of Police

16   David Brown, in the aftermath of an active shooter

17   event at a community protest that included the

18   presence of openly carrying civilians, stated, "We

19   don't know who the good guy is versus the bad guy

20   when everyone starts shooting."  Do you recall that?

21       A.   I do.

22       Q.   Do you agree with Chief Brown?

23       A.   I do not.

24       Q.   Why not?

25       A.   So I have a little bit of insider baseball

1    on the Dallas Police Department, and they used to be,

2    used to be one of the most extraordinarily

3    well-trained police departments on the planet, and I

4    can't say that that is any longer the case.

5          Their firearms training, their use of force

6    training, their defensive tactics training, in my

7    opinion and observation, has suffered from politics

8    and neglect.  He may have found it to be problematic,

9    or he may have been making it as a political

10   statement for it to be problematic, but everything

11   that I have seen -- and I have studied that incident

12   at length because part of that incident was there was

13   a lot of controversy on the manner in which they took

14   that bad guy out, you know.

15         They utilized a police bomb to kill the

16   gunman in that case, delivered by a robot, so there

17   was a lot of controversy about that.  I think the

18   police officers who were right there on the scene

19   immediately knew who the bad guy was.

20         If you see people running away who happen to

21   be carrying -- and I know I'm dangerously segueing

22   into what Ms. Bellantoni stated she didn't want me to

23   answer because I knew people had long guns at that

24   event as part of their -- the political part of the

25   protest.  If you have people leaving the vicinity in

Veritext Legal Solutions
866 299-5127

1    a hurry, you can tell by demeanor and their carriage,
2    how they're acting, that, "Yeah, that's not the guy
3    I'm looking for."
4       Q.   And by "demeanor" and "carriage," are you
5    talking about the same factors you were saying
6    earlier, behavior and demeanor, or are there other
7    factors that we haven't discussed?
8       A.   People who look like they're trying to kill
9    you don't look like people who are afraid and trying
10   to get out of someplace.  That's been my experience.
11      Q.   What if somebody is running toward the scene
12   instead of away from the scene?
13      A.   Well, then you'd have to evaluate, "Is that
14   a good guy?  Is that a bad guy?  Is that an off duty
15   SWAT cop that had his gear in the car and he hasn't
16   had time to change clothes?  Etc., etc.
17      Q.   And how can you go about evaluating that?
18      A.   It's going to be right there in the moment,
19   you know.  If the guy is running towards the scene,
20   then I know he's not -- he hasn't been part of the
21   scene.  Is he -- do I look at that guy?  What is his
22   demeanor?  What is his body posture?  How does his
23   facial expressions look?  What is his movement like?
24   Is he trying to get -- you know, is he putting a
25   muzzle on people that are perceived to be victims?

Veritext Legal Solutions
866 299-5127

1  That sort of thing. It all plays into that.
2  Q. Let's look at pages 12 and 13, paragraph 42.
3  You state "There is, however, historical precedent to
4  note that citizen non-law enforcement interdiction of
5  active shooter suspects happens more frequently than
6  interdiction by law enforcement officers." Would you
7  explain what you mean?
8  A. So post-Columbine, the trend was to have
9  what we would call a rapid response team approach
10  where you would get -- depending on who was doing the
11  training, typically it was a four-officer team, would
12  gather together and then move in.
13     Let's take, for an example, because
14  everybody's familiar with the Columbine event, that
15  if you showed up at Columbine in the middle of that
16  event, that you would wait for three other officers
17  to show up, and then you would move in as a team in a
18  particular set of tactics and then attempt to make
19  contact with the suspects and do that as rapidly as
20  possible.
21     What we found -- so -- excuse me. Sorry.
22  Ragweed is bad right now, and my allergies are acting
23  up.
24     So I wrote an article on solo response by
25  officers to an active shooter event because I'm a big

1    believer that you don't have time to wait for a team.
2    One of the active shooter events that I went to, I
3    had to respond by myself.  I didn't have anybody who
4    was there, going to be there in a timely manner to
5    assist me.  I couldn't wait for backup.
6          So in doing my research for these events,
7    what we find is is that more often than a law
8    enforcement officer -- in any kind of team or normal
9    police response that you would think of, more often
10   than not, that there's more events that are
11   interdicted by armed citizens than there are teams of
12   police officers showing up on the scene.
13         If you extrapolate that paradigm to include,
14   like, the Trolley Square mall shooting in Utah where
15   it was an off duty officer on his own time,
16   plainclothes, carrying a gun just like anybody else
17   would be carrying, that was another event where we
18   have off duty officer, but there are many events
19   where we have civilian.
20         And I use a generic term "conceal carrier"
21   but a civilian with a gun that's not -- somebody who
22   is not a cop is the person that is right there on the
23   scene and successfully interdicts or stops the bad
24   guy versus a law enforcement response putting an end
25   to it.

Veritext Legal Solutions
866 299-5127

```
1      Q.    Are the events that you just mentioned the
2   historical precedent you're referring to, or are you
3   referring to other historical precedent?
4      A.    If you take a history of active shooters in
5   the United States as a modern study, that's what I'm
6   referring to.
7      Q.    And are you aware of research that supports
8   this opinion?
9      A.    I am.
10     Q.    Okay.  What is that research?
11     A.    There's going to be a little bit of a pile
12   of that.  What we're talking about is -- what we're
13   talking about is when you actually quantify active
14   shooter events, you know, beyond the famous ones like
15   Columbine, etc., and you look at the factors involved
16   in those events, what has been successful, what has
17   not been successful, which has led to things like my
18   advocacy for police solo response versus waiting for
19   a team approach.
20         You know, one of the reasons, and I'm a big
21   advocate of that, is that's where the research,
22   that's where the data points to is what is
23   successful, what is not successful.  Team approach
24   takes too long.  It hasn't been successful.
25         The last I checked into that, there was one,
```

Page 87

1    maybe two of these events that were successful by the
2    team approach.  Vast majority of the time, the cops
3    show up too late if they utilize that model.
4          So one of the reasons I'm a big advocate for
5    solo response on the police part is because that's
6    been the model for success because it's more rapid,
7    and if you look at these incidents on an anecdotal
8    basis, if you have an armed good guy, whether they
9    have a badge or not, immediately on the scene that
10   takes action, that tends to be a successful
11   interdiction.
12         As far as, like, titles to papers like a
13   specific paper on the subject, I would definitely
14   have to get back to you on that.
15      Q.   Yeah.  If there's any specific research you
16   have in mind, would you work with Ms. Bellantoni to
17   provide that to me?
18      A.   Absolutely.
19      Q.   Thank you.  I appreciate that.
20         Do you mind if we go off the record for just
21   a moment?  I'm going to need 30 seconds to make sure
22   my computer does not turn off.
23         (Discussion off the record)
24         MR. WISE:  Thank you.  I appreciate that.
25   We can go back on the record.

Page 88

```
 1                THE WITNESS:  Okay.
 2     BY MR. WISE:
 3        Q.   Let's look at page 13, paragraph 43.  You
 4     state "Allowing open carry will not create a danger
 5     to public safety"; is that right?
 6        A.   Yes, sir.
 7        Q.   Are you familiar with research finding that
 8     right to carry laws are associated with higher
 9     aggregate violent crime rates?
10                MS. BELLANTONI:  Objection.
11                You can answer.
12                THE WITNESS:  I have read some of that, yes,
13     sir.
14     BY MR. WISE:
15        Q.   And what is your view of those studies in
16     terms of your opinion on whether open carry of
17     firearms in public --
18        A.   It directly contradicts my firsthand
19     observation in multiple states.  I believe that those
20     papers -- it is easy to utilize statistics to come to
21     a prearranged opinion and to make opinion -- or to
22     push an opinion towards a political end.
23        Q.   And so have you evaluated the basis for that
24     research?
25                MS. BELLANTONI:  I'm going to object.
```

Veritext Legal Solutions
866 299-5127

```
 1           You can answer.
 2           THE WITNESS:  Depends on how you mean
 3    "evaluate," but in my opinion of observing -- and I
 4    don't know specifically which one you're -- which --
 5    because there's been a couple of such studies that
 6    have been pushing that idea.  I put it up there with
 7    the same research that people like Kellerman were
 8    pushing that if you have a gun in your home, you're
 9    43 times more likely to be killed than if you don't
10    have a gun in your home which was statistically
11    cooking the books.
12           If you look at the realities of crime and
13    street crime and the people -- people will talk.
14    They'll push an alarming statement like, "You're more
15    likely to be killed by somebody you know than
16    somebody you don't."
17           Well, that's certainly my experience as far
18    as, like, gang crime because most people don't just
19    up and kill people they don't know.  They have a
20    specific beef with them.  You know, your rival drug
21    dealer whom you know by name, you're going to go
22    whack because he's coming -- he's, like, selling in
23    your territory, things like that.
24           So you have to take -- you have to look at
25    these things in context and, you know, look at the
```

Veritext Legal Solutions
866 299-5127

1    numbers, where the numbers come from, what's the

2    context of the numbers and that sort of thing because

3    it's very, very easy to come to false conclusions on

4    this sort of thing.

5    BY MR. WISE:

6        Q.   You've reviewed the preliminary injunction

7    submissions in this case?

8        A.   Okay.  I think so.  I believe that's part of

9    the -- Amy, was that all part of the paperwork that

10   you gave me, or was that not?

11            MS. BELLANTONI:  I'm not entirely sure.  I'd

12   have to look and see what I sent over.

13            THE WITNESS:  Okay.  I guess --

14            MS. BELLANTONI:  We could refer to your

15   declaration.  It says that there's something that was

16   turned over that you relied on.

17            MR. WISE:  I believe it does.  That's why I

18   was asking the question.

19   BY MR. WISE:

20       Q.   And the reason I'm asking is you had

21   mentioned you're familiar with a few of the studies.

22   Are you familiar with the peer reviewed studies

23   conducted by Professor John Donahue about right to

24   carry laws and the association with higher aggregate

25   violent crime rates?

Veritext Legal Solutions
866 299-5127

```
 1            MS. BELLANTONI:  I'm going to object because
 2    he's not a statistical expert, so that wouldn't have
 3    been in the purview of what he reviewed.
 4            MR. WISE:  He just mentioned he was familiar
 5    with a few studies, so I was trying to know which
 6    studies those might be.
 7            MS. BELLANTONI:  And I'm going to object
 8    because he's not a statistician, so I'm not going to
 9    have him giving testimony on -- it's not his
10    expertise.
11            MR. WISE:  Uh-huh.
12            MS. BELLANTONI:  He's not a statistician,
13    so --
14    BY MR. WISE:
15       Q.   So just so I'm clear on what your opinion
16    is, then, you're indicating that the findings of
17    those studies are not consistent with your personal
18    observations in the field; is that right?
19       A.   Yes.
20       Q.   But to be clear, you haven't relied on
21    studies that -- for your opinion in this case at
22    least, that support your opinion or that contradict
23    the studies that we were just discussing?
24       A.   So a big part of why I am here is both to
25    speak to the law enforcement part of this and
```

Veritext Legal Solutions
866 299-5127

1   personal experience that I can point to in living in

2   the reality of an open carry state and not only my

3   state but other states that I travel to, other states

4   that I do business in and, you know, states where I

5   am commonly in an open carry environment, if you

6   will.

7          So a big part of why I'm here and we're

8   talking is that firsthand observation and experience

9   over a number of years as it deals with the open

10  carry and the dynamic of police involvement with open

11  carry people.

12  Q.   Let's look at paragraph 44.  We're still on

13  page 13.  You refer to U.S. News and World Reports

14  public safety rankings and note that the top three

15  states, in terms of public safety, Maine,

16  New Hampshire and Idaho, allow a broader right to

17  public carry than California; is that right?

18  A.   That was certainly true at that time, yes,

19  and then it's easy to look that up, the U.S. News and

20  World Report part of that.

21  Q.   Are you aware of how U.S. News and World

22  Report determined these rankings?

23  A.   I am not.  Again, I can't say, you know, did

24  they hire a statistician, did they look up Bureau of

25  Justice Statistics or what their research methodology

Page 93

1    was.

2         Q.   Do you know whether U.S. News and World

3    Report compared factors such as population density

4    that might account for the difference in crime rates

5    between states such as Maine versus California?

6         A.   I don't, nor do I know if they looked at

7    things like sentencing guidelines or a variety of

8    other factors.

9         Q.   Do you agree that regional differences are

10   an important factor to consider in developing an

11   effective public safety response?

12        MS. BELLANTONI:  Objection.  And

13   specifically what public safety response are you

14   referring to?

15        MR. WISE:  Well, response that includes open

16   carry policy.

17        MS. BELLANTONI:  Could you be more specific?

18   I'm not understanding the question.

19        MR. WISE:  Sure.  Well, this case is about

20   California, and the expert here is from Kansas, and

21   I'm asking if he agrees.  Let me restate the

22   question.

23   BY MR. WISE:

24        Q.   Do you agree that regional differences are

25   an important factor to consider in developing an

1   effective public safety response with regard to

2   firearms?

3      A.   And --

4          MS. BELLANTONI:  I object.

5          You can go ahead and answer.

6          THE WITNESS:  I'm going to say in this case,

7   it does not, just as, you know, if we look at police

8   use of force, everybody in the United States is bound

9   by things like Graham v. Conner, Garr versus

10  Tennessee.  It is what it is.  Is my First Amendment

11  right to free speech different in the State of

12  California versus the State of Kansas?  It is not.

13       Is my freedom of religion different in the

14  State of California versus the State of Kansas?  It

15  is not.  So as far as that context, we're still

16  talking about the United States of America.  So, no,

17  I don't believe so.

18  BY MR. WISE:

19     Q.  Do you agree that demographic differences

20  are an important factor to consider in developing an

21  effective public safety response, again, with regard

22  to firearms?

23         MS. BELLANTONI:  Objection.

24         You can answer.

25         THE WITNESS:  I don't.  I don't because I

Veritext Legal Solutions
866 299-5127

1    believe that public safety factors response policy

2    are all far, far, far broader than that.

3    BY MR. WISE:

4        Q.   Have you ever been to California?

5        A.   Yes.

6        Q.   Have you ever served as a law enforcement

7    officer in California?

8        A.   I have not.

9        Q.   Are you familiar with open carry laws in

10   California?

11       A.   Just from what I have been able to read as

12   far as what is publicly available and then what I

13   have been briefed on in this case by Ms. Bellantoni.

14       Q.   Would you describe your understanding of

15   where, if at all, open carry is permitted in

16   California?

17           MS. BELLANTONI:  Objection.  He's not

18   testifying as an expert in that area.  I'm going to

19   ask him not to answer that question.

20           MR. WISE:  So is he an expert in open carry

21   in Kansas only?  I'm confused.

22           MS. BELLANTONI:  He's an expert and a law

23   enforcement officer in open carry jurisdiction.  It's

24   kind of irrelevant since it's banned in California

25   anyway, so --

Page 96

1    BY MR. WISE:

2        Q.   Are you aware that open carry is allowed in

3    certain circumstances in the State of California?

4            MS. BELLANTONI:   Objection.   That's actually

5    not true.

6    BY MR. WISE:

7        Q.   Are you aware that there are laws permitting

8    open carry in certain circumstances in California?

9            MS. BELLANTONI:   Objection.

10           THE WITNESS:   Frankly, at this point, with

11   the two attorneys arguing about that, I believe that

12   that would be the type of thing that you guys would

13   be the experts in.   It appears that you guys are at

14   an impasse on whether it's legal or not.   That would

15   certainly leave a layperson at a disadvantage to know

16   whether they were breaking the law or not.

