1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  LARA HADDAD
   Deputy Attorney General
4  State Bar No. 319630
    300 South Spring Street, Suite 1702
5   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6250
6   Fax:  (916) 731-2124
    E-mail:  Lara.Haddad@doj.ca.gov
7  *Attorneys for Defendant Attorney General Rob
   Bonta*

8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

| 13 | **MARK BAIRD and RICHARD GALLARDO,** | 2:19-cv-00617-KJM-AC |
|----|----|----|
| 14 | | |
| 15 | Plaintiff, | **SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS** |
| 16 | **v.** | |
| 17 | | |
| 18 | **ROB BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,** | |
| 19 | | |
| 20 | Defendants. | |

21

22

23

24

25

26

27

28

1

1
2

## SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS

3
4
5
6
7

I previously submitted a declaration and expert report in this matter, signed on June 9, 2023.  Everything that I stated in that report is true and accurate to the best of my knowledge.  I am submitting this supplemental declaration and sur-rebuttal expert report to address the rebuttal report prepared by Clayton Cramer and attached as Exhibit 1 to his declaration, signed on July 14, 2023.

8

### OPINIONS

9

10

**I.   INTRODUCTION**

11

Mr. Cramer's rebuttal report does not substantively address or rebut the following points made in my report:

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.     Public carry of concealable weapons has been *regulated* throughout American history. In many instances, that regulation took the form of concealed carry restrictions, while in others it addressed open carry as well. The following are state statutes that regulated the open carrying of knives and pistols in public spaces, which I described in my report. (Rivas Report, 21-23, 25-27, 30, 39, citing 1795 Mass. 2; 1801 Tenn. 22, § 6; 1821 Maine 76, § 1; Code of Massachusetts (1836), Part IV, Ch. 134, § 16; 1837 Ga. 90; - Statutes of Wisconsin (1838-1839), "An Act to prevent the commission of crimes," § 16; Revised Statutes of the State of Maine (1841), Ch. 169, § 16; Revised Statutes of the State of Michigan, (1846), Title 31, Ch. 162, § 16; Code of Virginia (1847-1848), Title 3, Ch. 14, § 16; Revised Statutes of the Territory of Minnesota (1851), Ch. 112, § 18; Revised Statutes of the State of Delaware (1852), Title 15, Ch. 97, § 13; General Laws of Oregon (1853), Ch. 16, § 17; 1870 Tenn. 13, § 1; 1871 Tenn. 90, § 1; 1871 Tex. 34, § 1; Acts of Arkansas (1875), 156, § 1; Compiled Laws of Wyoming (1876), Ch. 52, § 1; 1881 Ark. 96, § 1-2; 1882 W. V. 135, § 7; 1888 Id. Terr. 23, "Carrying Deadly Weapons," § 1; 1889 Ariz. Terr. 13, § 1; 1892 D. C. 159, § 1-2.) This is not an

exhaustive list of open-carry statutes, or of the statutes that I cited in my report. It does not include, for example, sensitive-place restrictions that prohibited deadly weapons and other arms at public assemblies, polling places, schools, etc. (Rivas Report, 34-36), or taxes that discouraged or otherwise disincentivized the public carrying of various deadly weapons. (Rivas Report, 30-34.)

      2.    When and where deadly weapons could be carried openly, they were constitutionally protected for lawful defense of oneself, community, and State. (Rivas Report, 17-24.)

      3.    Even while protected constitutionally in many circumstances, sources from the historical record question the frequency and commonness of openly carrying deadly weapons outside of emergency situations. Rather, the historical record shows that nineteenth-century Americans strongly opposed going armed with deadly weapons on a regular basis for preemptive self-defense. (Rivas Report, 17-24.)

      4.    Public carry regulations (regardless of their form) often worked in conjunction with other regulations pertaining to the sale, use, or possession of deadly weapons. (Rivas Report, 30-36.)

      5.    Requiring a license to carry concealed deadly weapons has deep roots in California history. (Rivas Report, 36-37.)

      6.    Public carry regulations have at times distinguished between urban and rural locales. (Rivas Report, 37-40.)

Instead, Mr. Cramer's rebuttal takes issue with my report's use of the phrase *deadly weapons*; treatment of revolvers and repeating handguns; focus upon contextualizing public carry laws and public sentiment regarding weapon-carrying as opposed to repeating well-known case law; and use of a particular quotation at p. 8, n. 10 of my report.

Mr. Cramer's rebuttal also misconstrues several points and passages within my report, and at times makes poorly constructed arguments that do not comport

with the standards of historical scholarship. Finally, Mr. Cramer appears to make ad hominem attacks that are both unnecessary and unprofessional. In the remainder of this sur-rebuttal report and declaration, I will take up each of these issues in turn.

## II.   RESPONSE TO POINTS MADE IN MR. CRAMER'S REBUTTAL REPORT

### A.   Deadly Weapons

Mr. Cramer's rebuttal takes issue with my use of the phrase "deadly weapons." (See Cramer Rebuttal, ¶¶ 3-4, 14-15.) In my report, I supported the assertion that Americans distinguished "deadly weapons" from militia or hunting arms in two ways. First, I established that public carry laws generally applied to a particular set of weapons that did not include muskets, shotguns, or rifles; the fact of their being distinguished from the firearms useful for hunting and militia service is an obvious and noteworthy fact for anyone seeking to understand the purpose of public carry laws. (Rivas Report, 4-11.) As my report demonstrates, public carry laws so frequently employed this phrase "deadly weapons"—grouping together large knives, pistols, metal knuckles, sword canes, and the like—that to deny its legitimacy in referring to these weapons in contradistinction from long guns is insupportable. (Rivas Report, pp. 4-11.) Second, I provided examples of state legal codes that used specific phrases like "deadly weapons," "concealed weapons," and "prohibited weapons" to describe the kinds of weapons typically included within public carry laws. (Rivas Report, 5-6.)

