ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
LARA HADDAD
Deputy Attorney General
State Bar No. 319630
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6250
  Fax:  (916) 731-2124
  E-mail:  Lara.Haddad@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his official capacity as Attorney General of California*[1]

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARK BAIRD and RICHARD GALLARDO,**<br><br>Plaintiff,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,**<br><br>Defendants. | Case No. 2:19-cv-00617-KJM-AC<br><br>**SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF ROBERT J. SPITZER** |

---

[1] Each defendant currently holds the position of the former respective named defendants.  *See* Fed. R. Civ. P. 25(d).

1

I. **INTRODUCTION**

I previously submitted a declaration and expert report in this matter, signed on June 8, 2023. Everything that I stated in that report is true and accurate to the best of my knowledge. I am submitting this sur-rebuttal expert report and declaration to address the rebuttal report prepared by Clayton Cramer and attached as Exhibit 2 to his declaration, signed on July 14, 2023.

In my Report and Declaration,[2] I examine an array of historical weapons restrictions to show that the carrying of weapons of all sorts, but especially guns, fighting knives (long, thin-bladed knives), and various types of clubs have been subject to wide-ranging regulation and restriction from the seventeenth century through the early twentieth century. I do this by examining the regulatory history of weapons carrying, extending to concealed carry laws (enacted by essentially every state), open carry restrictions (at least 29 states enacted at least 53 laws restricting or extending to the open carrying of weapons), and laws that restricted any kind of firearm carrying (at least 22 states enacted 36 laws specifically restricting the carrying of long guns or any kind of firearm). I then examine laws penalizing weapons brandishing and display, defined this way: "brandishing of weapons—that is, to display them in the presence of others and to do so in a menacing or threatening manner; and the mere display or wearing of weapons (i.e. that they simply can be seen) in the presence of others." (Spitzer Report, 11) In all, I identify 21 states that enacted brandishing laws, and 19 states that enacted weapons display laws, totaling 40 such laws enacted in 36 states. (4 states enacted both types.) I then examine several categories of weapons licensing laws.

---

[2] Signed June 8, 2023.

In his Rebuttal to my Report, which I have reviewed, Clayton Cramer (hereafter Cramer) makes numerous errors, misstatements, and assertions that are unrelated to the content of my report. None of Cramer's contentions undercut, minimize, or otherwise negate my analysis, evidence, and information. Of the hundreds of old laws I examine, Cramer disputes a relative handful. His contentions are inaccurate, and he attributes statements and assertions that I did not write. In addition, Cramer's declaration demonstrates a deficient understanding of the nature and history of constitutional law and early lawmaking in America. Cramer alleges that my Report exhibits "either confirmation bias or misrepresentation." (Cramer Rebuttal, 2, ¶6.) It does neither, as the account below will demonstrate.

## II.     CRAMER REBUTTAL – CONCEALED WEAPON REGULATION

Cramer first discusses a 1686 New Jersey law I cite as an early example of a law restricting both concealed and open weapons carrying. Cramer says that the *Bruen* Supreme Court decision "discounted" this law. (Cramer Rebuttal, 1-2, ¶4.) But the Supreme Court acknowledged that the 1686 New Jersey statute did indeed punish the concealed or "private. . .wear" of "pocket pistols" and open weapons carrying of pistols by planters.[3] That is the point that I raised in my report (Spitzer Report, 6): the law curtailed both concealed and open firearm and other weapons carrying as early as the 17th century.

Cramer next questions a 1750 Massachusetts law I cite, first saying that there was no such law (Cramer Rebuttal, 2, ¶ 7); then citing a law with a slightly different citation (dated 1749-51) which he assumes I meant to cite (*id.*, 3, ¶ 8); and then asserts that the law "does not prohibit carrying of arms except if they 'shall be unlawfully riotously or tumultuously assembled,'" (*id.*, 3, ¶9), attributing to me the claim that this law "prohibit[ed] carrying of arms"

---

[3] *NYSRPA v. Bruen*, 97 U. S. ____ (2022), 39.

