1 | ROB BONTA, State Bar No. 202668
Attorney General of California
2 | MARK R. BECKINGTON, State Bar No. 126009
Supervising Deputy Attorney General
3 | LARA HADDAD, State Bar No. 319630
Deputy Attorney General
4 |   300 South Spring Street, Suite 1702
Los Angeles, CA  90013-1230
5 |   Telephone:  (213) 269-6250
Fax:  (916) 731-2124
6 |   E-mail:  Lara.Haddad@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his official*
7 | *capacity as Attorney General of California*

8 | IN THE UNITED STATES DISTRICT COURT

9 | FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13 | **MARK BAIRD and RICHARD GALLARDO,** | 2:19-cv-00617-KJM-AC

14 | Plaintiffs, | **DECLARATION OF LARA HADDAD IN SUPPORT OF DEFENDANT'S COMBINED OPPOSITION TO**

15 | v. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REPLY**

16 | | **IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

17 | **ROB BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,** |

18 | | Date:            November 3, 2023

19 | Defendants. | Time:            10:00 a.m.
Courtroom:    3

19 | | Judge:           Hon. Kimberly J. Mueller
Trial Date:      None set.

20 | | Action Filed:   April 10, 2019

21

22

23

24

25

26

27

28

1

1   I, Lara Haddad, hereby declare and state the following:

2       1.      I am a Deputy Attorney General at the California Department of Justice and serve as

3   counsel to Defendant Rob Bonta, in his official capacity as Attorney General of the State of

4   California ("Defendant"), in the above-titled matter.  I make this declaration in support of

5   Defendant's Motion for Summary Judgment.  Unless otherwise stated, I have personal knowledge

6   of the facts set forth herein and am competent to testify thereto.

7       2.      On June 9, 2023, which was the deadline for expert disclosures set by this Court, I

8   served expert disclosures and accompanying reports on Plaintiffs' counsel, by email.  These

9   included reports from Dr. Brennan Rivas, Dr. Robert Spitzer, and Dr. Saul Cornell (in addition to

10  a report from Police Chief Kim Raney).  *See* ECF 90-5, ECF 90-6, ECF 90-7, and ECF 90-8.

11  Plaintiffs did not serve their own expert reports.

12      3.      On July 14, 2023, Plaintiffs' counsel served rebuttal expert disclosures which

13  included a declaration with expert rebuttal reports from Clayton Cramer.  A true and accurate

14  copy of the email from Plaintiffs' counsel attaching the rebuttal expert disclosures is attached as

15  Exhibit 1.  A true and accurate copy of the rebuttal declarations and reports that she served as one

16  document, is attached as Exhibit 2.

17      4.      On August 4, 2023, I served sur-rebuttal reports responding and rebutting Mr.

18  Cramer's rebuttal reports.  *See* Sur-Rebuttal Reports of Dr. Brennan Rivas, Dr. Robert Spitzer,

19  and Dr. Saul Cornell.

20      5.      On September 29, 2023, Plaintiffs filed their cross-motion for summary judgment and

21  opposition to Defendant's motion for summary judgment.  This included an expert declaration

22  and attached reports from Mr. Clayton Cramer, to rebut the reports of Dr. Rivas, Dr. Spitzer, and

23  Dr. Cornell.  *See* ECF 96-3.  I reviewed the declaration and reports, and realized that they were

24  different than what had been served on July 14, 2023.  They do not include many of the same

25  arguments Mr. Cramer had raised in his July 14 declaration and reports, and instead raises new

26  arguments that had not previously been raised.  For example, his previous expert report devoted

27  nine pages to the discussion of Dr. Spitzer's analysis of concealed weapons regulations.  Ex. 2 at

28  pp. 43-51.  His newly-filed report only contains one page of discussion.  ECF 96-3 at 14.

1      I declare under penalty of perjury under the laws of the United States of America that the

2 foregoing is true and correct.

3      Executed on October 13, 2023, at Los Angeles, California.

4

5                              */s/ Lara Haddad*

6                              Lara Haddad
                       Deputy Attorney General

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

**Lara Haddad**

| | |
|---|---|
| **From:** | Amy L. Bellantoni <abell@bellantoni-law.com> |
| **Sent:** | Friday, July 14, 2023 4:49 PM |
| **To:** | Lara Haddad |
| **Cc:** | Mark Beckington |
| **Subject:** | RE: Baird v. Bonta |
| **Attachments:** | 2023 Plaintiffs' Expert Disclosures.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Lara,

Thank you, I believe the August 18 would be the correct date for service of the summary judgment motions. Is that the date that you are intending to file/serve the State's motion?

Also please find attached hereto the plaintiffs' Expert Disclosures in rebuttal.

Amy



This Electronic Mail transmission and any attachments contain information belonging to the sender and such transmission is confidential and legally privileged.  This information is intended only for the intended recipient of this transmission.  If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this transmission is strictly prohibited.  If you have received this transmission in error, please reply to the sender at the telephone number above or return e-mail and delete this message and all attachments from your electronic storage files.
========================================================================

**From:** Lara Haddad <Lara.Haddad@doj.ca.gov>
**Sent:** Monday, July 3, 2023 1:45 PM
**To:** Amy L. Bellantoni <abell@bellantoni-law.com>
**Cc:** Mark Beckington <Mark.Beckington@doj.ca.gov>
**Subject:** RE: Baird v. Bonta

Amy,

Thanks very much for reaching out.  The district court's minute order on 11/4/2022 (ECF 77) states that all dispositive motions must be heard by September 22, 2023.  The local rules provide for at least 35 days' notice; I calculate August 18 as the last day by which the parties can file any motion for summary judgment.

Please let us know if you have a different understanding.

Thank you,

Lara

Lara Haddad
Deputy Attorney General
Government Law Section
California Department of Justice
Tel.: (213) 269-6250
Fax: (213) 897-5775
Lara.Haddad@doj.ca.gov

---

**From:** Amy L. Bellantoni <abell@bellantoni-law.com>
**Sent:** Friday, June 30, 2023 2:06 PM
**To:** Lara Haddad <Lara.Haddad@doj.ca.gov>
**Subject:** Baird v. Bonta

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Lara,

For scheduling (and planning) purposes, on what date will you be filing your summary judgment motion?



This Electronic Mail transmission and any attachments contain information belonging to the sender and such transmission is confidential and legally privileged.  This information is intended only for the intended recipient of this transmission.  If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this transmission is strictly prohibited.  If you have received this transmission in error, please reply to the sender at the telephone number above or return e-mail and delete this message and all attachments from your electronic storage files.

===========================================================================

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

EXHIBIT 2

1

COSCA LAW CORPORATION
CHRIS COSCA   SBN 144546

2

1007 7th Street, Suite 210

3

Sacramento, CA 95814
916-440-1010

4

5

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC

6

2 Overhill Road, Suite 400
Scarsdale, NY 10583

7

Telephone: 914-367-0090
Facsimile:  888-763-9761

8

*Pro Hac Vice*

9

Attorneys for Plaintiffs

10

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

11

--------------------------------------------------------x

12

MARK BAIRD and                          Case No.: 2:19-cv-00617-KJM-AC
RICHARD GALLARDO,

13

                              Plaintiffs,

14

         v.                              **PLAINTIFFS' EXPERT DISCLOSURES**
                                         **PURSUANT TO FRCP 26(a),(b)**,

15

16

ROB BONTA, in his official capacity
as Attorney General of the State of California,

17

                              Defendant.

18

19

--------------------------------------------------------x

20

      Plaintiffs make the following expert disclosures pursuant to and consistent with the

21

requirements of Federal Rule of Civil Procedure 26(a) and (b).

22

      The expert declaration of Clayton Cramer with accompanying written expert report is

23

annexed hereto as Exhibit 1.[1]

24

      The curriculum vitae of Clayton Cramer is annexed hereto as Exhibit 2.

25

      The expert declaration of Charles "Chuck" Haggard with accompanying written expert

26

27

---

28

[1] Plaintiffs also intend to rely on the testimony taken at the defendant's deposition of Clayton Cramer on October 20, 2021.

report and curriculum vitae is annexed hereto as Exhibit 3.[2]

Dated:  July 14, 2023

THE BELLANTONI LAW FIRM, PLLC

_____/s/ Amy L. Bellantoni, Esq._____
Amy L. Bellantoni
*Attorney for Plaintiffs*
*Pro Hac Vice*
Email: abell@bellantoni-law.com

2

---

[2] Plaintiffs also intend to rely on the testimony taken at the defendant's deposition of Charles "Chuck" Haggard on October 19, 2021.

PLAINTIFFS' EXPERT DISCLOSURES PURSUANT TO FRCP(a)(2)

# EXHIBIT   1

1  COSCA LAW CORPORATION
2  CHRIS COSCA   SBN 144546
   1007 7th Street, Suite 210
3  Sacramento, CA 95814
   916-440-1010
4
   AMY L. BELLANTONI
5  THE BELLANTONI LAW FIRM, PLLC
   2 Overhill Road, Suite 400
6  Scarsdale, NY 10583
   Telephone: 914-367-0090
7  Facsimile: 888-763-9761
8  *Pro Hac Vice*

9  Attorneys for Plaintiffs

10                          **UNITED STATES DISTRICT COURT**

11                          **EASTERN DISTRICT OF CALIFORNIA**

12

13
   MARK BAIRD and
14 RICHARD GALLARDO,                      Case No. 2:19-CV-00617

15
                          Plaintiffs,     **EXPERT DECLARATION AND REPORT**
16        v.                              **OF CLAYTON CRAMER IN REBUTTAL**

17 ROB BONTA, in his official capacity as  Judge:      Hon. Kimberly J. Mueller
                                           Room:       3
18 Attorney General of the State of California,
   and DOES 1-10,
19                                         Trial Date:  None set
                                           Action Filed: April 9, 2019
20                        Defendants.

21

22

23

24

25

26

27

28
                                    1
   EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER IN REBUTTAL

# DECLARATION OF CLAYTON CRAMER

I, Clayton Cramer, declare pursuant to 28 U.S.C. § 1746 that:

1.     I have been asked to offer an expert opinion in the above-entitled case in rebuttal to the expert reports and declarations of Brennan Rivas, Robert J. Spitzer, and Saul Cornell proffered by Defendant Rob Bonta.

2.     I have personal knowledge of each fact stated in this declaration, and if called as a witness I could and would testify competently thereto.

3.     Attached hereto as Exhibit 1 is my expert rebuttal to the report of Brennan Rivas.

4.     Attached hereto as Exhibit 2 is my expert rebuttal to the report of Robert J. Spitzer.

5.     Attached hereto as Exhibit 3 is my expert rebuttal to the report of Saul Cornell.

## I. BACKGROUND AND QUALIFICATIONS

6.     I attended Sonoma State University where I received a Bachelor of Arts and Masters Degree in History. My Master's Thesis was "Concealed Weapon Laws of the Early Republic".

7.     I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

8.     I am employed by College of Western Idaho where I teach history.

9.     My publications include:

- *Lock, Stock, and Barrel: The Origins of America Gun Culture*, Praeger Press, 2018;
- *Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*, CreateSpace, 2016;
- *Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*, CreateSpace, 2016;
- *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*, CreateSpace, 2012;
- "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;
- *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*, Nelson Current, 2006;

2

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER IN REBUTTAL

- *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, Praeger Press, 1999;
- *Black Demographic Data, 1790-1860: A Sourcebook*, Greenwood Press, 1997;
- *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing, 1995;
- *For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;
- *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine*, Editor, Library Research Associates, Inc., 1990.

10.     My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesiles' book contained quotations taken out of context, which completely reversed the author's original intent. Dates were altered and statutory text was changed to completely reversed the meaning of the law. The sheer volume of these errors, and their consistent direction, would seem to preclude honest error. Emory University conducted an investigation that strongly criticized Bellesiles' ethical standards; Bellesiles resigned from his tenured position at Emory. Columbia University initially awarded Bellesiles the Bancroft prize for his book "Arming America", but revoked the award after my research proved that the book was fraudulent.

II. MATERIALS REVIEWED

11.     I have reviewed the following documents in connection with this matter, which were provided to me by counsel for the plaintiffs: the complaints, preliminary injunction submissions, and the Expert Declarations and Reports of Brennan Rivas, Robert J. Spitzer, and Saul Cornell.

12.     In addition to the above documents, I have also relied upon materials cited within the text of this Declaration and the exhibits annexed hereto.

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER IN REBUTTAL

1    III.    OPINIONS

2          13.    Plaintiffs' counsel has asked me to provide an opinion on the accuracy of the

3    historical representations declared in the aforementioned expert reports.

4          14.    I have identified errors and omissions of fact as set forth herein.

5
6          15.    I am being compensated at a rate of $75 per hour for my time in the above-

7    captioned matter. My compensation is not in any way dependent on the outcome of this or any

8    related proceeding, or on the substance of my opinion.

9          I declare under penalty of perjury under the laws of the United States of America that the

10   foregoing is true and correct.

11

12
     Dated: July 14, 2023
13

14

15                                            Clayton Cramer

16

17

18

19

20

21

22

23

24

25

26

27

28                                            4

     ———————————————————————————————————————
     EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER IN REBUTTAL

**Exhibit 1 the Declaration of Cramer Clayton**

## Cases

Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840). .................................................. 22

Bliss v. Commonwealth, 3 Littel 90 (Ky. 1822). ........................................................................... 21

Carlton v. Commonwealth, 13 Ky.Law.Rep. 162, 163 (1892) ......................................................... 2

Cockrum v. State, 24 Tex. 394, 396 (1859) ................................................................................ 16

Cockrum v. State, 24 Tex. 394, 403 (1859). ................................................................................ 3

Commonwealth v. Duncan, 13 Ky.Law.Rep. 162, 163 (1891) ......................................................... 2

Dabbs v. State, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882) .................................................... 27

District of Columbia v. Heller, 128 S.Ct. 2783, 2788 (2008). ....................................................... 16

Dred Scott v. Sandford, 60 U.S. 393, 417 (1857) ........................................................................ 25

English v. State, 35 Tex. 473, 476 (Tex. 1872) ............................................................................ 3

Fife v. State, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876) .............................................................. 25

Fife v. State, 31 Ark. 455, 25 Am.Rep. 556 (1876) ...................................................................... 4

Holland v. State, 33 Ark. 560, 561 (1878) ................................................................................... 27

In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902) ................................... 28

New York State Rifle & Pistol Assn v. Bruen 142 S.Ct. 2111,  2121. (2022). ............................ 10

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022) ..................... 28

New York v. Miln, 36 U.S. 102, 103 (1837). ............................................................................... 17

Nunn v. State, 1 Ga. 243 (1846) .......................................................................................... 8, 21

Nunn v. State, 1 Ga. 243, 248 (1846) ........................................................................................ 5

Owen v. State, 31 Ala. 387, 388, 389 (1858). ............................................................................ 22

Page v. State, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871) ............................................................. 25

Simpson v. State, 5 Yerg. 356, 359, 360 (Tenn. 1833). ............................................................... 22

i

Smith v. State, 11 La. An. 633, 634 (1856) ............................................................................ 24

*State* v. *Chandler*, 5 La. An. 489, 490, 491 (1850) ................................................................ 24

State v. Chandler, 5 La. An. 489, 491 (1850) ........................................................................ 23

State v. Chandler, 5 La. Ann. 489, 490, 52 Am. Dec. 599 (1850) ........................................... 3

State v. Duke, 42 Tex. 455, 458 (1875) .................................................................................... 8

State v. Duke, 42 Tex. 455, 458, 459 (1875) ............................................................................ 8

State v. Herron, 12 Mont. 230, 13 Am.St.Rep. 576, 577 (1893) .............................................. 2

State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843) .................................. 23

State v. Jumel, 13 La. An. 399, 400 (1858) ............................................................................ 24

State v. Mitchell, 3 Blackford 229 (Ind. 1833) ...................................................................... 21

State v. Reid, 1 Ala. 612 (1840) ............................................................................................. 21

State v. Reid, 1 Ala. 612, 615, 616, 617 (1840) ....................................................................... 8

State v. Wilburn, 7 Tenn. 61 (1872). ...................................................................................... 20

Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878) ........................................... 26

### Statutes

1 Ohio Stats. Ch. 6 § 6 (1833) ................................................................................................. 5

1 Penn. Penal Code 207 n.1 (1883) .......................................................................................... 2

1871 Tex. Laws ch. 34. ........................................................................................................... 14

Black Code Of The District Of Columbia 11 (1848) ............................................................... 5

Cal. Laws ch. 385 (1863). ......................................................................................................... 4

Fla. Acts ch. 75 § 3 (1846). .................................................................................................... 10

Ga. Acts 90-91 (1838) ............................................................................................................... 5

Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820 ch. 22 § 6 at 710 (1801). .................. 9

Laws of Maryland Ch. 44, § 32 (1715) ........................................................................................ 5

Louisiana Terr. Laws ch. 1 § 6 (1804) ........................................................................................ 5

State v. Reams, 27 S.E. 1004 (N.C. 1897) ................................................................................. 18

Va. Acts ch. 101 § 1 (1838). ..................................................................................................... 10

Va. Laws ch. 41, § 8 (1792). ....................................................................................................... 6

### Other Authorities

An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87, Bonham's, ......................................................................................... 11

Antique Pepperbox Pistol 1850's Washington Arms Co, ............................................................ 12

Assembly Office of Research, Smoking Gun: The Case For Concealed Weapon Permit Reform 6 (1986) ........................................................................................................................................ 4

Bill Barring Loaded Weapons In Public Clears Senate 29-7, Sacramento Bee, Jul. 27, 1967, A6. 4

Capitol Is Invaded, Sacramento Bee, May 2, 1967, A1, A10 ....................................................... 4

Colonel Bowie and His Knife, 2 Temple Bar 124 (Jul. 1861) ...................................................... 9

Concealed Weapons, 8:4 Criminal Law Magazine and Reporter 409, 412 (Oct. 1886). ............. 18

David A. Hounshell, From the American System to Mass Production 1800-1932: The Development of Manufacturing Technology in the United States 47 (1984). .......................... 14

English Transitional Pepperbox Revolver, Forgotten Weapons, .................................................. 12

Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates ................................................................................................................................................. 11

iii

Immigration and Nationality Act (104th Cong., 1st sess.) 581 (10th ed. May 1995)....................... 6

James E. Serven, Colt Firearms: 1846-1954 13, 30 (1954). ......................................................... 14

Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder, 36 J. Am. Acad. Psychiatry & Law 82 (2008) ................................................................................................................ 17

Philip J. Cook, Jens Ludwig, and Anthony Braga, Criminal Records of Homicide Offenders, 294(5) JAMA 598-601 (Sep. 2005). ......................................................................................... 17

Pollard's History of Firearms 114 (1983). ..................................................................................11

Raymond L. Cohn, Mass Migration Under Sail: European Immigration to the Antebellum United States 15 (2009). ..................................................................................................................... 16

Self-Cocking and Revolving Six Barrel Pocket Pistol [Washington, D.C.] The Madisonian, Dec. 22, 1838, 1............................................................................................................................. 12

Studies in History, Economics, And Public Law 20 (1899) ......................................................... 7

The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It iii (1875)....................................................................................................................... 16

iv

# Rivas Rebuttal

1.  My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.  In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

## I. Deadly Weapons

3. Rivas at pp. 4-5 claims that there was a distinction between deadly weapons and "hunting knives, rifles, muskets, and shotguns."  Even her n.1 on p. 5 admits that "There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols…"  She then gives what she considers an exceptional case that established "a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." The phrase "other firearm" is pretty general, and would include all "rifles, muskets, and shotguns."  The supposed exceptions are *not* exceptions.  There is no shortage of laws that include firearms of all types in a list of deadly weapons to be regulated.

1

Act 10 April, 1873, Sec. 1, P. L., 659. -Any person within the limits of the county of Northampton, who shall carry *any firearms*, slung- shot, dirk-knife, or other deadly weapon, concealed upon his person, with intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed. guilty of a misdemeanor…[1] [emphasis added]

Act 18 March, 1875, Sec. 1, P. L., 33.-Any person within this Commonwealth who shall carry *any firearms*, slung-shot, hand-billy, dirk-knife, razor, or other deadly weapon, concealed upon his person, with the intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed guilty of a misdemeanor…[2] [emphasis added]

4. State supreme court decisions are also at variance with Dr. Rivas' supposed distinction:

"It is not questioned but *a loaded rifle is a deadly weapon*. In this case a rifle was used."[3]  A Kentucky Supreme Court decision decided that a rock was a *deadly weapon* as would a shot-gun*:*

The statute does not say what shall constitute a deadly weapon. It merely punishes for a wilful and malicious wounding with one. If one man maliciously wounds another with a rock, with which he might have killed him, there exists no reason why the same punishment should not be meted out to him *as if he had done it with a shot-gun*; and undoubtedly the Legislature, in enacting this statute, so intended.[4] [emphasis added]

The offense of which appellant was convicted and sentenced to the penitentiary for four years is maliciously beating and wounding Charles Brown with a car coupling-pin, a deadly weapon, with intention to kill him.[5]

5. Rivas' claim is so counterlogical that citing hundreds of statutes and decisions seems unnecessary.  A search of the phrase "deadly weapons" in published 19th century books and cases rapidly demonstrates that the term did not have such a precise meaning.

