UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Mark Baird and Richard Gallardo,                    No. 2:19-cv-00617-KJM-AC

                          Plaintiffs,               ORDER

            v.

Rob Bonta, et al.,

                          Defendants.

Plaintiffs Mark Baird and Richard Gallardo have brought this facial constitutional challenge to two California firearm laws under the Second Amendment.  These laws impose criminal liability on people who carry handguns openly without permits, which are available in the counties where Baird and Gallardo live, but not all counties.  They and the defendant, Attorney General of California, all have moved for summary judgment.

In cases like this one, the Supreme Court has instructed district courts to decide first whether the plaintiffs' conduct is protected by the plain text of the Second Amendment, and if it is, then whether the state has proven its laws are "consistent with the Nation's historical tradition of firearm regulation."  *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022).  The plain text of the Second Amendment protects what the Supreme Court has described as the right of "ordinary, law-abiding citizens" to carry firearms in public for self-defense.  *Id.* at 2122.  Here, California's laws place a burden on that conduct, meaning the state

1

1  must show those laws are consistent with this country's historical tradition of firearm regulation.

2  *Id.* at 2130.

3      It is not an easy task to make principled decisions about similarities and differences

4  between modern regulations and laws passed hundreds of years ago, as required here.  The

5  historical record reveals no obviously correct answers.  But the state has cited many historical

6  statutes and regulations, which—like California's modern laws—limited how people could carry

7  weapons in public in analogous circumstances based on analogous goals, such as preserving the

8  peace.  Those historical laws also were similarly restrictive, if not more so.  Baird and Gallardo

9  have not refuted the state's evidence.  For these reasons, as explained in full below, the court

10  concludes the state has shown what it must to prove its laws are constitutional.  The defendant's

11  motion for summary judgment is **granted**, and the plaintiffs' cross-motion is **denied**.

12  **I.      STATE STATUTES AND LICENSING SYSTEM**

13      In California, it is ordinarily a crime for people to carry firearms outside their homes and

14  businesses unless they have a license.  *See* Cal. Pen. Code §§ 25850(a), 26350(a), 26150, 26155.

15  There are several exceptions to this general rule.  Current and retired peace officers, military

16  personnel, and federal officers, for example, need no license; nor do security guards or private

17  investigators; licensed hunters may carry firearms on hunting trips.  *See id.* §§ 26000 *et seq.*  The

18  state also has created narrow exceptions for a few extraordinary circumstances in which firearms

19  might be necessary for self-defense.  For example, people can carry loaded firearms in public

20  without a license if they or their property are in danger and if they have notified law enforcement

21  but it has not arrived.  *See id.* § 26045.  Nor does the state punish those who carry loaded firearms

22  while making or attempting to make a lawful arrest.  *Id.* § 26050.  But ordinarily, a license from a

23  local law enforcement agency is a prerequisite to carrying a firearm in public.  *See id.* §§ 26150,

24  26155.

25      State law currently requires license applicants to satisfy three criteria: "good moral

26  character," residence or work in the relevant city or county, and completion of a "course of

27  training."  *Id.* §§ 26150(a)(1)–(3), 26155(a)(1)–(3).  The state once required applicants to

28  demonstrate "good cause" for a license as well, but after the United States Supreme Court

1    decided the *Bruen* case and struck down a similar "proper cause" requirement in New York, the

2    California Attorney General instructed prosecutors not to enforce that part of the state's licensing

3    statute.  *See* Office of the Attorney General, Legal Alert (June 24, 2022) (citing *Bruen*,

4    142 S. Ct. 2111).[1]  This instruction mooted any dispute about California's former "good cause"

5    law.  *See* Order, *Flanagan v. Bonta*, No. 18-55717, 2023 WL 1771160 (9th Cir. Feb. 1, 2023)

6    (dismissing a challenge to the "good cause" requirement as moot).  The state also requires

7    applicants to submit fingerprints.  *See* Cal. Pen. Code § 26185.  It does not issue licenses to

8    anyone the California Department of Justice determines is legally prohibited from possessing,

9    owning or purchasing a gun.  *See* Cal. Pen. Code § 26195.[2]

10        At this point, two types of licenses are available.  First are concealed-carry licenses: local

11   law enforcement agencies can issue licenses for a person "to carry concealed a pistol, revolver, or

12   other firearm capable of being concealed upon the person," and those licenses are viable

13   throughout the state.  *See* Cal. Pen. Code §§ 26150(b)(1), 26155(b)(1).  Second are open-carry

14   licenses: in counties with a population of less than 200,000 by the most recent federal census,

15   local authorities can issue licenses to carry the same types of weapons "loaded and exposed," but

16   only in that county.  *See id.* §§ 26150(b)(2), 26155(b)(2).  In practical terms, California allows

17   local authorities to issue licenses to carry handguns anywhere within its borders, but unless the

18   license holder lives or works in a county with fewer than 200,000 residents, the state requires that

---

[1] https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf (last visited Dec. 27, 2022).

[2] The Governor of California also recently approved a series of changes to the state's firearms regulations, including some that changed the state's licensing requirements.  For example, one new law replaced the "good moral character" requirement with a defined list of circumstances in which people are "disqualified" from receiving a license.  *See* 2023 Cal. Legs. Serv. Ch. 249 § 10 (S.B. 2) (amending Penal Code section 26150); *id.* § 21 (adding Penal Code section 26202).  People are "disqualified" if they are "reasonably likely to be a danger to self, others, or the community at large" or if they have been convicted of contempt of court, hate crimes, or making criminal threats, and in many other circumstances.  *Id.* § 21 (adding Penal Code section 26202).  Applicants must also be "the recorded owner . . . of the firearm for which the license will be issued" and must be 21 or older.  *Id.* § 10.  These changes were not in effect at the time of the operative complaint, *see* Def.'s Opp'n at 3, ECF No. 98, and Baird and Gallardo do not challenge them, so the court will not discuss them further in this order.

guns remain concealed.  Thirty California counties have populations below 200,000.[3]  Twenty-

eight counties have populations above 200,000.[4]  About 2 million people, roughly 5 percent of the

state's population, live in counties with populations below 200,000; the other 95 percent live in

California counties with populations above 200,000.  *See id.*  The counties in this second group

include those that are home to California's largest and most prominent cities, including Los

Angeles, San Diego, San Jose, San Francisco, Fresno, Sacramento and Oakland.  *See id.*

## II.    LEGAL AND PROCEDURAL BACKGROUND

Baird and Gallardo originally filed this case more than four years ago.  Since then, the law

concerning the Second Amendment as determined by the Supreme Court and federal appellate

courts has been changing almost constantly.  The history of this case is entangled with the

changing federal law.  An introduction to the changing precedent and its foundation is necessary

to understand the parties' cross-motions and this court's decision.

In 2008, the Supreme Court took a careful look at the Second Amendment for the first

time in many decades.  *See generally District of Columbia v. Heller*, 554 U.S. 570 (2008).  A

Court majority held for the first time that individuals have a constitutional right to possess

handguns in their homes for self-defense, while leaving many other questions unanswered.  *See

id.* at 592.  The Court did not decide, for example, whether people have any constitutional right to

carry firearms outside their homes, and it cautioned that "the right secured by the Second

Amendment is not unlimited."  *Id.* at 626.  It suggested, but did not decide, that several

---

[3] In ascending order of population, these counties are Alpine, Sierra, Modoc, Mono, Trinity, Mariposa, Inyo, Plumas, Colusa, Del Norte, Glenn County, Lassen, Amador, Siskiyou, Calaveras, Tuolumne, San Benito, Tehama, Lake, Yuba, Mendocino, Sutter, Nevada, Humboldt, Napa, Madera, Imperial, Shasta, and El Dorado counties.  U.S. Census Bureau, "Annual Estimates of the Resident Population for Counties: April 1, 2020 to July 1, 2022 (CO-EST2022-POP)," https://www.census.gov/data/datasets/time-series/demo/popest/2020s-counties-total.html (last visited Dec. 27, 2023).  The court takes judicial notice of these estimates.  *See, e.g.*, *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996).

[4] In ascending order of population, these counties are Butte, Yolo, Marin County, California, Santa Cruz, Merced, San Luis Obispo, Placer, Monterey, Santa Barbara, Solano, Tulare, Sonoma, Stanislaus, San Mateo, San Joaquin, Ventura, San Francisco, Kern, Fresno, Contra Costa, Sacramento, Alameda, Santa Clara, San Bernardino, Riverside, Orange, San Diego, and Los Angeles counties.  *See* Census Bureau Annual Estimates, *supra* note 3.

longstanding "prohibitions on carrying concealed weapons" were lawful.  *Id.*  The Court also expressed its sense that "prohibitions on the possession of firearms by the mentally ill" were constitutional, as were "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," but again, it did not decide these questions, and it did not explain further.  *Id.* at 626–27.  It did not intend these examples of "presumptively lawful regulatory measures" as a comprehensive list of permissible restrictions.  *See id.* at 627 n.26.  Finally, the Court did not decide whether lower courts such as this one should employ "any of the standards of scrutiny" that have "applied to enumerated constitutional rights" in other situations.  *Id.* at 628.  Rather, it declined to "establish a level of scrutiny for evaluating Second Amendment restrictions," although it rejected a proposal for a "freestanding" balancing test.  *See id.* at 634.

Although the Supreme Court's decision in *Heller* broke new ground, it had relatively few immediate consequences for state firearm regulations.  That is because the District of Columbia is not a state and so the *Heller* decision did not have the effect of applying the Second Amendment to the states, which the Supreme Court had long declined to do.  *See, e.g.*, *Presser v. Illinois*, 116 U.S. 252, 264–65 (1886); *United States v. Cruikshank*, 92 U.S. 542, 553 (1875).  But on the same day the Supreme Court issued its decision in *Heller*, several plaintiffs filed a lawsuit challenging state and local regulations like the D.C. laws the Supreme Court had just stricken down.  *See* Compl., *McDonald v. City of Chicago*, No. 08-3645 (N.D. Ill. June 26, 2008), ECF No. 1.  When these cases reached the Supreme Court, it confirmed "the Second Amendment right is fully applicable to the states."  *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) (plurality opinion); *see also id.* at 805 (Thomas, J., concurring in part and concurring in the judgment) (agreeing with the plurality's holding).  As in *Heller*, however, the Court did not decide whether any particular "longstanding regulatory measures" violated the Second Amendment.  *Id.* at 786 (plurality opinion).  Nor did the Court clarify how lower court judges should evaluate state laws and regulations in response to Second Amendment challenges.

In the next dozen years, then, although lower courts settled on a two-part test for adjudicating Second Amendment challenges, cases about carrying firearms outside the home—

1   cases such as this one—divided the federal courts of appeals and split several appellate panels,

2   including in the Ninth Circuit.  In 2014, for example, a divided three-judge Ninth Circuit panel

3   held that individual persons had a Second Amendment right to carry concealed handguns "outside

4   the home for the lawful purpose of self-defense."  *Peruta v. County of San Diego*, 742 F.3d 1144,

5   1166 (9th Cir. 2014) (alterations omitted).  Two years, later, however, the Ninth Circuit rejected

6   that conclusion in a divided en banc decision.  *See generally Peruta v. County of San Diego*,

7   824 F.3d 919 (9th Cir. 2016) (en banc).  The en banc majority held "the Second Amendment does

8   not preserve or protect a right of a member of the general public to carry concealed firearms in

9   public."  *Id.* at 924.  Another two years later, another divided three-judge panel held individual

10  persons have a Second Amendment right to carry firearms openly in public for self-defense.  *See*

11  *generally Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018).  As before, the Ninth Circuit agreed to

12  rehear that appeal en banc.  *See* 915 F.3d 681 (9th Cir. 2019).  Before the en banc court heard oral

13  arguments, however, the Supreme Court agreed to take up a case about a similar law in New

14  York, so the Circuit stayed the en banc proceedings.  *See* Order, No. 12-17808 (9th Cir.

15  Feb. 14, 2019), Dkt. No. 209 (citing *N.Y. Rifle & Pistol Ass'n v. City of New York*, No. 18-280).[5]

16       While the en banc proceedings were stayed, Baird and Gallardo filed this case.  Shortly

17  thereafter, the Supreme Court remanded the New York case, finding changes to New York laws

18  had rendered that case moot.  140 S. Ct. 1525 (2020) (per curiam).  The Ninth Circuit then lifted

19  the stay in *Young v. Hawaii* and scheduled oral arguments.  *See* No. 12-17808 (9th Cir. Apr. 30,

20  2020), Dkt. No. 227.  Baird and Gallardo pressed forward with a motion for a preliminary

21  injunction in this case while those en banc proceedings were pending.  *See generally* First Mot.

22  Prelim. Inj., ECF No. 14.  This court surveyed the conflicting out-of-circuit authority and the

23  conflicting Ninth Circuit opinions, and noted the pending en banc proceedings in *Young v.*

24  *Hawaii*, before concluding Baird and Gallardo had not shown they were likely to succeed on the

25  merits of their claims.  They had, however, raised "serious questions" about their Second

26  Amendment rights.  *See* Order (Aug. 31, 2020) at 5–8, ECF No. 33.  This meant they could be

---

[5] That New York case was distinct from *New York Rifle and Pistol Association v. Bruen*, No. 20-843, decided later, as explained below.

1    entitled to a preliminary injunction only if they showed the balance of hardships tipped sharply in

2    their favor, among other prerequisites.  *See id.* at 4 (citing *All. for the Wild Rockies v. Cottrell*,

3    642 F.3d 1127, 1131–35 (9th Cir. 2011)).  The court found they had not so shown and denied

4    their motion.  *Id.* at 10.  But the court expressly permitted Baird and Gallardo to renew their

5    motion if the Ninth Circuit en banc issued a favorable decision in *Young*.  *Id.*  In the meantime,

6    discovery began here.  *See* Sched. Order, ECF No. 39.

7         The Ninth Circuit issued its en banc opinion in *Young v. Hawaii* in March 2021, while

8    discovery was underway.  992 F.3d 765 (9th Cir. 2021) (en banc).  The Circuit held "Hawai'i's

9    restrictions on the open carrying of firearms reflect longstanding prohibitions."  *Id.* at 773.  For

10    that reason, the court concluded, openly carrying firearms in public was "outside the historical

11    scope of the Second Amendment."  *Id.*  This resolution clearly was unfavorable to Baird and

12    Gallardo.  They nevertheless renewed their motion for a preliminary injunction, s*ee* Second Mot.

13    Prelim. Inj., ECF No. 40, and this court heard oral arguments in July 2021, Mins., ECF No. 50.

14         In the meantime, the Supreme Court had granted a petition for certiorari in the case now

15    known as *Bruen*.  *See* 141 S. Ct. 2566.  At oral arguments on Baird and Gallardo's renewed

16    motion for a preliminary injunction, the state urged this court to stay this case until the Supreme

17    Court issued its decision in *Bruen*.  Hr'g Tr. at 13–14, ECF No. 52.  Baird and Gallardo initially

18    thought *Bruen* had no "bearing on this case," *see id.* at 14–15, but later reconsidered and joined

19    the state's request for a stay, *see* Stip. & Order, ECF No. 58.  The court granted that request and

20    stayed the case until *Bruen* was resolved.  *Id.*

21         The Supreme Court issued its opinion in *Bruen* in June 2022, holding the Second

22    Amendment gives "ordinary, law-abiding" people a right to carry firearms in public for self-

23    defense.  142 S. Ct. at 2122.  The Court also rejected the two-part test that most courts of appeals

24    had adopted.  It directed lower courts instead to use a test focused on "the historical tradition" of

25    firearms regulation.  *Id.* at 2127.  After *Bruen*, the Court granted certiorari in *Young*, vacated the

26    Ninth Circuit's en banc decision, and remanded that case for further consideration.  142 S. Ct.

27    2895 (2022).  The Circuit remanded the case to the district court in turn, 45 F.4th 1087 (9th Cir.

2022), but the parties stipulated to dismissal and the court granted that request, *see* Stip. & Order, No. 12-336 (D. Haw. Dec. 15, 2022), ECF No. 89.

After the Court filed its opinion in *Bruen*, this court lifted the stay here, ECF No. 59, Baird and Gallardo amended their complaint, ECF No. 68, and they renewed their request for a preliminary injunction, ECF No. 65.  The court denied that motion in late 2022, s*ee* Order (Dec. 8. 2022), ECF No. 83, finding Baird and Gallardo had not shown the balance of hardships and public interest favored an injunction, necessary conditions for injunctive relief under *Winter v. Natural Resources Defense Council*.  *Id.* at 10–15 (citing 555 U.S. 7 (2008)).  Baird and Gallardo then pursued an interlocutory appeal.  ECF No. 84.  Meanwhile, the parties completed discovery and filed and briefed cross-motions for summary judgment here.  *See* Order (Nov. 23, 2023), ECF No. 82; Def.'s Mot., ECF No. 90; Def.'s Mem., ECF No. 90-1; Pls.' Mot., ECF No. 96; Pls.' Mem., ECF No. 96-1.  The court heard oral argument on November 3, 2023.  Mins., ECF No. 104. Amy Bellantoni appeared for Baird and Gallardo, and Laura Haddad appeared for the Attorney General.

After briefing was complete and after this court heard oral argument, the Ninth Circuit issued its mandate in Baird and Gallardo's appeal related to their motion for a preliminary injunction.  *See generally* 81 F.4th 1036; *see also* Mandate, ECF No. 109.  The Circuit held this court had erred in denying the motion without deciding whether Baird and Gallardo were likely to succeed on the merits of their claims.  *See* 81 F.4th at 1042, 1044–46.  The Circuit remanded the case to this court to consider that question.  *See id.* at 1046–48.  The Circuit also required California to "identify a historical analogue that curtails the right to peaceably carry handguns openly for self-defense to a comparable degree, with a comparable severity, and with a comparable blanket enforcement to California's open-carry ban."  *Id.* at 1047.  Additionally, the Circuit ordered this court to act "expeditiously."  *Id.* at 1047–48.  Considering and resolving Baird and Gallardo's motion for a preliminary injunction now, however, rather than the pending cross-motions for summary judgment, would delay this action unnecessarily.  The parties' cross-motions are briefed, fully argued and ready for decision.  Resolving those motions will moot the preliminary injunction motion, because Baird and Gallardo either will have succeeded or not.  For

that reason, the court begins with the summary judgment motions rather than with the preliminary injunction.

## III.   CLAIMS AND EVIDENCE

Both Baird and Gallardo live in counties with populations below the 200,000-person limit, so local authorities can grant them licenses to carry firearms openly in public in those counties. Pls.' Resp. Stmt. Facts Nos. 4, 5, 9, 10, ECF No. 96-2.  Both men claim local authorities have not published applications for open-carry licenses and will not grant them those licenses.  Baird Decl. ¶¶ 7–8, ECF No. 96-4; Gallardo Decl. ¶¶ 6–7, ECF No. 96-5.  The reasons are unclear.  Baird and Gallardo have not sued any local licensing authorities, and neither side appears to have sought any information from the local authorities.  Nor has any party cited evidence about the local authorities' decisions or policies.  For these reasons, the court previously dismissed Baird and Gallardo's claims that licenses to carry firearms openly are not truly available to them as a practical matter; the court will not revisit those "as-applied" claims in this order.  *See Baird v. Bonta*, 644 F. Supp. 3d 726, 731 (E.D. Cal. 2022), *rev'd and remanded in part on other grounds*, 81 F.4th 1036 (9th Cir. 2023).

