1

2                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
3

4    MARK BAIRD, ET AL.,
             PLAINTIFFS,
5
     VS.                                SACRAMENTO, CALIFORNIA
6                                       NO. 2:19-CV-00617
     ROB BONTA, IN HIS OFFICIAL         FRI., NOV. 03, 2023
7    CAPACITY AS ATTORNEY               11:43 A.M.
     GENERAL OF THE STATE OF
8    CALIFORNIA,
             DEFENDANT.
9    _____/

10                         TRANSCRIPT OF HEARING
        BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
11                          ---OOO---

12
     APPEARANCES:
13
       FOR THE PLAINTIFFS:            THE BELLANTONI LAW FIRM, PLLC
14                                    2 OVERHILL ROAD, SUITE 400
                                      SCARSDALE, NY  10583
15                                    BY:  AMY L. BELLANTONI
                                      ATTORNEY AT LAW
16

17     FOR THE DEFENDANT:            CALIFORNIA DEPARTMENT OF
                                     JUSTICE
18                                   300 SO. SPRING STREET
                                     SUITE 1702
19                                   LOS ANGELES, CA  90013
                                     BY: LARA HADDAD
20                                   ATTORNEY AT LAW

21
       OFFICIAL COURT REPORTER:      KIMBERLY M. BENNETT,
22                                   CSR, RPR, RMR, CRR
                                     501 I STREET
23                                   SACRAMENTO, CA 95814

24
       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1          (CALL TO ORDER OF THE COURT, 11:43 A.M.)

