**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD,

*Plaintiff - Appellant*,

v.

ROB BONTA, in his official capacity
as Attorney General of the State of
California,

*Defendant - Appellee*.

No. 24-565

D.C. No.
2:19-cv-00617-
KJM-AC

OPINION

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding

Argued and Submitted June 24, 2025
Seattle, Washington

Filed January 2, 2026

Before: N. Randy Smith, Kenneth K. Lee, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge VanDyke;
Concurrence by Judge Lee;
Partial Concurrence and Partial Dissent by Judge N.R.
Smith.

# SUMMARY[*]

## Second Amendment

The panel affirmed in part and reversed in part the district court's summary judgment in favor of California Attorney General Rob Bonta in Mark Baird's civil rights lawsuit challenging, under the Second and Fourteenth Amendments, California's restrictions on the open carry of firearms.

Addressing Baird's facial and as applied challenges to California's urban open-carry ban, the panel held that California's ban on open carry in counties with a population greater than 200,000 is inconsistent with the Second Amendment's right to bear arms as applied to the states through the Fourteenth Amendment. Applying the standard set forth in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the historical record makes unmistakably plain that open carry is part of this Nation's history and tradition. It was clearly protected at the time of the Founding and at the time of the adoption of the Fourteenth Amendment. There is no record of any law restricting open carry at the Founding, let alone a distinctly similar historical regulation. California's failure to satisfy its burden to present evidence of a relevant historical tradition of firearm regulation is dispositive with respect to California's urban open-carry ban.

Addressing Baird's as-applied and facial challenges to California's licensing requirements in counties with

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

populations of less than 200,000, the panel concluded that
Baird waived his as-applied challenge by not contesting the
district court's dismissal in his opening brief.  To the extent
that Baird facially challenged California's rural licensing
scheme, his challenge runs counter to *Bruen*'s indication that
shall-issue licensing regimes like the licensing that
California theoretically allows in less populous counties can
be constitutional.  At least on its face, California's rural
licensing scheme is a shall-issue regime under which a
general desire for self-defense is sufficient to obtain a
permit.

Accordingly, the panel affirmed the district court's
judgment in part, reversed in part, and remanded with the
instruction to enter judgment in favor of Baird with respect
to his challenge to California's urban open-carry ban.

Concurring, Judge Lee, joined by Judge VanDyke, wrote
separately to highlight how California has apparently
resorted to subterfuge to deny its citizens their Second
Amendment rights.  California insists that citizens in
counties with populations of fewer than 200,000 people can
apply for an open-carry license.  Yet California admits that
it has no record of even one open-carry license being issued,
and one potential reason is that California has misled its
citizens about how to apply for an open-carry license.

Concurring in part and dissenting in part, Judge N.R.
Smith wrote that California's restrictions on open carry in
more populated counties are constitutional.  First, open carry
is not conduct that is covered by the plain text of the Second
Amendment.  Second, following the reasoning of *Bruen*,
California may lawfully eliminate one manner of public
carry to protect its citizens so long as its citizens may carry
weapons in another manner that allows for self-

defense.  Because California allows concealed carry, it may restrict open carry.

---

## COUNSEL

Amy L. Bellantoni (argued), Bellantoni Law Firm PLLC, Scarsdale, New York, for Plaintiff-Appellant.

Aaron D. Pennekamp (argued), Deputy Solicitor General; Iram Hasan, Deputy Attorney General; John D. Echeverria and R. Matthew Wise, Supervising Deputy Attorneys General; Thomas S. Patterson, Senior Assistant Attorney General; Helen H. Hong, Principal Deputy Solicitor General; Michael J. Mongan, Solicitor General; Rob Bonta, California Attorney General; Office of the California Attorney General, Sacramento, California; Lara Haddad, Supervising Deputy Attorney General; Office of the California Attorney General, Los Angeles, California; for Defendant-Appellee.

Michael D. McCoy and D. Sean Nation, Mountain States Legal Foundation, Lakewood, Colorado, for Amicus Curiae Mountain States Legal Foundation's Center to Keep and Bear Arms.

Jeremiah L. Morgan and William J. Olson, William J. Olson PC, Vienna, Virginia; John I. Harris III, Schulman LeRoy & Bennett PC, Nashville, Tennessee; for Amici Curiae Gun Owners of California Inc., Gun Owners of America Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, America's Future Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund.

## OPINION

VANDYKE, Circuit Judge:

This case arises out of Appellant Mark Baird's civil rights lawsuit against the Attorney General of California, Appellee Rob Bonta. Baird is a law-abiding citizen who wishes to openly carry a firearm in California, yet California has banned open carry in all counties with populations greater than 200,000. According to the most recent census, those counties are home to roughly 95% of the state's population. The 5% of California's population for whom open carry is not outright banned everywhere in the state are purportedly able to apply for a license that would allow them to exercise their constitutional right to open carry in just their county of residence, although their ability to secure even that license is, on the record before us, at best unclear. Baird has challenged California's open-carry restrictions under the Second and Fourteenth Amendments.

Baird initially sought a preliminary injunction, which the district court denied without analyzing Baird's likelihood of success on the merits. This court vacated and remanded for the district court to properly consider the likelihood of success. Rather than address the requested preliminary injunction on remand, the district court granted summary judgment in favor of California, holding that the Second Amendment does not protect Baird's desired conduct. Appealing again, Baird argues that the district court erred as a matter of law by incorrectly applying *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). We agree with Baird that California's ban on open carry in counties with a population greater than 200,000 fails under *Bruen*, and we reverse the district court's grant of summary judgment on

this issue.  With respect to Baird's as-applied and facial challenges to California's licensing requirements in counties with populations of less than 200,000, we conclude that Baird waived his as-applied challenge by not contesting the district court's dismissal in his opening brief and that Baird's facial challenge fails on the merits on the record of this case. Accordingly, we affirm the district court's grant of summary judgment on Baird's challenges to the licensing scheme in counties with populations of less than 200,000.    The judgment of the district court is therefore affirmed in part and reversed in part.

# I.

For most of American history, open carry has been the default manner of lawful carry for firearms.  It remains the norm across the country—more than thirty states generally allow open carry to this day, including states with significant urban populations.[1]  Indeed, several of our Nation's largest

---

[1]  *See* Ala. Code §§ 13A-11-73, -11-75(m) (2024); Alaska Stat. § 11.61.220 (2024); Ariz. Rev. Stat. § 13-3102 (2024); Ark. Code Ann. § 5-73-120 (2024); Del. Code Ann. tit. 11, § 1441 (2024); Idaho Code § 18-3302 (2024); Ind. Code § 35-47-2-1 (2024); Iowa Code §§ 724.4, .5 (2024); Kan. Stat. Ann. § 21-6302 (2024); Ky. Rev. Stat. Ann. § 237.109 (2024); La. Stat. Ann. § 40:1379.3 (2024); Me. Stat. tit. 25, § 2001-A (2024); Miss. Code Ann. §§ 45-9-101, 97-37-1 (2024); Mont. Code Ann. §§ 45-3-111, -8-321 (2024); Nev. Rev. Stat. § 202.3657 (2024); N.H. Rev. Stat. Ann. § 159:6 (2024); N.M. Stat. Ann. § 30-7-2 (2024); N.C. Gen. Stat. § 14-269 (2024); Ohio Rev. Code Ann. §§ 9.68, 2923.12 (2024); Okla. Stat. tit. 21, § 1289.6 (2024); 18 Pa. Cons. Stat. § 6106 (2024); S.D. Codified Laws § 23-7-7 (2024); Tenn. Code Ann. § 39-17-1307(g) (2024); Tex. Penal Code Ann. § 46.02 (2024); Utah Code Ann. §§ 53-5a-102, 76-10-505 (2024); Vt. Stat. Ann. tit. 13, § 4003 (2024); Va. Code Ann. § 18.2-308 (2024); Wash. Rev. Code § 9.41.050 (2024); W. Va. Code § 61-7-3 (2024); Wis. Stat. §§ 66.0409, 941.23 (2024); Wyo. Stat. Ann. § 6-8-104 (2024); *see also* Mitch Ryan, *31 Open*

cities and states recently returned to unlicensed open carry by explicitly authorizing it. For example, Texas reauthorized open carry without a license in 2021.[2] Kansas likewise transitioned back to allowing open carry without a permit in 2015.[3] And other states that placed restrictions on open carry in recent decades have also removed those burdens.[4]

Similarly, for the first 162 years of its history open carry was a largely unremarkable part of daily life in California. From 1850, when California first became a state, until the Mulford Act of 1967, public carry of firearms in California (open or concealed) was entirely unregulated. And when California first deviated (or considered deviating) from this practice, its reasons for doing so were less than morally exemplary. The first restriction on public carry that California contemplated was a concealed-carry ban in 1856—which was intended to apply only to "Mexicans," who were considered dangerous. *See The Rise and Fall of California's First Concealed-Carry Law*, NRA Institute for

---

*Carry States and 10 with 'Permissive' Open Carry*, HowStuffWorks (July 2, 2024), https://people.howstuffworks.com/open-carry-states.htm.

[2] *See* Tex. Penal Code Ann. § 46.02 (2024); *see also* Sami Sparber, *Texans can carry handguns without a license or training starting Sept. 1, after Gov. Greb Abbott signs permitless carry bill into law*, Tex. Trib. (June 16, 2021), https://www.texastribune.org/2021/06/16/texas-constitutional-carry-greg-abbott/.

[3] *See* Kan. Stat. Ann. § 21-6302 (2024); *see also* Wayne Fletcher, *What year did Kansas allow open carry?*, Gun Zone (June 23, 2024), https://thegunzone.com/what-year-did-kansas-allow-open-carry/.

[4] For example, Oklahoma made open carry legal in 2012. *See* Okla. Stat. tit. 21, § 1289.6 (2024); *see also* Wayne Fletcher, *When did open carry become legal in Oklahoma?*, Gun Zone (July 13, 2024), https://thegunzone.com/when-did-open-carry-become-legal-in-oklahoma/.

Legislative Action (Jan. 1, 2013) (citing John David Borthwick, "THREE YEARS IN CALIFORNIA" (1857); Roger D. McGrath, GUNFIGHTERS, HIGHWAYMEN, & VIGILANTES: VIOLENCE ON THE FRONTIER (1984)), https://www.nraila.org/articles/20130101/the-rise-and-fall-of-californias-first-concealed-carry-law.

Eventually, in 1967 California first criminalized the peaceful open carrying of a loaded handgun in the Mulford Act—legislation that was also tainted with racial animus. *See* Mulford Act, 1967 Cal. Stat. 2459 (codified as amended at various sections of Cal. Penal Code); Cal. Penal Code § 25850 (2024). Passed during a period of significant racial unrest, the Mulford Act was a legislative response to the Black Panther Party's activities, which included openly carrying firearms to protest police behavior in African-American communities. *See* Thaddeus Morgan, *The NRA Supported Gun Control When the Black Panthers Had the Weapons*, HISTORY (last updated May 28, 2025), https://www.history.com/articles/black-panthers-gun-control-nra-support-mulford-act. The catalyzing event occurred when "30 members of the Black Panthers protested on the steps of the California statehouse armed with .357 Magnums, 12-gauge shotguns and .45-caliber pistols and announced, 'The time has come for Black people to arm themselves.'" *Id.* The California legislature disagreed and responded by passing the Mulford Act. *Id.* Yet even then, it remained legal in California to openly carry a handgun, so long as it was unloaded. *See* Mulford Act, 1967 Cal. Stat. 2459.

That was the case for nearly half a century after the Mulford Act—Californians remained free to carry unloaded handguns openly and holstered for self-defense without penalty. That changed only when California enacted its

urban open-carry ban barely over a decade ago in 2012. *See* Cal. Penal Code § 26350 (2024). In doing so, California joined a *tiny* minority of states to have adopted such severe restrictions on open carry. In fact, California is the *only* state in the Ninth Circuit that has entirely banned open carry for the overwhelming majority of its citizens.

Today, California law nominally recognizes two different methods by which individuals may publicly carry firearms in the state—"concealed" carry and open carry. *See id.* §§ 26150, 26155. "Concealed" carry means that the firearm is carried in a manner that is not visible to others (e.g., hidden under a shirt), while open carry refers to the carrying of a firearm that is "exposed" to public view (e.g., visible in a holster on a person's hip). *Id.* §§ 26150(b)(2), 26155(b)(2); *see also id.* § 25400(b) (noting that "[a] firearm carried openly in a belt holster is not concealed"). Regardless of how a firearm is carried in California— concealed or openly—as a general matter it is unlawful under California law to publicly carry a firearm without a license to do so. *See id.* §§ 25400(a), 25850(a), 26350(a); *see also id.* §§ 25655, 26010, 26362.

To manage the issuance of public-carry licenses in the wake of *Bruen*, California adopted what it now characterizes as a "'shall-issue' licensing regime" for both concealed-carry and open-carry licenses. *Id.* §§ 26150(a), 26155(a). But that characterization is not entirely accurate. Although California law establishes a number of criteria that must be met for both concealed- and open-carry permits—such as completing a firearms course—the issuance of open-carry permits is subject to an additional set of geographic restrictions that ban open carry altogether throughout the state except in its most rural counties. These extreme geographic restrictions belie the characterization of this law

as merely a licensing regime.  The reality is that no one in California can open carry—with or without a permit—in the counties where 95% of Californians live.  Nor can the 95% of Californians who live in those urban counties get any open-carry permit at all, even to carry openly in one of California's rural counties.

By statute, California only allows local authorities to issue open-carry licenses in counties with a population of less than 200,000, as measured by the most recent federal census.  *See id.* §§ 26150(b)(2), 26155(b)(2).  And for the tiny minority of Californians who live in such a county and thus are at least theoretically able to obtain an open-carry license, that license is void outside of the county of issuance. *See id.*[5]

The effects of this rule are staggering.  As the district court acknowledged, California law strictly prohibits the issuance of open-carry permits in the areas of the state where 95% of Californians live.  Thirty California counties have populations below 200,000.[6]  Twenty-eight counties have

---

[5]  In contrast, concealed-carry licenses are—subject to many other restrictions not at issue in this case—theoretically available and valid throughout the state.  *See* Cal. Penal Code §§ 26150(b)(1), 26155(b)(1).

[6]  As the district court documented, in ascending order of population, these counties are Alpine, Sierra, Modoc, Mono, Trinity, Mariposa, Inyo, Plumas, Colusa, Del Norte, Glenn, Lassen, Amador, Siskiyou, Calaveras, Tuolumne, Tehama, Lake, San Benito, Yuba, Mendocino, Sutter, Nevada, Humboldt, Napa, Kings, Madera, Shasta, Imperial, and El Dorado counties.  *Annual Estimates of the Resident Population for Counties: April 1, 2020 to July 1, 2024 (CO-EST2024-POP)*, U.S. Census Bureau (last visited Oct. 25, 2025), https://www.census.gov/data/datasets/time-series/demo/popest/2020s-counties-total.html.

populations above 200,000. [7]   Approximately 2 million people—a mere 5% of the state's population—live in those counties with populations below 200,000.  The other 95% live in counties with populations above 200,000.[8]  As you might expect, the counties where open carry is flatly prohibited include those that are home to California's largest and most prominent cities, including Los Angeles, San Diego, San Jose, San Francisco, Fresno, Sacramento, and Oakland.[9]  *See* Cal. Penal Code §§ 25850, 26150, 26155, 26350.  And even for the 5% of Californians who live in counties with fewer than 200,000 people, because they can carry openly only in the county that issues their license, *at most* a license would allow them to carry openly only where fewer than 0.5% of the state population lives.[10]  *See* Cal. Penal Code §§ 26150(b)(2), 26155(b)(2).

## II.

Baird is a resident of Siskiyou County, California, and a lawful firearm owner.  For several years he has sought to lawfully open carry for self-defense throughout his home

---

[7]  As the district court likewise documented, in ascending order of population, these counties are Butte, Yolo, Marin, Santa Cruz, San Luis Obispo, Merced, Placer, Monterey, Santa Barbara, Solano, Tulare, Sonoma, Stanislaus, San Mateo, San Joaquin, San Francisco, Ventura, Kern, Fresno, Contra Costa, Sacramento, Alameda, Santa Clara, San Bernardino, Riverside, Orange, San Diego, and Los Angeles counties. *See Annual Estimates of the Resident Population*, *supra* note 6.

[8]  *See supra* notes 6–7.

[9]  *See supra* notes 6–7.

[10]  Dividing the 192,823 residents of El Dorado County (California's largest county with a population less than 200,000) by the 39,431,263 residents of California yields the 0.5% number. *See Annual Estimates of the Resident Population*, *supra* note 6.

state. But California has prevented him from doing so by criminalizing the open carry of a handgun in urban areas of the state—whether loaded, *see* Cal. Penal Code § 25850, or unloaded, *see id.* § 26350.**11** Siskiyou County, where Baird lives, has a population of 42,498 as measured at the last census. *See Annual Estimates of the Resident Population*, *supra* note 6. So Baird is among the 5% of California's population living in a county where open carry is theoretically allowed, but only with an open-carry license, and even then, only in his home county. Baird alleges that he has tried on multiple occasions to apply for an open-carry license in Siskiyou County, but he has been candidly "advised by the licensing authority in [his] county that no Open Carry licenses will be issued."

In 2019, Baird filed a complaint against the California Attorney General, challenging California's prohibition on the open carry of firearms under the Second, Fourth, and Fourteenth Amendments. After the Supreme Court announced the proper standard for evaluating Second Amendment claims in *Bruen*, 597 U.S. 1, Baird filed a motion for a preliminary injunction, along with a Second Amended Complaint ("Complaint"). In this operative Complaint, Baird maintained his challenge to the urban open-carry ban found in California Penal Code sections 25850 and 26350. Thus, although California attempts to frame Baird's claim as only challenging a licensing requirement, that characterization is inapt. Baird is challenging California's regime that bans him from open carrying in the areas of the state where 95% of the people live—and no license available in California can avoid that

---

[11] Baird does not fall within any of the very limited statutory exemptions to prosecution.

ban.[12]   Baird also challenges California's imposition of
licensing requirements for the 5% of the state's population
who live in counties with populations less than 200,000.[13]

In his opening brief before this court, Baird characterizes
the question presented broadly as "[w]hether California
Penal Code sections 25850 and 26350, which criminalize the
open carriage of handguns for self-defense, violate the
Second Amendment." In his reply brief, Baird has an entire
argument heading "No Tradition of an Open Carry
Ban." And his attorney at this panel's first oral argument
repeated the same point: "There is an open carry
ban in California." *See* Oral Argument at 2:30, *Baird v.
Bonta*, 81 F.4th 1046 (2023) (No. 23-15016),
ca9.uscourts.gov/media/audio/?20230629/23-15016/. The
district court likewise recognized that Baird "contend[s] it is
unconstitutional for California to impose criminal liability
on people who carry firearms in public," and understood his
theory "as an argument that California cannot
constitutionally require people to conceal any firearms they
carry in public."

Nevertheless, despite Baird's narrowing of his complaint
and requested relief, the district court denied his motion for
a preliminary injunction. The court reasoned that Baird had
"standing to contest the state law[s] generally in a facial
challenge," but concluded that he lacked "standing to assert"
any "as-applied challenges" to local government officials'
failure to approve open-carry permit applications because he
"brought [his] case against the wrong defendant." The

---

[12] For clarity, we refer to this policy as California's "urban open-carry ban."