17   BY MR. WISE:

18       Q.   Let's look at paragraph 45, same page, still

19   on page 13.   You state "People who legally possess

20   and carry firearms are generally compliant and

21   law-abiding, statistically speaking among the most

22   law-abiding group of persons in our country."   Would

23   you explain what you mean?

24       A.   So if you take people with -- and I'm going

25   to go with the statistics because we can nail those

Page 97

1     down on persons with a concealed carry license

2     because we can actually quantify that because, quite

3     frankly, on a day-to-day basis, if nobody tells

4     anybody that they're carrying a gun, we're not --

5     who's going to know about it?

6          So if we look at statistically people with a

7     concealed carry license, they are more law-abiding

8     than virtually any other demographic in the United

9     States, and that includes police officers.

10         When you look at things like -- even minor

11    things like DUI arrests, that sort of thing, they

12    tend to have a far lower criminal rate than any other

13    demographic you would pluck out of whatever pool you

14    want to look at, if you want to look at a certain

15    profession or whatever the case may be.

16         And then, you know, the rest of that

17    paragraph, if you will, my experience is is that

18    people who are going to unlawfully do things don't

19    look for permission, they don't get concealed carry,

20    whether it's banned or not, you know.

21         In Kansas, when we banned all carry, even

22    retired officers could not carry a gun, and that

23    didn't slow down the gang members one little bit, you

24    know.  My belief, what we're talking about here is

25    law-abiding citizens trying to gain access to the

Veritext Legal Solutions
866 299-5127

1    ability to open carry legally within your state,

2    clearly trying to go about doing thing the right way

3    and stay within the boundaries of the law.

4        Q.   What is the basis for your opinion?

5        A.   Again, 34 years of street level police work

6    and then some consultation of things like, you know,

7    research that has been done in this area as far as,

8    you know -- in particular, one of the things I look

9    at is police use of force, and then I have been

10   involved extensively in internal affairs

11   investigations on police officers and then

12   investigation on, like, officer-involved shootings,

13   use of force, things like that.

14        So I've had occasion to look at the

15   statistics that are out there that are available

16   on -- if you look at how my profession stacks up to

17   other professions where actually, you know, we do a

18   lot better than a lot of other professions that are

19   out there even though we -- you know, we are commonly

20   demonized for violating people's rights and that sort

21   of thing.

22        And then having looked into that as somebody

23   in the past who I actually advocated for concealed

24   carry in Kansas, which was -- didn't make me real

25   popular in some law enforcement circles, but you have

Veritext Legal Solutions
866 299-5127

1  to make sure you have your ducks in a row if you're
2  going to advocate for something and make statements
3  like that.
4       And in other places before Kansas had
5  concealed carry, like Florida was very famous for
6  that beginning in the '80s, the states of
7  New Hampshire and Vermont were very, very liberal,
8  and, in fact, my belief is Vermont has always had no
9  permit carry within the state.  I may have switched
10  that with New Hampshire, but one of those two has
11  always, like, historically had no permit carry, and
12  if you look at the demographics of people with
13  concealed carry, they tend to be extraordinarily
14  law-abiding.
15     Q.   And I think you were mentioning research
16  this supports your opinion.  What is that research
17  specifically?
18     A.   Some of it would be -- I can point to John
19  Lott, the famous gun rights researcher, but then to
20  another of -- pardon me -- a number of other sources
21  as far as, like, the actual titles of that, again, I
22  would have to research that and get back with you.
23     Q.   Yeah, that'd be great if you could work with
24  plaintiff's counsel to provide me any research that
25  supports that opinion.  I'd appreciate it.

Veritext Legal Solutions
866 299-5127

1              Do you agree that there are incidents in
2     which a previously law-abiding person engages in
3     criminal behavior?
4          A.   Well, I would argue, counselor, that
5     everybody that doesn't have a criminal record who
6     becomes a criminal was previously not, I mean,
7     law-abiding.
8          Q.   That's all the questions.
9              Ms. Bellantoni, are you on mute?
10             MS. BELLANTONI:  Yeah, I was.  I'm sorry.
11    Can we just take a brief break?  Just need to -- is
12    that okay?
13             MR. WISE:  Of course.  I'm done with my
14    questions.  That was my last one.
15             MS. BELLANTONI:  Can we just hold on one
16    second before we wrap up?
17             MR. WISE:  Of course.
18             MS. BELLANTONI:  All right.  Thanks.
19             THE WITNESS:  I'm over here making myself a
20    note on looking back at what we've been talking about
21    so I can get back to Amy.
22             MR. WISE:  Thank you.
23             (Recess)
24             MS. BELLANTONI:  So I guess we're done.  I
25    don't have any questions.

                                        Page 101

```
 1              MR. WISE:  Let's go back on the record
 2     briefly.
 3              Okay.  I am done with my questions.
 4              THE REPORTER:  And, Ms. Bellantoni, do you
 5     want a copy?
 6              MS. BELLANTONI:  Mr. Wise, will you be
 7     sending a copy to the witness for him to review?
 8              THE REPORTER:  That's why I got his email.
 9     Veritext will send him a locked PDF.
10              MS. BELLANTONI:  That's fine.  I'll take a
11     copy.
12              And also, Mr. Wise, can you just put some
13     requests -- I know there were some requests made.
14     Can you just put them in writing for me so I can
15     refer to them and properly have whatever additional
16     documents provided to you?
17              MR. WISE:  Sure, of course.  How formal
18     would you like me to make the request?
19              MS. BELLANTONI:  Email.
20              MR. WISE:  Email?  Okay.
21              MS. BELLANTONI:  Email.
22              MR. WISE:  Thank you.
23
24
25
```

                                        Page 102

1

2

3

4

5

6

7

8

9

10   I, CHARLES D. HAGGARD, do hereby declare

11 under penalty of perjury that I have read the

12 foregoing transcript; that I have made any

13 corrections as appear noted, in ink, initialed by me,

14 or attached hereto; that my testimony as contained

15 herein, as corrected, is true and correct.

16    EXECUTED this _____ day of _____,

17 20_____, at _____  _____,_____.

       (City)     (State)

18

19

20

21      _____

      CHARLES D. HAGGARD

22

23

24

25

             Page 103

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were duly sworn; that a record

8     of the proceedings was made by me using machine

9     shorthand which was thereafter transcribed under my

10    direction; that the foregoing transcript is a true

11    record of the testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review of

15    the transcript [  ] was [  ] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: 10/30/2021

23                         *Carrie Pederson*
                         _____

                         CARRIE PEDERSON

24                       CSR No. 4373

25

                                        Page 104

```
 1    CHARLES D. HAGGARD

 2    chuck@agiletactical.com

 3                              November 1, 2021

 4    RE: BAIRD vs. BONTA

 5    October 19, 2021, CHARLES D. HAGGARD, JOB NO. 4838109

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25
```

Veritext Legal Solutions
866 299-5127

1   _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2   Transcript - The witness should review the transcript and

3   make any necessary corrections on the errata pages included

4   below, noting the page and line number of the corrections.

5   The witness should then sign and date the errata and penalty

6   of perjury pages and return the completed pages to all

7   appearing counsel within the period of time determined at

8   the deposition or provided by the Federal Rules.

9   __ Federal R&S Not Requested - Reading & Signature was not

10   requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

```
 1   BAIRD vs. BONTA
 2   CHARLES D. HAGGARD (#4838109)
 3                    E R R A T A   S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____   _____
24   WITNESS                            Date
25
```

Page 107

**[& - agiletactical.com]**

| & |
|---|
| **&**  105:23 106:9 |

| 0 |
|---|
| **00617**  1:7 2:7 |
| **06**  48:24 |
| **08**  48:24 |

| 1 |
|---|
| **1**  1:24 5:4 11:21 11:22 23:6 105:3 106:1 |
| **10**  14:25 |
| **10/30/2021**  104:22 |
| **104**  1:24 |
| **10583**  3:9 |
| **11**  5:4 |
| **11:31**  2:18 7:2 |
| **12**  14:25 29:3 75:12 85:2 |
| **125**  3:18 |
| **13**  39:21 85:2 89:3 93:13 97:19 |
| **1300**  3:17 |
| **14**  12:17 |
| **15**  54:9 82:6 |
| **16**  81:20 |
| **17**  18:21 |
| **19**  1:17 2:19 6:4 7:1 17:1 105:5 |
| **1982**  16:25 |
| **1987**  18:12 |
| **1998**  17:1 |

| 2 |
|---|
| **2**  3:7 23:6 |
| **20**  52:20 54:9 103:17 |
| **2008**  48:22 |
| **2014**  48:21 |
| **2021**  1:17 2:19 7:1 105:3,5 |

| 2025.520  105:9,12 |
|---|
| **21**  56:4 |
| **22**  37:9 67:13,17 |
| **24**  49:6 60:17 67:16 |
| **26**  61:21,22 63:2,5 |
| **28**  62:16,23 63:20 |
| **2:9**  1:7 2:7 |

| 3 |
|---|
| **3**  69:17 |
| **30**  88:21 106:1 |
| **30s**  29:2 |
| **31**  67:4,9 |
| **34**  99:5 |

| 4 |
|---|
| **40**  18:1 75:12,16 77:19 |
| **400**  3:8 |
| **42**  85:2 |
| **43**  89:3 90:9 |
| **4373**  1:22 2:20 104:24 |
| **44**  93:12 |
| **45**  17:24 97:18 |
| **47**  60:1 |
| **4838109**  1:23 105:5 107:2 |

| 5 |
|---|
| **50**  17:25 |
| **57**  29:7 |

| 6 |
|---|
| **60**  21:20,23 |
| **600**  29:4 |
| **60s**  69:14 |
| **6995**  104:23 |

| 7 |
|---|
| **7**  4:6 |
| **70s**  69:15 |

| 75  11:13 |
|---|
| **78**  37:8 |

| 8 |
|---|
| **8**  6:3 |
| **80s**  100:6 |
| **82**  6:3 17:2 |

| 9 |
|---|
| **90s**  64:17 |
| **914-367-0090**  3:10 |
| **94244-2550**  3:21 |
| **944255**  3:19 |
| **96**  6:4 |
| **9:06**  2:18 7:2 |

| a |
|---|
| **a.m.**  2:18,18 7:2,2 |
| **abell**  3:11 |
| **abiding**  60:21 97:21,22 98:7,25 100:14 101:2,7 |
| **ability**  33:10 34:8 35:10,23 43:4 99:1 |
| **able**  9:4,23,25 26:20 31:18 76:24 77:23 79:9 96:11 |
| **absolutely**  55:10 63:9 88:18 |
| **ac**  1:7 2:7 |
| **academic**  45:21 |
| **academy**  19:9 32:19 |
| **access**  98:25 |
| **accidental**  53:2 56:8 |
| **account**  94:4 |
| **act**  52:23 60:22 |
| **acting**  17:10 74:2 74:19 84:2 85:22 |
| **action**  79:14 80:21 88:10 104:17,18 |

| **actions**  55:14 |
|---|
| **active**  14:5 20:4 21:9 77:25 78:1,8 78:9,16,23,23 79:2 79:2,7,20,20 81:5 82:16 85:5,25 86:2 87:4,13 |
| **actively**  78:7 |
| **activities**  76:2 |
| **activity**  76:10 77:5 77:12 |
| **actor**  60:13 |
| **actual**  72:17 77:12 100:21 |
| **ada**  25:15 26:6 |
| **adamant**  25:20,25 |
| **added**  18:6 |
| **additional**  102:15 |
| **adjunct**  15:16 16:20,21 |
| **administered**  7:5 |
| **adult**  39:20 |
| **advise**  44:1 |
| **advised**  43:25 |
| **advises**  8:20 |
| **advocacy**  87:18 |
| **advocate**  87:21 88:4 100:2 |
| **advocated**  99:23 |
| **affairs**  99:10 |
| **affect**  73:5 |
| **afoot**  76:10 |
| **afraid**  84:9 |
| **aftermath**  82:16 |
| **agency**  42:3 |
| **aggregate**  89:9 91:24 |
| **agile**  22:25 23:1 57:17 |
| **agiletactical.com**  105:2 |

Page 1

**[ago - avoid]**

| | | | |
|---|---|---|---|
| **ago** 9:18 36:1 | **america** 95:16 | **approached** 24:9 | **assist** 86:5 |
| **agree** 31:20 32:25 | **amorphous** 73:12 | **appropriate** 27:24 | **assistant** 26:7 |
| 33:8,13 36:12,15 | **amy** 3:5 91:9 | **approved** 19:10 | **assisted** 14:11 |
| 36:16 38:7 39:7 | 101:21 | **approximately** | 19:20 50:18 |
| 39:25 40:4,20 | **analyst** 16:11 | 22:3 48:20,25 | **associated** 89:8 |
| 41:14,16 42:2 | **anecdotal** 37:2 | **ar** 82:6 | **association** 50:22 |
| 69:2 82:22 94:9 | 88:7 | **area** 96:18 99:7 | 91:24 |
| 94:24 95:19 101:1 | **angeles** 64:19 | **argue** 34:12 66:6 | **assume** 38:12 39:5 |
| **agreed** 11:9,12 | **answer** 6:1 8:7,10 | 101:4 | 42:13 69:24 |
| **agreeing** 39:24 | 8:14,19,20 26:11 | **arguing** 97:11 | **assuming** 16:8 |
| **agrees** 94:21 | 27:10 28:13,15,16 | **armed** 23:23 | 24:1 42:9 60:13 |
| **ahead** 28:14,16 | 33:12 34:11 36:8 | 26:18 37:5 66:10 | 62:22 |
| 35:8 36:8 59:5 | 36:25 38:11 40:8 | 69:24 72:24,24 | **assumption** 69:24 |
| 79:15 95:5 | 40:18,24 41:20 | 86:11 88:8 | 70:2,4 |
| **ahold** 44:3 | 42:8 51:22 58:4 | **armor** 50:8 | **atlanta** 55:6 |
| **airplanes** 29:8 | 59:15 69:7 70:25 | **army** 17:19 | **atmosphere** 79:11 |
| **airport** 22:6 49:3 | 72:2 73:8 77:2 | **arrest** 19:7 23:13 | **attached** 103:14 |
| 49:4 | 79:13,16 80:23 | 52:4 55:1,7 | **attack** 79:18 |
| **aisle** 75:10 | 81:9 83:23 89:11 | **arrests** 98:11 | **attacks** 28:19 |
| **al** 1:9 2:9 | 90:1 95:5,24 | **arrow** 78:13 | **attempt** 85:18 |
| **alarm** 74:18 | 96:19 | **ars** 82:10 | **attempting** 36:3 |
| **alarming** 90:14 | **antigun** 74:10 | **article** 37:5 85:24 | **attend** 15:4 |
| **alleging** 37:9 | **antipersonnel** | **articles** 45:3,6,14 | **attention** 14:7 |
| **allergies** 85:22 | 18:2 | **artifice** 31:7 | 55:10 |
| **alley** 75:4 | **antipolice** 73:19 | **ascertain** 74:14 | **attorney** 1:8 2:8 |
| **allow** 44:9 52:21 | **antitank** 18:2 | **aside** 65:19 | 3:6,14,16 7:13 |
| 65:7 81:23 93:16 | **anybody** 25:10 | **asked** 12:3 22:12 | 8:18,20 26:7 |
| **allowed** 9:7 21:23 | 86:3,16 98:4 | **asking** 8:9 57:21 | 46:25 47:14,20 |
| 28:3 34:22 35:15 | **anyway** 96:25 | 66:20,24 91:18,20 | 104:18 |
| 35:16 46:16,17 | **appear** 103:13 | 94:21 | **attorneys** 97:11 |
| 47:15 61:23 62:4 | **appearances** 3:1 | **aspects** 24:5,14 | **audit** 73:21,21 |
| 62:17 63:11,15 | **appearing** 1:16 | **assault** 24:6,14,20 | **author** 50:14 |
| 97:2 | 105:18 106:7 | 26:18 | **authority** 22:6 |
| **allowing** 68:20 | **appears** 61:10 | **assaulting** 35:6 | **availability** 35:2 |
| 89:4 | 68:7,16,25 97:13 | **assertion** 81:21 | **available** 32:16 |
| **allows** 34:8 35:23 | **appreciate** 66:19 | **assess** 67:12 68:5 | 96:12 99:15 |
| 47:25 | 88:19,24 100:25 | 68:22 69:4 | **average** 31:22 |
| **alzheimer's** 59:8 | **approach** 70:1 | **assessing** 69:18 | 40:6,11,12,22 |
| **ambushes** 55:19 | 73:5 75:2,2 85:9 | **assigned** 17:11 | 41:18 42:5 60:14 |
| **amendment** 95:10 | 87:19,23 88:2 | 18:24 | **avoid** 44:2 55:3 |