While the phrase "deadly weapons" was not employed universally, it was certainly in common usage during the nineteenth century to describe knives, pistols, metal knuckles, and other such devices. (See, e.g., Rivas Report, 4-11.) Thus, this is the most useful, period-appropriate phrase to employ in reference to these weapons because the regulations pertaining to them reached beyond simply restricting the concealed carrying of them in public. It would be difficult to assimilate other kinds of laws pertaining to these weapons—from open-carry restrictions to sales regulations and more—into a historical narrative were the phrase "concealed

weapons" to be used exclusively. To describe sales restrictions and taxes as being assessed upon "concealed weapons" invites confusion; to describe them in relation to "prohibited weapons" is misleading.

Mr. Cramer points to legal cases which used the phrase "deadly weapons" to apply to other items, like a rock or a rifle. (Cramer Rebuttal, ¶¶ 4-5.) These are cases pertaining to assault with a deadly weapon rather than the public carrying of weapons, and are connected to the development of the legal phrase "deadly weapon" as a way of assessing malice and intent in early modern English law.[1] A deadly weapon is one likely to cause death, and even weapons not intrinsically deadly could become so, depending on their use.[2] It is reasonable to conclude that knives, pistols, metal knuckles and other weapons enumerated in public carry laws received the appellation "deadly weapons" by Americans because of their inherent deadliness. One of the cases cited elsewhere by Mr. Cramer says as much about the bowie knife, which was described as "an exceeding destructive weapon" that was "difficult to defend against…by any degree of bravery, or any amount of skill."[3] (Cramer Rebuttal, ¶ 7.) Even though rifles, rocks, and all manner of other firearms, blades, and blunt objects could be considered deadly weapons if they were used in an assault or homicide, it is clear from context that most public carry laws were not intended to apply to rocks or broomsticks.

Mr. Cramer also takes issue with the premise that concealability was a key feature of the deadly weapons regulated by public carry laws. (Cramer Rebuttal, ¶ 6.) To that argument, there is an abundant record of primary sources and newspaper articles that demonstrate Americans using the word "concealed" in

---

[1] Walter E. Oberer, "The Deadly Weapon Doctrine: Common Law Origin," *Harvard Law Review* 75, no. 8 (June 1962), 1565-1576.

[2] Oberer, "The Deadly Weapon Doctrine," 1573 at n 43. ("If a deadly result is likely to follow from the ordinary use of the weapon upon the person of another, the weapon is said to be deadly per se. If the deadly result is not likely to follow from mere ordinary use, but is likely to ensue when the weapon is used in some special way, the weapon so employed is said to be deadly 'as used'.").

[3] *Cockrum v. State*, 24 Tex. 394 (1859).

1    relation to deadly weapons. For example, a law journal synthesizing jurisprudence

2    on the subject in 1886 had this to say about "Deadly and Dangerous Weapons":

3         A statute making it indictable for one to carry concealed about his

4         person any 'pistol, bowie-knife, razor, or other deadly weapon of the

5         like kind,' embraces a butcher's knife. The words 'other deadly

6         weapon of the like kind' imply similarity in the deadly character of

7         weapons, such as can be conveniently concealed about one's person, to

8         be used as a weapon of offence and defense.[4]

9         Mr. Cramer also appears to express doubt as to whether deadly weapons such

10   as pocket pistols and bowie knives were very likely to be carried concealed.

11   (Cramer Rebuttal, ¶¶ 6-7.) The conclusion that they were, based on the research I

12   presented in my report, is well-reasoned: If they were known to be deadly weapons

13   per se; and one of their key characteristics was their concealability; and laws

14   emerged across the United States prohibiting their being carried concealed; and

15   arrests were made and prosecuted across the United States for violations of those

16   laws; and historical sources such as abundant newspapers, political speech, and the

17   like denounced the act of being armed with concealed deadly weapons; then it is

18   reasonable to conclude that these concealable weapons were very frequently being

19   carried concealed with negative effects upon American communities.

20        The fact that weapon-carriers continually chose to conceal their hardware

21   rather than carry openly invites the historian to question the commonness of open-

22   carry of non-militia, non-hunting weapons. If open-carry of deadly weapons were

23   common or typical in the lives and social spheres of Americans, one wonders why

24   so many people denounced the act of being armed with them in public and why so

25   many people chose to carry them concealed. The research in my report supports the

26   proposition that outside of emergency or otherwise unusual circumstances, open-

27

28   _____

     [4] "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4
     (October 1886), 410. This was quoted in *State v. Erwin*, 91 N. C. 545 (1884).