3

(*id.*). But he misstates my report. I stated that the Massachusetts law "penalize[d] any assemblage of twelve or more persons, whether the weapons were concealed or openly carried, 'being armed with clubs or other weapons.'" (Spitzer Report, 6.) This, indeed, is what the law says.

Cramer is also incorrect about the citation to the 1750 Massachusetts law in my report. My original cite to the Massachusetts law when I first encountered it was: 1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1. The original law was indeed dated 1750[4] but was apparently published separately as a notice later, in 1751.[5] The second citation is: 1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12, dated 1751. The law as I presented it is correct, as was my brief comment on it.

Cramer then comments on a Virginia law from 1786 and a North Carolina law from 1792, (Cramer Rebuttal, 3, ¶ 10), both of which I briefly discuss. (Spitzer Report, 7) Regarding the Virginia 1786 law, while Cramer is correct that it traces back to English law, the law is particularly relevant to this case because it was then adopted and passed as good law in the state of Virginia (as is true of the 1792 North Carolina law). (Spitzer Report, 7.) Much of American law is traceable back to earlier British law, as the colonies were mostly settled by British immigrants and the entire thirteen colonies were part of the British Empire until they rebelled successfully, winning independence in 1781, formalized by treaty in 1783.

The Virginia 1786 law was good law because it was adopted as such by the Virginia legislature. (See Spitzer Report, 7.) The same is true of the North Carolina law from 1792, about

---

[4] https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1749-51-Mass.-Acts-339.pdf
[5] https://firearmslaw.duke.edu/laws/1749-51-mass-acts-339-an-act-for-preventing-and-suppressing-of-riots-routs-and-unlawful-assemblies-chap-12-%c2%a7-1/

which he erroneously asserts, "As the title makes clear, this was not a statute passed by the North Carolina Legislature." (Cramer Rebuttal, 3, ¶11.) But the title makes clear the opposite point: that it *was* a statute in full force and effect within the state in 1792, as the law is titled "A Collection of Statutes of the Parliament of England *in Force in the State of North Carolina*" [emphasis added]. (See Spitzer Report, Exhibit E) Cramer's quote from Francis Martin (Cramer Rebuttal, 3, ¶11) confirms that it was, in fact, adopted as good law for the state by its state legislature. Martin's words, as quoted by Cramer, say this very thing: "'I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression.'" (Cramer Rebuttal, 3, ¶11.)

Cramer also refers to an 1801 Tennessee law that I cite (Spitzer Report, 13) by saying that it was "a vagrancy law for 'persons of ill fame or suspicious character.'" (Cramer Rebuttal, 4, ¶13.) He notes that the text harkens to earlier English law, thereby somehow suggesting that it was not valid law. Again, he fails to understand that this law, regardless of its provenance, was enacted by the Tennessee legislature, and it was therefore in full force and effect in Tennessee. Further, while the act's title does call it a law for "persons of ill fame or suspicious character" (see text below), legislative acts, both then and now, often combine different provisions, some or many of which may address a purpose not mentioned in the title. And here, the title suggests that individuals engaged in the proscribed conduct would have been considered disorderly.  =The Tennessee law below is an exemplar. The relevant portion, Section 6, makes clear that it applies to "*any person or persons* [emphasis added]" (see text below), language that reaches far beyond the narrow categories of "persons" used in the title. This is a common trait for laws in this period (no less than it is today), as this very law illustrates. Section 6 applies to any and all persons in the state, not just the "idle and disorderly" as described in the title:

5

> An Act for the Restraint of Idle and Disorderly Persons § 6. Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.[6]

Cramer then refers to an 1831 Tennessee compilation of laws (Cramer Rebuttal, 4, ¶13 & fn. 11) seemingly to imply that the 1801 Tennessee law does not exist; it does exist, as the citation above demonstrates, and as its inclusion in the compilation of laws shows.