6. There *were* distinctions by weapons type in 19th century law but not such a simple distinction as Rivas claims on p. 3: "Nineteenth-century public carry laws explicitly prohibited concealed weapons because the primary mode of carrying bowie knives, pocket pistols, brass knuckles, and other deadly weapons was concealed in one's pocket."  Decisions repeatedly accepted the constitutionality of bans on concealed carry of a variety of weapons because those laws banned only *concealed* carry and left open carry legal:

---

[1] 1 Penn. Penal Code 207 n.1 (1883).
[2] Id.
[3] State v. Herron, 12 Mont. 230, 13 Am.St.Rep. 576, 577 (1893).
[4] Commonwealth v. Duncan, 13 Ky.Law.Rep. 162, 163 (1891).
[5] Carlton v. Commonwealth, 13 Ky.Law.Rep. 162, 163 (1892).

2

The act of the 25th of March, 1813, makes it a misdemeanor to be "found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full view." This law became absolutely necessary counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. *It interfered with no man's right to carry arms (to use its words) "in full open view,"* which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.[6] [emphasis added]

7. When the Texas Supreme Court heard a challenge to a sentence enhancement law for manslaughter committed with a Bowie-knife, the question of whether it was concealed or openly carried was not relevant: "The right to carry a bowie-knife for lawful defense is secured, and must be admitted. It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill."[7]

8. There were distinctions similar to Rivas' but I doubt California wishes to follow that tangent. The Texas Supreme Court a few years later decided that:

The word "arms" "in the connection we find it in the Constitution of the United States, *refers to the arms of a militiaman or soldier*, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.[8] [emphasis added]

9. The Arkansas Supreme Court similarly defined arms as "arms as are *used for purposes of war*; and does not prevent the legislature from prohibiting the wearing of such weapons as are not used in civilized warfare…"[9]  If California wishes to argue that the Second Amendment protects possession and carry of weapons of war, go for it!

10. Regardless, Rivas' attempt to distinguish handguns from long guns as protected arms is a waste of time.  Handguns as protected arms left the station with D.C. v. Heller; denying a right carry them was the train whistle of Bruen.

---

[6] State v. Chandler, 5 La. Ann. 489, 490, 52 Am. Dec. 599 (1850)
[7] Cockrum v. State, 24 Tex. 394, 403 (1859).
[8] English v. State, 35 Tex. 473, 476 (Tex. 1872).
[9] Fife v. State, 31 Ark. 455, 25 Am.Rep. 556 (1876).

3

11. Rivas at p. 4 seeks to establish that open carry was restricted by California law in the 19th century:

> Public carry laws, for both concealed weapons and the open-carry of weapons, have often reserved special exemptions for "travelers" as defined under state law, reinforcing the idea that population density was a factor in developing and enforcing weapon policies in the nineteenth century.

12. The problem with this argument is that the "travelers" exemption appeared in California's 1863 ban on *concealed* carry of deadly weapons:

> Section 1.  Every person, not being a peace officer or *traveller*, who shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed, shall, upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the County Jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars.
>
> Sec. 2.  Such persons, and no others, *shall be deemed travellers within the meaning of this Act, as may be actually engaged in making a journey at the time*.[10] [emphasis added]

13. California imposed no ban on open carry of loaded firearms in cities until 1967.  The legislature passed the ban in response to a series of confrontations between Oakland Police and the Black Panthers.  The Panthers attending a State Senate hearing carrying loaded shotguns and pistols certainly sped up the debate.[11]

14. Rivas asserts on p. 6 that:

> The other feature shared by deadly weapons was their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.

15. Yet her following quote claims that "prohibited weapons… were not to be carried upon the person or concealed."  Few states attempted to ban possession of deadly weapons in one's home and only a few banned open carry.  One that did was Georgia's 1837 law that prohibited sale

---

[10] Cal. Laws ch. 385 (1863).
[11] Assembly Office of Research, *Smoking Gun: The Case For Concealed Weapon Permit Reform 6* (1986); *Capitol Is Invaded*, Sᴀᴄʀᴀᴍᴇɴᴛᴏ Bᴇᴇ, May 2, 1967, A1, A10; *Bill Barring Loaded Weapons In Public Clears Senate 29-7*, Sᴀᴄʀᴀᴍᴇɴᴛᴏ Bᴇᴇ, Jul. 27, 1967, A6.

4

of pocket pistols; the Georgia Supreme Court overturned it as contrary to the Second Amendment.[12]

16. The act which Nunn overturned was also quite explicit that it only prohibited *concealed* carry: "*Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view."[13] [emphasis in original]

17. Few states until the 20th century prohibited open carry of pistols or most other *deadly weapons*. The laws that prohibited carry either banned concealed carry or banned carrying a weapon while committing some other criminal act. Two examples of laws banning being armed while committing another crime. Ohio (1833):

> Burglary with theft…. If the person or persons *so breaking and entering any dwelling-house*, shop , store or vessel and violence, as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or *shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention*…[14] [emphasis added]

18. Louisiana Territory (1804):

> If any person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall actually steal and purloin therefrom any money, goods or chattels and shall commit or attempt to commit any personal abuse, force or violence, or *shall be so armed with any dangerous weapon or weapons*, or clearly to indicate a violent intention …[15] [emphasis added]

19. One set of laws that broadly prohibited possession or carry were explicitly aimed at slaves and free blacks:

> No negro or other slave within this province shall be permitted to carry any gun or any other offensive weapon from off their master's land, without license from their said master, and if any negro or other slave shall presume to do so, he shall be liable to be carried before a Justice of the Peace and be whipped, and his gun or other offensive weapon shall be forfeited to him that shall seize the same and carry such negro so offending before a Justice of the Peace.[16]

---

[12] Nunn v. State, 1 Ga. 243, 248 (1846).
[13] Ga. Acts 90-91 (1838).
[14] 1 Ohio Stats. Ch. 6 § 6 (1833).
[15] Louisiana Terr. Laws ch. 1 § 6 (1804).
[16] Laws of Maryland Ch. 44, § 32 (1715) quoted in BLACK CODE OF THE DISTRICT OF COLUMBIA 11 (1848).

> No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive…[17]

The 13th and 14th Amendments preclude such laws today.

20. On p. 4: "A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely to publicly carry and use deadly weapons such as dirks, bowie knives, and pocket pistols. Rates of homicide, violence, and crime were rising in many parts of the country, and weapon technology rose in tandem."  Rose in tandem?  Which caused which?  The normal response of people who feel as though they are at risk is to arm for self-defense. Establishing the direction of causality for two events except in a controlled laboratory environment is difficult.  When Rivas says a "series of socio-economic and political factors," she really should say, "A huge number of social changes took place simultaneously, and which ones might be factors in rising violent crime rates is uncertain."  The 19th century had many major social changes that likely contributed to rising violent crime rates.  Large-scale immigration is the most obvious:

> The mass migration of the 19th century was the result of a near perfect match between the needs of a new country and overcrowded Europe. Europe at this time was undergoing drastic social change and economic reorganization, severely compounded by overpopulation. An extraordinary increase in population coincided with the breakup of the old agricultural order which had been in place since medieval times throughout much of Europe. Commonly held lands were broken up into individually owned farms, resulting in landless status for peasants from Ireland to Russia. At approximately the same time, the industrial revolution was underway, moving from Great Britain to Western Europe, and then to Southern and Eastern Europe. *For Germany, Sweden, Russia, and Japan, the highest points of emigration coincided with the beginnings of industrialization and the ensuing general disruption of employment patterns.* The artisans joined the peasants evicted from their land as immigrants to the United States. Population pressure and related economic problems, sometimes in the extreme form of famine, are generally cited as being the major causes of the mass migration of this long period, followed by religious persecution and the desire for political freedom.[18] [emphasis added]

20. America was also changing from a nation of small towns to one of big cities:

> The urban population is defined in the United States census reports as the population of cities or towns having at least 8,000 inhabitants. Table II, column 3, shows the growth of the urban population from 210,873 persons residing in six cities in 1800 , to 18,284,385 inhabitants of 448

---

[17] Va. Laws ch. 41, § 8 (1792).

[18] IMMIGRATION AND NATIONALITY ACT (104th Cong., 1st sess.) 581 (10th ed. May 1995).

cities in 1890. That is, the urban population has increased eighty-seven fold in the century, while the population of the entire country has increased only twelve-fold.[19]

21. The transition from largely self-employed farmers and craftsmen to employees is another obvious factor, as was the increasing political polarization concerning the abolition of slavery.  A detailed examination of other social changes in the 19th century would make this declaration a book.  It seems at least as plausible that fear of violent crime increased demand for and carry of concealed weapons as Rivas' version.

22. Throughout p. 6, Rivas conflates *deadly weapons* with their ease of concealment by citing laws that prohibited *concealed* carrying of weapons.  It was not the weapons that these laws tried to eliminate, but the *concealed* carry of deadly weapons.  In n.5: "It is worth noting that these provisions prohibited not only carrying concealed, but carrying about the person generally. See *Ex parte Thomas*, 1908 OK 155."   While this statement accurately describes Oklahoma at the start of the 20th century, it misrepresents the state of American law in the 19th century.

23. Other decisions classified some of Rivas' putative *deadly weapons* with Rivas' unconcealable and therefore apparently protected arms:

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State.  *If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection.  But beyond question, the dragoon or holster pistol is part of the arms of a soldier in that branch of the service.*  (Coldwell v. The State, 3 Heiskell, 166,[20] and English v. The State, 35 Texas, 476).  [21]  [emphasis added]

24. Decisions throughout the 19th century recognized that concealed carry could be prohibited only if open carry remained lawful.  An 1840 Alabama Supreme Court decision:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion.  *A statute which, under*

---

[19] STUDIES IN HISTORY, ECONOMICS, AND PUBLIC LAW 20 (1899).
[20] State v. Duke, 42 Tex. 455, 458 (1875).  *Coldwell* v. *The State* is incorrect; the location cited is *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 8 Am. Rep. 8 (1871).
[21] State v. Duke, 42 Tex. 455, 458, 459 (1875).

7

*the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.* But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[22] [emphasis added]

An 1846 Georgia Supreme Court decision:

We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*...[23] [emphasis in the original]

An 1850 Louisiana Supreme Court decision:

This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's *right to carry arms (to use its own words), "in full open view,"* which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[24] [emphasis added]

25. Again, in 1858:

The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society.[25]

26. With enough time and space, I could provide many other decisions that upheld *concealed* carry regulation because *open* carry remained lawful.

27. In Dred Scott, the U.S. Supreme Court acknowledged that *whites* at least enjoyed a right to carry weapons:

It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night without molestation, unless they committed some violation of law for which a white man would be punished; and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might

---

[22] State v. Reid, 1 Ala. 612, 615, 616, 617 (1840).
[23] Nunn v. State, 1 Ga. 243, 250, 251 (1846).
[24] State v. Chandler, 5 La. An. 489, 490 (1850).
[25] State v. Jumel, 13 La. An. 399, 400 (1858).

8

speak; to hold public meetings upon political affairs, *and to keep and carry arms wherever they went.*[26] [emphasis added]

## A. Knives

28. Rivas' discussion of knives contains one fascinating quote… from somewhere, but not apparently from where she claims: "This was especially notable in southern areas, where 'so certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow." Her citation is to "'The Bowie-Knife In the South,' *San Francisco Evening Bulletin* (San Francisco, California), October 18, 1861." I attempted to find that article, but the SAN FRANCISCO EVENING BULLETIN does not appear in either the Library of Congress' Chronicling America[27] or the California Digital Newspaper Collection.[28] That article does appear in a London magazine in 1861.[29] The truth or falsity of the claim could be questioned in either publication, but a reader might have a bit more skepticism of such a claim in a British publication that was still skeptical of Americans as a bunch of uncouth colonials. It should also make you wonder about the accuracy are Rivas' other citations.

29. Rivas on p.8 n.11 cites "Tenn. 1801 ch. 22 § 6 (prohibiting 'privately; carrying 'any dirk, large knife, pistol or any other dangerous weapon.')." But that is a carefully selected quote. What § 6 prohibits is "That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person…"[30] This prohibition on riding "to the terror of the people" is directly

---

[26] Dred Scott v. Sandford, 60 U.S. 393, 417 (1857).
[27] Chronicling America, https://chroniclingamerica.loc.gov/, last accessed Jul. 5, 2023.
[28] *Browse by title,* California Digital Newspaper Collection , https://cdnc.ucr.edu/?a=cl&cl=CL1&e=-------en--20--1--txt-txIN-------#E, last accessed Jul. 5, 2023.
[29] *Colonel Bowie and His Knife*, 2 TEMPLE BAR 124 (Jul. 1861).
[30] Judge Edward Scott, LAWS OF THE STATE OF TENNESSEE: INCLUDING THOSE OF NORTH CAROLINA NOW IN FORCE IN THIS STATE: FROM THE YEAR 1715 TO THE YEAR 1820 ch. 22 § 6 at 710 (1801).

contradictory to the ban on concealed carry.  IF you cannot see that someone is armed, how does this cause terror?  Bruen specifically rejects the relevance of such laws:

> As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.[31]

30. The rest of her list of statutes in n.11 regulating the carrying of knives in public places are not as she represents bans of carrying of knives in public places, but bans on *concealed* carry. Rivas misrepresents these laws by quoting bits and pieces.  Examples: "Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ('any dirk, pistol or other arm or weapon, except a common pocket knife . . . .'"  The full text:

> That hereafter it shall not be lawful for any person in this State to carry arms of any kind whatsoever secretly, on or about their person, and if any dirk, pistol or other arm or weapon, except a common pocket knife, shall be seen or known to be secreted upon the person of any one in this State, such person so offending, shall on conviction, be fined not exceeding five hundred dollars and not less than five dollars, or imprisoned not exceeding six months and not less than ten days, at the discretion of the court: Provided, however, That this law shall not be so construed *as to prevent any person from carrying arms openly, outside of all their clothes* …[32] [emphasis added]

41. Still in n.11: "Virginia, *see* 1838 Vir., ch. 101 ('any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . .');"  The full text which shows Rivas' dishonest editing:

> That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, *and the same be hidden or concealed from common observation.*[33] [emphasis added]

42. This misrepresentation of laws banning *concealed* carry as being bans on open carry should cast serious doubts as to the accuracy and scholarship of Rivas' work.

---

[31] New York State Rifle & Pistol Assn v. Bruen 142 S.Ct. 2111,  2121. (2022).
[32] Fla. Acts ch. 75 § 3 (1846).
[33] Va. Acts ch. 101 § 1 (1838).

B. Pistols

43. On p. 9: "Another weapon that came to be associated with lawless violence in the antebellum period was the "pocket pistol." Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzleloading pistols modeled after designs that appeared in the eighteenth century."   Her supposed source: "Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116."

44. The only text referencing the United States and pistols in that page range:

> "America normally followed the British or French patterns over the decided time lag of perhaps as much as 10 or 20 years. There are also many other details of design and craftsmanship on these and other features of firearms which enable a specialist to identify the area and area of origin of a given specimen.[34]
>
> Probably the most unusual of all the special flint locks, however, with those the cock under the barrel. The theory, apparently, was to remove the cock from the line of sight and to shift the flash from the priming to a position where it would be of less of a distraction to the shooter. Both German and American versions of this unusual arrangement are known, and the date ranges from the mid 18th century to the early years of the 19th.[35]

45. That is it: every paragraph that references America in that page range.   Nothing that she claims appears in those pages of Pollard's.   Even then, she is wrong.   Percussion cap handguns were an innovation of the 19th century that rapidly replaced flintlock firearms.[36]   An "expert" knows this.

46. From the late 18th century, gun makers made repeating handguns called pepper-boxes. The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[37]   The development of the percussion cap certainly made them more practical; while a percussion cap could certainly be

---

[34] POLLARD'S HISTORY OF FIREARMS 114 (1983).

[35] Id. at 116.

[36] Id. at 62.

[37] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

11

detonated accidentally by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.

47. Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges merely by pulling the trigger, placing a man with but one hand on an equality with six men, each with the ordinary pocket pistol."[38]  Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[39]

48. While pepper-box pistols had a poor reputation for being more hazard to the shooter than the target, perhaps based on the necessarily dangerous flintlock method of firing, you can see examples of antique percussion pepperboxes being fired without any injuries or death to the shooter.[40]

49. Rivas has offered seemingly contradictory expert declarations to this in other cases. See DECLARATION OF BRENNAN G. RIVAS in OREGON FIREARMS FEDERATION, INC., v. Kotek (D.Ore. 2023).  In that expert declaration Rivas' p. 16: "Some multishot pistols were in existence prior to the patenting of Samuel Colt's revolver in 1836, but they were not widely available in the United States."  On p. 16, n. 32 tells us "Pepperbox pistols had multiple rotating barrels. See Blair, Pollard's History, 210."  Rivas in p. 16, n.31 points to an ad offering pepperboxes for sale.  Clearly, they could not have been terribly rare if Rivas can find ads for them and there are surviving American pepperboxes in use in YouTube videos.

---

[38] *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.
[39] *English Transitional Pepperbox Revolver*, FORGOTTEN WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.
[40] *Antique Pepperbox Pistol 1850's Washington Arms Co*, https://www.youtube.com/watch?v=jiSkuUmKW5E, last accessed March 9, 2023.

50. On p. 10: "While pocket pistols were less frequently the targets of popular outrage in the early nineteenth century, they were still regulated alongside other deadly weapons like bowie knives." If by "regulated" Rivas means states *prohibited concealed carry*, this was *generally* true, but by no means universal. There were no general prohibitions on open carry or possession in the antebellum period. I notice Rivas cites none.

51. Tennessee is one exception to Rivas' claim about "regulated alongside." The legislative journal shows that a variety of amendments were proposed to the law that prohibited sale of Bowie knives and Arkansas toothpicks.[41] It also prohibited concealed carry but did not prohibit open carry.[42] These amendments reveal that the bill at that point was narrowly focused, applying only to Bowie knives, and extreme in its goals: it made criminal *any* use against a person, and not just concealed carrying. Senator Anderson attempted to amend the bill to allow the use of a Bowie knife for self-defense, but this amendment was rejected.[43]

52. Amendments that were accepted that day broadened the ban on sale or use to cover not only Bowie-knives, but also Arkansas toothpicks and Spanish stilettos. Any use, "whether for self-defense or otherwise," subjected the offender to three to five years in prison.[44] The following day, the Senate gave the bill its third reading, the "Spanish stilettos" were removed, and the bill passed, 17-8.[45]

---

[41] "That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick…" 1838 Tenn. Laws ch. 138 § 1.

[42] "That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person…" 1838 Tenn. Laws ch. 138 § 2. § 3 criminalized drawing from concealment such knives and § 4 criminalized cutting or stabbing someone with such knives.

[43] *Senate*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 29, 1837, 2.

[44] *General Assembly*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 29, 1837, 2; *Senate*, NASHVILLE DAILY REPUBLICAN BANNER, Dec. 2, 1837, 2.

[45] *General Assembly*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 30, 1837, 2.

13

53. The Bowie knife bill received its first reading in the Tennessee House on December 28 and its second reading on January 12.  At the second reading, Representative Warner added dirks to the prohibited weapons, but Representative Dean's attempt to add "sword canes and *pistols*" to the prohibited weapons failed.[46]  [emphasis added]

54. On p. 10, Rivas again claims: "Public carry laws generally included 'pistols' within their purview, and other regulatory strategies attempted to discourage their presence in public spaces."  She cites no laws to support this claim.  I am aware of no laws until Texas' 1871 statute that prohibited open carry.[47]

55. On p. 10, Rivas makes a rather curious claim: "The year 1836 proved to be a turning point in the history of firearm development and a major catalyst for both a proliferation of interpersonal violence and intensification of firearm regulation in the nineteenth century," and claims this year was because "Samuel Colt patented his first revolver design."  Colt's production at his Paterson, N.J. factory was never huge before bankruptcy in 1843; Colt made 1,189 pistols by March of 1839.  Colt only sold 441 by that date.[48]   Many of these early sales appear to have been to military units, some U.S., others the Republic of Texas.[49]   Colt made revolvers for the commercial market starting in 1848.[50]

56. If Rivas had used 1848 as the turning point, there might be some argument as to the effect of Colt's revolvers.  Starting at 1836 simply shows that Rivas is no expert.

---

[46] *House of Representatives*, NASHVILLE DAILY REPUBLICAN BANNER, Dec. 29, 1837, 2; *House of Representatives*, NASHVILLE DAILY REPUBLICAN BANNER, Jan. 13, 1838, 2.

[47] 1871 Tex. Laws ch. 34.

[48] James E. Serven, COLT FIREARMS: 1846-1954 13, 30 (1954).

[49] Id. at 9-12.