Local authorities can also grant Baird and Gallardo licenses to carry concealed firearms in public.  Until the most recent hearing on the parties' pending cross-motions for summary judgment, the record did not make clear whether Baird and Gallardo have licenses or are exempted from the general ban on carrying concealed handguns in public.  Baird testified in his deposition that he has applied to county authorities for multiple permits to carry concealed firearms, most recently in 2021, and his most recent application was granted.  *See* Baird Dep. at 14, Haddad Decl. Ex. 2, ECF No. 90-4.  He denies now, however, that he has a permit to carry a concealed firearm.  Baird Decl. ¶¶ 7–8.  At hearing on the pending cross-motions, Baird's counsel explained his license has expired.  California does not argue otherwise.  Gallardo testified in his deposition he is exempted from the state's license requirement by virtue of a federal credential.  *See* Gallardo Dep. at 15, 27, Haddad Ex. 3, ECF No. 90-4.  But in a later declaration, he claimed he could not rely on any exemption to the state's licensing requirements.  *See* Gallardo Decl. ¶ 5. At hearing on the pending cross-motions, his counsel clarified his federal credential does not

allow him to carry a firearm openly in all the places he wishes.  Again, California does not argue otherwise.

For these reasons, the court finds it is undisputed that Baird and Gallardo both could apply to local authorities for permits to carry firearms openly and concealed in public.  It also is undisputed the state will not now, after *Bruen*, allow local licensing authorities to deny Baird and Gallardo a license based on any failure to show "good cause."  Baird and Gallardo nevertheless contend the state's system of licensing and criminal punishments is unconstitutional.  Their claims can be interpreted in a number of ways.  As their counsel clarified at hearing on the parties' pending cross-motions, their lawsuit rests on two basic theories.

First, they contend it is unconstitutional for California to impose criminal liability on people who carry firearms in public.  *See, e.g.*, Second Am. Compl. ¶¶ 70–71, ECF No. 68.  As explained above, however, if people have a license, California law does not impose criminal liability for carrying handguns in public.  *See* Cal. Pen. Code §§ 26150, 26155.  For that reason, the court understands Baird and Gallardo's first theory as an argument that the Second Amendment prohibits California from requiring licenses: in their words, they object "to having to seek permission from the government before being lawfully able to exercise a preexisting right."  Pls.' Mem. at 2; *see also* Baird Decl. ¶¶ 15–19; Gallardo Decl. ¶¶ 10–13.

Second, Baird and Gallardo contend California cannot dictate how people carry firearms in public, such as openly or concealed—what they refer to as limits on the "modality" of gun carrying.  Pl.'s Mem. at 6; *see also* Second Am. Compl. ¶¶ 25, 37; Pls.' Mem. at 2–3; Baird Decl. ¶ 5; Gallardo Decl. ¶ 5.  The court construes this theory as an argument that California cannot constitutionally require people to conceal any firearms they carry in public in counties with populations larger than 200,000, as Baird and Gallardo would be required to do if they were to enter one of these larger counties.

The state contends for its part that the challenged firearms laws are constitutional for two reasons.  First, it argues that "the text of the Second Amendment does not compel *unlicensed* open carry."  Def.'s Mem. at 5 (emphasis in original).  Nor, in the state's view, does "the plain text of the Second Amendment . . . require any right to *openly* carry when concealed carry (and

open carry under more limited circumstances) is authorized." *Id.* at 6 (emphasis in original).  In short, the state contends, because it "accommodates the right to public carry through its concealed carry licensing regime, the reasonable restrictions that California imposes on the open-carry of weapons, and the licensing requirements in place in the counties where Plaintiffs reside, do not interfere with the plain text of the Second Amendment." *Id.* at 7.  California therefore asks this court to hold an analysis of the historical tradition of firearm regulations is unnecessary because the Second Amendment does not protect Baird and Gallardo's conduct.  *See id.*

Second, the state contends, "[e]ven if Plaintiffs could show that California's open-carry restrictions implicate the Second Amendment," the state argues its "restrictions are consistent with the Nation's tradition of firearms regulation." *Id.*  It argues governments regulated the public carry of weapons throughout English and American history, *id.* at 11–17; governments commonly applied stricter regulations in more densely populated areas, *id.* at 17; and these historical regulations are similar to California's modern laws both because they imposed a similar burden and because they rested on similar justifications, *id.* at 17–20.

The state supports its arguments with references to hundreds of historical laws and regulations.  Baird and Gallardo objected that the state had not presented these statutes in admissible or complete form.  *See, e.g.*, Pls.' Mem. at 14–16.  To ensure the record was clear and complete, the court instructed California to file the full text of all relevant statutory provisions, which it now has done.  *See generally* Updated Req. J. Not., ECF No. 105.[6]  The court also grants the state's request to take judicial notice of those statutes and overrules Baird and Gallardo's objections to that request, ECF No. 106, to the extent the court has considered those statutes in this order.

Baird and Gallardo did not object at hearing when the court instructed the state to supplement its request for judicial notice, and the state requests judicial notice only of what it already had cited in its briefing, without offering any new citations or research.  But Baird and Gallardo now object the court's directive to file the statutes was error.   Their objections fall into

---

[6] When citing materials collected in this request, the court refers for convenience to the numbers in the left-most column of the table in ECF No. 105.

two categories.  First, they argue the state's updated request was untimely, contradicted this District's local rules and deprived them of a full opportunity to respond.  *See id.* at 1–3, 5–6.  The local rules permit a party to supplement its reply with the court's prior approval, as in this case.  *See* E.D. Cal. L.R. 230(m).  The court also permitted Baird and Gallardo to respond to the state's supplemental notice, which they have done in their objections, which include both procedural and substantive objections.  *See, e.g.*, Objs. Updated Req. J. Not. at 6–10 (contending state's evidence does not satisfy its obligations under *Bruen*).  The court has considered these objections below, which parallel arguments in the principal briefs.  Second, Baird and Gallardo argue the court improperly relieved the state of its burden of proof and became an "advocate" for the state's position by inviting the state to update its request for judicial notice.  *See id.* at 4.  The court has not relieved the state of its evidentiary burden or assumed an advocate's role, but rather as the trial court where this case begins has ensured the record is complete and clear.  The court merely instructed the state to update its request for judicial notice after considering Baird and Gallardo's original objection that the state's evidence was inadmissible and incomplete.  *See, e.g.*, Pls.' Mem. at 14–16.  Nor has the court given latitude only to the state in its attempt to ensure the record is complete.  The court has considered, for example, Baird and Gallardo's own supplements to their expert's opinions over the state's objections, which the court also overrules.  *See* Cal. Opp'n at 19.

In addition to its citations to historical statutes, the state relies on the opinions of three historians and a retired law enforcement officer, retained to explain the context of the cited laws and how to interpret them.  First, the state cites opinions by Robert Spitzer, Ph.D., a historian and professor of political science who has studied and written about gun policy for more than thirty years.  *See generally* Spitzer Decl., ECF No. 90-6; Spitzer Surrebuttal, ECF No. 98-5.  In his opinion, "[t]he carrying of weapons of all sorts, but especially guns, fighting knives (long, thin-bladed knives), and various types of clubs has been subject to wide-ranging regulation and restriction from the seventeenth century through the early twentieth century."  Spitzer Decl. at 5.  Not only were these "restrictions on the concealed carrying of these weapons . . . ubiquitous in America."  *Id.*  "[T]he open carrying of weapons was often restricted" as well.  *Id.*  Spitzer

1    describes modern weapons laws as largely "a more flexible form of government regulation" than

2    their harsher historical counterparts.  *Id.*

3          Second, Brennan Rivas, Ph.D., an historian who has studied historical weapons

4    regulations in the United States, filed a declaration in support of California's motion.  *See*

5    *generally* Rivas Decl., ECF No. 90-5; Rivas Surrebuttal. Decl., ECF No. 98-4.  She opines that

6    Americans have historically distinguished "military arms" from "deadly weapons" and have long

7    regulated how and whether people may carry deadly weapons in public places, especially in

8    towns and cities.  *See, e.g.*, Rivas Decl. at 3–4 (summarizing opinions).  She also explains how

9    weapons changed over time and what effects those changes had on gun violence, public

10   perceptions and weapons laws.  *See, e.g., id.*

11          Third, the state cites opinions of Saul Cornell, Ph.D., about "the history of firearms

12   regulation in the Anglo-American legal tradition, . . . the regulation of public . . . carry of arms at

13   the national and state levels" and "California's regulatory history."  Cornell Decl. Ex. A at 1, ECF

14   No. 90-1; *see also* Cornell Surrebuttal, ECF No. 98-6.  Cornell offers opinions about the

15   importance of context, including English common law concepts of "peace" and the state's power

16   "to promote public health and safety," Cornell Decl. Ex. A at 2, 4; how the Second Amendment's

17   contemporaries would have understood its terms, *see id.* at 7–8; how different firearms and

18   firearms violence were many years ago, *see id.* at 10–14; how nineteenth century American courts

19   interpreted early firearms regulations, *see id.* at 14–16; and the origins of modern regulations in

20   the United States and California, *see id.* at 17–24.

21          Finally, the state cites the declaration of Kim Raney, a retired California police chief who

22   offers opinions "on how restrictions on the open carry of firearms affect public safety."  Raney

23   Decl. at 6, ECF No. 90-8.  He explains his understanding of the burdens of California gun laws

24   and their justifications.  Baird and Gallardo object broadly to Raney's opinions as irrelevant in

25   light of the Supreme Court's rejection of "interest-balancing" tests in *Bruen. See, e.g.*, Pls.'

26   Mem. at 19–10; Pls.' Reply at 6–7.  The state does not rely on Raney's declaration to argue the

27   challenged laws satisfy any of the "means–ends" tests the Supreme Court has directed lower

28   courts to use in other circumstances.  *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163

(2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). Rather, the state relies on Raney's opinions when it compares the justifications and burdens to those of historical regulations. *See, e.g.*, Cal. Mem. at 18–20. As discussed further below, the Supreme Court directed lower courts to consider those justifications and burdens. *See Bruen*, 142 S. Ct. at 2133.

Baird and Gallardo urge this court to disregard almost all the statutes and regulations cited in the state's motion. They argue, for example, that most of the statutes cited in California's motion and experts' reports were passed many years after the Second Amendment was adopted and for that reason do not show what laws the Second Amendment permitted when it was adopted. *See* Pls.' Mem. at 9–13. Similarly, in Baird and Gallardo's reading of the Supreme Court's decisions, statutes passed after the Civil War, can only confirm—not contradict—the conclusions one might draw from laws and regulations in effect at the time the Second Amendment was adopted. *See id.* at 18. Baird and Gallardo similarly contend English laws and history predating the Second Amendment are irrelevant. *See id.* at 17–18. And they urge the court to disregard as irrelevant many other categories of evidence, such as laws about "affrays," brandishing and disorderly conduct, *id.* at 18–19; public safety, *id.* at 19–20; "dangerous" and "unusual" weapons, *id.* at 17; concealed weapons, *id.* at 20; and race or other similar discriminatory classifications, *id.* at 18.

Baird and Gallardo also cite the opinions of their retained expert, Clayton Cramer, who holds Bachelor's and Master's degrees in history and who has published research about the Second Amendment and firearms history. *See generally* Cramer Decl., ECF No. 96-3. Cramer does not advance affirmative opinions about the historical tradition of firearm regulation, but rather critiques Spitzer's, Rivas's and Cornell's opinions. Cramer argues, for example, the statutes Spitzer cites in his declaration did not actually prohibit people from carrying weapons openly, *see id.* at 15–17,[7] he argues Cornell has misrepresented the sources he cites, such as

---

[7] To avoid confusion, the pages cited in this declaration are those applied by the CM/ECF system at the top right of the page.

14

1   military censuses and historical court opinions, *see id.* at 36–37, and he argues Rivas has invented

2   an ahistorical distinction between "deadly weapons" and other firearms, *see id.* at 65–73.

3         Baird and Gallardo also attach two papers to their opposition: a "working draft" of a paper

4   by Mark W. Smith, an attorney and author, ECF No. 96-7, and an article published by David

5   Kopel, also an attorney and author, in the Charleston Law Review, ECF No. 96-9.  Like Baird

6   and Gallardo, Smith contends courts must consider evidence from "the Founding period," not the

7   years following the Civil War, when they interpret the Second Amendment.  *See, e.g.*, ECF No.

8   96-7 at 4–5.  Kopel argues British "abuses" in the 1770s—import bans on firearms and gun

9   powder and the violent confiscation of firearms and gunpowder—are an essential context for the

10  Second Amendment because they show analogous "abuses" would be unconstitutional today.

11  *See, e.g.*, ECF No. 96-9 at 285–86.

12        In its analysis and in reaching its conclusions, the court has considered the complete

13  record, including the declarations submitted by the parties.

14  **IV.   LEGAL STANDARDS**

15        The legal rule that applies to motions for summary judgment is undisputed and well-

16  known.  A party may move for and obtain summary judgment if "there is no genuine dispute as to

17  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

18  56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving

19  party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it

20  "might affect the outcome of the suit under the governing law."  *Id.*  The court views the record in

21  the light most favorable to the nonmoving party and draws reasonable inferences in that party's

22  favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes*

23  *v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Cross-motions for summary judgment are

24  evaluated separately under the same standard, "giving the nonmoving party in each instance the

25  benefit of all reasonable inferences."  *Am. Civil Liberties Union of Nev. v. City of Las Vegas*,

26  333 F.3d 1092, 1097 (9th Cir. 2003).

27        Although the parties disagree whether some evidence is relevant or material, and although

28  they vigorously dispute the history of firearms regulation in the United States and England,

1    neither side has identified a genuine dispute of material fact to be resolved at trial.[8]   It remains

2    only to determine who is entitled to judgment as a matter of law.

3        Baird and Gallardo challenge California's laws on their face.  A facial challenge is "the

4    most difficult challenge to mount successfully" because the challenge must show the law is not

5    valid in any set of circumstances.  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "Facial

6    challenges also run contrary to the fundamental principle of judicial restraint that courts should

7    neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor

8    'formulate a rule of constitutional law broader than is required by the precise facts to which it is

9    to be applied.'"  *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008)

10    (quoting *Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring)).  "Finally,

11    facial challenges threaten to short circuit the democratic process by preventing laws embodying

12    the will of the people from being implemented in a manner consistent with the Constitution."  *Id.*

13    Courts therefore must "keep in mind that 'a ruling of unconstitutionality frustrates the intent of

14    the elected representatives of the people.'"  *Id.* (quoting *Ayotte v. Planned Parenthood of N. New*

15    *Eng.*, 546 U.S. 320, 329 (2006)).

16        The constitutional rights in dispute here are those explained in *Bruen* and *Heller*.  In those

17    cases the Court held the Second Amendment protects an individual person's right to keep and

18    bear arms for self-defense, both inside and outside the home.  *Bruen*, 142 S. Ct. at 2122; *Heller*,

19    554 U.S. at 592.  This protection is "fully applicable to the States."  *McDonald*, 561 U.S. at 750.

20    "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution

21    presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2126.  "To justify its regulation, the

22    government . . . must demonstrate that the regulation is consistent with this Nation's historical

23    tradition of firearm regulation."  *Id.*  And in the broader context of a facial challenge, a state

24    firearms law typically will be upheld if it operates constitutionally in at least some circumstances.

25    *See Salerno*, 481 U.S. at 745.  Specific unconstitutional applications may be addressed in specific

26    cases.  *See Bruen*, 142 S. Ct. at 2138 n.9 (declining to resolve hypothetical as-applied disputes).

---

[8] As noted above, the court and the parties clarified at hearing the record discrepancies about Baird's and Gallardo's own handgun permits.

This latter history-and-tradition requirement was first announced in *Bruen* only a little more than a year ago, and lower federal courts have struggled to apply it since then.  The same requirement also is the parties' primary focus in their pending cross motions.  The court therefore reviews that requirement and its origins more thoroughly in the two subsections below.

**A.      Courts must identify analogous statutes and regulations in the historical tradition of firearms regulation.**

The Supreme Court offered sparse practical guidance in *Bruen* for how to decide whether state regulations are consistent with the historical tradition of firearm regulation.  It expected some cases would be "straightforward."  *Id.* at 2131.  For example, the Court majority wrote states were likely to prove there is a longstanding historical tradition of banning guns from specific "sensitive places," such as legislative assemblies, polling places, and courthouses.  *See id.* at 2133.  It expected lower courts would have no trouble concluding modern regulations about other analogous "sensitive places" were constitutional.  *See id.*  In fact, federal district courts since *Bruen* have found a number of restrictions on firearms in modern "sensitive places" are analogous to historical restrictions.  *See, e.g.*, *Kipke v. Moore*, ___ F. Supp. 3d ___, No. 23-1293, 2023 WL 6381503, at *7–14 (D. Md. Sept. 29, 2023) (museums, healthcare facilities, parks and mass transit facilities, schools, stadiums, racetracks, amusement parks and casinos, but not places where alcohol is sold, not public demonstrations and not private property); *Goldstein v. Hochul*, ___ F. Supp. 3d ___, No. 22-8300, 2023 WL 4236164, at *9–14 (S.D.N.Y. June 28, 2023) (places of worship), *appeal filed*, No. 23-995 (2d Cir. July 6, 2023).

The Supreme Court majority also wrote in *Bruen* that it expected some restrictions would prove to be straightforwardly unconstitutional.  It identified three types of evidence it said likely would favor that conclusion.  First, if "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  142 S. Ct. at 2131.  Second, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."  *Id.*  And third, "if some jurisdictions

17

1   actually attempted to enact analogous regulations during this timeframe, but those proposals were

2   rejected on constitutional grounds, that rejection surely would provide some probative evidence

3   of unconstitutionality." *Id.*

4   　　　The Court cited the laws in dispute in *Heller* and *Bruen* as examples of straightforwardly

5   unconstitutional restrictions.  The "general societal problem" in *Heller* was "firearm violence in

6   densely populated communities." *Id.*  The District of Columbia had "employed a regulation—a

7   flat ban on the possession of handguns in the home—that the Founders themselves could have

8   adopted to confront that problem." *Id.*  But no evidence in *Heller* showed people had flatly

9   banned handguns from the home in the founding era.  *See id.*  In *Bruen*, the "general societal

10  problem" was "handgun violence" in "urban areas." *Id.*  New York's solution was a "proper

11  cause" requirement, i.e., demonstrating "a special need for self-protection distinguishable from

12  that of the general community." *Id.* at 2156 (quoting *In re Klenosky*, 428 N.Y.S.2d 256, 257

13  (App. Div. 1980)).  The Court found no similar restrictions in the historical record New York had

14  offered.  It found governments historically had "limited the intent for which one could carry arms,

15  the manner by which one carried arms, or the exceptional circumstances under which one could

16  not carry arms." *Id.*  With the exceptions of a few "outliers," the Court determined the record

17  included neither broad prohibitions on "the public carry of commonly used firearms for personal

18  defense" nor a demand for proof of a "special need." *Id.*

19  　　　The Supreme Court did not expect every case to be straightforward. *Id.* at 2134.  It

20  anticipated many likely would be difficult.  For difficult cases, a more "nuanced approach" would

21  be necessary. *Id.* at 2132.  The Supreme Court chose not to "provide an exhaustive survey of the

22  features that render regulations relevantly similar under the Second Amendment," but it offered

23  "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-

24  defense." *Id.* at 2132–33.  That is, do modern and historical regulations "impose a comparable

25  burden on the right of armed self-defense"? *Id.* at 2133.  And is that burden "comparably

26  justified"? *Id.*  Beyond these "metrics," however, the Court could offer only generalities: it was

27  not putting governments in a "straightjacket" and it was not giving governments a "blank check."