2               THE CLERK:  CALLING CIVIL CASE 19-617, BAIRD, ET AL.

3    VERSUS BONTA.

4        THIS IS ON CALENDAR FOR DEFENDANT'S MOTION FOR SUMMARY

5    JUDGMENT.

6               THE COURT:  ALL RIGHT.  GOOD MORNING.

7        APPEARANCES, PLEASE, FOR PLAINTIFFS.

8               MS. BELLANTONI:  GOOD MORNING.  AMY BELLANTONI FOR

9    THE PLAINTIFFS.

10              THE COURT:  GOOD MORNING, MS. BELLANTONI.

11       AND MR. BAIRD IS MONITORING BY TELEPHONE --

12              MS. BELLANTONI:  YES.

13              THE COURT:  -- WITH THE COURT'S PERMISSION.

14              MS. BELLANTONI:  THANK YOU, YOUR HONOR, FOR ALLOWING

15   HIM TO DO THAT.  I APPRECIATE THAT.

16              THE COURT:  ALL RIGHT.  AND FOR THE DEFENSE.

17              MS. HADDAD:  LARA HADDAD FOR THE STATE ATTORNEY

18   GENERAL.

19              THE COURT:  GOOD MORNING, MS. HADDAD.

20       I HAVE SEVERAL QUESTIONS AND THEN I WOULD ALLOW BRIEF

21   WRAP-UP ARGUMENT IF YOU THINK THERE IS SOMETHING NOT COVERED BY

22   THE RECORD.

23       ONE QUESTION, MS. HADDAD.  JUST SO I'M CLEAR, AT THIS POINT

24   ARE ALL OF THE LAWS CITED IN THE STATE'S APPENDIX IN THE

25   RECORD?  I KNOW YOU OFFERED TO PROVIDE THEM, BUT HAVE THEY BY

1    NOW GOTTEN INTO THE RECORD?

2            MS. HADDAD:  NO, YOUR HONOR.  MY APOLOGIES.

3        SO THE ONLY -- THE ONLY -- THE PRINTED VERSIONS OF THE LAWS

4    THAT WE SUBMITTED WITH OUR REQUEST FOR JUDICIAL NOTICE, WE

5    HAVEN'T SUPPLEMENTED THOSE.  BUT THE TEXT OF MANY OF THE LAWS

6    ARE IN MR. SPITZER'S EXPERT REPORT AS WELL AND HIS EXHIBITS.

7    AND I'M HAPPY TO SUBMIT THE REST AS SOON AS -- AS SOON AS WE'RE

8    ABLE TO.

9            THE COURT:  AND THE PLAINTIFFS HAVE RECEIVED THOSE?

10           MS. HADDAD:  FOR THE -- EVERYTHING I JUST DESCRIBED,

11   YES, THE REQUEST FOR JUDICIAL NOTICE.  AND THOSE EXHIBITS, THEY

12   WERE SERVED.  BUT WE HAVE NOT SERVED THEM WITH ANY TEXT OF LAWS

13   THAT WE HAVE NOT PROVIDED TO THIS COURT.

14           THE COURT:  WELL I WOULD ACCEPT YOUR OFFER, AS STATED

15   IN YOUR -- IN ONE OF YOUR FOOTNOTES, TO PROVIDE.  I JUST --

16   TRIAL COURTS LAY FOUNDATIONS.  IT FEELS TO ME AS IF -- GIVEN

17   THAT THERE IS A REFERENCE THAT THE -- THE ENTIRE SET SHOULD BE

18   IN THE RECORD.

19       SO IS THAT A ZIP FILE?

20           MS. HADDAD:  SO WE HAVE NOT FILED IT YET, BUT WE

21   WILL.  AND I WOULD JUST ASK THAT YOU GIVE US A FEW DAYS TO PULL

22   THAT TOGETHER.

23           THE COURT:  ALL RIGHT.  SO ANY PROBLEM WITH THAT,

24   MS. BELLANTONI?

25           MS. BELLANTONI:  NO, YOUR HONOR.  JUST SO I'M CLEAR,

1   SO THEN WITHIN A FEW DAYS OR SO, EVERY STATUTE OR REGULATION

2   UPON WHICH THE STATE IS RELYING WILL BE PROVIDED IN ITS FULL

3   TEXT SO THAT THE COURT CAN REFER TO THE TEXT OF THE STATUTE; IS

4   THAT CORRECT?

5           THE COURT:  CORRECT.

6           MS. BELLANTONI:  THANK YOU.

7           THE COURT:  YEAH.

8           MS. HADDAD:  THAT'S CORRECT.  WE'LL SUBMIT A

9   SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE.  IT WILL FOLLOW THE

10  SAME FORMAT AS OUR REQUEST FOR JUDICIAL NOTICE.

11          THE COURT:  ALL RIGHT.

12          MS. BELLANTONI:  YOUR HONOR, IF I COULD HAVE A FEW

13  DAYS SUBSEQUENT TO THAT TO TAKE A LOOK AT THE ACTUAL TEXT.  AND

14  IF ANY SUPPLEMENTAL, I GUESS, OBJECTIONS NEED TO BE MADE BY

15  PLAINTIFFS, OR JUST TO CLARIFY OUR POSITION ON ANYTHING, I

16  WOULD ASK WE BE ABLE TO DO THAT.

17          THE COURT:  ALL RIGHT.  SO, SAY BY NEXT WEDNESDAY,

18  MS. HADDAD, YOU WOULD MAKE YOUR FILING?

19          MS. HADDAD:  YES, YOUR HONOR.  NEXT WEDNESDAY WOULD

20  BE FINE.

21          THE COURT:  THEN PLAINTIFFS BY END OF THE WEEK?

22  MS. BELLANTONI, IS THAT SUFFICIENT?

23          MS. BELLANTONI:  THAT SHOULD BE FINE, YOUR HONOR.

24  THANK YOU.

25          THE COURT:  ALL RIGHT.  VERY GOOD.  THAT'S THE

1    COURT'S ORDER.

2       ALL RIGHT.  JUST A COUPLE OF QUESTIONS ABOUT THE STATE OF

3    THE RECORD.  MR. BAIRD DID TESTIFY AT DEPOSITION THAT HE HAS

4    APPLIED FOR MULTIPLE PERMITS, MOST RECENTLY IN 2021, AND HE

5    SAID HIS MOST RECENT APPLICATION WAS GRANTED.  BUT NOW I

6    UNDERSTAND THERE IS A DECLARATION -- HIS DECLARATION SAYS THAT

7    HE HAS -- THAT HE DOES NOT HAVE A PERMIT TO CARRY A CONCEALED

8    FIREARM.

9       IS THERE A FACTUAL DISPUTE THERE?

10          MS. BELLANTONI:  HIS CONCEALED CARRY APPLICATION WAS

11    GRANTED AND HAS SINCE EXPIRED.  HE'S NOT REAPPLIED FOR A

12    CONCEALED CARRY LICENSE.

13          THE COURT:  SO IT'S BASED ON -- HE DOESN'T HAVE A

14    PERMIT NOW ONLY BECAUSE IT EXPIRED?

15          MS. BELLANTONI:  CORRECT.

16          THE COURT:  ALL RIGHT.  AGREE WITH THAT

17    CHARACTERIZATION, MS. HADDAD?

18          MS. HADDAD:  YES, YOUR HONOR.

19          THE COURT:  ALL RIGHT.  AND THEN MR. GALLARDO -- IS

20    IT GALLARDO OR GALLARDO?

21          MS. BELLANTONI:  GALLARDO.

22          THE COURT:  GALLARDO TESTIFIED AT DEPOSITION THAT

23    HE'S EXEMPTED FROM THE STATE'S LICENSE REQUIREMENT BY VIRTUE OF

24    A FEDERAL CREDENTIAL, BUT NOW CLAIMS IN HIS DECLARATION THAT HE

25    CAN'T RELY ON ANY EXEMPTION TO THE STATE'S LICENSING

1    REQUIREMENTS.

2        IS THAT A FACTUAL DISCREPANCY?

3            MS. BELLANTONI:  UNDER THE FEDERAL LEOSA STATUTE,

4    MR. GALLARDO IS ABLE TO CARRY CONCEALED.

5        AS AN ASIDE, YOUR HONOR, THERE ARE CERTAIN LOCAL PROHIBITED

6    AREAS THAT I DON'T BELIEVE ARE AT ISSUE HERE.  BUT THE FEDERAL

7    STATUTE DOES ONLY ALLOW HIM TO CARRY CONCEALED, IT DOES NOT

8    ALLOW OPEN CARRY.

9            THE COURT:  SO IT'S IN THAT SENSE THAT HE CLAIMS HE

10   CAN'T RELY ON ANY EXEMPTION?

11           MS. BELLANTONI:  YES.

12           THE COURT:  UNDERSTOOD, MS. HADDAD?

13           MS. HADDAD:  YES, YOUR HONOR.

14           THE COURT:  ALL RIGHT.  SO, MS. BELLANTONI, WHAT I --

15   I WANT TO MAKE CERTAIN I UNDERSTAND THE NATURE OF PLAINTIFFS'

16   CLAIMS BECAUSE IT SEEMS TO ME THERE MIGHT BE VARIOUS BASES.

17       SO ARE PLAINTIFFS CONTENDING THE SECOND AMENDMENT PREVENTS

18   CALIFORNIA FROM REQUIRING ANYONE TO OBTAIN A LICENSE BEFORE

19   CARRYING FIREARMS OPENLY IN PUBLIC?  IS THAT WHAT PLAINTIFFS

20   ARE CONTENDING?

21           MS. BELLANTONI:  WHAT WE'RE CONTENDING IS THAT THE

22   TWO STATUTES THAT WE ARE CHALLENGING, 25850 AND 26350, HAVE NO

23   HISTORICAL ANALOGUE AND VIOLATE THE PLAIN TEXT AND THE HISTORY

24   IN THIS NATION OF FIREARMS REGULATION.

25       I BELIEVE THE LICENSING ISSUE COMES INTO PLAY WHEN THE

1    STATE ATTEMPTS TO ARGUE THAT NOTWITHSTANDING THESE CRIMINAL

2    STATUTES THAT THERE IS A -- AN ALTERNATIVE LICENSING REGIME.

3    BUT -- AND WE'VE ADDRESSED THAT.  AND THEIR EXPERTS HAVE SHOWN

4    THAT LICENSING WAS NOT EVEN AROUND IN CIVIL LATE 1800S AND

5    EARLY 1900S.  SO IN THAT RESPECT, LICENSING ALSO VIOLATES THE

6    PLAIN TEXT OF THE SECOND AMENDMENT AND HAS NO HISTORICAL

7    ANALOGUE.