[13] We refer to this policy as California's "rural licensing scheme."

district court reached this conclusion on the grounds that
Baird sued only the California Attorney General, rather than
any statutorily designated licensing authorities (such as
county officials), and thus even a "favorable decision"
would not "redress [his] alleged injury."  The district court
then dismissed Baird's as-applied challenge to California's
licensing regime.  As to Baird's surviving facial claims, the
court denied the requested injunction without assessing his
likelihood of success on the merits because Baird had "not
shown the balance of harms and public interest favors a
preliminary injunction."

This court reversed.  *See Baird v. Bonta*, 81 F.4th 1036
(9th Cir. 2023).  Our decision was narrow, focusing on the
district court's denial of Baird's motion for a preliminary
injunction.  *Id.* at 1041–48.  We concluded that the district
court abused its discretion when it "deliberately skipped *any*
analysis of" Baird's likelihood of success on the merits,
because the likelihood-of-success factor can "sharply tilt[]"
the court's assessment of other preliminary-injunction
factors.  *Id.* at 1042, 1044.  We thus remanded the case to the
district court, ordering the district judge to apply the
framework set forth in *Bruen* and "expeditiously" assess the
merits of Baird's Second Amendment challenge.  *Id.* at
1046–47.

On remand, the district court addressed Baird's Second
Amendment claims by bypassing Baird's request for a
preliminary injunction and granting the government's
motion for summary judgment.  The district court denied
Baird's cross-motion for summary judgment on the merits
and denied Baird's motion for a preliminary injunction as
moot.  The district court concluded that Baird's as-applied
challenges to California's licensing regime remained
dismissed because Baird had declined to amend his

complaint to add any licensing officials or other local government defendants. With respect to Baird's facial challenge, the district court concluded that Baird's claims failed on the merits.

Although the district court acknowledged that Baird's proposed conduct was "presumptively protect[ed]" under the Second Amendment, it ultimately concluded that California's urban open-carry ban is consistent with the Nation's historical tradition of firearm regulation. The district court first characterized California's regime as a mere "licensing" system, largely ignoring the reality that California's regime categorically bans open carry in the areas of the state where 95% of the people live, and makes it challenging at best to acquire a license in those areas home to the remaining 5% of California's population where open carry could theoretically be lawful if one had a license. In this regard, the district court argued that "states may require people to obtain licenses before they carry firearms in public," and there is a long "historical tradition" of jurisdictions imposing such requirements to make "relevant distinctions" concerning "which people were not 'ordinary, law-abiding citizens.'" The district court conducted a historical survey and concluded that "American governments have imposed restrictions on how people carry guns since the founding era," and from that premise concluded that California's urban open-carry ban does not offend the Second Amendment. The district court thus entered summary judgment in favor of California.

Baird now appeals the district court's summary judgment order. He asks this Court to "restore" to the "citizens of California … the right to carry a handgun open and exposed on one's person for self-defense."

### III.

This court reviews a district court's grant of summary judgment de novo. *See Child.'s Hosp. Med. Ctr. of N. Cal. v. Cal. Nurses Ass'n*, 283 F.3d 1188, 1191 (9th Cir. 2002). A grant of summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020).

### IV.

We first address Baird's facial and as applied challenges to California's urban open-carry ban. If "the Second Amendment's plain text covers an individual's conduct" that is proscribed by a firearms regulation, then "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *see also United States v. Rahimi*, 602 U.S. 680, 691 (2024); *id.* at 711 (Gorsuch, J., concurring). In other words, "the government must affirmatively prove that [the challenged] regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. Regulations that extend beyond our historical tradition flout the Second Amendment's "unqualified command" that "the right of the people to keep and bear Arms, shall not be infringed." *Bruen*, 597 U.S. at 17, 32.

"This historical test often requires a searching inquiry, but not always." *United States v. Ayala*, 711 F. Supp. 3d 1333, 1339 (M.D. Fla. 2024). After all, many firearms regulations seek to address "general societal problem[s]" that have persisted since the Founding. *Bruen*, 597 U.S. at 26. In these instances, the inquiry is "fairly straightforward."

*Id.* The absence of "a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Whether regulations are "distinctly similar" or "relevantly similar" turns on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 26, 29. "Likewise, if earlier generations addressed the societal problem, but did so through materially different means," that too is evidence "that a modern regulation is unconstitutional." *Id.* at 26–27.

On the other hand, cases that implicate "unprecedented societal concerns or dramatic technological changes," *id.* at 27, may require courts to take a closer look at "how and why [historical] regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 29; *see also Rahimi*, 602 U.S. at 691. Stated differently, judicial review of "regulations that were unimaginable at the founding" "will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Bruen*, 597 U.S. at 28. This latter mode of analysis, the exception to *Bruen*'s "straightforward" inquiry for "regulation[s] address[ing] a general societal problem that has persisted since the 18th century," is frequently referred to in this circuit as the "nuanced approach." *Id.* at 26, 27; *see, e.g.*, *Duncan v. Bonta*, 133 F.4th 852, 872 (9th Cir. 2025) (en banc) ("[T]he 'More Nuanced Approach' … applies here.").

Under *Bruen* many questions are "straightforward," and when governments are attempting to address "general societal problem[s]" that have persisted since the Founding via regulations with no "distinctly similar" historical counterpart, then there is no need to consider the "nuanced approach." *Bruen*, 597 U.S. at 25–27. And of course, it should be clear enough that courts may not turn

"straightforward" cases into "nuanced approach" cases and then use the "nuanced approach" to ban the very things that were universally protected from the Founding through Reconstruction.    If that were allowed, then *Bruen*'s instruction that the absence of "a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment," *id.* at 26, would have little practical force.

Although this court has recently confronted a panoply of Second Amendment cases, this case stands out in that it unquestionably involves a historical practice—open carry—that predates ratification of the Bill of Rights in 1791.  This case does not necessarily involve any new technology, *see, e.g.*, *Duncan*, 133 F.4th at 883–84 (concluding that magazines holding more than ten rounds are not protected by the Second Amendment), or any alleged social changes, *see, e.g.*, *Wolford v. Lopez*, 116 F.4th 959, 982–83 (9th Cir. 2024) (holding that parks, although they existed at the time of the Founding in the form of "green spaces," now occupy a sufficiently different social position that the Second Amendment permits restrictions of firearms in parks), *cert. granted*, No. 24-1046, 2025 WL 2808808 (U.S. Oct. 3, 2025).  The historical record makes unmistakably plain that open carry is part of this Nation's history and tradition.  It was clearly protected at the time of the Founding and at the time of the adoption of the Fourteenth Amendment. [14]

---

[14]  Because the historical record is abundantly clear both at the time of the Founding and at the time of the ratification of the Fourteenth Amendment, we do not address the ongoing debate over whether evidence from 1791 or 1868 is more probative of the meaning of the right to bear arms made judicially enforceable against the states through the Fourteenth Amendment.  *See Ayala*, 711 F. Supp. 3d at 1340, 1342 n.4; *see also Bruen*, 597 U.S. at 37; *id.* at 82 (Barrett, J., concurring).

Therefore, applying the Supreme Court's methodology in *Bruen*, this is a "straightforward" case that does not require a court to embark on the more difficult analogical journey under the "nuanced approach." *Bruen*, 597 U.S. at 26–27.

We begin with the Founding. In 1789, despite there being "a series of laws that regulated the discharge, storage, and aggressive use of firearms," "there were *no* direct statutory bans on the carry of arms." Jonathan Meltzer, *Open Carry for All:* Heller *and Our Nineteenth-Century Second Amendment*, 123 Yale L.J. 1486, 1505 (2014) (emphasis added). This absence is particularly conspicuous because the founding generation was clearly aware of the dangers of gun violence, and states enacted a variety of regulations addressing the lawful use of firearms. For example, a 1790 Ohio law prohibited the firing of a gun within a quarter mile of any building or between sunset and sunrise. *See* Act of Aug. 4, 1790, ch. XIII, § 4, *reprinted in 1 The Statutes of Ohio and of the Northwestern Territory* 104 (Salmon P. Chase ed., Cincinnati, Corey & Fairbank 1833). Delaware likewise prohibited the discharge of firearms in developed areas with an exception for "days of public rejoicing." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162–63 (2007).

Yet none of these laws banned open carry. Even more striking than that, some of these laws went out of their way to make clear that open carry would *not* be banned. Consider, for example, a Founding-era Pennsylvania law that prevented the use of firearms on public highways, but explicitly specified that the law barred only the discharge and not the open carry of those arms. *Id.*; *see also* Meltzer, *Open Carry for All*, *supra*, at 1505.

The historical record from the time of the Fourteenth Amendment's adoption is, if anything, even more solicitous of the right to openly carry firearms for self-defense. What is also striking about this time period is the clear difference in attitude toward bans on concealed carry, which were sometimes tolerated, and bans on open carry, which were not. The general consensus at the time was that open carry was essential to protect the natural and common law right of self-defense, while "those who relied on concealed weapons could not possibly be interested in self-defense, but instead must have an improper, aggressive motive." *Id.* at 1511–12. Indeed, between 1822 and 1850, no fewer than six state high courts considered the scope of the right to carry firearms for self-defense and explicitly found constitutional significance in the distinction between open and concealed carry. *Id.* at 1512. And that significance manifested in broad constitutional protection for open carry, while the exigencies and interests of public safety were sometimes deemed to justify a ban on concealed carry.

For example, in *State v. Reid*, 1 Ala. 612 (1840), Alabama's highest court ruled that a concealed weapons ban was constitutional, but a ban on open carry would not be. *Id.* at 619. According to the court, "it is only when carried openly, that [weapons] can be efficiently used for defence." *Id.* Carrying concealed weapons did not fit within the state's constitutional allowance that a person could keep and bear arms "for the purposes of defending himself and the State." *Id.* The reason was that, for purposes of self-protection in moments of immediate danger, "there can be no necessity for concealing the weapon." *Id.* at 621. Tellingly, in so concluding, the court explicitly rejected an argument that open carry and concealed carry are functionally interchangeable, and it also rejected the idea that as long as

one mode of carry was permitted it was irrelevant which was allowed and which was barred.  *Id.* at 618.

Applying the same rationale, the Tennessee Supreme Court upheld that state's *concealed* weapons ban.  *See Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840).  Finding that "the right to bear arms in defence of themselves is coupled with the right to bear them in defence of the State," and that arms used in defense of the state "must necessarily be borne openly," the court held that only the open carry of weapons was protected.  *Id.* at 161.

This decision was followed only a few years later by a decision of the Georgia Supreme Court, which adhered to the same logic and concluded that the state's concealed weapons ban was permissible, but that a ban on the open carry of guns and knives was too great an imposition on the Second Amendment.  *See Nunn v. State*, 1 Ga. 243 (1846). The court noted that the proscription of concealed carry "does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms," but "a prohibition against bearing arms openly, is in conflict with the Constitution, and void."  *Id.* at 251 (emphasis omitted).   The U.S. Supreme Court has referenced with approval the interpretation of the Second Amendment adopted by the Georgia Supreme Court, *see District of Columbia. v. Heller*, 554 U.S. 570, 612 (2008), making the Georgia court's distinction between open and concealed carry all the more consequential.

Likewise, the Louisiana Supreme Court explained the constitutional significance of open carry in its opinion in *State v. Chandler*, 5 La. Ann. 489 (1850).  When it too held that a state statute could constitutionally ban concealed

carry, the court specifically noted that the ban on concealed
carry was only permissible because it

> interfered with no man's right to carry arms
> (to use its words) "in full open view," which
> places men upon an equality. This is the right
> guaranteed by the Constitution of the United
> States, and which is calculated to incite men
> to a manly and noble defence of themselves,
> if necessary, and of their country, without any
> tendency to secret advantages and unmanly
> assassinations.

*Id.* at 490; *see also State v. Mitchell*, 3 Blackf. 229 (Ind.
1833). The North Carolina Supreme Court reached a similar
conclusion when it upheld the conviction of a man for
arming himself with dangerous and unusual weapons. *See
State v. Huntly*, 25 N.C. (3 Ired.) 418, 422–23 (1843). This
understanding—that open carry is at the heart of the right to
bear arms—remained dominant in the wake of the
Fourteenth Amendment's adoption. *See, e.g.*, *State v. Duke*,
42 Tex. 455, 458–59 (1875) (holding that "the right to keep
and bear arms" was not infringed when the challenged
statute "respected the right to carry a pistol openly" for self-
defense).

These many courts were not just indulging
consequentialist reasoning in finding that open carry was
protected while concealed carry was not. They explicitly
rejected the argument that the two kinds of carry were
interchangeable, and they explicitly premised their
conclusion on the ground that the right to carry arms "in full

open view" is "guaranteed by the Constitution of the United States." *Chandler*, 5 La. Ann. at 489–90.**[15]**

Our esteemed dissenting colleague disagrees. Faced with this extensive historical support for the conclusion that open carry and concealed carry have never been treated as fungible under the Second Amendment—and the complete absence of any historical precedent for the opposite conclusion—the dissent basically musters one response: "*Bruen* controls." How? Because *Bruen* said "history reveals a consensus that States could *not* ban public carry altogether." *Bruen*, 597 U.S. at 53.

We wholeheartedly agree with the dissent that *Bruen* expressly forbids States from "ban[ning] public carry altogether." *Bruen*, 597 U.S. at 53. Where we apparently disagree is that we do not read that statement as somehow meaning the opposite—that so long as a state does not "ban public carry altogether," it can do whatever else it wants without violating the Second Amendment. Respectfully, that is not only a basic logical error, but also obviously a wrong way to interpret language in Supreme Court opinions. If the Supreme Court said, "States cannot ban speech altogether," nobody would think it was also implicitly saying that as long as the state allows some speech, it necessarily can ban all

---

[15] Florida's First District Court of Appeal, analyzing the same nineteenth century decisions, recently reached the same conclusion: "[T]he historical record from the relevant period shows that our Nation did not regard concealed carry and open carry as interchangeable." *McDaniels v. State*, No. 1D2023-0533, 2025 WL 2608688, at \*10 (Fla. Dist. Ct. App. Sep. 10, 2025). The court went on to declare Florida's open-carry ban unconstitutional, ruling that "[n]o historical tradition supports Florida's Open Carry Ban. To the contrary, history confirms that the right to bear arms in public necessarily includes the right to do so openly." *Id.* at \*11.

other speech.  Instead, lower courts would analyze partial speech restrictions under the various rubrics the Supreme Court had provided for doing so.

Here, in addition to directly addressing the relatively easy and narrow circumstance where a state attempts to "ban public carry altogether" (easy answer: it can't), the Court in *Bruen* also told us how to analyze other situations where the state imposes firearms restrictions short of a complete public carry ban.  As our court has now repeatedly recognized, in that circumstance we need to look to the "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *Duncan*, 133 F.4th at 865 (en banc) (quoting *Bruen*, 597 U.S. at 24); *Nguyen*, 140 F.4th at 1243 (quoting *Bruen*, 597 U.S. at 24). The dissent's attempt to short-circuit or predetermine that historical analysis by asserting that *Bruen* has already directly decided the question presented in this case fails from the get-go.  It clearly misreads one statement from *Bruen*, and then uses that misreading to justify failing to do the historical analysis *Bruen* expressly prescribed.

The Second Circuit committed a similar error by recently upholding New York's open-carry ban in *Frey v. City of New York*, No. 23-365-cv, 2025 WL 2679729, at *12 (2d Cir. Sept. 19, 2025).  The Second Circuit's analysis relied on a similar misreading of *Bruen*, as well as approaching historical evidence at too high a level of generality.  Like the dissent here, the court there claimed that *Bruen* treated open carry and concealed carry as fungible, quoting *Bruen* for the proposition that states "'could lawfully eliminate one kind of public carry—[open carry or] conceal carry—so long as they left open' the other option." *Frey*, 2025 WL 2679729, at *12 (alteration in original) (quoting *Bruen*, 597 U.S. at 59).  But again, that transparently is not what the Supreme Court said in *Bruen*—indeed, it is telling that the Second Circuit had to

modify the Court's language to support its holding. Unaltered, the quotation from *Bruen* reads: "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Bruen*, 597 U.S. at 59.

The Second Circuit then cited a number of historical state laws and cases that upheld *concealed*-carry bans. *Frey*, 2025 WL 2679729, at *12. Ignoring the fact that not a single one of its examples involved an open-carry ban, the court described these laws and cases as "evinc[ing] a strong historical tradition of regulating, and often criminalizing, one manner of public carry, so long as the government does not 'altogether prohibit public carry.'" *Id.* (quoting *Bruen*, 597 U.S. at 54). The court's own examples demonstrate the flaw in its logic: because those examples upheld concealed-carry bans for reasons unique to *concealed* carry, they are not "relevantly similar" to New York's *open*-carry ban. *Frey*, 2025 WL 2679729, at *12 (quoting *Bruen*, 597 U.S. at 29). As described above, *Chandler* (one of *Frey*'s examples) was concerned with "secret advantages and unmanly assassinations" "committed upon unsuspecting persons." *Chandler*, 5 La. Ann. at 490. Likewise, *Reid*'s rationale was that "it is only when carried openly, that [arms] can be efficiently used for defence." *Reid*, 1 Ala. at 619. Interpreting these cases—like the Second Circuit did—as supporting a tradition of banning, on generic safety grounds, whatever type of carry the legislature wishes is precisely what *Bruen*'s analogical approach forbids. [16]   Instead, a

---

[16]   In similar fashion, the dissent's conclusion that the "why" of historical firearm regulations involved "eliminat[ing] one manner of public carry in accordance with the cultural perception of what type of carry was more peaceable," completely unmoors the analysis from history and tradition. If the ultimate touchstone of the analysis is nothing historical or

correct understanding of *Bruen* and of our historical tradition
of firearm regulation leads inevitably to the conclusion we
reach today.

\* \* \*

California's clear failure to satisfy its burden to present
evidence of a relevant historical tradition of firearm
regulation is dispositive with respect to California's urban
open-carry ban.   Once again, under *Bruen*, Second
Amendment cases are "straightforward" when the
challenged firearm regulations seek to address "general
societal problem[s]" that have persisted since the Founding.
*Bruen*, 597 U.S. at 26.   California's urban open-carry ban
indisputably seeks to address such problems, including, to
quote California's briefing in this case, concerns about
firearms creating "a highly stressful and unsafe
environment" that "has the high potential to create panic and
chaos."

Because California's regulations seek to address
"general societal problem[s]" that have persisted since the
Founding, there is no need to reach the Ninth Circuit's
"nuanced approach"—the exception to *Bruen*'s default rule.
*Id.*   And the absence of "a distinctly similar historical
regulation addressing [the] problem is relevant evidence that
the challenged regulation is inconsistent with the Second
Amendment."   *Id.*   Likewise, under *Bruen*, the fact that
"earlier generations addressed the societal problem, but did
so through materially different means," is probative
evidence "that a modern regulation is unconstitutional."   *Id.*

---

traditional, but instead our present notions of what counts as "less
peaceable," that should be a red flag that we're not applying *Bruen*'s
history-and-tradition approach.

at 26–27.  There is no record of any law restricting open
carry at the Founding, let alone "a distinctly similar
historical regulation." *Id.* at 26.  And in the Antebellum era,
courts across the country were explicit in noting the unique
constitutional protection granted to open carry.[17]  Thus, we
conclude that California's de jure ban on open carry in
counties with a population above 200,000 is inconsistent
with the right to bear arms as applied to the states through
the Fourteenth Amendment.