[avoiding - bulge]

**avoiding** 57:7
**aware** 87:7 93:21
  97:2,7
**awhile** 10:9 14:1
  17:1 22:23 26:13

**b**

**b** 49:7 106:1
**back** 11:18,20
  34:15,16 35:19
  46:4,8 47:4 67:8
  67:20 71:5 74:13
  74:17 88:14,25
  100:22 101:20,21
  102:1
**background** 45:21
  49:24,25
**backing** 40:14
**backup** 86:5
**bad** 17:6 24:17,19
  29:7 31:19 37:19
  40:15 44:10 55:5
  57:2 62:12 66:15
  72:17,17 73:3
  82:19 83:14,19
  84:14 85:22 86:23
**badge** 88:9
**bags** 72:6
**bailiwick** 55:3
**baird** 1:4 2:4 3:25
  7:14 105:4 107:1
**ballistics** 52:1,2
**ban** 46:17 47:19
**banned** 46:21
  64:17 96:24 98:20
  98:21
**banning** 62:23
  63:22 65:13,20,23
  65:25 66:21,23
  70:8
**bans** 50:8

**barricaded** 80:3
**baseball** 82:25
**based** 36:21 45:14
  60:20
**basic** 23:5,5,6
**basically** 19:18
  52:11 55:7 74:9
**basis** 13:12,21
  14:3 17:19 52:9
  77:16 88:8 89:23
  98:3 99:4
**bat** 46:4
**batons** 19:6
**bean** 75:10
**beat** 34:24 35:17
**beaver** 64:25
**beef** 90:20
**beginning** 2:18
  100:6
**behalf** 2:17
**behavior** 24:6,21
  67:12 68:6,22
  69:5 71:11,14
  72:12,15 74:17
  75:16 76:1,18,22
  76:23 77:24 84:6
  101:3
**behavioral** 24:5
  24:14 72:12 75:22
  76:9
**beings** 31:6,12,13
  39:4,17 77:24
  80:25
**belief** 98:24 100:8
**believe** 11:11
  13:22,25 17:1
  26:8,14,19 31:2,8
  32:19 48:22 57:24
  59:9 60:11 61:19
  65:22,22 66:2,2
  67:2 72:3 89:19

91:8,17 95:17
  96:1 97:11
**believed** 63:14
  73:18 79:24
**believer** 29:25
  31:5 86:1
**bellantoni** 3:4,5,11
  9:16 10:4,10,14,19
  11:9 12:6,24
  13:23 26:10 27:9
  28:12,16 30:17
  31:1 33:11 34:10
  35:25 36:7,19
  38:10 39:10 40:7
  40:23 41:19 42:7
  43:8 51:21 53:25
  55:24 58:3 59:14
  67:19 69:6 70:16
  70:24 72:1 73:7
  73:10 77:1,17
  79:12 80:19 81:8
  82:8 83:22 88:16
  89:10,25 91:11,14
  92:1,7,12 94:12,17
  95:4,23 96:13,17
  96:22 97:4,9
  101:9,10,15,18,24
  102:4,6,10,19,21
**belt** 41:5 54:4
**best** 32:6 70:6
**better** 23:19 31:13
  31:21 32:20 53:12
  62:13 99:18
**beyond** 87:14
**big** 13:18 20:11,18
  24:18,20 28:23
  29:22,25 31:5
  33:18 46:7 54:19
  56:16 57:8 58:6
  78:2 85:25 87:20
  88:4 92:24 93:7

**bill** 11:7
**bit** 16:8 27:2 32:18
  42:22 46:2 64:10
  82:25 87:11 98:23
**blue** 20:16,16
**body** 50:8 62:20
  84:22
**bomb** 83:15
**bomber** 79:2
**bombing** 79:20
**bombs** 79:3
**bono** 11:10
**bonta** 1:7 2:7 7:14
  105:4 107:1
**book** 69:17
**books** 90:11
**borders** 53:13
**botched** 55:1
**bound** 95:8
**boundaries** 99:3
**bow** 78:13
**box** 3:19 43:25
  59:3
**breacher** 18:21
**break** 8:12,15 34:1
  101:11
**breaking** 97:16
**brief** 101:11
**briefed** 96:13
**briefly** 102:2
**bring** 54:15
**broader** 93:16
  96:2
**brought** 56:18
  79:15 80:22
**brown** 82:16,22
**bruce** 60:2
**buff** 46:7
**building** 79:4,21
**bulge** 54:7

[bunch - chuck]

**bunch** 16:4 41:24 53:14
**bureau** 58:25 59:7 93:24
**burglar** 37:9
**burglarize** 77:11
**burglary** 44:16
**business** 16:19 22:21,25 23:3,18 27:12 31:9,10 33:7 47:4 53:15 53:17 55:16 75:4 76:9 77:7 93:4
**button** 70:9
**buzz** 33:18

**c**

**c** 24:8 49:7
**ca** 105:9,12,20
**caliber** 17:25
**california** 1:2,9 2:2,9 3:14,20 7:13 46:6 62:4 63:11 63:16 69:16 93:17 94:5,20 95:12,14 96:4,7,10,16,24 97:3,8 104:2
**call** 20:4 25:3 47:15 61:7 74:8 77:22 78:13 85:9
**called** 20:12 37:5 73:20 74:3
**calls** 24:8
**camera** 30:8
**capability** 31:16 31:17 35:5
**capable** 29:14 31:6,11
**capacity** 1:8 2:8 15:20,21 21:16 23:19 25:15 27:16 29:24 49:21

**capita** 64:18
**captain** 16:22 49:2 49:9,13
**car** 28:7 30:7 37:20 43:13,18 44:1,19 46:20 70:22 71:4,23 72:5 84:15
**career** 18:9,11,18 18:18 21:9 48:9 64:15
**carjacking** 24:12 37:17
**carjackings** 31:25
**carriage** 45:11 82:10 84:1,4
**carrie** 1:21 2:19 104:23
**carrier** 86:20
**carriers** 48:7
**carry** 15:2 25:9,10 27:7 28:9 29:18 29:19 30:15 31:3 32:11 34:9 35:8 35:24 41:6 42:25 43:15 45:4 46:1 46:11,13,15,17 47:6,7,8,11,13,13 47:16,17,17,19,22 47:23,24 48:1,3 52:21 54:15 56:10 61:23 62:4,9,17,24 63:11,15,22 64:2,4 64:7,7,20,21,21 65:8,13,20,23,25 66:8,14,21,23 68:9 68:17,20 70:8,10 73:17,20 75:18 77:21 89:4,8,16 91:24 93:2,5,10,11 93:17 94:16 96:9

96:15,20,23 97:2,8 97:20 98:1,7,19,21 98:22 99:1,24 100:5,9,11,13
**carrying** 25:12 26:8 30:24 32:21 32:22 34:4 39:6 39:15 48:8 52:24 53:7 54:3,4,6,11 56:9,9 57:24,25 59:10 60:22 61:1 61:7,13 62:19 63:13,18 64:5 67:11 69:3 74:5 76:8,24 81:4,20 82:5,18 83:21 86:16,17 98:4
**cars** 39:18 46:21
**cartilage** 29:9,10
**case** 1:6 2:6 7:13 7:23 8:1 10:8,18 10:22 11:6 13:6,8 13:25 14:9 30:6 30:10 34:13 35:13 42:17 44:13 52:10 56:22 58:12,12 59:23 65:6 66:16 66:17,17 75:25 76:13,14 79:1,14 82:12 83:4,16 91:7 92:21 94:19 95:6 96:13 98:15 104:14
**cases** 30:8 37:8 44:13,21 47:3 56:15 78:7,10
**cash** 43:1,1
**casual** 9:17
**cattle** 46:5
**cause** 42:4,10,24 53:2 60:23 62:13

62:14 64:11 66:3 66:12 76:4
**causes** 79:14 80:21
**caveat** 40:25
**ccp** 105:9,12
**cellphone** 59:21
**center** 16:10,19
**certain** 34:7 47:1 97:3,8 98:14
**certainly** 8:11 40:3 64:5 65:2 90:17 93:18 97:15
**certified** 2:20 6:1 104:1
**certify** 104:3,16
**chainsaw** 33:5
**chainsaws** 39:19
**chance** 54:20
**change** 84:16 107:4,7,10,13,16 107:19
**changed** 18:4 47:2
**chaotic** 62:10 80:16
**charge** 19:18 48:15 49:4,7,8,10
**charged** 39:1
**charles** 1:15 2:16 4:2 5:4 7:4,16 103:10,21 105:1,5 107:2
**chase** 51:8
**checked** 87:25
**chief** 9:22,22 13:9 47:10 49:15,18 82:15,22
**chiefs** 50:22
**children** 44:22
**chuck** 5:4 7:17 105:2

Page 4

[circle - contacted]

circle  35:19

circles  99:25

circumstance  36:22

circumstances  32:2 68:21 75:3 97:3,8

cited  13:4

cites  13:3

cities  46:17,21 47:3

citizen  37:6 66:5 85:4

citizens  86:11 98:25

city  20:15 23:10 42:23 50:7 51:11 103:17

civil  14:18 105:19 105:20

civilian  23:19 36:4 36:6 37:16 38:8 40:1,6 42:6 53:17 57:12,25 58:2 59:10,12 69:3 70:22 82:5 86:19 86:21

civilians  53:3 56:8 61:1 82:18

clarification  30:18 31:4 36:20 43:9

clarified  43:23

clarify  36:1

clarifying  36:6

clarity  39:12 73:10

class  31:20

classes  15:22 16:1 23:7 25:8

classic  76:13,19

classically  80:2

claymore  18:2

clear  58:16 92:15 92:20

clearly  9:11 28:2 66:16 74:7 99:2

clients  23:4,25 25:9,13 27:7 28:9 29:18 30:14 43:5 44:8

close  37:18

closed  77:8

clothes  84:16

coalesced  16:4

code  50:7 69:17 105:9,12,19,20

coincided  64:23

college  15:4,6,12 15:23 16:3

colleges  15:16

color  61:10 68:16

colorado  48:2

colored  62:14

columbine  19:24 20:6 21:7 81:15 85:8,14,15 87:15

combination  34:21

come  13:16 21:1 22:13 60:7 64:19 73:18 89:20 91:1 91:3

comes  24:16 39:23 55:12 67:10 69:2 72:11

comfortable  25:23

coming  20:6 21:5 58:20 67:1 79:10 90:22

comma  28:24

command  21:13 48:10

commander  17:10 18:19 48:12

commanders  48:15

commands  34:22 35:14

comment  9:7

commissioned  46:10

common  48:6 78:3

commonly  93:5 99:19

communicate  33:20

communication  33:15

community  51:5 51:12 74:2 82:17

comorbidities  28:23

company  22:23 57:17,18

compared  94:3

compartment  72:5

compensated  11:5

competent  41:9

complaint  10:24 11:3

complete  15:13

completed  15:14 15:25 105:7,17 106:6

completely  82:12

completion  104:14 106:10

compliant  97:20

comport  69:25

computer  88:22

conceal  47:12,13 47:24 64:7,21 71:13 73:17,20 86:20

concealed  41:7,7 43:15 46:13 47:17 47:23 54:5 56:9 70:2 76:15 98:1,7 98:19 99:23 100:5 100:13

concerns  32:10,14 32:15

concert  35:16

conclusions  91:3

conduct  13:11,16 23:22

conducted  45:15 53:19 91:23

conducting  45:22

confrontation  74:10

confronted  34:16

confused  96:21

congruent  77:5

conner  95:9

consider  26:23 37:15 51:20 94:10 94:25 95:20

consistent  92:17

console  72:6

consoles  71:6

constitutional  47:16

consultation  99:6

consulting  22:21 22:25 23:1

contact  74:4 78:22 85:19 105:9

contacted  10:11 10:15

contacts 24:8
contained 103:14
context 90:25 91:2 95:15
continue 56:4
contradict 92:22
contradicts 89:18
contributing 57:5
control 14:3 19:7 23:13 52:4 55:1,8
controversy 83:13 83:17
conversation 9:17 10:19 53:24
cookie 23:4
cooking 90:11
cop 31:8 41:22 47:6 50:24 54:14 76:22 81:4,12 82:2 84:15 86:22
cops 40:14,15 47:9 47:9,11 55:3 62:12 64:3,4 88:2
copy 12:11,16,22 16:9 102:5,7,11
correct 63:8 68:1 103:15
corrected 103:15
corrections 9:4,6,7 103:13 105:14,15 106:3,4
correctly 24:23 35:20
council 51:11
counsel 12:22 14:10 27:13 28:3 28:6 31:12 32:6 44:24 100:24 105:18,21 106:7
counselor 101:4

count 16:2
country 97:22
county 21:25,25 22:9,12,14
couple 9:17 15:17 36:1 44:21 55:19 90:5
course 15:19 20:5 27:18 40:16 41:4 44:18 46:3 48:9 58:8 101:13,17 102:17
courses 15:13,14 15:15
court 1:1 2:1 8:3 14:18,18 47:3,20 52:7 56:15
courthouse 79:19
courtroom 7:20
courts 51:24 56:20
cover 32:7
covid 28:21,23
cpost 19:10
craig 24:7
create 53:1 89:4
created 61:24
creates 56:7
creating 50:12
creation 51:1,6,17
credit 15:23 16:3
crime 14:4 31:24 37:16 55:17,17 58:6,17 64:14,16 64:18,23,25 65:1 66:9 71:15 89:9 90:12,13,18 91:25 94:4
crimes 59:25 65:4
criminal 14:18 24:5,14,20 26:18 35:4 55:17 60:13

66:9 76:10 98:12 101:3,5,6
criminalistic 76:1
criminally 38:23
criminals 76:14
criteria 42:18,19
critical 41:24 65:16 80:24
crr 1:22
csr 1:22 104:24
cure 63:23 65:14
current 16:17,22 22:5,19 38:22 49:2 50:16
currently 22:15 23:8 32:18
custody 55:4
customize 23:7
cutter 23:4
cv 1:7 2:7 16:9

**d**

d 1:15 2:16 4:2 7:4 7:16,17 103:10,21 105:1,5 107:2
dabbled 45:12
dallas 82:15 83:1
danger 70:15,23 89:4
dangerously 83:21
dark 34:16 77:8
data 87:22
databases 37:2
date 10:9 104:19 105:16 106:5 107:24
dated 104:22
david 7:16 82:16
day 23:14 54:11 77:6,13 78:12 98:3,3 103:16

days 9:17 21:20,23 46:5
dead 44:18
deadly 26:25 27:4 30:10,12 32:4,5 67:17 68:14,24 71:25
deal 28:23 33:16 33:23 48:7 57:8 70:10 74:25
dealer 90:21
dealing 33:25 54:14 77:21 80:2 80:3
deals 93:9
dealt 71:7
dear 21:12
deaths 55:4
december 48:21
decided 15:9
decision 25:11 26:4 36:14,23 51:25 68:13,23 70:5 71:25 72:10 72:21
decisions 46:23 67:15 72:23
declaration 5:4 9:23 10:2 11:12 12:3,5,9,12,18,23 13:3,15,18 14:11 61:9 67:22,25 91:15
declare 103:10
deep 28:21 56:13
deeply 76:15
deer 46:15
deescalate 32:3 33:10,21 34:8,22 35:11,23