1    carry of deadly weapons was not particularly common or typical because it was

2    inconvenient and/or impolite: this is why so many people chose to carry their

3    weapons concealed. (Rivas Report, 17-24.) I cited several historical sources in my

4    report from newspapers as well as the statements of appellate judges from the body

5    of pertinent case law showing the rejection of constant arming with deadly

6    weapons. (See Rivas Report, 15-24.)

7        Relatedly, there are several places where Mr. Cramer brings up the fact that

8    nineteenth-century case law on the subject of weapons frequently protected the

9    kinds of arms used in warfare. (See Cramer Rebuttal, ¶¶ 8, 73-74, 83). I addressed

10   this in my initial report. (Rivas Report, 22, n. 61.) As my research shows, that

11   nineteenth-century Americans understood the right to bear arms as specifically

12   protecting militia and hunting weapons further illustrates their distinction from

13   pocket pistols, bowie knives, and other concealable weapons.

14       **B.    "Pistols" and "Other Deadly Weapons"**

15       Mr. Cramer takes issue with my overview of the history of revolvers and

16   repeating handguns. (See Cramer Rebuttal, ¶¶ 43-49, 55-57.) In my explication of

17   why pistols and other deadly weapons became targets of regulation, I provided a

18   brief overview of the development of the revolver.

19       First, Mr. Cramer appears to be unsatisfied with my citation of *Pollard's*

20   *History of Firearms* at p. 9, n. 7. (Cramer Rebuttal, ¶¶ 43-45.) I provided a pin cite

21   to pages from a section of the book specifically devoted to flintlock pistols of the

22   eighteenth century that include diagrams. (Rivas Report, 9.) The purpose was to

23   provide a reference to the kinds of pistols that were in circulation prior to revolvers,

24   not to prove that most American pistols conformed to that design. Still, the

25   selection from *Pollard's* which Mr. Cramer included in his rebuttal supports my

26   argument, noting that, in reference to eighteenth-century flintlock technology in

27

28

1   general, "America normally followed the British or French patterns over the

2   decided time lag of as much as 10 or 20 years."[5]

3       Mr. Cramer then points to "percussion cap pistols" as evidence that perhaps

4   the majority of American pistols prior to 1836 were something other than "single-

5   shot, muzzle-loading pistols modeled after designs that appeared in the eighteenth

6   century." (See Cramer Rebuttal, ¶ 43.) I declined to include information about

7   percussion caps in my brief overview because—for the purposes of my analysis and

8   report—the notable distinction between the revolver and its predecessors was its

9   firing of multiple rounds (which entailed reloading a detachable cylinder, unlike a

10  muzzle-loader). Mr. Cramer attributes this decision to ignorance or incompetence

11  when my motive was the pursuit of clarity and brevity. (See Cramer Rebuttal, ¶ 45.)

12  His citation to the rapid replacement of flintlocks is to *Pollard's* at p. 62, but that

13  section and chapter discuss innovations in firearm design that long predate

14  percussion caps, like matchlock and wheel-lock ignition systems.[6] No doubt the

15  percussion system replaced flintlocks in the nineteenth century, but another source

16  notes that "by 1830, the percussion cap was the generally accepted system for

17  igniting firearms powder charges,"[7] and elsewhere *Pollard's* describes the period

18  c.1835 – c.1865 as the one "in which percussion system of ignition flourished."[8]

19      While Mr. Cramer is correct that percussion caps came into existence and use

20  prior to 1836 and ushered in a period of substantial innovation, it is unlikely that

21  most American-owned handguns were of the percussion-cap design by 1836. The

22

---

23  [5] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan
    Publishing Company, 1983), 114. Quoted in Cramer Rebuttal, Paragraph 44.

24  [6] Blair, ed., *Pollard's*, 62-63, quotation at 62.
    [7] Edward Clinton Ezell, *Handguns of the World: Military Revolvers and Self-*

25  *Loaders from 1870 to 1945* (New York: Barnes & Noble, 1993), 21.
    [8] Blair, ed., *Pollard's*, 181. The percussion lock was invented around the year

26  1806. Using a percussion cap as part of the percussion system did not emerge in
    Europe until some time in the mid-to-late 1810s, and in the United States in the

27  1820s. See also Lewis Winant, *Early Percussion Firearms: A History of Early*
    *Percussion Firearms Ignition—from Forsyth to Winchester .44/40* (New York:

28  Bonanza Books, 1954).

first American patent for a percussion cap was issued in 1822.[9] While newly crafted pistols after that time may have used the percussion cap design, it is a stretch to believe that most pistols in circulation as of 1836 did. And even still, they were single-shot, muzzle-loading firearms.

Mr. Cramer then discusses "pepperbox" pistols, arguing that they existed prior to revolvers. (See Cramer Rebuttal, ¶¶ 46-48). While some of these barrel-rotating firearms were manufactured in Europe prior to the year of Colt's patent in 1836, their numbers and influence in the United States during that time were negligible. The earliest pepperbox firearms were designed and made in Europe.[10] The first American patent for a pepperbox-type arm was one that involved a revolving cylinder that was turned by hand, issued to Artemas Wheeler of Boston in 1818.[11] Wheeler likely produced nothing more than prototypes of this gun, because gun collectors apparently did not know about his patent until the mid-twentieth century.[12] A contemporary of Wheeler's patented a similar design in England, but produced no more than 300 between the filing of his patent there in 1819 and the dissolution of his business in 1827.[13] These "Collier guns" were exceedingly rare, and the possibility that Samuel Colt saw one on a trip to India has led to much speculation that he was deeply inspired by the design.[14] It is clear that Collier guns or rotating, pepperbox designs were anything but widespread or common in the United States prior to 1836, when a patent was granted to Benjamin Darling and his brother, Barton Darling, for a pepperbox pistol, and 1837—the year in which a patent was issued to gunmaker Ethan Allen, who included the design in his earliest