Cramer next quotes my Report (Cramer Rebuttal, 5, ¶ 14)[7] where I summarize the enactment of concealed carry laws by the states: "In the 1800s, as interpersonal violence and gun carrying spread, 43 states (including the District of Columbia) joined the list [of states adopting concealed carry laws]; 3 more did so in the early 1900s." (Spitzer Report, 7.) Cramer then adds, "This is an amazing claim that deserves actual evidence, not just a citation to work by himself and others." (Cramer Rebuttal, 5, ¶ 14.) But this ignores the evidence and citations I cite in support of this fact in the footnote attached at the end of this statement. (See Spitzer Report, 7) Specifically, I cite my own historical article published in an academic journal in 2017, and three Exhibits I attached to my Report that provide the texts and years of each of the concealed carry laws in question. (Spitzer Report, 7, citing Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80 (2017): 63-67; see also Exhibits B, C, and E.)

---

[6] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801.

[7] Cramer has two paragraphs listed as 14 in his report. (Cramer Rebuttal, 5, ¶ 14; 5-6, ¶ 14) I am discussing his first paragraph 14 here.

6

Cramer then makes the assertion that it is questionable whether the laws I cite to were constitutional. Referring to various carry laws, he states that the "passage of such laws are no more evidence that they were constitutional than laws racially segregating public schools before Brown v. Board of Education (1954) are evidence of the constitutionality of the latter laws." (Cramer Rebuttal, 5, ¶14)[8] But he offers no evidence that the Virginia or North Carolina laws discussed above were declared unconstitutional (and I know of no case that does so).[9]

Cramer then discusses an array of state court cases spanning the twentieth century (and as late as 1990) concerning rulings on the carrying of weapons (Cramer Rebuttal, 5-9, ¶¶14-26) that are not relevant to the laws I discuss, which are all about state and local public policy from the 1600s to the early 1900s.

Cramer next criticizes my quotation of an 1837 Georgia anti-carry law without also mentioning the case of *Nunn v. Georgia* in my report, which was a challenge to that law. (Cramer Rebuttal, 9, ¶ 27.) I am very familiar with the *Nunn* decision, but did not cite the case in my expert report, because the discussion in that report is about state statutory enactment of weapons carrying laws as state-enacted public policy, to demonstrate their prolific and varied nature throughout the country. Moreover, Cramer is mistaken that the 1837 Georgia "law [was] overturned on Second Amendment grounds." (Cramer Rebuttal, 9, ¶27.) Only a portion of the law was overturned.

*Nunn* involved a Georgia man who was prosecuted for carrying a pistol (apparently openly, not concealed). The state law (which is reprinted in full in my Report Exhibit E)

---

[8] This paragraph is the second paragraph 14 in Cramer's Rebuttal.  (Cramer Rebuttal, 5-6, ¶ 14)
[9] Further, laws that enforced racial segregation in public schools and accommodations were upheld by the Supreme Court from the end of the nineteenth century, in *Plessy v. Ferguson* upholding the racial doctrine of "separate but equal" in 1896, until the 1954 *Brown* case.

7

criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision of the law allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. Noting the "great vagueness" in the statute's wording, the court reversed the defendant's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State."[10] By contrast, the court upheld the constitutionality of the concealed carry restrictions and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*."[11] *Nunn* only overturned the portion of the law that might be construed as restricting the open carrying of weapons. It did not overturn the entire law, as Cramer erroneously says.

Finally, Cramer's assertion that the laws that I have included that were passed after 1868 are "irrelevant" ignores two facts. First, the *Bruen* court said no such thing, as the majority opinion and Justice Barrett's concurrence makes clear. Both emphasized that the relative merits of Founding-era laws versus Reconstruction-era laws was an unresolved question.[12] Second, these laws show the wide array and *sustained* tradition of restrictions on the public carry of weapons, to the end of the nineteenth century.