[50] David A. Hounshell, FROM THE AMERICAN SYSTEM TO MASS PRODUCTION 1800-1932: THE DEVELOPMENT OF MANUFACTURING TECHNOLOGY IN THE UNITED STATES 47 (1984).

57. Rivas also distinguished the Colt revolver as "it provided …" multiple shots without reloading…" As discussed previously, multishot pistols were already for sale before Colt started commercial sales of revolvers in 1848.

## C. Other Deadly Weapons

58. Rivas on p. 11 discusses several other deadly weapons of the era and how they were "associated with crime and interpersonal violence rather than militia service or communal policing; they were typically concealed when worn." She provides no source for this claim. Even if true, the Heller decision identified that arms are protected by the Second Amendment "for the lawful purpose of self-defense."[51] The association with criminal behavior might well describe a perception that indicated an economic class distinction between weapons that a poor person might carry for self-defense and a middle-class American's choice of a pistol. Cockrum's defense attorney in Cockrum v. State (Tex. 1859) crisply argued this discrepancy.

> A bowie-knife, or dagger, as defined in the Code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen. A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.[52]

59. All of these lower class weapons, like the pistol were intended for short-range use where a person under physical attack most needs a deadly weapon.

60. At p. 11: "Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors." There were profound social changes during this time, with rapid expansion to the West, large factories employing workers far removed from the traditional and more paternalistic employer/employee arrangements of colonial America, and increasing immigration from Europe (803,158 non-slave immigrants between 1790 and

---

[51] District of Columbia v. Heller, 128 S.Ct. 2783, 2788 (2008).
[52] Cockrum v. State, 24 Tex. 394, 396 (1859).

1835.[53]  Many of these immigrants arrived so destitute that New York passed a law requiring ship captains to report all immigrant arrivals; the law was "intended to prevent the state's being burdened with an influx of foreigners and to prevent their becoming paupers, and who would be chargeable as such."[54]  This dramatic wave of immigration, some of it quite poor, would seem to qualify as "profound social changes."  It hardly seems sensible to explain an increase in violence (gun or non-gun), as caused by handgun availability alone with so many other moving parts.

61. At pp. 11-12: "The proliferation of revolvers during the same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before."  While it seems logical to make this assumption, Rivas provides no source for this claim.  Homicide includes both criminal deaths (murder and manslaughter) but also lawful killings (justifiable and excusable homicide).  That some of this increase in homicides might be in the latter category because victims were more likely to successfully defend themselves against multiple attackers, or even stronger individual criminals, is at least as plausible explanation as Rivas' claim.  One of Rivas' source on p. 12 argues this will sometimes be the case:

> But let us look at the other aspect of the case. The house of one man is attacked, and because he either has no weapons, or does not know how to use them, his property is carried off and his wife, perhaps, outraged [raped] before his eyes. Under very different circumstances the same ruffians, emboldened by previous impunity, attack another house.[55]

62. At p. 14, Rivas attributes the carrying of pocket pistols to rising homicide rates because "having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families."  This is the "finger pulls the trigger" model of gun homicide causation: otherwise normal people "lose it" in a moment of anger.  The evidence from the modern era shows that murderers are disproportionately people with histories of antisocial

[53] Calculated from Raymond L. Cohn, MASS MIGRATION UNDER SAIL: EUROPEAN IMMIGRATION TO THE ANTEBELLUM UNITED STATES 15 (2009).
[54] New York v. Miln, 36 U.S. 102, 103 (1837).
[55] THE PISTOL AS A WEAPON OF DEFENCE IN THE HOUSE AND ON THE ROAD: HOW TO CHOOSE IT AND HOW TO USE IT iii (1875).

behavior or mental illness.  One study of Illinois "homicide offenders" found "For 1990-2000, 42.6% of 884 cases had at least 1 felony conviction compared with 3.9% of nearly 7.9 million controls."[56]

63. A study of Indiana murder convicts found that 18 percent were severely mentally ill, suffering from "schizophrenia or other psychotic disorder, major depression, mania, or bipolar disorder."[57]  Of the Indiana murder convicts "73 percent of offenders had diagnoses of major depression, bipolar disorder, or mania, while a psychotic disorder including schizophrenia, was diagnosed in only 41 percent, although there was some overlap among the diagnoses."[58] Furthermore, "studies that used hospitalized samples tended to have a higher proportion of persons with a diagnosis of schizophrenia and persons who were experiencing psychotic symptoms at the time of the murder than was found in the present study."[59]

64. It seems unlikely that 19th century murderers were fundamentally different than today. Availability of pocket pistols is an unlikely proximate cause of 19th century homicides.

65. At p. 14 Rivas claims: "Eventually, legal opinion coalesced around the idea that having deadly weapons upon one's person "raises a presumption of guilt," regardless of whether they were openly carried or concealed, and regardless of whether the carrier intended to use them in an assault or not.  Review of the sources cites shows a different story.  Her evidence of legal opinion is one decision, State v. Reams (N.C. 1897).  One decision is hardly evidence that "legal opinion coalesced" around this idea.  A citation to a standard legal text, or even a dozen similar decisions would be a *lot* more persuasive.

---

[56] Philip J. Cook, Jens Ludwig, and Anthony Braga, *Criminal Records of Homicide Offenders*, 294(5) JAMA 598-601 (Sep. 2005).
[57] Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, *Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder*, 36 J. AM. ACAD. PSYCHIATRY & LAW 82 (2008).
[58] *Id.* at 80.
[59] Id. at 83-84.

66. Even then, Reams is clear that it was the carrying of a *concealed* weapon that raised a presumption of guilt: "The offense of carrying a *concealed* weapon about one's person and off his own premises consists in the guilty intent to carry it *concealed* and not upon the intent to use it; and the possession of the weapon raises the presumption of guilt."[60] [emphasis added]  In n.35 Rivas does actually cite a legal journal in defense of her claim. The title of the article clearly states the concern: "Concealed Weapons."  Along with the discussion on p. 412 of mischievous intent for carrying concealed weapons, that article on p. 409 refers to a decision upholding open carry:

> In Stockdale v. State, carrying a pistol in the waist-band, with butt and cock exposed, was held not within the statute. This, however, is put upon the ground that it is lawful to bear arms openly, and impossible to carry a pistol without part of it concealed.[61]

67. Most of Rivas' other sources in n.35 condemned *concealed* carry.  Many are newspaper articles.  While Rivas may be correct that the chattering classes supported banning at least concealed carry, they are not evidence that support for bans on open carry enjoyed widespread support.

## D. Right to Keep and Bear Arms Decisions

68. At pp. 16-17, Rivas claims that modern interpretations of 19th century open carry are wrong because: "This idea is largely a result of simplified interpretations of the nineteenth-century case law surrounding public carry statutes that emphasize judges' protection of openly carrying deadly weapons without considering the narrow context in which such behavior would have occurred."  Yet even the more restrictive decisions, such as State v. Wilburn (Tenn. 1872) acknowledged that a *complete* prohibition on carrying revolvers had some constitutional limits. The 1871 Tennessee statute prohibited carrying various weapons included "belt or pocket pistol,

---

[60] State v. Reams, 27 S.E. 1004 (N.C. 1897).
[61] *Concealed Weapons*, 8:4 CRIMINAL LAW MAGAZINE AND REPORTER 409, 412 (Oct. 1886).

or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[62]

69. The Wilburn decision involved a clearly spurious indictment.  The first count charged him with carrying "a belt and pocket pistol and revolver pistol, the same being an arm such as is not commonly carried and used in the United States army."  The second count charged that Wilburn did "unlawfully and willfully carry an *army pistol* privately and concealed, and not openly in his hands..."[63] [emphasis added] which contradicts the claim in the first charge, since the Act of 1871 had defined an "army pistol" to be something other than "a belt or pocket pistol."  Yes, this was a mandatory brandishing law, which would seem especially effective as causing terror.  This demonstrates that both the Tennessee Legislature and Tennessee Supreme Court recognized that the bearing arms could not be completely extinguished by statute even if it required something absurdly dangerous.  Importantly, this decision was made based on the Tennessee Constitution's "for the common defence" right to keep and bear arms provision which included authorization for legislative regulation of "the wearing of arms,"[64] not the broader guarantee of the Second Amendment.

70. At p. 17, Rivas argues that the dominant view of in the early 19th century was "that concealed carry laws were constitutional because the Second Amendment and state analogues protected appropriate uses of militia arms, not the carrying of deadly weapons."  She cites Aymette v. State (Tenn. 1840); State v. Buzzard (Tex. 1872); Hill v. State (1874); and Ex parte Thomas (Okla. 1908).  (Only one of these is even in the first half of the 19th century, and one is in the 20th

---

[62] State v. Wilburn, 7 Tenn. 61 (1872).
[63] Id. at 58, 59.
[64] Id. at 58, 59.

century.)  She dismissed three decisions: one that recognized a right to carry concealed[65] and two decisions upholding concealed carry bans because open carry remained lawful.[66]  For some reason four decisions that agree with her claim are the dominant view vs. three decisions that disagree with her.

71. It would appear that Rivas has no knowledge of the enormous variety of decisions in this period concerning both state constitutional and Second Amendment guarantees of the right to keep and bear arms.  Most do indeed acknowledge that the state had authority to regulate concealed carry of arms, but often not for Rivas' explanation.

72. Some are silent as to why.[67]  Some recognize that the state constitution protected the right to carry deadly weapons (even while "then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make.")  The Simpson v. State (Tenn. 1833) decision is quite interesting and utterly contrary to Rivas' supposed consensus.  Denying the validity of the Statute of Northampton banning the carrying of "dangerous and unusual arms," Simpson found:

> But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, or portion of the common law, our constitution has completely abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their common defence." Article 11, sec. 26.  It is submitted, that this clause of our constitution fully meets and opposes the passage or clause in Hawkins, of "a man's arming himself with dangerous and unusual weapons," as being an independent ground of affray, so as of itself to constitute the offence cognizable by indictment.  By this clause of the constitution, an express power is given and *secured to all the free citizens of the state to keep and bear arms for their defence*, without any qualification what-ever as to their kind or nature. [68] [emphasis added]

73. Rivas represents Aymette v. State (Tenn. 1840) as guaranteeing "appropriate uses of militia arms, not the carrying of deadly weapons."  The decision is a bit more *interesting* than that:

> [E]very free white man may keep and bear arms.  But to keep and bear arms for what?  If the history of the subject had left in doubt the object for which the rights is secured, the words that are employed must completely remove that doubt.  It is declared that they may keep and bear

---

[65] Bliss v. Commonwealth, 3 Littel 90 (Ky. 1822).
[66] Nunn v. State, 1 Ga. 243 (1846); State v. Reid, 1 Ala. 612 (1840).
[67] State v. Mitchell, 3 Blackford 229 (Ind. 1833).
[68] Simpson v. State, 5 Yerg. 356, 359, 360 (Tenn. 1833).

20

arms for their common defence... The object, then, for which the right of keeping and bearing arms is secured is the defence of the public. *The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution.*[69] [emphasis added]

74. What sort of arms?  "[T]he *arms the right to keep which is secured are such as are usually employed in civilized warfare*, and that constitute the ordinary military equipment." [emphasis added]  Weapons of war.  If Rivas wants to cite Aymette as an authority, I look forward to her defense of the right to keep and bear semiautomatic detachable magazine rifles.

75. Owen v. State (Ala. 1858) upheld a conviction for carrying a concealed pistol.  While doing so, the decision analyzed the meaning of the Alabama Constitution's arms guarantee:

> That section was not designed to destroy the right, guarantied by the constitution to every citizen, "to bear arms in defense of himself and the State"; *nor to require them to be so borne, as to render them useless for the purpose of defense.*  It is a mere regulation of the manner in which certain weapons are to be borne...[70] [emphasis added]

76. State v. Buzzard (Ark. 1842) is as Rivas describes it, denying a right to carry arms, holding that the state constitution's guarantee was a guarantee that the state militia would be armed.

77. State v. Huntley (N.C. 1843) involved prosecution of a bully:

> His Honor instructed the jury, that if the facts charged in the indictment were proven to their satisfaction, the defendant had been guilty of a violation of the law, and that they ought to render their verdict accordingly. In the investigation before the jury it appeared, among other things, that *the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in the indictment), armed with a double-barrelled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him"*; on some, that "he had waylaid the house of James H. Ratcliff in the night about daybreak, and if he had shown himself he would have killed him; that he showed himself once, but for too short a time to enable him to do so, and that *he mistook another man for him, and was very near shooting him.*"[71] [emphasis added]

78. Huntley was not simply armed, but also making death threats; he came close to shooting someone he mistook for the object of his wrath.  To call this "to the terror of the people" seems

---

[69] Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840).
[70]  Owen v. State, 31 Ala. 387, 388, 389 (1858).
[71] State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843).

quite clear.  Yet the North Carolina Supreme Court while upholding the conviction made it clear

that riding around armed violated no laws:

> [I]t is to be remembered that the carrying of a gun per se constitutes no offence.  *For any lawful*
> *purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun*.  It
> is the wicked purpose—and the mischievous result—which essentially constitute the crime.  He
> shall not carry about this or any other weapon of death to terrify and alarm, and in such manner
> as naturally will terrify and alarm, a peaceful people.[72]  [emphasis added]

79. Nunn v. State (Ga. 1846) struck down a poorly written statute as contrary to the Second

Amendment:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of
> carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of
> his *natural* right of self-defence, or of his constitutional right to keep and bear arms.  But that so
> much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the
> Constitution, and *void*...[73] [emphasis in the original]

80. State v. Chandler (La. 1850) involved a defendant convicted of manslaughter.  The

prosecution appears to have used his concealed carry of a Bowie knife to suggest criminal intent.

In response to Chandler's claim that the Constitution protected his right to carry concealed, the

Louisiana Supreme Court ordered a new trial for manslaughter, based on errors related to the

charge to the jury with respect to the law of self-defense.[74]

81. Chandler explained the reason Louisiana banned concealed carry in 1813:

> This law became absolutely necessary to counteract a vicious state of society, growing out of
> the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed
> upon unsuspecting persons.  It interfered with *no man's right to carry arms (to use its own*
> *words), "in full open view,"* which places men upon an equality.  This is the right guaranteed by
> the *Constitution of the United States*, and which is calculated to incite men to a manly and noble
> defence of themselves, if necessary, and of their country, without any tendency to secret
> advantages and unmanly assassination.[75]  [emphasis added]

82. The Smith v. State (La. 1856) decision continues to recognize that open carry was

protected by the Second Amendment:

---

[72] State v. Huntly, 3 Iredell 418, 420, 421, 422, 423 (N.C. 1843).  This case has been frequently miscited as State v. Huntley,
perhaps because the name is spelled both ways in the decision
[73] *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).
[74] State v. Chandler, 5 La. An. 489, 491 (1850).
[75] State v. Chandler, 5 La. An. 489, 490, 491 (1850).

22

> The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States.  The arms there spoken of are such as are borne by a people in war, *or at least carried openly*.  The article explains itself.  It is in these words: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."  This was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke.[76]  [emphasis added]

83. Again, the idea is that military weapons were protected arms, and openly carried arms were lawful.

84. State v. Jumel (La. 1858) again involved a Second Amendment challenge to a concealed weapon ban. Again, the Louisiana Court argued: "The statute in question does not infringe the right of the people to keep or bear arms.  It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."[77]  The Louisiana Supreme Court then cited the *State* v. *Chandler* (1850) and *State* v. *Smith* (1856) decisions.  The *Jumel* decision implied that *because* "only a particular mode of bearing arms" (concealed) was restricted, it was not an infringement on the right protected by the Second Amendment.

85. Dred Scott v. Sandford (1857) clearly recognized a right to carry arms.  Contrasting the status of free blacks to white citizens:

> It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, … *and to keep and carry arms wherever they went.*  [emphasis added][78]

86. Rivas cites Bishop's claim that "dirks, bludgeons, revolvers and other weapons which are not used in war," and were therefore not protected arms.  This ignores that revolvers by the time of the Civil War *were* used in military service.  This is why decisions such as Page v. State

---

[76] Smith v. State, 11 La. An. 633, 634 (1856).
[77] State v. Jumel, 13 La. An. 399, 400 (1858).
[78] Dred Scott v. Sandford, 60 U.S. 393, 417 (1857).

(Tenn. 1871) recognized the right to carry at least military revolvers, even if the law required them to be carried in a manner that would be called brandishing today.[79]

87. Similarly, *Fife v. State* (Ark. 1876) decided that only weapons:

> What then, is he protected in the right to keep and thus to use? Not every thing that may be useful for offense or defense, *but what may properly be included or understood under the title of "arms," taken in connection with the fact that the citizen is to keep them, as a citizen.* Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. *Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater* [revolver]*, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the legislature.*[80]  [emphasis added]

88. Two years later, in *Wilson* v. *State of Arkansas* (Ark. 1878), the Arkansas Supreme Court once again defined what arms the state arms provision protected. Chancy Wilson was indicted on the grounds that he did "unlawfully carry a pistol as a weapon, contrary to the statute such case made and provided, and against the peace and dignity of the State..."  Wilson had borrowed "a large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting.  Upon reaching his destination, Wilson spoke with his host, "pulled the pistol out of his boot, cocked it a few times to see if it would revolve, and then put it around under his coat, and went into dinner."  It is not clear if the revolver was concealed in his boot, but it certainly was concealed under his coat.  The trial court refused to allow a statement either by the owner of the pistol or Wilson as to the purpose of having the revolver, and refused to charge the jury that "an army size pistol" was not subject to the restriction of the Arkansas law.

89. The Arkansas Supreme Court, citing *Fife*, agreed that regulation was acceptable, but:

> No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections, etc.  *Andrews* v. *State*, 3 *Heiskell*, 182.

---

[79] Page v. State, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871).
[80] Fife v. State, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876).

> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.

> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.[81]

90.   In the same session, the Arkansas Supreme Court decided another weapons case,

*Holland* v. *State* (1878):

> James Holland was indicted in the Circuit Court of Yell county, for carrying a pistol as a weapon.

> On the trial but one witness was examined.  He stated, in substance, that the first time he ever saw defendant, was on the 1st of October, 1875, in Yell county.  He had two large sized six shooting pistols, one of them a Remington, navy size and loaded, and the other a Colt's army pistol.  The pistols were such as are commonly used in the United States military and naval service.  Defendant was carrying them in his saddle-bags, and stated he was from Texas.  Witness did not know whether he was on a journey or not.

91.   Not surprisingly, Holland

> asked the court to charge the jury that if they found from the evidence that the pistols, proven to have been carried, were army sized pistols, and were such as are commonly used in the United States military and naval service, they must acquit defendant.

> The court refused this instruction, defendant was convicted, a new trial refused him, he took a bill of exceptions and appealed.[82]

92.   Chief Justice English again delivered the opinion of the Arkansas Supreme Court: "The court erred in refusing to instruct the jury as moved by appellant."  After citing *Fife* v. *State* (1876) and *Wilson* v. *State of Arkansas* (1878), the Arkansas Supreme Court reversed the conviction, and ordered a new trial.  The pistols in question were apparently concealed "in his saddle-bags," but the defense of the pistols being standard U.S. military models was sufficient to justify their concealed carriage.

93.   In Dabbs v. State (Ark. 1882), the Arkansas Supreme Court upheld the third section of the Act of April 1, 1881, which prohibited the sale of any pistol other than those "used in the army

---

[81] Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878).
[82] Holland v. State, 33 Ark. 560, 561 (1878).

25

or navy of the United States and known as the navy pistol."  The heart of the dispute is addressed in the last paragraph of the decision:

> The law was enacted as a measure of precaution for the prevention of crimes and calamities.  It is leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person.  It does not abridge t*he constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare.*  Fife v. State, 31 Ark., 455.[83] [emphasis added]

94. Other 19th century and early 20th century decisions recognized a right to carry handguns.

*In Re Brickey* (Ida. 1902) involved a man named Brickey who was convicted of carrying a loaded revolver within the city limits of Lewiston, Idaho.  On appeal, the Idaho Supreme Court raised federal and state constitutional provisions:

> The second amendment to the federal constitution is in the following language: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."  The language of section 11, article 1 of the constitution of Idaho is as follows: "the people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right of law."  Under these constitutional provisions, *the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho*, whether within or without the corporate limits of cities, towns, and villages.  The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it.  A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state.  But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages.  We are compelled to hold this statute void.[84] [emphasis added]

95. There is overwhelming evidence of later decisions recognizing a right to carry handguns, even if the state could prohibit *concealed* carry.

96. Why this lengthy discussion of obscure early 19th century decisions?  To emphasize that Rivas' expertise on this subject is limited, and her conclusions are therefore flawed.

97. Rivas at pp. 25-27 discusses surety bond laws which Bruen specifically rejects as irrelevant.[85]  Much of the rest of Rivas' declaration consists of similarly misleading "evidence"

---

[83] Dabbs v. State, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882).
[84] In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902).
[85] Bruen op cit. at 2144, 2145.

26

including such marvels as, "Hawaii, which became a territory in 1900, had enforced public carry regulations since 1852."  In 1852, Hawaii was a *kingdom*, not under U.S. law.