*Id.* It called for a "well-established and representative historical *analogue*, not a historical *twin*," not a "dead ringer." *Id.* (emphasis in original).

Not surprisingly, lower courts have not understood the Court's guidance consistently. To some, the test is quite strict. In *Teter v. Lopez*, for example, the plaintiffs challenged Hawaii's ban on butterfly knives. 76 F.4th 938 (9th Cir. 2023). The state cited historical laws banning everything from "Bowie knives" and "Arkansas Toothpicks" to "sling shots" and "sword-canes." *See id.* at 951–52. A Georgia statute passed in 1837, for example, prohibited Bowie knives and "any other kind of knives." *Id.* at 952. But the Ninth Circuit held these laws were not analogous to Hawaii's statute. Most prohibited only the concealed carrying of these knives, none regulated butterfly knives in particular, and few targeted small knives in particular. *See id.* at 953. The circuit thus reversed the district court's decision granting summary judgment to the state. *See id.* at 954–55.

The Fifth Circuit's decision in *United States v. Rahimi* similarly applied a strict test. *See generally* 61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023). The defendant had been charged with possessing a handgun in violation of 28 U.S.C. § 922(g)(8), which makes it unlawful for a person to possess a firearm or ammunition if that person previously was subject to a domestic violence restraining order. *See* 61 F.4th at 449. The defendant argued this prohibition was unconstitutional. *See id.* In response, the government cited several "surety" laws, which several colonies codified from the common law tradition at about the time the Second Amendment was ratified. *See id.* at 459–60. A person could "demand surety" from another based on suspicion a crime was intended or likely. *Id.* at 459. If that second person did not post a bond, they could not carry a weapon in public absent a special need. *Id.* The Fifth Circuit agreed the surety laws were passed for reasons very much like those that motivated § 922(g)(8): protecting specific people from harm by others. *See id.* at 459–60. The Fifth Circuit also agreed the surety laws resembled § 922(g)(8) in that they required a civil proceeding and could result in the forfeiture of weapons. *Id.* at 460. But the Fifth Circuit rejected the government's proposed analogy to those laws: it found, unlike § 922(g)(8), they permitted a person to prevent the state

19

1   from seizing a firearm by posting a bond.  *See id.*  As noted, however, the Supreme Court granted

2   the United States' petition for certiorari, and recently heard oral arguments.[9]

3         Other courts have accepted broader analogies to historical gun regulations.  In *United*

4   *States v. Alaniz*, for example, the Ninth Circuit upheld a federal sentencing enhancement

5   increasing the Guideline sentencing range for drug trafficking if the defendant possessed a

6   "dangerous weapon (including a firearm)."  *See* 69 F.4th 1124, 1126, 1128–30 (9th Cir. 2023)

7   (quoting U.S.S.G. § 2D1.1).  The Circuit found evidence of a "longstanding tradition" of

8   punishing those who committed robberies and burglaries while possessing a firearm.  *Id.* at 1130.

9   "Like burglary or robbery," the panel wrote, "drug trafficking plainly poses substantial risks of

10  confrontation that can lead to immediate violence."  *Id.*  It did not matter there was no evidence of

11  similar enhancements for other crimes that resembled modern prohibitions on drug trafficking,

12  such as historical prohibitions on smuggling.  *See id.* at 1129–30.

13        The district court's decision in *Kipke*, cited above, is another case in the same vein.  The

14  state prohibited firearms in museums but cited no founding-era restrictions on weapons in

15  museums specifically.  *See* 2023 WL 6381503, at *7.  The district court nevertheless found

16  museums were like schools in that "they serve an educational purpose and are often geared

17  toward children."  *Id.*  The state had cited "historical statutes that demonstrate a historical

18  tradition of firearm regulation in places of gathering for education, literary, or scientific

19  purposes," so the modern restriction was constitutional.  *Id.* at *8.

20        As these cases illustrate, again, it can be difficult to make principled decisions about

21  similarities and differences between modern and historical regulations.  That the relevant history

22  pointed to by the Supreme Court is hundreds of years behind us makes understanding and

23  faithfully comparing these historical laws to our own a daunting if not impossible task for a

24  generalist judge.  It is little wonder that before *Bruen*, lower courts tended to avoid "extensive

---

[9] *See* Oral Argument Transcript, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023), *available at* https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/22-915_986b.pdf (last visited Dec. 26, 2023).

historical analysis" when they could.  142 S. Ct. at 2179 (Breyer, J. dissenting) (quoting *Young*, 992 F.3d at 784–85).

The Supreme Court's sparse guidance for interpreting the relevant history in *Bruen* does include some general directives.  It warns, for example, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136 (majority opinion).  "The Second Amendment was adopted in 1791; the Fourteenth in 1868.  Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.*  Ancient historical practices might have become "obsolete" by the time the Constitution and Second Amendment were adopted. *Id.* (quoting *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935)).  The Supreme Court also urged lower courts to "be careful when assessing evidence concerning English common-law rights." *Id.*  "The common law, of course, developed over time.  And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution." *Id.* (citations omitted).

The Supreme Court also expressed skepticism about "postenactment history." *Id.*  It agreed "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases." *Id.* (quoting *Chiafalo v. Washington*, 140 S. Ct. 2316, 2326 (2020)).  It also recognized if "a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id.* at 2137 (quoting *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in the judgment)).  But it warned that if later history contradicts the text of the Second Amendment itself, "the text controls." *Id.*  While recognizing the significance of the Fourteenth Amendment as applying the Second  Amendment to the states, the Court opined that discussions of the right to keep and bear arms from after the Civil War "do not provide as much insight into its original meanings as earlier sources," *id.* (quoting *Heller*, 554 U.S. at 614), though that later history can at least confirm what earlier history implies, *id.* (citing *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) and *Heller*, 554 U.S. at 605–10).

As some Justices noted, the Court's opinion in *Bruen* left two "methodological" questions unanswered. *Id.* at 2162 (Barrett J., concurring); *see also id.* 2137–38 (majority opinion); *id.* at 2179–80 (Breyer J., dissenting). First, it is not clear how and in what circumstances lower courts should consider evidence that postdates the ratification of a particular constitutional provision in interpreting that provision. *See id.* at 2162–63 (Barrett, J., concurring). In the case of the Second Amendment, how long after 1791 may district courts look for evidence of historical analogues? *See id.* at 2163. What types of evidence about what historical practices are most and least informative? *See id.* Second, and of particular import here, in cases challenging state laws under the Second Amendment, courts of course are not enforcing the Second Amendment against states directly. *Id.* at 2137 (majority opinion). States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* In general, "individual rights enumerated in the Bill of Rights and made applicable to the states through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* But the Supreme Court acknowledges "an ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* (emphasis added).

In *Bruen*, the Court found it was not necessary to weigh in on that debate because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same." *Id.* at 2138; *see also id.* at 2163 (Barrett, J., concurring). The Court did not explain that conclusion in any detail. This left several difficult questions unanswered. For example, what should a lower court do if evidence from the late 1700s contradicts evidence from the reconstruction era? Or what if evidence from the late 1700s is absent, but evidence from the late nineteenth century is plentiful and compelling? The Court did offer some guidelines for drawing analogies, as noted, but until the Supreme Court offers more clarity, courts like this one are left to muddle their way.

As Justice Breyer wrote for the three dissenting justices in *Bruen*, judges are, as a group, not accustomed to "resolving difficult historical questions." *Id.* at 2177. This is not to say history

22

1   is completely beyond our reach.  Judges will hear and resolve disputes about historical traditions

2   of firearm regulation without producing professional historical research, just as we hear "antitrust

3   cases without producing cutting-edge microeconomic research" and "decide issues of toxic-tort

4   causation without ever donning lab coats."  William Baude & Stephen Sachs, *Originalism and the*

5   *Law of the Past*, 37 Law & History Rev. 809, 816 (2019).  By the same token, just as judges and

6   court staff can bungle econometrics and misunderstand organic chemistry, they can fall victim to

7   errors professional historians might easily avoid.

8          Out of a desire to avoid such errors, this court initially ordered the parties to show cause

9   why it should not appoint an independent expert historian under Federal Rule of Evidence 706.[10]

10  *See* 644 F. Supp. 3d at 738.  The parties argued an independent expert was unnecessary, among

11  other reasons because the parties' own retained experts could explain the historical record.  *See*

12  *generally* Pls.' Resp., ECF No. 88; Def.'s Resp., ECF No. 87.  Having reviewed the parties'

13  responses and the current record, the court discharges its previous order to show cause.  In

14  reviewing the record and the parties' filings, the court has taken steps—as it would in any case

15  involving subject matter with which it is unfamiliar—to inform its assessment of the evidence,

16  the historical record and the many filed experts' opinions; it has consulted a few publicly

17  available resources describing the fundamental conventions of historical scholarship with an

18  audience of legal professionals in mind, summarized in the following paragraphs.  The court

19  similarly has reviewed a collection of historical essays by scholars with contrasting views about

20  the Second Amendment and its history, some of which are cited below.  *See generally* Jennifer

21  Tucker et al., eds., *A Right to Bear Arms?* (2019).

22         Based on its review of these resources, the court accepts the proposition that an argument

23  from history, like any that draws from another "established discipline," is convincing only if "it

24  abides by the conventions of that discipline."  Martin S. Flaherty, *History "Lite" in Modern*

25  *American Constitutionalism*, 95 Colum. L. Rev. 523, 551 (1995).  "Just as scientific testimony

---

[10] "On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations. The court may appoint any expert that the parties agree on and any of its own choosing. But the court may only appoint someone who consents to act."  Fed. R. Evid. 706(a).

1    must adhere to the scientific method, so too must historical testimony adhere to the historical

2    method."  Jonathan D. Martin, Note, *Historians at the Gate: Accommodating Expert Historical*

3    *Testimony in Federal Courts*, 78 N.Y.U. L. Rev. 1518, 1521 (2003).

4         One historian wrote several years ago that historians, unlike legal professionals, can tend

5    to "focus on the differentness and irretrievability" of the past.  Laura Kalman, *Border Patrol:*

6    *Reflections on the Turn to History in Legal Scholarship*, 66 Fordham L. Rev. 87, 103 (1997).

7    "Visiting an earlier period is, as historians like to say, rather like visiting a foreign country.  One

8    can read the words and follow the events, but understanding them requires an authentic feel for

9    the culture."  Larry D. Kramer, *When Lawyers Do History*, 72 Geo. Wash. L. Rev. 387, 390

10   (2003); *see also* David Lowenthal, *The Past Is a Foreign Country* (1985).

11        The foreignness of the past can at times be obvious:  A student interpreting a fragmented

12   text written in a forgotten language and an ancient alphabet is "unlikely to forget that she is

13   dealing with the artifact of a culture different from her own."  H. Jefferson Powell, *Rules for*

14   *Originalists*, 73 Va. L. Rev. 659, 672–73 (1987).  The foreignness of the history that judges and

15   lawyers are likely to encounter can be easier to overlook.  A lawyer or judge might feel a kinship

16   or common heritage with those who wrote the Constitution.  *See id.* at 673.  And "the very ease

17   with which we can bridge the gap between our thought and that of the founders makes it too easy

18   to assume that there is no gap, that the historical distance between 1987 and 1787 or 1868 is

19   effectively zero."  *Id.*

20        "This is a false assumption.  The 1787 Constitution and the first twelve amendments were

21   written and ratified by people whose intellectual universe was distant from ours in deeply

22   significant ways."  *Id.*  "The differences between us just as often touch the most profound

23   questions in life, everything from rules of friendship and business to attitudes about fundamental

24   values to the way in which perceptions of reality itself are constructed and experienced."  Kramer

25   (2003), *supra*, at 397.  "[T]he founders thought, argued, reached decisions, and wrote about the

26   issues that mattered to them, not about our contemporary problems."  Powell (1987), *supra*, at

27   669.  For an historical analogy to be persuasive, it cannot be distorted by "anachronism or

28   reductionism or lack of context or simple misstatement."  Kramer (2003), *supra*, at 395.  "To

1    understand what a particular historical actor meant when he wrote about the right to bear arms

2    requires scholars to immerse themselves in the surviving evidence from this period and to analyze

3    published and unpublished sources, private comments as well as public statements."  Saul

4    Cornell, *Commonplace or Anachronism: The Standard Model,*[11] *The Second Amendment, and*

5    *the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 225

6    (1999).

7         Moreover, "[c]omplex historical assertions are always probabilistic in character."  *Powell*

8    (1987), *supra*, at 678.  "At best, history yields probabilities, not certainties."  *Id.* (italics omitted).

9    "The historical distance between the present and 1787, or even 1870, is great enough so as to

10   reduce to a practical nullity the possibility that [the founders'] opinions and divisions would

11   precisely parallel our own."  *Id.* at 677.  "[O]ne must respect the limits of historical interpretation,

12   which preserve a healthy space for concluding that something remained open or was not fully

13   appreciated or understood."  Kramer (2003) at 407.

14        Heeding these admonitions is no easy task.  "One needs continually to monitor and

15   double-check one's intuitions and interpretations."  *Id.* at 397.  This is particularly true of the

16   Second Amendment, "to the unending chagrin and frustration of professional historians."  *Id.*; *see*

17   *also, e.g.*, Jennifer Tucker, Introduction at 8, in Tucker (2019), *supra* ("Debates about firearms

18   history seem especially vulnerable to 'presentism': the anachronistic Introduction of present-day

19   perspectives into depictions or interpretations of the past."); Jack Rakove, *The Second*

20   *Amendment: The Highest Stage of Originalism*, 76 Chi.-Ken  L. Rev. 103, 105 (2000)

21   ("[H]istorical operations in the Second Amendment theater of combat are often mounted by

22   campaigners not intimately familiar with the terrain.  These are raiders who know what they are

23   looking for, and having found it, they care little about collateral damage to the surrounding

24   countryside that historians better know as context.").  The sharply divided "culture" of guns in

---

[11] As discussed in more detail below, the "standard model" is a term some legal scholars have used to describe an interpretation of the Second Amendment that protects and individual right to keep and bear arms.

1  modern America complicates the exercise further still.  *See, e.g.*, Joseph Blocher, "Firearm

2  Localism," 123 Yale L.J. 82, 90–107 (2013) (discussing competing "cultures").

3       For all these reasons, it would be unreasonable to expect "professional quality history" in

4  judicial opinions.  Saul Cornell, *Originalism on Trial: The Use and Abuse of History in* District of

5  Columbia v. Heller, 69 Ohio St. L.J. 625, 639 (2008); *see also* Transcript of Remarks by Gordon

6  S. Wood & Scott D. Gerber, *The Supreme Court and the Uses of History*, 39 Ohio N.U. L. Rev.

7  435, 443–44 (2013); Kramer (2003), *supra*, at 391.  Courts of course do their best to assess the

8  positions of the parties, their attorneys and the experts those parties retain, as the Supreme Court

9  noted in *Bruen*, 142 S. Ct. at 2130 n.6.  A generalist judge should hesitate to reject the work of

10  those who have devoted their careers to the study of history.  Kramer (2003), *supra*, at 390–91;

11  Flaherty (1995) at 553–54.  Historians themselves normally begin by mastering the "secondary

12  literature," the work of expert colleagues who have gone before.  Kramer (2003), at 390; *see also*

13  Schrag Decl. ¶¶ 13, 34, *Miller v. Bonta*, No. 19-1537 (S.D. Cal. Aug. 29, 2022), ECF No. 129-

14  1.[12]  That is because,"[i]f historical scholarship in a given area has settled on a certain account, or

15  more likely, on a framework for debate, historical assertions that acknowledge that account or

16  framework will simply be more persuasive."  Flaherty (1995), *supra*, at 554.

17  **B.       *Heller*, *McDonald*, and *Bruen* settled the law but did not close the evidentiary**
18  **record.**

19       It is difficult, if not impossible, to assess the history of the Second Amendment without

20  running head-on into one such "framework for debate"—a broad agreement among many

21  historians that the Supreme Court has misinterpreted the Second Amendment's history as

22  protecting an individual right to self-defense.  The trail to that conclusion begins in the many

23  briefs the parties have filed over the course of this litigation, runs through the parties' expert

24  reports and ends in those experts' own scholarship.  *See, e.g.*, Reply in Support of Second Mot.

25  Prelim. Inj. at 1, ECF No. 46 (contrasting *Heller* with later Ninth Circuit historical analyses);

26  Cornell (1999), *supra*, at 225.  Other federal courts have confronted this phenomenon as well.

---

[12] The court takes judicial notice of this declaration, which the state has cited in this case. *See, e.g.*, State's Resp. Order to Show Cause at 6, ECF No. 87.

1 | *See, e.g.*, *United States v. Gibson*, No. 23-20084, 2023 WL 8292372, at *3 (W.D. Tenn. Nov. 8,

2 | 2023); *United States v. Bullock*, ___ F. Supp. 3d ___, No. 18-165, 2023 WL 4232309, at *5 (S.D.

3 | Miss. June 28, 2023).

4 | This court, of course, must and will follow the Supreme Court's decision in *Heller*. The

5 | right to keep and bear arms is a fundamental constitutional right, not a "second-class" right. *E.g.*,

6 | *McDonald*, 561 U.S. at 780. Protecting that right is part of every federal judge's duty to

7 | "faithfully and impartially discharge all the duties incumbent upon [them] under the Constitution

8 | and laws of the United State States." 28 U.S.C. § 453. One way judges faithfully and impartially

9 | discharge their duties is by not closing their eyes to conflicting evidence.

10 | Regardless of whether historical scholars are correct about the history of the Second

11 | Amendment and the Supreme Court's analysis, however, this is a new and a different case than

12 | *Heller, McDonald* and *Bruen*. None of the Supreme Court's previous decisions addressed the

13 | California laws Baird and Gallardo now challenge. The Supreme Court set forth the basic legal

14 | test in *Heller*, *McDonald*, and *Bruen*. But it did not proscribe the record this court must use to

15 | adjudicate Baird and Gallardo's challenge to California's laws. Rather, the Court trusted lower

16 | courts would deploy the same "'evidentiary principles and default rules'" they have used to

17 | resolve "particular cases or controversies" many times before. 142 S. Ct. at 2130 n.6 (quoting

18 | Baude & Sachs (2019), *supra*, at 810–11). District courts may "decide a case based on the

19 | historical record compiled by the parties" in that case. *Id.* If a state cites no history in response to

20 | a plaintiff's assertion of a Second Amendment right, a court has no obligation to search through

21 | history for reasons to uphold the state's laws. *See Baird*, 81 F.4th at 1047 ("It is the parties' duty,

22 | not the court's, to collect and present historic analogues.").[13] But, as California has here, a state

23 | may rely on its own evidence and its own record in each new case; California is not bound by

24 | New York's failure to cite evidence or make certain arguments in *Bruen*, and it is not confined to

---

[13] As discussed above, courts do have authority to appoint independent experts. *See* Fed. R. Evid. 706(a). Even though the court here has determined it need not appoint such an expert, doing so may be appropriate in another case if necessary to obtain opinions on how to evaluate confusing and contradictory historical evidence. *Cf., e.g.*, *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999) (affirming appointment of independent expert "to assist the court in evaluating contradictory evidence" in medical dispute).