8        BUT WHAT WE ARE ALLEGING --

9            THE COURT:  SO THAT -- SO THAT DOES MEAN, AT LEAST IN

10   PART, THAT FROM YOUR POINT OF VIEW CALIFORNIA CAN'T REQUIRE

11   ANYONE TO OBTAIN A LICENSE BEFORE ENGAGING IN OPEN CARRY; IS

12   THAT RIGHT?

13           MS. BELLANTONI:  WELL, IF YOU PUT IT THAT WAY, YES,

14   YOUR HONOR.  THAT -- YES, LICENSING IS CONTRARY TO THE PLAIN

15   TEXT, PARTICULARLY IN CALIFORNIA WHICH REMAINS AN OUTLIER STATE

16   IN THAT IT STILL IS A "MAY ISSUE" LICENSING REGIME, AND

17   PERMISSION -- REQUIRING PERMISSION BEFORE AN INDIVIDUAL

18   EXERCISES THE NATURAL RIGHT IS REPUGNANT TO THE CONSTITUTION.

19           THE COURT:  SO IT'S NOT JUST THAT CALIFORNIA CAN'T

20   LIMIT OPEN CARRY TO THOSE WHO LIVE OR WORK IN THE SMALLER

21   COUNTIES, POPULATIONS BELOW 200,000?

22           MS. BELLANTONI:  WE'RE CHALLENGING THE ENTIRE -- THE

23   ENTIRETY OF THE TWO CRIMINAL STATUTES, YOUR HONOR.  AND IT --

24   LICENSING ASIDE, THE STATE MUST COME UP WITH AN HISTORICAL

25   ANALOGUE FOR -- FOR THEIR TWO CRIMINAL STATUTES.  AND THEY

1  CAN'T POINT TO CALIFORNIA'S MODERN LICENSING REGULATIONS AS

2  THEIR HISTORICAL ANALOGUE.  THAT'S -- THEY HAVE TO LOOK BACK TO

3  THE FOUNDING ERA AND WHETHER THERE WAS A HISTORY OR TRADITION

4  OF BANNING OPEN CARRY, WHICH WOULD REALLY MAKE NO SENSE AND

5  RENDER THE PLAIN TEXT MEANINGLESS.

6         THE COURT:  SO I'M -- I'LL GET INTO THE HISTORY,

7  TEXT, TRADITION.  BUT JUST ONE FINAL QUESTION.  TO THE EXTENT

8  PLAINTIFFS ARGUE THAT OPEN CARRY LICENSES ARE UNAVAILABLE AS A

9  PRACTICAL MATTER, DO PLAINTIFFS ACKNOWLEDGE THE COURT HAS

10  DISMISSED THAT CLAIM, NO AMENDMENT SINCE I DID, AND SO I

11  CAN'T -- I'M NOT ENTERTAINING ANY CLAIM ALONG THAT LINE,

12  UNDERSTOOD?

13         MS. BELLANTONI:  I UNDERSTAND THAT YOU DISMISSED THE

14  AS APPLIED CHALLENGES, YES, YOUR HONOR.

15         THE COURT:  SO FOR YOU, MS. HADDAD, LOOKING AT WHAT

16  BRUEN REQUIRES THIS COURT TO DO, IS IT THE ATTORNEY GENERAL'S

17  POSITION THAT THE SECOND AMENDMENT DOES NOT PROTECT THE RIGHT

18  TO CARRY HANDGUNS OPENLY IN PUBLIC FOR SELF-DEFENSE?

19         MS. HADDAD:  NO, YOUR HONOR.  THERE IS A SELF-DEFENSE

20  EXCEPTION IN THE PENAL CODE, THAT -- IT'S PENAL CODE

21  SECTION 26045(A), WHICH HAS A CARVEOUT.  IT PROVIDES THAT

22  ANYONE MAY OPENLY CARRY A FIREARM WITHOUT A LICENSE IF THAT

23  PERSON REASONABLY BELIEVES THAT ANY PERSON OR THE PROPERTY OF

24  ANY PERSON IS IN IMMEDIATE GRAVE DANGER, AND THAT THE CARRYING

25  OF THE WEAPON IS NECESSARY FOR THE PRESERVATION OF THAT PERSON

1    OR PROPERTY.

2        WHAT THE ATTORNEY GENERAL -- WHAT THE ATTORNEY GENERAL'S

3    POSITION IS, HOWEVER, IS THAT THE STATE MAY REGULATE THE MANNER

4    OF PUBLIC CARRY.  CONCEALED CARRY HAS A "SHALL ISSUE" LICENSING

5    REGIME, AS WE'VE EXPLAINED IN OUR BRIEFING, AND IT MAY LIMIT

6    PUBLIC CARRY -- THE OPEN CARRY OF WEAPONS WHEN NOT -- WHEN IT

7    DOESN'T FALL INTO ONE OF THE EXCEPTIONS DETAILED IN OUR BRIEF

8    OR THIS SELF-DEFENSE EXCEPTION THAT I'VE DETAILED HERE, THE

9    STATE MAY LAWFULLY LIMIT IT.

10        SO IT'S NOT A BAN ON PUBLIC CARRY, IT IS A RESTRICTION ON

11    THE OPEN CARRY OF WEAPONS.

12            THE COURT:  ALL RIGHT.  THEN LOOKING AT WHAT I THINK

13    YOU PRESENT AS TEXTUAL ARGUMENTS, BUT I WANT TO CLARIFY THAT

14    WITH YOU, YOU POINT TO BRUEN, AND THE -- MAKE THE POINT THAT

15    SEVERAL ANTEBELLUM STATE-COURT DECISIONS EVINCE A CONSENSUS

16    VIEW THAT STATES COULD NOT ALTOGETHER PROHIBIT THE PUBLIC CARRY

17    OF ARMS PROTECTED BY THE SECOND AMENDMENT OR STATE ANALOGUES.

18    BUT THAT'S A CONCLUSION BASED ON HISTORICAL RECORD, CORRECT,

19    NOT ABOUT WHAT THE PLAIN TEXT PROTECTS?

20            MS. HADDAD:  YES, YOUR HONOR, THAT'S CORRECT.

21            THE COURT:  SO IS IT FAIR TO INTERPRET THE ATTORNEY

22    GENERAL'S ARGUMENT ABOUT RESTRICTIONS ON OPEN CARRY AS

23    ARGUMENTS ABOUT HISTORICAL TRADITION?

24            MS. HADDAD:  YES, YOUR HONOR, WITH IT -- AND BASED ON

25    EXISTING CASE LAW THAT HAS INTERPRETED THE SECOND AMENDMENT,

1   THAT HAS OBSERVED THAT WHEN IT COMES TO THE MANNER OF CARRY,

2   STATES CANNOT RESTRICT PUBLIC CARRY ALTOGETHER, BUT IT

3   LEAVES -- BUT EXISTING CASE LAW LEAVES OPEN FOR STATES TO

4   RESTRICT PUBLIC CARRY IN CERTAIN WAYS, PROVIDED THAT THERE IS

5   A -- THAT THERE IS AN AVENUE FOR LEGITIMATE PUBLIC CARRY, WHICH

6   WE HAVE HERE.

7           THE COURT:  JUST A THRESHOLD QUESTION FOR YOU,

8   MS. BELLANTONI.

9     I'VE LOOKED AT YOUR BRIEFING WITH RESPECT TO THE SECOND

10  AMENDMENT AND THE FOURTEENTH AMENDMENT.  AND I -- I THINK YOU

11  SAY THAT BRUEN AT LEAST CLARIFIES THE COURT DOESN'T NEED TO

12  THINK ABOUT TWO ERAS -- SECOND AMENDMENT FOUNDING ERA,

13  FOURTEENTH AMENDMENT RECONSTRUCTION ERA, SOME PEOPLE CALL IT

14  THE SECOND FOUNDING -- BUT YOU'RE SAYING IT DOESN'T -- THERE IS

15  NO DIFFERENCE IN THE HISTORICAL CONTEXT FOR THE PURPOSES OF --

16  OF THIS CASE; IS THAT RIGHT?

17          MS. BELLANTONI:  SO FOR THE PURPOSES OF INTERPRETING

18  THE BILL OF RIGHTS THERE HAS BEEN NO SUPREME COURT CASE, NOR

19  HAS THE STATE CITED ANY, THAT HAS LOOKED TO THE

20  POST-RATIFICATION ERA AND/OR THE FOURTEENTH AMENDMENT

21  RATIFICATION AS THE PRIMARY SOURCE OF INTERPRETING WHAT THE

22  SCOPE OF ANY PARTICULAR RIGHT IS.

23    AS BRUEN MAKES CLEAR, THE SCOPE OF THE SECOND AMENDMENT AND

24  THE BILL OF RIGHTS IS PEGGED TO THE RATIFICATION AND THE PUBLIC

25  UNDERSTANDING OF THE RIGHT AT THAT POINT IN TIME.  AND WHILE

1    THE SUPREME COURT IN BOTH THE SECOND AMENDMENT AND WITH RESPECT

2    TO THE FIRST, THE FOURTH, THE FIFTH, THE SIXTH AND THE EIGHTH

3    AMENDMENTS, WHEN THEY'VE LOOKED TO 1868 OR POST-RATIFICATION

4    REGULATIONS, IT'S SIMPLY AND ONLY BEEN TO CONFIRM THE ORIGINAL

5    TEXT AND THE ORIGINAL MEANING AS THE PUBLIC UNDERSTOOD IT AT

6    THE TIME THAT IT WAS RATIFIED IN 1791.  AND FOR ANY OTHER VIEW

7    TO BE TAKEN WOULD LEAD TO A TWISTED DICHOTOMY OF A TWO-TIERED

8    SYSTEM WHERE THE FEDERAL GOVERNMENT IS PROHIBITED FROM DOING

9    CERTAIN THINGS BUT THE STATES ARE PROHIBITED FROM INTERFERING

10   WITH RIGHTS IN A DIFFERENT WAY.  AND THAT'S JUST NOT CONSISTENT

11   WITH SUPREME COURT PRECEDENCE AND IT REALLY MAKES NO SENSE AT

12   ALL.

13          THE COURT:  JUST CHECKING, MS. HADDAD, ARE YOU

14   HEARING ANY DEVELOPMENT OF THE PLAINTIFFS' ARGUMENT IN WHAT

15   MS. BELLANTONI JUST SAID, OR HAVE YOU HAD A CHANCE TO FULLY

16   ADDRESS THAT IN YOUR REPLY?

17          MS. HADDAD:  WE HAVE -- WE'VE ADDRESSED THIS IN THE

18   OPPOSITION, BUT I JUST WANT TO MAKE CLEAR THAT THERE -- THERE

19   IS NOTHING TO SUGGEST THAT LAWS THAT WERE ENACTED OR IN EFFECT

20   AT THE TIME OF THE RATIFICATION OF THE FOURTEENTH AMENDMENT ARE

21   IRRELEVANT TO THIS COURT'S ANALYSIS.  THAT WOULD -- THAT --

22   UNDER PLAINTIFFS' INTERPRETATION THAT WOULD RENDER MEANINGLESS

23   LOOKING AT ANY LAWS THAT WERE IN EFFECT IN 1868 EVEN IF THEY