## V.

We next address Baird's as-applied and facial challenges
to California's separate rural licensing scheme.  These
challenges are easily disposed of.  The district court
dismissed Baird's as-applied challenge to the rural licensing
scheme for lack of standing because Baird failed to join local
licensing authorities who could redress his injury.  *Baird v.
Bonta*, 709 F. Supp. 3d 1091, 1098–99 (E.D. Cal. 2023).  In
his opening brief, Baird never contests this standing-based
dismissal of his as-applied challenges to the rural licensing
scheme.  Because arguments rebutting the district court's
standing analysis were "not raised clearly and distinctly in
[Baird's] opening brief," he has waived this as-applied
challenge.  *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th
Cir. 2009).

---

[17] It is unclear where the dissent's criticism that we are requiring a
"historical twin" comes from.  Consistent with *Bruen*, we require only
that California's urban open-carry ban be "relevantly similar" to
historical firearm regulations.  *See Bruen*, 597 U.S. at 28–29.  For all the
reasons discussed above, the rationales underlying historical concealed-
carry bans—rationales that were explicitly about *concealed* carry—are
not relevantly similar to the generic safety rationale relied on by
California and the dissent.

To the extent that Baird facially challenged California's
rural licensing scheme, his challenge runs counter to *Bruen*'s
indication that shall-issue licensing regimes like the
licensing that California allows in less populous counties can
be constitutional.        Cal. Penal Code §§ 26150(b)(2),
26155(b)(2).   The Court explained that "nothing in [its]
analysis    should    be    interpreted    to    suggest    the
unconstitutionality of the 43 States' 'shall-issue' licensing
regimes, under which 'a general desire for self-defense is
sufficient to obtain a [permit]." *Bruen*, 597 U.S. at 39 n.9
(alteration in original) (quoting *Drake v. Filko*, 724 F.3d
426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)).  At least
on its face, California's rural licensing scheme is a shall-
issue regime. *See* Cal. Penal Code § 26150(b) ("The sheriff
shall issue or renew a license … [w]here the population of
the county is less than 200,000 persons …."); Cal. Penal
Code § 26155(b) (same).  *Bruen* left open the possibility of
as-applied challenges to such licensing regimes (including
Baird's arguments that California's rural licensing scheme
does not operate as a shall-issue regime in practice, but
Baird's waiver of his as-applied challenge to the rural
licensing scheme means no such arguments remain in this
case. *Id.*

**VI.**

California's arguments in defense of its urban open-carry
ban are misdirected and fail in any event.   Contrary to
California's   suggested   approach,   *Bruen*'s   analogical
approach does not permit loose analogizing against the
backdrop of a clear historical practice.  But even before we
get to that, most of the state's brief incorrectly asserts that
Baird is only challenging a licensing regime, and the rest of
its brief is predominantly dedicated to refuting the argument
that    the    Second    Amendment    prohibits    licensing

requirements.  But those arguments are red herrings with respect to California's urban open-carry ban.  Baird may have argued *in addition* that any licensing requirement would be unconstitutional under the Second Amendment. But in his Complaint and his briefing he clearly contends that California's ban on open carry in the areas of the state where 95% of the people live is unconstitutional.   Finally, California's heavy reliance on racist or explicitly xenophobic laws that are supposedly analogous to California's current open-carry ban is misplaced; such laws are part of "the history that the Constitution left behind," *Rahimi*, 602 U.S. at 723 (Kavanaugh, J., concurring), and are thus not appropriate analogues in the *Bruen* inquiry.

## A.

The loose analogizing California asks this court to conduct in connection with the nuanced approach is entirely inappropriate in this case.  As explained above, both at the time of the Founding and at the time of the Fourteenth Amendment's adoption there is a total absence of any historical practice of banning open carry.  Quite the opposite: in antebellum America it was clear that open carry was widely seen as entitled to special constitutional protection. And when there is a clear and unbroken historical tradition, it is impermissible to analogize at levels of generality so high that precisely what was recognized as protected may now be banned.  *Cf.* Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 747 (1993) (explaining that, when properly conducted, "analogical reasoning produces principles that operate at a low or intermediate level of abstraction").

Yet that is exactly what California asks this court to bless.  Despite a clear historical tradition of protecting open

carry—and regulating *only* concealed carry—the district court concluded that California nonetheless may ban open carry "for the simple reason that American governments have imposed restrictions on how people carry guns since the founding era." That is a paradigmatic example of extracting the supposedly governing constitutional principle at too high and too abstract a level. The fact that the extracted principle can be used to justify precisely the conduct that historically was consistently deemed protected should be a strong clue that a court has abstracted its governing principle at a level of generality that is much too high. Indeed, here it is hard to imagine any carry ban— including the sort of complete and total carry ban rejected in *Bruen*—that the principle extracted by the district court would fail to justify.

The district court may have been understandably led astray by cues from this court's recent Second Amendment cases employing a mode of analysis that abstracts a very generalized principle and applies it. In these instances, the principle is so generalized that it seems to always cover the "analogous" conduct. *See Wolford*, 116 F.4th at 983. That is what the district court did here. But what makes that approach still incorrect here, even accepting this circuit's Second Amendment precedents at face value, is that when the Ninth Circuit has applied the "nuanced approach" and analogized at such high levels of generality, it has been at least nominally predicated on the assumption that some circumstances have significantly changed. *See, e.g.*, *Duncan*, 133 F.4th at 872–73; *Wolford*, 116 F.4th at 983. But here, nothing has changed. Open carry remains open carry, just as it was at the Founding. And concealed carry remains concealed carry, just as it was in 1791.

To get around that reality, the analogical argument that California would have us adopt really boils down to the idea that today a state can ban all open carry because some other states regulated some *other* things at the Founding in some *other* ways.[18] That is too sloppy a fit. *Bruen* requires a closer relationship between "how" and "why" a historical regulation burdened the right to bear arms and "how" and "why" a modern analogue burdens that right. Yet by extracting a broad principle at such a high level of generality, California and the district court conclude that all open carry can be banned, so long as some type of other carry (here, concealed) is allowed. The historical record nowhere presents such a principle. As explained, the historical record clearly evinces that *open* carry was universally considered to be protected by the right to keep and bear arms, not just that *some form* of carry was protected.

It is of course true that, as *Heller* and *Bruen* both recognized, the Second Amendment is not unlimited. In our history and tradition, certain firearms regulations have existed comfortably alongside the Second Amendment, like, for example, some restrictions on concealed carry. But although some restrictions were allowed, most were not. Under the approach California and the dissent want us to adopt today, however, as long as certain aspects of firearms carry were regulated and others were not, it hardly matters at all *which* historically were regulated. Once again, that is not faithful to *Bruen*'s methodology, which requires a closer fit between the "how" and "why" before a historical

---

[18] Indeed, at oral argument California candidly conceded "yes" when asked if the principle it was defending was essentially that "it doesn't matter what areas are banned, they are kind of fungible … you can ban certain things as long you allow … enough left." *See* Oral Argument at 53:18–53:32, *Baird*, No. 24-565, *supra*.

analogue can be used to bless a modern-day restriction on the right to bear arms.  More pointedly, that the Founders permitted restrictions on concealed carry, but did not allow restrictions on open carry, is not a license to ban carte blanche open carry so long as concealed carry is—although tightly regulated—not *entirely* banned.

In other words, if there were ever an instance where it is impermissible to use loose analogizing under the auspices of applying the Ninth Circuit's "nuanced approach," it is this case.  If the "nuanced approach" can be properly applied here, where there is a clear and widely documented practice at the Founding and at the time of the Fourteenth Amendment, and that practice has remained unchanged from 1791 to now, then the "nuanced approach" exception has completely swallowed *Bruen*'s rule and there is no case where the default rule under *Bruen* would apply.

But that is not the law.  *Bruen* envisioned that the "nuanced approach" would be the exception, not the rule. *See Bruen*, 597 U.S. at 27.  And the overwhelming historical consensus that open carry was protected (both in 1791 and 1868) makes this case very much like *Bruen*.  *See id.* at 26 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."). Gun violence is an issue that plainly existed at the Founding, and yet open carry was never banned.  And in *Bruen*, when the Supreme Court was confronted with a practice that was entirely unchanged from the Founding—the ability to carry a firearm outside the home for self-defense—the Court never so much as hinted that the "nuanced approach" was appropriate.    Quite the opposite.    The Court held the

government to its burden of presenting a historical analogue that curtailed the right to bear arms in an analogous manner and for an analogous reason. *See id.* at 33–50. Given that the "nuanced approach" is inapposite in cases like this, which involve a clear practice dating back to the Founding, it is doubly true that the "nuanced approach" cannot be wielded to ban the very conduct that was protected at the Founding under the implicit principle that "a lot can be banned as long as not everything is banned." The bottom line: when there is a clear and unbroken historical tradition, it is not permissible to analogize at levels of generality so high that it becomes permissible to ban what was protected, so long as the government refrains from outright banning some other practice that could have been prohibited.

## B.

The state suggests that we can ignore the tremendous evidence of a tradition of open carry dating back to the Founding because Baird is only challenging a licensing regime. But that is inaccurate. California's legal regime is a complete *ban* on open carry in urban areas—the areas of the state where 95% of the people live. A licensing regime that entirely bans open carry in all the areas of the state where 95% of the population reside is a ban on open carry in those areas, theoretical exceptions notwithstanding. If a state by statute categorically banned drivers' licenses for 95% of the state's drivers, or for 95% of the roads in the state, it would be quite strange to characterize that as a mere "licensing" regime. We would have no trouble recognizing such a characterization as classic Orwellian doublespeak.

Accordingly, California's affirmative argument regarding the history and tradition of licensing regimes is irrelevant to this case. Because Baird alleges that he wants

to be able to open carry in the areas of the state where 95% of the people live—the areas where California flatly bans open carry, licensed or unlicensed—this evidence (regardless of whatever its force might be otherwise) is inapposite. And California has put forth no meaningful evidence that a ban on open carry is consistent with any of our Nation's history or traditions. Indeed, California scarcely even attempts to put forth any such evidence, despite having had multiple chances to satisfy its burden. *See generally* Oral Argument at 2:30, *Baird*, 81 F.4th 1046, *supra*.

In any event, for the reasons explained above a historical tradition permitting the banning of open carry finds no support in the historical record. It is hard (if not impossible) to find any practice associated with the carriage of firearms that received more explicit constitutional protection under the Second Amendment in the nineteenth century than open carry. Accordingly, it is perhaps unsurprising that the en banc Ninth Circuit has already recognized the primacy of open carry. In a pre-*Bruen* case, when the constitutional status of public carry was still being debated, this court explained that "[i]f there is such a right [to public carry], it is … a right to carry a firearm openly." *Peruta v. Cnty. of San Diego,* 824 F.3d 919, 942 (9th Cir. 2016) (abrogated in part on other grounds by *Bruen*, 597 U.S. 1). The en banc Ninth Circuit was correct, and *Bruen* has since laid to rest the antecedent question. There is clearly a constitutional right to publicly carry firearms. *Bruen*, 597 U.S. at 70. And as our court has already declared, that entails "a right to carry a firearm openly." *Peruta*, 824 F.3d at 942. California's urban open-carry ban that flatly prohibits all open carry in the areas of the state where 95% of the people live is thus unconstitutional.

**C.**

California briefly addresses some regulations regarding the manner of public carry, but these arguments also fail. As a threshold matter, as described above, there are very few laws from the Founding that regulated the manner of public carry, and *no* direct statutory bans on the carry of arms. *See* Meltzer, *Open Carry For All*, *supra*, at 1505. California attempts to circumvent this history by analogizing to affray laws, but those are not proper analogues here because the "how" and "why" of those historical laws do not match California's ban.

Affray laws have their root in the English Statute of Northampton, which was passed in 1328 and prohibited "bringing ... force in affray of the peace." 2 Edw. 3 c. 3 (1328). Affray was originally understood as "the fighting of two or more persons in some public place, to the terror of his majesty's subjects." 4 Blackstone, *Commentaries* \*145. But as applied to weapons, an affray was typically "understood … to encompass the offense of arming oneself to the Terror of the People." *Rahimi*, 602 U.S. at 697 (cleaned up) (citing T. Barlow, *The Justice of the Peace: A Treatise* 11 (1745)). Since affrays "le[d] almost necessarily to actual violen[c]e," *Huntly*, 25 N.C. at 422, they were punished with "forfeiture of the arms … and imprisonment," 4 Blackstone, *Commentaries* \*149.

From this it is clear that the "why" of an affray law was to combat the misuse of firearms in particular cases where physical violence was likely, and the "how" was by disarming specific individuals in discrete cases when they were already committing criminal acts with a firearm—and in doing so demonstrating that they were misusing their firearms in such a manner as to incite violence. *See* Joseph

G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 29, 35–36, 52–53 (2024).   Thus, affray laws might be more properly analogized to modern laws that criminalize the brandishing of firearms or otherwise using a firearm in a way that is criminal, and enforcing that proscription with disarmament.[19]   *See, e.g.*, 18 U.S.C. § 924(c)(1)(A)(ii).   That is plainly not analogous to California's ban on openly carrying a firearm lawfully and peacefully in the areas of the state where 95% of the population resides.   California's attempt to analogize its open-carry ban to historical affray laws is very much like trying to justify a new complete ban on speech in public areas by pointing to a historical prohibition on "fighting words."

Perhaps implicitly recognizing that "how" and "why" its ban burdens the Second Amendment right is not the same as "how" and "why" carry restrictions in 1791 and 1868 burdened the Second Amendment right, California retreats to quasi-interest balancing by arguing that (regardless of the "why" and "how") its ban "imposes only a minimal burden on Baird's Second Amendment right."   This argument fails too.   As explained above, in our Nation's history and tradition, open carry was widely recognized as being central to the Second Amendment right.   A ban on that which is at

---

[19] Indeed, the district court also recognized that affray laws are more properly analogized to modern laws against brandishing, thus appearing to implicitly concede that affray laws are therefore likely inapposite analogues for an open-carry ban. *See Baird*, 709 F. Supp. 3d at 1138 ("State and colonial governments did not allow people to carry firearms in ways that intimidated or suggested evil purposes.   Brandishing and display prohibitions, laws patterned on the Statute of Northampton, and prohibitions on firearms in large groups are examples from this category.").

the core of the Second Amendment is not a "minimal burden" on the Second Amendment right. And in any event, the Supreme Court has already rejected interest-balancing as a permissible approach to interpreting the Second Amendment. *See generally Bruen*, 597 U.S. 1.

**D.**

Next, we address the impropriety of conducting a historical analysis predicated on "the history that the Constitution left behind." *Rahimi*, 602 U.S. at 723 (Kavanaugh, J., concurring). In conducting its historical analysis below, the district court relied in part on a series of egregiously racially discriminatory laws that California offered as analogous "examples" of restrictions on constitutional carry in the historical tradition. Although the district court professed "reservations" about leaning on such a sordid legacy, the court ultimately concluded "it should take account of the history of discriminatory regulations rather than completely ignore it." If Supreme Court precedent and a faithful examination of our historical tradition required such "account," then courts would be forced to undertake the unpleasant task. But no authority requires that. Indeed, Supreme Court authority counsels against it.

Reliance on such racially odious laws in this case is both conceptually suspect and inconsistent with a proper application of *Bruen*. As an initial matter, it is conceptually suspect because the Fourteenth Amendment was designed to prohibit racially motivated misconduct, not countenance extensions of it—whether by analogy or otherwise. *See Strauder v. West Virginia*, 100 U.S. 303, 307–09 (1880) (explaining the design of the Fourteenth Amendment was to "declar[e] that the law in the States shall be the same for the

black as for the white; that all persons, whether colored or
white, shall stand equal before the laws of the States"). It is
sad but hardly surprising that racist state legislatures in some
instances reacted to the Fourteenth Amendment by
continuing to engage in—and at times even doubling down
on—racially motivated misconduct. But the fact that
recalcitrant groups (largely in the South) continued to
engage in discriminatory misconduct in the wake of the
Fourteenth Amendment's adoption does not mean that such
misconduct can be read back into the Constitution through
interpretation and analogy. It just means that some state
legislatures were committed to flouting the Fourteenth
Amendment. *See Rahimi*, 602 U.S. at 718 n.2 (Kavanaugh,
J., concurring); *see also id.* at 723 (noting that, when
analyzing history, "courts must exercise care to rely only on
the history that the Constitution actually incorporated and
not on the history that the Constitution left behind").

But even putting aside these deep conceptual problems
with relying on such a sordid legacy, *Bruen* itself instructs us
that these kinds of laws are irrelevant to a Second
Amendment analysis. In *Bruen*, the Supreme Court decreed
that even when courts are confronting a new technology or
societal problem that did not exist at the Founding—when
they must use the "nuanced approach"—they must be guided
by "how and why" a historical regulation "burden[ed] a law-
abiding citizen's right to armed self-defense." *Bruen*, 597
U.S. at 29. The "why" of the discriminatory laws that
California and the district court relied upon was
unapologetically to disadvantage black people and other
historically disfavored groups. That "why" plainly does not
carry over to the laws at issue here, which are ostensibly to
deter gun violence and prevent "a highly stressful and unsafe
environment for everyone." These xenophobic, explicitly

racist laws are therefore irrelevant to a faithful application of *Bruen*.

But once again, even putting aside the foregoing errors, these nineteenth century laws present no problem for a Second Amendment analysis unless one is analogizing at exceedingly high levels of generality. And, as we have explained, this is not a "nuanced approach" case where it could even conceivably be permissible to do so.

**E.**

Aside from its substantive arguments, California also makes procedural arguments. These too are unpersuasive.

First, California argues that Baird is challenging only a licensing regime. Again, that is incorrect. Indeed, as noted above, in the operative Complaint Baird abandoned his challenge to particular provisions of Penal Code sections 26150 and 26155, which set out California's licensing requirements. The Complaint makes clear that Baird is challenging the de jure urban open-carry ban. *See* Cal. Penal Code §§ 25850, 26350. Those challenges are independent of any challenges to California's licensing requirements in rural counties.

We next address the dispute between the parties over whether Baird's as-applied challenge to California's urban open-carry ban is still live in this case. Baird has the better of the argument that his as-applied challenge is presented for this court's review. But that question is ultimately beside the point. Some cases no doubt raise thorny questions about the differences between as-applied and facial challenges, but this is not such a case. With respect to California's urban open-carry ban, there is no meaningful distinction between the arguments supporting Baird's facial and as-applied

challenges, and Baird would win regardless of whether his challenge is facial, as-applied, or both.

First, Baird's as-applied challenge to California's ban on open carry in urban areas remains live. The district court stated that it dismissed Baird's as-applied challenge to California's licensing regime. But as explained, the district court failed to recognize the reality that California's law is an urban open-carry *ban*, not just a mere licensing requirement, and Baird has challenged that ban both facially and as applied to him. The discussion of California's licensing requirements (regardless of its merits) is immaterial to Baird's challenge to California's urban open-carry ban, and the district court could not dismiss Baird's as-applied challenge to that complete ban by conflating that challenge with any challenge to California's licensing requirements for open carry in rural counties.