[deescalation - early]

deescalation 16:13
24:25 33:14,17,24
34:3 35:3,7 36:2,4
defeat 35:5
defend 29:14,19
defendant 1:10
2:10 3:13
defendant's 5:2
defendants 2:17
defense 14:19
25:22 28:2 37:14
defensive 19:17
25:19 37:2 83:6
defer 10:10
deficiencies 63:24
65:14
definitely 17:2
26:25 88:13
degree 16:5 66:1
delirium 16:11
33:19 50:21
delivered 83:16
delve 54:20
demeanor 75:17
77:12 84:1,4,6,22
demographic
95:19 98:8,13
demographics
100:12
demonized 99:20
demonstrate
59:18
density 94:3
denver 56:17
department 15:9
16:16 18:13,14
19:1,13 21:16
22:1,15 23:10
41:11,12 43:20
48:12,17 49:20
50:16,16 83:1

departmental
63:24
departments
20:10 69:13 83:3
depend 42:18 71:1
depending 42:19
85:10
depends 90:2
deploy 41:7
deposition 1:15
2:16 7:25 9:3,14
9:16 10:5 82:13
104:13 105:19,22
105:24 106:8,10
depth 33:17
deputy 22:2,13,14
30:7 49:15,23
describe 17:15
23:2 79:10 96:14
describes 61:9
description 5:3
detail 73:12
detective 76:16
detectives 20:7
determine 76:24
determined 42:3
93:22 105:18,22
106:7
detriment 54:16
detrimental 52:25
develop 19:21
developed 20:23
developing 20:21
94:10,25 95:20
diallo 59:25
difference 66:5
94:4
differences 94:9
94:24 95:19
different 20:10
30:12 75:18 95:11

95:13
differentiating
62:11
diffused 74:11
dinkheller 30:6
direction 104:10
directly 89:18
disadvantage
97:15
disagree 42:20
disallowed 47:5
disarming 44:5
discussed 45:24
65:15 84:7
discussing 92:23
discussion 11:17
67:5 88:23
display 35:13
displaying 76:18
dispute 32:18
disputes 65:9
distance 36:21
37:21
distort 80:16
district 1:1,2 2:1,2
26:7
document 11:25
12:8
documents 13:4,4
13:5,10,12,16,20
13:22 102:16
dog 75:24
doing 12:14 14:1
15:20 16:15 22:15
33:16 35:15 41:8
45:2 47:4 48:20
79:20 85:10 86:6
99:2
doj.ca.gov 3:22
doke 8:16

domicile 28:3
donahue 91:23
douglas 24:7
downrange 57:2
dozen 14:16
drafting 11:2
draw 79:6
draws 80:12
dress 81:14
drill 73:2
drink 26:3
driver 17:8,20
driver's 28:6
39:21
drives 46:6
driving 39:18
dropped 65:1
drug 90:20
drugs 33:20
dry 26:13
ducks 100:1
dude 26:15 31:22
78:12
dudes 34:17
dui 98:11
duly 104:7
duress 81:1
duty 14:6 20:9
26:16 34:13 40:4
41:4 47:8,9,10
81:5 82:2,7 84:14
86:15,18
dynamic 16:12
93:10

e

e 105:9,12 106:1
107:3,3,3
earlier 27:5 84:6
early 30:4 64:16
69:14

Page 7

earned 16:3
earp 46:4
easily 78:17
eastern 1:2 2:2
easy 89:20 91:3
  93:19
ed 28:6
education 15:13
  16:6 27:14,23
  28:4 31:17
effect 52:25 53:10
  64:11 66:4,13
effective 94:11
  95:1,21
effectively 27:21
eight 14:23 23:14
  49:1,1 56:4 60:18
  61:22 63:3
either 34:23 35:17
  41:9 67:2,2 80:11
elderly 28:25
eliminate 68:17
email 9:20 55:13
  55:13 102:8,19,20
  102:21
emotional 38:14
  39:3,9,22,23
emotionally 39:1
emphasizing
  65:15
employee 104:17
employment 22:20
emporia 15:17
empty 34:19
encounter 24:11
  37:16,16
encounters 37:18
  37:22 38:3 66:5
ended 15:10 18:18
  34:20

enforcement
  10:23 16:18 18:10
  19:25 21:8,17
  22:16 23:20 29:24
  33:17 40:11 42:3
  46:9,10,22 47:7,10
  48:10 55:18 56:14
  57:11,12 59:12
  65:14 75:20 77:20
  81:6 82:7 85:4,6
  86:8,24 92:25
  96:6,23 99:25
engages 101:2
enhance 63:23
  65:20,24 66:22,23
enhances 66:24
entire 32:23
entirely 42:18
  80:10 91:11
environment 93:5
equal 58:2 59:11
equipment 81:13
era 64:25
errata 105:14,16
  106:3,5
escape 71:16,17
establishment
  77:11
et 1:9 2:9
evaluate 77:24
  84:13 90:3
evaluated 89:23
evaluating 84:17
event 19:25 21:7
  38:25 78:1,16,17
  79:11 81:5,19
  82:17 83:24 85:14
  85:16,25 86:17
events 21:10 69:15
  77:25 86:2,6,10,18
  87:1,14,16 88:1

eventually 18:17
everybody 17:6
  28:18 54:5 65:1
  95:8 101:5
everybody's 85:14
exact 62:7 66:12
exactly 22:4 39:16
  58:14 68:7 76:13
  78:20
examination 4:6
  7:8
examined 7:5
example 17:22
  30:9 35:12 56:17
  57:4 66:22 70:13
  81:16 85:13
examples 51:13
  60:6,7
exception 46:12
excited 16:11
  33:19 50:21
exciting 38:24
excuse 26:12
  60:24 85:21
executed 103:16
exercising 75:17
exhibit 5:4 11:15
  11:21,22
exhibits 5:1
exist 57:6 76:7
experience 13:19
  15:12 17:15 31:23
  45:20,25 46:2
  52:12 64:1 81:12
  84:10 90:17 93:1
  93:8 98:17
experienced 75:20
expert 5:4 7:22
  9:21 10:18,20,23
  13:9 14:13,17,19
  14:21 15:1 51:20

  51:24,25 52:5,7
  92:2 94:20 96:18
  96:20,22
expertise 92:10
experts 97:13
explain 53:5 56:10
  63:25 75:21 85:7
  97:23
exposed 56:10
  60:23 61:1 62:20
expressions 84:23
extensive 55:13
extensively 99:10
extent 65:21 66:25
extraordinarily
  81:11 83:2 100:13
extrapolate 86:13
extremely 26:4

**f**

facial 84:23
fact 35:3 53:2,6
  57:7,14 59:17,20
  64:24 65:18 82:3
  100:8
factor 32:25 33:8
  36:12,16 38:7
  39:7,25 57:11
  94:10,25 95:20
factors 16:13
  36:22 84:5,7
  87:15 94:3,8 96:1
failing 13:8
fairly 55:13
falls 31:22
false 91:3
familiar 17:13
  85:14 89:7 91:21
  91:22 92:4 96:9
famous 54:23 55:5
  59:23 60:1 69:17
  81:19 87:14 100:5

[famous - give]

100:19
**famously** 30:7
**fan** 78:4
**fancy** 17:5,5
**far** 10:9 13:24
  23:20 38:22 50:4
  88:12 90:17 95:15
  96:2,2,2,12 98:12
  99:7 100:21
**fear** 60:21
**federal** 79:18
  104:13 106:1,8,9
**feds** 58:20
**feel** 25:23 75:14
**feet** 37:25
**feloniously** 37:24
**felt** 29:4
**fence** 40:9,10
**field** 19:2,3,4
  51:20 92:18
**fight** 30:8 34:18,19
**fighting** 19:8
**fights** 38:1
**figuring** 32:3
**filing** 13:8
**finally** 21:12,13
**financially** 104:16
**find** 17:6 20:20
  30:10 31:19 32:7
  52:15 54:3,8,9
  56:14 72:15 75:8
  86:7
**finding** 89:7
**findings** 92:16
**fine** 102:10
**finish** 8:7,9
**fire** 16:1 22:6
  35:12 49:3,10
**firearm** 19:22
  23:23 25:9,11,13
  26:17,19 27:7,20

28:9 29:18 30:15
32:12 33:1,9 34:9
35:24 36:13,17
37:24 38:8 39:6,8
39:11,15 40:1,6,22
41:18 42:4,5 43:6
52:24 53:17 57:25
58:1,11,18 59:10
59:19 60:23 61:8
61:13 62:20 66:8
70:14,22 71:23
72:13 73:4,11
81:4
**firearms** 14:19,20
  14:21 15:2 17:13
  17:16 18:4,24
  19:5,13,16 21:2,3
  23:18 25:5,24,25
  26:1 27:15 44:9
  45:4 46:1,17 48:7
  49:8 52:1,1,2,3
  56:14 63:13 83:5
  89:17 95:2,22
  97:20
**fired** 60:1
**firefighter** 31:9
**firing** 59:2
**firm** 3:4
**first** 10:7,11 17:23
  48:14 64:12 95:10
**firsthand** 89:18
  93:8
**fishing** 46:13
**fit** 28:11,18 29:1
  36:10 38:4 64:8
  64:20
**flip** 40:16
**florida** 100:5
**floyd** 54:25
**fluctuate** 58:8

**focused** 71:14
**follows** 7:6 105:8
**force** 14:18 16:10
  16:10,12 19:5,12
  19:19 26:25 27:4
  30:3,5,10,11,12
  32:4,6 50:17 51:9
  51:25,25 52:3
  83:5 95:8 99:9,13
**foregoing** 103:12
  104:4,6,10,12
**forget** 9:19
**forgot** 65:1
**form** 13:12
**formal** 9:15 15:13
  16:6 37:11 41:5
  45:16 58:25 59:6
  102:17
**formalize** 57:23
**former** 9:22
**forms** 22:19
**forth** 74:13,18
  104:5
**forward** 13:9
**found** 24:22 83:8
  85:21
**founded** 57:17,18
**four** 23:13 77:20
  85:11
**frame** 70:6
**frankly** 23:18 54:4
  57:6 71:9 72:16
  74:12 97:10 98:3
**frcp** 106:1
**free** 95:11
**freedom** 95:13
**freeze** 48:13,13
**frequently** 85:5
**friend** 22:22 25:14
  25:18 44:15

**friends** 24:6
**front** 9:20 73:25
**frontier** 46:5
**full** 7:14
**fund** 21:22
**further** 104:12,16
**furtive** 71:12

g

**g** 7:17,17
**gain** 15:23 98:25
**gallardo** 1:4 2:4
**gang** 14:22 64:13
  90:18 98:23
**garr** 95:9
**gas** 18:25
**gated** 74:1
**gather** 69:1 85:12
**gear** 84:15
**general** 1:8 2:8
  3:14 7:13 31:12
  32:17 39:4 40:4
  40:20 41:16 42:2
  46:25 50:2,15,17
  60:7
**general's** 47:14,20
**generalized** 60:21
**generalizing** 66:18
**generally** 42:20
  97:20
**generic** 86:20
**gentleman** 56:23
  56:25 73:18 74:6
  79:19 81:18
**gentleman's** 59:24
**george** 54:25
**getting** 22:10
  30:24 57:19
**gimme** 72:20
**girlfriend** 34:14
**give** 8:10 39:21
  40:18 42:12

Veritext Legal Solutions
866 299-5127

[given - hereto]

| | | | |
|---|---|---|---|
| **given**  20:24,25<br>   21:4 104:11<br>**gives**  26:19<br>**giving**  92:9<br>**glad**  21:12<br>**glaring**  30:9 56:18<br>   57:3<br>**glasses**  52:15<br>**glove**  43:25 72:5<br>**go**  7:17 11:15,18<br>   17:5 27:17 28:14<br>   28:16 33:5 35:8<br>   36:8,22 37:4,19<br>   43:15,19,21 44:24<br>   45:2 46:4,8 47:4<br>   49:20 53:7,22<br>   54:2 59:4 63:20<br>   67:8 70:13 75:7,8<br>   75:12 79:15 81:13<br>   84:17 88:20,25<br>   90:21 95:5 97:25<br>   99:2 102:1<br>**god**  20:1 53:12<br>   66:15<br>**goes**  77:13<br>**going**  17:1,22 23:9<br>   24:18 25:21 27:19<br>   30:17 31:1,18,21<br>   36:19,20,25 38:12<br>   38:25 41:23 44:24<br>   46:7 48:23 56:24<br>   58:24 65:8,17<br>   67:19 68:10 73:13<br>   73:19,20 74:8,21<br>   76:8,22 77:9<br>   79:12,13,17 80:19<br>   81:12,22,23 82:8<br>   84:18 86:4 87:11<br>   88:21 89:25 90:21<br>   92:1,7,8 95:6<br>   96:18 97:24 98:5 | 98:18 100:2<br>**good**  7:10 14:16<br>   24:6 41:22,23<br>   42:4,12 56:13<br>   62:11 70:6 76:22<br>   77:10,22 82:1,19<br>   84:14 88:8<br>**google**  59:3<br>**gotcha**  74:22<br>**gotten**  79:22<br>**graduate**  15:8<br>**graham**  95:9<br>**grandest**  50:3<br>**grandma**  37:8<br>**great**  52:18 63:16<br>   64:10 100:23<br>**greater**  64:18<br>**greatly**  63:23<br>   65:24 66:21<br>**green**  75:9<br>**grenade**  18:1,6,25<br>**groceries**  75:25<br>**ground**  19:8 29:4<br>**group**  97:22<br>**grown**  29:6<br>**guarantee**  54:1<br>   75:6<br>**guess**  39:22,24<br>   65:4 80:17 91:13<br>   101:24<br>**guidelines**  94:7<br>**gun**  14:3 17:25<br>   18:1 25:4,20,21,22<br>   25:22 26:8,23<br>   27:22 30:8 34:4<br>   34:21 35:1,2,2,12<br>   35:13 38:21 41:6<br>   41:7 42:12 43:16<br>   43:17,21,22,24<br>   44:1,2,3,7,15 45:1<br>   46:11,19 47:8 | 48:8 53:7,12<br>   54:11 60:16,16<br>   63:18 64:4,20<br>   69:19 72:20 73:21<br>   74:5,5,7 75:9,23<br>   75:24 76:3,8,20<br>   81:25 82:6 86:16<br>   86:21 90:8,10<br>   98:4,22 100:19<br>**gunman**  83:16<br>**gunmen**  80:3<br>**gunner**  17:8<br>**guns**  18:7 30:11<br>   32:22,22 44:11,22<br>   45:11 46:21 65:8<br>   71:3,6,6,8,9,18<br>   76:16,17 81:16,17<br>   82:10 83:23<br>**guy**  18:25 24:19<br>   29:5 57:2 72:17<br>   72:17,18,19,19<br>   73:4 74:4,13,14,19<br>   75:4,5,23,24 77:7<br>   77:9,10 78:25,25<br>   79:1 82:19,19<br>   83:14,19 84:2,14<br>   84:14,19,21 86:24<br>   88:8<br>**guy's**  26:21 53:12<br>   54:11<br>**guys**  12:15 17:6<br>   22:24 24:17 34:19<br>   37:19 44:10 62:11<br>   62:12 81:20 97:12<br>   97:13<br>**gym**  81:18,20 | 103:10,21 105:1,5<br>   107:2<br>**half**  29:3<br>**hampshire**  93:16<br>   100:7,10<br>**hand**  60:3<br>**handcuffing**  19:7<br>   23:14<br>**handed**  34:19<br>**handgun**  46:13<br>   53:8 73:24<br>**handguns**  76:15<br>   82:11<br>**handle**  27:15 29:5<br>   32:11<br>**handled**  105:8<br>**handling**  41:24<br>**happen**  21:14 76:8<br>   83:20<br>**happened**  20:14<br>   56:21<br>**happening**  40:15<br>   66:16<br>**happens**  85:5<br>**hard**  10:12 14:16<br>   40:10,12 69:13<br>**harden**  25:18<br>**hardwire**  16:21<br>**harsh**  25:3<br>**hazard**  53:1 56:8<br>   57:6<br>**head**  44:23<br>**health**  38:13,18,20<br>**hear**  79:5<br>**heart**  21:12 28:19<br>**heighten**  70:15,23<br>**heller**  46:25<br>**helped**  25:17<br>**helping**  22:2 55:16<br>**hereto**  103:14 |
| | | **h** | |
| | | **h**  7:17 107:3<br>**haggard**  1:15 2:16<br>   4:2 5:4 7:4,17<br>   11:21 67:21 | |