---

[9] Blair, ed., *Pollard's*, 166-168 (Discussing advent of the percussion cap.)
[10] Lewis Winant, *Pepperbox Firearms* 12-14.
[11] On the Artemas Wheeler patent, see Ezell, *Handguns of the World* 22-24.
[12] Winant, *Pepperbox Firearms*, 22-24, notation ("Now it is revealed that the Collier gun was patented by Artemas Wheeler in the United States in June 1818, five months before it was patented in England.").
[13] Ezell, *Handguns of the World*, 24.
[14] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020), 53-54.

pepperbox pistols. These "Allen pistols" competed with Colt revolvers through about the mid-nineteenth century.[15]

My report did not include this additional detail about Allen pistols and European pepperboxes for the same reason that I did not address percussion caps—clarity and brevity. Although Allen's pistol was a competitor to Colt's for a short time, it was soon eclipsed by the revolver. The popularity of the Colt designs from 1848-1851 (particularly the Baby Dragoon, Pocket, and Navy models) were manufactured in significant numbers. The expiration of Colt's patent in 1857, and the United States military contracts with Colt and others for revolvers, consigned Allen pistols to the status of curiosa.

Neither the Allen pistol nor the Darling pistol predated the Colt revolver. The Wheeler patent, which did, was apparently not manufactured in any notable quantity in the United States; we know that its English counterpart, the Collier gun, was exceedingly rare. When Mr. Cramer accused me of submitting contradictory statements (Cramer Rebuttal, ¶¶ 49), he makes reference to the fact that the declaration which I submitted in another case briefly mentioned the rare, pre-1836 pepperbox pistols which were (as has been shown here) not available in the United States in significant numbers.

### C.   "Right To Keep and Bear Arms Decisions"

Much of Mr. Cramer's rebuttal consists of a repetition of case law surrounding concealed-carry regulations: he appears to take issue with the fact that my report focused on contextualizing public carry laws and public sentiment regarding weapon-carrying, as opposed to repeating well-known cases. (Cramer Rebuttal, ¶¶ 6, 24-26, 50, 68-84, 86-95.)

Among other things, I was asked by the State of California to identify historical laws that regulated the public carrying of weapons, with a special focus

---

[15] Winant, *Pepperbox Firearms*, 28. (Winant describes the Allen pistol, not as the first American repeating handgun, but as "the first immediately successful American multishot firearm.").

upon those that implicated open-carry. I found historical laws that regulated the open carrying of weapons. (See Rivas Report, 17-36.) As a historical expert in this case, I provided a detailed, multi-part history of these and other public carry laws which explained the kinds of weapons regulated by them, and why they emerged when and where they did. My report is a work of primary-source-based history that begins with the understanding that the Court is the expert in all matters of law, including the public-carry case law that has been evaluated at length by the Supreme Court of the United States. Mr. Cramer attributes the absence of this information in my report to ignorance when nothing can be further from the truth; I am fully aware of the nineteenth-century appellate record regarding open and concealed carry laws, and had I been writing for a different audience, I would have included it.

Mr. Cramer describes these cases as upholding concealed-carry statutes because open-carry remained legal. He ignores that the distinction was based on defense of oneself and the State in times of armed conflict, as opposed to preemptive self-defense, as I argued in my report. (Rivas Report, 15-24.) The cases which Mr. Cramer cites say the following about protecting open carry for defense purposes:

- *State v. Reid*, 1 Ala. 612 (1840): "The constitution in declaring that, 'Every citizen has the right to bear arms in defence of himself and the State,' has neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guarantied to the citizen, is not to bear arms upon all occasions and in all places, but merely 'in defence of himself and the State'."

- *Owen v. State*, 31 Ala. 387 (1858): A concealed carry statute was "a regulation, the object of which was to promote personal security, and to advance public morals." By regulating "the manner in which certain

weapons are to be borne," the law did not "require them to be so borne as to render them useless for the purpose of defense."

- *Nunn v. State*, 1 Ga. 243 (1846): The protection for "bearing arms openly" was directly tied to the citizen's "*natural* right of self-defence" and "his constitutional right to keep and bear arms." (Emphasis in original.)

- *State v. Chandler*, 5 La. Ann. 489 (1850): A man's "right to carry arms . . . 'in full open view' . . . is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

- *State v. Smith*, 11 La. Ann. 633 (1856): The Second Amendment "was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke." This decision upheld a concealed-carry statute.

- *State v. Jumel*, 13 La. Ann. 399 (1858): This case did not specifically address defensive arming and hardly even addressed the question of the statute's constitutionality, instead referring to *Chandler* and *Smith* (above). As Mr. Cramer's rebuttal stated, the judge in this case upheld the statute in question as "a measure of police" prohibiting behavior that endangered the public. (Cramer Rebuttal, ¶ 25.)