### III.     CRAMER REBUTTAL - BRANDISHING LAWS

Turning to laws that I discuss concerning regulation of the brandishing and display of weapons, the Cramer declaration fails to recognize the distinction between open weapons carrying restrictions and brandishing and display laws, even though I treat them as separate

---

[10] *Nunn v. State*, 1 Ga. 243, 246, 251(1846).
[11] *Nunn v. State*, 1 Ga. 243, 246 (1846). Italics in original.
[12] *NYSRPA v. Bruen,* 29 and Barrett concurrence.

categories. (See Cramer Rebuttal, 10-13, ¶¶ 30-41.) And while he offers some commentary on brandishing laws, he makes no mention of the second category that I discuss in my Report, weapons display laws. As I discuss in my Report, brandishing laws involve the display of weapons in the presence of others and to do so in a menacing or threatening manner. Weapons display laws criminalize the mere display of weapons in public—that is, they simply can be seen by and in the presence of others in public. (Unlike open carry law restrictions, display laws involve public carry but only come in to play with others present.) Brandishing laws do not punish the carrying of weapons per se, but do punish their public presence when combined with menace or threats. Display laws punish their mere public appearance or wearing in the presence of others. (*Id.*)

Cramer first quotes my discussion of brandishing and display laws where I begin by quoting a 1642 law from New Netherland/New York (Spitzer Report, 11), and then he writes: "[T]he statute 'that no one shall presume to draw a knife much less to wound any person,' prohibits not the open carry of a knife, but drawing it. In conjunction with any threat or hostilities, this would be assault with a deadly weapon under California law. Allowing open carry of a firearm changes this not at all." (Cramer Rebuttal, 10, ¶31.) But I never characterized this 1642 law as "prohibit[ing] the open carrying of a knife." I instead stated that the law "allowed for penalties for merely drawing or displaying a weapon, even if no brandishing or wounding occurred." (Spitzer Report, 11.) Cramer appears to conflate a law restricting open weapons carrying with brandishing/display laws. I treat these as separate categories of laws in my Report, and explain the differences. (See Spitzer Report, 11-16.)

Cramer next criticizes my Report for not citing more of the text of a 1786 Massachusetts law pertaining to thirty or more persons "unlawfully, routously, riotously or tumultuously

assembled." (Cramer Rebuttal, 10, ¶32.) He asserts that I "misrepresented the statute" (*id.*) but I provided the full text of that law in Exhibit E of my Report. Moreover, Cramer's criticism that I misrepresented the law is incorrect. First, the law states:

> if any persons to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously or tumultuously assembled, any Justice of the Peace, Sheriff or Deputy-Sheriff of the county, or Constable of the town, shall, among the rioters, or as near to them as he can safely come, command silence while proclamation is making. . . .[13]

A semi-colon appears after the word "weapons," followed by the word "or." That punctuation separates the description of "twelve, or more, being armed with clubs or other weapons," from the text that follows referring to thirty or more people that says nothing about them being armed, but with the added wording of them behaving "unlawfully, routously, riotously or tumultuously assembled." In other words, the law contemplates two sets of misdeeds: the first is twelve or more people armed with clubs or other weapons; the second is thirty or more people (no mention of them being armed) who behave in a riotous manner. Cramer appears to ignore this distinction.

    Second, Cramer implies that I take this law to mean that "[b]eing armed was…unlawful." (Cramer Rebuttal, 10, ¶33) Not so, as explained above. (See also Spitzer Report, 11-12.) Third, he fails to acknowledge that in the same paragraph I observe that "other provisions of the act also penalized such groups who also behaved in a threatening manner." (Spitzer Report, 11)

    For the portion of my Report (Spitzer Report, 12) that he critiques in paragraph 36 of his declaration, Cramer again argues that he cannot find the statutes—in this case, New Hampshire laws from 1699 and 1708. (Cramer Rebuttal, 11, ¶ 36)  The 1699 law was cited in an amicus