98. Even if Rivas' alternate reality version was correct, Bruen recognized a right to bear arms in public places.[86]  All previous decisions taking a narrower view are obsolete.

## III. Summary:

99. The evidence presented by Rivas:

- makes extensive misrepresentation of 19th century laws that prohibited *concealed* carry as being bans on all forms of public carry;

- purports expert knowledge of early 19th century case law on this subject that she fails to show;

- pretends that there was a consistent definition of deadly weapons to include all concealable weapons (including handguns) but excluding the far more deadly rifle and shotgun;

- attempts to tie rising murder rates to the introduction of the revolver, while admitting that there was a long list of other factors that might explain this problem in part or perhaps even in full.

---

[86] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022).

27

**Exhibit 2 to the Declaration of Clayton Cramer**

## Cases

Dano v. Collins, 166 Ariz. 322, 323, 324 (Ariz.App. 1990) ................................................ 9

In re Brickey, 8 Idaho 597, 70 P. 609, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902) .................. 5

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2140 (2022) .................3, 11

Nunn v. State of Georgia, 1 Ga. 243 (1846) ................................................................ 9

*People* v. *Zerillo*, 219 Mich. 635, 189 N.W. 927, 928 (1922) ........................................ 7

Simpson v. State, 13 Tenn. (5 Yer.) 356 (1833) ............................................................ 5

Simpson v. State, 13 Tenn. (5 Yer.) 356, 359, 360 (1833). ................................................ 5

*State* v. *Blocker*, 291 Or. 255, 257, 258, 259, 260 (1981) ........................................... 7

*State* v. *Delgado*, 298 Or. 395, 692 P.2d 610, 613, 614 (1984) ...................................... 8

State v. Huntly, 418, 420 (N.C. 1843). ..................................................................... 4

State v. McAdams, 714 P. 2d 1236, 1238 (Wyo. 1986) ................................................ 9

*State* v. *Rosenthal*, 75 Vt. 295, 55 Atl. 610, 611 (1903) ............................................. 6

State v. Smoot, 97 Or. App. 255, 258, 775 P.2d 344, 345 (1989). ................................... 8

## Statutes

1 *The Statute Laws of the State of Tennessee, of a Public and General Nature* (1831) ................. 4

14 Mass. Acts 1747 – 1752 339 or any of the Chapter 12s (1907) ................................... 3

14 Mass. Acts and Resolves 1747 – 1752 544 and ch. 17 (1907) .................................... 2

1692 Mass. Acts ch 18, § 6 at 52 ......................................................................... 12

1692-3 Mass. Laws ch. 18, § 6 at 52-53 ................................................................. 11

1786 Mass. Acts ch. 38 at 88 ............................................................................. 10

1786 Va. Laws ch. 49 at 334 ............................................................................... 3

1795 Mass. Acts ch. 2 at 464 ............................................................................. 12

i

1801 Tenn. Laws 259, 260-261, ch. 22, § 2 ................................................................... 4

1801 Tenn. Laws 259, 260-261, ch. 22, § 6 ................................................................... 4

1821 Me. Laws ch. 17 at 95 ........................................................................................ 12

1821 Me. Laws ch. 76 at 352-53 ................................................................................. 12

2 Laws Of New Hampshire Including Public And Private Acts And Resolves And The Royal
    Commissions And Instructions With Historical And Descriptive Notes, And An Appendix:
    Volume Two Province Period 1702-1745 82-87 (1913) ........................................... 12

Cal. PC § 245(a) ......................................................................................................... 10

### Other Authorities

T. Gordon, The History of New Jersey 49 (1834). ........................................................... 2

W. Whitehead, East Jersey Under the Proprietary Governments 150-151 (1875) ........................ 2

W. Whitehead, East Jersey Under the Proprietary Governments 151 (1846) ............................. 2

Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of
    North Carolina, iii (1792). ...................................................................................... 3

# Spitzer Rebuttal

1. My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2. In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

3. Spitzer includes among his qualifications: "For over twenty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence)." With NRA membership you get a magazine and continual fund-raising calls and letters.  It is difficult to see how NRA membership, which costs $45 per year, adds to one's qualifications.  My membership in NRA since 1982 adds nothing to *my* qualifications.

## I. Concealed Weapon Regulation

4. Spitzer at p. 6 points to a 1686 New Jersey statute that prohibited both concealed carry of "any pocket pistol, skeines, stilladers. daggers or dirks, or other unusual or unlawful weapons" as well as what appears to have been a ban on open carry: "no planter shall ride or go armed with

1

sword, pistol, or dagger."  Bruen discussed and discounted this statute's significance as applying to only one class of the population (farmers) who "may have been targeted because colonial-era East New Jersey was riven with 'strife and excitement' between planters and the Colony's proprietors 'respecting titles to the soil.'"

5. Examining the Court's sources for this claim[1] is not terribly illuminating; the 1846 edition of EAST JERSEY UNDER THE PROPRIETARY GOVERNMENTS provides a bit more interesting possible reason: "The truth became manifest that their [proprietors] private emoluments were curtailed, even their title to the soil endangered by the deranged state of the province, and the threatened procedure to test their right to its government gave little promise of repose for some years."[2]  The relatively small number of wealthy beneficiaries of royal favor might well have sought to intimidate the planters who they perceived as the source of their difficulties.

6. When Spitzer moves past the 1686 New Jersey law, he moves from the realm of certainty to what is either confirmation bias or misrepresentation.  "Massachusetts followed in 1750, penalizing any assemblage of twelve or more persons, whether the weapons were concealed or openly carried, 'being armed with clubs or other weapons.'"  Spitzer has the statute in Exhibit E, described as "1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1."

> If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled…

7. There are three problems here.  The first is that there is no such law in Massachusetts provincial laws at Mass. Acts and Resolves p. 544 or chapter 17.[3]

---

[1] W. Whitehead, EAST JERSEY UNDER THE PROPRIETARY GOVERNMENTS 150-151 (1875); T. Gordon, THE HISTORY OF NEW JERSEY 49 (1834).
[2] W. Whitehead, EAST JERSEY UNDER THE PROPRIETARY GOVERNMENTS 151 (1846).
[3] 14 Mass. Acts and Resolves 1747 – 1752 544 and ch. 17 (1907).

2

8. Secondly, It also appears that Spitzer had copied this text from the Duke Center for Firearms Law Repository of Historical Gun Laws, where this text appears as "1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12."  But as I have found typical of the Duke repository, that law is not at Massachusetts Acts and Resolves p. 339 nor at any Chapter 12 for these years.[4]

9. Third, assuming that Duke University Law School actually found this statute in some non-canonical edition of Massachusetts Acts and Resolves, their version does not prohibit carrying of arms except if they "shall be unlawfully riotously or tumultuously assembled."

10. "Virginia and North Carolina passed similar laws incorporating penalties for openly carrying weapons in 1786 and 1792, respectively."  Spitzer cites the Virginia law as "1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays."  The law Spitzer quotes is actually 1786 Va. Laws ch. 49 at 334.[5]  This is the Statute of Northampton (1328), specifically rejected by Bruen as primarily about the wearing of armor or threats to breach the peace.[6]

11. "Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)".  As the title makes clear, this was not a statute passed by the North Carolina Legislature.  The North Carolina Legislature tasked Martin to sift through all *existing* British statutes that might have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[7]

---

[4] 14 Mass. Acts 1747 – 1752 339 or any of the Chapter 12s (1907).
[5] 1786 Va. Laws ch. 49 at 334.
[6] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2140 (2022).
[7] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).

3

12. Curiously, when the North Carolina Supreme Court decided State v. Huntly (N.C. 1843), a case which charged the defendant under the Statute of Northampton, the opinion held that "whether this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838, at which day it is declared in the Revised Statutes, (ch. 1st, sect. 2,) that the statutes of England or Great Britain shall cease to be of force and effect here."[8] One might expect that if this statute had been adopted legislatively, as Spitzer claims, that it might have merited mention.

13. "In 1801, Tennessee enacted a law saying that no one was to "go armed to the terror of the people, or privately carry any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person." There is indeed "An Act for the restraint of idle and disorderly persons."[9] This was a vagrancy law for "persons of ill fame or suspicious character." Section 6 does indeed contain the text of the Statute of Northampton.[10] However a search of an 1831 compilation of Tennessee laws for the phrase "ride armed" found no matches.[11] Even more curiously, Simpson v. State (Tenn. 1833) involves a case where the defendant was indicted for "with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land." Yet when the defendant appealed, alleging "the record does not present any charge that is known to the law, as cognizable in our courts by indictment," the Tennessee Supreme Court ruled in Simpson's favor because

> But suppose it to be assumed on any ground, that our ancestors adopted and brought over with
> them, this English statute, or portion of the common law, our constitution has completely

---

[8] State v. Huntly, 418, 420 (N.C. 1843).
[9] 1801 Tenn. Laws 259, 260-261, ch. 22, § 2.
[10] 1801 Tenn. Laws 259, 260-261, ch. 22, § 6.
[11] 1 *The Statute Laws of the State of Tennessee, of a Public and General Nature* (1831).

4

abrogated it; it says , " that the freemen of this State have a right to keep and to bear arms for their common defence. " Article 11, sec . 26. [12]

While the Statute of Northampton was cited as the basis for this charge, there was no reference to any Tennessee statute in the decision.[13]

14. At 6: "In the 1800s, as interpersonal violence and gun carrying spread, 43 states (including the District of Columbia) joined the list; 3 more did so in the early 1900s."  This is an amazing claim that deserves actual evidence, not just a citation to work by himself and others.  In most states, *concealed* carry was banned but *open* carry was not.  Multiple court cases have recognized a right to carry arms, although not a right to carry concealed.  While many states passed various restrictions on open carry, many did not survive judicial review.  In re Brickey (Ida. 1902):

> The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it. *A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state. But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages. We are compelled to hold this statute void.* [14] [emphasis added]

14.  As the following decisions demonstrate, passage of such laws are no more evidence that they were constitutional than laws racially segregating public schools before Brown v. Board of Education (1954) are evidence of the constitutionality of the latter laws.   State v. Rosenthal (Vt. 1903) involved Andrew Rosenthal who was convicted in Rutland City Court of violating city ordinance No. 10, "prohibiting a person from carrying within the city any brass knuckles, pistol, slung shot, or weapon of similar character, or any weapon concealed on his person, without permission of the mayor or chief of police."  The Vermont Supreme Court struck down the ordinance based on Vermont Constitution's "art. 16, [which] declares that the people have a

---

[12] Simpson v. State, 13 Tenn. (5 Yer.) 356, 359, 360 (1833).
[13] Simpson v. State, 13 Tenn. (5 Yer.) 356 (1833).
[14] In re Brickey, 8 Idaho 597, 70 P. 609, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902).

right to bear arms for the defense of themselves and the state," and that the ordinance in question "so far as it relates to the carrying of a pistol under any circumstances without such consent, is repugnant to the Constitution, and to that extent void."

15. While Vermont Statutes §4922 prohibited the carrying of arms, "with the intent or avowed purpose of injuring a fellow man":

> Under the general laws, therefore, a person not a member of a school may carry a dangerous or deadly weapon, openly or concealed, unless he does it with the intent or avowed purpose of injuring another; and a person who is a member of a school, but not in attendance upon it, is at liberty, in a similar way, to carry such weapons.[15]

16. In People v. Zerillo (Mich. 1922), the Court explains in a subtle manner that the defendant was likely a disreputable person, perhaps a criminal:

> It was made to appear in evidence that, about 5 o'clock in the morning of the 25th day of September, 1921, at the corner of Chase and Russell streets in the city of Detroit, defendant was seated at the wheel of a Marmon touring car, with four or five men in the car with shotguns. Defendant had no shotgun, but in the pocket of the door of the automobile was found a .38-caliber revolver, and this is the firearm the possession of which led to his conviction…
>
> The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. The part of the act under which the prosecution was planted is not one of regulation, but is one of prohibition and confiscation. *It is not regulation to make it a crime for an unnaturalized foreign-born resident of the state to possess a revolver, unless permitted to have one by the sheriff of the county where he resides.*[16] [emphasis added]

17. Several Oregon decisions are reminders that many laws passed in the 19th and early 20th centuries have since failed judicial review, as should the California law at the heart of this case. *State* v. *Blocker* (Ore. 1981) involved a Michael Blocker who was convicted of possession of a billy club in his car. Much of the decision involved defining what constitutes "vague" and "overbroad" laws, but the opinion of the Oregon Supreme Court held that while the Legislature could prohibit the carrying of a concealed weapon, they had not done so in this case—the statute in question had banned possession of a billy club anywhere—and had apparently neglected to ban concealed carry of such a weapon. The Court did acknowledge that some types of regulation

---

[15] *State* v. *Rosenthal*, 75 Vt. 295, 55 Atl. 610, 611 (1903).
[16] *People* v. *Zerillo*, 219 Mich. 635, 189 N.W. 927, 928 (1922).

6

of the bearing of arms was legal, and gave some examples of then current Oregon statutes that were constitutional:

> This state has several such regulatory statutes, with which we are not concerned in this case: ORS 166.220(1) prohibiting possession of a dangerous weapon with intent to use such weapon unlawfully against another; ORS 166.240, prohibiting carrying certain weapons concealed about one's person; ORS 166.250, prohibiting carrying any firearm concealed upon the person or within any vehicle without a license to do so.
>
> On the other hand, ORS 166.510, with which we are here concerned, is not, nor is it apparently intended to be, a restriction on the manner of possession or use of certain weapons.  The statute is written as a total proscription of the mere possession of certain weapons, and that mere possession, insofar as a billy is concerned, is constitutionally protected.[17]

19.  Carrying arms with some criminal intent could be prohibited; carrying concealed could be prohibited; but some form of carry was protected, or the statute would be contrary to the constitutional protection to bear arms for self-defense.

20.  Three years later, in *State* v. *Delgado* (1984), the Oregon Supreme Court used very similar reasoning in a switchblade case.  Joseph Luna Delgado was stopped on October 3, 1983, by police, since he "appeared disorderly."  During a pat down search, the officer found a switchblade knife in the defendant's back pocket, and Delgado was convicted of possessing a switchblade knife, a prohibited weapon.

21.  On appeal, the conviction was reversed, based on the *Blocker* decision; the prosecution asked the Oregon Supreme Court to review the question of whether switch-blades were constitutionally protected arms.  Since the *Kessler* decision had recognized that "handcarried weapons commonly used by individuals for personal defense" were constitutionally protected, the state argued that switch-blades were not commonly used for defense, and were therefore outside the protection of the Oregon Constitution.

---

[17] *State* v. *Blocker*, 291 Or. 255, 257, 258, 259, 260 (1981).

22. The Oregon Supreme Court rejected the prosecution's evidence that switch-blade knives are "almost exclusively the weapon of the thug and delinquent," calling the material "no more than impressionistic observations on the criminal use of switch-blades."

> This court recognizes the seriousness with which the legislature views the possession of certain weapons, especially switch-blades. The problem here is that ORS 166.510(1) absolutely proscribes the mere possession or carrying of such arms. This the constitution does not permit.[18]

23. The last of the Oregon decisions is *State* v. *Smoot* (1989), and answered the questions raised by *State* v. *Delgado* (1984), concerning the limits of the right to bear switch-blade knives. Dayne Arthur Smoot was convicted in Lane County, Oregon, of carrying a switch-blade knife concealed in a trouser pocket. The Oregon Court of Appeals upheld the conviction, since only the manner of carrying this constitutionally protected arm was regulated: "A person may possess and carry a switchblade as long as it is not concealed."[19]

24. In State v. McAdams (Wyo. 1986), police stopped a cocktail waitress for a vehicle code violation, and saw that "had a knife in a sheath inside the right breast pocket of her jacket." The Wyoming Supreme Court upheld the concealed weapon violation as a legitimate use of the state's police powers but nonetheless:

> The police power cannot, however, be invoked in such a manner that it amounts to the destruction of the right to bear arms. *People v. Brown,* 253 Mich. 537, 235 N.W. 245, 82 A.L.R. 341 (1931); *State v. Dawson,* 272 N.C. 535, 159 S.E.2d 1 (1968). This precept is well stated in the case of *State v. Wilforth,* 74 Mo. 528, 530 (1881):
>
>> "A statute which, under the pretense of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for purposes of defense, would be clearly unconstitutional."[20]

25. In *Dano* v. *Collins* (Ariz. App. 1990), Franklin Dano and Paul Huebl brought suit against Tom Collins, the Maricopa County Attorney, and Richard G. Godbehere, the Maricopa County Sheriff, requesting that the "state statute which prohibits the carrying of concealed

---

[18] *State* v. *Delgado*, 298 Or. 395, 692 P.2d 610, 613, 614 (1984).
[19] State v. Smoot, 97 Or. App. 255, 258, 775 P.2d 344, 345 (1989).
[20] State v. McAdams, 714 P. 2d 1236, 1238 (Wyo. 1986).

8

weapons be declared in violation of the State Constitution."   The Maricopa Superior Court dismissed the complaint.   It was appealed to the Arizona Court of Appeals, where the "police power" was again cited as the basis for regulating, though not prohibiting, the carrying of arms:

> Arizona's prohibition on the carrying of concealed weapons does not frustrate the purpose of the constitutional provision.  We do not read the Arizona constitutional guarantee as granting an absolute right to bear arms under all situations.  *The right to bear arms in self-defense is not impaired by requiring individuals to carry weapons openly.   Appellants are free to bear exposed weapons for their defense.*[21] [emphasis added]

26. These are seven examples of the irrelevance of post-1868 laws that Spitzer claims banned open carry of arms.  Bruen has also rendered any such laws irrelevant.

27. At p. 7, Spitzer cites the 1837 Georgia law "restricting both the carrying and sale" of various weapons and somehow neglects to mention that Nunn v. State (Ga. 1846) struck down that law as contrary to the Second Amendment.[22] This was the first gun control law overturned on Second Amendment grounds rather than a state constitutional arms clause.   This is not the sign of an expert; leaving out contrary evidence is a mistake that in an undergraduate history class would cause me to make some sharp remarks and take away some points, but then again Spitzer is not a historian.

28. At p. 8: "An 1852 Hawaii law criminalized the carrying or 'found armed with' any of a list of deadly weapons."  Laws of the *Kingdom* of Hawai'i have no relevance to American law.  Why Spitzer would bother with this obviously irrelevant law eludes me.

29. Starting at p. 8, Spitzer lists many laws passed after 1868 and thus irrelevant to the standard adopted by Bruen.

---

[21] Dano v. Collins, 166 Ariz. 322, 323, 324 (Ariz.App. 1990).
[22] Nunn v. State of Georgia, 1 Ga. 243 (1846).

9

## Brandishing Laws

30. Starting at p. 11, Spitzer lists "Weapons Brandishing and Display Laws." If there was any challenge to brandishing laws, this might be relevant. Spitzer claims these laws

> penalized the mere public appearance of weapons (short of their actual use), including but not limited to firearms, in two circumstances: the brandishing of weapons—that is, to display them in the presence of others and to do so in a menacing or threatening manner; and the mere display of weapons (i.e. that they simply can be seen) in the presence of others. A 1642 provision in the colony of New Netherland (soon to be New York) stated: 'No one shall presume to draw a knife much less to wound any person, under . . . penalty."

31. As should be obvious, the statute "that no one shall presume to draw a knife much less to wound any person," prohibits not the open carry of a knife, but drawing it. In conjunction with any threat or hostilities, this would be assault with a deadly weapon under California law.[23] Allowing open carry of a firearm changes this not at all.

32. At p. 11: "Similarly, a 1786 Massachusetts law criminalized the mere assemblage of 'any persons to the number of twelve, or more, being armed with clubs or other weapons.' If they did not disperse within an hour of being warned, they could be subject to arrest." Unfortunately, Spitzer's citation is useless: "1786 Mass. Sess. Laws, § 1." Nonetheless, I found it. The full text shows that Spitzer has misrepresented the statute:

> if any persons to the number or twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, *shall be unlawfully, routously, riotously or tumultuously assembled*…[24] [emphasis added]

33. Being armed was not unlawful. Twelve or more armed and riotously assembled was unlawful. This is not a minor misreading of the statute.

34. Spitzer claims: "A 1694 Massachusetts law subjected to arrest any who "shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere." The cited statute: "1694 Mass. Laws 12, no. 6, An Act for the

---

[23] Cal. PC § 245(a).
[24] 1786 Mass. Acts ch. 38 at 88.