1    the District of Columbia's record in *Heller*.  The point is, this court must and will follow the legal

2    dictates of *Heller* and *Bruen*, but it has no obligation to perpetuate any mistaken or incomplete

3    accounts of what happened in the past that the parties and their amici presented to the Supreme

4    Court in those cases.  Otherwise, the Supreme Court would not have written that historical

5    analysis often requires "nuanced judgments about which evidence to consult and how to interpret

6    it" when it instructed lower courts like this one to answer the questions presented in each case.

7    *Bruen*, 142 S. Ct. at & 2130 & n.6 (emphasis omitted) (quoting *McDonald*, 561 U.S. at 803–04)

8    (Scalia, J., concurring)).

9         Moreover, lower courts can assist the Supreme Court by clearly and fairly identifying any

10   relevant conflicts in any given case.  Judges on lower courts manifest their respect for the

11   Supreme Court not only by following the Court's precedents, but also "in the respectful

12   expression of difference—that too is the essence of the judicial craft."  J. Harvie Wilkinson III, *Of*

13   *Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253, 255–56 (2009).  The

14   Supreme Court relies in part on the lower courts to identify problems that might justify a second

15   look at its decisions.  *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 284–86

16   (2022); *Pearson v. Callahan*, 555 U.S. 223, 234–35 (2009); *Payne v. Tennessee*, 501 U.S. 808,

17   829–30 (1991).  In crafting and issuing this order, this court manifests its respect for the Supreme

18   Court and its awesome responsibilities.

19        There is a second and more practical reason to think carefully about the historical debate

20   as well.  Some participants in that debate also have weighed in here.  As noted above, California

21   has retained Robert Spitzer and Saul Cornell, two historians who have expressed disagreement

22   with the Supreme Court's historical reasoning in *Heller*.  *See generally* Cornell Decl., ECF No.

23   90-7; Spitzer Decl., ECF No. 90-6.  Brennan Rivas, the state's third historical expert witness, also

24   has publicly criticized the reasoning the Supreme Court ultimately adopted in *Bruen*.  *See*

25   Brennan Rivas, "Gun Control, Texas Style" (Dec. 1, 2021).[14]  By contrast, the plaintiffs' retained

26   expert, Clayton Cramer, embraces the Court's historical conclusions and publicly favors a broad

---

[14] https://aggressivehistorian.com/2021/12/01/gun-control-texas-style/ (last visited Dec. 28, 2023).

28

1   interpretation of the Second Amendment.  *See generally* Cramer Decl., ECF No. 96-3; *see also,*

2   *e.g.*, Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second*

3   *Amendment*, 6 Georgetown J. L. & Pub. Policy 511 (2008) (claiming "the founding generation—

4   and at least two generations after them—did not understand 'bear arms' as limited to military or

5   collective militia duty").  He has written of his hope to win "the battle" for gun rights "not just in

6   the courts, but in the hearts and minds of the American people as well," Clayton Cramer, "Gun

7   Control and the Death of a Thousand Cuts," Shotgun News (Jan. 1, 2011),[15] and he publishes

8   similar sentiments on his personal blog, *see, e.g.*, Clayton Cramer, "*Miller v. Bonta* (S.D. Cal.

9   2023) Victory (Oct. 19, 2023).[16]

10         When historians serve as retained experts, they like lawyers "can be guilty of 'law-office

11   history.'"  Martin (2003), *supra*, at 1528.  "[T]he longer and more intimately involved historians

12   are in a case, the greater the possibility that they may begin unconsciously tailoring the research

13   to fit a predetermined conclusion."  *Id.* at 1542 (quoting Paul Soifer, *The Litigation Historian:*

14   *Objectivity, Responsibility, and Sources*, Pub. Historian, Spring 1983, at 47, 50).  But zealous

15   identification with a cause need not render an expert's opinions unreliable, nor the cause unjust.

16   *Cf. id.* at 1527–30 (documenting expert witnesses' roles—and misgivings about those roles—in

17   *Brown v. Board of Education* and later cases).  Understanding the broader context of an expert's

18   scholarship and opinions, however, may be necessary to put those opinions in perspective.  So in

19   this case: Cornell's and Spitzer's opinions may be reliable even though they have often disagreed

20   with the Supreme Court and criticized its conclusions about history; Cramer's views may be

21   unreliable or not credible despite his agreement with the Supreme Court's interpretation of

22   historical evidence.

23         In short, understanding the debate about the historical reasoning in *Heller*, *McDonald*, and

24   *Bruen* is indispensable to understanding the historical record in this case.  In reviewing that

---

[15] Cramer republished the text of this article on his personal website: http://www.claytoncramer.com/popular/DeathOfAThousandCuts.html (last visited Dec. 28, 2023).

[16] http://claytonecramer.blogspot.com/2023/10/miller-v-bonta-sdcal-2023-victory.html (last visited Dec. 28, 2023).

1  debate the court participates in an exercise courts elsewhere are carrying out, and keeping that

2  debate in mind assists this court in weighing the opinions of the parties' retained expert witnesses.

3  The court now turns to the debate with those purposes in mind.

4  **C.    The "standard model" draws criticism.**

5  There is no dispute that most historians—an "overwhelming majority" by one account—

6  remain "unconvinced" by what is known as the "Standard Model" of Second Amendment rights.

7  Patrick Charles, *The Reasonable Regulation Right to Arms: The Gun-Rights Second Amendment*

8  *Before the Standard Model*, at 168 & n.10, in Tucker (2019), *supra*; *see also, e.g.*, Robert J.

9  Spitzer, *Lost and Found: Researching the Second Amendment*, 76 Chicago Kent L. Rev. 349

10  (2000).  The "standard model" moniker was first imported from the lingo of the physical sciences

11  in a law review article published in 1995.  *See* Glenn H. Reynolds, *A Critical Guide to the Second*

12  *Amendment*, 62 Tenn. L. Rev. 461, 463 & n.9 (1995).  ("[T]here is sufficient consensus on many

13  issues that one can properly speak of a 'Standard Model' in Second Amendment theory, much as

14  physicists and cosmologists speak of a 'Standard Model' in terms of the creation and evolution of

15  the Universe.").  It connotes the theory that the Second Amendment protects individuals' right to

16  keep and carry weapons "to defend themselves from outlaws of all kinds" and "as a check on

17  government tyranny and on the power of a standing army."  *Id.* at 467.

18  For many years before the suggestion the "standard model" applied, most legal experts

19  understood the Second Amendment as preserving a communal or state right connected to the

20  militia, not an individual right.  *See, e.g.*, Charles (2019), *supra* at 168–69; Eric M. Ruben &

21  Darrell A.H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80:2

22  Law & Contemp. Problems 1, 1–3 (2017).  After having no reason to develop a jurisprudence for

23  more than 100 years, federal courts adopted this communal view after the Supreme Court upheld

24  a conviction for possessing a sawed-off shotgun in *United States v. Miller*.  *See, e.g.*, Charles

25  (2019) (citing 307 U.S. 174 (1939)); *see also, e.g.*, *Hickman v. Block*, 81 F.3d 98, 100 (9th Cir.

26  1996) ("We follow our sister circuits in holding that the Second Amendment is a right held by the

27  states, and does not protect the possession of a weapon by a private citizen."), *abrogated by*

28  *Heller*, 554 U.S. 570.  In *Miller*, the Court wrote, the Second Amendment was adopted with the

1  "obvious purpose to assure the continuation and render possible the effectiveness" of militias.

2  307 U.S. at 178 (citing U.S. Const. Art. 1, § 8).  The Court then interpreted and applied the

3  Second Amendment "with that end in view."  *Id.*

4        After *Miller*, it was "a matter of ordinary professional reason that Congress had the

5  power" to pass gun controls, even if they prevented individual people from keeping and carrying

6  guns.  Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller,

7  122 Harvard L. Rev. 191, 204 (2008).  President Lyndon B. Johnson called for federal gun

8  control legislation against that backdrop in the 1960s, and Congress appeared "ready to take

9  action" in the wake of rising crime, struggles over the Vietnam War, and the assassinations of

10  President John F. Kennedy, Martin Luther King Jr. and Senator Robert Kennedy, among others.

11  *Id.* at 202–03.

12        At the same time, however, resistance to regulation was growing.  *Id.* at 207–08; Charles

13  (2019), *supra*, at 170–73; Tucker (2019), *supra*, at 3.  In 1965, for example, an attorney published

14  an essay relying on eighteenth-century history to claim individual people had rights protected by

15  the Second Amendment.  Charles (2019), *supra*, at 172–73 (citing Robert A. Sprecher, *The Lost*

16  *Amendment*, 51 Am. Bar. Ass'n J. 554 (1965)).  In a 1975 magazine article, Ronald Reagan, then

17  Governor of California, also claimed the Second Amendment protected an individual right.

18  Siegel (2008), *supra*, at 210 (quoting Ronald Reagan, "Ronald Reagan Champions Gun

19  Ownership," Guns & Ammo Sept. 1975, at 34).  The same year, the head of the National Rifle

20  Association's Institute for Legislative Action expressed similar views in testimony before

21  Congress.  *Id.* at 208–09 (citing Firearms Legislation: Hearing Before the Subcomm. on Crime of

22  the H. Comm. on the Judiciary, 94th Cong. 2845–47 (1975) (statement of Harlon Carter)).

23        Scholarly debates about the Second Amendment did not begin in earnest until the 1980s

24  and 1990s.  *See* Tucker (2019), *supra*, at 3.  In those years, many legal scholars, along with some

25  historians, published articles contending the Second Amendment protects an individual right.

26  Ruben & Miller (2017), *supra*, at 3; *see also* Spitzer (2000), *supra*, at 376–77.  These articles

27  often relied on interpretations of historical English and colonial sources, such as the Statute of

Northampton,[17] the English Declaration of Rights,[18] and similar colonial statutes, in addition to the Second Amendment's text and context. *See generally, e.g.*, Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983); Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 Hastings Const. L.Q. 285 (1983); David I. Caplan, *Restoring the Balance: The Second Amendment Revisited*, 5 Fordham Urb. L.J. 31 (1976). A 1989 article in the Yale Law Journal by Professor Sanford Levinson raised the profile of the individual rights position. *See* Sanford Levinson, *The Embarrassing Second Amendment*, 99 Yale L.J. 638, 658 (1989) ("It is time for the Second Amendment to enter full scale into the consciousness of the legal academy."); *see also, e.g.*, Rakove (2000), *supra*, at 103–04 & n.3 (citing Levinson's article). The increasing body of scholarship is what led Professor Reynolds to declare in his 1995 law review article that the individual-rights theory had become the "standard." *See* Reynolds (1995), *supra*, at 463.

Such pronouncements hardly resolved the matter. In the year 2000, the Chicago-Kent Law School sponsored a conference, which made clear there was no consensus the Second Amendment protected an individualist right, as apparent in an article by Lois Schwoerer, for example. *See* Tucker (2019), *supra*, at 4, 5, 8; Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27 (2000); *see also, e.g.*, Carl T. Bogus, *The History and Politics of Second Amendment Scholarship: A Primer*, 76 Chi.-Kent L. Rev. 3 (2000) (discussing symposium and its origins). Like Schwoerer, Spitzer posited the "standard model" was supported by substandard historical research, which had, in his view, proliferated unchecked in law journals thanks to a lack of expert fact-checking and peer-review, an incentive to publish novel ideas rather than correct ideas, partisan political pressures and debates about proposed gun controls. *See generally*, *e.g.*, Spitzer (2000), *supra*; Robert Spitzer, *The Politics of Gun Control* (1995).

---

[17] The Statute of Northampton, discussed further below, was passed in 1328, "shortly after Edward II was deposed by force of arms and his son, Edward III, took the throne." *Bruen*, 142 S. Ct. at 2139. It imposed restrictions on when and where people could carry arms. *See id.*

[18] Article VII of the English Declaration of Rights, also discussed further below, was enacted in 1689 in response to the Stuart Kings' efforts to consolidate power in armies and militias. *See, e.g.*, *Heller*, 554 U.S. at 592–93.

More recent scholarship joins the debate in full, with a number of leading historians

rejecting the individual rights theory.  S*ee generally, e.g.*, Lois D. Schwoerer, *Gun Culture in Early Modern England* (2016) ("standard model" rests on misguided interpretations of Statute of Northampton, English Bill of Rights, and surrounding history); Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 Law & Contemp. Problems 11 (2017) (documenting longstanding limits on how and when people could carry guns in the American colonies; sharply and repeatedly criticizing the "standard model"); *see also* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, Yale L.J. Forum 121 (2015); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004).[19]

At the same time, many legal and historical scholars have continued to support the history behind the "standard model," including law professor emerita Joyce Malcolm.  *See, e.g.*, Joyce Lee Malcolm, "The Right to Be Armed: The Common Law Legacy in England and America," in *A Right to Bear Arms?* (Tucker et al. eds. 2019); *see also, e.g.*, Brief of Amici Curiae Professors of Second Amendment Law, et al., *N.Y. State Rifle & Pistol Ass'n*, No. 20-843 (expressing the opinions of Randy Barnett, Royce Barondes, Nicholas Johnson, Donald Kilmer, Michael O'Shea, Joseph Olson and Eugene Volokh—several law professors—that "[n]ineteenth-century sources and case law . . . support the right of ordinary citizens to carry for self-defense beyond the home," among other opinions).

Scholars who find support for an individual right in the Second Amendment cite evidence from the founding era showing people carried weapons for individual purposes unrelated to the militia.  *See, e.g.*, Brief of Amici Curiae Professors of Second Amendment Law, et al., *N.Y. State Rifle & Pistol Ass'n*, *supra*, at 6–7.  They also rely on similar evidence from English history and

---

[19] This is by no means a comprehensive list of those who doubt the validity of the "standard model."  Many others have joined with their own critiques.  *See generally, e.g.*, Charles (2019), *supra*; Charles (2012), *supra*; Rakove (2000), *supra*; Bogus (2000), *supra*.

1    point out that American colonists saw themselves as inheritors of that tradition.  *See, e.g.*, *id.*

2    at 7–15.  Even those who reject the "standard model" acknowledge the history of private arms use

3    for self-defense.  *See, e.g.*, Charles (2012), *supra*, at 1732–33 & nn.16–18.

4              Scholars on both sides of the debate submitted amicus briefs in *Heller.  Compare, e.g.*,

5    Brief of the Cato Institute and History Professor Joyce Lee Malcolm as Amici Curiae in Support

6    of Respondent, *District of Columbia v. Heller*, No. 07-290, *with, e.g.*, Brief of Amici Curiae Jack

7    N. Rakove, Saul Cornell, David T. Konig, William J. Novak, Lois G. Schwoerer, et al., in

8    Support of Petitioners, *District of Columba v. Heller*, No. 07-290.  The Supreme Court drew

9    heavily on this research, both in the majority and dissenting opinions.  *See, e.g.*, 554 U.S. at 592

10   (citing work by Malcolm and Schwoerer); *id.* at 671 (Stevens, J., dissenting) (citing work by

11   Cornell); *id.* at 685 (Breyer, J., dissenting) (same).  In the end, the Court majority largely adopted

12   the "standard model." *See, e.g.*, 554 U.S. at 592 (holding Second Amendment guarantees "the

13   individual right to possess and carry weapons in case of confrontation").

14             Following *Heller,* several of the historians referenced above questioned the majority's

15   reasoning.  *See* Cornell (2008), *supra* at 627–31 (pointing out that majority had dismissed the

16   opinions of one of most "prolific and influential popular legal writers of his day" as an outlier

17   position, while simultaneously elevating a minority view later "disowned by its authors"); *see also*

18   *id.* at 632–36 (noting legal readers would have understood Second Amendment's preamble— "A

19   well regulated Militia, being necessary to the security of a free State"—not as a justification, but

20   rather as statement of the amendment's true purpose or focus);[20] David T. Konig, *Why the Second*

21   *Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written*

22   *Constitutions in Revolutionary America*, 56 UCLA L. Rev. 1295, 1341–42 (2009)

23   (criticizing *Heller* majority for relying on "radical philosophy outside the mainstream of the

24   times"); Lois G. Schwoerer, "English and American Gun Rights" at 144, 150 in *A Right to Bear*

25   *Arms?* (Jennifer Tucker et al. eds. 2019) (Article VII of the English Declaration of Rights, which

---

[20] Cornell's criticisms of the majority's opinion in *Bruen* are harsh as well.  *See, e.g.*, Saul Cornell, "Cherry-Picked History and Ideology-Driven Outcomes: Bruen's Originalist Distortions," SCOTUSblog (Jun. 27, 2022), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/ (last visited Dec. 28, 2023).

1    the Supreme Court saw as a precursor or inspiration for the Second Amendment, focused not on

2    individual rights and self-defense, but rather on "the defense of the nation"); Charles (2012),

3    *supra*, at 1827–42 (describing "domino effect" of influential historical errors).

4        Others have focused on tools that were unavailable to the Supreme Court in 2008 when it

5    decided *Heller*.  Most prominent among these tools is "corpus linguistics," whose proponents

6    describe it as an "empirical approach to the study of language that involves large, electronic

7    databases of text," such as "books, magazines, newspapers, and even transcripts of spoken

8    language."  Thomas R. Lee & Stephen Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788,

9    828 (2018) (footnotes omitted).  Database searches can show how frequently words are used in

10   one sense or another, what words are more commonly used together, and what words appear in

11   what contexts, among other things.  *See id.* at 831–32.  Several years after *Heller*, linguistics

12   experts used these databases to test whether the words "keep and bear arms" were used in ways

13   that might suggest whether the Second Amendment would have been understood as protecting an

14   individual or collective right.  Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear

15   Arms*, 46 Hastings Const. L.Q. 509 (2019); Alison L. LaCroix, "Historical Semantics and the

16   Meaning of the Second Amendment," *The Panorama* (Aug. 3, 2018);[21] *see also* Josh Blackman &

17   James C. Phillips, Corpus Linguistics and the Second Amendment, *Harvard Law Review Blog*

18   (Aug. 7, 2018).[22]  They determined "[f]ounding era sources almost always use *bear arms* in an

19   unambiguously military sense," Baron (2019), *supra*, at 510 (emphasis in original), contrary to

20   the majority's conclusion in *Heller* that the phrase "in no way connotes participation in a

21   structured military organization," 554 U.S. at 584.

22       Many of these experts urged the Supreme Court to reconsider its pronouncements in

23   *McDonald* and *Bruen*.  In *McDonald* specifically, a group of historians, including Schwoerer,

24   Charles, and Spitzer, urged the Court to revisit the history of the English Bill of Rights and

25   related history.  *See generally* Brief for English/Early American Historians as Amici Curiae in

---

[21] http://thepanorama.shear.org/2018/08/03/historical-semantics-and-the-meaning-of-the-second-amendment/ (last visited Dec. 28, 2023).

[22] https://harvardlawreview.org/blog/2018/08/corpus-linguistics-and-the-second-amendment/ (last visited Dec. 28, 2023).