24   CONFIRM -- EVEN IF THEY COMPORT WITH LAWS FROM 1791.  IT JUST

25   MAKES NO SENSE.  AND THAT GOES AGAINST NOT ONLY THE LANGUAGE OF

1    BRUEN BUT ALSO THE LANGUAGE FROM THE MOST RECENT NINTH CIRCUIT

2    PANEL WHICH INTERPRETED BRUEN.

3              MS. BELLANTONI:  WELL, JUST TO CLARIFY, I DID SAY

4    THAT THE COURT -- THE SUPREME COURT HAS LOOKED TO THE LAWS

5    AROUND POST-RATIFICATION, INCLUDING LAWS IN 1868, BUT IT'S ONLY

6    TO CONFIRM THE ORIGINAL PUBLIC UNDERSTANDING OF THE RIGHT AT

7    THE TIME THAT THE BILL OF RIGHTS WAS RATIFIED IN 1791.

8         AND BRUEN MAKES CLEAR THAT TO THE EXTENT THAT

9    POST-RATIFICATION OR MODERN LAWS CONTRADICT THE PLAIN TEXT,

10   THAT THE PLAIN TEXT CONTROLS, AND THAT LAWS PASSED DURING THE

11   CIVIL WAR ERA ARE NOT A GREAT INDICATOR AND ARE NOT AS RELIABLE

12   AS THOSE THAT WERE PASSED IN AND AROUND THE RATIFICATION AND

13   THE PUBLIC UNDERSTANDING AT THAT TIME.

14             THE COURT:  ALL RIGHT.  I UNDERSTAND YOUR RESPECTIVE

15   POSITIONS ON THAT.  IF YOU WANT TO SAY MORE THAT YOU THINK IS

16   NOT IN THE BRIEFING, YOU CAN IN WRAP-UP.

17        SO I WANT TO MAKE CERTAIN I'M -- I'M -- I'VE GOT YOUR

18   POSITIONS RIGHT -- YOUR FUNDAMENTAL POSITIONS.

19        SO FIRST, FOR YOU, MS. BELLANTONI, IT'S FAIR TO SAY THE

20   PLAINTIFFS HERE ARGUE THE ATTORNEY GENERAL CANNOT RELY ON LAWS

21   OR REGULATIONS ABOUT CONCEALED OR CONCEALABLE WEAPONS IN

22   ATTEMPTING TO MEET ITS BURDEN, CORRECT?

23        I THINK THAT'S WHAT YOU'RE SAYING, INCLUDING ON PAGE 20 OF

24   YOUR BRIEF.

25             MS. BELLANTONI:  YES.  SO TO THE EXTENT THEIR EXPERTS

1   RELY ON LAWS THAT AS A GROUPING OUTLAWED DIRKS AND DAGGERS AND

2   PISTOLS AND CONCEALABLE WEAPONS, PISTOLS ARE, EVEN IN HELLER,

3   AND BRUEN AGAIN RECOGNIZED, AND MCDONALD RECOGNIZED THAT A

4   HANDGUN IS A WEAPON IN COMMON USE.

5        SO TO THE EXTENT THERE WAS AN OUTLAWING OF PISTOLS AT SOME

6   POINT IN TIME, THOSE REGULATIONS CANNOT BE RELIED ON BY THE

7   COURT BECAUSE PISTOLS ARE WEAPONS IN COMMON USE AND THE MOST

8   POPULAR WEAPON FOR SELF-DEFENSE BY AMERICANS IN THIS COUNTRY.

9            THE COURT:  MS. HADDAD, IN CONTRAST, THE ATTORNEY

10  GENERAL IS ARGUING CALIFORNIA MAY PLACE RESTRICTIONS ON THE

11  RIGHT TO BEAR ARMS AS LONG AS IT PRESERVES THE RIGHT TO CARRY

12  WEAPONS IN PUBLIC FOR SELF-DEFENSE.  IS THAT A FAIR

13  DISTILLATION?

14           MS. HADDAD:  YES.  AND AS LONG AS IT PRESERVES THE

15  RIGHT -- IT PRESERVES A "SHALL ISSUE" LICENSING REGIME FOR SOME

16  MANNER OF CARRY, IN THIS CASE CONCEALED CARRY, WHICH ALLOWS FOR

17  A MORE REGULAR CARRYING OF WEAPONS OUTSIDE OF THE CIRCUMSTANCES

18  THAT PENAL CODE SECTION 26045(A) SETS FORTH.

19           THE COURT:  SO FOR BOTH OF YOU, BEFORE BRUEN, THE

20  NINTH CIRCUIT LOOKED AT THE SECOND AMENDMENT AND DISTINGUISHED

21  THE RIGHT TO CARRY FIREARMS OPENLY FROM THE RIGHT TO CARRY

22  CONCEALED FIREARMS IN THE PERUTA CASE, 2016, THE EN BANC

23  DECISION.

24       SHOULD THIS COURT MAKE THAT SAME DISTINCTION HERE NOW,

25  MS. BELLANTONI, OR HAS BRUEN COMPLETELY REWRITTEN THE -- THE

1    LANDSCAPE?

2            MS. BELLANTONI:  SO JUST TO REITERATE, THE ISSUE HERE

3    IS WHETHER THE TWO CRIMINAL STATUTES AT ISSUE HAVE A -- AN

4    HISTORICAL ANALOGUE THAT IS CONSISTENT WITH THE PLAIN TEXT.

5        TO THE EXTENT THAT THERE IS DELINEATION IN THE MODALITY OF

6    PUBLIC CARRY, I WOULD SAY THAT THAT IS AN ARTIFICIAL CONSTRUCT.

7    AND THAT IF WE LOOK TO HELLER, AND THE DEFINITION THAT THE

8    SUPREME COURT IN HELLER GAVE WITH REGARD TO BEARING ARMS, THAT

9    DEFINITION COVERS WEARING A WEAPON ON YOUR PERSON OR CARRYING

10   IT IN YOUR POCKET, AND THAT ENCOMPASSES OPEN CARRY AND

11   CONCEALED CARRY.

12       AND WHEN WE LOOK TO THE BRUEN DECISION, NEW YORK STATE IS A

13   CONCEALED CARRY STATE AND ALSO BANS OPEN CARRY FOR NOW.  AND

14   WHAT THE BRUEN COURT DID IN THEIR DECISION WAS TO SAY THAT

15   PUBLIC CARRY IS COVERED BY THE PLAIN TEXT OF THE SECOND

16   AMENDMENT AND IS PRESUMPTIVELY PROTECTED.  THEY ALSO MADE NO

17   DISTINCTION BETWEEN OPEN CARRY AND CONCEALED CARRY.

18       AND TO THE EXTENT THAT THERE WERE ANTEBELLUM -- A HANDFUL

19   OF ANTEBELLUM STATES THAT MADE THAT DISTINCTION, FOR ONE, THE

20   SUPREME COURT SPOKE TO THE ANTEBELLUM EXAMPLES BECAUSE THEY HAD

21   BEEN RAISED BY NEW YORK STATE.  TWO, IT WAS NOT A NATIONAL

22   TRADITION TO MAKE THAT DELINEATION BETWEEN THE MODALITY OF

23   CARRY.  AND TO THE EXTENT THAT THESE STATES DECIDED TO DO THAT,

24   THAT DELINEATION IS FLAGRANTLY IN CONFLICT WITH THE PLAIN TEXT

25   OF THE SECOND AMENDMENT BECAUSE THE AMENDMENT ITSELF MAKES NO

1  DISTINCTION BETWEEN OPEN CARRY AND CONCEALED CARRY.  AND THE

2  HELLER COURT PUT THAT TO REST WHEN THEY DEFINED THE SCOPE AS

3  ENCOMPASSING BOTH WEARING ON THE PERSON, WHICH WOULD BE OPEN

4  CARRY, AND WEARING IN THE POCKET, WHICH WOULD BE CONCEALED

5  CARRY.

6          THE COURT:  SO THIS COURT -- POST-BRUEN FOR SURE,

7  THIS COURT SHOULD NOT MAKE THAT DISTINCTION?

8          MS. BELLANTONI:  I DON'T -- I DON'T NECESSARILY THINK

9  THAT THAT'S AN ISSUE BEFORE THE COURT JUST AS WE'RE SPEAKING

10 BECAUSE THE STATUTES THAT WE'RE CHALLENGING CRIMINALIZE PUBLIC

11 CARRY PERIOD.

12    SO 25850 CRIMINALIZES THE LOADED CARRIAGE OF A HANDGUN IN

13 PUBLIC.  DOESN'T MAKE A DISTINCTION BETWEEN OPEN CARRY AND

14 CONCEALED CARRY.  AND 26350, TO THE EXTENT THAT IT BANS OPEN

15 CARRY, BUT UNLOADED, YOU KNOW, TO THAT EXTENT I THINK THAT --

16 THAT MAKING THE DISTINCTION WOULD COME INTO PLAY BECAUSE THAT

17 CERTAINLY WOULD DELINEATE A MANNER OF CARRY THAT IS NOT

18 SEPARATED OUT IN THE PLAIN TEXT.

19         THE COURT:  ALL RIGHT.  MS. HADDAD --

20         MS. HADDAD:  YOUR HONOR --

21         THE COURT:  -- ANYTHING TO SAY ABOUT WHETHER OR NOT

22 THE COURT SHOULD THINK ABOUT THAT DISTINCTION AT ALL?

23         MS. HADDAD:  WE -- WE CERTAINLY THINK THE COURT

24 SHOULD THINK ABOUT THE DISTINCTION.  IT IS INCORRECT TO SAY

25 THAT BRUEN CONFLATED ALL MANNERS -- ALL MANNER OF WHETHER OPEN

1   OR CONCEALED CARRY INTO PUBLIC CARRY.  THEY -- YOU KNOW, THE

2   BRUEN COURT ACKNOWLEDGED SEVERAL TIMES THAT -- THAT STATES

3   COULD RESTRICT OR BAN CONCEALED CARRY ONLY WHEN PUBLIC CARRY --

4   ONLY WHEN OPEN CARRY WAS PERMITTED BUT THEY COULD NOT PROHIBIT

5   BOTH.  THERE WOULD BE NO POINT IN MAKING THAT DISTINCTION IF

6   THERE WAS NO DISTINCTION BETWEEN THE DIFFERENT MANNERS OF

7   CARRY.

8       PLAINTIFFS HERE HAVE THE RIGHT TO PUBLICLY CARRY, THEY JUST

9   CAN'T DO IT IN EVERY -- IN THE EXACT SAME WAY THAT THEY WANT OR

10  IN THE EXACT WAY THAT THEY WISH TO.  BUT AS A DISTRICT COURT IN

11  NEW YORK RECENTLY -- RECENTLY OBSERVED, THAT'S NOT

12  UNCONSTITUTIONAL.  THEY HAVE MULTIPLE AVENUES OPEN TO THEM TO

13  PUBLICLY CARRY.  AND CERTAINLY NOTHING IN BRUEN SUGGESTS AN

14  ANALYSIS OF THE HISTORY OF PROHIBITIONS OR RESTRICTIONS ON THE