Contrary to the dissent's assertion that Baird did not "point to any issue with the application of California's restrictions on open carry," it is clear from looking at the Complaint that Baird has alleged that he is banned from openly carrying in all the places to which he wishes to travel in California, and he is challenging as applied to him those applications of the law that prevent him from doing so—not merely challenging "the existence of California's restrictions on open carry." While the dissent is correct that as-applied challenges often contest "[h]ow the statute has been interpreted and applied by local officials," *Calvary Chapel Bible Fellowship v. Cnty. of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020), as-applied challenges need not hinge on such arguments. In *Project Veritas v. Schmidt*, an en banc panel of our court found that the plaintiff had raised facial and as-applied challenges to the same statute. 125 F.4th 929, 940–41 (9th Cir. 2025) (en banc). There, the as-

applied challenge did not hinge on how local officials had interpreted and applied the challenged statute to plaintiff's conduct.[20] *Id.* at 940. Instead, the "as-applied challenge [pertained] to [plaintiff's] *proposed* conduct"—various actions the plaintiff wanted to undertake that were barred by the text of a statute that "prohibit[ed] unannounced recordings of oral conversations." *Id.* at 937, 940 (emphasis added). Baird's as-applied challenge here is similar: he has pointed to specific actions he intends to take that are squarely barred by the text of California's statute, and he has argued that California cannot constitutionally prohibit him from taking those actions.[21] The fact that the statute might be applied identically to others engaging in the same conduct that Baird wants to engage in does not invalidate his as-applied challenge: in *Project Veritas*, there was no indication

---

[20] We do not "misstate the facts of *Project Veritas*" as the dissent claims. The dissent points to Oregon's concession at oral argument in *Project Veritas* that the statute covered only secret recordings, not open ones, to argue that "local officials had interpreted and applied the challenged statute to the plaintiff's conduct." But an oral argument concession is not the same thing as local officials applying the law in practice, so the dissent's argument fails to rebut our point that local interpretation and application are not prerequisites to bring an as-applied challenge. 125 F.4th at 940 n.5. On top of that, our court in *Project Veritas* treated the statute, on its face, as only applying to secret recordings, meaning that the court's understanding of the statute for facial purposes and as-applied purposes was the same. *See id.* at 937–38 (referring to the statute as only "prohibiting unannounced recordings"); *see also id.* at 953, 955–56 (noting that the statute permits certain "open recordings"—not as a matter of local interpretation and application, but on its face).

[21] The fact that, as the dissent points out, Baird "seeks to 'restore' the Second Amendment rights of 'the citizens of California,'" does not refute that Baird has as an as-applied challenge; it simply validates Baird's claim that he has a facial challenge *in addition* to his as-applied one.

that the challenged statute would have been applied
differently to others acting as the plaintiff there intended to,
yet our court still found that the plaintiff had brought a valid
as-applied challenge. *Id.* at 940; *see also Foti v. City of
Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (finding as-
applied challenges to a generally applicable speech ban to be
valid). By arguing that California's urban open-carry ban is
unconstitutional as applied to his planned conduct of
carrying openly in California's urban counties, Baird has
squarely presented an as-applied challenge to California's
urban open-carry ban for this court's review.

But again, regardless of whether Baird has a facial
challenge, an as-applied challenge, or both, our analysis and
conclusion would be the same. Because California's urban
open-carry ban applies equally to all those it covers, Baird's
as-applied challenge to the urban open-carry ban boils down
to the argument that California cannot constitutionally deny
him from carrying openly throughout the state—or at least
the 95% of the state (by population) covered by its urban
open-carry ban. The analysis of that claim is no different
than for Baird's facial challenge, which merely expands the
argument to contend that, for the same reasons, California
cannot constitutionally ban *others* from carrying openly
throughout the state. *Bruen*'s two-step framework applies to
both, and both challenges succeed. *See Rahimi*, 602 U.S. at
693–700. For Second Amendment challenges, whether
facial or as-applied, our analysis is guided by the question of
whether a challenged law fits within the plain text of the
Second Amendment and "this Nation's historical tradition."
*Bruen*, 597 U.S. at 17.

Moreover, our approach to Baird's challenge to
California's urban open-carry ban in this case follows the
example of the Supreme Court. The three leading Supreme

Court cases interpreting the Second Amendment, *Heller*, *Bruen*, and *Rahimi*, all involve facial challenges to laws restricting Second Amendment rights.    Although only *Rahimi* lays out the test from *United States v. Salerno*, 481 U.S. 739, 745 (1987),[22] the Supreme Court's analysis of the law at issue, in *Heller*, *Bruen*, and *Rahimi*, evaluated the constitutionality of the law on its face, not as applied to the appellant.

In *Heller*, the Supreme Court considered a facial challenge to a Washington, D.C., law banning handgun possession in the home and determined that the law was facially unconstitutional.    554 U.S. at 635.    In evaluating the constitutionality of the Washington, D.C., handgun ban, *Heller* did not assess whether the law might conceivably have some theoretical constitutional application.    Instead, *Heller* treated the law banning handguns in the home as facially unconstitutional, regardless of whether Washington, D.C. permitted individuals to keep other firearms in the home or whether *some* "set of circumstances exist[ed]" where Washington, D.C., might be justified in prohibiting some handguns for some people.    *Id.* at 629.

Relying on *Heller*, *Bruen* held that New York's may-issue licensing regime was unconstitutional on its face.    597 U.S. at 11, 20.    *Bruen* set forth the two-step framework we apply in assessing Second Amendment challenges.    *Id.* at 17–20.    Applying this framework, *Bruen* held that a

---

[22] In *Rahimi*, the Supreme Court stated that a facial challenge "requires a defendant to 'establish that no set of circumstances exists under which the [law at issue] would be valid,'" *Rahimi*, 602 U.S. at 693 (quoting *Salerno*, 481 U.S. at 745).    *Rahimi* also explained that in responding to a facial challenge, "the Government need only demonstrate that [the law] is constitutional in some of its applications."    *Id.*

licensing regime that issues carry permits only to applicants who show a special need for self-defense violates the Second Amendment. *Id.* at 38–39. The Supreme Court did not focus on whether New York could lawfully implement its may-issue licensing regime in some "set of circumstances." *See id.* at 38–70; *cf. Salerno*, 481 U.S. at 745. Instead, *Bruen* concluded that the New York may-issue licensing regime and the similar regimes in five other states were unconstitutional. 597 U.S. at 11.

In *Rahimi*, the Supreme Court assessed a facial challenge to 18 U.S.C. § 922(g)(8) and cited the *Salerno* test. 602 U.S. at 693. In analyzing the facial challenge to § 922(g)(8), *Rahimi* applied the two-step framework from *Bruen* uncoupled from the facts of the challenger's case. *See id.* at 693–700. *Rahimi* stated that § 922(g)(8)(C)(i) was lawful as applied to the challenger himself. *Id.* at 700. But *Rahimi* also made that clear that its analysis applied to all applications of § 922(g)(8)(C)(i) against a person determined by a court to "represent[] a credible threat to the physical safety" of another person. *Id.* at 699 (quoting § 922(g)(8)).

Our own court's precedent is in accord with the Supreme Court's approach in this regard. As indicated in several recent cases, we have applied *Bruen*'s two-step framework when evaluating both facial and as-applied challenges to laws alleged to violate the Second Amendment. In *Duncan v. Bonta*, for example, we applied *Bruen*'s two-step framework in assessing a facial challenge to California's ban on large-capacity magazines. 133 F.4th at 860. *B & L Productions, Inc. v. Newsom* assessed the constitutionality of California's ban on the sale of firearms on state property. 104 F.4th 108, 110 (9th Cir. 2024). The plaintiffs argued that California's law barring the sale of firearms on state

property was unconstitutional on its face and as applied to two specific state properties. *Id.* We did not separately analyze the facial and as-applied challenges. In *Wolford v. Lopez*, we considered the plaintiffs' facial challenges to California and Hawaii laws that barred firearms in certain classes of geographical locations, such as parks, playgrounds, bars, restaurants, and parking areas. 116 F.4th at 975–76, 982. We applied *Bruen*'s analytical framework in holding that the challenged state laws did not facially apply to each geographic place listed. *Id.* at 976, 984. *United States v. Duarte* addressed a criminal defendant's argument that 18 U.S.C. § 922(g)(1), which criminalizes the possession of firearms by felons, was unconstitutional as applied to nonviolent felons like him. 137 F.4th 743, 747 (9th Cir. 2025) (en banc). We held that § 922(g)(1) was not unconstitutional as applied to nonviolent felons like the defendant. *Id.* at 748. In reaching this conclusion, we applied *Bruen*'s two-step framework. *Id.* at 750–62.

In sum, the *Bruen* analysis conducted for Baird's challenge applies equally to his facial and as-applied challenges to California's urban open-carry ban. And even assuming Baird retains only his facial challenge to that ban, it would still succeed. Under the standard for facial challenges, as articulated by this court in *Wolford v. Lopez*, facial challenges in Second Amendment cases can succeed if plaintiffs "show either that the law is 'unconstitutional in every conceivable application' *or* that the law 'seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.'" *Wolford*, 116 F.4th at 984 (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (emphasis added)). Because no historical tradition authorizes an open-carry ban, Baird's challenge meets the first part of the standard described in *Wolford*. The

only constitutional application California could point to was
the availability of rural open-carry licenses, a provision
distinct from California's urban open-carry ban and
therefore not a constitutional application of the ban.  The
dissent's assertion that "California's restrictions on open
carry are constitutional in some circumstances, i.e., when
California allows concealed carry," fares no better.  As
discussed above, the history indicates that open carry and
concealed carry are not fungible: allowing licensed
concealed carry does not automatically authorize an open-
carry ban.  So California's concealed-carry licensing system
does not undermine Baird's facial challenge to the urban
open-carry ban.

Even if California or the dissent had identified some
narrow constitutional application of California's open-carry
ban—which they haven't—our precedent in *Wolford* makes
clear that some facial challenges to overly broad laws can
succeed even if state defendants can identify some small set
of hypothetical circumstances where the challenged law
would be constitutional.[23]  It is difficult to imagine a case
where an overbreadth challenge would be more appropriate
than here, where California has banned open carry entirely
for 95% of the population and throughout 95% of the state
by population.  The breadth of California's ban criminalizes
such a wide swath of protected conduct that Baird's facial
challenge unquestionably meets the second part of the
standard described in *Wolford*.[24]

---

[23] Although the Supreme Court has granted certiorari in *Wolford*,
*Wolford* remains binding law in the Ninth Circuit for the time being.
*Wolford v. Lopez*, No. 24-1046, 2025 WL 2808808 (U.S. Oct. 3, 2025).

[24] The dissent's criticisms that other circuits have not recognized
overbreadth challenges in the Second Amendment context and that

This court recently rejected a Second Amendment overbreadth challenge in *Untied States v. Stennerson*, 150 F.4th 1276 (9th Cir. 2025). There, the plaintiff facially challenged, among other provisions, 18 U.S.C. § 922(n), which makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to … receive any firearm or ammunition." Stennerson argued that "the historical record does not support § 922(n)'s restriction because it applies to many more offenses than triggered pretrial detention at the founding." *Stennerson*, 150 F.4th at 1290. Despite agreeing that "what constitutes a felony under modern law is much broader" than at the Founding, this court rejected Stennerson's facial challenge on the grounds that § 922(n) "is at least constitutional as applied to those indicted for offenses that triggered pretrial detention at the founding." *Id.* The statute's application is limited to the small percentage of the population indicted for serious crimes, and any overbreadth concern would apply only to the even smaller percentage of the population indicted for those

_____

*Wolford* merely "quoted the overbreadth standard in passing" are unavailing. First, the dissent's arguments incorrectly downplay Baird's as-applied challenge to California's urban open-carry ban and Baird's success under the conventional facial challenge standard. Second, the dissent provides no explanation for why our precedent in *Wolford* would mention facial overbreadth *in the Second Amendment context* if it did not mean to acknowledge the viability of the overbreadth doctrine in this context. Ultimately, the dissent simply disagrees with *Wolford*. Which puts it in good company, *Wolford v. Lopez*, 125 F.4th 1230, 1231 (VanDyke, J., dissenting from the denial of rehearing en banc), including possibly a majority of the Supreme Court, *Wolford v. Lopez*, No. 24-1046, 2025 WL 2808808 (U.S. Oct. 3, 2025). But *Wolford* remains good law, and until it is overturned we are bound by it—including its statement that the overbreadth doctrine can apply in the Second Amendment context.

crimes considered serious today but not considered serious
at the Founding.  On top of that, § 922(n), by its language,
applies only for the duration of the indictment.  In contrast
to *Stennerson*, California's open-carry ban at issue here
broadly forecloses almost all Californians' Second
Amendment rights to openly carry across almost all of the
state and has no time limit.  *Stennerson*'s overbreadth
analysis, therefore, accords with our conclusion here.

## F.

In addition to legal arguments, California makes a series
of policy arguments in support of its law.  For instance,
California argues that permitting open carry "would create a
highly stressful and unsafe environment" and "has the high
potential to create panic and chaos."  The district court
gestured at this argument as well, explaining it is significant
that there are changed "cultural and societal
expectations … about what is intimidating, frightening, or
dangerous" that make open carry a particularly "frightening"
manner of carry.  None of these policy points can overcome
the text of the Second Amendment, the Supreme Court's
commands in *Bruen*, or the unbroken history and tradition of
allowing open carry in this country.  The Supreme Court has
already rejected similar policy arguments.  Instead, *Bruen*
and *Heller* prescribed a historical analysis, not policy
reasoning, recognizing that policy concerns like "the
problem of handgun violence in this country" cannot trump
"the enshrinement of constitutional rights."  *Heller*, 554 U.S.
at 636; *see Bruen*, 597 U.S. at 24.

California also briefly suggests that changing technology
and the dangerousness of modern handguns justify
California's departure from the historical tradition of
permitting open carry.  Even putting aside that policy

arguments such as this can overcome neither the text of the Constitution nor the Supreme Court's commands, this argument too has already been rejected by the Supreme Court. If the increased lethality of modern handguns was a reason to deviate from history and tradition, then *Heller* would have come out differently. The Supreme Court made clear that the "dangerousness" of modern handguns did not militate in favor of finding an exception to the clear historical tradition of permitting individuals to have a handgun in the home for self-defense. *See, e.g.*, *Heller*, 554 U.S. at 634. And in any event, this is not a case about new technology. *Cf. Duncan*, 133 F.4th at 872–73. This is a case about a practice—open carry—that indisputably dates back to the earliest days of the Republic. *See, e.g.*, *Nunn*, 1 Ga. at 251. If this is somehow a case about new technology, then *every* Second Amendment case is a case about new technology.

## VII.

The dissent disagrees with our analysis in several ways, arguing that California's urban open-carry ban is facially constitutional, both because "carrying a handgun openly throughout California … is not covered by the plain text of the Second Amendment," and because "the Nation's 'historical tradition of firearm regulation'" supports such a ban. The dissent also claims that the urban open-carry ban provision is severable. None of these counterarguments are persuasive.

## A.

The dissent erroneously concludes that California's urban open-carry ban is facially constitutional. As explained, the dissent's primary basis for doing so is its misreading of cherrypicked quotations from *Bruen* to reach

the novel conclusion that the Second Amendment is a
"disjunctive" right that supposedly is not even implicated
unless both concealed and open carry are banned. *Bruen*
never says anything close to that. The Supreme Court has
never suggested that both types of carry must be banned
before the Second Amendment is even in play. Of course,
the Supreme Court acknowledged that some regulation of
the manner of carry is allowed because the Second
Amendment right is "not a right to keep and carry any
weapon whatsoever in any manner whatsoever." *Bruen*, 597
U.S. at 21 (quoting *Heller*, 554 U.S. at 626). But such
generalized language does not suggest that the Second
Amendment is a "disjunctive right," tells us nothing about
*what sort of* regulations are allowed, and comes nowhere
close to suggesting that California can constitutionally enact
a wholesale ban on a historically protected mode of carry for
95% of its population. In short, contrary to the dissent's
argument, the Supreme Court simply has not *directly*
addressed the Second Amendment issue presented in this
case—in *Bruen* or otherwise. But it has told us how to
analyze such questions: by looking to "the historical
tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Rather than conduct that analysis, the dissent interprets
the Supreme Court's statement that "history reveals a
consensus that States could *not* ban public carry altogether"
to mean that the Supreme Court has already done the
relevant historical analysis, and authoritatively distilled from
that analysis that most public carry can be banned as long
some public carry (though highly licensed, regulated, and
restricted) is not. *Bruen*, 597 U.S. at 53. Again, that is a
strange misreading of the Court's statement. If the Supreme
Court told us that the Fourth Amendment does not allow the
police to arbitrarily shoot people, no one would interpret

such a statement to mean anything short of that must be permitted by the Fourth Amendment. The statement in *Bruen* that the dissent twists and then clings to simply reflects the breadth of the ban at issue in *Bruen*. Because the facts there involved a near-total ban on handguns, *id.* at 11–15, it made sense for the Court to emphasize that functionally banning all forms of carry is impermissible, *id.* at 53.[25] That statement does not lead to the conclusion that the state may regulate however it wants to so long as its restrictions fall short of a total ban. Not even California has made such an argument. Such a conclusion is incompatible with the detailed analogical mode of analysis the Supreme Court laid out in *Bruen*, an approach requiring granular historical analysis rather than threadbare, generalized conclusions divorced from specific historical cases or statutes. *Id.* at 38–70.

**B.**

The dissent also argues that the open-carry ban provision is severable, and that we should judicially create an open-carry shall-issue licensing regime in California rather than merely invalidating California's ban. This argument fails as well.

---

[25] The dissent's contention that "*Bruen* defined the level of generality" for all Second Amendment cases "as 'public carry'" is incorrect. That was the appropriate level of generality in *Bruen* because of the kind of case *Bruen* was: it addressed what was functionally a total ban on all forms of public carry. *Bruen*, 597 U.S. at 12–14. The Court therefore did not have to reach the question of whether different types of public carry receive different levels of constitutional protection, and it would be a mistake to assume that we must use the same level of generality in a case that presents a different constitutional question.

First, the dissent insists we should do something California never asked or even suggested that we do. The state has never asked us to judicially manufacture a particular sort of urban open-carry licensing regime if we found its open-carry ban unconstitutional. The dissent insists that severability does not require the governmental party's permission. But that misunderstands our concern. Our point is not that a court's power to sever a statute necessarily must turn on the government's express consent. Instead, our point is that California's refusal to ask for a different regime here is a strong indicator of the difficulty of judicially crafting a new system—a difficulty that cautions against judges stepping in to fashion a new system without any indication of legislative approval of the system created. That alone is reason enough to avoid such judicial legislation here.

Even if we were inclined to consider severability sua sponte, we would look to state law to determine severability of a state statute. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). California law dictates that to be severable, "the invalid provision must be grammatically, functionally, and volitionally separable." *McMahan v. City & Cnty. of San Francisco*, 26 Cal. Rptr. 3d 509, 513 (Cal. Ct. App. 2005) (quoting *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1256 (1989)). "All three criteria must be satisfied." *Id.* The third component, volitional severability, "depends on whether the remainder [of the statute] would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute." *Cal. Redevelopment Ass'n v. Matosantos*, 267 P.3d 580, 608 (Cal. 2011) (internal quotation marks omitted) (quoting *Santa Barbara Sch. Dist. v. Superior Ct. of Santa Barbara Cnty.*, 530 P.2d 605, 618 (Cal. 1975)).

California's open-carry ban is not volitionally severable. The dissent argues that "[i]t is hard to imagine that California would not have adopted any open carry licensing requirements if it foresaw [our] holding." Even if it is true that California would have adopted *some* licensing requirement, it is not our role to say *what sort of* licensing regime California would have chosen to adopt. *See Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014) ("[A] court may not use severability as a fig leaf for judicial legislation …."); *Yu Cong Eng v. Trinidad*, 271 U.S. 500, 518 (1926) ("[I]t is very clear that amendment may not be substituted for construction, and that a court may not exercise legislative functions to save the law from conflict with constitutional limitation."). For us to create an open-carry shall-issue licensing regime by judicial mandate would be to effectively legislate an urban open-carry permitting regime into existence. Although we acknowledge that not all severing conducted by courts amounts to judicial policymaking, in line with the Supreme Court of California's decision in *Kopp v. Fair Political Practices Commission*, 905 P.2d 1248 (Cal. 1995), the wholesale creation of a new policy regime, without meeting all the severability factors, is exactly the sort of "'judicial policymaking' in the guise of statutory reformation" forbidden by *Kopp*.[26]  On top of that, if we followed the dissent's preferred approach and imposed a new urban open-carry regime of our own making, who would evaluate if our judicially created licensing regime

---

[26] The dissent is wrong to characterize its proposed severance as "simply eliminat[ing] an exception ... to California's open carry licensing system." Since the ban is the baseline rule throughout the vast majority of California, the dissent's proposed severance is more accurately characterized as drastically expanding a narrow exception to become the whole rule.

violated the Second Amendment?   Our court would essentially be tasked with adjudicating the constitutionality of a regulatory regime that we invented, raising thorny separation-of-powers questions.   It is better that we keep to our lane and leave the legislating to other branches of government.