Veritext Legal Solutions
866 299-5127

[hey - job]

| | | | |
|---|---|---|---|
| **hey** 20:25 | **hundreds** 29:24 | **incidentally** 57:16 | **instructors** 56:14 |
| **high** 33:20 42:25 | **hunt** 46:12 | **incidents** 41:25 | **intent** 71:2 |
| 59:18 | **hunter** 27:18 | 55:15 69:14,16 | **interdict** 30:4 |
| **higher** 89:8 91:24 | **hunting** 27:16 | 88:7 101:1 | **interdicted** 86:11 |
| **hint** 61:15 | 46:12,14 | **include** 86:13 | **interdiction** 85:4,6 |
| **hip** 29:11,12 71:8 | **hurry** 84:1 | **included** 82:17 | 88:11 |
| 75:9,23,24 76:3,21 | **hysteria** 62:15 | 105:14 106:3 | **interdicts** 86:23 |
| **hire** 15:10 93:24 | | **includes** 94:15 | **interested** 104:17 |
| **hiring** 48:13 | **i** | 98:9 | **interim** 18:20 |
| **historical** 57:3 | **iacp** 50:19 | **including** 47:6 | **interject** 36:24 |
| 85:3 87:2,3 | **idaho** 93:16 | **incorrect** 57:4 | **internal** 99:10 |
| **historically** 58:5 | **idea** 53:11 90:6 | **increase** 68:20 | **international** |
| 100:11 | **identifiable** 78:18 | **incredibly** 37:18 | 16:20 50:21 |
| **history** 46:7 69:14 | 81:4 | **independent** 45:15 | **intoxicated** 40:2 |
| 87:4 | **identification** | **index** 4:1 | **investigation** |
| **hit** 23:8 | 20:13 52:2 81:24 | **indicate** 76:10 | 99:12 |
| **hold** 17:3 101:15 | **identify** 79:9 | **indicating** 92:16 | **investigations** |
| **hollywood** 81:19 | 80:13 | **indicators** 76:9 | 99:11 |
| **holster** 54:3 73:24 | **identifying** 80:11 | **individual** 46:17 | **involve** 23:22 |
| **holstered** 53:7 | **idiot** 75:15 | 75:19 | **involved** 10:7 |
| 71:8 | **ieds** 79:4,21 | **individuals** 60:22 | 26:15 37:7 51:10 |
| **home** 25:22 37:13 | **illness** 74:15 | **infantrymen** | 76:1 79:1 80:25 |
| 43:10,12 44:2,16 | **imagine** 25:15 | 17:21 | 87:15 99:10,12 |
| 90:8,10 | **immediately** 79:9 | **informs** 45:25 | **involvement** 93:10 |
| **homicide** 14:22 | 81:3 83:19 88:9 | **initialed** 103:13 | **involves** 54:21 |
| **honest** 75:20 | **impact** 52:22 | **injunction** 91:6 | **involving** 19:22 |
| **hope** 38:19 81:10 | **impasse** 97:14 | **injury** 58:19 | **irrelevant** 96:24 |
| **hoping** 74:24 | **implementation** | **ink** 103:13 | **issue** 37:12 38:5 |
| **hostage** 79:25 80:2 | 52:21 | **innocuous** 59:21 | 76:11 |
| **hotel** 34:15 | **importance** 44:25 | 75:10 | **issues** 14:4,4 38:20 |
| **hour** 11:13 23:14 | 65:16 | **input** 10:22 51:7 | **items** 29:19 |
| 49:6 | **important** 44:8 | **inside** 79:4 | |
| **hours** 23:11,12,13 | 57:11 78:22 94:10 | **insider** 82:25 | **j** |
| **house** 25:18 44:17 | 94:25 95:20 | **insisted** 11:11 | **jack** 37:20 |
| 51:10 | **impossible** 66:7 | **instant** 61:24 62:3 | **jackson** 21:25 |
| **huh** 14:12 56:5 | **impression** 62:8 | **instruct** 74:6 | 22:9 |
| 92:11 | **improper** 57:4 | **instructed** 6:1 | **jeweler** 42:25 |
| **human** 16:12 31:5 | **improvement** | **instruction** 41:5 | **jewelry** 43:1 |
| 31:12,13 32:17 | 16:15 | **instructor** 16:20 | **job** 1:23 15:11 |
| 39:3,17 77:24 | **improves** 65:25 | 16:21 19:5,6,18 | 16:14,22 17:17,23 |
| 80:25 | **incident** 19:22 | | 19:15 20:24,25 |
| | 80:24 83:11,12 | | 22:5 41:23 44:14 |

Veritext Legal Solutions
866 299-5127

49:2 105:5
**jobs** 16:15 17:19
**joe** 60:14
**john** 91:23 100:18
**judo** 16:13 29:5
**jujitsu** 29:5
**jumped** 29:8
**jurisdiction** 96:23
**justice** 59:1,7
  93:25

**k**

**kan** 15:14
**kansas** 1:16 2:17
  7:1 15:7,25,25
  16:1 18:14 22:14
  23:10 27:18 28:1
  46:3,11,25 47:1,19
  48:1,19 53:15
  61:24 62:17 94:20
  95:12,14 96:21
  98:21 99:24 100:4
**keep** 35:16 44:6
**keeps** 70:5
**kellerman** 90:7
**kept** 34:23
**kill** 28:19 83:15
  84:8 90:19
**killed** 37:24,24
  44:14 90:9,15
**killing** 65:9 78:12
**kim** 10:2 67:9
**kind** 14:22 19:25
  20:3 23:7 31:14
  38:21 39:23,24
  57:23 65:1 66:18
  72:20 73:19 74:21
  86:8 96:24
**kinds** 62:11
**kjm** 1:7 2:7
**knee** 29:7

**knees** 29:10
**knew** 83:19,23
**knives** 78:11
**know** 8:13,24 9:5
  9:24 14:2,8 16:3
  16:14 19:24 20:5
  20:11,20 21:10,21
  22:6,10 23:5,15
  24:10,17,18 25:3,4
  25:6,6,16 26:2,16,18
  27:1,2,18 28:19,20
  29:1 30:2 31:9
  32:11 33:6,13,20
  33:24 34:3 35:14
  38:25 39:21 40:13
  40:16 41:1 42:10
  42:11,17,18,20,25
  43:19 44:11,12,21
  45:1,8 47:18 48:5
  53:18,25 54:6,25
  55:3,4,7,16,18
  56:12,16,22 60:1
  60:14 62:10,12,14
  64:12,22 65:3,5,10
  66:10,18 70:3
  71:12,14,19 72:8
  72:13,14,16,17,19
  72:22,24 73:3
  74:5,6,7,12,13,15
  74:18,21 75:1,3,6
  75:9 76:6,19 77:3
  77:6,8,10,12 78:5
  78:7,7,9,10,20
  80:16 81:24 82:19
  83:14,21 84:19,20
  84:24 87:14,20
  90:4,15,19,20,21
  90:25 92:5 93:4
  93:23 94:2,6 95:7
  97:15 98:5,16,20
  98:24 99:6,8,17,19

102:13
**knowledge** 42:22
**known** 7:14 55:5
**knows** 75:20 81:12
**kooky** 74:2,19
**kyle** 30:6

**l**

**l** 3:5
**label** 24:7
**lack** 56:6
**language** 66:20
**large** 32:1 73:23
**larger** 50:3 65:6
**late** 69:14 88:3
**lately** 23:17
**launcher** 18:1
**launchers** 19:1
**launching** 18:6
**law** 3:4,6,16 10:23
  16:18 18:1,10
  19:25 21:8,17
  22:16 23:20 28:1
  29:24 30:25 33:17
  40:11 42:3 43:23
  46:9,10,22 47:7,10
  48:10 55:18 56:14
  57:10,12 59:11
  60:21 65:14 75:20
  77:20 81:6 82:7
  85:4,6 86:7,24
  92:25 96:6,22
  97:16,21,22 98:7
  98:25 99:3,25
  100:14 101:2,7
**law.com** 3:11
**lawful** 52:23
**laws** 47:1,2 51:2
  52:21 89:8 91:24
  96:9 97:7
**lawsuits** 47:18
  56:17

**laying** 44:17 71:6
**layperson** 97:15
**lead** 56:7 60:25
  76:2
**leader** 17:8 18:22
  18:23
**leave** 26:20 43:24
  64:25 97:15
**leaving** 18:3 44:11
  53:21 83:25
**led** 76:19 87:17
**legal** 12:16 13:7
  46:19,23 47:22,23
  47:24 77:22 97:14
  105:7
**legalized** 73:17
**legally** 27:2 43:18
  43:22 64:3,4
  97:19 99:1
**length** 12:7 83:12
**lethal** 30:1
**level** 43:3 51:7
  64:25 77:23 99:5
**liberal** 100:7
**license** 47:17 98:1
  98:7
**licenses** 39:21
**lieutenant** 17:11
  18:19,24 48:11,23
  49:1
**lieutenants** 49:5
**life** 8:1 14:5 32:23
**lifesaving** 31:8,10
**lifestyle** 28:20
**limited** 26:23
**line** 6:2 105:15
  106:4 107:4,7,10
  107:13,16,19
**list** 18:4
**lists** 55:13

[litany - military]

litany 48:3
literally 71:12,18
literature 78:10
little 18:21 27:2
  29:10 37:10 42:22
  59:7 82:25 87:11
  98:23
live 22:12
living 93:1
loaded 44:17
  46:19,21
lobbying 51:3
locally 64:12
locate 13:11
location 77:4,5,13
  80:12
lock 43:17,22
locked 102:9
  105:12 106:1
logical 27:19
long 29:23 44:6
  49:12 57:19 82:10
  83:23 87:24
longer 22:9 83:4
longest 64:24
look 12:8,17 24:5
  25:7 28:22 38:1,3
  48:23 50:10 52:13
  52:20 54:24 55:17
  55:18 56:15,19,19
  56:21,22 58:5,9,24
  59:23 60:17 61:21
  62:16 67:4,8
  69:17 76:12,12,22
  77:9 81:15,18
  84:8,9,21,23 85:2
  87:15 88:7 89:3
  90:12,24,25 91:12
  93:12,19,24 95:7
  97:18 98:6,10,14
  98:14,19 99:8,14

99:16 100:12
looked 64:15 94:6
  99:22
looking 10:20 26:2
  31:23 55:14 66:20
  76:23 77:10 80:10
  84:3 101:20
looks 24:14
looser 47:13
los 64:19
lost 56:16
lot 16:9 23:19
  28:19 31:21 36:22
  38:3 39:17 41:22
  42:20,25 43:18,22
  46:21 47:25 48:4
  48:6 53:22,23
  54:21 59:16 64:3
  65:9 83:13,17
  99:18,18
lott 100:19
louisiana 15:18
lower 98:12

m

m 24:8 81:20
m16a1 17:25
m2 17:25
m203 18:1
m60 17:25
machine 17:8,25
  17:25 18:6 104:8
magazine 37:4
  45:8,8
magic 59:3 70:9
maine 93:15 94:5
maintenance
  19:17
majority 37:7,10
  37:19,23 50:23
  88:2

maker 50:25
making 36:14 52:1
  70:5 72:21 83:9
  101:19
mall 86:14
man 29:6 56:23
managing 24:8
  27:3
manifest 76:18
manner 83:13
  86:4
marched 29:9
margate 56:19
mark 1:4 2:4 3:25
marked 11:22
markedly 75:18
marksmanship
  27:22 36:18 37:12
  38:5
masks 50:8
mass 62:15 78:5
  78:17
massacre 69:15
master 19:15
masterson 46:4
math 48:20
matter 10:25
matthew 3:15 7:12
  12:25
matthew.wise
  3:22
mature 39:19
maturity 39:23
mayhem 61:24
  62:3
mayor's 51:11
mcfadden 76:16
mean 13:13 24:1
  27:15 30:23 32:14
  32:15 33:4 38:13
  38:15 43:9 50:3

51:2 53:5 56:11
  57:14 63:25 65:25
  69:19 73:21 75:21
  85:7 90:2 97:23
  101:6
means 29:14,15
  35:5
meant 63:2
measure 66:7
mechanically
  27:21
mechanics 27:20
meet 23:3
member 18:20
members 51:11
  62:19 63:7,12
  98:23
mental 38:9,13,13
  38:18,20,22 74:15
mentally 40:11,12
mentioned 16:23
  17:12 18:9 29:22
  30:25 60:6 77:6
  87:1 91:21 92:4
mentioning 27:5
  100:15
mercy 26:21
mere 53:6
merely 63:17
message 21:13
methodology
  93:25
metro 34:15
metropolitan 22:5
middle 50:9 55:2
  71:15 75:5 85:15
miles 29:3
military 15:16,21
  15:21 16:24,24
  17:3,13,16 18:5
  32:15

Veritext Legal Solutions
866 299-5127

[millimeter - officer]

millimeter 18:1
mind 53:13 60:8
    70:6,7 88:16,20
mine 24:20 25:14
    44:15
mine's 22:22
mines 18:2
minimal 17:21
    45:23
minor 98:10
minuses 25:12
minutes 29:3 54:9
missed 34:14,15
missouri 23:11
    48:2 53:21
misstate 59:1
mistake 23:2 57:7
    57:14 59:17,20
    65:18
mistakenly 60:12
mode 81:13
model 23:3 50:20
    88:3,6
modern 87:5
moment 11:16
    38:14 65:19 73:2
    84:18 88:21
month 37:5
morning 7:10,11
motorcycle 48:16
mouse 75:14
mouthful 22:7
move 85:12,17
movement 78:22
    84:23
muc 24:8
mug 37:20
mugging 24:12
    37:17
muggings 31:24

multiple 20:10
    89:19
municipal 50:4,6
    50:12
murder 14:20
    78:5,6,14
murdered 30:7
mute 101:9
muzzle 84:25