- *Amyette v. State*, 21 Tenn. 154 (1840): This court said: "They say, there can be no difference between a law prohibiting the wearing concealed

weapons, and one prohibiting the wearing them openly. We think there is a *manifest* distinction. In the nature of things, if they were not allowed to bear arms openly, they could not bear them in their defence of the State at all. To bear arms in defence of the State, is to employ them in war, as arms are usually employed by civilized nations. The arms, consisting of swords, muskets, rifles, &c., must necessarily be borne openly; so that a prohibition to bear them openly, would be a denial of the right altogether."

A series of cases from Arkansas and Tennessee, dated in the 1870s and 1880s, chart a back-and-forth between legislature and judiciary in each of those states that resulted in public carry laws that tightly constricted permissible open-carry of deadly weapons.[16] I addressed these laws in my report and cited some of the pertinent case law. (Rivas Report, 21-23.) In each state, a sweeping public carry law that did not confine itself to the wearing of deadly weapons concealed was struck down by an appellate court on the basis that such a rule prohibited the open carrying of the kinds of pistols used in warfare—specifically the revolvers issued by the United States military and appropriate for militia use.[17] In each state, the legislature responded by updating the public carry law, not to replicate the typical prohibition against carrying "concealed weapons," but to provide an open-carry exception that was: 1) exclusively reserved for army/navy pistols; and 2) only applicable to openly carrying army/navy pistols in one's hand.[18] Both states then also prohibited the sale of pistols that were not army/navy models—in other words, they specifically supplemented their strict public carry laws with sales prohibitions

---

[16] Rivas Report, 22 (citing 1870 Tenn. 13).

[17] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878). Mr. Cramer cites *Wilson* positively, but its holding reversed course from *Fife v. State* (1876) and was subsequently reversed by *Haile v. State* (1881). See also *Fife v. State*, 31 Ark. 455, and *Haile v. State*, 38 Ark. 564.

[18] Rivas Report, 22-23 (citing 1871 Tenn. 90; 1881 Ark. 96, §1; 1881 Ark. 96, §2.)

upon pocket pistols.[19] The sensible takeaway from the policy evolution in Arkansas and Tennessee is that bowie knives and pocket pistols were not appropriate for defensive use in public, and that proper defensive use of an army/navy pistol would entail carrying it openly in a way that was both inconvenient and certain to draw attention.[20]

As I noted in my report, state appellate judges regularly made clear that public-carry laws addressed habitual arming for preemptive self-defense. (See, e.g., Rivas Report, 23 (citing *Haile v. State*, 38 Ark. 564 (1882), 24 (quoting *Huntley v. State*, 25 N.C. 418 (1843)). My report also addressed numerous examples of historical evidence that Americans opposed going armed for preemptive self-defense. (Rivas Report, 15-24.) Meanwhile, Mr. Cramer has not provided any social history sources demonstrating that open-carry of deadly weapons on an everyday basis was common or socially acceptable.

Mr. Cramer also questions my assertion that having deadly weapons on one's person "raises a presumption of guilt." (See Cramer Rebuttal, ¶ 65). The quotation was taken directly from a North Carolina case[21] and aptly expresses the predicament of deadly weapon carriers, who were expected to prove that their behavior fell within a public-carry exception. I discussed how several laws made this requirement explicit in my report.  (Rivas Report, 20-21.)

As my report and this sur-rebuttal make clear, exclusive reliance upon caselaw without exploring local sentiment and practice, and without bearing in mind the

---

[19] Rivas Report, 23 (citing 1881 Ark. 96.)

[20] I have written a scholarly essay on these statutes and their associated case law. See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Duke Ctr. For Firearms L.: Second Thoughts Blog* (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee.

[21] *State v. Reams*, 121 N.C. 556 (1897).

deep well of police power exercised by local officials, is not standard practice for legal historians.[22]

In my own research and for the purposes of my report, I have placed public carry laws within their social and cultural context. Numerous sources from social history which I have cited—including statements of judges in some of these very cases—beg the question of what permissible open-carry of deadly weapons looked like, what meaning it conveyed in the public sphere, and whether it encompassed the everyday open-carrying of deadly weapons for preemptive self-defense. Thus, though they may not satisfy Mr. Cramer, my conclusions that 1) in many circumstances the possession of a deadly weapon (which was very likely to be carried concealed) was prima facie evidence of some malintent; and 2) that openly carried weapons invited the intervention or questioning of local authorities, are supported by ample evidence.

## D.   Citation to San Francisco Evening Bulletin

Mr. Cramer stated that he was unable to confirm a footnote in my report—at p. 8, n. 10, referring to the *San Francisco Evening Bulletin*. He takes issue with my use of this source based upon his inability to confirm it, and asserts it is inaccurate. (See Cramer Rebuttal, ¶ 28).

The *San Francisco Evening Bulletin* did indeed publish the words which I quoted on the date and under the title which I cited at p. 8, n. 10. I have provided a copy of the article, appended as EXHIBIT 1. Mr. Cramer stated that he checked two digital repositories, *Chronicling America* and the *California Digital Newspaper*

---

[22] The "new" legal history, which embraces sources from social and cultural history and interprets the law in a broader sense than statutes and case law, is no longer new. Examples include: Hendrik Hartog, "Pigs and Positivism," *Wisconsin Law Review* (1985); Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June 1997), 67-96; Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 3-10. For a brief application of this method to the local regulation of weapons in early America, see Edwards, "Weapons and the Peace," *Second Thoughts*, Duke Center for Firearms Law (July 25, 2023), https://firearmslaw.duke.edu/2023/07/weapons-and-the-peace/.