---

[13] 1786 Mass. Sess. Laws 502, §§ 1-2, An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof. (Spitzer Report, Exhibit E)

brief submitted by professors of English and American history and law, to the U.S. Supreme Court in *Bruen*.[14]

> This law is nearly identical to the following New Hampshire law from 1701:[15]
>
> New Hampshire - Acts and Laws June 1701:
> That every justice of the peace within this province, may cause to be stayed and arrested all affrayers, rioters, disturbers or breakers of the peace, or any other that shall go armed offensively, to put his Majesty's subjects in fear by threatening speeches; and upon view of such justice, confession of the Party, or legal proof of any such offence, the justice may commit him to prison, until he the offender find such sureties as is requited for his good behavior, and cause his arms or weapons to be taken away, and apprized and answered to his Majesty, as forfeited: And may further punish the breach of the peace, in any person that shall smite or strike another by fine to the King, not exceeding twenty shillings, or require bond for their good behavior, and to pay all just costs; as also may make out hue and cry after run-away-servants, thieves, and other criminals.[16]

The New Hampshire 1708 law, which Cramer was unable to find, is as follows:

> New Hampshire Public Carry Prohibition (1708)
> And every justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches :
> And upon view of such justice, confession of the offender, or legal proof of any such offence, the justice may commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required, according to the aggravations of the offence ; and cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use. And may also punish the breach of the peace in any person, who shall smite, or strike another, by fine to the King, not exceeding twenty shillings ; and require bond with sureties for the peace, till the next court of

---

[14] The brief cites 1699 N.H. Laws 1, and states that justices of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches." Amicus Brief at 11, available at https://www.supremecourt.gov/DocketPDF/20/20-843/193309/20210921191001002_20-843%20bsacProfessorsOfHistoryAndLaw.pdf. This 1699 law is also cited in *Young v. Hawaii*, 992 F.3d 765, 794-95 (9th Cir. 2021).

[15] It is possible that the aforementioned amicus brief and the *Young v. Hawaii* decision intended to cite the 1701 law.

[16] Available at https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh

> general sessions of the peace, or may bind the offender over to answer for said offence at said court, as the nature and circumstances of the offence may require.[17]

In addition, below is a very similar New Hampshire law from 1744:

> New Hampshire - Acts and Laws, 1744, 9-10:[18]
> That if twelve persons or more, being armed with clubs, or other weapons; or that if fifty persons or more, whether armed or not, shall be unlawfully, riotously, tumultuously or routerously assembled, any of the officers aforesaid, shall make a proclamation, in manner and form aforesaid; and if such persons so unlawfully assembled, shall not thereupon immediately disperse themselves, according to said proclamation, each of them, and every one who shall wilfully hinder any such officer (who shall be known, or shall openly declare himself to be such) making the said proclamation, shall forfeit and pay a fine not exceeding the sum of five hundred pounds, at the discretion of the said superior court, (which only shall have cognizance of the offense,) considering the aggravations attending the same, and shall be whipt thirty stripes on the naked back at the publick whipping-post, and suffer twelve months imprisonment, and once every three months, during said twelve months, receive the same number of stripes aforesaid.[19]

Another law that I cite from Massachusetts 1795 that Cramer could not find (Cramer Rebuttal, 12, ¶37), is as follows:

> 1795 Mass. Laws 436, ch. 2, An Act for Repealing an Act, made and passed in the year of our Lord, one Thousand six Hundred and ninty-two, entitled, "An Act for punishing Criminal Offenders," and for reenacting certain provisions therein.
> And it is further enacted by the authority aforesaid, That every Justice of the Peace, within the county for which he may be commissioned, may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the Peace, and being of the good behavior; and in want therof, to commit him to prison until he shall comply with such requisition: and may further punish the breach of the Peace in any person that shall

---

[17] New Hampshire 1708, "Laws of New Hampshire," available at https://heinonline.org/HOL/Page?handle=hein.ssl/ssnh0244&id=68&collection=ssl.  Also available at https://firearmslaw.duke.edu/laws/new-hampshire-public-carry-prohibition-1708/

[18] This law was dated by this phrase: "made and passed in the Seventeenth Year of His present Majesty's Reign," which would calculate to be in the reign of King George II (1727-1760) as the year 1744.