Punishing of Criminal Offenders."   The actual text is a bit broader than Spitzer's careful selection:

> That every justice of the peace in the county where the justice of peace, offence is committed, may cause to be staid and arrested all *affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively before any of their majesties' justices* or other their officers or ministers doing their office or elsewhere by night or by day, in fear or affray of their majesties' liege people, and such others as shall utter any menaces or threatening speeches; and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison until he find *sureties for the peace and good behaviour, … and require bond with sureties for the peace*, or bind the offender over to answer it at the next sessions of the peace, as the nature or circumstance of the offence may be; and may make enquiry of forcible entry and detainer, and cause the same to be removed, and make out hue and crys after runaway servants, thiefs and other criminals.[25] [emphasis added]

35. The punishment of affrayers, rioters, and disturbers of the peace has no relevance to the challenged California law. The "ride, or go armed offensively before any of their majesties' justices" provision is yet another variant of the Statute of Northampton rejected by Bruen.[26]  At most, this might be an argument for prohibiting going armed into a courthouse or legislative body, which would qualify as a sensitive place under Heller.  Bruen also rejects the "surety bond" laws as irrelevant.[27]

36. Spitzer at p. 12: "New Hampshire enacted a law in 1699 (and in 1708) that punished anyone who 'went armed offensively' or 'put his Majesty's subjects in fear.'"  Spitzer's citation: "1699 N.H. Laws, 1. Quoted in Young v. Hawaii, 794–795; New Hampshire Public Carry Prohibition (1708)."  He seems not to have bothered checking the primary source: ACTS AND LAWS, PASSED BY THE GENERAL COURT OR ASSEMBLY OF HIS MAJESTIES PROVINCE OF NEW HAMPSHIRE IN NEW ENGLAND (1699).  It is only 10 pages long.  There is no such law there. What about the "New Hampshire Public Carry Prohibition (1708)"?  The session laws for 1708 took several minutes to find: LAWS OF NEW HAMPSHIRE INCLUDING PUBLIC AND PRIVATE ACTS

---

[25] 1692-3 Mass. Laws ch. 18, § 6 at 52-53.
[26] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2140 (2022).
[27] Id. at 2149, 2150.

AND RESOLVES AND THE ROYAL COMMISSIONS AND INSTRUCTIONS WITH HISTORICAL AND DESCRIPTIVE NOTES, AND AN APPENDIX: VOLUME TWO PROVINCE PERIOD 1702-1745.  There are six chaptered laws between two sessions for 1708.[28]  None of them have that content or title.

37.  "Massachusetts added to its existing firearms regulations in a 1795 law that authorized justices of the peace to arrest those who 'ride or go armed offensively, to the fear or terror of the good citizens.'"  Cited to "1795 Mass. Acts 436, ch. 2. Quoted in Young v. Hawaii, 799. See also 1692 Mass. Acts 10, 11–12."  Again, Spitzer has not checked the readily available primary source:

> 1795. - Chapter 2. [ May Session , ch . 2. ) An act to change the name of William Shelden of hadley in the county of Hampshire, to the name of Giles Crouch Kellogg.[29]

Nor is there a match at p. 436.

38.  In the footnote: "See also 1692 Mass. Acts 10, 11–12."  This is nearly identical to 1694 Mass. Laws 12, no. 6, discussed above.  It is on pp. 52-53.[30]  There is nothing at pp. 10-12 of any relevance, suggesting that he did not read it before citing it.

39.  "Maine's 1821 law outlawed "affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens" cited as "1821 Me. Laws 285, ch. 73 § 1."  Actually it is ch. 76 at 353. Like the similar 1694 Mass. Laws 12, no. 6, it is limited to a small number of criminal acts and is not a ban on open carry except if you "go armed offensively, to the fear or terror of the good citizens."[31]  What he missed was ch. 17 which is identical to 1786 Mass. Acts ch. 38 at 88.  Again, it only prohibits being armed while "unlawfully, riotously, or tumultuously assembled."[32]

---

[28] 2 LAWS OF NEW HAMPSHIRE INCLUDING PUBLIC AND PRIVATE ACTS AND RESOLVES AND THE ROYAL COMMISSIONS AND INSTRUCTIONS WITH HISTORICAL AND DESCRIPTIVE NOTES, AND AN APPENDIX: VOLUME TWO PROVINCE PERIOD 1702-1745 82-87 (1913).
[29] 1795 Mass. Acts ch. 2 at 464.
[30] 1692 Mass. Acts ch 18, § 6 at 52.
[31] 1821 Me. Laws ch. 76 at 352-53.
[32] 1821 Me. Laws ch. 17 at 95.

40. Spitzer at pp. 12-13 repeats his earlier misrepresentations of N.C. (1792) and 1801 Tenn. Pub. Acts 260, ch. 22, § 6.  He also contends that widespread brandishing laws that by his own admission required:

> Note the two key elements: the "exhibit" or display of the weapon combined with doing so "in a rude, angry and threatening manner," revealing a criminal intent as invoked by the terms "rude, angry, and threatening."

41. Somehow, Spitzer imagines that these brandishing laws prohibited open carry.

## Licensing Laws

42. Spitzer's licensing laws section is a bit mystifying.  He includes laws that licensed hunting with firearms, commercial sales, and firearms discharge.  None of these laws are challenged in this case.

43. Spitzer acknowledges there was "licensing on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks."  If Spitzer believes racist laws provide evidence of an American tradition of restrictive gun laws, then he may want to read the 14th Amendment.  Again, pointing to these laws as justification for current licensing is something that might play well at a KKK meeting, but it seems an odd defense of a law today.

44. Spitzer at pp. 19-26 gives a history of gun licensing that starts in 1871, three years after the 14th Amendment incorporated the Second Amendment on to the states, and thus after the date Bruen sets for determining whether a law is constitutional or not.

45. Subsequent sections of his declaration discuss firearms discharge licensing, and dealer recording of sales.  To what purpose Spitzer does this for Baird v. Bonta is utterly mystifying

13

## Summary

46. Spitzer's claims about general bans on carrying of firearms disappear when you look up his cited sources, some of which do not exist, some of which he misrepresents, and many of which Bruen specifically rejected as controlling.  His use of brandishing laws to justify bans on open carry make no sense; even his own summary of those laws admit that there needed to be more than just the visibility of a weapon to constitute a crime.  Allowing open carry in no way impairs California's current assault with a deadly weapon law.

47. The quality of Spitzer's scholarship (citing non-existent laws, relying on secondary sources when primary sources are readily available, misrepresenting the laws that are actually present) should raise serious questions about his conclusions.

58. His attempt to justify current licensing laws by using racially motivated licensing laws is the most mystifying part of this whole declaration.  As I said earlier, this would be a strong selling point to a bench filled with Klansmen.

14

**Exhibit 3 to the Declaration of Clayton Cramer**

## Table of Authorities

### Cases

Brown v. Maryland, 25 US 419, 436 (1827) ................................................................. 21

Commonwealth v. Leach, 1 Mass. 59 (1804). ............................................................... 3

Franchise Tax Bd. of Cal. v. Hyatt, 139. S.Ct. 1485, 1498 (1019)................................ 7

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2120 (2022) .................... 23

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140 (2022). ........... 2

State v. Newsom, 27 N.C. (5 Ired.) 250, 255 (1844). .................................................... 3

Vanhorne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795).... 4

### Statutes

1 The Public Records of the Colony of Connecticut, 1636-1776 15 (1850) ................................. 9

5 *Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay* 479 (1886)*, ch. 21*.................................................................................................................... 10

9 Statutes at Large of Pennsylvania 30 (1903) .......................................................... 2

Charles J. Hoadly, ed., Records Of The Colony And Plantation Of New Haven, From 1638 To 1649 25-26 (1857)................................................................................................. 9

U.S. Const., Art. I, § 9, cl. 3.................................................................................... 10

### Other Authorities

2 Massachusetts Digest: Being a Digest of the Decisions of the SUPREME JUDICIAL COURT OF MASSACHUSETTS, FROM THE YEAR 1804 TO THE YEAR 1857. 661 (1863)......... 3

An ACT to suppress the disorderly practice of FIRING GUNS, &c., Pennsylvania Gazette, Dec. 28, 1774................................................................................................................. 17

i

Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform (1999)......................................................................... 21

FBI, Crime in the United State: 2019, Table 4 ......................................................... 13

FBI, Crime in the United States 2019, Expanded Homicide Data Table 2 (2019)...................... 11

FBI, Crime in the United States: 2017, Table 4........................................................ 12

FBI, Crime in the United States: 2019, Table 4........................................................ 12

Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798-1870 34 (1948) .......................... 14

Frank Klay, The Samuel E. Dyke Collection of Kentucky Pistols 4-15 (1972)........................... 14

Harold L. Peterson, Arms and Armor in Colonial America: 1526-1783 213-14, 202, 205, 209 (1956)................................................................................................. 14

John M. Dawson and Patrick A. Langan, Murder in Families, Bureau of Justice Statistics Special Report 1 (Jul. 1994) ................................................................................ 12

John Winthrop, 2 Winthrop's Journal: "History of New England", 27, 153, 180, 275 (1908). ... 15

John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83......................................................................... 19

Last Friday one Hunt, a lime seller in this…, Pennsylvania Gazette, Apr. 20, 1749. .................. 16

Last Monday Capt. Tyng in the Massachusetts…, Pennsylvania Gazette, Aug. 15, 1745.......... 16

M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 312 (1980).......................................................................................... 14

Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina iii (1792)................................................................................. 2

Monday Evening last a very melancholy…,  Pennsylvania Gazette, Oct. 31, 1745 ................... 16

ii

Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840) .................................................... 14

Randolph Roth, American Homicide xii (2009).......................................................................... 12

Richard Maxwell Brown, The South Carolina Regulators 35, 40, 54 (1963) ............................. 16

Robert V. Wells, Population of the British colonies in America Before 1776: A Survey of Census

    Data Table 1-1 at 9 (1975). .................................................................................................. 11

William M. Burwell, Address Delivered Before the Society of Alumni of the University of

    Virginia 446-47 (1847) ........................................................................................................ 10

## I.    Introduction

1.      This Rebuttal Declaration to Prof. Cornell demonstrates multiple errors that demonstrate a limited knowledge of the colonial period and legal history.

## II.    Qualifications

2.      My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

3.      In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

## III.    Carrying Over English Common Law

At p. 3, Cornell asserts "Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations."  His footnote lists "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); Commonwealth v. Leach, 1 Mass. 59 (1804)."

1

7. "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30" carried over English law but with the important provision:

> all and every person and persons whosoever are hereby enjoined and required to yield obedience to the said laws as the case may require *until the said laws or acts of general assembly respectively, shall be repealed or altered* or until they expire by their own limitation and the common law and such of the statute laws of England as have heretofore been in force in the said province, except as is hereafter excepted.[1]  [emphasis added]

8. Certainly, the Pennsylvania Constitution of 1790, with its guarantee of a right to keep and bear arms,[2] qualifies as alteration of English common law concerning arms.

9. "FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792)."  The legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[3]  North Carolina's 1776 Constitution guarantees "That the people have a right to bear arms, in defense of the State"[4]  Again, this guarantee concerning the right to bear arms overrode English common law.  Furthermore pp. 60-61 in Martin's collection is the Statute of Northampton disqualified for relevance by Bruen.[5]

10. When the North Carolina Supreme Court heard State v. Newsom (1844), one of the claims made by the black defendant was that the 17th article the Bill of Rights of North Carolina protected his right to carry a shotgun.  The North Carolina Supreme Court in deciding in this

---

[1] 9 STATUTES AT LARGE OF PENNSYLVANIA 30 (1903).
[2] Penn. Const., Art. IX, § 21 (1790).
[3] Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA iii (1792).
[4] North Carolina Const. Art. XVII (1776).
[5] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140 (2022).

2

case, did not question whether the right to keep and bear arms was individual in nature. Instead, they ruled that the defendant's color was the deciding principle, taking precedence over the text. Referring to the authors of the North Carolina Constitution: "They must have felt the absolute necessity of the existence of a power somewhere, to adopt such rules and regulations, as the safety of the community might, from time to time, require."[6]

11. "*Commonwealth v. Leach*, 1 Mass. 59 (1804)": The decision did nothing to make English common law applicable in Massachusetts:

> Hooker, for the prosecution, conceded that justices of the peace were officers created by statute, and that their jurisdiction and powers were wholly dependent upon the statutes; 2 Hawk. P. C. c. 8, 13 , &c. But he contended that their jurisdiction here was not limited to those offences which are expressly, and by name in our own statutes, made cognizable by them; on the contrary, that it extended to all cases in which justices of the peace in *England* had jurisdiction by any of the statutes of that country which were passed previous to the emigration of our ancestors; which were to be considered as a part of our common law; that this was strongly implied in the act for establishing Courts of General Sessions of the Peace, passed July 3, 1782, (stat. 1782, c. 14 ,) by the first section of which" they are empowered to hear and determine all matters relative to the conservation of the peace, and the punishment of such offences as are cognizable* by them at common law, or by the acts and laws of the legislature, and to give judgment, &c.
>
> In this act, the term *common law* cannot mean the common law of *England*, because justices of the peace there are not common law officers; it must, therefore, mean our common law; and on this subject, our common law must be precisely what the *statute* law of *England* was at the time of the emigration of our ancestors from that country. The statutes which were previous to that time enacted in England, and which define or describe the authorities, powers, and jurisdiction of justices of the peace, give to them, expressly, cognizance of divers offences which were offences at common law; among which are trespasses.[7] [emphasis in original]

Clearly, only *some* parts of English law were common with Massachusetts law. Where Massachusetts law had differed, English law was no longer valid.

12. A later digest of Massachusetts decisions includes "*Commonwealth v. Leach*, 1 Mass. 59 (1804)" in its list of "English Statutes Adopted Here."[8]   Only individual s*tatutes*, not

---

[6] State v. Newsom, 27 N.C. (5 Ired.) 250, 255 (1844).
[7] Commonwealth v. Leach, 1 Mass. 59 (1804).
[8] 2 MASSACHUSETTS DIGEST: BEING A DIGEST OF THE DECISIONS OF THE SUPREME JUDICIAL COURT OF MASSACHUSETTS, FROM THE YEAR 1804 TO THE YEAR 1857. 661 (1863).

3

necessarily all of common law applied in Massachusetts, or there would be no need to have a detailed list.

13. Cornell has attributed this carryover of English law as it was in 1776 to sources from three states, none of which fits his claim.  Cornell does not understand his sources.

15. The U.S. Supreme Court has also emphasized how little significance English common law has compared to a constitution: "Legislation is the exercise of sovereign authority. High and important powers are necessarily vested in the Legislative body; whose acts, under some forms of government, are irresistible and subject to no controul. In England, from whence most of our legal principles and legislative notions are derived, the authority of the Parliament is transcendant and has no bounds."[9]

## IV.    Conserving the Peace

16. Prof. Cornell on p. 3 quotes Blackstone's COMMENTARIES about how the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."   True enough, but Blackstone's quote is from a discussion of:

> [S]ubordinate magistrates, whom I am to consider justices of the peace…  Of these, some had, and still have, this power annexed to other offices which they hold; others had it merely by itself, and were thence named *custodes* or *conservatores pacis*. Those that were so *virtute officii* still continue: but the latter sort are superseded by the modern justices.[10]

17. While perhaps an accurate statement of Blackstone's view of the common law, it seems a good case can be made that it is a retrospective description, and irrelevant to English law in Blackstone's time and therefore irrelevant to American law.

---

[9] Vanhorne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795).
[10] William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 143 (1775).

18. When Blackstone listed the absolute rights that every Englishman enjoyed, peace was not on the list, but "5. THE fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence…"[11]  Blackstone does not identify peace as one of these "Rights of Persons" in Book I, ch. 1:

> The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that residuum of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals.[12]

19. If Blackstone is of great importance for determining what was important in English and therefore American law, this core right of self-defense deserves *at least* as much weight as Cornell's apparently out of context of quote from Blackstone.

20. Next, Cornell quotes Justice Kavanaugh from D.C. v. Heller (2008): "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."  I am unsure why Cornell claims these are Kavanaugh's words.  While Kavanaugh joined in Justice Thomas' opinion in Bruen, Kavanaugh was not on the Court in 2008.[13]  Cornell is here quoting no from any Justice of the Supreme Court, but from the Syllabus for Heller, which carefully footnotes, "The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader."[14]  Any serious legal scholar knows the syllabus or headnotes on any federal or state court decision are not part of the opinion, nor precedential; Cornell is obviously not a legal scholar.

21. On p. 4:

> The right of the people to pass laws to promote public health and safety is one of the most fundamental rights in the pantheon of American rights. The idea of popular sovereignty, a core

---

[11] Id., at 143.
[12] Id., at 121.
[13] D.C. v. Heller, 554 U.S. 570 (2008).
[14] D.C. v. Heller, 554 U.S. 570 (2008).

5

belief of the Founding generation, included a right of legislatures to enact laws to promote the common good. Although modern lawyers and jurists are accustomed to thinking of this concept under the rubric of state police power, the Founding generation viewed it as a right, not a power.

22. What the people, and ideally the legislature as well, consider "laws to promote public health and safety" has been restrained by both state constitution bills of rights and the U.S. Bill of Rights from the very beginning. Rep. James Madison, author of the Bill of Rights, is also remembered for his MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN arguing that Virginia should disestablish the Anglican Church:

> Either then, we must say that the will of the Legislature is the only measure of their authority, and that, in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: either we must say that they may control the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary powers of the State; nay, that they may despoil us of our right of suffrage, and erect themselves into an independent and hereditary assembly: or, we must say, that they have no authority to enact into law the bill under consideration.[15]

23. If Cornell really believes in "popular sovereignty,… included a right of legislatures to enact laws to promote the common good," I look forward to his stalwart defense of state laws mandating racially segregated public schools and public accommodations, censorship of dirty books, prohibitions on sodomy, one man/one woman marriage laws, and bans on transgender sports. It is hard to consider a person a legal scholar or historian who does not understand that the American experiment in democracy has always been restrained by a recognition that majorities can and do make mistakes. This is the reason that every state constitution today, many of the Revolutionary state constitutions, and the U.S. Constitution has a Bill of Rights.

24. At p. 5, Cornell appears to trot out another decision by Justice Thomas to argue against his decision in Bruen: "In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history,

---

[15] James Madison, A MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN; WRITTEN IN 1784-5, AT THE REQUEST OF THE RELIGIOUS SOCIETY OF BAPTISTS IN VIRGINIA 41 (1828).

text, and tradition with an 'ahistorical literalism.'"  Cornell then cites "*Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019)"   But Thomas' decision actually is attacking "ahistorical literalism" and in a way that Bruen's arguments about interpreting text with analogous laws today:

> Hyatt argues that we should find no right to sovereign immunity in another State's courts because no constitutional provision explicitly grants that immunity. But this is precisely the type of "ahistorical literalism" that we have rejected when "interpreting the scope of the States' sovereign immunity since the discredited decision in Chisholm ."[16]

25. At pp. 6-7, Cornell quotes the Second Amendment and asserts, "Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state."  The first clause of the Second Amendment references not well-regulated arms but a "well-regulated militia."

26. Heller pointed out that, "The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but rather announces a purpose."[17]  Either Cornell is misreading the Second Amendment's text or he is unfamiliar with the Heller decision.  In either case, he has demonstrated his lack of expertise in this subject.

27. Cornell at pp. 7-8 cites the Burns' New Law Dictionary definition of "liberty," but it does not match any American concept of that term.  If anything, it is a profoundly anti-American concept: privilege granted to a select few:

> LIBERTY, is a privilege held by grant or prescription, by which men enjoy some benefit beyond the ordinary subject.[18]

28. At p. 7:

---

[16] Franchise Tax Bd. of Cal. v. Hyatt, 139. S.Ct. 1485, 1498 (1019).
[17] D.C. v. Heller, 554 U.S. 570, 577 (2008).
[18] Richard Burn and John Burn, A NEW LAW DICTIONARY 79 (1792).

7

In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed." In Founding-era American English, the word "infringement" meant to "violate" or "destroy." In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying *right*. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment….

29. Cornell makes a strong claim but it is a distinction without a difference. In what way is limiting free speech *just a bit* (e.g., prohibiting criticism of the U.S. Government) different from limiting the right to bear arms *just a bit* (e.g., prohibiting the open carry of knives). Of course *just a bit* has a non-boolean aspect to it. In 1863, California banned concealed carry, but open carry was lawful. In 1967, California banned carrying *loaded* firearms in cities without a license, rendering them useless for self-defense.[19] You could still carry a loaded handgun in most of the state without a license. Now even that is gone. Has not this right been destroyed?

30. At p. 8, quoting a "patriotic revolutionary era orator," "True liberty consists, not in having *no government*, not in a destitution of all law, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property." [emphasis in original] The relevance of this quote to this case seems confused. The plaintiffs are not arguing for no government or a "destitution of all law," but a disagreement about *this* law. Cornell's reasoning could be equally applied to laws prohibiting free speech, or opponents of warrantless searches; First Amendment or Fourth Amendment opponents of unlimited power to the government are not arguing for anarchy.

31. Cornell quotes Jud Campbell that "Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."

---

[19] *Capitol Is Invaded*, SACRAMENTO BEE, May 2, 1967, A1, A10.

What Cornell and perhaps Campbell seem to have missed is that the Bill of Rights limits democracy because a majority can, and often does, abuse its power.  The recent consequences of panic after 9/11 should be a reminder that even well-intentioned polity's can blow it.

32. Cornell continues: "In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order."  Mustering the militia required no such recordkeeping. Colonial and state militia laws did not keep track of who was armed.  They imposed a duty to be armed and to show up with those arms on muster day or face fines for failure.[20]  I am unaware of any safe storage laws of this period.