1    Support of Respondents, *McDonald v. City of Chicago*, No. 08-1521.  They expressed what they

2    said was the "overwhelming consensus among leading English historians" that the Court majority

3    had misinterpreted English history.  *Id.* at 7.  Another group of legal historians, including Cornell,

4    submitted an amicus brief collecting evidence to show "that states and municipalities have long

5    enjoyed authority to enact reasonable non-discriminatory gun safety regulations, including bans

6    on the possession of particularly dangerous classes of weapons."  Brief of Thirty-Four

7    Professional Historians and Legal Historians as Amici Curiae in Support of Respondents at 2,

8    *McDonald v. City of Chicago*, No. 08-1521.  In *McDonald*, decided in 2010, the Court

9    acknowledged "there is certainly room for disagreement about *Heller*'s analysis of the history of

10   the right to keep and bear arms," but "nothing written since *Heller*" persuaded the Court to

11   "reopen the question there decided."  561 U.S. at 788.  In *Bruen*, a group of linguistics experts

12   urged the Court to revisit its conclusions about the meaning of the phrase "keep and bear arms"

13   based on the new evidence from corpus linguistics searches.  *See generally* Brief for Corpus

14   Linguistics Professors and Experts as Amici Curiae Supporting Respondents, *N.Y. State Rifle &*

15   *Pistol Ass'n v. Bruen*, No. 20-843.  The dissenting justices in *Bruen* cited the corpus linguistics

16   amicus brief while the justices in the majority did not.  See 142 S. Ct. at 109–10 (Breyer, J.,

17   dissenting).

18       As Cornell puts it in the declaration he submitted in this case, "research is still ongoing:

19   new materials continue to emerge; and since *Bruen* was decided, additional evidence about the

20   history of regulation has surfaced and new scholarship interpreting it has appeared in leading law

21   reviews and other scholarly venues."  Cornell Decl. Ex. A at 6 (citing *Symposium—The 2nd*

22   *Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in*

23   *Public*, 55 U.S. Davis L. Rev. 2495 (2022); *New Histories of Gun Rights and Regulations: Essays*

24   *on the Place of Guns in American Law and Society* (Joseph Blocher, Jacob D. Charles & Darrell

25   A.H. Miller eds. 2023).  In his opinion, "much more work needs to be done to fill out this

26   picture."  *Id.*

27       In sum, although the Supreme Court's decisions in *Heller*, *McDonald* and *Bruen* settle the

28   law this court must and will follow, these decisions did not settle the debate among historians of

England, of colonial America, of firearms regulation, or of linguistics about what the Second Amendment meant to the people who adopted it in the founding era or, indirectly, in the reconstruction era.  Nor does this court read the Supreme Court's decisions in *Heller*, *McDonald* and *Bruen* as closing the historical record that this court and other lower courts must review and interpret, in this case and others, about particular state firearm laws and regulations.  Newly identified and different historical evidence, and new and different interpretations of that evidence by those who know it best, might prove decisive in this case and others even though that evidence and those opinions do not change the law as articulated by the Supreme Court and the federal courts of appeals.

## V.   DISCUSSION

The court turns to the parties' motions and evidence, keeping the foregoing in mind.  As a threshold matter, the court finds the Second Amendment's plain text covers Baird's and Gallardo's conduct, i.e., carrying firearms in public.  California law prohibits people from carrying firearms in public without a license and allows for open firearms carrying in only some counties.

California argues otherwise, as noted above.  *See* Def.'s Mem. at 5–7.  To repeat, by the state's reading, "the text of the Second Amendment does not compel *unlicensed* open carry," *id.* at 5 (emphasis in original), and does not bestow a right to carry firearms openly in all circumstances, *see id.* at 6.  "[T]he term 'bear,'" it contends, as used in the Second Amendment, "requires some form of public carry but does not require open carry."  *Id.*  In support, the state cites the Supreme Court's observation in *Bruen* that several "antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues."  142 S. Ct. at 2147.  The state similarly cites the Supreme Court's footnote cautioning against reading the majority opinion as invalidating "shall-issue" firearms licensing regulations, *id.* at 2138 n.9, as well as Justice Kavanaugh's concurring opinion, which makes a similar point, *see id.* at 2161.

As explained further below, there is a long history of government restrictions on how guns can be carried.  Many state licensing regimes are likely consistent with that historical tradition.

1   But this does not mean the Second Amendment offers no protection to those who would carry

2   firearms openly in public.  Under *Bruen*, the Second Amendment protects the right of "ordinary,

3   law-abiding," individual people "to 'bear' arms in public for self-defense."  *Id.* at 2135 (majority

4   opinion).  For present purposes, the state does not dispute that Baird and Gallardo are ordinary,

5   law-abiding citizens who wish to carry handguns in public for self-defense.  *See* Baird Decl. ¶ 5;

6   Gallardo Decl. ¶ 5.  California law limits where and how Baird and Gallardo can carry firearms in

7   public, so the Second Amendment "presumptively protects" their conduct in the face of that law.

8   *Id.* at 2130.  Thus, to prevail here, California must show its regulations are "consistent with the

9   Nation's historical tradition of firearm regulation."  *Id.* at 2126, 2130.

10          This brings the court to the two questions posed by the parties' cross motions, previewed

11   in the legal and procedural background above.  First, can California require people to obtain a

12   license before they carry handguns in public, regardless of whatever more specific restrictions the

13   state might impose?  Second, if so, are the specific terms of California's licensing system for

14   open carry of handguns consistent with the country's history of firearm regulations?  And in both

15   instances the question is facial: are the state's laws unconstitutional in all circumstances?  The

16   court answers these questions in the next two subsections.

17          **A.      California may require a license of those who carry handguns in public.**

18          The Supreme Court has all but confirmed that states may require people to obtain licenses

19   before they carry firearms in public.  In *Heller*, after interpreting the Second Amendment's

20   "operative clause"—i.e., that "the right of the people to keep and bear Arms, shall not be

21   infringed"—the Court cautioned that this right, like others guaranteed in the Bill of Rights, was

22   "not unlimited."  554 U.S. at 595.  By way of example, the Court noted, the First Amendment

23   prohibits Congress from making any law "abridging the freedom of speech," but Congress did not

24   violate the First Amendment when it criminalized offering images depicting the sexual abuse of

25   children.  *See generally United States v. Williams*, 553 U.S. 285 (2008), *cited in Heller*, 554 U.S.

26   at 595.  Likewise, the Second Amendment does not "protect the right of citizens to carry arms for

27   *any sort* of confrontation."  *Heller*, 554 U.S. at 595 (emphasis in original).  "From Blackstone

28   through the 19th-century cases, commentators and courts routinely explained that the right was

1    not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

2    purpose." *Id.* at 626.  In *Heller*, the Supreme Court expressed no doubts that governments could

3    prohibit concealed weapons, could keep weapons from those who suffer from mental illnesses or

4    have been convicted of a felony, could prohibit weapons in schools and government buildings,

5    could impose "conditions and qualifications on the commercial sale of arms," and could impose

6    other similar limits. *Id.* at 626–27 & n.26.  If a state can impose these restrictions, it stands to

7    reason it could impose the restrictions with a licensing system.

8           As the Supreme Court put it in *Bruen*, the Second Amendment protects the right of

9    "ordinary, law-abiding citizens" to possess handguns in the home and in public for self-defense.

10   *Bruen*, 142 S. Ct. at 2122.  For that reason, people who are not "ordinary, law-abiding citizens"

11   cannot claim these Second Amendment protections under the Supreme Court's decisions in *Bruen*

12   and *Heller*.  If states must not infringe the rights of "ordinary, law-abiding citizens" to possess

13   handguns in the home and in public for self-defense, but may forbid others from possessing the

14   same guns, the Second Amendment must allow states to distinguish "ordinary, law-abiding

15   citizens" from others somehow, including by requiring a license.

16          The Court majority confirmed as much in *Bruen* and made clear its opinion should not be

17   interpreted as upending most states' licensing systems.  *See* 142 S. Ct. at 2138 n.9.  The nearly

18   universal "shall-issue" systems in states other than New York and California required merely "a

19   background check" or a "firearms safety course," conditions the majority described as "designed

20   to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible

21   citizens.'"  *Id.*  The majority noted just one caveat: "any permitting scheme can be put toward

22   abusive ends," so it did not "rule out constitutional challenges to shall-issue regimes where, for

23   example, lengthy wait times in processing license applications or exorbitant fees deny ordinary

24   citizens their right to public carry." *Id.*

25          Justice Alito made a similar point in his concurring opinion.  "All that we decide in this

26   case is that the Second Amendment protects the right of law-abiding people to carry a gun outside

1   the home for self-defense and that the Sullivan Law,[23] which makes that virtually impossible for

2   most New Yorkers, is unconstitutional." *Id.* at 2159.  "Our holding decides nothing about who

3   may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.* at 2157.

4   "Nor have we disturbed anything that we said in *Heller* or *McDonald* about restrictions that may

5   be imposed on the possession or carrying of guns." *Id.* at 2157 (citation omitted).

6         Justice Kavanaugh concurred and wrote separately, joined by Chief Justice Roberts, to

7   underscore "the Court's decision does not prohibit states from imposing licensing requirements

8   for carrying a handgun for self-defense." *Id.* at 2161.  Rather, they clarified, the Court addressed

9   "only the unusual discretionary licensing regimes, known as 'may-issue' regimes, that are

10   employed by 6 States including New York." *Id.*  The states that impose "objective" requirements,

11   such as fingerprinting, a background check, mental health records check, and training, could

12   continue to impose those requirements. *Id.*  In fact, the petitioners seeking vindication of their

13   Second Amendment rights in *Bruen* had conceded at oral arguments that objective licensing

14   schemes were constitutional. *Id.* at 2162.  Thus in the future, the 43 states that used "objective

15   shall-issue licensing regimes" could "continue to do so." *Id.*  Similarly, the 6 states that had

16   imposed a "good cause" or "proper cause" requirement, like California, could also require

17   licenses if they employed only "objective licensing requirements like those used by the 43 shall-

18   issue States." *Id.*  Even if no other justice in the majority agreed with Justices Kavanaugh and

19   Roberts, the three dissenting justices believed New York's law was constitutional. *See id.* at 2164

20   (Breyer, J. dissenting).  For that reason, Justice Kavanaugh's concurrence controlled: states may

21   not demand "good" or "proper" cause, but may continue issuing and requiring licenses.  *See*

22   *Marks v. United States*, 430 U.S. 188, 193 (1977).

23         California no longer demands "good cause" or "proper cause" for handgun licenses, and

24   no evidence in the record shows the state—rather than local officials—charges exorbitant fees or

25   forces people to wait a long time for a license.  For these reasons, the Court's decisions in *Heller*

26   and *Bruen* do not prohibit California from requiring Baird and Gallardo to obtain a license before

---

[23] The "Sullivan Law" was the predecessor to the modern statute under review in *Bruen*. *See id.* at 2122–23 (majority opinion).

1    carrying a gun in public.  If anything, *Bruen* confirms a state like California may require a license

2    without violating the Second Amendment.

3         Other federal district courts have reached the same conclusion in adjudicating challenges

4    to state licensing and registration laws after *Bruen*.  *See, e.g.*, *Cupp v. Harris*, No. 16-00523, 2023

5    WL 5488420, at *5–6 & n.4 (E.D. Cal. Aug. 24, 2023), *reconsideration denied*, 2023 WL

6    6626118 (E.D. Cal. Oct. 11, 2023); *Frey v. Nigrelli*, ___ F. Supp. 3d ___, No. 21-05334, 2023

7    WL 2473375, at *12 (S.D.N.Y. Mar. 13, 2023).  But in some of these decisions, courts did not

8    rely solely on that conclusion.  In *Frey*, for example, the district court did not stop after

9    concluding that New York City could use an objective licensing system, but rather continued and

10   considered whether cities and other local governments could impose their own regulations.  *See*

11   2023 WL 2473375, at *13.  The public's and the parties' interests in completeness and certainty

12   persuade this court to engage in further analysis here.  That is, the court will consider directly

13   whether licensing systems in general are "consistent with this Nation's historical tradition of

14   firearm regulation."  *See Bruen*, 142 S. Ct. at 2126.

15        Upon consideration, the court concludes California has proven licensing systems fit

16   comfortably within the historical tradition of firearm regulation.  California points to a number of

17   historical statutes to illustrate how states and colonies made relevant distinctions in both the

18   founding and reconstruction eras.  Many of these statutes effectively codified presumptions, some

19   dubious, about which people were not "ordinary, law-abiding citizens."  For example, there was

20   long a presumption that only criminals carried some weapons, such as small pistols and large

21   knives.  *See, e.g.*, Cornell Decl. Ex. A at 14 (describing "concealed carry" as "a dastardly and

22   cowardly practice to most Americans in antebellum America"); Rivas Decl. at 4–6 ("A

23   characteristic feature of deadly weapons was their association with crime and needless bloodshed;

24   as a result, the people habitually carrying them were presumed to be ruffians, burglars, and

25   assassins—those ready to settle personal difficulties with blood rather than by reason and law.").

26   Some states and colonies therefore banned concealed weapons or concealed weapons carrying

27   outright, and many others placed restrictions on weapons associated with crimes and illegal

28   violence.  *See, e.g.*, Spitzer Decl. at 6–9; Cornell Decl. Ex. A at 15–16; *see also, e.g.*, Def.'s'

41

1   Updated Req. J. Not. No. 5 (1686 New Jersey enactment); *id.* No. 23 (1801 Tennessee

2   enactment).  Other historical laws assumed essentially that people were lawbreakers if they

3   carried weapons while moving about in large groups.  *See, e.g.*, Spitzer Decl. at 11–12; *see also,*

4   *e.g.*, Defs.' Updated Req. J. Not. No. 14 (1771 New Hampshire enactment); *id.* No. 11

5   (1750 Massachusetts enactment).  Historical surety statutes placed heavier restrictions on some

6   than others, by requiring those who posed a danger or threat to others based on a specific

7   complaint to post a bond before they carried weapons in public.  *See Bruen*, 142 S. Ct. at 2148.

8   Many states and local governments also used licensing systems or levied taxes on specific

9   weapons, some prohibitive, although licenses were much less common until later in the nineteenth

10  century.  *See* Spitzer Decl. at 17–26; Rivas Decl. at 31–35.

11         An account of American firearm restrictions inevitably runs into historical restrictions

12  based on racial prejudice and ugly biases.  As one scholar notes in an article California cites,

13  "[t]he landscape of American history is littered with facially racist, misogynistic, homophobic,

14  xenophobic, and other demeaning, marginalizing, and subordinating laws. . . . The history books

15  teem with tales of these heinous American legacies.  But legacies they are."  Jacob D. Charles, *On*

16  *Sordid Sources in Second Amendment Litigation*, Stan. L. Rev. Online, 30, 30 (2023) (footnote

17  omitted), *cited in* Def.'s Opp'n at 11 n.9.  "Within the Anglo-American legal tradition there have

18  been laws expressly disarming specific marginalized groups, like African-Americans, Native

19  Americans, and religious minorities."  *Id.* at 31 & n.3; *see also* Spitzer Decl. at 18, 31–32.  White

20  European settlers often prohibited non-whites from carrying weapons.  Spitzer Decl. at 18, 31–32.

21  Virginia, for example, prohibited any "negro or mulatto" from possessing or carrying guns and

22  other weapons and required Catholics to swear an oath of loyalty.  *See, e.g.*, Cornell Decl. at 10;

23  Charles (2023) at 31 & n.3; Def.'s Updated Req. J. Not. No. 19 (1792 Virginia enactment).

24         The court acknowledges these stains in the historical record and faces them head on.

25  Some government officials, including the state in this case, cite these discriminatory laws as

26  evidence that modern firearms regulations fit a historical tradition of making distinctions based on

27  status.  *See* Def.'s Mem. at 15 & n.9; State Defs.' Mem. at 21 & n.4; *Antonyuk v. Hochul*, No. 22-

28  986 (N.D.N.Y. Oct. 13, 2022), ECF No. 48; United States's Suppl. Opp'n Mot. Dismiss at 6,

1  *United States v. Guthery*, No. 22-173 (E.D. Cal. Mar. 6, 2023), ECF No. 46; *cf.*, *Antonyuk v.*

2  *Chiumento*, ___ F.4th ___, No. 22-2908, 2023 WL 8518003, at *33 n.46 (2d Cir. Dec. 8, 2023)

3  ("As the district court pointed out, many 18th-century restrictions aimed at keeping firearms away

4  from people perceived as dangerous were based on readily ascertainable—but overbroad and

5  discriminatory—racial, religious, or political categories.  Judgments based on 'objective'

6  characteristics are not inherently more fair than individualized determinations.").  This court

7  cannot accept that approach, at least not without significant qualifications.  It simply cannot be

8  the racist and biased laws of the past justify a modern law if similarly discriminatory.  *See United*

9  *States v. Guthery*, No. 22-00173, 2023 WL 2696824, at *8 (E.D. Cal. Mar. 29, 2023).

10      Here, the California Attorney General is not defending a facially discriminatory law, and

11  he emphasizes his disagreement with the biased laws of the past, offering them "only as

12  additional examples" of restrictions in the historical tradition.  Def.'s Mem. at 15 n.9.  Despite its

13  reservations, this court is persuaded that in the circumstances of this case, at least, it should take

14  account of the history of discriminatory regulations rather than completely ignore it.

15      It is impossible to extract ourselves completely from the biases of our past.  Facially

16  discriminatory laws are relatively easy to spot, but racism and bias likely infected many other

17  laws as well, and the implicitly discriminatory laws might be very difficult to separate from the

18  others.  Facially neutral laws may have been passed with a racist or discriminatory motive, neutral

19  laws enforced selectively in practice, and laws perhaps should have been passed but were not.

20  *See, e.g.*, Franita Tolson, *Parchment Rights*, 135 Harv. L. Rev. Forum 525 (2022) (describing

21  history of Colfax Massacre[24] and its legacy); Robert J. Cottrol & Raymond T. Diamond, *The*

22  *Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 354–55

23  (1991) (describing racial history of facially neutral gun control statutes).  "If *Bruen* forces

24  reliance on regulations passed in the days when the law protected race-based chattel slavery,

---

[24] The Colfax Massacre took place during Reconstruction, in April 1873, when a well-armed white mob slaughtered "between 50 and 150" members of a poorly-armed black militia guarding the Grant Parish Courthouse in Colfax, Louisiana, from which Republicans had been attempting to assert control over the parish.  *Id.*

1    some of those regulations will surely be infected with America's original sin."  Charles (2023),

2    *supra*, at 43.

3        Rather than relying on history selectively or through a sterilized modern lens, the Supreme

4    Court has instructed lower courts to ascertain and follow the "original meaning of the

5    constitutional text." *Bruen*, 142 S. Ct. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d

6    1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).  It wrote in *Heller*, for example,

7    that courts are "guided by the principle that '[t]he Constitution was written to be understood by

8    the voters.'"  554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).  As

9    some Second Amendment scholars have said, "under a test that demands sole reliance on history

10   and tradition, 'it is hard to justify ignoring these unseemly laws, which after all help demonstrate

11   the principles the Framers thought relevant.'"  Charles (2023), *supra*, at 38 (quoting Joseph

12   Blocher & Caitlan Carberry, "Historical Gun Laws Targeting 'Dangerous' Groups and Outsiders,

13   in Blocher (2023), *supra*.[25]

14        In some cases, this one included, a court cannot understand what the Second Amendment

15   permitted and forbade at the time it was adopted without considering the racist or discriminatory

16   laws commonly accepted at the time.  *See Kanter v. Barr*, 919 F.3d 437, 457–58 & n.7 (7th Cir.

17   2019) (Barrett, J., dissenting) (although facially discriminatory laws are almost certainly

18   unconstitutional today, not to mention repugnant, they can demonstrate what people in the past

19   thought their governments could do without violating the Second Amendment).  And as reviewed

20   above, historical assessment must unearth the context and the circumstances of a historical text's

21   creation to properly understand it.  *See, e.g.*, Kramer (2003), *supra*, at 392; Flaherty (1995),

22   *supra*, at 550; Powell (1987), *supra*, at 674–75.  Cutting discriminatory laws from the picture

23   would make that picture incomplete or misleading.  Excluding racist and discriminatory laws

24   from the record might even perpetuate inequality today.  *See* Charles (2023) at 38–39 ("It would

25   be a sad irony if the fact that our forebears were so explicitly racist in regulating guns meant that

---

[25] Manuscript available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696 (last visited Dec. 28, 2023).