15  OPEN CARRY OF WEAPONS.  THAT CASE -- THAT CASE FOCUSED SOLELY

16  ON THE CONCEALED CARRY OF WEAPONS.

17          THE COURT:  SO LET ME ASK -- HOLD THE THOUGHT.

18      JUST LOOKING AT THE -- THE HISTORY THAT YOU CITE TO ME, ARE

19  YOU POINTING ME TO ANY HISTORICAL REGULATION OR LAW IN EFFECT

20  IN 1791 THAT REQUIRED PERSONS TO OBTAIN A LICENSE OR SOME

21  SIMILAR PERMISSION BEFORE CARRYING A WEAPON IN PUBLIC?

22          MS. HADDAD:  SO FOR -- REGARDING LICENSING, YOUR

23  HONOR, NO LICENSING --

24          THE COURT:  OR SIMILAR PERMISSION.

25          MS. HADDAD:  SO THE -- THE LAWS THAT WERE IN EFFECT

1   AROUND 1791 WERE ACTUALLY FAR STRICTER THAN CALIFORNIA'S

2   LICENSING REGIME.  THEY -- THEY BANNED OR PROHIBITED THE CARRY

3   OF WEAPONS ALTOGETHER.

4       WE DO POINT TO CERTAIN LICENSING LAWS THAT WERE IN EFFECT

5   IN 1868, OR AROUND THE PERIOD OF THE RATIFICATION OF THE

6   FOURTEENTH AMENDMENT.  BUT I -- I -- YOU KNOW, WE WANT TO

7   STRESS -- AND I THINK WE MADE THIS POINT IN OUR BRIEFING --

8   THAT LICENSING IS A MORE FLEXIBLE APPROACH THAT WAS TAKEN BY

9   THE STATES.  CERTAINLY THERE IS A HISTORY AND TRADITION OF

10  BANNING OR PROHIBITING OR OTHERWISE RESTRICTING THE PUBLIC

11  CARRY OF WEAPONS, AND LICENSING WAS INTRODUCED AS -- AS A MORE

12  SOPHISTICATED WAY FOR STATES TO REGULATE THAT.

13      SO THE FACT THAT THERE ARE NO SPECIFIC LICENSING OR PERMIT

14  LAWS FROM 1791 DOES NOT INVALIDATE LAWS THAT IMPOSE A LESSER

15  BURDEN THAN LAWS THAT WERE IN EFFECT AROUND THE TIME OF THE

16  SECOND OR FOURTEENTH AMENDMENT.

17          THE COURT:  MS. BELLANTONI, ASSUME FOR SAKE OF

18  ARGUMENT THAT THE STATE CORRECTLY CHARACTERIZES THE

19  CIRCUMSTANCES IN 1791 AS MORE STRICT, DOES THAT MEAN A DIRECT

20  ANALOGUE IS NOT REQUIRED IF LICENSING IS LESS STRICT THAN WHAT

21  WAS IN -- THE NORMS IN PLACE IN 1791?

22          MS. BELLANTONI:  THERE IS NOT ONE STATUTE THAT HAS

23  BEEN CITED, LET ALONE A NATIONAL TRADITION, OF BANNING CARRY

24  ALTOGETHER IN 1791.

25      WHAT WOULD BE THE POINT OF CODIFYING THE SECOND AMENDMENT,

1    WHICH STATES VERY CLEARLY THAT THE RIGHT TO KEEP AND BEAR ARMS

2    SHALL NOT BE INFRINGED IF BEARING ARMS WAS BANNED ALTOGETHER?

3    THAT ABSOLUTELY MAKES NO SENSE.  AND THERE IS NOT ANY EVIDENCE

4    IN THE RECORD OF ANYTHING OF THE NATURE THAT THE STATE HAS JUST

5    REPRESENTED TO THIS COURT EXISTING IN '91.  THAT WAS THE ENTIRE

6    POINT OF CODIFYING THE SECOND AMENDMENT, THE PREEXISTING, FREE,

7    OPEN, GOD-GIVEN RIGHT TO SELF-DEFENSE, TO HAVE ARMS AND TO

8    CARRY ARMS FOR SELF-DEFENSE.

9        SO ANY REGULATION THAT IS PLACED ON THAT FREE AND EXISTING

10   RIGHT MUST BE SCRUTINIZED AND MUST BE LOOKED AT IN THE CONTEXT

11   OF WHAT DID THAT RIGHT MEAN TO THE FOUNDERS WHO JUST CAME OUT

12   FROM UNDER A TYRANNICAL REGIME IN ENGLAND THAT ATTEMPTED TO

13   DISARM THEM.  WHAT SENSE DOES IT MAKE THAT THEY WOULD THEN GIVE

14   THAT POWER AND AUTHORITY BACK TO ANOTHER GOVERNMENT TO DICTATE

15   WHEN AND HOW AND WHO COULD DEFEND THEMSELVES AND DEFEND THEIR

16   LIVES.  MAKES NO SENSE.  AND THE RECORD IS DEVOID OF ANY SUCH

17   REGULATION IN 1791.

18           THE COURT:  JUST THINKING ABOUT THE TEXT, THE SECOND

19   AMENDMENT DOES NOT SAY THE RIGHT TO KEEP AND BEAR ARMS OPENLY

20   SHOULD NOT BE INFRINGED.

21           MS. BELLANTONI:  RIGHT.  SO WE'VE TALKED ABOUT THAT

22   BECAUSE IN THE HELLER CASE THE TERM BEAR ARMS HAS BEEN DEFINED.

23       AND SPECIFICALLY THEY TOOK IT FROM THE MUSCARELLO CASE, AND

24   JUSTICE GINSBURG'S DISSENT IN THAT CASE, AS TO WHAT THE

25   DEFINITION -- AS IT MEANT TO THOSE IN THE FOUNDING ERA, WHAT

1   DID THAT DEFINITION MEAN.  AND THAT DEFINITION ENCOMPASSED

2   WEARING OR CARRYING ON THE PERSON OR CARRYING IN THE POCKET

3   WHICH COVERS BOTH OPEN CARRY AND CONCEALED CARRY.  IT'S AN

4   OVERARCHING RIGHT TO BEAR ARMS AND NOT FOR THE GOVERNMENT TO

5   DICTATE THE MODALITY IN WHICH SOMEONE DECIDES THAT THEY'RE

6   GOING TO -- HOW THEY'RE GOING TO DEFEND THEIR LIFE BY CARRYING

7   THEIR ARMS.  MUCH LIKE THE FIRST AMENDMENT WHERE THE GOVERNMENT

8   CANNOT DICTATE WHICH RELIGION AN INDIVIDUAL MUST WORSHIP OR

9   WHICH VERSION OF THE BIBLE THEY MUST READ OR ADHERE TO, IT'S

10  THE INDIVIDUAL CHOICE.  IT'S A VERY PERSONAL CHOICE AND HAS

11  MANY FACTORS THAT ENTER INTO THAT CHOICE.

12      AND TO BE HONEST, YOUR HONOR, IT WOULD MAKE LITTLE SENSE

13  FOR AN INDIVIDUAL TO BE CRIMINALLY LIABLE SIMPLY BECAUSE A

14  PIECE OF -- AN ARTICLE OF CLOTHING WAS IN THE DECIDING FACTOR

15  BETWEEN BEING A CRIMINAL AND NOT BEING A CRIMINAL AND BEING

16  LAW-ABIDING.

17      SO, FOR INSTANCE, LET'S SAY OPEN CARRY AS IT IS HERE WAS

18  BANNED AND AN INDIVIDUAL WAS CARRYING CONCEALED BUT YET THEIR,

19  YOU KNOW, JACKET WAS OPENED AND ALL OF A SUDDEN NOW THEIR

20  HANDGUN CAN BE SEEN, WHICH COULD BE, YOU KNOW, THEN INTERPRETED

21  TO BE OPEN CARRY.  IT'S A NUANCE AND IT'S A -- IT'S A

22  DELINEATION THAT IS A -- IT'S A COMPLETELY FABRICATED

23  CONSTRUCT.  AND THE SECOND AMENDMENT DOESN'T NEED TO SAY OPEN

24  OR CONCEALED BECAUSE IT COVERS BOTH.  IT SAYS BEAR.  AND IT

25  INURES TO THE BENEFIT OF THE PEOPLE FOR THAT TO BE INTERPRETED,

1    AS IT WAS IN HELLER, BROADLY AND NOT NARROWLY IN SCOPE.

2              THE COURT:  BUT THE COURT IN HELLER DID SAY THE RIGHT

3    ISN'T UNLIMITED.

4              MS. BELLANTONI:  RIGHT.  SO THE RIGHT ISN'T

5    UNLIMITED.

6              THE COURT:  IT DOES NOT PROTECT THE RIGHT OF CITIZENS

7    TO CARRY ARMS FOR ANY SORT OF CONFRONTATION.

8              MS. BELLANTONI:  RIGHT.  LIKE BRANDISHING AND AFFRAY

9    AND TERRORIZING AND SHOOTING GUNS INTO THE AIR.  BUT THE

10   PEACEFUL CARRY -- WHETHER IT'S OPEN OR CONCEALED, THE PEACEFUL

11   CARRY IS ABSOLUTELY PROTECTED BECAUSE THAT'S THE --

12             THE COURT:  BUT HELLER ALSO -- BUT HELLER ALSO WENT

13   ON TO SAY GOVERNMENTS COULD PROHIBIT CONCEALED WEAPONS, COULD

14   KEEP WEAPONS FROM THOSE WHO SUFFER FROM MENTAL ILLNESS OR ARE

15   CONVICTED OF A FELONY, COULD PROHIBIT WEAPONS IN SCHOOLS AND

16   GOVERNMENT BUILDINGS --

17             MS. BELLANTONI:  THAT'S --

18             THE COURT:  -- COULD IMPOSE CONDITIONS AND

19   QUALIFICATIONS ON COMMERCIAL SALE.  RIGHT?  THAT'S ALL IN

20   HELLER.

21             MS. BELLANTONI:  SO COMMERCIAL SALE IS NOT AT ISSUE.

22   WE'RE TALKING ABOUT THE INDIVIDUAL RIGHT HERE.  AND NEITHER ARE

23   THE PROHIBITORS.  AND THE PROHIBITORS ARE ALL LAID OUT --

24   OBJECTIVE PROHIBITORS -- THEY'RE ALL LAID OUT IN 18 USC 922(G).

25   AND MY CLIENTS HAVE NONE OF THOSE PROHIBITORS.  THEY'RE NOT

1    DISQUALIFIED.  SO --

2              THE COURT:  SO HERE IS THE QUESTION EXTENDING THE

3    REASONING OF HELLER.  IF A STATE CAN IMPOSE THE RESTRICTIONS

4    THAT HELLER ACKNOWLEDGES ARE POSSIBLE, WHY IS IT NOT REASONABLE

5    THAT A STATE COULD IMPOSE RESTRICTIONS THROUGH A LICENSING

6    SYSTEM?

7              MS. BELLANTONI:  THE STATE CAN ONLY IMPOSE THOSE