## VIII.

Open carry is unquestionably part of our Nation's history and tradition of "the right to keep and bear arms."  The clear protection for open carry, stretching back to the Founding, means that under *Bruen* we do not reach the "nuanced approach" in evaluating California's broad ban on open carry.   And in any event, courts cannot use the "nuanced approach" to analogize at levels of generality so high that they can bless bans on conduct that was indisputably unregulated and widespread both in 1791 and 1868.   We decline California's invitation to open that Pandora's box.

Under *Bruen*, this is a straightforward case.  California is attempting to address a general societal problem through materially different means than were used during either the Founding or Reconstruction.    From the Founding to Reconstruction, it was well-established that "a prohibition against bearing arms openly, is in conflict with the Constitution, and void." *Nunn*, 1 Ga. at 251 (emphasis omitted).  California's ban on open carry in counties with a population greater than 200,000 is therefore inconsistent with the Second Amendment.   With respect to Baird's challenge to California's licensing restrictions on open carry in rural counties, we affirm the district court's grant of summary judgment because Baird waived his as-applied challenge and cannot prevail on his facial challenge on the record in this case.  We therefore **AFFIRM** the judgment of

the district court in part, **REVERSE** in part, and **REMAND** with the instruction to enter judgment in favor of appellant Baird with respect to his challenge to California's urban open-carry ban. Each party will bear its own costs on appeal.

Concurring, LEE, Circuit Judge, with whom VANDYKE, Circuit Judge, joins:

I join Judge VanDyke's excellent opinion.

I also write separately to highlight how California has apparently resorted to subterfuge to deny its citizens their Second Amendment rights. California insists that citizens in counties with populations fewer than 200,000 people can apply for an open-carry license. Yet California admits that it has no record of even *one* open-carry license being issued. How could this be? One potential reason is that California has misled its citizens about how to apply for an open-carry license.

California has issued a 17-page application with the heading, "STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE TO CARRY A WEAPON CAPABLE OF BEING *CONCEALED.*" *See* Form BOF 4012 (emphasis added). The first paragraph of the form then says that the law "requires the Attorney General to issue a statewide standard application form for CCW [Concealed Carry Weapon] licenses." *Id.* at 1. Throughout the application, it uses the word "concealed" or "CCW" 67 times. But the phrase "open carry" is not mentioned once.

Most Californians would reasonably think that this form is used only for a concealed carry weapon permit. But they would be mistaken. A person seeking an *open-carry* permit

must fill out a document described as a "Weapon Capable of Being Concealed" / "CCW [Concealed Carry Weapon]" form.  This would be like a city telling its citizens that they can obtain a building permit for a fence in their front yard but not advising them that they actually have to submit a demolition permit form.  The only way that a Californian seeking an open-carry permit would know that she must submit a Concealed Carry Weapon form is if she scoured the dense 17-page document and found in small print on one of the pages that a "CCW license shall be issued . . . [w]here the population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person."  The reader can try to find that language in the form, which is attached as Appendix A to this concurrence.

Most Californians would have no clue.  But that appears to be the very point—California tries to hide the fact that citizens in those counties have a right to open carry their weapon under the law.  Our constitutional rights, however, should not hinge on a Where's Waldo quiz.

California routinely sues private companies for engaging in similar deceptive conduct.[1]  Under California law, a

---

[1] *See, e.g.*, Press Release, Rob Bonta, Attorney General of California, Attorney General Bonta Sues ExxonMobil for Deceiving the Public on Recyclability of Plastic Products (Sept. 23, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-exxonmobil-deceiving-public-recyclability-plastic (alleging the term "advanced recycling" is misleading); Press Release, Rob Bonta, Attorney General of California, Attorney General Bonta Announces Service Corporation International, Nation's Largest Funeral Service Provider, to Pay $23 Million Penalty and Consumer Restitution for

"reasonable" person should not "be expected to look beyond misleading representations" and scrutinize the form "to discover the truth . . . in small print" elsewhere. *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (applying California's Unfair Competition Law and Consumer Legal Remedies Act). Yet that is exactly what California forces its citizens to do when they try to exercise their Second Amendment rights. Our own state government must behave better than an unscrupulous telemarketer.

---

Consumer Protection Law Violations (May 1, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-service-corporation-international-nation%E2%80%99s (alleging "deceptive marketing"); Press Release, Rob Bonta, Attorney General of California, Attorney General Bonta Announces $10.25 Million Settlement Against AT&T, Verizon, and T-Mobile for Misleading Advertising Practices (May 9, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-1025-million-settlement-against-att-verizon-and# (alleging "misleading advertising practices" in violation of California law).

# Appendix A

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)



DEPARTMENT OF JUSTICE
PAGE 1 of 17

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

## Authority

California Penal Code sections 26150, 26155, and 26170 provide that a sheriff of a county or the chief or other head of a municipal police department of any city or city and county, upon proof that the applicant meets the statutory qualifications, shall issue or renew a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person (CCW license). Penal Code section 26175 requires the Attorney General to issue a statewide standard application form for CCW licenses.

## Who Shall be Issued a CCW License

The licensing authority specified in Penal Code sections 26150 and 26155 (a sheriff or the chief, or other head of a municipal police department, or one of the two if there is an agreement between the relevant authorities under subdivision (c)) shall issue a license to persons who (1) are not a disqualified person to receive such a license, as determined in accordance with the standards set forth in Penal Code section 26202; (2) are at least 21 years of age; (3) are residents of the county or a city within the county of the licensing authority, or have their principal place of employment or business in the county or a city within the county and spend a substantial amount of time in that place of employment or business; (4) have completed the required course of training, as described in Penal Code section 26165; and (5) are the recorded owner, with the Department of Justice, of the pistol, revolver, or other firearm for which the license will be issued.

The licensing authority specified in Penal Code section 26170 (a sheriff or the chief, or other head of a municipal police department) shall issue a license to persons who (1) are not a disqualified person to receive such a license, as determined in accordance with the standards set forth in Penal Code section 26202; (2) are at least 21 years of age; (3) have been deputized or appointed as a peace officer pursuant to Penal Code section 830.6, subdivisions (a) or (b) by that sheriff or that chief of police or other head of a municipal police department; and (4) are the recorded owner, with the Department of Justice, of the pistol, revolver, or other firearm for which the license will be issued, or are authorized to carry a firearm that is registered to the agency for which the licensee has been deputized or appointed to serve as a peace officer.

Every applicant for an initial CCW license will be fingerprinted and state and federal records will be checked to determine if the applicant is eligible to possess, receive, own, or purchase firearms under state and federal law. For informational purposes only, provided along with this application is a separate enclosure which lists categories that prohibit a person from possessing firearms and thus from being granted a CCW license. Because the enclosure is updated periodically to reflect new legislation and other changes in the law, the most recent version should be reviewed.

## Disqualified Persons Who Cannot Receive or Renew a CCW License

Under Penal Code section 26202, unless a court makes a contrary determination pursuant to Penal Code section 26206, an applicant shall be deemed to be a disqualified person and cannot receive or renew a CCW license if the licensing authority determines that the applicant:

1. Is reasonably likely to be a danger to self, others, or the community at large;
2. Has been convicted of contempt of court under Penal Code section 166;
3. Has been subject to any restraining order, protective order, or other type of court order issued pursuant to the statutory provisions listed in Penal Code section 26202, subdivision (a)(3), unless that order expired or was vacated or otherwise canceled more than five years prior to the licensing authority receiving this completed application;
4. In the ten years prior to the licensing authority receiving this completed application, has been convicted of an offense listed in Penal Code sections 422.6, 422.7, 422.75, or 29805;
5. Has engaged in an unlawful or reckless use, display, or brandishing of a firearm;
6. In ten years prior to the licensing authority receiving this completed application, has been charged with any offense listed in Penal Code sections 290, 667.5, 1192.7, 1192.8, or 29805 that was dismissed pursuant to a plea or dismissed with a waiver pursuant to *People v. Harvey* (1979) 25 Cal.3d 754;
7. In the five years prior to the licensing authority receiving this completed application, has been committed to or incarcerated in county jail or state prison for, or probation, parole, post release community supervision, or mandatory supervision as a result of, a conviction of an offense, an element of which involves controlled substances (as described in Health and Safety Code sections 11053 to 11058, inclusive) or alcohol;
8. Is currently abusing controlled substances (as described in Health and Safety Code sections 11053 to 11058, inclusive), or alcohol;

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

DEPARTMENT OF JUSTICE
PAGE 2 of 17

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

9. Within the ten years prior to the licensing authority receiving this completed application, has experienced the loss or theft of multiple firearms due to the applicant's lack of compliance with federal, state, or local law in storing, transporting, or securing the firearm; or

10. Failed to report a loss of a firearm as required by Penal Code section 25250 or any other state, federal, or local law requiring the reporting of the loss of a firearm.

**Format of CCW License**

A CCW license shall be issued in either of the following formats:

1. A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person; or
2. Where the population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person.

**Training Required**

Penal Code sections 26150 and 26155 specify that new license applicants must complete a course of training. The training may consist of any course acceptable to the licensing authority and no less than 16 hours in length that meets the minimum criteria set forth in Penal Code section 26165, subdivision (a). Instead of a course described in Penal Code section 26165, subdivision (a), the licensing authority may require a community college course, not to exceed 24 hours, certified by the Commission on Peace Officer Standards and Training. If the licensing authority requires the community college course, it must be uniformly required for all CCW license applicants.

For license renewal applicants, the course of training may be any course acceptable to the licensing authority that is no less than eight hours in length, and that otherwise meets the minimum criteria set forth in Penal Code section 26165, subdivision (a).

A licensing authority must establish and make available to the public the live-fire exercise requirements it uses (including the minimum number of rounds to be fired and minimum passing scores from specified firing distances) when issuing licenses. (Penal Code § 26165, subd. (b).)

**Psychological Testing**

Under Penal Code section 26190, subdivision (e), licensing authorities may also require psychological assessment for each initial application. If required, the applicant shall be referred to a licensed psychologist acceptable to the licensing authority. The applicant may be charged for the actual cost of the assessment. An additional psychological assessment of an applicant seeking license renewal shall be required only if there is compelling evidence of a public safety concern to indicate that an assessment is necessary.

**Completing the Application**

Pursuant to Penal Code section 26160, each licensing authority, in addition to using the standard application form, is required to publish and make available a written policy summarizing the provisions of Penal Code sections 26150 and 26155.

The application on the following pages sets forth standardized questions to be used by the CCW licensing authority to determine whether a CCW license shall be issued. The applicant must certify under penalty of perjury that all answers provided are true and correct to the best of their knowledge and belief. The applicant must also acknowledge that information disclosed in this application may be subject to the public disclosure.

Pursuant to Penal Code section 26175, subdivision (c)(2), in lieu of a residence or business address, an applicant who participates in the program described in Chapter 3.1 of Division 7 of Title I of the Government Code (allowing address confidentiality for victims of domestic violence, sexual assault, and stalking) may provide the address designated to the applicant by the Secretary of State. Pursuant to Penal Code section 26175, subdivision (c)(3), in lieu of a residence address, an applicant who falls within the categories described in Penal Code section 26220, subdivision (c) (listing judicial officers) may provide a business address or an alternative mailing address, such as a Post Office Box.

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)



DEPARTMENT OF JUSTICE
PAGE 3 of 17

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

Answering all the questions on this standard application does not guarantee the issuance of a CCW license. Prior to issuing a CCW license, the licensing authority is required to determine whether the applicant meets all the statutory qualifications under Penal Code section 26202, subdivision (b), the licensing authority is also required to conduct an investigation to determine whether the applicant is a disqualified person and cannot receive or renew a CCW license. That investigation must, at a minimum, include a review of all information provided in this application, an in-person interview with the applicant, interviews with at least three character references, a review of publicly available information about the applicant, a review of information provided by the Department of Justice, and a review of information in the California Restraining and Protective Order System. Interviews of the applicant and character references are mandatory for initial license applications. The licensing authority may elect to require these interviews for renewal license applications. The licensing authority may engage in investigative efforts in addition to these minimum requirements.

**Important Instructions**
Complete, read, and sign Sections 1 through 5, as directed. Use additional pages if more space is required.

Review your answers before your in-person interview with the licensing authority investigator and be prepared to clarify the information provided upon request. You have an affirmative duty to inform the investigator of any changes to your answers. Note that under Penal Code section 26180, any person who files an application for a CCW license knowing that statements contained therein are false is guilty of a misdemeanor, and in some instances, a felony.

Sections 7 and 8 must be completed in the presence of an official of the licensing authority.

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

DEPARTMENT OF JUSTICE
PAGE 4 of 17

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

**Official Use Only**
**Type of License Requested**

| Standard | Judge | | ☐ Initial Application | ☐ Renewal Application |
| Reserve Peace Officer | Employment | ☐ Custodial Officer | | |

### Section 1 - Personal Information

Last Name     First Name     Middle Name

If Applicable, Maiden Name or Other Names(s) Used

CA Driver License / ID No.     CA Driver License Restrictions     Country of Citizenship

Date of Birth     Age     Place of Birth (City, County, State or City and County if outside the U.S.)

Height     Weight     Eye Color     Hair Color

Residence Address     City     State     Zip Code     Telephone Number (Day)

Mailing Address (if different)     City     State     Zip Code     Telephone Number (Evening)

Spouse/Domestic Partner Last Name     Spouse/Domestic Partner First Name     Spouse/Domestic Partner Middle Name

Spouse/Domestic Partner Physical Address (*if different than applicant*)     City     State     Zip Code

Applicant Occupation     Business/Employer Name

Business/Employer Address     City     State     Zip Code     Telephone Number

List all previous residence addresses for the past five years. Use additional pages if necessary.

Address     City     State     Zip Code

Address     City     State     Zip Code

Address     City     State     Zip Code

Address     City     State     Zip Code



STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

DEPARTMENT OF JUSTICE
PAGE 5 of 17

**Section 2 - Information Pertaining to Eligibility and Disqualification for CCW License**

1. Do you now have, or have you ever had, a license to carry a concealed weapon (CCW)? If yes, please enter the issuing agency name, issuing state, CCW license number, and issue date. Use additional pages if necessary.      ☐ YES ☐ NO

Issuing Agency Name                          Issuing State

CCW License Number                           Issue Date

2. Have you ever been denied a CCW license or had a license revoked for any reason? If yes, please enter the agency name, date, and the reason for denial/revocation.      ☐ YES ☐ NO

Agency Name                                  Date

Reason for Denial/Revocation

3. Have you ever held and subsequently renounced your United States citizenship? If yes, please explain.      ☐ YES ☐ NO

4. Have you ever been charged with any criminal offense (civilian or military) in the United States or any other country, even if such charges were dismissed? If yes, please explain including the date, agency, charges, and disposition.      ☐ YES ☐ NO

5. Have you ever been detained or arrested in the United States or any other country? If yes, please explain including the date, agency, and whether the detention or arrest resulted in criminal charges, and if so, the disposition.      ☐ YES ☐ NO

6. Are you now, or have you been, on probation, parole, post release community supervision, or mandatory supervision from any state for conviction of any offense including traffic? If yes, please explain.      ☐ YES ☐ NO

7. Are you now, or have you been, a party to a lawsuit in the last five years? If yes, please explain.      ☐ YES ☐ NO

BAIRD V. BONTA
63

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS
STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE
TO CARRY A WEAPON CAPABLE OF BEING CONCEALED

DEPARTMENT OF JUSTICE
PAGE 6 of 17

8. If you served with the Armed Forces, was your discharge other than honorable? If yes, please explain.  ☐ YES ☐ NO

9. Are you now, or have you been, subject to any restraining order, protective order, or other type of court ☐ YES ☐ NO
order issued pursuant to Penal Code section 646.91 (stalking); Part 3, commencing with section 6240, or
Part 4, commencing with section 6300, of Division 10 of the Family Code (domestic violence or abuse);
Penal Code section 136.2 (victims and witnesses of crime); Penal Code section 18100 (gun violence
restraining order); Code of Civil Procedure section 527.6 (civil harassment); Code of Civil Procedure
section 527.8 (workplace violence); Code of Civil Procedure section 527.85 (school violence); Welfare and
Institutions Code sections 213.5, 304, 362.4, or 726.5 (juvenile court orders); or Welfare and Institutions
Code section 15657.03 (elder/dependent adult abuse)? If yes, please explain.

10. Are you now, or have you been, subject to a valid restraining, protective, or stay-away order issued by an ☐ YES ☐ NO
out-of-state jurisdiction pursuant to laws concerning domestic violence, family law, protection of children
or elderly persons, stalking, harassment, witness intimidation, or firearm possession? If yes, please
explain.

11. Are you now, or have you been, subject to a valid restraining, protective, or stay-away order issued by ☐ YES ☐ NO
any court within the United States or by any out-of-state jurisdiction? If yes, please explain.

12. List all traffic violations (moving violations only) and motor vehicle accidents you have had in the last five years. Use
additional pages if necessary.

| Date | Violation/Accident | Agency | Citation No. |
|---|---|---|---|
| Date | Violation/Accident | Agency | Citation No. |
| Date | Violation/Accident | Agency | Citation No. |
| Date | Violation/Accident | Agency | Citation No. |
| Date | Violation/Accident | Agency | Citation No. |



STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

DEPARTMENT OF JUSTICE
PAGE 7 of 17

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

13. Have you ever been taken into custody as a danger to self or others for reasons related to mental health     ☐ YES ☐ NO
under Welfare and Institutions Code sections 5150 or 5585, or assessed under Welfare and Institutions
Code section 5151, or admitted to a mental health facility under Welfare and Institutions Code sections
5150 or 5152, or certified for mental health treatment under Welfare and Institutions Code sections 5250,
5260, or 5270.15? If yes, please explain.

14. Have you ever otherwise been treated for mental illness? If yes, please explain.     ☐ YES ☐ NO

15. Have you ever been found not guilty by a reason of insanity or mentally incompetent to stand trial? If yes,  ☐ YES ☐ NO
please explain.

16. Are you now, or have you ever been, addicted to a controlled substance or alcohol, or have you ever     ☐ YES ☐ NO
utilized an illegal controlled substance, or have you ever reported to a detoxification or drug treatment
program? If yes, please explain.

17. Have you engaged in an unlawful or reckless use, display, or brandishing of a firearm ? If yes, please     ☐ YES ☐ NO
explain.

18. Have you ever been involved in an incident involving firearms? If yes, please explain.     ☐ YES ☐ NO

19. Have you ever been involved in a domestic violence incident? If yes, please explain.     ☐ YES ☐ NO



STATE OF CALIFORNIA
BCF 4012 (Rev. 01/2024)

DEPARTMENT OF JUSTICE
PAGE 8 of 17

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

20. Have you withheld any fact that might affect the decision to approve this license? If yes, please explain.    ☐ YES ☐ NO

21. Have you ever lost a firearm, or had a firearm stolen? If yes, please explain and describe whether you    ☐ YES ☐ NO
reported the loss or theft of the firearm.