**n**

nail 97:25
name 7:15,15,16
    24:7 58:25 59:2,6
    59:8,24 90:21
    104:20
name's 7:12
national 16:18,18
    58:7,24
nature 12:13
    14:24
near 21:12
nebraska 48:2
nebulous 66:11
necessary 105:14
    106:3
need 8:4,12 21:1
    27:1,13 29:11,12
    29:14,15 88:21
    101:11
needed 21:14
needs 23:4,7,16
negative 52:22,25
    53:9 54:12 66:8
neglect 83:8
negotiations 80:3
negotiators 80:5
neither 104:16
never 16:4 25:10
    33:5 44:21,24
    70:10 71:3,10,19

new 3:9 20:15
    42:11,21,23 93:16
    100:7,10
newhall 69:15
news 14:3 37:3
    93:13,19,21 94:2
newsletters 55:12
night 75:5
nine 62:16 67:4,9
non 24:2 25:22
    40:12 85:4
nonexistent 57:4
nonpolice 37:1
    48:7
nonsworn 24:2
normal 86:8
north 21:25 81:19
norway 78:11
nose 34:20
notating 105:15
    106:4
note 64:12 85:4
    93:14 101:20
noted 54:13
    103:13
notice 12:18
noticed 66:3,4,14
november 105:3
nowadays 76:20
    79:4
nra 37:4
number 13:3 50:1
    50:10 93:9 100:20
    105:15 106:4
numbers 91:1,1,2
nypd 59:23

**o**

o0o 7:7
oath 7:5,19
object 31:1 36:7
    36:19 79:12 80:20

82:8 89:25 92:1,7
    95:4
objection 8:18
    26:10 27:9 28:12
    33:11 34:10 38:10
    39:10 40:7,23
    41:19 42:7 43:8
    51:21 58:3 59:14
    69:6 70:16,24
    72:1 73:7 77:1
    80:19,20 81:8
    89:10 94:12 95:23
    96:17 97:4,9
observation 13:19
    45:20 53:14 54:13
    83:7 89:19 93:8
observations 54:1
    54:17 92:18
observed 62:19
    67:9
observing 90:3
obvious 54:7
obviously 17:21
    27:13 29:21 38:24
    46:14 54:25 76:17
occasion 99:14
occurs 29:13
october 1:17 2:19
    7:1 105:5
odds 82:1
offer 25:25
offering 32:20
    41:12
office 47:20 51:11
    105:11
officer 14:6 18:17
    19:2 20:10,17,17
    21:17 22:22 24:2
    30:2 31:7 36:3
    40:5,21 41:17
    44:14 46:10 47:10

[officer - particularly]

52:12 59:12 67:10
67:12 68:5,13,21
69:2,17,21 70:6,15
70:23 71:24 75:20
85:11 86:8,15,18
96:7,23 99:12
**officers** 19:4,19
20:2,7,8,8,12
22:11 37:23 40:11
41:3,8 47:7 48:16
53:3 57:13 60:24
61:1,6,12 62:18
63:6,12,17,25
69:18 81:6,23
82:7 83:18 85:6
85:16,25 86:12
98:9,22 99:11
**official** 1:7 2:7
43:2
**oh** 17:14 20:1
53:12 63:2 66:15
**ohio** 76:13
**okay** 8:22 9:9
10:14 11:14,20,25
12:11,17,21 35:21
36:12 39:6 50:11
51:19 52:13,16,18
53:5 59:6,9 60:19
61:2,5,21 62:2
63:20,21 67:8
68:3 75:16 87:10
89:1 91:8,13
101:12 102:3,20
**okie** 8:16
**oklahoma** 48:2
53:20
**old** 22:11 37:8
38:1 44:14 47:4
**olds** 39:21
**olympic** 31:20

**onboard** 22:13
**once** 22:23
**ones** 37:3 59:17
78:19 87:14
**oneself** 26:20
**online** 45:10
**onus** 34:2
**open** 47:17,19
52:21 54:15 56:10
61:23 62:3,9,17,24
63:11,15,18,22
64:5,7,20 65:13,20
65:23,25 66:8,14
66:21,23 68:9,17
68:20 70:8,9
75:17 77:3,21
82:10 89:4,16
93:2,5,9,10 94:15
96:9,15,20,23 97:2
97:8 99:1
**openly** 32:11
52:23 61:8,14
63:13 67:11 69:3
76:25 81:4 82:5
82:18
**opinion** 13:6,12,17
13:21 47:1,14
53:3 54:18 55:23
57:10 61:3,6,12,16
61:18,20 62:3,5,7
62:8 63:5,10,14,19
65:7 68:4,12,15,16
68:20,25 69:1
77:16 81:21 83:7
87:8 89:16,21,21
89:22 90:3 92:15
92:21,22 99:4
100:16,25
**opinions** 51:19
52:9 60:20

**opportunity** 9:2
**option** 26:20 27:4
30:10
**options** 15:10
25:19,23 32:4,5
**orders** 50:2,15,17
**ordinance** 50:4,6
50:12
**oregon** 46:6
**organization**
49:11 50:22
**original** 13:7
104:13 105:10,21
**orthos** 29:12
**outline** 20:6
**outside** 41:10
46:11 57:21 79:14
80:20 82:12
**overall** 37:1 75:1
**overarching** 50:5
**overcome** 31:18
**overhill** 3:7
**overland** 47:19
**overreact** 74:12
**overused** 51:24

**p**

**p.o.** 3:19
**pacing** 74:13,17
**package** 21:5 23:5
23:9,14,16 25:18
75:22
**page** 4:5 5:3 6:2
12:17 52:13 56:4
59:6 60:18 61:21
61:22 62:16 63:3
67:4,9 75:12 89:3
93:13 97:18,19
105:15 106:4
107:4,7,10,13,16
107:19

**pages** 1:24 85:2
105:14,17,17
106:3,6,6
**paid** 11:8 21:24
**paint** 68:8
**panic** 60:23 61:6
**paper** 45:8,17 56:2
81:22 88:13
**papers** 50:1 88:12
89:20
**paperwork** 91:9
**paradigm** 42:14
86:13
**paragraph** 52:20
56:4 60:17 61:22
62:16 63:2,5,20
67:4,9,13,16,17
75:12,16 77:19
85:2 89:3 93:12
97:18 98:17
**paranoid** 34:1
**pardon** 100:20
**park** 47:19
**parking** 43:18,22
65:9,10
**part** 13:13,18
15:19 20:11,18
22:2,9,13 24:4,20
25:1 29:21 32:24
35:2,3,6,17,18
47:21 49:3,10
50:20 53:15,24
62:23 63:19 71:17
75:2 78:22 80:1,7
81:21 83:12,24,24
84:20 88:5 91:8,9
92:24,25 93:7,20
**particular** 27:6
58:23 85:18 99:8
**particularly** 42:22
46:24 59:17

Page 15

**[party - police]**

| | | | |
|---|---|---|---|
| **party** 104:18 | **pepper** 19:6 23:11 | 92:17 93:1 | **planet** 33:22 83:3 |
| **patrol** 18:17,17 | 25:2 29:22 30:9 | **personally** 26:14 | **platoon** 17:9,10 |
| 22:3 48:15 | 30:24 31:3 52:3 | 51:23 66:3 71:2 | **play** 72:11 77:14 |
| **patrolman** 18:16 | **perceived** 84:25 | **persons** 32:10 | **playing** 44:22 |
| **pay** 14:7 55:10 | **perception** 20:2 | 97:22 98:1 | **plays** 85:1 |
| **paycheck** 21:21 | 43:3 80:16 | **pertained** 10:21 | **please** 8:23 |
| **paying** 23:21 | **perceptions** 81:1 | **pertains** 104:12 | **pllc** 3:4 |
| **pd** 48:19 55:6 | **period** 64:9 | **pertinent** 13:25 | **pluck** 98:13 |
| **pdf** 102:9 105:12 | 105:18 106:7 | 14:5 15:24 16:12 | **pluses** 25:12 |
| 106:1 | **perjury** 103:11 | 73:16 | **point** 17:9 18:10 |
| **pederson** 1:21 | 105:17 106:6 | **phone** 9:17 | 18:23 19:12 21:3 |
| 2:19 104:23 | **permission** 47:9 | **photos** 81:15 | 21:4 30:1 44:13 |
| **peer** 91:22 | 98:19 | **physical** 30:11 | 48:12 56:1 59:18 |
| **penalty** 103:11 | **permit** 42:13 | **physically** 28:10 | 64:10,19 66:12 |
| 105:16 106:5 | 47:13,14,24 48:1,5 | 28:18 29:1,14 | 73:15,17 93:1 |
| **pending** 8:14 | 61:23 64:6,21,22 | **pick** 29:3 33:5 | 97:10 100:18 |
| **people** 20:1 21:6 | 100:9,11 | 42:21 | **points** 87:22 |
| 22:1 23:8,20 | **permits** 42:21 | **picked** 25:17 | **police** 9:22,23 |
| 24:16 25:16,24,25 | **permitted** 96:15 | **pickup** 71:6 | 10:21 14:6,17 |
| 27:1,2,13,16,25 | **permitting** 97:7 | **picture** 68:8 72:18 | 15:9,20 16:12,16 |
| 28:3,19,25 29:13 | **person** 8:5 23:23 | **pictures** 20:5 | 16:22 18:14 20:10 |
| 32:6,7,21,22 33:23 | 24:2 25:21 26:9 | 44:23 | 21:15 22:6,14 |
| 36:25 37:7,10 | 28:2 31:25 33:1,9 | **pid** 20:13 | 23:10 24:2 30:2 |
| 38:19 40:13 41:13 | 33:15,21 34:2,3,8 | **pile** 87:11 | 31:7 32:15 36:3 |
| 42:21 44:24 47:8 | 36:13,17 39:8 | **pipe** 79:3 | 37:22,23 41:3,4,5 |
| 47:15,25 48:4,6,8 | 40:22 41:18 42:2 | **pistol** 17:24 18:5 | 49:3,9,16,18,25 |
| 51:10 54:14 55:16 | 43:10,12 45:1 | 23:6,6 38:1 44:17 | 50:16,22 51:7,8,25 |
| 57:15,21 58:6,9 | 46:20 52:23 57:24 | 54:3,6 | 52:2,5,12 53:3,11 |
| 62:9 63:17 64:3 | 59:12,19 61:7,13 | **place** 31:19 64:2 | 53:16 54:21,22 |
| 65:7,7,9 66:8 71:5 | 66:10 67:11 69:24 | 104:5 | 55:11 56:6,18,20 |
| 71:7,12 72:4 | 70:2 71:14 72:12 | **places** 16:4 20:15 | 57:1,5,7,8,19,22 |
| 74:18 77:21 78:3 | 73:6 75:17 76:6 | 48:3 53:23 56:16 | 60:12,15,23,25 |
| 78:12,25 79:1 | 76:24 78:21 79:6 | 100:4 | 61:1,6,12 62:10,18 |
| 81:16,17 83:20,23 | 81:3,7 82:1,2 | **plainclothes** 20:8 | 63:6,11,17,24 |
| 83:25 84:8,9,25 | 86:22 101:2 | 20:17 86:16 | 64:13 65:3 66:5 |
| 90:7,13,13,18,19 | **person's** 35:22 | **plaintiff** 1:5 2:5 | 68:4,12 69:12 |
| 93:11 97:19,24 | 67:12 68:5,22 | 3:3 | 70:11 74:3,10,22 |
| 98:6,18 100:12 | 69:4 71:2 73:3 | **plaintiff's** 12:21 | 77:23 80:7 82:15 |
| **people's** 23:7 | **personal** 13:19 | 14:10 100:24 | 83:1,3,15,18 86:9 |
| 99:20 | 25:11 26:4 45:19 | **plaintiffs** 7:23 | 86:12 87:18 88:5 |
| | 53:14,25 54:17 | | 93:10 95:7 98:9 |

[police - putting]

| | | | |
|---|---|---|---|
| 99:5,9,11 | precedent 85:3 | problematic 83:8 | provided 13:23 |
| policy 49:24,25 | 87:2,3 | 83:10 | 14:7 102:16 |
| 50:1,5,17,18,20,25 | precedents 46:24 | problems 62:11 | 105:19 106:8 |
| 51:1,6,8,17 94:16 | precise 78:14 | procedure 105:19 | psychotic 34:1 |
| 96:1 | prefer 78:5 | 105:20 | public 15:2 27:8 |
| political 60:24 | preliminary 91:6 | proceedings 47:21 | 28:10 30:16 32:12 |
| 83:9,24 89:22 | preparation 9:16 | 104:4,6,8,14 | 32:14 45:4 46:1 |
| politics 83:7 | 12:4 16:14 | process 33:15 35:3 | 48:8 49:24 50:5 |
| ponder 40:17 | prepare 9:14 12:5 | 35:7 36:14 71:17 | 51:1,6,17 52:22,22 |
| pool 98:13 | prepared 40:5,21 | 72:21 | 52:24,25 53:10 |
| poorly 54:5 | 41:17 42:5 | profession 98:15 | 54:16 56:7 57:5 |
| popow 56:19,22 | preparing 14:11 | 99:16 | 57:25 58:1 59:10 |
| popular 25:1 | presence 70:14,22 | professions 99:17 | 60:24 62:15,19,20 |
| 99:25 | 71:23 82:18 | 99:18 | 63:7,13,23 65:16 |
| population 94:3 | present 3:24 | professor 91:23 | 65:20,24,25 66:22 |
| populations 28:25 | pretty 12:8 37:14 | profile 59:18 | 66:23,24 73:25 |
| porch 56:24 57:1 | 55:5 58:16 79:18 | profoundly 33:25 | 74:21 75:19 76:25 |
| port 64:15 | 82:1 | program 19:19 | 89:5,17 93:14,15 |
| pose 63:16 76:25 | prevent 9:11 43:5 | 20:25 | 93:17 94:11,13 |
| posing 75:19 | 57:12 | progress 78:6,14 | 95:1,21 96:1 |
| positions 17:3 | prevented 35:11 | 79:25 | publications 55:11 |
| 48:10 | previous 63:1 | progressive 41:12 | publicly 96:12 |
| positive 20:13 | previously 8:1 | 69:12 | publish 45:6 |
| 54:12 81:23 | 77:7 101:2,6 | promoted 19:3 | published 45:3 |
| possess 42:4 97:19 | price 11:9 | 48:22 | pull 28:1 50:9 |
| possibilities 32:7 | primarily 22:25 | promotion 48:13 | 69:22,22 70:2 |
| possibility 66:6 | 54:19 | pronounce 59:24 | pulling 10:9 34:20 |
| possible 8:17 31:6 | primary 19:15 | proper 20:19 56:6 | 74:23 |
| 32:4 55:15 80:10 | 21:2,3 | 57:10 | purse 31:24 |
| 85:20 | prime 29:2 | properly 32:11 | purview 92:3 |
| possibly 31:11 | prior 104:7 | 102:15 | push 25:21 65:7 |
| post 77:21 85:8 | prison 25:16 | property 43:18 | 70:9 89:22 90:14 |
| posture 84:22 | pro 11:10 | proponent 29:22 | pushing 90:6,8 |
| potentially 41:25 | probable 76:4 | protest 50:9 82:17 | put 13:8 23:15 |
| pounds 29:4 | probably 14:16,23 | 83:25 | 24:6 39:2 66:13 |
| practice 69:11,21 | 14:25 18:3 28:4,4 | protests 50:8 | 90:6 102:12,14 |
| practices 10:21 | 33:3 39:18,19 | protocols 19:21 | putting 25:16 |
| pre 24:5,20 77:21 | problem 29:16 | prove 42:11 | 84:24 86:24 |
| prearranged | 32:2 41:10 68:11 | provide 12:22 | |
| 89:21 | 70:8,10,11 71:20 | 13:20 36:21 88:17 | |
| | 82:3 | 100:24 | |