*Collection*, but was unable to locate this particular newspaper. There are a great many more repositories of digitized newspapers than these two open-access databases. At my home institution of Texas Christian University, the Mary Couts Burnett Library offers access to dozens of subscription-only newspaper, periodical, and primary-source databases which I use in my research.[23]

Mr. Cramer also questions the accuracy of the quotation as a result of its being published in a British magazine. The original article, a lengthy travel account entitled "Colonel Bowie and His Knife," appears to be a distillation of the kind of travel literature that was popular during the nineteenth century.[24] The original piece measures ten pages in length and presents a first-person telling of stories and encounters in the American South circa 1860. It captures the stereotypes of southern culture quite well, including the popularity of bowie knives, the penchant for carrying deadly weapons, and the tendency to satisfy manly honor with violence. Though British-written and probably not based on the writer's own firsthand experiences, the account describes southern men in terms familiar to students of southern history. Since the latter twentieth century, historians have presented a view of southern male culture as one preoccupied with appearances and committed to a violent defense of honor.[25] The essay is certainly in line with this history in its description of the perceived attitudes and behaviors of white southern men.

The *San Francisco Evening Bulletin* then reprinted a short segment of this travelogue under a different title, "The Bowie Knife in the South," in autumn 1861. Mr. Cramer offers nothing to dispute the well-documented fact that bowie knives were popular in southern states.  (See, e.g., Rivas Report, 8.)

---

[23] https://library.tcu.edu/.

[24] "Colonel Bowie and His Knife," *Temple Bar Magazine* 2 (July 1861), 120-130.

[25] This is a large and growing field of historical scholarship. See, e.g., Angela M. Hornsby-Gutting, "Manning the Region: New Approaches to Gender in the South," *Journal of Southern History* 75, no. 3 (August 2009), 663-676; see especially 664, 667-668.

The reprinted excerpt from the *San Francisco Evening Bulletin* aptly expressed that connection and is one of countless sources demonstrating its veracity.

### E.    Rebuttal's Arguments

Mr. Cramer's claims about American history do not comport with the standards of historical scholarship.  (See, e.g., Cramer Rebuttal, ¶¶ 20, 20-21, 60-64.)

First, Mr. Cramer questions my assertion that violence and weapon-carrying "rose in tandem" during the nineteenth century, and insists on an answer to the question, "Which caused which?" (Cramer Rebuttal, ¶ 20.) The study of history generally cannot produce demonstrative results like those which can be replicated in a lab, therefore historians "must base their arguments upon the interpretation of partial primary sources that frequently offer multiple explanations for a single event."[26] It is impossible to know with certainty the extent to which rising violence prompted Americans to carry deadly weapons, versus the extent to which their carrying of these weapons produced yet more violence. But it is clear that Americans of the nineteenth century lived through a more violent period of American history than their eighteenth-century predecessors, that they were more likely to carry deadly weapons concealed about them, and that their deadly weapons (especially pistols) were more lethal than eighteenth-century analogues.[27] I make

---

[26] Thomas Andrews and Flannery Burke, "What Does It Mean to Think Historically?" *Perspectives on History* (January 2007); https://www.historians.org/research-and-publications/perspectives-on-history/january-2007/what-does-it-mean-to-think-historically

[27] Roth analyzes the southern tendency to carry knives and pistols, and that behavior's connection to underlying social problems in the South in Roth, *American Homicide*, 217-220 (On p. 218: "Few whites had carried pistols or fighting knives in the eighteenth century, but the practice became more popular in the plantation South in the nineteenth century as fears of black violence grew and whites became more anxious and belligerent. The proportion of homicides committed with such weapons is uncertain, since most records did not specify the kind of gun or knife used, but guns and knives accounted for a growing share of the known weapons that whites used to kill other whites."). Roth then goes on to cite statistical information drawn from his robust analysis, which can be found in the

(continued…)

1 this point throughout my report, including by citing to the work of historian

2 Randolph Roth, an eminent scholar, professor, and co-director of the well-respected

3 Historical Violence Database, whose monograph, *American Homicide*, is the most

4 thorough exploration of the subject to date and the standard reference work for

5 regionally specific conclusions driven by quantitative analysis.[28] The historian's

6 question as to the connection between carrying deadly weapons and violence is not

7 "Which caused which?" but *how are they related?* Throughout my report, I

8 endeavored to place the development of deadly weapons, their proliferation within

9 American communities, and the regulatory efforts focused upon them within this

10 context of American violence.

11     I also presented evidence showing that the availability and popularity of

12 deadly weapons made them more likely to be carried and/or used. (See Rivas

13 Report, 5-6, 11-15.) Sources previously cited in my report speak to their conviction

14 that going armed was a temptation. (See Rivas Report, 15.) Whether that sense

15 among historical people comports with current statistics (as Mr. Cramer disputes, at

16 ¶¶ 62-64) is irrelevant to the historian, whose mission is to understand historical

17 actors in their historical context. His attempt to take a recent statistical study

18 pertaining to mentally ill persons and superimpose its conclusions upon nineteenth-

19 century Americans without accounting for differences in social mores, conceptions

20 of mental illness, or availability of sources defies some of the most fundamental

21 principles to the practice of history. (Cramer Rebuttal, ¶ 64.) Moreover, it defies

22 common sense to believe that exceptionally lethal deadly weapons were more

23 available to nineteenth-century consumers and more likely to be owned or carried

24 by them, but reject the idea that their presence or market saturation had a role to

25 play in measurably rising rates of violence during the nineteenth century. We

26  

27 American Homicide Supplemental Volume, "Weapons," available at
https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf

28 [28] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of
Harvard University Press, 2009).

cannot quantify the influence of weapon-carrying upon violence, and we cannot make unilateral statements about causality, but we can reasonably conclude that access to deadly weapons was related to growing violence.