[19] Available at https://heinonline-org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10.

assault or strike another, by fine to the Commonwealth, not exceeding twenty shillings, and require sureties as aforesaid, or bind the offender, to appear and answer for his offence, at the next Court of General Sessions of the Peace, as the nature or circumstances of the case may require.[20]

Thus, Cramer's implied assertions that the many laws I reference do not exist are plainly wrong.

Next, Cramer references a Maine 1821 law I cite that, as I describe in my Report, outlawed "affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens."[21] (Spitzer Report, 13.) Cramer asserts that the law "is not a ban on open carry" (Cramer Rebuttal, 12, ¶39)—but I do not represent that it is a ban on open carry. It is a brandishing law, as I plainly state. (Spitzer Report, 13-14.)

Cramer again makes this statement about my general examination of brandishing and display laws in my Report: "Somehow, Spitzer imagines that these brandishing laws prohibited open carry." (Cramer Rebuttal, 13, ¶41.) Even a casual reading of my Report shows that I make no such claim. As is clear from my Report, I treat brandishing laws in a category separate from, but nevertheless related to, open carry prohibitions, just as display laws are. (See above; Spitzer Report, Part II, Weapons Carrying, 6-11; Part III, Brandishing and Display, 11-17.)

Cramer also notes that I include in my tabulation of licensing laws those pertaining to enslaved persons and free Blacks but objects to my inclusion of them, calling the laws' inclusion "an odd defense of a law today." (Cramer Rebuttal, 13, ¶43.) Such laws are abhorrent, but we cannot and should not ignore them when reviewing licensing laws because they are part of the history and tradition of arms regulation. And contrary to Cramer's assertion, licensing laws

---

[20] 1795 Mass. Laws 436, ch. 2. Available at https://firearmslaw.duke.edu/laws/1795-mass-laws-436-ch-2-an-act-for-repealing-an-act-made-and-passed-in-the-year-of-our-lord-on-ethousand-six-hundred-and-ninty-two-entitled-an-act-for-punishing-criminal-offenders-and-for-r/
[21] 1821 Me. Laws 285, ch. 76, § 1.

actually allowed African Americans to carry weapons in the pre-Civil War period subject to the issuance of a license to do so; 18 such laws were enacted by Southern and border states, out of a total of 266 licensing laws in all categories. (See Spitzer Report, Exhibit G.). That is, race-based licensing laws comprise about 6.8% of all licensing laws.

### IV. CRAMER REBUTTAL - CONCLUSION

Finally, the conclusions in Cramer's final Summary are each incorrect. (Cramer Rebuttal, 14, ¶¶46-48.) As the above discussion shows, the laws I cited did indeed exist, even if he was unable to locate them himself. He repeats his error of not understanding the distinction between various types of carry law restrictions (open carry, concealed carry, any gun carrying), which I discussed in Part II of my Report, and brandishing/display laws, which I discussed separately in Part III of my Report. In sum, the Cramer declaration contains numerous critical errors and misstatements (as well as ad hominem attacks), including misrepresentations, and even invention, of statements that I made in my Report. These problems reflect a misunderstanding of historical constitutional law and of early lawmaking.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on August 3, 2023, at Williamsburg, Virginia

/s/ Robert Spitzer

Robert Spitzer

# CERTIFICATE OF SERVICE

Case Name:   **Baird, Mark v. Rob Bonta**          No.   **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>October 13, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF ROBERT J. SPITZER**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 13, 2023</u>, at Los Angeles, California.

|  |  |
|---|---|
| Lara Haddad | *Lara Haddad* |
| Declarant | Signature |