33. At p. 10: "The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties."

34. In 1777, Pennsylvania responded to concerns that Loyalists might be a fifth column by passing a law that provided that those of militia age refusing to swear an oath of loyalty to the Revolutionary governments were prohibited from "holding any office or place of trust in this state, serving on juries, suing for any debts, electing or being elected, buying, selling or transferring any lands, tenements or hereditaments, and shall be disarmed by the lieutenant or sub-lieutenant of the city or counties respectively."

---

[20] A few examples: 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) ("It, it is ordered that all persons shall beare Armes that are above the age of sixteene yeeres except they doe tender a sufficient excuse [to] the Corte & the Cort allowe the same."); Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649  25-26 (1857) ("It is ordered that every one that beares armes shall be compleatly furnished with armes (viz), a muskett, a sworde, bandaleers, a rest, a pound of powder, 20 bullets fitted to their muskett, or 4 pound of pistoll shott or swan shott att least, and be ready to show them in the markett place upon Munday the 16th of this Month before Captaine Turner and Leiutennant Seely under the penalty 20 s fine for every default or absen[ce].")

9

35. Massachusetts' similar Test Act:

> That every male person above sixteen years of age, resident in any town or place in this colony, who shall neglect or refuse to subscribe a printed or written declaration, of the form and tenor hereinafter prescribed, upon being required thereto by the committee of correspondence, inspection and safety, shall be disarmed, and have taken from him, in manner hereafter directed, all such arms, ammunition and warlike implements, as, by the strictest search, can be found in his possession or belonging to him…[21]

36. Like its cousins in other states, refusing the oath disqualified one for any public office, work as a minister, voting, or teaching.[22]  Cornell could easily use these wartime emergency acts as justification today for restrictions on transferring property, voting, teaching, or preaching the gospel.

37. Abuses of civil liberties were widespread during the chaos of the Revolution. Thomas Jefferson drafted a bill of attainder passed by the Virginia Legislature in 1778.[23]  In Cornell's model, the U.S. Constitution's prohibition on Bills of Attainder[24] can be safely ignored.

## V.    Colonial America

### A. Murder Rates

38. Cornell at p. 11:

> Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment…. Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the

---

[21] 5 *Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay* 479 (1886), ch. 21.
[22] *Ibid.*, 481.
[23] William M. Burwell, ADDRESS DELIVERED BEFORE THE SOCIETY OF ALUMNI OF THE UNIVERSITY OF VIRGINIA 446-47 (1847).
[24] U.S. Const., Art. I, § 9, cl. 3.

region. The data presented in Figure 1 is based on the pioneering research of Ohio State historian Randolph Roth.

39. There is no Figure 1 in Cornell's declaration.  He likely means "Figure 2.3 Unrelated-adult homicide rates by race, 1677-1797 (per 100,000 persons per year)" on p. 13.  While Cornell does not cite a source for this Figure, he *implies* that it comes from Roth's AMERICAN HOMICIDE (2009).

40. This figure is full of problems.  Cornell's Figure 2.3 shows New England European-American unrelated-adult murder rates.  (The graph needs some horizontal lines to more easily determine rates in various years.  I have used a T-square to deduce that murder rates for European-American unrelated-adult varied from 4.5/100,000 to 1.5/100,000 over the specified years.)

41. How Roth calculated these rates is a bit mystifying.  Figure 2.3 shows murder rates by race for 1677-1797, yet the earliest census in Massachusetts appears to be 1754.  Connecticut's first census was in 1756; Maine 1764-65; New Hampshire, 1772; Rhode Island, 1768; Vermont, 1771.[25]   How censuses would have counted often unfriendly Indians before 1700 is a mystery.

42. The title of Figure 2.3 says "Unrelated-adult homicides."  There are three separate problems when comparing this data to modern murder rates.  About 6% of murder victims in 2019 were under 18.[26]  Yet, Roth tells us they are not included.  Elsewhere, Roth has insisted that children killed in mass murders should not be counted.[27]  It would appear that he did not consider their murders worth counting here, either.

---

[25] Robert V. Wells, CRIME IN THE Population of the British colonies in America Before 1776: A Survey of Census Data Table 1-1 at 9 (1975).
[26] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).
[27] Randolph Roth,  Supplemental Sur-Rebuttal Expert Report and Declaration of Randolph Roth, Rupp v. Bonta (C.D.Cal. 2023) ("The two club-wielding robbers in Washington, Connecticut, in 1780, managed to kill only two adults. The other three victims

11

43. "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[28]

44. About 6% of recent civilian homicides are either initially classified as justifiable or excusable.  Justifiable homicides are killings of a person engaged in a felony; excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")[29]  Roth tells us that his homicide numbers include "assaults that were legally justified or not meant to cause death."[30]  Roth's measure of New England homicide even if there is census data somewhere that supports his rates is likely an undercount of actual murder rates (+6% for children; +16% for family murders; -6% for lawful killings).

45. Yet today, with access to modern firearm technology, including semiautomatic, magazine-fed firearms, Vermont's 2019 murder rate was 1.8/100,000;[31] in 2017, the year before they adopted a Large Capacity Magazine ban, it was 2.2/100,000.[32]  Other fairly laissez faire states with respect to gun regulation have similarly low murder rates.  Maine 1.5/100,000; New Hampshire: 2.4.  My home state, Idaho, which does not even require a license to carry, and has

---

were children. The husband who attacked his family with an axe in Clarksburg, Virginia, in 1805 killed only one adult, his wife. His other eight victims were his children. And the husband who attacked his family with a knife in Hallowell, Maine, in 1806 killed only one adult, his wife. His other 7 victims were his children.")
[28] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).
[29] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).
[30] Randolph Roth, AMERICAN HOMICIDE xii (2009).
[31] FBI, Crime in the United States: 2019, Table 4.
[32] FBI, Crime in the United States: 2017, Table 4.

no machine gun regulation, is 2.0/100,000; South Dakota (1.9); Wyoming (2.2).[33]  And these 2019 murder rates include related adults and children but no justifiable homicides.  If the lack of modern firearms explains low murder rates in the colonial period, why are murder rates in some New England states and other states awash in modern firearms still so low?  Perhaps Cornell is refusing to face that other factors might be more important than firearms technology?

### B. Pistols in Colonial America

46. At p. 12: "Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates."  Bayonets are not a firearms technology, nor does this case involve bayonet regulation.  (Perhaps Cornell copied this whole paragraph from a declaration related to assault weapons bans, where bayonet lugs have become a basis for prohibition, in spite of a lack of bayonet charges in recent American History.)  Cornell's assumption of who owned pistols and why reflects, I think, Cornell's single source, a book about dueling by people in national politics.

47. How common were pistols before the Revolution?  The evidence from archaeological digs, probate inventories, advertising, and from surviving pistols demonstrates that Americans made handguns before the Revolution; that there was a civilian market for them in at least some cities; and that pistol ownership was unremarkable.  An analysis of all Plymouth Colony probate

---

[33] FBI, Crime in the United State: 2019, Table 4.

13

inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.[34]

48. On August 22, 1775, the New-York Provincial Congress ordered the militia to arm themselves; Calvarymen were obligated to provide themselves with "a case of pistols. . and a carabine." Every man 16 to 50 was to "furnish himself" with either a long gun or "a case of pistols." [35] (How many pistols were in one case? At least one.)

49. While Americans made pistols early in the eighteenth century, most colonists preferred to buy pistols imported from Britain, perhaps because of price or prestige. Only a few pre-Revolutionary War American-made pistols have survived.[36] Surviving pistols made for William Smith of Farmington, Connecticut by Medad Hills in 1771, were equipped with American-made barrels, and apparently English locks.[37]

50. Advertising and news reports show that merchants offered pistols for sale in Colonial America. Such ads appear in the *Boston Gazette* as early as 1720. Sampling ads from the 1741-1742 period reveals at least two different merchants offering pistols for sale.[38]

51. A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749. A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having

---

[34] Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony" (2002), Tables 1 and 4, available at https://www.plymoutharch.com/wp-content/uploads/2014/11/62869457-Firearms-in-Plymouth.pdf, last accessed March 1, 2023.
[35] Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840).
[36] Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA: 1526-1783 213-14, 202, 205, 209 (1956); M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792 312 (1980); Frank Klay, THE SAMUEL E. DYKE COLLECTION OF KENTUCKY PISTOLS 4-15 (1972); Felicia Johnson Deyrup, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 34 (1948).
[37] George A. Stickels, *The William Smith Pistols Made by Medad Hills*, THE GUN REPORT 10-12 (September, 1979).
[38] BOSTON GAZETTE issues with one or more ads offering pistols: May 30, 1720, November 17, 1741, December 8, 1741, February 2, 1742, May 11, 1742¸ May 18, 1742, May 25, 1742, July 13, 1742, August 10, 1742, August 24, 1742, August 31, 1742, [September 13?], 1742.

as they said, got the six Pair at some other Place."[39]  In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[40] as did Henry Deabarear, who sold "pistols for holsters and the pocket…."  Philadelphia merchants advertised pistols for sale repeatedly from 1744 onward.[41]  A 1745 ad in the PENNSYLVANIA GAZETTE, offered "ship muskets, *pistols* , cutlashes and poleaxes, gunpowder, lead, shot and bullets, English and French gun flints."[42] [emphasis added]

52. Pistols appear in journals and newspaper articles throughout the colonial period—and while the crimes committed with them are sometimes shocking, the *presence* of pistols is never remarkable.  Governor John Winthrop made several references to pistols in New England in the nineteen years that his journal covers.  One was a 1641 theological dispute at Pascataquack (now Dover, New Hampshire) that led the factions to arm themselves and march, at least one member identified as armed with a pistol.  There were murders with pistols at Stamford, Connecticut and at Penobscott in 1644, and an attempted murder with a pistol at Cape Sable in 1646.[43]  Pistols appear in other places in Winthrop's Journal.[44]  Winthrop never expressed any surprise over the presence of pistols.

53. An accident in New York City in 1745: "a young Gentleman having been on board the Clinton Privateer, then going out, had a Pair of *Pistols* given him; which on his coming on Shore he carried into a Publick House, among some of his Acquaintance, where one of them was

---

[39] PENNSYLVANIA GAZETTE, August 31, 1749.
[40] September 4, 1772 and September 14, 1773, WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (Lewiston, N.Y.: Edwin Mellen Press, 1992).
[41] *Pennsylvania Gazette*, November 1, 1744; September 26, 1745; October 3, 1745; October 17, 1745; February 11, 1746; July 17, 1746; July 30, 1747; May 12, 1748; September 15, 1748; October 25, 1750; November 27, 1755; August 2, 1759; February 11, 1762; April 14, 1763; May 19, 1763; April 12, 1764; April 19, 1764; August 16, 1770; May 28, 1772; February 17, 1773; September 15, 1773.
[42] *Just imported by Hamilton, Wallace and Company, in the Ship*, PENNSYLVANIA GAZETTE, Sep. 26, 1745, Oct. 3, 1745.
[43] John Winthrop, 2 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND", 27, 153, 180, 275 (1908).
[44] Id., at 95, 151,

15

found to be loaded; upon which several Attempts were made to discharge it; but it missing Fire, he sat down in order to amend the Flint; in doing of which, the *Pistol* unhappily went off, and shot Mr. Thomas Cox, Butcher, through the Head…"[45]

54. Many eighteenth century accounts also mention pistols. Eliza Lucas Pinckney described the suicide of Anne LeBrasseur with a pistol as "melancholy and shocking," but newspaper accounts suggest that what was shocking was not the weapon, but that she was "a Disciple of Mr. Whitefield's" (the noted evangelist).[46]  In 1749, the PENNSYLVANIA GAZETTE reported that, "Sunday night last, about eight a Clock, Richard Green, coming to Town from Kensington, was stopt on the Road, and his Money demanded, by two Men with Pistols…."[47] There are other examples available in the PENNSYLVANIA GAZETTE of the criminal misuse of and accidental deaths from pistols; they are never described as surprising.[48]  Pistols appear among the South Carolina Regulators and the criminals to whom they administered frontier justice.[49] Nor was there any surprise when pistols appear in the hands of the law-abiding, such as a description of Rev. Whitfield preaching in Massachusetts, "he was attended by many Friends with Muskets and Pistols on Account of the Indians…."[50]

55. Pistols appear in news reports: This came from New York in 1775, describing events before March 23 (so before the Revolutionary War started):

> The sheriff came to the courthouse, and demanded entrance, which was refused him; and whilst struggling to enter the door, he received a blow upon his head, which leveled him with the ground: Having recovered a little, he arose and discharged a *pistol* among the opposers, and commanded the Court party to fire also; when, as Mr. Langdon supposes, about five of them fired. Mr. French, one of the opposers, was killed by a ball's being lodged in his head,

---

[45] *NEW YORK, October 28. Monday Evening last a very melancholy*, PENNSYLVANIA GAZETTE, OCT. 31, 1745.

[46] Eliza Lucas Pinckney, Elise Pinckney, ed., THE LETTERBOOK OF ELIZA LUCAS PINCKNEY 42, 42 n. 55 (1997).

[47] *By the last Post from New York…*, PENNSYLVANIA GAZETTE, Aug. 31, 1749.

[48] *Monday Evening last a very melancholy…*,  PENNSYLVANIA GAZETTE, Oct. 31, 1745; Last Friday one Hunt, a lime seller in this…, PENNSYLVANIA GAZETTE, Apr. 20, 1749.

[49] Richard Maxwell Brown, THE SOUTH CAROLINA REGULATORS 35, 40, 54 (1963).

[50] *Last Monday Capt. Tyng in the Massachusetts…*, PENNSYLVANIA GAZETTE, Aug. 15, 1745.

and two more of the same party were also wounded. The sheriff and the Court party then entered the courthouse. The populace without discharged a gun and two *pistols* .[51] [emphasis added]

56. Many news accounts report pistols being used by people far removed from "wealthy, powerful, and influential."[52]

57. A London gun-maker complained in the SOUTH CAROLINA GAZETTE that "a Person in the Country in putting my Name and *London* on some parcels of Guns and Pistols" apparently not proofed (as English law required) thus creating a risk to his reputation.[53]  A 1766 ad in the SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL offered "brass barrel pistols."[54]

58. Enough pistols were present in private hands in Pennsylvania in 1774 for the legislature to include handguns in a law regulating New Year's Day festivities.  This statute made it illegal for "any person or persons shall, on any thirty-first day of December, or first or second day of January, in every year, wantonly, and without reasonable occasion, discharge and fire off any handgun, pistol, or other firearms, or shall cast, throw or fire any squibs, rockets or other fireworks, within the inhabited parts of this province…."[55]

---

[51] *MR. Mark Langdon, from Westminster, in the…,* VIRGINIA GAZETTE, Apr. 22, 1775.
[52] BY THE LAST POST FROM NEW YORK…, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[53] *To the Publick,*  SOUTH CAROLINA GAZETTE, DEC. 26, 1743.
[54] *GUERIN & WILLIAMSON, Have just imported in the London*, SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL, Jun. 24, 1766,  Jul. 1, 1766, Jul. 8, 1766
[55] *An ACT to suppress the disorderly practice of FIRING GUNS, &c.,* PENNSYLVANIA GAZETTE, Dec. 28, 1774.

17



PAUL REVERE'S VERY COMPACT POCKET PISTOL [56]

59. My search through newspapers from the 1730s through 1760s at Accessible Archives for "pistol" showed 2,962 matches.[57]  Some of these are militia use references, some are references to a coin of that time, and some to a type of cloth called pistol. A few are references to foreign news events; some news accounts appear in multiple newspapers, still it is pretty apparent that Cornell's claim about the scarcity of pistols outside of those being used by the elite for dueling is utterly wrong and shows a limited knowledge of the period for which he has "expert" opinions.

## B. Black Powder

60. At pp. 12-14:

> Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons

---

[56] Photograph by Clayton E. Cramer at the Massachusetts Historical Society.
[57] Accessible Archives is a proprietary data base.  I searched for "pistol" in all newspapers for the 1730s through 1760s.

18

was not only corrosive, but it attracted moisture like a sponge…. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

61. This is a perfectly logical statement, but the documents left by colonial Americans show that they did not follow it very consistently.  As mentioned above, people tried to unload firearms in public places with tragic results.  Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to follow this very logical action:

At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[58]

62. And:

Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.[59]

63. And with reference to Cornell's claim at p. 14: "The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge":

It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[60] [emphasis added]

And:

One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle ; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one, ) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do,

---

[58] John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.
[59] Id. 2:55.
[60] Id., 2:317.

19

and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[61]

64. These four incidents of firearms kept loaded when not in active use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in books that I have not read?

65. Finally, there is one more piece of evidence that Americans had loaded firearms when not ready for use.  In 1783, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

66. The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

> Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town…

67. You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one did this?

68. Cornell knows about this ordinance; he first brought it to my attention by email some years back.

## VI.    Firearms Regulation in Antebellum America

---

[61] Id., 2:72.

69. At p. 14, Cornell claims that the perceived Southern lead in firearms regulation ignores the regulatory development in the other states.  "Southern slavery was an important contributing factor to this process of regional differentiation. Indeed, many gun-rights advocates focus primarily on a string of Southern cases decided by slave-holding judges to ascertain the public meaning of the right to bear arms."  That such cases were in slave states overstates the role of slavery in this development.

70. When I started research on my master's thesis[62] my hypothesis was that slavery played some part in the process of concealed weapon regulation.  This would be unsurprising: some antebellum decisions overtly identified firearms regulation with race;[63] as did many postbellum Southern statutes and decisions.[64]  As I researched the antebellum statutes legislative hearings and state constitutional debates, it became increasingly clear that these statutes were aimed at the violent Scots-Irish honor culture of the upland South, not blacks.

71. Cornell rambles towards his goal with a misleading reference to Brown v. Maryland, (1827): "[t]he power to direct the removal of gunpowder is a branch of the police power." The decision involved not gunpowder or even police power, but a state requirement

> [T]hat all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spiritous liquors, &c. and other persons selling the same by wholesale, bale or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license, as by the original act is directed, for which they shall pay fifty dollars…[65]

---

[62] Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999).

[63] State v. Newsom, 27 N.C. 250 (1844) ("The defendant is not indicted for carrying (254) arms in defense of the State, nor does the act of 1840 prohibit him from so doing. Its only object is to preserve the peace and safety of the community from being disturbed by an indiscriminate use, on ordinary occasions, by free men of color, of firearms or other arms of an offensive character." at 253, 254)

[64] Clayton E. Cramer, Nicholas James Johnson, and George A. Mocsary, *'This Right Is Not Allowed by Governments That Are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEORGE MASON LAW REVIEW 823 (2010) cited in McDonald v. Chicago (2010).

[65] Brown v. Maryland, 25 US 419, 436 (1827).

21

72. The Brown decision was based on the Dormant Commerce Clause.  The reference to gunpowder was in response to a hypothetical by Maryland: "He may sell by retail, at auction, or as an itinerant pedlar. He may introduce articles, as gunpowder, which endanger a city, into the midst of its population; he may introduce articles which endanger the public health, and the power of self-preservation is denied."  Chief Justice Marshall's decision quoted by Cornell was: "The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States."[66]  The hazard of storing gunpowder in a crowded city is clear; it may explode without human agency and represents an enormous risk to persons perhaps far removed from the gunpowder.  If Cornell wants to liken the risk of open carry to gunpowder storage, then all forms of open carry deserve this same treatment, including the licensed open and concealed carry that California law allows.

73. Cornell also quotes from the License Cases (1847) to justify what seems to be a nearly unlimited police power of the state:

> When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied. Under the pretense of a police regulation, a state cannot counteract the commercial power of Congress. And yet, as has been shown, to guard the health, morals, and safety of the community, the laws of a state may prohibit an importer from landing his goods, and may sometimes authorize their destruction.[67]

74. This understanding of the nearly unlimited authority of the state by invoking the magic incantation "health, morals, and safety of the community" makes the entire Bill of Rights null and void.  If a state decided that sodomy and divorce impaired the morals of the community, gun possession impaired its health and safety, the state would enjoy unlimited power to criminalize these actions.

---

[66] Id. at 443.
[67] License Cases, 46 U.S. 504, 592 (1847).

22

75. Cornell at 16 quotes selectively from State v. Reid (Ala. 1840) to claim that "the *Reid* Court rejected the idea of permissive public carry," and then quotes from Reid that the state's arms guarantee "neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guaranteed to the citizen, is not to bear arms upon all occasions and in all places …"

76. The following paragraph admits

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, *under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.*[68] [emphasis added]

I do not see how Cornell missed this utter rejection of his claim, two sentences later.

77. Also at 16:

> *Reid* acknowledged a fact that many modern gun rights activists and some judges have ignored—the imposition of a peace bond was central to the powers of justices of the peace, constables, and sheriffs, who all continued to function as conservators of the peace under American law. The appropriate legal response to the danger posed by someone traveling armed in public was to impose a peace bond, a surety of the peace.