1  contemporary Americans, including Black Americans who favor stricter gun regulation, were

2  prevented from regulating guns today for their own safety.").

3      For these reasons it is appropriate to remember in this case that the American tradition of

4  firearms regulations included discriminatory restrictions based on class, religion, and race.  States

5  and colonies passed laws that prevented people from keeping and bearing arms based at times on

6  false and repugnant but widely accepted categorical assumptions.  But the acceptance of these

7  laws further demonstrates the Second Amendment did not prevent American governments from

8  placing sometimes heavy and often categorical burdens on the right to keep and bear arms.

9      Finally, the state has cited many licensing requirements passed by state and local

10  governments, both inside and outside California, soon after the Fourteenth Amendment was

11  adopted.  *See, e.g.*, Cal. Mem. at 13–17 (citing Spitzer Decl. at 10, 17–18; Cornell Decl. Ex. A at

12  20–21).  Other courts and historians have relied on similar evidence.  *See, e.g.*, *Antonyuk*,

13  2023 WL 8518003, at *26–27 & nn.27–33 (surveying this evidence and citing Brief of Amicus

14  Curiae Patrick J. Charles in Support of Neither Party, *N.Y. State Rifle & Pistol Ass'n v. Bruen*,

15  No. 20-843 (2022), among other sources).  No evidence in this record shows these licensing laws

16  were successfully challenged on constitutional grounds, if they were even challenged in the first

17  place.  *See id.* at *28 ("Strikingly, moreover, these laws and ordinances did not merely exist—

18  they appear to have existed without constitutional qualms or challenges.").  This historical

19  evidence strongly confirms the evidence the state has cited from the eighteen century and earlier

20  in the nineteenth century.  It shows licensing requirements are a "[l]ong settled and established

21  practice" with "great weight in a proper interpretation" of the Second Amendment.  *Chiafalo*,

22  140 S. Ct. at 2326 (quoting *The Pocket Veto Case*, 179 U.S. 655, 689 (1929)).  Firearm licenses

23  are part of "our whole experience as a Nation."  *Id.* (quoting *N.L.R.B. v. Noel Canning*, 573 U.S.

24  513, 557 (2014)).

25      Viewed in perspective, then, the American tradition of firearms regulation is a patchwork

26  history of bans, presumptions, taxes, licenses, and bonds that governments have used to keep

27  weapons away from people who were not "ordinary, law-abiding citizens."  Rather than relying

28  on such a patchwork, California requires everyone to obtain a license before they carry handguns

1   in public, and it relies on specific, objective criteria to identify those who are not "ordinary, law-

2   abiding citizens."  The state's licensing system also fits comfortably within the history of

3   licensing regimes adopted after the Fourteenth Amendment took effect.  Baird and Gallardo

4   cannot prevail in their claim that California violates the Second Amendment simply by requiring

5   people to obtain a license.

6          This conclusion withstands Baird and Gallardo's argument that California has

7   criminalized a natural right.  *See, e.g.*, Pls.' Mem. at 2–3; Pls.' Reply at 1–2, 4–5.  It has not.

8   California imposes criminal penalties only on those who carry guns in public without a license,

9   and only then against people who cannot rely on a statutory exception, such as the exception for

10  reasonable responses to imminent threats to safety and property.  Nor can Baird and Gallardo

11  obtain summary judgment by denying that their lawsuit challenges the licensing system and

12  refocusing on the criminal code, as they do in their reply.  *See* Pls.' Reply at 8.  Their pleadings

13  plainly contend licenses themselves are unconstitutional.  *See, e.g.*, Second Am. Compl. ¶ 8 ("No

14  permission from the government, licensing, registration, or any other action was required (or even

15  imagined) for people to exercise the God-bestowed, preexisting right that was later codified in the

16  Second Amendment."); Pls.' Mem. at 3 ("[T]he State failed to identify an historical analogue for

17  requiring ordinary people to apply for and obtain a license to exercise the right to 'bear Arms.'");

18  *id.* at 20 ("Licensing is also repugnant to the plain text of the Second Amendment . . . ."); Pls.'

19  Reply at 8 ("Licensing a 'preexisting and guaranteed right' is an oxymoron.").  Even if the court

20  were to consider plaintiff's eleventh-hour argument, American governments have used criminal

21  laws to enforce their firearms restrictions for hundreds of years.  *See* Def.'s Opp'n at 10–15;

22  Spitzer Decl. at 6–17; Rivas Decl. at 17–30.  The New York licensing system in *Bruen* also

23  imposed criminal penalties, and the Supreme Court did not doubt that New York could continue

24  to enforce it, provided the state renounced its "proper cause" requirement.  *See, e.g.*, 142 S. Ct.

25  2122 (summarizing law); *see also id.* at 2162 (Kavanaugh, J., concurring) ("[T]he 6 States

26  including New York potentially affected by today's decision may continue to require licenses for

27  carrying handguns for self-defense so long as those States employ objective licensing

28  requirements like those used by the 43 shall-issue States.").

46

1    Nor are Baird and Gallardo correct in their argument that California's licensing system

2    continues to be enforced as an unconstitutionally discretionary "may-issue" regime.  The

3    defendant, the California Attorney General, has made clear the state will no longer require "good

4    cause," as noted above.  And as the Supreme Court noted in *Bruen*, a state law is not

5    unconstitutionally discretionary just because it uses some specific forbidden words, but rather

6    because its effect is to restrict constitutional rights.  *See id.* at 2123 n.1 (citing Connecticut,

7    Delaware and Rhode Island laws with "discretionary criteria" that however "appear to operate

8    like [the laws in] 'shall issue' jurisdictions"); *id.* at 2123 (explaining New York courts'

9    interpretation of the "proper cause" requirement at issue, noting the absence of a statutory

10   definition).  California may require people to obtain licenses before they carry firearms openly in

11   public without violating the Second Amendment.

12       **B.    California's open-carry licensing system is consistent with the historical**
13             **tradition reflected in the record before the court.**

14       The next question is whether California's licensing system violates the Second

15   Amendment by preventing people, including Baird and Gallardo, from carrying handguns openly

16   in about half of California's counties.  Baird and Gallardo argue California must defend its laws

17   specifically as restrictions on openly carrying firearms in public.  *See supra* notes 3–4.  That is,

18   they contend the state cannot rely on historical restrictions on carrying concealed weapons, but

19   must instead cite only restrictions on carrying weapons openly.  *See, e.g.*, Pls.' Mem. at 20.

20   California argues the right in question is not the right to carry firearms in some specific way, such

21   as openly or concealed, but rather the right to carry firearms in public for self-defense in general.

22   *See, e.g.*, Def.'s Mem. at 6 ("[T]he term 'bear' in 'to keep and bear arms' requires some form of

23   public carry but does not require open carry."); Def.'s Opp'n at 5 ("[N]ot all forms of public carry

24   are required. . . . [S]tates can restrict some forms of public carry if it allows others." (emphasis

25   omitted)).  These competing positions illustrate how the scope of a plaintiff's rights can be pivotal

26   in Second Amendment cases.  In general, plaintiffs who assert rights under the Second

27   Amendment will have an incentive to define the challenged state laws and their own rights

28   narrowly and in turn to demand similarly specific evidence from the government.  States will

47

1  have an incentive to define the plaintiffs' rights and its own laws broadly and to offer broader

2  evidence.

3  Defining a plaintiff's Second Amendment rights may be difficult in some cases, but in this

4  one, the Court's opinion in *Bruen* makes the decision relatively simple.  The plaintiffs in *Bruen*

5  focused their complaint on laws that prevented them from carrying handguns for self-defense

6  outside their homes and businesses.  142 S. Ct. at 2125; *see also* 354 F. Supp. 3d 143, 146

7  (N.D.N.Y. 2018) (citing *Bruen* complaint).  The Court accepted that framing, but considered the

8  statute as a whole.  *See* 142 S. Ct. at 2122–24.  People could carry a concealed pistol or revolver

9  for self-defense outside their homes and businesses if they demonstrated a "special need for self-

10  protection distinguishable from that of the general community." *Id.* at 2123 (citation omitted).

11  The Supreme Court confirmed the plaintiffs had a right to carry handguns publicly for self-

12  defense without showing "proper cause," as the state did not show that requirement was

13  consistent with the historical tradition of firearm regulation.  *Id.* at 2156.

14  The Court in *Bruen* did not decide, however, whether the plaintiffs had a right to carry

15  handguns openly or concealed.  Nor did the Court consider what other restrictions the state might

16  lawfully impose on that right, such as banning handguns from specific sensitive places.  *See*

17  142 S. Ct. at 2133.  But as California points out, Cal. Opp'n at 5, the Court construed the right in

18  question broadly as "the right to carry handguns publicly for their self-defense," and the Court

19  suggested strongly that states could adopt regulations very much like California's without

20  violating the Second Amendment:

21  The historical evidence from antebellum America does demonstrate
22  that the *manner* of public carry was subject to reasonable regulation.
23  Under the common law, individuals could not carry deadly weapons
24  in a manner likely to terrorize others. Similarly, although surety
25  statutes did not directly restrict public carry, they did provide
26  financial incentives for responsible arms carrying. Finally, States
27  could lawfully eliminate one kind of public carry—concealed
28  carry—so long as they left open the option to carry openly.

29  142 S. Ct. at 2150 (emphasis in original).  In sum, the Supreme Court's decision in *Bruen* shows

30  lower courts must accept a plaintiff's claims as they are framed but should consider state laws as

1  a whole, along with their practical effects.  For cases about the right to carry handguns in public,

2  like this one, it is appropriate to consider whether a state's law is a "reasonable regulation" on

3  "the manner of public carry" in line with tradition and history.  *Id.* (emphasis omitted).

4        Additionally, Baird and Gallardo repeatedly refer to the state's laws as a "ban."  *See, e.g.*,

5  Pls.' Mem. at 6 (header for section II).  California does not ban the carrying of firearms for self-

6  defense in public.  People can carry handguns in public throughout California if they obtain a

7  license.  Local law enforcement agencies may issue licenses for concealed carry in any county

8  based on objective criteria.  Local authorities also may issue licenses to carry guns openly to

9  those who live and work in counties with populations below 200,000.  Additionally, people may

10  carry firearms without a license for self-defense in a few limited circumstances.  The question,

11  then, is whether California may require people who carry handguns in public to conceal those

12  handguns if they live in, work in, or enter a county with a population greater than 200,000.  That

13  limit must fit the historical tradition of firearm regulations if it is to stand.  The court considers

14  first the backdrop of English and early colonial history, then regulations of colonial and

15  antebellum America, and finally post-Civil War laws before finally evaluating whether that

16  history shows California's laws are consistent with the historical tradition of firearm regulation.

17        **1.    The English history of firearms regulations is a relevant backdrop but**
18        **does not itself show whether the state's regulation is constitutional.**

19        As the state argues and the parties' experts discuss, the earliest arms restrictions that might

20  have some bearing on the American tradition were established hundreds of years ago, long before

21  European colonists first came to North America.  *See* Def.'s Mem. at 11–12; Spitzer Decl. at 11–

22  12 (citing colonial laws that "mirrored" English statutes); Cornell Decl. Ex. A at 2–3 (discussing

23  English common law); *see also, e.g.*, *Bruen*, 142 S. Ct. at 2139–40 (reviewing English statutes

24  and history); Cornell (2017), *supra* at 18–19 (same); Charles (2012), *supra*, at 1801–03 (same);

25  Blocher (2013), *supra*, at 112 (same).  The most commonly cited of these laws, the Statute of

26  Northampton, was passed in 1328.  *Bruen*, 142 S. Ct. at 2139; Cornell (2017), *supra* at 18.

27  "Precisely what the Statute of Northampton prohibited is a matter of debate."  Blocher (2013),

28  *supra*, at 112.  We know comparatively little about the daily lives of English kings in the 1300s

1   and even less about the everyday people who lived under their laws.  It is difficult to say what the

2   Statute of Northampton might mean for this country's historical traditions.  The weapons and

3   armor people used in those times bore little resemblance to the handguns Baird and Gallardo

4   would like to carry.  *See, e.g.*, *Bruen*, 142 S. Ct. at 2140.  "Although gunpowder-fired weapons

5   were known in England as early as the late thirteenth century, they were used almost entirely in

6   war." Schwoerer (2019), *supra*, at 140.  Over the centuries since the 1300s, the Statute of

7   Northampton has been paraphrased and adapted to many circumstances.  *See, e.g.*, Cornell

8   (2017), *supra*, at 18–20.  Generalized comparisons are unhelpful.

9        The Supreme Court has said, however, the history of the English Bill of Rights, passed in

10  the late 1600s, and the years leading up to its codification are "particularly instructive."  *Bruen*,

11  142 S. Ct. at 2140 (citing *Heller*, 554 U.S. at 592).  It has described Article VII of that Bill of

12  Rights as "the predecessor to our Second Amendment."  *Heller*, 554 U.S. at 593.  California thus

13  cites and discusses Article VII in its motion.  *See* Def.'s Mem. at 11–12.  But the history of

14  Article VII is unenlightening in this case.  A few details about the history and context of Article

15  VII help explain why.

16        The members of the body that debated and proposed the Declaration of Rights, known as

17  the Convention, met in England in early 1689.  Schwoerer (2019), *supra* at 142.  "Their target

18  was to limit the power of the crown."  *Id.*  They listed twenty-three grievances.  *Id.*  Three were

19  related to the military.  The first declared "the Acts concerning the Militia are grievous to the

20  Subject."  *Id.*  That is, the committee members decried laws that had given King Charles II and

21  King James II power over the militia, which those monarchs had used to seize weapons and

22  harass their enemies.  *Id.*  The second grievance was against standing armies.  *Id.*  The

23  Convention declared standing armies "against Law" in times of peace.  *Id.*  Third, the Convention

24  declared "it is necessary for the public Safety that the Subjects, which are Protestants, should

25  provide and keep arms for their common Defence; and the arms which have been seized, and

26  taken from them be restored."  *Id.*  This was "[a]lmost certainly" a response to James II's

27  treatment of some Protestant members of parliament.  *Id.*

1      This third grievance eventually became Article VII of the English Bill of Rights.  *See id.*

2  at 143–44.  In its final version, it provided "Protestant subjects may have Armes for their defence

3  Suitable to their Condition and as allowed by law."  *Id.* at 144.  In context, the limitation to

4  Protestants is unsurprising.  "A national fear and loathing of Roman Catholicism and of persons

5  who practiced it were the major reasons for the revolution," i.e., the revolution of 1688–1689 that

6  led to the Convention and King James II's flight to France.  *Id.* at 143.  The reference to

7  "Condition" also is comprehensible, given "the hierarchical nature of early modern English

8  society and its attendant social and economic prejudices."  *Id.* at 144.  The limiting phrase "as

9  allowed by law" emphasized that Parliament, not the crown, was sovereign and prohibited the

10  crown from disarming subjects in the future.  *See id.*  The omission of any reference to the

11  "public Safety" was "almost certainly" a concession to Prince William, because its inclusion

12  "implied he was unable to protect the nation."  *Id.* at 143.  The word "Armes" likely referred to

13  "war equipment."  *Id.* (quoting Gary Wills, *To Keep and Bear Arms*, 42 N.Y. Review of Books

14  64–65 (Sept. 21, 1995)).  Finally, it is uncertain why the final version of Article VII used the

15  phrase "for their defence" rather than "for their common Defense."  Some historians believe the

16  final version, "for their defence," referred specifically to "the use of force against a tyrannical

17  government and against 'outside forces.'"  *Id.* (quoting Patrick J. Charles, *Arms for Their*

18  *Defence"? An Historical, Legal, and Textual Analysis of the English Right to Have Arms and*

19  *Whether the Second Amendment Should be Incorporated in* McDonald v. City of Chicago,

20  57 Cleveland State L. Rev. 351, 390 (2009)).

21      No party in this case has established a strong connection between the English Bill of

22  Rights and the Second Amendment.  Although in this country during the founding era, the Anti-

23  Federalists protested the Federalists' proposal to set up a standing army just as the members of

24  the 1689 Convention decried the king's standing army, records of the American debates of 1787

25  and 1788 include no references to Article VII.  *Id.* at 146.  Neither the Federalist Papers nor the

26  Anti-Federalist Papers refer to Article VII, although Federalist No. 26 does invoke Article V,

27  which prohibits a standing army in peacetime.  *Id.* at 147.  Madison did make a scant notation

28  referencing Article VII in papers related to his draft Bill of Rights in 1789, but it is unclear from

1   those notes whether he thought of Article VII as a model, and the Senate debates about the

2   proposed Bill of Rights "were kept secret." *Id.* at 149.

3          People who read the Second Amendment in the 1790s might very well have understood it

4   as an adaptation of Article VII of the English Bill of Rights.  Baird and Gallardo invite that

5   comparison implicitly.  *See* Pls.' Mem. at 21–22.  From the circumstances of its creation, Article

6   VII seems to have been a Protestant upper class's effort to preserve its power against the crown

7   and the minority adherents of a mostly foreign faith.  Did the American colonists see themselves

8   as heirs to these protections, even if they did not experience equivalent tension rooted in religion?

9   Would they also have understood that inheritance as more than just a right to resist tyrants, but

10  also a right to carry weapons in public?  And if so, would they have understood also that their

11  elected representatives could place limits on when and where they could bear arms, or not?  And

12  are any of those historically acceptable limits comparable to California's firearms licenses in

13  purpose and effect?  On balance, this court cannot find the English history and its legacy offer

14  helpful guidance here.

15         But as the state argues, *see* Def.'s Mem. at 11–12, and as Cornell explains in his

16  declaration, there are other "continuities between English law and the common law in America,"

17  Cornell Decl. Ex. A at 3.  Each of the new American states "adopted multiple aspects of the

18  common law, focusing primarily on those features of English law that had been in effect in the

19  English colonies for generations." *Id.*  One of these aspects was "the concept of peace." *Id.*

20  "The right of the people to pass laws to promote public health and safety is one of the most

21  fundamental rights in the pantheon of American rights." *Id.* at 4.  "Although modern lawyers and

22  jurists are accustomed to thinking of this concept under the rubric of state police power, the

23  Founding generation viewed it as a right, not a power," that is, "the right of the people to regulate

24  their own internal police." *Id.* at 4–5.  Cornell cites, for example, the contrast between "wild and

25  savage liberty" in nature with a "civil society" governed by "laws and regulations that promoted

26  *ordered* liberty." *Id.* at 7 (emphasis original; quotation marks omitted).

27         In Cornell's opinion, people saw "the right to keep and bear arms" and "the right of the

28  people to regulate arms" as complementary. *Id.*  He offers a contrast between the First and

                                          52

1   Second Amendments to illustrate his point.  The First Amendment bars the government from

2   "abridging" several rights it lists, whereas the Second Amendment uses the word "infringed."  At

3   the time the Bill of Rights was adopted, the word "abridged" was understood as a synonym for

4   "reduce" in this context.  *Id.*  The word "infringe," by contrast, meant something more like

5   "destroy."  *Id.*; *see also id.* at 8 (collecting contemporary dictionary definitions).  Cornell believes

6   the contrasting choices in vocabulary were meaningful: the government could not even reduce

7   rights protected by the First Amendment, whereas it was forbidden by the Second Amendment

8   only from destroying the right to keep and bear arms, not from regulating.  *See id.* at 7.  To that

9   end, "early American governments enacted laws to preserve the rights of law-abiding citizens to

10  keep and bear arms and promote the equally vital goals of promoting public safety."  *Id.* at 10.