8    RESTRICTIONS THAT ARE JUSTIFIED BY LOOKING BACK TO THE FOUNDING

9    ERA.  AND IF THOSE RESTRICTIONS EXISTED THEN, THEN THERE IS AN

10   HISTORICAL ANALOGUE.  AND IF THEY DID NOT THEN THE STATE CANNOT

11   IMPOSE THOSE RESTRICTIONS.

12             THE COURT:  AND IT'S NOT -- THE PLAINTIFFS AREN'T

13   SAYING -- MAKING CERTAIN I UNDERSTAND YOUR POSITION, PLAINTIFFS

14   ARE NOT SAYING THAT CALIFORNIA DOESN'T ALLOW PEOPLE TO CARRY

15   FIREARMS IN PUBLIC FOR SELF-DEFENSE, RIGHT?

16             MS. BELLANTONI:  OH, I'M SAYING THAT THEY DON'T ALLOW

17   IT.  THERE ARE TWO CRIMINAL STATUTES THAT -- THAT BAN THAT

18   RIGHT.  THE FACT THAT THERE IS NOW A LICENSING SCHEME -- WHICH

19   I WILL AGAIN SAY, IF YOU LOOK AT THE PLAIN TEXT OF THE

20   LICENSING STATUTES, 26150 AND 26155 STILL SAY "MAY."  SO THEY

21   CAN SAY "SHALL ISSUE" 'TIL THE COWS COME HOME, BUT THE LANGUAGE

22   OF THE STATUTE IS "MAY."  IT'S A "MAY ISSUE" LICENSING SCHEME.

23   SO DISCRETION IS STILL THERE.  IT'S STILL ASKING PERMISSION

24   FROM THE GOVERNMENT.

25             THE COURT:  THE ATTORNEY GENERAL HAS -- HAS MADE A

1    DETERMINATION NOT TO ENFORCE AND LANGUAGE IS CHANGING IN

2    JANUARY.  IS THAT RIGHT?

3         MS. HADDAD:  THAT'S CORRECT, YOUR HONOR.

4         THE COURT:  DO YOU ACKNOWLEDGE THAT, THE ATTORNEY

5    GENERAL'S EXPRESS DIRECTION NOT TO ENFORCE AND THE MODIFIED

6    LANGUAGE COMING ONLINE?

7         MS. BELLANTONI:  I -- AS I SIT HERE TODAY, I DON'T.

8    IT'S NOT THERE YET.  IT'S STILL PART OF THE STATUTE.

9         BUT EVEN IF THEY DO TRANSITION TO A "SHALL ISSUE," THE

10   BRUEN COURT DID NOT ANALYZE LICENSING REQUIREMENTS UNDER THE

11   TEXT, HISTORY, AND TRADITION ANALYSIS.  THEY SIMPLY COMMENTED

12   THAT SIX OF THE STATES, INCLUDING NEW YORK, IS -- ARE STILL

13   OUTLIERS IN THAT THEY STILL ARE DISCRETIONARY.

14        SO TO THAT EXTENT, TO AVOID CONFUSION ACROSS THE COUNTRY,

15   THEY INDICATED THAT THE "SHALL ISSUE" REGIMES WOULD STAY IN

16   PLACE AND THAT THEY WOULD STAY IF THERE WERE OBJECTIONABLE

17   FACTORS -- OBJECTIONABLE FACTORS -- I'M SORRY -- OBJECTIVE

18   FACTORS WOULD STAY IN PLACE.  BUT EVEN OBJECTIVE FACTORS ARE

19   SUBJECT TO THE TEXT, HISTORY, AND TRADITION ANALYSIS --

20        THE COURT:  BUT JUST SO I'M CLEAR --

21        MS. BELLANTONI:  -- IN LICENSING -- YES.

22        THE COURT:  -- DO YOU GIVE NO WEIGHT TO THE ATTORNEY

23   GENERAL'S POSITION THAT THE LAWS AS WRITTEN CURRENTLY WILL NOT

24   BE ENFORCED?

25        MS. BELLANTONI:  NO.

1              THE COURT:  ALL RIGHT.  SO THE COURT -- JUSTICE

2   KAVANAUGH AND THE CHIEF JUSTICE OPINED THAT 43 STATES WITH

3   OBJECTIVE LICENSING SYSTEMS COULD CONTINUE TO ENFORCE THOSE

4   LICENSING SYSTEMS.  THREE DISSENTERS WOULD HAVE UPHELD THE NEW

5   YORK LICENSING LAW.  BUT LOOKING AT THE WAY THE VOTES ALIGNED

6   IN THE DECISION, DON'T I APPLY WHAT'S KNOWN AS THE MARKS RULE,

7   LOOKING FOR THE POSITION TAKEN BY THOSE CONCURRING IN THE

8   JUDGMENT ON THE NARROWEST GROUNDS?

9              MS. BELLANTONI:  THE ONLY TWO STATUTES THAT ARE BEING

10  CHALLENGED HERE ARE 25850 AND 26350.  AND THE ISSUE HERE IS

11  WHETHER IS THERE A -- AN HISTORICAL ANALOGUE FOR CRIMINALIZING

12  PUBLIC CARRY, WHICH THERE IS NOT.  AND THE STATE HAS FAILED TO

13  MEET ITS BURDEN OF SHOWING THAT THERE IS ONE.  AND THEY CAN'T

14  JUSTIFY THE LACK OF HISTORICAL ANALOGUE BY POINTING TO

15  MODERN-DAY LICENSING REGULATIONS.  BECAUSE ON THAT NOTE, AGAIN,

16  THERE WAS NO LICENSING AT THE FOUNDING.  THEY WOULDN'T EVEN

17  HAVE CONTEMPLATED HAVING TO SEEK AND ASK PERMISSION IN ORDER TO

18  EXERCISE A PREEXISTING RIGHT.

19          NOBODY HAS TO GO ASK THE GOVERNMENT IF THEY COULD GO TO

20  CHURCH OR IF THEY COULD HAND OUT, YOU KNOW, PUBLIC POLITICAL

21  FLYERS ON A SIDEWALK.  THOSE ARE THINGS -- YOU WAKE UP IN THE

22  MORNING, YOU HAVE THE RIGHT TO DEFEND YOURSELF IF SOMEONE TRIES

23  TO ATTACK YOU AND TAKE YOUR LIFE FROM YOU.  YOU HAVE THE RIGHT

24  TO HAVE A WEAPON ON YOU IN ORDER TO DO THAT.

25          AND JUST WHILE WE'RE ON THAT, THAT 26045 CARVEOUT, IT

1   REQUIRES THE INDIVIDUAL TO ESSENTIALLY BE A CRIMINAL AND CARRY

2   WITHOUT A LICENSE.  AND THEN IF THEY ARE ATTACKED, THEY HAVE A

3   DEFENSE.  BUT WHAT ABOUT THE SITUATION WHERE, YOU KNOW, THEY'RE

4   FOUND IN POSSESSION OF THEIR GUN AND THEY WEREN'T IN A

5   SELF-DEFENSE SITUATION AND THEY WEREN'T BEING IMMINENTLY

6   ATTACKED?

7        THE SECOND AMENDMENT DOESN'T REQUIRE -- AND THIS IS THE

8   PROPER CAUSE REGULATION THAT WAS STRICKEN BY BRUEN -- THEY

9   DON'T REQUIRE YOU TO HAVE AN IMMINENT, YOU KNOW, FEAR OF BEING

10  ATTACKED.  YOU DON'T HAVE TO SHOW THAT SOMEONE IS AFTER YOU OR

11  THAT YOU'RE SEPARATE FROM EVERYBODY ELSE IN SOCIETY.  THAT WAS

12  STRICKEN ALREADY.  SO TO THE EXTENT THE STATE IS RELYING ON

13  THAT EXCEPTION, IT'S -- IT -- IT'S BEEN STRICKEN BY, YOU KNOW,

14  ESSENTIALLY -- IN PRACTICE BY BRUEN BECAUSE IT'S THE SAME AS

15  THE PROPER CAUSE ANALYSIS.  AND IT'S A FALLACY BECAUSE IT

16  REQUIRES YOU TO BREAK THE LAW BY CARRYING A GUN AND THEN ONLY

17  PROVIDES A DEFENSE IF YOU ARE ACTUALLY ATTACKED.

18          THE COURT:  SO HELP -- JUST THINKING MORE ABOUT WHAT

19  THE COURT SAID IN BRUEN, ONLY ORDINARY LAW-ABIDING CITIZENS --

20  THAT'S BEEN A THEME IN THE RECENT SUPREME COURT JURISPRUDENCE

21  -- ONLY LAW-ABIDING CITIZENS CAN CARRY FIREARMS IN PUBLIC FOR

22  SELF-DEFENSE.  SO STATES HAVE TO HAVE THE ABILITY TO

23  DISTINGUISH ORDINARY LAW-ABIDING CITIZENS FROM OTHERS, CORRECT?

24          MS. BELLANTONI:  NO.  I DON'T AGREE WITH THAT.

25  EVERYONE STARTS OUT WITH THE RIGHT.  IT'S YOUR LIFE.  YOU HAVE

1    THE RIGHT TO DEFEND IT.  AND IF YOU'VE DONE SOMETHING, LET'S

2    SAY --

3              THE COURT:  SO IS THE PRESUMPTION -- THE PRESUMPTION

4    IS THAT EVERYONE IS AN ORDINARY LAW-ABIDING CITIZEN?

5              MS. BELLANTONI:  THE -- YES.  THE PRESUMPTION IS THAT

6    ALL AMERICANS HAVE THE RIGHT TO BEAR ARMS FOR SELF-DEFENSE.

7    THAT IS THE PRESUMPTION.  THAT'S THE CONDUCT THAT'S

8    PRESUMPTIVELY PROTECTED BY THE PLAIN TEXT OF THE SECOND

9    AMENDMENT.

10             THE COURT:  SO STATES CANNOT ENGAGE IN ANY EFFORT TO

11   DISTINGUISH THOSE THAT THE SUPREME COURT HAS ACKNOWLEDGED MAY

12   NOT -- MAY NOT HAVE THAT RIGHT BECAUSE OF A FELONY CONVICTION,

13   BECAUSE OF A MENTAL HEALTH CONDITION?  THE STATE HAS NO RIGHT

14   TO TRY TO MAKE ANY DISTINCTIONS TO IDENTIFY THOSE PERSONS WHO

15   MIGHT BE EXCEPTED?

16             MS. BELLANTONI:  SO, JUDGE, THE PROBLEM WITH THE

17   LICENSING SCHEME IS THAT IT -- IT --

18             THE COURT:  JUST ANSWER -- WHAT ABOUT -- JUST THINK

19   ABOUT DISTINCTIONS.

20             MS. BELLANTONI:  OKAY.  SO THERE ARE RULES.  LIKE I

21   TALKED ABOUT BEFORE, THE FEDERAL STATUTE 18 USC 922(G), THAT

22   LAYS OUT OBJECTIVE FACTORS FOR INDIVIDUALS WHO HAVE, BY ACTS OR

23   CONDITIONS OR EVENTS, DISQUALIFIED THEMSELVES FROM THE RIGHT