The licensing authority investigator should request clarification on any of the information provided by the applicant, as appropriate, and confirm that none of the applicant's answers have changed.

Investigator's notes.  Use additional pages if necessary.



STATE OF CALIFORNIA
BCF 4012 (Rev. 01/2024)

DEPARTMENT OF JUSTICE
PAGE 9 of 17

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

**Section 3 - Character References**

Please list the names and contact information of three persons willing to serve as references. One of the three must be person described in Penal Code section 273.5, subdivision (b) (your spouse or former spouse, your cohabitant or former cohabitant, your fiancée, or someone with whom you have, or previously had, an engagement or dating relationship, or the mother or father of your child), if applicable. At least one of the three must be your cohabitant, if applicable.

| Name | Relationship | Phone Number |
|---|---|---|
| Name | Relationship | Phone Number |
| Name | Relationship | Phone Number |

**Section 4 - Description of Firearms**

List below the firearms you desire to carry if granted a CCW license. You must be the recorded owner, with the Department of Justice, of any firearm listed below. You may use a CCW license granted in response to this application only for carrying the firearm(s) which you list and describe herein, unless you apply for and obtain an amendment. Any misuse will cause an automatic revocation under Penal Code section 26195, subdivision (b), and possible arrest. Use additional pages if necessary.

| Make | Model | Caliber | Serial Number |
|---|---|---|---|
| Make | Model | Caliber | Serial Number |
| Make | Model | Caliber | Serial Number |
| Make | Model | Caliber | Serial Number |
| Make | Model | Caliber | Serial Number |
| Make | Model | Caliber | Serial Number |
| Make | Model | Caliber | Serial Number |
| Make | Model | Caliber | Serial Number |
| Make | Model | Caliber | Serial Number |

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

DEPARTMENT OF JUSTICE
PAGE 10 of 17



**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

**Section 5 - CCW License Conditions and Restrictions**

The licensee is responsible for all liability for, injury to, or death of any person, or damage to any property which may result through any act or omission of either the licensee or the licensing authority. In the event any claim, suit, or action is brought against the licensing authority, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the licensing authority, its chief officer or any of its employees from such claim, suit, or action.

The licensee authorizes the licensing authority to investigate, as they deem necessary, the licensee's record and character to ascertain any and all information which may concern their possible disqualifications to be issued a CCW license and release said issuing agency of any and all liability arising out of such investigation.

While exercising the privileges granted to the licensee under the terms of this license, the licensee shall not (pursuant to Penal Code section 26200), when carrying a concealable weapon as authorized by this license:

- Consume any alcoholic beverage, or controlled substance as described in Health and Safety Code sections 11053 to 11058, inclusive.
- Be in a place having a primary purpose of dispensing alcoholic beverages for on-site consumption.
- Be under the influence of any alcoholic beverage, medication, or controlled substance as described in Health and Safety Code sections 11053 to 11058, inclusive.
- Carry a firearm not listed on the license or a firearm for which they are not the recorded owner (unless the licensee was issued a CCW under Penal Code section 26170 and has been authorized to carry a firearm that is registered to the agency for which the licensee has been deputized or appointed to serve as a peace officer).
- Falsely represent to a person that the licensee is a peace officer.
- Engage in unjustified display of a deadly weapon.
- Fail to carry the license on their person.
- Impede any peace officer in the performance of their activities.
- Refuse to display the license or provide the firearm to any peace officer upon demand for purposes of inspecting the firearm.
- Fail to comply with any reasonable restrictions or conditions the licensing authority imposes, including restrictions as to the time, place, manner, and circumstances under which a licensee may carry a pistol, revolver, or other firearm capable of being concealed on the person.
- Carry more than two firearms under the licensee's control at one time.
- Violate any federal, state, or local criminal law.

Title 49, section 46505 of the United States Code states that a license to carry a concealed weapon does not authorize a person to carry a firearm, tear gas, or any dangerous weapon aboard commercial airlines. Such violation can result in arrest by law enforcement.

Any violation of these restrictions or conditions may result in the CCW license being revoked, or may void any further use of the license until reinstated by the licensing authority.

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)



**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

DEPARTMENT OF JUSTICE
PAGE 11 of 17

### Section 6 - Applicable California Penal Code Sections for CCW Licensees

Although license holders must obey all current federal, state, and local laws, the following Penal Code sections are of special importance to the holder of a CCW license regarding the use, carrying, and storage of firearms. Please note that the Penal Code excerpts provided below are for informational purposes only. To the extent these laws change over time, those changes have controlling effect.

#### Penal Code section 26180 - False Statement on Application Form
(a) Any person who files an application required by Section 26175 knowing that statements contained therein are false is guilty of a misdemeanor.
(b) Any person who knowingly makes a false statement on the application regarding any of the following is guilty of a felony:
  (1) The denial or revocation of a license, or the denial of an amendment to a license, issued pursuant to this article.
  (2) A criminal conviction.
  (3) A finding of not guilty by reason of insanity.
  (4) The use of a controlled substance.
  (5) A dishonorable discharge from military service.
  (6) A commitment to a mental institution.
  (7) A renunciation of United States citizenship.

#### Penal Code section 192 - Manslaughter [excerpt, subdivisions (c) - (f) not included]
Manslaughter is the unlawful killing of a human being without malice.
(a) Voluntary - upon a sudden quarrel or heat of passion.
(b) Involuntary - in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. This subdivision shall not apply to acts committed in the driving of a vehicle.

#### Penal Code section 197 - Justifiable Homicide; Any Person
Homicide is also justifiable when committed by any person in any of the following cases:
  (1) When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person.
  (2) When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein.
  (3) When committed in the lawful defense of such person, or of a spouse, parent, child, master, mistress or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he or she was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed.
  (4) When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace.

#### Penal Code section 198 - Justifiable Homicide; Sufficiency of Fear
A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

#### Penal Code section 25100 - Criminal Storage of Firearm
(a) Except as provided in Section 25105, a person commits the crime of "criminal storage of a firearm of the first degree" if all of the following conditions are satisfied:
  (1) The person keeps any firearm within any premises that are under the person's custody or control.
  (2) The person knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or legal guardian, or that a person prohibited from possessing a firearm or deadly weapon pursuant to state or federal law is likely to gain access to the firearm.

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

DEPARTMENT OF JUSTICE
PAGE 12 of 17



**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

    (3) The child obtains access to the firearm and thereby causes death or great bodily injury to the child or any other
        person, or the person prohibited from possessing a firearm or deadly weapon pursuant to state or federal law obtains
        access to the firearm and thereby causes death or great bodily injury to themselves or any other person.
(b) Except as provided in Section 25105, a person commits the crime of "criminal storage of a firearm of the second degree"
    if all of the following conditions are satisfied:
    (1) The person keeps any firearm within any premises that are under the person's custody or control.
    (2) The person knows or reasonably should know that a child is likely to gain access to the firearm without the permission
        of the child's parent or legal guardian, or that a person prohibited from possessing a firearm or deadly weapon
        pursuant to state or federal law is likely to gain access to the firearm.
    (3) The child obtains access to the firearm and thereby causes injury, other than great bodily injury, to the child or any
        other person, or carries the firearm either to a public place or in violation of Section 417, or the person prohibited from
        possessing a firearm or deadly weapon pursuant to state or federal law obtains access to the firearm and thereby
        causes injury, other than great bodily injury, to themselves or any other person, or carries the firearm either to a
        public place or in violation of Section 417.
(c) Except as provided in Section 25105, a person commits the crime of "criminal storage of a firearm in the third degree" if
    the person keeps any firearm within any premises that are under the person's custody or control and negligently stores or
    leaves a firearm in a location where the person knows, or reasonably should know, that a child is likely to gain access to
    the firearm without the permission of the child's parent or legal guardian, unless reasonable action is taken by the person
    to secure the firearm against access by the child.

**Penal Code section 25105 - Exceptions to Criminal Storage of Firearm**
Section 25100 does not apply whenever any of the following occurs:
(a) The child obtains the firearm as a result of an illegal entry to any premises by any person.
(b) The firearm is kept in a locked container or in a location that a reasonable person would believe to be secure.
(c) The firearm is carried on the person or within close enough proximity thereto that the individual can readily retrieve and
    use the firearm as if carried on the person.
(d) The firearm is locked with a locking device, as defined in Section 16860, which has rendered the firearm inoperable.
(e) The person is a peace officer or a member of the Armed Forces or the National Guard and the child obtains the firearm
    during, or incidental to, the performance of the person's duties.
(f) The child obtains, or obtains and discharges, the firearm in a lawful act of self-defense for defense of another person.
(g) The person who keeps a loaded firearm on any premises that are under the person's custody or control has no
    reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premises.

**Penal Code section 25200 - Storage of Firearm Accessed by Children or Prohibited Persons and Carried Off-**
**Premises**
(a) If all of the following conditions are satisfied, a person shall be punished by imprisonment in a county jail not exceeding
    one year, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine:
    (1) The person keeps a firearm, loaded or unloaded, within any premises that are under the person's custody or control.
    (2) The person knows or reasonably should know that a child is likely to gain access to that firearm without the
        permission of the child's parent or legal guardian, or that a person prohibited from possessing a firearm or deadly
        weapon pursuant to state or federal law is likely to gain access to the firearm.
    (3) The child or the prohibited person obtains access to that firearm and thereafter carries that firearm off-premises.
(b) If all of the following conditions are satisfied, a person shall be punished by imprisonment in a county jail not exceeding
    one year, by a fine not exceeding five thousand dollars ($5,000), or by both that imprisonment and fine:
    (1) The person keeps any firearm within any premises that are under the person's custody or control.
    (2) The person knows or reasonably should know that a child is likely to gain access to the firearm without the permission
        of the child's parent or legal guardian, or that a person prohibited from possessing a firearm or deadly weapon
        pursuant to state or federal law is likely to gain access to the firearm.
    (3) The child or the prohibited person obtains access to the firearm and thereafter carries that firearm off-premises to any
        public or private preschool, elementary school, middle school, high school, or to any school-sponsored event, activity,
        or performance, whether occurring on school grounds or elsewhere.
(c) A firearm that a child gains access to and carries off-premises in violation of this section shall be deemed "used in the
    commission of any misdemeanor as provided in this code or any felony" for the purpose of Section 29300 regarding the
    authority to confiscate firearms and other deadly weapons as a nuisance.



STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

DEPARTMENT OF JUSTICE
PAGE 13 of 17

(d) As used in this section, "off-premises" means premises other than the premises where the firearm was stored.

**Penal Code section 25205 - Exceptions to Unlawful Storage of Firearm Accessed and Carried Off-Premises**
Section 25200 does not apply if any of the following are true:
(a) The child obtains the firearm as a result of an illegal entry into any premises by any person.
(b) The firearm is kept in a locked container or in a location that a reasonable person would believe to be secure.
(c) The firearm is locked with a locking device, as defined in Section 16860, which has rendered the firearm inoperable.
(d) The firearm is carried on the person within close enough range that the individual can readily retrieve and use the firearm as if carried on the person.
(e) The person is a peace officer or a member of the Armed Forces or National Guard and the child obtains the firearm during, or incidental to, the performance of the person's duties.
(f) The child obtains, or obtains and discharges, the firearm in a lawful act of self-defense or defense of another person.
(g) The person who keeps a firearm has no reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premises.

**Penal Code section 626.9  - Schools [excerpt, subdivisions (f), (g), and (k) - (q) not included]**
(a) This section shall be known, and may be cited, as the Gun-Free School Zone Act of 1995.
(b) Any person who possesses a firearm in a place that the person knows, or reasonably should know, is a school zone as defined in paragraph (4) of subdivision (e), shall be punished as specified in subdivision (f).
(c) Subdivision (b) does not apply to the possession of a firearm under any of the following circumstances:
   (1) Within a place of residence or place of business or on private property, if the place of residence, place of business, or private property is not part of the school grounds and the possession of the firearm is otherwise lawful.
   (2) (A) When the firearm is an unloaded pistol, revolver, or other firearm capable of being concealed on the person is within a locked container in a motor vehicle or is within the locked trunk of a motor vehicle at all times.
      (B) This section does not prohibit or limit the otherwise lawful transportation of any other firearm, other than a pistol, revolver, or other firearm capable of being concealed on the person, in accordance with state law.
   (3) When the person possessing the firearm reasonably believes that they are in grave danger because of circumstances forming the basis of a current restraining order issued by a court against another person or persons who has or have been found to pose a threat to their life or safety. This subdivision does not apply when the circumstances involve a mutual restraining order issued pursuant to Division 10 (commencing with Section 6200) of the Family Code absent a factual finding of a specific threat to the person's life or safety. Upon a trial for violating subdivision (b), the trier of a fact shall determine whether the defendant was acting out of a reasonable belief that they were in grave danger.
   (4) When the person is exempt from the prohibition against carrying a concealed firearm pursuant to Section 25615, 25625, 25630, or 25645.
   (5) When the person holds a valid license to carry the firearm pursuant to Chapter 4 (commencing with Section 26150) of Division 5 of Title 4 of Part 6, who is carrying that firearm in an area that is within a distance of 1,000 feet from the grounds of the public or private school, but is not within any building, real property, or parking area under the control of a public or private school providing instruction in kindergarten or grades 1 to 12, inclusive, or on a street or sidewalk immediately adjacent to a building, real property, or parking area under the control of that public or private school. Nothing in this paragraph shall prohibit a person holding a valid license to carry the firearm pursuant to Chapter 4 (commencing with Section 26150) of Division 5 of Title 4 of Part 6 from carrying a firearm in accordance with that license as provided in subdivisions (b), (c), or (e) of Section 26230.
(d) Except as provided in subdivision (b), it shall be unlawful for any person, with reckless disregard for the safety of another, to discharge, or attempt to discharge, a firearm in a school zone as defined in paragraph (4) of subdivision (e). The prohibition contained in this subdivision does not apply to the discharge of a firearm to the extent that the conditions of paragraph (1) of subdivision (c) are satisfied.
(e) As used in this section, the following definitions shall apply:
   (1) "Concealed firearm" has the same meaning as that term is given in Sections 25400 and 25610.
   (2) "Firearm" has the same meaning as that term is given in subdivisions (a) to (d), inclusive, of Section 16520.
   (3) "Locked container" has the same meaning as that term is given in Section 16850.
   (4) "School zone" means an area in, or on the grounds of, a public or private school providing instruction in kindergarten or grades 1 to 12, inclusive, or within a distance of 1,000 feet from the grounds of the public or private school.



STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

DEPARTMENT OF JUSTICE
PAGE 14 of 17

(f) [not included here]

(g) [not included here]

(h) Notwithstanding Section 25605, any person who brings or possesses a loaded firearm upon the grounds of a campus of, or buildings owned or operated for student housing, teaching, research, or administration by, a public or private university or college, that are contiguous or are clearly marked university property, unless it is with the written permission of the university or college president, their designee, or equivalent university or college authority, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years. Notwithstanding subdivision (k), a university or college shall post a prominent notice at primary entrances on noncontiguous property stating that firearms are prohibited on that property pursuant to this subdivision.

(i) Notwithstanding Section 25605, any person who brings or possesses a firearm upon the grounds of a campus of, or buildings owned or operated for student housing, teaching, research, or administration by, a public or private university or college, that are contiguous or are clearly marked university property, unless it is with the written permission of the university or college president, their designee, or equivalent university or college authority, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for one, two, or three years. Notwithstanding subdivision (k), a university or college shall post a prominent notice at primary entrances on noncontiguous property stating that firearms are prohibited on that property pursuant to this subdivision.

(j) For purposes of this section, a firearm shall be deemed to be loaded when there is an unexpended cartridge or shell, consisting of a case that holds a charge of powder and a bullet or shot, in, or attached in any manner to, the firearm, including, but not limited to, in the firing chamber, magazine, or clip thereof attached to the firearm. A muzzle-loader firearm shall be deemed to be loaded when it is capped or primed and has a powder charge and ball or shot in the barrel or cylinder.

**Penal Code section 26230 - Prohibited Places**

(a) A person granted a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person pursuant to Section 26150, 26155, or 26170 shall not carry a firearm on or into any of the following:

(1) A place prohibited by Section 626.9.

(2) A building, real property, or parking area under the control of a preschool or childcare facility, including a room or portion of a building under the control of a preschool or childcare facility. Nothing in this paragraph shall prevent the operator of a childcare facility in a family home from owning or possessing a firearm in the home if no child under child care at the home is present in the home or the firearm in the home is unloaded, stored in a locked container, and stored separately from ammunition when a child under child care at the home is present in the home so long as the childcare provider notifies clients that there is a firearm in the home.

(3) A building, parking area, or portion of a building under the control of an officer of the executive or legislative branch of the state government, except as allowed pursuant to paragraph (2) of subdivision (b) of Section 171c.

(4) A building designated for a court proceeding, including matters before a superior court, district court of appeal, or the California Supreme Court, parking area under the control of the owner or operator of that building, or a building or portion of a building under the control of the Supreme Court, unless the person is a justice, judge, or commissioner of that court.

(5) A building, parking area, or portion of a building under the control of a unit of local government, unless the firearm is being carried for purposes of training pursuant to Section 26165.

(6) A building, real property, and parking area under the control of an adult or juvenile detention or correctional institution, prison, or jail.

(7) A building, real property, and parking area under the control of a public or private hospital or hospital affiliate, mental health facility, nursing home, medical office, urgent care facility, or other place at which medical services are customarily provided.

(8) A bus, train, or other form of transportation paid for in whole or in part with public funds, and a building, real property, or parking area under the control of a transportation authority supported in whole or in part with public funds.

(9) A building, real property, and parking area under the control of a vendor or an establishment where intoxicating liquor is sold for consumption on the premises.



STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

DEPARTMENT OF JUSTICE
PAGE 15 of 17

(10) A public gathering or special event conducted on property open to the public that requires the issuance of a permit from a federal, state, or local government and sidewalk or street immediately adjacent to the public gathering or special event but is not more than 1,000 feet from the event or gathering, provided this prohibition shall not apply to a licensee who must walk through a public gathering in order to access their residence, place of business, or vehicle.

(11) A playground or public or private youth center, as defined in Section 626.95, and a street or sidewalk immediately adjacent to the playground or youth center.

(12) A park, athletic area, or athletic facility that is open to the public and a street or sidewalk immediately adjacent to those areas, provided this prohibition shall not apply to a licensee who must walk through such a place in order to access their residence, place of business, or vehicle.

(13) Real property under the control of the Department of Parks and Recreation or Department of Fish and Wildlife, except those areas designated for hunting pursuant to Section 5003.1 of the Public Resources Code, Section 4501 of Title 14 of the California Code of Regulations, or any other designated public hunting area, public shooting ground, or building where firearm possession is permitted by applicable law.

(14) Any area under the control of a public or private community college, college, or university, including, but not limited to, buildings, classrooms, laboratories, medical clinics, hospitals, artistic venues, athletic fields or venues, entertainment venues, officially recognized university-related organization properties, whether owned or leased, and any real property, including parking areas, sidewalks, and common areas.

(15) A building, real property, or parking area that is or would be used for gambling or gaming of any kind whatsoever, including, but not limited to, casinos, gambling establishments, gaming clubs, bingo operations, facilities licensed by the California Horse Racing Board, or a facility wherein banked or percentage games, any form of gambling device, or lotteries, other than the California State Lottery, are or will be played.

(16) A stadium, arena, or the real property or parking area under the control of a stadium, arena, or a collegiate or professional sporting or eSporting event.