Veritext Legal Solutions
866 299-5127

[qualification - research]

| q | | | |
|---|---|---|---|
| **qualification** 41:4 | **rapidly** 67:12 68:5 | **recall** 14:7 82:15 | **related** 45:4 |
| **qualifications** 22:24 | 68:22 69:4 85:19 | 82:20 | **relationship** 64:11 66:4,13 |
| **qualify** 17:18,24 17:24 | **rate** 52:6 53:22 64:18 98:12 | **recess** 67:6 101:23 | **relative** 104:17 |
| **quality** 32:16 | **rates** 89:9 91:25 94:4 | **reciprocity** 47:25 | **released** 105:21 |
| **quantify** 39:16 58:14 87:13 98:2 | **reach** 54:18 72:4,5 72:5 74:7 75:14 | **recognition** 20:19 21:8 24:21 25:4 32:2 80:8 | **relevant** 65:4 |
| **quantity** 32:16 | **reached** 57:20 | **recognize** 11:25 | **relied** 91:16 92:20 |
| **question** 8:8,10,14 8:15,17,19,19,21 8:23,24 39:7,12 58:15 70:19 91:18 94:18,22 96:19 | **reaching** 13:5 | **recognized** 52:7 | **religion** 95:13 |
| | **react** 73:22 81:6 82:7 | **recoil** 45:7 | **rely** 13:5 54:18 55:22 |
| | **reaction** 74:23 | **recollection** 59:4 | **remotely** 1:16 |
| | **read** 9:19,23 10:1 12:4 13:7,10 14:3 24:10 45:18 61:19 62:7 63:14 67:20 77:23 89:12 96:11 103:11 | **recommend** 25:8 25:10 27:6 28:10 28:17 29:19 | **rephrase** 8:24 |
| **questions** 6:1 36:1 101:8,14,25 102:3 | | **recommends** 31:3 | **replacement** 29:11 29:12 |
| **quiet** 79:22 | | **reconnaissance** 17:4 | **replicate** 20:14 |
| **quite** 14:1 16:8 23:18 40:13 46:2 54:4 57:6 58:12 64:10 71:9 72:16 74:12 98:2 | **reading** 13:24 30:24 69:1 72:12 72:14 105:23 106:9 | **record** 7:15 9:6 11:16,17,18,20 26:5 67:5,8 88:20 88:23,25 101:5 102:1 104:7,11 | **report** 5:4 52:14 66:21 67:10 93:20 93:22 94:3 |
| | **real** 9:15 12:8 79:22 99:24 | | **reported** 1:21 |
| **quote** 65:24 | | **recording** 8:3 | **reporter** 2:20 102:4,8 104:2 |
| r | **realities** 90:12 | **recruit** 19:11,16 22:11 | **reporter's** 8:3 |
| **r** 3:15 7:17 107:3,3 | **reality** 93:2 | **refer** 91:14 93:13 102:15 | **reports** 93:13 |
| **r&s** 106:1,9 | **realize** 33:22,24 35:4 | **referenced** 105:6 | **represent** 7:12 |
| **rabid** 78:13 | | **referring** 13:14 26:6 30:18 58:22 58:23 67:21,25 87:2,3,6 94:14 | **request** 102:18 |
| **race** 32:17 | **really** 10:12 13:18 21:11 34:2 40:10 40:17 43:3 51:18 71:3 72:10 79:6 | | **requested** 104:15 106:1,9,10 |
| **ragweed** 85:22 | | **reflect** 12:9 | **requests** 102:13 102:13 |
| **ran** 29:6 | **realm** 54:16 | **refresh** 59:4 | **require** 27:3 |
| **raney** 10:2 13:9 61:5,11 62:2 63:10 68:3,11,19 | **reason** 39:20 42:12 53:24 66:19 91:20 107:6,9,12 107:15,18,21 | **regard** 50:24 95:1 95:21 | **required** 17:18,23 |
| | | **regardless** 81:13 | **requirement** 41:3 |
| **raney's** 60:20 67:10,22,25 | **reasons** 57:16 87:20 88:4 | **regional** 19:9 94:9 94:24 | **requires** 25:5 |
| **range** 19:15 32:1,7 | | **regular** 14:2 55:16 | **rereading** 62:5 |
| **rankings** 93:14,22 | | | **research** 13:11,16 16:10 45:15,16,22 55:22 86:6 87:7 87:10,21 88:15 89:7,24 90:7 93:25 99:7 100:15 100:16,22,24 |
| **rapid** 20:4,24 21:6 79:24 85:9 88:6 | | | |

Page 18

[researcher – see]

**researcher** 51:16
100:19
**resist** 58:9,17
**resource** 48:16
**resources** 60:25
**respond** 19:22
23:23,25 24:23
43:4 82:9 86:3
**responded** 21:9
32:24
**responding** 20:19
61:7
**response** 20:4,20
20:25 21:6 25:6
39:3 50:21 52:5
79:24 85:9,24
86:9,24 87:18
88:5 94:11,13,15
95:1,21 96:1
**responsible** 19:12
**rest** 98:16
**restate** 94:21
**result** 62:3
**results** 67:16
68:14,23 71:25
**retained** 7:22 9:22
14:17,19,21
**retention** 19:8
23:12 44:5
**retired** 16:17 22:4
22:22 41:16 47:7
48:21 98:22
**retirement** 21:20
21:22 57:21
**retiring** 21:18
**return** 105:17
106:6
**review** 9:3 102:7
104:14 105:8,10
105:13 106:2

**reviewed** 10:24
51:14 91:6,22
92:3
**revolver** 34:20
**revolvers** 45:12
**richard** 1:4 2:4
**ridiculous** 53:13
**rifle** 17:25 37:9
46:15
**rifles** 18:6 71:5
**right** 19:24 33:17
38:4 42:16 48:25
55:2 57:9 61:25
62:21 67:17 75:17
83:18 84:18 85:22
86:22 89:5,8
91:23 92:18 93:16
93:17 95:11 99:2
101:18
**rights** 73:21 99:20
100:19
**riot** 55:6
**risk** 63:16
**rival** 90:20
**rmr** 1:22
**road** 3:7 22:3
**rob** 1:7 2:7
**robberies** 31:25
58:10
**robbers** 62:12
**robbery** 14:22
26:18 34:17,24
**robot** 83:16
**rocket** 18:2
**role** 11:2 17:17
19:1,17 20:21
21:2,4 49:12
**roles** 16:17 17:7
18:15 22:16
**rounds** 60:1

**routine** 70:13,21
71:22
**row** 100:1
**rub** 29:9
**rules** 106:8
**run** 21:6 29:3 64:5
65:8 70:4
**running** 38:20
56:23,25 58:19
83:20 84:11,19

**s**

**s** 1:5,10 2:5,10 3:3
3:13 107:3
**sacramento** 3:20
**safe** 44:25 69:24
**safely** 27:15 33:1,9
34:9 35:24 36:13
36:17 38:8 39:8
40:1,6,22 41:18
42:5 45:2
**safer** 26:9
**safest** 33:7 58:10
**safety** 27:18 51:1
51:6,17 52:23,25
53:1,10 54:16
56:7 57:5 63:23
65:16,20,24,25
66:22,23,25 69:21
70:6 89:5 93:14
93:15 94:11,13
95:1,21 96:1
**sailboat** 31:21,22
**saw** 76:16,16
**saying** 38:1 54:10
61:18 67:20,21
73:4 84:5
**says** 24:19 66:21
91:15
**scan** 12:14
**scarsdale** 3:9

**scenario** 20:20
24:22 25:5 32:5,6
34:23 36:10,21
37:14 38:23 39:2
55:2,8 70:18
72:15 73:12,14
79:8,25 80:4,9
**scenarios** 24:23
26:15 30:13 34:13
**scene** 67:11 69:3
80:15 83:18 84:11
84:12,19,21 86:12
86:23 88:9
**schedule** 105:10
**schizophrenic**
34:1
**scholarly** 45:17
**school** 48:16
**science** 16:2,10
**scope** 79:14 80:21
82:12
**scratch** 20:23
**screen** 11:14,21
38:21 52:16
**screws** 21:21
**se** 33:14
**seat** 72:4
**seats** 71:7 72:6
**second** 48:14
62:25 67:15 68:13
68:23 71:24 72:10
72:23 77:9 101:16
**seconds** 38:2
88:21
**secure** 44:1,2
**security** 22:22
25:18
**see** 11:21 37:8,12
37:22 48:7 52:16
53:22,23 54:6
56:24 62:25 64:8

Page 19

64:20 65:4,11,12
66:3,10 69:19
70:11 71:4,9,10,18
72:9,20 73:21
74:5,10 76:17
78:24 79:5 81:25
83:20 91:12
**seeking** 41:10
**seen** 20:5 72:4
83:11
**segueing** 83:21
**self** 27:12
**selling** 90:22
**send** 11:7 12:15
102:9
**sending** 102:7
**sensation** 80:15
**sense** 28:7
**sent** 91:12
**sentence** 67:3
**sentencing** 94:7
**separate** 14:23
**sergeant** 17:9
18:17 19:3
**serial** 78:6,14
**series** 14:22,23
**seriously** 21:11
**serve** 16:24
**served** 14:13
16:23 48:10 49:12
49:15,18,21 96:6
**service** 19:11,16
21:5 23:9
**serving** 27:12
**set** 9:25 85:18
104:5
**setting** 24:12
65:19
**seven** 52:13
**share** 11:14

**shawnee** 22:14
**sheriff** 22:12
49:22
**sheriff's** 21:25
49:20
**shift** 18:19 48:11
48:14,14 49:7
**shifts** 49:6,6
**shirt** 24:19
**shoot** 27:2,21
34:25 41:4 53:13
61:12 63:12
**shooter** 20:4 21:9
77:25 78:1,8,16,17
78:23 79:2,7 81:5
82:16 85:5,25
86:2 87:14
**shooters** 87:4
**shooting** 20:17
35:18 55:5 56:8
56:23 57:14,15
59:20 61:1 62:18
63:6,17 78:17,25
79:9,20 81:25
82:20 86:14
**shootings** 37:2
53:2 57:8,12
59:17 65:3,18
99:12
**shoots** 37:9
**shopping** 75:24
**short** 21:24
**shorthand** 2:20
104:1,9
**shortly** 21:18 22:1
**shorts** 81:18,20
**shot** 44:15,18,22
57:1 58:2,15,16
59:11,20 60:3,12
60:15

**shotgun** 46:15
**shotguns** 71:5
**shots** 38:2
**show** 11:15 42:10
53:11 85:17 88:3
**showed** 20:9 57:7
79:21 85:15
**showing** 86:12
**side** 22:21 31:10
40:16
**sidewalk** 73:25,25
74:13 75:6
**sign** 12:11,14
24:18 105:16
106:5
**signature** 104:23
105:21,23,23
106:9
**signed** 12:19,19,22
**significant** 38:20
39:3 64:14
**signs** 43:16
**silly** 75:13
**similar** 37:15
49:21 50:12
**simple** 27:16
**simply** 60:22
61:13
**simultaneously**
48:14
**sinks** 31:21
**sir** 7:24 10:6 11:1
12:10,20 14:9,14
21:18 22:18 45:18
48:11 49:17,19
51:15 52:17 56:2
89:6,13
**situation** 33:10
34:8,24 35:10,11
35:23 80:8

**situational** 73:11
**situations** 26:24
27:3 30:2,3 31:18
34:7 35:22
**six** 18:18
**size** 34:18
**skills** 24:24 44:5
**slow** 80:4 98:23
**small** 44:22 74:1
**smaller** 45:11
**smart** 27:25
**snatchings** 31:24
**sneaky** 24:17
**sniper** 18:22
**snub** 34:20
**solo** 85:24 87:18
88:5
**solutions** 105:7
**solve** 29:16 68:18
70:11
**solving** 70:8
**somebody** 33:19
33:25 39:2 44:16
54:3,8,9 69:19,22
69:23 74:2 75:2,8
76:20 78:6 84:11
86:21 90:15,16
99:22
**somebody's** 53:6
**someplace** 43:16
43:25 54:2 75:7
84:10
**sorry** 26:7 39:14
61:22 63:2 85:21
101:10
**sort** 16:2 26:19
27:14,23 41:13
51:3 55:21 58:10
62:15 64:14 71:8
77:11 85:1 91:2,4
98:11 99:20

[sounds - susceptible]

| | | | |
|---|---|---|---|
| **sounds** 27:11 | **stakeholder** 51:6 | **statistically** 58:11 | **study** 87:5 |
| **sources** 100:20 | 51:12 | 58:16 90:10 97:21 | **stuff** 50:23,24 |
| **south** 49:3 | **stalker** 25:17 | 98:6 | 53:23 55:12 66:15 |
| **space** 65:10 | **standard** 69:11,21 | **statistician** 92:8 | **stunt** 74:22 |
| **speak** 8:5 10:4,20 | **start** 8:10 33:6 | 92:12 93:24 | **subdivision** 74:1 |
| 25:12 92:25 | 75:13 81:25 | **statistics** 58:22 | **subject** 30:11 81:1 |
| **speaking** 42:14 | **started** 17:2 18:16 | 59:1,7 66:13 | 88:13 |
| 65:5 97:21 | 46:8,22 64:12 | 89:20 93:25 97:25 | **submissions** 91:7 |
| **speaks** 76:13 | 66:15 | 99:15 | **subscribed** 104:20 |
| **specialist** 17:4 | **starts** 82:20 | **stats** 58:7 64:16 | **subway** 34:15 |
| **specialties** 44:4 | **state** 1:8 2:8 7:14 | **stay** 55:9,20 99:3 | **success** 88:6 |
| **specific** 14:8 19:23 | 15:7,14,17,18,18 | **steps** 27:6 30:15 | **successful** 87:16 |
| 44:13 56:2 70:17 | 15:25 19:10 28:1 | 30:18,23,25 | 87:17,23,23,24 |
| 74:21 88:13,15 | 32:19 33:19 38:9 | **stimulus** 79:5 | 88:1,10 |
| 90:20 94:17 | 38:13,14,23 39:9 | 80:11 | **successfully** 86:23 |
| **specifically** 82:11 | 41:2,6 42:10 | **stipulation** 105:20 | **suffer** 58:18 |
| 90:4 94:13 100:17 | 43:17 46:3,11,16 | **stolen** 43:6,9,12 | **suffered** 83:7 |
| **speculation** 60:21 | 47:22 51:2 52:20 | 44:9,15 | **suffering** 74:15 |
| **speech** 95:11 | 60:20 61:22 62:17 | **stop** 35:15 69:23 | **sufficient** 30:3 |
| **speeding** 44:18,19 | 63:15,22 65:13,23 | 70:14,21 71:22 | **suit** 81:16 |
| 69:22 | 73:18 75:16 85:3 | 76:4,5,19,20 | **suite** 3:8,18 |
| **spell** 7:15 | 89:4 93:2,3 95:11 | **stopped** 44:19 | **sunny** 54:11 |
| **split** 67:15 68:13 | 95:12,14,14 97:3 | **stops** 71:4 86:23 | **supervising** 19:3 |
| 68:23 71:24 72:10 | 97:19 99:1 100:9 | **storage** 44:25 | **support** 13:17,21 |
| 72:23 | 103:17 104:2 | **store** 43:20,21 | 55:15,22 92:22 |
| **spoke** 12:6 60:2 | 105:9,12 | **strategos** 16:20 | **supports** 87:7 |
| **spontaneously** | **stated** 28:2 82:18 | **street** 3:17 24:10 | 100:16,25 |
| 62:18 63:12 | 83:22 | 31:23 34:17 37:13 | **suppose** 27:25 |
| **spot** 62:5 | **statement** 9:24 | 37:15,16,16 41:22 | **supposed** 38:21 |
| **spray** 19:7 23:12 | 11:12 83:10 90:14 | 54:14 59:25 77:23 | 43:19,21 |
| 25:2 29:23 30:9 | **statements** 100:2 | 90:13 99:5 | **sure** 8:6 13:13 |
| 30:24 31:3 52:3 | **states** 1:1 2:1 | **stress** 36:14 | 30:23 32:13 35:20 |
| **springsteen** 60:2 | 53:18 64:16 67:10 | **strict** 47:12 | 38:17 39:16 41:14 |
| **squad** 17:8 18:22 | 87:5 89:19 93:3,3 | **strictly** 45:10 | 58:14 60:5 61:9 |
| **square** 86:14 | 93:4,15 94:5 95:8 | **stuck** 44:23 | 62:6 63:4 73:13 |
| **stabber** 78:9 | 95:16 98:9 100:6 | **studied** 45:19 | 78:20 88:21 91:11 |
| **stabbing** 78:25 | **stating** 56:6 | 83:11 | 94:19 100:1 |
| **stability** 39:23 | **statistic** 58:19 | **studies** 89:15 90:5 | 102:17 |
| **stacks** 99:16 | **statistical** 64:11 | 91:21,22 92:5,6,17 | **surprise** 24:16 |
| **staff** 21:13 | 92:2 | 92:21,23 | **susceptible** 28:22 |