Mr. Cramer's rebuttal also questions my synthesis of the root causes of rising rates of homicide in the nineteenth century. (See Cramer Rebuttal, ¶ 60). He takes issue with my assertion that "[r]ates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors." (Rivas Report, 11.) This statement was made in a section of my report entitled "Context of American Violence" (*id.* at pp. 11-15). I listed the four factors which have been shown to correlate to homicide rates: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy.[29] (Rivas Report, p. 12, n. 25.) These overarching factors are found in widely accepted scholarship about the history of violence in America, which Mr. Cramer questions.[30] (Cramer Rebuttal, ¶¶ 20-21, 60.)

### F.   Rebuttal's Misreading of My Report

Mr. Cramer's assessment of my statements relating to the larger atmosphere of violence in the nineteenth century seems to have been informed by a misreading on his part. He appears to have read my report to argue that the availability of deadly weapons was solely responsible for rising rates of violence in nineteenth-century America. (Cramer Rebuttal, ¶ 60.) At no point in my report did I argue that "handgun availability alone" caused the rising violence. In explaining causes, as previously stated, I referred to *American Homicide* and its four correlating factors. What I argued about the connection between deadly weapons and violence during the nineteenth century was that "[t]he proliferation of revolvers during [the nineteenth century] exacerbated these problems, rendering armed encounters even

---

[29] Roth, *American Homicide*, 17-26.
[30] Mr. Cramer's rebuttal includes two separate paragraphs bearing the number 20.

more deadly than they had been before." (Rivas Report, 12-13.) This is an argument which even Mr. Cramer admits "seems logical." (Cramer Rebuttal, ¶ 61.)

This is just one of several instances where Mr. Cramer appears to have misconstrued points and passages within my report:

He misreads a statement in my report's "Summary of Opinions" to apply exclusively to the state of California which is instead a general statement: in states that provided a travel exception—whether their public carry laws implicated open carry or not—the existence of that exception speaks to "the idea that population density was a factor in developing and enforcing weapon policies in the nineteenth century." (Rivas Report, 4.)

At Paragraph 70, Mr. Cramer takes the opening sentence of a paragraph beginning with the phrase "In the early nineteenth century" to mean that every fact listed in the paragraph occurred during the early nineteenth century. The paragraph in question is from a section entitled "Approaches to Public Carry Regulation in the Nineteenth Century" and addressed "Restrictions on Public Carry" throughout the entire nineteenth century, as my writing makes clear. (See Rivas Report, 17.)

At Paragraph 97, Mr. Cramer seems to believe that I am unaware that Hawaii was an independent nation prior to its being made a United States Territory, even though I stated as much in my report and accompanying citation. (See Rivas Report, 30.) The fact that Hawaiian people had lived for approximately fifty years with public carry regulation prior to their joining the United States is significant to a thorough examination of public carry laws in American history.

At Paragraphs 29-30 and 41-42, Mr. Cramer misinterprets a footnote providing citations to numerous public carry laws that "regulated the presence of knives larger than a pocket knife in public places." (Rivas Report, 8, n. 11.) I quoted the regulated weapons within each statute, showing that the laws aimed to apply to fighting knives as distinguished from pocket knives. The notation's purpose of describing regulated knives was clear from the sentence, and was yet

more clear from the report section title "Large Knives," printed on the previous page. He accuses me of "dishonest editing" and misrepresenting concealed-carry laws as open-carry laws, when in fact he misread my report.

Mr. Cramer's misconstruction in Paragraph 42 reveals his most serious misreading of my report—that a "public carry regulation" indicates an open-carry restriction. It is unclear where or how Mr. Cramer arrived at the false conclusion that every time I used the phrase "public carry regulation" in my report, I intended to convey the idea of "open-carry ban."[31] Concealed-carry laws are a form of public carry regulation, and I treated them as such in my report.

### G.    Rebuttal's Unprofessionalism

Finally, Mr. Cramer at various points attacks my integrity and intelligence in ways that are both unnecessary and unprofessional. (See Cramer Rebuttal, ¶¶ 28-30, 41-42, 45, 56, 71, 96-97.) Such attacks are inconsistent with the manner in which historians engage in disagreements about history.

As a member of the historical profession and its preeminent organization in the United States, the American Historical Association (AHA), I abide by the AHA Statement on Standards of Professional Conduct.[32] Professional historians are part of a community "collectively engaged in investigating and interpreting the past as a matter of disciplined learned practice," and even though historians "believe in vigorous debate…they also believe in civility."[33]

Mr. Cramer's attacks at times seem to arise from misreading my report. Perhaps Mr. Cramer did not read the document with sufficient care to engage substantively with the issues I addressed. Indeed, it seems as though Mr. Cramer did not read with much care at all beyond page 27 of my report—consolidating his

---

[31] See also Paragraph 50: "If by 'regulated' Rivas means states *prohibited concealed carry*, this was *generally true*, but by no means universal."