78. *Bruen* specifically rejected peace bonds as "the surety statutes presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.'"[69]   At p. 1, Cornell claims: "this report is a shorter version of that previous report, and is updated in light of the U.S. Supreme Court's decision last year."   Yet he continues citing laws that Bruen specifically rejected in its analysis.

## VII.    Post-1868 Evidence

---

[68] State v. Reid, 1 Ala. 612, 616, 617, 35 Am. Dec. 44 (1840).
[69] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2120 (2022).

79. At pp. 17-25, Cornell throws a pile of post-1868 statutes against the wall, hoping some of it will stick, even though Bruen is clear: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right."[70]

## VIII.    Summary

80. Cornell misrepresents the broadness of the carryover of English law to the American colonies.  He lists three states that apparently must stand in for all thirteen former colonies and even these two of these three are clear that later statutes (presumably including post-Revolutionary state constitutions) take precedence.  In Massachusetts, only a few aspects of English law carried over to the new state.

64. He misrepresents Blackstone about the importance of conserving the peace; quotes decisions by a Supreme Court justice not yet on the Court; argues for a unlimited democracy that the Bill of Rights exists to prevent; quotes an English lawyer who defends privilege over equal protection of the law (which to be fair, is California's position on the challenged law).  He misrepresents how the militia laws and the Test Acts worked.

65. He uses a tendentious understanding of colonial murder rates; shows ignorance of the widespread possession and use of pistols; and accepts too readily what appears to be a false understanding of how black powder firearms were stored in colonial America.

66. He engages in a straw-man argument about Southern firearms regulation exceptionalism; misrepresents State v. Reid (Ala. 1840); misuses Dormant Commerce Clause

---

[70] Id. at 2119.

cases to argue for an unlimited power of the states to regulate everything with no power of the Bill of Rights to counter such abuses of majority power.

67. Cornell attempts to use post-1868 laws contrary to Bruen's clear instructions.

25

# EXHIBIT   2

# Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

|  |  |
|---|---|
|  | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
|---|---|
|  | First Place, Undergraduate Division |

**TEACHING EXPERIENCE:**

Fall, 2017 – present   ***Adjunct Faculty*:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**.

Fall, 2014 – Spring, 2017   Recovering from stroke

Spring, 2010 – Spring, 2014   ***Adjunct Faculty*:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**.

Fall, 2009 – Summer 2010   ***Adjunct Faculty*:** ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**.

Fall, 2003   ***Adjunct Faculty*:** Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**.

1996        ***Teaching Assistant*:** Assisted Professor Peter Mellini in his course
            "Twentieth Century World."  I graded quizzes, exams, and answered
            weekly written questions from students.  I also prepared and lectured
            about the rise of totalitarianism in the period between the world wars.


**BOOKS:**

*Lock, Stock, and Barrel: The Origins of America Gun Culture*
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian
Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological
and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the
Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns
Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern
Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent
and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel
McIlvaine,* editor
Library Research Associates, Inc., 1990

**SELECTED PUBLICATIONS:**

"Bellesiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" Southern Illinois University Law Journal Spring 2017 Forthcoming "

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic."  *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

*"*An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997.  "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

## WORKS CITED IN COURT DECISIONS:

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008).  In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

>Very basic reading competence in German.

**OTHER SKILLS:**

>I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance.  I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.

# EXHIBIT   3

1   CHRIS COSCA   SBN 144546
2   COSCA LAW CORPORATION
    1007 7th Street, Suite 210
3   Sacramento, CA 95814
    916-440-1010
4
5   AMY L. BELLANTONI
    THE BELLANTONI LAW FIRM, PLLC
6   2 Overhill Road, Suite 400
    Scarsdale, NY 10583
7   914-367-0090
    *Pro Hac Vice*
8
9   Attorneys for Plaintiffs

10                  **UNITED STATES DISTRICT COURT**

11                 **EASTERN DISTRICT OF CALIFORNIA**

12

13
    MARK BAIRD and                    Case No.  2:19-cv-00617-KJM-AC
14  RICHARD GALLARDO,
                                      **EXPERT DECLARATION AND REPORT**
15           Plaintiffs,              **OF CHARLES "CHUCK" HAGGARD**

16        v.
                                      Judge:      Hon. Kimberly J. Mueller
17  ROB BONTA, in his official capacity as   Room:       3
    Attorney General of the State of California,
18  and DOES 1-10,                    Trial Date:  None set
                                      Action Filed:  April 9, 2019
19
             Defendants.
20

21

22

23

24

25

26

27

28
                                  1

              EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

### DECLARATION OF CHARLES "CHUCK" HAGGARD

1.      I, Charles "Chuck" Haggard, am over the age of 18, and submit this declaration in further support of the plaintiffs' motion for a preliminary injunction.

2.      Counsel for the plaintiffs requested my expert opinion in response to the declaration of Kim Raney submitted by the defendant, Attorney General Rob Bonta, in connection with the above-captioned matter. I have personal knowledge of each fact stated in this declaration, and if called as a witness I could and would testify competently thereto. A copy of my most recent resume is attached hereto as "Exhibit 1".

## I. LAW ENFORCEMENT AND PROFESSIONAL EXPERIENCE

3.      I served as a law enforcement officer with the Topeka Police Department from 1987 to 2014 in the following capacities: Patrol Officer (1987 – 1999); Field Training Officer (1989 – 1999); Sergeant (1999 - 2008 [Zone supervisor, Acting Watch Commander in absence of Lieutenant, squad leader and acting team leader for the Response Team]); Field Training Supervisor (1999 – 2006); Rangemaster (2006 – 2008); Lieutenant/Deputy Watch Commander (2008 - 2014 [LT/Watch Commander on all three Field Operations shifts, including Acting Commander during a period of manpower shortage/promotion freeze in which I was the LT for 1st and 2nd shift, along with the SROs and Motor Unit, supervising 56 officers and Sgts, Co-chair of Department Shooting Review and Use of Force Review Board]).

4.      As a member of the Topeka Police Department, I served as an instructor at the Police Academy, lead Defensive Tactics Instructor, Firearms Instructor, and SWAT/Officer Survival Tactics, car stop tactics; Response Team member, Breacher, Chemical Munitions officer, Sniper, and Supervisor; Honor Guard team member and supervisor; FTO Program Development Committee, Shooting Review Board/Use of Force Review Board member; Use of Force General Orders Development Committee.

2

5.      I developed the following protocols for the Topeka Police Department: Use of Force Continuum and General Orders; Defensive Tactics Program; Active Shooter Response Training; Force on Force scenario and decision-making training; and Handgun, Shotgun, Patrol Rifle Training and Policy.

6.      I received specialized training in: Control/Defensive Tactics, Police Baton, Firearms, Reasonable Use of Force, Taser, OC Spray, Handcuffing, SWAT Tactics, High Risk Patrol Tactics, Low Light Tactics, Active Shooter/Rapid Response, Police Defensive Tactics (empty hand control, weapon retention, LVNR, ground control and defense), Excited Delirium, Force of Force scenario training, investigation of police use of force and officer involved shooting events.

7.      I also served as a Team Member of the North East Kansas Incident Management Team in the capacity of Liaison Officer and Public Information Officer.

8.      My faculty appointments include: National Trainer, National Law Enforcement Training Center; Adjunct Instructor, Strategos International; Instructor/Board of Directors, Survival Operations System, Inc.

9.      From 2015 to 2018, I served in a part-time capacity as a Deputy Sheriff and in-service instructor with the Jackson County Sheriff's Office.

10.     Since December 2015, I have served with the Metro Topeka Airport Authority as a police officer/air crash rescue fire fighter/fire fighter, use of force instructor, firearms Instructor, and policy writer for police operations.  I am currently assigned as the Patrol Captain for MTAA. In that capacity, I supervise three shift lieutenants, all patrol operations, as well as law enforcement training for the agency.

11.     Since 2019, I have also served as a part-time Deputy and in-service instructor with the Shawnee County Sheriff's Office.

3

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

12.      My military service and Officer Safety/Field Operations Training is detailed in my annexed CV, which includes Understanding and Investigating Officer Actions in Deadly Force Encounters; Officer Survival, Winning Mindset; Winning Mind/Physical and Emotional Survivability.

13.      My weapons and defensive tactics training are detailed in my annexed CV, which includes Advanced Combat Pistol, Levels 1 and 2 (Defensive Shooting Academy of Tulsa); HK International Law Enforcement Training Conference; Tactical Pistol; Officer Survival; Tactical Sub-Machinegun; Tactical Pistol Course (HSS International); National Law Enforcement Training Center Certifications; Control/Defensive Tactics; Handcuffing, Handgun/Long Gun Retention and Disarming; Knife Defense and Disarming; Trainer Development; Legal/Medical Implications of Use of Force; Instinctive Shooting Course (Israeli Shooting International); Officer Survival and Advanced Handgun Course (Jim Cirillo); Advanced Handgun Skills Course (Lethal Force Institute); Immediate Action counter–assault courses (Immediate Action Combatives). My advanced tactics, leadership, and specialized training is detailed in my annexed CV, which includes Weapons of Mass Destruction Tactical Commander's Course (Louisiana State University); Tactical Supervision of Critical Incidents Course (DanCor Ltd.); LE Counter-Terrorism Course (Direct Action Resource Center); GSG 9 Counter-Terrorist Tactics Course (HSS International); High Risk Entry Course (HSS International);  Weapons of Mass Destruction, Tactical Response and Hostage Rescue (Louisiana State University/U.S. Department of Homeland Security); Hostage Rescue Course (National Tactical Officer's Association); Response to the Active Shooter Instructor Courses (Strategos International); Officer Survival in Low Light Conditions Instructor Courses (Sure-Fire Institute/Strategos International); Hostage Rescue/High Risk Warrant Course (Tactical Explosive Entry School); Basic SWAT Course (Topeka Police Department); US Army: Police SWAT (SRT) Course; US Army: Police Sniper Course;

4

AAFT/Sioux City PD: Two Man Team Tactics; Crisis Communications and Media Response for Today's Leaders; Fair and Impartial Law Enforcement Train the Trainer course, KLETC/University of South Florida; Lexipol, Risk Management for Law Enforcement Supervisors; FLETC TCCC emergency medical training; Emergency Management/FEMA/Fire Service.

14.     My Instructor and Instructor-Trainer Certifications are detailed in my annexed CV, which include Active Countermeasures Systems: Defensive Tactics Instructor; American Society of Law Enforcement Trainers (ASLET): Use of Force Training Seminars; Live interactive Use of Force Training; Bullet Proof Mind; Firearms Confrontation Course; Flashlight as an Emergency Defense Tool; Casco System: Expandable Police Baton Instructor-Trainer; Defense Technology (Safariland Training Group): Less Lethal Munitions Instructor Courses; International Association of Law Enforcement Firearms Instructors (IALEFI) Regional Training Conferences; Low-Light Shooting; Defensive Tactics Instructor Course (assisted with course development, content and instruction); Defensive Tactics Review; Midwest Law Enforcement Trainers Association: Winning Lethal Confrontations Course; Monadnock Defensive Tactics System (MDTS) Instructor Course; Oklahoma Council on Law Enforcement Education & Training (CLEET); Shawnee County Sheriff's Department: Defensive Tactics Instructor Course; Strategos International: Low Light Tactics Instructor Certification Course; Strategos International: Law Enforcement Response to Active/School Shooter Instructor Course; Strategos International: Physical Conflict Resolution System Instructor; Strategos International: Active Shooter/Intruder Response Instructor; Rangemaster Advanced Instructor course

15.     My Instructor and Instructor-Trainer Certifications are detailed in my annexed CV, which include High Risk Entry; Vehicle Assault; Defensive Tactics; Defensive Tactics Instructor Course; Excited Delirium Recognition and Response; Narcotics Entries; High Risk Warrants;

5

Kansas City MO Police Department: Defensive Tactics/Use of Force and Instructor Certification Classes/Seminars (annually since 1994); St. Louis Police Department: Defensive Tactics Instructor Certification Course; LEO Response to the Active Shooter-Instructor Course; Prevailing in Low-Light Conditions-Instructor Course; Patrol Response to High Risk Incidents; Physical Conflict Resolution Instructor courses; Building Search Tactics; Crowd Control; Use of Force Continuum; Taser; Ponca City OK, Solo Officer Response to the Active Shooter; Kansas Transportation Safety Conference, LE Recognition and Response to Excited Delirium.

I am a member or past member of the following organizations: American Society of Law Enforcement Trainers; International Association of Law Enforcement Firearms Instructors; International Defensive Pistol Association (Expert ranking); International Law Enforcement Educators and Trainers Association; International Wound Ballistics Association; Kansas Narcotics Officers Association; Metro Area Tactical Officers Association; National Field Training Officers Association; National Tactical Officers Association; and United States Practical Shooting Association.

## II. PUBLICATIONS and POLICY WRITING

16.     I have written several articles and policies including: Concealed Carry and the 'Pea Shooter', The Outdoor Wire, Fall 2012 Special Edition; Gunlights, Switching and Gunpoint: Analysis – Part II, Tactical Wire, April 7, 2011; Gunlights, Switching and Gunpoint: An Analysis – Part I, Tactical Wire, April 5, 2011; Single Officer Response in Active Shooter Events, Tactical Wire, July 3, 2008; He Who Ignores History: Epic-scale Gunfights … Lessons for Law Enforcement, Police Magazine, April 20, 2011; Use of Force and Firearms policy author for Topeka PD General Orders; Assisted TPD legal advisor is authoring City of Topeka Municipal Code 9.40.050; Authored MTAA Use of Force, Racial Profiling and Domestic Response policy; and Assisted with IACP Response to Excited Delirium position paper and model policy.

6

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

### III. EXPERT WITNESS SERVICES

17.     I have testified or served as an expert witness in the following subjects: firearms (mechanics/operation/deployment/safety), control/defensive tactics, less lethal/less than lethal tools, physical skills training, reasonable use of force, police training/SOP, tactical training. I have provided expert testimony or opinion in the following venues: Kansas State District Court (multiple cases, criminal and civil); Federal District Court, Kansas; Plano, Texas; and the Court of Military Justice, Ft. Riley.

18.     I am being compensated at a rate of $75 per hour for my time, which includes reviewing materials, communications with counsel, preparing reports, appearing for depositions, court appearances, and the like. My compensation is not dependent in any way on the outcome of this or any other proceeding or on the substance of the opinion(s) provided.

### IV. MATERIALS REVIEWED

19.     Counsel for Plaintiffs has provided, and I have reviewed, the complaints, the preliminary injunction submissions, both Declarations of Kim Raney submitted in this action, San Mateo County Sheriff's Office, "Unloaded Open Carry" (January 14, 2010), Manny Fernandez, Alan Blinder, and David Montgomery, "Texas Open-Carry Laws Blurred Lined Between Suspects and Marchers," N.Y. Times, July 10, 2016.  Any other materials that I have relied upon are cited herein.

### V. OPINIONS

20.     Counsel for Plaintiff has asked me to express an opinion on what effect the open carry of firearms has on public safety. The implementation of laws that allow open carry in public does not have a negative impact on public safety. The act itself – a lawful person openly carrying a firearm in public – does not have any negative or detrimental effect on public safety, does not itself create a 'safety hazard', and is not the cause of accidental or mistake-of-fact shootings of

7

---

civilians by police officers.

21.     The lack of proper police training creates or can lead to a public safety hazard and the accidental shooting of civilians – whether unarmed, carrying concealed, or carrying exposed (open carry).

22.     I have reviewed the Declaration of Kim Raney, which was submitted by the defendant in opposition to Plaintiffs' motion for a preliminary injunction.

23.     Mr. Raney has no law enforcement experience in a jurisdiction where individuals are legally permitted to open carry, nor does he have experience in a jurisdiction that legalized open carry virtually overnight.

24.     Mr. Raney's opinions are based on speculation and a generalized fear that law-abiding individuals – simply by the act of carrying their firearm exposed – will cause panic among police officers and the public, waste police resources, and ultimately lead to police officers shooting civilians carrying exposed.

25.     The open carry of a firearm in public was legalized in Kansas in 2011, leaving open the ability of the state's cities to 'regulate' the manner of carry in its jurisdiction. An example of this would be requiring that handguns openly carried be in a holster. In 2013, however, Attorney General opinion 2011-24 clarified that no city in Kansas could ban the open carriage of firearms.

26.     In 2008, the constitutional open carry [no permit required] of firearms in public went into effect immediately in Kansas. At the time, I was a Lieutenant/Watch Commander in the Topeka Police Department. No 'instant mayhem' was created. Our police officers were not spontaneously shooting members of the public they observed carrying a firearm exposed on their body in public.

8

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

27.     Public awareness of the passage of open carry laws through the media and public service announcements alerted the public to the changes in the law and reduced the possibility of confusion and/or alarm. The non-carrying public quickly grew accustomed to seeing their friends, neighbors, and other residents openly carrying firearms and the novelty faded.

28.     Banning open carry does not greatly enhance public safety, nor does it cure deficiencies in departmental training of police officers. Police shootings of innocent civilians – whether unarmed, carrying concealed, or carrying exposed – will continue to occur absent proper training or in those situations where the armed person is willfully forcing a confrontation with officers. This can and will happen regardless of the legalities of open or concealed carry.

29.     Topeka PD officers were instructed on the changes in the law. It was emphasized that open carry was now legal and that they should expect to see members of the public carrying firearms. Specific communication-based training was provided to our police officers for properly dealing with the public – how to respond to and interact with individuals who openly carried firearms, if necessary, and how to respond to members of the public who were reporting other people openly carrying firearms.

30.     I should note that Kansas went from being a state with no legal method of concealed or open carry, except for hunting or active-duty law enforcement officers (even retired officers were not exempt), to a state where concealed carry was allowed with a license, to a state where open and concealed carry was allowed with no license, in a relatively short period of time.

31.     Mr. Raney attempts to demonstrate that open carry creates a "public safety threat" by using terms that attempt to create panic: an officer "must rapidly assess" a person's behavior (¶22), "split-second decisions sometimes have to be made" (¶24), where the "results could be deadly" (¶22).

9

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

32.     The very nature of police work is the constant ability to rapidly assess what is going on and forming the proper response. A properly trained officer should be in a constant state of situational assessment and observation. Open carry by citizens in no way changes this fact. Training to enhance tactical situational awareness creates effective, skilled, and disciplined police officers through the use of repetition, "muscle memory", and situational cognition, which fosters confidence, decisiveness, and greatly heightens accuracy in decision-making. Communication, tactical scenarios and range training, and force-on-force drills are imperative generally to avoid accidental shootings of innocent individuals irrespective of open carry laws.

33.     If, as Mr. Raney urges, open carry should be banned because of some speculative 'havoc' that will result, then everyone outside of on duty uniformed officers should be banned from carrying in public as well – including off-duty officers, detectives, federal agents, undercover officers, concealed firearm carriers, retired officers, as well as armed home- and business-owners awaiting police response in the face of a past burglary or robbery because, as Mr. Raney reasons, the officers may "rush in" and shoot the first person they see with a gun. Inadequate and/or improper police training leads to mistakes and tragedy – irrespective of whether the public is permitted to openly carry firearms.

34.     With proper training, officers will not be surprised to see members of the public carrying a firearm openly. Open carry in fact places the officer in a more advantageous position than concealed carry. When an individual is carrying openly, the officer knows the person possesses a firearm because the officer can see the gun in plain, open view.  This scenario is more advantageous to the officer than where an individual reaches for something unknown – a phone, gun, their waistband to pull their pants up or while making furtive movements such as to hide drugs.

10

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

35.     Those situations, not the act of legal open carry, force police officers to make a split-second decision regarding how to react. When a handgun is carried openly, the officer can plainly observe the movements and actions of the individual, knowing exactly where the firearm is located in relation to the individual's movement. Where the Department has provided training and repeated notice and education regarding open carry laws, officers will be equipped with the knowledge and training to effectively deal with the public.

36.     Situational awareness training for officers, enforcing a broad view approach when responding to an event and/or interacting with the public, decreases the likelihood of an accidental shooting. Training officers to see the totality of the circumstances and contextual cues, then to observe whether the subject they are dealing with is armed, greatly reduces, if not eliminates, the possibility of an accidental or mistake of fact shooting.

37.     The very phrase, "Law-enforcement officers are taught that guns can be a dangerous and deadly threat to their safety and the safety of the public they serve" is a degrading depiction of trained police officers. (¶22). The portrayal of police officers immediately going to panic mode and/or shooting anyone openly carrying a firearm [basically] 'on sight' is inaccurate, reckless, and insulting to fellow law enforcement officers.

38.     Mr. Raney comments that "officers may have no idea about the armed person's motives, intent, mental condition, or emotional stability. The armed person's behavior and ability or failure to comply with law enforcement's instructions will have great bearing on the outcome of the contact. Should the armed person fail to comply with an officer's instructions or move in a way that could be construed as threatening, the results could be deadly". (Raney Dec. at ¶22). It should go without saying that every single encounter where the police interact with the public falls into this "no idea" area.  Modern officer survival training has for decades worked under the premise that officers should assume that everyone is armed with a weapon and act accordingly.