11  Individual states, for example, "imposed loyalty oaths, disarming those who refused to take such

12  oaths."  *Id.* at 10.  But "[n]o state imposed a similar oath as pre-requisite to the exercise of First

13  Amendment-type liberties."  *Id.*  In Cornell's view, "some forms of prior restraint, impermissible

14  in the case of expressive freedoms protected by the First Amendment or comparable state

15  provisions, were understood by the Founding generation to be perfectly consistent with the

16  constitutional right to keep and bear arms."  *Id.*

17         Clayton Cramer disagrees with this interpretation of the First and Second Amendments

18  and their history, but he sets up a straw man and attacks an extreme and nonsensical version of

19  the argument Cornell actually advances.  *See, e.g.*, Cramer Decl. at 33–36 (suggesting Cornell's

20  position would permit legislatures to criminalize any conduct at whim, such as anti-miscegenation

21  laws and the internment of Japanese Americans).  His criticisms also set up a false dichotomy

22  between the total adoption of all English common law or none, *see, e.g.*, *id.* at 32–34, and often

23  unhelpfully target Cornell's character or intelligence rather than his conclusions and arguments,

24  *see, e.g.*, *id.* at 58 ("Cornell fails to understand what we were supposed to have learned in high

25  school Civics classes . . . .").

26         It bears noting that Cornell is not alone in his assessment of the historical context.  As one

27  prominent scholar of the American revolution summarized many years ago, "it is nearly

28  inconceivable that eighteenth-century notions of the police power of state and local governments

1   would have precluded their regulation in the name of some vague threat of tyranny."  Rakove

2   (2000), *supra*, at 110.  American colonial "traditions of governance permitted legislatures and

3   institutions of local government to act vigorously in the pursuit of public health and safety."  *Id.*

4       In sum, English history itself offers relatively little direct guidance in this case.  But it

5   does offer a relevant backdrop: members of the founder generation who adopted the Second

6   Amendment in the late eighteenth century probably would not have understood it as preventing

7   them from exercising what they saw as an inherited common law right to organize and regulate

8   their own health and safety.

9             **2.**    **Colonial and early state laws severely restricted or prohibited specific**
10                   **types and means of public firearms carrying.**

11      Colonial and state laws from before the Civil War are a more fruitful source of evidence

12  about the American tradition than the English history and common law.  Without some context,

13  however, these laws can be misread.  When many people conjure early America, they may think

14  of hardscrabble lives eked out on the frontier, unspoiled wildernesses, armed gangs of outlaws,

15  and conflicts between colonists and Native Americans.  *See, e.g.*, Cornell Decl. Ex. A at 11, 20 &

16  nn.43–44; Blocher (2013) at 84, 117–18.  The reality is more complicated, as were the people's

17  conceptions of firearms at the time.

18      Americans in the eighteenth and early nineteenth centuries used a variety of weapons for a

19  variety of purposes.  Hunting knives, rifles, muskets and shotguns were the tools of the trade in

20  rural and remote or agricultural places.  People used them to drive away pests, to hunt, and to

21  protect themselves and their animals.  Rivas Decl. at 5.  These functional weapons were

22  commonly also used for militia service, and people carried them when they were called to join a

23  "posse."  *See id.*  Most of these weapons were bulky and could not easily be concealed, so people

24  carried them openly, and for the most part, they had different and nobler connotations than

25  smaller weapons, like knives and pistols, which were better suited to the purposes of ruffians,

26  burglars, and assassins.  *See id.* at 4–6.  As noted, carrying concealed weapons in public was "a

27  dastardly and cowardly practice to most Americans in antebellum America."  Cornell Decl. Ex. A

28  at 14.  People used different words to describe these weapons, as well.  The larger weapons that

1   served as the tools of rural life and the militia usually were called "arms." Rivas Decl. at 4.

2   Smaller, concealable weapons were often called "deadly" weapons. *Id.* at 5. As both Rivas and

3   Cramer explain, that general rule does not hold uniformly, *see id.* at 5 n.1; Cramer Decl. at 65–73,

4   but the trend is clear and accurately describes the historical context, *see* Rivas Surrebuttal at 4–7.

5         Gun violence and gun deaths of the nature we contend with in the United States today

6   were not a widespread social problem in the American colonies or in the United States' early

7   history. Cornell Decl. Ex. A at 11. White European settlers in North America in the late 1700s

8   contended with relatively low gun violence. *Id.* There are many reasons. Rivas Decl. at 11–12;

9   Cornell Decl. Ex. A at 11–12; Randolph Roth, "Why Guns Are and Are Not the Problem: The

10  Relationship between Guns and Homicide in American History," in *A Right to Bear Arms?*

11  (Jennifer Tucker, et al. eds. 2019). Many people lived in largely homogenous rural places, and

12  many shared religious traditions and social expectations with their neighbors. Cornell Decl. Ex.

13  A at 11–12. Guns were not nearly as effective in those days. *Id.* at 12. They were almost always

14  loaded one shot at a time through the muzzle in a time-consuming process. *Id.* at 12–13; Rivas

15  Decl. at 9–10. The gunpowder the guns required was corrosive and attracted moisture. Cornell

16  Decl. Ex. A at 13. This meant guns were commonly stored unloaded. *Id.* More than 90 percent

17  of firearms also were long guns, not handguns, and could not be easily concealed. *Id.* (citing

18  Randolph Roth, Transcript: Why is the United States the Most Homicidal in the Affluent World,

19  Nat'l Inst. Justice (Dec. 1, 2013)).[26] In all, the weapons people normally carried openly in public

20  were not useful for self-defense, or for committing crimes, for that matter. *See, e.g.*, Cornell

21  Decl. Ex. A at 13–14.

22        Smaller guns were available, but like long guns, they usually were loaded through the

23  muzzle one shot at a time, and it took more than fifteen seconds to reload them. Rivas Decl. at 9,

24  10. Some also were quite large, a foot long or more, and were intended for use on a saddle. *Id.* at

25  9. Others were smaller and could be carried on a belt, in a coat or in a case. *Id.* Travelers

26  commonly carried mid-sized pistols for self-defense in this way. *Id.* Even smaller "pocket

27  pistols" also were available. *Id.* They fit in the pockets of the clothes people ordinarily wore, and

---

[26] https://nij.ojp.gov/media/video/24061#transcript--0 (last visited Dec. 28, 2023).

could be extremely lethal at close range.  *Id.*  The skill necessary to load and fire these weapons, combined with their size, made them an unlikely choice for unplanned crimes of passion, and as they were commonly stored unloaded, they were less likely to discharge accidentally at home as well.  *See* Cornell Decl. Ex. A at 13–14.  Rather than gun violence, the "pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military style weapons." *Id.* at 12.  Those kinds of weapons, useful for militia service, were relatively expensive and less so for domestic tasks than the alternatives, such as fowling pieces and lighter hunting muskets.  *Id.*

Moreover, knives and other edged weapons, not guns, were the most dangerous weapons of the eighteenth and early nineteenth centuries.  Rivas Decl. at 7; *see also, e.g.*, Rakove (2000), *supra*, at 110.  One very common large knife was the "bowie" knife, a weapon with a long, curved blade that was double-edged near the tip.  Rivas Decl. at 7.  It was named for nineteenth century Texas revolutionary Jim Bowie, who used a knife of that type in a famous melee, and who later died at the Alamo.  *Id.*  A bowie knife was easily concealed in a pocket or waistband.  *Id.*  Other common knives included dirks, which had a straight blade; daggers, which usually had double-edged blades; navajas, with large folding blades; and "Arkansas toothpicks," sharply tapered double-edged knives the size of a bowie knife.  *Id.*  According to one mid-nineteenth century newspaper report, large knives were ubiquitous in southern states.  *Id.* at 8 & n.10 (citing "The Bowie-Knife In the South," *San Francisco Evening Bulletin* (San Francisco, California), October 18, 1861).

American weapons restrictions passed in the seventeenth, eighteen, and early nineteenth centuries reflect these realities.  Many governments banned or severely curtailed the possession and carrying of large knives and other "dangerous" or "concealed" weapons that were neither useful as the tools of daily life nor commonly employed in militia service; as noted, concealed weapons were associated with crime and violence.  *See id.* at 8 & nn.11–12; Spitzer Decl. at 6–9; see also, e.g., Def.'s Updated Req. J. Not. No. 35 (1820 Indiana enactment).  In the late 1600s, for example, New Jersey made it illegal to carry several specific concealable weapons, such as pocket pistols, daggers, dirks, and other "unlawful" or "unusual" weapons.  Def.'s Updated Req.

1   J. Not. No. 5 (1686 New Jersey enactment).  Governments in several states passed similar laws in

2   the early 1800s, including Indiana, Maine, Tennessee, Massachusetts, and Mississippi.  *See, e.g.*,

3   *id.* Nos. 23, 35, 37, 38, 41, 45, 53, 54, 59.  Although these restrictions varied in their details, they

4   often mentioned specific "dangerous weapons," and many made exceptions for travelers or for

5   those who reasonably feared an assault.  *See, e.g.*, *id.* Nos. 35, 37, 41.  At least one state allowed

6   people to carry these weapons if they posted a surety.  *Id.* No. 23 (1801 Tennessee enactment).

7       Other colonial and state laws prohibited people from carrying any weapon—"concealed"

8   and "dangerous" or not—in a way that would cause fear or terror or that posed an unusual risk of

9   violence.  Brandishing weapons often was illegal, for example, but sometimes simply displaying

10  a particular weapon was prohibited as well.  *See* Spitzer Decl. at 6, 11–17; Rivas Decl. at 25–29.

11  Other restrictions focused on specific places, such as fairs and markets.  Massachusetts, North

12  Carolina, New York, Virginia, New Jersey, and New Hampshire passed laws in this category as

13  early as the 1600s and 1700s.  Spitzer Decl. at 11–12 & nn.22, 24, 25, 29; Def.'s Updated Req. J.

14  Not. Nos. 7, 11, 14, 15.  Tennessee passed a similar law in 1801, Maine in 1821, and Mississippi

15  in 1837.  Spitzer Decl. at 12–13 & nn.31–32.   Some of these laws were patterned on the Statute

16  of Northampton and the English common law.  *Id.* at 11–12; Cornell (2017), *supra*, at 27–32.  A

17  1694 Massachusetts law, for example, prohibited riding or going "armed Offensively" before

18  authorities.  Def.'s Updated Req. J. Not. No. 7.  States and colonies also singled out people for

19  stricter regulations based on race, religion and other characteristics, now understood as

20  discriminatory as discussed above.  Spitzer Decl. at 18, 31–32.

21      In addition to laws that regulated the possession and carrying of weapons, colonial and

22  state governments passed laws limiting when and how guns could be discharged, especially in

23  cities and towns.  *Id.* at 18, 26–28.  In the 1700s, Philadelphia began imposing penalties on people

24  who discharged guns without a license, as did the District of Southwark, and Pennsylvania itself.

25  *See id.* at 27 & nn.89–93.  Cities and towns in South Carolina, New Hampshire, New York, Ohio,

26  and other states followed that lead in the early 1800s.  *Id.* at 27–28 & nn.95–98.  Gunpowder

27  storage licensing restrictions also were common.  *Id.* at 29–30.  Guns of the time were useless

28  without gunpowder, so in effect, these restrictions regulated the use of the guns themselves.  And

1    more broadly, many cities and towns enacted restrictions that placed tighter controls on arms

2    carrying than in more rural places.  *See, e.g.*, Blocher (2017), *supra*, at 112–21.

3        States similarly made exceptions to their firearms laws for people traveling outside their

4    more populated areas.  As noted, travelers commonly carried mid-sized and larger pistols outside

5    urban areas.  Rivas Decl. at 9.  "Public carry laws often featured modified rules for long-distance

6    travelers venturing beyond the safety of their local communities."  *Id.* at 38.  "When exposed to

7    the dangers of the highway bushwhacker or the prowling coyote that went along with nineteenth-

8    century horseback travel, laws generally allowed the carrying of weapons—including those

9    statutorily restricted as deadly weapons."  *Id.*  The reasoning behind these exceptions seems to

10   have been that common presumptions about intentions in urban areas might not be accurate in

11   remote and unpopulated areas.  *See id.* at 40.

12       Views on firearms and permissible regulations also differed regionally, from north to

13   south.  "In the slave South a more expansive view of open carry developed, while prohibitions on

14   concealed carry . . . posed no constitutional problems."  Cornell Decl. Ex. A at 14; *see also*

15   Cornell (2017), *supra*, at 34–36.  For example, in *State v. Reid*, the Alabama Supreme Court

16   concluded the state's prohibition on concealed weapons was a legitimate exercise of its police

17   power.  *See* Cornell Decl. Ex. A at 16; *State v. Reid*, 1 Ala. 612, 621 (1840).  People with a

18   legitimate reason to carry a firearm, such as an emergency, would not conceal their weapon.  *See*

19   1 Ala. at 621.  Courts in Tennessee and Arkansas likewise drew a line between concealed

20   weapons and protected arms.  *See* Cornell (2017), *supra*, at 36–37 (citing *Aymette v. State*,

21   21 Tenn. 154 (1840); *State v. Buzzard*, 4 Ark. 18 (1842)).  "Firearms with little or no value to the

22   preservation of the militia," such as pocket pistols, "were treated as ordinary property and subject

23   to the full range of the state's police powers, including in the case of some especially dangerous

24   weapons, prohibition."  *Id.* at 36.

25       Northern states favored a narrower rule that originally emerged in Massachusetts.

26   Cornell Decl. Ex. A at 14–15; Cornell (2017), *supra*, at 39.  As noted above, that state adapted

27   the Statute of Northampton in the late 1700s and forbade riding and going armed "offensively, to

28   the fear or terror of the good citizens of the Commonwealth."  Cornell (2017), *supra*, at 39 &

1   n.184.  About forty years later, Massachusetts revised the law and required a surety from those

2   who carried specific concealed or dangerous weapons in public, but it made an exception for

3   people who had a reasonable cause to fear an assault or property damage.  *Id.* at 39 & n.189.

4   Many other states passed similar laws in the years and decades that followed.  *See id.* at 40–41 &

5   n.193.  A law like this one eventually came before the Texas Supreme Court after the Civil War,

6   which upheld the law based in part on its exception for imminent threats.  *See id.* at 41–42.

7          Rivas perceives a slightly different division in nineteenth century judicial decisions.

8   Under the more common conception of public weapons carrying, states could prohibit people

9   from carrying concealed weapons because the Second Amendment and its state-law counterparts

10   protected the appropriate uses of militia arms, not "deadly weapons."  Rivas Decl. at 17 & n.46.

11   Under the second theory, which in Rivas's opinion was uncommon, carrying weapons openly was

12   "permissible" for self-defense, so statutes that prohibited people from carrying weapons only for

13   self-defense could not stand.  *See id.* at 17 & n.45.  Many nineteenth century state courts

14   concluded the federal and state constitutions allowed government regulation of how people

15   carried their weapons in public.  *See* Rivas Surrebuttal at 11–13.

16          In *Bruen*, the Supreme Court surveyed several nineteenth century laws and related court

17   decisions and reached similar conclusions.  *See* 142 S. Ct. at 2146–47.  It found that on the record

18   before it in that case, the "history reveal[ed] a consensus that States could not ban public carry

19   altogether."  *Id.* at 2146.  Instead, the Court held, "the manner of public carry was subject to

20   reasonable regulation."  *Id.* at 2150.  States could stop people from carrying weapons in ways that

21   were frightening and dangerous as long as an effective option remained available for self-defense.

22   *See id.*  That option was to carry weapons openly in the nineteenth century.  *See id.*  As explained

23   above, the types of weapons that people could carry openly did not normally suggest any evil

24   intent or danger.

25          This is not to say, however, that nineteenth century Americans universally approved of

26   those who carried their weapons in public.  State laws passed in the first half of the nineteenth

27   century sometimes expressly condemned the habitual practice of going armed in public.  *See*

28   Rivas Decl. at 24 & nn. 66–67 (citing an 1838 Virginia enactment and an 1813 Louisiana

59

1   enactment).  As one state appellate court wrote in 1843, although it was not a crime to carry a gun

2   openly in public, a gun was nonetheless "an 'unusual weapon,' wherewith to be armed and clad."

3   *State v. Huntley*, 25 N.C. 418 (1843), *cited in* Rivas Decl. at 24.  "No man amongst us carries it

4   about with him, as one of his every day accoutrements—as part of his dress—and never we trust

5   will the day come when any deadly weapon will be worn or wielded in our peace loving and law-

6   abiding State, as an appendage of manly equipment."  *Id.*

7          Considering these historical strands together, the court discerns three broad trends in the

8   laws and regulations California has cited.  First, restrictions on functional weapons, especially

9   those commonly used for legitimate purposes, such as muskets and other long guns, were

10   narrower than restrictions on weapons that could be concealed, such as large knives and small

11   pistols.  Concealed weapons were perceived as inherently dangerous, illegitimate, or both.  People

12   accepted harsh restrictions and outright prohibitions based on this distinction, as did the courts,

13   because people retained the right to carry weapons for self-defense and militia service.  Second,

14   when governments did place harsh restrictions on functional weapons with legitimate uses, those

15   restrictions usually called for some additional element of unusual danger or evil purpose, such as

16   surety laws and laws that prohibited guns in larger groups.  These restrictions also included racial,

17   religious, and class-based prohibitions,  now impermissible, which prevented many people from

18   carrying any weapons at all.  Fundamentally, the types of regulations put into effect show people

19   commonly accepted harsh restrictions on public arms-carrying based on popular categorical

20   distinctions about what was frightening or dangerous.  Third, different and more specific rules

21   were adopted in more populous places where guns and the ammunition required to use them

22   could cause more serious problems than in sparse rural areas.  States also made exceptions for

23   travelers, recognizing their different needs for personal security in remoter and more rural places.

24              **3.      Simliar laws and regulations were passed after the Civil War and the**
25                      **Fourteenth Amendment, but in a new context.**

26          The Supreme Court has looked to laws from the years surrounding the Fourteenth

27   Amendment's adoption to help round out the relevant history and tradition.  *See Bruen*, 142 S. Ct.

28   at 2137–38, 2150–53; *Heller*, 554 U.S. at 614–19.  Lower federal courts have as well. *See, e.g.*,

*Antonyuk*, 2023 WL 8518003, at *16 (collecting authority from the Third, Seventh and Eleventh Circuits). The court therefore disagrees with Baird and Gallardo that evidence from these years is essentially irrelevant. Evidence from later years "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence," *Bruen*, 142 S. Ct. at 2154 (citing *Heller*, 554 U.S. at 614), but this court finds that is not the situation in this case. Evidence from after the Civil War and adoption of the Fourteenth Amendment—the constitutional source of Baird and Gallardo's right to assert a Second Amendment claim against the state—reinforces the conclusions the court has drawn from the law and regulations that went before. This evidence shows what people understood the Second Amendment to mean when that amendment became enforceable against state and local laws like California's.