24   THAT'S PROTECTED BY THE SECOND AMENDMENT.  SO FELONY

25   CONVICTIONS, MISDEMEANOR DOMESTIC VIOLENCE CONVICTIONS.  BUT AS

1    WE SEE IN THE RAHIMI CASE, IN THE RANGE CASE THAT ARE GOING UP

2    TO THE SUPREME COURT, THAT EVEN THOSE MAY NOT HAVE A -- AN

3    HISTORICAL ANALOGUE AND THOSE ARE BEING CHALLENGED.  BUT

4    OBJECTIVELY THE STATE ALREADY HAS STATUTES THAT PUNISH

5    INDIVIDUALS WHO ARE PROHIBITED INDIVIDUALS FROM CARRYING.

6         THERE IS NO REASON TO PUNISH EVERYONE SIMPLY BECAUSE SOME

7    PEOPLE ARE PROHIBITED FROM CARRYING AND THAT'S WHAT THE

8    LICENSING DOES.  IT PUTS EVERYONE ON THE DEFENSIVE AND SAYS

9    EVERYONE IS PROHIBITED.  EVEN THOUGH THEY HAVEN'T DONE

10   ANYTHING, EVERYONE IS PROHIBITED UNTIL THEY PROVE THAT THEY'RE

11   NOT PROHIBITED TO THE -- YOU HAVE TO PROVE TO THE GOVERNMENT.

12   AND IT'S A SUBJECTIVE SCHEME.  AND EVEN IF IT WERE OBJECTIVE,

13   THERE IS STILL NO -- IT STILL VIOLATES THE PLAIN TEXT AND THE

14   INTENTION OF CODIFYING THE SECOND AMENDMENT TO MAKE SOMEONE GO

15   TO THE GOVERNMENT AND SAY I'M NOT PROHIBITED.

16        EVERYONE STARTS OUT WITH THE NATURAL RIGHT.  IT'S A NATURAL

17   RIGHT.  AND IT'S ONLY, YOU KNOW, THAT WE'VE HAD ALL THESE

18   REGULATIONS PILED ON TOP OF THE NATURAL RIGHT, NOW WE'RE TRYING

19   TO PEEL THEM BACK AND GET BACK TO THE NATURAL RIGHT OF BEING

20   ABLE TO JUST DEFEND YOURSELF.

21        THE COURT:  THAT COMES THROUGH IN YOUR BRIEFING.  I'M

22   VERY CLEAR ON THAT.  AND I KNOW HELLER TALKED ABOUT THAT.

23        SO THIS IS A NIT -- A RELATIVE NIT, BUT AT ONE POINT THE

24   PLAINTIFFS DO ARGUE THAT WEAPONS MIGHT BE DIFFICULT TO CONCEAL.

25   IT'S AN ARGUMENT.  IS THERE ANY EVIDENCE IN THE RECORD THAT

1    SUPPORTS THAT ARGUMENT THAT HANDGUNS ARE INEFFECTIVE FOR

2    SELF-DEFENSE WHEN CONCEALED?

3            MS. BELLANTONI:  NO, YOUR HONOR, IT WAS -- IT'S

4    REALLY ANECDOTAL FROM A COMMON SENSE PERSPECTIVE.  AND IT GOES

5    TO WHAT WE HAD TALKED ABOUT BEFORE IN THAT THE PLAIN TEXT

6    COVERS BOTH CONCEALED AND OPEN CARRY.  BUT IT'S COMMON -- IT'S

7    A COMMON SENSE, YOU KNOW, ANECDOTAL PIECE OF INFORMATION THAT

8    IF AN INDIVIDUAL IS UNDER DURESS AND ATTEMPTING TO ACCESS THEIR

9    FIREARM WHERE TIMING IS OF THE ESSENCE, AND AN EMERGENT

10   SITUATION, IT'S MUCH EASIER TO ACCESS A FIREARM THAT'S NOT

11   HIDDEN AND CONCEALED BENEATH CLOTHING AND LAYERS OF CLOTHING

12   AND IS OPEN AND ABLE TO BE ACCESSED MORE EXPEDITIOUSLY.

13           THE COURT:  ALL RIGHT.

14      MS. HADDAD, I ASKED MS. BELLANTONI QUITE A FEW QUESTIONS.

15   IF YOU HAVE SOMETHING TO SAY IN RESPONSE TO WHAT YOU'VE HEARD

16   THAT'S NOT IN YOUR BRIEFING, YOU CAN DO THAT.  I THINK MY

17   BOTTOM LINE QUESTION FOR YOU THAT I HAVEN'T ASKED IS, BASED ON

18   THE RECORD BEFORE THE COURT, WOULD YOU CONCEDE THE COURT COULD

19   CONCLUDE THERE IS NO HISTORICAL 1790S ANALOGUE TO THE STATE'S

20   LICENSING STATUTE?

21           MS. HADDAD:  TO LICENSING SPECIFICALLY?

22           THE COURT:  RIGHT.

23           MS. HADDAD:  WE WOULD CONCEDE THAT THERE IS NO

24   ANALOGUE.  THERE ARE LAWS THAT IMPOSE FAR GREATER BURDENS THAN

25   THE RELATIVE FLEXIBILITY OF A LICENSING SCHEME THAT IS HERE,

1   WHICH AS I THINK YOUR HONOR HAS CORRECTLY NOTED, THAT BRUEN

2   HAS -- THAT BRUEN HAS SANCTIONED -- THAT BRUEN HAS ALLOWED FOR

3   LICENSING SCHEMES THAT APPLY OBJECTIVE, NARROW RESTRICTIONS.

4   JUSTICE KAVANAUGH'S CONCURRENCE SPELLS THAT OUT QUITE CLEARLY.

5         SO IS THERE A LAW THAT SAYS, IN 1791, THERE WAS -- THAT

6   INDIVIDUALS COULD ONLY CARRY IF THEY OBTAINED A LICENSE FROM

7   THE STATE?  NO.  THERE WERE LAWS THAT INSTEAD PROHIBITED

8   CARRYING ALTOGETHER.  SO IN THAT RESPECT I WOULD -- I WOULD

9   JUST URGE YOUR HONOR TO STILL CONSIDER THE LAWS THAT WE HAVE

10  PUT FORTH BECAUSE THE BURDENS ARE NOT ONLY COMPARABLE, THE

11  BURDENS ARE -- IMPOSED WERE FAR GREATER THAN CALIFORNIA'S

12  SCHEME HERE.  THAT DOES NOT MAKE THEM IRRELEVANT TO THE

13  ANALYSIS.

14            THE COURT:  I UNDERSTAND THAT ARGUMENT.

15            MS. HADDAD:  THANK YOU.

16            THE COURT:  ALL RIGHT.  ANYTHING ELSE YOU WANT TO SAY

17  IN RESPONSE TO WHAT YOU HEARD FROM MS. BELLANTONI?

18            MS. HADDAD:  JUST A FEW -- JUST A FEW POINTS.

19        I UNDERSTAND PLAINTIFFS' POSITION THAT THE ATTORNEY

20  GENERAL'S LEGAL ALERT HAS NO WEIGHT.  HOWEVER, I THINK THAT THE

21  NINTH CIRCUIT'S DECISION IN FLANAGAN V. BONTA PUT THIS TO REST.

22  THAT DISMISSED AN APPEAL INVOLVING THE GOOD CAUSE REQUIREMENT

23  THAT'S IN THE STATUTES THAT ARE ABOUT TO BE AMENDED BY SB2.

24  THAT DISMISSED IT AS MOOT.

25        I ALSO WOULD LIKE TO POINT OUT THAT REGARDING THE ARGUMENT

1  THAT CLOTHES -- THAT -- THAT WEAPONS COULD NOT BE CARRIED

2  CONCEALED UNDER CLOTHING, DR. RIVAS, OUR EXPERT, GAVE EXTENSIVE

3  -- DEVOTED AN EXTENSIVE PART OF HER REPORT TO THE PURPOSE OF

4  WEAPONS THAT WERE DEVELOPED DURING THE 17TH, 18TH AND 19TH

5  CENTURIES, AND THAT THEY WERE -- EXCUSE ME, THE 18TH AND 19TH

6  CENTURIES THEY WERE INTENDED TO BE CARRIED CONCEALED.  SO I

7  WOULD JUST DIRECT THIS COURT'S ATTENTION TO THAT PORTION OF HER

8  REPORT.

9      AND THEN I JUST -- RESPONDING TO PLAINTIFFS' CONTENTIONS

10  THAT THE STATE HAS NOT PUT FORTH LAWS DEMONSTRATING SIMILAR

11  BURDENS, THE -- BRUEN MADE CLEAR THAT -- AND THE -- AND THE

12  NINTH CIRCUIT RECENTLY ENDORSED THAT LANGUAGE, THAT NO ANALOGUE

13  NEED BE A DEAD RINGER OR AN HISTORICAL TWIN.

14      THE QUESTION -- SO SOME OF THESE LAWS MAY NOT HAVE THE SAME

15  LANGUAGE OR THE SAME BURDENS AS CALIFORNIA'S LAWS, BUT THE

16  BURDENS ARE STILL SIMILAR.  OFTEN THE BURDENS THAT WE HAVE

17  CITED -- THE LAWS THAT WE HAVE CITED TO IMPOSE GREATER BURDENS

18  THAN CALIFORNIA'S CURRENT LAWS, AND THE PURPOSES FOR THOSE LAWS

19  STILL REMAIN.

20      THERE IS NOTHING IN BRUEN -- THERE IS NOTHING IN BRUEN TO

21  SUGGEST THAT LAWS THAT WERE IN EFFECT IN -- IN -- AT THE TIME

22  OF THE RATIFICATION OF THE FOURTEENTH AMENDMENT IN 1868 ARE NOT

23  TO BE CONSIDERED.  BRUEN IN FACT SAYS THE OPPOSITE, AS DOES THE

24  NINTH CIRCUIT.

25      AND SO RESPONDING TO THOSE POINTS, I THINK -- I THINK THAT

1  GETS TO EVERYTHING THAT PLAINTIFFS RAISED THAT I WANTED TO MAKE

2  SURE I RAISED HERE.

3      THERE IS ONE ADDITIONAL POINT.  IN OUR OPPOSITION BRIEFING

4  WE SET FORTH A SERIES OF LAWS THAT WE THOUGHT EXEMPLIFY THE

5  COMPARABLE BURDENS THAT CALIFORNIA'S LAWS PUT FORTH.  TWO

6  POINTS ON THAT.

7      FIRST, WE NEGLECTED TO INCLUDE IN THAT BULLET POINT LISTING

8  A LAW IDENTIFIED BY DR. SPITZER AT PAGE 7 OF HIS REPORT.  IT'S

9  AN 1837 GEORGIA LAW THAT RESTRICTED ALL CARRYING OF -- PUBLIC

10 CARRYING OF WEAPONS.  WE'LL INCLUDE THAT IN OUR UPDATED REQUEST

11 FOR JUDICIAL NOTICE.

12          THE COURT:  SO THAT'S YOUR BULLET POINT LIST ON --

13          MS. HADDAD:  YES.

14          THE COURT:  -- ON -- IT WOULD APPEAR PROBABLY ON PAGE

15 18?