(17) A building, real property, or parking area under the control of a public library.

(18) A building, real property, or parking area under the control of an airport or passenger vessel terminal, as those terms are defined in subdivision (a) of Section 171.5.

(19) A building, real property, or parking area under the control of an amusement park.

(20) A building, real property, or parking area under the control of a zoo or museum.

(21) A street, driveway, parking area, property, building, or facility, owned, leased, controlled, or used by a nuclear energy, storage, weapons, or development site or facility regulated by the federal Nuclear Regulatory Commission.

(22) A church, synagogue, mosque, or other place of worship, including in any parking area immediately adjacent thereto, unless the operator of the place of worship clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property. Signs shall be of a uniform design as prescribed by the Department of Justice and shall be at least four inches by six inches in size.

(23) A financial institution or parking area under the control of a financial institution.

(25) A police, sheriff, or highway patrol station or parking area under control of a law enforcement agency.

(25) A polling place, voting center, precinct, or other area or location where votes are being cast or cast ballots are being returned or counted, or the streets or sidewalks immediately adjacent to any of these places.

(26) Any other privately owned commercial establishment that is open to the public, unless the operator of the establishment clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property. Signs shall be of a uniform design as prescribed by the Department of Justice and shall be at least four inches by six inches in size.

(27) Any other place or area prohibited by other provisions of state law.

(28) Any other place or area prohibited by federal law.

(29) Any other place or area prohibited by local law.

STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

DEPARTMENT OF JUSTICE
PAGE 16 of 17

(b) Notwithstanding subdivision (a), except under paragraph (21) or (28) of subdivision (a), a licensee may transport a firearm and ammunition within their vehicle so long as the firearm is locked in a lock box, as defined in subdivision (y) of Section 4082 and subdivision (b) of Section 4094 of Title 11 of the California Code of Regulations, and the lock box is a firearm safety device, as defined in Section 16540, that is listed on the department's Roster of Firearm Safety Devices Certified for Sale pursuant to Sections 23650 and 23655. Nothing in this subdivision is intended to preempt local laws placing more restrictive requirements upon the storage of firearms in vehicles.

(c) Notwithstanding subdivision (a), except under paragraph (21) or (28) of subdivision (a), a licensee prohibited from carrying a concealed firearm into the parking area of a prohibited location specified in subdivision (a) shall be allowed to:

   (1) Transport a concealed firearm or ammunition within a vehicle into or out of the parking area so long as the firearm is locked in a lock box.

   (2) Store ammunition or a firearm within a locked lock box and out of plain view within the vehicle in the parking area. Nothing in this paragraph is intended to preempt local laws placing more restrictive requirements upon the storage of firearms in vehicles.

   (3) Transport a concealed firearm in the immediate area surrounding their vehicle within a prohibited parking lot area only for the limited purpose of storing or retrieving a firearm within a locked lock box in the vehicle's trunk or other place inside the vehicle that is out of plain view.

(d) For purposes of subdivision (c), a lock box is an item as defined in subdivision (b) of Section 4082 and subdivision (y) of Section 4094 of Title 11 of the California Code of Regulations, which is a firearm safety device, as defined in Section 16540, that is listed on the Department's Roster of Firearm Safety Devices Certified for Sale pursuant to Sections 23650 and 23655.

(e) Except in the places specified in paragraph (14) of subdivision (a), a licensee shall not be in violation of this section while they are traveling along a public right-of-way that touches or crosses any of the premises identified in subdivision (a) if the concealed firearm is carried on their person in accordance with the provisions of this act or is being transported in a vehicle by the licensee in accordance with all other applicable provisions of law. Nothing in this section allows a person to loiter or remain in a place longer than necessary to complete their travel.

(f) Nothing in this section shall prohibit the carrying of a firearm where it is otherwise expressly authorized by law.



STATE OF CALIFORNIA
BOF 4012 (Rev. 01/2024)

**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
**STANDARD INITIAL AND RENEWAL APPLICATION FOR LICENSE**
**TO CARRY A WEAPON CAPABLE OF BEING CONCEALED**

DEPARTMENT OF JUSTICE
PAGE 17 of 17

**Section 7 - Agreement to Restrictions and to Hold Harmless**

I accept and assume all responsibility and liability for, injury to, or death of any person, or damage to any property which may result through an act or omission of either the licensee or the licensing authority. In the event any claim, suit or action is brought against the licensing authority, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the licensing authority, its chief officer or any of its employees from such claim, suit, or action.

I understand that the acceptance of any application by the licensing authority does not guarantee the issuance of a CCW license and that fees and costs are not refundable if denied. I further understand that if my application is approved and I am issued a CCW license, that the license is subject to restrictions placed upon it and that misuse of the license will cause an automatic revocation and possible arrest. I am aware that any use of a firearm may bring criminal action or civil liability against me.

I have read, understand, and agree to the CCW license liability clauses, conditions, and restrictions stated in this application and Agreement to Restrictions and to Hold Harmless.

I have read and understand the applicable Penal Code sections regarding false statements on a CCW Application, manslaughter, killing in defense of self or property, limitation on self-defense and defense of property, firearm storage and access by children or prohibited persons, and prohibited places, stated in this application.

I have read and understand the Firearms Prohibiting Categories enclosed with this application. I further acknowledge that these prohibiting categories can be amended or expanded by state or federal legislative or regulatory bodies and that any such amendment or expansion may affect my eligibility to hold a CCW license.

_____                    _____
                 Applicant Signature                                              Date

_____    _____    _____
                 Witness Signature                        Badge Number                    Date

**Section 8 - Release of Information and Declaration**

I hereby give permission to the licensing authority to which this application is made to conduct a background investigation of me and to contact any person or agency who may add to or aid in this investigation. I further authorize persons, firms, agencies and institutions listed on this application to release or confirm information about me and statements I have made as contained in this application.

Notwithstanding any other provision of law and pursuant to the Public Records Act (Government Code section 7920.000 et seq.), I understand that information contained in this application may be a matter of public record and shall be made available upon request or court order.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____                    _____
                 Applicant Signature                                              Date

_____    _____    _____
                 Witness Signature                        Badge Number                    Date

N.R. SMITH, Senior Circuit Judge, concurring in part and dissenting in part:

*Bruen* controls this case. Not because Mark Baird brings a Second Amendment challenge, but because Baird challenges a public carry restriction. *Bruen* was a public carry case. The Supreme Court held that New York—which banned open carry—could not constitutionally require proper cause for a concealed carry license because "history reveals a consensus that States could *not* ban public carry altogether." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 53 (2022) (emphasis in original). California does not "ban public carry altogether." Californians may publicly carry in a concealed manner throughout the state and in an open manner in less populated counties. *See* Cal. Penal Code §§ 26150(b), 26155(b). California's restrictions on open carry in more populated counties are thus constitutional.

In their majority opinion, my colleagues strike down California's restrictions on open carry because they ignore the facts and holding of *Bruen* and jettison our longstanding rules for facial challenges. These errors also create a circuit split. *See Frey v. City of New York*, 157 F.4th 118, 138–40 (2d Cir. 2025) (upholding New York's open carry ban because the state allowed concealed carry). I respectfully dissent.

Baird facially challenges California Penal Code sections 25850 and 26350 but cannot satisfy the facial challenge standard. To bring a facial challenge, a plaintiff "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). California's restrictions on open carry are constitutional in at least some circumstances. Following the

reasoning of *Bruen*, California may lawfully eliminate one manner of public carry to protect its citizens so long as its citizens may carry weapons in another manner that allows for self-defense. *See Bruen*, 597 U.S. at 60; *Frey*, 157 F.4th at 138–40.

Because Baird cannot satisfy *Salerno*'s demanding standard, my colleagues adopt a more forgiving standard—the facial overbreadth doctrine. *See* Maj. Op. 46–48. This is an error because the facial overbreadth doctrine "applies only in the limited context of the First Amendment." *United States v. Adams*, 914 F.3d 602, 607 (8th Cir. 2019). And this error creates another circuit split. *See, e.g.*, *id*.

My colleagues got this case half right. The majority opinion correctly holds that California's open carry licensing scheme is facially constitutional under *Bruen*. However, my colleagues misread *Bruen* to prohibit California's other restrictions on open carry. We should have affirmed the district court.

I

California's open carry regulations operate in three steps. First, California generally criminalizes publicly carrying firearms. *See* Cal. Penal Code §§ 25850, 26350. Second, California exempts those who hold concealed or open carry licenses from criminal liability. *See id.* §§ 25850(c)(4), 26350(b)(2)(B), 26010, 26362. Third, California vests the power to issue licenses in local law enforcement based on applications provided by the state's Attorney General. *See id.* §§ 26150, 26155, 26175.

Sections 26150 and 26155 command that local law enforcement "shall issue" a license to carry a concealable firearm if certain qualifications are met. *Id.* §§ 26150(b),

26155(b).  Concealed carry licenses can be issued and are valid in every county.  *Id.* §§ 26150(b)(1), 26155(b)(1). Open carry licenses may be issued if the population of the county of issuance is "less than 200,000 persons according to the most recent federal decennial census," but the license only allows open carry in that county.  *Id.* §§ 26150(b)(2), 26155(b)(2).

Sections 25850 and 26350 create criminal penalties for carrying firearms.  Section 25850 criminalizes carrying a loaded firearm in any public place or street.  *Id.* § 25850. Section 26350 criminalizes openly carrying an unloaded firearm.  *Id.* § 26350.  But, "[s]ection 25850 does not apply to the carrying of any handgun by any person" authorized to do so under the Code.  *Id*. § 26010.  Similarly, "[s]ection 26350 does not apply to, or affect, the open carrying of an unloaded handgun by any person to the extent that person may openly carry a loaded handgun" pursuant to other sections in the Code.  *Id.* § 26362.

However, publicly carrying a firearm without a license is not always illegal.  Section 26045 provides an exemption for the carrying of any loaded firearm "by a person who reasonably believes that any person or the property of any person is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property."  *Id.* § 26045(a).  There are also exemptions for trained peace officers, *id*. § 26025, guards, *id*. § 26030, persons making lawful arrests, *id*. § 26050, and possession at a "person's place of residence, including any temporary residence or campsite," *id*. § 26055.

II

"[A] facial challenge" to a statute, including those challenged here, "fails if the law is constitutional in at least

some of its applications." *United States v. Rahimi*, 602 U.S. 680, 701 n.2 (2024) (citing *Salerno*, 481 U.S. at 745). Facial challenges are disfavored because they "often rest on speculation," "short circuit the democratic process," and "run contrary to the fundamental principle of judicial restraint." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008).

In a facial challenge, our review of the statutory scheme is limited to the text and context of the statute itself. *Cf. Calvary Chapel Bible Fellowship v. Cnty. of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020). The sections must be reviewed in the context of the underlying statutory scheme as a whole, not in isolation. *See West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022). That was *Heller*'s approach and the correct approach here. *See District of Columbia v. Heller*, 554 U.S. 570, 628 (2008).

To evaluate Second Amendment challenges, "[w]e first consider whether the Second Amendment's plain text covers an individual's proposed course of conduct." *United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024) (citing *Bruen*, 597 U.S. at 24). If so, "the Constitution presumptively protects that conduct" and the "government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. If not, the Second Amendment's protection does not extend to the proposed course of conduct, and the challenge is rejected. *See Duncan v. Bonta*, 133 F.4th 852, 869 (9th Cir. 2025) (en banc).

III

Baird argues that sections 25850 and 26350 unconstitutionally prohibit people from carrying a handgun openly throughout California. Such conduct is not covered

by the plain text of the Second Amendment.  But even if it were, California successfully justified its regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.  Because California allows concealed carry, California may restrict open carry. *See id*. at 53.

## A

The Supreme Court has interpreted the plain text of the Second Amendment to include either open or concealed carry.  *Heller* defined the "natural meaning of 'bear arms'" as to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting))*.*  Carrying "in the clothing or in a pocket" suggests concealed carry, whereas wearing "upon the person" suggests open carry. *Heller* included both concealed carry and open carry in its definition of "bear arms."     That disjunctive definition is also reflected in *Bruen*'s discussion of "public carry," which clarified that it includes both concealed carry and open carry. *See Bruen*, 597 U.S at 53.

According to *Heller*'s definition, so long as one may "bear arms" by carrying "upon the person *or* in the clothing or in a pocket," there is no restriction on the Second Amendment right. *Heller*, 554 U.S. at 584 (emphasis added).  Because concealed carry is permitted everywhere in California, there is no infringement on the plain text of the Second Amendment.  The people of California may keep and bear arms throughout the state in a concealed manner.

As the Supreme Court has stated in each of its recent major Second Amendment opinions, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 21 (quoting same); *Rahimi*, 602 U.S. at 691 (quoting same). To provide that individuals must conceal their weapons as they carry them is a restriction on the *manner* of carry, not a restriction on the right to bear arms or to carry in public. Baird's challenge should have been rejected on the basis that his proposed conduct is not covered by the Constitution's plain text. *See Duncan*, 133 F.4th at 869.[1]

B

However, even if Baird had successfully argued that open carriage fell within the plain text of the Second Amendment, the Nation's "historical tradition of firearm regulation" provides an independent reason to reject his challenge. *Rahimi*, 602 U.S. at 691; *see Frey*, 157 F.4th at 138–40.

"[T]he right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Bruen*, 597 U.S. at 38. California presented historical regulations that show its restrictions on the manner of carry have "well-established

---

[1] This conclusion is not in conflict with the Second Circuit. *Frey* "assume[d], without deciding, that Plaintiffs have satisfied *Bruen*'s step-one textual requirements." *Frey*, 157 F.4th at 138 n.11.

and representative historical *analogue[s]*." *Id.* at 30 (emphasis in original); *see also Rahimi*, 602 U.S. at 692.

To determine whether a historical regulation is an appropriate analogue for a modern regulation, courts consider whether the regulations are "relevantly similar." *Bruen*, 597 U.S. at 28–29. This process is "neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. The law is not "trapped in amber," and the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691–92. For the challenged regulation to pass constitutional muster, it must be a "well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30 (emphasis in original).

Two factors are central to the determination whether a regulation is relevantly similar: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29; *see also Rahimi*, 602 U.S. at 692. In assessing the "how," courts must consider the nature and extent of the challenged regulation. *See Rahimi*, 602 U.S. at 692. Even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). In assessing the "why," courts must look at why the historical analogue regulated firearms and whether it was enacted to address a certain problem. *Id.* "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.*

"[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced

approach," *Bruen*, 597 U.S. at 27, but "the result in this case does not hinge on this categorization," *Duncan*, 133 F.4th at 874. I therefore do not apply "a more nuanced approach."

Applying *Bruen*'s default approach, the nineteenth-century concealed carry bans proffered by California burdened the Second Amendment in a distinctly similar way to the challenged regime for distinctly similar reasons. *See Bruen*, 597 U.S. at 26. The historical laws mirror both the "how"—eliminating one manner of public carry—and the "why"—reducing violence and protecting the safety of citizens—of California's regime. *See Frey*, 157 F.4th at 138–40.

*Bruen* itself discussed historical laws that eliminated one manner of carry. Relying on state-court decisions from Alabama, *see State v. Reid*, 1 Ala. 612, 616, 619–621 (1840); Louisiana, *see State v. Chandler*, 5 La. Ann. 489, 490 (1850); Kentucky, *see Bliss v. Commonwealth*, 12 Ky. 90 (1822); and Georgia, *see Nunn v. State*, 1 Ga. 243 (1846), *Bruen* concluded that there is a "consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues," but could and did eliminate one manner of carry. 597 U.S. at 54–55. Indeed, the 1897 Supreme Court noted in dicta, "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281–82 (1897). Similar to California's regime, historical state laws restricted one manner of carry, and some imposed criminal sanctions. *See Reid*, 1 Ala. at 614; *Nunn*, 1 Ga. at 245, 251; *Chandler*, 5 La. Ann. at 489–90.

My colleagues focus on the fact that the historical laws restricted only concealed carry. *See* Maj. Op. 20–22. Yet,

evaluating the same examples, *Bruen* drew a more general conclusion: "history reveals a consensus that States could *not* ban public carry altogether." *Bruen*, 597 U.S. at 53 (emphasis in original). Given the common difficulty in discerning the appropriate "level of generality" with which to evaluate history after *Bruen*, *see Rahimi*, 602 U.S. at 739 (Barrett, J., concurring), the best course in this case is to adopt the level of generality used by *Bruen* itself. Using *Bruen*'s level of generality is by definition not "a level of generality that is much too high." *Contra* Maj. Op. 30.

In *Bruen*, rather than concluding that the relevant history revealed that only concealed carry may be banned, the Supreme Court held that "States could *not* ban public carry altogether." 597 U.S. at 53 (emphasis in original); *see also id.* at 38, 59, 70. *Bruen* stated, "[t]o summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation." *Id.* at 59 (emphasis in original). Understood at the proper level of generality, the level used by the Supreme Court in *Bruen*, the nature and extent of California's regime—the "how"—is analogous to that of multiple historical examples cited by *Bruen*. *See* 597 U.S. at 53–55.

The reasoning of the historical laws—the "why"—is also similar to California's regime. The historical laws eliminated one manner of public carry in accordance with the cultural perception of what type of carry was more peaceable. *See Frey*, 157 F.4th at 139. States banned concealed carry because it "was seen as a dubious practice characteristic only of thugs, robbers, duelers, and other deplorables," as compared to open carry, which was viewed "as appropriate for honest citizens." Nicholas J. Johnson, David B. Kopel, George A. Mocsary, E. Gregory Wallace &

Donald Kilmer, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy*, 409 (3d ed. 2022).  On this historical point, my colleagues agree.  *See* Maj. Op. 20–22.

For example, in a prosecution under Louisiana's 1813 prohibition of concealed carriage for enumerated weapons, the Supreme Court of Louisiana determined that the concealed carry ban was "absolutely necessary to counteract a vicious state of society . . . and to prevent bloodshed and assassinations committed upon unsuspecting persons.  It interfered with no man's right to carry arms . . . 'in full open view,' which places men upon an equality."  *State v. Chandler*, 5 La. Ann. 489, 489–90 (1850).  Similarly, the Supreme Court of Georgia in upholding a concealed carry ban stated that the law was "merely intended to promote personal security, and to put down lawless aggression and violence."  *Nunn v. State*, 1 Ga. 243, 249 (1846).  The Supreme Court of Georgia reasoned that by prohibiting "the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, [the law] does not come in collision with the Constitution."  *Id.*

California's regulation "impose[s] a comparable burden" that is "comparably justified."  *Bruen*, 597 U.S. at 29; *see Frey*, 157 F.4th at 138–40.  The state eliminates one manner of public carry in accordance with the cultural perception of what type of carrying is more peaceable.  *See* David B. Kopel, *Restoring the Right to Bear Arms: New York State Rifle & Pistol Association v. Bruen*, Cato Sup. Ct. Rev., 2021-2022 305, 318 ("Peaceable lawful carry is now most socially harmonious when it is concealed carry.  Wisely, *Bruen* accurately characterizes the 19th century concealed carry cases as recognizing legislative discretion on the mode

of carry rather than requiring one particular mode."). California justified its first restrictions on open carry as a response to the recent "increasing incidence of organized groups and individuals publicly arming themselves for purposes inimical to the peace and safety of the people of California." Act of July 28, 1967, ch. 960, § 6, 1967 Cal. Stat. 2459, 2462–63. The bill analysis of California's 2012 restrictions on open carry justified the further restrictions, in part, on increased security concerns related to 911 calls. *See* S. Comm. Pub. Safety, Bill Analysis, A.B. 144 (Portantino), 2011-2012 Leg., Reg. Sess., at 10 (Cal. 2011).