Veritext Legal Solutions
866 299-5127

**[suspect - tool]**

**suspect** 37:1,25
  56:25 72:18 80:11
  80:13
**suspects** 85:5,19
**swat** 18:20 80:5
  81:20 84:15
**swimmer** 31:20
**switched** 100:9
**swords** 78:11
**sworn** 22:13 104:7
**sympathy** 29:1
**system** 41:6 47:13
  47:14

**t**

**t** 24:19 107:3,3
**tactfully** 32:13
**tactic** 19:17
**tactical** 16:21 45:9
  57:17
**tactics** 19:7 52:4,5
  69:25 70:4 78:21
  83:6 85:18
**take** 8:12,15 21:22
  27:7 30:14 31:15
  37:2 38:17 51:9
  71:15 77:9 85:13
  87:4 90:24 97:24
  101:11 102:10
**taken** 2:17 7:25
  21:11 44:7 104:4
**takes** 87:24 88:10
**talk** 10:11 24:13
  34:2 36:2 43:14
  53:25 77:25 78:4
  90:13
**talked** 13:23 45:10
**talking** 24:1 26:12
  36:2,5 37:13 38:4
  59:2 60:7 73:14
  73:16 76:14 82:9
  84:5 87:12,13

93:8 95:16 98:24
  101:20
**talks** 62:23
**targeted** 66:9
**taser** 19:6 52:4
  55:8
**taught** 29:23
**teach** 78:21
**teaching** 44:6 55:3
**team** 18:20,21
  85:9,11,17 86:1,8
  87:19,23 88:2
**teams** 80:5 86:11
**technicality** 21:19
**tell** 10:17 14:2
  17:6 54:5 71:2
  84:1
**tells** 98:3
**tend** 37:18 98:12
  100:13
**tends** 88:10
**tennessee** 95:10
**tense** 79:18 80:25
**term** 17:5 51:23
  62:13 78:2,15
  86:20
**terminal** 52:2
**terms** 36:3 89:16
  93:15
**terrific** 13:1
**territory** 90:23
**terry** 76:5,13,20
**testified** 7:6 15:1
  55:25
**testifying** 7:18,19
  9:12 96:18 104:7
**testimony** 31:2
  92:9 103:14
  104:11
**texas** 48:2 53:20

**thank** 59:9 88:19
  88:24 101:22
  102:22
**thanks** 36:6
  101:18
**that'd** 100:23
**thing** 8:13 14:22
  16:2 20:13 26:19
  27:19 28:21 45:10
  50:3 51:4 54:25
  55:20,21 57:23
  58:10 64:14 71:8
  73:11 74:11,11,24
  75:10 77:11 85:1
  91:2,4 97:12
  98:11 99:2,21
**things** 14:3,4,6
  15:18 16:1,10,11
  18:7 19:6,8 20:9
  22:24 23:8 24:21
  27:1,25 31:24,25
  37:20,20 39:17,22
  41:8 42:24 43:2
  44:1,20,25 45:12
  45:18,19 46:4,6,14
  46:15,18,24 50:2
  50:17 51:8,9 52:6
  54:7,20,22,23 55:4
  58:1,8,9 59:11
  61:17 62:10 64:13
  64:17 65:3,9,18
  66:11 70:1,5 72:4
  72:6,8,9,25 74:25
  77:6 79:22 80:2,3
  80:5,6 87:17
  90:23,25 94:7
  95:9 98:10,11,18
  99:6,8,13
**think** 11:12 17:12
  27:5,22 31:19
  34:4 39:1,17

40:13 50:2 51:15
  51:23 58:16 60:14
  63:1 70:7 73:15
  79:3,13,23 83:17
  86:9 91:8 100:15
**thinking** 9:11 36:9
**thirty** 77:20
**thought** 29:13
  57:22 74:2
**thoughts** 12:7,9
**threat** 20:19 43:3
  75:19 76:25
**threatening** 24:11
**three** 19:14 29:12
  34:17,19 37:25,25
  38:2,2,2 49:5,5
  85:16 93:14
**throat** 26:13
**throwing** 79:3,21
**ties** 81:17
**time** 8:5,12 22:2,9
  22:13 29:4,23
  31:7 44:6 46:9,22
  47:5 54:13 58:13
  64:9,24 75:13
  77:5,13 84:16
  86:1,15 88:2
  93:18 104:5
  105:10,18,24
  106:7
**timeframe** 48:18
**timely** 86:4
**times** 14:15,25
  29:9,25 90:9
**titles** 88:12 100:21
**today** 9:4,10 10:23
  45:24
**today's** 9:14
**toddler** 44:3,12
**tool** 26:23,25 27:3
  30:1,11

[tools - utah]

tools  29:15
top  55:9,20 93:14
topeka  1:16 2:17
  7:1 16:16 18:14
  21:15 22:5 48:19
  49:4 50:7,15
  64:18 79:19
topics  45:4
totality  52:11
  76:21
totally  67:1
touched  16:7
  22:17
touching  37:21
tough  38:5
town  54:3 75:7
traffic  70:14,21
  71:22
tragedies  20:14
tragic  69:14
trail  46:6
train  17:18,24
  23:25 30:14 43:5
  69:13
trained  18:8 81:11
  81:22 83:3
trainer  16:18
  18:25 21:3 53:16
  53:18 57:19
trainers  21:4
training  10:21
  13:7 14:20 16:11
  16:19 19:2,3,4,11
  19:11,13,16,20
  20:12,18,22 21:5
  21:11 22:3,25
  23:1,16,18,19,20
  23:21 24:4 25:1
  25:24,25 26:1
  27:12,14,23 28:5
  29:21 30:24 31:17

32:16,20 33:2
  37:11 41:1,10,12
  41:13 49:9 52:1
  52:11 53:20,20
  56:7,13,20 57:5,9
  57:11,22 63:24
  65:14,16,19 80:1,7
  81:24 83:5,6,6
  85:11
trainings  23:22
transcribed  104:9
transcript  9:3,5
  103:12 104:10,13
  104:15 105:6,8,10
  105:13,13,21
  106:2,2
transition  79:23
transitioned  80:8
transports  43:1,2
travel  48:5 93:3
travelling  53:18
travels  45:20
trend  85:8
trends  55:9,18,18
trial  14:20
trials  14:24
tried  47:4,19
tries  68:8
trolley  86:14
trouble  36:9
truck  17:20 71:6
  82:6
true  93:18 97:5
  103:15 104:10
truth  75:21
truthfully  9:12
  11:9
try  8:4,7,9,24
  11:14 13:16 23:3
  32:3 33:24 55:9
  71:15 80:12

trying  55:20 60:8
  71:13 74:9 84:8,9
  84:24 92:5 98:25
  99:2
tuesday  1:17 2:19
  7:1
turn  51:19 65:5
  74:9 88:22
turned  14:23 55:6
  74:20 91:16
turning  34:23
  35:17
two  10:13 21:9
  23:11,12 29:3,11
  30:12 33:14 88:1
  97:11 100:10
type  21:11 23:4
  24:2,11,21,21
  42:10,14 44:20
  45:8,10,17 74:10
  74:22 80:9 97:12
typically  85:11

**u**

u  24:8
u.s.  93:13,19,21
  94:2
ugly  33:18
uh  14:12 56:5
  92:11
ultimately  60:25
unarmed  56:9
  58:2 59:13
uncommon  68:4
  68:12
unconcealed  47:23
unconstitutional
  47:2
undercover  40:21
  82:2
undersigned  104:1

understand  7:18
  8:23,25 61:5,11,17
  62:2 63:10 68:3
  68:11,19
understanding
  10:22 35:20 60:5
  94:18 96:14
unfortunately
  41:2
uniform  82:3
uniformed  20:9,16
  36:3
unit  17:11 18:25
  48:16 60:1
united  1:1 2:1
  64:16 87:5 95:8
  95:16 98:8
university  15:7,15
  15:17,19,25 16:1
  23:10
unknown  24:8
unlawfully  98:18
unsecured  44:16
update  23:12,12
upgraded  18:5,6
upper  62:23
ups  54:23
uptick  64:23 65:2
usage  78:3
use  14:17 16:12
  19:5,12,18 30:3,4
  35:1 40:5,22
  41:17 42:5 50:17
  51:8,12,25,25 52:3
  58:17 83:5 86:20
  95:8 99:9,13
uses  33:1,9 36:13
  36:17 38:8 39:8
  40:1
utah  53:21 86:14

[utility - works]

| | | | |
|---|---|---|---|
| **utility** 26:24 | **virtually** 28:20 | **ways** 32:3 67:3 | 92:14 94:15,19,23 |
| **utilize** 58:11 70:3 | 29:6 98:8 | **we've** 14:1 45:24 | 95:18 96:3,20 |
| 71:17 78:3 80:5 | **visible** 54:4 72:13 | 65:15 78:10 | 97:1,6,17 101:13 |
| 88:3 89:20 | 73:23,24 | 101:20 | 101:17,22 102:1,6 |
| **utilized** 52:5 83:15 | **volume** 1:18 2:16 | **weapon** 19:8 | 102:12,17,20,22 |
| **utilizing** 18:25 | 4:3 | 23:12 44:5 70:3,3 | **witness** 4:1 10:20 |
| 39:19 45:11 | **volunteered** 11:10 | 71:17 | 11:23 14:13,17,21 |

**v**

| | | | |
|---|---|---|---|
| | **vs** 1:6 2:6 105:4 | **weapons** 71:9 | 26:12 27:11 28:14 |
| **v** 7:14 56:17,19 | 107:1 | **wearing** 71:7 | 28:17 30:20 31:5 |
| 76:13 95:9 | **vulnerable** 28:24 | 73:23 81:16,18,20 | 33:13 34:12 36:9 |
| **vacation** 21:24 | | **week** 31:13,14 | 36:24 38:12 40:9 |

**w**

| | | | |
|---|---|---|---|
| **valid** 56:20 | | **weeks** 9:25 | 40:25 41:21 42:9 |
| **variety** 20:7 94:7 | **wait** 85:16 86:1,5 | **weigh** 15:10 | 51:23 56:1 58:5 |
| **vast** 37:7,9,19,23 | **waited** 20:3 | **weight** 34:3 | 59:16 69:8 71:1 |
| 50:23 88:2 | **waiting** 87:18 | **weirdly** 46:20 | 72:3 73:9,15 77:3 |
| **vehicle** 17:7 | **waived** 105:23,23 | **went** 47:6,12 64:2 | 79:17 80:24 81:10 |
| **verbal** 16:13 24:24 | **waiving** 105:20 | 78:19 86:2 | 89:1,12 90:2 |
| 24:24 33:24 34:22 | **walk** 34:16 54:1,8 | **whack** 90:22 | 91:13 95:6,25 |
| 35:14 | **walked** 71:4 | **wheel** 28:6 | 97:10 101:19 |
| **veritext** 102:9 | **walking** 73:24 | **whereof** 104:19 | 102:7 104:19 |
| 105:7,9,11 | 75:5,23 | **wide** 20:6 77:3 | 105:13,16 106:2,5 |
| **vermont** 100:7,8 | **wallet** 60:2 | **wider** 19:1 | 107:24 |
| **version** 12:19 | **walmart** 54:2 75:8 | **win** 34:18 | **witnesses** 104:6 |
| **versus** 56:21 72:13 | **want** 20:14 23:11 | **window** 71:5 | **word** 17:5 25:3 |
| 82:19 86:24 87:18 | 25:20,24 26:1 | **wire** 45:9 | 32:13 33:18 51:12 |
| 94:5 95:9,12,14 | 27:17 28:4,5,21 | **wise** 3:15 4:6 7:9 | 79:17 |
| **vicinity** 83:25 | 35:25 43:24 44:10 | 7:12 11:18,19,24 | **wording** 67:3 |
| **victim** 26:17 37:22 | 50:10 59:1 60:5 | 13:1,2 26:22 28:8 | **words** 62:7 |
| 58:17 | 62:13 64:20 71:16 | 29:17 30:22 32:9 | **work** 11:5 12:21 |
| **victimized** 38:24 | 78:4,14 80:4 | 34:6 35:9 36:5,11 | 18:13 21:16 50:11 |
| 39:6,11 | 83:22 98:14,14 | 38:6,16 39:13 | 50:13 68:4,12 |
| **victims** 55:17 58:6 | 102:5 | 40:19 41:15 42:1 | 70:12 77:23 88:16 |
| 84:25 | **wanted** 10:17 | 42:15 43:11 52:8 | 99:5 100:23 |
| **video** 72:19 74:22 | 20:24 | 56:3 58:21 60:4 | **worked** 25:13 |
| 81:18 | **washington** 15:17 | 67:7,23,24 69:9 | 44:21 50:25 51:5 |
| **view** 37:1 89:15 | **waste** 60:24,25 | 70:19,20 71:21 | 51:16 |
| **views** 45:25 | **watershed** 19:25 | 73:1,13 75:11 | **working** 19:19 |
| **violating** 99:20 | 21:7 | 77:15,18 80:14 | 21:15 22:9 31:13 |
| **violence** 64:13 | **way** 33:7,14 46:9 | 81:2 82:4,14 | 41:9 48:17 |
| **violent** 26:17 89:9 | 47:4 58:10 61:10 | 88:24 89:2,14 | **works** 21:22 27:21 |
| 91:25 | 67:2 73:5 99:2 | 91:5,17,19 92:4,11 | |

Veritext Legal Solutions
866 299-5127

[world - zuchel]

| world 54:22 56:18 | z |
|---|---|
| 57:8,22 64:2,6,6 | zuchel 56:17 |
| 64:13 69:12 93:13 | |
| 93:20,21 94:2 | |
| worried 71:10,11 | |
| 71:19 | |
| worrisome 72:9 | |
| 72:25 | |
| worry 32:21 71:3 | |
| wrap 101:16 | |
| write 54:23 | |
| writing 50:18 | |
| 102:14 | |
| written 45:7,9 | |
| 50:1,4,17 69:16 | |
| wrong 57:15 63:17 | |
| wrote 12:7 85:24 | |
| wyatt 46:4 | |
| wyoming 53:21 | |

| x | |
|---|---|
| x 106:1 | |

| y | |
|---|---|
| yards 37:25 38:2 | |
| yeah 12:24 23:15 | |
| 33:3,3 36:5 45:12 | |
| 60:10 62:25 67:23 | |
| 84:2 88:15 100:23 | |
| 101:10 | |
| year 10:12 22:4 | |
| 37:8 39:21 49:14 | |
| 53:19 55:1 58:8,8 | |
| 58:20 | |
| yearly 17:19 | |
| years 18:18,21 | |
| 19:14 41:22 49:1 | |
| 49:1 55:19 66:17 | |
| 77:20 93:9 99:5 | |
| yep 9:1 | |
| york 3:9 20:15 | |
| 42:11,21,23 | |

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.