[32] https://www.historians.org/jobs-and-professional-development/statements-standards-and-guidelines-of-the-discipline/statement-on-standards-of-professional-conduct

[33] Id.

unstated criticisms into a single accusation that the remainder of my report was nothing more than "misleading 'evidence'." (Cramer Rebuttal, ¶ 97.) Professional historians often disagree about how to interpret the past, and Mr. Cramer is free to disagree with the conclusions I drew based upon my research for this report. But it is inappropriate to denigrate another's work and attack it without engaging substantively on the issues of significance that were presented and substantiated with primary sources. Mr. Cramer's rebuttal adds nothing to the question of how common the open carrying of deadly weapons was, or whether nineteenth-century Americans approved of openly carrying deadly weapons for preemptive self-defense; it does not contextualize public carry laws, and in fact, rejects the contextualization I provided without constructing a reasonable alternative; his rebuttal mounts no argument other than a repetition of well-known case law pertaining to public carry regulations.

## III.  CONCLUSION

Overall, Mr. Cramer has failed to rebut or undercut the arguments I have made in my initial report:

1. The public carrying of deadly weapons has been regulated throughout American history.

2. When laws prohibited the concealed carrying of deadly weapons, the open carrying which they implicitly protected was generally reserved to emergency or unusual situations—not everyday arming for the purpose of preemptive self-defense.

3. Sources from American history demonstrate strong public sentiment against being armed on a regular basis for the purpose of preemptive self-defense.

4. Public carry regulations often worked in conjunction with other statutes affecting the sale, use, and possession of weapons; at times these other

regulations acted to disincentivize or discourage the public carrying of deadly weapons.

5. Requiring a license to carry concealed weapons is a longstanding regulatory policy in California.

6. Public carry regulations have at times distinguished between urban and rural locales.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  8/3/ 2023, at Fort Worth, Texas.


Dr. Brennan Rivas


*Brennan Rivas*

EXHIBIT 1

**Early American Newspapers**

# The Bowie-Knife in the South

**San Francisco Bulletin (published as Evening Bulletin)** (San Francisco, California)    October 18, 1861

| Page [1] | | Page 1 of 4 |

View Full Page      Search Issue      View Details

Find text on this page          Highlight

THE BOWIE-KNIFE IN THE SOUTH.—So certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow. So much so is this the case, that in a violent argument with a Memphis or Vicksburg man, it would be unsafe to scratch the back of your neck, for it is down the back that the bowie-knife is often kept; to pull out your watch, for in the waistcoat pocket often lurks the miniature Derringer pistol; to take out your pocket handkerchief from your coat-tail pocket, because there is the den of the "five-shooter." Indeed, it is the rule, when you quarrel with suspicious characters, rowdies or gamblers, as one of them himself told me, to fire the Derringer from the trowsers pocket the very instant you have called your opponent "darned thief," "scoundrel," or flung whatever mud of curses and abuses you choose to pelt at him. If you do not, ten to one three bullets and a bowie-knife will be in you before you can draw your pistol and fire, and there you will be dead and gouged on the bar-room floor. To draw the Derringer would be dangerous, but by firing it from the trow-sers or paletot pocket, you gain a move in the game; and if the "blue pill" go right through brain or artery, the result to your enemy is unmis-takably "checkmate," or, as rowdy would say in

billiard-room jargon, "one love."—Temple Bar
Magazine.

©2023 Readex.
Contact Customer Service: 1-800-243-7694 or custservice@readex.com
Share Your Feedback      Privacy Policy      Terms of Use

## THE BOWIE-KNIFE IN THE SOUTH.

So certain, indeed, is the bowie-knife in an appeal, that the great anxiety of a disputant in the South seems to be always to strike the first blow. So much is this the case, that in a violent argument with a Memphis or Vicksburg man, it would be unsafe to doubt the hit of your neck, for it is down the back that the bowie-knife is often kept; to pull out your watch, for in the waistcoat pocket often lurks the miniature Derringer pistol; to take out your pocket handkerchief from your coat-tail pocket, because there is the den of the "five-shooter." Indeed, it is the rule, when you quarrel with suspicious characters, rowdies or gamblers, as one of them himself told me, to fire the Derringer from the trowsers pocket the very instant you have called your opponent "darned thief," "scoundrel," or flung whatever mud of curses and abuses you choose to pelt at him. If you do not, ten to one three bullets and a bowie-knife will be in you before you can draw your pistol and fire, and there you will be dead and gouged on the bar-room floor. To draw the Derringer would be dangerous, but by firing it from the trowsers or paletot pocket, you gain a score in the game; and if the "blue pill" go right through brain or artery, the result to your enemy is unmistakably "checkmate," or, as rowdy would say in billiard-room jargon, "one love."—*Temple Bar Magazine.*

# CERTIFICATE OF SERVICE

Case Name:   **Baird, Mark v. Rob Bonta**          No.   **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>October 13, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 13, 2023</u>, at Los Angeles, California.

|  |  |
|---|---|
| Lara Haddad | *Lara Haddad* |
| Declarant | Signature |