11

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

Just because the officer does not see a gun, does not mean the individual is unarmed. Further, officers must always be aware that on any call for service their gun is also in play, due to the history of weapon retention issues in law enforcement. Officers are commonly murdered or assaulted by "unarmed" suspects. Every time an officer arrives at a location, s/he must assess the 'person's motives, intent, mental condition, and emotional stability".

39.     The San Mateo County Sheriff's Office "Unloaded Open Carry" publication dated January 14, 2010, presents important information with respect to the importance of officer training. Comments like, "[o]pen carry advocates create a potentially very dangerous situation" and "[o]fficers may have no idea [when responding to a man with a gun call] that these people are simply 'exercising their rights'" have no practical use. The message here is either that their police officers lack proper training and rush to judgment [and shoot] without properly assessing the situation or that open carry creates panic, fear, and a public safety danger. Either way, this is editorial opinion, not a statement of facts.

40.     The behavior and demeanor of a person "exercising his right to open carry" will be markedly different than that of an individual posing a threat to the public. Any experienced, honest, law enforcement officer knows that to be the truth.

41.     Assessment of a person's demeanor, compliance or non-compliance with commands, furtive or threatening movements – are all factors that officers must assess - independent of whether the person is openly carrying a firearm or not, or whether open or concealed carry is legal or not.

42.     With respect to the matter of responding to an active shooter event where lawful gun owners are carrying openly, Mr. Raney provides no evidence (even anecdotal) that the presence of civilians openly carrying firearms delays first responders from stopping the shooter and saving lives.  There is however historical precedent to note that citizen/non law enforcement

12

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

interdiction of active shooter suspects happens more frequently than interdiction by law enforcement officers.  In any event, inadequate police training, speculatively playing out every possible scenario that may or may not happen in life (¶30) – nothing represented by Mr. Raney establishes that open carry itself creates a danger to public safety.

43.     Allowing open carry will not create a danger to public safety; failure to properly train police officers does endanger the public.

44.     There are only 5 states that ban open carry in the United States: New York ("shall not issue" concealed carry unless "proper cause"); Florida ("shall issue" concealed carry; Illinois ("shall issue" concealed carry); California ("may issue" concealed carry if "good cause"); D.C. ("shall issue" concealed carry).[1]  According to US News and World Report[2], 6 of the top 10 states for public safety are constitutional carry states (open carry or concealed, no permit required); the top 3 states being Maine, New Hampshire, and Idaho.[3]

45.     People who legally possess and carry firearms are generally compliant and law-abiding, statistically speaking among the most law-abiding group of persons in our country. Gang members and other criminals, on the other hand, do not carry firearms openly, as concealment provides an advantage over their victims. Criminals are also more likely to engage in furtive or non-compliant behavior for reasons including fear of being arrested, secreting drugs and/or weapons, and/or contemplating a physical attack or flight to avoid apprehension.

46.     In other words, the conduct, behavior, and mental and emotional reaction of a criminal will differ greatly from that of a law-abiding gun owner.

[1] https://www.usconcealedcarry.com/resources/terminology/carry-types/open-carry/?link=LearnTerminologyGuide_Grid1_Text_ConcealedCarry/
[2] https://www.usnews.com/news/best-states/rankings/crime-and-corrections/public-safety
[3] https://www.usconcealedcarry.com/resources/terminology/carry-types/open-carry/?link=LearnTerminologyGuide_Grid1_Text_ConcealedCarry/

13

1     I declare under penalty of perjury under the laws of the United States of America that the

2     foregoing is true and correct.

3

    Dated: September 27, 2021                 _____

4                                       Charles "Chuck" Haggard

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

**Charles "Chuck" Haggard**

---

520 SW Garfield Ave. • Topeka, Kansas 66606 • 785-221-0260 • tpd223@gmail.com chuck@agiletactical.com

*Curriculum Vitae*

| LAW ENFORCEMENT and PROFESSIONAL EXPERIENCE |
| --- |

- Police officer/air crash rescue fire fighter/fire fighter, Use of force and firearms instructor, policy writing for police operations, Metro Topeka Airport Authority, Dec 2015 to present, currently serving as the patrol Captain overseeing three shift LTs, all patrol operations and law enforcement training for the agency.
- Shawnee County Sheriff's Office, part time Deputy and in-service instructor, 2019 to present.
- Jackson County Sheriff's Office, part time Deputy, in-service instructor, 2015 to 2018
- Topeka Police Department:  1987 to 2014
  - Patrol Officer 1987-1999
  - FTO 1989 to 1999
  - Honor Guard, team member and supervisor
  - Sergeant 1999-2008 (Zone supervisor, acting WC in absence of LT, squad leader and acting team leader for the Response Team)
  - Field Training Supervisor 1999 to 2006
  - Rangemaster 2006-2008
- Lieutenant/Watch Commander 2008-2014 (serve as LT/Watch Commander on all three Field Operations shifts, including acting commander during a period of manpower shortage/promotion freeze in which I was the LT for 1st and 2nd shift, along with the SROs and motor unit, supervising 56 officers and SGTs), co-chair of department shooting review and Use of Force review board.
- Academy and In-service Instructor for Defensive Tactics, Range/Firearms, SWAT/Officer Survival Tactics.  Response Team member, Sniper and Supervisor.  Honor Guard member.  FTO Program Development Committee.
- Shooting Review Board/Use of Force Review Board member.  Use of Force General Orders Development Committee.
- Topeka Police Department Letters of Commendation, Medal of Merit for actions taken during flood rescue event
- Topeka Police Medal of Merit, Letter of Commendation
- Developed Topeka Police Department Use of Force Continuum
- Developed Topeka Police Department Defensive Tactics Program
- Developed Topeka Police Department Active Shooter Response Training
- Developed patrol rifle training and policy
- Specialties: Defensive Tactics, Police Baton, Field Force/crowd control operations and training, Firearms, Reasonable Use of Force, Taser, OC Spray, SWAT Tactics, High Risk Patrol tactics, Low Light tactics, Active Shooter/Rapid Response, police defensive tactics (empty hand control, weapon retention, LVNR, ground control and defense), Excited Delirium recognition and response, investigation of police use of force and officer involved shooting events, VIP security
- Team member, North East Kansas Incident Management Team, command staff, serving as Liaison Officer and Public Information Officer
- Faculty Appointments:
  - National Law Enforcement Training Center — National Trainer
  - Strategos International — Adjunct Instructor, VIP security
  - Survival Operations System, Inc. — Instructor/Board of Directors

**Chuck Haggard**

## MILITARY SERVICE

- Kansas Army National Guard; 1982, 1985-1998, E Troop 114 Cav, Det2 1/635 Armor, 19Delta
- Reconnaissance Specialist 19Delta
- Left service at rank of Staff Sergeant
- Positions Held — Scout, Driver, Armorer, Track Commander, NBC NCO, Squad Leader, Platoon Sergeant, Platoon Leader (acting Lieutenant's position)
- Duties— Marksmanship instructor, machinegun range instructor, grenade launcher range instructor, demolitions instructor, Claymore instructor, LAW/AT4 range instructor, first aid instructor, Officer Candidate School assistant instructor, squad/platoon tactics instructor, nuclear/biological/chemical instructor, battalion rifle and pistol team
- Commendations:
  - Army Achievement Medal (3 awards) for outstanding service and performance of duties
  - Army Excellence in Marksmanship Award (overall winner of Adjutant General's Combat Match on three occasions)
  - Expert badge awarded for M16, pistol, hand grenade, M203 grenade launcher

## ACADEMIC EDUCATION

- Junction City High School, graduate 1982
- Kansas State University, 1986-1987 (courses in general studies, geology, Spanish, and criminal justice)
- US Army Schools:
  - Basic and Advanced Training
  - Primary Leadership Development Course
  - Basic Non-Commissioned Officer's Course (SMG's academic honor graduate)
- City of Topeka: 16-week Leadership Development course
- Leadership training courses; Kansas City MO Police Leadership training series, including classes taught by LtCol. Randy Watt, and risk management classes by Gordon Graham.  Leadership training classes by SGM Kyle Lamb USARSF (ret)
- Force Science Research Center, Force Science Analyst Certification

## OFFICER SAFETY / FIELD OPERATIONS (PATROL) TRAINING

- Calibre Press: Street Survival Seminars (numerous)
- Kansas Highway Patrol: Felony Car Stop Class
- Kansas Highway Patrol: Prisoner Transport Class
- Sioux City Regional Training Center: Understanding and Investigating Officer Actions in Deadly Force Encounters
- Topeka Police Department: Field Training Officer Course
- Topeka Police Department: Officer Basic Academy
- Topeka Police Department: Pepperball Launcher Class
- Washburn University: Field Training Officer Seminar
- Washburn University: Officer Survival, Winning Mindset
- Wichita State University: Winning Mind/Physical and Emotional Survivability

**Chuck Haggard**

## WEAPON SYSTEMS & DEFENSIVE TACTICS TRAINING

- Beretta USA Pistol Armorer
- Berretta USA Shotgun Armorer
- Colt AR/M16/M4 Series Rifle/Carbine/SMG Armorer
- Defensive Shooting Academy of Tulsa: Advanced Combat Pistol, Levels 1 and 2
- Glock Armorer
- HK International Law Enforcement Training Conference
  - Tactical Pistol
  - Tactical Shotgun
  - Liability Issues
  - Officer Survival
  - Breeching Fortified Targets
  - Tactical Sub-Machinegun
- HSS International: Tactical Pistol Course
- National Law Enforcement Training Center Certifications:
  - Control/Defensive Tactics
  - Ground Control and Defense
  - OC Spray and Counter-Assault Course
  - Handcuffing, Handgun/Long Gun Retention and Disarming
  - Universal Baton
  - Knife Defense and Disarming
  - LVNR
  - Trainer Development
  - Legal/Medical Implications of Use of Force
- Israeli Shooting International: Instinctive Shooting Course
- Jim Cirillo: Officer Survival and Advanced Handgun Course
- Kansas Highway Patrol/FAA: Officers Flying Armed Course
- Lethal Force Institute: Advanced Handgun Skills Course
- Mossberg Shotgun Armorer
- Remington Police Shotgun Armorer
- Remington Sniper Rifle Armorer
- Smith & Wesson Pistol Armorer
- Systema Russian Martial Arts System
- Strategos International: Physical Conflict Resolution Instructor courses
- Craig Douglas/Shivworks Armed Movement in Structures and Extreme Close Quarters Concepts
- Immediate Action Combatives; Immediate Action jujitsu/counter–assault courses

## ADVANCED TACTICS, LEADERSHIP & SPECIALIZED TRAINING

- Louisiana State University: Weapons of Mass Destruction Tactical Commander's Course
- DanCor Ltd.: Tactical Supervision of Critical Incidents Course
- Direct Action Resource Center: LE Counter-Terrorism Course
- HSS International: GSG 9 Counter-Terrorist Tactics Course
- HSS International: High Risk Entry Course
- Kansas Bureau of Investigation: Clan Lab First Responder Course
- Louisiana State University/U.S. Department of Homeland Security: Weapons of Mass Destruction, tactical response and hostage rescue
- National Tactical Officer's Association: Hostage Rescue Course

- New Mexico Institute of Mining and Technology: Prevention and Response to Suicide Bombing Incidents
- Strategos International: Ballistic Shield Instructor Course
- Strategos International: Response to the Active Shooter Instructor courses
- Sure-Fire Institute/Strategos International: Officer Survival in Low Light Conditions Instructor Courses
- Tactical Explosive Entry School: Hostage Rescue/High Risk Warrant Course
- Topeka Police Department: Basic SWAT Course
- US Army: Police SWAT (SRT) Course
- US Army: Police Sniper Course
- US Army: Counter Drug Commander's Course
- AAFT/Sioux City PD: Two Man Team Tactics
- Kansas Narcotics Association Training Conferences
- Crisis Communications and Media Response for Today's Leaders
- Fair and Impartial Law Enforcement Train the Trainer course, KLETC/University of South Florida
- Lexipol, Risk Management for Law Enforcement Supervisors
- FLETC TCCC emergency medical training
- Emergency Management/FEMA/Fire Service;
  - Public Information Officer, G290
  - Liaison Officer (LOFR) L-956
  - NIMS ICS All-Hazards Position Specific: Finance/Administration Section Chief (FSC) Course
  - National Fire Academy Health and Safety Officer
  - ICS 100, 200, 300, 400, 700, 800
  - MGT 315 Enhanced Threat and Risk Assessment
  - Command and General Staff Functions for Local Incident Management Teams Course (CGSFLIMT)
  - NE KS IMT/KDEM yearly training seminars
  - Traffic Incident Management (TIM) Train the Trainer course
  - MAFT/ARF certification, 2016, 2017, 2018
  - SCAFFA seminars, including fire fighter skills training, live burn, Reading Smoke,
  - Using Thermal Imaging and Modern Fire Dynamics to Improve Fireground Operations,
  - HazMatIQ; Above The Line/Below The Line Training Course

## INSTRUCTOR & INSTRUCTOR-TRAINER CREDENTIALS

- Active Countermeasures Systems: Defensive Tactics Instructor
- American Society of Law Enforcement Trainers (ASLET): Use of Force Training Seminars
  - Live interactive Use of Force Training
  - Bullet Proof Mind
  - Firearms Confrontation Course
  - Flashlight as an Emergency Defense Tool
- Casco System: Expandable Police Baton Instructor-Trainer
- Defense Technology (Safariland Training Group): Less Lethal Munitions Instructor Courses
- Glock Pistol Transition Instructor Course
- Inayan Systems: Reactive Knife Defense Instructor
- International Association of Law Enforcement Firearms Instructors (IALEFI) Regional Training Conferences:
  - Instructor Development

**Chuck Haggard**

- - o Working With Problem Shooters
  - o Tactical Carbine
  - o Injured Officer Shooting Techniques
  - o Low-Light Shooting
  - o Tactical Shotgun
  - o Range Safety
  - o Less-Lethal Munitions
  - o OC/Firearms Deployment
  - o Back-up Gun Deployment
- Kansas Law Enforcement Training Center (KLETC):
  - o Defensive Tactics Instructor Course (assisted with course development, content and instruction)
  - o Defensive Tactics Review
- Midwest Law Enforcement Trainers Association: Winning Lethal Confrontations Course
- Monadnock Defensive Tactics System (MDTS) Instructor Course
- Monadnock International (now Safariland Training Group): Instructor Trainer
  - o PR-24 (straight baton)
  - o MEB (Monadnock Expandable Baton)
- NRA Police Firearms Instructor School
- NRA Patrol Rifle Instructor School
- NRA Tactical Shooting Instructor School
- ODV Incorporated: NarcoPouch and Narcotest, Field Drug Test Kit Instructor
- Offshoots Training Institute: Tactical Rifle Instructor
- Oklahoma Council on Law Enforcement Education & Training (CLEET)
  - o Defensive Tactics System Instructor
  - o Ground Control System Instructor
- One-On-One Control Tactics System Instructor
- Police Training Division: Auto Pistol Transition Instructor
- PPCT Training Systems: Instructor
- Shawnee County Sheriff's Department: Defensive Tactics Instructor Course
- Strategos International: Low Light Tactics Instructor Certification Course
- Strategos International: Law Enforcement Response to Active/School Shooter Instructor Course
- Strategos International: Physical Conflict Resolution System Instructor
- Strategos International: Active Shooter/Intruder Response Instructor
- Taser International: Taser M26 and X26 Instructor
- Topeka Police Department: Train the Trainer Course
- Tom Givens/Rangemaster Firearms Instructor course (Top Gun award)
- Rangemaster Advanced Instructor course
- Tactical Treatment of Gunshot Wounds Train the Trainer course
- KLETC/University of South Florida: Biased Based Policing Instructor course
- FLETC TCCC instructor course
- Force Science Research Center De-escalation Instructor

**PRESENTATIONS / CLASSES TAUGHT**

- Kansas Army National Guard CDSOG Group, Forbes Field
  - o High Risk Entry
  - o Vehicle Assault
  - o Defensive Tactics
  - o OC Courses

- - o Field force/riot control
- Kansas Law Enforcement Training Center
  - o Defensive Tactics Instructor Course
  - o Excited Delirium Recognition and Response
- Kansas Narcotics Officers Association
  - o Narcotics Entries
  - o High Risk Warrants
  - o Defensive Tactics Course
- National Law Enforcement Training Center
  - o Kansas City MO Police Department: Defensive Tactics/Use of Force and Instructor Certification Classes/Seminars (annually since 1994)
  - o St. Louis Police Department: Defensive Tactics Instructor Certification Course
  - o Johnson County Community College Regional Police Training Academy: Handcuffing and Handgun/Long Gun Retention and Disarming Instructor Certification Courses
- Osage County Sheriff's Department/Scranton Police Department
  - o High Risk Warrant
  - o Defensive Tactics Course
- Salina Police Department/Kansas Highway Patrol
  - o Lateral Vascular Neck Restraint (LVNR) Instructor Certification Course
- Strategos International
  - o LEO Response to the Active Shooter-Instructor Course
  - o Prevailing in Low-Light Conditions-Instructor Course
  - o Patrol Response to High Risk Incidents
  - o Physical Conflict Resolution Instructor courses
  - o Teacher/School Response to Intruders and Active Shooter
- Topeka Police Department (In-Service and Recruit Academy Classes)
  - o Defensive Tactics
  - o Baton/PR 24 Certification
  - o Firearms Range Instruction
  - o Active Shooter Class
  - o Low-Light Tactics
  - o Felony/Unknown Risk Car Stops
  - o Building Search Tactics
  - o Prisoner Transport
  - o Crowd Control
  - o SWAT Tactics
  - o Use of Force Continuum
  - o In-Custody Death Issues/Liability/Avoidance
  - o CIT academy, Excited Delirium recognition and response
  - o Counter Knife
  - o Taser
- US Army, Ft. Riley (various units)
  - o CQB/Room Entries/Raid Class
  - o OC Certification Class
  - o PR 24 Class
- Rangemaster Tactical Conference presenter, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019
- Presenter for Paul-E-Palooza training conferences
- Kansas Emergency Management, instructor for state POI course
- Blue Cell/Kansas IMT Liaison Officer (LOFR) course, Kansas City
- Ponca City OK, Solo Officer Response to the Active Shooter
- Kansas Transportation Safety Conference, LE Recognition and Response to Excited Delirium

**Chuck Haggard**

- Girl and a Gun organization presenter, national conference 2021
- KLETC, Shawnee Sheriff's Office, Atchison KS PD, Topeka PD Academy, LE recognition and response to Excited Delirium, Realistic De-escalation, avoiding in-custody deaths.
- Washburn University
  - o Intro to SWAT Classes
  - o Excited Delirium recognition and response

## PROFESSIONAL MEMBERSHIPS

- American Society of Law Enforcement Trainers
- International Association of Law Enforcement Firearms Instructors
- International Defensive Pistol Association (Expert ranking)
- International Law Enforcement Educators and Trainers Association
- International Wound Ballistics Association
- Kansas Narcotics Officers Association
- Metro Area Tactical Officers Association
- National Field Training Officers Association
- National Tactical Officers Association
- United States Practical Shooting Association

## PUBLICATIONS and POLICY WRITING

- "Concealed Carry and the 'Pea Shooter.'" *The Outdoor Wire*, Fall 2012 Special Edition
- "Gunlights, Switching and Gunpoint: Analysis – Part II." *Tactical Wire*, April 7, 2011
- "Gunlights, Switching and Gunpoint: An Analysis – Part I." *Tactical Wire*, April 5, 2011
- "Single Officer Response in Active Shooter Events." *Tactical Wire*, July 3, 2008
- "He Who Ignores History: Epic-scale Gunfights ... Lessons for Law Enforcement" *Police Magazine*, April 20, 2011
- Recoil magazine, multiple articles
- The Tactical Wire, multiple articles
- Primary and Secondary site; military and law enforcement leadership series
- Use of Force and Firearms policy author for Topeka PD General Orders
- Assisted TPD legal advisor is authoring City of Topeka Municipal Code 9.40.050
- Authored MTAA Use of Force, Racial Profiling and Domestic Violence Response policy
- Assisted with IACP Response to Excited Delirium position paper and model policy

## EXPERT WITNESS SERVICES

- Areas of expertise: firearms (mechanics/operation/deployment/safety), defensive tactics, less lethal/less than lethal tools, physical skills training, reasonable use of force, police training/SOP, tactical training
- Testimony or Consultation provided in the following jurisdictions (civil and criminal):
  - o Kansas state court (multiple cases, criminal and civil)
  - o Kansas district US federal court
  - o Texas state court
  - o Court of Military Justice, Ft. Riley

# CERTIFICATE OF SERVICE

Case Name: __**Baird, Mark v. Rob Bonta**__          No. __**2:19-cv-00617-KJM-AC**__

I hereby certify that on <u>October 13, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DECLARATION OF LARA HADDAD IN SUPPORT OF DEFENDANT'S COMBINED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 13, 2023</u>, at Los Angeles, California.

|  |  |
|---|---|
| Lara Haddad | *Lara Haddad* |
| Declarant | Signature |