Again, historical context is essential to a fair understanding. The Civil War "was a time of violence, turmoil, and political instability." Rivas Decl. at 12. Homicide rates in the United States began diverging from rates in the rest of the Western world. *Id.* "The most severe violence occurred in the former Confederate States, where military defeat, emancipation, and reconstruction inflamed white supremacism and set the stage for racist paramilitaries, lynchings, and widespread electoral fraud." *Id.* "A lack of faith in governing institutions and a failure to become a cohesive citizenry drove both the war itself and the coinciding bloodshed." *Id.*

In addition, "[t]he limitations of early firearms as murder weapons were overcome by a burst of innovation in the arms industry between the late 1840s and the end of the Civil War." Roth (2019), *supra*, at 122. These years saw the invention of the breech-loading rifle, the self-expanding bullet, the repeating rifle, and finally the "first truly modern rifle." *Id.* "The limitations on early handguns were overcome in the same period." *Id.* Samuel Colt patented his first revolver design in 1836. Rivas Decl. at 10. Unlike earlier pistol designs, these new revolvers were breech loading, which meant ammunition was loaded from the back of the barrel, and they could fire multiple shots without reloading as well. *Id.* Smith and Wesson introduced a seven-shot breech loading revolver in the 1850s, the same year Colt's patent expired. *See id.*; Roth (2019), *supra*, at 122–23. Smith and Wesson's gun was "a near perfect murder weapon— lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time."

1    *Id.* at 123.  Manufacturers of these new weapons sold them first to the United States Military,

2    then to civilians in "the urban middle class, the urban poor, and former slaves."  *Id.*; *see also*

3    Rivas Decl. at 12–13.  The country was in the midst of a "homicide crisis" by the 1860s and

4    1870s, and the arms industry exploited that crisis "by promoting the need for personal

5    protection."  Roth (2019), *supra*, at 123.  "[M]any working-class and middle-class Americans and

6    former slaves were afraid they might become victims of violence, and so armed themselves as

7    fast as they could with the new weapons, specially revolvers."  Roth (2019), *supra*, at 123; *see*

8    *also* Rivas Decl. at 13–14.

9        As gun violence grew more prevalent and weapons grew more dangerous, Americans

10   began to change their opinions about what types of weapons and what types of weapons carrying

11   were frightening or dangerous.  In general, Americans criticized those who carried weapons

12   publicly as the nineteenth century wore on.  *See* Rivas Decl. at 15.  "Even though they were

13   particularly opposed to the concealment of them beneath one's clothes, there was an overarching

14   opposition to having weapons in public at all—even when carried openly."  *Id.*  Carrying

15   weapons habitually was a "relic of barbarism."  *Id.* (quoting The Cattlemen, Fort Worth Daily

16   Democrat, March 5, 1883).  And so, by the late nineteenth century, many newspapers had

17   published emphatic denunciations of firearms-carrying.  *See id.* at 15–16; *see also, e.g.*, "The

18   Revolver Must Go," Clarksville Weekly Chronicle (Tennessee) May 24, 1884, at 1 (reprinted

19   from Gainesville Register (Texas) ("[T]here seems to be a well-developed crusade in the

20   newspapers, against the deadly pistol, the Southern Press especially.")).[27]  Public opinions about

21   open firearms carrying seems to have so drastically changed that pants often included secret

22   pockets specially designed for hiding small handguns.  *See* Rivas Decl. at 19.  Concealing

23   weapons was likely more acceptable than displaying them in many places.

24        During these years, states continued to pass firearms regulations.  "Republicans sought to

25   protect the rights of African Americans to bear arms, but were equally insistent on enacting

26   strong racially neutral regulations aimed at public safety."  Cornell Decl. Ex. A at 17.  As in

---

[27] https://chroniclingamerica.loc.gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/ (last visited Dec. 28, 2023).

1    previous years, governmental bodies made exceptions for urgent needs for self-defense.  *See*

2    Rivas Decl. at 20–21.  States also continued to pass laws like those surveyed above barring

3    brandishing or displaying weapons in intimidating or frightening ways.  *See* Spitzer Decl. at 13–

4    17.  But more prominently, "[t]he rise in the circulation of handguns in society . . . was

5    accompanied by the rapid spread of concealed carry restrictions, beginning in the early 1800s but

6    then escalating in the post-Civil War period with the spread of multi-shot handguns, precisely

7    because of their contribution to increasing interpersonal violence."  *Id.* at 6–7.  "By the start of

8    the twentieth century, every state in the country (with the apparent sole exception of New

9    Hampshire) prohibited or severely restricted concealed gun and other weapons carrying."  *Id.* at 7.

10   Open carry restrictions followed a similar pattern.  "From 1860 to 1900, 24 states enacted anti-

11   open carry laws, and 9 states did so in the early 1900s (a few states enacted laws in both

12   centuries)."  *Id.* at 8 (citations omitted).  State courts generally upheld these laws, as long as they

13   made exceptions for emergencies and members of the militia or military.  *See* Rivas Decl. at 20–

14   23.  California was no exception to the tightening regulatory trend.  Many state and local laws

15   restricted public weapons carrying.  *See* Cornell Decl. Ex. A at 20–25; Rivas Decl. at 36–38.

16   Law enforcement and policing also changed.  "[A]s America modernized, urbanized, and

17   became a more diverse and highly mobile society" in the nineteenth century, "traditional

18   community-based mechanisms of law enforcement eroded."  Cornell Decl. Ex. A at 19.

19   American governments turned to professional police forces and administrative agencies, which

20   people had come to believe "were better suited to maintaining social order and the peace in the

21   urban world of nineteenth century America."  *Id.*; *see also, e.g.*, *Antonyuk*, 2023 WL 8518003, at

22   *28–30 (holding similarly and collecting similar evidence).

23   It was under these circumstances that modern firearms license and permitting regimes

24   were first introduced.  *See* Cornell Decl. Ex. A at 19.  "At least 29 states enacted 61 licensing

25   requirement laws for individuals as a pre-requisite for their weapons ownership during this time;

26   17 of those states did so in the 1800s."  Spitzer Decl. at 17 (citation omitted).  Many other local

27   jurisdictions passed licensing laws as well.  *See id.* at 19–24.  But these licensing regimes did not

28   necessarily tighten firearms controls; in some respects, they relaxed the states' strict regulations

1    forbidding some weapons outright or made those regulations more flexible.  *See id.* at 18.

2    Sometimes licensing schemes replaced bans; sometimes they did not.  *See id.*  "The jurisdictions

3    enacting licensing for [public firearms carrying] were now allowing firearms or other dangerous

4    weapons or substances to be used or possessed with the granting of a license to do so, when their

5    possession or use would otherwise be subject to criminal penalties."  *Id.*  Licenses were "in most

6    instances a more flexible form of government regulation of the activities and weapons in

7    question."  *Id.* at 18–19.  And as noted above, no evidence in the record shows any of these

8    licensing systems were subjected to any successful constitutional challenges, or any challenges at

9    all, which strongly confirms that licensing systems as a whole are part of the historical tradition of

10   firearm regulation.

11        In sum, laws and regulations passed after the Fourteenth Amendment's adoption changed,

12   but did not contradict laws passed in the colonies and early in the nineteenth century.

13   Consistently, over many years, American governments recognized the right to bear arms but

14   circumscribed that right in recognition of the need to preserve the peace and public safety.  As

15   violence increased and weapons became more deadly, as America urbanized and grew more

16   diverse, and as policing professionalized, common ideas about what was socially acceptable

17   changed.  No longer was it as useful or common to draw distinctions between concealed or

18   "deadly" weapons and acceptable firearms.  It was more common than before to carry concealed

19   weapons.  Some of the most common weapons that many people purchased for self-defense could

20   be concealed.  Licensing and permit regimes were a natural reaction to this reality, and in many

21   cases they were more flexible and permissive than the laws that had gone before.

22        **4.    California has demonstrated its open-carry restrictions are consistent
23             with the historical tradition.**

24        Although the Supreme Court observed that some Second Amendment cases will be

25   "straightforward," *see Bruen*, 142 S. Ct. at 2131–33, this is not an obviously straightforward case.

26        When the Supreme Court discussed "straightforward" cases in *Bruen*, it first mentioned

27   evidence about laws addressing a common "general societal problem."  *See id.*  If the challenged

28   law or regulation addresses a "general societal problem that has persisted since the 18th century,"

1   but there is no "distinctly similar historical regulation addressing that problem," or if the

2   historical solution is "materially different" from the challenged regulation, that is "relevant

3   evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*

4         The "general societal problem" addressed by California's licensing system resembles a

5   problem that Americans faced in 1791, only in the simplest sense: then, as now, weapons carried

6   openly in public can risk fright, intimidation and violence.  But California has persuasively

7   demonstrated how difficult it is to draw parallels between the modern and historical problems.

8   As reviewed above, expectations about what types of gun-carrying is dangerous or frightening

9   have changed drastically.  Handguns differ fundamentally from the weapons in common use in

10  the founding era.  Modern handguns are more reliable, simpler to use, easier to conceal, and more

11  lethal than the firearms in common use when the Second Amendment was adopted.  Modern

12  weapons also differ widely, both in form and connotation, from the ancient weapons that could

13  easily be concealed, such as knives and pocket pistols.  Comparisons between the modern and

14  historical responses to the general societal problem defy simple analysis as well.  Is a modern

15  licensing system that permits ordinary people to carry concealed, reliable, breech-loading

16  semiautomatic handguns in their cars comparable to historical regulations that permitted white

17  land-owning men to openly carry fowling pieces and unloaded muskets on horse saddles because

18  neither use inspired fear in witnesses?  The record does not offer any easy answer.

19        The Supreme Court also mentioned in *Bruen* that cases might be straightforward if "some

20  jurisdictions actually attempted to enact analogous restrictions during the timeframe, but those

21  proposals were rejected on constitutional grounds."  142 S. Ct. at 2131.  California's evidence

22  shows how difficult it would be to draw any confident conclusions along those lines in this case.

23  For example, some nineteenth century American courts upheld bans on concealed weapons but

24  not weapons carried openly.  *See id.* at 2146–47.  But these decisions rested on the presumption

25  that it was "beyond the constitutional pale in antebellum America to altogether prohibit public

26  carry."  *Id.* at 2147 (citing *Nunn v. State*, 1 Ga. 243 (1846)).  Does this mean California could

27  prohibit some forms of public gun carrying but not others?  Or that it could prohibit concealed

28  weapons?  The answer again is not obvious.

1    The court therefore must follow the Supreme Court's instruction to consider (1) "whether

2    modern and historical regulations impose a comparable burden" on those who carry firearms in

3    public for self-defense and (2) "whether that regulatory burden is comparably justified." *Id.* at

4    2133.  Or as the Ninth Circuit put the question in its decision on Baird and Gallardo's preliminary

5    injunction motion, has California identified "a historical analogue that curtails the right to

6    peaceably carry handguns openly for self-defense to a comparable degree, with a comparable

7    severity, and with a comparable blanket enforcement"?  81 F.4th at 1047.

8    In one sense, California's regulation might seem to be the reverse of the historical

9    tradition.  Rather than placing heavier restrictions on concealed and concealable weapons,

10   California limits open handgun carrying more strictly than concealed carrying.  In context,

11   however, the historical regulations on concealed weapons and concealed carrying are analogous

12   to California's modern system.

13   As California has shown, for many years before and after the Second Amendment was

14   adopted, American governments placed limits on how people could carry the weapons for self-

15   defense in public.  The only available concealed and concealable weapons, like knives and pocket

16   pistols, were associated with aggression, violence and crime.  They often were banned

17   completely.  When governments did not ban those weapons, they often required people to carry

18   them openly or in circumstances that telegraphed a lawful intent, such as when traveling in

19   remote areas, and governments still imposed penalties on those who used concealable weapons in

20   ways that by societal norms were intimidating or threatening.  Some governments also required

21   people to provide a surety.  By contrast, restrictions on weapons commonly used for legitimate

22   purposes, such as muskets and other long guns, were narrower or absent.  These weapons could

23   be carried openly because by prevailing norms, doing so communicated no evil intents, no risk of

24   violence, no threat.  So, when governments did place restrictions on functional weapons with

25   legitimate uses, those restrictions usually called for some additional indication of unusual danger

26   or evil purpose, such as an assembly of many people or intent to intimidate.  In all, historical

27   restrictions depended on public conceptions about the types of weapons and public weapons

28   carrying were threatening, intimidating, risky or otherwise unacceptable.

These historical conceptions are not an identical match with our own.  Presumptions about why people carry concealed and concealable weapons are different now than in the founding and reconstruction eras, as are the weapons themselves.  As time passed and technology improved, all firearms, both large and small, could be loaded more quickly and conveniently, and they could be fired many times before reloading.  They were more effective in committing murder, but they also were more effective for self-defense, and many people bought them and carried them for that reason.  Today, handguns are "the quintessential self-defense weapon" in the minds of many Americans, *Heller*, 554 U.S. at 629, not the accessories of ruffians and assassins.  So modern states, including California, allow people to carry handguns in public even though they can be concealed.  Their concealable nature connotes no evil intent; nor does the bearer's decision to conceal them.

Appearances and generalizations play a role today, as they did in the past.  State and colonial governments did not allow people to carry firearms in ways that intimidated or suggested evil purposes.  Brandishing and display prohibitions, laws patterned on the Statute of Northampton, and prohibitions on firearms in large groups are examples from this category.  Governments historically adopted different and more specific rules—gunpowder storage requirements and gun discharge rules, for example—in places where guns and their ammunition could cause unusual problems.  For similar reasons they permitted travelers to carry a wider variety of weapons than those who lived in cities.  Today, by contrast, the open carrying of firearms by those who are not law enforcement officers is threatening or intimidating, especially in more heavily populated places.  *See, e.g.*, Blocher (2017), *supra*, at 90–103; *see also* Raney Decl. at 9; Rivas Decl. at 19–20; Def.'s Mem. at 18.

In sum, California has proven an historical tradition of imposing categorical limits on how guns are carried in public based on categorical cultural and societal expectations, including limits derived from the differences between urban and rural areas.  California also has proven the burden of these laws was heavy, including outright bans on specific types of weapons and weapons carrying.  California's licensing system is similarly justified by reference to widespread and categorical expectations about what is intimidating, frightening and dangerous.

1    This is not to say California has identified a historical "twin" for its challenged regulation.

2    *Bruen*, 142 S. Ct. at 2133.  There is no twin, no "dead ringer."  *Id.*  But California's licensing

3    system serves a similar purpose as historical restrictions on how people could carry firearms in

4    public, and it imposes a similar or lesser burden: now as in the founding era, "ordinary, law-

5    biding citizens" in California can carry arms in public for self-defense without fearing criminal

6    prosecution, and they can do it anywhere in the state.  Now, as in the founding era, the

7    government imposes restrictions on how people carry those weapons, and those restrictions are

8    categorical and based on widely accepted societal norms.  People can carry handguns publicly

9    anywhere in California for self-defense if they obtain a permit and if they conceal their weapon.

10   With a permit, they can also carry their handguns openly in counties with lower populations, and

11   they can carry weapons openly in emergencies, even without a permit, such as when it is

12   necessary to protect life or property.  In a few words, California does not prevent "ordinary, law-

13   abiding citizens" from carrying handguns in public for self-defense.

14           **5.       Baird and Gallardo have not refuted the state's evidence.**

15           Baird and Gallardo argue California cannot constitutionally require them to carry

16   handguns in a specific way, namely concealed.  *See, e.g.*, Pls.' Reply at 2–3.  This contention is

17   unpersuasive for the simple reason that American governments have imposed restrictions on how

18   people carry guns since the founding era, as the Supreme Court has twice held.  *See Bruen*,

19   142 S. Ct. at 2156 ("The Second Amendment guaranteed to 'all Americans' the right to bear

20   commonly used arms in public subject to certain reasonable, well-defined restrictions, . . . for

21   example, . . . [restrictions on] the manner by which one carried arms, or the exceptional

22   circumstances under which one could not carry arms . . . ."); *Heller*, 554 U.S. at 626 ("[T]he

23   majority of the 19th-century courts to consider the question held that prohibitions on carrying

24   concealed weapons were lawful under the Second Amendment or state analogues").  The

25   Supreme Court did not hold otherwise when it referred in *Heller* to its previous definition of

26   "bear" as including carrying a gun "in a pocket."  *See* 554 U.S. at 583; *see also* Pls.' Reply at 3.

27   The Court was offering examples, not listing requirements.  It was asking, in other words,

28   whether a person would be "bearing" a weapon if he were carrying it in his pocket.  The answer

1  was "yes." *See* 544 U.S. at 583–84.  It was not asking whether the Second Amendment

2  prohibited any restrictions on carrying arms in pockets.

3      Nor can the court agree with Baird and Gallardo's contention that California has deprived

4  people of an effective right to self-defense in public.  *See, e.g.*, Pls.' Reply at 3.  Baird and

5  Gallardo argue some weapons might be difficult to conceal in tight clothing, but they do not

6  explain why those who wish to defend themselves with handguns cannot choose not to wear tight

7  clothing, if that is their position.  Baird and Gallardo also argue handguns might be difficult to

8  remove quickly from wherever they are concealed, but the record here as well includes no

9  evidence to suggest handguns are ineffective for self-defense when concealed.

10      As noted above, Baird and Gallardo cannot prevail by claiming licenses are not actually

11  available.  The court dismissed their as-applied challenge and it is no longer part of this case.  At

12  the same time, nothing  prevents them from arguing in a future case that licenses are practically

13  unavailable or that local officials do not accept or process license applications.  The Supreme

14  Court has not "rule[d] out constitutional challenges to shall-issue regimes where, for example,

15  lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens

16  their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9.

17      Finally, Baird and Gallardo and their expert contend California has cited irrelevant

18  statutes from long before and long after the time the Second Amendment was adopted or have

19  misinterpreted the evidence.  *See, e.g.*, Pls.' Mem. at 11–20; Cramer Decl., *passim*.  The court

20  disagrees that California's evidence is irrelevant, for the reasons above.  The court has reviewed

21  Cramer's declaration and his criticisms of the opinions of California's retained experts,  finds

22  them poorly reasoned and suggesting a lack of true expertise.  For example, he digresses into an

23  irrelevant discussion of the role of mental illness in firearms violence, Cramer Decl. at 55–58;

24  criticizes Rivas for citing a newspaper and implies the newspaper does not exist, but the

25  newspaper's archives are available in a digital database, *see* Rivas Surrebuttal at 15–16; and

26  levels hyperbolic attacks sounding in partisan politics rather than historical expertise, *see, e.g.*,

27  Cramer Decl. at 58 ("Of course, California's politicians would rather focus on guns rather than

28  ask how deinstitutionalization in the 1960s created cities awash in homeless often mentally ill

1   drug addicts, sidewalks with discarded hypodermic needles and human feces and random acts of

2   mass murder.").  The court finds in contrast, the responses of Rivas, Spitzer, and Cornell to

3   Cramer's criticisms are measured, persuasive and thorough.  *See generally* Rivas Surrebuttal,

4   ECF No. 98-4; Spitzer Surrebuttal, ECF No. 98-5; Cornell Surrebuttal, ECF No. 98-6.  Baird and

5   Gallardo have not rebutted the state's substantial showing, which satisfies its burden.

6   **VI.   CONCLUSION**

7        California's motion for summary judgment is **granted**.  Baird and Gallardo's motion for

8   summary judgment is **denied**.

9        Because California is entitled to judgment as a matter of law, Baird and Gallardo's motion

10  for a preliminary injunction is **denied as moot**.

11       This order resolves ECF Nos. 65, 90 and 96 and **closes** the case.

12       IT IS SO ORDERED.

13  DATED:  December 28, 2023.

CHIEF UNITED STATES DISTRICT JUDGE