16          MS. HADDAD:  I THINK THAT'S CORRECT.  AND IT GOES FOR

17 SEVERAL PAGES.

18          THE COURT:  PAGE 18 AT ECF PAGE -- PAGE 12 OF YOUR

19 BRIEF.

20          MS. HADDAD:  YES, YOUR HONOR.

21          THE COURT:  UNDERSTOOD.

22          MS. HADDAD:  AND THEN ONE -- ONE POINT THAT

23 PLAINTIFFS HAVE MADE THAT WE -- THAT WE TAKE GREAT ISSUE WITH

24 IS THAT THE LAWS THAT WE'VE CITED TO ONLY PENALIZE THE CARRYING

25 OF WEAPONS TO THE TERROR OF THE COUNTY, THERE WERE -- OR -- OR

1   THAT ARE OFFENSIVELY DISPLAYED, SOME OF THE -- SOME OF THE

2   LANGUAGE IN THE LAWS ARE PHRASED ARMED DEFENSIVELY.

3        FIRST OFF, THIS IS INCORRECT.  WE HAVE CITED TO LAWS THAT

4   BAN OR PROHIBIT OR SEVERELY RESTRICT THE PUBLIC CARRYING OF

5   WEAPONS REGARDLESS OF HOW THEY ARE CARRIED.

6        BUT SECONDLY, AS DR. SPITZER WENT TO DESCRIBE AT LENGTH IN

7   HIS -- IN HIS EXPERT REPORT, THOSE LAWS ARE ABSOLUTELY RELEVANT

8   BECAUSE THE IDEA IS THAT THE MERE PUBLIC APPEARANCE OF A WEAPON

9   IS UNLAWFUL.  AND THESE DATE BACK TO THE BRITISH STATUTE OF

10   NORTHAMPTON.  THE SAME LANGUAGE OF BEING -- OF LAWS INCLUDING

11   PHRASES THAT -- THE PROHIBITING OF BEING ARMED DEFENSIVELY, OR

12   PROHIBITING OF CARRYING TO THE TERRORIZING OF THE PEOPLE.  THE

13   MERE PUBLIC -- THE MERE CARRYING OF A WEAPON IN PUBLIC IN FRONT

14   OF OTHERS MEETS THOSE REQUIREMENTS.

15        SO THE LAWS THAT WE HAVE CITED CAN'T JUST BE DISREGARDED.

16   THEY -- THEY HAVE -- THEY CARRY THE COMPARABLE BURDENS.  AND

17   ALL OF THOSE LAWS THAT WE HAVE CITED HAVE SIMILAR SELF-DEFENSE

18   EXCEPTIONS TO THE ONE THAT I'VE CITED HERE THAT'S CURRENTLY IN

19   EFFECT IN CALIFORNIA.

20             THE COURT:  ALL RIGHT.  UNDERSTOOD.

21        MS. BELLANTONI, ANY -- ANY RESPONSE TO WHAT YOU'VE JUST

22   HEARD THAT'S NOT COVERED IN THE BRIEFING OR WHAT YOU SAID

23   PREVIOUSLY?

24             MS. BELLANTONI:  YES.  BRIEFLY, YOUR HONOR.

25        SO THE CASE CITED BY MR. SPITZER IN GEORGIA, NUNN VERSUS

1   STATE, WAS OVERRULED BY THE GEORGIA SUPREME COURT.  CAN'T BAN

2   CARRY ALTOGETHER.

3       AND I'LL REITERATE THAT THIS IS AN OPEN CARRY BAN.  SO EVEN

4   IF THE STATUTE IS CHANGED TO A "SHALL ISSUE" STATUTE, THERE IS

5   NO INDICATION THAT THE DOJ IS GOING TO START ISSUING AN

6   APPLICATION THAT ALLOWS FOR OPEN CARRY TO BE APPLIED FOR.  THE

7   ONLY APPLICATION WHICH ALL OF THE LICENSING OFFICERS ARE

8   REQUIRED TO USE, THE ONLY APPLICATION ISSUED BY THE DOJ IS

9   CONCEALED CARRY.  THERE ARE GEOGRAPHICAL RESTRICTIONS ON OPEN

10  CARRY THAT ONCE YOU STEP OUT OVER YOUR COUNTY OF ISSUANCE THAT

11  THAT OPEN CARRY LICENSE IS AUTOMATICALLY INVALIDATED.  AND,

12  AGAIN, THERE WAS NO LICENSING REQUIREMENT OR PROHIBITION

13  REQUIRED BACK IN 1791.

14      AND ALSO HELLER AND BRUEN SPEND A FEW PAGES TALKING ABOUT

15  THE STATUTE IN NORTHAMPTON AND HOW IT'S ABSOLUTELY NOT

16  COMPARABLE TO PEACEFUL PUBLIC CARRY.  AND THERE IS NOTHING IN

17  ANY STATUTE OR IN THE SUPREME COURT'S ANALYSIS THAT SEEMS TO

18  INDICATE THAT -- OR EVEN IMPLY THAT SIMPLY WEARING A HANDGUN

19  OPEN AND HOLSTERED IS GOING TO TERRORIZE PEOPLE.

20      CALIFORNIA AND HAWAII IN THE NINTH CIRCUIT ARE THE ONLY TWO

21  STATES OF ALL SEVEN STATES THAT OUTLAW AND BAN OPEN CARRY.

22  OPEN CARRY IS PRACTICED UNREMARKABLY THROUGHOUT THIS COUNTRY.

23  AND 27 STATES, MORE THAN HALF, ARE CONSTITUTIONAL CARRY AND

24  DON'T EVEN REQUIRE A PERMIT TO ENABLE PEOPLE TO PROTECT

25  THEIR -- THEMSELVES OUT IN PUBLIC.

1          THANK YOU.

2                THE COURT:  ALL RIGHT.  MS. HADDAD, ANY FINAL WORD?

3          THEY ARE CROSS-MOTIONS HERE, BUT SOMEONE HAS TO HAVE THE

4     LAST WORD.

5                MS. HADDAD:  WELL, JUST A FINE POINT.

6          PLAINTIFFS HAVE -- THERE IS NO EVIDENCE IN THE RECORD THAT

7     PLAINTIFFS HAVE REAPPLIED FOR AN OPEN CARRY PERMIT SINCE THE

8     ISSUANCE OF BRUEN.

9          AND THERE IS CERTAINLY NOTHING TO SUGGEST THAT WHEN SB2

10    TAKES EFFECT THAT -- THAT THE INDIVIDUAL COUNTIES ISSUING

11    LICENSES THAT MAKE THE DETERMINATION ON LIMITATION OF LICENSES

12    WON'T COMPLY WITH THE PLAIN LETTER OF THE LAW.  SO THE COUNTIES

13    THAT PLAINTIFFS LIVE IN, THAT WOULD APPLY TO THEM AS WELL.

14                THE COURT:  ALL RIGHT.

15                MS. BELLANTONI:  BUT, AGAIN, JUDGE, JUST TO -- JUST

16    BRIEFLY -- THESE ARE TWO CRIMINAL STATUTES.  SO IF THE

17    LICENSING, YOU KNOW -- YOU KNOW OUR POSITION ON LICENSING AND

18    WHETHER THAT HAS HISTORICAL ANALOGUE.  BUT EVEN IF LICENSING

19    WERE REQUIRED, WHAT'S THE PUNISHMENT FOR NOT BEING LICENSED?

20    IT'S NOT -- CAN'T BE GOING TO JAIL.  YOU CAN'T CRIMINALIZE AND

21    PROSECUTE SOMEONE FOR EXERCISING A NATURAL RIGHT AND THAT'S

22    WHAT THESE TWO STATUTES DO.  THEY CAN'T CRIMINALIZE A NATURAL

23    RIGHT.  CAN'T PUT PEOPLE IN JAIL FOR READING THE BIBLE ON THE

24    BENCH OUT IN PUBLIC.  YOU CAN'T PUT PEOPLE IN JAIL FOR

25    EXERCISING THEIR RIGHT TO SELF-DEFENSE BY CARRYING ARMS

1    PEACEFULLY.

2            THE COURT:  I UNDERSTAND THAT POSITION.

3            MS. BELLANTONI:  THANK YOU.

4            THE COURT:  YOU UNDERSTAND -- I MEAN, THE CRIMINAL

5    STATUTES -- IT'S BEEN A REFRAIN, AND I -- YOU'VE SAID

6    EVERYTHING YOU HAVE TO SAY ABOUT THAT?

7            MS. HADDAD:  YES, YOUR HONOR.  I JUST WANT TO REPEAT

8    THAT PLAINTIFFS CAN CARRY CONCEALED THROUGHOUT THE STATE.

9            THE COURT:  ALL RIGHT.  THE MATTER WILL BE SUBMITTED

10    ONCE I SEE THE -- THE COMPILATION OF THE LAWS AND THE

11    PLAINTIFFS' RESPONSE.

12       YES?

13            MS. HADDAD:  I -- I APOLOGIZE.  I JUMPED -- I THINK I

14    JUMPED AHEAD OF MYSELF.  WOULD IT BE POSSIBLE TO HAVE UNTIL

15    THURSDAY TO SUBMIT THE LAWS --

16            THE COURT:  THAT'S FINE.  SO THURSDAY FOR --

17            MS. HADDAD:  FRIDAY IS A HOLIDAY.

18            THE COURT:  I'M SORRY.  WHICH IS THE HOLIDAY?

19            MS. HADDAD:  SO FRIDAY IS VETERANS DAY.

20            THE COURT:  RIGHT.  OKAY.  SO THURSDAY FOR THE

21    DEFENDANTS AND THEN --

22            MS. BELLANTONI:  MONDAY, YOUR HONOR?

23            THE COURT:  YEAH.

24            MS. BELLANTONI:  THANK YOU.

25            THE COURT:  THE 13TH.

1          MS. BELLANTONI:  THANK YOU SO MUCH.

2          MS. HADDAD:  THANK YOU.

3          THE COURT:  THANK YOU.

4          THE CLERK:  COURT IS IN RECESS.

5              (PROCEEDINGS ADJOURNED, 12:34 P.M.)

6                      ---oOo---

7   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

8   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9

10                      /S/ KIMBERLY M. BENNETT
                        KIMBERLY M. BENNETT
11                      CSR NO. 8953, RPR, CRR, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25