Resisting this conclusion, my colleagues ignore *Bruen*. New York conditioned concealed carry licenses "on a citizen's showing of some additional special need." *Bruen*, 597 U.S. at 11. In defense of the restrictions, New York argued that most nineteenth-century courts upheld concealed carry bans. *Id*. at 52–53 (quoting *Heller*, 554 U.S. at 626). *Bruen* agreed, but New York still lost because it entirely banned public carry by prohibiting both concealed and open carry. *Id*. at 60. *Bruen* thus affirmed the right to public carry—not the right to "*the manner* of public carry," which remains "subject to reasonable regulation." *Id*. at 59 (emphasis in original).

The right to public carry—not the right to concealed carry—is the bedrock of *Bruen*. The Supreme Court explained that the "textual elements" of the Second Amendment guarantee "the individual right to possess and carry weapons in case of confrontation," which "naturally encompasses public carry" based on the definitions of "keep" and "bear." *Id*. at 32 (quoting *Heller*, 554 U.S. at 592). The Supreme Court looked to history and held that "the history reveals a consensus that States could *not* ban public carry altogether." *Id*. at 53 (emphasis in original).

The Supreme Court then struck down New York's concealed carry restrictions because states could only "lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Id*. at 59.

My colleagues' sole response is that the "historical record nowhere presents such a principle" that "all open carry can be banned, so long as some type of other carry (here, concealed) is allowed." Maj. Op. 31. This is a call for a historical twin, or worse, a carbon copy, which *Bruen* does not demand. *See Frey*, 157 F.4th at 139. As the Second Circuit correctly held, an open carry ban in combination with a shall-issue concealed carry licensing regime is relevantly similar to historical laws. *See id*. This is not "loose analogizing under the auspices of applying the Ninth Circuit's 'nuanced approach.'" *Contra* Maj. Op. 32. This is *Bruen*'s approach. *Bruen* defined the level of generality as "public carry," not the manner of carry. *See Bruen*, 597 U.S. at 55. Today's decision moves the goalposts by fixing the level of generality at "open carry." *See* Maj. Op. 25.

Compounding that error, my colleagues retreat to Ninth Circuit precedent. However, my colleagues read too much into *Peruta v. Cnty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc). Contrary to my colleagues' contention, *Peruta* did not address open carry, as it is challenged here. *Peruta,* 824 F.3d at 939 ("There may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public. The Supreme Court has not answered that question, and we do not answer it here."); *contra* Maj. Op. 34.

A state may not prohibit the public carriage of firearms by eliminating both open and concealed carry, but a state can lawfully eliminate one manner of carry to protect and ensure

the safety of its citizens, as long as they are able to carry in another manner. *See Bruen*, 597 U.S. at 59–60; *Frey*, 157 F.4th at 138–40. Permitting states to place restrictions only on concealed carry misreads *Bruen* and requires a historical twin rather than a historical analogue. *See Bruen*, 597 U.S. at 59–60; *Frey*, 157 F.4th at 139. No such twin is required to comport with the Constitution. A faithful application of *Bruen* commands us to uphold California Penal Code sections 25850 and 26350.

C

Faced with the reality that California's restrictions on open carry are constitutional in some circumstances, i.e., when California allows concealed carry, my colleagues resort to the facial overbreadth doctrine. *See* Maj. Op. 46–48. That is an error. Plaintiffs cannot bring a Second Amendment facial overbreadth challenge.

Every circuit to address whether the facial overbreadth doctrine applies to the Second Amendment has held that it does not. *See Hightower v. City of Boston*, 693 F.3d 61, 80 (1st Cir. 2012); *United States v. Decastro*, 682 F.3d 160, 169 (2d Cir. 2012); *United States v. Barton*, 633 F.3d 168, 172 n.3 (3d Cir. 2011); *Baer v. Lynch*, 636 F. App'x 695, 697 (7th Cir. 2016); *Adams*, 914 F.3d at 607; *accord United States v. Yancey*, No. 23-1651, 2024 WL 317636, at *1 n.2 (8th Cir. Jan. 29, 2024). While these cases mostly predate *Bruen* and *Rahimi*, my colleagues fail to point to anything in *Bruen* or *Rahimi* that expanded the overbreadth doctrine to the Second Amendment. This is unsurprising because the author of *Bruen*, Justice Thomas, wrote before and after *Bruen* that the "overbreadth doctrine lacks any basis in the Constitution's text, violates the usual standard for facial challenges, and contravenes traditional standing principles."

*United States v. Sineneng-Smith*, 590 U.S. 371, 383 (2020) (Thomas, J., concurring); *see also United States v. Hansen*, 599 U.S. 762, 791 (2023) (Thomas, J., concurring).

*Wolford v. Lopez* did not create a circuit split by extending the overbreadth doctrine into the Second Amendment context. *Wolford* does not contain a "statement that the overbreadth doctrine can apply in the Second Amendment context." *Contra* Maj. Op. 46–47 n.24. *Wolford* quoted the overbreadth standard in passing, but the context of that quote shows that *Wolford* applied *Salerno*'s facial challenge standard. *Wolford v. Lopez*, 116 F.4th 959, 984 n.3 (9th Cir. 2024), *cert. granted in part*, No. 24-1046, 2025 WL 2808808 (U.S. Oct. 3, 2025) ("We need not, and do not, reach whether the ban on firearms comports with the Second Amendment with respect to each individual park in Hawaii and California."). Reading *Wolford* to expand the overbreadth doctrine "does not actually rely on general historical 'principles,' distilled from history and tradition, or the holdings and reasoning of Supreme Court precedent," but rather creates "a jurisprudence built on throwaway lines" and "disregard[s] holdings to embrace dictum." *United States v. Duarte*, 137 F.4th 743, 784 (9th Cir. 2025) (en banc) (VanDyke, J., concurring in the judgment in part and dissenting in part).

My colleagues are wrong that I "simply disagree[] with *Wolford*." *Contra* Maj. Op. 46–47 n.24. My disagreement is with my colleagues' interpretation of *Wolford*. We held in *Wolford* that "in the specific context of a Second Amendment challenge that, 'to prevail, the Government need only demonstrate that [a challenged law] is constitutional in some of its applications.'" *Wolford*, 116 F.4th at 984 (quoting *Rahimi*, 602 U.S. at 693) (alteration in *Wolford*). I agree with that holding.

It is my colleagues, not *Wolford*, that extend the "overbreadth doctrine . . . based on the misguided 'notion that some constitutional rights demand preferential treatment.'" *Sineneng-Smith*, 590 U.S. at 390 (Thomas, J., concurring) (quoting *Whole Woman*'s *Health v. Hellerstedt*, 579 U.S. 582, 641 (2016) (Thomas, J., dissenting)). Justice Thomas and Justice Alito would both be surprised. *Bruen* affirmed that the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010) (Alito, J., plurality opinion)).

Extending the overbreadth doctrine is one error; my colleagues' cavalier application of the doctrine is another. "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770. My colleagues do not identify any unconstitutional applications, let alone a substantially disproportionate number. *See* Maj. Op. 46–48. California's open carry restrictions are constitutional when the state allows concealed carry. *Bruen*, 597 U.S. at 59–60, *Frey*, 157 F.4th at 138–40. Members of our court have reasoned that "[g]iven the overbreadth doctrine's shaky foundation, we must be cautious in deploying it." *United States v. Hansen*, 40 F.4th 1049, 1072 (9th Cir. 2022) (Bumatay, J., joined by Callahan, Ikuta, R. Nelson, Lee, VanDyke, dissenting from the denial of rehearing en banc). Today, my colleagues throw caution to the wind.

## D

Even if my colleagues correctly applied *Bruen* (which is not the case), they err by declining to sever the

unconstitutional part of California Penal Code sections 26150(b)(2) and 26155(b)(2) to accomplish their task.

"The severability of a state statute is a matter of state law." *Project Veritas v. Schmidt*, 125 F.4th 929, 958 (9th Cir. 2025) (en banc).   In California, an unconstitutional statutory provision may be severed and the remainder of the statute enforced if the invalid provision is "grammatically, functionally, and volitionally separable." *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 821 (1989).   The absence of a severability clause "is not conclusive." *Cnty. of Sonoma v. Superior Ct.*, 173 Cal. App. 4th 322, 352 (2009).   The ultimate test is whether the unconstitutional provision is grammatically, functionally, and volitionally separable. *See Jevne v. Superior Ct.*, 35 Cal. 4th 935, 960 (2005).

My colleagues should have severed the provision of the California Penal Code that limits open carry licenses to people who reside in counties with less than 200,000 people and the provision that limits such licenses to the county of issuance. *See* Cal. Penal Code §§ 26150(b)(2), 26155(b)(2). Such a severance would allow Californians to open carry across the entire state with one license.   California Penal Code section 26150(b) would read:

> (b) The sheriff shall issue or renew a license under subdivision (a) in either of the following formats:
>
>> (1) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.
>>
>> (2) ~~Where the population of the county is less than 200,000 persons according to the most recent federal decennial census~~,

> a license to carry loaded and exposed ~~in only that county~~ a pistol, revolver, or other firearm capable of being concealed upon the person.

California Penal Code section 26155(b) would read:

> (b) The chief or other head of a municipal police department shall issue or renew a license under subdivision (a) in either of the following formats:
>
>> (1) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.
>>
>> (2) ~~Where the population of the county in which the city is located is less than 200,000 persons according to the most recent federal decennial census,~~ a license to carry loaded and exposed ~~in only that county~~ a pistol, revolver, or other firearm capable of being concealed upon the person.

California's open carry license limitations are grammatically separable. "Grammatical separability . . . depends on whether the invalid parts can be removed as a whole without affecting the wording or coherence of what remains." *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (internal quotation marks omitted). "To be grammatically separable, the valid and invalid parts of the statute can be separated by paragraph, sentence, clause, phrase, or even single words." *People v. Nguyen*, 222 Cal. App. 4th 1168, 1192 (2014) (internal quotation marks

omitted).   With the severed provisions, the remainder of sections 26150(b) and 26155(b) are coherent.   The "severance did not alter the meaning of the remaining text in any way." *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 575 (9th Cir. 2014).

California's open carry license limitations are functionally separable. "Functional separability depends on whether the remainder of the statute is complete in itself." *Cal. Redevelopment Ass'n*, 53 Cal. 4th at 271 (internal quotation marks omitted).   With the severed provisions, California's regulations on open carry remain operable.   The only change is more open carry licenses are possible.

California's open carry license limitations are volitionally separable. "Volitional separability depends on whether the remainder would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute." *Id*. (internal quotation marks omitted).   California eliminated open carry but not concealed carry in accordance with the cultural perception of what type of carrying is more peaceable.   It is hard to imagine that California would not have adopted any open carry licensing requirements if it foresaw my colleagues' holding.   In essence, "it seems eminently reasonable to suppose that those who favor the proposition would be happy to achieve at least some substantial portion of their purpose . . . ." *Santa Barbara Sch. Dist. v. Superior Ct*., 13 Cal. 3d 315, 332 (1975).

My colleagues hesitate to analyze severability and are reluctant to find California's open carry license limitations volitionally separable.   This is an error.

First, my colleagues claim (without citation to any authority) that we should ignore severability altogether

because "California never asked."   Maj. Op. 52.   My
colleagues look to the wrong branch of California's
government.   The Supreme Court of California has held that
severability is a question of "statutory construction."   *Hale
v. McGettigan*, 114 Cal. 112, 119 (1896); *see also People v.
Capelli*, 55 Cal. App. 461, 468 (1921).   Parties do not need
to ask us to engage in statutory construction.   *See Kamen v.
Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see also
E.E.O.C. v. Fed. Lab. Rels. Auth.*, 476 U.S. 19, 23 (1986).   It
is our "duty" and a "necessity" to analyze severability.   *Kopp
v. Fair Pol. Pracs. Com.*, 11 Cal. 4th 607, 670 (1995); *Ex
parte Blaney*, 30 Cal. 2d 643, 654–55 (1947).

We cannot "avoid" analyzing severability because
California's decision not to argue for severability is a "strong
indicator of the difficulty of judicially crafting a new
system."   *Contra* Maj. Op. 52.   Difficulty is not part of
California's severability standard.   Courts look at whether an
invalid provision is "grammatically, functionally and
volitionally separable."   *Cal. Redevelopment Ass'n*, 53 Cal.
4th at 271 (internal quotation marks omitted).   Even if
difficulty was a factor, my colleagues read too much into
California's decision not to make an alternative argument.
There are many reasons why a party may choose not to make
an alternative argument, so that decision's value as an
"indicator" is trifling.

Second, my colleagues hold that California's open carry
license limitations are not volitionally separable because "it
is not our role to say *what sort of* licensing regime California
would have chosen to adopt."   Maj. Op. 53 (emphasis in
original).   California courts disagree.   In 2023, multiple
California courts severed the unconstitutional provision of
the then-current versions of California Penal Code sections
26150(a)(2) and 26155(a)(2) that required "good cause" for

a concealed carry license. *In re D.L.*, 93 Cal. App. 5th 144, 163 (2023), *review denied* (Oct. 11, 2023); *People v. Mosqueda*, 97 Cal. App. 5th 399, 409 (2023). Thus, effectively, these courts said "*what sort of* licensing regime California would have chosen to adopt." *Contra* Maj. Op. 53 (emphasis in original). Although we are not bound by California intermediate courts, we cannot disregard these courts' holdings "unless [we are] convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.,* 311 U.S. 223, 237 (1940). "This is the more so where, as in this case, the highest court has refused to review the lower court's decision." *Id.*; *see also Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1069 (9th Cir. 2020).

There is no "persuasive data" that the Supreme Court of California would agree with my colleagues that California's open carry license limitations are not volitionally separable. The Supreme Court of California has observed that its prior "professed reluctance to invade the legislative domain actually did far more violence to the legislative scheme than would the proposed reformation." *Kopp*, 11 Cal. 4th at 659. *Kopp* emphasized that "we conclude courts may legitimately employ the power to reform in order to effectuate policy judgments clearly articulated by the Legislature or electorate, when invalidating a statute would be far more destructive of the electorate's will." *Id*. at 661.

Declining to sever the unconstitutional part of the California Penal Code is far more destructive of the California State Legislature's will than severance. My colleagues "thwart all efforts to regulate" open carry. *In re D.L.*, 93 Cal. App. 5th at 164.

By contrast, the severance I propose effectuates the Legislature's will. My proposed severance simply eliminates an exception (that my colleagues hold is unconstitutional) to California's open carry licensing system. I do not propose what substantive or procedural requirements should apply to the system. The California State Legislature already created those requirements for open carry. *See* Cal. Penal Code §§ 26150, 26155. Removing an unconstitutional exception is not an exercise of legislative functions but a judicial "duty." *Kopp*, 11 Cal. 4th at 670.

My colleagues' fleeting appeal to "thorny separation-of-powers questions" is misguided. Maj. Op. 54. Over thirty years ago, the Supreme Court of California tackled these questions and held that "the separation of powers doctrine guides, but does not invariably preclude, judicial rewriting of statutes to preserve constitutionality." *Kopp*, 11 Cal. 4th at 670. "By applying [the Supreme Court of California's] factors, courts may steer clear of 'judicial policymaking' in the guise of statutory reformation, and thereby avoid encroaching on the legislative function in violation of the separation of powers doctrine." *Id*. at 661. As a federal court applying California law, we are bound by that interpretation. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam).

IV

Addressing and refuting Baird's facial challenges to California's open carry restrictions should constitute the whole of my dissent. However, because my colleagues also address as-applied challenges, I do so as well.

My colleagues correctly hold that Baird forfeited his as-applied challenge to California's open carry license system in less populated counties. Maj. Op. 27. The district court

determined that Baird lacked standing. *Baird v. Bonta*, 644 F. Supp. 3d 726, 731 (E.D. Cal. 2022), *rev'd and remanded in part on other grounds*, 81 F.4th 1036 (9th Cir. 2023). Baird failed to challenge that conclusion on appeal.

However, my colleagues erroneously conclude that Baird brought an as-applied challenge to California's restrictions on open carry in more populated counties. Baird did no such thing. In an as-applied challenge, "it is the application of the statute that violates the Constitution." Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1242 (2010). Neither Baird nor my colleagues point to any issue with the application of California's restrictions on open carry. *See Calvary Chapel Bible Fellowship*, 948 F.3d at 1177 ("How the statute has been interpreted and applied by local officials is the province of an as-applied challenge."). Instead, Baird and my colleagues take issue with the *existence* of California's restrictions on open carry. That is the exclusive province of a facial challenge. *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) ("[A] facial challenge is a challenge to an entire legislative enactment or provision."); *see also Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021) (en banc), *vacated*, 142 S. Ct. 2895 (2022) ("A facial challenge is a claim that the legislature has violated the Constitution, while an as-applied challenge is a claim directed at the execution of the law.").

The distinction between an as-applied and facial challenge matters because my colleagues are wrong that "regardless . . . our analysis and conclusion would be the same." Maj. Op. 42. True, "the underlying constitutional standard remains the same." *Regino v. Staley*, 133 F.4th 951, 967 (9th Cir. 2025). But "[w]hether a challenge is classified as facial or as-applied affects the extent to which the

invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy." *Project Veritas*, 125 F.4th at 939 (quoting *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019)) (internal quotation marks omitted). "A successful as-applied challenge does not render the law itself invalid but only the particular application of the law." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

The difference in remedy is so paramount that the Supreme Court has looked to the requested remedy to determine whether a challenge is facial or as-applied when a challenge has "characteristics of both." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). Under *John Doe No. 1*, courts look at whether the "claim and the relief that would follow . . . reach beyond the particular circumstances of [the] plaintiffs." *Id.*; *accord Benezet Consulting LLC v. Sec'y Commonwealth of Pennsylvania*, 26 F.4th 580, 585 n.5 (3d Cir. 2022) (collecting cases). If so, plaintiffs must satisfy the facial challenge standard. *John Doe No. 1*, 561 U.S. at 194. Here, Baird seeks to "restore" the Second Amendment rights of "the citizens of California," not his rights. Because Baird's requested remedy reaches beyond his particular circumstances, he does not have an as-applied challenge and "must therefore satisfy our standards for a facial challenge." *Id.*[2]

---

[2] To avoid this conclusion, my colleagues misstate the facts of *Project Veritas*. There, we addressed the constitutionality of restrictions on "secret recordings," but not "open recordings" because the defendants interpreted the law to only restrict the former. *Project Veritas*, 125 F.4th at 940, 940 n.5. Our analysis therefore "hinge[d] on how local officials had interpreted and applied the challenged statute to plaintiff's conduct." *Contra* Maj. Op. 41.

V

Normally, dissents do not respond to concurrences. But Judge Lee's concurrence is not the normal concurrence because it was joined by Judge VanDyke. I therefore briefly respond.

Judges "do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties." *Sineneng-Smith*, 590 U.S. at 376 (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of reh'g en banc)) (alteration in *Sineneng-Smith*). Baird did not challenge the form of the open carry license application, so I express no view on the merits of the concurrence. My colleagues' dicta is just that—dicta.

VI

*Bruen* held that "the history reveals a consensus that States could *not* ban public carry altogether." *Bruen*, 597 U.S. at 53 (emphasis in original); *Frey*, 157 F.4th at 139 n.12 (same). My colleagues defy *Bruen* and hold that California may not restrict open carry while preserving Californians' ability to concealed carry. Although my colleagues can disagree with the breadth of *Bruen*'s holding, we "are never free to defy" the Supreme Court. *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part).